IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRAUN GmbH,<br><br>        Plaintiff,<br><br>        v.<br><br>REMINGTON PRODUCTS COMPANY, LLC,<br><br>        Defendant. | Civil Action No. 03-CV-12428-WGY |

**MEMORANDUM OF LAW IN SUPPORT OF BRAUN GmbH'S
<u>MOTION TO CORRECT INVENTORSHIP</u>**

BRAUN GmbH

By its attorneys,

William L. Patton (BBO #391640)
Dalila Argaez Wendlandt (BBO #639280)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000
(617) 951-7050 (facsimile)

Dated:   August 2, 2004

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................................................................1

**BACKGROUND FACTS** ..........................................................................................................1

**ARGUMENT** .............................................................................................................................7

    I.    SECTION 256 ALLOWS THE COURT TO CORRECT INVENTORSHIP DURING THE PENDENCY OF LITIGATION WHERE THE UNNAMED INVENTOR ACTED WITHOUT DECEPTIVE INTENT, THE NAMED INVENTORS DOES NOT OBJECT, AND THE ASSIGNEE CONSENTS .....................7

    II.   DR. PAHL IS A CO-INVENTOR OF THE INVENTIONS DISCLOSED IN THE PATENTS-IN-SUIT ...............................................................................................8

          A.    Dr. Pahl's Cleaning Device .................................................................9

          B.    Dr. Pahl Is A Co-Inventor On The Patents-In-Suit .............................10

    III.  THE OMISSION OF DR. PAHL OCCURRED WITHOUT DECEPTIVE INTENT .....11

**CONCLUSION** ........................................................................................................................15

## TABLE OF AUTHORITIES

## CASES

A.F. Stoddard & Co. v. Dann, 564 F.2d 556 (D.C. Cir. 1977) ............................................. 12

Ajinomoto Co. v. Archer-Daniels-Midland Co., 228 F.3d 1338 (Fed. Cir. 2000) ............ 13

Akiebolag v. Wankesha Cutting Tools, Inc., 1 U.S.P.Q. 2d 2002 (E.D. Wis. 1986) .. 12, 13

C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340 (Fed. Cir. 1998) ................................ 12, 13

Dee v. Aukerman, 625 F. Supp. 1427 (S.D. Ohio 1986) ..................................................... 12

Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456 (Fed. Cir. 1998) .................. 8

E-Z Bowz, L.L.C. v. Professional Prod. Research Co., No. 00 Civ. 8670(LTS)GWG, 2003 WL 22068573 (S.D.N.Y. Sept. 5, 2003) ............................... 13

Fina Oil & Chemical Co. v. Ewen, 123 F.3d 1466 (Fed. Cir. 1997) ............................. 9, 11

Frank's Casing Crew & Rental Tools, Inc. v. PMR Tech., Ltd., 292 F.3d 1363 (Fed. Cir. 2002) ........................................................................................................ 8, 9

Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367 (Fed. Cir. 1986) ............... 9

MCV, Inc. v. King-Seeley Thermos Co., 870 F.2d 1568 (Fed. Cir. 1989) ............... 7, 8, 12

Nichols Institute Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc., 218 F. Supp. 2d 1243 (S.D. Cal. 2002) ................................................................................ 7

Pannu v. Iolab, 155 F.3d 1344 (Fed. Cir. 1998) ...................................................... 8, 11, 12

PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 12 F. Supp. 2d 69 (D. Mass. 1998) ...................................................................................................... 12

Stark v. Advanced Magnetics, Inc., 119 F.3d 1551 (Fed. Cir. 1997) ....................... 7, 8, 14

Trovan Ltd. v. Sokymat SA, Irori, 299 F.3d 1292 (Fed. Cir. 2002) ............................... 8, 9

University of Colo. Found., Inc. v. American Cyanamid Co., 342 F.3d 1298 (Fed. Cir. 2003) ............................................................................................................... 9

Winbond Elec. Corp. v. International Trade Comm'n, 262 F.3d 1363 (Fed. Cir. 2001) ............................................................................................................. 12

## STATUTES

35 U.S.C. § 116..................................................................................................................8

35 U.S.C. § 256..................................................................................................................7

Plaintiff Braun GmbH ("Braun") hereby submits this Memorandum of Law in support of its Motion to Correct Inventorship.

