IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRAUN GmbH,<br><br>        Plaintiff,<br><br>        v.<br><br>RAYOVAC CORPORATION,<br><br>        Defendant. | Civil Action No. 03-CV-12428-WGY |

**BRAUN GmbH'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT</u>**

## *Preliminary Statement*

Plaintiff Braun GmbH ("Braun") moves for partial summary judgment of infringement on the grounds that Rayovac Corporation's ("Rayovac") deposition testimony, expert reports, responses to written discovery, and marketing literature show that three of Rayovac's dry shaver cleaning products infringe at least claim 11 of Braun's United States Patent No. 5,711,328 (the "'328 Patent"), and that there is no genuine issue as to any material fact. Claim 11 comprises five elements. During discovery and the submission of expert reports, Rayovac has contested infringement on the basis of only two of them – the Cradle Structure Element[1] and the Feed Device Element.[2] The Court has construed those elements during an earlier Markman hearing. The Court construed the Cradle Structure Element as "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both." See Transcript of March 15, 2005 Hearing Before Judge Young ("Hearing Trans.") at 5, 11. The Feed Device Element was construed as "a mechanism that feeds cleaning fluid from the cleaning fluid container to the cradle structure." Id. at 13, 14.

The undisputed evidence shows conclusively that the accused products meet each of the contested elements. As Rayovac's principal engineer for its accused products explains (and as the product packaging artfully depicts), the accused products feature a shaver head supported by ports in a "manifold" and supporting structures able to receive or retain fluid or both. See Deposition of James Chasen on May 5, 2005 ("Chasen Dep.") at 85:21 – 86:12. Rayovac also concedes that the accused products use a "mechanism

---

[1] The "Cradle Structure Element" is "a cradle structure adapted to receive a shaving head of a shaving apparatus." See '328 Patent, col. 14, lines 13-14.
[2] The "Feed Device Element" is "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure." See '328 Patent, col. 14, lines 16-17.

9797800_1

that feeds cleaning fluid." It distinguishes its products solely by claiming that the feed mechanism does not deliver fluid to a "cradle structure," a feature Rayovac insists its products do not have. See Second Expert Report of Samuel R. Phillips ("Phillips 2nd Rep.") at ¶ 69-70. The facts, however, show otherwise; Rayovac's shavers rest in what is plainly a fluid-receiving cradle structure. Because Rayovac's accused products therefore meet each of the five claim elements, there is no genuine issue of material fact as to Rayovac's infringement. For this reason, Braun is entitled to partial summary judgment.

## *Facts*[3]

Braun's '328 Patent claims an innovation in the cleaning and maintenance of electric shavers. The innovation allows consumers to clean the shaver simply by securing it in a cleaning center; the cleaning center then circulates fluid that washes the shaving head automatically. Braun began to market products embodying the patented technology in Japan in 1999 and in the United States by 2000. These products have enjoyed widespread commercial success – success that internal documents and deposition testimony show Rayovac noticed and sought to achieve for itself. See, e.g., Deposition of James Doyle on June 3, 2005 ("Doyle Dep.") at 44:21 – 46:19, 47:12 – 48:6 (testimony of Rayovac's division vice president for all Remington products, describing study of the success of Braun's commercial cleaning products embodying the patented technology); Deposition of Alan Schoepp on May 12, 2005 ("SchoeppDep.") at 167:12-19 (Rayovac's controller for North American marketing acknowledging that Rayovac considered Braun's products embodying the patented technology to be successful commercially at the time Rayovac entered the market with its accused products).

---

[3] Braun files herewith its Local Rule 56.1 Statement of Undisputed Material Facts. This section presents those facts that Braun considers most critical, as well as facts that will provide additional background.

Claim 11 of the '328 Patent consists of five elements. They are:

a cradle structure adapted to receive a shaving head of a shaving apparatus,

a cleaning fluid container,

a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure,

said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure, and

a drying device.

See '328 Patent, col. 14, lines 12-23.

