IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRAUN GmbH,

    Plaintiff,

v.

RAYOVAC CORPORATION,

    Defendant.

Civil Action No. 03-CV-12428-WGY

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF BRAUN GMBH'S
MOTION FOR PARTIAL SUMMARY JUDGMENT TO CORRECT INVENTORSHIP**

In support of its Motion For Partial Summary Judgment To Correct Inventorship, Plaintiff Braun GmbH, pursuant to Local Rule 56.1, submits this statement of material undisputed facts.

9799808_1

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On January 27, 1998, U.S. Patent No. 5,711,328 (the "'328 Patent") issued.  See Declaration of Dalila Argaez Wendlandt In Support Of Braun GmbH's Motion For Summary Judgment On Inventorship ("Wendlandt Decl."), Exhibit 1.  The '328 Patent has been duly assigned to Braun GmbH ("Braun").  See id., Exhibit 9.

2.      From 1992 through 1993, Mr. Braun worked to develop the cleaning system, which he described in an internal invention disclosure given to Braun's internal patent department on July 22, 1993.  See Wendlandt Decl., Exhibit 7 at ¶7, Exhibits A & B; see also id., Exhibit 4 at 111:23-24.

3.      The internal invention disclosure described the problems associated with the dusty and time consuming process of hand cleaning of dry shavers, as well as prior dry shaver cleaners that were ineffective because they operated by continuously recirculating increasingly contaminated cleaning fluid.  Mr. Braun posited that as dry shavers become more intricate and complex, the old cleaning methods would be increasingly unacceptable.  See Wendlandt Decl., Exhibit 7 at ¶7, Exhibits A & B.

4.      In the internal invention disclosure, Mr. Braun disclosed a cleaning system that runs virtually automatically to clean, dry and charge a dry shaver.  The disclosure, through words and drawings, describes the cleaning system disclosed in the patents-in-suit.  Id.

5.      On September 15, 1993, Mr. Braun supplemented his internal invention disclosure.  The supplement described Mr. Braun's invention of allowing the same motor to drive the feed pump as the dryer impeller.  Id. at Exhibits C & D.

9799808_1

6. Dr. Dietrich Pahl reviewed these internal invention disclosures and approved Mr. Braun as the sole inventor. See Wendlandt Decl., Exhibit 6 at ¶¶22, 24; see also id., Exhibit 4 at 105:20-21.

7. On January 26, 1994, Braun's Patent Department caused German patent applications to be filed based on Mr. Braun's internal invention disclosure. See Wendlandt Decl., Exhibit 7 at ¶9. As in the internal invention disclosure, Mr. Braun was listed as the sole inventor on the German patent applications with Dr. Pahl's approval. See Wendlandt Decl., Exhibit 7 at ¶9; Exhibit 6, ¶22; Exhibit 4 at 105:20-21; Exhibit 2 at 132:18-22.

8. In mid-1992, Dr. Pahl was the Technical Manager for a Braun Research and Development facility in Lyon, France. At that time, Dr. Pahl began developing an idea and design concept for a device for cleaning dry shavers. See Wendlandt Decl., Exhibit 6, ¶5; Exhibit 2 at 43:12-21.

9. Dr. Pahl's cleaning device consisted of a cradle contoured to conform to the outer counter of the shaving head of a dry shaver. See Wendlandt Decl., Exhibit 6 at ¶7; Exhibit 3 at 50:24 through 51:20; Exhibit 2 at 50:12-21. The cradle was open to the atmosphere, allowing a dry shaver to be easily inserted into the cleaning device without disassembly of the shaver head or the cleaning device. See id., Exhibit 6 at ¶17; Exhibit 2 at 206:1-4. The cleaning device also had a cleaning fluid container. See id., Exhibit 6 at ¶8; Exhibit 2 at 86:15 through 87:3 & 53:1-4; Exhibit 3 at 53:1-4.

10. During the cleaning operation, an electrical circuit activated a pump, which fed cleaning fluid from the container, through a filter, and into the cradle. See Wendlandt Decl.,

Exhibit 6 at ¶¶9, 13; Exhibit 2 at 50:22 though 51:5 & 110:10-15. The cradle was located above the fluid in the cleaning fluid container. See id., Exhibit 6 at ¶9; Exhibit 2 at 86:15 through 87:3.

11. The cradle had a fluid inlet port for receiving the cleaning fluid and a fluid outlet port to allow hair, debris, and used cleaning fluid to flow out of the cradle. See Wendlandt Decl., Exhibit 6 at ¶11. The outlet port was dimensioned such that the amount of cleaning fluid exiting the cradle through the outlet port was smaller than the amount of cleaning fluid entering the cradle through the inlet port. See id. Also during the cleaning operation, the electrical circuit activated the dry shaver. The oscillatory motion of the shaver head therefore assisted the cleaning operation. See id. at ¶10. The cradle also had an overflow device, which allowed excess cleaning fluid from the cradle to be drained directly into the cleaning fluid container. See id. at ¶12; Exhibit 3 at 53:9-18.

