**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BRAUN GmbH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 03-CV-12428-WGY |
| | ) |
| RAYOVAC CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF UNCONTESTED FACTS PURSUANT TO LOCAL RULE 56.1

1. On December 2, 2003, Braun GmbH ("Braun") filed an action against Remington Products Company, LLC for patent infringement of U.S. Patent No. 5,711,328 in violation of the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq*.

2. The Original Complaint included The Gillette Company ("Gillette") as a co-plaintiff. Rayovac brought a motion to dismiss Gillette, which was granted on June 3, 2004.

3. On March 9, 2004, Remington Products, LLC merged with and into Rayovac Corporation effective March 29, 2004, with Rayovac Corporation as the surviving entity. (Ex. 13, Motion to Amend Caption.)

4. On August 2, 2004, Braun brought its Motion to Correct Inventorship. This Motion was granted on June 3, 2004. (Ex. 26, Motion to Correct Inventorship.)

5. On August 30, 2004, Rayovac served Braun with Defendant's First Set of Interrogatories to Plaintiff, asking Braun to identify, *inter alia*, each claim element Braun contended had been infringed under the doctrine of equivalents, and the basis for Braun's contentions. (Ex. 8, Braun's Answer to First Interrogatories, at 3.)

6. On October 25, 2004, Braun served Rayovac with Braun GmbH's Answers to Remington's First Set of interrogatories. (*Id.*)

7. On December 10, 2004, the parties moved jointly to amend the caption by naming Rayovac Corporation ("Rayovac"). (Ex. 13, Motion to Amend Caption.)

8. Braun's response to Defendant's First Set of Interrogatories to Plaintiff has not mentioned the doctrine of equivalents. (*See*, Ex. 8, Braun's Answer to First Interrogatories, at 4.)

K&E 10690204.1

9. On May 23, 2005, Braun's expert, Dr. Samir Nayfeh, submitted his first expert report in which he opined that Rayovac devices literally infringe claims 11, 12, 14 and 18 of the '328 patent. (*See*, Ex. 14, First Nayfeh Report, at 3-7.)

10. Dr. Nayfeh's first report contained no opinion regarding the doctrine of equivalents. (*See id*.)

11. On June 13, 2005, Samuel R. Phillips ("Phillips") submitted his second expert report in response to Dr. Nayfeh's first report. Phillips noted that neither Braun nor Dr. Nayfeh had asserted that Rayovac product infringed the '328 patent under the doctrine of equivalents. (Ex. B, Second Phillips Report, at ¶ 25.)

12. On June 27, 2005, Dr. Nayfeh submitted his third report which he opined that Rayovac devices literally infringe claims 11, 12, 14 and 18 of the '328 patent. (Ex. F, Third Nayfeh Report.)

13. Dr. Nayfeh's third report contained no opinion regarding the doctrine of equivalents. (*See id.*)

14. The deadline for expert reports was June 27, 2005.

15. U.S. Patent No. 5,711,328 ("the '328 patent") was issued on January 27, 1988. (Ex. 1, the '328 patent.)

16. Claim 11 of the '328 patent is:

> A cleaning device comprising: a cradle structure adapted to receive a shaving head of a shaving apparatus, a cleaning fluid container, a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure, and a drying device.

(*Id.*)

17. Claim 12 of the '328 patent is:

> A device as claimed in claim **11**, wherein the drying device is an impeller.

(*Id.*)

18. Claim 14 of the '328 patent is:

> A cleaning device comprising: a cradle structure adapted to receive a shaving head of a shaving apparatus, said cradle structure being permanently open to atmosphere, a cleaning fluid container, and a

2

        feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure.

(*Id.*)

19. Claim 18 of the '328 patent is:

        A cleaning device comprising: a cradle structure adapted to receive a shaving head of a shaving apparatus, a cleaning fluid container, a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said container during the feeding of said cleaning fluid to said cradle structure, and a bracket for insertion of the shaving apparatus therein.

(*Id.*)

## **Inventorship and Inequitable Conduct**

20. Braun had investigated various methods for cleaning dry shavers since at least as early as the 1950's. (*See* Ex. L, Hoeser Timeline.)

