# **EXHIBIT 7**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRAUN GmbH,

          Plaintiff,

        v.

REMINGTON PRODUCTS COMPANY,
LLC,

          Defendant.

Civil Action No. 03-CV-12428 (WGY)

## DECLARATION OF GEBHARD BRAUN

I, GEBHARD BRAUN, declare under penalty of perjury under the laws of the United States of America as follows:

1. I submit this Declaration in support of Braun's Motion to Correct Inventorship.

2. I am the named inventor on U.S. Patent Nos. 5,711,328 and 5,649,556 (collectively, the "patents-in-suit").

3. From 1968 until I retired in 1995, I was an employee of Plaintiff Braun GmbH, and its predecessor Braun Aktiengesellschaft. I will use the term "Braun" to refer to both entities.

4. From 1992 to 1995, I worked under the supervision of Dr. Dietrich Pahl, Director of Research and Development for shavers in Braun's Product Development Group.

5. In 1992, Dr. Pahl asked me to develop further a device for cleaning dry shavers (the "cleaning center") that he had been developing. He showed me technical drawings, functional models and a prototype of the cleaning center.

6. From 1992 until my retirement in 1995, I worked to develop and improve the cleaning center.

7. On July 22, 1993, I filed an internal invention disclosure for a device to clean dry shavers with the Patent Department at Braun. The internal invention disclosure described

Dr. Pahl's cleaning center as well as certain of the improvements that I had developed under Dr. Pahl's supervision. I attached to this declaration a copy of the internal invention disclosure as Exhibit A, as well as a certified translation as Exhibit B. On September 15, 1993, I filed an invention disclosure addendum. I attach to this declaration a copy of the addendum as Exhibit C, as well as a certified translation as Exhibit D.

8.    With Dr. Pahl's approval, the internal invention disclosure named me as the sole inventor of the device to clean dry shavers.

9.    On January 26, 1994, Braun filed German patent applications based on the internal invention disclosure, naming me as the sole inventor.

10.    In January of 1995, Braun filed two applications in the United States based on the German patent applications and my internal invention disclosure. I retired from Braun shortly thereafter, and I was minimally involved in the prosecution of the U.S. patent applications. Consistent with the inventorship listed on the corresponding German patent applications, I signed an Inventor's Declaration as the sole inventor of the patents-in-suit.

11.    At the time I signed the Inventor's Declaration for the U.S. patent applications, I was not aware of any differences between German and U.S. patent laws.

12.    Based on his development of the cleaning center and his subsequent collaboration with me while he was my supervisor, I believe that Dr. Pahl is a co-inventor with me on the patents-in-suit.

13.    I do not object to amending the inventorship of the patents-in-suit to add Dr. Pahl as a co-inventor to the patents-in-suit.

14.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July [*14*], 2004
Kelkheim, Germany

Gebhard Braun
Spessartstr. 18, D-65779
Kelkheim, Germany

IM BEZIRKSGERICHT DER VEREINIGTEN STAATEN
FÜR DEN BEZIRK MASSACHUSETTS

|  |  |
|---|---|
| BRAUN GmbH,<br><br>            Klägerin,<br><br>            gegen<br><br>REMINGTON PRODUCTS COMPANY,<br>LLC,<br><br>            Beklagte. | Zivilklage Nr. 03-CV-12428 (WGY) |

## ERKLÄRUNG VON GEBHARD BRAUN

Ich, GEBHARD BRAUN, versichere Folgendes bei Strafe wegen Meineid gemäß den Gesetzen der Vereinigten Staaten von Amerika:

1.   Ich gebe diese Erklärung zur Unterstützung des Antrags der Fa. Braun auf Berichtigung der Erfinderschaft ab.

2.   Ich bin der benannte Erfinder in den US-Patenten Nr. 5,711,328 und 5,649,556 (gemeinsam die „klagegegenständlichen Patente").

3.   Von 1968 bis zu meiner Pensionierung im Jahr 1995 war ich bei der Klägerin, der Fa. Braun GmbH, und ihrer Vorgängergesellschaft, der Braun Aktiengesellschaft, beschäftigt. Ich verwende den Begriff „Braun" im Hinblick auf beide Unternehmen.

