IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRAUN GmbH,

    Plaintiff,

v.

RAYOVAC CORPORATION,

    Defendant.

Civil Action No. 03-CV-12428-WGY

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTIONS FOR
<u>PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Preliminary Statement..................................................................................................1

I.   THE '328 PATENT DOES NOT LACK ADEQUATE WRITTEN
     DESCRIPTION........................................................................................................1

     A. The Specification And Original Claims Reveal To The Ordinary Artisan That
        The Invention Includes A Cradle Structure That Receives Or Retains Cleaning
        Fluid Or Both......................................................................................................2

     B. The Testimony Of The Inventors Confirms The Written Description...........4

     C. The Court Properly Construed The Cradle Structure Element..................6

II.  THE OMISSION OF DR. PAHL AS COINVENTOR ON THE '328 PATENT
     WAS NOT INEQUITABLE CONDUCT...............................................................7

Conclusion.......................................................................................................................11

# TABLE OF AUTHORITIES

## Cases

Abbott Labs. v. TorPharm, Inc., 300 F.3d 1367 (Fed. Cir. 2002)..............................1

Akiebolag v. Wankesha Cutting Tools, Inc., 1 U.S.P.Q.2d 2002 (E.D. Wis. 1986)..........8

C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340 (Fed. Cir. 1998)...........................8

In re Wertheim, 541 F.2d 257 (C.C.P.A. 1976)......................................2, 4, 4 n.7

In re Wilder, 736 F.2d 1516 (Fed. Cir. 1984)...................................................2

Izumi Prod. v. Koninklijke Philips Electronics N.V., Nos. 04-1418, 04-1423, 2005 WL 1606952 (Fed. Cir. Jul. 7, 2005).................................................................4

John Blue Co. v. Dempster Mill Mfg. Co., 172 F.Supp. 23 (D. Neb. 1958) aff'd on other grounds by 274 F.2d 668 (8th Cir. 1960)........................................................8

Kraftco v. Beatrice Foods Co., 342 F.Supp. 1361 (D. N.J. 1971).........................9 n.12

Monsanto Co. v. Bayer Bioscience, N.V., 363 F.3d 1235 (Fed. Cir. 2004)..................9

Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561 (Fed. Cir. 1987).......................1

Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 12 F.Supp.2d 69 (D. Mass. 1998)....................................................................................10 n.13

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)......................................1-2

Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc., 410 F.3d 690 (Fed. Cir. 2005).....9, 10

Purdue Pharma L.P. v. Faulding, Inc., 230 F.3d 1320 (Fed. Cir. 2000).......................2

Smith v. Snow, 294 U.S. 1 (1935).................................................................7

Solomon v. Kimberly-Clark Corp., 216 F.3d 1372 (Fed. Cir. 2000)..........................4

Stark v. Advanced Magnetics, Inc., 119 F.3d 1551 (Fed. Cir. 1997)..............8, 9, 9 n.12

Union Oil Co. of California v. Atlantic Richfield Co., 208 F.3d 989 (Fed. Cir. 2000)...3n6

Univ. of Colorado Foundation v. American Cyanamid Co., 196 F.3d 1366 (Fed. Cir. 1999)..................................................................................9 n.12

Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555 (Fed. Cir. 1991)..................................2

Winbond Elec. Corp. v. Int'l Trade Comm'n, 262 F.3d 1363 (Fed. Cir. 2001)..............8

**Statutes**

35 U.S.C. § 282...........................................................................................1

35 U.S.C. § 112...................................................................................1 n.2

35 U.S.C. § 256...........................................................................................8

### *Preliminary Statement*

Braun GmbH ("Braun") opposes Rayovac Corporation's ("Rayovac") two[1] motions for partial summary judgment on the following grounds: first, U.S. Patent No. 5,711,328 (the "'328 Patent") does not lack an adequate written description; and second, the omission of Dr. Dietrich Pahl as a coinventor on the '328 Patent occurred without deceptive intent and does not support a claim of inequitable conduct. Rayovac's motions should therefore be denied.

