IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRAUN GmbH,

                Plaintiff,

                v.

RAYOVAC CORPORATION,

                Defendant.

Civil Action No. 03-CV-12428-WGY

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF**
**UNCONTESTED FACTS PURSUANT TO LOCAL RULE 56.1**

Plaintiff Braun GmbH ("Braun") submits this Statement of Material Facts Pursuant to Local Rule 56.1 in opposition to Defendant Rayovac Corporation's ("Rayovac") Statement Of Uncontested Facts Pursuant To Local Rule 56.1 supporting Rayovac's Motions for Partial Summary Judgment.

**FACT NO. 1**

On December 2, 2003, Braun GmbH ("Braun") filed an action against Remington Products Company, LLC for patent infringement of U.S. Patent No. 5,711,328 in violation of the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq.*

**RESPONSE TO FACT NO. 1**

Undisputed.

**FACT NO. 2**

The Original Complaint included The Gillette Company ("Gillette") as a co-plaintiff.  Rayovac brought a motion to dismiss Gillette, which was granted on June 3, 2004.

**RESPONSE TO FACT NO. 2**

Undisputed.

**FACT NO. 3**

On March 9, 2004, Remington Products, LLC merged with and into Rayovac Corporation effective March 29, 2004, with Rayovac Corporation as the surviving entity.  (Ex. 13, Motion to Amend Caption.)

**RESPONSE TO FACT NO. 3**

Undisputed.

**FACT NO. 4**

On August 2, 2004, Braun brought its Motion to Correct Inventorship. This Motion was granted on June 3, 2004.  (Ex. 26, Motion to Correct Inventorship.)

**RESPONSE TO FACT NO. 4**

There is a clerical or typographical error in Rayovac's Fact No. 4.  The

Motion was granted on August 24, 2004.  Otherwise, the facts are undisputed.

**FACT NO. 5**

On August 30, 2004, Rayovac served Braun with Defendant's First Set of Interrogatories to Plaintiff, asking Braun to identify, *inter alia*, each claim element Braun contended had been infringed under the doctrine of equivalents, and the basis for Braun's contentions.  (Ex. 8, Braun's Answer to First Interrogatories, at 3.)

**RESPONSE TO FACT NO. 5**

       Undisputed.

**FACT NO. 6**

       On October 25, 2004, Braun served Rayovac with Braun GmbH's Answers to Remington's First Set of interrogatories.  (*Id.*)

**RESPONSE TO FACT NO. 6**

       Undisputed.

**FACT NO. 7**

       On December 10, 2004, the parties moved jointly to amend the caption by naming Rayovac Corporation ("Rayovac").  (Ex. 13, Motion to Amend Caption.)

**RESPONSE TO FACT NO. 7**

       Undisputed.

**FACT NO. 8**

       Braun's response to Defendant's First Set of Interrogatories to Plaintiff has not mentioned the doctrine of equivalents.  (*See*, Ex. 8, Braun's Answer to First Interrogatories, at 4.)

**RESPONSE TO FACT NO. 8**

       Disputed.  In its answer to Defendant's First Set of Interrogatories to Plaintiff, Braun identified several claims that infringed the patents-in-suit, without specifying whether infringement was literal or under the doctrine of equivalents. Because, under the Court's March 15, 2005 claim construction, Rayovac's products infringe literally, Braun has not subsequently asserted infringement under the doctrine of equivalents; however, should the Court change its construction, Braun reserves the right to determine, at that time, whether Rayovac's accused products infringe under the doctrine of equivalents in light of any such changed construction.

**FACT NO. 9**

On May 23, 2005, Braun's expert, Dr. Samir Nayfeh, submitted his first expert report in which he opined that Rayovac devices literally infringe claims 11, 12, 14 and 18 of the '328 patent. (See, Ex. 14, First Nayfeh Report, at 3-7.)

**RESPONSE TO FACT NO. 9**

Undisputed.

**FACT NO. 10**

Dr. Nayfeh's first report contained no opinion regarding the doctrine of equivalents. (*See id.*)

**RESPONSE TO FACT NO. 10**

Undisputed. Because, under the Court's March 15, 2005 claim construction, Rayovac's products infringe literally, Professor Nayfeh has not opined as to infringement under the doctrine of equivalents; however, should the Court change its construction, Braun reserves the right to consult with Professor Nayfeh to determine, at that time, whether Rayovac's accused products infringe under the doctrine of equivalents in light of any such changed construction.

**FACT NO. 11**

On June 13, 2005, Samuel R. Phillips ("Phillips") submitted his second expert report in response to Dr. Nayfeh's first report. Phillips noted that neither Braun nor Dr. Nayfeh had asserted that Rayovac product infringed the '328 patent under the doctrine of equivalents. (Ex. B, Second Phillips Report, at ¶ 25.)

