**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

BRAUN GmbH,                                      )
                                                 )
            Plaintiff,                           )
                                                 )
      v.                                         )    Civil Action No. 03-CV-12428-WGY
                                                 )
RAYOVAC CORPORATION,                             )
                                                 )
            Defendant.                           )
_____)

**<u>RAYOVAC CORPORATION'S OPPOSITION TO BRAUN'S MOTIONS FOR
SUMMARY JUDGMENT ON INFRINGEMENT, INVALIDITY, AND INVENTORSHIP</u>**

# TABLE OF CONTENTS

I.      Rayovac Has Not Infringed Claim 11 of the '328 Patent. ................................1

        A.    "a cradle structure adapted to receive a shaving head of a shaving apparatus" .................................................................................................3

        B.    "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure" ...............................................................6

II.     Dr. Pahl May Not Be Joined As An Inventor On the '328 Patent. ...................7

III.    Claim 11 Of The '328 Patent Is Anticipated By Several Prior Art Patents. ...............10

        A.    "a cradle structure adapted to receive a shaving head of a shaving apparatus" ...............................................................................................11

        B.    "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure" .............................................................13

        C.    "said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure" .................................................................13

              1.    "a drying device" .......................................................................14

IV.     The '328 Patent is Indefinite ............................................................................14

V.      The '328 Patent Has an Inadequate Written Description .................................15

VI.     Braun Committed Fraud In Connection With The Prosecution Of The '328 Patent. .............................................................................................................16

        A.    The Zeischke Thesis ...............................................................................17

        B.    Braun's False Translation .......................................................................17

VII.    The '328 Patent Fails To Name Norbert Smetana and Helmut Kraus As Inventors. .........................................................................................................18

VIII.   The '328 Patent Fails To Disclose A Best Mode. ...........................................20

IX.     CONCLUSION .................................................................................................20

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*,
    261 F.3d 1329, 1344 (Fed. Cir 2001) .............................................................. 3

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
    228 F.3d 1338 (Fed. Cir. 2000) ...................................................................... 9

*Amhil Enters. v. Wawa, Inc.*,
    81 F.3d 1554, 1557-58 (Fed. Cir. 1996) ......................................................... 4

*Anchor Walls Sys., Inc. v. Rockwood Retaining Walls, Inc.*
    340 F.3d 1298, 1313-14 (Fed. Cir. 2003) ....................................................... 7

*Bayer AG v. Schein Pharms., Inc.*,
    301 F.3d 1306, 1314 (Fed. Cir. 2002) ........................................................... 22

*Bell & Howard Document  Mgmt. Prods. Co. v. Altek Sys.*,
    132 F.3d 701, 705 (Fed. Cir. 1997) ................................................................ 4

*Bruno Independent Living Aids, Inc. v. Acorn Mobility Svcs., Ltd.*,
    394 F.3d 1348, 1354 (Fed. Cir. 2005) ............................................................ 9

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
    157 F.3d 1340 (Fed. Cir. 1998) ...................................................................... 9

*Cadle Co. v. Hayes*,
    116 F.3d 957, 959 (1st Cir. 1997) ................................................................... 5

*Cardiac Pacemakers, Inc. v. St. Jude Medical*, Inc.,
    381 F.3d 1371, 1378, (Fed. Cir. 2004) .......................................................... 21

*Critikon, Inc. v. Becton Dickinson Vascular Access*,
    120 F.3d 1253, 1256 (Fed. Cir. 1997) ..................................................... 18, 19

*Datamize, LLC v. Plumtree Software, Inc.*,
    2005 WL 1845106, at *4 (Fed. Cir. Aug. 5, 2005)........................................ 16

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336, 1342 (Fed. Cir. 2001) ............................................................ 4

*John Blue Co. v. Dempster Mill Mfg. Co.*,
    172 F. Supp. 23, 29-30 (D. Neb. 1958) ........................................................... 9

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
    175 F.3d 985, 988-89................................................................................. 6, 15

*Kraftco Corp. v. Beatrice Foods Co.*,
    342 F. Supp. 1361, 1372 (D.N.J. 1971) ........................................................................ 9

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
    320 F.3d 1354, 1364 (Fed. Cir. 2003) ........................................................................ 17

*Pannu v. Iolab Corp.*,
    155 F.3d 1344, 1350 (Fed. Cir. 1998) ........................................................................ 8

*Perseptive BioSystems, Inc. v. Pharmacia Biotech, Inc.*,
    225 F.3d 1315, 1318-20 (Fed. Cir. 2000) ................................................................ 20

*Rohm & Haas Co. v. Crystal Chem. Co.*,
    722 F.2d 1556, 1571 (Fed. Cir. 1983) ........................................................................ 19

*Stark v. Advanced Magnetics, Inc.*,
    119 F.3d 1551, 1555 (Fed. Cir. 1997) ........................................................................ 8

*Transclean Corp v. Bridgewood Servs., Inc.*,
    290 F.3d 1364, 1373-74 (Fed. Cir. 2002) ................................................................ 5

*Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*,
    11 F. Supp. 2d 141, 144-45 (D. Mass. 1998) ........................................................ 7

*Univ. of Colo. Found., Inc. v. Am. Cyanamid*,
    880 F. Supp. 1387, 1399 (D. Colo. 1995) .............................................................. 9

**Statutes**

35 U.S.C. § 102(b) ........................................................................................................ 13

35 U.S.C. § 132 ............................................................................................................ 21

35 U.S.C. § 256 ............................................................................................................ 10

U.S.C. § 102 ................................................................................................................ 13

Rayovac hereby opposes Braun's motions for summary judgment that (1) Rayovac has infringed claim 11 of the '328 patent, (2) that inventorship should be corrected, and (3) that claim 11 of the '328 patent is valid and unenforceable.  For most issues presented, summary judgment should be granted in favor of Rayovac.  For the rest, there are genuine issues of material fact, precluding summary judgment.

