**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BRAUN GmbH, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>RAYOVAC CORPORATION, )<br>)<br>    Defendant. )<br>_____) | Civil Action No. 03-CV-12428-WGY |

**RAYOVAC CORPORATION'S RESPONSE TO
BRAUN'S STATEMENT OF UNDISPUTED FACTS REGARDING INVALIDITY**

1.  On January 27, 1998, U.S. Patent No. 5,711,328 (the "'328 Patent") issued. See Declaration of Dalila Argaez Wendlandt in Support of Braun GmbH's Motion for Summary Judgment on Invalidity ("Wendlandt Decl."), Exhibit 1. The '328 Patent has been duly assigned to Braun GmbH ("Braun"). See id., Exhibit 9.

    **RESPONSE**: Denied. Rayovac admits that the '328 patent issued on January 27, 1998. Rayovac admits that Exhibit 9 indicates that Mr. Braun purported to assign his rights to Braun Aktiengesellschaft. Exhibit 9 is silent as to Braun GmbH. To the extent that Braun seeks to add Dr. Pahl as an inventor on the '328 patent, Rayovac denies that the '328 patent has been "duly assigned" as Braun has produced no evidence that Dr. Pahl has assigned his rights to the '328 patent.

2.  Claim 11 of the '328 Patent is directed to a cleaning device comprising:

    a cradle structure adapted to receive a shaving head of a shaving apparatus,

    a cleaning fluid container,

    a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure,

    said cradle structure being arranged above a fluid level of the cleaning fluid in said

cleaning fluid container during the feeding of said cleaning fluid to said cradle structure, and

a drying device.

See Wendlandt Decl., Exhibit A, col. 14, lines 12-23.

**RESPONSE**:  Rayovac admits that Braun has accurately quoted claim 11 of the '328 patent.

3. The MeKiney Patent (U.S. Patent No. 3,365,267) discloses a sterilizing device for barber tools.  In the MeKiney device, cutter blades that have been disassembled from a hair clipper appliance may be held on a shelf on an upper tank of that device by magnets.  Declaration of Samir Nayfeh In Support of Braun GmbH's Motion For Partial Summary Judgment on Invalidity ("Nayfeh Decl.") at 6; Wendlandt Decl., Exhibit E, col. 3, lines 27-40.  The MeKiney device does not disclose a structure to receive or support the assembled cutter head of a hair clipper appliance.  See Nayfeh Decl. at 7-10.

**RESPONSE**: Denied.  Braun mischaracterizes the disclosure of the MeKiney patent.  The MeKiney patent discloses a "cradle structure adapted to receive a shaving head of a shaving apparatus." (Ex. 35, First Phillips Report, at ¶103.)  The MeKiney patent teaches a shelf 44 and a tank 12 adapted to receive and support the shaving head of a shaving apparatus wherein "shelf [44] is specifically adapted to support clipper blades such as 48, which will be retained and held on the shelf 44 by means of the magnets 46."  (Ex. 9, MeKiney patent at col. 3, ll. 37-39.)  The shelf 44 and tank 12 also both receive and retain cleaning fluid.  (Ex. 35, First Phillips Report, at ¶ 103.)  Because Dr. Nayfeh has admitted that claim 11 does not require an assembled shaving head, it is irrelevant whether the MeKiney Patent cleaning device cleans a shaving head assembled with a hair clipper. (Ex. 31, Nayfeh Dep., at 38-39.)

4. In the MeKiney device, a siphon tube drains sterilizing fluid from the upper tank to a lower tank, and the barber tools may drip dry.  See Wendlandt Decl., Exhibit E, col. 4, lines 12-14.

**RESPONSE**: Denied.  Braun mischaracterizes the disclosure of the MeKiney patent.  The MeKiney patent discloses a "drying device." wherein siphon tube 24 acts to automatically

drain fluid from tank 12, drip drying the cleaning shaver head. (Ex. 35, First Phillips Report, at ¶ 108; Ex. 9, MeKiney patent at col. 4, ll. 12-13.)

5.  The MeKiney patent does not disclose the cradle structure and drying device elements of claim 11 of the '328 Patent. See Nayfeh Decl. at ¶¶ 7-13.

    **RESPONSE**: Denied. The MeKiney device discloses the cradle structure and drying elements of claim 11 of the '328 patent. (Ex. 35, First Phillips Report, at ¶¶ 102-112.)

