## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BRAUN GmbH,                            )
                                       )
        Plaintiff,                )
                                       )
      v.                              )    Civil Action No. 03-CV-12428-WGY
                                       )
RAYOVAC CORPORATION,                   )
                                       )
        Defendant.                )
_____)

### RAYOVAC CORPORATION'S RESPONSE TO BRAUN'S STATEMENT OF
### UNDISPUTED FACTS REGARDING INVENTORSHIP

1.      On January 27, 1998, U.S. Patent No. 5,711,328 (the "'328 Patent") issued.  <u>See</u> Declaration of Dalila Argaez Wendlandt in Support of Braun GmbH's Motion for Summary Judgment on Inventorship ("Wendlandt Decl."), Exhibit 1.  The '328 Patent has been duly assigned to Braun GmbH ("Braun").  <u>See id.</u>, Exhibit 9.

      <u>**RESPONSE**</u>:  Denied.  Rayovac admits that the '328 patent issued on January 27, 1998.

Rayovac admits that Exhibit 9 indicates that Mr. Braun purported to assign his rights to Braun

Aktiengesellschaft.  Exhibit 9 is silent as to Braun GmbH.  To the extent that Braun seeks to add

Dr. Pahl as an inventor on the '328 patent, Rayovac denies that the '328 patent has been "duly

assigned" as Braun has produced no evidence that Dr. Pahl has assigned his rights to the '328

patent.

2.      From 1992 through 1993, Mr. Braun worked to develop the cleaning system, which he described in an internal invention disclosure given to Braun's internal patent department on July 22, 1993.  <u>See</u> Wendlandt Decl., Exhibit 7 at ¶ 7, Exhibits A & B; <u>see also</u> <u>id.</u>, Exhibit 4 at 111:23-24.

      <u>**RESPONSE**</u>:  Rayovac admits that from 1992 through 1993, Mr. Braun worked to

further refine the cleaning system design and prototype conceived of and designed by Dr. Pahl,

and that, on July 22, 1993, Mr. Braun submitted an invention disclosure form to Braun's internal

patent department.

3.      The internal invention disclosures described problems associated with the dusty and time
        consuming process of cleaning dry shavers, as well as prior dry shaver cleaners that were
        ineffective because they operated continuously recirculating increasingly contaminated
        cleaning fluid.  Mr. Braun posited that as dry shavers become more intricate and complex,
        the old cleaning methods would be increasingly unacceptable.  See Wendlandt Decl.,
        Exhibit 7 at ¶ 7, Exhibits A & B.

        **RESPONSE**:  Rayovac submits that the facts stated in Paragraph 3 are immaterial to the

question of whether this Court should allow correction of inventorship under 35 U.S.C. § 256.

Rayovac admits that Mr. Braun's internal invention disclosure discussed the Simmons Patent,

upon which Mr. Braun allegedly improved.  Mr. Braun did state that the "main drawback of the

[Simmons Patent] is the continuous circulation of contaminated liquid for cleaning[.]  Mr. Braun

also stated that "[t]he background … is the development of increasingly more complicated

cutting systems that make cleaning increasingly more difficult and demanding."  Rayovac does

not admit that any statement in Mr. Braun's disclosure is accurate; nor has Braun offered any

such proof.

4.      In the internal invention disclosure, Mr. Braun disclosed a cleaning system that runs
        virtually automatically to clean, dry and charge a dry shaver.  The disclosure, through
        words and drawings describes the cleaning system disclosed in the patents-in-suit.  Id.

        **RESPONSE**:  Rayovac submits that the facts stated in Paragraph 4 are immaterial to the

question of whether this Court should allow correction of inventorship under 35 U.S.C. § 256.

Rayovac admits that the internal invention disclosure describes cleaning and drying generally.

