IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRAUN GmbH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 03-CV-12428-WGY |
| ) | |
| RAYOVAC CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF RAYOVAC'S
OPPOSITION TO BRAUN'S MOTION FOR SUMMARY JUDGEMENT**

**Infringement**

1. The Rayovac products accused of infringement are (1) the R-9500 cleaning system for men's rotary razors ("men's rotary"); (2) the MS-5500/5700 cleaning system for men's foil electric razors ("men's foil") and (3) the WDF-7000CS cleaning system for women's foil electric razors ("women's foil). (Ex. 36, Second Phillips Report, at ¶ 17.)

2. In all of Rayovac's cleaning systems, there is an upper housing and a lower reservoir which form the cleaning device. (Ex. 36, Second Phillips Report, at ¶ 19.) Cleaning fluid is manually poured from a bottle into the reservoir. (Ex. 36, Second Phillips Report, at ¶¶ 19-38.)

3. In all of Rayovac's cleaning systems, the electric razor is placed in the cleaning device before cleaning. (Ex. 36, Second Phillips Report, at ¶ 75.)

4. During the cleaning operation of Rayovac's cleaning systems, cleaning fluid is fed via a pump into a manifold. (Ex. 36, Second Phillips Report, at ¶ 20.)

5. The shaver head is immersed in a bath in a cradle structure filled to the rim with cleaning fluid in the cleaning system disclosed in the '328 patent. (Ex. 1, '328 patent.)

6. During the cleaning operation of Rayovac's cleaning systems, the cleaning fluid is injected via the manifold into the hair pocket of the shaver; resulting in backflushing of the dirt and hair inside the hair pocket. (Ex. 36, Second Phillips Report, at ¶¶ 20.) The backflushing results in cleaning fluid with debris draining out of the hair pocket by the force of gravity. (*Id.* at ¶ 20.) The hair pocket is the interior portion of the shaver that receives hair, dirt, etc. during shaving. (*Id.* at ¶ 20.)

7. The shaver in the men's rotary product has three openings for the injunction of fluid. (Ex. 36, Second Phillips, at ¶ 30.) In the foil products, the men's shaver has four openings, and the women's shaver has two openings. (*Id.*)

8. For all of Rayovac's cleaning products, the exterior of the manifold ends in injection nozzles that fit into the openings on the shaver. (Ex. 36, Second Phillips, at ¶ 30.)

9. Rayovac's products differ to what Braun calls the "supporting surfaces 3c". For the men's rotary product, the supporting surfaces 3c are allegedly a post and ribs. (Ex. 7, First Nayfeh Report, at 33.) For the men's and women's foil products, the supporting surfaces are allegedly spring-loaded baskets. (Ex. 7, First Nayfeh Report, at 33; Ex. 36, Second Phillips Report, at ¶¶ 31.) Mr. Chasen never testified that the ribs support a shaving head. (Ex. 38. Chasen Dep.)

10. The Court has tentatively construed the "cradle structure" limitation to mean a "structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both."

11. Mr. Phillips opines that the manifolds and injection nozzles in Rayovac's accused products serve the same function as the "conduits 64" illustrated in Figure 6 of the '328 patent (except that fluid is not fed to anything constituting a cradle structure. (Ex. 1 '328 patent, at Fig. 6; Ex. 36, Second Phillips Report, at ¶ 34.)

12. Mr. Braun testified that the "conduits 64" would not be considered part of the "cradle structure." (Ex. 28, Braun Dep., at 72-74.) Mr. Phillips agrees that the "conduits 64" and the functionally equivalent manifold and injection nozzles are not a "cradle structure." (Ex. 35, Second Phillips Report, at ¶ 47.)

13. Dr. Nayfeh argued in his Third Expert Report, that the "conduits 64" differ from the manifold and injection nozzles because the "conduits 64" do not bear any load. (Ex. 42, Third Nayfeh Report, at 3-4.) In his deposition, Dr. Nayfeh conceded that he does not know whether the "conduits 64" bear a load or not. (Ex. 31, Nayfeh Dep., at 180-82.)

14. Dr. Nayfeh believes that the basin in Rayovac's products is not a "cradle structure" or a part of it. (Ex. 31, Nayfeh Dep., at 190-91.)

15. In the Rayovac cleaning systems, droplets of fluid remain in the basin after being channeled back into the cleaning fluid container due to surface tension. (Ex. 38, Chasen Dep. at 65-66.)

16. Dr. Nayfeh stated in his deposition that he believes that the Court's tentative claim construction will not read on a structure if that structure does not "directly" support a shaver head. (Ex. 31, Nayfeh Dep., at 41-42.) He admitted that the "manifold 3a" does not even contact the shaver head in Rayovac's products, and the manifold at most "indirectly" supports the shaver head. (*Id.* at 177.)

17. Mr. Phillips opines that the manifold does not receive or support the shaver head at all. (Ex. 36, Second Phillips Report, at ¶ 33.)

18. Mr. Phillips opines that one of ordinary skill in the art would view the interior and exterior surfaces of the injection nozzles as distinct structures. (Ex. 36, Second Phillips Report, at ¶¶ 30, 33, 35,75.) He also believes that the exterior surfaces of the injection nozzles do not receive or retain cleaning fluid. (*Id.*) Dr. Nayfeh disagrees with these opinions. (Ex. 42, Third Nayfeh Report, at 2-4.)

19. Dr. Nayfeh stated in his deposition that he believes that the Court's tentative claim construction will not read on a structure unless that structure has a "specific shape" with a particular form and dimensions. (Ex. 31, Nayfeh Dep., at 39-40.)

