# EXHIBIT
# 28B

1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3    BRAUN GmbH,                    )
                                    )
4              Plaintiff,           )
                                    )
5          -vs-                     )   No. 03-CV-12428 (WGY)
                                    )
6    RAYOVAC CORPORATION,           )
                                    )
7              Defendant.           )

8

9           Continued videotaped deposition through

10   interpreter of GEBHARD BRAUN taken before TRACY L.

11   BLASZAK, CSR, CRR, and Notary Public, pursuant to the

12   Federal Rules of Civil Procedure for the United States

13   District Courts pertaining to the taking of depositions,

14   at Braun GmbH, Frankfurter Strasse 145, D-61476 Kronberg

15   im Taunus, Germany, at 10:33 a.m. on the 27th day of

16   April, A.D., 2005.

17           There were present at the taking of this

18   deposition the following counsel:

19

20

21

22

23

24

Gebhard Braun   April 27, 2005
Volume 2

Page 94

1  ROPES & GRAY by
   MR. WILLIAM L. PATTON
2  MS. LESLEY F. WOLF
   One International Place
3  Boston, Massachusetts 02110-2624
   (617) 951-7000
4
      on behalf of the Plaintiff;
5
6  KIRKLAND & ELLIS, LLP
   MR. JAMES SHIMOTA
7  200 East Randolph Drive
   Chicago, Illinois 60601
8  (312) 861-2000
9      on behalf of the Defendant;
10
   ALSO PRESENT: Mr. Uwe Sievers
11           Braun GmbH;
12        Dr. Wolfgang Stutius
          Ropes & Gray;
13
          Dr. Wolfgang Vorbeck
14        Braun GmbH;
15        Ms. Jeanette Fröhlich
          Interpreter;
16
          Mr. Kevin Duncan
17        Legal Videographer.
18        - - - - -
19
20
21
22
23
24

Page 95

1  CONTINUED VIDEOTAPED DEPOSITION OF
            GEBHARD BRAUN
2
       April 27, 2005
3
4  EXAMINATION BY:              PAGE
5  Mr. James Shimota            97
6       * * * * * *
7
       EXHIBITS
8
                     PAGE
9
   Deposition Exhibit No. 2      104
10    (previously marked)
   Deposition Exhibit No. 4      170
11    (previously marked)
12 Deposition Exhibit No. 7      100
13 Deposition Exhibit No. 8      113
14 Deposition Exhibit No. 9      138
15 Deposition Exhibit No. 10     138
16 Deposition Exhibit No. 11     147
      (not attached)
17 Deposition Exhibit No. 12     147
      (not attached)
18 Deposition Exhibit No. 13     158
19 Deposition Exhibit No. 14     171
20 Deposition Exhibit No. 15     173
      (not attached)
21 Deposition Exhibit No. 16     178
22 Deposition Exhibit No. 17     180
23 Deposition Exhibit No. 18     182
24 Deposition Exhibit No. 19     182

Page 96

1                      PAGE
2  Deposition Exhibit No. 20     182
3  Deposition Exhibit No. 21     183
      (not attached)
4  Deposition Exhibit No. 22     183
5  Deposition Exhibit No. 23     183
6  Deposition Exhibit No. 25     183
7  Deposition Exhibit No. 26     183
8       * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 97

1      THE VIDEOGRAPHER:  Good morning.  We are going on
2  the video record at 10:33 a.m.  Today's date is April
3  27th, 2005.
4      Here continues the videotaped deposition of
5  Mr. Gebhard Braun taken in the matter of the Gillette
6  Company, et al. vs. Remington Products Company, LLC.
7      You may continue, please.
8      JEANETTE FRÖHLICH,
9  recalled as an interpreter herein, was previously sworn
10 to interpret all of the questions from English to German
11 and all of the answers from German to English:
12     GEBHARD BRAUN,
13 recalled as a witness herein, having been previously
14 duly sworn, was examined upon oral interrogatories and
15 testified as follows:
16     FURTHER EXAMINATION
17     by Mr. Shimota:
18 Q  Good morning, Mr. Braun.
19 A  Good morning.
20 Q  In connection with this litigation, are you
21 currently employed by Braun?
22 A  No, I left the company on the 1st of April, '95.
23 Q  Let me make sure I understand that.  Are you
24 being retained as a consultant or an assistant by Braun

Page 98

1  in connection with this litigation?
2      A  No.
3      Q  If you were asked by Braun, would you come to
4  the United States and testify at the trial in connection
5  with this patent litigation?
6      A  I would not very much like to.
7      DR. STUTIUS:  He would hesitate.  He would not like
8  it.
9      MR. SHIMOTA:  Q  Why would you hesitate?
10     A  Because usually I make long distance -- my trips
11 to foreign countries, especially long distance trips,
12 together with my wife.
13     Q  If Braun agreed to bring your wife to the United
14 States, would you be willing to testify at the trial?
15     A  In case of emergency, if there really were a
16 case of emergency, I would do so.
17         But I cannot see a case of emergency because,
18 otherwise, you should be here and ask me why should I go
19 there.  I do not know the language.  I do not know the
20 circumstances.  It's not very easy for me to get along
21 in such a situation in the States.
22         When I was to the States ever, it was within a
23 whole group.  It was an organized travel group.
24     Q  Just one last question there.  If Braun told you

Page 99

1  it was an emergency and they needed you to come to the
2  trial in the United States, would you come?
3      MR. PATTON:  I object to the form of the question as
4  calling for speculation.
5      THE INTERPRETER:  But he should answer nevertheless?
6      MR. PATTON:  Yes.
7      THE WITNESS:  (through interpreter) I would expect
8  in this case that Braun would at least also tell me that
9  I can have another 14 days of holidays in the states and
10 that they also provide me with a language course.
11     MR. SHIMOTA:  Q  When you were performing your work
12 on the shaver cleaning system, did any of that work
13 occur in the United States?
14     A  In the States?  No.
15     Q  While you were performing your work on the
16 shaver cleaning system, did you communicate with anyone
17 in the United States regarding that work?
18     A  No, not that I know.
19     Q  Do you know whether anyone at Braun communicated
20 the results of your work on the shaver cleaning system
21 to anyone in the United States in the early 1990s?
22     A  I do not know anything in this respect.
23     MR. SHIMOTA:  I'd like to mark as Defendant's
24 Deposition Exhibit No. 7 a document bearing the Bates

Page 100

1  No. B1066 to B001068.  Attached at the end is also the
2  B1066 ENG to B001068 ENG as the declaration of Gebhard
3  Braun.
4         (Exhibit 7 marked as requested.)
5      MR. SHIMOTA:  Q  Do you recognize this document?
6      A  In general, yes, but the details I would have to
7  check them.
8      Q  If you'd like to take your time to, I mean,
9  review it, you may.
10     A  Yes, that's correct, that's the one.
11     Q  If you can look -- Thank you.
12         If you could look to paragraph No. 5, you will
13 see it states that in 1992 Dr. Pahl asked me to develop
14 further a device for cleaning dry shavers the "cleaning
15 center" that he had been developing.
16         Does that refresh your recollection -- I'll
17 speak louder.
18         Does that refresh your recollection as to when
19 Dr. Pahl showed you his original prototype?
20     A  Yes, sure.  He showed it to me already right at
21 the beginning of my work, that's when I saw it already.
22     Q  Can you tell me what month in 1992 Dr. Pahl
23 asked you to further develop his prototype?
24     A  No, I cannot tell.  I cannot say so.

Page 101

1      Q  Do you recall whether it would have been at the
2  beginning of 1992 or at the end of 1992?
3      A  No, I could not even tell from my recollection
4  that it was in '92.
5      Q  If you look at the next sentence in paragraph 5,
6  it states, "He showed me technical drawings, functional
7  models, and a prototype of the cleaning center."
8         What do you mean or what do you mean by
9  functional models?
10     A  This is like a very, let's say, simple looking
11 or simple device which means it's just put together --
12     DR. STUTIUS:  Screws.
13     THE WITNESS:  (through interpreter) -- with screws
14 and it just shows how it functions, how it works.  It
15 has nothing to do with design and it could not be sold
16 as it is.
17     MR. SHIMOTA:  Q  How did the functional models
18 differ from the prototype that Dr. Pahl developed?
19     A  That Dr. Pahl developed?
20     Q  Yes.
21     A  About the wording.  I saw where the development
22 of Dr. Pahl, right?
23     DR. STUTIUS:  Yes, what you meant was what Dr. Pahl
24 developed what he saw.

3 (Pages 98 to 101)

Gebhard Braun    April 27, 2005
Volume 2

Page 102

1    MR. SHIMOTA: Let me reask the question.
2    DR. STUTIUS: Yes.
3    MR. SHIMOTA: Q  How did the functional models
4  differ from the prototype that Dr. Pahl developed?
5    A  I do not know what you mean with Dr. Pahl's
6  prototype, prototypes. If you mean the one I developed,
7  I understand your question.
8    Q  Okay. It says in paragraph 5 that Dr. Pahl
9  showed you both functional models and a prototype.
10    So my question is: In the context of paragraph
11  5, what were the differences between the functional
12  models and the prototype?
13    A  I must say I cannot really tell anything more
14  with respect to this prototype, I cannot really say what
15  to understand --
16    DR. STUTIUS: Cannot make sense out of the term
17  prototype in that context.
18    THE WITNESS: (through interpreter) For me I thought
19  or I think a prototype is just a different name for
20  functional model.
21    MR. SHIMOTA: Q  Okay. So did Dr. Pahl show you
22  more than one prototype in 1992?
23    A  I do not know whether the functional model was a
24  real -- a separate thing or whether it was just a

Page 103

1  component of a different development, different stages
2  of development.
3    Q  How many functional models approximately did
4  Dr. Pahl show you in 1992?
5    A  I recollect, indeed, only one really operating
6  model. Maybe there was a second one, but I cannot
7  really remember exactly.
8    Q  And the one device that you're referring to is
9  the prototype that we were discussing yesterday, is that
10  correct?
11    A  What did we talk yesterday? Please help me. We
12  talked the whole day, it was a long day.
13    Q  Certainly. I asked you questions yesterday
14  about the prototype -- or I asked you questions
15  yesterday about Dr. Pahl's prototype. Do you remember
16  that?
17    A  Yes, of course. Of course. Then if this
18  prototype would be that of Dr. Pahl and the others would
19  be the ones I developed.
20    Q  Okay. Then back to the paragraph 5, my question
21  is: What was it or what were all of the things that
22  Dr. Pahl showed you in 1992?
23    A  He showed me the device that is shown here. He
24  showed me just during a short time so that I could see

Page 104

1  the principal what was done. But he, for example, did
2  not allow me to take it apart, but he put it back into
3  his cabinet.
4    Q  I understand. So am I correct, then, that
5  Dr. Pahl showed you his prototype and also the schematic
6  which is Defendant's Exhibit 2?
7    (Exhibit 2 previously marked.)
8    THE INTERPRETER: The schematic of this part, did I
9  get that right?
10    THE WITNESS: (through interpreter) Yes, right,
11  sure.
12    MR. SHIMOTA: Q  How did you come to prepare your
13  declaration, which is Defendant's Exhibit 7?
14    A  I did not prepare it myself. This was prepared
15  in the patent department where we agreed and conversed
16  about this topic.
17    Q  Who did you work with in preparing your
18  declaration?
19    A  At least Mr. Sievers was present and his boss,
20  Dr. Vorbeck, and I think one or two other people were
21  present whose name I do not remember.
22    Q  Do you recall whether there were drafts of your
23  declaration?
24    A  Drafts? No, this declaration was written, sent

Page 105

1  to me, and I signed it.
2    Q  So where was the declaration sent?
3    DR. STUTIUS: Where was it signed or sent?
4    MR. SHIMOTA: Q  Sent, sent.
5    A  To my home address.
6    Q  When you received the declaration, did you
7  request that any changes be made to it?
8    A  No.
9    Q  If you could look to paragraph 8 of your
10  declaration, it states, "With Dr. Pahl's approval, the
11  internal invention disclosure named me as the sole
12  inventor of the device to clean dry shavers."
13    My question is: Did you discuss with Dr. Pahl
14  whether he was an inventor of any aspect of the shaver
15  cleaning system?
16    A  I think so, yes.
17    Q  And what did Dr. Pahl say to you regarding
18  whether he was an inventor of any aspect of the shaver
19  cleaning system?
20    A  He categorically rejected this, and he even told
21  me that I should be the sole inventor.
22    Q  Why did he tell you -- or what reason did he
23  provide you that you should be named the sole inventor?
24    A  Before Dr. Pahl became our superior superior

4 (Pages 102 to 105)

