# EXHIBIT
# 29B

Dietrich Pahl    April 28, 2005

Page 117

1  the people who are working on an idea also are being
2  credited by whatever compensation might occur later on.
3  Thus to avoid a problem which Americans call not
4  invented here. It's very often in R & D departments
5  that if somebody comes along with good idea, people
6  working on it try to prove it's not good, try to have
7  other solution bypass that solution so that they are
8  being named as the inventor.
9         My policy strictly was that I give or I credit
10 the guy who is working on the subject which I might have
11 been initiator of and that he is also being named as
12 inventor that he is being credited as the inventor.
13 This motivates people to put their full workload into
14 the subject.
15        And there's another reason. I experienced if
16 you are the inventor and you are sponsoring your own
17 idea, you are getting the type of miscredit insofar that
18 other people say he's only wanting or sponsoring this
19 project or this idea because he is the inventor and he
20 possibly might have got some money out of it. And to
21 avoid that I think it was just feasible to give the
22 credit of the idea to the person working for it so it's
23 being motivated and I can easier sponsor his idea
24 anonymously as you can say.

Page 118

1    Q    Let's take the second first, see if I'm
2  understanding you. It was your idea if you were not
3  named as an inventor it would be easier for you to push
4  a particular idea through Braun management?
5    A    Correct.
6    Q    And was it your desire to push the shaver
7  cleaning system into production?
8    A    Oh, of course.
9    Q    And you thought if Gebhard Braun was named the
10 sole inventor of the shaver cleaning system it would be
11 easier to push it through Braun management, is that
12 correct?
13   A    Yes.
14   Q    Did you, in fact, find -- it was the case that
15 as a result of Mr. Braun being named as the sole
16 inventor it was easier to push -- push the idea through
17 Braun management?
18   A    It's hard to judge on it because I didn't try
19 the other way. In general it is so. We have less
20 resistance within the organization if you as the boss
21 and inventor are trying to sponsor to push it through
22 and another person is the inventor and I'm the
23 sponsoring guy.
24   Q    So when you say compensation -- you mentioned

Page 119

1  compensation. Would the inventor -- if a device were
2  eventually commercialized, would there be some
3  compensation granted to the inventor?
4    A    Yes.
5    Q    Do you recall what that amount of compensation
6  is?
7    A    There's a German law --
8    MR. VORBECK: It's German law that inventors have to
9  be compensated and it's based on the royalty base. And
10 normally rough estimates are about 1 per million or less
11 of the net sales of the invention.
12   MR. SHIMOTA: So is it --
13   MR. VORBECK: So it might be -- to some -- sometimes
14 inventors compensation big numbers, huge quantities and
15 high price it could be nearly salary of the person or it
16 could be about one or two thousand dollars a year.
17 That's the range.
18   MR. SHIMOTA: Q So this could be a lot of -- if
19 it's a commercial -- a very successful product, this
20 could be a lot of money for an inventor, correct?
21   A    Sure. But I have to add to you that the higher
22 the job I assume the less the money is being paid for
23 which means Braun is getting -- Mr. Braun is getting
24 paid more for his -- for this thing here than if I would

Page 120

1  have been the sole inventor.
2    Q    Why is that?
3    A    It is policy of our patent department.
4    MR. VORBECK: German inventor law says the higher
5  the person is in the hierarchy the more you can expect
6  that he makes inventions. So person which works on the
7  assembly line is not real likely to be expected to make
8  invention, patentable invention, and the head of R & D
9  department he should make invention more likely,
10 therefore, one person gets more money than the other.
11   MR. SHIMOTA: Q Are you being compensated for the
12 sale of Braun's shaver cleaning systems now?
13   A    No.
14   Q    Do you know why that is?
15   A    I didn't ask for it to be honest.
16   Q    Well, are you now an inventor on Braun's German
17 patent applications related to the shaver cleaning
18 system?
19   A    No.
20   Q    Well, now that you have discussed the
21 inventorship issue with Braun's patent department, do
22 you believe that you are entitled to compensation as a
23 result of your invention?
24   MR. PATTON: Object to the form of the question,

30 (Pages 117 to 120)

Dietrich Pahl    April 28, 2005

Page 121

1  but --
2      THE WITNESS: Let's put that way. Theoretically I
3  might be entitled to it, but ever since it was my policy
4  not to be named on any patents, I simply neglect the
5  fact. I'm not looking for compensation.
6      MR. SHIMOTA: Q  Well, you recognize the fact that
7  you are named on several patents, correct?
8      A  Very, very few.
9      Q  Do you know how many?
10     A  One or two, I assume.
11     Q  I'd like to mark as defendant's Deposition
12  Exhibit No. 28 U.S. Patent No. 4,578,861 which bears the
13  Bates number B4099 to B4107.
14         (Exhibit 28 marked as requested)
15     A  Yes.
16     Q  I'd like to mark as defendant's Exhibit No. 29
17  U.S. Patent No. 4,922,608 bearing the Bates numbers
18  B4123 to B4132.
19         (Exhibit 29 marked as requested)
20  MR. PATTON: This is 29.
21  MR. SHIMOTA: Did I misspeak?
22     A  That was my first mistake.
23  MR. SHIMOTA: Q  I'd like to mark as defendant's
24  deposition Exhibit No. 30 U.S. Patent No. 5,704,935

Page 122

1  which bears the Bates numbers B4223 to B4229.
2         (Exhibit 30 marked as requested)
3     Q  Finally, I'd like to mark as Defendant's
4  Deposition Exhibit No. 31 documents bearing the Bates
5  number -- defendant's Exhibit No. 31 U.S. Patent No.
6  6,083,233 which bears the Bates number B4230 to B4247.
7         (Exhibit 31 marked as requested)
8     Q  Starting with U.S. Patent No. 4,588,861, do you
9  see the named inventors listed there?
10    A  Yes.
11    Q  Do you see yourself?
12    A  I do.
13    Q  Do you recognize the other gentlemen listed?
14    A  Sure.
15    Q  Were you the boss of Otto Schweingruber?
16    A  Not the direct one, but the boss of Hilfinger
17  and Schweingruber was the boss -- Hilfinger was the boss
18  of Schweingruber.
19    Q  It went Dietrich Pahl, Schweingruber and then
20  Peter Hilfinger?
21    A  Right.
22    Q  When you filed for this patent application,
23  had you developed your general policy of not naming
24  yourself --

Page 123

1     A  Not quite at the time.
2     Q  So in 1986 it was not your policy to --
3     A  Not so strictly.
4     Q  Do you know when you started to strictly
5  enforce that policy for yourself?
6     A  After the patent -- United States patent,
7  4,922,608 this was the particular case where an idea and
8  people within the organization tried to kill it. That's
9  as simple as that.
10    Q  Is that so?
11    A  That's so.
12    Q  After the '608 patent, that's when you
13  established your policy of not naming yourself as an
14  inventor of patents?
15    A  Yes. And then there are a couple of patent
16  which you certainly have not investigated yet where I
17  was the inventor, and my name is being shown -- is not
18  being shown on it. You cannot, of course, find them.
19  And then when the epilating business started these two
20  other patents were there. I said, gee, this is totally
21  different ballgame altogether at the point in time when
22  Silk Epil was not in the organization, and I made again
23  the same mistake once you are proud as an inventor and
24  filed these two. But this was it. I remember only this

Page 124

1  patent here and this patent here. I told you two -- one
2  to two. The others ones slipped my mind.
3     Q  If you look at the 5,704,935, do you recognize
4  the name Detart Mertz?
5     A  Yes.
6     Q  Were you the boss of Detart Mertz?
7     A  No, no, I wasn't. Who was Detart Mertz? He
8  was working at this time -- I was not his boss to be
9  honest, but I don't know what his function was at the
10  time, but he was certainly not reporting to me. He
11  helped me on something here, but I don't know what it
12  was exactly.
13    Q  But -- I guess you said you thought the
14  business was different for epilating appliances and
15  that's why you violated your policy for this patent?
16    A  Yes.
17    Q  If you look then at the U.S. Patent No.
18  6,083,233. Do you recognize the names of the inventors
19  listed on that patent?
20    A  Yes, I do.
21    Q  Were you the boss of any of those individuals?
22    A  I was the boss of Mr. Sanchez. Mr. Cohen as
23  you can see was a person from the United States. He had
24  made his Ph.D in pain, pain measurement methods. So I

31 (Pages 121 to 124)

Dietrich Pahl    April 28, 2005

Page 125

1  needed him and actually got him over to Braun to help me
2  on measuring pain while epilating. And he came up in a
3  meeting we had together with the idea to overwhelm or --
4     MR. VORBECK: To superimpose.
5     THE INTERPRETER: To overcome the pain, to
6  substitute the pain by something else.
7     MR. VORBECK: Mask.
8     A  Mask the pain by causing different pain but
9  more agreeable pain.
10    MR. SHIMOTA: Q But you were the boss of
11 Mr. Sanchez, correct?
12    A  Correct.
13    Q  Were you the boss of Mr. Kreutz?
14    A  Mr. Kreutz. Yes, I think he was a draftsman at
15 the time.
16    Q  Do you recall why you violated your policy with
17 respect to this patent?
18    A  I can't tell you to be honest. We're sitting
19 altogether in meeting with development staff here and
20 then, of course, everybody said, okay, we all mentioned
21 as inventor, and apparently I was not clever enough to
22 stick to my policy.
23    Q  So there were at least two occasions following
24 your U.S. Patent No. 4,922,608 in which you violated a

Page 126

1  policy of not naming yourself as an inventor, is that
2  correct?
3     A  Well, I have to look to the dates when it has
4  been first filed.
5     Q  Sure.
6     A  You checked the dates?
7     MR. VORBECK: You should look at the priority date.
8     MR. SHIMOTA: Q The '608 patent has a priority date
9  of June 27th, 1987, and the two patents I referred to
10 have a priority date respectively of May 16th, 1994 and
11 June 14th, 1995.
12    A  Where is the priority date mentioned here on
13 these things? Do you know? Can you show me?
14    Q  It says foreign application priority data then
15 there's a date.
16    A  When is the priority date of the patent we are
17 discussing here? The cleaning device patent. I don't
18 know when it was, priority date of that cleaning device.
19    Q  It would have been in January of '94.
20    A  There were two hair pluckers things that were
21 after these both patents. They were after that American
22 -- cleaning machine patent, am I correct there?
23    Q  Sure. I guess my point is that you said your
24 policy started with the '608 patent, the shearing

Page 127

1  apparatus with a shearing system. That would have been
2  approximately 1987?
3     A  Yes.
4     Q  I guess my question was that you at least --
5  you violated your policy on two occasions following that
6  time?
7     A  In this business, yes.
8     Q  If you look at the U.S. Patent No. 5,704,935,
9  you'll see that that has a priority date of May 16th,
10 1994. Do you see that?
11    MR. PATTON: See the foreign application priority
12 date?
13    THE WITNESS: Oh, yes.
14    MR. SHIMOTA: Q Isn't it correct that with respect
15 to this patent you violated your policy on or around
16 May 16th, 1994?
17    A  Yes, looks like it.
18    Q  Had your policy regarding inventorship ever
19 resulted in a situation such as we have here where a
20 patent needed to be corrected later?
21    A  No.
22    Q  Turning to the first reason that you had no
23 desire to be named as an inventor. Am I correct that
24 you thought that -- is it correct that you thought that

Page 128

1  your employees would be motivated if they thought they
2  would receive all the compensation for inventions if
3  they were pursued as patents eventually?
4     A  Sure.
5     Q  And you thought that your employees would be
6  more motivated if they thought they could get more
7  money, is that right?
8     A  That's right.
9     Q  So your choice -- your decision not to name
10 yourself as an inventor on the shaver cleaning system,
11 that was a deliberate choice, correct?
12    A  Totally.
13    Q  And when you made that choice you did recognize
14 that you were actually an inventor of the shaver
15 cleaning system?
16    A  Sure, yeah.
17    Q  After you -- after you left Braun, did you ever
18 tell anyone that you thought you were an inventor of the
19 shaver cleaning system?
20    A  No.
21    Q  Well, do you know how it was that Braun came to
22 discover that you were actually an inventor of the
23 shaver cleaning system?
24    A  I don't know the background of that what was

32 (Pages 125 to 128)

Dietrich Pahl    April 28, 2005

Page 129

1  reason that they called me in. Only simply because of
2  -- that what I learned then later on that the United
3  States all inventors have to be named which is -- I
4  didn't know of.
5      Q   Well, did you have any understanding one way or
6  the other?
7      A   Which way?
8      Q   Regarding United States patent law.
9      A   No, I haven't -- I don't know about patent
10 laws.
11     Q   So I mean --
12     A   Inform me on that.
13     Q   Did you have any understanding regarding German
14 patent law as to inventorship in the early '90s?
15     A   Well, I had -- I had the information that -- I
16 was aware that one can deliberately not name himself on
17 any patent. It's up to everybody that he has not put
18 his name on the invention.
19     Q   How were you aware of that?
20     A   Don't ask me. I don't know the details. I
21 can't tell you to be honest.
22     Q   But you were aware of that in the early '90s,
23 is that correct?
24     A   Earlier even.

Page 130

1      Q   Because you were aware of that was that -- did
2  you feel more comfortable with your policy because you
3  were aware of that fact?
4      MR. PATTON: I object to the form of the question.
5      THE WITNESS: Can you please repeat the question?
6      MR. SHIMOTA: Q Did you feel more comfortable with
7  your policy because you were aware that in Germany an
8  inventor could deliberately choose to conceal his role
9  in the process?
10     MR. PATTON: I object to the form of the question.
11 That's not the testimony.
12     THE WITNESS: Sorry. I can't follow you.
13     MR. PATTON: I'm objecting to the form of his
14 question because I think it misstates what your earlier
15 testimony was. But if you understand the question, you
16 can answer it.
17     THE WITNESS: Put that way I wasn't worried too much
18 about whether it's possible yes or no. My objective was
19 to motivate my crop, my workforce, and I think one of
20 the methods was to just stay off them of my ideas, let
21 them be the inventors on these dockets here, on this
22 patent applications, especially because there was one
23 reason which made it easier to decide on my policy,
24 inverted commas, it was the climate when I took over the

Page 131

1  department of R & D shavers. The climate was lousy due
2  to the fact that it happened that ideas had been stolen
3  to say regret. And simply to overcome that I had to
4  make it clear as a boss setting positive example that
5  this never ever will happen as I'm boss of the
6  department. And to prove that was the best thing that
7  was evident that I don't fancy to be named on any
8  patent.
9      MR. SHIMOTA: Q In any of your -- the two earlier
10 patents which are filed, the U.S. Patent No. 4,922,608
11 and U.S. Patent No. 4,578,861, did you have occasion to
12 communicate with United States patent attorneys?
13     A   No.
14     Q   Well, in connection with those patents did you
15 sign an oath?
16     A   I don't know.
17     MR. PATTON: Is it something you remember?
18     THE WITNESS: I don't remember that, no.
19     MR. SHIMOTA: Q Do you know what an oath is?
20     A   Yes, that thing.
21     Q   Where you swear to be truthful.
22     A   Yes.
23     Q   Well, do you have any reason to disbelieve that
24 you would have signed an oath at that time?

