# EXHIBIT
# 31A

Dr. Samir Nayfeh    August 26, 2005

**Page 1**

1    VOL. I, PAGES 1 - 224
2    IN THE UNITED STATES DISTRICT COURT
3    FOR THE DISTRICT MASSACHUSETTS
4    CIVIL ACTION NO. 03-CV2428-WGY
5
6    BRAUN, GmbH
7         Plaintiff
8    V.
9    RAYOVAC CORPORATION
10        Defendant
11
12    - - - - - - - -
13    Deposition of Samir Nayfeh, Ph.D.
14    Friday, August 26, 2005
15    8:58 a.m.
16    Ropes & Gray
17    One International Place
18    Boston, Massachusetts
19    - - - - - - - -
20    Reporter:  Deborah Roth, RPR/CSR
21
22
23
24

**Page 2**

1    PRESENT:
2
3
4    Dalila Argaez Wendlandt, Esq.
5    Ropes & Gray, LLP
6    One International Place
7    Boston, Massachusetts  02110
8    617 951 7000
9    dwendlandt@ropesgray.com
10   For the Plaintiff
11
12   James A. Shimota, Esq.
13   Kirkland & Ellis, LLP
14   200 East Randolph Drive
15   Chicago, Illinois  60601
16   312 861 2236
17   jshimota@kirkland.com
18   For the Defendant
19
20   ALSO PRESENT:  Jason Lachapelle, Videographer
21
22
23
24

**Page 3**

1    INDEX
2    WITNESS:  Samir Nayfeh, Ph.D.
3    EXAMINATION    DIRECT  CROSS  REDIRECT  RECROSS
4    By Mr. Shimota  4
5
6    EXHIBITS                              PAGE
7    150 First Report of Samir Nayfeh        10
8    151 Second Report of Samir Nayfeh        10
9    152 U.S. Patent No. 3,365,267           29
10   153 U.S. Patent No. 3,478,758           56
11   154 U.S. Patent No. 3,500,840           75
12   155 U.S. Patent No. 2,976,552           89
13   156 Third Expert Report of Samuel Phillips 111
14   157 U.S. Patent No. 3,890,988          135
15   158 U.S. Patent 4,815,486              137
16   159 U.S. Patent No. 5,335,394          140
17   160 Deposition of D. Paul              147
18   161 Volume 1 of the deposition of G. Braun 157
19   162 Sketch by Witness                  172
20   163 Sketch by Witness                  175
21   164 Sketch by Witness                  175
22   165 Third Report of Samir Nayfeh       194
23
24   Original exhibits retained by Mr. Shimota

**Page 4**

1             P-R-O-C-E-E-D-I-N-G-S
2         SAMIR NAYFEH, Ph.D., Sworn,
3         having been satisfactorily identified by
4    the production of his driver's license, and duly
5    sworn by the Notary Public, was examined and
6    testified as follows:
7         MR. SHIMOTA:  James Shimota of Kirkland
8    & Ellis, appearing on behalf of Rayovac Corporation.
9         MS. WENDLANDT:  Dalila Wendlandt,
10   appearing on behalf of the plaintiffs.
11        DIRECT EXAMINATION
12   BY MR. SHIMOTA:
13   Q.  Would you please state your name for the
14   record.
15   A.  Samir Nayfeh.
16   Q.  Also say your address.
17   A.  25 Perry Street in Somerville, Massachusetts.
18   Q.  Have you ever been deposed before?
19   A.  Yes.
20   Q.  And in what connection?
21   A.  Another litigation in which I was appearing
22   as an expert.
23   Q.  What litigation was that?
24   A.  It was Mykroslis versus Pall Corporation.

Dr. Samir Nayfeh    August 26, 2005

Page 5

1    Q. And when did you appear as an expert in
2  connection with that litigation?
3    A. I am terrible with dates.
4        We were in court, I think, last summer.
5    Q. So did you testify at trial?
6    A. Yes. I am not sure you call it a trial or --
7  I don't know the distinction, but a hearing for a
8  preliminary injunction.
9    Q. Okay. You said Mykroslis versus Pall
10  Corporation.
11        How do you spell "Pall"?
12    A. P-A-L-L.
13    Q. And M-Y-K-R-O-S-L-I-S?
14    A. M-Y-K-R-O-S-L-I-S.
15    Q. In connection with that litigation, I assume
16  you prepared an expert report; is that correct?
17    A. Yes, at least one.
18    Q. And you gave a deposition in that litigation?
19    A. Yes, twice. Two depositions.
20    Q. And did you also -- I take it you also
21  testified at a preliminary injunction hearing?
22    A. Yes.
23    Q. Did you provide any testimony beyond that?
24    A. No.

Page 6

1    Q. In general terms, what was the subject matter
2  of the Mykroslis versus Pall Corporation litigation?
3    A. Mykroslis claimed that Pall had infringed on
4  some of its patents.
5    Q. In general, what was the subject matter of
6  the patents?
7    A. Okay. Filter devices used in semiconductor
8  manufacturing equipment.
9    Q. Have you testified -- have you been deposed
10  on any other occasion?
11    A. No.
12    Q. Have you given testimony on any other
13  occasion?
14    A. No.
15    Q. Have you served as an expert in connection
16  with litigation on any other occasion?
17    A. Yes.
18    Q. Can you tell me what? Could you describe
19  that for me?
20    A. Okay. The first was ASM Lithography versus
21  Nikon, and that was again to do with semiconductor
22  manufacturing equipment patents.
23        The other was Thule versus Yakima,
24  T-H-U-L-E versus Y-A-K-I-M-A.

Page 7

1    Q. And was the Thule versus Yakima litigation a
2  patent matter?
3    A. Yes.
4    Q. And what was the technology at issue in that
5  litigation?
6    A. You might recognize the names from the
7  carriers that you put on top of cars for caring skis
8  and other equipment, and Thule believed Yakima was
9  infringing on their patent.
10    Q. I do recognize the names.
11        Have you served as an expert on any other
12  occasions?
13    A. I think that's it.
14    Q. In connection with the Pall Corporation
15  litigation, where was that action filed?
16    A. In Boston.
17    Q. And in connection with the Pall Corporation
18  litigation, what firm, what law firm did you work
19  with?
20    A. Ropes & Gray.
21    Q. Do you recall the attorneys you worked with?
22    A. Ms. Wendlandt and John Montgomery.
23        I should mention that there was another
24  law firm, Hamilton Brooks Smith & Reynolds, that was

Page 8

1  also involved.
2    Q. For the Pall Corporation litigation, that was
3  approximately a year to a year and a half ago?
4    A. I believe so. I am terrible with dates.
5    Q. In connection with the ASM Lithography
6  litigation, which law firm or firms did you work
7  with?
8    A. Hale and Dorr.
9    Q. Am I correct that that litigation would have
10  been pending in Boston?
11    A. We never got so far as a deposition. So I'm
12  not quite clear as to where it was -- if we had gone
13  to trial, where it would have been.
14    Q. And the Thule versus Yakima litigation, which
15  law firm or firms did you work with on that case?
16    A. The name escapes me. That one really didn't
17  go so far. I can't recall the name of the firm,
18  strangely.
19    Q. Okay. I know you have been deposed, but let
20  me step back and go through a few ground rules.
21        You understand I am going to ask you
22  questions and you are going to provide answers to the
23  best of your ability; is that correct?
24    A. Yes.

2 (Pages 5 to 8)

Dr. Samir Nayfeh    August 26, 2005

Page 9

1    Q.  And during the course of the day, if any of
2  the questions I ask you are unclear or you don't
3  understand them, would you please ask me for
4  clarification or tell me?
5    A.  Yes.
6    Q.  If during the course of the day you come to
7  believe that your earlier testimony was incomplete or
8  inaccurate, would you also tell me that during the
9  day?
10    A.  Yes.
11    Q.  Is there any reason that you think of sitting
12  here today that you are unable to answer my questions
13  truthfully and accurately?
14    A.  No.
15    Q.  In connection with this litigation, how were
16  you initially contacted with respect to providing
17  expert services?
18    A.  Ms. Wendlandt either telephoned or e-mailed.
19  I don't remember.
20    Q.  Do you recall approximately when that would
21  have been?
22    A.  Again, I'm terrible with dates.
23       The spring.  Maybe, March, April.
24    Q.  Did you sign a retention agreement in

Page 10

1  connection with this litigation?
2    A.  Yes, as I recall.
3    Q.  When you were contacted by Ms. Wendlandt, why
4  did you agree to act as an expert in this litigation?
5    A.  You're asking for my personal motivation?
6    Q.  Yes.
7    A.  I find this kind of work interesting.  My
8  previous experience with the firm was good.
9       I do consulting.  This is another type of
10  consulting.
11    Q.  Is there anything about the technology that
12  you found particularly interesting?
13    A.  Yes.  I find all kinds of things about this
14  interesting, yes.
15    Q.  You are employed by MIT, correct?
16    A.  Yes.
17    Q.  And what is your position at MIT?
18    A.  Associate professor.  I should say some of
19  the documents say "assistant," but I guess the
20  promotion became official July 1.
21       MR. SHIMOTA:  Why don't I mark as
22  Defendant's Exhibit 150 the first report of Samir
23  Nayfeh and 151 the second report.
24       EXHIBITS NOS. 150 and 151 MARKED

Page 11

1    Q.  Turn to Tab A of your first expert report.  I
2  believe it lists your CV.
3    A.  Yes.
4    Q.  As we were speaking about that list, I guess
5  you are an associate professor effective July 2005?
6    A.  Yes.
7    Q.  Do you list in your CV anywhere your
8  litigation, the times in which you've provided
9  testimony in connection with litigation in the past
10  four years?
11    A.  No.
12    Q.  Do you know if you provide that information
13  anywhere in your expert report?
14    A.  I don't recall done so.
15    Q.  Do you understand that is a requirement of
16  the law whenever you provide an expert report in
17  connection with litigation?
18    A.  I didn't know that.
19    Q.  One of the things that -- I am not sure the
20  parties agree or disagree upon -- is the level of
21  skill in the art pertinent to the patents involved in
22  this litigation?
23    A.  Yeah.
24    Q.  I think you said that there may be no

Page 12

1  disagreement between yourself and Mr. Phillips
2  insofar as has been stated, at least for someone with
3  an education, would be at least a bachelor's degree
4  and three to five years of experience; is that
5  correct?
6    A.  I think -- I think we both agreed you
7  wouldn't necessarily need a bachelor's degree.  You
8  might have experience rather than the formal
9  education.
10    Q.  Okay.  Well, I guess my question is, what is
11  the art related to the patents-in-suit?
12       MS. WENDLANDT:  Objection.
13    A.  The art is mechanical design.
14    Q.  Mechanical design of any product or a subset
15  of products?
16    A.  You might say an emphasis on consumer
17  products, but I'm not sure I would want to
18  necessarily narrow it that far.
19    Q.  Well, so, you wouldn't narrow it that far?
20       In your opinion, the art is mechanical
21  design of any product?
22    A.  Let me try to answer this way:  You would
23  expect anyone with a good background in mechanical
24  design to be able to pick up these patents, read them

3 (Pages 9 to 12)

Dr. Samir Nayfeh    August 26, 2005

Page 13

1  and understand them and do what's disclosed.
2      Q. In connection with some of the opinions you
3  rendered, there's been discussion of the prosecution
4  history with respect to indefiniteness.
5          Do you recall that?
6      A. Yes.
7      Q. For example, there was an argument made by
8  Braun during the prosecution that a patent related to
9  a tool-cleaning apparatus was not analogous art.
10          Do you remember that?
11     A. Yes.
12     Q. So do you think that a tool-cleaning
13  apparatus would not be within the art that we have
14  been discussing?
15          MS. WENDLANDT: Objection.
16     A. Okay. It seems like there are two separate
17  issues: One is what the definition of a person would
18  be skilled in the art.
19          It seems to me that there is a narrow
20  class of things that you would consider to be
21  analogous art. That is, if you wanted to look at all
22  patents related to mechanical design, that's
23  certainly far too broad a class to be practical.
24          Whereas, a person who knows mechanical

Page 14

1  design should be able to understand all of these
2  patents.
3      Q. Okay. I guess that's where I do have some
4  confusion then.
5          I mean, in particular, the Lee patent,
6  would that be within the art of the patents-in-suit?
7      A. Could you remind which one is Lee?
8      Q. Tool-cleaning apparatus. Do you have your
9  second report?
10          MS. WENDLANDT: Page 23 of your second
11  report, Exhibit 151.
12     A. Oh, okay.
13          So Braun had said that it was not
14  analogous art.
15          Whether it's analogous for this -- is
16  there a strict definition of the term "analogous,"
17  "analogous art," in other words?
18          I haven't really, anywhere in here,
19  rendered an opinion on it, or really considered it as
20  a question that I have analyzed.
21     Q. So you haven't considered whether Braun's
22  argument as to whether it was analogous or not --
23  analogous art -- well, you do not offer an opinion as
24  to whether or not the Lee patent is or is not

Page 15

1  analogous art; is that correct?
2      A. Well, I haven't offered an opinion, I don't
3  think.
4      Q. Let's take a step back to the level of skill
5  in the art.
6          I guess there may be agreement between
7  you and Mr. Phillips as to the level of skill.
8          For someone who lacks a formal education,
9  what type of experience would you expect that
10  individual to possess?
11     A. I would say, again, experience in mechanical
12  design.
13     Q. And, again, mechanical design of any
14  products?
15     A. Yeah. I would say broadly, unless the
16  person's experience was so narrow as to not provide
17  them any background in the basic elements of what is
18  going on here, but I would say typically someone with
19  a few year's experience in mechanical design would
20  have enough background to understand what is going on
21  here.
22     Q. When you say "the basic elements of what is
23  going on here," what do you mean those basic
24  elements?