## PRELIMINARY STATEMENT

After filing the present action, Braun – a German corporation – discovered that there is an error in the inventorship as listed in its U.S. Patent Nos. 5,711,328 (the "'328 Patent") and 5,649,556 (the "'556 Patent," together with the '328 Patent, the "patents-in-suit"). In particular, Braun has discovered that, as a result of an honest mistake as to the inventorship requirements of United States patent law, which differ from those under German patent law, Dr. Dietrich Pahl was inadvertently not named as a co-inventor with Mr. Gebhard Braun – the named inventor – on these patents. Because the omission occurred without deceptive intent, Braun respectfully requests, under section 256 of the Patent Act, that the Court order the Director of the United States Patent and Trademark Office to issue Certificates of Correction to add Dr. Pahl as a co-inventor on the patents-in-suit.

## BACKGROUND FACTS

<u>Overview Of The Invention</u>

The patents-in-suit disclose a revolutionary cleaning system for dry shavers, which has enjoyed widespread commercial success. The invention solves the problems associated with prior dry shaver cleaners and the cleaning challenges posed by the increasingly intricate and complex shaver heads of current and future dry shavers. Most prior devices were ineffective at cleaning debris from the shaver head, often requiring a sealed environment to clean the cutter portion of the shaving head or manual brushing of debris from the shaver head. Many were cumbersome, requiring separate cleaning and storage of the shaver or even disassembly of the shaver. The invention solves these problems by providing a device that allows a dry shaver to be cleaned, charged, and dried virtually automatically.

9505293_1

As is illustrated in a preferred embodiment of the invention (Figure 1 of the patents-in-suit), after shaving, a user places the dry shaver (1) in a cradle (7) that is open to the atmosphere. To commence the cleaning operation, the user pushes a switch (9) to activate a pump to feed cleaning fluid from a cleaning fluid container (6) to the cradle, which rests above the cleaning fluid level in the container. During cleaning, cleaning fluid is continuously flushed through the cradle, which is equipped with an overflow device (26) to ensure that only the shaver head portion of the shaver gets wet. The shaver is also activated during the cleaning operation, and the resulting oscillatory motion assists the cleaning process.



Fig. 1

Cleaning fluid is allowed to drain from the cradle through an outlet port (27) through a porous hose member (20) immersed in the cleaning fluid container and connected to the intake portion of the feed pump. The pump then drives the cleaning fluid through a filter to remove hair and debris before returning the cleaning fluid to the cradle. The switch (9) is connected to an electric control device, which controls the timing of the cleaning cycle. Following cleaning for a predetermined period, the pump is deactivated while the shaver apparatus is allowed to continue to run to shake off excess cleaning fluid. The shaver is then turned off and, after the cleaning fluid is drained from the cradle through the outlet port, the motor (13) activates an impeller (16) to dry the shaver head either with or without the assistance of a heating apparatus to begin the drying cycle. As disclosed in the patents-in-suit,

because the cleaning and drying operations do not run simultaneously, the same motor can be used to drive the feed pump and the impeller. Following the drying cycle, the shaver can then be left in the cradle for storage and charging. An interlocking mechanism prevents removal of the shaver until the cleaning operation is finished.

Mr. Braun's Development Of The Invention

In 1992, Mr. Braun, then a designer in Braun's Product Development Group, was assigned the task of developing a cleaning system for dry shavers by his supervisor, Dr. Pahl. From 1992 through 1993, Mr. Braun worked to develop the cleaning system, which he described in an internal invention disclosure given to Braun's internal patent department on July 22, 1993. See Declaration of Mr. Gebhard Braun ("Mr. Braun Decl.")[1] ¶ 7, Exs. A & B.

The internal invention disclosure described the problems associated with the dusty and time consuming process of hand cleaning of dry shavers, as well as prior dry shaver cleaners that were ineffective because they operated by continuously recirculating increasingly contaminated cleaning fluid. Mr. Braun posited that as dry shavers become more intricate and complex, the old cleaning methods would be increasingly unacceptable. Id.

Thus, Mr. Braun disclosed a cleaning system that runs virtually automatically to clean, dry and charge a dry shaver. The disclosure, through words and drawings, describes the cleaning system disclosed in the patents-in-suit. Id. On September 15, 1993, Mr. Braun supplemented his internal invention disclosure. The supplement described Mr. Braun's invention of allowing the same motor to drive the feed pump as the dryer impeller. Id. at Exs. C & D.