Rayovac's expert opines that the accused products do not meet the first and third elements of claim 11. Phillips 2nd Rep. at ¶¶ 65-70. His report concludes that because these products inject fluid into the hair pocket, instead of simply bathing the shaving head, the accused products do not infringe. Id. at ¶¶ 20, 30. The expert has stated further that the supporting structures in the accused product do not constitute a cradle structure. Id. at ¶ 33. Rayovac's argument with regard to the third element is similar; while Rayovac admits there is a feed device, it contends that fluid is not fed to anything constituting a cradle structure. Id. at ¶¶ 69-70.

The three accused products include: two "Titanium Smart System" electric shaving systems – a men's rotary system with product designation R-9500 and a men's foil system with product designations MS-5500 and MS-5700; and one "Smooth & Silky Titanium System," which is a women's foil system with product designation WDF-7000CS.[4] Each of these Rayovac products includes an electric shaver and a cleaning

---

[4] The parties agree that the women's foil shaver is included in this action.

system. In each, the operation of the cleaning system is identical in all material respects. See Chasen Dep. at 88:8-90:23.

In its deposition testimony and product literature, Rayovac describes how its accused products work. The shaver and cleaning system "kind of go hand-in-hand." Chasen Dep. at 52:5-6. The operating manual instructs consumers to "[p]lace the shaver into the [cleaning] unit, head side down, and slide its 'tail' toward the 'neck' of the base until it clicks into place [in] . . . the cleaning base." See Declaration of Dalila Argaez Wendlandt in Support of Motion for Partial Summary Judgment of Infringement ("Wendlandt Decl."), Exhibit J at 8.[5] The "cleaning base" then supports the shaver while conducting a 25 minute "cleaning cycle." Id.

Specifically, in the men's rotary cleaning system, the three "pins" or ports in the fluid "manifold" and a "post in the bottom of the basin" support the shaving head. Chasen Dep. at 85-86. During the cleaning operation, the manifold and its ports receive and retains cleaning fluid and "inject[]" that fluid into the shaver head; the fluid then flows into the basin and eventually to the cleaning base, where it is stored. Id. at 85-86, 90.

The basin will retain a small amount of fluid at the end of each cleaning cycle. Id. at 65. Most of the fluid, however, will return to a closed reservoir – a cleaning fluid container – from which a pump will draw to feed fluid to the manifold and ports, thus repeating the cycle. See Deposition of Yuri Avila on June 2, 2005 ("Avila Dep.") at 56; see also Phillips 2nd Report at ¶ 20. The operation of the men's and women's foil cleaning systems is, in all material respects, identical.

---

[5] Unless otherwise noted, all exhibits referenced herein are attached to the Wendlandt Declaration, filed herewith.

## *Argument*

### I. GOVERNING STANDARDS

Federal Rule of Civil Procedure 56(c) entitles a moving to party to summary judgment when the evidence before the Courts shows "that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The Court must perform two steps in deciding this Motion: it must first construe the claims, which is a question of law, and it must compare the construed claims to the accused product, which is a question of fact. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996); SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1337 (Fed. Cir. 2005). To establish infringement, Braun must show "by a preponderance of the evidence that every limitation of the asserted claim is literally met by the allegedly infringing device." Biovail Corp. Int'l v. Andrx Pharma., Inc., 239 F.3d 1297, 1302 (Fed. Cir. 2001) (citation omitted); see also Amhil Enters., Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996) (infringement occurs "when the properly construed claim reads on the accused device exactly.").