12. Once the cleaning operation was finished, the pump was deactivated and the cleaning fluid was drained from the cradle through the outlet port. Thereafter, the shaver could remain in the cradle to dry and for storage. See Wendlandt Decl., Exhibit 6 at ¶14. Drying of the shaver was assisted in Dr. Pahl's cleaning device through the use of a dryer, consisting of a heater and impeller. See id. at ¶15; Exhibit 2 at 148:10-12. Finally, Dr. Pahl's cleaning device could be used with a wall mount.

13. While he was at the Lyon facility, Dr. Pahl commissioned technical drawings and functional models and a prototype of his concept. See Wendlandt Decl., Exhibit 6 at ¶6, Exhibit A. Dr. Pahl presented his cleaning device concept internally at Braun during a November 1992 presentation entitled, "R&D Shavers – Future." See id. at ¶16, Exhibit B.

14. While he was serving as Technical Manager at the Lyon facility, which closed in 1993, Dr. Pahl was concurrently the Director of Research and Development for dry shavers in Braun's Design and Product Development Group in Kronberg, Germany. See Wendlandt Decl., Exhibit 6 at ¶¶5, 19. As part of his duties at the Kronberg facility, Dr. Pahl asked Mr. Braun to further develop his idea and design concept for a device to clean dry shavers. See id. at ¶20; Exhibit 7 at ¶5.

15. From 1992 through 1993, Mr. Braun further developed the cleaning device that Dr. Pahl had begun to develop in France. See Wendlandt Decl., Exhibit 7 at ¶6. Dr. Pahl supervised Mr. Braun during this development process. In addition, Dr. Pahl reviewed and approved Mr. Braun's invention disclosures. See id., Exhibit 6 at ¶20.

16. In particular, Dr. Pahl approved of Mr. Braun as the sole inventor of the cleaning device because, consistent with his general policy, he wanted to motivate Mr. Braun to take ownership of the cleaning device project. See Wendlandt Decl., Exhibit 6 at ¶23; Exhibit 2 at 116:23 through 117:24, 121:2-4 & 127:22 through 128:16. Additionally, Dr. Pahl did not want his position as the "boss" to influence decisions by Braun as to whether to invest the resources to commercialize the product. See id., Exhibit 6 at ¶23. Thus, the internal invention disclosure named Mr. Braun as the sole inventor. See Wendlandt Decl., Exhibit 7 at ¶7, Exhibits A & B.

17. Dr. Pahl understood that, under German law, a patent is not rendered invalid by incomplete disclosure of the inventors. See Dr. Wendlandt Decl., Exhibit 6 at ¶25. Dr. Pahl was not familiar with the inventorship disclosure requirements of United States patent law. Id. at ¶¶25-26; Exhibit 2 at 129:5-10 and 139:6-8.

18.   Neither Mr. Braun nor Dr. Pahl had a clear understanding of inventorship law in the United States. See Wendlandt Decl., Exhibit 7 at ¶11; Exhibit 6 at ¶26; Exhibit 2 at 129:5-10 and 139:6-8; Exhibit 4 at 158:1-9. And, Mr. Braun, having lawfully been named as the sole inventor on the German patent applications, did not believe that there was any reason to question the inventorship designation in the United States counterpart applications. See Wendlandt Decl., Exhibit 7 at ¶10; Exhibit 5 at ¶4.

19.   Dr. Pahl was not involved in the United States patent application process. See Wendlandt Decl., Exhibit 6 at ¶17. By that time, he had developed serious medical problems and had been moved to a research group with a reduced workload where he remained until his retirement in October 1998. See id. at ¶3.

20.   Mr. Braun does not object to the correction of inventorship on the patents-in-suit. See Wendlandt Decl., Exhibit 7 at ¶13. Braun, the assignee of the patents-in-suit, also does not object. See Wendlandt Decl., Exhibit 5 at ¶5.

21.   Rayovac agrees that Dr. Pahl is an inventor of the '328 patent. See Wendlandt Decl., Exhibit 9 at ¶¶67-68.

Respectfully submitted,

Braun GmbH

By its attorneys,

/s/ Dalila Argaez Wendlandt
William L. Patton (BBO #391640)
Dalila Argaez Wendlandt (BBO #639280)
Dalila.Wendlandt@ropesgray.com
  ROPES & GRAY
  One International Place

9799808_1

-5-

Boston, MA  02110
 Telephone:  (617) 951-7000
 Facsimile:  (617) 951-7050
Stanley D. Liang (admitted *Pro Hac Vice*)
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, NY 10021
Telephone: (212) 596-9000
Facsimile: (212) 596-9500

August 22, 2005