21. In 1992, Dr. Dietrich Pahl conceived the idea for a device that automatically cleaned the head of a dry shaver. (*See* Ex. 18, Pahl Decl., at ¶ 5.)

22. Under Dr. Pahl's direction, engineers at Braun's facilities in Lyon, France, began drafting detailed drawings and putting together a working prototype for a device that automatically cleaned the head of a dry shaver. (*Id.,* at ¶ 6.)

23. The drawings and prototype that Dr. Pahl developed in France included most, if not all, of the elements claimed in the '328 Patent. (*See id.*) Dr. Pahl made the following statements about his prototype:

        "This cleaning center had many components, including a trough or cradle in which the shaving head of a dry shaver could be placed." (*Id*., at ¶ 7.)

        The cleaning center also had a container for cleaning fluid, which was positioned below the cradle." (Pahl Decl. ¶ 8)

        "During the cleaning operation, an electrical circuit…activated a pump to feed the cleaning fluid from the cleaning fluid container to the cradle." (*Id*., at ¶ 9.)

>"The functional model of the cleaning center also included a dryer, consisting of a fan and a heater, to aid in the drying function."[1] (*Id*., at ¶ 15.)
>
>"As Exhibits A and B show, the cradle was open to the atmosphere, such that the dry shaver could be inserted from the top into the cleaning device…." (*Id*., at ¶ 17.)
>
>Dr. Pahl's 1992 Prototype had a bracket for insertion of the shaving device therein. (*See* Ex. J, Pahl Dep., at 148:13-149:3.)

24. Dr. Pahl presented drawings detailing his invention internally at Braun in November 1992. (Ex. 18, Pahl Decl., at ¶ 16.)

25. After this meeting Dr. Pahl also presented his prototype to the head of Braun's Men's Hair Removal Unit, Gilbert Greaves, as well as Jacques LaGarde, Braun's CEO. (*See* Ex. J, Pahl Dep., at 53:21-59:15.)

26. At some point in 1993, Dr. Pahl enlisted the assistance of Gebhard Braun to further refine the alleged invention that Dr. Pahl had designed. (*See* Ex. 18, Pahl Decl., at ¶ 20; *see also*, Ex. J, Pahl Dep., at 60:2-11.)

27. Dr. Pahl showed Mr. Braun the drawings and prototype, which revealed the elements claimed in the '328 Patent. (*See* Ex. 18, Pahl Decl., at ¶ 20.)

28. Nearly all of the elements of the alleged invention, including all asserted against Rayovac, were complete *before* Mr. Braun began working on it. (*See* Ex. K, Braun Dep., at 113:5-17.)

29. Mr. Braun revised Dr. Pahl's alleged invention, making minor adjustments, including devising a method for using a single motor to drive both the impeller and pump of the cleaning device. (*See Id.*, at 81:3-8.)

30. Mr. Braun was directed by Braun's Patent Department to fill out an Invention Disclosure, a form used by Braun internally to ascertain details regarding an invention, including details regarding inventorship. (*See* Ex. 19, Invention Disclosure form; Ex. M, Vorbeck Dep., at 47:5-16.)[2]

31. Hans Dieter Klauer, Braun's in-house patent counsel, was aware of Dr. Pahl's contributions to the alleged invention and assisted Mr. Braun in preparing his response to the Invention Disclosure form. (Ex. K, Braun Dep., at 113:18-116:5.)

---

[1] For purposes of separate inventorship defenses not at issue here, Rayovac disputes that Dr. Pahl's French prototype included a heater.

[2] Rayovac only has the rough transcript of Mr. Vorbeck's deposition presently. When an official transcript is available, Rayovac will make it available to the Court.

32. Dr. Pahl directed Mr. Braun to falsely name himself as the sole inventor on the Invention Disclosure form. (*Id.*, at 105:13-21.)

33. Dr. Pahl admitted that his decision to direct Mr. Braun to hide the fact that Dr. Pahl was an inventor was knowing and deliberate. (*See* Ex. J, Pahl Dep., at 128:9-16.)

34. Mr. Braun, despite knowing that the details regarding inventorship were incorrect, signed the Invention Disclosure form. (*See Id.*, at 122:22-123:24.)