4.   Von 1992 bis 1995 war ich unter der Leitung von Dr. Dietrich Pahl, Leiter der Forschung und Entwicklung von Rasierapparaten in der Produktentwicklungsgruppe von Braun, tätig.

5.   1992 beauftragte Dr. Pahl mich damit, eine Vorrichtung zur Reinigung von Trockenrasierern (der Reinigungsstation) weiterzuentwickeln, mit deren Entwicklung er

begonnen hatte. Er zeigte mir technische Zeichnungen, Funktionsmodelle und einen Prototyp der

Reinigungsstation.

     6.   Von 1992 bis zu meiner Pensionierung im Jahr 1995 arbeitete ich an der

Entwicklung und Verbesserung der Reinigungsstation.

     7.   Am 22. Juli 1993 reichte ich bei der Patentabteilung von Braun eine interne

Offenlegungsschrift ein. Die interne Offenlegungsschrift beschrieb Dr. Pahls Reinigungsstation

sowie bestimmte Verbesserungen, die ich mit Dr. Pahl als Vorgesetztem entwickelt hatte. Ich

füge dieser Versicherung eine Kopie der internen Offenlegungsschrift als Beleg A sowie eine

beglaubigte Übersetzung derselben als Beleg B bei. Am 15. September 1993 reichte ich einen

Anhang zu der Offenlegungsschrift ein. Ich füge dieser Versicherung eine Kopie des Anhangs

als Beleg C sowie eine beglaubigte Übersetzung derselben als Beleg D bei.

     8.   Mit Dr. Pahls Zustimmung benannte die interne Offenlegungsschrift mich als den

alleinigen Erfinder der Vorrichtung zur Reinigung von Trockenrasierern.

     9.   Am 26. Januar 1994 meldete Braun auf der Grundlage der internen

Offenlegungsschrift deutsche Patente an und benannte mich dabei als den alleinigen Erfinder.

     10.   Im Januar 1995 meldete Braun auf der Grundlage der deutschen

Patentanmeldungen und meiner internen Offenlegungsschrift zwei US-Patente an. Ich ging kurz

danach von Braun weg in den Ruhestand und war kaum an der Durchsetzung der US-

Patentanmeldungen beteiligt. Im Einklang mit der in den entsprechenden deutschen

Patentanmeldungen aufgeführten Erfinderschaft unterzeichnete ich die „Erklärung des Erfinders"

als alleiniger Erfinder der klagegegenständlichen Patente.

11.    Zu dem Zeitpunkt, wo ich die „Erklärung des Erfinders" für die US-Patentanmeldungen unterzeichnete, besaß ich keinerlei Kenntnisse über etwaige Unterschiede zwischen dem deutschen und dem US-Patentrecht.

12.    Auf der Grundlage seiner Entwicklung der Reinigungsstation und seiner nachfolgenden Zusammenarbeit mit mir als mein Vorgesetzter bin ich der Meinung, dass Dr. Pahl bezüglich der klagegegenständlichen Patente zusammen mit mir Miterfinder ist.

13.    Ich erhebe keinen Einspruch gegen die Ergänzung der Erfinderschaft der klagegegenständlichen Patente dahingehend, dass Dr. Pahl als Miterfinder der klagegegenständlichen Patente benannt wird.

14.    Ich erkläre bei Strafe wegen Meineid gemäß den Gesetzen der Vereinigten Staaten von Amerika, dass das oben Gesagte wahr und richtig ist.

Ausgefertigt am [ _16_ ]. Juli 2004
in Kelkheim

_Gebhard Braun_ (signature)

Gebhard Braun
Spessartstr. 18
D-65779 Kelkheim
Bundesrepublik Deutschland

9473194                                          -3-

A

# Erfindungsmeldung an Patentabteilung

Bitte mit Schreibmaschine ausfüllen

**BRAUN**

Braun Form 101407-89

Patentabteilung
Eing. 2.2. JULI 1993
Vorlage
Frist

| | Eing. | INA-Frist | Roller-Nr. | Bearbeiter | Telefon |
|---|---|---|---|---|---|
| | 2 2. JULI 1993 | | 5818 | H. D. Maier | 2388 |