### *Argument*

**I.  THE '328 PATENT DOES NOT LACK ADEQUATE WRITTEN DESCRIPTION**

The '328 Patent, like all issued patents, is presumed to be valid, a presumption that extends ". . . to all of the many bases for challenging a patent's validity." Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1570 (Fed.Cir. 1987); 35 U.S.C. 282. Accordingly, Rayovac has the burden of proof to show invalidity. Id. It must carry that burden by clear and convincing evidence. See, e.g., Abbott Labs. v. TorPharm, Inc., 300 F.3d 1367, 1379 (Fed. Cir. 2002). Rayovac has not done so.

Under the guise of a written description defense,[2] Rayovac seeks a new construction of the Cradle Structure Element.[3] This "defense" is heedless of well-settled law holding that limitations from the preferred embodiment should not be read into the claims. Phillips v. AWH

---

[1] Rayovac originally filed four motions for partial summary judgment. The memoranda filed in support of these motions exceeded the twenty (20) page limit established by the Local Rules. Subsequently, Rayovac filed two memoranda in support of two of its four motions – specifically, its written description and inventorship/inequitable conduct motions. Braun, therefore, focuses its arguments in this memorandum on those two motions. In response to Rayovac's other two motions, Braun states briefly that it is no longer pursuing damages for price erosion and that, to the extent the Court's March 15, 2005 construction of the asserted claims remains unchanged, Braun's claim is that Rayovac's accused devices infringe Braun's patented claims literally. Braun reserves its right to pursue a theory of infringement pursuant to the doctrine of equivalents should the Court change its claim construction.

[2] The written description requirement provides that "the specification shall contain a written description of the invention . . . ." 35 U.S.C. § 112, ¶1.

[3] The "Cradle Structure Element" of claim 11 of the '328 Patent is "a cradle structure adapted to receive a shaving head of a shaving apparatus." See '328 Patent, col. 14, lines 13-14. The Court construed the Cradle Structure Element as "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both." See Transcript of March 15, 2005 Hearing Before Chief Judge Young ("Hearing Trans.") at 5, 11.

Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) ("[W]e have repeatedly warned against confining the claims to [specific] embodiments.") (citations omitted). Specifically, Rayovac argues that the '328 Patent lacks adequate written description for the cradle structure as construed by the Court because the preferred embodiment of the patent is a cradle that receives <u>and</u> retains cleaning fluid during the cleaning operation, rather than one that receives <u>or</u> retains cleaning fluid. <u>See</u> Rayovac's Written Description Memo.[4] at 1-2 (citing to portion of specification describing the preferred embodiment of the invention). In doing so, Rayovac ignores the broader use of cradle structure throughout the specification and the original claims of the '328 Patent's application, and mischaracterizes the testimony of the inventors.

### A. The Specification And Original Claims Reveal To The Ordinary Artisan That The Invention Includes A Cradle Structure That Receives Or Retains Cleaning Fluid Or Both

The purpose of the written description requirement is to ensure that the applicant "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." <u>In re Wilder</u>, 736 F.2d 1516, 1563 (Fed. Cir. 1984). The subject matter of the claims need not be described literally for the specification to satisfy the description requirement. <u>See</u> <u>Purdue Pharma L.P. v. Faulding Inc.</u>, 230 F.3d 1320, 1323 (Fed. Cir. 2000). It is sufficient that the specification "convey clearly to those skilled in the art, to whom it is addressed, in any way, the information that the applicant has invented the specific subject matter later claimed." <u>In re Wertheim</u>, 541 F.2d 257, 262 (C.C.P.A. 1976). The test is therefore "whether the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." <u>Vas-Cath Inc. v. Mahurkar</u>, 935 F.2d 1555, 1563 (Fed. Cir. 1991) (internal quotation marks omitted).

---

[4] "Rayovac's Written Description Memo." refers to Rayovac Corporation's Memorandum In Support Of Its Motion For Summary Judgment Declaring U.S. Patent No. 5,711,328 Invalid For Lack Of Written Description.

While the preferred embodiment described a cradle that is filled to the rim with cleaning fluid,[5] the specification's discussion of cradle is not so limited. For example, the specification states that "a continuous supply of cleaning fluid can be fed to the shaving head received in the separate cradle until the shaving head is completely clean." See '328 Patent, col. 2, line 15-17; see also id. at col. 2, lines 32-35 ("Further it is advantageous that the cradle or the shaving head are adapted to be supplied with cleaning fluid from the cleaning fluid container by means of the feed pump for a predetermined period of time . . . ."); id. at col. 6, lines 20-21 (The cradle "holds only as much cleaning fluid as is necessary for the respective cleaning operation"). Thus, the specification is not limited to cradle structures where the shaving head is immersed in cleaning fluid. Indeed, these discussions do not mention immersion of the shaving head at all.