**RESPONSE TO FACT NO. 11**

It is undisputed that Mr. Phillips expressed his opinion that Dr. Nayfeh did not assert that Rayovac product infringed claims of the '328 patent under the doctrine of equivalents.

**FACT NO. 12**

On June 27, 2005, Dr. Nayfeh submitted his third report which he opined that Rayovac devices literally infringe claims 11, 12, 14 and 18 of the '328 patent. (Ex. F, Third Nayfeh Report.)

**RESPONSE TO FACT NO. 12**

Undisputed.

**FACT NO. 13**

Dr. Nayfeh's third report contained no opinion regarding the doctrine of equivalents. (*See id.*)

**RESPONSE TO FACT NO. 13**

Undisputed. Because, under the Court's March 15, 2005 claim construction, Rayovac's products infringe literally, Professor Nayfeh has not opined as to infringement under the doctrine of equivalents; however, should the Court change its construction, Braun reserves the right to consult with Professor Nayfeh to determine, at that time, whether Rayovac's accused products infringe under the doctrine of equivalents in light of any such changed construction.

**FACT NO. 14**

The deadline for expert reports was June 27, 2005.

**RESPONSE TO FACT NO. 14**

Undisputed.

**FACT NO. 15**

U.S. Patent No. 5,711,328 ("the '328 patent") was issued on January 27, 1988. (Ex. 1, the '328 patent.)

**RESPONSE TO FACT NO. 15**

There appears to be a clerical or typographical error in Rayovac's Fact No. 15. It is undisputed that the '328 patent issued on January 27, 1998.

**FACT NO. 16**

Claim 11 of the '328 patent is:

A cleaning device comprising: a cradle structure adapted to receive a shaving head of a shaving apparatus, a cleaning fluid container, a

feed device for feeding cleaning fluid from said cleaning fluid
container to said cradle structure, said cradle structure being
arranged above a fluid level of the cleaning fluid in said cleaning
fluid container during the feeding of said cleaning fluid to said
cradle structure, and a drying device.

(*Id.*)

## RESPONSE TO FACT NO. 16

Undisputed.

## FACT NO. 17

Claim 12 of the '328 patent is:

A device as claimed in claim **11**, wherein the drying device is an
impeller.

(*Id.*)

## RESPONSE TO FACT NO. 17

There appears to be a clerical or typographical error in Rayovac's Fact No.

17. It is undisputed that claim 12 of the '328 patent is:

A device as claimed in claim **11**, wherein the drying device comprises an

impeller.

## FACT NO. 18

Claim 14 of the '328 patent is:

A cleaning device comprising: a cradle structure adapted to receive
a shaving head of a shaving apparatus, said cradle structure being
permanently open to atmosphere, a cleaning fluid container, and a
feed device for feeding cleaning fluid from said cleaning fluid
container to said cradle structure, said cradle structure being
arranged above a fluid level of the cleaning fluid in said cleaning
fluid container during the feeding of said cleaning fluid to said
cradle structure.

(*Id.*)

## RESPONSE TO FACT NO. 18

Undisputed.

**FACT NO. 19**

Claim 18 of the '328 patent is:

A cleaning device comprising: a cradle structure adapted to receive a shaving head of a shaving apparatus, a cleaning fluid container, a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said container during the feeding of said cleaning fluid to said cradle structure, and a bracket for insertion of the shaving apparatus therein.

(*Id.*)

**RESPONSE TO FACT NO. 19**

There appears to be a clerical or typographical error in Rayovac's Fact No. 19. It is undisputed that Claim 18 of the '328 patent is: A cleaning device comprising: a cradle structure adapted to receive a shaving head of a shaving apparatus, a cleaning fluid container, a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure, and a bracket for insertion of the shaving apparatus therein.

**Inventorship and Inequitable Conduct**

**FACT NO. 20**

Braun had investigated various methods for cleaning dry shavers since at least as early as the 1950's. (*See* Ex. L, Hoeser Timeline.)

**RESPONSE TO FACT NO. 20**

The facts recited in "Rayovac's Fact No. 20" are not material to the issues that are the subject of Rayovac's motions for partial summary judgment. The underlying facts are not disputed, though the timeline cited by Rayovac's Fact No. 20, includes cleaning methods not developed by Braun.

**FACT NO. 21**

In 1992, Dr. Dietrich Pahl conceived the idea for a device that automatically cleaned the head of a dry shaver. (*See* Ex. 18, Pahl Decl., at ¶ 5.)

**RESPONSE TO FACT NO. 21**

Undisputed.

**FACT NO. 22**

Under Dr. Pahl's direction, engineers at Braun's facilities in Lyon, France, began drafting detailed drawings and putting together a working prototype for a device that automatically cleaned the head of a dry shaver. (*Id.*, at ¶ 6.)