The purported "laundry list" of Rayovac's defenses is not an indictment of Rayovac's case; it is better directed at Braun.  Simply, Braun has radically altered what it allegedly invented in an attempt to read its claims on to Rayovac's fundamentally different products — now even contradicting arguments it made at the *Markman* stage.  In so doing, Braun has now run afoul of numerous requirements of U.S. patent law, as it did previously during prosecution.  The number of factually supported defenses here underscore the fact that Braun's case was unsound from the start and it has become progressively worse.  Summary judgment must be granted to Rayovac.

## I.    Rayovac Has Not Infringed Claim 11 of the '328 Patent.

There is no "cradle structure" in Rayovac's products.  Braun does not assert that the Court's tentative claim construction reads on any structure in Rayovac's products.  Instead, Braun jumbles together ***three*** separate and distinct structures (none of which meets the Court's tentative construction) that "together" allegedly constitute a "cradle structure."  In so doing, Braun abuses the notion of a "cradle structure."  If anything, summary judgment should be granted to Rayovac that it has not infringed the '328 patent.

The Rayovac accused products are (1) the R-9500 cleaning system for men's rotary electric razors ("men's rotary"); (2) the MS-5500/5700 cleaning system for men's foil electric razors ("men's foil"); and (3) the WDF-7000CS cleaning system for women's foil electric razors

("women's foil").  ¶ 1.[1]  In all of Rayovac's cleaning systems, there is an upper housing and a lower reservoir which form the cleaning device that holds and cleans an electric razor.[2]  ¶ 2. Prior to the use of the device, cleaning fluid is poured from a bottle into the reservoir.  ¶ 2.

During the cleaning operation, fluid is fed via a pump into a manifold.  ¶ 4.  Unlike the cleaning system claimed by the '328 patent in which a shaver head is bathed in a fluid-retaining "cradle," in Rayovac's products, the fluid is forced via injection nozzles into the hair pocket of the shaver.[3]  ¶ 6.  Exhibit 47 illustrates the difference between the "cradle" claimed in the '328 patent and Rayovac's cleaning method.  Rayovac's cleaning method results injection of fluid into the hair pocket and flushing hair and dirt out of  the hair pocket, as the fluid drains out of the hair pocket by the force of gravity.  ¶ 6.  The drained fluid is channeled to (1) a basin and then (2) a drain into a filter and finally (3) back into the reservoir.  ¶ 11.

In the men's rotary product, the shaver has three openings for the injection of fluid.  ¶ 7. In the foil products, the men's shaver has four openings, and the women's shaver has two openings.  ¶ 7.  For all, the manifold is fitted with injection nozzles that are inserted into the openings on the shaver.  ¶ 8.

The Rayovac products also have significant differences with respect to what Dr. Nayfeh calls the "supporting surfaces 3c.".  In particular, for the men's rotary product, the supporting surfaces 3c are allegedly a post and ribs.  ¶ 9.  For the men's and women's foil products, the supporting surfaces are allegedly spring-loaded baskets.  ¶ 9.[4]

---

[1]    Paragraph numbers refer to Rayovac's responsive Statement of Undisputed Facts.

[2]    Pictures of Rayovac's cleaning systems are attached as Exhibits 6.

[3]    The hair pocket is the interior portion of the shaver that collects hair, dirt, etc. from shaving.  ¶ 6.

[4]    Braun grossly distorts the deposition testimony of James Chasen.  Mr. Chasen never testified that "the manifold, ports and supporting surfaces form the 'unit' that you 'put it [the shaver head] into."  (Braun Br., at 10.)  Mr. Chasen unremarkably called Rayovac's entire cleaning device a "unit."  Moreover, Dr. Nayfeh has opined that

### A. "a cradle structure adapted to receive a shaving head of a shaving apparatus"

Rayovac has advocated that the Court's tentative claim construction should be modified. Regardless of the construction, however, Braun's motion must be denied at least because:

- The experts disagree as to whether three separate and distinct structures are a "cradle structure."

- The "manifold 3a" does not directly support the shaving head of Rayovac shavers.

- The experts dispute whether Dr. Nayfeh's "ports 3b" receive or support the shaving head of Rayovac shavers.

- Dr. Nayfeh offers no opinion that the "manifold 3a, ports 3b, and supporting surfaces 3c" have the "specific shape" mandated by the Court's tentative claim construction.

- The "supporting surfaces 3c," which Dr. Nayfeh says are part of a "cradle structure," neither receive nor retain fluid.

- Under the modified claim construction Rayovac has proposed, Dr. Nayfeh has **no opinion** whether Rayovac has infringed the '328 patent.

*First*, there is a genuine disagreement between the experts as to whether the "manifold 3a, the ports 3b, and the supporting surfaces 3c" are a "cradle structure." Mr. Phillips explains that the manifolds and injection nozzles in Rayovac's accused products serve the same function as the "conduits 64" illustrated in Figure 6 of the '328 patent. ¶ 11 (Ex. 1, at Fig. 6.) Mr. Braun has testified that the "conduits 64" are not a "cradle structure" or part of it.[5] ¶ 12. Mr. Phillips agrees that the "conduits 64" and the functionally equivalent manifold and injection nozzles are not a "cradle structure." ¶ 12.

---

his "supporting surfaces 3c" in the rotary product are a post **and ribs**. ¶ 9. Braun conveniently ignores the fact that Mr. Chasen never testified that the ribs support a shaving head. ¶ 9.

[5]   It is appropriate for the Court to consider an inventor's testimony regarding his understanding of his alleged invention. *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 261 F.3d 1329, 1344 (Fed. Cir 2001).

Dr. Nayfeh originally responded that the "conduits 64" differ from the manifold and injection nozzles because the "conduits 64" allegedly do not bear any load. ¶ 13. But he subsequently conceded that he has doesn't know whether the "conduits 64" in the '328 patent bear a load or not. ¶ 13. As Dr. Nayfeh's rebuttal is (charitably) a guess, his opinion cannot be credited over Mr. Phillips' opinion at the summary judgment stage.[6] *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1342 (Fed. Cir. 2001); *Bell & Howard Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 705 (Fed. Cir. 1997).