6.  The Davies Patent (U.S. Patent No. 3,478,758) discloses a sterilizing device for barber tools. In the Davies device, in order to sterilize cutter blades that have been disassembled from a hair clipper appliance, the blades may be placed between a pair of counter-rotating brushes mounted on a motor. See Nayfeh Decl. At 18; Wendlandt Decl., Exhibit F, col. 5, line 73 through col. 6, line 2. The Davies Patent does not disclose a structure to receive or support the assembled cutter head of a hair clipper appliance. See Nayfeh Decl. at 17-20.

    **RESPONSE**: Denied. Braun mischaracterizes the disclosure of the Davies Patent. The Davies Patent discloses "a cradle structure adapted to receive a shaving head of a shaving apparatus" wherein "implement positioning means 20 comprises a perforated tray 74 for holding an implement to be washed and sterilized, and locating the instrument in its aforementioned washing and sterilizing positions." (Ex. 10, Davies patent, at col. 4, ll. 34-36.) While the Davies patent cleaning system describes cleaning many "implements," the one object to be cleaned that is explicitly disclosed is hair clippers, a type of dry shaving apparatus. (Ex. 10, Davies patent, at col. 5, l. 75.) Thus the structure described in Davies is adapted to receive and support a shaving head. (Ex. 35, First Phillips Report, at ¶ 114.)

7.  In the Davies device, sterilizing fluid is fed manually to the cleaning device through a tap and hose from an external source. See Wendlandt Decl., Exhibit F, col. 4, lines 66-69, col. 5, lines 4-6. In the Davies device, there is no mechanism that feeds fluid from container 12. Id. at col. 4, lines 66-69; Nayfeh Decl. at 21-24.

    **RESPONSE**: Denied. Braun mischaracterizes the disclosure of the Davies patent. Davies discloses a structure that feeds fluid from container 12. (Ex. 35, First Phillips Report, at ¶116.) Specifically, fluid is fed from an external source through fitting 80 to the container 12.

The fluid then proceeds from container 12 to the cradle structure, tray 74. (Ex. 10, Davies patent, at col. 4, ll. 66-69.)

8. In the Davies device, tray 74 is not above the fluid level of the cleaning fluid container 12 during the entire feeding operation. During the feeding operation, cleaning fluid rises above the tray. Wendlandt Decl., Exhibit F, col. 4, lines 74-75; Nayfeh Decl. at 25-27.

   **RESPONSE**: Denied. Braun mischaracterizes the disclosure of the Davies Patent. In one embodiment of the Davies patent, the level of cleaning fluid in the container 12 is below the "cradle structure" prior to the washing of the implement. "According to the alternative method … of locating an implement in its washing and sterilizing positions, the implement tray 74 is supported in its elevated position of FIGURE 3, and the liquid 14 is initially fed to the container 12, through the fitting 80, until the liquid level rises above the implement tray. The implement is then submerged in its washing position with the liquid." (Ex. 10, Davies patent, at col. 4, l. 69 - col. 5, l. 1.) The Davies patent thus discloses the element-at-issue. (Ex. 35, First Phillips Report, at ¶117.) Dr. Nayfeh has admitted that the element-at-issue does not require that the fluid level be below the "cradle structure" for the *entire* feeding operation. (Ex. 31, Nayfeh Dep., at 69-74.)

9. The Davies Patent does not disclose the cradle structure, feed device, and elevation of the cradle structure relative to the cleaning fluid in the cleaning fluid container elements of the '328 Patent. See Nayfeh Decl., at ¶¶ 17-28.

   **RESPONSE**: Denied. The Davies patent discloses a cradle structure, feed device, and elevation of the cradle structure relative to the cleaning fluid in the cleaning fluid container elements of the '328 patent. (Ex. 35, First Phillips Report, ¶¶ 113-121.)

10. In the Maatz Patent (U.S. Patent No. 3,500, 840) discloses a sterilizing device for barber tools. In the Maatz device, cutter blades that have been disassembled from a hair clipper appliance may be held on a rack or grid (located in a cleaning tank) by means of magnets. See Nayfeh Decl. at 32; Wendlandt Decl., Exhibit G, col. 2, lines 27-32. The Maatz Patent does not a structure to receive or support the assembled cutter head of a hair clipper appliance. See Nayfeh Decl. at 31-33.

**RESPONSE**: Denied. Braun mischaracterizes the disclosure of the Maatz patent. Maatz discloses a "cradle structure adapted to receive the shaving head of a shaving device." Cleaning tank 10 is a structure adapted to at least receive a shaving head of a shaving apparatus. (Ex. 11, Maatz patent, at col. 2, ll. 27-30.) The cleaning tank receives and retains fluid. (Ex. 35, First Phillips Report, at ¶ 122.)