Rayovac disputes that the internal invention disclosure describes charging a dry shaver.  Rayovac

further disputes that the internal invention disclosure describes the cleaning system disclosed in

the patents-in-suit.  For example, the internal invention disclosure says nothing about the

cartridge claimed in the '556 patent.  (Ex. 29, Pahl Dep., at 172.)

5.      On September 15, 1993, Mr. Braun supplemented his internal invention disclosure. The supplement described Mr. Braun's invention of allowing the same motor to drive the feed pump as the dry impeller. <u>Id.</u> at Exhibits C & D.

        **<u>RESPONSE</u>**:  Rayovac submits that the facts stated in Paragraph 5 are immaterial to the question of whether this Court should allow correction of inventorship under 35 U.S.C. § 256. Rayovac admits that Mr. Braun's supplement discussed the use of the same motor for a pump and an impeller. Rayovac denies that Mr. Braun's supplement constitutes "an invention," an issue not asserted in this litigation.

6.      Dr. Dietrich Pahl reviewed these invention disclosures and approved Mr. Braun as the sole inventor.

        **<u>RESPONSE</u>**:  Rayovac admits that Dr. Pahl approved the listing of Mr. Braun as the sole inventor on the invention disclosure form. Rayovac further submits that at the time Dr. Pahl did so, he was aware that the invention disclosure form described the cleaning device that he had developed alone in Lyon, France. (Ex. 16 Pahl Decl. ¶ 20).

7.      On January 26, 1994, Braun's Patent Department caused German patent applications to be filed based on Mr. Braun's invention disclosure. <u>See</u> Wendlandt Decl., Exhibit 7 at ¶ 9. As in the internal disclosure, Mr. Braun was listed as the sole inventor on the German Patent applications with Dr. Pahl's approval. <u>See</u> Wendlandt Decl., Exhibit 7 at ¶ 9; Exhibit 6, ¶ 22; Exhibit 4 at 105:20-21; Exhibit 2 at 132:18-22.

        **<u>RESPONSE</u>**:  Rayovac admits that on January 26, 1994, Braun's Patent Department caused German patent applications to be filed based on Mr. Braun's invention disclosure. Rayovac also admits that the German Patent applications list Mr. Braun as the sole inventor based on Dr. Pahl's direction. Rayovac further submits that at the time the German patent applications were filed, both Mr. Braun and Dr. Pahl knew that the inventorship details were incorrect. (Ex. 28, Braun Dep. Tr. at 122-123; Ex. 16, Pahl Decl. ¶ 20.)

8.      In mid-1992, Dr. Pahl was the Technical Manager for a Braun Research and Development facility in Lyon, France. At that time, Dr. Pahl began developing an idea and design concept for a device for cleaning dry shavers. <u>See</u> Wendlandt Decl., Exhibit 6, ¶ 5; Exhibit 2 at 43:12-21.

**RESPONSE**:  Rayovac admits the facts alleged in Paragraph 8.

9.    Dr. Pahl's cleaning device consisted of a cradle contoured to conform to the outer counter of the shaving head of a dry shaver.  <u>See</u> Wendlandt Decl., Exhibit 6, ¶ 7; Exhibit 3 at 50:24 through 51:20; Exhibit 2 at 50:12-21.  The cradle was open to the atmosphere, allowing a dry shaver to be easily inserted into the cleaning device without disassembly of the shaver head or the cleaning device.  <u>See id.</u>, Exhibit 6 at ¶ 17; Exhibit 2 at 206:1-4. The cleaning device also had a cleaning fluid container.  <u>See id.</u>, Exhibit 6 at ¶ 8; Exhibit 2 at 86:15 through 87:3 & 53:1-4; Exhibit 3 at 53:1-4.

**RESPONSE**:  Rayovac admits the facts alleged in Pargraph 9.

10.    During the cleaning operation, an electrical circuit activated a pump, which fed cleaning fluid from the container, through a filter, and into a cradle.  <u>See</u> Wendlandt Decl., Exhibit 6 at ¶¶ 9, 13; Exhibit 2 at 50:22 through 51:5 & 110:10-15.  The cradle was located above the fluid in the cleaning fluid container.  <u>See id.</u>, Exhibit 6 at ¶ 9; Exhibit 2 at 86:15-87:3.