20. Dr. Nayfeh offers no opinion in any of his reports regarding whether the "manifold 3a, ports 3b, and supporting structures 3c " have the requisite "specific shape." (Ex. 7, First Nayfeh Report; Ex. 42, Third Nayfeh Report.) There is not a single sentence about the shape of the manifold, the ports, or the supporting structure, let alone, the "shape" of the three combined. (*Id.*)

21. The manifold of Rayovac's foil products (as drawn by Dr. Nayfeh) bears no resemblance to a shaver head. (Ex. 28.)

22. Dr. Nayfeh concedes that the claimed "cradle structure" in the '328 patent must at least get wet. (Ex. 31, Nayfeh Dep., at 170.) According to Mr. Phillips, Dr. Nayfeh's "supporting surfaces 3c" neither receive nor retain cleaning fluid. (Ex. 36, Second Phillips Report, at ¶ 33.) At most, Dr. Nayfeh has testified that he "thinks" the post and ribs of the rotary product might get wet. (Ex. 31, Nayfeh Dep., at 183.) Dr. Nayfeh has no opinion on whether the "supporting surfaces 3c" of the foil products receive or retain cleaning fluid. (Ex. 31, Nayfeh Dep., at 182.)

23. Mr. Phillips has advocated that the Court's "cradle structure" should be modified to read a "structure adapted to support or receive a shaving head of a shaving apparatus and able to receive and retain fluid." Mr. Phillips has further opined that the injection nozzles - Dr. Nayfeh's "ports 3b" - do not retain cleaning fluid as an additional reason Rayovac cannot infringe the '328 patent. (Ex. 36, Second Phillips Report, at ¶ 33.)

24. Dr. Nayfeh concedes that he has not considered whether Rayovac's products infringe if the Court modifies its tentative claim construction as suggested by Mr. Phillips. (Ex. 31, Nayfeh Dep., at 193.)

25. At the *Markman* Hearing, the Court declined to decide whether the "feed device' limitation required that the fluid be fed directly or indirectly from the "cleaning fluid container" to the "cradle structure."

26. Fluid is never fed to the "supporting structure 3c" in Rayovac's foil products. (Ex. 36, Second Phillips Report, at ¶ 33; Ex. 31, Nayfeh Dep., at 182-83.)

27. Dr. Nayfeh believes the "supporting structures 3c" get wet due to leakage in Rayovac's rotary product. (Ex. 31, Nayfeh Dep., at 191.) Mr. Phillips disagrees. (Ex. 36, Second Phillips Report, at ¶ 32-35.)

## Anticipation

28. Braun has asserted that the '328 patent was conceived and reduced to practice in the 1992-93 time frame. (Ex. 17, Braun Response to Rayovac Interrogatory No. 2.)

29. U.S. Patent No. 3,365,267 ("the MeKiney Patent") issued on January 23, 1968. (Ex. 9, '267 patent.)

30. Mr. Phillips has opined, and Dr. Nayfeh does not disagree that the MeKiney Patent discloses many elements of claim 11 of the '328 patent. (Ex. 35, First Phillips Report, at ¶¶ 1-2-108; Ex. 8, Second Nayfeh Report; Ex. 37, Third Phillips Report, at ¶¶ 90-96.)

31. The MeKiney Patent discloses a "cleaning fluid container," as tentatively construed by the Court. (Ex. 9, '267 patent, at col. 2, l. 43, Figs. 1 & 3; Ex. 35, First Phillips Report, at ¶ 105.) Dr. Nayfeh concedes that the MeKiney Patent discloses a "cleaning fluid container." (Ex. 31, Nayfeh Dep., at 29.)

32. The MeKiney Patent discloses a "feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure," as tentatively construed by the Court. (Ex. 9, '267 patent, at Figs. 1 & 3; Ex. 35, First Phillips Report, at ¶ 106.) Dr. Nayfeh concedes that the MeKiney Patent discloses a "feed device for feeding cleaning fluid from said cleaning fluid container" to tank 12. (Ex. 31, Nayfeh Dep., at 30.)

33. Tank 12 and shelf 44 of the MeKiney Patent are both arranged above a fluid level of the cleaning fluid in said cleaning fluid during feeding of said cleaning fluid to the tank 12 and shelf 44. (Ex. 9, '267 patent, at Figs. 1-3; Ex. 35, First Phillips Report, at ¶¶102-108.)

34. Tank 12 in the MeKiney Patent is a structure. (Ex. 9, '267 patent, at Figs. 1-3; Ex. 35, First Phillips Report, at ¶¶ 102-108.)

35. Tank 12 in the MeKiney Patent both receives and supports razor 42. (Ex. 9, '267 patent, at Figs. 1 & 3; Ex. 35, First Phillips Report, at ¶¶ 109-112.)

36. Razor 42 in the MeKiney Patent is a shaving apparatus. (Ex. 9, '267 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶104.)

37. During cleaning, tank 12 of the MeKiney Patent is filled with cleaning fluid. (Ex. 9, '267 patent, at col. 2, l. 43; Ex. 35, First Phillips Report, at ¶105.)

38. Tank 12 of the MeKiney Patent is able to both receive and retain cleaning fluid. (Ex. 9, '267 patent, at Figs. 1-3; Ex. 35, First Phillips Report, at ¶¶ 102-112.)

39. Dr. Nayfeh concedes that tank 12 of the MeKiney Patent is a structure that receives and retains cleaning fluid. (Ex. 31, Nayfeh Dep., at 34-37.)

40. Dr. Nayfeh concedes that tank 12 of the MeKiney Patent is a structure adapted to receive and support razor 42. (Ex. 31, Nayfeh Dep., at 41-42.)

4

41. Dr. Nayfeh concedes that razor 42 of the MeKiney Patent is a shaving apparatus. (Ex. 31, Nayfeh Dep., at 34.)

42. During prosecution of what became unasserted claim 1 of the '328 patent, the Patent Examiner found that tank 12 of the MeKiney Patent is a "cradle structure" in rejecting application claim 1. (Ex. 15, '328 patent prosecution history, 5/15/97 Office Action.)