Gebhard Braun   April 27, 2005
Volume 2

Page 106

1   boss, we had Mr. Messinger. And he was a compassionate
2   co-inventor. And the staff knew that -- the staff knew
3   that he would write in his -- or that in his booklet it
4   was written that he had made such an invention before.
5   And this created a bad climate in the department.
6       Q   Dr. Messinger wrote that he had created a shaver
7   cleaning system prior to your work?
8       A   No, he had absolutely nothing to do with that.
9   This is just according to my opinion the reason why
10  Dr. Pahl wanted to handle it totally differently, that
11  he said the one who made the invention should be the
12  inventor.
13      Q   I guess what did Dr. Messinger's policies have
14  to do with Dr. Pahl's belief that you should be named
15  the sole inventor?
16      MR. PATTON: I object to the form of the question.
17  He may answer.
18      THE WITNESS: Mr. Messinger was the preceder of
19  Dr. Pahl, the direct preceder of Dr. Pahl, and he wanted
20  to bring a new eloign to the department.
21      MR. PATTON: And the he is Dr. Pahl?
22      THE WITNESS: Yes, Dr. Pahl.
23      MR. SHIMOTA: Q   Let me see if I can understand.
24  You stated that Dr. Messinger had, I believe, a

Page 107

1   compassionate policy towards patents?
2       DR. STUTIUS: Actually, the word was previously more
3   enthusiastic in a facetious way.
4       MR. SHIMOTA: Q   All right. Let me see. Was it
5   your belief that Dr. Messinger's policy was to name
6   himself as an inventor on patents that were not --
7   Excuse me.
8           Was it your belief that Dr. Messinger had a
9   policy to name himself as an inventor on work performed
10  by others?
11      A   No, not that.
12      Q   Well, what was Dr. Messinger's policy towards
13  patents?
14      A   Mr. Messinger strived to be the co-inventor of
15  patents.
16      Q   And why did Dr. Messinger strive to be a
17  co-inventor of patents?
18      MR. PATTON: Object to form.
19      THE INTERPRETER: Strive to?
20      MR. SHIMOTA: Q   Why did Dr. Messinger strive to be
21  the co-inventor of patents?
22      MR. PATTON: I object to the form. It calls for
23  speculation.
24      THE WITNESS: (through interpreter) This was a

Page 108

1   personal --
2       DR. STUTIUS: Ambition.
3       THE WITNESS: (through interpreter) -- ambition.
4       MR. SHIMOTA: Q   And how did Dr. Pahl differ from
5   Dr. Messinger?
6           Well, let me ask: How did Dr. Pahl differ from
7   Dr. Messinger with respect to Dr. Pahl's attitude
8   towards patents?
9       DR. STUTIUS: Other way around. How did Dr. Pahl
10  differ from Mr. Messinger as far as his attitude towards
11  patents goes, right?
12      MR. SHIMOTA: That is correct.
13      THE WITNESS: (through interpreter) During the early
14  work with Dr. Pahl, we had a bad feeling when we made
15  applications for patents.
16          We thought that Dr. Messinger would know about
17  it because then it came back and he would see it because
18  he had to see this application when it came back from
19  the patent department. And then he would look into his
20  little booklet and there would be written that he had
21  already done something in this respect.
22      MR. SHIMOTA: Q   Was there a rivalry between
23  Dr. Pahl and Dr. Messinger?
24      A   I cannot tell.

Page 109

1       Q   Well, why did you have the belief that if an
2   application were -- why did you have the belief that if
3   an application which named Dr. Pahl came to
4   Dr. Messinger, Dr. Messinger would say that he had come
5   up with the idea previously?
6       MR. PATTON: I object to the form of the question.
7   I think it misstates the testimony.
8       MR. SHIMOTA: Would you just reread the witness'
9   previous answer about Dr. Messinger's booklet, that
10  answer.
11          (answer read)
12      MR. SHIMOTA: Q   Why did you have a bad feeling
13  about Dr. Messinger in the early times of submitting
14  patent applications?
15      DR. STUTIUS: Dr. Pahl?
16      MR. SHIMOTA: No, no.
17      THE INTERPRETER: Excuse me, would you repeat it
18  again.
19      MR. SHIMOTA: Q   Why did you have a bad feeling in
20  the early times when submitting patent applications that
21  Dr. Messinger would see those applications?
22      A   From my recollection, I have the feeling that he
23  did not want that I would apply for a patent. He would
24  like me to look for alternatives and so on but not to

Gebhard Braun   April 27, 2005
Volume 2

Page 110

1  apply for a patent.
2     Q   When you say that, you mean Dr. Messinger would
3  like you to look for alternatives, is that correct?
4     A   And the last alternative was the one he wanted
5  to have from the beginning on, and then that's the one
6  that was created.
7     Q   So I guess to your recollection, did
8  Dr. Messinger have any role in -- To your recollection,
9  was there any connection between Dr. Messinger and the
10 fact that Dr. Pahl told you that he should -- that you
11 should be named as the sole inventor of the shaver
12 cleaning system?
13    A   It was a very -- I was very pleased with the
14 fact that he was positive to patent application from my
15 side without any problems.
16    MR. PATTON: Again, Jim, the he is Dr. Pahl?
17    THE WITNESS: (through interpreter) Yes, Dr. Pahl.
18    MR. SHIMOTA: Q   Did Dr. Pahl ever express to you
19 any reason why he wanted you to be named the sole
20 inventor of the shaver cleaning system?
21    A   No.  He determined that's the way it should be.
22       In an early stage already we had already
23 elaborated the application.
24    DR. STUTIUS:  Drafted the invention disclosure.

Page 111

1     MR. SIEVERS:  Invention disclosure.
2     THE WITNESS: (through interpreter) And we still
3  were working on it.
4     MR. SHIMOTA: Q   When you say we, who do you mean
5  we?
6     THE INTERPRETER:  Excuse me, it was my fault.
7     THE WITNESS: (through interpreter) From my -- As I
8  see it, it was myself but with the support of Dr. Pahl.
9  Nobody else worked on it as far as I know, nobody else.
10    MR. SHIMOTA: Q   So you and Dr. Pahl worked on the
11 invention disclosure record, is that correct?
12    A   Yes.  And a patent attorney was also present.
13    Q   Which patent attorney was present?
14    A   I only know that it was an external patent
15 attorney, he was not from our patent department. I did
16 not know him.
17    DR. STUTIUS: I think the word was not present but
18 more involved.
19    MR. SHIMOTA: Q   Did an attorney assist you in
20 drafting the invention disclosure record?
21    A   My application --
22    DR. STUTIUS:  Invention disclosure.
23    THE WITNESS:  My invention disclosure I make myself,
24 but he rewrote it.

Page 112

1     MR. SHIMOTA: Q   I understand.  Just on this
2  document, if you look to paragraph 12, it states, "Based
3  on his development of the cleaning center and his
4  subsequent collaboration with me while he was my
5  supervisor, I believe that Dr. Pahl is a co-inventor
6  with me on the patents in suit."
7        The question is:  Do you believe that Dr. Pahl
8  is a co-inventor with you on the patents in suit?
9     A   I have read it.  I do not have to read it.
10       I'm especially of the opinion that he was a
11 prior inventor.
12    Q   What do you mean by a prior inventor?
13    A   That was what was already there.  What was here
14 lying before me, that is not what I invented.  This can
15 only have been him or other people who worked this out.
16    Q   And did you believe that Dr. Pahl was a prior
17 inventor in the early 1990s?
18    A   At least together with the people who
19 elaborated, this possibly a co-inventor.
20    Q   So you did believe that Dr. Pahl was a
21 co-inventor with you of the shaver cleaning system in
22 the early 1990s?
23    A   Since he was the only reference person to me, I
24 was always in conversation with him, always in contact

Page 113

1  with him.
2        And as I was not afraid to show him and to
3  propose to him what I found out, he was always connected
4  with it.
5     Q   Did you think that Dr. Pahl had invented
6  anything with respect to the shaver cleaning system in
7  the early 1990s?
8     MR. PATTON:  I object to the form of the question.
9  It calls for a legal conclusion.
10    THE WITNESS: (through interpreter) The state I
11 found that was there when I started, yes, with this
12 respect, yes.
13    MR. SHIMOTA: Q   So you believe that what Dr. Pahl
14 showed you, which is represented in the schematic, that
15 was his work?
16    A   I had no reason to think about anything else, to
17 suspect something else.
18    MR. SHIMOTA:  I'd like to mark as Defendant's
19 Deposition Exhibit 8 a document bearing the Bates label
20 B1069 to 1073, which also has the English translations
21 of that.  And it is the invention disclosure record of
22 Gebhard Braun.
23       (Exhibit 8 marked as requested.)
24    MR. SHIMOTA: Q   I'd like you to take the time to

6 (Pages 110 to 113)

Page 114

1 review whatever you need on this document, but my first
2 question is: Did Dr. Pahl assist you in preparing this
3 document?
4    A  When preparing this?
5    Q  Yes, that is correct.
6    A  He asked me to make that up -- to develop this,
7 but he did not take influence.
8    Q  Well, did you write your invention disclosure
9 record?
10    A  Not typewrite, it was the secretary, but I wrote
11 it before by hand.
12    Q  So you wrote this document and then provided it
13 to -- you hand wrote this document and then provided it
14 to a secretary?
15    A  Exactly.
16    Q  And did you provide it, then, to Dr. Pahl for
17 his review?
18    A  The secretary was at the same time Dr. Pahl's
19 secretary. And I'm convinced when it was written by the
20 secretary that I showed it to Dr. Pahl because I cannot
21 imagine that I gave it to the patent department without
22 informing him. But I cannot recollect that I made any
23 corrections in it.
24    Q  If you look on, for example, B00170, there is

Page 115

1 handwriting.
2    A  Which page?
3    Q  I was wondering if that is your handwriting?
4    A  No, that's not my handwriting.
5    Q  Do you recognize the handwriting?
6    A  I do not know Dr. Pahl's handwriting in case it
7 were his.
8    Q  So you don't know whose handwriting it is?
9    A  No, no idea.
10    Q  If you look on B00169, at the top you see H.D.
11 Klauer.
12    A  I don't see it, but I know the name. Yes, here.
13 It's written in English. That's a little bit difficult.
14    Q  Who is H.D. Klauer?
15    A  This was the patent attorney responsible in the
16 patent department, the gentleman responsible for
17 patent --
18    MR. SIEVERS:  Patent professional we used to say.
19    THE WITNESS:  (through interpreter) Patent
20 professional.
21    MR. SHIMOTA:  Q  What was Mr. Klauer's first name?
22    A  Hans Dieter Klauer, I think. It was not Klaus.
23 I think it was H.D. Before I saw Klaus, but maybe I'm
24 wrong.

Page 116

1    Q  Was Mr. Klauer the individual who you worked
2 with in connection with the preparation of your patent
3 application on the shaver cleaning system?
4    A  No Mr. Klauer, no Mr. Pahl helped me in
5 developing and making this scripture.
6    Q  My question, after they started -- After Braun
7 began working on a patent document, was Mr. Klauer the
8 person you -- the individual you worked with on
9 preparing the patent application?
10    A  I only can remember that we had this external
11 gentleman working on the patent we worked with and maybe
12 later on Klauer was also involved because he was the man
13 responsible in the company.
14    Q  Okay. The external lawyer you mentioned, was
15 that a -- do you recall whether that was an American
16 attorney or a German attorney?
17    A  I was certain and I am still that it was a
18 German one, but I'm not 100 percent sure, but I do not
19 have any reason to think that it would have been an
20 American. And I'm sure Dr. Pahl can tell you that.
21    Q  Dr. Pahl could tell who the German attorney was?
22    A  Yes, I think so.
23    Q  Why do you think that?
24    A  Because the elaboration, the working on it took

Page 117

1 place at least to some extent in the office of Dr. Pahl.
2    Q  So the work on the patent application took place
3 in the office of Dr. Pahl with the German attorney of
4 which you spoke?
5    A  At least with regards to the exchange of
6 information, the patent lawyer was present and I was
7 also present but not all the time. It was mostly
8 Dr. Pahl.
9    Q  So Dr. Pahl had most of the discussions with the
10 attorney of which you spoke?
11    A  In my opinion, yes, but, of course, when I was
12 not present any longer I would not know how long he was
13 still there.
14    Q  On how many occasions did this attorney come to
15 Braun and speak with either you or Dr. Pahl,
16 approximately?
17    A  I think it would be speculation to tell exactly
18 how it was. I cannot -- it's possible that I'm not -- I
19 cannot recollect so well, but it was a long time. It
20 can be that it was two days. It's possible that there
21 was a second date or a third or a fourth time.
22    Q  Did you -- did there come a time when you
23 stopped working with the German external attorney and
24 began working with an internal Braun attorney? And I

Gebhard Braun    April 27, 2005
Volume 2

Page 118

1  mean on the patent application.
2      A  I with my own initiative did not start to talk
3  with the patent -- did not talk to the patent attorney.
4      Q  Do you mean the external patent attorney or an
5  internal Braun attorney?
6      A  The external I mean.  I mean especially the
7  external.
8      Q  Did you have discussions regarding your patent
9  application with any internal Braun attorneys?
10     THE INTERPRETER:  With any internal attorney?
11     MR. SHIMOTA:  Q  Yes, internal.
12     A  With Mr. Klauer.
13     Q  Do you recall Mr. Klauer having any discussions
14  with Dr. Pahl regarding the patent application on the
15  shaver cleaning system?
16     A  I think I can vaguely remember to have been with
17  him at Mr. Klauer's -- in Mr. Klauer's office, but I
18  cannot remember whether it was about the patent
19  application, but maybe.
20     Q  Well, when you were in Mr. Klauer's office with
21  Dr. Pahl, did you discuss the work on the shaver
22  cleaning system?
23     A  If so, then in connection with how it would be
24  incorporated reasonably into a patent application.