Page 132

1      A   Sorry. I didn't get you.
2      Q   Signed an oath attesting to the fact that you
3  were an inventor on at least these two patents.
4      A   I'm not aware. I'm sorry. I really don't
5  know.
6      Q   Did anyone ever have -- did any lawyer ever
7  discuss the concept of inventorship with you?
8      A   No.
9      Q   I want to again ask you this question. How did
10 you come to your understanding of German law at some
11 point prior to or on -- in the early '90s?
12     A   Really hard for me to tell you. I don't know
13 how I arrived to that. I don't see anything uncorrect
14 or incorrect when I just refrain from being mentioned on
15 a patent. So if I would have put my name additionally
16 on it, it might be a crime, but not if I stay off the
17 patent.
18     Q   Did you explicitly -- did you order Mr. Braun
19 not to list you as an inventor on this invention
20 disclosure?
21     A   Yes, I told him he should be named alone on the
22 thing.
23     Q   Did he tell you that he felt uneasy about
24 naming himself as the sole inventor of the shaver

33 (Pages 129 to 132)

Dietrich Pahl    April 28, 2005

Page 133

1    cleaning system?
2        A    I'm not 100 percent sure, but I don't know
3    whether he felt unhappy or uneasy, I don't know.
4        Q    Would it surprise --
5        A    Because it's -- he didn't mention it to me, but
6    as far as I recall, and I cannot read in his head, you
7    know.
8        Q    Well, did he ever ask you whether you should be
9    listed as inventor of the shaver cleaning system?
10       A    Not as I'm aware of. I cannot recall that.
11       Q    Well, how did you come to tell him that you
12   should not be listed as -- on the shaver cleaning
13   system?
14       A    As I told you, I wanted to motivate him. I
15   told him that all he's doing on the cleaning shaver
16   system will be his patent or he will be the inventor of
17   the thing, the official one.
18       Q    Well, did you assist him in preparing his
19   invention application?
20       A    Pardon?
21       Q    Did you -- it says in paragraph 22 I reviewed
22   the invention disclosure statement.
23       A    Yes.
24       Q    Did you assist Mr. Braun in preparing that

Page 134

1    invention disclosure statement?
2        A    The invention disclosure statement, what's
3    this? Yes, but this is normal thing. He has to do
4    that -- what was the name again?
5        Q    It says invention disclosure statement.
6        A    It says invention disclosure statement. He has
7    to do it when he wants to apply for patent. That's
8    normal type of procedure inhouse.
9        Q    Did you -- did you -- but my question is, did
10   you assist Mr. Braun in preparing --
11       A    No, I did not assist.
12       Q    But you did eventually review it, correct?
13       A    Yes.
14       Q    And you recognize it described your work,
15   correct?
16       A    Yes.
17       Q    Look at paragraph 24. It states I neither
18   informed Mr. Braun nor Braun's patent department that I
19   was inventor of portions of the invention disclosed in
20   the internal invention disclosure submitted by Mr. Braun
21   that described the device for cleaning dry shavers.
22           My first question is, so you never told
23   Mr. Braun that you had performed the original work on
24   the shaver cleaning system?

Page 135

1        A    I told him that this has been developed in
2    Leon, yes. I asked him to proceed in developing the
3    product for Braun.
4        Q    You also told Mr. Braun that you did not --
5    that you had no desire to be named as an inventor on any
6    patents for the shaver cleaning system?
7        A    Right, later on, once he started putting in
8    invention -- what is the name? Disclosure.
9        Q    It says that you -- I neither -- you didn't
10   inform Braun's patent department that you were an
11   inventor of portions of the invention?
12       A    I assure you not.
13       Q    Did you ever discuss with them the fact that
14   you had performed work on the shaver cleaning system?
15       A    With the patent department?
16       Q    Yes.
17       A    No.
18       Q    Had you kept it a secret from the patent
19   department?
20       A    Captured the secret.
21       Q    Did you keep the existence of your work on the
22   shaver cleaning system a secret from the patent
23   department?
24       A    Yes, it is mentioned here.

Page 136

1        Q    Why did you keep it a secret from the patent
2    department?
3        A    Possibly by then they might have said okay we
4    need your name on the paper there.
5        Q    Why do you think they would have said we need
6    your name on the patent document?
7        A    I don't know, but I assumed that, you know. I
8    said possibly.
9        Q    In states in paragraph 27, I have reviewed the
10   claims in U.S. Patent Nos. 5,711,328, '328 patent, and
11   5,649,566, '566 patent. Is it correct you reviewed the
12   claims of those two patents?
13       A    Yes.
14       Q    You understand the claims of those two patents
15   after reviewing them.
16       A    Yes, as far as one can understand patent
17   English, yes.
18       Q    In connection with deciding whether or not you
19   were co-inventor, did you take the time to read the
20   claims and make an effort to understand them?
21       A    Yes.
22       Q    In paragraph 25 you state that you have
23   understanding -- states, first, that you understand that
24   based on Mr. Braun's internal invention disclosure Braun

34 (Pages 133 to 136)

Dietrich Pahl    April 28, 2005

**Page 137**

1  filed German patent applications on the cleaning device.
2      You didn't know in the early '90s that patent
3  applications had been filed in the cleaning device?
4      A    Early '90s?
5      Q    When the patent applications were actually
6  filed, you were not aware that Braun was pursuing patent
7  protection?
8      A    I didn't worry about it. It wasn't -- I didn't
9  know when they filed the patent thing because this I
10  don't read.
11      Q    You didn't know that Braun had even filed
12  patent applications until very recently?
13      A    No, I knew that Mr. -- Mr. Braun Braun.
14      Q    Braun the company?
15      A    Braun the company?
16      Q    Braun the company?
17      A    I knew that Mr. Braun was looking for patent --
18  to put in patent declaration, but I was not pursuing the
19  case anymore. And I don't know when and if Braun put in
20  patents until this issue came up with the United States
21  patent.
22      Q    So I guess I'm correct in assuming that you
23  never reviewed any draft of the German patent
24  application?

**Page 138**

1      A    No, I didn't.
2      Q    Am I also correct in assuming you didn't have
3  any discussions with any attorneys in --
4      A    No.
5      Q    It says here in the next sentence I understand
6  that under German patent law a German patent is valid
7  even if it fails to name all inventors.
8      A    Yes.
9      Q    How did you gain that understanding?
10      A    You asked me that question a couple of minutes
11  ago. I cannot give you concrete answer on that how and
12  when.
13      Q    Well, I mean that's just what confuses me
14  because when the phrase I understand appears, it seems
15  to suggest to me that someone told you something and you
16  are just recounting I understand what has been told to
17  me by the lawyers. Is that what is meant by what you
18  mean when you use the phrase I understand?
19      MR. PATTON: I object to the form of the question.
20      THE WITNESS: Can we divide the question into
21  different wording, rephrase it. That's the problem.
22      MR. SHIMOTA: Q What do you mean when you say I
23  understand?
24      A    What I'm aware of in other words.

**Page 139**

1      Q    And I mean basically because of the verb tense
2  it's not clear when your awareness came about and that's
3  what --
4      A    It's not clear. I cannot tell you when and how
5  I came to that point.
6      Q    What was your understanding regarding
7  inventorship under U.S. patent law?
8      A    None.
9      Q    You have no understanding whatsoever?
10      A    No understanding, yes.
11      Q    And what is your understanding today?
12      A    That all inventors have to be named.
13      Q    Given that understanding do you now regret your
14  policy?
15      MR. PATTON: I object to the form of the question.
16      I'm just objecting to the form. If you
17  understand the question you can answer it.
18      THE WITNESS: Okay. Would you please repeat your
19  question?
20      MR. SHIMOTA: Q Given your current understanding of
21  U.S. patent law, do you regret your -- regret your
22  decision not to include yourself as an inventor on the
23  shaver cleaning system?
24      MR. PATTON: Same objection.

**Page 140**

1      THE WITNESS: But I can still answer the question so
2  far, I do regret because I was not fulfilling the
3  American or U.S. patent law. I didn't know of it. This
4  particular case I'd say in -- if I would have known,
5  certainly I would have put my name on the invention.
6  But I didn't know that thing that it's necessary or it's
7  a must or it's law. I didn't know that. So and so far
8  I regret that I didn't put my name on the U.S. patent
9  application.
10      MR. SHIMOTA: Q And --
11      A    You see I'm not criminal.
12      Q    You had, I believe -- well -- do you have any
13  reason to disbelieve that in connection with the patents
14  I have marked as exhibits that you signed an oath which
15  attested, amongst other things, that you were an
16  inventor of those patents?
17      MR. PATTON: I object to the form of the question,
18  and I also object on the ground it's been asked and
19  answered.
20      THE WITNESS: It's a little bit confusing for me the
21  question. Would you please repeat it?
22      MR. SHIMOTA: Q Do you have any reason to disagree
23  that in connection with your issued U.S. patents that
24  you signed an oath in each which attested to, among

35 (Pages 137 to 140)

Dietrich Pahl    April 28, 2005

Page 141

1 other things, that you were an inventor of those
2 patents?
3     MR. PATTON: Same objection.
4     THE WITNESS: I'm not quite clear about the
5 beginning of your question. What you -- can you please
6 repeat it. Excuse me?
7     MR. SHIMOTA: Q Sure. Do you have any reason to
8 disagree that in connection with your U.S. patent
9 applications you signed an oath attesting to the fact
10 that you were an inventor on each of those patents?
11     MR. PATTON: I object to the form of the question.
12     THE WITNESS: I don't understand the question.
13     THE INTERPRETER: It's really too complicated with
14 three or four negative formulations.
15     MR. SHIMOTA: Let me try and reask the question.
16     THE WITNESS: Can you put the question in say in
17 separate --
18     MR. PATTON: My objection is that I think you asked
19 Dr. Pahl earlier if he recalled signing an oath, and he
20 testified that he did not. So that's one of the reasons
21 I think the question is confusing.
22     MR. SHIMOTA: Q It is a different question. But in
23 connection with your U.S. patent applications, did
24 anyone explain to you the duty of candor?

Page 142

1     A What's candor?
2     THE INTERPRETER: You have say the truth, to be open
3 and say everything that is the truth.
4     MR. SHIMOTA: Q That you have the duty to tell the
5 truth in U.S. patent applications.
6     A I think telling the truth is quite common
7 thing. It doesn't apply only for American patent
8 applications.
9     MR. PATTON: The question is did anyone explain to
10 you the duty -- in connection with U.S. patent.
11     THE WITNESS: No. You mean what consequences it
12 would have had if I wouldn't tell the truth or what?
13     MR. PATTON: Well, I think the -- I think the
14 question asked did anyone explain to you in connection
15 with the U.S. patents the duty of candor.
16     THE INTERPRETER: Which is the duty to say the
17 truth.
18     THE WITNESS: No, nobody explained it to me, but if
19 it says it at the end of the thing I -- declaration
20 under -- knowing what's the wording there, I declare
21 under penalty of perjury and so on, so forth.
22 Expectation I have to tell the truth.
23     MR. SHIMOTA: Q Do you understand what perjury is?
24     A Punishment, I assume.

Page 143

1     THE INTERPRETER: False oath.
2     MR. SHIMOTA: Q Do you understand what filing a
3 false oath is?
4     A Yes.
5     Q Do you understand that there are consequences
6 associated with filing a false oath?
7     A Yes, sure.
8     Q And what is your understanding of what those
9 consequences are?
10     A That I don't tell you, but it's some type of
11 punishment. Let's put it that way. If I go into United
12 States they would catch me at the border and put into
13 jail, whatever. I don't know.
14     Q If you look again to your presentation again,
15 the future. Turn to B4855 if that makes sense.
16     You see there -- well, is this page discussing
17 as well the cleaning system?
18     A Let me look. Partly, yes.
19     Q Which parts?
20     A You see it says the page ahead, before, that I
21 wanted to make the functions and the handleability of
22 the shaver easier for the consumer. I put the heading
23 the shaver does everything on its own without the user
24 has to do anything such as cleaning or maintenance ever

Page 144

1 batteries, charging, et cetera. And then on the page
2 855 it gives you possible solutions and new features.
3 And it says that the user only had to do the following
4 things to shave in the morning. He put -- switches
5 shaver on, he shaves, and if he needs he has trimmer to
6 trim sideburns. Then once per year he renews the
7 cutting elements -- replace cutting elements, he cleans
8 the filter of the cleaning solution and he refills the
9 cleaning liquid. And the whole thing is being
10 controlled by fuzzy logic which at the time was a little
11 bit questionable thing at the time.
12     Q What do you mean by fuzzy logic?
13     A It was standing name for complicated electronic
14 logic. Had a certain meaning at the time. You should
15 know the word. It was in every newspaper, technical
16 magazine, fuzzy logic.
17     MR. VORBECK: Term of art fuzzy logic.
18     MR. SHIMOTA: Q Did you use fuzzy logic in your
19 shaver cleaning system?
20     A No, but at that time it was fashionable and in
21 presentation from time to time you put in some
22 fashionable words.
23     Q It indicates there or indicates on this
24 document, B4855, that the cleaning -- would you clean

36 (Pages 141 to 144)

Dietrich Pahl    April 28, 2005

Page 145

1 the filter and refill the fluid once per year?
2    A    Yes.
3    Q    Is that correct?
4    A    Right.
5    Q    So at that time you thought that you would only
6 need to clean the filter once a year?
7    A    Right.  If you look at the heading it mentions
8 future.  That was not the present state of art.  That
9 was the vision for some five years ahead.
10    Q    Why did you think it was five years ahead?
11    A    Even 10 years ahead, future, vision was the
12 purpose of that presentation.
13    Q    So at that time you thought the shaver cleaning
14 system would be introduced approximately 5 to 10 years
15 ahead into the future?
16    A    Even earlier introduced, but to have it in a
17 way done or designed or operated that you only have to
18 refill it and clean after one year was the ultimate
19 target.  Whether it's -- it could become reality or not
20 is not mentioned here.  It was -- purpose of that
21 presentation was to show visions where Braun can go to.
22    Q    At that time when did you think it was feasible
23 to have the shaver cleaning system introduced into the
24 market?