Page 16

1      A. How you fixed your things. Basic ideas of
2  pumps, fittings.
3      Q. Anything else?
4      A. Those are what come to mind. I don't say it
5  is a complete list.
6      Q. The basic elements, then, in your opinion,
7  are the fixtures, the pumps and the fittings that you
8  would expect one of skill in the art to know about?
9      A. I would say at least those.
10     Q. For the one of ordinary skill without a
11  formal education, would he be required to have more
12  work experience than one with a formal education?
13     A. That's a loose question to answer.
14          It seems sufficient experience may have
15  better more direct experience related to this. So I
16  am not sure you would say "more."
17          So, yeah, I wouldn't necessarily say
18  "more," but you might say typically, yes.
19     Q. Working from the definition that -- working
20  from your definition of one of ordinary skill in the
21  art, can you tell me at what point in time you became
22  one of ordinary skill in the art?
23     A. Probably by the time I was most of the way
24  through my undergraduate education I had enough -- a

4 (Pages 13 to 16)

Dr. Samir Nayfeh    August 26, 2005

Page 17

1 combination of education and experience working in
2 labs and stuff to be able to understand this.
3     Q. So you mean -- are you saying approximately
4 by the time you would have been a junior in college
5 you would have been one of ordinary skill in the art?
6     A. Yeah, I think so.
7     Q. Do you think it's a fair statement that
8 anyone who had completed -- who had worked through
9 the requirements of a mechanical engineering degree
10 to approximately their junior year would be able to
11 understand the concepts described in the
12 patents-in-suit?
13         MS. WENDLANDT: Objection.
14     A. No.
15     Q. And why not?
16     A. Most people during their education don't
17 really get exposure to the practical aspects of
18 mechanical design.
19         There would be some educational programs
20 which do that, but I would say being in the education
21 business, most engineering educations that one would
22 come upon, unless the student had some experience,
23 wouldn't be enough to enable them to understand these
24 patents.

Page 18

1     Q. What then was different about your education?
2     A. I have been working in labs, for example,
3 during my undergraduate work, and doing things like
4 spec'ing blowers and making fixtures and so on.
5     Q. How many laboratory courses did you take in
6 your undergraduate education?
7     A. There is a big difference. I wasn't talking
8 about lab courses. I was talking about employment in
9 labs.
10     Q. You worked for a professor in your
11 undergraduate work?
12     A. Uh-huh.
13     Q. What was the focus of your work for -- what
14 professor did you work for at MIT?
15     A. At MIT I worked for two professors. One
16 named Asada, A-S-A-D-A, and another named Slocum,
17 S-L-O-C-U-M.
18         MS. WENDLANDT: I remind you to give
19 verbal answers.
20     Q. When did you begin -- well, when did you
21 begin working for the first -- when did you first
22 become employed in the laboratory at MIT -- in a
23 laboratory? Excuse me.
24     A. When I first arrived at MIT, which would have

Page 19

1 been -- it's on my CV. When I finished my master's
2 in '93. So in the fall of '93.
3     Q. I misspoke. What we were talking about was
4 your undergraduate education?
5     A. Undergraduate education.
6     Q. Were we --
7     A. Earlier we were talking about the
8 undergraduate education and at MIT.
9     Q. That's my mistake. Let's go back.
10         Speaking then to your undergraduate
11 education, did you work for Professors Asada and
12 Slocum at Virginia Tech?
13     A. No. They are at MIT.
14     Q. Did you work for any professors at Virginia
15 Tech?
16     A. Professors Nayfeh and Mook.
17     Q. And when did you begin working for either --
18 when did your employment begin with Dr. Nayfeh or
19 Dr. Mook?
20     A. I believe when I first entered -- I am a
21 little bit foggy on exactly when, but probably right
22 around '87.
23     Q. Okay. How much beyond your studies, how
24 often were you working in the laboratory in 1987?

Page 20

1     A. During the summers, full-time, probably, 40,
2 50, 60 hours a week. During the terms, it fluctuated
3 a lot.
4     Q. What were you working on at that point?
5     A. There were a variety of experiments from a --
6 let's see.
7         There was a ship in a towing tank for
8 which we built some fixtures and instrumentation -- a
9 model ship I should say.
10     Q. Yes.
11     A. And we propagated waves at it and saw how it
12 responded.
13         There are various vibration experiments
14 for which we built fixtures and instrumentation.
15 Then there was theoretical work, also.
16     Q. Did you during that period of time perform
17 any work on designing cleaning systems?
18     A. No.
19     Q. Have you ever performed any work on designing
20 cleaning -- designing a cleaning system or systems?
21     A. No.
22     Q. Have you ever done any work in the design of
23 shavers?
24     A. No.

5 (Pages 17 to 20)

Dr. Samir Nayfeh     August 26, 2005

1      Q. Have you ever used an electric razor in the
2  past?
3      A. Yes.
4      Q. When would that have been?
5      A. That is very difficult to answer. I remember
6  maybe twice trying them out for a week or so.
7          A while back. At least a year or two
8  ago. Probably more.
9      Q. Okay. I take it you shave with a disposable
10  razor or a wet razor?
11      A. Yes.
12      Q. You work for -- do you know whether MIT
13  receives any grants, endowments or donations from the
14  Gillette Company?
15      A. I don't know.
16      Q. Do you know whether the department of
17  mechanical engineering receives any endowments from
18  the Gillette Company?
19      A. Again, I don't know.
20      Q. Have you personally, aside from this
21  litigation, have you personally received any
22  endowments, grants, donations from the Gillette
23  Company?
24      A. No.

1      Q. And I would ask the same question with
2  respect to the Braun.
3          Have you personally received any money
4  from Braun, putting aside this litigation?
5      A. No.
6      Q. Do you know whether MIT has received money
7  from Braun in the form of grants, endowments or
8  donations?
9      A. I don't know.
10      Q. Now, you provided a series, or three expert
11  reports in connection with this litigation; is that
12  right?
13      A. Yes.
14      Q. And is all the information that you
15  considered in forming your opinions listed in those
16  reports?
17      A. All the information that I considered that is
18  directly related to the case, I believe, I listed, as
19  far as I know.
20      Q. Did you consider information that was not
21  directly related to the case in forming your
22  opinions?
23      A. Well, one is using all of your education
24  background experience to do things.

1          Are you asking for specific things that I
2  consulted or studied or --
3      Q. Yes. Is there anything specific that you
4  consulted that would not be listed in your expert
5  report?
6      A. I can't think of anything.
7      Q. And do your three reports present all the
8  opinions that you have been asked to render in this
9  case?
10          MS. WENDLANDT: Objection.
11      A. Yes.
12      Q. Subsequent to the last of your expert
13  reports, have you reviewed any additional
14  information?
15      A. I read the most recent papers that were
16  submitted.
17      Q. You read the summary judgment briefs?
18      A. Yes. And I can't think of anything else.
19          MS. WENDLANDT: The witness also
20  reviewed the third report of Mr. Phillips, which came
21  in after his third report.
22      Q. You reviewed that, right?
23      A. Yes.
24      Q. Did you review anything else beyond the

1  summary judgment briefs and the third report of
2  Mr. Phillips?
3      A. Beyond that, I can't think of anything no.
4          I did go back and reread some of the case
5  histories and prior art -- alleged prior art
6  references, but I think that is listed as to what I
7  studied.
8      Q. When you say "alleged prior art references,"
9  you don't dispute that the references in this case
10  are prior to the patients-in-suit, do you?
11      A. Okay. I suppose. No, I don't dispute that.
12          (A recess was taken.)
13          (Videotape deposition begins.)
14      Q. Welcome back.
15          Did you prepare for your deposition
16  today?
17      A. Yes.
18      Q. What did you do to prepare for your
19  deposition?
20      A. Reread my reports. Reread the patent.
21  Browsed through some of the other documents.
22      Q. Did you meet with counsel in preparation for
23  your deposition?
24      A. We met. I am not sure if we explicitly set

Legalink Chicago
(312) 263-3524

Dr. Samir Nayfeh    August 26, 2005

Page 25

1  out to prepare for the deposition or did so during
2  that meeting.
3      Q. Well, were you here at Ropes & Gray
4  yesterday?
5      A. No. Monday.
6      Q. Monday. And whom did you meet with?
7      A. Ms. Wendlandt and Mr. Patton.
8      Q. And for how long did you meet, approximately?
9      A. Three hours, maybe.
10     Q. And I take it you -- did you review any
11 documents on Monday?
12     A. We had finalized the -- I am not sure what
13 they are called -- the letters I wrote in support of
14 the summary judgment.
15         MS. WENDLANDT: The declarations.
16     A. The declarations.
17         And what else did we do? And we
18 discussed Mr. Phillips' third report.
19     Q. Did you meet with counsel on any other
20 occasions in preparation for your deposition?
21     A. No.
22     Q. Did you communicate with counsel in
23 preparation for your deposition -- did you
24 communicate with counsel in preparation for your

Page 26

1  deposition?
2      A. We did speak over the phone.
3      Q. And when would that have been?
4      A. Wednesday, I think.
5      Q. And how long did you talk on the phone?
6      A. Probably less than ten minutes.
7      Q. Would there have been any other
8  communications with counsel?
9      A. I think that was it for this week.
10     Q. If you would look to Defendant's Exhibit 151,
11 which is your second expert report, could you
12 describe to me, in general, the process by which you
13 prepared Defendant's Exhibit No. 151.
14     A. I think I drafted most or all of the sections
15 in here originally, and then sent it to
16 Ms. Wendlandt, and then there were revisions.
17     Q. Can you describe the revision process for me.
18     A. Probably two or three back-and-forth e-mails.
19     Q. So when you say "e-mails," there would have
20 been communications regarding revisions to the
21 report?
22     A. So typically I would send her my draft, and
23 then she would revise and send it back to me and I
24 would revise and so on.

Page 27

1      Q. An iterative process, I would assume,
2  correct?
3      A. Yes.
4      Q. Aside from e-mail, would you also speak on
5  the phone?
6      A. Yes.
7      Q. Let me take one step away from the report,
8  and we will go back to it.
9          How long have you -- or how many hours
10 have you spent in total in connection with this
11 litigation?
12     A. I can only give a very rough estimate.
13     Q. If you could.
14     A. Let's see. I suppose -- my memory is failing
15 me -- but I suppose it is in the neighborhood of 60
16 -- no. It must be more than that.
17         Maybe 60, 80 hours.
18     Q. Do you know how much you would billed to
19 Braun?
20     A. That's what I am trying to remember. I was
21 going to do the math to calculate back from there.
22 So I think that's about right.
23     Q. And your hourly rate in connection with this
24 litigation is $300 per hour, correct?

Page 28

1      A. Correct.
2      Q. Taking a step back, what was the hourly rate
3  that you charged in connection with the Pall
4  Corporation litigation?
5      A. I don't remember.
6      Q. Do you know whether it would have been more
7  or less than $300?
8      A. I think it was less. It may have been $250.
9      Q. Do you know what your rate would have been in
10 connection with -- each of the two other litigations
11 in which you worked as an expert?
12     A. Those are harder to remember. Probably in
13 the same ballpark.
14     Q. Approximately $250 an hour?
15     A. I would say approximately $300. It could
16 have been $250, $300, $350. I don't remember.
17     Q. Do you have a standard hourly rate for expert
18 consulting services?
19     A. No.
20     Q. Well, how did you come -- how did you come to
21 agree that $300 would be your standard rate for this
22 litigation?
23     A. They asked me how much I wanted, and I said
24 $300.

7 (Pages 25 to 28)

Dr. Samir Nayfeh    August 26, 2005

Page 29

1    Q. And they agreed?
2    A. Yeah.
3    Q. Turning back to your second expert report, if
4  you go to Page 2, where you discuss the MeKiney
5  patent. Let me give it to you.
6    MR. SHIMOTA: I would like to mark as
7  Defendant's Exhibit No.152 U.S. Patent No. 3,365,267.
8  It's the MeKiney patent.
9         EXHIBIT NO. 152 MARKED
10    Q. Do you on Page 2, you have the figure listed,
11  and you refer to the lower tank 14.
12         First, do you see that right above the
13  figure?
14    A. Yes.
15    Q. Is the lower bank 14 a cleaning fluid
16  container as claimed in the '328 patent?
17    A. Is it okay if I look at my first report?
18  There is a table there that helps me with the claims.
19    Q. Sure. I think the table is accurate as well.
20    A. Okay. Could you repeat the question?
21    Q. Is lower tank 14 a cleaning fluid container
22  as claimed in the '328 patent?
23    A. Yes.
24    Q. And you also see in your second expert report

Page 30

1  there is reference to pump 16.
2         Is pump 16 a feed device for feeding
3  cleaning fluid as claimed in the '328 patent?
4    A. No.
5    Q. And is it not?
6    A. The claim specifies that it needs to feed to
7  the cradle structure.
8    Q. I understand. I understand that you believe
9  there is no cradle structure in the MeKiney patent.
10         But putting that aside, is pump 16 a feed
11  device as claimed in the '328 patent?
12    MS. WENDLANDT: Objection.
13    A. It is a feed device.
14    Q. And it does feed fluid from tank 14 to the
15  upper tank 12; is that correct?
16    A. Yes.
17    Q. So with respect to that element, the
18  disagreement is whether or not there is a cradle
19  structure in the MeKiney patent?
20    MS. WENDLANDT: Objection.
21    A. Principally.
22         Although, I didn't -- I haven't really
23  rendered an opinion, in other words, or thought
24  through whether the feed device itself would qualify

Page 31

1  were all else -- were there a cradle structure.
2         So that based on my examination just now,
3  it appears that it would qualify as a feed device;
4  but I haven't, say, previously studied this thing and
5  laid out, and said, okay, there is a feed device, but
6  not a cradle structure.
7         My answers to you now are given in the
8  spirit of on-the-fly answers.
9    Q. So you haven't considered whether or not the
10  feed device element is met in the MeKiney patent
11  prior to today?
12    A. No. In other words, we pointed out the -- we
13  pointed out, at least in the report -- at least we
14  pointed out certain differences that we thought were
15  the most prominent differences between what is
16  claimed and what is in the MeKiney patent, but I am
17  trying to be careful about making any pronouncement
18  to other things that are not.
19    Q. Okay. I take it in your report you don't
20  offer any opinion regarding the feed device element
21  with respect to the MeKiney patent?
22    A. I don't recall having done that.
23    Q. Well, your opinion regarding the MeKiney
24  patent -- you are talking about the '556 here, but I

Page 32

1  think it's '328 patent.
2         I will ask if you can point me -- is this
3  the '328? We are looking at '328 at right not. It's
4  on 2 to 4.
5         If you can point to where, if at all, you
6  do discuss the feed device element with respect to
7  the MeKiney patent, if you need to refresh your
8  recollection.
9    A. I believe close to the top of Page 3, I say,
10  "In operations, sterilizing fluid is the pumped from
11  the lower tank to the upper tank via a conduit 18.
12         I believe that's it.
13    Q. So that sentence that you read to me, that's
14  your opinion with respect to the feed device element?
15    MS. WENDLANDT: Objection.
16    A. It doesn't really say "feed device element,"
17  but it describes the operation of the device.
18    Q. Well, do you express --
19    A. I stand by that statement.
20    Q. Okay. Aside from that statement, do you
21  express any other opinions with respect to the feed
22  device element vis-a-vis the MeKiney patent?
23    A. I don't recall giving any other opinion on
24  the feed device.