---

[1]  Mr. Braun's native language is German. Therefore, Braun submits herewith a copy of Mr. Braun's declaration in German as well as in English.

As Mr. Braun's supervisor, Dr. Pahl reviewed these internal invention disclosures and approved Mr. Braun as the sole inventor. See Declaration of Dr. Dietrich Pahl ("Pahl Decl.") ¶¶ 22, 24.

Braun Files Patent Applications In Germany And Then In The United States

On January 26, 1994, Braun's Patent Department caused German patent applications to be filed based on Mr. Braun's internal invention disclosure. See Compl. Exs. 1 & 2; Mr. Braun Decl. ¶ 9. As in the internal invention disclosure, Mr. Braun was listed as the sole inventor on the German patent applications with Dr. Pahl's approval. See Mr. Braun Decl. ¶ 9; Pahl Decl. ¶ 22.

In January 1995, the counterparts to these German patent applications were filed in the United States. See Compl., Ex. 1, 2. Consistent with the German patent applications, Mr. Braun was named as the sole inventor.

Dr. Pahl's Contributions To The Invention

Although Dr. Pahl was not named as an inventor on the United States patents, he made contributions to the inventions disclosed therein.

In particular, in mid-1992, Dr. Pahl was the Technical Manager for a Braun Research and Development facility in Lyon, France.[2] At that time, Dr. Pahl began developing an idea and design concept for a device for cleaning dry shavers. See Pahl Decl. ¶ 5. In one example, Dr. Pahl's cleaning device consisted of a concave cradle contoured to conform to the outer counter of the shaving head of a dry shaver. See id. at ¶ 7. The cradle was open to the atmosphere, allowing a dry shaver to be easily inserted into the cleaning device without disassembly of the shaver head or the cleaning device. See id. at ¶ 17. The cleaning device also had a cleaning

---

[2] The facility had been formerly owned by Silk-e-pil and was acquired by Braun in 1990.

fluid container.  See id. at ¶ 8.  During the cleaning operation, an electrical circuit activated a pump, which fed cleaning fluid from the container, through a filter, and into the cradle.  See id. at ¶¶ 9, 13.  The cradle was located above the fluid in the cleaning fluid container.  See id. at ¶ 9.

The cradle had a fluid inlet port for receiving the cleaning fluid and a fluid outlet port to allow hair, debris, and used cleaning fluid to flow out of the cradle.  See id. at ¶ 11.  The outlet port was dimensioned such that the amount of cleaning fluid exiting the cradle through the outlet port was smaller than the amount of cleaning fluid entering the cradle through the inlet port.  See id.  Also during the cleaning operation, the electrical circuit activated the dry shaver.  The oscillatory motion of the shaver head therefore assisted the cleaning operation.  See id. at ¶ 10.  The cradle also had an overflow device, which allowed excess cleaning fluid from the cradle to be drained directly into the cleaning fluid container.  See id. at ¶ 12.

Once the cleaning operation was finished, the pump was deactivated and the cleaning fluid was drained from the cradle through the outlet port.  Thereafter, the shaver could remain in the cradle to dry and for storage.  See id. at ¶ 14.  Drying of the shaver was assisted in Dr. Pahl's cleaning device through the use of a dryer, consisting of a heater and impeller.  See id. at ¶ 15.  Finally, Dr. Pahl's cleaning device could be used with a wall mount.

While he was at the Lyon facility, Dr. Pahl commissioned technical drawings and functional models and a prototype of his concept.  See, e.g., id. at ¶ 6, Ex. A.  Dr. Pahl presented his cleaning device concept internally at Braun during a November 1992 presentation entitled, "R&D Shavers – Future."  See id. at ¶ 16, Ex. B.

While he was serving as Technical Manager at the Lyon facility, which closed in 1993, Dr. Pahl was concurrently the Director of Research and Development for dry shavers in Braun's Design and Product Development Group in Kronberg, Germany.  See id. at ¶¶ 5, 19.  As part of

his duties at the Kronberg facility, Dr. Pahl asked Mr. Braun to further develop his idea and design concept for a device to clean dry shavers. See id. at ¶ 20, Mr. Braun Decl. ¶ 5.