### II. PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT IS APPROPRIATE BECAUSE RAYOVAC'S ATTEMPT TO DISTINGUISH ITS PRODUCT DOES NOT RAISE A GENUINE ISSUE OF MATERIAL FACT

#### A. The Court Has Already Construed the Five Elements of Claim 11 of the '328 Patent

Based on the parties' joint proposal for an early Markman hearing, the Court has already completed step one of the two-step summary judgment process. Claim 11's five elements have already been construed. Having completed that step, the Court must now determine only whether the accused product infringes Braun's patent. See, e.g., Neutrino

Devel. Corp. v. Sonosite, Inc., 337 F.Supp.2d 937 (S.D. Tex. 2004) (trial court first issued claim construction, then awarded summary judgment for literal infringement in separate opinion); SDS USA, Inc. v. Ken Specialties, Inc., 122 F.Supp.2d 533 (D. N.J. 2000) (same); Chiron Corp. v. Genentech, Inc., No. Civ. S-00-1252, 2002 WL 32123930 (E.D. Cal. June 24, 2002) (same). Braun offers a short summary of the Markman construction to aid the Court's analysis.

### 1. The Court's Construction Of The Cradle Structure Element

Prior to the Court's Markman hearing, the parties filed extensive briefs, and, at the hearing, each party had ample opportunity to argue for its own interpretation. Only two of claim 11's five elements were seriously disputed. Braun sought to construe the Cradle Structure Element as a "cradle structure able to receive the shaving head of a shaving apparatus." See Braun GmbH's Markman Memorandum Of Law In Support Of Its Claim Construction at 5. Rayovac, in turn, argued that means-plus-function under Section 112, ¶ 6 governed this limitation or, in the alternative, that the element should be construed as "a trough that supports a seated shaving head and that receives and retains fluid during the cleaning of the shaving head." See Rayovac Corporation's Brief On Claim Construction at 37.

At the Markman hearing, the Court rejected as a matter of law Rayovac's means-plus-function argument. Hearing Trans. at 6. The Court construed the Cradle Structure Element as a "structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both." Id. at 5, 11. This construction is manifestly correct. A "cradle" is a "framework or other resting place for supporting or restraining objects." MCGRAW-HILL DICTIONARY OF SCIENTIFIC & TECHNICAL TERMS

(6th ed. 2003). In this case, as the claim language makes clear, the cradle structure is a structure adapted for the particular purpose of supporting the shaving head of a shaving apparatus. Nothing in the claim language itself, the specification, or the prosecution history requires a "trough"-shaped cradle that receives <u>and</u> retains cleaning fluid during the cleaning operation.

Abandoning Rayovac's earlier insistence on a trough-shaped cradle, Rayovac's expert contends, despite this Court's <u>Markman</u> construction, that the Cradle Structure Element is limited to structures that receive <u>and</u> retain cleaning fluid because, according to him, the preferred embodiment in the patent describes only such a cradle structure. <u>See</u> Phillips 2nd Report at ¶¶ 27-28. In doing so, he ignores well-settled law that the terms of the preferred embodiment do not limit the claim's construction. <u>Phillips v. AWH Corp.</u>, Nos. 03-1269, 03-1286, 2005 WL 1620331, at *15 (Fed. Cir. 2005) (en banc) ("[W]e have repeatedly warned against confining the claims to [specific] embodiments.") (citations omitted).

Limiting the Cradle Structure Element to the preferred embodiment (as Rayovac suggests) would also violate the doctrine of claim differentiation with respect to claims 1 and 2 of the '328 patent. <u>See</u> <u>Izumi Prod. v. Koninklijke Philips Electronics N.V.</u>, Nos. 04-1418, 04-1423, 2005 WL 1606952, at *10 (Fed. Cir. Jul. 7, 2005) ("Under the doctrine of claim differentiation, 'there is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.'") (quoting <u>Tandon Corp. v. United States Int'l Trade Comm'n</u>, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). Claim 1 provides that the cradle structure has an outlet port connecting the cradle structure to the cleaning fluid container. Claim 2 then requires that the outlet port "is

dimensioned such that during the cleaning operation the amount of cleaning fluid drained through the outlet port is smaller than the amount of cleaning fluid supplied to the cradle structure by the feeding device." See '328 Patent, col. 13, lines 37-42. Under the doctrine of claim differentiation, if the term "cradle structure" in claim 1 were limited to structures that receive and retain cleaning fluid, the subsequent limitation in claim 2 would be superfluous. See Phillips v. AWH Corp., 2005 WL 1620331, at *17 (reasoning that limitations in subsequent claims "would be unnecessary if persons of skill in the art understood that the [device] inherently served such a function."). Thus, pursuant to the doctrine of claim differentiation, the term "cradle structure" is not limited in the fashion Rayovac suggests.