35. Dr. Pahl and Gilbert Greaves both reviewed and approved the details set forth in the Invention Disclosure form. (*See* DX 43 and 44; Ex. 18, Pahl Decl., at ¶ 22.).

36. Indeed, in a separate form that Braun used to ensure that the details regarding inventorship were correct (S*ee* Ex. M, Vorbeck Dep. at 100:4-101:7), Dr. Pahl represented that the details regarding inventorship set forth in the Invention Disclosure form were correct. *See* DX 43 and 44. Additionally, this form also asked whether Dr. Pahl was aware of prior art material to the invention. *Id.*

37. Mr. Vorbeck testified that it was an "exceptional" case for a Director, such as Dr. Pahl, to lie on this form. (Ex. M, Vorbeck Dep., at 104:20-106:17.)

38. Based on the Invention Disclosure form, Braun submitted a patent application to the German patent office, falsely listing Mr. Braun as the sole inventor. (Ex. 21, Braun German patent No. DE 44 02 238.7).

39. Mr. Klauer knew that Dr. Pahl was an inventor of the cleaning system. (Ex. H, Hoser Dep. at 110:14-19.)

40. Mr. Klauer was aware of the duty of disclosure in the United States. (Ex. M, Vorbeck Dep., at 46:1-8.)

41. Mr. Klauer signed inventorship oaths in the past on patents that were filed and issued prior to the '328 patent. He is listed as the inventor on three other U.S. patents. (*See* Ex. 3, U.S. Patent No. 3,989,071 (filed May 1974), Ex. 4, U.S. Patent No. 4,015,151 (filed October 1975), and Ex. 27, U.S. Patent No. 5,704,126 (filed September 1995).)

42. Dr. Pahl signed inventorship oaths in the past on patents that were filed and issued prior to the '328 patent. He is a named inventor on four other United States patents. Two of these patents were filed earlier than the '328 patent. (Ex. J, Pahl Dep., at 121:6-127:17.)

43. Mr. Braun signed inventorship oaths in the past on patents that were filed and issued prior to the '328 patent. He is a named inventor on several other United States patents, including patents on which he was named as a co-inventor. (Ex. K, Braun Dep., at 149:8-150:9.)

44. Mr. Klauer assisted in the prosecution of the German patent application, which ultimately issued as DE 44 02 238.7. (Ex. K, Braun Dep., at 118:8-12.)

5

45. Mr. Klauer, along with Braun's United States patent counsel, Fish & Richardson, also participated in the prosecution of Braun's U.S. patent application. (Ex. M, Vorbeck Dep., at 19:3-19:18; *see also* Ex. 28, B001157, 58.)

46. As required by U.S. statute, Mr. Braun signed an oath when the '328 patent application was filed with the USPTO, in which he falsely stated that he was the "original, first, and sole inventor…of the subject matter which is claimed and for which a patent is sought…." (*See* Ex. 29, Inventorship Oath for the '328 patent.)

47. Mr. Braun admitted that when he signed the inventorship oath, he knew that Dr. Pahl was an inventor. (Ex. K, Braun Dep., at 112:7-15; 157:2-24.)

48. Supported by Mr. Braun's false oath, the '328 patent issued on January 27, 1998. (*See* Ex. 1, U.S. Pat. No. 5,711,328.)

49. Under German law, if a patented invention is commercialized, it is required that the inventor be compensated commensurate with the sales of the patented product. (*See* Ex. J, Pahl Dep., at 118:24-119:17, 121:9-122:14.)

50. A sole inventor is entitled to more money from a successful invention than if they have to share credit with a co-inventor. (*See* Ex. M, Vorbeck Dep., at 88:11-89:22.)

51. Based on German law, Mr. Braun, as the sole inventor listed on the German and U.S. patents has been paid approximately € 40,000 by Braun. (*Id.*, at 36:7-11.)

## Price Erosion

52. The first product embodying the invention claimed by the '328 Patent, Braun's Syncro System, a cleaning device for a foil shaver, was launched in the United Stats through a subsidiary of Braun's parent company, The Gillette Company ("Gillette"), in July 2000. (*See* Ex. D, David Expert Report, at 4.)