**Titel oder Kurzbezeichnung der Erfindung**

Rasierer-Reinigungsgerät

| | Vor- und Zuname ggfs. mit genauer Titelangabe (z.B. Dr.-Ing., Dipl.-Phys., Ing.-grad) | Funktion im/ Unternehmen (z.B. Sachbearbeiter, Abteilungsleiter) | Abteilung, Telefon | Beanstandungs-Frist | INA-Frist | Personal-Nr. | Privatanschrift Postleitzahl, Ort, Straße | Erfin-dungs-Anteil, in % ¹) ²) |
|---|---|---|---|---|---|---|---|---|
| Erfin-der | Ing.-grad. Gebhard Braun | Konstrukteur | 22.9.93 | 22.11.93 | 1440. 00098 | Spessartstraße 18 65779 Kelkheim | |
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |

Bitte erläutern Sie Ihre Erfindung, indem Sie zu folgenden Punkten in der angegebenen Reihenfolge auf Blatt 2 Stellung nehmen:

1. Ausführliche schriftliche Darstellung der Erfindung (genaue Angabe der Merkmale der Erfindung) anhand beigefügter Skizzen, Zeichnungen o.ä.

2. Vorteile, die mit der Erfindung erreicht werden können.

3. Bei welchem Produkt (genaue Bezeichnung) kann die Erfindung angewendet werden?

4. Von welchem bekannten betriebseigenen oder fremden Stand der Technik geht die Erfindung aus? Angabe von Produkten, Literaturstellen, Druckschriften, Zeichnungen u.ä.

5. Nachteile des unter 4. auf geführten Standes der Technik. Aufgabe der Erfindung.

6. Erteilte Weisungen bzw. Auftrag (z.B. genaue Bezeichnung des Projektauftrages).

¹) Hiermit wird versichert, daß alle Angaben nach bestem Wissen gemacht wurden und daß keine weiteren Erfinder am Zustandekommen der Erfindung beteiligt waren.

²) gdfs. nach Merkmalen der Erfindung auf die Erfinder aufgeteilt.

²) Enthält diese Spalte keine Eintragungen, so werden die Erfindungsanteile zu gleichen Teilen auf die Erfinder aufgeteilt.

| | Datum | Unterschrift |
|---|---|---|
| Erfinder 1 | 22.9.93 | Gebhard Braun |
| Erfinder 2 | | |
| Erfinder 3 | | |
| Erfinder 4 | | |
| Erfinder 5 | | |

Patentabteilung

Anlage zur Erfindungsmeldung Rasierer-Reinigungsgerät

Punkt 1

Die Erfindung betrifft ein Reinigungsgerät für Rasierer, welches eine weitgehend automatisch ablaufende, hygienische Scherkopf-Reinigung ermöglicht.

Nach der Rasur kann das Gerät komplett ohne weitere Vorbereitung in den Reiniger gesteckt werden, wo es nach Starten des Reinigungsprogramms vollautomatisch gereinigt und für die nächste Rasur getrocknet wird. Das Gerät kann im Reiniger bleiben, der so zusätzlich die Funktionen von Wandhalter und Ladegerät erfüllt. *neu*

Das Reinigungsprinzip beruht auf der Erkenntnis, daß sich der Scherkopf eines Elektrorasierers ohne Demontage selbst reinigt, wenn er laufend in eine geeignete Reinigungsflüssigkeit getaucht wird. Der im Rasierkopf angesammelte Haarstaub, z. T. festgebacken an verschiedenen Stellen im Schneidsystem, wird durch die mit hoher Frequenz in der Reinigungsflüssigkeit oszillierenden Scherteile gelöst und durch die Öffnungen - insbesondere der Scherfolie - in die Flüssigkeit gespült.

Für die automatische Reinigung ist dafür zu sorgen, daß die gut fettlösende Flüssigkeit laufend erneuert wird und dabei immer in ausreichender Höhe über den Messerköpfen steht.

Die erfindungsgemäße Ausführung sieht vor, den Reinigungsprozeß in einer speziell gestalteten Wanne (1) durchzuführen, in die der Rasierer (2) kopfüber eintaucht. Die Wanne ist noch leer und trocken, der Rasierer ausgeschaltet. Er kann so auch zur Aufbewahrung deponiert werden.