Moreover, depending on the dimension of the outlet port of the cradle structure of the preferred embodiment, the cradle can receive or retain fluid or both. Indeed, the originally filed claims of the '328 Patent's application describe such a cradle structure.[6] As originally filed, claim 1 included a "cradle structure [that] is connected with the cleaning fluid container . . . through . . . at least one outlet port . . . ." See Declaration of Dalila Argaez Wendlandt In Support Of Braun GmbH's Motion For Partial Summary Judgment On Invalidity, Exhibit D at B000169. As originally filed, claim 9 (which became claim 2 of the issued patent) was dependent on claim 1 and provided that the "outlet port . . . in the cradle structure . . . is dimensioned such that during the cleaning operation the amount of cleaning fluid drained through the outlet port . . . is smaller than the amount of cleaning fluid supplied to the cradle structure . . . through the feed device . . . ." Id. at B000170. Depending on the dimension of the

---

[5] See '328 Patent at col. 6, lines 44-49 (noting that in the preferred embodiment "the outlet port 27 is dimensioned such that the cradle 7 . . . is at all times kept filled to the rim").
[6] The written description includes not only the specification, but also the original claims to the patent application. See Union Oil Co. of California v. Atlantic Richfield Co., 208 F.3d 989, 998 n.4 (Fed. Cir. 2000).

outlet port of the cradle structure of original claim 1, the cradle structure can receive or retain fluid or both. See Second Report Of Samir Nayfeh ("Nayfeh 2nd Rep.") at 27.[7] If, as Rayovac argues, the cradle structure includes only structures that receive and retain fluid, then the limitation of original claim 9 would be superfluous. Rayovac's proposed reading would violate the rules of claim construction. See Izumi Prod. v. Koninklijke Philips Electronics N.V., Nos. 04-1418, 04-1423, 2005 WL 1606952, at *11 (Fed. Cir. Jul. 7, 2005) ("Under the doctrine of claim differentiation, there is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.") (internal quotation and citation omitted). Thus, one of ordinary skill would recognize that the cradle structure of original claim 1 includes not only those structures that receive and retain fluid, but also those that receive but do not retain fluid.

Thus, the specification and original claims describe a cradle structure that receives or supports a shaving head of a shaving apparatus and that is able to receive or retain fluid or both.

### B. The Testimony Of The Inventors Confirms The Written Description

A court tests the written description requirement by looking at the specification (along with the originally filed claims) and determining whether the invention disclosed in the claims is described. In re Wertheim, 541 F.2d at 262. Statements of inventors years after the prosecution of a patent application and during litigation are of little value. See, e.g., Solomon v. Kimberly-Clark Corp., 216 F.3d 1372 (Fed. Cir. 2000) (holding that inventor's statement during litigation was not probative during invalidity challenge under § 112, ¶2). Nonetheless, a full examination

---

[7] Rayovac faults Professor Nayfeh for reading the specification from the vantage point of the ordinary artisan, claiming that such a reading amounts to determining whether something is "obvious" in light of the specification. See Rayovac's Written Description Memo at 4. Rayovac misreads the law. The written description is tested from the viewpoint of the ordinary artisan. In re Wertheim, 541 F.2d at 262 (noting that the specification must only "convey clearly to those skilled in the art, to whom it is addressed, in any way, the information that the applicant has invented the specific subject matter later claimed") (emphasis added).

of the inventors' testimony reveals that the inventors conceived of the operation of the cleaning device by spraying cleaning fluid into a cradle that did not retain cleaning fluid, but determined that such an embodiment would not function as well as the preferred embodiment disclosed in the patent. Not surprisingly, therefore, the inventors never created nor tested such a system.

For example, when asked whether he ever "create[d] a shaver cleaning system in which the trough did not retain fluid," April 26, 2005 Transcript of Deposition of Gebhard Braun "Braun Dep. Vol. 1" at 73:13-14 (emphasis added), Mr. Braun responded: "Do you mean this was only like – spray? One could imagine it was only spray. No, we did not do [that is, create] such a thing. It was always immersed in the fluid." Id. at 73:17-20 (emphasis added). Asked further why "it was always immersed in the fluid," id. at 73:20, Mr. Braun responded:

> Because this showed this fantastic cleaning effect. We found that this especially was the reason why the device could clean itself so fast and the fluid could enter through the [w]alls through these small openings and we felt this could not have been achieved by spraying.