**RESPONSE TO FACT NO. 22**

Undisputed.

**FACT NO. 23**

The drawings and prototype that Dr. Pahl developed in France included most, if not all, of the elements claimed in the '328 Patent. (*See id.*) Dr. Pahl made the following statements about his prototype:

> "This cleaning center had many components, including a trough or cradle in which the shaving head of a dry shaver could be placed." (*Id.*, at ¶ 7.)

> The cleaning center also had a container for cleaning fluid, which was positioned below the cradle." (Pahl Decl. ¶ 8)

> "During the cleaning operation, an electrical circuit...activated a pump to feed the cleaning fluid from the cleaning fluid container to the cradle." (*Id.*, at ¶ 9.)

> "The functional model of the cleaning center also included a dryer, consisting of a fan and a heater, to aid in the drying function." (*Id.*, at ¶ 15.)

> "As Exhibits A and B show, the cradle was open to the atmosphere, such that the dry shaver could be inserted from the top into the cleaning device...." (*Id.*, at ¶ 17.)

> Dr. Pahl's 1992 Prototype had a bracket for insertion of the shaving device therein. (*See* Ex. J, Pahl Dep., at 148:13-149:3.)

**RESPONSE TO FACT NO. 23**

Braun disputes Rayovac's Fact No. 23 because Dr. Pahl did not testify at his deposition (148:13-149:3) that his prototype had a bracket for insertion of the shaving device therein. Dr. Pahl's prototype contained many of the elements of the asserted claims of the '328 Patent. The other facts are not disputed.

**FACT NO. 24**

Dr. Pahl presented drawings detailing his invention internally at Braun in November 1992. (Ex. 18, Pahl Decl., at ¶ 16.)

**RESPONSE TO FACT NO. 24**

It is undisputed that Dr. Pahl presented drawings detailing his prototype cleaning system internally at Braun in November 1992; however, Dr. Pahl did not disclose to Braun that the prototype was his invention.

**FACT NO. 25**

After this meeting  Dr. Pahl also presented his prototype to the head of Braun's Men's Hair Removal Unit, Gilbert Greaves, as well as Jacques LaGarde, Braun's CEO. (*See* Ex. J, Pahl Dep., at 53:21-59:15.)

**RESPONSE TO FACT NO. 25**

Undisputed.

**FACT NO. 26**

At some point in 1993, Dr. Pahl enlisted the assistance of Gebhard Braun to further refine the alleged invention that Dr. Pahl had designed. (*See*  Ex. 18, Pahl Decl., at ¶ 20; *see also*, Ex. J, Pahl Dep., at 60:2-11.)

**RESPONSE TO FACT NO. 26**

Undisputed, except for the characterization that the invention is an "alleged" invention.

**FACT NO. 27**

Dr. Pahl showed Mr. Braun the drawings and prototype, which revealed the elements claimed in the '328 Patent. (*See* Ex. 18, Pahl Decl., at ¶ 20.)

**RESPONSE TO FACT NO. 27**

It is undisputed that Dr. Pahl showed Mr. Braun the drawings and prototypes.  It is also undisputed that Dr. Pahl in his Declaration at ¶ 20 did not state that the drawings and elements revealed all the elements claimed in the '328 Patent.

**FACT NO. 28**

Nearly all of the elements of the alleged invention, including all asserted against Rayovac, were complete *before* Mr. Braun began working on it.  (*See* Ex. K, Braun Dep., at 113:5-17.)

**RESPONSE TO FACT NO. 28**

It is undisputed that Dr. Pahl invented elements of the invention before Mr. Braun began work on it.  Braun disputes the characterization of "[n]early all of the elements of the alleged invention" were complete before Mr. Braun began working on it.

**FACT NO. 29**

Mr. Braun revised Dr. Pahl's alleged invention, making minor adjustments, including devising a method for using a single motor to drive both the impeller and pump of the cleaning device.  (*See* Id., at 81:3-8.)

**RESPONSE TO FACT NO. 29**

Braun disputes the characterization that Mr. Braun made only "minor adjustments" to Dr. Pahl's invention.  The other facts are not disputed.

**FACT NO. 30**

Mr. Braun was directed by Braun's Patent Department to fill out an Invention Disclosure, a form used by Braun internally to ascertain details regarding an invention, including details regarding inventorship.  (*See* Ex. 19, Invention Disclosure form; Ex. M, Vorbeck Dep., at 47:5-16.)

**RESPONSE TO FACT NO. 30**

Braun disputes that there is any evidence that Mr. Braun was directed by Braun's Patent Department to fill out an Invention Disclosure.  The other facts are not disputed.