**Second**, Dr. Nayfeh admits that the Court's tentative claim construction will not read on a structure if the structure does not "**directly**" support a shaver head. ¶ 16. Mr. Phillips has explained that the manifold in Rayovac's products does not receive or support a shaver head. ¶ 17. Dr. Nayfeh concedes that the manifold never even touches a shaver head, and it at most provides "**indirect**" support. ¶ 16. As "indirect support" is not enough according to Dr. Nayfeh, the Court must grant summary judgment in favor of Rayovac, not Braun. *See Amhil Enters. v. Wawa, Inc.,* 81 F.3d 1554, 1557-58 (Fed. Cir. 1996).

**Third**, the experts dispute whether it is the exterior surfaces of the injection nozzles or the combination of the interior and exterior surfaces of the injection nozzles that support a shaving head. ¶¶ 1-14, 16-18. Dr. Nayfeh calls the interior surface of the injection nozzles his "ports 3b." ¶ 23. Mr. Phillips explains that the interior and exterior surfaces of the injection nozzles are distinct structures. ¶ 18. He also notes that the exterior surfaces of the injection nozzles do not receive or retain fluid. ¶ 18. Dr. Nayfeh, however, opines that interior and exterior surfaces

---

[6] Significantly, however, Dr. Nayfeh believes that the basin in Rayovac's products (which does not retain cleaning fluid) is ***not*** a "cradle structure" or a part of one. ¶ 14. Rayovac agrees. Braun states that miniature droplets of fluid remain in the basin after the cleaning process is complete. ¶ 15. While Rayovac disputes that miniature droplets constitute retention of fluid, Braun's discussion of the basin is a red herring clearly directed at confusing the Court.

of the injection nozzles are not distinct.    ¶ 18.    Here, it must be assumed that the jurors would credit Mr. Phillips' opinion.    *See Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).

**Fourth**, Dr. Nayfeh repeatedly testified that the Court's tentative claim construction will not read on a structure unless that structure has a "specific shape" of particular form and dimensions.[7]    ¶ 19.    Despite committing himself to a "specific shape" requirement, Dr. Nayfeh offers **no opinion** in any of his reports regarding whether the "manifold 3a, ports 3b, and supporting structures 3c" have the requisite "specific shape."[8]    There is not a single sentence about the shape of the manifold, the ports, or the supporting structure, let alone the "shape" of the structures combined.    ¶ 20.    The lack of any analysis is not surprising since the manifold of Rayovac's foil products (as drawn by Dr. Nayfeh), for example, bears no resemblance to a shaver head.    ¶ 21.    Dr. Nayfeh's failure to offer an infringement opinion is fatal to Braun's case. *See Transclean Corp v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373-74 (Fed. Cir. 2002).

**Fifth**, Dr. Nayfeh concedes that the "cradle structure" claimed in the '328 patent must at least get wet.    ¶ 22.    According to Mr. Phillips, Dr. Nayfeh's "supporting surfaces 3c" neither receive nor retain cleaning fluid.    ¶ 22.    In response, Dr. Nayfeh testifies that he "thinks" the post and ribs of the **rotary product** "might" get wet.    ¶ 22.    For the **foil products**, he has **no idea** whether the spring-loaded basket ever receives fluid at all.[9]    ¶ 22.    For Rayovac's foil products, Mr. Phillips' unrebutted expert opinion mandates summary judgment in favor of Rayovac.

---

[7]    The opinion of **Braun's own expert** renders Braun's argument in the *Markman* proceedings that the "cradle structure" limitation "says nothing about the shape of the cradle structure" manifestly disingenuous.    (Braun Markman Br., at 9.)    Rayovac has argued that the claim language requires a trough-shaped structure.    The Court should respectfully reconsider Rayovac's argument in view of the agreement with it of Dr. Nayfeh.

[8]    Mr. Phillips, on the other hand, does not believe any structure in Rayovac's products has the specific shape of a "cradle structure."

[9]    Indeed, Braun does not even address the spring-loaded basket of the foil products in its summary judgment motion.    Braun's attempt to gloss over the differences between the products-at-issue speaks volumes.

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988-89. For Rayovac's rotary product, Mr. Phillips' clear opinion contrasted against Dr. Nayfeh's guess must at least create an issue of fact.

*Sixth*, Mr. Phillips has explained his view that the Court's "cradle structure" limitation should be modified to read "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive and retain fluid." ¶ 23. Mr. Phillips has further explained, that the interior surfaces of the injection nozzles — Dr. Nayfeh's "ports 3b" — do not (1) receive or (2) retain cleaning fluid. ¶ 23. Dr. Nayfeh concedes that he has not even considered whether Rayovac's products infringe if the Court modifies its tentative claim construction. ¶¶ 10, 24. His failure to even consider the modified claim construction is inexplicable as (1) Mr. Phillips provided notice of his opinion and (2) the Court instructed the parties that its tentative constructions might change. The deadline for expert reports having past, Dr. Nayfeh cannot offer any new opinions. *Anchor Walls Sys., Inc. v. Rockwood Retaining Walls, Inc.* 340 F.3d 1298, 1313-14 (Fed. Cir. 2003). Thus, if the Court modifies its construction, summary judgment must be granted to Rayovac.

### B. "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure"

The Court did not decide against Rayovac on the "feed device" limitation at the *Markman* Hearing. The Court explicitly declined to decide whether the limitation required that fluid be fed directly or indirectly. Under any construction, Rayovac cannot infringe.

*First*, for reasons presented above, Rayovac's products have no "cradle structure," and thus fluid cannot be fed to a non-existent structure (directly or indirectly).

*Second*, there can be ***no dispute*** that fluid is never fed to the "supporting structures 3c" in Rayovac's foil products. ¶ 26. Fluid must be fed to ***said*** cradle structure, not just the parts

6

Braun's expert thought it was convenient to analyze. *Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*, 11 F. Supp. 2d 141, 144-45 (D. Mass. 1998) ("The word 'said' is used by many practitioners rather than 'the' to refer back to previously recited elements." (citation omitted)).