11. In the Maatz device, a drain hole drains sterilizing fluid from the cleaning tank to a storage tank, and the barber tools drip dry. See Wendlandt Decl. Exhibit G, col. 3, lines 26-30; Nayfeh Decl. at ¶¶ 31-36.

**RESPONSE**: Denied. Braun mischaracterizes the disclosure of the Maatz patent. The drain 22 of the Maatz Patent aids in the drying of cleaned barber's tools including shaving apparatuses. (Ex. 35, First Phillips Report, at ¶ 125).

12. The Maatz Patent does not disclose the cradle structure and drying device elements of the '328 patent. See Nayfeh Decl., at ¶¶ 31-36.

**RESPONSE**: Denied. Maatz discloses the cradle structure and drying device elements of the '328 patent. (Ex. 35, First Phillips Report, at ¶¶ 122-131.)

13. During prosecution of the U.S. Patent No. 5,649,556 ("the '556 Patent"), Braun distinguished the Lee Patent (U.S. Patent No. 3,890,988) - a cleaning device for automobile parts -- on the basis that its sink was not a cradle adapted to receive a shaving head, but rather designed to receive automotive parts. See Wendlandt Decl., Exhibit D at B000096.

**RESPONSE**: Denied. Braun mischaracterizes the prosecution history of the '556 patent. During prosecution of the '556 patent, the USPTO rejected certain application claims as obvious over the Lee patent and stated that the Lee patent discloses a "cradle adapted to receive the article therein." (Ex. 12, '556 File History, at B00083-84.) In response to the Examiner's rejection, Braun argued that "Lee provides nothing like a cradle structure adapted to receive a shaving head of a dry shaving apparatus." (*Id*. at B00096.) However, the basin (referred to in the Lee specification as receptacle 10) shown in Figure 5 of the Lee patent clearly is a structure

that retains fluid.  The experts agree that the receptacle in the Lee patent is able to receive a shaving head of a shaving apparatus.  (Ex. 35, First Phillips Report, at ¶¶ 43, 44; Ex. 31, Nayfeh Dep., at 136.)  Dr. Nayfeh offers no opinion on whether the Lee patent is analogous art or not.  (Ex. 31, Nayfeh Dep., at 14-15.)

14.     During prosecution of the '556 Patent, Braun distinguished the Schinn Patent (U.S. Patent No. 4,815,486) - a cleaning device for paint equipment - on the basis that its drum was not a cradle adapted to receive a shaving head, but rather designed to hold painting equipment.  See id. at B000103.

**RESPONSE**:  Denied.  Braun mischaracterizes the prosecution history of the '556 patent.  During prosecution of the '556 patent, the USPTO rejected certain application claims as obvious over the Schinn patent.  (Ex. 12, '556 File History, at B00099-100.)  Braun told the USPTO that the "limitation of a cradle structure adapted to receive a shaving head … structurally defines the cradle structure of he invention over Schinn's hooks and baskets."  (Ex. 12, '556 File History, at B000103; Ex. 13, Schinn patent.)  However, the structure shown in Figure 5 of the Schinn Patent clearly is a structure that retains fluid.  Moreover, the experts agree that the structure of the Schinn Patent is able to receive a shaving head of a shaving apparatus.  (Ex. 35, First Phillips Report, at ¶ 46; Ex. 31, Nayfeh Dep., at 137-38.)  Dr. Nayfeh offers no opinion on whether the Lee patent is analogous art or not.  (Ex. 31, Nayfeh Dep., at 14-15.)

15.     During prosecution of the '328 Patent, Braun distinguished the Cunningham Patent (U.S. Patent No. 5,335,394) - a device for cleaning eye glasses and dentures - on the basis that the structure that supported the eye glasses and dentures was not above the cleaning fluid level of the cleaning fluid in the cleaning fluid container during the cleaning operation. See Wendlandt Decl., Exhibit C at B000335.