**RESPONSE**:  Rayovac admits the facts alleged in Paragraph 10.

11.    The cradle had a fluid inlet port for receiving the cleaning fluid and a fluid outlet port to allow hair, debris, and used cleaning fluid to flow out of the cradle.  <u>See</u> Wendlandt Decl. Exhibit 6 at ¶ 11.  The outlet port was dimensioned such that the amount of cleaning fluid exiting the cradle through the outlet port was smaller than the amount of cleaning fluid entering the cradle through the inlet port.  <u>See id.</u> at ¶ 10.  The cradle also had an overflow device, which allowed excess cleaning fluid from the cradle to be drained directly into the cleaning fluid container.  <u>See id.</u> at ¶ 12; Exhibit 3 at 53:9-18.

**RESPONSE**:  Rayovac admits the facts alleged in Paragraph 11.

12.    Once the cleaning operation was finished, the pump was deactivated and the cleaning fluid was drained from the cradle through the outlet port.  Thereafter, the shaver could remain in the cradle to dry and for storage.  <u>See</u> Wendlandt Decl., Exhibit 6 at ¶ 14. Drying of the shaver was assisted in Dr. Pahl's cleaning device through the use of a dryer, consisting of a heater and impeller.  <u>See id.</u> at ¶ 15; Exhibit 2 at 148:10-12.  Finally, Dr. Pahl's cleaning device could be used with a wall mount.

**RESPONSE**:  While Braun submits that Dr. Pahl's original design contained a heater, Jurgen Hoser, Braun's 30(b)(6) designee on conception and reduction to practice, was unable to identify a heater in any documents that Braun produced from the early 1990's.  (Ex. 34, Hoeser Dep. Tr., at 82.)  Rayovac has explicitly asserted that Norbert Smetana at least jointly conceived of the idea of adding a heater to the impeller.  Rayovac otherwise admits the facts alleged in Paragraph 12.

13. While he was at the Lyon facility, Dr. Pahl commissioned technical drawings and functional models and a prototype of his concept. See Wendlandt Decl., Exhibit 5 at ¶ 6, Exhibit A. Dr. Pahl presented his cleaning device concept internally at Braun during a November 1992 presentation entitled "R&D Shavers -- Future." See id. at ¶ 16, Exhibit B.

  **RESPONSE**: Rayovac admits the facts alleged in Paragraph 13.

14. While he was serving as Technical Manager at the Lyon facility, which closed in 1993, Dr. Pahl was concurrently the Director of Research and Development for dry shavers in Braun's Design and Product Development Group in Kronberg, Germany. See Wendlandt Decl., Exhibit 6 at ¶¶ 5, 19. As part of his duties at the Kronberg facility, Dr. Pahl asked Mr. Braun to further develop his idea and design concept for a device to clean dry shavers. See id. at ¶ 20; Exhibit 7 at ¶ 5.

  **RESPONSE**: Rayovac admits the facts alleged in Paragraph 14.

15. From 1992 through 1993 Mr. Braun further developed the cleaning device that Dr. Pahl had begun to develop in France. See Wendlandt Decl., Exhibit 7 at ¶ 6. Dr. Pahl supervised Mr. Braun during this development process. In addition, Dr. Pahl reviewed and approved Mr. Braun's invention disclosures. See id., Exhibit 6 at ¶ 20.

  **RESPONSE**: The facts alleged in Paragraph 15 are cumulative of the facts alleged in Paragraphs 2 and 6. Accordingly, Rayovac incorporates its responses to those Paragraphs. In particular, Rayovac submits that at the time Dr. Pahl did so, he was aware that the invention disclosure form described the cleaning device that Dr. Pahl had developed in Lyon, France as well as the minor changes to the system that were added by Mr. Braun. (Ex. 16, Pahl Decl. ¶ 20.)