43. Braun never disputed that argument, and instead amended the "cradle structure" limitation in application claim 1. (Ex. 15, '328 patent prosecution history, 7/18/97 Interview Summary; Ex. 15, '328 patent prosecution history, 8/14/97 Response.)

44. Shelf 44 of the MeKiney Patent is a part of tank 12. (Ex. 9, '267 patent, at Fig. 3; Ex. 36, First Phillips Report, at ¶ 84.)

45. Shelf 44 of the MeKiney Patent is a structure. (Ex. 9, '267 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶ 84.)

46. Shelf 44 of the MeKiney Patent is specifically adapted to support clipper blades. (Ex. 9, '267 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶ 84.)

47. The clipper blades in the MeKiney Patent are the head of an electric hair clipper. (Ex. 9, '267 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶¶ 83-84.)

48. The electric hair clipper of the MeKiney Patent is a shaving apparatus. (Ex. 9, '267 patent, at Figs. 1 & 3; Ex. 35, First Phillips Report, at ¶ 84.)

49. Mr. Phillips and Dr. Nayfeh disagree as to whether a hair clipper is a "shaving apparatus." (Exs. 7, 8, and 42, Nayfeh Reports, Exs. 35, 36, 37, Phillips Reports). However, Dr. Nayfeh concedes that claim 11 of the '328 patent reads on a disassembled shaving head received and supported in a "cradle structure." (Ex. 31, Nayfeh Dep., at 38-39.)

50. The claims of U.S. Patent No. 5,649,556 ("the '556 patent") explicitly require a "dry shaving apparatus." (Ex. 18, '556 patent.)

51. The claims of the '328 patent do not explicitly require a "dry shaving apparatus." (Ex. 1, '328 patent.)

52. The claims of the '328 patent only explicitly require a "shaving apparatus." (Ex. 1, '328 patent.)

53. Dr. Nayfeh concedes that the claims of the '328 patent do not require a "dry shaving apparatus." (Ex. 31, Nayfeh Dep., at 79.)

54. The MeKiney Patent discloses a siphon tube 24. (Ex. 9, '267 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶ 108.)

5

55. Following the cleaning of barbers' tools, the siphon tube 24 of the MeKiney Patent acts as device that drains fluid from tank 12 and shelf 44. (Ex. 9, '267 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶ 108.)

56. In Figure 1 of the MeKiney Patent, shelf 34 and slot 38 function to support the razor 42 received in tank 12. (Ex. 9, '267 patent, at col. 3, ll. 37-37; Ex. 35, First Phillips Report, at ¶ 112.)

57. Mr. Phillips opines that magnets 46 in the MeKiney Patent function as a bracket. (Ex. 35, First Phillips Report, at ¶¶ 111-112.)

58. Dr. Nayfeh concedes that a "shelf may be considered a bracket or a projecting support." (Ex. 8, Second Nayfeh Report, at 13.)

59. Dr. Nayfeh concedes that shelf 34 functions as a "bracket" for insertion of razor 42 therein. (Ex. 31, Nayfeh Dep., at 105-109.)

60. U.S. Patent No. 3,478,758 ("the Davies Patent") issued on November 18, 1969. (Ex. 6, '758 patent.)

61. Mr. Phillips has opined, and Dr. Nayfeh does not disagree that the Davies Patent discloses many elements of claims 11 and 12. (Ex. 35, First Phillips Report, at ¶¶ 113-121; Ex. 15, Second Nayfeh Report; Ex. 37, Third Phillips Report, at ¶¶ 102-117.)

62. The Davies Patent discloses that "implement positioning means 20 comprises a perforated tray 74 for holding an implement to be washed and sterilized and locating the instrument in its aforementioned washing and sterilizing positions." (Ex. 10, Davies '758 patent, at col. 4, ll. 34-36; Ex. 35, First Phillips Report, at 113-121.)

63. While the Davies Patent cleaning system describes cleaning many "implements," the one object to be cleaned explicitly disclosed is a hair clipper. (Ex. 10, '758 patent, at col. 5, l. 75; Ex. 35, First Phillips Report, at ¶ 114.)

64. Braun has argued that brushes are often not suitable for cleaning the head of a shaving apparatus. (Ex. 17, Braun Response to Remington's First Set of Interrogatories.)

65. Dr. Nayfeh admits that tray 74 of the Davies Patent is a basket. (Ex. 8, Second Nayfeh Report, at 5.)

66. Dr. Nayfeh has testified that tray 74 lacks the shape necessary to constitute a "cradle structure," as claimed in the '328 patent. (Ex. 31, Nayfeh Dep., at 57-59.)

67. Tray 74 of the Davies Patent is a structure. (Ex. 10, '758 patent, at Fig. 3; Ex. 28, First Phillips Report, at ¶¶ 113-121.)

68. Tray 74 of the Davies Patent receives cleaning fluid. (Ex. 10, '758 patent, at Fig. 4; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

6

69. Dr. Nayfeh concedes that tray 74 can both receive and support clipper blades. (Ex. 8, Second Nayfeh Report, at 5-6.)

70. Tray 74 of the Davies Patent can both receive and support clipper blades. (Ex. 10, '758 patent, at Fig. 3 & 4; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

71. In one embodiment of the Davies Patent, fluid rises from container 12 up to the tray 74 for cleaning. (Ex. 10, '758 patent, at Fig. 3 & 4; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

72. In the Davies Patent, water is fed from an external source through fitting 80 into container 12. (Ex. 10, '758 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

73. The Davies Patent states that "[t]he liquid 14 is initially fed to the container 12, through the fitting 80, until the liquid level rises above the implement on the tray." (Ex. 10, '758 patent, at col. 3, ll. 53-63; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

74. It is Mr. Phillips' opinion that both the ordinary artisan and lay people regularly use a hose and a water tap to "feed" water[.] (Ex. 37, Third Phillips Report, at ¶¶ 113-121.)