Page 119

1      Q  So in the meeting that you recall, am I correct
2  that you did discuss the work on the shaver cleaning
3  system with Mr. Klauer?
4      A  Insofar as it was necessary to explain to him
5  what we wanted to apply for or to clarify to him for
6  what's already incorporated in the document for sure we
7  spoke about Dr. Pahl.
8      Q  Did Dr. Pahl discuss -- Well, in the meeting
9  that you spoke of, did Dr. Pahl discuss the work that he
10  had done on the shaver cleaning system with Mr. Klauer?
11     A  For sure not.
12     Q  Why do you say for sure not?
13     A  There was never -- there were never talks about
14  the difference between what was before and what was
15  invented afterwards but only about the whole that was --
16  the application was made for.
17     Q  Well, was it understood that both you and
18  Dr. Pahl had worked on the shaver cleaning system?
19     A  The only thing that was clear was that I was the
20  one who worked on it and Dr. Pahl was my boss.
21     Q  So I assume that Mr. Klauer did not know that Dr. Pahl had
22  performed any work on the shaver cleaning system?
23  
24     A  I'm convinced that Mr. Klauer was not at all

Page 120

1  interested in this.
2      Q  Why are you convinced of that?
3      A  He was only interested in how the patent looked
4  like, what was incorporated in it, but he was not
5  interested in who the inventor was.
6      Q  And at the point that we're talking about, the
7  patent application had already been drafted by the
8  external attorney of which we spoke?
9      A  I think so, yes.
10     MR. PATTON:  When you come to a convenient place.
11     MR. SHIMOTA:  This is a convenient time, actually.
12     MR. PATTON:  We could take a brief break, I'd
13  appreciate it.
14     MR. SHIMOTA:  Yes, certainly.
15     THE VIDEOGRAPHER:  We are going off the video record
16  of tape No. 1 at 11:34 a.m.
17     (a brief recess was taken)
18     THE VIDEOGRAPHER:  We are going back on the video
19  record at 11:49 a.m.  Here continues tape 1.
20     MR. SHIMOTA:  Q  Mr. Braun, looking at the same
21  page we are at, it lists on the far right-hand side, it
22  states at the top of the column share in invention and
23  it has the subscripts 1, 2 -- or superscripts, excuse
24  me.

Page 121

1          Do you have any recollection of why there is
2  listed an entry for the share in invention?
3      A  Yes, sure.
4      Q  And what is your recollection?
5      A  This is not filled in by me.  I did not fill
6  this in.  This is filled out by the patent department.
7      Q  Did you -- Well, did Braun compensate
8  inventors -- did Braun -- Let me restate.
9          Did Braun compensate its employees for granted
10  patents?
11     A  It's remuneration for patent applications.
12     Q  Do you recall how much remuneration that was?
13     A  As far as I remember, you are remunerated only
14  when there is a success with this -- if this -- if there
15  is the granted patent.
16     MR. SIEVERS:  Application.
17     THE WITNESS:  (through interpreter) If there is a
18  patent application.
19     DR. STUTIUS:  If it comes to -- if it comes to a
20  patent application, they get remuneration.
21     MR. SHIMOTA:  Q  If a patent application -- Do you
22  recall how much money you were -- Braun employees were
23  paid if a patent application was filed?
24     A  Yes, I remember there was several stages, and

8 (Pages 118 to 121)

Gebhard Braun    April 27, 2005
Volume 2

Page 122

1  each stage was 100 D Mark. It was -- when it was
2  applied for --
3     DR. STUTIUS: When applications were filed, patents
4  were granted and foreign patents were -- I don't know if
5  it was granted -- granted or applied for.
6     MR. SHIMOTA: Q  Did the amount of remuneration
7  that you received vary depending upon whether or not
8  there was a co-inventor listed or there was a
9  co-inventor on a particular patent application?
10    A  Yes, it was divided in accordance to the share
11 of the invention.
12    Q  And to your recollection, is that the purpose
13 for this column for the share in the invention?
14    A  Yes, I think so.
15    Q  If you could turn to the preceding page, it's
16 actually the German original, I believe. Is that your
17 signature?
18    A  Yes.
19    Q  And did you read the statement above your
20 signature at the time you signed this document?
21    A  You mean all these points that are listed here?
22    Q  There is that statement above your signature, "It
23 is hereby assured that all information was provided to
24 the best of my knowledge and that no additional

Page 123

1  inventors participated in creation of the invention."
2     A  Right. I for sure had not absolutely -- very --
3  absolutely good feeling in this respect. But I'm sure
4  that I informed Mr. Klauer that in my opinion Dr. Pahl
5  was a co-inventor, he did not want to be mentioned.
6  Dr. Pahl did not want to.
7     Q  So you are certain that you informed Mr. Klauer
8  that Dr. Pahl should be listed as a co-inventor, and
9  that is why you didn't feel good about this?
10    MR. PATTON: Let me object to the form.
11    THE WITNESS: (through interpreter) If it is about
12 whether I am sure whether I informed Mr. Klauer, I am
13 not sure in this respect.
14       If Dr. Pahl told me and he said he was very
15 determined in telling me that I should apply for it,
16 this was binding for me.
17    MR. PATTON: Would you reread the preceding answer,
18 I want to make sure I'm not stating anything necessary.
19    (answer read)
20    MR. SHIMOTA: Q  Well, let me just ask this
21 question, then: Why did you have a bad feeling when you
22 signed this document?
23    A  Because I found something that was part of the
24 invention which I did not invent.

Page 124

1     Q  Did anyone do anything for you to ease the bad
2  feeling that you had?
3     MR. PATTON: I'm going to object to the form of the
4  question.
5     THE WITNESS: (through interpreter) At least
6  Dr. Pahl himself because he said you go -- are going to
7  apply for that, and I do not want to have anything to do
8  with it.
9     MR. SHIMOTA: Q  Did he tell you then why he did
10 not want to have anything to do with it?
11    A  No.
12    Q  Did you wonder why Dr. Pahl did not want to have
13 anything to do with it?
14    A  I was happy with the different style Dr. Pahl
15 had in comparison with the one of the predecessor.
16    Q  I don't want to tread over old ground, but just
17 why were you happy with the new style?
18    A  Because I could speak openly with him about the
19 patent, I could work on the patent openly during days.
20 And I did not hold it back to --
21    DR. STUTIUS: Hide it.
22    THE WITNESS: (through interpreter) -- to hide it
23 from my boss, which is not a very good feeling to hide
24 it.

Page 125

1     MR. SHIMOTA: Q  I understand.
2        If you could turn to B1070, it would be the
3  first page. You can look at the German.
4     A  Which number?
5     Q  At the bottom paragraph, the last paragraph, in
6  the last sentence it states, "By appropriate flow path
7  configuration, pump running time and throughput, it can
8  be assured that after the end of the cleaning process,
9  the cleaning vessel and the liquid paths, as well as the
10 entire liquid vessel, are all in a clean state. There
11 is no dirt region in the machine except for the filter."
12       And my question is, what are -- well, for each,
13 what are appropriate flow path configuration, pump
14 running time, and throughput?
15    THE INTERPRETER: This was very long. Could we go
16 through that step by step.
17    MR. SHIMOTA: Oh, yes, all right. I thought that's
18 what you -- my question was bad.
19    Q  For this device, what was the appropriate flow
20 path configuration?
21    A  It's the total path the fluid flows from the
22 beginning of the pumping on when the device is on, how
23 the fluid flows into the trough where the shaver is on
24 and operating, that the trough itself will not overflow,

9 (Pages 122 to 125)

Gebhard Braun   April 27, 2005
Volume 2

Page 126

1  and that the drain is made in that way --
2      DR. STUTIUS: Sized in a way.
3      THE WITNESS: (through interpreter)-- it can take on
4  the fluid and that there is no overflow.
5      That the pump is configured in that way in the
6  flow way that on the pressure side off the pump the
7  resistance off the filter --
8      DR. STUTIUS: The pump exerts pressure on the filter
9  to pump the fluid through the filter.
10     MR. SHIMOTA: Q  Okay. First, why was the sizing
11 of the drain important?
12     A  If it is too big, the trough will become empty
13 where the trough rather -- where the draining -- where
14 the cleaning is done, then it will be empty. If it's
15 too small, there would be an overflow in the trough or
16 there would be a too high overflow.
17     Q  Okay. So you didn't want to make it too big
18 such that there would not be fluid retained in the
19 cradle, is that correct?
20     Well, you did not want to make the drain too
21 large so there would not be fluid retained in the
22 cradle, is that correct?
23     DR. STUTIUS: By cradle I think we should translate
24 with the patent translation.

Page 127

1      MR. SHIMOTA: That's fine.
2      THE WITNESS: (through interpreter) So that the
3  level of the fluid would be held, but it would not drain
4  down during the pumping cycle.
5      MR. SHIMOTA: Q  I understand.
6      You also mentioned the filter on the pressure
7  side of the pump. Did you need to select a special --
8  Was there any particular type of filter selected to
9  avoid resistance as hair collected in it over time?
10     MR. PATTON: Object to the form of the question.
11     THE INTERPRETER: Could you repeat that part.
12     THE WITNESS: (through interpreter) As I remember,
13 we had a filter from the predecessor. I think it was
14 the filter that was used here or was already developed
15 in here.
16     MR. SHIMOTA: Q  Well, was there ever a problem
17 with the filter such that hair began to collect in it
18 over time affecting the flow of fluid?
19     A  Not that I know. I cannot recollect, no.
20     Q  Okay. If you could turn to the next page, which
21 is B1071, and in the second sentence it states, "This
22 trick permits optimal cleaning with the filter on the
23 pump pressure side and simultaneously permits an always
24 clean liquid supply."

Page 128

1      And my question is: Why did that trick permit
2  optimal cleaning?
3      A  The pump suctions or sucks the dirty liquid
4  through the filter tube. It is inside the filter
5  tube -- through the pump through the pressure side of
6  the filter.
7      The fluid in which the tube is placed can at
8  any time enter the tube. This means the tube is always
9  filled with fluid. There is no air inside if no fluid
10 comes in. Through the clean fluid that streams into the
11 tube from outside --
12     DR. STUTIUS: Just for the record, it's filter hose
13 or this permeable hose member.
14     MR. SHIMOTA: Are you asking me?
15     DR. STUTIUS: No, you mentioned -- he mentioned --
16 He said filter schlauch and it's a permeable hose
17 member, not tube, just for the record.
18     THE INTERPRETER: Filter tube?
19     DR. STUTIUS: Same with permeable hose member. It's
20 permeable hose member.
21     THE INTERPRETER: I call it filter tube. Is that
22 okay for you?
23     MR. SHIMOTA: Q  If it helps, I think it's called
24 filtering bag in the --

Page 129

1      A  It's a filter tube or permeable hose member.
2      THE INTERPRETER: So it's a filtering hose, okay?
3  So we call it filtering hose?
4      DR. STUTIUS: Whatever.
5      THE INTERPRETER: Uh-huh.
6      MR. SHIMOTA: Q  Well, did you ever consider
7  placing the filter on the suction side of the pump?
8      A  The filtering hose is, indeed, on the side of
9  the suction; but the filter itself that deposits the
10 dirt is on the pressure side.
11     Q  So that's why -- I mean, you said in some
12 embodiments you didn't use the -- use the permeable hose
13 member.
14     THE INTERPRETER: Excuse me?
15     MR. SHIMOTA: Q  The permeable hose member.
16     A  For this functional model, it is not necessary
17 to have this hose. But the advantage is to have a
18 continuous cycle for the patent document.
19     Q  In functional models where you didn't use the
20 permeable hose member, did you ever consider placing the
21 filter on the suction side of the pump?
22     THE INTERPRETER: To have the filter on the suction
23 side?
24     MR. SHIMOTA: Q  That's correct.