Page 146

1    A    As soon as possible.
2    Q    Did you have a timeframe in mind?
3    A    No.
4    Q    Did you think it would take more than three
5 years?
6    A    It can be.  Normal time of projects through put
7 in a company is round about 3 years, but I never thought
8 about that.
9    Q    I'm going to show you what has been previously
10 marked as defendant's Exhibit No. 3.  I ask you if you
11 recognize these pictures.
12    A    Of course.  These are first one.  Second one
13 looks similar, not quite, shaver is missing.  Okay.
14    Q    What is represented in this picture?
15    A    This is what I named the two -- one of the two
16 prototypes, however, with a modification in that area.
17    Q    What is the modification you're referring to?
18    A    This tower here looks to me like electric
19 motors or one electric motor.
20    Q    What is the purpose of that tower?
21    A    I can tell you -- apparently these are motors
22 for driving a pump or fan wheel or both.  I honestly
23 can't tell you that.
24    Q    Is this a picture of the original prototype

Page 147

1 that was built in Leon?
2    A    Yes.
3    Q    Is this the whitish device that you described?
4    A    No, that's one of the coarse ones, the two
5 coarse ones.  Remember?
6    Q    I was just wondering.  This is one of what we
7 called the functional models?
8    A    Correct.
9    Q    And how -- just if you can describe in words
10 how would the original prototype have differed from
11 what's represented in this picture, pictures?  Excuse
12 me.
13    A    As I mentioned the motors there or motor, looks
14 like whether it's one motor, and the shaver itself it
15 looks like different one -- I can't tell you.  But this
16 one definitely is something new to me.
17    Q    Would you say that again?  I didn't hear.
18    A    Something new to me, the tower.
19    Q    The tower?
20    A    The motors, motor.
21    Q    So you -- what you had seen developed you had
22 never seen this device with the motors and the tower?
23    A    No.  The lower part, yes, but not that one.
24    Q    Do you know whether Braun -- Mr. Braun had ever

Page 148

1 put motors at the top of the tower?
2    A    No, I don't know of.
3    Q    Do you know what happened to your original
4 prototypes after you left Braun?
5    A    No.
6    Q    Did you ever keep any of the prototypes in your
7 office or prototypes or functional models?
8    A    I can't tell you.  I don't know.  Really I
9 don't know.
10    Q    Did your functional models include both an
11 impeller and heater?
12    A    Yes, they did.
13    Q    Did your functional models also include a
14 bracket for insertion of the shaver?
15    A    What do you mean by bracket?
16    Q    Anything to support the shaving device.
17    A    As I mentioned, down in the cradle the two
18 rubber cushions and up there a quite narrow plastic and
19 partly rubber -- it's called ring or device to keep the
20 shaver that it doesn't fall left or right.
21    Q    That part that we discussed earlier, that
22 wasn't part of the cradle, right?
23    A    Which one wasn't?
24    Q    The part that you were discussing, the ring,

37 (Pages 145 to 148)

Dietrich Pahl    April 28, 2005

Page 149

1  was not part of the cradle, is that correct?
2     A   It was not part of the cradle. It was part of
3  the upper half of the cleaning center.
4     Q   And can you point to on that first picture
5  where the cleaning fluid container is?
6     A   That whole thing here is a container in which
7  the cradle reaches in. That is the cradle here. And
8  was filled up to some level with liquid.
9     Q   Okay. And so is the pump -- can you point me
10  to the pump in that picture?
11     A   The pump itself is sitting down there. Let me
12  turn around to verify. You cannot see it on the
13  picture. But it's down there on the bottom of the
14  container and the motor is sitting in the upper half of
15  the device.
16     Q   Can you tell me where the filter would have
17  been in this drawing as well or show me?
18     A   You cannot see the filter because it's sitting
19  -- this is the pump motor or fan motor and the filter is
20  sitting behind here, but in lower part.
21     Q   That's where the filtration is occurring in the
22  lower part?
23     A   In the lower part. That is the wet part, that
24  is the electric part. As I mentioned to you strictly

Page 150

1  divided by means of these two shelves, clamp, you push
2  here it opens -- opens the thing and you can tilt the
3  whole thing away.
4     Q   I see. You mentioned Mr. Schneider as a
5  designer. What did Mr. Schneider do to change this
6  design to, I guess, make it more pleasing?
7     A   Therefore I have to make you sketch.
8     Q   If I give you a piece of paper, could you do it
9  for me?
10     A   Sure.
11     Q   Mark this as defendant's deposition Exhibit
12  No. 32.
13     MR. PATTON: I only point out that Dr. Pahl is doing
14  this from memory.
15        (Exhibit 32 marked as requested)
16     THE WITNESS: Sure. Let's start with a shaver. See
17  here is the head and cradle, something like that,
18  internally, of course, it's the shape of the shaver head
19  and the thing went like that. And behind there was
20  sitting to make a bird's-eye view looked roundabout like
21  that with a shaver sitting in here, and it was a cradle
22  and here was the cartridge. Both at the time when we
23  had the cartridge standing -- sketches are different --
24  are difficult. Cartridge was little V shaped, was like

Page 151

1  that. That was the shaver cartridge.
2        Don't ask me now where pump was. Must have
3  been down there in the thing. It was overhanging. This
4  would be like that somehow. And then, of course, shaver
5  was in two contacts there. But the basic feature of the
6  concept was that when you have a bird's-eye view, look
7  from here, that you had a cartridge, I think the
8  cartridge was even like that, sitting here forming the
9  rear end of the cleaning center and the shaver was just
10  sitting outside there visible, not as immersed as in the
11  old original drawings from Leon, sitting there. And the
12  cradle was covered by means of that plastic box.
13  Somewhat understand. But you see the model the feature
14  was that I call it key shape, a little bit like a
15  keyhole.
16     MR. SHIMOTA: Q  Do you know when that design would
17  have been completed approximately?
18     A   No, no.
19     Q   Would it have been -- it would have taken a
20  period of months after you first talked with Mr. Braun
21  or would it have been --
22     A   Would have been quite a while. Say
23  three-quarters of a year could have been easily.
24     Q   Do you know why it took that amount of time?

Page 152

1     A   Pardon?
2     Q   Do you know why it took that amount of time,
3  three-quarters of a year?
4     A   I'm not 100 percent sure, but that's what I
5  guess, because development of that is not so easy,
6  designer come up with an aesthetic, the poor designer
7  like Braun has to get the bits and pieces into it. It
8  is most difficult.
9     Q   Do you know whether Mr. Schneider would be able
10  to provide some answer to that question for me?
11     A   I assume, yes, from his memory.
12     MR. SHIMOTA: We have to take -- switch tapes. Also
13  I mean, as I said, if you ever want to take a break,
14  just ask.
15     THE VIDEOGRAPHER: Here concludes tape 2. We're
16  going off the video record at 2:52 p.m.
17        (Off the record)
18     THE VIDEOGRAPHER: We are going back on the video
19  record at 3:07 p.m. Here begins tape 3.
20     MR. SHIMOTA: Q  Welcome back.
21        Have you reviewed any notes today to assist you
22  in recalling facts?
23     A   No.
24     Q   Did you bring any notes with you today?

38 (Pages 149 to 152)

Dietrich Pahl    April 28, 2005

Page 153

1    A    Well, I have American patent application with
2    me and my declaration.
3    Q    I'd like to mark as defendant's deposition
4    Exhibit No. 33 a document bearing the Bates number
5    B00856.1 to B861.
6        (Exhibit 33 marked as requested)
7    Q    I believe the German original is in the back
8    and English translation in the front. Ask you to take
9    your time, if you need to, whether you recognize at
10   least the German language documents.
11   MR. PATTON: Did you --
12   MR. SHIMOTA: Q I asked him if he recognized the
13   document.
14   A    Yes.
15   Q    You do?
16   A    Yes.
17   Q    What is the document?
18   A    You mean page 1?
19   Q    Do you know what the document is as a whole?
20   A    Yes.
21   Q    What is it?
22   A    It is page 1 the questionnaire or questionnaire
23   format from the patent department which I had to
24   supervise and there were questions whether -- in English

Page 154

1    and I have to give my comments on that.
2    Q    Is this your handwriting on this?
3    A    This is my handwriting.
4    Q    Was this document sent to both yourself and
5    Gilbert Greaves.
6    A    Yes.
7    Q    Do you know why it's it was sent to
8    Mr. Greaves?
9    A    It's common procedure.
10   Q    What department was Mr. Greaves again in?
11   A    He was business director of shavers and what
12   his -- I don't know what it was then I don't know.
13   Q    Do you know why it was common practice to sent
14   an invention application to a business director?
15   A    For instance, there's one question number 2, is
16   it proposed to implement the proposal in an existing or
17   future product. This might have been only business
18   director can answer.
19   Q    Did you answer that question, is that your
20   handwriting?
21   A    I did.
22   Q    What was your answer?
23   A    Eventually in the appliance 6016 is the code
24   name for top line shaver plus appliances which have been

Page 155

1    put into theory after '94.
2    Q    What was significant about the year 1994?
3    A    I don't know what was significant then, but you
4    normally don't put in a new -- a new cleaning center,
5    new item, new product into old age shavers. I would say
6    that was the reason I wrote '94.
7    Q    Does that refresh your recollection as to when
8    you thought the shaver cleaning center could be
9    commercialized?
10   A    No, no because I cannot tell you at what date
11   top line model 6016 was planned to be in production. I
12   cannot tell you off record.
13   Q    Do you know how I could find out when the 6016
14   was planned to be in production?
15   A    Yes, certainly could find out.
16   Q    How would I find that out if I needed to?
17   A    With the PPM, the program project manager.
18   Q    Do you know who the project manager for the
19   6016 was in -- at least --
20   A    Gentleman called Mr. Faulstich,
21   F-A-U-L-S-T-I-C-H.
22   Q    If you look at item 4 on this list, can you
23   tell me what your response to item 4 is or the first
24   response?

Page 156

1    A    The answer was yes because of the fact that our
2    competitors have got the same problems.
3    Q    Did you have reason to believe that your
4    competitors were also working on cleaning systems?
5    A    No, but I was aware that they had the same
6    problems, how to get rid of the dirt.
7    Q    You did tell the patents application they
8    should rush the filing of this patent application,
9    correct, or that you did believe it should be rushed, is
10   that correct?
11   MR. PATTON: I object to the form.
12   THE WITNESS: That's what I said, yes.
13   MR. SHIMOTA: Q Did you know of any other reasons
14   why there would be a need to rush?
15   A    No. But you normally answer the things with
16   yes or no and give a reason why you answer that. And if
17   you write no then it's normally the project is dead.
18   The question is -- you have it quite correct translated
19   is it particular rush requested and -- you write no then
20   the project would be dead. Ever since I was a sponsor
21   for project and co-inventor I was interested in getting
22   it off the road. And I was convinced it was a good
23   thing right away.
24   Q    You said the translation is not quite correct.

39 (Pages 153 to 156)

Dietrich Pahl    April 28, 2005

Page 157

1  What --
2      A    Your translation of the question is correct,
3  but the answer wasn't -- hasn't been translated because
4  they couldn't read my writing, I assume.
5      Q    What was your answer to the second question
6  under point 4?
7      A    That's a funny question.  Is contact with third
8  parties intended?  This is in the moment when due to any
9  reason a sub supplier for any item is necessary to have,
10 let's say, for instance some guy who develops liquid for
11 the shaver.  In this particular moment you do -- if you
12 go to the sub supplier and he gets aware about what you
13 are doing there and he might file patent on it, and to
14 avoid that it's a question whether contact with third
15 party is necessary, is intended and at this point in
16 time there was none, that's why I put no in.
17     Q    Is that also asking whether there would be
18 potential contact with testing agencies?
19     A    That could include it, yes, but normally we
20 have testing agency, our test department here in house.
21     Q    Did any third parties perform tests on the
22 shaver cleaning device?
23     A    It didn't happen, no, but you could ask a third
24 party, but normally we test all appliances first in our

Page 158

1  house here and they are very strict so you don't need a
2  third party.
3      Q    You have no recollection of any third party
4  testing the shaver cleaning device in this timeframe
5  approximately?
6      A    No.
7      Q    Can you look to point 5?  I'll ask you what
8  your answer to point 5 was.
9      A    See enclosure is what it stated, but don't ask
10 me what enclosures that were.  Are the enclosures
11 attached to the thing here?
12     Q    Well, my question for you is, did you attach
13 enclosures to this memo?
14     A    Apparently, yes, because I wrote it there.
15     Q    And you would have provided this memo and the
16 enclosures to the patent department, am I right?
17     A    Yes.
18     Q    And do you recall what those enclosures were?
19     A    Unfortunately not.  Unfortunately not.
20     Q    And what is the question under point 5?
21     A    Are you aware about -- of prior art going
22 beyond the details in the invention indication.  It's
23 correctly translated.
24     Q    At the time -- around this time was it your

Page 159

1  practice to monitor prior art related to projects that
2  you were working on?
3      A    No.  It's basically this is mostly objective of
4  the patent department, but I can't tell you -- what I
5  mean -- what were the attachments.  I haven't a clue.
6  It's very long ago.
7      Q    Do you have any reason to believe that the
8  patent department did not receive what you submitted to
9  them?
10     A    No.  They received everything.
11     Q    Why do you say they received everything?
12     A    Normal inhouse mail was perfect.
13     Q    I take it that before preparing this document
14 you reviewed Mr. Braun's invention application?
15     A    Yes, that was attached to it.
16     Q    Do you know whether Mr. Greaves also reviewed
17 the invention application?
18     A    I don't know.  I don't get feedback of him.
19     Q    Did you discuss the invention application with
20 Mr. Greaves?
21     A    No, no.
22     Q    Did Mr. Greaves ever ask you any questions
23 about the invention applications?
24     A    Not that I'm aware of.