8 (Pages 29 to 32)

Dr. Samir Nayfeh    August 26, 2005

Page 33

1    Q.  Do you see -- you can look to your first
2    expert report, too, but would you agree with me that
3    during the feeding of fluid from tank 14 to tank 12
4    the fluid level of the cleaning fluid in the cleaning
5    fluid container is below tank 12 in the MeKiney
6    patent?
7    A.  Yes.
8    Q.  Now, with respect to Claim 11 of the '328
9    patent, there is no requirement in that claim that
10   the shaving head be easily removed and inserted from
11   the cradle structure; is that correct?
12       MS. WENDLANDT:  Objection.
13   A.  Correct.
14   Q.  Turn to Page 3 of your second report.
15       Are you there?
16   A.  Yes.
17   Q.  You refer there, in the second sentence, "The
18   upper tank 12 also includes a shelf 44 shown in
19   Figure 3 below with magnets 46 for holding clipper
20   blades that have been disassembled from a hair
21   clipper."
22       Do you see that?
23   A.  Yes.
24   Q.  In your opinion, is a hair clipper a shaving

Page 34

1    apparatus?
2    A.  No.
3    Q.  Why not?
4    A.  Shaving is cutting hairs off down to the
5    skin.  Hair clippers don't do that.
6    Q.  Have you ever use hair clippers before?
7    A.  Yes.
8    Q.  And it doesn't shave down to the skin?
9    A.  No.
10   Q.  So, in your opinion, shavings has to be
11   cutting down to the skin, that is a shaving
12   apparatus?
13   A.  Yes.
14   Q.  I believe it is also your opinion that a hair
15   clipper is not a dry shaving apparatus as well?  That
16   would be your opinion as well, correct?
17       MS. WENDLANDT:  Objection.
18   A.  Correct.
19   Q.  If you see in Figure 3, there is shown a
20   razor 42.  Do you see that?
21   A.  Yes.
22   Q.  Is razor 42 a shaving apparatus?
23   A.  Yes.
24   Q.  Look back to the upper paragraph at the top.

Page 35

1    It would be the third sentence.
2        It states there, "The sterilizing fluid
3    then builds up in the upper tank, soaking the barber
4    tools in cleaning fluid."
5        Do you see that?
6    A.  Yes.
7    Q.  In this sentence, in your report, are you
8    using the terms "sterilizing fluid" and "cleaning
9    fluid" synonymously.
10   A.  Yes.
11   Q.  In the next sentence, you refer to a siphon
12   24.
13   A.  Yes.
14   Q.  Is siphon 24 an outlet port?
15       MS. WENDLANDT:  Objection.
16   A.  You could say it includes an outlet port or
17   the function of outlet port.  It may be something.
18       I would say it is more than simply an
19   outlet port.
20   Q.  It's not a drain.  They don't drain the
21   holes; is that correct?
22   A.  It's not a drain?  I am not sure what
23   distinction you are asking me to make.
24   Q.  When we say it's not -- it might have the --

Page 36

1    it's more than an outlet port, what do you mean?
2    It's more than an outlet port?  Let me ask that.
3    A.  The port would be just an opening.  An outlet
4    port would be just an opening through which fluid
5    exits.
6        This certainly includes an outlet through
7    which fluid exits, but it also provides a structure that is
8    more than that that provides additional
9    functionality.
10   Q.  In the next paragraph you have a heading with
11   the cradle structure element and you note shelf
12   structure 44.
13       Do you see that?
14   A.  Yes.
15   Q.  In your opinion, is shelf 44 of the MeKiney
16   patent a structure?
17   A.  Yes.
18   Q.  In your opinion, is shelf 44 of the MeKiney
19   patent able to receive and retain cleaning fluid --
20   let me rephrase that.
21       In your opinion, is shelf 44 of the
22   MeKiney patent able to receive or retain cleaning
23   fluid?
24   A.  It does become submerged in the fluid.  So

9 (Pages 33 to 36)

Legalink Chicago
(312) 263-3524

Dr. Samir Nayfeh    August 26, 2005

Page 37

1   you could say it receives cleaning fluid.
2        Q.  Why does it not retain cleaning fluid?
3        MS. WENDLANDT:  Objection.
4        Q.  Let me ask this question:  Is it your opinion
5   that shelf 44 does not retain cleaning fluid?
6        A.  Yes.  It does not retain cleaning fluid.
7        Q.  Why does it not retain cleaning fluid?
8        A.  Well, if it weren't submerged in the larger
9   tank, the cleaning fluid would just flow out.  You
10  can't really say that the shelf retains fluid.
11       Q.  But tank 12 -- is it your opinion that tank
12  12 retains cleaning fluid?
13       A.  Yes.
14       Q.  And so it is your opinion that shelf 44
15  doesn't retain cleaning fluid because it is a part of
16  tank 12; is that correct?
17       MS. WENDLANDT:  Objection.
18       A.  No, not because it is a part of -- or
19  submerged in tank 12, but rather, it doesn't perform
20  the function of retaining.
21       Q.  Oh, I understand.
22           Is it your opinion that shelf 44 is
23  adapted to receive the shaving head of a shaving
24  apparatus?

Page 38

1        A.  It is not.
2        Q.  And why is that?
3        A.  There are several reasons.  I think the
4   primary, as we said, hair clipper blades are not the
5   shaving head of a shaving apparatus.
6        Q.  Okay.  Any other reasons?
7        A.  Components of a shaving apparatus are not the
8   shaving apparatus.
9        Q.  Well, does the claim require that the shaving
10  apparatus be -- does Claim 11 require that the
11  shaving apparatus be inserted in the cradle
12  structure?
13       A.  Well, the shaving head.
14       Q.  Okay.
15       A.  Okay.  So the components of the shaving head
16  or some components of a shaving head do not
17  constitute a shaving head.
18       Q.  Let me ask this question again:  Does Claim
19  11 require a fully assembled shaving apparatus be
20  cleaned?
21       MS. WENDLANDT:  Objection.
22       A.  Well, it requires that you receive a shaving
23  head of a shaving apparatus.
24           So if you are receiving a shaving head,

Page 39

1   the shaving head should not be disassembled.
2        Q.  What if you took the shaving head off a
3   shaving apparatus and cleaned it, would that not fall
4   within the Claim 11 of the '328 patent?
5        A.  Provided that the shaving head itself were
6   completely intact, right.
7        Q.  Okay.  If you cleaned a completely intact
8   shaving head of a shaving apparatus in the cradle,
9   that would meet Claim 11; is that correct?
10       A.  Well, not quite.  There's more to it, right?
11  It has to be a structure adapted to receive.
12       Q.  Oh, certainly a structure adapted to receive
13  the shaving head of shaving apparatus, and you had
14  just a fully intact shaving head in the cradle
15  structure, that would meet Claim 11 of the '328
16  patent; is that right?
17       A.  Yes.  I should say it would meet that clause
18  of the claim 11.
19       Q.  Would it offend any other clause of Claim 11?
20       MS. WENDLANDT:  Objection.
21       A.  Not that I can see.
22       Q.  You gave me two reasons why shelf 44 is not a
23  cradle structure, in your opinion, or you gave me two
24  reasons why a cradle structure is not adapted to

Page 40

1   receive -- let me start again.
2           You have given me two reasons why shelf
3   44 is not adapted to receive the shaving head of a
4   shaving apparatus.  Are there any other reasons?
5        A.  I would say that it's -- it's not adapted --
6   well, the term "adapted" implies that it should be of
7   a specific form to receive that specific object.
8           So it doesn't appear to me that it has
9   that specific adaptation to receive an object of that
10  given shape.
11       Q.  So I guess, in your opinion, the term
12  "adapted" implies that the cradle will be shaped like
13  a shaving head?
14       A.  Shaped to support specifically the item that
15  it is -- the shaving head.
16       Q.  Okay.  Do you see tank 12 in Figure 3 of the
17  -- of the MeKiney patent?  Do you see that?
18       A.  Yes.
19       Q.  Is tank 12 a structure?
20       A.  Yes.
21       Q.  And in your opinion, is tank 12 able to
22  receive and retain cleaning fluid?
23       A.  Yes.
24       Q.  And is tank 12 adapted to receive or support

10 (Pages 37 to 40)

Dr. Samir Nayfeh    August 26, 2005

Page 41

1  the shaving head of a shaving apparatus?
2      A.  No.
3      Q.  And why not?
4      A.  Well, I don't see any form to it that is
5  adapted to receive the head of a shaving apparatus.
6      Q.  Well, would you agree with me that Figure 3
7  shows razor 42 being received by tank 12?
8      A.  Yes.
9      Q.  And would you agree with me that Figure 3
10  shows razor 42 being supported in tank 12?
11      A.  Yes.
12      Q.  So the reason that you believe that tank 12
13  is not adapted to receive a shaving head of a shaving
14  apparatus is because it does not have a particular
15  shape?
16          MS. WENDLANDT:  Objection.
17      A.  As drawn here, you have received the whole
18  razor, handle, blade.  So I don't see it receiving
19  the head of a shaving apparatus.
20      Q.  Well, if the whole razor is received, isn't
21  everything?  Isn't the entire shaving apparatus
22  received by the cradle?
23      A.  I think when the clause says "to receive
24  shaving head," to see if something reads on that, you

Page 42

1  would look for a shaving head, which I can't actually
2  even identify in a razor, in a straight razor.
3          So the straight razor, as far as I can
4  tell, doesn't actually have a shaving head; and then
5  I think when you say you are going to receive or
6  support the shaving head, you are talking about
7  supporting the head directly.
8      Q.  When you say "directly," what do you mean,
9  "directly"?
10      A.  Well, if I support the handle, and thereby
11  wind up receiving the head, that doesn't seem to read
12  on the structure adapted to support or receive a
13  shaving head.
14      Q.  So if the structure only provides indirect
15  support to a shaving head, it is outside the claims?
16      A.  That's quite a generalization, but at least
17  so far as I have considered it, I would say, yes.
18      Q.  Turn to the next page of your report.  I
19  guess in the about the middle, the third line.  You
20  refer to magnets on the shelf 44.
21          Do you see that?
22      A.  Yes.
23      Q.  Is it your opinion that -- well, would it be
24  your opinion that the combination of shelf 44 and the

Page 43

1  magnet would be adapted to receive and support the
2  clipper blades?
3      A.  No.
4      Q.  Why not?
5      A.  They are not -- they don't have a form that
6  is specific to receiving and supporting the clipping
7  blades.
8      Q.  Well, what form would be specific to
9  receiving and supporting the clipper blades?
10      A.  So, if you imagine an example -- I suppose I
11  am giving you example.  I am not trying to give you a
12  categorical definition -- something that's shaped
13  that would -- shaped so that it would conform to the
14  specific item that you are trying to cradle, or could
15  involve a set of pins or plates, again, that would
16  specifically be adapted to receive that item.
17      Q.  Would you look to the MeKiney patent, Column
18  3, approximately Line 37, where it states, "This
19  shelf is specifically adapted to support clipper
20  blades such as 48 which will be retained and held on
21  the shelf 44 by means of the magnet 46."
22          Do you see that?
23      A.  Yes.
24      Q.  Do you disagree with that statement?

Page 44

1      A.  No.
2      Q.  So you believe that statement is accurate?
3      A.  Well, it's accurate within the context of
4  what is being said here in the Loeffler patent.
5      Q.  No.  This is MeKiney.
6      A.  In the MeKiney patent.
7      Q.  Is that statement inaccurate, outside of the
8  context of the patent?
9      A.  In other words, they are not adapted.  It's
10  not adapted in the sense that we are using Claim 11.
11      Q.  So adapted in the sense of Claim 11, does
12  "adapted" mean "shaped" in the context of Claim 11?
13      A.  Yeah, shape, form.
14      Q.  Where in the court's construction of "cradle
15  structure" do you see any requirement of shape and
16  form?
17      A.  Adapted to support or receive.
18      Q.  So it would be, I guess, in your first
19  report, following a structure, the words "adapted to
20  support or receive a shaving head"?
21      A.  I'm sorry, I didn't understand the question.
22      Q.  Sure.  In the court's construction, the words
23  "adapted to support or receive a shaving head" imply
24  a limitation of shape and form, is that your opinion?

11 (Pages 41 to 44)

Dr. Samir Nayfeh    August 26, 2005

1    A. Yes.
2    Q. On Page 4, you refer to the drying device
3  element.
4        MS. WENDLANDT: This is the second
5  report?
6        MR. SHIMOTA: Yes. I'm sorry. Second
7  report. Thank you.
8    A. Yes.
9    Q. And you opine that siphon tube 24 is not a
10  drying device; is that correct?
11    A. Correct.
12    Q. And you state in the second paragraph,
13  "Siphon tube 24 is not a drying device since it is
14  not a mechanism for active drying of the barber
15  tools."
16        Do you see that?
17    A. Yes.
18    Q. Can you tell me anywhere within Claim 11
19  where there is a requirement of active drying? Claim
20  11 of the '328 patent. Excuse me.
21    A. It's implied by the words "a drying device,"
22  by the phrase "a drying device."
23    Q. "Device" implies active?
24        MS. WENDLANDT: Objection.

1    A. "Device" implies means, or you would be
2  looking for something in the machine that actually
3  acts to speed the drying of the device.
4    Q. Well, if you took the siphon tube 28 out of
5  the MeKiney patent, would it take longer for the
6  tools to dry?
7    A. Very, very long.
8    Q. So the siphon tube 24 does work to speed
9  drying; is that correct?
10    A. I would say it is a prerequisite for drying,
11  that you take the thing out of the liquid, and the
12  siphon tube fulfills that prerequisite for drying.
13    Q. Is it your opinion that a towel -- is a
14  towel, in your opinion, a drying device?
15    A. Yes. Provided I don't rub on myself while I
16  am still in the tub full water, and then it is a wash
17  cloth.
18    Q. Understood. Exactly.
19        In the context of the MeKiney patent, if
20  a barber used a towel to wipe off the tools, would
21  the towel be acting as a drying device?
22    A. Yeah. After they are clean, yeah.
23    Q. Sure.
24    A. Yes.