From 1992 through 1993, Mr. Braun further developed the cleaning device that Dr. Pahl had begun to develop in France. See id. at ¶ 6. As discussed above, Dr. Pahl supervised Mr. Braun during this development process.

In addition, Dr. Pahl reviewed and approved Mr. Braun's invention invention disclosure. See Pahl Decl. at ¶ 20. He declined to take any credit for the invention because, consistent with his general policy, he wanted to motivate Mr. Braun to take ownership of the cleaning device project. See id. at ¶¶ 23. Additionally, Dr. Pahl did not want his position as the "boss" to influence decisions by Braun as to whether to invest the resources to commercialize the product. See id. Thus, the internal invention disclosure named Mr. Braun as the sole inventor. See Mr. Braun Decl. ¶ 7, Exs. A & B.

Dr. Pahl understood that, under German law, a patent is not rendered invalid by incomplete disclosure of the inventors. See Dr. Pahl Decl. ¶ 25. Dr. Pahl was not familiar with the inventorship disclosure requirements of United States patent law. Id. at ¶¶ 25-26.

Indeed, neither Mr. Braun nor Dr. Pahl had a clear understanding of inventorship law in the United States. See Mr. Braun Decl. ¶ 11; Pahl Decl. ¶ 26. And, Mr. Braun, having lawfully been named as the sole inventor on the German patent applications, did not believe that there was any reason to question the inventorship designation in the United States counterpart applications. See Mr. Braun Decl. ¶ 10; Declaration of Wolfgang Vorbeck ("Vorbeck Decl.") ¶ 4. Dr. Pahl was not involved in the United States patent application process. See Pahl Decl. ¶ 17. By that time, he had developed serious medical problems and had been moved to a research

group with a reduced workload where he remained until his retirement in October 1998. See Pahl Decl. ¶ 3.

Mr. Braun does not object to the correction of inventorship on the patents-in-suit. See Mr. Braun Decl. ¶ 13. Braun, the assignee of the patents-in-suit, also does not object. See Vorbeck Decl. ¶ 4.

## ARGUMENT

### I. SECTION 256 ALLOWS THE COURT TO CORRECT INVENTORSHIP DURING THE PENDENCY OF LITIGATION WHERE THE UNNAMED INVENTOR ACTED WITHOUT DECEPTIVE INTENT, THE NAMED INVENTORS DOES NOT OBJECT, AND THE ASSIGNEE CONSENTS

Section 256 provides, in part:

> Whenever … through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.
>
> The error of omitting inventors … shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256. This Court has jurisdiction to order correction of a patent to name omitted, also described as "nonjoined," inventors. See Stark v. Advanced Magnetics, Inc., 119 F.3d 1551, 1553 (Fed. Cir. 1997) ("Section 256 permits correction by application to the Commissioner or in federal court."); MCV, Inc. v. King-Seeley Thermos Co., 870 F.2d 1568, 1570 (Fed. Cir. 1989) (holding that district courts have subject matter jurisdiction even where the complaint seeks relief only under section 256); Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc., 218 F. Supp. 2d 1243, 1248 (S.D. Cal. 2002) (observing that Section 256 "permits correction … by the district court during pending infringement litigation").

Section 256 "prescribes only one prerequisite to judicial action: all parties must be given notice and an opportunity to be heard." MCV, Inc., 870 F.2d at 1570; accord Stark, 119 F.3d at 1553-1554. Once the jurisdictional prerequisite has been met, a court may correct the omission, or nonjoinder, of an inventor "upon a showing that the error occurred without any deceptive intent on the part of the unnamed inventor." Pannu v. Iolab, 155 F.3d 1344, 1350 (Fed. Cir. 1998); accord Stark, 119 F.3d 1551, 1555 (Fed. Cir. 1997) ("Section 256 merely precludes any deceptive intention in the inventor that seeks to be restored to a rightful place in the patent."). Plaintiff has met the requirements to bring a Section 256 motion before this Court: all parties to the patents-in-suit, named inventor Mr. Braun, omitted inventor Dr. Pahl, and the assignee of the Patents-in-Suit Braun, have all been given notice and all hereby submit Declarations in support of this motion. See Pahl Decl. ¶ 1, Mr. Braun Decl. ¶ 1, and Braun Decl. ¶ 4.