### 2. The Court's Construction Of The Feed Device Element

The dispute over the Feed Device Element during the Markman hearing was even more straightforward. Braun proposed a "mechanism that feeds cleaning fluid from the cleaning fluid container to the cradle structure." Hearing Trans. at 12. Rayovac responded simply that it believed that Section 112, ¶ 6 applied, see id.; however, after the Court refused such a construction, Rayovac argued that the construction should require that fluid be fed "directly" to the cradle structure, id. at 14. The Court declined to "put in the word directly" and adopted the construction proposed by Braun as "a mechanism that feeds cleaning fluid from the cleaning fluid container to the cradle structure." Id.

### B. Rayovac's Products Meet All Five Elements of the '328 Patent's Claim 11, And Therefore Infringes Braun's Patent

Braun's properly construed claim "reads on the accused device exactly." Wawa, 81 F.3d at 1562. Rayovac's products meet each of claim 11's five elements. Indeed, Rayovac has not argued, nor proffered any evidence to suggest, that its products do not

have "a cleaning fluid container," "said cradle being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during feed of said cleaning fluid to said cradle," and "a drying device."[6] The parties only disagree as to whether the Cradle Structure Element and the Feed Device Element read on the accused devices. Irrefutably, they do; Rayovac's products plainly meet both elements. The overwhelming evidence of literal infringement leaves no genuine issue of fact that would entitle Rayovac to a trial. Therefore, Braun's Motion should be granted.

### 1. The Cradle Structure Element Reads On Rayovac's Products

The accused products clearly contain a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both.[7] First, the Rayovac cleaning systems admittedly contain a structure designed to support a shaving head of a shaving apparatus. The manifold 3a, ports 3b and supporting surfaces 3c receive and support the shaver head. See Exhibits B (Figure 1a); C (Figures 2a-c); D (Figures 3a-c); see also Declaration of Professor Samir Nayfeh In Support Of Braun GmbH's Motion For Partial Summary Judgment Of Infringement ("Nayfeh Decl.") at ¶9; Chasen Dep. at 85:21 – 86:12. Together, these components form the supportive part of the "cleaning base" that, as Rayovac puts it, the shaver head "clicks into." Exhibit J at 8.

---

[6] It is undisputed, first, that each Rayovac cleaning system has a container for holding cleaning fluid. Chasen Dep. at 86:14-17. Secondly, in each Rayovac cleaning system, the cradle structure is above the cleaning fluid level in the cleaning fluid container during cleaning. Chasen Dep. at 67-68 (discussing importance of cleaning fluid draining down at a certain rate). In particular, the cradle structure 3a, 3b and 3c is located above the cleaning fluid level in the container 5 during the feeding of cleaning fluid. Exhibits B (Figure 1a); C (Figure2a); D (Figure 3a). Lastly, Rayovac's cleaning products have a drying device. Chasen Dep. at 87:9-11.

[7] Notably, Rayovac's expert begins his analysis of infringement by rejecting the Court's construction of this element. Phillips 2nd Report at ¶¶ 27-28. This tactic shows that Rayovac's primary defense is to twist the meaning of the element, substituting it with a definition Rayovac provides. Even if, Rayovac's expert's proposed construction were adopted by the Court, its products infringe claim 11 since the cradle structure (comprising manifold 3a, ports 3b, and supporting surfaces 3c) support the shaving head and receive *and* retain cleaning fluid during the cleaning operation.