53. Braun subsequently developed two lower priced models, the Flex 400 (in 2002), and Flex 700 (in 2003), and a higher priced, "premium" model, the Activator (in 2004). (*Id.*)

54. Rayovac introduced the Titanium Smart System, a cleaning device for a rotary shaver (the R-9500), in October 2003. Subsequently, in August 2004, Rayovac launched a Titanium Smart System for foil shavers (the MS-5500 and MS-5700). (*Id.*)

55. On September 24, 2004, Rayovac served its First Set of Interrogatories on Braun, asking, Interrogatory No. 6, which asked Braun to provide its damages contentions. (*See* Ex. 8, Braun's Answer to Remington's First Set of Interrogatories, at 7.) Braun refused to answer, claiming that Rayovac's inquiry was premature. (*Id.* at 8.)

56. Braun admits, as it must, that it only seeks to collect its damages, and not those of its parent company, Gillette. (*See* Ex. 32, Plaintiff's Answers to Defendants' Second Set of Interrogatories, at 8.)

57. On March 30, 2005, Rayovac moved to compel Braun to supplement its deficient discovery responses. (*See* Ex. 9, Rayovac Corporation's Memorandum in Support of its Motion to Compel). On April 27, 2005, this Court granted Rayovac's motion. (*See* 4/27/05 Order Regarding Docket No. 54.)

58. Braun has not supplemented its response to Interrogatory No. 6, choosing instead to rely on Dr. David's expert report for Braun's damages contentions. (*See* Ex. 22, Braun's Supplemental Responses to Remington's Second Set of Interrogatories, Nos. 17-19.)

59. Redacted.

60. Redacted.

61. Redacted.

62. Redacted.

63. Redacted.

64. Redacted.

65. Redacted.

66. Redacted.

67. Redacted.

### Written Description

68. Samuel Phillips has opined that the sole explicit written description in the '328 patent specification for a "cradle structure" corresponds with a structure that receives and retains cleaning fluid. (Ex. A, First Phillips Report, at ¶ 51.)

69. Dr. Samir Nayfeh does not dispute that the sole explicit written description in the '328 patent specification for a "cradle structure" corresponds with a structure that receives and retains cleaning fluid. (Ex. 15, Second Nayfeh Report.)

70. Prior to the filing date of the '328 patent, Gebhard Braun did not conceive of a "cradle structure" that received, but did not retain cleaning fluid. (Ex. K, Braun Dep., at 73-75.)

71. Prior to the filing date of the '328 patent, Dr. Dietrich Pahl did not conceive of a "cradle structure" that received, but did not retain cleaning fluid. (Ex. J, Pahl Dep., at 80-81.)

72. Gebhard Braun never attempted to develop a cleaning system in which the shaver was sprayed with cleaning fluid as opposed to being bathed with cleaning fluid. (Ex. K, Braun Dep., at 73-75.)

73. Gebhard Braun never tested his cleaning system in a situation where there was no cleaning fluid retained in the "cradle structure." (*Id.*)

7

74. When Gebhard Braun worked on the cleaning system described in the '328 patent, he believed that a cleaning device lacking a "cradle structure" that retained fluid would not function. (*Id.*)

75. When Dr. Dietrich Pahl worked on the cleaning system described in the '328 patent, he believed that a cleaning device lacking a "cradle structure" that retained fluid would not function. (Ex. J, Pahl Dep., at 80-81.)

76. Gebhard Braun testified that a cleaning system without a "cradle structure" that retains cleaning fluid is no different than no cleaning system at all. (Ex. K, Braun Dep., at 73-75.)

77. Gebhard Braun described his alleged invention in an internal Invention Disclosure as "a specially configured trough (1) into which the shaver (2) is immersed upside down." (Ex. 19, Braun Invention Disclosure Record.)

78. According to Dr. Pahl, the most important thing for a good cleaning result in the cleaning system described in the '328 patent is that the cutter block is immersed in liquid in the "cradle structure." (Ex. J, Pahl Dep., at 80-81.)

79. Juergen Hoeser took over the work on the cleaning device from Braun/Pahl in approximately July 1995. (Ex. H, Hoeser Dep., at 19-20.)