Der Start des Reinigungsvorganges wird durch Drücken des Versorgungsknopfes (3) eingeleitet, durch den der Rasierer mit Betriebs- und Ladestrom versorgt wird. Er wird von einer im Reinigungsgerät eingebauten Elektronik (4) eingeschaltet, die über eine regelbare Zeitautomatik auch die Pumpe (5) schaltet: Reinigungsflüssigkeit wird aus dem integrierten Vorratsbehälter (6) durch einen Filter in die Reinigungswanne gepumpt, in welcher der laufende Rasierer sich auf die beschriebene Weise reinigt. Ein entsprechend dimensionierter Überlauf (7) sichert nach kurzer Pumpenlaufzeit den notwendigen Füllstand, kleine Auslaufbohrungen (8) am Wannenboden ermöglichen das Ablaufen der Restflüssigkeit nach Beendigung der Reinigung. *sowie während d. Reinigung* *neu*

Bevor der Rasierer jetzt entnommen werden kann, wird er von dem eingebauten (Heiz-)Lüfter (9) getrocknet. Eine Sicherheitsschaltung verhindert die vorzeitige Entnahme, um sicherzustellen, daß keine Restfeuchtigkeit in das Geräteinnere gelangen kann. *neu*

Die verunreinigte Flüssigkeit wird von der Reinigungswanne in einen Filterschlauch (10) geleitet, der durch die (gereinigte) Vorratsflüssigkeit zur Pumpe führt, von der sie direkt durch den Filter (11) wieder zur Reinigungswanne gepumpt wird. Durch geeignete Fließwegegestaltung, Pumpenlaufzeit und -Durchsatz kann sichergestellt werden, daß sich nach Beendigung des Reinigungsprozesses das Reinigungsgefäß und die ableitenden Flüssigkeitswege sowie der gesamte Flüssigkeitsvorrat jeweils in sauberem Zustand befinden; es gibt keinen Schmutz-bereich im Gerät außer dem Filter.

- 2 -

Dies wird durch die Verwendung des Filterschlauches erreicht, der einerseits die gelösten Schmutzpartikel zur Saugseite (12) der Pumpe führt, ohne die Vorratsflüssigkeit zu verschmutzen, gleichzeitig dieser aber ermöglicht, durch die Schlauchwandung zur Pumpen-Saugseite zu gelangen.                                                                  *Filter*

Dieser Kunstgriff ermöglicht eine optimale Reinigung mit Filter auf der Pumpendruckseite (13) und gleichzeitig einen stets sauberen Flüssigkeitsvorrat. + *Flüssigkeitsvorratsbehälter*

Ein positiver Begleiteffekt des Systems ist die automatische Reinhaltung auch der Filter-schlauchinnenseite durch den Flüssigkeitsübertritt von außen zum Schlauchinneren.

Punkt 2

Das Reinigungsgerät ersetzt die unangenehme, staubige Handreinigung durch eine zeit-sparende, hygienische Naßreinigung, die den Rasierer - was die Schneidsystem-Sauberkeit anbelangt - mühelos in einen annähernd neuwertigen Zustand versetzt.

Dabei wird das Reinigungsmittel sparsam verwendet, immer wieder gereinigt, und die Schmutzteilchen im Filter gesammelt. Der in kompakter Form im Filter deponierte Rasier-staub kann bequem und hygienisch in größeren Zeitabständen entsorgt werden.

Punkt 3

Ein Reinigungsgerät nach diesem Prinzip ist grundsätzlich für jeden Trockenrasierer mach-bar. Die beschriebenen Automatikfunktionen setzen aber einen elektronisch zu schaltenden Rasiererschalter voraus, der in den betreffenden Rasierertyp einzubauen ist. Vorzugsweise sind also Neuentwicklungen geeignet, reinigertauglich ausgerüstet zu werden.

Besonders vorteilhaft ist die Automatikreinigung für die zunehmend filigraneren und auf-wendigeren Schwingkopfrasierer der neuesten und zukünftigen Rasiererentwicklungen. Sie ermöglicht den Kunden einen problemlosen Umgang mit diesen unseren hochwertigsten Rasiersystemen, ersparen den Ärger durch beschädigte Folien oder Messerköpfe und erhöhen damit auf lange Sicht die Akzeptanz dieser Geräte.