Id. at 73:21 through 74:2. Asked whether he ever attempted to develop a cleaning system in which the "shaver was sprayed with cleaning fluid as opposed to being bathed," id. at 74:8-10, Mr. Braun explained that "[y]ou don't want to clean the whole shaver. We just want to clean the cutting head." Id. 74:15-16. In response to whether he ever "th[ought] of pumping fluid directly into the shaver head to flush out hair," id. at 74:17-18, Mr. Braun stated:

> What we found out that if the trough was not filled high enough, if the level of fluid was too low to cover the cutting head the result was not so good.

Id. at 74:20-23 (emphasis added). Finally asked whether he ever "test[ed] the cleaning system in a situation where there was no fluid retained in the cradle structure," id. at 75:3-6 (emphasis added), Mr. Braun understood the question to mean a system in which no cleaning fluid was used: "I just turned the razor with the head down and I just operate it." Id. at 75:6-7. Not

surprisingly, he believed that if the shaver could be cleaned by just turning it upside down and turning it on, then "we would not need a cleaning system." Id. at 75:8-10.

Dr. Pahl confirmed that the inventors had conceived a cradle into which cleaning fluid was sprayed. In particular, asked the difference between "spraying of fluid in a dishwasher" and "the operation of the cleaning center in that particular," April 28, 2005 Transcript of Depositoin of Dr. Dietrich Pahl ("Pahl Dep.") at 80:2-4, Dr. Pahl responded:

> Let's put [it] that way[. W]e once considered whether we could spray the stuff in, but I personally feel it's much more efficient if you immerse the shaver head, especially the cutter blocks, into liquid because by the high speed movement of the cutter blocks you have the advantage that you benefit from cavitation which occurs as the blades of a cutter block [move]. We never made test with spraying, as far as I recall, but simply because of thinking we think its better to dive the head down into liquid than to spray."

Id. at 80:5-14 (emphasis added). Thus, contrary to Rayovac's suggestion, the inventors conceived a cleaning system with a cradle that did not retain fluid, one in which the fluid was sprayed. They did not create or test such a system because they felt that immersion of the shaving head produced a "[b]etter cleaning result." Pahl Dep. at 81:13.

### C. The Court Properly Construed The Cradle Structure Element

The Court's construction of the Cradle Structure Element is supported by the specification, the prosecution history, and the claim language itself. There is no new evidence[8] or law that would require the Court to alter its construction of the Cradle Structure Element. In particular, Rayovac points to no new law in the Phillips decision that requires the Court to reconsider its construction.

Instead, Rayovac relies on a 1935 Supreme Court case, Smith v. Snow, 294 U.S. 1 (1935), which actually supports Braun's argument. In Smith, the patented invention was for a revolutionary egg incubator. Id. at 3-7. The defendant argued that claim 1 of the patent required

---

[8] As discussed supra, the inventors' testimony is consistent with the Court's construction.

- 6 -

a particular airflow direction (from more mature/advanced stage eggs to newer eggs) because the embodiment disclosed in the specification contained such an airflow. Id. at 10. The Supreme Court rejected the argument, affirming the well settled law that limitations from a preferred embodiment should not be introduced into claims lacking such limitations. Id. at 11 (holding that inventor "is not confined to [the best] mode of use, since the claims of the patents, not its specifications, measure the invention."). The Supreme Court held that its refusal to introduce the limitation into the claim was further justified by looking to other claims in the patent, which included elements such as the location of fans and partitions, and which the Court felt were "obviously intended to give direction to the current of air." Id. at 13-14. The Court held that because these limitations were not found in claim 1, claim 1 must be broader.[9] Id. Thus, the Smith decision is not only not new law, but actually supports Braun's argument. Simply, there is no need for the Court to revisit its claim construction.