**FACT NO. 31**

Hans Dieter Klauer, Braun's in-house patent counsel, was aware of Dr. Pahl's contributions to the alleged invention and assisted Mr. Braun in preparing his response to the Invention Disclosure form. (Ex. K, Braun Dep., at 113:18-116:5.)

**RESPONSE TO FACT NO. 31**

Braun disputes Rayovac Fact No. 31 because Rayovac misrepresents the

facts. Mr. Klauer was not aware of Dr. Pahl's contributions to the invention. The

undisputed facts are the Dr. Pahl confirmed to Braun's in-house patent department that

Mr. Braun was the sole inventor of the invention. It is also undisputed that Mr. Braun

did not testify that Mr. Klauer assisted him in preparing his response to the Invention

Disclosure form and Mr. Braun testified that he was not sure if he told Mr. Klauer that

Dr. Pahl should be listed as a co-inventor, as shown below.

> Q So you are certain that you informed Mr. Klauer
>
> that Dr. Pahl should be listed as a co-inventor, and
>
> that is why you didn't feel good about this?
>
> MR. PATTON: Let me object to the form.
>
> THE WITNESS: (through interpreter) If it is about
>
> whether I am sure whether I informed Mr. Klauer, I am
>
> not sure in this respect.

Rayovac Exh. K, Braun depo. 123:7-13.

**FACT NO. 32**

Dr. Pahl directed Mr. Braun to falsely name himself as the sole inventor on the Invention Disclosure form. (*Id.*, at 105:13-21.)

**RESPONSE TO FACT NO. 32**

It is undisputed that Mr. Braun testified that Dr. Pahl approved Mr. Braun

in naming himself as the sole inventor on the Invention Disclosure form.

**FACT NO. 33**

Dr. Pahl admitted that his decision to direct Mr. Braun to hide the fact that Dr. Pahl was an inventor was knowing and deliberate. (*See* Ex. J, Pahl Dep., at 128:9-16.)

**RESPONSE TO FACT NO. 33**

Undisputed.

**FACT NO. 34**

Mr. Braun, despite knowing that the details regarding inventorship were incorrect, signed the Invention Disclosure form. (*See Id.*, at 122:22-123:24.)

**RESPONSE TO FACT NO. 34**

It is undisputed that Mr. Braun, pursuant to orders from Dr. Pahl (his

supervisor), signed the Invention Disclosure form knowing that Dr. Pahl made

contributions to that invention.

**FACT NO. 35**

Dr. Pahl and Gilbert Greaves both reviewed and approved the details set forth in the Invention Disclosure form. (*See* DX 43 and 44; Ex. 18, Pahl Decl., at ¶ 22.).

**RESPONSE TO FACT NO. 35**

Undisputed.

**FACT NO. 36**

Indeed, in a separate form that Braun used to ensure that the details regarding inventorship were correct (*See* Ex. M, Vorbeck Dep. at 100:4-101:7), Dr. Pahl represented that the details regarding inventorship set forth in the Invention Disclosure form were correct. *See* DX 43 and 44. Additionally, this form also asked whether Dr. Pahl was aware of prior art material to the invention. *Id.*

**RESPONSE TO FACT NO. 36**

Undisputed.

**FACT NO. 37**

Mr. Vorbeck testified that it was an "exceptional" case for a Director, such as Dr. Pahl, to lie on this form. (Ex. M, Vorbeck Dep., at 104:20-106:17.)

**RESPONSE TO FACT NO. 37**

Braun disputes Rayovac's Fact No. 37 because Rayovac misrepresents the facts. It is undisputed that Mr. Vorbeck testified that upon learning that Dr. Pahl is a co-inventor he thought this is an "exceptional" case (Rayovac Ex. M, Vorbeck Dep., at 104:20-106:17). It is an undisputed fact that Mr. Vorbeck did not testified that it was an "exceptional" case for a Director, such as Dr. Pahl, to lie on this form. Id.

**FACT NO. 38**

Based on the Invention Disclosure form, Braun submitted a patent application to the German patent office, falsely listing Mr. Braun as the sole inventor. (Ex. 21, Braun German patent No. DE 44 02 238.7).

**RESPONSE TO FACT NO. 38**

It is undisputed that, based on the Invention Disclosure form, Braun submitted a patent application to the German patent office, listing Mr. Braun as the sole inventor.

**FACT NO. 39**

Mr. Klauer knew that Dr. Pahl was an inventor of the cleaning system. (Ex. H, Hoser Dep. at 110:14-19.)