**Third**, Dr. Nayfeh only "thinks" the "supporting structures 3c" might get wet due to accidental leakage in Rayovac's rotary product. ¶ 27.  Mr. Phillips disagrees.  ¶ 27.  But accidental leakage is not "feeding" of cleaning fluid.  ¶ 26.  If the supporting structures 3c in the rotary product get wet at all, an issue of fact remains as to whether fluid has actually been "fed" to "said cradle structure" (directly or indirectly). *See Hilgraeve Corp.*, 224 F.3d at 1352.

## II.    Dr. Pahl May Not Be Joined As An Inventor On the '328 Patent.

Braun does not dispute that Dr. Pahl lied and ordered Mr. Braun to lie.  Relying on inapposite case law, Braun attempts to focus the Court on the motives underlying Dr. Pahl's deception.  But, where as here, intent to deceive is admitted, motive is irrelevant.[10]

Under Section 256 a patent can be corrected to cure errors in inventorship, but only if the error occurred "without any deceptive intention." *See* 35 U.S.C. § 256; *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998); *see also Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1555 (Fed. Cir. 1997)[11].  Here, Dr. Pahl has **admitted** that he deliberately directed Mr. Braun to falsify inventorship details and then lied to keep his role as an inventor secret.

Braun proceeds as though deceptive intent were not admitted, and offers two irrelevant excuses.  First, Braun claims that Dr. Pahl misunderstood the differences between U.S. patent

---

[10]    Unlike Rayovac, Braun has not moved for summary judgment on Rayovac's **separate** theory that Gebhard Braun committed fraud by knowingly filing a false inventorship oath.  Even if one assumes that Dr. Pahl is as kind and generous as Braun asserts (and Rayovac does not), Mr. Braun, whose motives are likewise irrelevant, lied to the United States government for the oldest reason on the books — money.

[11]    In *Stark*, the Federal Circuit **only** considered whether § 256 requires analysis of the intent of all inventors or **just** the unnamed inventor.  *See* 199 F.3d at 1555-56.  The Federal Circuit did not pass on what constitutes "deceptive intent," and, contrary to Braun's suggestion, its opinion says absolutely nothing about irrelevant questions such as "motives," "decency," "good faith," etc.

law and German patent law.  Second, Braun claims that Dr. Pahl's deception was motivated by generosity.  But these assertions do not contradict the fact that Dr. Pahl deliberately lied.

Dr. Pahl has, in fact, admitted that his actions have nothing to do with U.S. or German law:

> Q:    So your choice -- your decision not to name yourself as an inventor on the shaver cleaning system, that was a deliberate choice, correct?
>
> A:    Totally.
>
> Q:    And when you made that choice you did recognize that you were actually an inventor of the shaver cleaning system?
>
> A:    Sure, yeah.

(Ex. 143, at 129.)  Dr. Pahl's deliberate actions were clearly not a mistake; thus, the inquiry should end there.  *See John Blue Co. v. Dempster Mill Mfg. Co.*, 172 F. Supp. 23, 29-30 (D. Neb. 1958), *aff'd on other grounds by*, 275 F.2d 668, (8th Cir. 1960).[12]

Braun's first alibi for Dr. Pahl, that he misunderstood the differences between U.S. and German patent law, is both legally irrelevant and factually unsupported.  The claimed confusion is immaterial to whether Dr. Pahl's action was deceptive.[13]  In his Declaration, Dr. Pahl states, "I understand that, under German patent law, a German patent is valid even if it fails to name all inventors."  *See* Pahl Decl. ¶ 25.  But Dr. Pahl still intended to deceive (and, in fact, did deceive),

---

[12]  *See also Univ. of Colo. Found., Inc. v. Am. Cyanamid*, 880 F. Supp. 1387, 1399 (D. Colo. 1995), *vacated on other grounds*, 196 F.3d 1366 (Fed. Cir. 1999) (holding **only** that section 256 only inquires into the intent of an unnamend inventor with no discussion of the district court's interpretation of what constitutes "deceptive intent"); *Kraftco Corp. v. Beatrice Foods Co.*, 342 F. Supp. 1361, 1372 (D.N.J. 1971).

[13]  Braun cites to *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338 (Fed. Cir. 2000), and *C.R. Bard, Inc. v. M3 Sys., Inc*., 157 F.3d 1340 (Fed. Cir. 1998), for the proposition that deceptive intent is lacking where an inventor acts in ignorance of U.S. patent law requirements.  But these cases are inapposite.  In neither of the cited cases did the unjoined inventor admit that he intended to deceive, nor was there other direct evidence of an intentional act.  Deceptive intent is usually difficult to prove by direct evidence, and may be inferred from the circumstances.  *Bruno Independent Living Aids, Inc. v. Acorn Mobility Svcs., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005).  In contrast, here, nothing needs to be inferred.  Dr. Pahl has admitted that he lied.

regardless of whether he understood the precise legal ramifications of his actions.  Moreover, Braun's assertion that Dr. Pahl did not understand the inventorship requirement under U.S. law is wholly unsupported by the record, and is, in fact, contradicted by Dr. Pahl's past experiences with U.S. patent law.  ¶ 153.

Braun claims that the failure to name Dr. Pahl as an inventor "occurred as a result of a misunderstanding of the requirements of U.S. patent law."  (*See* Braun Br., at 6-8.)  While Braun argues — and cites to Dr. Pahl's Declaration — that "Dr. Pahl was not familiar with the inventorship disclosure requirements of United States patent law," the cited Paragraphs do not so state.  In Paragraph 25 Dr. Pahl states that he understood that "under *German* patent law, a *German* patent is valid even if it fails to name all inventors."  In Paragraph 26, Dr. Pahl states in full:

> I also understand that, based on Mr. Braun's internal invention disclosure and the corresponding German patent applications, Braun filed corresponding patent applications on the cleaning device in the United States.  *I was not involved in the prosecution of these patent applications.*

Pahl Decl., at 26 (emphasis added).  Nowhere in his Declaration does Dr. Pahl state that he was not familiar with the inventorship requirements of U.S. patent law.[14]

More fundamentally, Dr. Pahl's testimony directly contradicts Braun's argument and shows that Dr. Pahl knew that it was important to correctly identify inventors:

> Q:    Did you keep the existence of your work on the shaver cleaning system a secret from the patent department?
>
> A:    Yes, it is mentioned here.
>
> Q:    Why did you keep it a secret from the patent department?