**RESPONSE**:  Denied.  Braun mischaracterizes the prosecution history of the '328 patent.  The Cunningham patent discloses a cleaning system for eye glasses.  (Ex. 14, Cunningham patent)  It also discloses an alternative embodiment in which dentures placed in a basket are also cleaned.  Id.  During prosecution of the '328 patent, the USPTO issued an

obviousness rejection over the Cunningham patent. (Ex. 15, '328 File History, at B000322-23.) In response to the USPTO's rejection, Braun explicitly argued that there is no "cradle structure" in the Cunningham patent. *Id*. However, the basket shown in Figure 4 of the Cunningham Patent clearly is a structure that receives fluid. (Ex. 14, Cunningham patent.) Moreover, the experts agree that the basket of the Cunningham Patent is able to receive a shaving head of a shaving apparatus. (Ex. 35, First Phillips Report, at ¶¶ 47-49; Ex. 31, Nayfeh Dep., at 140-42.) Mr. Phillips has also opined that the "cradle structure" in the Cunningham Patent is above the fluid level in the cleaning fluid container during cleaning. (Ex. J, Third Phillips Report, at ¶ 25-26.)

16. In the preferred embodiment of the invention, described in the specification of the '328 patent, the cradle 7 is a structure that supports and receives the shaving head of a shaving apparatus The cradle 7 contains an outlet port and, thus, is able to receive fluid, retain fluid or both receive and retain fluid. In the preferred embodiment, for example, the cradle is able to receive and retain fluid because the outlet port of the cradle is dimensioned such that the inflow of cleaning fluid from the pump is greater than the outflow of cleaning fluid. However, it would be clear to one of ordinary skill in the art that if the outlet port of the cradles were of a greater cross-sectional area, the inflow of cleaning fluid would be smaller than the outflow. In such a configuration, the cradle would receive, but not retain cleaning fluid. See the Nayfeh Decl at 53.

**RESPONSE**: Rayovac admits that the '328 patent discloses a cradle 7 is a structure that supports the shaving head of a shaving apparatus and contains an outlet port dimensioned such that the cradle 7 is filled with cleaning fluid. Rayovac denies that there is any disclosure of a structure that merely receives cleaning fluid. (Ex. 35, First Phillips Report, at ¶¶ 50-52, Ex. 28, Braun Dep., at 73-74; Ex. 29, Pahl Dep., at 79-81.) The '328 specification states that it is "advantageous that the cradle is provided with an overflow device and/or at least one outlet port through which the cleaning fluid can be conveyed to a cleaning fluid container, and that the area of cross-section of the outlet port in the cradle is dimensioned such that during the cleaning operation the amount of cleaning fluid drained through the outlet port is smaller than the amount

of cleaning fluid supplied to the cradle through the feed pump. The overflow device which constitutes part of the cradle ensures that the cradle is at all times filled with a sufficient amount of cleaning fluid, remaining filled to the upper rim area of the cradle." (Ex. 1, '328 Patent, col. 2, ll. 56-67.) Rayovac further denies Dr. Nayfeh's assertion that it would be "clear" to modify the only embodiment of the cradle 7 in the '328 patent. (Ex. 37, Third Phillips Report, at ¶ 30.)

17. The Zeischke thesis discloses a cleaning system for shavers employing brushes and a vacuum. See Wendlandt Decl., Exhibit Y & Z. The Zeischke thesis does not disclose a bracket that holds the shaver in place during cleaning. Instead, it discloses two distinct "park positions," which are not brackets. See Nayfeh Decl. At 76-77.

**RESPONSE**: Denied. The Zeischke thesis proposed a cleaning system for shavers employing brushes and a vacuum. (Ex. 39, Zeischke Thesis, at 41). In addition to the cleaning operation, the thesis proposed a cleaning station that would be used to charge the shaving apparatus as well. *Id.* at 41-42. To that end, items #6 and #8 of the schematics at pages 41 and 42 of the Zeischke Thesis, respectively, of the thesis are listed as "park positions" for shaver charging. The park positions constitute "backets" as that term has been construed by the court. (Ex. 35, First Phillips Report, at ¶¶ 155-56).

18. Gebhard Braun, the named inventor of the '328 Patent, was not aware of the Zeischke thesis at the time the '328 Patent was prosecuted. See Wendlandt Decl., Exhibit P at 178-179.

**RESPONSE**: Rayovac admits that Mr. Braun testified that he was not aware of the Zeischke thesis. Mr. Klauer, however, knew about the Zeischke thesis and his duty of full disclosure. (Ex. 41, Vorbeck Dep., at 59). Mr. Braun's knowledge is thus irrelevant to Rayovac's fraud theory premised upon the Zeischke thesis.

19. During the development of the invention disclosed in the '328 Patent, Dr. Dietrich Pahl conceived of a cleaning system wherein cleaning fluid was not retained by the cradle, but was flushed through the shaver head. See Wendlandt Decl., Exhibit N at 80:2-14.