16. In particular, Dr. Pahl approved of Mr. Braun as the sole inventor of the cleaning device because, consistent with his general policy, he wanted to motivate Mr. Braun to take ownership of the cleaning device project. See Wendlandt Decl., Exhibit 6 at ¶ 23; Exhibit 2 at 116:23 through 117:24, 121:2-4 & 127:22 through 128:16. Additionally, Dr. Pahl did not want his position as the "boss" to influence decisions by Braun as to whether to invest the resources to commercialize the product. See id., Exhibit 6 at ¶ 23. Thus, the internal invention disclosure named Mr. Braun as the sole inventor. See Wendlandt Decl., Exhibit 7 at ¶ 7, Exhibits A & B.

  **RESPONSE**: Rayovac admits that Dr. Pahl has testified that it was his general policy to allow his employees to take credit for his inventions in order to motivate them. But Rayovac

submits that Dr. Pahl admitted that he violated his policy for two other patents — U.S. Patent No. 5,704,935 and U.S. Patent No. 6,083,222, both of which issued after the '608 Patent. (*See* Ex. 29, Pahl Dep., at 124-127.) Rayovac further states that Dr. Pahl admitted that his decision to direct Mr. Braun to provide false information on the invention disclosure form was deliberate. (*Id.* at 128:9-16.) Dr. Pahl further testified that his actions were at least partially motivated by a desire to avoid jealousies among his peers at Braun. (Ex. 29, Pahl Dep., at 124-128.) Rayovac otherwise admits the allegations of Paragraph 16.

17.    Dr. Pahl understood that, under German law, a patent is not rendered invalid by incomplete disclosure of the inventors. See Dr. [sic] Wendlandt Decl., Exhibit 6 at ¶ 25. Dr. Pahl was not familiar with the inventorship disclosure requirements of United States patent law. Id. at ¶¶ 25-26; Exhibit 2 at 129:5-10 and 139:6-8.

**RESPONSE**:  Denied.  Rayovac submits that Braun's citation to Dr. Pahl's declaration as support for the proposition that Dr. Pahl was not familiar with the inventorship disclosure requirements of U.S. patent law is improper.  Neither Pargraph 25, nor Paragraph 26 state anything about Dr. Pahl's understanding of U.S. patent law.  Moreover, while Dr. Pahl testified that he did not understand the requirements of U.S. patent law, this assertion is belied by the facts and Dr. Pahl's own testimony.  First, Dr. Pahl has signed inventorship oaths for other U.S. patents, both before the '328 patent and after.  (Ex. 29, Pahl Dep., at 121-127.)  Second, Dr. Pahl testified that he intentionally tried to keep the details regarding his inventorship a secret because he believed that Braun would require him to be listed as an inventor.  (Ex. 29, Pahl Dep. Tr. 135-136.)  This testimony evinces some understanding that, at a minimum, Braun was concerned with ascertaining the correct details regarding inventorship.

18.    Neither Mr. Braun nor Dr. Pahl had a clear understanding of inventorship law in the United States. See Wendlandt Decl., Exhibit 7 at ¶ 11; Exhibit 6 at ¶ 26; Exhibit 2 at 129:5-10 and 139:6-8; Exhibit 4 at 158:1-9. And, Mr. Braun, having lawfully been named as the sole inventor on the German patent application, did not believe there was any reason to question the inventorship designation in the United States counterpart applications. See Wendlandt Decl., Exhibit 7 at ¶ 10; Exhibit 5 at ¶ 4.