75. Dr. Nayfeh concedes that he has not even considered whether a tap and hose constitute a "feed device," as claimed in the '328 patent. (Ex. 31, Nayfeh Dep., at 62.)

76. The Davies Patent discloses that tray 74 is above the level of cleaning fluid in container 12 prior to cleaning. (Ex. 10, '758 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

77. Dr. Nayfeh concedes that claim 11 of the '328 patent covers both manual and automatic "feed devices." (Ex. 31, Nayfeh Dep., at 64-65.)

78. Dr. Nayfeh concedes that the word "during" encompasses both the entirety of an event and part of an event. (Ex. 31, Nayfeh Dep., at 71-72.)

79. The Davies Patent discloses a "drying device." (Ex. 10, '758 patent, at Fig. 4; Ex. 10, First Phillips Report, at ¶¶ 113-121.)

80. The Davies Patent discloses a "drying device" comprising an "impeller." (Ex. 10, '758 patent, at Fig. 4; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

81. The Davies Patent discloses a "cleaning fluid container." (Ex. 10, '758 patent, at Fig. 3; Ex. 35, First Phillips Report, at ¶¶ 113-121.)

82. U.S. Patent No. 3,500,840 ("the Maatz Patent") issued on March 17, 1970. (Ex. 11, '758 patent.)

83. The Maatz Patent discloses "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure." (Ex. 11, First Phillips Report, at ¶ 125).

7

84. In the Maatz Patent, pump 32 feeds the cleaning fluid from the storage tank 12 to the cleaning tank 10. (Ex. 11, Maatz patent, at col. 1, ll. 63-64.)

85. The Maatz Patent discloses the cradle structure and drying device elements of the '328 patent, and that structure is identical to the cleaning system of the MeKiney patent. (Ex. 35, First Phillips Report, at ¶¶ 122-131; Ex. 9, MeKiney Patent, Ex. 11, Maatz patent.)

86. Dr. Nayfeh testified that a "drying device," as claimed in the '328 patent, is a device that aids in the drying of a shaving head. (Ex. 31, Nayfeh Dep., at 51-53.)

87. Dr. Nayfeh concedes that, without the siphon tube 24 of the MeKiney Patent and the drain 22 of the Maatz Patent, it would take substantially long for the cleaned tools to be dried in the cleaning systems of the MeKiney and Maatz Patents. (Ex. 31, Nayfeh Dep., at 46-47.)

### **Best Mode**

88. Mr. Braun testified that the cleaning fluid at least partially accounts for the "magic" of his alleged invention. (Ex. 28, Braun Dep., at 61-62.)

89. The '328 specification only states that the cleaning fluid should be a "fat dissolving cleaning fluid." (Ex. 1, '328 pat.)

90. Dr. Pahl testified that he preferred a particular cleaning fluid composed of (1) an alcohol; (2) a lubricant, and (3) a fragrance. (Ex. 29, Pahl Dep., at 165-66.)

91. Dr. Pahl obtained his preferred cleaning fluid from spray cans for cleaning shavers sold by Braun in the early 1990's. (Ex. 29, Pahl Dep., at 167-69.)

92. Dr. Pahl and Braun have now "forgotten" the exact chemical composition of the preferred cleaning fluid. (Ex. 29, Pahl Dep., at 168; Ex. 19, Braun Response to Rayovac's Third Set of Interrogatories.)

93. The '328 patent specification provides no chemical specification for the cleaning fluid. (Ex. 1, '328 patent)

94. Mr. Braun testified that he relied upon Dr. Pahl's judgment with respect to what cleaning fluid was best for the alleged invention. (Ex. 28, Braun Dep., at 88-89.)

95. Mr. Phillips has opined that the '328 patent does not disclose the inventors' best mode. (Ex. 35, First Phillips Report, at ¶¶ 60-66.)

96. Dr. Nayfeh concedes that the '328 patent does not disclose the use of (1) an alcohol, (2) a lubricant, or (3) a fragrance. (Ex. 31, Nayfeh Dep., at 164-66.) He instead argues that Dr. Pahl's preferred cleaning fluid would have been obvious to one of ordinary skill in the art. (Ex. 8, Second Nayfeh Report, at 28.)

8

## Written description and Indefiniteness

97. Mr. Phillips has opined that the "cradle structure" limitation, as tentatively construed by the Court, cannot be reconciled by one of ordinary skill in the art with prior art unambiguously disclaimed during the prosecution of the '328 and '556 patents. (Ex. 36, Second Phillips Report, at ¶ 27.)

98. During the *Markman* proceedings, Rayovac argued that Braun had unambiguously disclaimed structures that were able to receive the head of a shaving apparatus in order to secure patent claims. (Rayovac *Markman* Br., at 21-30.) Braun never disputed that it had disclaimed such structures.

99. Braun disclaimed the following structures: (1) U.S. Patent No. 3,890,988 (a basin shaped receptacle); (2) U.S. Patent No. 4,815,486 (a cylindrical drum); (3) U.S. Patent No. 5,335,394 (a basket). (Ex. 36, First Phillips Report, at ¶¶ 41-48.) Mr. Phillips has opined that each of these structures is (1) a structure; (2) *adapted* to receive or support a shaving head; and (3) at least able to receive fluid. (*Id.*)

100. Braun's expert Dr. Nayfeh has admitted that each of the structures is (1) a structure; (2) *able* to receive or support a shaving head; and (3) at least able to receive fluid. (Ex. 31, Nayfeh Dep., at 137-42.)

101. Dr. Nayfeh argues that the "adapted to" language in the "cradle structure" limitation would be understood by an ordinary artisan to require a "cradle structure" of a "specific shape." (Ex. 31, Nayfeh Dep., at 40-41.) Rayovac also advanced this argument in its *Markman* briefing. (Rayovac Markman Br., at 44.)