10 (Pages 126 to 129)

Gebhard Braun    April 27, 2005
Volume 2

Page 130

1    A  I think we had good success in putting it on the
2  pressure side, so we did not have a reason to put it on
3  the suction side.
4    Q  If you look under point 4 on this same page, it
5  states, "A primitive forerunner is our shaking beaker
6  for the shaving head which already partly implements wet
7  cleaning."
8       My question is:  What was the shaving beaker
9  for shaving heads?
10   A  I only knew from history that something like
11  that had existed before my time.  I do not know whether
12  this was actually produced or if this was just for fun,
13  a gag.
14      It just was a beaker like for films, a small --
15   MR. SIEVERS:  Cartridge.
16   THE WITNESS:  (through interpreter) -- cartridge
17  where the shaving head was taken and put into -- fluid
18  was put into and it was shaken.
19   MR. SHIMOTA:  Q  How did you know about this device
20  from history?
21   A  I cannot tell definitely.  I had it in my head
22  from the very past.
23   Q  At the time did you have any recollection of any
24  other cleaning systems sold by Braun -- Well, strike

Page 131

1  that.
2       Did you have any -- At the time that you wrote
3  this invention application, did you have any
4  recollection of Braun shaver cleaning systems which used
5  fluid?
6   THE INTERPRETER:  Which used fluid?
7   MR. SHIMOTA:  Yes.
8   THE WITNESS:  (through interpreter) For sure not for
9  products that were destined to be sold, only for
10  production.
11   MR. SHIMOTA:  Q  What do you mean only for
12  production?
13   A  In the production department there were a lot of
14  places where you had to clean, so there they had fluids.
15   Q  Well, how would they clean in the production
16  department?
17   A  It was immersed into fluid.  Afterwords it was
18  drained, some chemical fluid I did not know, it smelled,
19  and this was this duct -- the parts were erect and taken
20  up again, but the functional process I did not know.  I
21  just saw it when it went by.
22   Q  When was the first time you saw this process?
23   A  For sure during the first years I was with
24  Braun.

Page 132

1    Q  This would have been in the late '60s?
2    A  Yes.
3    Q  Were you aware that Braun sold an ultrasonic
4  cleaning bath for shavers in the 1960s?
5    A  I thought these were only laboratory samples,
6  otherwise, I did not have to do anything with that.  And
7  I heard it was too expensive to do that.
8    Q  So you saw this ultrasonic cleaning bath in the
9  laboratory, is that correct?
10   A  I saw some ultrasonic baths here, but I am not
11  sure whether this was made here or it was bought.
12   Q  How did the ultrasonic bath operate?
13   A  As far as I know, this cutting part had to be
14  put inside this bath.  This device was put on.  And
15  after some time you could take out this part again and
16  dry it.
17   Q  So the shaving head was taken off and placed in
18  a bath?
19   A  Yes.  As far as possible, it was dismantled --
20   DR. STUTIUS:  Disassembled.
21   THE WITNESS:  (through interpreter) -- disassembled
22  in single components.
23   MR. SHIMOTA:  Q  To your recollection, how did
24  fluid enter the ultrasonic cleaning bath?

Page 133

1    A  This was an open receptacle --
2   DR. STUTIUS:  Container.
3   THE WITNESS:  (through interpreter) -- container,
4  and it was poured in.
5   MR. SHIMOTA:  Q  And how did the ultrasonic process
6  take place?
7    A  The foil was put in and the cutting block was
8  put in and the device was put on with the fluid inside.
9  It operated for a certain period of time, I do not know
10  how long, for a few minutes.  Then the parts were taken
11  out, shaken, and put on a rack to dry.
12   Q  Was the rack a drying device for the shaver
13  head?
14   A  I only know that this was done for testing, it
15  was nothing to be sold.
16   Q  How did you know that this was done for testing?
17   A  I only have the information that it was not
18  interesting for Braun because the whole process would be
19  too expensive.
20   Q  Do you know who worked on the ultrasonic
21  cleaning bath?
22   A  It was the whole development department for
23  shavers, it was our laboratory.
24      Almost half of the department was laboratory

11 (Pages 130 to 133)

Gebhard Braun   April 27, 2005
Volume 2

Page 134

1  and it was only done in the laboratory.
2     Q   Did you personally work on the ultrasonic
3  cleaning bath?
4     A   No, not at all.
5     Q   But you had -- you did see it when it was --
6     A   Yes, sure.
7     Q   Under point 4, as well, you mentioned in the
8  second paragraph U.S. patent No. 3,172,416. Can I point
9  it out to you?
10       My question is first, how did you obtain that
11  patent?
12     A   I think I received it through the patent
13  department. I cannot recollect whether it was Dr. Pahl
14  who gave it to me or whether it was directly through the
15  patent department, but it was in connection with the
16  elaboration, collaboration of the patent application.
17     Q   So prior to writing this invention application,
18  someone, it could have been Dr. Pahl or someone from the
19  patent department, gave you the referenced patent?
20     A   I think so. I wrote this, so I must have had it
21  before, otherwise I could not have written that.
22     Q   Were you given any other patents in connection
23  with writing this invention application?
24     A   I do not think so, no.

Page 135

1     Q   Do you recall whether Dr. Pahl maintained shaver
2  patents in his office?
3     A   There is no reason why I should think so.
4     Q   Well, as part of your job as an engineer at
5  Braun, had you reviewed patents over the course of your
6  career related to shavers?
7     THE INTERPRETER: In relation to shavers?
8     THE WITNESS: (through interpreter) Yes, sure.
9     MR. SHIMOTA: Q   And had you ever reviewed a
10  patent -- well, as part of your job, had you reviewed
11  patents related to the cleaning of shavers?
12     A   I cannot remember that I would have seen any
13  others than this one. And if then, only to evaluate
14  whether our patent could -- this patent would be
15  suitable as a patent.
16     Q   Well, did there come a time -- Well, during the
17  prosecution of your patent applications in either
18  Germany or the United States, were you ever asked to
19  review patents related to shaver cleaning systems?
20     A   I cannot recollect anything of that at all.
21     Q   If you look under point 5 on the next page, it
22  states, "The main drawback of the cleaner described
23  under point 4 is the continuous circulation of the
24  increasingly contaminated liquid for cleaning. Final

Page 136

1  rinsing is not possible so that this system no longer
2  reliably satisfies present day hygienic requirements."
3       Aside from the main drawback, did you know of
4  any other drawbacks to the prior art or to the previous
5  state of the art described under point 4?
6     THE INTERPRETER: Excuse me, do you mean further
7  drawbacks than those mentioned here?
8     MR. SHIMOTA: Q   Yes.
9     A   It's not nice to handle it if you have to take
10  it out of the device when it's still wet. It would be
11  primitive in handling it, too primitive compared to what
12  we mentioned.
13     Q   Why would it be too primitive in handling?
14     A   It's nicer if one has a device that is dirty and
15  you put it in a fluid and it is clean, you to take it
16  out and it is clean, this is nicer than if you take it
17  out and it is wet or if you have to clean it otherwise
18  with the hand.
19     Q   Okay. I understand.
20       Can you think of any other drawbacks to the
21  previous state of the art?
22     MR. PATTON: I object to the form of the question.
23     THE WITNESS: (through interpreter) Just put down
24  the last point, such a device would not be able to be

Page 137

1  approbated. It could not be approbated. We could not
2  approve it.
3     DR. STUTIUS: Approved, certified.
4     MR. SHIMOTA: Q   So beyond what you've told me now
5  when you wrote this application, did you know of any
6  other drawbacks to the previous state of the art?
7     A   You mean drawbacks compared to the arts that I
8  knew to that -- at that point?
9     Q   Yes.
10     A   They are never a -- fixation of the device was
11  planned both during the cleaning process and drying
12  process.
13     DR. STUTIUS: The device was never secured during
14  the fixed, during the cleaning process.
15     MR. SHIMOTA: Q   So the previous state of the art
16  lacked the type of locking mechanism that we discussed
17  yesterday?
18     A   That the device would be locked, interlocked,
19  that there was one pressure of the button, that it
20  operated in one, and that the whole process would be
21  automatic, the whole process of cleaning and drying and
22  draining and always -- and also charging.
23     Q   So beyond what you told me now at the time you
24  wrote this invention application, were you aware of any

12 (Pages 134 to 137)

Gebhard Braun    April 27, 2005
Volume 2

Page 138

1   other drawbacks?
2       MR. PATTON: Object to the form of the question.
3       THE WITNESS: (through interpreter) One thing that
4   was before we had two motors and we made one -- we only
5   had one motor in the end, so it could be -- the size
6   could be reduced.
7       And we were thinking of a filter to take it --
8   that could be removed to remove the dirt and to replace
9   it by a new one so that the whole thing would be clean.
10  Somehow the fluid had to be poured out and then
11  afterwards we had to -- new fluid had to be put in, so
12  for a clean and easy to use handling.
13      MR. SHIMOTA: I understand.
14      I'd like to mark as Braun Deposition Exhibit
15  No. 9 a document bearing the Bates range B004615 to
16  B004617. Those are not stapled together.
17      Exhibit 10, the English translation of the
18  document
19      (Exhibit 9 and Exhibit 10 marked as
20      requested.)
21      MR. SHIMOTA: Q  I ask you if you recognize the
22  memo dated August 3rd, '93?
23      A  If I would not have received this, I would not
24  remember.

Page 139

1       Q  Well, do you recall attending a meeting in
2   Norbert Smetana's office regarding work on the drying
3   device for the cleaning system?
4       A  In the far distance I remember.  I think
5   Dr. Pahl had the main activity in this -- in contacting
6   Mr. Smetana.
7       Q  So am I correct that Dr. Pahl asked Mr. Smetana
8   to work on the blower for the device?
9       A  I think so, yes.
10      Q  Did you work with Mr. Smetana on the blower for
11  the cleaning device?
12      A  No, I cannot recall Mr. Smetana concrete
13  correctly.
14      Q  You do not recall Mr. Smetana or -- who
15  Mr. Smetana is?
16      A  No, I cannot recall who he is.  I just can't
17  imagine that he was in a department that had to do with
18  blowers.
19      Q  Well, did you personally perform any work on the
20  drying device used in the shaver cleaning system?
21      A  Not completely, not exactly, only for the -- I
22  did just the drafting for the patent document.  I cannot
23  recollect that I myself would have worked on the blower.
24      Q  So you have no recollection of working on

Page 140

1   optimizing the drying device for the shaver cleaning
2   system?
3       A  No, I don't -- wouldn't think so.
4       THE VIDEOGRAPHER: Counsel, can I change tapes now?
5       MR. SHIMOTA: That's fine.
6       THE VIDEOGRAPHER: Here concludes tape No. 1.  We
7   are going off the video record at 12:45 p.m.
8       (a brief recess was taken)
9       THE VIDEOGRAPHER: Good afternoon.  We are going
10  back on the video record at 1:48 p.m.  Here begins tape
11  2.
12      MR. SHIMOTA: Q  If you could direct your attention
13  to the document we were looking at, Exhibit 9, that
14  document right there.  Do you see the name Dr. R. Jung?
15  Do you recall Dr. Jung?
16      A  Firstly, only I remember the name.  This was in
17  the research department.  I cannot remember that I had
18  to do with him directly me personally, but I know he was
19  in the research department.
20      Q  Do you know if Dr. Jung had any role in the
21  development of the shaver cleaning system at Braun in
22  the early 1990s?
23      A  No, absolutely not.  I have no idea about that
24  he would have had to do with it.

Page 141

1       Q  Can you turn to the last page of Exhibit 9.
2       A  This one?
3       Q  No, no, no, the very last page.  Do you
4   recognize this document?
5       A  No, no really.
6       Cimbal was the head of our own part of the
7   laboratory of the shaver development.
8       Q  Do you know if Mr. Cimbal had any role in the
9   development of the shaver cleaning system?
10      A  He played a role insofar as he was my contact
11  person and he was the contact person for Dr. Pahl in the
12  laboratory.  He was the boss of the laboratory, but he
13  was a subordinate of Dr. Pahl as well as the same as me.
14      Q  Do you have any recollection of any specific
15  tasks that Mr. Cimbal undertook with respect to the
16  development of the shaver cleaning system?
17      A  He was involved in how to make the electronic --
18      DR. STUTIUS: Circuitry.
19      THE WITNESS: (through interpreter) -- circuitry.
20  Exclusively he was only responsible for that, or let's
21  say he or people in his laboratory.
22      MR. SHIMOTA: Q  Do you recognize any of the other
23  names on this memoranda?
24      A  Yes, Faulstich is here mentioned, PPM, but I

13 (Pages 138 to 141)

Page 142

1    cannot exactly say where he belongs to.  He was the
2    product manager.  He was informed insofar as if this
3    device would have come in to use.
4        Q   So was Mr. Faulstich in charge -- or was
5    Mr. Faulstich tasked with determining how to
6    commercialize the device?
7        MR. PATTON:  I object to the form of the question.
8        THE WITNESS:  I'm not exactly informed what his task
9    was, but possibly it was in this responsibility that
10   followed the other tasks like commercialization.
11       MR. SHIMOTA:  Q   Do you recognize any other names
12   on this memoranda?
13       A   He was for a long time our VDE approbation
14   gentleman.
15       DR. STUTIUS:  VDE is the German authority that
16   approves commercial use of electric equipment and other
17   equipment.
18       MR. SHIMOTA:  Q   So was Mr. Gebert a liaison with
19   the VDE?
20       A   Contact for VDE and to other approbation sites
21   that were necessary for commercializing our devices.
22       Q   Do you know if any of the shaver cleaning
23   systems that you worked on were submitted to the VDE in
24   the 1993 time frame?