Page 160

1      Q    Do you know which lawyer you provided -- which
2  lawyer in the patent department you provided this
3  document to?
4      A    Well, there was one gentleman called Mr. Klauer
5  who was dealing with all shaver related applications and
6  he got the thing certainly.
7      Q    Would you have hand -- you would have placed
8  this in the mail and reached him through the mail?
9      A    Yes.
10     Q    How do you know that Mr. Klauer was in charge
11 of -- did you say patents on shaver developments?
12     A    Yes, on all.
13     Q    How did you know that?
14     A    Because we worked together with him so every
15 designer went to him presenting him the thing and -- his
16 idea, and, of course, we discussed from time to time
17 with Mr. Klauer and myself discuss the thing, and there
18 were the monthly patent reviewing meetings when he would
19 present us the shaver or his side, the shaver related
20 patents, and we're to decide whether we continue in
21 pursuing it yes or no.  So it was quite clear that
22 Mr. Klauer was the one -- the man who was dealing with
23 shaver, dry shaver patents.
24     Q    You say the monthly patent reviewing meetings.

40 (Pages 157 to 160)

Dietrich Pahl    April 28, 2005

Page 161

1    A    Yes.
2    Q    What were those?
3    A    Well, there were basically decisions to be made
4    whether one applies for a patent in Germany or in
5    different country or which country, whether one should
6    not pursue the patent, let it fall because it's of no
7    use and this -- the patent costs are too expensive to
8    save money, so on, so forth. Basically decision on what
9    happens to the patent.
10    Q    Did you attend these meetings?
11    A    Yes.
12    Q    Was your attendance at these meetings required
13    as part of your job responsibilities?
14    A    Yes.
15    Q    Were documents distributed at these meetings?
16    A    Yes, basically what they do, they put first
17    picture of the patent, with picture you know, so you
18    know what the patent is dealing with, and the different
19    countries where it's being filed, where we could
20    eliminate countries, et cetera, et cetera, to save cost,
21    this type of thing.
22    Q    Was the shaver cleaning system ever discussed
23    in one of these monthly patent reviewing meetings?
24    A    No.

Page 162

1    Q    Why -- do you know why not?
2    A    I'm sure because as long as I was in charge
3    there was not the issue to where one should withdraw
4    patents in which country because it was apparently brand
5    new then or not even filed in our countries. So on
6    these meetings, normally these meetings only they deal
7    with existing patents.
8    Q    So this monthly patent review meeting, the
9    monthly patent review meetings, the discussion, the
10    topic of discussion was a filed patent application?
11    A    Correct --
12    Q    So the -- How -- To your knowledge in general
13    how soon after the patent application was filed would
14    that patent application be discussed in a monthly
15    meeting?
16    A    I haven't a clue. I haven't a clue. I'm sure
17    there's not a certain timing set on it. Just comes up
18    let's say the question we have to pay United States for
19    a patent in two months, shall we pursue the patent
20    rights here, should we let it fall down, that type of
21    thing. Depending on the actual necessity.
22    Q    I understand. Did you -- You left the -- I
23    forgot your title. Director of shaver research and
24    development, is that what -- let me just look for it.

Page 163

1    The head of the dry shaver development group, you left
2    that position in May of '95?
3    A    Yes.
4    Q    And from the period -- up until May of '95,
5    would you have attended all these monthly patent review
6    meetings?
7    A    Yes.
8    Q    After May of '95 did you stop attending the
9    monthly patent review meetings?
10    A    Not entirely. When I was asked to attend them
11    I went there, but this was on a necessity basis, not
12    regular basis.
13    Q    I assume after May of '95 when you were
14    attending on an intermittent basis -- when you were
15    attending on an intermittent basis these meetings, was
16    the topic of discussion ever the shaver cleaning system
17    patent applications?
18    A    No.
19    Q    After the monthly patent review meetings, was
20    there ever any documents presented regarding the results
21    of the meeting?
22    A    I don't know whether internally the patent
23    department, but I'm sure there will be something, but it
24    would have -- would not have been distributed to the

Page 164

1    people attending the meeting.
2    Q    In addition to the provision of the patents,
3    the front page of the patents with the figures that you
4    discussed, were any other documents provided to you at
5    these patent review meetings?
6    A    No.
7    Q    So it would have been just a copy of at least
8    the front page of the patent application?
9    A    Right.
10    Q    If you could turn to B857, be the German or
11    English. I suppose if we both look at the English,
12    that's what I'll be working with. In the third
13    paragraph, first sentence it states, the cleaning
14    principle is based on the finding --
15    MR. PATTON: If you turn the page. This is the
16    German, this is the English.
17    MR. SHIMOTA: Q    It states that the cleaning
18    principle is based on the finding that the shaving head
19    on electric shaver cleans itself without disassembly, it
20    is continuously immersed in an appropriate cleaning
21    liquid.
22    At the time you read this document, did you
23    agree with Mr. Braun?
24    A    Yes.

41 (Pages 161 to 164)

Dietrich Pahl    April 28, 2005

Page 165

1    Q    Why did the shaving head need to be continually
2  immersed in the appropriate cleaning liquid?
3    MR. PATTON: Object to the form of the question.
4    THE WITNESS: Let's put it the other way. If it is
5  in the air without liquid around you cannot clean.
6    MR. SHIMOTA: Q  So you need a liquid in the cradle
7  in order to clean?
8    A    That's it.
9    Q    It also states there -- makes reference to an
10 appropriate cleaning liquid. Did you have an
11 understanding of what was an appropriate cleaning liquid
12 for the cleaning system?
13    A    As I mentioned prior it has to be grease
14 dissolving, lowest possible viscosity and it would
15 smell.
16    Q    Did you select a particular cleaning liquid?
17    A    Alcohol.
18    Q    You're talking about methyl alcohol, ethyl
19 alcohol?
20    A    It is methyl alcohol. I'm not 100 percent
21 sure, but I think it's the primary thing.
22    Q    Were there any additives?
23    A    Little bit of grease, of oil to lubricate the
24 cutting elements, and a fragrance.

Page 166

1    Q    Do you know what the fragrance was?
2    A    No.
3    Q    What did the fragrance smell like? Can you
4  describe that for me?
5    A    It's difficult to describe.
6    Q    For example, did it smell like mint?
7    A    We actually tried with mint and all different
8  type of thing, and at the end of the day what you have
9  to do you have to do to run the test, smelling test and
10 they make dashes who likes it most at the end of the
11 day, you decide on the quantity of the majority.
12    Q    Did there ever come a time where you determined
13 there was one particular fragrance that users liked the
14 most?
15    A    Not as long as -- not during the time when I
16 was in charge of the thing.
17    Q    You also mentioned you included a lubricant.
18 Why did you include a lubricant?
19    A    As I mentioned to grease the cutting elements
20 because if you clean a shaver thoroughly with alcohol,
21 you also dissolve wanted grease. Wanted grease is
22 little bit complicated to explain, but if you make a
23 cross section --
24    Q    Want me to give you another piece of paper?

Page 167

1    A    No, that's okay. Like that. You see this is a
2  cross section through a bridge between two holes. This
3  is metal, in our case nickel. In this case cutter block
4  is oscillating underneath this. This is the skin side,
5  this is the internal side. And the normal grease of the
6  skin is being deposited in here, and it forms a type of
7  greasing so that -- which lubricates the part where
8  cutter blade touches the foil.
9         If, however, by using alcohol as cleaning fluid
10 as part of our cleaning method this grease will
11 disappear, natural grease from your skin. So -- you
12 would have what we call a dry friction. This would mean
13 that the foil would be -- cutter block would be worn too
14 fast. To overcome that you add a little bit of oil into
15 the alcoholic cleaning liquid.
16    Q    Do you know how much oil you would add to
17 the --
18    A    No, I can't tell you.
19    Q    Was the cleaning liquid produced at Braun
20 itself?
21    A    At the beginning, yes, we did the mixer on our
22 own in Leon, then I took the cleaning liquid from that
23 spray thing we mentioned earlier, the cleaning set it
24 was called from here in Braun and later on we developed

Page 168

1  or start developing right cleaning liquid with an
2  external company who was specialized in the thing.
3    Q    What was the name of that external company?
4    A    I only know that it was -- it was situated in
5  Wolflaratshausen south of Munich.
6    Q    Was it Inchem, I-N-C-H-E-M?
7    A    No, no, doesn't ring a bell.
8    Q    Do you know when you would have been working
9  with the third party on the cleaning liquid?
10    A    It was actually at the end of my being there
11 in -- with the development department, '95 somewhere,
12 early '95.
13    Q    As between -- if I asked you this morning, I
14 apologize, who provided the spray cans with the
15 cleaning fluid to Braun?
16    A    I don't know either.
17    Q    Do you know how I'd find out?
18    A    Could have been the same company, but I'm not
19 sure. Forget about it. I'm not sure.
20    Q    Do you know how I could find the answer to that
21 question?
22    A    No chance. If Mr. Braun doesn't know --
23    Q    As between the cleaning liquid from Leon and
24 the cleaning liquid in the spray can, which did you

42 (Pages 165 to 168)

Dietrich Pahl   April 28, 2005

Page 169

1  prefer as the cleaning liquid?
2      A   I personally preferred the one from Braun
3  simply because they had a constant parameters.  If you
4  mix the stuff on yourself you never know how many
5  percentage oils in there and so on, so forth.  So the
6  one which was in the spray bottle from Braun had always
7  the same mixture oil and alcohol.
8      Q   Did the spray can have any fragrance to it too
9  in the mixture?
10     A   Oh, yes, little bit.
11     Q   Would you have started working with the spray
12  can soon after you -- the Leon facility closed?
13     A   Yes.
14     Q   Turn to the next page of Mr. Braun's invention
15  disclosure.  Under point 3 it is stated in the last full
16  paragraph, the development of a shaver special model
17  that is to be cleaned exclusively automatically is also
18  imaginable.
19         At the time that Mr. Braun filed his invention
20  application, wasn't it the intention that the device
21  would work to clean a shaver exclusively automatically?
22     A   Sure it was.
23     Q   Do you know -- do you have --
24     A   Wait a minute.  Just read the German.  The

Page 170

1  German version it says, it's also imaginable to develop
2  a shaver special model which is designed exclusively for
3  automatic cleaning.  Apparently has some ideas that if
4  the cleaning device doesn't suit the shaver then the
5  shaver has to be adapted to the cleaning device.  That's
6  what he says here in his German version if I take that
7  freely.
8      Q   So at the time --
9      A   It says here shaver special model, but special
10  model is -- it's not quite what he meant with sonder
11  model.
12     DR. STUTIUS: That's literal translation.  The
13  special should be in front of the English.
14     MR. SHIMOTA: Special shaver model.
15     DR. STUTIUS: Yes, poor translation.
16     MR. SHIMOTA: Q   Were you aware of any work on the
17  special shaver model at the time?
18     A   No, hasn't been done.
19     Q   So at the time had there been any work done --
20  well, was the work that was being done solely on the
21  cleaning system or was it working on the cleaning system
22  integrated with a shaver?
23     A   I didn't get your question.
24     Q   Sure.  Maybe it was not as clear.

Page 171

1          In the 1993 timeframe were you at a point yet
2  where you were working solely on the cleaning system or
3  were you working on the integration of the cleaning
4  system with a shaver as well?
5      A   Well, we were working with the top line model
6  shaver and designing for that particular type the
7  cleaning device and there are two aspects which you have
8  to take into consideration.  Basically it's the form or
9  the shape of the cradle and the length or the height of
10  the shaver.  So this you can do exchangeable.  Let's say
11  for shaver 1, you have narrow, for shaver 2, you have
12  bigger one, wider one, and concerning the length where
13  you have later on this press button, this thing, this
14  you have to vary depending on the length of the shaver.
15  That's it basically.
16         So, of course, what you do, you choose the top
17  model shaver and design the cradle and the length of the
18  business for -- where you position the press button
19  based on the dimensions of the top line shaver because
20  with that top line shaver naturally it's easier to sell
21  such a product, deluxe product.
22     Q   One thing -- do you recall or -- one thing that
23  I don't see in this device or this invention application
24  is any discussion of the removable cartridge which I

Page 172

1  think we discussed earlier.  Is that consistent with
2  your recollection of this document?
3      A   With what --
4      Q   With Mr. Braun's invention application.
5      A   I didn't get your question.
6      Q   Yeah.  Is it your recollection -- is it your
7  recollection that Mr. Braun described the removable
8  cartridge in this invention application?
9      A   What means recollection?
10         Sure.
11     Q   Can you point me to where he describes that?
12     A   Within the application?  Within here?
13     Q   Uh-huh.
14     A   I have to look for it.
15         It's not mentioned in here, but here's two
16  patent applications, and possibly it's the second one
17  then.
18     Q   Two invention disclosures?
19     A   Two inventions, yeah.
20     Q   Did he have any more than two?
21     A   I don't know.
22     Q   Do you have any recollection of reviewing more
23  than two?  Well, excuse me.  One step at a second.
24         Had you ever seen his supplemental invention

43 (Pages 169 to 172)

Dietrich Pahl    April 28, 2005

Page 173

1  application?
2      A    This one and the second one, United States
3  second one, those are there.
4      MR. PATTON:  No.
5      THE WITNESS:  Maybe in my suitcase.
6      MR. SHIMOTA:  Q  When you say United States second
7  one, what do you mean?
8      MR. PATTON:  I think we're mixing up.  Maybe it's
9  some terminology.  What you're looking at is the
10  invention disclosure?
11      MR. SHIMOTA:  Yes.
12      MR. PATTON:  Just so everybody is clear on the
13  record, are you saying there's a second invention
14  disclosure?
15      THE WITNESS:  There should be one.  As far as I know
16  there was in the second one mentioning the cartridge
17  business, cartridge design.
18      MR. SHIMOTA:  Q  Do you recall ever having seen an
19  invention disclosure which talked about --
20      A    No, I only know it from the patents.
21      Q    So from after having reviewed the U.S. patents,
22  you're aware that there's discussion of cartridge?
23      A    Right.
24      Q    And so, to your recollection, you've never seen

Page 174

1  another Braun -- another Gebhard Braun disclosure record
2  pertaining to shaver cleaning system.  I'm not talking
3  about the U.S. patent application.
4      A    I can't tell you 100 percent I can tell you to
5  be honest.
6      Q    I'll just mark it, ask if you've seen it.
7      Let's mark as defendant's Exhibit No. 34
8  document bearing the Bates number Braun 1074 to 1075.
9  Actually it's to 1076.
10      (Exhibit 34 marked as requested)
11      Q    I'd just like to ask you if you've ever seen
12  this document before.
13      DR. STUTIUS:  Where's the German version?
14      MR. PATTON:  This is English translation.
15      MR. SHIMOTA:  Q  The German is there too, isn't it?
16      A    The only thing I know are the drawings here,
17  but the rest of the docket --
18      DR. STUTIUS:  There is a German version, I believe.
19  We don't have it.
20      THE WITNESS:  Only describes the back and forth of
21  clock, anticlockwise clutch you can say for driving the
22  fan wheel and the pump.
23      MR. SHIMOTA:  Q  You do recognize the figures I
24  assume?