1    Q. If, for example, the barber took his hair
2  dryer and held it to the tools, would the hair dryer
3  be acting as a cleaning device after they were
4  cleaned?
5    A. Yes.
6        I should make a distinction. You are
7  asking me if it is acting as a drying device, not as
8  if it's acting as a drying device as claimed here?
9    Q. So, is there a distinction?
10    A. There may be. I haven't thought about that.
11    Q. Well, let me ask a question then.
12        Is a towel a drying device within the
13  meaning of the claims of the '328 patent?
14        MS. WENDLANDT: Objection.
15    A. If the machine brought a towel into contact
16  with the wet portions and used that towel to dry the
17  device, then I think it would read on Claim 11.
18    Q. So your opinion is that the towel has to be
19  the part of the one machine; is that right?
20        MS. WENDLANDT: Objection.
21    A. One, "machine" might be too narrow, but it
22  would have to be part of the device that was invented
23  or disclosed. So that if you said I am selling you a
24  drying device as part of this machine, this machine

1  includes a drying device, and that is when you take
2  it out, you rub a towel over it with your hand, I
3  don't think you would consider that drying device to
4  be what's claimed here.
5    Q. Okay. So, say, in the context of this
6  litigation, you sold one of these cleaning bases, and
7  you also included a rag in the box, the rag included
8  along with the base. That would not be a drying
9  device within the meanings of the claims?
10    A. A rag which --
11    Q. And an instruction book that says: When it
12  is done, take it out and wipe it down.
13    A. Yes, I don't see that as a drying device as
14  claimed.
15    Q. Okay. And where in the claims do you see
16  something that stops that or where in the claims do
17  you see a limitation which places my hypothetical
18  outside the claims?
19    A. Well, I think this is common sense as to how
20  you read claims.
21        You say one skilled in the art reads a
22  claim that includes a system that has a drying
23  device, and then see that as part of the invention
24  that you would take a towel and dry it.

12 (Pages 45 to 48)

Dr. Samir Nayfeh    August 26, 2005

Page 49

1    You would be looking for a device that
2    dries and is asking the person, the user of the
3    device to do the drying separately, seems not to fall
4    within the claims.
5    Q.  And what specific portion of the -- what
6    specific language in Claim 11 makes it fall outside
7    of the claims?
8    A.  Well, in other words, your cleaning devices
9    comprises all of these things.
10    So the towel on the side, I don't see as
11    part of this cleaning device, and it would just seem
12    bizarre to claim that it's providing a towel so
13    somebody would constitute having an invented a drying
14    device.
15    Q.  So you think it's -- the language that you
16    are pointing to precludes that the towel hypothetical
17    is a cleaning device in Claim 11?
18    A.  Well, I think if we said a cleaning device
19    comprising a set of those elements, and one of those
20    elements being a drying device, then you would look
21    for a device that is comprised within the cleaning
22    device that does the drying.
23    Q.  Are you aware that the parties have agreed
24    that the preamble to Claim 11 is not a limitation in

Page 50

1    the case?
2    MS. WENDLANDT:  Objection.
3    A.  Yes.  I'm aware of that.
4    Q.  So it is your opinion that -- let me ask
5    again then.
6    What language in Claim 11 specifically
7    precludes my towel hypothetical?
8    MS. WENDLANDT:  Objection.
9    Q.  Let me ask again.  What language in Claim 11
10    specifically precludes my towel hypothetical from
11    falling within the scope of Claim 11's coverage?
12    MS. WENDLANDT:  Objection.
13    A.  You need a device that is part of the machine
14    as far as I can tell.
15    The word "device" implies some mechanism,
16    something, some item and some physical object, and
17    all of these elements are components of this system,
18    and to sort of import the function of drying to
19    something outside of the system itself, I don't think
20    anybody skilled in the art would ever consider
21    somebody wiping a towel on the thing after you have
22    taken it out of the machine to be the drying device.
23    Q.  So you ponit me to the word "device" in Claim
24    11; is that correct?

Page 51

1    MS. WENDLANDT:  Objection.
2    A.  At least the word "device."
3    Q.  Is there any other language that you can see,
4    sitting here today, that precludes my hypothetical
5    from falling within the scope of Claim 11?
6    A.  I think the word "comprising," whether or not
7    you consider "a cleaning device comprising" to be a
8    limitation, I think is meaningful.
9    Q.  So, any other language?
10    A.  I think that's it for specific language.
11    Q.  What if Rayovac began selling its cleaning
12    base, and also had in a larger box a handheld fan,
13    and included an instruction book that said, "use this
14    fan to dry off the head of the shaver after
15    cleaning," would that fall within the scope of Claim
16    11?
17    A.  No.
18    Q.  And why not?
19    A.  Repeat of the argument for the towel.  Same
20    principle.
21    You are asking somebody -- you are using
22    something that is not part of the cleaning device to
23    do the drying.  Whether it is a towel or hair dryer,
24    it's not important.

Page 52

1    Q.  So the language "cleaning device comprising"
2    is what precludes those hypotheticals from falling
3    within the scope of Claim 11; is that correct?
4    MS. WENDLANDT:  Objection.
5    A.  Not only that.  We had a long discussion
6    about the towel, and I think everything said about
7    the towel would apply for the hair dryer.
8    Q.  Is there anything different for the hair
9    dryer?  The fan?
10    A.  Yeah, I don't think there is anything
11    different.  I am saying all of that discussion I
12    think applies.
13    Q.  Well, in the language "a drying device," the
14    specific language "a drying device" of Claim 11, does
15    that imply any requirement that the drying device be
16    in some kind of an integrated unit?
17    A.  Again, "drying device" tells you there should
18    be a device to aid in drying, and the word
19    "comprising" tells you it is part of the cleaning
20    system.
21    Q.  Okay.  So a drying device -- what is your
22    understanding of a drying device?
23    A.  So a device that speeds in drying or aids,
24    acts to dry the shaving head.

13 (Pages 49 to 52)

Dr. Samir Nayfeh    August 26, 2005

Page 53

1    Q.  Okay.  So that -- the words "a drying device"
2    don't place any limitation on where the drying device
3    is; is that correct?
4         MS. WENDLANDT:  Objection.
5    A.  On their own, no.
6    Q.  So with respect to these series of questions
7    regarding my hypotheticals, the language you would
8    rely on is "a cleaning device comprising"; is that
9    correct?
10        MS. WENDLANDT:  Objection.
11   A.  So, yeah, the cleaning device has to comprise
12   a drying device in addition to the other elements.
13   Q.  Let's just stay on this topic.  If you should
14   turn to Page 18 of your expert report.
15   A.  Okay.
16   Q.  You speak there, in some detail, regarding
17   this louvered shutter system; is that correct?  It
18   starts at Page 18 --
19   A.  Correct.
20   Q.  -- but it continues on.
21       Where in Claims 11 and 12 of the '328
22   patent do we find this louvered shutter system?
23   A.  We don't.
24   Q.  So why, then, are you discussing the louvered

Page 54

1    shutter system in connection with obviousness?
2    A.  Because when you look at obviousness, you ask
3    what would it take for the inventors to make this
4    invention?
5         The inventors couldn't have written the
6    claim that requires a drying device unless they could
7    have written a document which would enable one
8    skilled in the art to incorporate a drying device
9    into the cleaning system.
10   Q.  So absent the louvered shutter system, the
11   cleaning device with a -- the cleaning system with a
12   drying device would not work?
13        MS. WENDLANDT:  Objection.
14   A.  What I was pointing to was that they couldn't
15   have written that claim unless they had taught you
16   some means of incorporating the drying device into
17   the cleaning system.
18        So when you look at obviousness, you
19   can't just look at the claims.  You have to look at
20   the active invention, and the active invention
21   includes being able to write the enabling document.
22   Q.  What is your understanding of what you are
23   supposed to be comparing for purposes of the
24   obviousness analysis?

Page 55

1    A.  I don't see it as strictly a comparison.
2    Q.  Okay.  When you were rendering your opinions
3    on obviousness, you weren't comparing the claims to
4    the prior art?
5         MS. WENDLANDT:  Objection.
6    A.  You're not comparing strictly the claims.
7         You're looking at the claim in the
8    context of the overall invention and asking whether
9    the active invention was obvious.
10   Q.  And what is the active invention?
11   A.  The active invention is conceiving of what is
12   claimed and enabling what is claimed.
13   Q.  So when you were opining on obviousness, you
14   were considering the claims and the specification
15   against the prior art; is that right?
16   A.  Yes.
17   Q.  And did counsel explain to you what you were
18   supposed to consider in connection with your
19   obviousness analysis?
20   A.  I think when I first wrote this, we hadn't
21   discussed it, and it's just things that I had learned
22   in previous experiences.
23   Q.  Turn back to Page 4.
24        MS. WENDLANDT:  Jim, if this is an okay

Page 56

1    place, I would like to take a break.
2         MR. SHIMOTA:  Sure.
3         THE VIDEOGRAPHER:  Going off the record.
4    The time is 10:38.
5         (A recess was taken.)
6         THE VIDEOGRAPHER:  One moment.  We are
7    back on the record.  The time is 10:45.
8         MR. SHIMOTA:  I would like to mark as
9    Defendant's Exhibit No. 153, U.S. Patent No.
10   3,478,758, which we refer to in the reports as the
11   Davies patent.
12        EXHIBIT NO. 153 MARKED
13   Q.  If you could turn again to Page 5 of your
14   second expert report.
15        You offer several opinions about the
16   Davies patent; is that correct?
17   A.  Yes.
18   Q.  In your opinion, does the Davies patent have
19   a cleaning fluid container as claimed in the '328
20   patent?
21   A.  No.  No.
22   Q.  Why not?
23   A.  It doesn't satisfy the clause that requires
24   it to be below what you are calling the cradle

14 (Pages 53 to 56)

Dr. Samir Nayfeh    August 26, 2005

Page 57

1  structure during the feeding.
2      Q. So, is it your opinion that the Davies patent
3  does not have a container for holding cleaning fluid?
4      A. If you are asking me just whether it has a
5  container for holding cleaning fluid, divorced from
6  any further clauses of the claim, yes, it does have a
7  container for holding cleaning fluid.
8      Q. So that particular limitation is disclosed by
9  the Davies patent. There may be others, but that
10  particular limitation is disclosed by the Davies
11  patent; is that correct?
12      A. I'm not used to thinking about it so
13  piecemeal, but apparently, yes.
14      Q. And, in your opinion, does the Davies patent
15  disclose a drying device as claimed in the '328
16  patent?
17      A. We are talking about Claim 11?
18      Q. Yes.
19      A. Yes.
20      Q. With respect to Claim 12, does the Davies
21  patent disclose a drying device comprising an
22  impeller as claimed in the '328 patent?
23      A. Yes.
24      Q. Now, at the bottom of Page 5, you refer to

Page 58

1  tray 74 of the Davies patent. The first sentence
2  starts off, "In particular tray 74 is a basket."
3      A. Yes.
4      Q. Is tray 74 a structure?
5      A. Yes.
6      Q. Is tray 74 able to receive or retain cleaning
7  fluid?
8      A. Yes.
9      Q. Is tray 74 adapted to receive the shaving
10  head of a shaving apparatus?
11      A. No.
12      Q. And why not?
13      A. The argument is quite similar to we have been
14  over.
15          I will go through it. It is not adapted
16  specifically to receive the shaving head of a shaving
17  apparatus.
18      Q. And that, again, has to do with the shape of
19  the basket? Shape, form or dimensions?
20      A. Yes. At least that. We talked about other
21  things.
22      Q. Sure. You note, I believe in your first
23  expert report, that Braun -- that you consider
24  Braun's Marksman briefs in connection with this case?

Page 59

1      A. Yes.
2      Q. Do you know whether or not Braun argued that
3  the words "adapted" to had anything to do with the
4  shape of the cradle structure?
5          MS. WENDLANDT: Objection.
6      A. I don't remember.
7      Q. If the court asked your opinion, would you
8  tell the court that the words "adapted" in the '328
9  patent imply shape and form?
10      A. I think we are crossing things up a bit.
11          Now, the patent has a couple of words
12  that go to this, right? There is "a cradle structure
13  adapted to."
14          Now, in the court's construction, the
15  "adapted to" stuck with that. So if we are talking
16  about the patent, "a cradle structure adapted to"
17  tells us something about form and specificity of that
18  form.
19      Q. Okay. Well, in the judge's -- let's stick
20  with the construction.
21          The construction says -- the construction
22  doesn't even use the word "cradle." We can agree
23  with that?
24      A. Right.

Page 60

1      Q. In the judge's construction, where do you
2  find any -- I think we talked about this before --
3  it's the adaptive language --
4      A. Right, that word "adaptive," as I see it, in
5  the court's construction to tell you that it is -- to
6  give you this notion of specific form that's tailored
7  to receive and support.
8      Q. So if the court asked you, you would tell the
9  court that within your construction: I see a
10  requirement of specific form in the word "adaptive"?
11      A. Yes.
12      Q. And tray 74 of the Davies patent does not
13  have that specific form or structure; is that
14  correct? Form or shape?
15      A. Correct.
16      Q. Looking next to the feed device element which
17  have you opined is not met by the Davies patent.
18      A. Yes.
19      Q. Putting aside the cradle structure notion,
20  you opine that a tap and a hose are not a feed
21  device; is that correct?
22      A. I think I had said that the port is not a
23  feed device. Let me reread.
24          So, yeah, certainly the fitting itself

15 (Pages 57 to 60)

Dr. Samir Nayfeh    August 26, 2005

Page 61

1  does not comprise a -- does not constitute a feed
2  device.
3      Q. Okay.
4      A. Now, your question was slightly different.
5      Q. Yes. Is it your opinion that the hose and
6  tap, water tap are not a feed device within the
7  meaning of the '328 patent?
8      A. They are not part of the cleaning device.
9      Q. They are not attached to the cleaning device?
10     A. I wouldn't say they are part of the cleaning
11 device. The tap is part of your house or barber
12 shop.
13     Q. Where is the requirement again of the --
14     A. Well, it's the idea that things that are
15 claimed in the patent as being part of the cleaning
16 device ought to be part of the cleaning device.
17     Q. Okay. Let's take a step back then.
18        Putting aside -- do you have an
19 understanding of the words "a feed device" in the
20 '328 patent?
21     A. Yes.
22     Q. And what is understanding of "a feed device"?
23     A. So the feed device would include, for
24 example, the pump, its inlet, its conduits.