## II.    DR. PAHL IS A CO-INVENTOR OF THE INVENTIONS DISCLOSED IN THE PATENTS-IN-SUIT

Inventorship is determined on a "claim-by-claim basis." Trovan Ltd. v. Sokymat SA, Irori, 299 F.3d 1292, 1302 (Fed. Cir. 2002). To be an inventor, making "[a] contribution to one claim is enough." Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998); see also 35 U.S.C. § 116 (2004)[3]; Pannu, 155 F.3d at 1351 (finding that a reasonable jury could find that co-inventorship where the purported co-inventor's contribution was to one claim). An inventor "need not make a contribution to every claim in the patent," Frank's Casing Crew & Rental Tools, Inc. v. PMR Tech., Ltd., 292 F.3d 1363, 1373 (Fed. Cir. 2002). There is "no [minimum] on the quantum or quality of inventive contribution required for a person to qualify

---

[3] 35 U.S.C. § 116 provides, in part:
> Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

as a joint inventor." Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997). Rather, "to be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention." Id.

"Conception is the touchstone of determining inventorship." University of Colo. Found., Inc. v. American Cyanamid Co., 342 F.3d 1298, 1308 (Fed. Cir. 2003) (quoting Fina Oil & Chem Co., 123 F.2d at 1473 (internal quotation marks omitted)). "[C]onception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." Trovan, Ltd., 299 F.3d at 1302 (quoting Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986) (internal quotation marks omitted)). Thus, "the critical question … is who conceived … the subject matter of the claims at issue." Frank's Casing, 292 F.3d at 1373 (quoting Ethicon, 135 F.3d at 1460 (internal quotation marks omitted)).

### A. Dr. Pahl's Cleaning Device

In this case, Dr. Pahl conceived of and developed a cleaning device for dry shavers in mid-1992 and beginning of 1993. In one embodiment, his cleaning device included at least the following features: (1) a cradle open to the atmosphere with a concave surface contoured to receive and conform to the outer surface of the shaving head of a dry shaver; (2) a cleaning fluid container positioned such that the cleaning fluid level is below the cradle; (3) a feed device, or pump, for feeding cleaning fluid from the cleaning fluid container to the cradle; (4) a filter to remove hair and other debris from the cleaning fluid being delivered to the cradle; (5) an outlet port on the cradle dimensioned such that the amount of cleaning fluid drained from the cradle is smaller than the amount of cleaning fluid fed to the cradle from the pump; (6) an overflow device on the cradle, allowing cleaning fluid to drain into the cleaning fluid container; (7) a

dryer, consisting of an impeller and heater, to dry the shaving head following the cleaning operation; and (6) a wall mount.  Dr. Pahl's cleaning device was illustrated in technical drawings, and, under Dr. Pahl's direction, functional models and a prototype of his cleaning device were created.

### B. Dr. Pahl Is A Co-Inventor On The Patents-In-Suit

Based on his work on the cleaning device, Dr. Pahl is an inventor on, at least, independent claims 1, 9, 11, and 14 of the '328 patent because his cleaning device contained all of the elements of each of these independent claims.  For example, Claim 1 of the '328 patent claims:

> A cleaning device comprising:
> a cradle structure including a concave surface for receiving a shaving head of a shaving apparatus,
> a cleaning fluid container, said cradle structure including an outlet port connecting the cradle structure with the cleaning fluid container, said outlet port allowing hair to drain from said cradle structure, and
> a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure.

Compl., Ex.1 at col. 13, lines 25-36.  As discussed above, all of the elements of Claim 1 of the '328 Patent were present in the cleaning device developed by Dr. Pahl during his time in France.  Thus, Dr. Pahl is an inventor on, at least, Claim 1 of the '328 patent.  See Trovan, Ltd., 200 F.3d at 1302 (holding that an inventor is one who has a "definite and permanent idea of the complete and operative invention").

Dr. Pahl also made significant contributions to, at least, dependent claims 2, 4, 5, and 8.  For example, Claim 2 of the '328 patent claims:

> A device as claimed in claim 1, wherein a cross-sectional area of the outlet port is dimensioned such that during the cleaning operation the amount of cleaning fluid drained through the outlet port is smaller than the amount of cleaning fluid supplied to the cradle structure by the feeding device.