Rayovac's expert asserts that the manifolds do not support the shaver head; rather, he claims that it is only the "exterior surfaces of the injection nozzles" (that is, ports 3b) and the supporting surfaces 3c that support the shaving head. Phillips 2nd Rep. at ¶33. This strained distinction does not describe an actual difference. The manifold 3a, the ports 3b, and the supporting surfaces 3c <u>together</u> secure the shaver head in place when the consumer inserts the shaver into the cleaning system. <u>See</u> Nayfeh Decl. at ¶9. A "structure" includes not only the surfaces of that structure that make direct contact with the shaving head, but the whole structure in its entirety. <u>See id</u>. at ¶12. The ports are integrally formed with the manifold. <u>Id</u>. One of ordinary skill in the art would recognize that the manifold, ports, and supporting surfaces together constitute "a structure adapted to support or receive a shaving head of a shaving apparatus." <u>See id.</u> at ¶13.

Indeed, as deposition testimony shows, that appears to be the understanding of James Chasen, the Rayovac engineer primarily responsible for developing the accused products and Rayovac's Rule 30(b)(6) designee to speak to the accused products. Chasen Dep. at 10. According to Mr. Chasen, the shaving head is supported by (1) "a post [that is, supporting surfaces 3c] in the bottom of the basin" and (2) the "injection manifold [3a] that helps align everything." Id. at 85:21-25. Prompted to explain his answer further, Mr. Chasen admitted that the "pins" or ports, upon which the shaver head "rests," are "<u>in</u> the manifold." Id. at 86 (emphasis added). Together, Mr. Chasen testified, the manifold, ports and supporting surfaces form the "unit" that you "put it [the shaver head] into." Id. at 85. Mr. Chasen's testimony is revealing since Mr. Chasen understanding of the accused products' cradle structure plainly refutes the contention of Rayovac's expert.

Moreover, the accused products' cradle is able to receive or retain fluid or both. Rayovac acknowledges that the pump in its accused device "circulate[s] the fluid from the lower housing to the manifold" during the cleaning operation. Chasen Dep. at 87:3-8. The manifold thus receives and/or retains fluid or both during cleaning. The ports 3b in the manifold also receive and/or retain fluid or both during cleaning since they receive fluid from the manifold throughout the cleaning process and then direct fluid to the shaving head. See id.; Nayfeh Decl. at ¶9. The cradle structure of the accused product performs exactly as the Court has construed claim 11, and no genuine issue of material fact exists.

The first element of claim 11 thus reads on the accused products.

### 2. The Feed Device Element Reads On Rayovac's Product

The accused products clearly contain a mechanism – a pump and conduit – that feeds cleaning fluid from the cleaning fluid container to the cradle structure. See Nayfeh Decl. at ¶9. As noted supra, Rayovac acknowledges that the accused products have a mechanism that feeds cleaning fluid from the cleaning fluid container to the manifold 3a and ports 3b. See Chasen Dep. at 87:3-8. Rayovac's expert attempts to differentiate its products only on the basis of his unsupportable assertion that the products do not contain a "cradle structure" and thus, no mechanism that feeds to a "cradle structure." Phillips 2nd Rep. at ¶¶69-70, 47-48. The record, however, shows otherwise. As discussed supra, the Rayovac products contain a cradle structure (consisting of manifold 3a, ports 3b, and supporting surfaces 3c). Moreover, Rayovac concedes that the cleaning center feeds fluid to the manifold and ports during the cleaning operation. Thus, the Court's construction of claim 11's third element precisely describes the accused products' operation.

The third element of claim 11 thus reads on the accused products.

### *Conclusion*

Because the accused product meets each element of claim 11, as construed by the Court, and because the complete overlap between the accused product and claim 11 does not raise a genuine issue of material fact, Braun is entitled to partial summary judgment.

Respectfully submitted,

Braun GmbH

By its attorneys,

/s/ Dalila Argaez Wendlandt
William L. Patton (BBO #391640)
Dalila Argaez Wendlandt (BBO #639280)
Dalila.Wendlandt@ropesgray.com
  ROPES & GRAY
  One International Place
  Boston, MA  02110
  Telephone:  (617) 951-7000
  Facsimile:  (617) 951-7050

Stanley D. Liang (admitted *Pro Hac Vice*)
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, NY 10021

August 22, 2005