80. At or near 1995, Mr. Hoeser described the work of Mr. Braun and Dr. Pahl as a "chicken trough" based upon his recollection of a tub filled to the rim with water on a farm to feed chickens. (*Id.*, at 24-25.)

81. Mr. Hoeser testified that he is the only individual at Braun to think of a cleaning device in which a "cradle structure" does not retain fluid. (*Id.*, at 97-98.)

82. Dr. Nayfeh asserts that "Dr. Pahl testified that he conceived of a cleaning system wherein liquid was not retained by the cradle, but was flushed through the shaver head." (Ex. J, Second Nayfeh Report, at 27.)

83. Dr. Pahl never testified that he conceived of a cleaning system in which fluid is flushed through the shaver head. (Ex. J, Pahl Dep., at 80-81.)

84. Regardless of how cleaning fluid reaches the "cradle structure" in the '328 patent (be it pumping or spraying), it is essential that the "cradle structure" retain cleaning fluid for the cleaning device to work. (Ex. J, Pahl Dep., at 80-81.)

85. Dr. Nayfeh does not disagree with Mr. Phillips' opinion that the '328 patent does not describe a "cradle structure" that receives (but does not retain) cleaning fluid. (Ex. 15, Second Nayfeh Report.)

86. The '328 patent was filed in January 1995. (Ex. 1, '328 patent.)

8

87. Dependent claim 2 of the '328 patent depends from independent claim 1. (Ex. 1, '328 patent.)

88. Unasserted dependent claim 2 provides: "A device as claimed in claim 1, wherein a cross-sectional area of the outlet port is dimensioned such that during the cleaning operation the amount of cleaning fluid drained through the outlet port is smaller than the amount of cleaning fluid supplied to the cradle structure by the feeding device." (Ex. 1, '328 patent.)

89. Braun amended dependent claim 2 — application claim 9 — of the '328 patent during prosecution of the '328 patent. (Ex. 23, '328 patent prosecution history, 6/24/96 Response.)

90. Braun amended claim 1 of the '328 patent during prosecution. (Ex. 24, '328 patent prosecution history, 8/14/97 Response.)

91. Mr. Phillips has opined that the '328 patent is indefinite pursuant to 35 U.S.C. § 112, ¶ 2. (Ex. A, First Phillips Report, at ¶¶ 41-49.)

92. It is Mr. Phillips' opinion that one of ordinary skill in the art could not reconcile the Court's tentative claim construction with the '328 patent prosecution history. (*Id.*, at ¶¶ 41, 42, 49.)

93. Mr. Phillips has opined that the Court's construction of the "cradle structure" limitation should be modified to read "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive and retain fluid." (Ex. B, Second Phillips Report, at ¶ 32, n. 4.)

94. In its *Markman* Briefing, Braun relied upon a definition of the word "cradle" in the McGraw-Hill Dictionary of Scientific and Technical Terms.

95. In the '328 patent, the cradle (7) is referred to as the "wet portion." (Ex. 1, '328 patent, at col. 6, ll. 29-30.)

96. In the '328 patent, the cradle includes an overflow device (26) which prevents fluid from exceeding a defined level and ensures that the shaving head is immersed in cleaning fluid. (Ex. 1, '328 patent, at col. 6, ll. 35-38.)

97. In the '328 patent, the outlet port is dimensioned such that the "cradle," when supplied with cleaning fluid from the pump, is at all times filled to the rim during the cleaning operation. (Ex. 1, '328 patent, at col. 6, ll. 44-50.)

## Anticipation

98. Braun has asserted that the '328 patent was conceived and reduced to practice in the 1992-93 time frame. (Ex. 8, Braun Response to Rayovac Interrogatory No. 2.)

99. U.S. Patent No. 3,365,267 ("the MeKiney Patent") issued on January 23, 1968. (Ex. 5, '267 patent.)

100. Mr. Phillips has opined, and Dr. Nayfeh does not disagree that the MeKiney Patent discloses many elements of claim 11 of the '328 patent. (Ex. A, First Phillips Report, at ¶¶ 1-2-108; Ex. 15, Second Nayfeh Report; Ex. C, Third Phillips Report, at ¶¶ 90-96.)