Vorstellbar ist auch die Entwicklung eines Rasierer-Sondermodells, das ausschließlich auto-matisch zu reinigen ist. Durch den Wegfall der Demontierbarkeit zur Reinigung des Schneidsystems ergeben sich interessante kontruktive Verbesserungsmöglichkeiten, die bisher nicht realisierbar sind.

Punkt 4

Ein primitiver Vorläufer ist unser Schüttelbecher für Messerköpfe, der schon teilweise eine Naßreinigung verwirklicht.

- 3 -

Den bisherigen Stand der Technik zeigt das US-Patent Nr. 3, 172, 416. Dort wird der laufende Rasierer in die Reinigungsflüssigkeit getaucht und diese Flüssigkeit dabei umge-wälzt. Zur Beendigung des Vorgangs wird der Rasierer entnommen, die Eintauchsöffnung geschlossen und der nasse Rasierer zum Abtropfen in die Deckelmulde gesteckt. Mit dem Abschalten des Gerätes wird mechanisch eine Schmutzabsetzzone im untersten Bereich des Reinigungsgerätes geöffnet, sodaß schwebende Schmutzteilchen sich dort absetzen können. Diese Zone wird vor erneutem Betrieb des Gerätes beim Einschalten wieder geschlossen, um eine Aufwirbelung durch den Pumpbetrieb zu verhindern. Eine gesteuerte Stromversorgung des Rasierers über das Rasierernetzkabel vom Reinigungsgerät aus ist ebenfalls dargestellt.

Punkt 5

Hauptnachteil des unter Punkt 4 beschriebenen Reinigungsgerätes ist die dauernde Umwäl-zung der zunehmend verschmutzten Flüssigkeit zur Reinigung, ein Klarspülen ist nicht möglich, sodaß dieses System heutigen Hygieneansprüchen sicher nicht mehr genügt.

Die umständliche Handhabung sowie das primitive Reinigungsverfahren durch Absetzen-lassen sind ebenfalls unbefriedigend.

Daß das Gerät nicht approbationsfähig wäre, wenn der Rasierer naß entnommen werden muß, ist ein zusätzlicher Systemmangel.

Punkt 6

Die Vorgabe war, ein Reinigungsgerät für Rasierer zu entwickeln, das eine hygienische Scherkopfreinigung weitgehend automatisch ohne zusätzliche Vor- oder Nacharbeiten durchführt.

Hintergrund ist neben dem allgemeinen Wunsch nach Verbesserung von Komfort und Hygiene die Entwicklung immer komplizierterer Schneidsysteme, die eine Reinigung zunehmend schwieriger und aufwendiger machen, was die Akzeptanz dieser Geräte eventuell langfristig für einen immer größeren Personenkreis gefährden könnte.



B

Invention Application to
the Patent Department
Please fill out with typewriter

Patent Department
Received July 22, 1993
Deadline

BRAUN

Title or brief designation of the invention
Shaver-Cleaner

| | 9/22/93 | Complaint deadline: 11/22/935818 | INA deadline July 22, 1993 | File No. H.-D. Klauer | Handled by 2382 | | Telephone |

| Inventor | First and last name optionally with precise title (for example, Dr.-Ing., Dipl-Phys, Ing.-grad.) | Function in company (for example, specialist, department manager) | Department, telephone | Personal ID No. | Private address P.O. Box, town, street | Share in invention in %[1)2)] |
|---|---|---|---|---|---|---|
| 1 | Engineer Gebhard Braun | Designer | 1440. | 00098 | Spessartstrasse 18 65779 Kelkheim | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |

Please explain your invention by providing your opinion concerning the following points in the mentioned sequence on page 2:

4. From which known -- in-house or outside prior art does the invention start? Statement of products, literature sources, documents, drawings, etc.

5. Disadvantages of the prior art listed under 4 -- Task of the Invention.

6. Issued instructions or orders (for example precise name of project order).

1. Detailed written presentation of the invention (precise statement of the features of the invention) with reference to accompanying sketches, drawings, etc.

2. Advantages that can be achieved with the invention.

3. In which product (precise name) can the invention be used?

It is hereby assured that all information was provided to the best of my knowledge and that no additional inventors participated in creation of the invention.

Inventor 1    Date        Signature
7/22/93 [signature]

Inventor 2    Date        Signature

Inventor 3    Date        Signature

Inventor 4    Date        Signature

Inventor 5    Date        Signature

1) If this column contains no entries, the share in the invention will be divided in equal parts among the inventors.