## II. THE OMISSION OF DR. PAHL AS COINVENTOR ON THE '328 PATENT WAS NOT INEQUITABLE CONDUCT

Braun has moved for summary judgment to correct inventorship on the '328 Patent by adding Dr. Pahl as a co-inventor. Rayovac concedes that Dr. Pahl is a co-inventor, but it opposes correction, and indeed argues that the omission of Dr. Pahl constitutes inequitable conduct. Rayovac bases its argument on cases that are outdated or expressly overruled and on factual assertions that have no basis. One has only to read the testimony cited by Rayovac to see that its argument has no substance.

The Federal Circuit construes 35 USC § 256 to allow joinder of an omitted inventor unless the omitted party had "deceptive intent." Stark v. Advanced Magnetics, Inc., 119 F.3d

---

[9] As discussed supra, limitations in dependent claim 2 (application claim 9), concerning the dimension of the outlet port to the cradle structure, do not support Rayovac's proposed construction of the Cradle Structure Element.

1551, 1555 (Fed. Cir. 1997). Braun has earlier set out the facts of Dr. Pahl's omission.[10]

Dr. Pahl sought in good faith to encourage a colleague and, because he was a supervisor, to remove himself from decisions to develop the product. See Winbond Elec. Corp v. Int'l Trade Comm'n, 262 F.3d 1363, 1374 (Fed. Cir. 2001) (affirming Commissioner's decision not to find deceptive intent on the basis of plaintiff's statement that the omission was in good faith.). Mr. Braun does not object to adding Dr. Pahl and neither does Braun, the assignee of the patent. Dr. Pahl has done nothing that could be considered selfish or unseemly. Inventorship is not important to a patent's validity under German law, and Dr. Pahl, who had no role in prosecuting the U.S. patent, had no understanding of the requirements of United States law. As one court has noted, correction should be allowed where "no one has been harmed and the integrity of the patent system has not been compromised." Akiebolag v. Wankesha Cutting Tools, Inc., 1 U.S.P.Q.2d 2002, 2004 (E.D. Wis. 1986). Finally, it simply cannot be said that Dr. Pahl's actions "intended to and did mislead the examiner into taking favorable action that would not otherwise have been taken." C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1365 (Fed. Cir. 1998).

Rayovac attempts to avoid these well-settled principles. It ignores the flexible inquiry into motive and consequences set forth above, instead arguing that any deliberate omission – for any reason – constitutes deceptive intent. See Rayovac's Invalidity Memo.[11] at 9-10. That is simply not the law. The cases upon which Rayovac relies are profoundly flawed. The first, John Blue Co. v. Dempster Mill Mfg. Co., was first decided in 1958, nearly four decades before the Federal Circuit, in Stark, issued its comprehensive interpretation of Section 256. 172 F. Supp. 23

---

[10] Braun incorporates herein its Memorandum In Support Of Its Motion For Summary Judgment To Correct Inventorship.
[11] "Rayovac's Invalidity Memo." refers to Rayovac Corporation's Memorandum In Support Of Its Motion For Summary Judgment Declaring U.S. Patent No. 5,711,328 Invalid And Unenforceable.

(D. Neb. 1958), aff'd on other grounds by, 274 F.2d 668 (8th Cir. 1960). Rayovac cites the decision in John Blue for the proposition that where the omission of an inventor was a result of "deliberate action," it is "unnecessary to pass upon whether the omission was without any deceptive intent." Id. at 29-30. In light of the Federal Circuit's straightforward reading of Section 256 in Stark, the district court's reasoning in John Blue is no longer tenable. Stark, 119 F.3d at 1555 ("[T]he statute allows correction . . . in those nonjoinder cases where the unnamed inventor is free of deceptive intent."). After Stark, courts must decide the issue of deceptive intent; "deliberate" omissions do not constitute deceptive intent per se.[12] The issue is good faith. Because Dr. Pahl's conduct was indisputably borne of decency, not malice, and because no one was harmed, correction of inventorship should be allowed as a matter of law.

Similarly, the omission of Dr. Pahl as an inventor does not amount to inequitable conduct. To show that the '328 patent is unenforceable because of inequitable conduct, Rayovac must "prove materiality and intent by clear and convincing evidence." Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc., 410 F.3d 690, 695-96 (Fed. Cir. 2005) (citations omitted) (emphasis added). If Rayovac can meet this high burden, the Court must then balance the equities to determine if the overall conduct warrants holding the patent unenforceable. See Monsanto Co. v. Bayer Bioscience, N.V., 363 F.3d 1235, 1239 (Fed. Cir. 2004); Purdue Pharma, 410 F.3d at 700 ("When determining whether intent has been shown, a court must weigh all evidence, including evidence of good faith.").