**RESPONSE TO FACT NO. 39**

Braun disputes Rayovac's Fact No. 39 because Rayovac misrepresents the facts. The undisputed fact is there is no evidence that Mr. Klauer knew that Dr. Pahl was an inventor of the cleaning system. To the contrary, the undisputed fact shows that Dr. Pahl confirmed to Braun's in-house patent department that Mr. Braun was the sole inventor of the cleaning system. It is also undisputed that Mr. Hoeser did not testify that Mr. Klauer knew Dr. Pahl was an inventor of the cleaning system.

**FACT NO. 40**

          Mr. Klauer was aware of the duty of disclosure in the United States.
(Ex. M, Vorbeck Dep., at 46:1-8.)

**RESPONSE TO FACT NO. 40**

          Braun disputes Rayovac's Fact No. 40 because Rayovac misrepresents the

facts.  It is undisputed that Mr. Vorbeck testified that Mr. Klauer was aware of the duty to

disclose prior art to the United States Patent Office (Ex. M, Vorbeck Dep., at 46:1-16).  It

is also an undisputed fact that Mr. Vorbeck did not testify that Mr. Klauer was aware and

understood the duty of candor as set forth in 37 C.F.R. section 1.56.  It is also an

undisputed fact that Mr. Vorbeck testified that the European patent attorneys at Braun,

such as Mr. Klauer, would have relied on U.S. patent attorneys with respect to the duty of

candor as set forth in 37 C.F.R. section 1.56 (Rayovac Ex. M, Vorbeck Dep., at 19:19-

24).  Further, Rayovac has presented no evidence that Mr. Klauer was a registered patent

attorney in the United States.

**FACT NO. 41**

          Mr. Klauer signed inventorship oaths in the past on patents that were filed
and issued prior to the '328 patent. He is listed as the inventor on three other U.S. patents.
(*See* Ex. 3, U.S. Patent No. 3,989,071 (filed May 1974), Ex. 4, U.S. Patent No. 4,015,151
(filed October 1975), and Ex. 27, U.S. Patent No. 5,704,126 (filed September 1995).)

**RESPONSE TO FACT NO. 41**

          Braun disputes Rayovac's Fact No. 41 because Rayovac misrepresents the

facts.  Braun does not dispute that Mr. Klauer is listed as an inventor on these three U.S.

patents.  But Rayovac's three exhibits do not show that Mr. Klauer signed inventorship

oaths in the past on patents that were filed and issued prior to the '328 patent.  Should

Rayovac prove that Mr. Klauer signed such oaths in these three patents, Rayovac would

still not have provided evidence that Mr. Klauer was aware and understood the duty of

candor as set forth in 37 C.F.R. section 1.56.

**FACT NO. 42**

   Dr. Pahl signed inventorship oaths in the past on patents that were filed
and issued prior to the '328 patent. He is a named inventor on four other United States
patents. Two of these patents were filed earlier than the '328 patent. (Ex. J, Pahl Dep., at
121:6-127:17.)

**RESPONSE TO FACT NO. 42**

   Braun disputes Rayovac's Fact No. 42 because Rayovac misrepresents the

facts. Dr. Pahl testified that he did not know if he signed an inventorship oath on U.S.

patents that were filed and issued prior to the '328 patent (Ex. J, Pahl Dep., at 131:15-

16). Even if he signed such an oath, it would not constitute proof that Dr. Pahl was aware

and understood the duty of candor as set forth in 37 C.F.R. section 1.56.

**FACT NO. 43**

   Mr. Braun signed inventorship oaths in the past on patents that were filed
and issued prior to the '328 patent. He is a named inventor on several other United States
patents, including patents on which he was named as a co-inventor. (Ex. K, Braun Dep.,
at 149:8-150:9.)

**RESPONSE TO FACT NO. 43**

   Undisputed.

**FACT NO. 44**

   Mr. Klauer assisted in the prosecution of the German patent application,
which ultimately issued as DE 44 02 238.7. (Ex. K, Braun Dep., at 118:8-12.)

**RESPONSE TO FACT NO. 44**

   Undisputed.

**FACT NO. 45**

   Mr. Klauer, along with Braun's United States patent counsel, Fish &
Richardson, also participated in the prosecution of Braun's U.S. patent application.
(Ex. M, Vorbeck Dep., at 19:3-19:18; *see also* Ex. 28, B001157, 58.)

**RESPONSE TO FACT NO. 45**

It is undisputed that Mr. Klauer and Mr. Eric Prahl and Ms. Phyllis Kristal

of Fish & Richardson participated in the prosecution of Braun's U.S. patent application

that led to the '328 patent.

**FACT NO. 46**

As required by U.S. statute, Mr. Braun signed an oath when the '328
patent application was filed with the USPTO, in which he falsely stated that he was the
"original, first, and sole inventor...of the subject matter which is claimed and for which
a patent is sought...." (*See* Ex. 29, Inventorship Oath for the '328 patent.)