---

[14]  While Dr. Pahl later testified that he did not understand U.S. patent law, this assertion cannot be squared with other facts.  Dr. Pahl cannot credibly claim misunderstanding of U.S. patent law in light of the fact that he is a named inventor on four other United States patents, two of which were filed earlier than the '328 Patent.  ¶ 153.

> A:     Possibly by then they might have said okay we need your
> name on the paper there.

(Ex. 29, at 135-136.)  Dr. Pahl knew that Braun would want to name him as an inventor if they

knew the truth.  He obviously understood the importance of the issue.

Braun also argues that Dr. Pahl lied for a "generous" reason.[15]  But lying with good (or

bad) motives does not change the fact that it is lying.  When the rhetoric is stripped away, the

"policy" that Braun attempts to cast as charitable amounts to a policy committed to lying.  The

inventorship of the '328 patent thus cannot be corrected here.

**III.     Claim 11 Of The '328 Patent Is Anticipated By Several Prior Art Patents.**

Claim 11 of the '328 patent is anticipated by U.S. Patent Nos. 3,365,267 ("the MeKiney

Patent")[16], 3,478,758 ("the Davies Patent")[17], and 3,500,840 ("the Maatz Patent")[18].  *See* 35

U.S.C. § 102.[19]   .

---

[15]  Braun glosses over Dr. Pahl's admission that he lied, again arguing that deceptive intent cannot be inferred because "Dr. Pahl did not attempt to purloin another's invention, did not act to misstate the true state of the prior art, and did not conceal material facts going to patentability of the claimed invention."  (*See* Braun Br., at 8.)  But, deceptive intent need not be inferred where it is admitted.

Moreover, there is a genuine issue of material fact as to Braun's claim that Dr. Pahl did not misstate the true state of the prior art.  Dr. Pahl reviewed the details of Mr. Braun's internal Invention Disclosure form.  In a separate form, not only was Dr. Pahl asked to verify whether the inventorship details were correct (he lied and said they were), he was also asked whether he was aware of any prior art.  In response Dr. Pahl wrote, "see enclosures."  This art — which Dr. Pahl cannot now recall, nor can Braun now locate — was not disclosed to the USPTO, as it presumably would have been had Dr. Pahl been named as an inventor.  ¶¶ 146-147.

[16]  The MeKiney Patent discloses the "cleaning fluid container" and the "feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure" limitations.  ¶¶ 31-32.

[17]  The Davies Patent discloses the "cleaning fluid container" and the "drying device" limitations.  ¶¶ 61, 79, 81.

[18]  The Maatz Patent discloses the "cleaning fluid container" and the "feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure, said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure" limitations.  ¶¶ 83-87.

[19]  The MeKiney, Davies, and Maatz Patents are all prior art.  35 U.S.C. § 102(b).  ¶¶ 29, 60, 82.

### A. "a cradle structure adapted to receive a shaving head of a shaving apparatus"

The MeKiney, Davies, and Maatz Patents disclose liquid cleaning devices with "cradle structures" for shaving apparatuses including hair clippers and razors. First Phillips Report, at ¶¶ 103, 104, 114, 123.

*First*, according to Mr. Phillips, the MeKiney Patent discloses two "cradle structures" meeting the Court's construction — (1) the tank 12 for, *inter alia*, razor 42 and (2) the "shelf 44" for the head of a hair clipper.[20] ¶¶ 10, 33-48. Dr. Nayfeh concedes that tank 12 is a structure that (1) receives and retains fluid and (2) is adapted to receive and support "razor 42," a "shaving apparatus."[21] ¶¶ 39-41. Tank 12 meets "cradle structure" limitation, mandating summary judgment in Rayovac's favor.[22]

Shelf 44 is (1) able to receive and retain cleaning fluid and (2) adapted to receive and support the head of a hair clipper, a type of dry shaving apparatus. ¶¶ 38, 44-48. Dr. Nayfeh says that shelf 44 "is not adapted to support or receive anything," but his opinion is not credible as the MeKiney Patent explicitly states "[shelf 44] is specifically adapted to support clipper blades[.]" ¶ 46.

---

[20] Mr. Phillips and Dr. Nayfeh disagree upon whether a hair clipper is a "shaving apparatus." ¶¶ 49. While that disagreement cannot change the fact that "razor 42" is a shaving apparatus, the hair clipper dispute between the experts is not amenable to resolution at the summary judgment stage.

[21] Braun cannot argue that razor 42 is not a "shaving apparatus" covered by the claims of the '328 patent. Braun had previously asserted the '556 patent, the claims of which explicitly require a "dry shaving apparatus." ¶ 50. As Dr. Nayfeh admits, the claims of the '328 patent are broader insofar as they merely require a "shaving apparatus." ¶¶ 52-53. Having chosen to pursue broader patent scope with the '328 patent, Braun cannot limit claim 11 now to escape anticipation.

[22] That tank 12 is a "cradle structure" is, not only the opinion of the experts, it is also the opinion of the USPTO. During prosecution of what became unasserted claim 1 of the '328 patent, the Examiner found that tank 12 of the MeKiney Patent is a "cradle structure" in rejecting application claim 1. ¶ 42. Braun never disputed that argument, and instead substantially amended the "cradle structure" limitation in application claim 1. ¶ 43. For claim 11, however, the original "cradle structure" language remained.

Dr. Nayfeh further argues that shelf 44 is not a "cradle structure" because it receives and supports disassembled clipper blades, not the entire hair clipper. ¶ 55. Dr. Nayfeh's opinion is irrelevant as he concedes that the "cradle structure" limitation reads on assembled **and** disassembled shaver heads. ¶ 49.