**RESPONSE**: Denied. As discussed in Rayovac's motion for summary judgment, the cited testimony from Dr. Pahl, in fact, establishes that Dr. Pahl only conceived of a cleaning system in which fluid was always retained by the shaver head. (Ex. 29, Pahl Dep., at 80; Ex. 37, Third Phillips Report, at ¶ 30.) Moreover, the cited deposition testimony is absolutely silent about "flushing" fluid. (Ex. 37, Third Phillips Report, at ¶¶ 35.)

20. Mr. Norbert Smetana, an engineer who worked with Mr. Braun to optimize the drying device of the device for cleaning dry shaver, does not claim that he invented the addition of a heater to the drying device. He testified that he did not know who thought to add the heater to the drying device and the addition of heat was well-known in the art at the time of his involvement with the cleaning device. See Wendlandt Decl., Exhibit U at 48:23 through 49:19.

    **RESPONSE**: Rayovac admits that Mr. Smetana does not claim to be an inventor (presumably because he does not wish to offend his employer Braun GmbH). However, he suggested that a heater be used with the fan to expedite the drying and testified that he at least jointly conceived the idea for using a heater with a fan to expedite drying. (Ex. 30, Smetana Dep., at 48-49.) On the other hand, Mr. Braun testified that he had no role in the development of the drying device for the Braun cleaning system. (Ex. 28, Braun Dep., at 139.) Claim 13 of the '328 patent depends from claim 12 and requires that the "drying device" comprise both an impeller and a heater. Thus, Mr. Smetana provided the idea for the subject matter of claim 13. (Ex. 35, First Phillips Report, at ¶¶69-73.) Dr. Nayfeh testified that he does not believe the addition of a heater to an impeller, as in the '328 patent, constitutes obvious subject matter. (Ex. 31, Nayfeh Dep., at 168-69.)

21. Dr. Pahl testified that his original prototype (which preceded Mr. Smetana's involvement in the cleaning center) already had a heater in the drying device. See Wendlandt Decl., Exhibit N at 110:5-11; 148:10-12; 197:17 through 198:7.

    **RESPONSE**: Admitted that Dr. Pahl so testified, but there is no documentary proof to support his contention. On the other hand, Mr. Smetana suggested that a heater be used

with the fan to expedite the drying and testified that he at least jointly conceived the idea for using a heater with a fan to expedite drying. (Ex. 30, Smetana Dep., at 48-49.) Mr. Braun testified that he had no role in the development of the drying device for the Braun cleaning system. (Ex. 28, Braun dep., at 139.) Claim 13 of the '328 patent depends from claim 12 and requires that the "drying device" comprise both an impeller and a heater. Thus, Mr. Smetana provided the idea for the subject matter of claim 13. (Ex. 35, First Phillips Report, at 69-73.)

22. Mr. Braun testified that he invented the interlock. See Wendlandt Decl., Exhibit O at 75:18 through 77:9. Mr. Braun was aware of the need to lock the shaver in place during cleaning based on his experience with electrical devices and fluids and his general knowledge of the dangers posed by such conditions. See id. Dr. Pahl confirmed that Mr. Braun invented the interlock. See Wendlandt Decl., Exhibit N at 11:9-18.

> **RESPONSE**: Denied. The cited testimony of Mr. Braun says nothing about his alleged invention of the interlock. Likewise, the cited testimony of Dr. Pahl provides no such confirmation. Prior to June 4, 1993, Braun submitted a prototype of Dr. Pahl's cleaning system to VDE, a German testing group. (Ex. 40) Dr. Pahl requested that VDE inspect his cleaning system. (Ex. 29, Pahl Dep., at 183-84.) Mr. Kraus, a VDE employee, analyzed the prototype and met with Mr. Stiegler and Mr. Petretti of Braun to relay his ideas. Following that meeting, Mr. Stiegler sent a June 4, 1993 memorandum to Dr. Pahl (among others) reporting Mr. Kraus' ideas. (Ex. 40). The purpose of the interlock was to preclude a consumer from removing the shaver during cleaning/drying due to the risk of electric shock. (Ex. 29, Pahl Dep., at 184-86.) According to Dr. Pahl, the interlock shown in item 9 of Figure 1 of the '328 patent represents the idea of Mr. Kraus. *Id*. at 206. Dr. Pahl believes that he conveyed the ideas of Mr. Kraus to Mr. Braun. *Id*. at 184-86.