**RESPONSE**: Denied.  Rayovac submits that Mr. Braun's understanding of U.S. patent law is immaterial to the question of whether this Court should allow correction of inventorship under 35 U.S.C. § 256.  This Court' inquiry begins and ends with the question of whether the *unnamed* inventor — Dr. Pahl — intended to deceive.  *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998) ("Nonjoinder may be corrected…upon a showing that the error occurred without any deceptive intent on the part of the unnamed inventor.'"); *see also Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1555 (Fed. Cir. 1997).  Moreover, Mr. Braun had previously signed inventorship oaths in connection with other U.S. patents that issued prior to the '328 patent, casting serious doubt upon Braun's assertion.  (*See* Ex. 28, Braun Dep., at 149-150.)

Rayovac submits that Braun's citation to Dr. Pahl's declaration as support for the proposition that Dr. Pahl was not familiar with the inventorship disclosure requirements of U.S. patent law is improper.  Paragraph 26 does not state anything about Dr. Pahl's understanding of U.S. patent law.  Moreover, while Dr. Pahl testified that he did not understand the requirements of U.S. patent law, this assertion is belied by the facts and Dr. Pahl's own testimony.  First, Dr. Pahl has signed inventorship oaths for other U.S. patents, both before the '328 patent and after. (Ex. 29, Pahl Dep., at 121-27.)  Second, Dr. Pahl testified that he intentionally tried to keep the details regarding his inventorship a secret because he believed that Braun would require him to be listed as an inventor.  (*See* Ex. 29, Pahl Dep. Tr. 135-136.)  This testimony evinces some understanding that, at a minimum, Braun was concerned with ascertaining the correct details regarding inventorship

19.    Dr. Pahl was not involved in the United States patent application process.  <u>See</u> Wendlandt Decl., Exhibit 6, ¶ 17.  By that time, he had developed serious medical problems and had been moved to a research group with a reduced workload where he remained until his retirement in October 1998.  <u>See id.</u> at ¶ 3.

**RESPONSE**:   Rayovac submits that the facts alleged in Paragraph 19 are immaterial to the question of whether this Court should allow correction of inventorship under 35 U.S.C. § 256.   Rayovac further submits that the cited Paragraph of Dr. Pahl's Declaration does not support Braun's statement that Dr. Pahl was not involved in the U.S. patent application process.   Rayovac otherwise admits the facts alleged in Paragraph 19.

20.    Mr. Braun does not object to the correction of inventorship on the patents-in-suit.  <u>See</u> Wendlandt Decl., Exhibit 7 at ¶ 13.  Braun, the assignee of the patents-in-suit, also does not object.  <u>See</u> Wendlandt Decl., Exhibit 5 at ¶ 5.

**RESPONSE**:   Rayovac submits that the facts alleged in Paragraph 20 are immaterial to the question of whether this Court should allow correction of inventorship under 35 U.S.C. § 256.  Rayovac otherwise admits the facts alleged in Paragraph 20.

21.    Rayovac agrees that Dr. Pahl is an inventor of the '328 patent.  <u>See</u> Wendlandt Decl., Exhibit 9 at ¶¶ 67-68.

**RESPONSE**:  Rayovac admits that Dr. Pahl was an inventor of the alleged inventions of the '328 patent as a matter of fact, but asserts that Dr. Pahl should not be allowed to be added an inventor on the '328 patent.

Respectfully submitted,

RAYOVAC CORPORATION

By its attorneys,

  /s/ Jessica P. Driscoll
Thomas E. Dwyer, Jr. (BBO No. 139660)
Jessica P. Driscoll (BBO No. 655394)
DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, MA 02210-1122
Phone: (617) 371- 1000
Facsimile: (617) 371-1037

Mark A. Pals, P.C. (admitted *pro hac vice*)
James A. Shimota (admitted *pro hac vice*)
Kevin S. Ueland (admitted *pro hac vice*)
James B. Coughlan (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
Aon Center
200 E. Randolph Dr.
Chicago, IL 60601
Phone: (312) 861-2000
Facsimile: (312) 861-2200

Dated:        September 13, 2005