102. Braun argued in its *Markman* briefing that the language "adapted to receive a shaving head" is synonymous with "able to receive a shaving head." (Braun *Markman* Br., at 5-9.)

103. Samuel Phillips has opined that the sole explicit written description in the '328 patent specification for a "cradle structure" corresponds with a structure that receives and retains cleaning fluid. (Ex. 35, First Phillips Report, at ¶ 51.)

104. Dr. Samir Nayfeh does not dispute that the sole explicit written description in the '328 patent specification for a "cradle structure" corresponds with a structure that receives and retains cleaning fluid. (Ex. 8, Second Nayfeh Report.)

105. Prior to the filing date of the '328 patent, Gebhard Braun did not conceive of a "cradle structure" that received, but did not retain cleaning fluid. (Ex. 28, Braun Dep., at 73-75.)

106. Prior to the filing date of the '328 patent, Dr. Dietrich Pahl did not conceive of a "cradle structure" that received, but did not retain cleaning fluid. (Ex. 29, Pahl Dep., at 80-81.)

107. Gebhard Braun never attempted to develop a cleaning system in which the shaver was sprayed with cleaning fluid as opposed to being bathed with cleaning fluid. (Ex. 28, Braun Dep., at 73-75.)

9

108. Gebhard Braun never tested his cleaning system in a situation where there was no cleaning fluid retained in the "cradle structure." (*Id.*)

109. When Gebhard Braun worked on the cleaning system described in the '328 patent, he believed that a cleaning device lacking a "cradle structure" that retained fluid would not function. (*Id.*)

110. When Dr. Dietrich Pahl worked on the cleaning system described in the '328 patent, he believed that a cleaning device lacking a "cradle structure" that retained fluid would not function. (Ex. 29, Pahl Dep., at 80-81.)

111. Gebhard Braun testified that a cleaning system without a "cradle structure" that retains cleaning fluid is no different than no cleaning system at all. (Ex. 28, Braun Dep., at 73-75.)

112. Gebhard Braun described his alleged invention in an internal Invention Disclosure as "a specially configured trough (1) into which the shaver (2) is immersed upside down." (Ex. 43, Braun Invention Disclosure Record.)

113. According to Dr. Pahl, the most important thing for a good cleaning result in the cleaning system described in the '328 patent is that the cutter block is immersed in liquid in the "cradle structure." (Ex. 29, Pahl Dep., at 80-81.)

114. Juergen Hoeser took over the work on the cleaning device from Braun/Pahl in approximately July 1995. (Ex. 34, Hoeser Dep., at 19-20.)

115. At or near 1995, Mr. Hoeser described the work of Mr. Braun and Dr. Pahl as a "chicken trough" based upon his recollection of a tub filled to the rim with water on a farm to feed chickens. (*Id.*, at 24-25.)

116. Mr. Hoeser testified that he is the only individual at Braun to think of a cleaning device in which a "cradle structure" does not retain fluid. (*Id.*, at 97-98.)

117. Dr. Nayfeh asserts that "Dr. Pahl testified that he conceived of a cleaning system wherein liquid was not retained by the cradle, but was flushed through the shaver head." (Ex. 8, Second Nayfeh Report, at 27.)

118. Dr. Pahl never testified that he conceived of a cleaning system in which fluid is flushed through the shaver head. (Ex. 29, Pahl Dep., at 80-81.)

119. Regardless of how cleaning fluid reaches the "cradle structure" in the '328 patent (be it pumping or spraying), it is essential that the "cradle structure" retain cleaning fluid for the cleaning device to work. (Ex. 29, Pahl Dep., at 80-81.)

120. Dr. Nayfeh does not disagree with Mr. Phillips' opinion that the '328 patent does not describe a "cradle structure" that receives (but does not retain) cleaning fluid. (Ex. 15, Second Nayfeh Report.) At his deposition, Dr. Nayfeh confirmed that he does not disagree with Mr. Phillips. (Ex. 31, Nayfeh Dep., at 143-46.)

121. The '328 patent was filed in January 1995. (Ex. 1, '328 patent.)

122. Dependent claim 2 of the '328 patent depends from independent claim 1. (Ex. 1, '328 patent.)

123. Unasserted dependent claim 2 provides: "A device as claimed in claim 1, wherein a cross-sectional area of the outlet port is dimensioned such that during the cleaning operation the amount of cleaning fluid drained through the outlet port is smaller than the amount of cleaning fluid supplied to the cradle structure by the feeding device." (Ex. 1, '328 patent.)

124. Braun amended dependent claim 2 — application claim 9 — of the '328 patent during prosecution of the '328 patent. (Ex. 23, '328 patent prosecution history, 6/24/96 Response.)

125. Braun amended claim 1 of the '328 patent during prosecution. (Ex. 15, '328 patent prosecution history, 8/14/97 Response.)

126. Mr. Phillips has opined that the '328 patent is indefinite pursuant to 35 U.S.C. § 112, ¶ 2. (Ex. 35, First Phillips Report, at ¶¶ 41-49.)

127. Unasserted claim 2 is directed to the sizing of the outlet port of the concave "cradle structure" in unasserted claim 1. (Ex. 1, '328 patent) Mr. Phillips' proposed claim construction says nothing about concavity or outlet port dimensions.

128. Dr. Nayfeh conceded that unasserted claim 2 provides no written description in addition to that which is described in the '328 patent specification. (Ex. 31, Nayfeh Dep., at 143-46.)

129. Dr. Nayfeh conceded that the subject matter of unasserted claim 2 is identical to the corresponding written description in the '328 patent specification. (Ex. 31, Nayfeh Dep., at 143-46.)

## Inventorship

130. Braun had investigated various methods for cleaning dry shavers since at least as early as the 1950's. (*See* Ex. 44, Hoeser Timeline.)