Page 143

1        THE INTERPRETER:  Excuse me, could you repeat your
2    question.
3        MR. SHIMOTA:  Q   Sure.
4            Do you know if any of the shaver cleaning
5    systems were submitted to the VDE in the 1993 time
6    frame?
7        A   I'm convinced this was not what happened, but
8    Dr. Gebert would only tell us as an expert what was
9    necessary to do to get an approbation.
10       Q   Do you know if Dr. Gebert did inform you of what
11   was necessary to receive an approbation?
12       A   I cannot remember correctly in this case.  I
13   only know he was responsible for it and he was asked
14   right from the beginning on before already about his
15   opinion.
16       DR. STUTIUS:  In the early stage of development.
17       THE WITNESS:  (through interpreter) In the early
18   stage of the development.
19       MR. SHIMOTA:  Q   Who asked for his opinion?
20       A   I would not know that I asked after that for
21   that or that anybody else asked him.
22       Q   Did you ask Dr. Gebert for his opinion?
23       A   No, not that I remember.
24       Q   So you know that he was asked for an opinion,

Page 144

1    you just don't know who asked it of him?
2        A   I just see that he is here on the distribution
3    list, and that's why I think he is -- he was -- he is
4    listed here to be informed about the status of the
5    development.
6        Q   I understand.
7            Do you know who Mr. Goswami was?
8        A   I think he came from India or -- he was in
9    quality control in the area of shavers probably.
10       Q   Was it a man or woman?
11       A   A man.
12       Q   Do you know what role, if any, Mr. Goswami
13   played in the development of the shaver cleaning system?
14       A   No, I would not know at all that he would have
15   to do anything with that.
16       Q   Do you know who Mr. Schäfer is?
17       A   Yes, this was my direct boss in the department
18   of shavers.
19       Q   And did Mr. Schäfer play any role in the
20   development of the shaver cleaning system?
21       A   No, indeed not.  This was the special thing,
22   that usually he would have been the one who would give
23   me the order and counsel me, but this was the exception
24   in this case, that Dr. Pahl told me what to do directly

Page 145

1    and not via Mr. Schäfer.
2            Mr. Schäfer did not at all get involved in the
3    development.  Nevertheless, he was informed because he
4    was my superior.
5        Q   All right.  Do you know why the exception was
6    made in the case of your work on the shaver cleaning
7    system?
8        A   I think, yes.  Because Dr. Pahl was the one who
9    had done all this previous work, he wanted to have short
10   ways with the person, in this case me, who worked on
11   this project, and he did not want to detour via other
12   persons.
13       Q   Do you know who Mr. Stiegler is?
14       A   I see here that Dr. -- Mr. Stiegler must have
15   been in the same department as Mr. Gebert because the
16   combination of the letters is the same.
17           This is the designation for the approbation
18   department, so I suppose at that time Mr. Stiegler did
19   directly report to Mr. Gebert.
20       Q   And do you know what role, if any, Mr. Stiegler
21   played in the development of the shaver cleaning system?
22       A   I think from this first sentence that,
23   obviously, he might have been asking according to which
24   criteria it was tested.

Gebhard Braun    April 27, 2005
Volume 2

Page 146

1    THE INTERPRETER: If you want me to read the
2  sentence, to translate it?
3    MR. SHIMOTA: That's fine.
4    Q  My last question about this document is -- well,
5  I might have a follow-up, but do you know who
6  Mr. Petretti was?
7    A  I know the name. Is he somewhere in the text?
8    Q  He is in this area.
9    A  Oh, participants, one of the participants.
10    I'm relatively sure that he was below with --
11  that he reported to Mr. Gebert in the laboratory --
12  Mr. Cimbal in our laboratory.
13    Q  Do you know if Mr. Petretti worked on the
14  electronic circuitry for the shaver cleaning system, as
15  well?
16    A  I do not know, but I suppose very strongly that
17  he was the one who really did it under Mr. Cimbal.
18    Q  Did you personally do any work on the electronic
19  circuitry for the shaver cleaning system?
20    DR. STUTIUS: Electronic circuitry.
21    THE WITNESS: (through interpreter) I only told the
22  laboratory what were our requirements, what we wanted
23  from the circuit for our purposes.
24    MR. SHIMOTA: Q  Okay. So you provided the --

Page 147

1  Well, you provided individuals at Braun with the list of
2  requirements for the circuitry and asked them to develop
3  that circuitry, is that correct?
4    A  Yes, and he worked on it.
5    MR. SHIMOTA: I'd like to mark as Defendant's
6  Deposition Exhibit No. 11 the file history for U.S.
7  patent 5,649,556 with Bates No. R4954 through R5184.
8    (Exhibit 11 marked as requested.)
9    MR. SHIMOTA: And I would also like to mark as
10  Defendant's Exhibit No. 12 the file history for U.S.
11  patent No. 5,711,328 which was located at Rayovac or R,
12  excuse me, 5185 to R5485.
13    (Exhibit 12 marked as requested.)
14    MR. SHIMOTA: Q  If you could direct your attention
15  first to Exhibit 12, the first red tab. That's 12 this
16  one here.
17    THE WITNESS: This one?
18    MR. SIEVERS: No, the first red tab.
19    THE WITNESS: This one?
20    MR. SHIMOTA: Exactly.
21    Q  I'll just ask you and then it goes to the second
22  red tab if you recall seeing this declaration and power
23  of attorney for patent application?
24    A  From recollection, I do not remember, but on the

Page 148

1  second page I see my signature, so.
2    Q  So you believe that you signed this document on
3  December 21st, 1994?
4    A  I think I did so.
5    Q  Direct your attention back to the first page in
6  the third sentence, it states, "I believe I am the
7  original, first and sole inventor if only one name is
8  listed below or an original, first and joint inventor if
9  plural names are listed below of the subject matter
10  which is claimed and for which a patent is sought on
11  this invention entitled cleaning device for the shaving
12  head of a dry shaver."
13    My question is: Do you believe that you read
14  that sentence in or around December of 1994?
15    A  As far as I know myself, I would say I
16  usually -- I read what -- before I sign something, but
17  it may be that the patent department -- maybe it is
18  possible that the patent department called me and told
19  me that in general or the essential parts were the same
20  in the German like now for this for the American
21  application and that they asked me to sign it.
22    Q  So you believe you did not read that sentence?
23    A  No, I think I read this sentence, but I am
24  convinced that it was necessary that I sign it. So I

Page 149

1  thought it would make sense also to sign the American --
2  the English version because Dr. Pahl wanted me to be the
3  sole inventor, so it was me who should do that.
4    As we see it regarding patents, it isn't usual
5  to say that if one says you should be the sole inventor,
6  it is usual that the sole inventor says, okay, I'll be
7  it. And I do not see what should be wrong with that.
8    Q  Well, had you filed or had you received U.S.
9  patent applications prior to -- or had you received U.S.
10  patents prior to December of 1994?
11    THE INTERPRETER: I didn't get that question.
12    DR. STUTIUS: He was named the inventor. Maybe you
13  want to rephrase.
14    THE INTERPRETER: Yes, yes, maybe you want to ask
15  again, please.
16    MR. SHIMOTA: Q  Yes. Had you received patents in
17  the United States before December of 1994?
18    A  You mean patents from the States?
19    Q  Yes.
20    A  You mean of all this procedure or any other
21  patents?
22    Q  Any other patent.
23    A  I'm convinced that I have that.
24    Q  And on the earlier patent applications, were you

15 (Pages 146 to 149)

Gebhard Braun    April 27, 2005
Volume 2

Page 150

1  ever named as a co-inventor?
2      A  Yes.
3      Q  And in connection with those earlier patents,
4  did you also sign inventorship roles to what you were
5  looking at in Defendant's Exhibit 12?
6      A  I think in former inventions, at least those
7  that were really put into -- or realized, put into
8  practice, I was not the -- I was not the sole inventor
9  but a co-inventor.
10     Q  I understand.
11         And in those -- In connection with those
12  patents, did you also sign an inventorship role similar
13  to what we are looking at right now?
14     A  I'm convinced that I signed according to how --
15  to the number of inventors that were present and
16  according to the share of inventors.
17     Q  And when you did that in the past, why did you
18  sign according to the number of inventors that were
19  listed?
20     A  Because the form was already filled that way and
21  in the German -- in this first application in German,
22  the inventors were named.
23     Q  So in previous situations there had been several
24  individuals listed in the German patent application?

Page 151

1      A  Yes.
2      Q  During, you know, either in connection with this
3  patent application or the earlier patents that were
4  filed in the United States, did any attorney ever
5  explain to you the duty of candor?
6      THE INTERPRETER:  Duty of?
7      DR. STUTIUS:  Candor.
8      THE INTERPRETER:  Does this mean to give the patent
9  authorities all the information they might need?
10     MR. SHIMOTA:  It means the duty of full honesty.
11     MR. PATTON:  Object to the form of the question.
12     THE WITNESS:  (through interpreter) The relation --
13  the relation that existed to the States was only between
14  patent department and the States.  I myself was only the
15  inventor.
16         When the patent department provides me with the
17  document and fills it and it seems plausible, I have no
18  reason why I should not sign.
19     MR. SHIMOTA:  Q  Well, if you look down at the
20  second to last sentence on the first page, it states, I
21  acknowledge --
22     A  This is English here.
23     Q  Yes, but on the other side I believe is the
24  translation.  It states, "I acknowledge the duty to

Page 152

1  disclose information which is material to the
2  examination of this application in accordance with Title
3  37, Code of Federal Regulations Section 1.56(a).
4      A  I would not know what these paragraphs are.
5  This was the work of the patent department.
6      Q  So did you ever ask or did anyone ever explain
7  to you what that sentence meant?
8      A  I wouldn't think so.
9      Q  Did you ever wonder what that sentence meant?
10     A  Now in this moment I see it.
11     Q  So at the time you had no understanding of what
12  that sentence meant?
13     A  I still do not know today.  What information
14  should I provide?  What else information should I
15  provide?  I gave my application to the patent
16  department.  What else information should I give?  If
17  any more information were necessary, the law -- people
18  from the law department should know, not me.
19     Q  Well, did anyone from the law department ever
20  ask you whether there were any other inventors -- or if
21  anyone else had contributed to the inventions of the
22  shaver cleaning system?
23     A  I cannot tell.  I'm convinced -- I'm
24  convinced -- I'm convinced the patent department will,

Page 153

1  first of all, examine the patent and all it has to do
2  with the patent itself and not so much who else was
3  involved.  And then when it goes back to my superior,
4  this can be verified.
5      DR. STUTIUS:  Gives the blessing, you know, then
6  gives the blessing after that.
7      MR. SHIMOTA:  Q  So Dr. Pahl reviewed the patent
8  application and gave the blessing to it, is that
9  correct?
10     A  This was the regular way as I know it.
11     Q  So let me ask this question:  Do you know
12  whether anyone in the law department knew whether anyone
13  else had contributed to any of the inventions of the
14  shaver cleaning system?
15     A  With the law department?  You mean the patent
16  department?
17     Q  Yes.
18     A  I do not know, but I could suspect so.
19     Q  Why would you suspect so?
20     A  If it went a regular way, it was that it came
21  back to Dr. Pahl and he gave the blessing and he would
22  be the one who would inform.  But why should he inform
23  that he was also part of it because he renounced to be
24  part of it.  He didn't want to.  I think it was not of

16 (Pages 150 to 153)

Gebhard Braun    April 27, 2005
Volume 2

Page 154

1  interest for the patent department, that's what I think.
2      Q  Well, when you say Dr. Pahl renounced his part
3  in the development of the shaver cleaning system, was it
4  your understanding that he intentionally kept his role
5  secret?
6      THE INTERPRETER:  That he wanted to keep it secret?
7      MR. SHIMOTA:  Q  He intentionally kept it secret.
8      A  I have no opinion to that.  I don't know.
9      Q  Well, why do you think Dr. -- when you say he
10  renounced his role or his role in the development of the
11  shaver cleaning system, why do you say he renounced it?
12      A  Because he wanted me to be the applicant and me
13  to be the inventor.  He wanted me to apply for it and he
14  wanted me to be the inventor.
15      Q  So do you know if -- did Dr. Pahl know that you
16  were also applying for a United States patent
17  application?
18      MR. PATTON:  I object to the form.
19      THE WITNESS:  No idea.
20      MR. SHIMOTA:  Q  If you look on the first page of
21  this oath, the page 1 of 3, it says there, "I hereby
22  state that I have reviewed and understand the contents
23  of the above identified specification, including the
24  claims as amended by any amendment referred to above."