Page 175

1      A    The figures I recognize.
2      Q    Can you see the removable clean fluid cartridge
3  anywhere?
4      A    No.  Not in the drawing and not in description.
5      Q    If we could turn back to -- marked as
6  Exhibit 33.
7      MR. PATTON:  Which one?
8      MR. SHIMOTA:  Q  Mr. Braun's first disclosure
9  record.  If you could turn to Braun 858 to point 4.
10  Under the first point there's a reference by Mr. Braun
11  to a shaken beaker for shaping heads.
12      A    Yes.
13      Q    Did you know -- pardon me -- what was the
14  shaking beaker for shaving heads?
15      A    I don't know whether this has ever been
16  marketed.  I'm not aware of it, looks like a cartridge
17  for film, like film, and there was some liquid in, don't
18  ask me which one people should put in the cutter block,
19  and liquid -- close the cover and shake it.  That was
20  it.
21      Q    How did you know about that device?
22      A    That was zooming around or flying around there
23  I've seen here.  It was a gimmick.
24      Q    Do you know what timeframe this was being

Page 176

1  worked upon?
2      A    No, must be old age and -- hard to sell I would
3  say.
4      Q    Sure.  The next reference there is to a patent.
5  Says the previous state of the art is shown in U.S.
6  Patent No. 3,721,416.  Do you see that?
7      A    No, I don't know that patent.
8      Q    Did you give that patent to Mr. Braun?
9      A    No.  I don't know it.
10      Q    I take it you never -- never reviewed it?
11      A    Never saw it, no.
12      Q    So did you -- he discusses the state of the art
13  and his discussion of the -- and the drawbacks of the
14  state of the art.  Did you understand his --
15      A    By reading through it, yeah, but I never saw
16  pictures or the figures.
17      Q    I assume because you've never seen this patent
18  before that was not the enclosures as included -- one of
19  the enclosures included with this that you've provided
20  to the Patent Office, correct?
21      A    It was nothing included in that thing here so I
22  would have been very conscious.  I would have gone down
23  to the patent department, ask the guys, please, show me
24  that patent, but with the description I could see state

44 (Pages 173 to 176)

Dietrich Pahl    April 28, 2005

Page 177

1  of the art, that's it.  And I had not too much time at
2  the time to fill out every bits and pieces here.
3      Q   I mean my question is slightly different.  We
4  discussed earlier that there were enclosures included
5  with this, and because you have no familiarity with this
6  listed patent I assume then that it would not have been
7  one of the enclosures which you provided to the patent
8  department, correct?
9      A   That's correct.
10     Q   Put this aside.  I'm going to show you what's
11 been previously marked as Rayovac -- defendant's
12 deposition Exhibit Nos. 9 and 10.  It's actually two
13 memos attached there.  I'd ask if you could look at both
14 and ask if you recognize the German originals.
15     A   To be honest I don't recognize, but since my
16 name is on it we have read it.  I do not remember the --
17     Q   Sure -- we'll start with the first one.  You
18 see at the top of this memo there's listed meeting
19 notes.
20     A   Yes.
21     Q   Was it the regular practice of engineers to
22 take meeting notes?
23     A   If they felt it was of high importance,
24 apparently they did.  And I assume this has one has been

Page 178

1  done by Mr. Smetana who signed this thing.  Smetana was
2  lucky man working in research and in research you have
3  time to write loads of memos, not in the drawing
4  department or developing department.  So it was not in
5  my department not usual to write memos.  In my
6  department didn't have time to write memos.
7      Q   Did you ask Mr. Smetana to do anything with
8  respect to --
9      A   No.
10     Q   How -- You understand from this memo
11 Mr. Smetana was working on dryer for the shaver cleaning
12 system?
13     A   Mr. Smetana it was specialist in designing fan
14 wheels and did a good job on designing them for hair
15 dryers to make them more efficient with higher
16 efficiency you could reduce the speed and with reducing
17 speed you could reduce the noise.  I think he was one of
18 the fathers of silent hair dryers which we had at the
19 time, and possibly Mr. Braun asked him to design a fan
20 wheel that's little appliance that's called shaver
21 cleaner.
22     Q   Did you ever monitor any of the work done by
23 Mr. Smetana?
24     A   No, nothing.

Page 179

1      Q   Did you ever communicate with him?
2      A   No.
3      Q   Aside -- I assume you were at this meeting?
4      A   No, I wasn't.
5      Q   This memo does not -- it states participants,
6  correct?
7      A   Yes.  Participants were Mr. Braun and
8  Mr. Smetana, and as usual it says give copy to Mr. Braun
9  and Mr. Smetana and also to Dr. Pahl and Dr. Jung.
10     Q   Can you look -- is this a mistranslation?
11 DR. STUTIUS:  That's a comma after participants in
12 English, I believe.
13 THE WITNESS:  First participants, second Pahl and
14 then Jung.
15 MR. SHIMOTA:  Q  Do you believe he you would have
16 reviewed this memo?
17     A   He wanted to make public relation for himself
18 that he did something.  That's the simple reason why
19 they write a memo.
20     Q   So --
21 THE INTERPRETER:  A reason for existing.
22 MR. SHIMOTA:  Q  I take it then that you weren't --
23     A   Because Dr. Jung was his boss at the time.
24     Q   Were there any problems with the drying device

Page 180

1  in approximately August of '93?
2      A   No.  With the drying device?
3      Q   In shaver cleaning system there's heater and a
4  blower, correct?
5      A   Yes.
6      Q   Was it your belief in approximately August of
7  '93 that the drying device was working perfectly?
8      A   Only thing I can speculate on that is to reduce
9  the size of the it whole cleaning center.  Braun had to
10 reduce the size of the diameter of the fan wheel.  To
11 find a guy who could help him he went to Smetana who is
12 specialist and ask him can you please design a fan wheel
13 which is smaller than the one he had developed in the
14 type hair dryer, and that's what then came up.
15     Q   So you think Mr. Braun asked Mr. Smetana for
16 help?
17     A   Yes, only explanation I can have on that.
18     Q   Can you think of any reason why Mr. Braun would
19 have told me yesterday that you asked Mr. Smetana for
20 help?
21 MR. PATTON:  Object to the form of the question.
22 THE WITNESS:  Then he has a better memory.
23 MR. SHIMOTA:  Q  Is there anyone else aside from
24 yourself and Mr. Braun who could have asked Mr. Smetana

45 (Pages 177 to 180)

Dietrich Pahl   April 28, 2005

Page 181

1  to perform work on the dryer for the shaver cleaning
2  system?
3      A   No.  But I'm definitely not aware that I asked
4  him.
5      Q   You're definitely not aware or you definitely
6  did not ask him?
7      A   I'm not aware.
8      Q   Well, do you have any reason to disagree with
9  the second sentence which states, the drying times are,
10  however, still too long according to Mr. Braun or the
11  drying result is not satisfactory, and that was the case
12  in August of '93?
13      MR. PATTON:  Well, I object to the form of the
14  question.
15      THE WITNESS:  Can you please repeat it?  I don't
16  know what I should answer on that.
17      MR. SHIMOTA:  Q   Let me reask it.  I think you told
18  me earlier when you provided the -- head of Braun his
19  wife told him that the -- too noisy.
20      A   Right.
21      Q   Was that as a result of the fan noise?
22      A   No, it was more than.  As I mentioned to you
23  already the rattling of the shaver causing vibration in
24  the hold box and you then see the design here it's built

Page 182

1  like a loud speaker.  So if you have an element here, an
2  electric shaver which oscillates and gives vibration
3  onto the housing and you have the noise.  Ventilator
4  doesn't create much noise.
5      Q   Do you have any recollection of what actual
6  blower was used in the shaver cleaning system around
7  1993?
8      A   I can't tell you anymore.
9      Q   If you needed to find out the answer to that
10  question, who would you ask?
11      A   The only thing I could do and try to find the
12  old models and see what was in there.
13      Q   Do you know whether Mr. Smetana would know the
14  answer to that question?
15      A   I cannot speculate what he knows, but you can
16  try.
17      Q   Have you ever met Mr. Smetana?
18      A   Sure, I know him.
19      Q   And did you ever speak with him about the
20  shaver cleaning system?
21      A   Not about the shaver cleaning system as far as
22  I recall.  To say hello, good morning and so because he
23  was not in research guy for dry shavers as such.
24      Q   Let's turn to the next memo, see if you

Page 183

1  recognize that document.
2      A   Okay.
3      Q   The question is, do you recognize the document?
4      A   Well, I know that I asked for this type of
5  meeting, and I'm sure I've read it, but not fresh in my
6  memory.
7      Q   You said you knew you had asked for this type
8  of meeting?
9      A   Especially for case of the approval from the
10  point of view of safetiness.  I know that we had
11  explosive stuff in this thing and electricity and motors
12  which create brush fire, and if you put one to one
13  together it might explode.
14      Q   Who is VDE?
15      A   This is the German Electrical Association and
16  -- sorry.  It's even more.  It's what in America is UL.
17  United --
18      Q   Underwriters Laboratory?
19      A   Underwriters Laboratory, that's VDE in Germany.
20      Q   And I take it that you -- well, let me ask.
21  Did you request that one of your prototypes be tested by
22  VDE?
23      A   No, I did not request, but I did request that
24  the experts from VDE or whoever could ask them what do

Page 184

1  we have to observe when we design a machine like that,
2  with alcohol and sparking in it and to be on the safe
3  side because doesn't mean anything if you design a
4  machine, have expensive prototypes being made and later
5  on the UL or the VDE people come along can scrap it.  So
6  that's what we mean by first stages of the project,
7  rather first stages test to be cleared, what can happen
8  from the point of view of approval authorities.
9      Q   Do you see the name Mr. Krauss/VDE?
10      A   Yes.  He's the guy responsible for that thing
11  at VDE, I don't know him.
12      Q   Do you know -- let me ask this question.  I'm
13  sorry.  Were you finished?
14      A   No, go ahead.
15      Q   Do you know if anyone from VDE came to Braun
16  and inspected any of the prototypes?
17      A   I don't know, but from what I see he was there.
18  He was -- appliance has been presented to him and he
19  gave his recommendation on it.
20      Q   If you look down to what was the fourth
21  paragraph, second sentence, it states a mechanical lock
22  is necessary so that the shaver can only be used when
23  dry.
24      A   Yes.

46 (Pages 181 to 184)

Dietrich Pahl    April 28, 2005

Page 185

1    Q   Was a mechanical lock ever included in the
2   shaver cleaning system?
3    A   Not in this one you're not, but it was always
4   be on the target list that has to be done -- has to have
5   any lock. You see the early days we had to tie off
6   electrical lock already in, but it was an objective to
7   design an interlock, and so far that's a wet shaver.
8   The shaver with a wet head could not be taken out of the
9   appliance because of the fact that if you turn the
10  shaver around with the head upwards, the liquid can go
11  into the body of the shaver and cause there problems
12  from corrosion up to explosion.
13   Q   In development upon your original prototype was
14  there a mechanical interlock ever included?
15   A   In the development of the original prototype,
16  this one here?
17   Q   No. Look at the figures. I think we have it
18  in another marked document. I think it was this
19  document here.
20   A   Yes.
21   Q   If you look at the figures. Could you point me
22  to where, if anywhere, there's the mechanical interlock?
23   A   In the area 3.
24   Q   Is it the cap on top or --

Page 186

1    A   The push button there was some spring-loaded
2   device in the thing as far as I recall.
3    Q   So is it the -- this L-shaped area at the top?
4    A   No, within that thing here. This portion.
5    Q   Okay. Prior to June of '93 was that spring
6   portion not included?
7    A   Sorry. I can't tell you.
8    Q   You don't know?
9    A   No, I don't know.
10   Q   Did you convey -- did you ever convey the
11  recommendations of VDE to anyone?
12   A   What means convey?
13  THE INTERPRETER: Pass on.
14  MR. SHIMOTA: Q  Did you tell anyone about the
15  recommendations of VDE?
16   A   It was not necessary because the guy who are
17  involved in the thing are on the distribution list. I'm
18  sure I think the things with Mr. Cimbal, I direct
19  report -- reported directly to me, and based on that
20  redesign or its modification of the design has to be
21  redone.
22   Q   Did you discuss the recommendations of VDE with
23  Mr. Braun?
24   A   I'm not aware of that, but I'm sure should have

Page 187

1   done, but --
2    Q   You're saying you're sure --
3    A   I did. I'm not aware. I cannot prove that
4   thing.
5    Q   But --
6    A   Normally, of course, you say look, Mr. Braun,
7   that's so and so, but I'm -- I don't recall a detailed
8   meeting of it at the point in time when I discussed the
9   thing.
10   Q   Do you know -- do you believe it's likely that
11  you would have provided this memorandum to Mr. Braun?
12   A   Definitely, yes.
13   Q   Did you say definitely?
14   A   It's my normal job to do. Did Mr. Braun say no
15  of this thing?
16   Q   I don't know his testimony exactly so I don't
17  want to misrepresent it.
18   A   Okay.
19   Q   Do you recall -- also looking back at this memo
20  there's a statement that the device is top heavy.
21   A   Yes.
22   Q   Do you recall the shaver cleaning device having
23  the problem of being top heavy in approximately June of
24  '93?

Page 188

1    A   No, I don't recall that.
2    Q   And the next statement or the next paragraph it
3   states before the beginning of the test the medium
4   cleaning fluid must be tested for absolute safety with
5   respect to health inflammability and danger of exploding
6   or documentary evidence should be forthcoming.
7       Do you know whether the cleaning fluid was ever
8   tested?
9    A   No, I'm not aware of that.
10   Q   Would you have been in charge of testing the
11  cleaning fluid?
12   A   No. This is actually due to our quality
13  department which has been represented by Mr. Stigler who
14  wrote that memo.
15   Q   So Mr. Stigler would have been in charge of
16  testing the cleaning fluid?
17   A   Yes.
18   Q   Do you know whether Mr. Stigler actually did
19  test the cleaning fluid?
20   A   I don't know.
21   Q   This memo is to a Mr. Schaeffer.
22   A   Yes.
23   Q   Do you know why this memo would have been sent
24  to Mr. Schaeffer?