Page 62

1        So those parts of the cleaning system
2  that actually act to push fluid and deliver fluid
3  from the cleaning fluid container to the target,
4  which we would say is the cradle structure over which
5  there's lots of dispute.
6      Q. Okay. And your understanding is based on the
7  plain and ordinary meaning of "a feed device"; is
8  that correct?
9      A. Yes.
10     Q. And within the definition we have been
11 discussing, is a hose and a tap a feed device?
12        MS. WENDLANDT: Objection.
13     A. It's an interesting question. It includes
14 the equivalence of the conduits and a control valve.
15 That wouldn't really include the element of the
16 system that feeds water, the element that provides
17 the pressure or mode of force.
18        So I haven't really thought about that
19 one enough to give you a definite answer, I think.
20     Q. Okay. Then, I take it, that you haven't
21 thought about it. Then your opinion on that is not
22 expressed in your expert report; is that correct?
23     A. I think not.
24        I think in the expert report, I was

Page 63

1  saying that -- I was saying that certainly the
2  fitting is not a feed device on its own, and I think
3  also in here the idea that you are going to feed
4  using something external to your device into the
5  device, that that is -- that doesn't meet the claims.
6      Q. Okay.
7      A. Now, if you had -- well, I think that's what
8  I said.
9      Q. Then those two opinions are --
10     A. And I stand by those.
11     Q. But there are no additional opinions
12 expressed in your report with respect to the feed
13 device element?
14        MS. WENDLANDT: Objection.
15     A. Not as I recall. It's been a while.
16     Q. Well, I mean --
17     A. Right here.
18     Q. It's three paragraphs. I want to make sure I
19 am not missing anything. If you could look.
20        If there is something that will help you
21 recall, tell me now, please.
22     A. So you're asking just about the tap or
23 everything else about this claims?
24     Q. Specifically, I am just asking you if the

Page 64

1  opinion we have been discussing of whether the feed
2  -- a feed device would cover a tap and the hose and
3  whether there is any opinion about that in your
4  expert report?
5      A. I think not.
6      Q. You see there in the middle of the second
7  paragraph, that you make a reference to manual
8  feeding or manually feeding?
9      A. Yes.
10     Q. Does manually feeding -- is there any
11 requirement of automatic feeding within the claims of
12 '328 patent?
13        MS. WENDLANDT: Objection.
14     Q. The claims of the '328 patent?
15     A. Well, the claim calls for a feed device, and
16 that would imply to one skilled in the art, I think,
17 you should include in this system something that does
18 the feeding of fluid, and I think that that would
19 bias you against considering any manual feeding
20 device as reading on the claim.
21     Q. Well, say, for example, Rayovac redesigned
22 its product to include a manual pump, something by
23 which the user basically used its thumb to push on a
24 button to pump fluid throughout the system, would

16 (Pages 61 to 64)

Dr. Samir Nayfeh    August 26, 2005

Page 65

1  that not be covered by the claims of the '328 patent?
2  A.  Yeah, you could consider the pump and outlets
3  to be the feed device, and that might be -- that,
4  again, having just considered it now, probably would
5  read on the claim.
6  Q.  And that would be a form of manual feeding,
7  correct?
8  A.  To a degree.  I don't think it's completely
9  manual.  You are providing a pump.
10  Q.  Sure.  In the next paragraph, you state that,
11  "Moreover, the claimed feeding device feeds cleaning
12  fluid from the cleaning fluid container to the cradle
13  structure," and then you continue on, "The Davies
14  device provides no mechanism from feeding cleaning
15  fluid from container 12 to tray 74 of Mr. Phillips
16  supposed cradle structure."
17  Do you see that?
18  A.  Yes.
19  Q.  Can you tell me how, what sequence the fluid
20  travels in in the Davies patent to go from the tap
21  ultimately to tray 74?
22  A.  It goes from the tap into cleaning fluid
23  container.  So not from the cleaning fluid container
24  into.  The opposite.

Page 66

1  Q.  Okay.  And then where does it go after it
2  goes to the cleaning fluid container?
3  A.  So it stays in the cleaning fluid container.
4  It doesn't leave it.  Rises, the level rises, and
5  thereby submerges the basket.
6  So it's always "to" the cleaning fluid
7  container during the feeding, not "from."
8  Q.  So fluid never goes from the cleaning fluid
9  container to the tray 74?
10  A.  No.  It does not leave the cleaning fluid
11  container to get to the tray.
12  Q.  So it has to -- so it is your requirement --
13  you believe that the words "from" -- what word in the
14  claims requires that fluid leave the cleaning fluid
15  container when it travels to the cradle structure?
16  A.  Well, the word "from" is pretty indicative of
17  that.  Quite strongly indicative of that.
18  If you are going to feed fluid from
19  something, then you would be taking it from that
20  thing.
21  Q.  So, fluid from the cleaning fluid -- so,
22  cleaning fluid does not travel from one point in the
23  cleaning fluid container to another point before it
24  reaches tray 74?

Page 67

1  MS. WENDLANDT:  Objection.
2  A.  Say that again.  That was confusing.
3  Q.  Sure.  In the Davies patent, is it your
4  opinion that cleaning fluid does not travel from one
5  point in the cleaning fluid container to another
6  point before reaching tray 74?
7  A.  I mean, sure.  Fluid in any container is
8  traveling from one point in the container to another
9  point in the container all of the time.
10  Q.  Okay.  And so --
11  A.  If I didn't have a feed device, fluid would
12  be -- in my cup here, fluid is flowing from one point
13  to another point (indicating).
14  Q.  When it is sitting there, it is static?  It's
15  somewhat so.
16  A.  So, it's no longer static (indicating).
17  Q.  With the pump -- with any kind of a pump or
18  some kind of mode of force, fluid is traveling from
19  Point A to Point B.  That necessarily follows; is
20  that not correct?  If the pump is operating or --
21  A.  If the pump is operating, and you are not at
22  a stagnation point, and so on.
23  Many caveats, yes, but fluid flows from
24  point to other points in a tank, sure.

Page 68

1  Q.  During the normal operation of the Davies
2  patent, fluid is moving within container 12 or is --
3  sorry.  In the cleaning -- yes, container 12.
4  A.  Yes.
5  Q.  And that fluid is moving from one point to
6  another in the container 12?
7  A.  Yes.
8  Q.  In a normal operation, the fluid is actually
9  moving from one point to tray 74; is that correct?
10  Let me make it more clear.  The cleaning
11  fluid is moving from a starting point in container 12
12  ultimately to the tray 74?
13  A.  This is kind of funny notion.
14  You're also bringing more fluid in.  So
15  some of the fluid that is in the container, as the
16  thing gets mixed, winds up over the level of the tray
17  -- I forget the number.
18  Q.  74 I believe.
19  A.  Tray 74.  And of course some of the new fluid
20  you are pumping in winds up there, so yes.
21  Q.  So I guess the answer to my question was
22  "yes," though?
23  MS. WENDLANDT:  Objection.
24  A.  That's been a way back.  If we can get it

17 (Pages 65 to 68)

Dr. Samir Nayfeh    August 26, 2005

Page 69

1 read back.
2    Q. Sure.
3        (The record was read.)
4    A. I would have to say "no" to that, because you
5 said the cleaning fluid, implying all of the cleaning
6 fluid.
7    Q. Well, some of the cleaning fluid.
8    A. Some of the cleaning fluid, yes, I think I
9 would agree with that.
10    Q. You next go to the elevation of the cradle
11 structure element, and you opine that that element is
12 not met.
13    A. Yes.
14    Q. And you state on the top of Page 7, "It is
15 clear from this description that the tray 74 is not
16 above the fluid level of the cleaning fluid in the
17 cleaning fluid container during the entire feeding
18 operation. "
19        Do you see that?
20    A. Yes.
21    Q. Is tray 74 above the level of the cleaning
22 fluid in the cleaning device of cleaning fluid
23 container during part of the feeding operation?
24    A. Just at the very beginning, yes.

Page 70

1    Q. Where in the claims is it required that the
2 cradle structure must be above the fluid level during
3 the entire -- where do you see the words "entire" in
4 the language of the claims or the parties' agreed
5 construction?
6    A. The word "during" -- you say:  During A, B
7 must be true.
8        Without a specific qualifier, you would
9 take it all of the first clause, A.  So that seems
10 directly to read to me you are required to be above
11 during the whole feeding -- what's the term -- during
12 the entire feeding operation.
13    Q. Well, let me ask you this question.  Jumping
14 back.
15        If I make the statement to you, "I drank
16 a cup of coffee during the deposition today," as a
17 matter of common English, would you think I was
18 drinking coffee constantly throughout the day, or at
19 some point during the deposition, or both, one or the
20 other?
21    A. Could I try a better analogy?
22    Q. Sure.
23    A. "During the deposition you must remain
24 seated."  I would take that to mean I would have to

Page 71

1 be in my chair during the whole deposition.
2    Q. We have taken breaks, haven't we?
3    A. Yes.  "During the take off and landing your
4 seat belts must remain fastened."  It seems that they
5 have to be fastened during the take off and landing.
6        When you stating a requirement with the
7 clause "during," it's stronger than saying something
8 occurred during something else.
9    Q. What is your understanding of the word
10 "during"?
11    A. This is a challenging question.
12        "During" means that something -- that
13 temporally something has to occur during.  The second
14 thing means it has to occur while that thing is
15 happening.
16    Q. Let me ask this question.
17    A. It's a very --
18    Q. It's probably a bad question.  Let me
19 withdraw it.
20        Would you agree with me that the word
21 "during" as a meaning of common English includes both
22 all of an event temporally and some of an event
23 temporally?
24        MS. WENDLANDT:  Objection.

Page 72

1    A. I think we have seen examples of at least
2 both.  So I would agree.
3    Q. And do you have any opinion -- I mean, the
4 '328 patent -- or the '328 patent refers to feeding,
5 in this particular clause we are talking about.
6        Do you have any opinion about when
7 feeding ends and when cleaning begins -- or let me
8 ask the question.  Take a step back.
9        In your mind, do you distinguish between
10 the act of feeding and the act of cleaning within the
11 '328 patent?
12    A. You're asking temporally?
13    Q. Yes.  Temporally, yes.
14    A. And you're asking just about trying to read
15 the claim language or the specification?
16    Q. Yes sure.  Let's talk about in the spec, in
17 the context of the -- the device disclosed in the
18 '328 patent.
19    A. Do I have the actual patent in front of me?
20    Q. The Davies or '328?
21    A. '328.
22    Q. Let me give you the '328.  We have marked
23 this.
24        I hand you what has been marked

18 (Pages 69 to 72)

Legalink Chicago
(312) 263-3524

Dr. Samir Nayfeh    August 26, 2005

Page 73

1  previously, probably a number times, but as
2  Defendant's Exhibit No. 10, which is the U.S. Patent
3  No. 5,711,328.
4       MS. WENDLANDT:  Is it 10 or 12?
5       MR. SHIMOTA:  I see 10 on this one.  It
6  must have been Exhibit 12 to Phillips' report.
7  Somewhere along the lines, it was 12.
8    A.  I just want to verify.  There is a timeline
9  here, but I believe that the duration of cleaning is
10  the same as the duration of feeding, maybe plus or
11  minus a little bit, as the fluid begins to flow and
12  actually gets in there and the time it takes for
13  fluid to drain out, still caring away possibly some
14  contaminants, and then you start -- probably a little
15  bit of overlap, but I would say substantially their
16  duration is the same.
17    Q.  At least in the context of the '328 patent,
18  cleaning and feeding are regarded as discrete events
19  temporally?
20    A.  You mean discrete, separate from each other,
21  or as having a definite beginning and end?
22    Q.  Having a definite beginning and end.
23       MS. WENDLANDT:  Objection.
24    A.  I don't think it's necessarily said so

Page 74

1  explicitly, but my reading of this is, yeah, there is
2  a definite beginning and ending of the feed
3  operation.
4    Q.  So, just now looking, rather than to the
5  spec, but actually to the claim, do you have any
6  understanding of when feeding ends and cleaning
7  begins within the meaning of the claims?
8    A.  Well, the claims, I don't think, really talk
9  about a cleaning operation.  Do they?  I don't think
10  so.
11       We just said we don't think of the
12  feeding as ending and the cleaning beginning.  We
13  think of them happening more or less simultaneously,
14  right?
15    Q.  Yes.
16    A.  So I guess, on two points, I don't get the
17  question.
18    Q.  Well, okay.  Within the meaning of the
19  claims, there would be a point where feeding with not
20  end, but along the timeline of the feeding, that
21  cleaning would begin; is that correct?
22       Let me take a step back.  On the claims,
23  because the claims say nothing about the cleaning
24  within the specification, there is a point in time at

Page 75

1  which feeding continues and will ultimately end, but
2  cleaning begins and also will end?
3    A.  So the question is:  Is there a point in time
4  at which cleaning continues and will ultimately end
5  but cleaning begins and also will end?
6       Are you asking me again whether they
7  happen simultaneously?
8    Q.  I will withdraw the question.  Let's move on.
9    A.  I'm sorry.
10    Q.  It's a minor point.  It's a bad question.
11       MR. SHIMOTA:  I would like to mark as
12  Defendant's Exhibit No. 154, U.S. Patent No.
13  3,500,840, referred to as the Maatz patent.
14       EXHIBIT NO. 154 MARKED
15    Q.  Is it correct that you have offered the
16  opinion that the Maatz patent does not anticipate
17  Claim 11 of the '328 patent?
18    A.  Yes.
19    Q.  I believe Figure 1 and 2 of the Maatz patent
20  are on the next page.
21       My first question is:  Is storage tank 12
22  a cleaning fluid container within the meaning of the
23  Maatz patent?
24       MS. WENDLANDT:  Objection.