Compl. Ex. 1 at col. 13, lines 37-42. As discussed above, the outlet port on the cradle of Dr. Pahl's device had the requisite dimensional limitation. Thus, Dr. Pahl is an inventor of, at least, Claim 2 of the '328 patent. See Fina Oil & Chem. Co., 123 F.3d at 1473 (holding that a joint inventor is one who "make[s] a contribution to the conception of the claimed invention that is not insignificant in quality").

Similarly, Dr. Pahl made significant contributions to at least claims 1 and 18 of the '556 patent. Claim 1 of the '556 patent claims:

> A cleaning device for cleaning a shaving head of a dry shaving apparatus, said cleaning device comprising:
> a cradle structure adapted to receive therein the shaving head;
> a cleaning fluid container separate from the cradle structure for holding a cleaning fluid;
> a filter; and
> a fluid feed mechanism which feeds the cleaning fluid after it passes through the filter to the cradle structure during cleaning, said container and filter being separable from the cradle structure as a unit.

Compl., Ex. 2 at col. 11, lines 16-26. Dr. Pahl's cleaning device contained at least the cradle structure, filter, and feed mechanism of this claim. Thus, Dr. Pahl is a co-inventor of, at least, Claim 1 of the '556 Patent. See Fina Oil & Chem. Co., 123 F.3d at 1473.

After Dr. Pahl moved back to Germany, he directed Mr. Braun to further develop the cleaning device. Mr. Braun proceeded to make certain inventive contributions to the inventions disclosed in the patents-in-suit. Therefore, Dr. Pahl and Mr. Braun are co-inventors on these patents.

### III. THE OMISSION OF DR. PAHL OCCURRED WITHOUT DECEPTIVE INTENT

Where an inventor has been omitted from a patent, correction of inventorship under section 256 is proper in any case where the omission occurred without deceptive intent on the part of the omitted inventor. Section 256 is a "savings provision," Pannu, 155 F.3d at 1350, with

"broad remedial purposes," Dee v. Aukerman, 625 F. Supp. 1427, 1428 (S.D. Ohio 1986) (adopted by the Federal Circuit in MCV, Inc., 870 F.2d at 1570). As such, correction should be allowed where "no one has been harmed and the integrity of the patent system has not been compromised." Akiebolag v. Wankesha Cutting Tools, Inc., 1 U.S.P.Q. 2d 2002, 2004 (E.D. Wis. 1986). Moreover, where patent rights have been assigned, inventorship defects are especially "harmless" and easily correctable. A.F. Stoddard & Co. v. Dann, 564 F.2d 556, 565 (D.C. Cir. 1977).

  Consistent with this broad remedial purpose, the Federal Circuit has directed that, when determining the intent of an omitted inventor, "good faith is presumed in the absence of a persuasive showing of deceptive intent." Pannu, 155 F.3d at 1350, n.4; see, e.g., C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1365 (Fed. Cir. 1998) (finding of lack of deceptive intent where "evidence points to good faith"); Winbond Elec. Corp. v. International Trade Comm'n, 262 F.3d 1363, 1374 (Fed. Cir. 2001) (affirming the Commission's decision not to find deceptive intent on the part of the omitted inventor on the basis of plaintiff's statement that the omission was in good faith); PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 12 F. Supp. 2d 69, 70 (D. Mass. 1998) (vacating earlier denial of section 256 motion to correct inventorship where no evidence as to the intent of the omitted inventors was presented); Akiebolog, 1 U.S.P.Q. 2d at 2005 (granting motion to correct inventorship where opposing party failed to show "some sort of fraud"). Moreover, deceptive intent is lacking in instances where there is no "attempt to purloin another's invention, to misstate the true state of the art to advance their application, to obtain a more favorable filing date, or to conceal material facts and circumstances going to the patentability of the claimed invention." Akiebolag, 1 U.S.P.Q. 2d at 2004.

Importantly, the Federal Circuit has held that foreign inventors did not act with deceptive intent when they acted "in ignorance of United States [patent law] requirements." See, e.g., Ajinomoto Co. v. Archer-Daniels-Midland Co., 228 F.3d 1338, 1344 (Fed. Cir. 2000) (rejecting defense of inequitable conduct even though not all Russian inventors were named because there is no deceptive intent when "the inventors authorized others to sign the documents in ignorance of United States requirements.").