101. The MeKiney Patent discloses a "cleaning fluid container," as tentatively construed by the Court. (Ex. 5, '267 patent, at col. 2, l. 43, Figs. 1 & 3; Ex. A, First Phillips Report, at ¶ 105.)

102. The MeKiney Patent discloses a "feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure," as tentatively construed by the Court. (Ex. 5, '267 patent, at Figs. 1 & 3; Ex. A, First Phillips Report, at ¶ 106.)

103. The MeKiney Patent discloses a "cleaning fluid container," as tentatively construed by the Court. (Ex. 5, '267 patent, at Figs. 1 & 3; Ex. A, First Phillips Report, at ¶105.)

104. Tank 12 and shelf 44 of the MeKiney Patent are both arranged above a fluid level of the cleaning fluid in said cleaning fluid during feeding of said cleaning fluid to the tank 12 and shelf 44. (Ex. 5, '267 patent, at Figs. 1-3; Ex. A, First Phillips Report, at ¶¶102-108.)

105. Tank 12 in the MeKiney Patent is a structure. (Ex. 5, '267 patent, at Figs. 1-3; Ex. A, First Phillips Report, at 102-108.)

106. Tank 12 in the MeKiney Patent both receives and supports razor 42. (Ex. 5, '267 patent, at Figs. 1 & 3; Ex. A, First Phillips Report, at ¶¶ 109-112.)

107. Razor 42 in the MeKiney Patent is a shaving apparatus. (Ex. 5, '267 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶104.)

108. During cleaning, tank 12 of the MeKiney Patent is filled with cleaning fluid. (Ex. 5, '267 patent, at col. 2, l. 43; Ex. A, First Phillips Report, at ¶105.)

109. Tank 12 of the MeKiney Patent is able to both receive and retain cleaning fluid. (Ex. 5, '267 patent, at Figs. 1-3; Ex. A, First Phillips Report, at 102-112.)

110. During prosecution of what became unasserted claim 1 of the '328 patent, the Patent Examiner found that tank 12 of the MeKiney Patent is a "cradle structure" in rejecting application claim 1. (Ex. 24, '328 patent prosecution history, 5/15/97 Office Action.)

111. Braun never disputed that argument, and instead amended the "cradle structure" limitation in application claim 1. (Ex. 25, '328 patent prosecution history, 7/18/97 Interview Summary; Ex. 20, '328 patent prosecution history, 8/14/97 Response.)

112. Shelf 44 of the MeKiney Patent is a part of tank 12. (Ex. 5, '267 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶ 84.)

113. Shelf 44 of the MeKiney Patent is a structure. (Ex. 5, '267 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶ 84.)

114. Shelf 44 of the MeKiney Patent is specifically adapted to support clipper blades. (Ex. 5, '267 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶ 84.)

115. The clipper blades in the MeKiney Patent are the head of an electric hair clipper. (Ex. 5, '267 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶¶ 83-84.)

116. The electric hair clipper of the MeKiney Patent is a shaving apparatus. (Ex. 5, '267 patent, at Figs. 1 & 3; Ex. A, First Phillips Report, at ¶ 84.)

117. The claims of U.S. Patent No. 5,649,556 ("the '556 patent") explicitly require a "dry shaving apparatus." (Ex. 5, '556 patent.)

118. The claims of the '328 patent do not explicitly require a "dry shaving apparatus." (Ex. 1, '328 patent.)

119. The claims of the '328 patent only explicitly require a "shaving apparatus." (Ex. 1, '328 patent.)

120. The words "assembled," "disassembled," "assembly," and "disassembly" do not even appear in the '328 patent. (Ex. 1, '328 patent.)

121. The MeKiney Patent discloses a siphon tube 24. (Ex. 5, '267 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶ 108.)

122. Following the cleaning of barbers' tools, the siphon tube 24 of the MeKiney Patent acts as device that drains fluid from tank 12 and shelf 44. (Ex. 5, '267 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶ 108.)

123. In Figure 1 of the MeKiney Patent, shelf 34 and slot 38 function to support the razor 42 received in tank 12. (Ex. 5, '267 patent, at col. 3, ll. 37-37; Ex. A, First Phillips Report, at ¶ 112.)