2) Optionally divided among the inventors according to features of the invention (for example under point 1).

Patent Department

<u>Enclosure for invention application Shaver-Cleaner</u>

<u>Point 1</u>

The invention concerns a cleaner for shavers that permits largely automatically running hygienic cleaning of the shaving head.

After shaving the machine can be placed completely into the cleaner without further preparation, where it is cleaned fully automatically after starting the cleaning program and dried for the next shave. The machine can remain in the cleaner, which thus functions additionally as a wall mount and charging device.

The cleaning principle is based on the finding that the shaving head of an electric shaver cleans itself without disassembly, if it is continuously immersed in an appropriate cleaning liquid. The hair dust collected in the shaving head, sometimes baked firmly onto different sites in the cutting system, is loosened by the cutting parts oscillating with high frequency in the cleaning liquid and rinsed into the liquid through the openings – especially the cutting foil.

For automatic cleaning it must be ensured that the liquid that readily loosens grease be continuously removed and is always at a sufficient height above the shaving heads.

The variant according to the invention proposes to conduct the cleaning process in a specially configured trough (1) into which the shaver (2) is immersed upside down. The trough is still empty and dry, the shaver is switched off. It can also be kept in here for storage.

Starting of the cleaning process is initiated by pressing the power supply button (3), through which the shaver is supplied with operating and charge current. It is engaged by an electronic device (4) incorporated in the cleaner that also switches on the pump (5) via a controllable timer; cleaning liquid is pumped from the integrated supply vessel (6) through a filter into the cleaning trough in which the running shaver is cleaned in the described manner. A correspondingly dimensioned overflow (7) ensures the necessary filling level after a short pump running time and small outlet holes (8) on the bottom of the trough permit discharge of the remaining liquid after cleaning is completed.

Before the shaver can be removed, it is dried by the incorporated (heating) fan (9). A safety switch prevents premature removal in order to ensure that no residual moisture can reach the interior of the shaver.

The contaminated liquid is fed from the cleaning trough into a filtering bag (10) that leads to the pump through the (cleaned) supply liquid, from which it is pumped directly back through the filter (11) to the cleaning trough. By appropriate flow path configuration, pump running time and throughput, it can be ensured that, after the end of the cleaning process, the cleaning vessel and the liquid paths, as well as the entire liquid vessel, are all in the clean state; there is no dirt region in the machine except for the filter.

This is achieved by using a filtering bag that, on the one hand, leads the loosened dirt particles to the intake side (12) of the pump without contaminating the supply liquid, but at the same time enables it to reach the pump intake side through the tube wall.

This trick permits optimal cleaning with the filter on the pump pressure side (13) and simultaneously permits an always clean liquid supply.

A positive additional effect of the system is automatic cleaning of the filtering bag inside by liquid overflow from the outside to the bag interior.

Point 2

The cleaner replaces the unpleasant, dusty hand cleaning with a time-saving, hygienic wet cleaning, which restores the shaver effortlessly to an almost new condition, as far as cutting system cleanness is concerned.

The cleaning agent is used sparingly, always cleaned again and the dirt particles are collected in the filter. The shaver dust deposited in the filter in compact form can be conveniently and hygienically disposed of over longer time intervals.

Point 3

A cleaner according to this principle is feasible in principle for any dry shaver. The described automatic function, however, requires a shaver switch that can be switched electronically, which is incorporated in the corresponding shaver type. Preferably new developments should therefore be appropriately equipped cleaner-compatible.

Automatic cleaning is particularly advantageous for the increasingly more intricate and more demanding oscillating head shavers of the latest and future shaver developments. It enables the customer to handle our best shaver systems without problem, sparing him aggravation from damaged foils or shaving heads and thus increasing the acceptance of these shavers over the long term.

The development of a shaver special model that is to be cleaned exclusively automatically is also imaginable. By eliminating disassembly for cleaning of the cutting system, interesting design improvement possibilities are obtained that thus far could not be implemented.

Point 4

A primitive forerunner is our shaking beaker for the shaving heads, which already partly implements wet cleaning.