---

[12] Rayovac submits (see Rayovac's Invalidity Memo. at 10) as further support a case that has been expressly overruled and vacated on the very point Rayovac now argues. See Univ. of Colorado Foundation, Inc. v. American Cyanamid Co., 196 F.3d 1366, 1374 (Fed. Cir. 1999) (vacating the district court decision cited (at 10) by Rayovac because, citing Stark, "the district court's premise – that the actual inventors could not be substituted for a fraudulently-named inventor in a patent without thereby invalidating the patent – was incorrect.") Rayovac's improper reading of Section 256 has thus already been expressly refuted. Rayovac also incorrectly references (see Rayovac's Invalidity Memo. at 11) Kraftco v. Beatrice Foods Co., 342 F.Supp. 1361 (D. N.J. 1971). That case in no way states or implies that, as Rayovac would have it, "Section 256 allows the correction only if the error was an error in the inventorship contributions, not error in what the law requires."

Rayovac's presentation of "clear and convincing evidence" is deficient in the extreme. The facts as Rayovac portrays them – they rely primarily on Dr. Pahl's self-denial – show only a good-faith effort to reward an industrious subordinate, as discussed above. Nor did Mr. Braun scheme to mislead the PTO. Having lawfully been named the sole inventor on the German patent application, Mr. Braun did not question his status as inventor on the United States counterpart application. See Braun Decl. at ¶10. The undisputed evidence shows that Mr. Braun, like Dr. Pahl, did not clearly understand United States patent law. Id. at ¶11. Mr. Braun's actions were thus not in any way devious; he made no attempt to exclude or marginalize another inventor.[13] Dr. Pahl had expressly approved Mr. Braun's claim, and Mr. Braun has no objection to correcting inventorship. See Braun Decl. at ¶13. The only undisputed evidence that Rayovac has brought forward actually underscores Mr. Braun's good faith and the lack of harm his actions caused. Rayovac has therefore failed to meet its heightened burden.

Nor does Rayovac create an issue of fact by asserting (see Rayovac's Invalidity Memo. at 14) that Mr. Klauer knew United States patent requirements, and knew that Dr. Pahl was an inventor, when he made disclosures to the PTO. Rayovac's assertion has no basis in fact. Indeed, quite the contrary – Braun's present in-house patent counsel, Mr. Vorbeck, testified that while he could not possibly say what Mr. Klauer knew about U.S. law, Braun's in-house counsel typically rely on U.S. counsel since "we are not experts regarding U.S. law." Deposition of Wolfgang Vorbeck on August 10, 2005 at 90, 110-11. Nor is there any basis for Rayovac's assertion that Mr. Klauer knew that Dr. Pahl was a co-inventor with Mr. Braun. Indeed, contemporary documents show that Dr. Pahl – who was Mr. Braun's supervisor – confirmed to Braun's in-house patent department that Mr. Braun was a sole inventor. See July 21, 2004

---

[13] These facts contrast completely with those in Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 12 F.Supp.2d 69 (D. Mass. 1998) (holding the patents unenforceable for inequitable conduct because the named inventors acted in bad faith and in their own self-interest to exclude other inventors).

Declaration of Dietrich Pahl at ¶ 22. That is the only evidence taken on the issue of Mr. Klauer's knowledge. (Mr. Klauer is now dead.) Rayovac has thus fallen far short of its burden to present clear and convincing evidence of inequitable conduct. Braun's Motion to have the '328 patent ruled valid and enforceable should be granted.

### *Conclusion*

WHEREFORE, Rayovac's motions for partial summary judgment should be denied, and Braun's Motions for Summary Judgment On Invalidity and to Correct Inventorship should be granted.

Braun GmbH

By its attorneys,

/s/ Dalila Argaez Wendlandt
William L. Patton (BBO #391640)
Dalila Argaez Wendlandt (BBO #639280)
Dalila.Wendlandt@ropesgray.com
 ROPES & GRAY
 One International Place
 Boston, MA  02110
 Telephone:  (617) 951-7000
 Facsimile:  (617) 951-7050

Stanley D. Liang (admitted *Pro Hac Vice*)
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, NY 10021

September 13, 2005