**RESPONSE TO FACT NO. 46**

It is undisputed that Mr. Braun signed a Declaration in connection with the

'328 patent and in that Declaration he stated that he was the sole inventor.

**FACT NO. 47**

Mr. Braun admitted that when he signed the inventorship oath, he knew
that Dr. Pahl was an inventor. (Ex. K, Braun Dep., at 112:7-15; 157:2-24.)

**RESPONSE TO FACT NO. 47**

It is undisputed that, when Mr. Braun signed the inventorship oath, he

knew that Dr. Pahl made significant contributions to the cleaning system described in the

patent application.

**FACT NO. 48**

Supported by Mr. Braun's false oath, the '328 patent issued on January 27,
1998. (*See* Ex. 1, U.S. Pat. No. 5,711,328.)

**RESPONSE TO FACT NO. 48**

Braun disputes the characterization and the tone that the '328 patent was

secured under false pretense. Braun does not dispute that the '328 patent issued on

January 27, 1998.

16

**FACT NO. 49**

Under German law, if a patented invention is commercialized, it is required that the inventor be compensated commensurate with the sales of the patented product. (*See* Ex. J, Pahl Dep., at 118:24-119:17, 121:9-122:14.)

**RESPONSE TO FACT NO. 49**

Undisputed.

**FACT NO. 50**

A sole inventor is entitled to more money from a successful invention than if they have to share credit with a co-inventor. (*See* Ex. M, Vorbeck Dep., at 88:11-89:22.)

**RESPONSE TO FACT NO. 50**

Undisputed.

**FACT NO. 51**

Based on German law, Mr. Braun, as the sole inventor listed on the German and U.S. patents has been paid approximately € 40,000 by Braun. (*Id.*, at 36:7-11.)

**RESPONSE TO FACT NO. 51**

Disputed. Dr. Vorbeck <u>speculated</u> that Mr. Braun could have been paid as much as € 40,000 by Braun (Ex. M, Vorbeck Dep., at 36:7-11).

**Price Erosion**

**FACT NO. 52**

The first product embodying the invention claimed by the '328 Patent, Braun's Syncro System, a cleaning device for a foil shaver, was launched in the United States through a subsidiary of Braun's parent company, The Gillette Company ("Gillette"), in July 2000. (*See* Ex. D, David Expert Report, at 4.)

**RESPONSE TO FACT NO. 52**

It is undisputed that this product was launched by Gillette in the U.S. at that time.

**FACT NO. 53**

Braun subsequently developed two lower priced models, the Flex 400 (in 2002), and Flex 700 (in 2003), and a higher priced, "premium" model, the Activator (in 2004). (*Id.*)

**RESPONSE TO FACT NO. 53**

It is undisputed that these products were developed by Braun at or around those times.

**FACT NO. 54**

Rayovac introduced the Titanium Smart System, a cleaning device for a rotary shaver (the R-9500), in October 2003. Subsequently, in August 2004, Rayovac launched a Titanium Smart System for foil shavers (the MS-5500 and MS-5700). (*Id.*)

**RESPONSE TO FACT NO. 54**

Undisputed.

**FACT NO. 55**

On September 24, 2004, Rayovac served its First Set of Interrogatories on Braun, asking, Interrogatory No. 6, which asked Braun to provide its damages contentions. (*See* Ex. 8, Braun's Answer to Remington's First Set of Interrogatories, at 7.) Braun refused to answer, claiming that Rayovac's inquiry was premature. (*Id.* at 8.)

**RESPONSE TO FACT NO. 55**

Disputed. At the time that Braun's response to Rayovac's First Set of Interrogatories was due, discovery had just begun and Braun answered Interrogatory No. 6 to the best of its ability at that time. Subsequently, Braun served the Expert Report of Dr. Jesse David in response, *inter alia*, to Interrogatory No. 6.

**FACT NO. 56**

Braun admits, as it must, that it only seeks to collect its damages, and not those of its parent company, Gillette. (*See* Ex. 32, Plaintiff's Answers to Defendants' Second Set of Interrogatories, at 8.)

**RESPONSE TO FACT NO. 56**

Undisputed.

## FACT NO. 57

On March 30, 2005, Rayovac moved to compel Braun to supplement its deficient discovery responses. (*See* Ex. 9, Rayovac Corporation's Memorandum in Support of its Motion to Compel) On April 27, 2005, this Court granted Rayovac's motion. (*See* 4/27/05 Order Regarding Docket No. 54.)

## RESPONSE TO FACT NO. 57

Undisputed.

## FACT NO. 58

Braun has not supplemented its response to Interrogatory No. 6, choosing instead to rely on Dr. David's expert report for Braun's damages contentions. (*See* Ex. 22, Braun's Supplemental Responses to Remington's Second Set of Interrogatories, Nos. 17-19.)