Dr. Nayfeh finally asserts that shelf 44 "cannot be properly called a 'cradle structure adapted to receive a shaving head of a shaving apparatus,' which one of skill in the art would understand to require a ***structure of form and dimensions to 'cradle'*** the shaving head." (Ex. 8, Nayfeh Second Report, at 4 (emphasis added).) Nothing in the Court's tentative claim construction facially requires particular "form and dimensions." Assuming there is such a requirement, summary judgment of non-infringement must be granted to Rayovac.

***Second***, the Davies Patent discloses "implement positioning means 20 comprises a perforated tray 74 for holding an implement to be washed and sterilized and locating the instrument in its aforementioned washing and sterilizing positions." ¶ 62. As recognized by Mr. Phillips, "while the Davies Patent cleaning system describes cleaning many 'implements,' the one object to be cleaned that is explicitly disclosed is hair clippers, a type of dry shaving apparatus."[23] ¶ 63.

The experts agree that tray 74 of the Davies Patent is (1) at least able to receive cleaning fluid and (2) able to receive and support clipper blades. ¶¶ 61, 67-70. In his Second Expert Report, Dr. Nayfeh reiterated his no "disassembly" argument, but he personally demonstrated the irrelevance of that argument at his deposition. ¶ 49. Moreover, while Mr. Phillips disagrees with

---

[23] Dr. Nayfeh notes that the Davies Patent **also** discloses the use of rotating brushes for cleaning at col. 5, ll. 73-75. (Ex. 7, at 5-6.) That is irrelevant. The liquid aspect of the Davies Patent cleaning device is used for all implements, the only implement specifically named being a hair clipper. ¶ 63.

him, Dr. Nayfeh also argues that tray 74, a basket, does not have the "specific shape" to constitute a "cradle structure," an argument fatal to Braun's infringement claim.  ¶ 66.

**Third**, the Maatz Patent discloses a liquid cleaning system with a tank 10, rack 15, and grid 17, all of which function as "cradle structures" for, *inter alia*, razors and clipper blades. ¶¶ 82-85.  With respect to the "cradle structure" limitation, the cleaning system of the Maatz Patent is identical to the cleaning system of the MeKiney Patent.   ¶ 85.  For reasons set forth above , summary judgment should be granted to Rayovac, not Braun.

### B.    "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure"

The Davies Patent discloses "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure" in an embodiment where fluid rises from the "cleaning fluid container" up to the tray 74 for cleaning.  ¶¶ 61, 70-71.  Water is fed from an external source through fitting 80 into container 12.  ¶¶ 72.  As recognized by Mr. Phillips, "both the ordinary artisan and lay people regularly use a hose and water tap to 'feed' water[.]"  ¶ 74.  Dr. Nayfeh admits that he has not even considered whether a tap and hose constitute a "feed device." ¶ 75.

Dr. Nayfeh instead argues that, because cleaning fluid is fed "manually," there is "no mechanism for feeding cleaning fluid from container 12 to tray 74."  (Ex. 7, at 6.)  There can be no dispute that fluid flows to (1) the fitting 80 (from the "feed device") then (2) the container 12 and then (3) to the tray 74.  ¶ 72-73.  At his deposition, Dr. Nayfeh, in fact, conceded that claim 11 covers both manual and automatic feed devices.  ¶ 77.

### C.    "said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure"

In one embodiment of the Davies Patent, the level of cleaning fluid in the container 12 is below the "cradle structure" prior to the washing of the implement. ¶ 71. Mr. Phillips has explained that the claim language reads on the embodiment. ¶¶ 60-81. In his Second Expert Report, Dr. Nayfeh argued that the limitation is not met because the fluid level in the container 12 is not below the "cradle structure" during the "*entire*" feeding operation. ¶ 78. However, at his deposition, Dr. Nayfeh conceded that the word "during" encompasses *both* the entirety of an event *and* part of an event. ¶ 78. Dr. Nayfeh's concession mandates summary judgment for Rayovac. *See Johnson Worldwide*, 175 F.3d at 988-89.

### 1. "a drying device"

The parties have agreed that the limitation "a drying device" means "a device to dry the shaver head." ¶ 86. The MeKiney and Maatz Patents both disclose "drying devices." ¶¶ 54-55, 85. The MeKiney Patent discloses a siphon tube 24 that acts to automatically drain the fluid from tank 12, facilitating drying of the razor and clipper blades. ¶¶ 54-55, 87. Likewise, in the Maatz Patent, drain 22 also facilitates drying. ¶ 87.

In his Second Expert Report, Dr. Nayfeh argued that siphon tube 24 and drain 22 are not "drying devices" because they are "not a *mechanism[s]* for *active* drying of the barber tools." (Ex. 8, Second Nayfeh Report, at 4 (emphasis added).) Dr. Nayfeh tried to avoid the agreed construction as nothing in it requires "active" drying. At his deposition, Dr. Nayfeh backtracked, testifying that a "drying device" is a device that aids drying. ¶ 86. He also conceded that, absent the siphon tube 24 and the drain 22, it would take substantially longer for the shavers to dry. ¶ 87. As siphon tube 24 and drain 22 indisputably aid in drying, summary judgment must be granted to Rayovac.

## IV.    The '328 Patent is Indefinite

"[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 2005 WL 1845106, at *4 (Fed. Cir. Aug. 5, 2005). The "cradle structure" limitation, as tentatively construed, cannot be reconciled by an ordinary artisan with prior art unambiguously disclaimed during the prosecution. ¶¶ 97, 101.

During the *Markman* proceedings, Rayovac argued that Braun had unambiguously disclaimed prior art structures to secure patent claims. ¶ 98. Braun never disputed that it had. ¶ 98. The structures that Braun disclaimed were (1) U.S. Patent No. 3,890,988 (a basin shaped receptacle); (2) U.S. Patent No. 4,815,486 (a cylindrical drum); (3) U.S. Patent No. 5,335,394 (a basket). ¶ 99.