23. The claims of the '328 Patent are directed to cleaning devices for cleaning the shaving head of a dry shaver apparatus and are not directed to an improved cleaning fluid for such devices. See Wendlandt Decl., Exhibit A, col. 13, line 24 to col. 16, line 31.

> **RESPONSE**: Denied. The claims of the '328 patent recite, and are therefore directed to, "cleaning fluid." (Ex. 1, '328 patent) Moreover, the claimed cleaning device will not function without cleaning fluid. (Ex. 28, Braun Dep., at 75).

24. The '328 patent discloses that the cleaning fluid should be fat dissolving. See Wendlandt Decl., Exhibit A at col. 6, lines 14-16.

    > **RESPONSE**: Rayovac admits that the '328 patent discloses that the cleaning fluid should be fat dissolving.

25. Among the most widely used fat solvents (especially in consumer applications) are alcohols. See Nayfeh Decl. At 61.

    > **RESPONSE**:
    >
    > Rayovac admits that alcohol is a solvent. However, there are many other fat solvents aside from alcohols used in consumer applications. (Ex. 37, Third Phillips Report, at ¶ 44.)

26. Mr. Gebhard Braun testified that he did not know the composition of the cleaning fluid that he used for testing his prototype cleaning center. See Wendlandt Decl., Exhibit O at 87:8 - 88:4.

    > **RESPONSE**: Rayovac admits that Mr. Braun testified that he did not know the composition of the cleaning fluid used in the prototype cleaning center. However, Dr. Pahl testified that he preferred a particular cleaning fluid. (Ex. 29, Pahl Dep., at 169). Mr. Braun further testified that he relied upon Dr. Pahl's judgment as to the appropriate cleaning fluid. (Ex. 28, Braun Dep., at 163-64.)

27. Dr. Pahl knew that the cleaning fluid he preferred was the fluid made by a third party and marketed by Braun in a spray can for cleaning shaver parts. See Wendlandt Decl., Exhibit O at 168:23 - 169:7. Dr. Pahl did not know who manufactured the cleaning fluid, but he knew it contained alcohol (methyl alcohol, he believed). Id. at 165:16-21. Dr. Pahl testified that alcohol was the "primary thing" and that the cleaning fluid had a "[l]ittle bit of grease, of oil to lubricate the cutting elements, and a fragrance." Id. at 156:20-24. Dr. Pahl was not aware of the precise composition of alcohol, lubricant, or fragrance, but he preferred the commercially available spray bottle because it "had always the same mixture of oil and alcohol." Id. at 166:12-16 & 169:2-7.

**RESPONSE**: Rayovac admits that Dr. Pahl did not know the exact composition of the cleaning fluid. However, Dr. Pahl knew that the cleaning fluid had certain required components, such as an added fragrance and a lubricant. (Ex. 29, Pahl Dep., at 165.) Rayovac denies that Dr. Pahl was never aware of the precise composition of his preferred cleaning fluid. Rather, at the time of this litigation, he has now allegedly forgotten the precise composition. (Ex. 29, Pahl Dep., at 166.)

28. Mr. Juergen Hoeser, the engineer developed the cleaning device for dry shavers following Mr. Braun's retirement, testified that Braun continued to work to optimize the composition of the cleaning fluid long after the application for the '328 Patent was submitted to the PTO. See Wendlandt Decl., Exhibit T at 192:12 through 193:16 (describing three binders dedicated to correspondence with third party manufacturer involved in the continued optimization of cleaning fluid).

**RESPONSE**: Rayovac admits that Braun continued to work to optimize the composition of the cleaning fluid after the application for the '328 patent was submitted to the PTO. Dr. Pahl nevertheless failed to disclose the preferred embodiment for his cleaning fluid. (Ex. 1, '328 Patent) Mr. Hoeser is not an inventor of the '328 patent, and his subjective beliefs are therefore irrelevant.

Respectfully submitted,

RAYOVAC CORPORATION

By its attorneys,

  /s/ Jessica P. Driscoll
Thomas E. Dwyer, Jr. (BBO No. 139660)
Jessica P. Driscoll (BBO No. 655394)
DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, MA 02210-1122
Phone: (617) 371- 1000
Facsimile: (617) 371-1037

Mark A. Pals, P.C. (admitted *pro hac vice*)
James A. Shimota (admitted *pro hac vice*)
Kevin S. Ueland (admitted *pro hac vice*)
James B. Coughlan (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Aon Center
200 E. Randolph Dr.
Chicago, IL 60601
Phone: (312) 861-2000
Facsimile: (312) 861-2200

Dated:        September 13, 2005