131. In 1992, Dr. Dietrich Pahl conceived the idea for a device that automatically cleaned the head of a dry shaver. (*See* Ex. 16, Pahl Decl., at ¶ 5.)

132. Under Dr. Pahl's direction, engineers at Braun's facilities in Lyon, France, began drafting detailed drawings and putting together a working prototype for a device that automatically cleaned the head of a dry shaver. (*Id.* at ¶ 6.)

133. The drawings and prototype that Dr. Pahl developed in France included most, if not all, of the elements claimed in the '328 Patent. (*See id.*) Dr. Pahl made the following statements about his prototype:

11

> "This cleaning center had many components, including a trough or cradle in which the shaving head of a dry shaver could be placed." (*Id*., at ¶ 7.)

> The cleaning center also had a container for cleaning fluid, which was positioned below the cradle." (Ex. 16, Pahl Decl., ¶ 8)

> "During the cleaning operation, an electrical circuit…activated a pump to feed the cleaning fluid from the cleaning fluid container to the cradle." (*Id*., at ¶ 9.)

> "The functional model of the cleaning center also included a dryer, consisting of a fan and a heater, to aid in the drying function."[1] (*Id*., at ¶ 15.)

> "As Exhibits A and B show, the cradle was open to the atmosphere, such that the dry shaver could be inserted from the top into the cleaning device…." (*Id*., at ¶ 17.)

> Dr. Pahl's 1992 Prototype had a bracket for insertion of the shaving device therein. (*See* Ex. 29, Pahl Dep., at 148:13-149:3.)

134. Dr. Pahl presented drawings detailing his invention internally at Braun in November 1992. (Ex. 16, Pahl Decl., at ¶ 16.)

135. After this meeting Dr. Pahl also presented his prototype to the head of Braun's Men's Hair Removal Unit, Gilbert Greaves, as well as Jacquac LaGarde, Braun's CEO. (*See* Ex. 29, Pahl Dep., at 53:21-59:15.)

136. At some point in 1993, Dr. Pahl enlisted the assistance of Gebhard Braun to further refine the alleged invention that Dr. Pahl had designed. (*See* Ex. 16, Pahl Decl., at ¶ 20; *see also*, Ex. 29, Pahl Dep., at 60:2-11.)

137. Dr. Pahl showed Mr. Braun the drawings and prototype, which revealed the elements claimed in the '328 Patent. (*See* Ex. 16, Pahl Decl., at ¶ 20.)

138. Nearly all of the elements of the alleged invention, including all asserted against Rayovac, were complete *before* Mr. Braun began working on it. (*See* Ex. 28, Braun Dep., at 113:5-17.)

139. Mr. Braun revised Dr. Pahl's alleged invention, making minor adjustments, including devising a method for using a single motor to drive both the impeller and pump of the cleaning device. (*See Id.*, at 81:3-8.)

---

[1] For purposes of separate inventorship defenses not at issue here, Rayovac disputes that Dr. Pahl's French prototype included a heater.

140. Mr. Braun was directed by Braun's Patent Department to fill out an Invention Disclosure, a form used by Braun internally to ascertain details regarding an invention, including details regarding inventorship. (*See* Ex. 43, Invention Disclosure form; Ex. 41, Vorbeck Dep., at 47:5-16.)

141. Hans Dieter Klauer, Braun's in-house patent counsel, was aware of Dr. Pahl's contributions to the alleged invention and assisted Mr. Braun in preparing his response to the Invention Disclosure form. (Ex. 28, Braun Dep., at 113:18-116:5.)

142. Dr. Pahl directed Mr. Braun to falsely name himself as the sole inventor on the Invention Disclosure form. (*Id.*, at 105:13-21.)

143. Dr. Pahl admitted that his decision to direct Mr. Braun to hide the fact that Dr. Pahl was an inventor was knowing and deliberate. (*See* Ex. 29, Pahl Dep., at 128:9-16.)

144. Mr. Braun, despite knowing that the details regarding inventorship were incorrect, signed the Invention Disclosure form. (*See Id.*, at 122:22-123:24.)

145. Dr. Pahl and Gilbert Greaves both reviewed and approved the details set forth in the Invention Dislcosure form. (*See* Ex. 45; Ex. 16, Pahl Decl., at ¶ 22.).

146. Indeed, in a separate form that Braun used to ensure that the details regarding inventorship were correct (Ex. 41, Vorbeck Dep. at 100:4-101:7), Dr. Pahl represented that the details regarding inventorship set forth in the Invention Disclosure form were correct. (Ex. 45.) Additionally, this form also asked whether Dr. Pahl was aware of prior art material to the invention. *Id.* Dr. Pahl was aware of material prior art, and he attached it to the form with an indicated "See Enclosures." *Id.*

147. Dr. Pahl cannot now recall what prior art he attached to the form. (Ex. 29, Pahl Dep., at 158.) Braun also cannot now ascertain the substance of the prior art that Dr. Pahl attached. (Ex. 20, Braun Response to Rayovac's Second Set of Interrogatories.)

148. Mr. Vorbeck testified that it was an "exceptional" case for a Director, such as Dr. Pahl, to lie on this form. (Ex. 41, Vorbeck Dep., at 104:20-106:17.)

149. Based on the Invention Disclosure form, Braun submitted a patent application to the German patent office, falsely listing Mr. Braun as the sole inventor. (Ex. 21, Braun German patent No. DE 44 02 238.7).

150. Mr. Klauer knew that Dr. Pahl was an inventor of the cleaning system. (Ex. 34, Hoser Dep. at 110:14-19.)

151. Mr. Klauer was aware of the duty of disclosure in the United States. (Ex. 41, Vorbeck Dep., at 46:1-8.)

152. Mr. Klauer signed inventorship oaths in the past on patents that were filed and issued prior to the '328 patent. He is listed as the inventor on three other U.S. patents. (*See* Ex.