Page 155

1      In December of '94 did you review the claims
2  and specification of your United States patent
3  application?
4      A  I think I only had an overview and I just had
5  a -- more a glance and not in detail.
6      DR. STUTIUS:  Cursory review.
7      THE WITNESS:  Because when I saw it was the same we
8  applied for in Germany, there was no reason for me to
9  have such a detailed look.
10      MR. SHIMOTA:  Q  Did you take the time to make sure
11  or to -- did you review whether the U.S. application
12  appeared to be the same as your German application?
13      A  I did not use a lot of time for that.  This
14  patent description is very difficult for me to read and
15  it's not my favorite to read these things.
16      Q  Well, before your German patent application was
17  filed, did you review the claims and specification of
18  that application?
19      A  You mean how these were elaborated, developed by
20  the patent department?
21      Q  Yes.  Did you read the application which was
22  ultimately filed in Germany?
23      A  Yes, but this is for me like Chinese.
24      Q  I understand.  Sometimes it's the same for me.

Page 156

1      MR. SIEVERS:  So it was a good application.
2      MR. SHIMOTA:  Q  If you could look on page 2 of 3,
3  at the bottom it states, and you can read along on the
4  left, it states there, "I hereby declare that all
5  statements made herein of my own knowledge are true and
6  that all statements made on information and belief are
7  believed to be true and, further, that these statements
8  were made with the knowledge that willful false
9  statements and the like so made are punishable by fine
10  or imprisonment or both under Section 1001 of Title 18
11  of the United States Code and that such willful false
12  statements may jeopardize the validity of the
13  application or any patent issued thereon."
14      Do you see that?
15      A  I cannot at all recall that I have read this
16  before.  This is the same language on our notes, on our
17  bills.  They write who falsifies these bills and who
18  produces them and so on can be punished with
19  imprisonment not below two years and still I used this
20  money.
21      I was not at all -- I had no knowledge at all
22  that I would have made false statements.
23      Q  Let me ask you this question:  On December 21st,
24  1994, when you signed this document, did you believe

Page 157

1  then that Dr. Pahl was a co-inventor of the shaver
2  cleaning system that you worked on?
3      A  No.  He transferred it to me to invent it, so
4  that's why I was the inventor.
5      Q  When you say he transferred it to you, what do
6  you mean?
7      A  He renounced to be named as a co-inventor of the
8  patent and on the application of the patent, and this is
9  why -- so I was the inventor of it.
10      Q  So you believe that because Dr. Pahl renounced
11  his inventorship, he was no longer a co-inventor, is
12  that correct?
13      A  I do not know what this means.  I -- he denied
14  to be mentioned as an inventor, so yes.
15      Q  Well, let me ask this:  You filed a declaration
16  in this case that states that as of today you now
17  believe that Dr. Pahl is a co-inventor of the patents in
18  suit, isn't that correct?
19      A  Afterwards.
20      Q  But you, in December, '94, you didn't believe he
21  was a co-inventor?
22      A  Of course he was one, but he renounced to be
23  stated there and that's why I entered my name as sole
24  inventor.

17 (Pages 154 to 157)

Gebhard Braun   April 27, 2005
Volume 2

Page 158

1    Q   Did anyone ever explain to you that this
2    document was given under oath?
3    A   It is absolutely not plausible to me why --
4    DR. STUTIUS:  Inconceivable.  He said it's
5    inconceivable to me.
6    THE WITNESS:  -- what was normal in all other
7    applications in the different countries when where I was
8    mentioned as the sole inventor, which was okay, why it
9    should not be with the U.S. application.
10   MR. SHIMOTA:  I'd like to mark as Defendant's
11   Exhibit No. 13 documents bearing the Bates range B1148
12   to Braun, B1209.  It also has the English.
13   (Exhibit 13 marked as requested.)
14   MR. SHIMOTA:  Q   I'd like to direct your attention
15   to the red tab.  I believe there is a German version of
16   that earlier.  It corresponds with B1158.
17   At the bottom, you see at the far left where it
18   states, "I herewith assure that to the best of my belief
19   and knowledge no other persons are involved in this
20   invention"?
21   A   This has been signed by Mr. Klauer.  This was
22   signed by Mr. Klauer.
23   Q   Did you review this document when it was
24   submitted to the German Patent Office?

Page 159

1    A   I do not remember this.  But as I was named as
2    the inventor towards Dr. Klauer, he had all the right to
3    put this in like that.
4    Q   I understand.
5    That language that you see there, "I herewith
6    assure that to the best of my belief and knowledge no
7    other persons are involved in this invention," isn't
8    that the language that we read earlier in the invention
9    application that you submitted?
10   A   This text was not submitted to me like it is
11   here.  If this would have been submitted to me, I would
12   have said that Dr. Pahl was involved in the
13   development -- in the development and I myself would not
14   have filled it like that.  I thought this was a
15   formality.
16   Q   So you thought that was a formality in German,
17   as well?
18   A   If I would have seen it, then I would have
19   thought it's a formality.
20   THE INTERPRETER:  You asked do you see it as a
21   formality in a German application, as well?
22   MR. SHIMOTA:  Yes.
23   THE WITNESS:  (through interpreter) I said, I mean,
24   if they -- if this would have been read out to me in

Page 160

1    German, I would have said to the man from the patent
2    department that Dr. Pahl was also involved.
3    MR. SHIMOTA:  Q   Would you look then again at your
4    invention -- at the application, Exhibit No. 8.
5    MR. PATTON:  9?
6    MR. SHIMOTA:  No, the one right there.
7    MR. PATTON:  8.
8    MR. SHIMOTA:  Q   And if you flip to the language
9    right above your signature again, it states there, "It
10   is hereby assured that all information was provided to
11   the best of my knowledge and that no additional
12   inventors participated in creation of the invention."
13   A   That's right.  Here it is stated, as well,
14   that's right.
15   I cannot write down Dr. Pahl is a co-inventor
16   if he does not want that.  I would be in a conflict.  So
17   if my superior tells me to put down that I am the
18   inventor, I have to do so.
19   Q   So you signed this because you were following
20   the orders of your direct -- well, a superior, is that
21   correct?
22   A   Yes.
23   Q   Before what I marked as Defendant's 11, you also
24   have an oath there.  I don't want to waste your time.  I

Page 161

1    would ask you if I would ask the same questions that I
2    asked regarding the oath for the '328 -- well,
3    Defendant's Exhibit 12, would your answers be the same
4    to my questions?
5    A   I did not understand your question correctly.
6    What is 12?
7    Q   That would be this right here -- oh, no, it's
8    11.
9    A   And what is the question?
10   Q   That there is an oath.  If you go to the first
11   tab, there is a declaration power of attorney for patent
12   application there, as well?
13   A   Is this where it is about representation by the
14   patent attorneys?
15   Q   Yes.  My question to you, in general, is that
16   this is a similar oath to what we went through before.
17   And if I asked you the same questions regarding this
18   oath, would you give me the same answers?
19   A   Is this the declaration that you're talking
20   about?
21   Q   Yes.
22   A   I have read it now.  Please, what is the
23   question again?
24   Q   Yes.  I don't want to waste your time going

18 (Pages 158 to 161)

Gebhard Braun    April 27, 2005
Volume 2

Page 162

1  through the questions I asked, so if I ask you the same
2  questions regarding this oath, would you give me the
3  same answers?
4     A  Yes.
5     Q  When you left the employ of Braun in April of
6  1995, had Braun taken steps yet to commercialize your
7  shaver cleaning system?
8     A  No.
9     Q  And do you know why Braun had not taken steps to
10  commercialize your shaver cleaning system?
11    A  My development was not so far -- had not
12  proceeded so far that it was already commercializable,
13  ready for commercialization.
14    Q  Do you know what additional work needed to be
15  done?
16    A  First of all was, of course, the product design.
17    Q  Was there anything else aside from product
18  design?
19    A  The whole device was still in a state, in a
20  testing state, and it was in functional -- to make
21  functional tests. It was not yet in a state to be
22  commercialized.
23    Q  What functional tests were being undertaken?
24    MR. PATTON: Just to clarify. This is after

Page 163

1  Mr. Braun left?
2     MR. SHIMOTA: That's a good clarification.
3     Q  At the time that you were departing from Braun,
4  what functional tests were being undertaken?
5     A  Okay. It was about the basic function of
6  cleaning according to the principle that the shaver was
7  on, the pump was on and the pump was off, the cleaning,
8  the drying but without blower and the tests -- and
9  taking and removing the device and shave tests, shaving
10  tests.
11    Q  What do you mean by shave tests?
12    A  Test persons were asked to test it and to get
13  soil to rate the shavers. I cannot clean a clean
14  shaver.
15    Q  So was there any -- well, was there any
16  testing -- I think we talked about this. Was there
17  testing being done with respect to the cleaning fluid
18  when you were leaving Braun?
19    A  I would not know -- I do not have any knowledge
20  about anything like that because we got the fluid from
21  Dr. Pahl. And as I said before, we had, I think, two
22  test bottles from different suppliers, but they were in
23  the cabinet. There was no reason because the fluid was
24  good.

Page 164

1     Q  So Dr. Pahl had the bottles of cleaning fluid
2  when you were departing?
3     A  I'm not sure. Maybe they were all -- they were
4  in the cabinet in our department where different devices
5  were in.
6     Q  Do you know when Braun first commercialized the
7  shaver cleaning system?
8     A  I think much later than when I left. Many years
9  passed before it was ready.
10    Q  Did it surprise you that it took -- that it was
11  commercialized much later?
12    A  No. I was involved in this work for many years,
13  so I was not astonished at all because the complete
14  development of form and function within a small device
15  takes its time.
16    Q  Do you think that -- Well, getting the device
17  into the form that you speak of, do you think that would
18  require routine engineering work?
19    MR. PATTON: I object to the form of the question.
20    THE WITNESS: (through interpreter) No, it's not --
21  no, I think it was a fantastic performance. It was very
22  good looking.
23    MR. SHIMOTA: Q  So, I mean, you believe that it
24  would require quite a bit of time and effort?

Page 165

1     A  Yes, a lot, of course.
2     Q  Have you seen Braun's current cleaning system?
3     A  Yes, but only from outside.
4     Q  Do you -- based upon what you have seen, does
5  Braun's cleaning system differ from your original work?
6     A  Yes, it looks totally different. I would not
7  have recognized it again from my own. I think it's
8  fantastic. It's this high art of design to make such a
9  device so good looking, so appealing, so good looking.
10    Q  In what ways does it differ from your original
11  work?
12    A  This is a difference like between a Lorey
13  (phonetic), a truck or a Ferrari.
14    Q  Have you ever heard your work, your device
15  referred to as a chicken watering system, does that mean
16  anything to you?
17    A  No, not at all.
18    THE INTERPRETER: What was that? Chicken?
19    DR. STUTIUS: Chicken watering system.
20    MR. SHIMOTA: Q  That's for someone else.
21    A  I suppose this can only be our competitors who
22  make up the product bad.
23    Q  No, but the question is for someone else,
24  though.

19 (Pages 162 to 165)

Gebhard Braun    April 27, 2005
Volume 2

Page 166

1    When you were doing your original work on the
2  shaver cleaning system, did you ever consider using
3  solely a heater as the drying device?
4    A  Only a heater?
5    Q  Yes, eliminating the blower.
6    THE INTERPRETER:  Eliminating the blower?
7    MR. SHIMOTA:  Yes.
8    THE WITNESS:  No, not really.  I thought something
9  like a ventilator or a blower would have more effect.
10    MR. SHIMOTA:  Q  When you were working on the
11  original device, did you ever consider eliminating the
12  drying device entirely and allowing the shaver to air --
13  to drip dry or air dry?
14    A  To be dried on air, this was not a solution for
15  us.  There could have been the solution that it is dried
16  when it is still inside the device, but this would have
17  taken too much time and we could not have sold it that
18  way.
19    Q  Why would it take too much time?
20    A  You could see this.  We had the function -- but
21  we took it out in a wet state and we did not -- I cannot
22  remember that we measured the time.  But then you always
23  have some places where there is still some water.
24    DR. STUTIUS:  Liquid.