47 (Pages 185 to 188)

Dietrich Pahl    April 28, 2005

Page 189

1    A    No, I cannot -- I don't know why it went to him
2    because as far as I know at this time Mr. Braun did not
3    report to Mr. Schaeffer. I don't know why Stigler wrote
4    that one to Schaeffer. I can't tell you. Sorry.
5        Q    I think we talked about the name Cimbal,
6    Faulstich, got -- Mr. Gebert?
7        A    Gebert is quality probation department,
8    approval department within the quality organization
9    because Braun is boss of Stigler has to be informed by
10   nature. I have to be informed because I'm the boss of
11   Schaeffer.
12       Q    You were the boss of Schaeffer. Was Mr. Braun
13   underneath Schaeffer?
14       A    I'm not sure. At this time I'm not -- I don't
15   believe that Braun reported to Schaeffer because Braun
16   reported to me. I had three guys reporting to me. One
17   was Schaeffer, one was Cimbal and another one then Braun
18   who was on special assignment reporting to me.
19       Q    Braun, what was his special assignment?
20       A    That he reported directly to me, not through
21   Mr. Schaeffer, for instance.
22       Q    If you look at the second send sentence of this
23   memo, it states the device was attested according to VDE
24   0700 part 1 in conformity with other norms, e.g. for

Page 190

1    dishwashers or medical apparatus. Do you know why the
2    device was tested in accordance with --
3        A    Doesn't mean anything to me.
4        Q    To your recollection was Mr. Stigler the
5    liaison with the VDE contact regarding this device?
6        A    Yes. He was -- yes, in former times dealing
7    with VDE, especially when Braun still had the hi fi
8    department. He was -- he would be the hi fi appliances
9    and be --
10       Q    You mean stereo equipment?
11       A    Hi fi.
12       Q    That's okay. In the last sentence it notes
13   that absolute safety with respect to -- well, it --
14   there's a recommendation that there be testing at the
15   PTB in Braunschwaeg. Do you know whether that testing
16   ever took place?
17       A    No, I don't know, but without them you should
18   never get approval from it. So I assume it has taken
19   place, but I'm not present when it did.
20       Q    If someone were going to -- if you tasked your
21   engineers with building this device, do you think it
22   would be important to warn them about the risk of
23   explosion, et cetera, associated with this device?
24       A    Yes, sure.

Page 191

1        Q    Would you, in fact, warn them about the risk
2    of --
3        A    I did. I asked to have -- I don't know whom I
4    asked, but I wanted to have that meeting because it was
5    quite a totally new field for Braun, and I was afraid
6    that something happens. And nothing is worse than
7    recall of a product from the market.
8        Q    Would you have expected your engineers wouldn't
9    have known all these risks?
10       A    Sure.
11       Q    What precautions did you tell your engineers to
12   take?
13       A    While developing or while fooling around with
14   prototypes or what?
15       Q    Both.
16       A    First of all, they are very --
17   THE INTERPRETER: Cautious.
18   THE WITNESS: Cautious. They knew about problems,
19   and when they have lab work there's always a risk. As
20   long as people are aware that there's risk they can
21   react or can at least handle the problem, but they knew
22   once we bring the thing to marketplace it had to be
23   absolutely safe.
24   MR. SHIMOTA: Q Let me make sure I understand. Did

Page 192

1    you tell your engineers to take precautions?
2        A    Yes.
3        Q    Did you tell them any specific precautions to
4    take?
5        A    No. Simply to watch out the thing doesn't
6    explode. Put their nose on the fact that there's
7    alcohol on the business and there's sparking in the
8    business.
9        Q    But you did feel it was necessary to tell them
10   that?
11       A    It's my job as a boss.
12       Q    I understand. I'm going to show you first what
13   has previously been marked as defendant's deposition
14   Exhibit No. 4 which is 5,711,328.
15           I'm going to mark this now as defendant's
16   deposition Exhibit No. 35, U.S. Patent No. 5,649,556.
17           (Exhibit 35 marked as requested)
18       Q    These are the patents that you reviewed in
19   connection with signing your declaration, correct?
20       A    Yes.
21       Q    I think you said that you brought these patents
22   with you today as well, correct?
23       A    Yes.
24       Q    Did you review them again prior to your

48 (Pages 189 to 192)

Dietrich Pahl    April 28, 2005

Page 193

1  deposition?
2      A   Yes.
3      Q   Why did you review them prior to your
4  deposition?
5      A   You see, always good to fresh your memory up.
6      Q   Did you take any notes on the patents?
7      A   No.  Apart from putting heading what the
8  content is to differentiate between the two.
9      Q   How did you differentiate between the two?
10     A   If you let me to my suitcase, I can tell you.
11  Because they look all similar.  The figures are similar
12  in terms of -- I have to read the claims then.
13     Q   It's at the very end.
14     A   Always mixing up the figures.  This one I think
15  is -- it start with the cartridge business here.
16     Q   Which patent are you referring to?
17     A   Just looking -- this was the basic patent,
18  wasn't it?  Because my problem I cannot keep the figures
19  in my head.  Normally do you it by looking at the
20  figures.  They are more or less the same in both of
21  them, you know.  To differentiate between them both I
22  have to read the claims through.
23     Q   Sure.  If it will help you, if you want to take
24  a look, take a look at them.

Page 194

1      A   Okay.  I'm somewhat online.
2      Q   I guess I'll ask this question.  How do you
3  personally differentiate between the two patents?
4      A   This being the basic patent, the basic patent
5  here, in other words, explains the function of the
6  cleaning center.
7          This, as far as I can see, similar wording
8  there but has additional claims in it as compared to the
9  cartridge thing, for instance.
10     Q   Which do you refer to as the basic patent?
11     A   '328.
12     Q   '328 is the basic patent?
13     A   That's how I feel.
14     Q   The '556, how would you characterize that?
15     A   As an additive, in addition.
16     Q   Additive in what way?
17     A   Well, the improvement of the '328.
18     Q   What is --
19     A   Extension of the '328.
20     Q   What is the improvement?
21     A   I'll go through the claims.  Okay.  For
22  instance, claim 1A there's -- wherein the cleaning fluid
23  container is comprised of two chambers, one chamber
24  serving to hold the cleaning fluid, the other chamber

Page 195

1  being configured as a filter.  I think this doesn't
2  exist in the '328.
3      Q   With respect to your reference there, what is
4  your understanding of a chamber?
5      A   Of the chamber?
6      Q   What is your understanding of chambers?
7      A   There are two parts.
8      Q   Parts of what?
9      A   If you see -- there's a picture here.  This one
10  chamber which holds liquid and one chamber who holds the
11  filter.
12     Q   I see.  So those -- so the reservoir underneath
13  the cradle, that's your understanding of the chamber?
14     A   Yes.
15     Q   One of the chambers?
16     A   How I understand it.
17     Q   Then there's another chamber there?
18     A   Another chamber here, which I personally would
19  call cartridge, but the patent guy didn't always mention
20  it.
21     Q   Why would you personally call it a cartridge?
22     A   Because it should have been a changeable piece,
23  a throw away one.
24     Q   That was the -- that was one of Mr. Braun's

Page 196

1  improvements was coming up with a replaceable cartridge,
2  correct?
3      A   Yes.  That would represent this picture here.
4      Q   I forgot -- when you talked with -- I'm sorry.
5  I forgot his name, the head of Braun, what was --
6      A   Mr. LaGarde.
7      Q   Mr. LaGarde, You expressed to him the
8  importance of an aftermarket for the cleaning fluid?
9      A   Yes, it was Gilbert Greaves.
10     Q   That was Gilbert Greaves?
11     A   You could make money with.
12     Q   Wasn't also the idea of a replaceable cartridge
13  something -- an extension of that idea, something you
14  could make money with?
15     A   At this point it was not the cartridge, but it
16  was the refill of the liquid which you can sell in
17  bottle and pour it in.  Later on the idea of throw away
18  cartridge came up.
19     Q   That was one of the ideas of Mr. Braun,
20  correct?
21     A   Right.
22     Q   Did you ever tell the business people of the
23  idea of the throw away cartridge?
24     A   No, no.  For them the project was dead and they

49 (Pages 193 to 196)

Dietrich Pahl   April 28, 2005

Page 197

1  didn't like to touch the issue anymore.
2      Q   Was that the case until you left your position
3  in '95?
4      A   Yes.
5      Q   Was Mr. Greaves still in his position until
6  1995 when you left?
7      A   I assume -- not 100 percent sure, but in the
8  time I left -- I think I went first and then he got
9  another assignment.
10     Q   I understand.  If you could look at the '328
11 patent, claim 11.
12     A   Yes, sir.
13     Q   If you look at the last element, a drying
14 device.  Would you tell me the universe of drying
15 devices?
16     A   The universe?
17     Q   Well, can you tell me the -- types of drying
18 devices that you considered for use in your shaver
19 cleaning system in the early '90s?
20     A   A motor with a fan wheel, and, if necessary,
21 heating element on top.
22     Q   Why do you say if necessary a heating element
23 on top?
24     A   If the only was a fan wheel with normal air,

Page 198

1  room temperature, cleaning would have taken too long
2  time.  What you do to speed it up you take heat, you
3  need a heater.  If I'm not --
4      THE INTERPRETER:  If I'm not wrong?
5      THE WITNESS:  If I do remember there was heating
6  element in that thing here, I'm not 100 percent sure.
7  But at least I brought some heating elements to Leon.
8      MR. SHIMOTA:  Q  Did you ever consider simply using
9  a heating element as the drying device?
10     A   Only heating element?
11     Q   I'm sorry.  Let me rephrase.
12     A   No, no.
13     Q   Let me reask.  Did you ever consider and reject
14 that idea or you just never considered it?
15     A   I don't know exactly, but for me the efficiency
16 of simply heating or creating heat is not as efficient
17 as blowing if you want to evaporate a thing.
18     Q   Did you consider the outlet port as being part
19 of the drying device?
20     A   Of the drawing device?
21     Q   Yes, the --
22     A   The drawing -- air circulating device.
23     THE INTERPRETER:  Drying device.
24     MR. PATTON:  Wait.  I don't understand that

Page 199

1  question.
2      MR. SHIMOTA:  Q  Did you consider -- Let me ask you
3  this.  The outlet port assisted -- the outlet port's
4  function was to -- ultimately was to drain cleaning
5  fluid from the trough, is that correct?
6      A   From the cradle, yes.
7      Q   From the cradle.  And did the outlet port
8  assist then in drying the cradle -- drying the shaver
9  head?
10     A   No.
11     Q   Why not?
12     A   Well, the function of the outlet port, the
13 little hole there, what you call outlet port in the
14 cradle is simply to drain or empty the cradle.  Once
15 this thing is empty then starts drying operation by
16 switching on a fan wheel motor.  So that outlet port
17 helps only so far that it drains the liquid into the
18 liquid tank, but it has nothing to do with drying
19 itself.
20     Q   I see.  So am I correct in assuming you don't
21 think a drain is a drying device?
22     MR. PATTON:  I object to the form of the question.
23     THE WITNESS:  I don't understand the question.
24     MR. SHIMOTA:  Q  Do you know what a drain is?

Page 200

1      A   What's a drainer?
2      Q   I see.  In a sink there's something at the
3  bottom which water goes in and drained down into, a
4  drain that flows down into?
5      THE INTERPRETER:  Is drain.
6      THE WITNESS:  A drain.  I don't understand what
7  drainer.  Again your question, please?
8      MR. SHIMOTA:  Q  Am I correct in assuming you don't
9  consider a drain a drying device?
10     MR. PATTON:  I object to the form of the question.
11 If you're asking Dr. Pahl to interpret a term in the
12 patent, then I object on the ground you're asking him
13 for a legal conclusion.
14     MR. SHIMOTA:  Q  You state in your declaration that
15 you read and understood the patent claims, correct?
16     A   That I --
17     Q   That you read and understood the patent claims,
18 correct?
19     A   Yes.
20     Q   So I guess I'll just ask you then, what is your
21 understanding of the term a drying device?
22     A   Drying device is, as I mentioned to you, a
23 motor, fan wheel, heating element and the appropriate
24 channels to conduct the air stream into the cradle.

50 (Pages 197 to 200)

Dietrich Pahl    April 28, 2005

Page 201

1    Q    What are the appropriate channels?
2    A    Holes or whatever it is.  If we have a
3    technical drawing of the existing one I can show you.
4    You need a guidance for the air stream relative to the
5    head of the shaver.  So if, let's say, for instance, you
6    blow from the sides, your drying time will be
7    indefinite.  But if you blow from that direction then
8    you can dry a shaver much faster and to get the air
9    wherever the fan wheel is in this direction, therefore,
10    you need guidance of the air stream.  That's what I
11    meant.  It's also a part of the drying device.
12    Q    Did you say holes or what did you say?
13    A    The holes -- wait a minute.  Somebody had to
14    suck the air.  Normally you have holes in the -- maybe
15    not any drawings there I can explain to you easier.
16    Q    Can you show me in the figures where the holes
17    would be that you're talking about?
18    A    In that figure, this is the hole for the fan
19    wheel.
20    Q    Which figure?
21    A    Where?  That's where the air is being sucked
22    from the bathroom into the machine if you want.
23    Q    Gotcha.  So that's at the lower left-hand
24    corner --

Page 202

1    A    Lower left-hand corner.
2    Q    -- of the schematic?
3    A    Looks like -- like a seat with two rings.  This
4    one here.
5    Q    I see.  How does that show -- how would that
6    guide the direction of the air?
7    A    This doesn't guide.  This is the hole.  You're
8    asking me holes.  You need a hole to get the air into
9    the machine and -- into the machinery, into the what is
10    it called -- cleaning device.  Now having got the holes
11    where can I show you guidance -- you have to then guide
12    the air -- it's not in here.  Somewhere to the fan
13    wheel, different drawing of course.  Must be hole, like
14    a turbine.  You need -- how can I tell you?
15    Air channels to -- there's a turbine zoom
16    around somehow in open room.  You would never, ever have
17    an air stream.  So we have to send some guides for the
18    air so that the fan wheel can take and pick up the air
19    then press then through another hole which you'll see
20    here into the cradle chamber, into the head and then out
21    again.
22    Q    I see.  Can you look at Figure 12 in the
23    patent?  Can you see any description of that we've been
24    discussing in this figure?