Page 76

1    A.  Okay.  Again, it is a cleaning fluid
2  container.
3       I don't -- I haven't checked whether it
4  actually reads on the claim, everything in the claim,
5  but it is a cleaning fluid container.
6    Q.  It meets that particular limitation, correct?
7    A.  Yes.
8    Q.  And you state next, "The filter tank consists
9  of a filter and holds sterilizing fluid."
10       Do you see that?
11    A.  Yes.
12    Q.  Is the sterilizing fluid cleaning fluid in
13  the Maatz patent?
14    A.  Yes.  It has both.
15    Q.  You refer to a pump 32, above that,
16  basically?
17    A.  Yes.
18    Q.  And is pump 32 a feed device within the
19  meaning of the claims of the '328 patent?
20    A.  Again, there's the question of pumping to a
21  cradle structure.  So it is a feed device.
22    Q.  And does the level -- well, with respect to
23  the elevation element of the Claim 11 of the '328
24  patent, putting aside the question of whether or not

Legalink Chicago
(312) 263-3524

Dr. Samir Nayfeh    August 26, 2005

Page 77

1  there is a cradle structure, is that limitation
2  disclosed in the Davies -- or the Maatz patent?
3      A.  Yes.
4      Q.  You discuss on Page 8 cleaning tank 10, rack
5  15, grid 17.
6          To speed things up, can we agree that
7  those three structures are all structures, and that
8  they are able to receive or retain cleaning fluid?
9      A.  I think that rack 15 remains above the level
10  of the cleaning fluid at all times, so it cannot even
11  receive.
12      Q.  So that one -- so grid 17, does that receive
13  and retain cleaning fluid -- receive or retain?
14      A.  Receive or retain.
15      Q.  And cleaning tank 10, that receive or retains
16  cleaning fluid?
17      A.  Yes.
18      Q.  And grid 17 and cleaning tank 10 are both
19  structures, right?
20      A.  Yes.
21      Q.  Your opinion with respect to cleaning tank 10
22  and grid 17 is that they do not meet the claim
23  limitation because they are not adapted to receive
24  the shaving head of a shaving apparatus; is that

Page 78

1  correct?
2      A.  At least that.  I don't remember if there is
3  anything else.
4      Q.  There is also the point -- you also mention
5  the point about the clipper blades, too, and that's
6  not the shaving head of a shaving apparatus?
7      A.  Yes.
8      Q.  But one of your opinions, like MeKiney and
9  Davies, is that grid 17 and tank 10 do not have a
10  particular shape; is that correct?
11      A.  Correct.
12      Q.  And that's where at the bottom of this
13  paragraph you say, "Such surfaces cannot properly be
14  called cradle structures and are not adapted to
15  receiving a shaving head of the shaving apparatus"?
16      A.  Correct.
17      Q.  Now, have you -- you've also considered that
18  the '556 patent in connection with this litigation;
19  is that correct?
20      A.  Yes.
21      Q.  And you're aware that the '556 patent
22  explicitly calls out a dry shaving apparatus; is that
23  correct?
24      A.  Yes.

Page 79

1      Q.  And are you also aware that the '328 patent
2  does not explicitly require a dry shaving apparatus?
3      A.  Yes.
4      Q.  And with respect to the drying device element
5  of the Maatz patent at the bottom of this page --
6      A.  Yes.
7      Q.  -- your opinion is that the drain hole 22 is
8  not a drying device; is that correct?
9      A.  Correct.
10      Q.  If you took the drain hole 22 out of the --
11  well, if you plug the drain hole 22 in the Maatz
12  patent, would it take longer for the cleaned tools to
13  dry?
14      A.  So does the drain hole aid in the drying of
15  the barber's tools, cleaned barber tools?
16      A.  I think the word is it is a prerequisite for
17  the drying of those tools.
18      Q.  Do you see a distinction there?
19          Well, do you see a distinction between
20  being a prerequisite for drying the tools and aiding
21  in the drying of the tools?
22      A.  I think so.
23          I mean, if you said, "aid," I guess I

Page 80

1  the context here, when we say "aid," we are implying
2  that things would have become dry anyways, in some
3  reasonable amount of time.
4          So obviously if you didn't drain the
5  cleaning fluid out of this thing, it would take a
6  very, very long time.  You could say they are not
7  drying at all.  Stuff evaporates and so on.
8      Q.  Yes.
9      A.  So , I guess, the -- that's the notion I was
10  trying to get at.
11      Q.  Okay.  If you could turn to Page 9 of your
12  report.  This is now the -- let me rephrase -- for
13  Claim 14 -- Claim 14 of the '328 patent introduces
14  the notion of the cradle structure being permanently
15  open to the atmosphere; is that correct?
16      A.  Yes.
17      Q.  And with respect to the MeKiney patent, is
18  tank 12 of the MeKiney patent permanently open --
19  take your time -- of the MeKiney permanently open to
20  the atmosphere?
21      A.  Yes.
22      Q.  And in the MeKiney patent, is shelf 44
23  permanently open towards the atmosphere?
24      A.  Shelf 44?

20 (Pages 77 to 80)

Dr. Samir Nayfeh     August 26, 2005

Page 81

1      MS. WENDLANDT: You can only see it on
2  Figure 3.
3      MR. SHIMOTA: Yes.
4      A. Yes.
5      Q. Then if you grab the Davies patent, I will do
6  these in order.
7          With respect to the element permanently
8  opened towards the air, does the word "towards," in
9  your opinion, apply -- imply any direction?
10     MS. WENDLANDT: Objection. I am just
11 trying to figure out where the word "towards" come
12 in.
13     Q. Well, for example, in the second sentence,
14 you say -- of the second paragraph -- "The court
15 construed this element of Claim 14 to require that
16 the cradle structure be permanently open toward the
17 open air."
18     A. That is the court's construction.
19     Q. Yes.
20     A. I don't think it implies a direction -- let
21 me make sure I understand.
22          You are talking about a direction of air
23 flow?
24     Q. Yes.

Page 82

1      A. Or a direction of something passing -- I
2  shouldn't say "air" -- from the tank to the
3  atmosphere. So I don't think the word "towards"
4  implies a direction.
5      Q. What do you mean by "the open air"?
6      A. The atmosphere. The exterior of the tank.
7      Q. Okay. Let me see. If -- so we are sitting
8  in this room, and we are breathing, and the door is
9  closed. Do you agree?
10     A. Yes.
11     Q. So in this room -- is the open air in this
12 room?
13     A. If we had a cleaning device on this table?
14     Q. Just more in general. I am trying to
15 understand the term.
16          Is the room we are sitting in open to,
17 towards the open air?
18     A. Okay. To make sense of this, we would have
19 to establish a little bit of context.
20     Q. Okay.
21     A. If we are talking about the room and what it
22 is open to, then the open atmosphere means the
23 exterior of the building or at least hallway and so
24 on, and I would say we are not open to those.

Page 83

1      Q. Okay. And if you sit the cleaning device
2  that is at issue in this litigation on the table,
3  would -- the Rayovac device -- you have analyzed
4  Rayovac's device -- would Rayovac, which you have
5  defined as the cradle, would that be open toward the
6  open air?
7      A. Yes.
8          In that case the "open air" refers to the
9  air in the room outside of the cradle device and
10 the rest of the cradle device.
11     Q. Okay. In the next sentence, after we talked
12 about the open air, you state that, "As the '328
13 patent explains, this feature of the cradle structure
14 enables the shaving apparatus to be inserted into the
15 cradle structure without any effort and to be removed
16 without the need to utilize any parts for closing the
17 cradle structure."
18          Did you see that?
19     A. Correct.
20     Q. Where do you see any language in Claim 11
21 requiring -- limiting the claim to easy insertion and
22 removal of the shaving apparatus?
23     A. Well, you ask yourself what "open to the
24 atmosphere" means. So we have established that

Page 84

1  "atmosphere" is the region outside of the cleaning
2  device; and so, then, "open to the atmosphere" would
3  imply, you know, not simply that it is not
4  hermetically sealed, but with an opening large enough
5  to put the shaver in and out.
6          So that -- basically to understand that
7  claim element, we look at sort of the plain ordinary
8  meaning which means open somehow, and I -- then
9  based on having read the specification, we conclude
10 that is what they meant.
11     Q. Well, based upon your reading of Claim 14 --
12 you know that Claim 14 -- that the "permanently open
13 to the atmosphere" element is only included in Claim
14 14 of the '328 patent?
15     A. At least among the ones that are --
16     Q. That are asserted. That's correct. Most of
17 the asserted claims.
18     A. Does Claim 18 -- Claim 18 depends from 11?
19     Q. No. Claim 18 is independent.
20     A. But it doesn't have that? I just --
21     Q. No.
22     A. Okay.
23     Q. So you are aware that both Claims 11 and 18
24 cover closed cradle structures, correct?

21 (Pages 81 to 84)

Dr. Samir Nayfeh    August 26, 2005

Page 85

1    A. If by "closed" you mean being permanently
2  opened to the atmosphere or not being permanently
3  opened to the atmosphere, yes.
4    Q. So your discussion here in the context of
5  Claim 14 with respect to the easy insertion and
6  removal of a shaving apparatus, that only applies to
7  claim 14, correct?
8    A. To be more specific, the business about not
9  having to remove a cover to insert the shaving head
10  is what's specific to Claim 14.
11       Now, the reason for not having to remove
12  the cover is to make it easier to take the thing in
13  and out, but I can't categorically say that things
14  like Claim 11 don't imply something -- in other
15  words, I think you are asking me to make a more
16  general statement than I would be comfortable making.
17    Q. So the statement -- what I am asking you now,
18  that's something you haven't considered before today?
19    A. I am not prepared or studied -- I have not
20  prepared to make a categorical statement that ease of
21  inserting and removal of the shaving head is not
22  relevant to, or important to understanding any of the
23  other claims.
24    Q. Okay. Now, Mr. Phillips opines that vented

Page 86

1  air reaching tray 74 in the Davies patent. Do you
2  understand that?
3    A. Yes.
4    Q. Do you disagree with him that vented air
5  reaches tray 74 in the Davies device?
6    A. I do not disagree.
7    Q. But you nonetheless think that that -- tray
8  74 is not permanently open to the outside air; is
9  that correct?
10    A. Yeah, it's not permanently open to the open
11  air, as stipulated by the claim.
12    Q. And why is it not permanently opened to the
13  air?
14    A. As we said, in the meaning of the patent, we
15  are talking about an opening large enough to insert
16  and remove a shaving head.
17    Q. So, the "permanently open to the air"
18  limitation is something has -- it has a size
19  requirement to it?
20    A. Well, a function and that function implies
21  size.
22    Q. Why?
23    A. Well, the function -- what you are getting at
24  is the function of -- in other words, how we

Page 87

1  understand "permanently open to the open air."
2       We take the plain and ordinary meaning,
3  which is opening. We take some guidance from the
4  specification in this, and say, okay, what they meant
5  is it was open enough that you could put the shaver
6  in without removing the cover. That's what it says
7  in the specification.
8    Q. And is that size requirement anywhere in the
9  parties-agreed construction?
10       MS. WENDLANDT: Objection.
11    Q. Well, let me restate --
12    A. I said "a function."
13    Q. Function. I don't mean to put words in your
14  mouth.
15       Is that functional limitation stated
16  anywhere within the agreed construction of the
17  parties, in your opinion?
18    A. I think it's implied.
19    Q. What language do you think implies --
20    A. "Permanently open towards the open air,"
21  which is paraphrasing quite a bit, what is in the
22  claim, but also saying "open air" as opposed to "air"
23  or "atmosphere," which to me seems to be reaffirming
24  what is stated in the specification.

Page 88

1    Q. So in the context of the Davies patent, you
2  agree that tray 74 is receiving air from -- receives
3  air from the outside, correct?
4    A. Receiving air, yes.
5    Q. You think that "permanently open to the
6  atmosphere" limitation is not met because there is a
7  lid on the Davies device?
8    A. Yes.
9    Q. So do you know if that lid is sealed in the
10  Davies device?
11    A. I don't remember what sort of sealing is
12  stipulated or if it is stipulated at all.
13       Then the question was sort of convoluted.
14  Is it sealed against particles? Are you sealed
15  against liquid? Are you sealed against air?
16    Q. To the air. To the air.
17       Let me ask this question: Does the
18  language of the claims or parties-agreed construction
19  imply any requirement that the cradle structure be
20  sealed or unsealed?
21    A. Well, at least unsealed.
22    Q. So the parties-agreed construction does imply
23  that the cradle structure be permanently unsealed?
24    A. At least.

22 (Pages 85 to 88)

Dr. Samir Nayfeh    August 26, 2005

1    Q. When you say "at least," what else would it
2 imply?
3    A. There is kind of a difference between being
4 unsealed and completely open from the top or having a
5 partial lid or so on.
6    Q. With respect to the Maatz patent, do you
7 agree that the grid 17 and tank 10 are permanently
8 open towards the atmosphere?
9    A. Yes.
10    MR. SHIMOTA: I would like to mark as
11 Defendant's Exhibit 155, U.S. Patent No. 2,976,552,
12 which the parties have referred to the Loeffler
13 patent.
14    EXHIBIT NO. 155 MARKED
15    Q. You have offered an opinion that the Loeffler
16 patent does not anticipate Claim 14 of the '328
17 patent; is that correct?
18    A. Yes.
19    Q. Is it -- would you agree with me that the
20 Loeffler patent discloses a cradle structure adapted
21 to receive a shaving head of a shaving apparatus,
22 said cradle structure being permanently opened to the
23 atmosphere within the meaning of the '328 patent?
24    A. No.