Thus, for example, in C.R. Bard, Inc., 157 F.3d at 1353, the Federal Circuit affirmed the grant of a petition to correct inventorship where omission of inventor "was due to differences between United States and Swedish patent law." In that case, a Swedish team collaborated on a series of biopsy device patents; the named and omitted inventors declared the omissions inadvertent and attributed them to differences in Swedish and United States law. Part of the dispute focused on the contributions of a third, omitted inventor. The defendant argued the court should infer that the failure to add this inventor constituted deceptive intent. The Federal Circuit explained: "Deceptive intent is not inferred simply because information was in existence that was not presented to the examiner." C.R. Bard, 157 F.3d at 1365. Accord E-Z Bowz, L.L.C. v. Professional Prod. Research Co., No. 00 Civ. 670(LTS)GWG, 2003 WL 22068573, at *18 (S.D.N.Y. Sept. 5, 2003) (quoting the same language in a discussion about nonjoinder of an inventor). To be deceptive, the court explained, the omission must have been "intended to and did mislead the examiner into taking favorable action that would not otherwise have been taken." C.R. Bard, 157 F.3d at 1365.

Similarly, in Akiebolag, 1 U.S.P.Q. 2d 2002, 2005 (E.D. Wis. 1986), the district court allowed correction under section 256 where Japanese father and son co-inventors that first filed patents in Japan and subsequently filed a patent in the United States signed only by the father –

but in his son's name.  1 U.S.P.Q. 2d at 2003.  The father did not clearly understand United States patent law.  The district court allowed correction under section 256, emphasizing that the Japanese father and son[4] "did not attempt to purloin another's invention, to misstate the true state of the art to advance their application, to obtain a more favorable filing date, or to conceal material facts and circumstances going to the patentability of the claimed invention."  Id. at 2004.  The court explained that the Japanese father and son "did not seek to secure any advantage for themselves by way of the irregularity."  Id.

Moreover, the courts have held that, where both foreign co-inventors have assigned their rights to the invention to an assignee, correction should be allowed.  The holding in A.F. Stoddard, 564 F.2d at 564 is instructive.  In that case, Belgian inventors who assigned patents to their Belgian employer acted without deceptive intent where the United States patents named the director of the Belgian company as the sole inventor because the director mistakenly believed that only he, as a representative of the owner of the assigned patents, could sign United States patent documents.  Id.  The Court allowed the correction, noting that "to permit the requested [correction] would … harm no one" and to deny correction would, instead, "frustrate the constitutional objective, would exalt form over substance, and would punish [the Belgian company's] commendable candor."  Id.

In the instant case, Dr. Pahl's omission on the patents-in-suit occurred without deceptive intent.  In particular, as in C.R. Bard and Akiebolag, Dr. Pahl's omission occurred as a result of a misunderstanding of the requirements of United States patent law, which differ from German law – where the failure to name an inventor does not affect a patent's validity.  See Vorbeck Decl.

---

[4]  The district court in Akiebolag looked at the intent of both the named and omitted inventors. Stark now requires that the courts limit the deceptive intent inquiry to the intent of the omitted inventor.  119 F.3d at 1555

¶ 4; Pahl Decl. ¶ 25.  Dr. Pahl did not attempt to purloin another's invention.  He did not act to misstate the true state of the prior art or to conceal material facts going to patentability of the claimed invention.  Instead, because inventorship is not material to the validity of a German patent, Dr. Pahl approved the naming of Mr. Braun as the sole inventor on Braun's internal invention disclosure to foster inventiveness and encourage Mr. Braun.  The omission of Dr. Pahl did not cause the examiner to take favorable action he might not otherwise have taken.  And, the patents would have still been assigned to Braun, regardless.  In light of the lack of deceptive intent in Dr. Pahl's omission as a co-inventor, Braun's motion to correct inventorship should be granted.

## CONCLUSION

WHEREFORE, Braun respectfully requests that this motion be allowed and that Court order the Director of the Patent and Trademark Office to issue Certificates of Correction for the '328 Patent and the '556 Patent, thereby adding Dr. Dietrich Pahl as co-inventor on these patents.

BRAUN GmbH

By its attorneys,

/s/ Dalila Argaez Wendlandt
William L. Patton (BBO #391640)
Dalila Argaez Wendlandt (BBO #639280)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000
(617) 951-7050 (facsimile)

Dated:   August 2, 2004