124. Mr. Phillips opines that magnets 46 in the MeKiney Patent function as a bracket. (Ex. A, First Phillips Report, at ¶¶111-112.)

125. Dr. Nayfeh concedes that a "shelf may be considered a bracket or a projecting support." (Ex. 15, Second Nayfeh Report, at 13.)

126. Dr. Nayfeh concedes that shelf 34 supports razor 42. (Ex. 15, Second Nayfeh Report, at 13.)

127. U.S. Patent No. 2,976,552 ("the Loeffler Patent") issued on March 28, 1961. (Ex. 7, '552 patent.)

11

128. In the Loeffler Patent, a hair clipper is held in a "cradle" and cleaned, *inter alia*, by a sterilizing fluid held in a spray can. (Ex. 7, '552 patent; Ex. A, First Phillips Report, at ¶¶ 134-140.)

129. Mr. Phillips has opined, and Dr. Nayfeh does not disagree that the Loeffler Patent discloses many elements of claim 14 and 18. (Ex. A, First Phillips Report, at ¶¶ 134-140; Ex. C, Third Phillips Report, at ¶¶ 129-139; Ex. 15, Second Nayfeh Report.)

130. The Loeffler Patent discloses "a cradle structure adapted to receive a shaving head of a shaving apparatus, said cradle structure being permanently open atmosphere." (Ex. 7, '552 patent, at Fig. 1; Ex. A, First Phillips Report, at ¶¶ 132-140.)

131. The Loeffler Patent discloses a conventional spraying can 60 containing sterilizing fluid. (Ex. 7, '552 patent, at Fig. 1; Ex. A, First Phillips Report, at ¶¶ 132-140.)

132. Dr. Nayfeh uses the terms "sterilizing fluid" and "cleaning fluid" synonymously in his Second Expert Report. (Ex. 15, Second Nayfeh Report, at 11.)

133. Washing by spraying in the Loeffler Patent is a cleaning process. (Ex. C, Third Phillips Report, at ¶¶ 132-140.)

134. The cleaning fluid that Gebhard Braun and Dietrich Pahl used in the development of their cleaning device came from Braun spray cans. (Ex. J, Pahl Dep., at 36.)

135. The Loeffler Patent discloses that spraying can 60 is at the top thereof provided with a conventional, depressible valve 75 having the usual spray opening at one side thereof. (Ex. 7, '552 patent, at Fig. 1; Ex. A, First Phillips Report, at ¶¶ 132-140.)

136. When valve 75 is depressed, the "cradle structure" and clipper head are sprayed with fluid. (Ex. 7, '552 patent, at Fig. 1; Ex. A, First Phillips Report, at ¶¶ 132-40.)

137. The Loeffler Patent states that depressing valve 75 "force[s] a powerful spray of disinfectant against the clipper head[.]" (Ex. 7, '552 patent, at col. 3, ll. 15-18; Ex. A, First Phillips Report, at ¶¶ 132-140.)

138. Dr. Pahl testified that spraying fluid and pumping fluid are effectively the same thing. (Ex. J, Pahl Dep., at 80.)

139. Forcing a spray of fluid in the Loeffler Patent constitutes moving fluid from the can 60 to the cradle. (Ex. C, Third Phillips Report, at ¶¶ 129-139.)

140. In the Loeffler Patent, before the clipper head is cleaned, spraying can 60 is tilted downward. (Ex. 7, '552 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶¶ 132-140.)

141. By tiling the can in the Loeffler Patent, the level of cleaning fluid in the can would be below the "cradle structure" during feeding. (Ex. A, First Phillips Report, at ¶¶ 132-140.)

142. The Loeffler Patent discloses that over time the amount of fluid in the can will decrease, and the spray can will need to be replaced. (Ex. 7, '552 patent, at Fig. 1; Ex. A, First Phillips Report, at ¶¶ 132-140.)

143. In the Loeffler Patent, the level of cleaning fluid in the spraying can 60 would be below the "cradle structure" during at least some of the device's operation. (Ex. 7, '552 patent, at Fig. 1; Ex. A, First Phillips Report, at ¶¶ 132-140.)