The previous state of the art is shown in US Patent No. 3,172,416. The running shaver there is immersed in the cleaning liquid and this liquid is then circulated. To complete the process the shaver is removed, the immersion opening closed and the wet shaver placed in the cover trough to dry. With switching off of the machine a dirt settling zone in the lowermost region of the cleaner is mechanically opened so that suspended

dirt particles can settle there. This zone is closed again by operating the machine during engagement in order to prevent turbulization through the pump drive. A controlled power supply of the shaver via the shaver power cord of the cleaner is also shown.

## Point 5

The main drawback of the cleaner described under point 4 is the continuous circulation of the increasingly contaminated liquid for cleaning, final rinsing is not possible, so that this system no longer reliably satisfies present-day hygienic requirements.

The awkward handling and the primitive cleaning method by settling are also unsatisfactory. The fact that the machine would not be certifiable, if the shaver has to be removed wet, is an additional system deficiency.

## Point 6

The task was to develop a cleaner for shavers that carries out hygienic shaving head cleaning largely automatically without additional preparation or subsequent handling.

The background, apart from the general desire for improvement of comfort and hygiene, is the development of increasingly more complicated cutting systems that make cleaning increasingly more difficult and demanding, which might threaten the acceptance of these machines over the long term for an increasingly larger number of people.

[see source for figure]

Shaver-Cleaner

 TRANSPERFECT | TRANSLATIONS

# AFFIDAVIT OF ACCURACY

This is to certify the attached document, **Erfindungsmeldung an Patentabteilung/Invention Application to the Patent Department,** has been translated from German into English by staff members of TransPerfect Translations familiar with both the German and English languages and is to the best of our knowledge, ability and belief, a true and accurate translation.

ATLANTA
BOSTON
BRUSSELS
CHICAGO
DALLAS
FRANKFURT
HONG KONG
HOUSTON
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
NEW YORK
PARIS
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
SEATTLE
WASHINGTON, DC

Susan Christian
TransPerfect Translations, Inc.
15 Broad St., Suite 305
Boston, MA 02109

Sworn to before me this
29th day of June 2004

Signature, Notary Public

NICOLE P. VOLIN
Notary Public
Commonwealth of Massachusetts
Commission Expires Aug 14, 2009

Stamp, Notary Public

C

<u>Nachtrag zur Erfindungsmeldung Rasierer-Reinigungsgerät 05818</u>

Anlaß zur Entwicklung dieser Klinkenumschaltung war der Wunsch nach Verkleinerung und Verbilligung des Reiniger-Antriebskonzepts für Lüfter und Pumpe. Da beide einen ähnlichen Leistungsbedarf haben, dabei aber nie gleichzeitig laufen müssen, lag es nahe, nur einen Motor für beide Funktionen einzusetzen. Eine einfache Möglichkeit der automatischen Steuerung stellt die Drehrichtungsumkehr dar, die hier dazu verwendet wird, wahlweise den Lüfter oder die Pumpe anzutreiben.

Die Funktionsweise ist folgende (vergl. Fig. 1-3): der Motor (1) treibt über die Motorwelle (2) den aufgepreßten Mitnahmeflansch (3) an. Dieser trägt die Klinkenachsen (4) für die Lagerung der Klinken (5a und 5b). Dargestellt ist der Betriebszustand rechtsdrehend mit voller Drehzahl. In Fig. 2 sind die Klinken (5a) im Eingriff mit der Sägeverzahnung (6) des Lüfterrades (7), der Lüfter ist in Funktion.

Fig. 3 zeigt die gleichzeitige Position der Klinken (5b) für den Pumpenantrieb (10). Sie sind außer Eingriff, weil sie im Gegendrehsinn angeordnet sind, <u>bei</u> rechtsdrehendem Flansch also aus der Sägeverzahnung (11) ausrasten.

Damit sie nun nicht dauernd über die Zahnspitzen der Sägeverzahnung rattern, wird erfindungsgemäß die Klinkenmasse bezüglich des Klinkendrehpunktes und der in Aushebeposition vorliegenden Lage der Klinken im Rotationssystem so gewählt, daß sich bei der vorgesehenen Drehzahl des Systems eine Klinken-Fliehkraft einstellt, die die Klinken entgegen der Andruckkraft durch die Feder (8) von der Sägeverzahnung abhebt bis zum Anschlag (9) am "Flansch". Diese Anlage bleibt bestehen, bis sich durch Drehzahlverringerung das Fliehkraftmoment so weit reduziert, daß das Federkraftmoment überwiegt und die Klinken wieder zur Einrastposition zurückkehren. Läuft der Motor nun im Gegendrehsinn an, so rasten die Klinken sofort in die Sägeverzahnung (11) ein, sodaß jetzt also linksdrehend der Pumpenantrieb (10) in Funktion ist.