## RESPONSE TO FACT NO. 58

Braun disputes Rayovac's Fact No. 58 because Rayovac distorts the facts. Braun served the Expert Report of Dr. Jesse David in response, *inter alia*, to Interrogatory No. 6. Braun also incorporated the contents of Dr. Jesse David's report by reference in its answer to Rayovac's Interrogatory No. 19 with respect to the profits that Braun made.

## FACT NO. 59

Redacted.

## RESPONSE TO FACT NO. 59

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

## FACT NO. 60

Redacted.

**RESPONSE TO FACT NO. 60**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

**FACT NO. 61**

Redacted.

**RESPONSE TO FACT NO. 61**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

**FACT NO. 62**

Redacted.

**RESPONSE TO FACT NO. 62**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

**FACT NO. 63**

Redacted.

**RESPONSE TO FACT NO. 63**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

**FACT NO. 64**

Redacted.

**RESPONSE TO FACT NO. 64**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

**FACT NO. 65**

Redacted.

**RESPONSE TO FACT NO. 65**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

**FACT NO. 66**

Redacted.

**RESPONSE TO FACT NO. 66**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

**FACT NO. 67**

Redacted.

**RESPONSE TO FACT NO. 67**

This "fact" is disputed as Braun cannot ascertain what "fact" is asserted as Rayovac has filed and served only a redacted version of its Statement Of Uncontested Facts Pursuant To Local Rule 56.1 to Braun.

## Written Description

### FACT NO. 68

Samuel Phillips has opined that the sole explicit written description in the '328 patent specification for a "cradle structure" corresponds with a structure that receives and retains cleaning fluid. (Ex. A, First Phillips Report, at ¶ 51.)

### RESPONSE TO FACT NO. 68

Undisputed.

### FACT NO. 69

Dr. Samir Nayfeh does not dispute that the sole explicit written description in the '328 patent specification for a "cradle structure" corresponds with a structure that receives and retains cleaning fluid. (Ex. 15, Second Nayfeh Report.)

### RESPONSE TO FACT NO. 69

Braun disputes Rayovac's Fact No. 69 because Rayovac misrepresents the facts. In his Second Report, Professor Nayfeh disagrees with Mr. Phillips's opinion that the Court's construction of a cradle structure as a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both is inconsistent with the written description of the '328 patent. (Rayovac Ex. 15, Second Nayfeh Report at pp. 26-28). Professor Nayfeh notes that the preferred embodiment of the invention includes a cradle structure that receives and retains cleaning fluid, but notes that, depending on the dimension of the outlet port to the cradle structure, the cradle structure could receive or retain cleaning fluid. Professor Nayfeh notes further that claim 2 of the patent (which corresponds to claim 9 of the originally filed application) includes the limitation that the outlet port be dimensioned such that cleaning fluid is retained in the cleaning fluid. Such a limitation would be superfluous if the cradle structure included only those structures that received and retained cleaning fluid.

**FACT NO. 70**

Prior to the filing date of the '328 patent, Gebhard Braun did not conceive of a "cradle structure" that received, but did not retain cleaning fluid. (Ex. K, Braun Dep., at 73-75.)

**RESPONSE TO FACT NO. 70**

Disputed. Mr. Braun testified that the idea of a cradle structure that received but did not retain cleaning fluid was rejected by him because, in his opinion, the cradle structure that received and retained cleaning fluid had a better cleaning result. (Rayovac Ex. K, Braun Dep., at 73-76). Mr. Braun therefore testified that he never created nor developed a prototype of a cleaning system in which cleaning fluid was not retained by the cradle. *Id.* Dr. Pahl conceived of a cradle structure that received, but did not retain, cleaning fluid (Rayovac Ex. J, Pahl Dep., at 80:5-6). He also rejected the idea as not producing a good cleaning result. *Id.* at 83.

**FACT NO. 71**

Prior to the filing date of the '328 patent, Dr. Dietrich Pahl did not conceive of a "cradle structure" that received, but did not retain cleaning fluid. (Ex. J, Pahl Dep., at 80-81.)

**RESPONSE TO FACT NO. 71**

Braun disputes Rayovac's Fact No. 71 because Rayovac misrepresents the facts. It is undisputed that Dr. Pahl testified that he did consider that alternative embodiment (Rayovac Ex. J, Pahl Dep., at 80-83) and therefore he conceived of a cradle structure that received, but did not retain, cleaning fluid.

**FACT NO. 72**

Gebhard Braun never attempted to develop a cleaning system in which the shaver was sprayed with cleaning fluid as opposed to being bathed with cleaning fluid. (Ex. K, Braun Dep., at 73-75.)

**RESPONSE TO FACT NO. 72**

       Undisputed.