Mr. Phillips has explained that each of structures is (1) a structure; (2) **adapted** to receive or support a shaving head; and (3) at least able to receive fluid. ¶ 99. Dr. Nayfeh admits that each of the structures is (1) a structure; (2) **able** to receive or support a shaving head; and (3) at least able to receive fluid.[24] ¶ 100. Braun argued in its *Markman* briefing that the language "adapted to receive a shaving head" means "able to receive a shaving head." ¶102. The manifest inconsistency between Braun' positions prove that the ordinary artisan could not reconcile the Court's current "cradle structure" construction with the disclaimed prior art.

## V.    The '328 Patent Has an Inadequate Written Description

For reasons set forth in Rayovac's motion for summary judgment, the '328 patent lacks adequate written description. Here, Rayovac briefly illustrates the illogic of Braun's argument and evidence unavailable to Rayovac when it moved for summary judgment.

---

[24] Dr. Nayfeh argues that the "adapted to" language in the "cradle structure" limitation would be understood by an ordinary artisan to require a "cradle structure" of a "specific shape." ¶¶ 19, 101. That is the argument that Rayovac advanced in its *Markman* briefing. (Rayovac *Markman* Br., at 44.) In finalizing the tentative claim constructions, the Court should consider that Braun's position has been rejected by its own expert.

Braun is fundamentally confused. Citing to unasserted claim 2 and the doctrine of claim differentiation, Braun argues that the Court cannot modify its tentative "cradle structure" construction as suggested by Mr. Phillips. (Braun Br., at 7.) Claim 2 deals with the sizing of an outlet port of the concave "cradle structure" in unasserted claim 1, and Mr. Phillips' proposed claim construction says nothing about concavity or outlet port dimensions. ¶127. That, however, is not the issue. Assuming claim 2 precluded modification of the Court's construction, that has nothing to do with whether there is adequate written description in the '328 patent for a "cradle structure" that receives, but does not retain fluid. Patent infringement (of which claim construction is the first step) and patent validity are distinct questions. *Pandrol USA, LP v. Airboss Ry. Prods., Inc*., 320 F.3d 1354, 1364 (Fed. Cir. 2003) ("Supreme Court precedent and our case make clear that patent infringement and patent validity are treated as separate issues."). As admitted by the named and unnamed inventors, retention of the cleaning fluid in the "cradle structure" is essential to the alleged invention. ¶¶ 109-110. Given that fact, Dr. Nayfeh's admission that there is no description corresponding with a "cradle structure" that receives, but does not retain cleaning fluid is unsurprising. ¶ 120.

Claim 2 is simply a red herring. Dr. Nayfeh concedes that claim 2 provides no written description in addition to that which is described in the '328 specification. ¶ 128. That is, claim 2 provides the same amount of written description as the rest of the '328 patent with respect to a "cradle structure" that merely receives cleaning fluid — zero.

## VI.    Braun Committed Fraud In Connection With The Prosecution Of The '328 Patent.

Braun committed fraud in connection with the prosecution of the '328 patent. Braun only moves on two of Rayovac's theories: (1) Braun's intentional failure to disclose the Zeischke Thesis and (2) the submission of an intentionally false oath to the USPTO that the '328 patent application was a literal translation of the German priority application. ¶¶ 187-190, 195-196.

16

## A.    The Zeischke Thesis

The Zeischke Thesis is not cumulative to French Patent No. 2,568,111 ("the French '111 patent").[25]    The experts disagree as to whether the Zeischke Thesis teaches a "bracket for insertion of the shaving apparatus therein," an element of claim 18.  ¶ 181.  During prosecution, Braun affirmatively represented to the USPTO in a telephonic interview that the prior art of record **including the French '111 patent** did not disclose a "bracket."  ¶ 185.  Assuming that Braun correctly represented the French '111 patent, a reasonable examiner clearly would have considered the Zeischke Thesis highly material to rebutting Braun's assertion during the telephonic interview.  *See Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

Braun argues that Rayovac has no evidence of intent to deceive, but ignores Hans Dieter Klauer, the in-house patent agent responsible for the '328 patent.  ¶ 186.  During prosecution of the '328 patent, Mr. Klauer knew of and understood (1) his duty of disclosure and (2) the Zeischke Thesis.  ¶¶ 187-188.  Rayovac's evidence of knowledge and materiality is clearly sufficient.  *See Critikon*, 120 F.3d at 1256.

## B.    Braun's False Translation

Rayovac has asserted a new matter defense based upon the mistranslation of the word "aufnameteil" to "cradle structure" when it should have read "receptacle."  35 U.S.C. § 132.  Dr. Nayfeh admits that "cradle structure" and "receptacle" have wholly different meanings.  ¶ 193. But Rayovac's fraud theory is different.

During prosecution, the Examiner transmitted a Notice to File Missing Parts because Braun had filed its application in a language other than English.  ¶ 195.  In response, Braun

---

[25]    Dr. Nayfeh did not consider whether the Zeischke Thesis is cumulative of the French '111 patent.  ¶ 184.

affirmatively represented that the U.S. patent application it had filed was a literal translation of its January 1994 German priority application.  ¶ 196.  That was not true.  A false oath is *per se* material.  *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983). The U.S. translation differed from the German priority application because (1) "aufnameteil" does not mean "cradle structure;" (2) the patent claims of the two documents are different, and (3) Braun had inserted a new paragraph regarding the French '111 patent.  ¶¶ 197-199.

Braun says that its misrepresentation was "inadvertent," but the facts prove otherwise. First, because he handled the prosecution of the German priority application, Mr. Klauer ***personally altered*** the German priority application by changing the claims and adding the discussion of the French '111 patent.  ¶ 199.  He ***personally*** oversaw the translation into English. ¶ 200.  He moreover coordinated all aspects of the U.S. prosecution.  ¶¶ 186-190.  The reasonable inference from such facts is that Mr. Klauer knew that Braun had not submitted a literal translation, and intentionally misrepresented that Braun had.  *See Perseptive BioSystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318-20 (Fed. Cir. 2000).