13

22, U.S. Patent No. 3,989,071 (filed May 1974), Ex. 23, U.S. Patent No. 4,015,151 (filed October 1975), and Ex. 24, U.S. Patent No. 5,704,126 (filed September 1995).)

153. Dr. Pahl signed inventorship oaths in the past on patents that were filed and issued prior to the '328 patent. He is a named inventor on four other United States patents. Two of these patents were filed earlier than the '328 patent. (Ex. 29, Pahl Dep., at 121:6-127:17.)

154. Mr. Braun signed inventorship oaths in the past on patents that were filed and issued prior to the '328 patent. He is a named inventor on several other United States patents, including patents on which he was named as a co-inventor. (Ex. 28, Braun Dep., at 149:8-150:9.)

155. Mr. Klauer assisted in the prosecution of the German patent application, which ultimately issued as DE 44 02 238.7. (Ex. 28, Braun Dep., at 118:8-12.)

156. Mr. Klauer, along with Braun's United States patent counsel, Fish & Richardson, also participated in the prosecution of Braun's U.S. patent application. (Ex. 41, Vorbeck Dep., at 19:3-19:18; *see also* Ex. 28, B001157, 58.)

157. As required by U.S. statute, Mr. Braun signed an oath when the '328 patent application was filed with the USPTO, in which he falsely stated that he was the "original, first, and sole inventor…of the subject matter which is claimed and for which a patent is sought…." (*See* Ex. 25, Inventorship Oath for the '328 patent.)

158. Mr. Braun admitted that when he signed the inventorship oath, he knew that Dr. Pahl was an inventor. (Ex. 28, Braun Dep., at 112:7-15; 257:2-24.)

159. Supported by Mr. Braun's false oath, the '328 patent issued on January 27, 1998. (*See* Ex. 1, '328 patent.)

160. Under German law, if a patented invention is commercialized, it is required that the inventor be compensated commensurate with the sales of the patented product. (*See* Ex. 29, Pahl Dep., at 118:24-119:17, 121:9-122:14.)

161. A sole inventor is entitled to more money from a successful invention than if they have to share credit with a co-inventor. (*See* Ex. 41, Vorbeck Dep., at 88:11-89:22.)

162. Based on German law, Mr. Braun, as the sole inventor listed on the German and U.S. patents has been paid approximately € 40,000 by Braun. (*Id.*, at 36:7-11.)

163. The original prototype of Dr. Pahl's cleaning device included an axial fan to dry the shaver head. (Ex. 30, Smetana Dep., at 18.)

164. At some point in 1993, at the request of Dr. Pahl and/or Mr. Braun, Norbert Smetana began working on aspects of Dr. Pahl's prototype. (Ex. 30, Smetana Dep., at 36-38.)

14

165. Mr. Smetana memorialized his work in an August 3, 1993 memorandum addressed to Mr. Braun, Dr. Pahl, and Dr. Jung. (Ex. 46.)

166. In that memorandum, Mr. Smetana reported that the fan in the cleaning system dried the shaver head with "cold air." (Ex. 46.)

167. At the end of the memorandum, Mr. Smetana suggested that a heater be used with the fan to expedite drying. (Ex. 46.) Mr. Smetana testified that the idea for using the heater with the fan was at least conceived jointly with Mr. Braun. (Ex. 30, Smetana Dep., at 48-49.)

168. Mr. Braun testified that he had no role in the development of the drying device for the cleaning device he allegedly invented. (Ex. 28, Braun Dep., at 139.)

169. Claim 13 of the '328 patent depends from claim 12, and requires that the "drying device" comprise both an impeller and a heater.

170. Mr. Hoeser, Braun's designee on conception and reduction to practice, could not identify a heater in any documents that Braun has produced from the early 1990's. (Ex. 34, Hoeser Dep., at 82-86.)

171. Prior to June 4, 1993, Braun had submitted a prototype of Dr. Pahl's cleaning system to VDE, a German testing group, for approbation. (Ex. 40.) Dr. Pahl had requested that VDE inspect his prototype. (Ex. 29, Pahl Dep., at 183-184.)

172. Mr. Kraus, an engineer at VDE, analyzed the prototype, and, thereafter, had a meeting with Mr. Stiegler and Mr. Petretti of Braun to relay his ideas. (Ex. 40.) following the meeting, Mr. Stiegler sent a June 4, 1993 memorandum to Dr. Pahl (and others) reporting Mr. Kraus' ideas. (*Id.*)

173. In the June memorandum, Mr. Stiegler reported that Mr. Kraus had instructed Braun that an interlock needed to be included with the cleaning system. (*Id.*) The purpose of the interlock was to preclude a consumer from removing the shaver during cleaning/drying due to the risk of electric shock. (Ex. 29, Pahl Dep., at 184-86.)

174. Mr. Phillips has opined that one of ordinary skill in the art would have been able to implement the Mr. Kraus' idea with routine engineering. (Ex. 35, First Phillips Report, at ¶ 76.)

175. Dr. Pahl testified that he believed that the interlock constituted an inventive improvement upon his original cleaning system prototype. (Ex. 29, Pahl Dep., at 111-12.) According to Dr. Pahl, the interlock is illustrated in item 9 of Figure 1 of the '328 patent. (Ex. 29, Pahl Dep., at 206.) Dr. Pahl also testified that item 9 of Figure 1 of the '328 patent represents the idea from Mr. Kraus. (*Id.*)

176. Dr. Pahl believes that he would have conveyed Mr. Kraus' ideas to Mr. Braun. (Ex. 29, Pahl Dep., at 184-186.)

177. Mr. Braun testified that he believed the interlock to be an inventive improvement upon the original work of Dr. Pahl. (Ex. 28, Braun Dep., at 69.)