Page 167

1    THE WITNESS:  Liquid.
2    MR. SHIMOTA:  Q  Did you ever consider marketing
3  the device such that a user would simply use a rag or a
4  towel to dry the shaving head?
5    MR. PATTON:  I object to the form of the question.
6  It assumes that Mr. Braun had some role in marketing.
7    THE WITNESS:  This was not in my imagination that we
8  could have sold it in this way.
9    MR. SHIMOTA:  Q  Well, let me ask this:  When you
10  were doing your work on developing the cleaner shaving
11  system, what different types of drying devices did you
12  consider?
13    A  I thought surely about the principle of a hair
14  dryer with warm air.
15    Q  Did you think of anything else?
16    A  There was also an idea that in this trough where
17  the head was in that there could be something like a
18  heating plate.
19    Q  Was there -- did you consider anything else that
20  would work as a drying device?
21    A  Blower, warm blower, heating plate with
22  additional airing, ventilating, ventilation, and for
23  sure a certain time of dry operation of the device that
24  it is still working, still operating so that fluid gets

Page 168

1  off after it had been cleaned wet, after wet cleaning.
2    Q  Was that all the types of drying devices that
3  you considered?
4    A  These are all that I can remember now.
5    Q  When you were working at Braun, did Braun ever
6  sell clippers?  No, no, no, no, no.  Have you ever been
7  to a barber shop, hair clippers?
8    THE INTERPRETER:  What is a hair clipper?
9    THE WITNESS:  (through interpreter) A shaver, a
10  razor?
11    MR. SHIMOTA:  Q  No, no.  An electric razor used,
12  for example, on the back of your neck?
13    THE INTERPRETER:  Electric haircutter with vibrating
14  blades -- with vibrating knives, is that what you mean?
15
16    DR. STUTIUS:  I know the German term.
17    THE WITNESS:  Is that what you mean, that the barber
18  uses for the back of --
19    MR. SHIMOTA:  Q  Sure.
20    A  And do you mean have I ever developed such
21  things?
22    Q  Yes.  While you were working at Braun, did Braun
23  develop such devices?
24    A  I'm not sure.  Have they developed during that

Page 169

1  time when I was at Braun?  I think that they were
2  developed and the cutting elements were bought in Japan.
3    Q  Did you ever consider using your cleaning system
4  for hair clippers?
5    A  Not me.
6    Q  Do you know if anyone considered using your
7  cleaning system for hair clippers?
8    A  No.
9    Q  Did you ever consider making any portion of the
10  shaver cleaning system out of a zinc alloy?
11    A  The part of the cleaning device?
12    Q  Yes.  Do the initials ZSB mean anything to you?
13    DR. STUTIUS:  Z like the last letter in the
14  alphabet?
15    MR. SHIMOTA:  Yes.
16    THE WITNESS:  (through interpreter) No, not right
17  now.  What is that?
18    MR. SHIMOTA:  Q  Well, did you ever have a meeting
19  with anyone at Braun regarding procuring, I guess, an
20  alloy made of zinc, steel, and brass?
21    A  I cannot at all remember something like that.
22    Q  Was there a valve included anywhere in your
23  shaver cleaning system?
24    A  You mean our test setup?

20 (Pages 166 to 169)

Gebhard Braun    April 27, 2005
Volume 2

Page 170

1    Q  Sure, or your prototype.
2    A  I think it would have made sense, but if we
3  really indeed incorporated one, I don't know.
4    Q  Well, do you ever recall having a meeting with
5  anyone at Braun to discuss the use of a valve in the
6  cleaning device?
7    A  I could imagine that in the house, in the
8  company there were talks with people who had experience
9  with it, but in concrete situation I do not remember.
10    Q  You said that it would make sense, I believe, to
11  include a valve in the device.  Why do you think that?
12    A  Yes, like, for example, to prevent that fluid
13  drops down afterwards.  After the device is shut off, it
14  should be quiet, there should be no more dropping.
15    MR. SHIMOTA:  I think I marked the '328 patent.
16    MR. PATTON:  It's 12.
17    MR. SHIMOTA:  No, no, no, not the prosecution
18  history.  I think I marked it yesterday.
19    MR. PATTON:  4?
20    MR. SHIMOTA:  Yes, I believe so.
21    (Exhibit 4 previously marked and tendered.)
22    MR. SHIMOTA:  Q  If you look to column 9, I'll read
23  a phrase to you in column 9, you can't read this
24  document.

Page 171

1    A  Is there a German version?
2    MR. SHIMOTA:  We'll mark as Defendant's Exhibit 14 a
3  document bearing the Bates No. B1077 to 1096.  There is
4  also an English translation of that.
5    (Exhibit 14 marked as requested.)
6    MR. SHIMOTA:  Q  I'm not sure if the lines and
7  numbers match up exactly.  I'm looking at the statement,
8  "The outlet port 27 may also be closable by a valve not
9  shown in the drawing which opens automatically when
10  point 31 is reached."
11    A  Can you show me where it is?
12    Q  Column 9, line 30.
13    A  Now I understand what is meant of that, yes.
14    MR. PATTON:  I was just going to say, it might be
15  the best thing to do is to have her translate this thing
16  that you read.
17    MR. SHIMOTA:  Yes, I think so.
18    MR. PATTON:  Because it's probably the best thing
19  you do.
20    THE INTERPRETER:  Should I just translate it again?
21    MR. PATTON:  Yes, I think so so we are sure that
22  he's understanding what we are talking about.
23    MR. SHIMOTA:  Q  It says, "The outlet port 27 may
24  be closable by a valve not shown in the drawings which

Page 172

1  opens automatically when point 31 is reached."
2    A  And the question is now what sense this function
3  could have had?
4    Q  Yes.  Why was -- why was it suggested that there
5  would be a valve to close the outlet port?
6    A  Because this outlet has practically a bypass
7  function.  Through this outlet, fluid is let out from
8  the trough, but this is not -- but this is not good --
9  this is not what was intended.  That's not the intention
10  for the function.  From optimal functioning, the trough
11  must be able to fill the trough as fast as possible.  It
12  should become made full with as less fluid as possible
13  so that I do not have to pump too much without really
14  needing it, which, again, would lead to overflow,
15  collection overflow.
16    When I start the process, I want to have this
17  trough full as soon as possible.  And this outlet lets
18  always the fluid out.  If I can close it with a valve,
19  the process functions optimally.  And I can have a
20  larger outlet in order to empty the trough very fast
21  when the valve is opened.
22    Q  Okay.  So it takes -- the purpose is that it
23  takes less fluid or less time and fluid to be filled up
24  and then you can drain it more quickly, as well?

Page 173

1    A  Yes.  And in addition, the opening should not be
2  too small because then it would happen that fluid will
3  remain and will not be let out, especially since this
4  fluid is dirty.
5    Q  It says, as well, that the valve would be able
6  to be closable -- or opens automatically.  How would the
7  valve be opened automatically?
8    A  By electric circuit that is incorporated anyway.
9  So there would be an electric contact to open the valve.
10    Q  And the valve, you use the valve to operate the
11  device optimally, is that correct?
12    MR. PATTON:  I object to the form.
13    MR. SHIMOTA:  Q  Do you recall what type of valve
14  that you used?
15    A  We have not used it.  This was only in our
16  heads.
17    Q  Do you know if the idea of the valve was ever
18  implemented?
19    A  I do not know.
20    MR. SHIMOTA:  I'd like to mark as Rayovac Deposition
21  Exhibit No. 15 a document bearing the Bates range B4205
22  to B4222.  It is U.S. patent No. 5,614,030.
23    (Exhibit 15 marked as requested.)
24    MR. SHIMOTA:  Q  If I could direct your attention

21 (Pages 170 to 173)

Gebhard Braun    April 27, 2005
Volume 2

Page 174

1  to Figure 13, do you recognize this figure?
2      A  I think more likely not. I think this could be
3  from a laboratory or from a patent lawyer in cooperation
4  with the laboratory.
5      Q  Whose laboratory do you believe this figure
6  would have come from?
7      A  Petretti, our shaver laboratory.
8      Q  So you believe that Mr. Petretti may have
9  designed this figure?
10     MR. PATTON: I object to the form of the question.
11  I don't think that's his testimony.
12     THE WITNESS: I just can assume so. I have not done
13  it.
14     MR. SHIMOTA: Q  Do you know whether this is the
15  control circuit for the shaver cleaning device?
16     A  To make such circuits was the typical work of
17  the laboratory people. But usually he would do this by
18  hand, a sketch by hand. And then in the patent
19  department it would be made like this, but I have no
20  concrete idea who made it.
21     Q  Was the control circuitry necessary for the
22  operation of your shaver cleaning device?
23     MR. PATTON: I object to the form of the question.
24     THE WITNESS: (through interpreter) No, we for our

Page 175

1  test devices did not need it. This was only used for
2  the idea to make a device ready for commercialization.
3      MR. SHIMOTA: Q  So the control circuitry would be
4  used to make the device automatic, right?
5      A  That's what I assume.
6      Q  And if the device wasn't automatic, it wouldn't
7  have been ready for commercialization, is that correct?
8      MR. PATTON: I object to the form of the question.
9          (Whereupon, Dr. Wolfgang Vorbeck entered the
10             deposition room.)
11     THE WITNESS: (through interpreter) These two --
12  what our idea was, what our concept was, it was
13  necessary.
14     MR. SHIMOTA: Q  And what was your concept?
15     A  The idea or the concept was that it would
16  automatically self acting work after the device was set
17  in and put on and that the device would be cleaned,
18  dried, and charged and that the device could be removed
19  afterwards, after all this process had been done.
20     Q  And that process would be done automatically,
21  correct?
22     A  Yes, this was the concept, the idea. This was
23  the idea for the concept.
24     Q  And your -- Well, in the early 1990s had you

Page 176

1  ever heard from anyone express a need for a shaver
2  cleaning system of the type that you worked upon?
3      A  I had the opinion that the need would be
4  there -- would come up if the product were present.
5      Q  I understand. So prior -- you had never
6  yourself heard anyone express a need for such a device?
7      A  I heard often that men said -- those men who
8  shaved dry and alternatively wet that they did not like
9  the dusty debris.
10     Q  I think I understand.
11         Had you then heard from anyone within Braun a
12  desire to create a system for cleaning shavers?
13     A  I do not know what are you aiming at? It just
14  is when Dr. Pahl showed me his first functional sample,
15  I was impressed how it was possible to have it cleaned
16  in just one process.
17     Q  Okay. I understand that.
18         Outside of Braun have you ever seen any
19  document which stated a need for a shaver cleaning
20  system?
21     A  No, not a document, not at all. But we saw
22  often and we were not very pleased with the fact that we
23  had no wet shaver to be cleaned like the Japanese people
24  had.

Page 177

1      I thought it would be a good idea if we had a
2  product to -- for wet shaving without sealing it totally
3  and to clean it.
4      Q  So was some of the work done on the shaver
5  cleaning system prompted by the existence of the wet
6  shavers in Japan?
7      A  No, not at all.
8      THE INTERPRETER: Excuse me, please.
9      DR. VORBECK: It's not a wet shaver. It's a
10  washable electric dry shaver. So it's a shaver which
11  can be put -- electric shaver which can be put under
12  water, not a wet shaver like Mach 3.
13     THE INTERPRETER: A washable electric dry shaver.
14     THE WITNESS: (through interpreter) For me, a dry
15  shaver first from the beginning on, a dry thing, but
16  then I realized from Japan that there is a need -- there
17  is an interest in wet shaving.
18     MR. SIEVERS: With dry shavers. With blade --
19     DR. STUTIUS: Can we make -- Can we make the term as
20  shaving under water, is that the term?
21     MR. SIEVERS: Shaving in the shower.
22     DR. VORBECK: Washable electric shaver.
23     THE INTERPRETER: A dry shaver that can be used as a
24  wet shaver.

22 (Pages 174 to 177)

Gebhard Braun   April 27, 2005
Volume 2

Page 178

1    MR. PATTON: Okay. Just so we're clear, it's a
2    washable electric shaver.
3    MR. SHIMOTA: For the record, okay, we're fine
4    there.
5        Can you please repeat the witness' answer.
6        (answer read)
7    MR. SHIMOTA: Q  Let me just ask the question that
8    I asked before.
9        Were the washable dry shavers -- Did the
10   washable dry shavers in Japan prompt your work on the
11   cleaning device system at Braun?
12   MR. PATTON: I object to the form.
13   THE WITNESS: No. Dr. Pahl prompted it.
14   MR. SHIMOTA: Q  So was there anything aside from
15   what Dr. Pahl showed you that prompted you to work on
16   the shaver cleaning system?
17   A  No, I thought it was great how this worked and I
18   liked it very much to work on it.
19   MR. SHIMOTA: We're almost done. This series of
20   questions will be quick.
21       I'd like to mark as Defendant's Deposition
22   Exhibit No. 16 a document bearing the Bates No. B5220
23   through B5277. It is the thesis of Stefan Zeischke.
24       (Exhibit 16 marked as requested.)