Page 203

1    A    Yes.  For instance somebody make apparently
2    clearer, make here hole for sucking into air, but this
3    is handmade.  I don't know whether it's part of the
4    patent.
5    You see that embodiment here should have a
6    bird's-eye view to show the guidance of the air stream.
7    This lammelt here guide the air down here, but on top
8    they have a different function.  It means once the pump
9    is on this one is running anticlockwise from the point
10    of view of transporting the air.  It's basically
11    sucking.  It means these little lamellens will close so
12    that's by means of running ventilator in wrong
13    direction.  No liquid is being evaporated -- absorbed by
14    means of air stream.  That's why it's closed here.  It's
15    also type of guidance of air, in this case blocking.
16    Q    Can you tell that -- all of that from this
17    drawing?
18    A    Yes.
19    Q    You said you'd need a bird's-eye view to see
20    the direction of the air?
21    A    Yes.
22    Q    What would a bird's-eye view show you?
23    A    It would show possibly -- I don't know what the
24    detail background of that drawing is, but from some side

Page 204

1    the air that's the input hole -- input hole that's
2    called that way that this ring around the fan wheel like
3    a normal turbine -- I can make my sketches.  This is the
4    turbine which rotates.  What you need is something where
5    the air is being sucked onto is being compressed because
6    it's going smaller and smaller and then you have the
7    outlet.  Here it's very narrow gap.  That's what I call
8    guidance of the airstream.  The overall is aerodynamics.
9    Q    Was that design in that way or -- was this
10    particular design important to the operation of the
11    shaver cleaning system?
12    MR. PATTON:  I object to the form of the question.
13    THE WITNESS:  I first don't know whether it has been
14    designed way.  Secondly, can tell you if you build or
15    design a proper turbine, which is common state of art,
16    you get good efficiency.  If you don't know you get
17    lousy efficiency which means the drying time is too
18    long.
19    MR. SHIMOTA:  Q    When you say trying time is too
20    long, what would be too long?
21    A    Let's put it that way.  Too long is for my
22    opinion something about 20 minutes, half an hour because
23    during the drying time the shaver is interlocked into
24    the appliance.  If somebody forgot to cut his mustache

51 (Pages 201 to 204)

Dietrich Pahl     April 28, 2005

Page 205

1  or something like, he has to wait there until the bloody
2  thing stops working to get, and then he'd have problem
3  and Braun would have problem because it drag on too
4  long.
5      MR. PATTON:  Can we take a brief break and can I
6  have any estimate of how much longer?
7      MR. SHIMOTA:  Hour, to hour and a half.
8      THE VIDEOGRAPHER:  We are going off the video record
9  of tape number 3 at 4:29 p.m.
10     (Off the record)
11     THE VIDEOGRAPHER:  We're going back on the video
12 record at 4:42 p.m.  Here continues tape 3.
13     MR. SHIMOTA:  Q  If you could direct your attention
14 again to the '328 patent.  I direct your attention to
15 more specifically claim 18.  Last element states a
16 bracket for insertion of the shaving apparatus therein.
17 Do you see that?
18     A  Yes.
19     Q  What is your understanding of a bracket for
20 insertion of a shaving apparatus therein?
21     A  Well, I think that this -- the guidance here
22 and cradle, combination of it, if I refer to that
23 particular drawing here.  I developed it -- see it
24 better, refer to drawings within the patent.

Page 206

1      Q  Sure.
2      A  Then the bracket is that whole device here.
3      Q  When you say the whole device here, what are
4  you referring to?
5      A  That area here.
6      Q  10?
7      A  The number 10.
8      Q  Shown as 10?
9      A  Claim it as one part, yeah.
10     Q  Is it also item 9 or is that something
11 different?
12     A  9 is a part of the bracket, but in this case
13 here it's bracket for me.  My understanding is a part
14 which holds the shaver in the position.
15     Q  In what position?
16     A  Upside down position, heads down.
17     Q  Erect and upside down, is that correct?
18     A  Is it --
19     Q  Erect or in a vertical upside down position?
20     A  Yes, has not be necessarily rectangular, but
21 anything to hold the shaver in position.
22     Q  What is your understanding of the item that is
23 item 9?
24     A  Item 9?  Is push button with an interlock

Page 207

1  system which locks the shaver in for the time that it's
2  being cleaned and dried.
3      Q  Was that the interlock that was recommended by
4  VDE, gentleman from VDE?
5      A  Yes, in principal, yes.
6      Q  That you saw in the June of '93 memo?
7      A  What I read -- '93 memo, yes.  No.  Wrong one
8  here.  Yes, it is here.  August of '93 memo.  No.
9  Sorry.  I'm on the wrong list.  You supplied me with too
10 much paper.  The one that has been from Mr. Stigler.
11 Yes.  June of '93.
12     Q  Could you turn to claim 19 of the '328 patent,
13 please?  You see there it says device as claimed in
14 claim 18 further comprising a switch for interlocking
15 the shaving apparatus to the bracket.  Can you provide
16 me with your understanding of the switch for
17 interlocking?
18     A  Well, this can be mechanical or
19 electromechanical switch which is not shown in any of
20 these figures here in my opinion.
21     Q  The switch for interlocking is not shown --
22     A  It's somewhere in the number 9, but it's not
23 detailed within the patent as far as I can see.
24     Q  I see.  So the full technical details of the

Page 208

1  switch are not shown?
2      A  Are not presented.
3      Q  But in -- is it correct in abstract terms it is
4  shown at item 9?
5      A  9, yes.
6      Q  Turn to column 6 in the '328 patent.  I don't
7  know if you noticed --
8      A  Claim 6?
9      MR. PATTON:  You see the column on the top?
10     MR. SHIMOTA:  Q  Yes.  Down at the bottom at a line
11 approximately 57, there's listed elastic supporting
12 means 8 --
13     MR. PATTON:  Column 6, 57.
14     THE WITNESS:  57 is here.  Yes -- elastic supporting
15 means.
16     MR. SHIMOTA:  Q  My question is, you referred
17 earlier to the rubber parts in the cradle.  Is that --
18 to your understanding of the patent, is that what is
19 meant by the elastic supporting means?
20     A  Yes.
21     Q  Throughout your development of the cleaning
22 system, did you always use those rubber parts or were
23 they ever replaced with something else?
24     A  They were there as you can see from the

52 (Pages 205 to 208)

Dietrich Pahl    April 28, 2005

Page 209

1  original drawings.  Rubber part or any type of elastical
2  shock-absorbing material.  Can be silicone, soft
3  silicone, for instance.  The main thing is that it
4  absorbs vibration as much as possible.
5      Q    Did you prefer the use of an elastic supporting
6  material?
7      A    Should be considered also rigid one, but from
8  the knowledge of an engineer should be soft to reduce or
9  eliminate the transfer of vibration into the casing of
10  the cleaning center.
11      Q    So I guess one last question, did you ever
12  consider the use of other supporting means?
13      A    Other materials, yes.
14      Q    Other materials aside from elastic.
15      A    Yes.
16      Q    What materials did you consider?
17      A    As I mentioned silicones, for instance, or soft
18  PVC, but at the end of the day you take what you have,
19  and the best thing is still even as compared to the
20  liquid or the durability within the liquid is still
21  rubber.
22      Q    So the best thing ultimately was the elastic
23  material?
24      A    Yes.

Page 210

1      Q    After you left -- when you changed jobs in
2  1995, did you still continue to work on the shaver
3  cleaning system?
4      A    No.
5      Q    No?
6      A    No.
7      Q    Did you ever have meetings?
8      A    No.
9      Q    Did you ever meet with a gentleman named Jurgen
10  Höser regarding his work on the shaver cleaning system?
11      A    Yes.  Say once in a while when I met him
12  somewhere in the canteen, ask him how are you
13  progressing.
14      Q    You never?
15      A    He wanted to show his newest invention, his
16  newest appliance, but I'm not sure on that.
17      Q    So to your recollection you never had scheduled
18  meetings with Mr. Höser?
19      A    No way, no, nothing.
20      Q    When you met Mr. Höser in the canteen, did you
21  ever provide him insight and guidance as to the --
22      A    No, I stayed out of the thing.
23      Q    Did you intentionally stay out of it?
24      A    Let's put that way.  The development went ahead

Page 211

1  and I didn't attend the development so I couldn't give
2  any advice or any ideas because I didn't know exactly
3  what they were working on.
4      Q    Do you know the name of a gentleman named
5  Dr. Finger?
6      A    Yes.
7      Q    Who is Dr. Finger?
8      A    Let me think.  Finger.  I was mixing up the two
9  with -- no great memory on Mr. Finger, Dr. Finger
10  apparently.
11      Q    Okay.  So I take it the answer to my question
12  is, you never would have had a meeting, formal or
13  informal, with both Mr. Höser and Mr. -- and Dr. Finger
14  regarding the shaver, development of the shaver cleaning
15  system?
16      A    Definitely not.
17      Q    When you left Braun in 1998, had a shaver
18  cleaning system yet been commercialized?
19      A    I can't tell you.
20      Q    Well --
21      A    I only know one thing, that somebody gave me
22  one of the first appliances which came out of the
23  prototype serie, but when it was, whether I was still
24  with Braun or whether I was not with Braun I can't tell

Page 212

1  you.
2      Q    When you say prototype serie, do you mean
3  S-E-R-I-E?  Is that what you were saying?
4      A    Yes.
5      Q    What is meant by serie S-E-R-I-E?
6      A    Normally if people think prototypes are 1, 2,
7  3, 4, maximum ten appliances made in model shop, but if
8  you have to have better feeling about production quality
9  you run it in a serie, which means you don't have a full
10  cavity mold.  Within the full cavity mold you only have
11  one gravity in, and from that you mold many parts.  So
12  you can build up, let's say, couple hundred of
13  appliances for better testing, et cetera, et cetera.
14      Q    Were you impressed by the prototype serie?
15      A    Yes.
16      Q    What impressed you about it?
17      A    What they made out of my first ideas it really
18  worked well.
19      Q    It had changed much since your first ideas?
20      A    Totally new and the shaver
21  was sitting tilted in.  When I asked them why, and the
22  whole thing went automatically as I had envisioned long
23  time ago.  So it really worked well, I was impressed.
24      Q    So you were impressed by what they had done?

53 (Pages 209 to 212)

Dietrich Pahl   April 28, 2005

Page 213

1    A    Yes.
2    Q    Can you describe for me -- I think you said
3  there were some differences between your original work
4  and prototype serie, correct?
5    A    Yes.
6    Q    Can you tell me all the differences that you
7  can recall?
8    A    First of all, I mentioned the tilted position
9  of the shaver itself.  Obviously the shape.  What was
10  also impressive was the type of cartridge, which they
11  found out at the end of the day, and maneuverability --
12  the handleability of the appliance which means ease of
13  use of the appliance, exchanging the cartridge, pressing
14  some push buttons to differentiate between charging and
15  cleaning or both.  That's it.
16    Q    Those are the differences you can think of?
17    A    Yes.  The rest was still the basic features.
18    Q    Do you know whether there were any patents
19  applied for on later developments?
20    A    No.
21    Q    What impressed you about the shape of the
22  device?
23    A    Well, it was totally different shape altogether
24  than I had in mind or when I was working on the

Page 214

1  appliances I had in mind or I knew of.  They came out
2  with that round thing there with a bracket on an angle.
3  So it was totally new for me.
4    Q    When you were working on -- when you were
5  originally considering your ideas for the shaver
6  cleaning system, did you have any ideas as to what
7  features would be important to consumers?
8    A    Yes, sure.
9    Q    What features did you think would be important?
10    A    Well, first of all, a good cleaning result.
11  Secondly, easy handleability, easy use, then fast
12  cleaning, low liquid consumption.  Of course, nice
13  design, not too bulky design.
14    Q    Can you think of anything else?
15    A    No.  Up until today I don't know the price of
16  it in the market otherwise.  I would have told you it
17  should be cheaper.
18    Q    In your declaration you stated that the cradle
19  structure was open to the atmosphere.
20    A    Yes.
21    Q    When you were thinking of your -- when you were
22  developing your original ideas, did you think that it
23  would be important to the consumer that the cradle
24  structure was open to the atmosphere?

Page 215

1    A    From the point of view of drying, yeah, because
2  if you have as this particular case an airstream, it has
3  to go somewhere, into the outside atmosphere, so.  From
4  the efficiency point of view it is important.
5    Q    So you did think -- so you did believe that
6  having a cradle structure open to the atmosphere would
7  have been important to the consumer?
8    A    Yes.
9    Q    We also just discussed the bracket.
10    A    Yes.
11    Q    When you were developing original ideas, did
12  you believe that the bracket would be important to the
13  consumer?
14    A    You can do the interlock system possibly
15  without having the bracket, the other -- you can think
16  of many, many solutions.  So bracket is not so important
17  as long as the shaver is being held in position but what
18  means so ever.
19    Q    You mentioned could you think of many solutions
20  aside from using a bracket.  What are you thinking of?
21    A    Let's try for instance, magnetics.  You can
22  keep the shaver with magnets in position, with flexible
23  elements, not rigid bracket.  You can do it -- so --
24    Q    Can you think of any others?

Page 216

1    A    Not at the moment, no.  But if you would force
2  me I'd certainly come up with another solution.
3    Q    Sure.  I imagine.  Did you consider the use of
4  magnets or flexible elements in your original work on
5  the shaver cleaning system?
6    A    Well, we considered this, but then we said we
7  do it the simplest way possible.
8    Q    Do you know who considered those solutions?
9    A    This was definitely Braun and myself.
10    Q    Did you ever make any prototypes with either
11  the magnets or the flexible elements?
12    A    No, no.  Flexible elements you can -- that has
13  flexible elements for instance in very coarse way, very
14  abstract way.  This has flexible elements in position.
15    Q    You're talking about the rubber?
16    A    Yes.
17    Q    Those are in the cradle, correct?
18    A    The cradle, yes.  It was cradle in -- rubber in
19  the cradle, but there's also rubber up there in the
20  upper half.  That thing there, that piece.
21    Q    I understand.  That was something other than a
22  bracket, correct?
23    A    Bracket mean something like that or columnar
24  type of thing.  This was basically cylindrical or shaped

54 (Pages 213 to 216)

Dietrich Pahl   April 28, 2005

Page 217

1  hole where shaver was stuck in to fix it.
2    Q    I understand.
3    A    It's my understanding of the word bracket.
4    Q    That's all I can ask you.
5        Did you ever consider operating the device
6  by -- in your original work did you ever consider simply
7  allowing the device to air dry?  Maybe that's -- allow
8  to dry without a fan or heater.
9    A    No, I never considered because I knew that it
10  would take too long.
11    Q    You said too long would be approximately 20 to
12  30 minutes?
13    A    Yeah.
14    Q    I'd like to mark as Braun deposition Exhibit
15  No. 36 a document bearing the Bates range B002043 to
16  B2047.  I'd like to briefly ask you -- just go along
17  this timeline and ask you if you remember any of these
18  products at Braun.
19        The first of which I'd like to ask you about is
20  whether you recall there having -- you've seen the first
21  page pointing to around 1960, ultrasonic clean device,
22  first shaver.
23    A    1960.
24    Q    Do you recall that device?