1    Q. Why not?
2    A. The hair clippers are not a shaving
3 apparatus.
4    Q. And where do you express that opinion in your
5 expert report?
6    A. I think it's not expressed. There were other
7 things.
8    Q. But the opinion with respect to the cradle
9 structure element is not in your expert report; is
10 that correct?
11    MS. WENDLANDT: Objection.
12    A. Well, I mean, there is also -- I mean, there
13 is another reason why there is not -- well, let me
14 remember what's going on here.
15    So I think in the report we emphasized
16 other points, and we didn't talk about the
17 distinction between hair clippers; but in other
18 words, in the earlier sections we said: Hair
19 clippers are the purported shaving devices. So I
20 think it isn't repeated here.
21    Q. So, am I correct that you don't offer an
22 opinion with respect to the cradle structure element
23 vis-a-vis the Loeffler patent in your expert report?
24    A. Yeah, I mean, it comes up in the discussion

1 of things like the cradle structure being arranged
2 above the cleaning fluid level of the cleaning fluid
3 and the cleaning fluid container which would -- if
4 everything else about this made it a valid cradle
5 structure, it still wouldn't be, based on the level
6 -- the level clause.
7    Q. Sure. I understand that. I understand you
8 make other distinctions --
9    A. Yes.
10    Q. -- that --
11    A. That particular distinction I don't think is
12 made.
13    Q. Let me ask you this question: If Rayovac
14 came out with a device tomorrow which used the same
15 cleaning system it always had, but it was cleaning
16 hair clippers as opposed to an electric razor, it
17 would be your opinion that that device would not
18 infringe the '328 patent?
19    A. Yes. It would not infringe, because the '328
20 patent is -- well, I need to be careful, right? You
21 said it's not a limitation or is a limitation that it
22 is a shaving apparatus.
23    Q. Well, just, you know, based --
24    A. I would say, yes, such device would not be

1 adapted to receive a shaving head of a shaving
2 apparatus. So I think it would not read on the '328
3 patent.
4    Q. That would be true of the '556 patent as
5 well --
6    A. Uhm.
7    Q. -- that they are -- you could take a second
8 to look, but the '556 patent also has --
9    A. It also says a shaving apparatus, so yes.
10    MR. SHIMOTA: Let's take a break.
11    THE VIDEOGRAPHER: This marks of end of
12 videotape number one in the deposition of Samir
13 Nayfeh. We are going off the record. The time is
14 11:47.
15    (A lunch recess was taken.)
16
17
18
19
20
21
22
23
24

23 (Pages 89 to 92)

Dr. Samir Nayfeh   August 26, 2005

Page 93

1   A F T E R N O O N   S E S S I O N
2          THE VIDEOGRAPHER:  One moment.  We're
3   back on the record.
4          Here marks the beginning of videotape
5   number two in the deposition of Samir Nayfeh.  The
6   time is 12:33.
7   BY MR. SHIMOTA:
8   Q.  Dr. Nayfeh, what is your area of expertise?
9   A.  Mechanical design.
10  Q.  Are you an expert in marketing?
11  A.  No.  Only to the extent that it overlaps with
12  mechanical design, the way we teach it and practice
13  it.
14  Q.  Well, what areas of overlap are there?
15  A.  In other words, when we teach mechanical
16  design, product development, we invariably get into
17  thinking about the customer, what the customer wants.
18  Q.  Do you consider yourself an expert in the
19  arena of marketing?
20  A.  No.
21  Q.  Turning back to the Loeffler patent.
22         At the top of Page 11, you do -- you note
23  that there is a cradle 50 shape to receive the
24  clipper head.  Do you see that?

Page 94

1   A.  Yes.
2   Q.  It is your opinion that the Loeffler patent
3   discloses a cradle?
4          MS. WENDLANDT: Objection.
5   A.  Yes.  A cradle shape to receive a clipper
6   head.
7   Q.  And is that cradle in the Loeffler patent
8   permanently open towards the atmosphere?
9   A.  I believe so.
10         I don't remember if on the specification
11  there was any discussion of there being a lid over
12  the device, but at least in the pictures I don't see
13  any kind of a cover or anything that would render it
14  not permanently open to air.
15  Q.  You also offer the opinion that the Loeffler
16  patent lacks a cleaning fluid container; is that
17  correct?
18  A.  Yes.
19  Q.  If you can look at Figure 1, do you see spray
20  can 60?
21  A.  Yes.
22  Q.  Is spray can 60 a container?
23  A.  Yes.
24  Q.  Does spray can 60 hold fluid?

Page 95

1   A.  Yes.
2   Q.  Does spray can 60 hold sterilizing fluid?
3   A.  Yes.
4   Q.  Does spray can 60 hold cleaning fluid?
5   A.  No.
6   Q.  And why not?
7   A.  So the Loeffler patent, in contrast, for
8   example, with the Maatz patent, uses the fluid
9   strictly for sterilization, whereas most of the other
10  things we discussed, the fluid at least cleans, and
11  also, in most cases, sterilizes.
12         So the fluid here does no cleaning,
13  strictly sterilizes.
14  Q.  So you don't consider sterilization cleaning?
15  A.  They are different things.
16  Q.  Well, so, in your opinion, this is about Venn
17  diagrams?  You have cleaning as one type of process.
18         It's your opinion that sterilizing would
19  not be a subset of cleaning?
20  A.  You are talking about a Venn diagram, about
21  these two functions, and they are quite distinct.
22         Now it happens that in the process of
23  cleaning, if you clean a surface so well that you
24  remove all bacteria, then you could sterilize it; but

Page 96

1   you could also sterilize it without removing all of
2   the debris.
3          So sterilization is really the killing of
4   bacteria, viruses, I suppose fungus, whereas cleaning
5   is the removal of unwanted things from surfaces.
6   Q.  And so I guess the -- my question previously
7   about the Venn diagrams -- is there overlap or are
8   these two completely separate functions?
9   A.  Well, a Venn diagram on the functions would
10  be a difficult thing.  I am not sure I could answer,
11  but if you said cleaning devices and sterilizing
12  devices, then there would be overlap.
13  Q.  So there would be -- okay.
14         If you had Venn diagrams for cleaning
15  devices and sterilizing devices, there would be
16  overlap between those two?
17  A.  Yes.  You could have strictly sterilizing
18  devices, strictly cleaning devices, and things, of
19  course, that do both.
20  Q.  Are you aware that in the initial work
21  performed by Dr. Pahl and Mr. Braun that a cleaning
22  fluid that they used came from spray cans that Braun
23  sold?
24  A.  I believe I read that in a deposition, yes.

24 (Pages 93 to 96)

Dr. Samir Nayfeh    August 26, 2005

Page 97

1    Q. And does that fact in any way impact your
2  opinion that the Loeffler patent does not have a
3  cleaning fluid container?
4    A. No.
5    Q. And why is that? Let me re-ask -- that's
6  probably a bad question.
7       Do you think the spray can from which
8  Dr. Pahl got the fluid for his cleaning device
9  prototypes, was that spray can a cleaning fluid
10  container?
11       MS. WENDLANDT: Objection.
12    A. It was a cleaning fluid container.
13       I don't think it would read on the
14  claims. So I assume your question is whether it is a
15  cleaning fluid container divorced from the claims?
16  And the answer would be yes.
17    Q. Let's just look at the limitation on its own.
18       We can agree that -- let's see what it
19  means, as agreed to by the parties -- cleaning fluid
20  container means a container for holding cleaning
21  fluid.
22    A. Okay.
23    Q. Is the spray can that Dr. Pahl -- or was the
24  spray can that Dr. Pahl procured, was that a

Page 98

1  cleaning fluid container within the agreed
2  construction of the parties?
3       MS. WENDLANDT: Objection.
4    A. Yes.
5    Q. And is it your understanding that that spray
6  can would have been similar to the -- is it your
7  understanding that the spray can that Dr. Pahl
8  procured would be similar to the spray can 60 of the
9  Loeffler patent?
10       MS. WENDLANDT: Objection.
11    A. I can't say.
12    Q. You also note with respect to the spray can
13  in 60 of the Loeffler patent, in the last sentence,
14  you state, "As is clear from Figure 1 of the Loeffler
15  patent reproduced immediately above, there is no
16  provision to catch or contain the contaminated fluid
17  that would drain from the shaving head in a fluidic
18  cleaning operation."
19       Do you see that?
20    A. Yes.
21    Q. Can you point me to where in the language of
22  Claim 14 there is any requirement of a provision to
23  catch or contain contaminated fluid?
24    A. It's only implied.

Page 99

1    Q. And implied within the construction of
2  cleaning fluid container?
3    A. Yes. And possibly elsewhere. Yeah. It's
4  implied when you say "cleaning fluid."
5    Q. Let me ask you this: You're aware that
6  Rayovac sells its product with a bottle of cleaning
7  fluid; is that correct?
8    A. Yes.
9    Q. And is that bottle of cleaning fluid a
10  cleaning fluid container?
11    A. Yes.
12    Q. And you are also aware that the fluid is
13  poured out of that bottle into Rayovac's device,
14  correct?
15    A. Correct.
16    Q. And you're also aware that the contaminated
17  fluid is not poured back into that bottle; is that
18  correct?
19       MS. WENDLANDT: Objection.
20    A. It could be, but probably not. You wouldn't
21  expect to.
22    Q. So, let me ask, also, as well: They sell
23  detergent for mops, for cleaning dishes and perhaps a
24  floor in containers; is that correct? Are you aware

Page 100

1  of those?
2    A. Correct.
3    Q. And are those cleaning fluid containers, a
4  bottle of dishwasher detergent?
5    A. Yes.
6    Q. Do people return the dishwasher detergent to
7  the bottle after the detergent has been used for
8  cleaning?
9       MS. WENDLANDT: Objection.
10    A. No.
11    Q. Could you look at the feed device element,
12  Part 11 of your report?
13    A. Yes.
14    Q. You opine that the feed device element is not
15  met by the Loeffler patent?
16    A. Yes.
17    Q. You also state that valve 75 is a flow
18  control device?
19    A. Yes.
20    Q. What is the difference between a feed device
21  and a flow control device?
22    A. So the feed device, as we mentioned,
23  exemplified by the pump and conduits, and possibly
24  other components, includes that thing which provides

25 (Pages 97 to 100)

Dr. Samir Nayfeh    August 26, 2005

Page 101

1  the mode of force for the fluid to move.
2      So conduits are part of a fluid feed
3  system; control valves are part of a fluid feed
4  system; but I don't think you would call the valve
5  the fluid feed system.
6      Q. And why not?
7      A. One skilled in the art would realize a valve
8  alone doesn't make a fluid feed system. I mean, you
9  wouldn't hand me a valve and say, "Here is your fluid
10 feed system."
11     Q. How does fluid move from spray can 60 to the
12 cradle in the Loeffler patent?
13     A. There's pressurized gas in the can that -- so
14 that when you press the control valve -- in other
15 words, when you open -- create an opening in the can,
16 then things flow out quickly.
17     Q. The pressure differential creates the force?
18     A. Yes, pressure.
19     Q. And so -- and the valve enables the pressure
20 -- the valve enables the pressure to create the force
21 to move the fluid?
22     A. The force is there. The valve enables the
23 fluid to flow.
24     Q. That's right.

Page 102

1      And without the valve, the fluid could
2  not move from the spray can 60 to the cradle 50 in
3  the Loeffler patent.
4      A. Without the valve or some other opening,
5  yeah.
6      Q. For the elevation of the cradle structure,
7  you would agree with me that this limitation is met,
8  at least some of the time, in the operation of the
9  Loeffler device, correct?
10     A. Most likely, depending on how the aerosol can
11 is configured. I haven't -- I can't say for sure.
12     Q. Why can't you say for sure?
13     A. In some aerosol cans the propellent is gas,
14 distinct from the liquid, and in others that may not
15 be the case, liquid propellent, and I would have to
16 double-check; but in those cases you may not have a
17 sort of distinct gas and liquid phase in the can as
18 it starts to empty. I am not sure.
19     Q. For the liquid propellent, when would that
20 have been used in aerosol cans?
21     A. How recent historically?
22     Q. Yes.
23     A. See, that, I don't know.
24     Q. Well, you state on Page 12, the end of the

Page 103

1  full first a paragraph, "And the fluid level in the
2  Loeffler device's sterilizing food container is not
3  below the cradle structure until the spray can has
4  been partially emptied."
5      Do you see that?
6      A. Yes.
7      Q. What do you mean by that statement?
8      A. So that would be consistent with certainly a
9  gas propellent spray can and most likely also true in
10 the liquid propellent spray can, but I am not sure.
11     So I don't -- I don't want to say for
12 sure what the inside of the liquid propellent can
13 looks like. That's the only qualifier I am making.
14     Q. In the gas propellent spray can situation,
15 you would agree that once the can is partially
16 emptied, then it would meet the cradle structure
17 elevation limitation?
18     A. Yes.
19     Q. But you do disagree with Mr. Phillips that
20 when the can is filled, the cradle structure
21 elevation element is met; is that correct?
22     A. I do disagree, yes.
23     Q. Why do you disagree?
24     A. Well, if the can is full, then the liquid --

Page 104

1  if you just look at the picture, not all of the can
2  -- not all of the interior volume of the can is below
3  the cradle structure.
4      Q. When it is tilted down for feeding, at least
5  some of the can is below the cradle structure; is
6  that correct?
7      A. Yeah, but we are talking about the level of
8  fluid in the can.
9      Q. I understand that.
10     A. So that level of the fluid, when the can is
11 mostly full, could very well be above that horizontal
12 bar labeled 50.
13     Q. How far are you assuming that the can would
14 be filled?
15     A. Again, I don't know the details of -- well,
16 certainly if it were liquid propelled -- I shouldn't
17 say "certainly." I am speculating.
18     I don't know the details of the internals
19 of aerosol cans and how far they fill them.
20     Q. Okay. For a gas propellent, how far do you
21 assume the can would be filled?
22     A. Yes, I don't know how much of the volume
23 typically would be occupied by the gas propellent
24 when it is full.

26 (Pages 101 to 104)

Dr. Samir Nayfeh    August 26, 2005

Page 105

1    Q. Well, how do you know that Mr. Phillips is
2 wrong then?
3    A. Well, it would be a matter of degree, and he
4 is making a categorical statement that it would be
5 below.
6        I would just disagree that he could make
7 that categorical statement, but it would be possible
8 for a given set of dimensions, given that the can is
9 partially below the cradle structure, and without gas
10 in there or little enough liquid in there, that you
11 might meet that clause.
12    Q. So is it your opinion that under certain
13 circumstances Mr. Phillips is correct?
14    A. So if we presume that when the can is in its
15 position, the can is emptied enough, or does not have
16 enough liquid, so that the liquid is above the cradle
17 structure, under those conditions, the claim element
18 is met.
19        I hate to say I agree or disagree because
20 that might entail more or less, but I think that is a
21 short statement.
22    Q. Well, did you make any effort to understand
23 the design of aerosol cans in the late fifties and
24 early sixties?