144. U.S. Patent No. 3,478,758 ("the Davies Patent") issued on November 18, 1969. (Ex. 6, '758 patent.)

145. Mr. Phillips has opined, and Dr. Nayfeh does not disagree that the Davies Patent discloses many elements of claims 11 and 12. (Ex. A, First Phillips Report, at ¶¶ 113-121; Ex. 15, Second Nayfeh Report; Ex. C, Third Phillips Report, at ¶¶ 102-117.)

146. The Davies Patent discloses that "implement positioning means 20 comprises a perforated tray 74 for holding an implement to be washed and sterilized and locating the instrument in its aforementioned washing and sterilizing positions." (Ex. 6, '758 patent, at col. 4, ll. 34-36; Ex. A, First Phillips Report, at 113-121.)

147. While the Davies Patent cleaning system describes cleaning many "implements," the one object to be cleaned explicitly disclosed is a hair clipper. (Ex. 6, '758 patent, at col. 5, l. 75; Ex. A, First Phillips Report, at ¶114.)

148. Braun has argued that brushes are often not suitable for cleaning the head of a shaving apparatus. (Ex. 8, Braun Response to Remington's First Set of Interrogatories.)

149. Dr. Nayfeh admits that tray 74 of the Davies Patent is a basket. (Ex. 15, Second Nayfeh Report, at 5.)

150. Tray 74 of the Davies Patent is a structure. (Ex. 6, '758 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶¶ 113-121.)

151. Tray 74 of the Davies Patent receives cleaning fluid. (Ex. 6, '758 patent, at Fig. 4; Ex. A, First Phillips Report, at ¶¶ 113-121.)

152. Dr. Nayfeh concedes that tray 74 can both receive and support clipper blades. (Ex. 15, Second Nayfeh Report, at 5-6.)

153. Tray 74 of the Davies Patent can both receive and support clipper blades. (Ex. 6, '758 patent, at Fig. 3 & 4; Ex. A, First Phillips Report, at ¶¶ 113-121.)

154. In one embodiment of the Davies Patent, fluid rises from container 12 up to the tray 74 for cleaning. (Ex. 6, '758 patent, at Fig. 3 & 4; Ex. A, First Phillips Report, at ¶¶ 113-121.)

155. In the Davies Patent, water is fed from an external source through fitting 80 into container 12. (Ex. 6, '758 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶¶ 113-121.)

156. The Davies Patent states that "[t]he liquid 14 is initially fed to the container 12, through the fitting 80, until the liquid level rises above the implement on the tray." (Ex. 6, '758 patent, at col. 3, ll. 53-63; Ex. A, First Phillips Report, at ¶¶ 113-121.)

157. It is Mr. Phillips' opinion that both the ordinary artisan and lay people regularly use a hose and a water tap to "feed" water[.]  (Ex. C, Third Phillips Report, at ¶¶ 113-121.)

158. The Davies Patent discloses that tray 74 is above the level of cleaning fluid in container 12 prior to cleaning.  (Ex. 6, '758 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶¶ 113-121.)

159. The Davies Patent discloses a "drying device."  (Ex. 6, '758 patent, at Fig. 4; Ex. A, First Phillips Report, at ¶¶ 113-121.)

160. The Davies Patent discloses a "drying device" comprising an "impeller."  (Ex. 6, '758 patent, at Fig. 4; Ex. A, First Phillips Report, at ¶¶ 113-121.)

161. The Davies Patent discloses a "cleaning fluid container."  (Ex. 6, '758 patent, at Fig. 3; Ex. A, First Phillips Report, at ¶¶ 113-121.)

DATED: August 22, 2005                     DWYER & COLLORA LLP

By:   /s/ Kevin S. Ueland_____
Mark A. Pals (admitted *pro hac vice*)
James A. Shimota (admitted *pro hac vice*)
Kevin S. Ueland (admitted *pro hac vice*)
James B. Coughlan (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Aon Center
200 E. Randolph Dr.
Chicago, IL 60601
(312) 861-2000
Facsimile: (312) 861-2200

Joseph E. Haviland (BBO #643814)
Dwyer & Collora LLP
600 Atlantic Avenue
Boston, MA  0210-1122
(617) 371- 1000
Facsimile: (617) 371-1037

Attorneys for Defendant
Rayovac Corporation