Die Klinken des Lüfterantriebs (vergl. Fig. 2) verlassen die Rastposition in ihrer Sägeverzahnung und kommen in der oben beschriebenen Weise durch die Fliehkraftwirkung in die geräuschlose Außereingriffstellung.

Außer den eingangs genannten Gründen Verkleinerung und Verbilligung trägt das Konzept auch zur sinnvolleren Motorauslastung bei: Die minimale Laufzeit der Pumpe im Vergleich zu der des Lüfters kann ein Motor bequem noch zusätzlich leisten. Ein Einzelmotor für die Pumpe wäre zwangsläufig überdimensioniert.

15.9.93    *[signature]*



D

<u>Supplement to Invention Application Shaver-Cleaner 05818</u>

The incentive for development of this ratchet changeover was the desire to reduce the size of the cleaner-drive concept for the fan and pump and make it cheaper. Since both have a similar power demand but never have to run simultaneously, it was obvious to use only one motor for both functions. A simple possibility for automatic control is reversal of direction of rotation, which is used here to alternately drive the fan or the pump.

The method of function is as follows (cf. Figures 1-3): the motor (1) drives the pressed-on drive flange (3) via the motor shaft (2). This carries the ratchet axes (4) for mounting the ratchets (5a and 5b). The operating state of right rotation at full speed is depicted. The ratchets (5a) in Figure 2 are engaged with the sawtooth mechanism (6) of the fan impeller (7) and the fan is functioning.

Figure 3 shows the simultaneous position of ratchets (5b) for the pump drive (10). They are disengaged because they are arranged in the opposite direction of rotation, i.e., disengaged from the sawtooth mechanism (11) with the right-rotating flange.

In order not to rattle continuously over the teeth tips of the sawtooth mechanism, according to the invention the ratchet mass is chosen with reference to the rotation point of the ratchet and the position of the ratchet in the rotation system in the raised position so that, at the prescribed speed of the system, a ratchet centrifugal force is established that raises the ratchets against the pressure force of spring (8) from the sawtooth mechanism to a stop (9) on the flange. This support persists until the centrifugal force is reduced by reducing the speed far enough that the spring force overcomes it and the ratchets return to the engaged position. If the motor now runs in the opposite direction of rotation, the ratchets immediately snap into the sawtooth mechanism (11) so that the pump drive (10) is now functional, i.e., left-rotating.

The ratchets of the fan drive (cf. Figure 2) leave the engaged position in the sawtooth mechanism and enter the noiseless disengaged position by the action of centrifugal force in the manner just described.

In addition to the reasons of size and cost reduction mentioned at the outset, the concept also contributes to more acceptable motor loading: a motor can still comfortably furnish additional power for the minimal running time of the pump in comparison with that of the fan. An individual motor for the pump would necessarily be over-dimensioned.

9/15/93 [signature]

[see source for figure]

9/15/93 [signature]

TRANSPERFECT | TRANSLATIONS

## AFFIDAVIT OF ACCURACY

This is to certify the attached document, **Nachtrag zur Erfindungsmeldung Rasier-Reinigungsgeratt/ Supplement to Invention Application Shaver-Cleaner 05818,**  has been translated from German into English by staff members of TransPerfect Translations familiar with both the German and English languages and is to the best of our knowledge, ability and belief, a true and accurate translation.

Susan Christian
TransPerfect Translations, Inc.
15 Broad St., Suite 305
Boston, MA 02109

Sworn to before me this
28th day of May 2004

Signature, Notary Public

NICOLE P. VOLIN
Notary Public
Commonwealth of Massachusetts
Commission Expires Aug 14, 2009

Stamp, Notary Public

ATLANTA
BOSTON
BRUSSELS
CHICAGO
DALLAS
FRANKFURT
HONG KONG
HOUSTON
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
NEW YORK
PARIS
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
SEATTLE
WASHINGTON, DC

90.