**FACT NO. 73**

       Gebhard Braun never tested his cleaning system in a situation where there was no cleaning fluid retained in the "cradle structure." (*Id.*)

**RESPONSE TO FACT NO. 73**

       Undisputed.

**FACT NO. 74**

       When Gebhard Braun worked on the cleaning system described in the '328 patent, he believed that a cleaning device lacking a "cradle structure" that retained fluid would not function. (*Id.*)

**RESPONSE TO FACT NO. 74**

       Braun disputes Rayovac's Fact No. 74 because Rayovac misrepresents the facts. Mr. Braun testified that such a device would not work as well as one that retained fluid (Rayovac Ex. K, Braun Dep., at 73-75). When Mr. Braun was asked whether he ever "tested the cleaning system in a situation where there was no fluid retained in the cradle" (*id.* at 75), Mr. Braun understood the question to mean a system in which no cleaning fluid was used: "I just turned the razor with the head down and I just operate it." *Id.* at 75:6-7. Not surprisingly, he believed that if the shaver could be cleaned by just turning it upside down and turning it on, then "we would not need a cleaning system." *Id.* at 75:8-10.

**FACT NO. 75**

       When Dr. Dietrich Pahl worked on the cleaning system described in the '328 patent, he believed that a cleaning device lacking a "cradle structure" that retained fluid would not function. (Ex. J, Pahl Dep., at 80-81.)

**RESPONSE TO FACT NO. 75**

   Braun disputes Rayovac's Fact No. 75 because Rayovac misrepresents the facts. Dr. Pahl testified that such a device would not work as well as one that retained fluid (Ex. J, Pahl Dep., at 80-83).

**FACT NO. 76**

   Gebhard Braun testified that a cleaning system without a "cradle structure" that retains cleaning fluid is no different than no cleaning system at all. (Ex. K, Braun Dep., at 73-75.)

**RESPONSE TO FACT NO. 76**

   Braun disputes this fact as desposition transcript reveals that Mr. Braun did not understand the question. When Mr. Braun was asked whether he ever "tested the cleaning system in a situation where there was no fluid retained in the cradle" (*id.* at 75), Mr. Braun understood the question to mean a system in which no cleaning fluid was used: "I just turned the razor with the head down and I just operate it." *Id.* at 75:6-7. Not surprisingly, he believed that if the shaver could be cleaned by just turning it upside down and turning it on, then "we would not need a cleaning system." *Id.* at 75:8-10.

**FACT NO. 77**

   Gebhard Braun described his alleged invention in an internal Invention Disclosure as "a specially configured trough (1) into which the shaver (2) is immersed upside down." (Ex. 19, Braun Invention Disclosure Record.)

**RESPONSE TO FACT NO. 77**

   Braun disputes Rayovac's Fact No. 77 because Rayovac distorts the facts. Mr. Braun did in that Invention Disclosure statement is to describe a preferred embodiment of his invention in such a manner.

**FACT NO. 78**

According to Dr. Pahl, the most important thing for a good cleaning result in the cleaning system described in the '328 patent is that the cutter block is immersed in liquid in the "cradle structure." (Ex. J, Pahl Dep., at 80-81.)

**RESPONSE TO FACT NO. 78**

Undisputed.

**FACT NO. 79**

Juergen Hoeser took over the work on the cleaning device from Braun/Pahl in approximately July 1995. (Ex. H, Hoeser Dep., at 19-20.)

**RESPONSE TO FACT NO. 79**

Undisputed.

**FACT NO. 80**

At or near 1995, Mr. Hoeser described the work of Mr. Braun and Dr. Pahl as a "chicken trough" based upon his recollection of a tub filled to the rim with water on a farm to feed chickens. (*Id.*, at 24-25.)

**RESPONSE TO FACT NO. 80**

Braun disputes Rayovac's Fact No. 80 because Rayovac distorts the facts.

Mr. Hoeser testified that he did not use the term "chicken trough" to describe the cleaning

system developed by Mr. Braun and Dr. Pahl. (Rayovac Ex. H, Hoeser Dep., at 24-26).

**FACT NO. 81**

Mr. Hoeser testified that he is the only individual at Braun to think of a cleaning device in which a "cradle structure" does not retain fluid. (*Id.*, at 97-98.)

**RESPONSE TO FACT NO. 81**

Braun disputes Rayovac's Fact No. 81 because Rayovac distorts the facts.

Mr. Hoeser testified that he thought a device in which cleaning fluid was injected into the

interior of the shaving head of the shaver was his idea. Mr. Hoeser did not work at Braun

until 1995 (*Id.*, at 19:9-10) and did not testify to what happened Braun with respect to a

cleaning device in which a "cradle structure" does not retain fluid before 1995.