## VII.    The '328 Patent Fails To Name Norbert Smetana and Helmut Kraus As Inventors.

Braun's argument as to Mr. Smetana and Mr. Kraus is long on denial, but short on facts. With regard to Mr. Smetana, Braun ignores inconsistent testimony by Mr. Braun, and misrepresents the testimony of Mr. Smetana.  ¶¶ 167-168.  Similarly, with respect to the requirement of the interlock or "bracket" element suggested by Mr. Kraus, Braun's citation to the testimony does not support Braun's argument.  If anything, the testimony supports Rayovac's contentions that Mr. Smetana and Mr. Kraus should have been named as inventors.

Braun asserts that Dr. Pahl's original prototype included a "drying device."[26]  But what Braun fails to state is that this drying device was ineffective because it lacked a heater.  Among other issues, the drying process utilized by the prototype failed to completely dry the head of the shaver.  *See* DX 37; ¶.133.  Indeed, Mr. Braun sought a meeting with Mr. Smetana for the express purpose of improving the drying system.  ¶ 164.  Among the improvements that Mr. Smetana suggested was the inclusion of a heater, as in claim 13 of the '328 patent.  ¶¶ 165-167.  While Mr. Smetana testified that he could not recall whether the heater was his idea, or whether it was something that he and Mr. Braun conceived together, he is an inventor.[27]  ¶ 167.

Similarly, Braun's cursory discussion of the circumstances regarding the conception of the interlock or "bracket" limitations in claims 18 and 19 omits material facts that contradict Braun's claim that Mr. Kraus is not an inventor.  Mr. Kraus was an engineer with VDE, a German approbation group.  Around June 1993, Braun submitted a prototype of Dr. Pahl's device to VDE for testing.  ¶ 171 .  Mr. Kraus recommended that the device include an interlock mechanism.  ¶¶ 172-173.  In addition, Dr. Pahl testified that he "definitely" discussed Mr. Kraus' recommendations with Mr. Braun.  ¶¶ 173, 176.  These facts are left out of Braun's account.

The cited testimony (75:18-77:9) of Mr. Braun regarding the interlock likely arose out of conversations he had either with the approbation department or with Dr. Pahl, supporting Rayovac's theory.[28]  The cited testimony of Dr. Pahl (111:9-18) does not address whether the

---

[26]  Braun also asserts that "the 'heater' element that Rayovac ascribes to [Mr. Smetana] was already present in the original prototype of the invention.  (*See* Braun Br., at 16.)  But Mr. Smetana did not testify that a heater was present in the original prototype.  ¶¶ 166-167.  Moreover, Braun's 30(b)(6) designee on conception and reduction to practice was unable to identify a heater in any of Dr. Pahl's documents.  ¶ 170.

[27]  Mr. Braun testified that he had no role in the development of the drying device.  ¶ 168.

[28]  Mr. Braun also testified that it was his experience that consumers should not handle an electronic device when wet, but that this knowledge ***and*** contact with approbation department led to the interlock mechanism.  ¶ 178.

interlock was added before or after Mr. Kraus' suggestion. And, Dr. Pahl testified unequivocally that he conveyed Mr. Kraus' suggestion with Mr. Braun. At a minimum, there is an issue of fact.

## VIII.    The '328 Patent Fails To Disclose A Best Mode.

"A best mode violation requires that the inventor knew of and concealed a better mode than was disclosed for making and using the claimed invention." *Cardiac Pacemakers, Inc. v. St. Jude Medical*, Inc., 381 F.3d 1371, 1378, (Fed. Cir. 2004). While all claims of the '328 patent recite "cleaning fluid," the '328 patent does not disclose the particular cleaning fluid preferred by Dr. Pahl and Mr. Braun. The '328 specification merely notes in the use of a "fat dissolving cleaning fluid." ¶ 89. In contrast, Dr. Pahl testified that he preferred a particular fluid composed of (1) an alcohol; (2) a lubricant, and (3) a fragrance. ¶ 90-92. Mr. Braun testified that he relied upon Dr. Pahl's judgment with respect to the best cleaning fluid. ¶ 94. Mr. Phillips has explained that the '328 patent does not disclose the inventors' best mode.[29] ¶ 95.

Dr. Nayfeh concedes that the '328 patent does not disclose the preferred fluid. ¶ 96. Thus, Braun can only assert irrelevantly that the chemical formulation would be "obvious:"

> Because the existence of a best mode of carrying out the invention is by definition known only to the inventor, ***section 112 demands actual disclosure regardless of whether, as an abstract matter, practicing that mode would be within the knowledge of one of ordinary skill in the art.***

*Bayer AG v. Schein Pharms., Inc.*, 301 F.3d 1306, 1314 (Fed. Cir. 2002) (emphasis added).

## IX.    CONCLUSION

For the foregoing reasons, summary judgment should be granted to Rayovac. At a minimum, clear issues of fact preclude summary judgment on each ground asserted by Braun.

---

[29]    Juergen Hoeser worked on the cleaning fluid after Dr. Pahl retired. Mr. Hoeser's subsequent work in the ***late 1990's*** has nothing to do with what Braun/Pahl subjectively preferred in the ***early 1990's***.

Respectfully submitted,

RAYOVAC CORPORATION

By its attorneys,

    /s/ Jessica P. Driscoll
Thomas E. Dwyer, Jr. (BBO No. 139660)
Jessica P. Driscoll (BBO No. 655394)
DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, MA 02210-1122
Phone: (617) 371- 1000
Facsimile: (617) 371-1037


Mark A. Pals, P.C. (admitted *pro hac vice*)
James A. Shimota (admitted *pro hac vice*)
Kevin S. Ueland (admitted *pro hac vice*)
James B. Coughlan (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Aon Center
200 E. Randolph Dr.
Chicago, IL 60601
Phone: (312) 861-2000
Facsimile: (312) 861-2200

Dated:  September 13, 2005