178. Mr. Braun testified that he may have received the idea for the interlock from conversations with Dr. Pahl about the approbation process. (Ex. 28, Braun Dep., at 76-77.) At a minimum, Mr. Braun testified that the idea for the interlock likely came from the approbation process. (*Id.*)

179. Mr. Hoeser, Braun's designee on the topic of conception and reduction to practice, testified that the interlock recommended by Mr. Kraus is represented by items 9 and 10 on Figure 1 of the '328 patent. (Ex. 34, Hoeser Dep., at 87-90.) Item 10 in Figure 1 of the '328 patent is the "bracket" recited in claim 18 of the '328 patent. Mr. Hoeser further testified that the June 4, 1993 memorandum of Mr. Stiegler represents an earlier conception date for claim 18 of the '328 patent than the July 1993 date asserted in Braun's interrogatory response. (Ex. 34, Hoeser Dep., at 90.)

## **Inequitable Conduct**

180. The Zeischke Thesis was published in 1991, and is thus prior art to the '328 patent.

181. Mr. Phillips has opined that the Zeischke Thesis discloses a "bracket for insertion of a shaving apparatus therein." (Ex. 35, First Phillips Report, at ¶¶ 156.) Dr. Nayfeh disagrees that the Zeischke Thesis discloses a "bracket for insertion of a shaving apparatus therein." (Ex. 8, Second Nayfeh Report, at 21.)

182. French Patent No. 2,568,111 ("the French '111 patent") does not disclose a "bracket for insertion of a shaving apparatus therein," as claimed in claim 18 of the '328 patent.

183. The French '111 patent discloses a "bracket for insertion of a shaving apparatus therein," as claimed in claim 18 of the '328 patent.

184. Dr. Nayfeh did not consider whether the Zeischke Thesis is cumulative to the French '111 patent. (Ex. 31, Nayfeh Dep., at 127.)

185. During prosecution of the '328 patent, Braun affirmatively represented to the USPTO in a telephonic interview that the prior art of record including the French '111 patent did not not disclose a "bracket for insertion of a shaving apparatus therein." (Ex. 15.) The Examiner relied upon Braun's argument in allowing claim 18 of the '328 patent.

186. Hans Dieter Klauer was the in-house patent agent at Braun responsible for the prosecution of the '328 patent. (Ex. 41, Vorbeck Dep., at 20-21.)

187. During the prosecution of the '328 patent, Mr. Klauer knew of and understood his duty to disclose prior art material to the '328 patent application. (Ex. 41, Vorbeck Dep., at 50.)

188. During the prosecution of the '328 patent, Mr. Klauer knew of the Zeischke Thesis. (Ex. 41, Vorbeck Dep., at 58-59.)

16

189. Mr. Klauer intended to deceive the USPTO in not disclosing the Zeischke Thesis during the prosecution of the '328 patent.

190. Braun has no evidence that Mr. Klauer did not intend to deceive the USPTO when he did not disclose the Zeischke Thesis during the prosecution of the '328 patent.

191. On Braun's behalf, Susan Christian of TransPerfect Translations translated "aufnameteil" to mean "receptacle." (Ex. 26.)  The German word "aufnameteil" does not translate into the English word "cradle." (Ex. 27.)

192. Mr. Phillips has opined that a "cradle structure" is a different structure than a "receptacle." (Ex. 35, First Phillips Report, at ¶ 57.)

193. Dr. Nayfeh admits that the terms "cradle structure" and "receptacle" have different meanings. (Ex. 31, Nayfeh Dep., at 138-39.)

194. Dr. Nayfeh testified that various prior art structures constituted "receptacles," but those structures did not constitute "cradle structures." (*Id.*)

195. During prosecution of the '328 patent, the Examiner transmitted a Notice to File Missing Parts because the USPTO believed that Braun had filed its patent application in a language other than English. (Ex. 25, at B000259-60.)

196. In response, Braun affirmatively represented that the U.S. patent application for the '328 patent it had filed was a literal translation of its January 1994 German priority application. (Ex. 25, at B000182.)  Braun's representation to the USPTO was, in fact, false.

197. The U.S. patent application for the '328 patent, as originally filed, had different patent claims than the January 1994 German priority application. (Ex. 41, Vorbeck Dep., at 168-71.)

198. The U.S. patent application for the '328 patent, as originally filed, included a discussion of the French '111 patent not present in the January 1994 German priority application. (Ex. 41, Vorbeck Dep., at 65-66, 74-76.)

199. Mr. Klauer personally altered the January 1994 German priority application by changing the claims and adding the discussion of the French '111 patent. (Ex. 21.)

200. Mr. Klauer personally oversaw the translation of the altered German priority application into the English '328 patent application. (Ex. 41, Vorbeck Dep., at 51.)

201. Braun has no evidence that the translation into English of the altered German priority application rather than the original German priority application was inadvertent or a clerical mistake.

>Respectfully submitted,
>
>RAYOVAC CORPORATION
>
>By its attorneys,
>
>   /s/ Jessica P. Driscoll
>Thomas E. Dwyer, Jr. (BBO No. 139660)
>Jessica P. Driscoll (BBO No. 655394)
>DWYER & COLLORA, LLP
>600 Atlantic Avenue
>Boston, MA 02210-1122
>Phone: (617) 371- 1000
>Facsimile: (617) 371-1037
>
>Mark A. Pals, P.C. (admitted *pro hac vice*)
>James A. Shimota (admitted *pro hac vice*)
>Kevin S. Ueland (admitted *pro hac vice*)
>James B. Coughlan (admitted *pro hac vice*)
>KIRKLAND & ELLIS LLP
>Aon Center
>200 E. Randolph Dr.
>Chicago, IL 60601
>Phone: (312) 861-2000
>Facsimile: (312) 861-2200

Dated: September 13, 2005