Page 179

1    MR. SHIMOTA: Q  And take your time to review the
2    document. I just want to ask you if you have ever seen
3    it before?
4    A  No, I do not know that. I can absolutely not
5    remember that I have seen this before.
6    Q  Did you know Mr. Zeischke?
7    A  Is the name correctly spelled? I just see the
8    signature.
9        I cannot remember.
10   Q  So you didn't know that Mr. Zeischke worked on a
11   cleaning system at Braun in the --
12   THE INTERPRETER: For?
13   MR. SHIMOTA: Q  Shavers.
14   A  No, I do not. I think this was already '91, but
15   it was before?
16   Q  Yes, it is 1991.
17   THE VIDEOGRAPHER: Counsel, can I change tapes?
18   MR. SHIMOTA: Change that, and then I have like 15,
19   20 minutes to finish up.
20   THE VIDEOGRAPHER: Here concludes tape 2. We are
21   going off the video record at 3:41 p.m.
22       (a brief recess was taken)
23   THE VIDEOGRAPHER: We are going back on the video
24   record at 3:53 p.m. Here begins tape 3.

Page 180

1    MR. SHIMOTA: I'm going to mark as Rayovac -- excuse
2    me, Defendant's Deposition Exhibit No. 17, it's Braun's
3    privilege log in this action.
4        (Exhibit 17 marked as requested.)
5    MR. SHIMOTA: Q  I was just going to ask you to
6    take a look at it and see if you can recognize the name
7    of the external attorney that you discussed earlier.
8    A  Here in this list?
9    Q  Yes, there is some names in there. I just want
10   to know if you can recognize or it helps you remember
11   what the name of the external attorney was?
12   A  Mr. Klauer and Mr. Sievers are there, Braun GmbH
13   and Braun Ag.
14   Q  Let me see if I can help you. Let's turn to
15   page 3. Was the name of the individual you see at the
16   bottom C. Hirsch?
17   A  It does not say anything to me the connection.
18   Q  Was the name of the external attorney A.
19   Dietrich?
20   A  I do not know at all that. I have a colleague
21   that was Dietrich, but I don't think he has something to
22   do with this.
23   Q  If you look on the next page, in the fourth
24   entry there is someone named E. Cordes?

Page 181

1    A  Cordes, I think that's your secretary, right? I
2    think that's the secretary of the patent department.
3    Q  So that wasn't the external attorney?
4    A  No.
5    Q  If you look on the next page, you will see the
6    name E. Prahl, P-R-A-H-L.
7    A  Maybe this is a misspelling of Dr. Pahl. No, I
8    do not know this name.
9    Q  If you look on the next page, there is the name,
10   the fifth entry, R. Einsele?
11   A  I think Mr. Einsele was your predecessor. I
12   know this name from the patent department. Maybe -- but
13   he had not to do with me personally.
14   Q  Okay. This was not the external attorney --
15   A  This was internal.
16   Q  Okay. If you see on page 7, there is listed the
17   name of the firm Fish & Richardson. Does that name mean
18   anything to you?
19   A  No, it does not tell me anything. I did not
20   have to do anything with that.
21   Q  I guess I'll just ask you again -- Well, you
22   remember the name Mr. Sartorius?
23   A  Some kind -- I kind of know this name, but I
24   know it more from a movie than of real life.

23 (Pages 178 to 181)

Gebhard Braun    April 27, 2005
Volume 2

Page 182

1    Q  Well, I assume, then, you don't remember him as
2  being the external attorney, either?
3    A  I do not remember.  I did not know him.  I was
4  just called into the office of Dr. Pahl.  I just knew
5  him from seeing, but I would not have called him by name
6  or I would not have called him on the phone.
7    Q  Did you ever write anything to this external
8  attorney?
9    A  Possibly I wrote something that then was sent to
10  him, but I myself did not send it.  The contacts were
11  via Mr. Pahl.
12    MR. SHIMOTA:  Okay.  You can stop there.  All right.
13  This is it.  This will look like a lot, but I'm just
14  going to show you a series of documents and just ask you
15  if you've seen them before.
16      I'd like to mark as Defendant's Exhibit 18
17  German patent No. 3,125,940 A1
18      (Exhibit 18 marked as requested.)
19    MR. SHIMOTA:  I'll also mark as Defendant's Exhibit
20  No. 19 U.S. patent No. 1,868,904.
21      (Exhibit 19 marked as requested.)
22    MR. SHIMOTA:  Mark as Defendant's Exhibit No. 20
23  U.S. patent No. 1,938,159.
24      (Exhibit 20 marked as requested.)

Page 183

1    MR. SHIMOTA:  Mark as Defendant's Exhibit No. 21
2  U.S. patent No. 2,987,036.
3      (Exhibit 21 marked as requested.)
4    MR. SHIMOTA:  Mark as Defendant's Exhibit 22, U.S.
5  patent No. 2,788,536.
6      (Exhibit 22 marked as requested.)
7    MR. SHIMOTA:  Mark as Defendant's Exhibit 23 U.S.
8  patent No. 2,976,552.
9      (Exhibit 23 marked as requested.)
10    MR. SHIMOTA:  Mark as Defendant's Exhibit 25 U.S.
11  patent No. 3,478,758.
12      Just note for the record I withdrew Defendant's
13  Exhibit 24.
14      (Exhibit 25 marked as requested.)
15    MR. SHIMOTA:  And mark as Defendant's Exhibit 26
16  U.S. patent No. 3,500,840.
17      (Exhibit 26 marked as requested.)
18    MR. SHIMOTA:  Q  And, again, my question would be
19  just if you had ever seen any of these documents
20  previously?
21    A  Now that I have a short look at it, I would say
22  I cannot remember that I would have seen one of these
23  before.
24    Q  Did you ever keep any files of patents related

Page 184

1  to shavers?
2    THE INTERPRETER:  Brushes?
3    MR. SHIMOTA:  Shavers.
4    MR. PATTON:  Just shavers, right?
5    MR. SHIMOTA:  Q  Well, let me ask this question,
6  maybe make it easier.
7      In connection with the prosecution of your
8  German patent application or your last patent
9  application, did you provide any patent documents to
10  attorneys?
11    A  If I gave patents to attorneys?
12    Q  Yes.
13    A  No, for sure not.
14    Q  Why do you say for sure not?
15    A  I never gave to other lawyers anything that has
16  to do with patents.
17    Q  Well, when your patent applications were filed,
18  were you aware of any patents aside from the one we
19  discussed -- well, aside from the -- let me just give
20  you here -- Do you remember the patent in your invention
21  application?
22    THE INTERPRETER:  The patent?
23    MR. SHIMOTA:  Q  Yes, the patent described in your
24  invention application.

Page 185

1      At the time that you filed your patents in
2  Germany and the United States, were you aware of any
3  other patents which related to the cleaning of shavers?
4    A  I knew of that one patent that is stated in the
5  application.
6    Q  And my question is did you know of any others?
7    A  At least today I would not know that I would
8  have known of any others.
9    Q  Did you know of any other literature aside from
10  patents related to systems for cleaning shavers prior to
11  the time you filed your patent application?
12    A  No, this was not interesting for me because I
13  worked on my work but regarding the patents, this was
14  the part of the patent department.
15    Q  And during prosecution, did any attorneys ask
16  for your advice regarding patents related -- well,
17  during prosecution, did any attorneys ask for your
18  advice regarding prior art related to systems for
19  cleaning shavers?
20    THE INTERPRETER:  About the state of the art?
21    MR. PATTON:  Prior art.
22    THE WITNESS:  (through interpreter)  It is possible
23  that I talked to my own attorneys in the patent
24  department in order to explain the invention.

24 (Pages 182 to 185)

Gebhard Braun    April 27, 2005
Volume 2

Page 186

1    DR. STUTIUS: My own invention.
2    THE WITNESS: (through interpreter) My own
3    invention.
4    MR. SHIMOTA: Q Okay. Did they ask you to provide
5    any guidance or explanation regarding not your invention
6    but prior art related to cleaning shavers?
7    THE INTERPRETER: Excuse me, you mean whether he
8    explained about the state of the art of the invention to
9    the attorneys in Braun?
10    MR. SHIMOTA: No.
11    THE INTERPRETER: Could you find different wording.
12    MR. SHIMOTA: Yes, I'm just trying to think of it.
13    Q Did the attorneys ever ask you questions
14    regarding a -- regarding one or more specific patents
15    related to systems for cleaning shavers? And I don't
16    mean your own patent applications.
17    A If they ask me, then for sure only about the
18    patent we applied for.
19    DR. STUTIUS: No, that was listed in the invention
20    disclosure.
21    THE INTERPRETER: That's not the same.
22    THE WITNESS: (through interpreter) That was listed
23    in the invention disclosure in the patent application,
24    in the patent application.

Page 187

1    MR. SHIMOTA: Q Other than the patent and the
2    application, did they ask you questions regarding any
3    other patents?
4    A I do not recall at all something like that.
5    MR. SHIMOTA: Thank you for your time. I have
6    nothing further for you.
7    MR. PATTON: Thank you.
8    THE VIDEOGRAPHER: In conclusion for April 27th,
9    2005, we are going off the video record at 4:12 p.m.
10    Thank you.
11           - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 188

1    STATE OF ILLINOIS   )
2                        ) ss:
     COUNTY OF COOK   )
3
4         The within and foregoing deposition of the
5    aforementioned witness was taken before TRACY L.
6    BLASZAK, CSR, CRR, and Notary Public, at the place, date
7    and time aforementioned.
8         There were present during the taking of the
9    deposition the previously named counsel.
10         The said witness was first duly sworn and was
11    then examined upon oral interrogatories; the questions
12    and answers were taken down in shorthand by the
13    undersigned, acting as stenographer and Notary Public;
14    and the within and foregoing is a true, accurate and
15    complete record of all of the questions asked of and
16    answers made by the aforementioned witness, at the time
17    and place hereinabove referred to.
18         The signature of the witness was not waived,
19    and the deposition was submitted, pursuant to
20    Rules 30(e) and 32(d) of the Rules of Civil Procedure
21    for the United States District Court, to the deponent
22    per copy of the attached letter.
23         The undersigned is not interested in the within
24    case, nor of kin or counsel to any of the parties.

Page 189

1    Witness my official signature and seal as
2    Notary Public in and for Cook County, Illinois, on this
3    _____ day of _____, A.D. _____.
4
5
6
7
8                     _____
                      TRACY L. BLASZAK, CSR, CRR
9                     CSR No. 084-002978
                      230 West Monroe Street
10                    Suite 1500
                      Chicago, Illinois  60606
11                    Phone:  (312) 263-3524
12
13
14
15
16
17
18
19
20
21
22
23
24

25 (Pages 186 to 189)

Gebhard Braun    April 27, 2005
Volume 2

Page 190

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRAUN GmbH,          )
                     )
        Plaintiff,   )
                     )
    -vs-             )  No. 03-CV-12428 (WGY)
                     )
RAYOVAC CORPORATION,      )
                     )
        Defendant.   )

        I, GEBHARD BRAUN, being first duly sworn, on
oath say that I am the deponent in the aforesaid
deposition taken on April 27, 2005; that I have read the
foregoing transcript of my deposition, consisting of
pages 93 through 190 inclusive, and affix my signature
to same.

        _____
        GEBHARD BRAUN

Subscribed and sworn to
before me this _____ day
of _____, _____.

_____
Notary Public
tb

        LEGALINK - CHICAGO
        (312) 263-3524

---

CASE: Braun vs. Rayovac          DATE TAKEN: 4-27-05
DEPONENT: Gebhard Braun
PAGE    LINE            ERRATA SHEET
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
(signed) _____DATE_____
Reporter: Tracy L. Blaszak
        LEGALINK - CHICAGO
        (312) 263-3524

---

        LEGALINK - CHICAGO
        230 West Monroe St. - Suite 1500
        Chicago, Illinois 60606
        (312) 263-3524   (312) 236-8461

        May 5, 2005

Mr. Gebhard Braun
c/o Ropes & Gray, LLP
One International Place
Boston, MA 02110
Attn: Mr. William L. Patton
    Re: Braun vs. Rayovac
    03-CV-12428
    Dep: Mr. Gebhard Braun - 4-27-05
Dear Mr. Braun:
    The deposition testimony given on April 27, 2005,
in the above-captioned case has been transcribed, and
inasmuch as signature was not waived, this is to advise
that the deposition will be available in our office for
30 days for reading and signing.
    If you choose to read and sign your deposition at
our offices, please call the undersigned for an
appointment. Our office hours are from 9:00 a.m. to
4:00 p.m., Monday through Friday.

    If you choose to make other arrangements for the
reading and signing of your deposition, please advise us
of the arrangements have been made in writing within 30
days from the date of this letter.
        Sincerely yours,

        _____
        LegaLink

cc: Mr. James Shimota (Kirkland)      tb126181
    LEGALINK - CHICAGO
    (312) 263-3524

---

CASE: Braun vs. Rayovac          DATE TAKEN: 4-27-05
DEPONENT: Mr. Gebhard Braun
PAGE    LINE            ERRATA SHEET
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
____  ____    CHANGE: _____
____  ____    REASON: _____
(signed) _____DATE_____
Reporter: Tracy L. Blaszak
        LEGALINK - CHICAGO
        (312) 263-3524