Page 218

1    A    No.  But it's aftersales service offices or
2  departments.  If you ever saw a shaver when it didn't
3  work, it came to the aftersales service.  First thing
4  you had to do was clean it because it filled up with
5  debris and dirt.  Apparently they had these ultrasonic
6  devices to clean shaver then they could start
7  dismantling it and repairing it.
8    Q    So does that aftersales service mean to you
9  that it would have been some department?
10    A    You get a shaver in to repair it, they are so
11  filthy you couldn't even touch it with rubber gloves.
12    Q    I understand.
13    A    That's why they use ultrasonic cleaning device
14  to do the job there.
15    Q    Underneath that there's an arrow pointed to
16  1960 refers to as a cleaning box/sink, cleaning wet dry.
17  Do you remember there ever being a cleaning box or sink
18  for shavers at or around 1960?
19    A    The only thing with water I don't know if this
20  was on the market.  It was a box which cover which could
21  open to two sides.  In there there was a brush you
22  should put the shaver in, and let it run.  And then
23  hopefully cutter block only was cleaned -- dismantle the
24  shaver, of course.  Just put the cutter block in.  Then

Page 219

1  if you are lucky shaver was clean and brushes was dirty.
2        Next operation can you imagine what happened
3  here?
4    Q    In this box how was fluid used?
5    A    There was no fluid.  It was simply a dry.  The
6  only thing what I can interpret to thing.  Cleaning box,
7  sink wet and dry, I have no clue about that.
8    Q    That's fine.  I'm just -- I'm just asking if
9  you recall any of these.
10    A    Wet and dry I never had.
11    Q    If you look to the next page, this is listed at
12  or around 1990.  It says first prototype;
13  Braun/Dr. Pahl.
14        Do you have any reason to believe that you
15  would have begun working on your -- your original work
16  on the shaver cleaning system would have begun --
17    A    No.  That was certainly wrong date.  I can tell
18  you why because Braun took over the Silk Epil in August
19  of '90, and then I had enough to do to get the people in
20  Leon working on epilators.  So I had no time to fool
21  around with any type of prototype.  It's certainly wrong
22  information there.
23        I don't know what they mean with first and
24  second prototype.  I have no clue what that means.

Page 220

1    Q    Let me ask you this question.  Over the course
2  of your work leading up to approximately the time of
3  Mr. Braun's invention disclosure record, and I'm using
4  prototype too when we've been discussing, how many
5  prototypes would there have been of the cleaning system
6  approximately?
7    A    Designs under the design of Mr. Braun?
8    Q    Mr. Braun or yourself.
9    A    First of all, there were the Leon thing, the
10  three units here.  Basically would be the same.
11    Q    There's the one white unit which we call the
12  prototype.
13    A    Okay.  Then Mr. Braun produced couple of
14  prototypes.  One was that shape there, the keyhole
15  shape.  There was another one and can mean that -- Höser
16  did it or was there.  Came later on.  Apparently he
17  means second type that being that one there, the keyhole
18  thing.  So I don't know if you're asking what he means.
19  You can speculate on that.
20    Q    Look to the next page B0245.
21    A    There are a couple of prototypes.
22    Q    I see it says design, P. Schneider.
23    A    By the way, that I mean there.
24    Q    And do you know do you know what

55 (Pages 217 to 220)

Dietrich Pahl    April 28, 2005

Page 221

1    Mr. Schneider's first name is?
2    A    Peter.
3    Q    That's the device with the keyhole shape?
4    A    Yes.
5    Q    And again do you see in the left side, which is
6    also a picture -- representation of the picture we're
7    looking for, it says first prototype 1990, that's
8    incorrect?
9    A    Okay. '94, '94. That should be the one.
10    Q    You can put that document away.
11    A    It's very informative for me. I never saw it.
12    Q    I'll show you what has been marked previously
13    as defendant's Deposition Exhibit 16. I ask you if
14    you've ever seen this document before.
15    A    Not at all.
16    Q    Do you know —
17    A    When is it dated?
18    Q    Turn to the next page. I think it's June 14th,
19    '91.
20    A    A '91.
21    Q    Do you know who Stefan Zeischae is?
22    A    I haven't a clue. First time I have that thing
23    in my hand.
24    Q    So I assume you never heard about any work he

Page 222

1    would have done?
2    A    No.
3    Q    With shaver cleaning systems?
4    A    What in there?
5    Q    If you could turn to the very last page of this
6    document? Do you recall the time in 1991 in Kronberg
7    there would have been a Dr. Jung?
8    A    Yes, still there.
9    Q    He's still there?
10    A    Yes.
11    Q    Where does Dr. Jung work?
12    A    I know I can't imagine where he's coming from.
13    He was apparently at the time in charge of the research
14    department and he influenced that thing here, I assume.
15    Q    In 1991 did you also know a Herr Klauer or
16    Mr. Klauer?
17    A    Yes, patent department.
18    Q    Is this the same Mr. Klauer who was in charge
19    of the shaver system patents?
20    A    Yes, yes.
21    Q    You see the name up at the top, it says Pahl
22    Bietz?
23    A    Nothing to do with me.
24    Q    Someone else?

Page 223

1    A    That's a professor.
2    Q    Professor Pahl?
3    A    Yes. He was -- very old already. This is an
4    interesting thing. Can I have that?
5    Q    I have to keep the exhibit stamped. Would you
6    like a copy of it?
7    A    Yes, it's really great.
8    Q    We have to change the tape. We can take a very
9    quick break. I have very little at all.
10    MR. PATTON: Okay.
11    THE VIDEOGRAPHER: We're going off the video record
12    at 5:12 p.m. Here concludes tape 3.
13    (Off the record)
14    THE VIDEOGRAPHER: We're going back on the video
15    record at 5:20 p.m. Here begins tape 4.
16    MR. SHIMOTA: Q Welcome back.
17    Last series of questions I have I'm just going
18    to show you series of prior art I've already marked. As
19    you recall, in your review of Mr. Braun's invention
20    disclosure record there's indicated there were
21    disclosures. What I wanted to know is if any of the
22    documents that I'm going show you were the enclosures or
23    you believe they were the enclosures that you submitted
24    to the patent department.

Page 224

1    I'll show you first what's been marked as --
2    previously marked as defendant's Exhibit 18 as well as
3    defendant's Exhibit 19. I show you next what's been
4    marked as defendant's Exhibit 20, next what's marked
5    defendant's Exhibit 22.
6    A    That's a good one.
7    Q    Show you also defendant's Exhibit 23, show you
8    defendant's Exhibit 25, defendant's Exhibit 26. That is
9    it.
10    MR. PATTON: The question? I'm sorry.
11    MR. SHIMOTA: Q I just want to know -- there would
12    be two questions, if you recognize any of the documents
13    and if you believe any of them would have been one or
14    more of the enclosures that you provided to Braun's
15    patent department.
16    A    To your first question I don't know any of
17    them. And second question, I'm sure none.
18    Q    Okay. Last follow-up then. Did you ever
19    maintain any patents related to shaver cleaning systems?
20    A    No.
21    Q    Aside from the patents we've been talking about
22    today, have you ever -- even sitting here today, have
23    you ever seen any patents related to shaver cleaning
24    systems?

56 (Pages 221 to 224)

Dietrich Pahl    April 28, 2005

<div style="page-number">Page 225</div>

1    A    No.
2    Q    Have you ever seen any literature on the topic
3  of shaver cleaning systems?
4    A    Whether exists one, but definitely nothing, I'm
5  not aware about anything.
6    Q    Okay.
7    A    About shaver cleaning system. I'd be glad I
8  never read that thing here or the others.
9    Q    Why would you say you'd be glad you never read
10  that thing there?
11    A    They are looking so difficult, complicated I
12  would have started inventing healing system because --
13  can you imagine to market this stuff there?
14    Q    I suppose not now. Well, since you have never
15  seen or you don't recall seeing any patents or
16  literature regarding shaver cleaning systems, does that
17  help you recall what enclosures you might have provided
18  to the patent department?
19    A    For what enclosures?
20    Q    What you provided to the patent department
21  indicated you provided enclosures.
22    A    Mr. Braun?
23    Q    No, you did. We talked about that earlier.
24    A    I didn't put any enclosures to that thing.

<div style="page-number">Page 226</div>

1  Wait a minute. Where is that? Says -- that thing
2  there.
3        Oh, you mean -- now I got your thought. No,
4  was nothing like that. None of these documents were
5  mentioned by that -- the enclosures.
6    Q    I guess my last question for you, does any of
7  this help you recall what type of documents the
8  enclosures would have been?
9    A    No, this doesn't help me at all.
10    MR. SHIMOTA: Thank you for your time. I have no
11  further questions, unless you want me to ask some more.
12    THE VIDEOGRAPHER: One moment. In conclusion for
13  April 28th, 2005. We are going off the video record at
14  5:26 p.m. Thank you.
15        (Off the record)
16        - - - - - -
17
18
19
20
21
22
23
24

<div style="page-number">Page 227</div>

1  STATE OF ILLINOIS  )
                       )  SS:
2  COUNTY OF C O O K  )
3
4        The within and foregoing deposition of the
5  aforementioned witness was taken before CAROL CONNOLLY,
6  CSR, CRR and Notary Public, at the place, date and time
7  aforementioned.
8        There were present during the taking of the
9  deposition the previously named counsel.
10        The said witness was first duly sworn and was
11  then examined upon oral interrogatories; the questions
12  and answers were taken down in shorthand by the
13  undersigned, acting as stenographer and Notary Public;
14  and the within and foregoing is a true, accurate and
15  complete record of all of the questions asked of and
16  answers made by the forementioned witness, at the time
17  and place hereinabove referred to.
18        The signature of the witness was not waived,
19  and the deposition was submitted, pursuant to Rule 30
20  (e) and 32 (d) 4 of the Rules of Civil Procedure for the
21  United States District Courts, to the deponent per copy
22  of the attached letter.
23
24

<div style="page-number">Page 228</div>

1        The undersigned is not interested in the within
2  case, nor of kin or counsel to any of the parties.
3        Witness my official signature and seal as
4  Notary Public in and for Cook County, Illinois on this
5        _____ day of _____, A.D. 2005.
6
7
                      _____
8                      CAROL CONNOLLY, CSR, CRR
                       CSR No. 084-003113
9                      Notary Public
                       230 West Monroe Street
10                     Suite 1500
                       Chicago, Illinois 60606
11                     Phone: (312) 263-3524
12
13
14
15
16
17
18
19
20
21
22
23
24

57 (Pages 225 to 228)

Dietrich Pahl    April 28, 2005

Page 229

```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
 3    BRAUN GmbH,            )
                            )
 4         Plaintiff,        )
                            )
 5         -vs-             )  No. 03-CV-12428 (WGY)
                            )
 6    RAYOVAC CORPORATION,   )
                            )
 7         Defendant.        )
 8
 9        I hereby certify that I have read the foregoing
10    transcript of my deposition given at the time and place
11    aforesaid, consisting of Pages 1 to 229, inclusive, and
12    I do again subscribe and make oath that the same is a
13    true, correct, and complete transcript of my deposition
14    so given as aforesaid, and includes changes, if any, so
15    made by me.
16
17        _____
            DIETRICH PAHL, Ph.D
18
19
20
21    SUBSCRIBED AND SWORN TO before me this
22    _____ day of _____, 2005.
23    _____
24    Notary Public
```

Page 231

LEGALINK - CHICAGO
230 West Monroe Street - Suite 1500
Chicago, Illinois 60606
(312) 263-3524   (312) 236-8461
May 6, 2005
MR. WILLIAM L. PATTON
One International Place
Boston, Massachusetts 02110
CASE: BRAUN -vs- RAYOVAC
CASE NO.: 03-CV-12428 (WGY)
DEP OF:  DIETRICH PAHL    DATE TAKEN: April 28, 2005
Dear Mr. Patton:
Per your instruction, enclosed is a copy of the
deposition transcript, along with the original signature
page and errata sheet.
Pursuant to the rules of court in this matter, the
transcript is to be read and then signed before a notary
public.
If any corrections/changes are to be made, please TYPE
or PRINT them on the attached errata sheet, giving the
page and line number, desired correction/change and
reason.

Please arrange for accomplishment of same and
transmittal of the signature page and errata sheet back
to our office within 30 days from the date of this
letter.
Upon failure to comply, we shall forward an appropriate
affidavit of noncompliance to all counsel of record.

Sincerely yours,

_____
LegaLink - Chicago

cc: Mr. James Shimota (org)

C.C.          Job No. CC126183

Page 230

```
 1    CASE:  BRAUN -vs- RAYOVAC
 2    DATE TAKEN:  April 28, 2005
 3    DEPONENT:  DIETRICH PAHL, Ph.D
 4    PAGE   LINE                ERRATA SHEET
 5    ____  ____    CHANGE: _____
 6    ____  ____    REASON: _____
 7    ____  ____    CHANGE: _____
 8    ____  ____    REASON: _____
 9    ____  ____    CHANGE: _____
10    ____  ____    REASON: _____
11    ____  ____    CHANGE: _____
12    ____  ____    REASON: _____
13    ____  ____    CHANGE: _____
14    ____  ____    REASON: _____
15    ____  ____    CHANGE: _____
16    ____  ____    REASON: _____
17    ____  ____    CHANGE: _____
18    ____  ____    REASON: _____
19    ____  ____    CHANGE: _____
20    ____  ____    REASON: _____
21    ____  ____    CHANGE: _____
22    ____  ____    REASON: _____
23    (SIGNED)_____
24    Reporter:  Carol Connolly
```

Page 2005

```
      CASE:  BRAUN -vs- RAYOVAC
      DATE TAKEN:  April 28,
      DEPONENT: DIETRICH PAHL, Ph.D
      PAGE   LINE                ERRATA SHEET
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      ____  ____    CHANGE: _____
      ____  ____    REASON: _____
      (SIGNED)_____DATE_____
      Reporter:  Carol Connolly
```

58 (Pages 229 to 2005)