Page 106

1    A. I didn't do any research. Just the general
2 background I have as to how they work. I didn't
3 research -- didn't do any research particularly for
4 this.
5    Q. Prior to this litigation, did you have any
6 understanding of the design of aerosol cans in the
7 late fifties and early sixties?
8    A. Just the knowledge of the basic principles of
9 how they work, but I don't have historical data.
10    Q. Turn to Page 13. Here you are discussing the
11 bracket element with respect to the McKiney patent.
12        Do you see that?
13    A. Yes.
14    Q. Would you agree with me that shelf 34 is a
15 bracket for insertion of razor 42?
16    A. I'm sorry, can you repeat the question?
17    Q. Sure. Would you agree with me that shelf 23
18 is a bracket for insertion of razor 42?
19    A. I hadn't considered that question previously;
20 but just sitting here now, yes, it appears it would
21 qualify, at least literally, as a bracket for
22 insertion of razor 42.
23    Q. You also state that the magnets on the shelf
24 44 do not function as a bracket; is that correct?

Page 107

1    A. That's correct.
2    Q. Why could you believe the magnets are not a
3 bracket or --
4    A. So it doesn't function as a projecting
5 support.
6    Q. You can see the magnets in Figure 3, if that
7 is helpful.
8    A. The magnet 46 in Figure 3?
9    Q. Yes.
10    A. So you could hardly call that a projecting
11 support. It has no projection.
12    Q. So it is not drawn as projecting from the
13 shelf 44?
14    A. Or as even being part of a projection.
15    Q. Why would you say it is not part of the
16 projection?
17    A. You are attaching to an existing structure
18 that is vertical. If we are talking about something
19 that projects from that, you would want something not
20 parallel to the vertical.
21    Q. Your understanding of projecting support is
22 projecting from something -- projecting presumably
23 horizontally from a vertical structure?
24    A. Well, you could have a horizontal with a

Page 108

1 vertical projection, that would, also, I think, be a
2 projecting support, but it should project.
3    Q. I understand. So the magnets are not
4 projecting from the horizontal surface of the shelf
5 44?
6    A. That's not the relevant surface. The
7 relevant thing is the wall of 12.
8    Q. Why is the vertical wall of 12 the relevant
9 thing?
10    A. Because you're providing a structure to
11 support something relative to -- you have an existing
12 device, and you want to provide a projecting support
13 in addition, or something that projects from that
14 structure. So laying a magnet parallel to the wall
15 of that existing structure, I think, does not qualify
16 as a bracket.
17    Q. Okay. So let me ask this: Do the magnets
18 provide support for the clipper blades?
19    A. Yes.
20    Q. And do the magnets project vertically from
21 the shelf 44?
22    A. No. The shelf 44 is horizontal. The magnets
23 46 are arranged parallel to the vertical, but you
24 couldn't say those project from the shelf.

27 (Pages 105 to 108)

Dr. Samir Nayfeh    August 26, 2005

Page 109

1    Q. Could you say they sit on the shelf?
2    A. I would rather that think that the shelf 44
3 -- how should I express this? Actually, maybe, if
4 you permit me to reread this for a moment.
5    Q. Sure.
6    A. And your question is whether the magnets
7 could be called the bracket?
8    Q. No.
9    A. Sorry. Please repeat the question.
10    Q. My question was -- let me rephrase -- does
11 shelf 44 support the magnets?
12    A. Well, literally, the vertical leg of the
13 shelf supports the magnets. That's the phrase used
14 in the specification. I think that's pretty
15 accurate.
16       So when I say "the vertical leg of the
17 shelf 44," that might imply something different than
18 saying the shelf itself supports the magnets.
19    Q. So do the magnets project from the vertical
20 leg of the shelf 44?
21    A. No. They are embedded in the vertical leg of
22 the shelf 44.
23    Q. So they are part of the shelf -- vertical leg
24 of the shelf 44?

Page 110

1    A. They are embedded within. So assembled to
2 it. So in that sense, they are a part of it.
3    Q. Okay. Go to Page 14 of your report.
4       You opine that the bracket element of the
5 Loeffler patent is not met in the Loeffler patent; is
6 that correct?
7       MS. WENDLANDT: Objection.
8       MR. SHIMOTA: Did I misspeak?
9       MS. WENDLANDT: Yes.
10    Q. Did you opine that the bracket element is not
11 disclosed in the Loeffler patent; is that correct?
12    A. Correct.
13    Q. You said you had a chance to read
14 Mr. Phillips' third expert report?
15    A. Yes.
16    Q. I can mark it if you need it, but in general,
17 are you aware of that -- of his opinion that the hair
18 clipper would fall over without some type of bracket?
19    A. Yes.
20    Q. And do you disagree with Mr. Phillips?
21    A. Yes.
22    Q. And why do you disagree?
23    A. As I recall, all he says is the thing has a
24 center of mass, and therefore, it would fall over.

Page 111

1       I am not sure if there is any other step
2 to his argument. If you want to pull it out, we can.
3    Q. Sure.
4       MR. SHIMOTA: Let's mark the third
5 expert report of Samuel Phillips as Defendant's
6 Exhibit 156.
7       EXHIBIT NO. 156 MARKED
8    Q. It will be at Page 39.
9    A. Okay. So I don't find this compelling.
10    Q. Do you disagree that the cradle structure
11 shown in Figure 2 of the Loeffler patent is V-shaped,
12 and it would not provide support sufficient to stop
13 the clipper from tipping over?
14    A. It is V-shaped, but I can't really conclude
15 that it would not provide support to keep it from
16 tipping over.
17    Q. Why can you not reach that conclusion?
18    A. Well, it would depend on where the center of
19 mass is, and also what sorts of disturbances, not
20 just -- uhm, you might expect the shaver to
21 experience during the cleaning operation.
22    Q. Let's assume there would be no nudges.
23    A. So if there are no nudges, provided that the
24 center of mass is -- let's see, loosely speaking --

Page 112

1 between the extremities of the V -- there is not so
2 much detail here that it is easy to make out -- then
3 it would remain upright.
4    Q. Well, let's assume -- you've seen the shavers
5 that Braun and Rayovac sell, correct?
6    A. The shavers, yes.
7    Q. Let's assume that the center of mass for the
8 hair clipper in the Loeffler patent would be roughly
9 the same.
10    A. For the Loeffler and -- sorry?
11    Q. Do you have any understanding of where the
12 center of mass would be for -- let's assume you are
13 using one of the razors sold by Rayovac or Braun in a
14 Loeffler patent. Do you have any better
15 understanding of where the center of mass would be?
16       MS. WENDLANDT: Objection.
17    A. Okay. The relevant point about the center of
18 mass is, in the absence of nudges, the relevant point
19 is -- or the relevant parameter is the -- when you
20 put the shaver roughly oriented vertically into the
21 cradle, it's position in the horizontal direction,
22 right? So, again, in the absence of disturbances,
23 you wouldn't care how high up or down the center of
24 mass is. So that's a hard thing to make out from a

28 (Pages 109 to 112)

Dr. Samir Nayfeh    August 26, 2005

Page 113

1  drawing, okay?
2        I should mention, also, that friction and
3  -- tends to keep you in place, but at least to a
4  first approximation, the thing would stay upright if
5  the center of mass were between the extremities of
6  the V in the lateral direction.
7    Q. Taking into the account the fact that brushes
8  are also used in connection with the Loeffler patent,
9  does that in any way change your opinion regarding
10  whether or not the V-shaped cradle would support the
11  hair clipper, absent any other support?
12    A. So those are disturbances and akin to the
13  nudges, and you couldn't categorically say whether
14  that was going to be stable or not stable.
15    Q. So sitting here today, you can't say one way
16  or the other, the cradle 50, on its own, is stable or
17  not?
18        Let me rephrase it. Sitting here today,
19  you cannot say the shaver in the cradle 50 without
20  any of the projecting support would be stable or not?
21    A. Yeah. You would have to look at things we
22  just discussed. So it would turn out to be a
23  quantitative matter that you would have to work out.
24    Q. And have you undertaken that quantitative

Page 114

1  analysis?
2    A. No. And it wouldn't be possible without
3  dimensions on things and knowledge of the interior of
4  the shaver and so on -- sorry -- the interior of the
5  hair clipper.
6    Q. Well, you could presumably go obtain a hair
7  clipper, correct?
8    A. Yeah, but there are many, many hair clippers
9  out there.
10    Q. But you could start to -- you could obtain a
11  hair clipper and start to gain an understanding,
12  correct?
13    A. Well, you need -- you could gain an
14  understanding of how a given hair clipper's mass is
15  distributed, but then you would also need to know the
16  dimensions of that V in the cradle there; and then if
17  you wanted to do an analysis that included the
18  effects of disturbances like the brushes, you would
19  have to think about the coefficient of friction in
20  there. You know, many other effects.
21    Q. Let me ask this question: Is it your opinion
22  that a projecting support in the cleaning device --
23  is inventive in a cleaning device such as what is in
24  the '328 patent is inventive?

Page 115

1        MS. WENDLANDT: Objection.
2    A. Are you asking whether it would be obvious?
3  In other words, are we talking about obviousness here
4  or --
5    Q. Let me ask a more general question.
6        What do you think the inventors of the
7  '328 patent invented? How would you describe their
8  invention?
9        MS. WENDLANDT: Objection.
10    A. Well, how long a description would you like?
11  If it is about to be a paragraph, I would probably
12  start with the claims, read you one of the claims,
13  which would be a pretty good description.
14    Q. Let me ask this: You state, as we discussed
15  earlier this morning, and I think this is an exact
16  quote, but maybe not, but I think you said the
17  louvered shutter system required significant
18  inventiveness?
19    A. Correct.
20    Q. Do you think the brackets required
21  significant inventiveness?
22        MS. WENDLANDT: Objection.
23    A. Incorporation of the bracket to form along
24  with the cradle a structure into which you could

Page 116

1  insert the shaver required significant inventiveness.
2    Q. If you turn to Page 15 of your report,
3        You offer a certain number of opinions
4  regarding the '556 patent; is that right?
5    A. Yes.
6    Q. Are you aware that the parties have agreed
7  that the '556 patent will be dismissed from this
8  case?
9    A. That wasn't the phrase used, but that it is
10  -- I forget what the phrase was that was used, but
11  that Braun will no longer -- I am losing terms --
12  Braun will no longer assert, during this matter, the
13  infringement of '556.
14    Q. Were you surprised when you learned that?
15        MS. WENDLANDT: Objection.
16    A. I wasn't surprised, because I understand that
17  people often drop things during litigation, but I
18  wasn't expecting it either.
19    Q. Why weren't you expecting it?
20        MS. WENDLANDT: Objection.
21    A. It seemed to me the arguments on infringement
22  and validity for the '556 were about as good as those
23  on the '328.
24    Q. Okay. Turn back to Page 18 of your report,

29 (Pages 113 to 116)

Dr. Samir Nayfeh    August 26, 2005

Page 117

1  which we discussed a bit earlier.
2       There you refer to an ultrasonic cleaning
3  system to which the inventors at Braun had access.
4  Do you see that?
5     A. I am looking for it.
6     Q. Sure. It is in the second paragraph.
7     A. Okay.
8     Q. You also state that you considered the
9  prosecution history of the '328 patent; is that
10  correct?
11     A. Correct.
12     Q. Are you aware of the prior art that was cited
13  to the examiner in connection with the prosecution of
14  the '328 patent?
15     A. You are asking whether I know comprehensively
16  of each reference that was cited?
17       Well, I browsed the list -- at least
18  browsed, and in many cases, read at least most of the
19  references, but that was a long time ago.
20     Q. Okay. During the prosecution of the '328
21  patent, do you know whether Braun cited any cleaning
22  systems in which a blower was used to dry an item
23  that had been cleaned?
24       MS. WENDLANDT: Objection.

Page 118

1     A. Was it the eyeglass cleaner that was cited?
2     Q. That's Cunningham that you're thinking of?
3     A. Cunningham?
4     Q. Cunningham.
5     A. Cunningham had a blower for drying. There
6  may have been others.
7     Q. Were there any references cited in which
8  either a shaver or parts of a shaver were cleaned
9  that incorporated a blower for drying?
10       MS. WENDLANDT: Objection.
11     A. Nothing comes to mind.
12     Q. If you turn to the top of Page 19, you cite
13  to a portion of the specification which refers to the
14  -- at the top -- the agitation and splashing of fluid
15  in the cradle.
16     A. Yes.
17     Q. Is there any requirement in the claims that
18  there -- claims of the '328 patent -- that there be
19  agitation and splashing in the cradle?
20       MS. WENDLANDT: Objection.
21     A. In the claims themselves?
22     Q. Yes.
23     A. No.
24     Q. And with respect to the MeKiney patent, which

Page 119

1  we discussed earlier, during cleaning, is there
2  agitation and splashing in tank 12?
3     A. There's agitation, probably not splashing.
4     Q. Why would you say there is agitation?
5     A. Well, you are going to flow -- flow liquid in
6  there and over and around areas structures. So you
7  are sure to have agitation.
8     Q. And in the Maatz patent, would there be
9  agitation -- let me take a step back to MeKiney.
10       It is your opinion in MeKiney there would
11  be agitation, but there would not be splashing of
12  liquid in the tank 12?
13     A. Correct.
14       I mean, presuming you didn't run the pump
15  too fast. You know, if you had a high enough flow
16  rate, you would certainly get splashing and
17  agitation, but not necessarily.
18     Q. And with respect to the Maatz patent, the
19  same question: Would there be agitation and
20  splashing in the Maatz patent?
21     A. Okay. Same question. Same answer.
22     Q. Okay. At the bottom of the page, where you
23  are discussing the Suzuki patent, in the last
24  sentence you say, "Such a system is not readily

Page 120

1  applicable to be a system that is open to atmosphere
2  and considerable inventiveness would be required by
3  one of -- one skilled in the art to arrive at the
4  arrangement disclosed in the '328 patent."
5       Do you see that?
6     A. Yes.
7     Q. The first question is: With respect to the
8  Claims 11 and 12, is there any requirement that the
9  cradle be open to the atmosphere? Claims 11 and 12
10  of the '328 patent.
11     A. No.
12     Q. The next question is: What do you mean by,
13  "the arrangement disclosed in the '328 patent"?
14     A. So there is the specific arrangement in the
15  specification. Well, that's what I was referring to
16  there.
17     Q. So you're refer there --
18     A. Okay. To the system of louvers and the
19  method of driving the system so as to keep
20  contaminants off the blower.
21     Q. As we discussed earlier today, you are
22  comparing the prior art to the claims in the system
23  disclosed in the specification in connection with
24  your obviousness opinion?

30 (Pages 117 to 120)