# EXHIBIT
# 32

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3
4   BRAUN GmbH,              )
5        Plaintiff,    )
6        -vs-              ) Civil Action No.
7   RAYOVAC CORPORATION,      ) 03-CV-12428-WGY
8        Defendant.    )
9
10       The deposition of SAMUEL R. PHILLIPS, called
11   by the Plaintiff for examination, taken pursuant to
12   the Federal Rules of Civil Procedure of the United
13   States District Courts pertaining to the taking of
14   depositions, taken before CORINNE T. MARUT, C.S.R.
15   No. 84-1968, a Certified Shorthand Reporter of the
16   State of Illinois, at the offices of Kirkland &
17   Ellis LLP, Suite 5600, 200 East Randolph Drive,
18   Chicago, Illinois, on the 30th day of August, A.D.
19   2005, commencing at 8:53 a.m.
20
21
22
23
24

Page 2

1   PRESENT:
2       ROPES & GRAY LLP,
3       (One International Place,
4       Boston, Massachusetts  02110-2624,
5       617-951-7000), by:
6       MS. DALILA ARGAEZ WENDLANDT,
7       dwendlandt@ropesgray.com,
8          appeared on behalf of the Plaintiff;
9
10   KIRKLAND & ELLIS LLP,
11       (200 East Randolph Drive,
12       Chicago, Illinois  60601,
13       312-861-2336), by:
14       MR. JAMES A. SHIMOTA,
15       jshimota@kirkland.com
16          appeared on behalf of the Defendant.
17
18
19
20
21   REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
22
23
24

Page 3

1            (WHEREUPON, the witness was duly
2             sworn.)
3            SAMUEL R. PHILLIPS,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6            EXAMINATION
7   BY MS. WENDLANDT:
8       Q.    Will you please state your name for the
9   record.
10      A.    Samuel R. Phillips.
11      Q.    And what is your address?
12      A.    5 Joaquin Road, Portola Valley,
13   California, 94028.
14      Q.    Mr. Phillips, can you describe the
15   circumstances under which you were retained for
16   this case?
17      A.    I -- I received a call from a fellow
18   that I work with that said that this case was
19   coming and described the particulars and asked if
20   it was something I could do.  I thought it was, and
21   he arranged a meeting for me to meet Mr. Shimota
22   and Mr. Pals.
23      Q.    And who was this person with whom you
24   work?

Page 4

1       A.    A little embarrassing because I work
2   with several.  I believe it's Teklicon.  Yes.  So,
3   it would be -- I don't know who at Teklicon.  Most
4   likely Lee Eggerman.
5       Q.    And had you worked either with Mr. Pals
6   or Mr. Shimota before?
7       A.    No.
8       Q.    How about Kirkland & Ellis?
9       A.    No.
10      Q.    Had you done any expert -- served as an
11   expert prior to this engagement for Rayovac
12   Corporation?
13      A.    Yes.
14      Q.    In what capacity?
15      A.    As a testifying and consulting expert.
16      Q.    In what case?
17      A.    Well, there's a long list of them in my
18   report.
19      Q.    Okay.  How many hours would you say you
20   have put into this case?
21      A.    I imagine about 100.  About 100 I think.
22      Q.    Are you a native German speaker?
23      A.    No.
24      Q.    Have you received a degree in German

1 (Pages 1 to 4)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 5

1  language?
2     A.   No.
3     Q.   Have you studied German?
4     A.   Yes.
5     Q.   Can you describe the studies that you've
6  undertaken?
7     A.   Very, very brief. University of Houston
8  when I lived there.
9     Q.   And what courses did you take in German?
10    A.   Just a course in elementary German.
11    Q.   One course?
12    A.   Yes.
13    Q.   German 101 type thing?
14    A.   Yeah.
15    Q.   Have you traveled --
16    A.   Gave me the knowledge of all the
17 prepositions to take the data, which is not
18 terribly useful.
19    Q.   The what?
20    A.   Prepositions to take the data. It's
21 hard to conduct a conversation exclusively with
22 those words.
23    Q.   Have you traveled in Germany?
24    A.   No.

Page 6

1     Q.   Have you ever given expert testimony on
2  the meaning of a particular German word?
3     A.   No.
4     Q.   I'm going to place before you three
5  expert reports by you which I have previously
6  labeled Phillips Exhibit 1, which is your first
7  expert report; Phillips Exhibit 2, which is your
8  second expert report; and Phillips Exhibit 3, which
9  is your third expert report.
10         I'm giving them to you now because I
11 don't want to hold them anymore.
12         I'm also going to place before you
13 Phillips Exhibit 4, which is tabs 1, 2 and 3 and
14 Exhibits 1 through 16 to your first expert report.
15         If I can ask you to turn in Exhibit 4 to
16 tab 1, which is your CV, dated June 12, 2004.
17    A.   Yes.
18    Q.   The last page of that CV is a list of
19 cases in which you've testified in deposition or
20 trial in the last four years. Do you see that?
21    A.   Yes.
22    Q.   You had mentioned that you had
23 previously served as an expert for Rayovac
24 Corporation and that that would be included in one

Page 7

1  of your reports. Is this the list that you were
2  speaking of?
3     A.   There is some misunderstanding. This is
4  the first case I've ever worked on with Rayovac.
5     Q.   Oh, I see. Okay. And how about
6  Remington?
7     A.   Likewise Remington, I've never worked
8  for them.
9     Q.   And Spectrum Brands?
10    A.   And Spectrum Brands.
11    Q.   Just for the purposes of this deposition
12 I will be referring to those three entities all as
13 Rayovac Corporation?
14    A.   That's fine.
15    Q.   If there is some need to clarify, let me
16 know.
17    A.   All right.
18    Q.   All right. Turning to this list of
19 cases in which you've testified in the last four
20 years, the first case is Weekend Warrior Trailers,
21 Inc. vs. Thor California, Inc. Can you tell me the
22 nature of your testimony in that case generally?
23    A.   The case involved recreational trailers,
24 and I have testified on the matters relating to a

Page 8

1  bed in the trailer, a stowable bed.
2     Q.   I'm sorry. Stowable bed?
3     A.   S-t-o-w-a-b-l-e. My word. It may not
4  exist.
5     Q.   Does that mean you can store it?
6     A.   No. Stow. Temporarily put it to one
7  side.
8     Q.   And for whom were you an expert?
9     A.   Thor.
10    Q.   In that case it looks like you gave a
11 deposition in May 2005?
12    A.   That's correct.
13    Q.   Was there any testimony thereafter at a
14 trial?
15    A.   Not yet.
16    Q.   The case is still ongoing I take it?
17    A.   Yes, it is.
18    Q.   And what law firm are you working with
19 in connection with that consulting?
20    A.   It's Shohl, Dinsmore, S-h-o-h-l, comma,
21 D-i-n-s-m-o-r-e.
22    Q.   The next case is CFM Corporation vs.
23 Dimplex North America, Ltd.?
24    A.   Yes.

2 (Pages 5 to 8)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 9

1    Q.   Can you describe the nature of your
2   expert services in that case?
3       A.   I was testifying on behalf of Dimplex in
4   a matter concerning simulated fire, artificial
5   fireplaces and stoves.
6       Q.   And do you recall the law firm that you
7   worked with in that case?
8       A.   Venable.
9       Q.   Where is Venable?
10      A.   Baltimore.
11      Q.   Is that case ongoing?
12      A.   There is a second case -- there were
13  several cases filed at the same time.  There is a
14  second related case going on now.
15      Q.   And where is that case pending?
16      A.   Toronto.
17      Q.   In connection with the first case for
18  Dimplex, has there been a judgment?
19      A.   Yes.
20      Q.   And what was the judgment?
21      A.   The judgment was in favor of Dimplex
22  with punitive damages.
23      Q.   I'm sorry.  With punitive damages?
24      A.   Um-hmm.  Yes.

Page 10

1       Q.   The third case is Applica Consumer
2   Products vs. Tilia.  What was the nature of your
3   involvement in that case?
4       A.   I was testifying on behalf of Applica in
5   a matter concerning a home appliance, a kitchen
6   appliance.
7       Q.   What was the kitchen appliance?
8       A.   It's a vacuum sealer for food.
9       Q.   Was that a patent case?
10      A.   Yes.
11      Q.   And the prior two, were they also patent
12  cases?
13      A.   Yes.
14      Q.   It says here it was an arbitration in
15  September of 2004?
16      A.   Yes.
17      Q.   Did you give testimony during the
18  arbitration?
19      A.   I did.
20      Q.   What was the outcome of that case?
21      A.   I'm not entirely clear because
22  arbitrations, the results are generally
23  confidential.  I think, though, that Tilia
24  prevailed.

Page 11

1       Q.   The fourth case on this list is
2   PLH Products?
3       A.   Yes.
4       Q.   What was the nature of your involvement
5   in that case?
6       A.   I testified as an expert in a matter
7   involving theft of trade secrets for a portable
8   sauna.
9       Q.   And for whom did you testify?
10      A.   PLH.
11      Q.   Is that case still pending?
12      A.   No.
13      Q.   What was the outcome of that case?
14      A.   I think it was a tie vote.  I don't
15  believe PLH won but I don't think Saunas won
16  either.
17      Q.   The fifth case on this list is Packaging
18  Aids Corporation.  What was the nature of your
19  involvement in that case?
20      A.   I testified on behalf of Mr. Kennedy in
21  another case of theft of trade secrets.
22      Q.   And what was the trade secret involved
23  or just generally?
24      A.   A machine for sealing plastic bags.

Page 12

1       Q.   It says here that the trial was in
2   May 2004.  Is that case still pending?
3       A.   No, it's completed.
4       Q.   And what was the outcome of that case?
5       A.   The jury found against Mr. Kennedy but
6   markedly reduced the damages.
7       Q.   The sixth case is Certain Home Vacuum
8   Packaging Machines.  It says here you gave
9   deposition testimony in March 2004.  Can you
10  describe the nature of the services you provided?
11      A.   It was a predecessor for No. 3 on this
12  list.
13      Q.   So, it concerned the vacuum sealer for
14  foods?
15      A.   Yes.
16      Q.   Was there a decision in that case?
17      A.   There was a -- yes.
18      Q.   What was the decision?
19      A.   I'm trying to think.  I'm trying to
20  think of how to recall exactly what it was.  At
21  least part of the outcome was that there was to be
22  a further arbitration, i.e., No. 3 on the list.
23  The other matters were somehow settled or
24  adjudicated.  I don't really recall.

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 13

1  Q.  And for No. 3, Applica, and No. 6,
2  Certain Home Vacuum Packaging Machines, were you an
3  expert for -- for Applica?
4  A.  Yes, for Applica.
5  Q.  So, Applica was a party to Certain Home
6  Vacuum Packaging?
7  A.  Yes.  You know that ITC matters are
8  tripartite matters.  So, it was the same players
9  plus the ITC.
10  Q.  And what law firm did you work for in
11  connection with both of those cases?
12  A.  Baker Botts.
13  Q.  And for the PLH case, No. 4, what was
14  the law firm that you worked with?
15  A.  James Dumas, D-u-m-a-s.
16  Q.  And where is James Dumas located?
17  A.  Los Angeles.
18  Q.  And for Mr. Kennedy, No. 5, what law
19  firm, if any?
20  A.  It was Franklin Cram, C-r-a-m.
21  Q.  And where is Franklin Cram?
22  A.  Fort Worth.
23  Q.  Turning to No. 7 on the list, Systems
24  Division, what was the nature of your involvement

Page 14

1  in that case?
2  A.  I was testifying on behalf of Teknek in
3  a matter of patent infringement.
4  Q.  And what was the technology?
5  A.  Sheet cleaning machines.  Sheet in the
6  sense of rigid boards.
7  Q.  And what was the cleaning machine, just
8  generally described?
9  A.  Certain manufacturing processes such as
10  lamination require the substrates to be or the
11  things that are to be laminated to be extremely
12  clean and you can imagine keeping something the
13  size of this tabletop perfectly clean.  Once it's
14  laminated together, that's it.  Whatever is
15  captured is captured.  So, it's an industrial
16  process.
17  Q.  Is that case completed?
18  A.  It is completed.
19  Q.  And what was the outcome of that case?
20  A.  They found against Teknek.
21  Q.  The next case, No. 8, is Illinois Tool
22  Works, Inc.  What was the nature of your
23  involvement in that case?
24  A.  Testifying in a matter of patent

Page 15

1  infringement having to do with nail guns.
2  Q.  And for whom were you testifying?
3  A.  Powers.
4  Q.  In connection with No. 7, the Teknek
5  case.
6  A.  Yes.
7  Q.  What was the law firm with whom you were
8  working?
9  A.  It will probably come to me, but I
10  don't -- I don't recall at the moment.
11  Q.  And --
12  A.  It's in Los Angeles.  It's a well-known
13  firm.  I want to say Milberg.  Milberg Weiss.
14  Q.  Milberg Weiss?
15  A.  That -- I don't think that's it.  I
16  can't quite recall the name.
17  Q.  Okay.  For the Illinois Tool Works, were
18  you testifying on behalf of Illinois Tool Works?
19  A.  No, Powers.
20  Q.  I'm sorry.  And what law firm were you
21  working with?
22  A.  Morgan Lewis.
23  Q.  What was the outcome of the nail gun
24  case?

Page 16

1  A.  There was a -- after a Markman hearing,
2  the -- I don't think there was -- I don't think
3  there was a judgment.  Let me get this straight.
4  Powers in my view won, but I'm not entirely sure
5  the details.
6  Q.  And No. 9, the Arris International case,
7  what was your role in that case?
8  A.  Testifying in a matter of patent
9  infringement over an electrical connector.
10  Q.  And for whom or what law firm were you
11  working with?
12  A.  Saunders in Atlanta.  That's not the
13  full name, but I can't think of the full name.
14  Q.  And what side were you testifying for?
15  A.  Arris.
16  Q.  It says here there was a deposition in
17  November 2002.  Was there a trial?
18  A.  There was not a trial, and I don't
19  recall how it came out.
20  Q.  Okay.
21  A.  It was some kind of settlement.
22  Q.  Can you describe generally what the
23  electrical connector patent covered?
24  A.  It covered what's called an F connector,

4 (Pages 13 to 16)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 17

1  letter F. It's the connector on the back of your
2  television set for the antenna.
3      Q.   Turning to No. 10, Semitool case. What
4  was the nature of your involvement in that case?
5      A.   Testifying in a matter of patent
6  infringement. Patents are on semiconductor
7  processing equipment.
8      Q.   And on whose behalf were you testifying?
9      A.   TEA or Tokyo Electron.
10     Q.   Generally what was the technology at
11 issue? You said semiconductor processing
12 equipment.
13     A.   Yes, it's washing. Washing wafers.
14     Q.   And what did the patent cover?
15     A.   As I recall, it was a specific method of
16 holding the wafer and conducting the washing
17 operation. Like a glorified dishwasher.
18     Q.   Do you recall what firm you were working
19 with?
20     A.   No, I don't. It was in New York.
21 That's all I can recall.
22     Q.   It says here you gave a deposition in
23 October and November 2002?
24     A.   Yes.

Page 18

1      Q.   Was there a trial?
2      A.   I don't believe there was. I did not
3  participate in it.
4      Q.   Do you know the outcome of that case?
5      A.   I believe it settled, but I'm pretty
6  vague on details.
7      Q.   Okay. I ask you to turn your attention
8  to Phillips 1, 2 and 3, which are your three expert
9  reports. Do these reports set forth all that you
10 considered in rendering your opinions?
11     A.   I think I have -- they did at that time.
12 I think I've received some information since. I
13 believe there is a third expert report of
14 Dr. Nayfeh.
15     Q.   Yes.
16     A.   And there may have been something else.
17 That's all I can recall.
18     Q.   And do these three reports set forth all
19 of the opinions you have?
20     A.   Yes, at that time, yes.
21     Q.   Do you have any other opinions?
22     A.   No, not yet.
23     Q.   Have you had cause to change any of your
24 opinions that are set forth in these three reports?

Page 19

1      A.   No.
2      Q.   Aside from Dr. Nayfeh's third report,
3  have you considered anything else since the
4  submission of your third report, Phillips
5  Exhibit 3?
6      A.   No.
7      Q.   What is your experience in -- with
8  regard to shavers?
9      A.   Well, like everyone else, I have used a
10 shaver.
11     Q.   I haven't.
12     A.   Speak for yourself. A lot of women do.
13 They make special models for them.
14     Q.   When you say like everyone else you've
15 used a shaver, you mean electric shavers in
16 particular?
17     A.   Yes.
18     Q.   And how often have you used an electric
19 shaver?
20     A.   It's a long time ago. I don't use one
21 anymore. I'm involved in another litigation matter
22 involving safety razors.
23     Q.   What are safety razors?
24     A.   That's the kind that has a blade but is

Page 20

1  not the traditional "slash 'em up on Saturday
2  night" razor.
3      Q.   What does that mean?
4      A.   It's the original invention of
5  King Gillette. It's a device for guarding a razor
6  so you don't kill yourself with it.
7      Q.   So, as opposed to the electric shavers,
8  these --
9      A.   Originally there was a barber straight
10 razor. Then there was a Gillette safety razor.
11 Then there was the electric razor.
12     Q.   So, the safety razor, just so that I
13 understand, would include things like the Mach 3?
14     A.   Yes. Every razor you buy at the
15 drugstore is a safety razor.
16     Q.   What is the difference between a safety
17 razor and an electric shaver?
18     A.   A safety razor, you use it wet with
19 soap, shaving cream. And an electric razor,
20 typically it's dry although it doesn't have to be.
21     Q.   And this other litigation where you are
22 serving as an expert in a safety razor case?
23     A.   Yes.
24     Q.   What is that litigation?

5 (Pages 17 to 20)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 21

1    A.    It's Gillette v. Schick.
2    Q.    Where is that case pending?
3    A.    Boston.
4    Q.    Do you know who the judge is in that
5    case?
6    A.    No.
7    Q.    And for whom are you serving as an
8    expert?
9    A.    Schick.
10   Q.    Is that the Quattro case?
11   A.    Yes.
12   Q.    What law firm are you working with in
13   that case?
14   A.    Price Heneveld. It's H-e-n-e-v-e-l-d.
15   Q.    Where are they located?
16   A.    Grand Rapids.
17   Q.    Have you given any deposition or trial
18   testimony in that case?
19   A.    Yes.
20   Q.    Which?
21   A.    A deposition.
22   Q.    And when was that deposition taken?
23   A.    A couple weeks ago.
24   Q.    Where was that taken?

Page 22

1    A.    San Francisco.
2    Q.    Do you know who took the deposition, the
3    firm?
4    A.    No. I'm sorry. I don't.
5    Q.    Would it have been Paul Weiss?
6    A.    Yes. It would have been Paul Weiss. I
7    don't remember the attorney's name. Let me -- I
8    think it was Paul Weiss. I wasn't ever formally
9    introduced. I don't have his card.
10   Q.    Sure.
11   A.    I think it was Paul Weiss.
12   Q.    What was the nature of your testimony in
13   that case?
14   A.    I was, well, testifying as an expert on
15   behalf of Schick who is accused of patent
16   infringement.
17   Q.    Have you given expert reports in
18   connection with this case?
19   A.    Yes.
20   Q.    How many?
21   A.    Two, maybe three.
22   Q.    And what were the nature of those
23   reports? What issues did they cover, validity and
24   infringement?

Page 23

1    A.    Yeah, the usual issues.
2    Q.    Including those?
3    A.    Including those.
4    Q.    How long have you been involved in that
5    case? When were you retained?
6    A.    I want to say it was April.
7    Q.    April of 2005?
8    A.    Yes.
9    Q.    When were you retained in connection
10   with this case?
11   A.    I think it was November of 2004. That's
12   when I met Mr. Shimota was in November, and I can't
13   recall if I was retained then or if it was later.
14   I know nothing happened until a considerable time
15   after November. Nothing happened involving me, let
16   me put it that way.
17   Q.    So, aside from your personal use of
18   electric shavers and the other litigation involving
19   safety razors, what other experience do you have
20   with electric shavers?
21   A.    I don't have any.
22   Q.    What is the connection between the
23   safety razor case on which you are currently
24   serving as an expert witness and the electric

Page 24

1    shaver?
2         MR. SHIMOTA: Objection; form.
3    BY THE WITNESS:
4    A.    I would not make -- I would not make a
5    connection. I understand that one of the parties
6    is essentially the same because Gillette owns
7    Braun, although I understand Gillette may be
8    divesting Braun. I don't know the situation there.
9    BY MS. WENDLANDT:
10   Q.    Okay. But in terms of the technology?
11   A.    The technology is irrelevant between the
12   two. It just makes you familiar with the shaving
13   environment. That's probably it.
14   Q.    What is your experience with hair
15   clippers?
16   A.    Except for having them used on me, none.
17   Q.    Have you ever served as an expert in a
18   case involving electric shavers?
19   A.    No.
20   Q.    Aside from this one?
21   A.    Aside from this one.
22   Q.    I'm asking you to turn your attention to
23   Phillips Exhibit 1, page 3. Paragraph B lists
24   exhibits to be used as a summary or support for the

6 (Pages 21 to 24)

Page 25

1 opinions.
2    A.    Yes.
3    Q.    Do you see that?
4         Aside from what's listed in paragraph
5  14, which continues on to page 4, were there any
6  other exhibits you intended to use at trial?
7    A.    No.
8    Q.    What are the graphical presentations
9  describing the technology relevant to the
10 patents-in-suit?
11        Let me direct your attention to a
12 particular line here.  On page 4, three lines down.
13 You describe "other graphical presentations
14 describing the technology relevant to the
15 patents-in-suit."
16   A.    I can't think of any at this point.
17   Q.    Have you discussed such graphical
18 presentations with counsel?
19   A.    In a preliminary way, yes.
20   Q.    What were those preliminary discussions?
21 THE WITNESS:  Am I allowed to say so?
22 MR. SHIMOTA:  You may.
23 BY THE WITNESS:
24   A.    Thinking of a way to diagram the

Page 26

1  differences between the '328 patent and the
2  Remington shaver cleaner.
3  BY MS. WENDLANDT:
4    Q.    What is the technology relevant to the
5  patents-in-suit?
6    A.    It's mechanical design of fluid flow,
7  heat transfer, a little bit of thermodynamics,
8  perhaps a little chemistry.  I think that's about
9  it.
10   Q.    Why do you say perhaps chemistry?
11   A.    The cleaning action, the cleaning action
12 is a washing and the nature of the liquid and the
13 contaminants to be washed, there is chemical
14 interaction between them.
15   Q.    In Phillips Exhibit 1, your first
16 report, and Exhibit 3, your third report, you opine
17 that the '328 patent and the '556 patent are
18 invalid for indefiniteness?
19   A.    Yes.
20   Q.    Can you explain the basis for your
21 opinion?
22   A.    Where is the reference in the reports?
23   Q.    Sure.  On page 13 is the beginning of
24 your indefiniteness discussion for the first report

Page 27

1  and in the third report, Exhibit 3, it begins on
2  page 3.
3    A.    Yes.  It's that the patent specification
4  is not consistent with the construction of the
5  cradle concept and for it to be consistent, the
6  specification would need to be different.  It's a
7  *consequence of the claim construction.*
8    Q.    Can you explain to me how the
9  specification is not consistent with the
10 construction of the cradle structure?
11   A.    Well, the specification, and by that I
12 include the figures, the specification describes a
13 bowl or basin into which the shaver head is placed
14 and then operated very much like a birdbath with --
15 instead of the bird flapping the wings, you have
16 the motor of the shaver running its parts.  And
17 requires immersion of the head in the cleaning
18 fluid that is held in the basin, what I also
19 understand has been referred to as a receptacle.
20        Well, the cradle, the way that is
21 construed by the judge, does not require retaining
22 the fluid, as I state in the report.  And if
23 that's -- if that's what the cradle means, i.e.,
24 doesn't have to retain fluid, well, the patent does

Page 28

1  not explain how this can be and so it's shy of a
2  written description that is complete.
3    Q.    Now, how is that different than your
4  opinion later on in your report that the patent --
5  *the '328 patent is invalid for inadequate written*
6  *description?*
7    A.    I have to say I'm not entirely clear.
8    Q.    Okay.  What is your understanding of
9  indefiniteness?
10   A.    It means that you -- it's very similar
11 to written description.  As I say, I have great
12 trouble telling them apart.  It means that you --
13 in return for the monopoly of the patent, you have
14 to tell people how to practice your invention; and
15 the inventor has not done so.
16   Q.    How is the prosecution history relevant
17 to making that assessment?
18   A.    Just a moment, please.
19   Q.    Sure.
20   A.    Could you point me to the place in the
21 report where you are noting that.
22   Q.    Sure.  Starting at page 14 of your
23 report, of the first report, Exhibit 1.
24   A.    Yes.

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 29

1    Q.    Paragraph 42 -- 43, you discuss the
2  prosecution statements of Braun with regard to the
3  Lee patent and then you discuss on paragraph 45 the
4  Schinn patent and then paragraph 47, the Braun --
5  the Cunningham patent.
6    A.    Yes.
7    Q.    All of which were part of the
8  prosecution histories of either the '556 or the
9  '328 patent.
10    A.    Yes.
11    Q.    And then again in your third report,
12  paragraph 19, you start discussing the Lee patent,
13  which is on page 5.
14        I could repeat the question when you're
15  ready.
16    A.    Yes, read it again if you don't mind.
17    Q.    The question is:  In making your
18  assessment of whether the patent specification is
19  consistent or inconsistent with the Court's
20  construction of cradle structure, why is the
21  prosecution history important or discussed in your
22  opinion?
23    A.    The patents referred to all have basins
24  as the Braun does, as the '328 patent does, and yet

Page 30

1  Braun was -- Braun said his device was not anything
2  like those.  And it's hard to see why -- why he
3  said that.
4        That the grounds seem to have been that
5  the -- that the cited patents were not exactly the
6  same size as the shaver although it's my
7  understanding of patents that the patent drawings,
8  that they are not to scale, and if you maintain the
9  topology of them you can make them any size or
10  shape you want, including a size suitable to accept
11  a shaver.
12    Q.    So, again, why are the statements of
13  Mr. Braun in prosecution important in making the
14  assessment of whether or not the specification
15  discloses something that the Court construed?
16    A.    The -- what I think is that the prior
17  art does render Braun at least obvious.  I'm not
18  sure what the prosecution history has to do with it
19  exactly, but the art cited -- except for citing the
20  art in the prosecution history.
21    Q.    I'm going to place before you what has
22  been previously marked Phillips Exhibit 5, which is
23  Exhibits 17 through 32 to your first report.
24        I'm going to ask you to turn to tab 20,

Page 31

1  which is the Lee patent, U.S. Patent No. 3,890,988.
2        Looking at figure 5 of that patent, is
3  receptacle 10 in figure 5 adapted to receive the
4  shaving head of a shaving apparatus?
5    A.    Yes.
6    Q.    Well, in paragraph 21 of your third
7  report, Exhibit 3, you state three lines down, "The
8  receptacle in figure 5 of the Lee patent also
9  clearly could receive or support a shaving head of
10  a shaving apparatus if appropriately sized."
11        My question is:  Is it actually adapted
12  to receive a shaving head of a shaving apparatus?
13    A.    Yes.  I think you are working on the
14  difference of definition of the word "adapted" and
15  the word "sized."
16    Q.    Okay.  Can you explain that?
17    A.    Well, I think -- I think adapted means
18  suitable except for perhaps the sizing and as I
19  mentioned, patent drawings are not to scale.
20    Q.    So, this is your discussion before about
21  so long as the topology is maintained --
22    A.    Yes.
23    Q.    -- the size is irrelevant?
24    A.    Yes.

Page 32

1    Q.    So, in your third report when you say
2  "could," you actually mean "is," is adapted to
3  receive a --
4    A.    I say -- well, what I say is it could
5  receive if appropriately sized.  I take that to be
6  the same as is adapted.
7    Q.    What about in figure 5 of the Lee
8  patent, the oil drum 15.  If appropriately sized,
9  is that adapted to receive the shaving head of a
10  shaving apparatus?
11    A.    Wait a minute.  You say figure 5?
12    Q.    Yes.
13    A.    And you say oil drum and you say 15.
14    Q.    Let's see.  Well, let's work with figure
15  1, then.  Figure 1.
16        In figure 1 of the Lee patent is oil
17  drum 15 adapted to receive the shaving head of a
18  shaving apparatus if appropriately sized?
19    A.    I don't think I considered figure 1 as
20  much as figure 5.
21    Q.    Can you from figure 5 tell which is the
22  oil drum --
23    A.    Well, it looks --
24    Q.    -- of figure 1?

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 33

1    A.   It looks to me that -- I would have to
2    reread the Lee patent in more detail. I see some
3    features in figure 1 that are absent in figure 5.
4    Perhaps oil drum either 15 or 12, it's kind of --
5    if in fact that is an oil drum, is similar to 59 or
6    50, something to do with the outer shell of the
7    lower casing.
8        Q.   Well, looking to column 2 of the Lee
9    patent, lines 40 through 45, you will see there is
10   a description of container 12 and oil drum 15. Can
11   you read that to yourself.
12       A.   Column 2, line 45.
13       Q.   40 through 45.
14       A.   Okay. I've read the paragraph.
15       Q.   Does that help you determine whether oil
16   drum 15 could or is a structure adapted to receive
17   the shaving head of a shaving apparatus?
18       A.   Well, it doesn't relate it to figure 5,
19   which is what I'm most interested in.
20       Q.   Okay. The discussion of figure 5 begins
21   at column 3, line 55, maybe 56.
22       A.   And what is your question?
23       Q.   The question is: Having read that
24   discussion, and I understand you haven't read the

Page 34

1    whole thing currently, does that aid your
2    assessment as to whether or not the container 50 in
3    figure 5 or the oil drum 15 in figure 1 is a
4    structure adapted to receive the shaving head of a
5    shaving apparatus?
6        A.   It doesn't -- it doesn't help. It
7    doesn't really address the issue.
8        Q.   And what would you need to see to
9    understand the issue?
10       A.   Well, I think the receptacle that is
11   adapted to receive the shaving head is Item 10.
12       Q.   And you gather that through looking at
13   figure 5?
14       A.   Yes.
15       Q.   Or a discussion --
16       A.   Figure 5.
17       Q.   And by looking at figure 5, you can't
18   determine whether or not the container 50 is also
19   adapted to receive the shaving head of a shaving
20   apparatus?
21       A.   Well, no, I don't think it is. I think
22   it's -- it's a housing -- it holds the liquid not
23   being used. It holds the sludge that's removed
24   from the parts. It's kind of a catch basin.

Page 35

1    Q.   But it --
2    A.   But it's not the basin that receives
3    the -- that could receive the shaving head.
4    Q.   Because it performs those other
5    functions?
6    A.   Well, because 10 performs that function
7    and 10 is blocking the way to 50.
8    Q.   So, it's the fact that 10 is a lid or
9    cover to 50?
10   A.   No, I don't think it is. I think it's a
11   basin.
12   Q.   Maybe I misspoke. The reason you think
13   that 50 is not adapted to receive a shaving head of
14   a shaving apparatus is because the receptacle 10 is
15   blocking the top portion of 50?
16   A.   Yes. And 10 is intended for that
17   purpose. 10 is kind of a sink. Like a wash basin.
18       As I understand Mr. Lee's patent, this
19   thing is very much like a lavatory sink with its --
20   with its own liquid supply and its own drain, sort
21   of self-regenerating in that little cabinet under
22   the sink.
23       And item 50 is simply that cabinet.
24   It's a convenient liquid-tight structure,

Page 36

1    inexpensive, and then the sink is inserted in the
2    top of it and the workman performs his work on the
3    top part in that sink.
4        So, I think 10 is adapted to, in the
5    context of the discussion, receive the razor
6    shaving head and 50 is merely a support for it.
7        Q.   In paragraph 19 of your third report,
8    you note in the last sentence that the examiner did
9    not appear to be persuaded by Braun's argument,
10   referring to the argument that the Lee patent was
11   non-analogous art. Do you see that?
12       A.   I do see it.
13       Q.   Why was the agreement or disagreement of
14   the examiner with Braun's argument as to the
15   non-analogous nature of the Lee patent important in
16   making your opinion with regard to indefiniteness?
17       A.   Just a moment, please.
18       Q.   Sure.
19       A.   I am in this paragraph taking issue with
20   Dr. Nayfeh, rebutting an assertion that he made.
21   Really correcting what I think he said.
22       Q.   And how is the -- how, if at all, is the
23   examiner's agreement or disagreement with Braun's
24   argument with regard to the analogous nature or

9 (Pages 33 to 36)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 37

1  non-analogous nature of the Lee patent relevant to
2  your indefiniteness opinion other than refuting
3  Dr. Nayfeh?
4      A.   Well, it's -- it's all tied into the
5  construction. I think that Dr. Nayfeh erred when
6  he said that the examiner agreed with Mr. Braun in
7  the prosecution.
8          It appears that the examiner did not
9  agree with Mr. Braun and it's -- Braun is trying to
10  distinguish his basin from Lee's basin and doing so
11  by calling it a cradle and somehow distinguishing
12  it that way. And it didn't look to me as if that
13  were proper.
14      Q.   How does that relate to your
15  indefiniteness opinion?
16      A.   Well, he's got -- Braun apparently has
17  something that is a basin but not a basin and that
18  sounds pretty indefinite to me.
19      Q.   And the examiner's agreement with that
20  argument, with the non-analogous argument, how does
21  that fit into the assessment?
22      A.   I cannot at this point recall the
23  examiner's -- we'd have to look at the chain of
24  correspondence back and forth with the examiner and

Page 38

1  the attorney prosecuting the case to see just what
2  the effect is.
3      Q.   Why?
4      A.   Well, that's where the correspondence
5  is. That's where the contact between the examiner
6  and Mr. Braun occurs.
7      Q.   I understand that. But why is that
8  related to indefiniteness?
9      A.   It's to get the exact shade of meaning
10  that Mr. Braun was putting forth to the examiner on
11  why his patent should be granted.
12      Q.   Asking you to turn your attention to
13  Phillips Exhibit 5, tab 19 is the prosecution
14  history for the '556 patent or portions thereof?
15      A.   Um-hmm, yes.
16      Q.   I believe it's on page B 83 that the
17  examiner's discussion of the Lee patent begins,
18  paragraph E. If I could ask you to review
19  paragraph E.
20      A.   Right. Thank you. I'm doing that.
21      Q.   Okay. Then at page B 94.
22      A.   Yes. 94?
23      Q.   94, yes.
24      A.   Go ahead.

Page 39

1      Q.   Are the arguments made by the patentee,
2  Mr. Braun, in response with regard to the Lee
3  patent, if you could review those.
4      A.   Paragraph E and then start beginning on
5  94.
6      Q.   That's right.
7      A.   Thank you. And on 94 is the part
8  beginning with "Remarks"?
9      Q.   Yes, it is.
10      A.   All right. I have read those.
11      Q.   Having read the prosecution history's
12  discussion of the Lee patent, can you now tell me
13  why in forming your opinion on the indefiniteness
14  of the '328 patent it's important whether or not
15  the examiner agreed with Mr. Braun's assessment or
16  argument that the Lee patent is non-analogous art?
17      A.   Well, I disagree with the -- with the
18  attorney's argument here saying that Lee is not
19  relevant and I don't think his arguments have any
20  merit and I'd have to look still further in the
21  prosecution history to find out how this view was
22  accepted or acquiesced to by the examiner.
23          But it remains clear that the cradle as
24  construed is not the same as the cradle that is

Page 40

1  described. And, so, either the construction is
2  wrong or the description is wrong.
3      Q.   And you're talking about the description
4  within the patent itself?
5      A.   Yes.
6      Q.   Not within the prosecution history?
7      A.   Not within the prosecution history.
8      Q.   What would it tell you if the examiner
9  hypothetically wrote a note and it was in the
10  prosecution history saying, "I disagree with the
11  argument that Lee is non-analogous"?
12      A.   Well, I'd be interested to see what
13  arguments were used to persuade him because I don't
14  see it in this and but -- and I have read the
15  prosecution history, but I don't recall this aspect
16  of it. I recall several of the phrases that I see
17  here. I'm reminded of them by reading this.
18  "Tossed" specifically.
19      Q.   I'm sorry?
20      A.   Tossed, t-o-s-s-e-d. That word was very
21  conspicuous to me.
22          The attorney is playing down the
23  cradling effect of the basin or sink and referring
24  to tossing parts into it and being somehow not

10 (Pages 37 to 40)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 41

1  adapted to receive.  I just didn't buy that.
2      Q.    Asking you to turn your attention to
3  Phillips Exhibit 4 or Exhibit 5, tab 21.  The
4  Schinn patent, which is U.S. Patent 4,815,486.
5      A.    Yes.  Schinn.
6      Q.    Does the Schinn patent incorporate a
7  structure adapted to receive the shaving head of a
8  shaving apparatus?
9      A.    Yes, it does.
10     Q.    What is that structure?
11     A.    Well, it's shown generally as Item 10.
12     Q.    You are referring to figure 2 of the
13 Schinn patent?
14     A.    Yes, it's the only place that Item 10
15 appears.
16     Q.    In paragraph 23 of Exhibit 3, your third
17 report.
18     A.    Paragraph what?
19     Q.    23, page 7.
20     A.    Thank you.
21     Q.    Sure.
22     A.    Yes.
23     Q.    About four lines down you state, "The
24 Schinn device could have just as easily

Page 42

1  incorporated a structure to receive a shaving
2  head."
3          Do you see that?
4      A.    Yes, I do.
5      Q.    Is it your opinion that the Schinn
6  device does actually incorporate a structure to
7  receive the shaving head of a shaving apparatus?
8  As opposed to hypothetically could have, does it?
9      A.    I understand the difference.
10     Q.    Sure.
11     A.    Well, I think it's less obvious in the
12 case of Schinn than it was in Lee.
13     Q.    Why is that?
14     A.    In Schinn, part of the room is taken up
15 with a filter.
16     Q.    Item 20?
17     A.    Yeah.
18     Q.    Okay.
19     A.    And I think it would take more -- would
20 take further design to get that to receive the
21 shaving head.  I think it would be obvious to do
22 it.
23     Q.    What would you need to do to the Schinn
24 device in order to get it to receive the shaving

Page 43

1  head of a shaving apparatus?
2      A.    Well, of course, you'd have to size it
3  correctly, as you would with Lee, and I think -- I
4  think the filter would be in the way.  I would
5  be -- it might be possible to design it and leave
6  the filter in place.  I haven't given that any
7  thought.
8      Q.    Looking back at figure 2 of the Schinn
9  patent, Item No. 32, which I believe the patent
10 describes as a cleaning tank?
11     A.    Yes, ma'am.
12     Q.    Is that adapted to receive a shaving
13 head of a shaving apparatus?
14     A.    No.
15     Q.    Why do you say that?
16     A.    Well, for one thing, there is no opening
17 big enough to put something into it.
18     Q.    And so -- so No. 10, the top is open?
19     A.    Yes.
20     Q.    Okay.  Any other reasons why cleaning
21 tank 32 is not adapted to receive the shaving head
22 of a shaving apparatus?
23     A.    That's the only one I can think of.
24     Q.    And would it be obvious in your opinion

Page 44

1  to remove the lid of tank 32?
2      A.    No, it would not.  It would be
3  counterproductive.
4      Q.    What do you mean by that?
5      A.    Well, it's designed as a separate tank.
6  You can see the fluid lines going up to the pump
7  contained in Item 10.
8      Q.    Is that No. 30, the pump?
9      A.    I believe it is.
10     Q.    Okay.
11     A.    It looks like a pump to me, but I'd have
12 to refer to the patent to be absolutely sure.
13     Q.    Sure.
14     A.    I see that there is an item 42, which
15 could also be a pump.  So, I'm not entirely sure
16 what 30 is.
17     Q.    Okay.
18     A.    Anyhow, it's intended to be a separate
19 tank for whatever reasons the inventor gives in the
20 patent, and once you marry it to the -- he had some
21 reason for keeping it separate and I don't recall
22 what that is.  But that would be -- would be harmed
23 if you opened the top of that tank.
24     Q.    Going back to Phillips 3, which is your

11 (Pages 41 to 44)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 45

1  third report, on page 4, paragraph 15.
2      A.   Yes.
3      Q.   You state, "It is true that frameworks
4  are structures, but not all structures are
5  frameworks"?
6      A.   Yes.
7      Q.   Can you explain that?
8      A.   I will try to.  A framework is a
9  particular kind of structure.  It is more open,
10  more skeletal.  The word frame in common use means
11  something that surrounds or encloses.  A frame is
12  distinguished from a panel, for instance.  And the
13  combination of a framework and panels could
14  constitute a structure.  Panels could constitute a
15  structure.  The frame could constitute a
16  structure, but the reverse is not true.  The structure is a
17  more enveloping word.
18      Q.   So, my next question was: Can you give
19  me an example of something that's a structure but
20  not a framework?
21      A.   Well, a solid cube is a structure.  It
22  is not a framework.  And a --
23      Q.   Because the cube doesn't envelop
24  anything?

Page 46

1      A.   That's right.  And a panel would be
2  another example.
3      Q.   What's a panel?
4      A.   Well --
5      Q.   Like the tabletop?
6      A.   A tabletop.  A window pane.  You notice
7  similarity between the word "pane" and the word
8  "panel."  A rectangular solid that is thin in one
9  dimension.
10      As I look across the street, I see a big
11  office building and it certainly is a structure and
12  if I were to look at it with x-ray eyes I would see
13  the component pieces including the steel skeleton,
14  the steel frame that is holding it up.
15      Q.   I ask you to turn your attention to
16  Phillips 5, tab 22.
17      A.   22?
18      Q.   22.  The Cunningham patent, which is
19  U.S. Patent No. 5,335,394.
20      A.   Yes.
21      Q.   In that patent or in that device, the
22  Cunningham device, what is the structure adapted to
23  receive the shaving head of a shaving apparatus, if
24  any?

Page 47

1      A.   It's item 45.
2      Q.   In figure 4?
3      A.   It's in figure 4, yes.
4      Q.   And why do you say that is adapted to
5  receive a shaving head of a shaving apparatus?
6      A.   It's a -- it's a basket with an open top
7  and you could size it to receive the shaving head.
8  Right now it's sized to receive dentures.
9      Q.   If I could ask you to turn your
10  attention to paragraph 22 of Exhibit 3, your third
11  report.
12      A.   Yes.
13      Q.   If you could read paragraph 26 to your
14  report to refresh your recollection of what you
15  wrote and then in your own words if you could
16  explain to me the argument here with regard to
17  paragraph 26.
18      A.   Wait.  We were -- we were talking about
19  Cunningham and this refers to Lee.  What --
20      Q.   Oh, I'm sorry.  It's in your third
21  report.
22      A.   Yes.  Third report, paragraph 22?
23      Q.   26.  I'm sorry.
24      A.   Thank you.  Would you let me have your

Page 48

1  question again, please.
2      Q.   Sure.  Let me refine the question a bit.
3      The last sentence in this paragraph is,
4  "It remains my opinion that Braun's clear
5  disclaimer of the basket in the Cunningham patent."
6  Starting there.
7      Where in the prosecution history did
8  Braun clearly disclaim the basket of the Cunningham
9  patent?
10      And the prosecution history for your
11  reference is in Exhibit 4, tab 12.  I note that
12  Braun's discussion of the Cunningham patent is at
13  B 335.
14      A.   Yes.
15      Q.   Of Exhibit 12.
16      A.   Please, sorry.  But please repeat your
17  question.
18      Q.   Sure.  In paragraph 26 of your third
19  report you say, you refer to Braun's clear
20  disclaimer of the basket in the Cunningham patent.
21      Where in the prosecution history did
22  Braun clearly disclaim the basket of the Cunningham
23  patent?
24      A.   It looks to me as if it's on page 335 of

12 (Pages 45 to 48)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 49

1  that prosecution history and it is the sixth line
2  from the bottom. "Cunningham does not teach."
3      Q.   "Cunningham does not teach a cradle
4  structure adapted to receive an object to be
5  cleaned and to which cleaning fluid is fed arranged
6  above a fluid level of the cleaning fluid"?
7      A.   Yes.
8      Q.   And you read that to be a clear
9  disclaimer of the basket in the Cunningham patent?
10     A.   Yes, I do.
11     Q.   Prior to that sentence, the prosecution
12 history discusses the other embodiment of the
13 Cunningham patent in which eyeglasses to be cleaned
14 are immersed in a chamber. Do you see that?
15     A.   I do.
16     Q.   You don't connect the prior sentence to
17 this sentence?
18     A.   Well, I see why you make the point
19 because the eyeglasses -- clearly the person
20 writing this letter wants you to make that
21 connection.
22         But if he had said "that part of
23 Cunningham," I would probably not have an argument
24 with him. But he doesn't say that. He says

Page 50

1  "Cunningham."
2      Q.   Okay.
3      A.   And Cunningham includes figure 4 and
4  figure 4 has got what looks mighty like a cradle to
5  me as defined by the judge.
6      Q.   In paragraph 26 of your third report,
7  you state, "Braun's ultrasonic cleaner appears to
8  use the type of basket used in the Schinn patent."
9          Do you see that?
10     A.   Yes, I recall that.
11     Q.   Did you mean to say in the Cunningham
12 patent or are you referring to the Schinn patent?
13     A.   I -- I meant the -- I realized it's kind
14 of a jump there, but I meant the ultrasonic
15 cleaner. It's reference to the Hoeser deposition.
16     Q.   Yes.
17     A.   That's where the ultrasonic cleaner
18 surfaces and we have the description by Mr. Hoeser
19 of how the thing worked and it was another basket
20 and that's why it's in paragraph 26.
21     Q.   So, when you are referring to the
22 basket, you are referring to the basket not of the
23 Schinn patent, but of the Cunningham patent, figure
24 4 of the Cunningham patent?

Page 51

1      A.   Neither. Of the -- the basket is used
2  with the ultrasonic cleaner in Braun's factory.
3  There are lots of baskets and that's one of them.
4      Q.   And you say, though, that Braun's
5  ultrasonic cleaner appears to use the type of
6  basket used in the Schinn patent.
7      A.   Oh.
8      Q.   Do you see that?
9      A.   That I think is a mistake.
10     Q.   That is just typo. That should have
11 been Cunningham?
12     A.   It should have been Cunningham, yes. I
13 could see the reason for your confusion because
14 there isn't any basket in Schinn.
15     Q.   It continues, "The basket in the
16 Cunningham patent is lowered into the cleaning
17 fluid thereby feeding the fluid."
18     A.   Yes.
19     Q.   Can you explain to me how lowering the
20 basket in the Cunningham patent is feeding the
21 fluid?
22     A.   Yes.
23     Q.   Okay.
24     A.   The analogy is are you going to raise

Page 52

1  the bridge or lower the river.
2      Q.   Can you explain that further?
3      A.   Well, I better not. If the analogy
4  needs explaining, we're in trouble.
5      Q.   We may be.
6      A.   The feeding is a relative motion and
7  whether it's liquid is fed to the solid or the
8  solid is fed to the liquid is really irrelevant
9  because the action -- the action is the same. The
10 liquid progressively wets the solid.
11         So, I think the -- I think lowering the
12 basket of Cunningham into the liquid is the same as
13 holding the basket still and flooding the
14 environment so that it envelops the basket.
15     Q.   And so in the Cunningham patent what is
16 the device that feeds the fluid?
17     A.   It's the motor that lowers the basket.
18 I haven't even looked at it to refresh my memory if
19 there is a motor, but I'm pretty sure there is.
20 Some kind of device that lowers it. Whatever it
21 is.
22     Q.   And would that include manually
23 lowering?
24     A.   Yes, it would.

13 (Pages 49 to 52)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 53

1  Q.  Okay. Can you explain to me the basis
2  of your opinion that the '328 patent is invalid for
3  inadequate written description? For your
4  reference, in Exhibit 3, that written description
5  discussion starts at page 8. And in your first
6  report it starts at page 18.
7  A.  I don't know that I have anything to add
8  to what we have previously discussed in this point.
9  I think -- I will try to say it again if I can and
10  hope I can be consistent.
11     It's that the '328 patent doesn't teach
12  a structure that holds the shaving head but that
13  does not retain liquid, and it would have to do
14  that to be consistent with the construction of the
15  Court.
16  THE WITNESS: Could we take a break?
17  MS. WENDLANDT: Sure.
18  THE WITNESS: Is this an okay time?
19  MS. WENDLANDT: Right now is a good time, yes.
20     (WHEREUPON, a recess was had
21        from 10:23 to 10:36 a.m.)
22  BY MS. WENDLANDT:
23  Q.  Mr. Phillips, placing before you what
24  has been marked as Phillips Exhibit 7. This is a

Page 54

1  copy of the '328 patent. Can I ask you to look at
2  the first claim of that patent, which is on column
3  13, around line 25.
4  A.  Yes.
5  Q.  Can you read that claim to yourself.
6  Claim 1.
7  A.  Yes. Yes.
8  Q.  Does claim 1 describe a cradle structure
9  that receives or retains cleaning fluid?
10  A.  Yes.
11  Q.  Does it describe a cradle structure that
12  receives and retains cleaning fluid?
13  A.  Yes.
14  Q.  What is the basis of your opinion?
15  A.  The word "concave."
16  Q.  Can you explain that further?
17  A.  A concave surface is a basin and it will
18  retain fluid, if it's horizontal, and it does say a
19  cradle structure, which I presume to be horizontal.
20  Horizontal up.
21  MS. WENDLANDT: Can you read that back,
22  please.
23     (WHEREUPON, the record was read
24        by the reporter as requested.)

Page 55

1  BY MS. WENDLANDT:
2  Q.  Can you explain that answer? I don't
3  understand the "horizontal up" portion of it.
4  A.  Yes. I can see why it would be
5  confusing.
6     The retention of a concave surface
7  depends on the direction of gravity and so if it's
8  a horizontal basin with the concavity pointing up,
9  then it would retain fluid. Look at the word basin
10  in geologic terms.
11  Q.  What if claim 1 said a cradle
12  structure -- was the same except it didn't say
13  including a concave surface. Would that receive or
14  retain cleaning fluid?
15  A.  Yes.
16  Q.  Would it receive and retain cleaning
17  fluid?
18  A.  No.
19  Q.  And why not?
20  A.  Well, a cradle structure -- if you take
21  away the concave surface, you then have the first
22  part of claim 11, which I understand is asserted
23  and claim 1 is not.
24     And claim -- and claim 11, that term,

Page 56

1  "cradle structure," the judge has construed it as
2  received or retained.
3  Q.  I see. So, you are working off the
4  Court's construction?
5  A.  Yes, I am.
6  Q.  Okay. You disagree with the Court's
7  construction --
8  A.  Yes.
9  Q.  -- of cradle structure?
10  A.  Of cradle structure.
11  Q.  Setting aside the Court's construction,
12  would you believe that a cradle structure as in
13  claim -- as claimed in claim 1 without the concave
14  surface would receive and retain cleaning fluid?
15  A.  If I didn't have the judge's
16  construction, then I would presume there has been
17  no construction hearing and if that is the case,
18  when I have a somewhat ambiguous word as "cradle,"
19  I would turn to the specification of the patent to
20  define what it is. I know what -- I know what a
21  cradle is in ordinary English.
22     When I turn to the patent, I would find
23  that a cradle structure has got a concave surface.
24  I don't know that it uses the word, but it is

14 (Pages 53 to 56)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 57

1  certainly pictured. And I would say, yes, that
2  will retain -- that will retain liquid.
3      Q.   And would -- setting aside the Court's
4  construction, again, claim 1, could the cradle
5  structure of claim 1 include a structure that
6  receives or retains cleaning fluid if claim 1 did
7  *not have the concave surface?*
8      A.   Ask it again.
9      Q.   Sure. I will try.
10          Setting aside the Court's construction,
11  would the cradle structure of claim 1 receive or
12  retain cleaning fluid if it did not have a concave
13  surface?
14      A.   Yes, and I have to say that "or" to my
15  way of thinking is not exclusionary.
16      Q.   Can you explain that?
17      A.   Well, if you want to exclude it, if you
18  want to say retain -- if you said either retain
19  or -- either receive or retain, that would mean
20  A or B but not both. If you say receive or retain,
21  you also include receive and retain.
22      Q.   Okay. Going with the exclusionary
23  definition, that is, receive but not retain, would
24  the cradle structure of claim 1 that does not

Page 58

1  include a concave surface receive but not retain
2  cleaning fluid?
3      A.   No, it would retain.
4      Q.   And why do you say that?
5      A.   Well, it's a basin. Gravity is at work.
6  The liquid can't get out.
7      Q.   What about at the outlet port connecting
8  the cradle structure with the cleaning fluid
9  container. Let's see, at lines 9 to 30.
10      A.   I know where it is. That -- that works
11  by -- well, you've got a continuous inlet and
12  continuous outlet. It's -- it's very much like the
13  wash basin with the water turned on full and the
14  drain open. The water -- if there is more water
15  coming in than going to out, the water level will
16  rise, eventually getting to the overflow. And the
17  figure in the '328 patent shows that quite clearly,
18  and there is some discussion in the text of how it
19  works.
20          So, it's -- it's self-draining you might
21  say. It retains fluid -- retains fluid for a while
22  until it eventually, until you shut off the supply
23  and what's left drains out the hole.
24      Q.   And how can you based on claim 1

Page 59

1  determine, again, without the concave surface,
2  determine that the cradle structure retains but
3  not -- well, receives and retains as opposed to
4  receives only cleaning fluid?
5          Can you tell from claim 1 the dynamics
6  that you were describing about the influx and
7  outflow and whether or not water or cleaning fluid
8  will be retained?
9      A.   Well, I can do it by turning to the
10  specification for interpretation of cradle. That's
11  all I have to go on.
12      Q.   Okay. So, the specification describes a
13  cradle that -- in which fluid is received and
14  retained?
15      A.   Yes, it does.
16      Q.   And based on that, you interpret the
17  fluid dynamics that you were describing before
18  where there is actually retention?
19      A.   Yes.
20      Q.   Okay.
21      A.   And it's covered in several places. The
22  inventor says that one is to immerse the head of a
23  razor in a bath of liquid. So, that has to happen.
24      Q.   Turning your attention to Phillips

Page 60

1  Exhibit 3, your opinion as to new matter on
2  page 12, and in Exhibit 1, your first report, it's
3  at page 20.
4      A.   Yes.
5      Q.   Do you opine that the '328 patent is
6  invalid for inclusion of new matter?
7      A.   Yes.
8      Q.   Can you explain to me the bases of your
9  opinion?
10      A.   Yes, but give me a moment to review
11  this.
12      Q.   Sure.
13      A.   Okay. I'm ready to talk.
14      Q.   Can you explain to me the bases of your
15  opinion that the '328 patent is invalid due to the
16  introduction of new matter?
17      A.   Yes. It's my understanding that the
18  '328 patent was granted a priority date on the
19  basis of the German application.
20          It's further my understanding that in
21  order to do that, the U.S. Patent has -- must not
22  introduce any new matter over the old one to get
23  that priority date.
24      Q.   The old one being the German one?

15 (Pages 57 to 60)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 61

1    A.    The old one being the German one.
2         During the German application, they
3    used -- the German application naturally was
4    written in German and it used the word
5    "aufnahmeteil." And that word presumably would
6    have been translated by the German-speaking Patent
7    Office correctly as "receptacle."
8         But when it got to the U.S. Patent
9    office, somehow that word became "cradle," and
10   that's -- I don't know whether it was for this
11   litigation or previously became cradle, but Braun
12   produced the translation that said that.
13        And then Braun produced another
14   translation that said it meant receptacle; and
15   that's confirmed, as I say here, by German
16   dictionary going both ways.
17        So, it seems to me that if the -- if the
18   German case is a receptacle, which in my view
19   retains liquid, the later American application
20   using the word "cradle," which has been construed
21   as not retaining -- not necessarily retaining
22   liquid, then that's -- it's somehow new. It's
23   different from what was previously applied for and
24   therefore should at least not receive the earlier

Page 62

1    patent date, priority date.
2         Q.    I guess that's what I don't understand.
3         It shouldn't -- if your argument is
4    true, it shouldn't receive the earlier priority
5    date, but why would the patent itself be invalid?
6         A.    That's a -- that's a legal matter that
7    I'm really not qualified to speak on.
8         Q.    Now, you had mentioned in your prior
9    answer that you had consulted German dictionaries
10   going both ways?
11        A.    Yes.
12        Q.    What did you mean by that?
13        A.    Going from the -- from German to English
14   but then also taking the suggested English
15   alternatives -- English versions and going
16   backwards and seeing what they came out to be in
17   German.
18        Q.    And you have stated that your -- in your
19   opinion a receptacle receives and retains fluid?
20        A.    Yes.
21        Q.    What is the basis for that opinion?
22   Does it -- go ahead.
23        A.    It's as far as I know just the ordinary
24   meaning of the word. I think in some sacramental

Page 63

1    applications, receptacle is a basin where holy
2    water is kept. I think I'm correct there. A bowl
3    is often referred to as a receptacle. It's — I'd
4    have to confirm it with the dictionary, but it's
5    the ordinary meaning to me.
6         Q.    Have you confirmed your understanding of
7    receptacle with any technical dictionaries?
8         A.    No.
9         Q.    Any dictionaries at all?
10        A.    No.
11        Q.    Does "receptacle" have a special
12   technical meaning aside from what your
13   understanding of the ordinary usage of the word is?
14        A.    It has some alternative meanings as many
15   words do. The electrical outlet on the wall that
16   I'm looking at over there is frequently referred to
17   as a receptacle.
18        Q.    Does that receptacle receive and retain
19   fluid?
20        A.    The electrical outlet in the wall? No.
21        Q.    So, when you were speaking of
22   receptacles always receiving and retaining fluid,
23   you are speaking of receptacles, not electrical
24   receptacles.

Page 64

1         How do you distinguish between the
2    electrical outlet that doesn't receive and retain
3    fluid and the other set of receptacles that do in
4    your opinion?
5         A.    Well, in the context, receptacle is not
6    a unique word. Many, many words in English have
7    multiple meanings that seem to have no relation one
8    to the other. How anyone learns English is a
9    mystery to me.
10        Q.    It's my second language.
11        A.    You do awfully well if it's your second
12   language. I would never have guessed.
13        Q.    So, it's the fact that there are
14   multiple meanings to receptacle that you are
15   comfortable with your opinion that all receptacles
16   in this context receive and retain fluid?
17        A.    Yes, I am comfortable with that.
18        Q.    Turning your attention to Exhibit 1,
19   your first report, at paragraph 59 on page 21.
20        A.    Yes.
21        Q.    You describe a second basis for your
22   opinion that the patent is invalid for introduction
23   of new matter and that basis is the French patent?
24        A.    Yes.

16 (Pages 61 to 64)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 65

1    Q.   Can you explain to me why the
2  introduction of the French patent in the '328
3  patent application causes the patent to be invalid?
4    A.   Let me find the French patent.
5    Q.   It is included in Exhibit 4, tab 15.
6  No, that's not right. It is Exhibit 5, tab 24.
7    A.   Thank you.
8    Q.   Try that again. I'm sorry. I think
9  it's not included in your exhibits that I can see.
10 Unfortunately I do not have it with me here.
11        But if you were to look at it, what is
12 it that you would be looking for?
13   A.   I have to see that patent.
14   Q.   I'm sorry.
15   A.   I have to see that patent to answer the
16 question.
17   Q.   And have you seen that patent?
18   A.   I have, but I don't recall it very well.
19 I need to refresh my memory.
20   Q.   Aside from the French patent, is there
21 anything else that you've considered and consulted
22 in forming your opinion that is not listed at tab 3
23 of Exhibit 4?
24   A.   I don't believe so.

Page 66

1    Q.   Mr. Phillips, you opine also that the
2  patent, the '328 patent, is invalid for failure to
3  disclose the best mode. Is that correct?
4    A.   That's correct.
5    Q.   And what is the basis of your opinion?
6    A.   The --
7    Q.   You can look at --
8    A.   The patent -- I have it here on page 22
9  of the first report. And the problem is that the
10 cleaning fluid was evidently important and it --
11 than it's not disclosed at all in the patent. It
12 just says cleaning fluid, and it describes what it
13 has to clean. But it doesn't go into enough detail
14 that a -- someone copying the invention would know
15 what to use. It omits that important information.
16 So, in that respect it is not taught the best mode.
17   Q.   When you say the cleaning fluid is not
18 disclosed at all, you will admit that at least the
19 cleaning fluid is described as fat dissolving,
20 isn't it?
21   A.   As I say, it is described as it has what
22 to do. It doesn't say how to do it or how to --
23 more precisely what it has to be made of in order
24 to do it. It's a wish list.

Page 67

1    Q.   What is a wish list?
2    A.   The list of the things it has to do.
3  Doesn't tell you how to do it. Has to dissolve
4  fat. Fine. Well, it has to dissolve fats. It
5  doesn't say how to dissolve the fat, what to use.
6  So it's a wish list.
7    Q.   What is naphtha?
8    A.   Lighter fluid. It's a light
9  hydrocarbon. Sort of like kerosene or paint
10 thinner. Lighter than kerosene and similar to
11 paint thinner.
12   Q.   And that is a cleaning fluid?
13   A.   Yes.
14   Q.   Fat-dissolving cleaning fluid?
15   A.   Yes.
16   Q.   Is that used in commercial applications?
17   A.   It used to be the dry cleaning fluid of
18 choice before chlorinated solvents took over. It's
19 dangerous. It's why they don't use it in dry
20 cleaning anymore.
21   Q.   Why do you say it's dangerous?
22   A.   It's inflammable. But then so is
23 alcohol in right conditions.
24   Q.   Another cleaning fluid you discuss in

Page 68

1  your report is a detergent mixed with water?
2    A.   Yes.
3    Q.   Could you explain to me how that is a
4  cleaning fluid?
5    A.   Certainly. It's how you wash dishes.
6    Q.   Okay.
7    A.   I can explain in more detail, but I
8  think you get the idea.
9    Q.   Yes. I've done that.
10        In paragraph 46 of your third report,
11 Exhibit 3.
12   A.   Paragraph what?
13   Q.   46. Page 15.
14   A.   Okay. Thank you.
15   Q.   Your opinion is that it's
16 counterintuitive to put lubricant in cleaning
17 fluid. Do you see that?
18   A.   Yes, I do.
19   Q.   Why is that?
20   A.   Well, the lubricant is almost certainly
21 going to be an oil and an oil and fat are very
22 similar. Here you are taking the -- you're
23 dissolving the oil or dissolving the fat and then
24 you're adding more fat to it. It's not obvious

17 (Pages 65 to 68)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 69

1  that that's a good thing to do.
2       In -- for instance, when you clean a
3  gun, you first get rid of all the oil and then you
4  come back later and oil it. It's a two-step
5  operation.
6    Q.   Are you familiar with the Simmons
7  patent?
8    A.   Yes.
9    Q.   U.S. Patent 3,172,416.
10   A.   Yes, I am. Can you point to it in the
11 report?
12   Q.   I can. It's Exhibit 4, tab 7.
13   A.   Yes, Simmons.
14   Q.   Can you describe generally what the
15 Simmons patent discloses?
16   A.   You put a shaver head -- a shaver upside
17 down in a -- well, cradle, for want of a better
18 word, in the top of the device, and then you
19 circulate a stream of variously air or liquid over
20 it with a pump and there is a filtration device in
21 it. So, it's a kind of vacuum cleaner or washer.
22 I think this one works with either air or liquid.
23   Q.   And the Simmons patent was issued in
24 1965, is that right?

Page 70

1    A.   Yes.
2    Q.   Turning your attention to column 6,
3  lines 8 through 15. Mr. Simmons describes what he
4  describes as a suitable cleaning liquid --
5    A.   Yes.
6    Q.   -- for his device. Do you see that in
7  his suitable cleaning liquid he discloses the
8  addition of a wetting agent or a razor lubricant?
9    A.   Yes, I do see that.
10   Q.   Is it still your opinion that it would
11 be counterintuitive to add such a lubricant to
12 cleaning fluid for cleaning a shaving apparatus in
13 light of the 1965 disclosure of Mr. Simmons?
14   A.   Well, I take your point. I think that
15 Simmons does disclose doing that. Slight
16 difference in the kinds of alcohol, but general
17 idea is certainly a solvent plus a lubricant in one
18 material.
19   Q.   In paragraph 47 of your third report,
20 Exhibit 3.
21   A.   Yes.
22   Q.   You say that viscosity -- well, you say,
23 "It is my opinion that wetting and surface tension
24 would be of interest to one of ordinary skill in

Page 71

1  the art, but viscosity would not."
2       Do you see that?
3    A.   Yes.
4    Q.   Can you explain to me why viscosity
5  would not be of interest to one of ordinary skill
6  in the art?
7    A.   Yes. I can, but I would like to make a
8  slight correction to that.
9    Q.   Sure.
10   A.   I would say that -- I put the wrong
11 emphasis on viscosity. I probably should have said
12 that the viscosity is much less important. I mean,
13 it is a consideration. And if I were what I --
14 well, to perhaps clarify this paragraph, what I
15 mean to say is that I would -- I would consider the
16 wetting and the surface tension first. I would
17 check the viscosity to figure out that -- to make
18 sure that I had not accidentally picked honey in
19 the course of doing this.
20       But the viscosity is not the most
21 important thing. Wetting and surface tension are.
22   Q.   Why is viscosity a consideration at all?
23   A.   It has to be sufficiently inviscid,
24 i-n-v-i-s-c-i-d, to penetrate the tiny holes in the

Page 72

1  foil or other shaving head.
2    Q.   And would viscosity affect the
3  characteristics of the pump you could use?
4    A.   To a slight extent.
5    Q.   Any other reasons why viscosity would be
6  a consideration?
7    A.   Can't think of any.
8    Q.   Is a hair clipper a shaving apparatus?
9    A.   Well, the Marine Corps thinks so when it
10 shaves your head.
11   Q.   Do you think so?
12   A.   Yes, I do.
13   Q.   What is the shaving head of a hair
14 clipper?
15   A.   It's the -- it's the portion where the
16 cutter and guard are located.
17   Q.   What is the cutter?
18   A.   Electric razors and hair clippers are
19 very similar. They are like hedge trimmers. They
20 have a stationary blade, sometimes serrated,
21 sometimes with holes or slots, and they have a
22 moving blade or series of moving blades driven by a
23 motor. And the moving blade plate is placed very
24 close to the stationary plate and one reciprocated

18 (Pages 69 to 72)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 73

1  with respect to the other so you get an action of
2  thousands of tiny scissors. And that's the way
3  they work.
4       And that mechanism I would call a
5  shaving head. Distinguishing it from the motor and
6  whatever electronics there might be.
7    Q.   But you just said that the shaving head
8  includes not only the cutter but a guard?
9    A.   Oh, it's the guard is a stationary part.
10   Q.   That's the stationary blade?
11   A.   Yes. That's the part that contacts your
12 skin.
13   Q.   So, the cutter is the moving blade and
14 the guard is the stationary blade?
15   A.   Yes, and you wouldn't want the moving
16 blade next to your skin. It would be way too
17 dangerous.
18   Q.   Because it might cut you?
19   A.   Yes. At least it would abrade your
20 skin.
21   Q.   In paragraph 72 of your third report,
22 Exhibit 3.
23   A.   Yes.
24   Q.   You state, "I intend to explain the hair

Page 74

1  clippers to the jury."
2    A.   Yes.
3    Q.   "And I have attached pictures at
4  Exhibit 39."
5    A.   Yes.
6    Q.   Do you see that?
7    A.   Yes, I do.
8    Q.   What is the explanation that you intend
9  to give to the jury?
10   A.   I plan to show them a -- both an
11 electric and a manual hair clipper and in the case
12 of the electric one, show how the head is very
13 rapidly and easily removed from the clipper body
14 and, in fact, is routinely done so by the barber.
15 It's probably easier than taking the head off an
16 electric shaver.
17   Q.   Why do you say it's routinely done so by
18 a barber?
19   A.   He changes the -- he changes the head.
20 He does it for a couple of reasons. He wants to --
21 well, barbers serve multiple customers, so
22 sterility and transmission of disease is of
23 interest to them. So, in theory they have some
24 heads being sterilized and some heads being used

Page 75

1  and they swap them out.
2       They also -- that the heads come in
3  different finenesses and they substitute one for
4  the other when they want to cut a different kind of
5  hair or cut more closely or cut farther away.
6    Q.   And have you seen barbers do this
7  swapping-out process?
8    A.   Yes.
9    Q.   When?
10   A.   Well, at the barbershop.
11   Q.   Just on your routine visits to the
12 barbershop you have seen that?
13   A.   Yes.
14   Q.   And the fineness differentiation, is
15 that when somebody says, "Give me a No. 4"?
16   A.   They come in numbers. You're right
17 about that. And the customer of course doesn't
18 know enough to ask for a No. 4 or whatever. But
19 the barbers routinely use different clippers on
20 your hair. They use two or three.
21       And for whatever reason, though, when
22 you look at one of these clippers, you see how easy
23 it is to get the head off.
24   Q.   And with regard to the manual hair

Page 76

1  clippers -- or was that the extent of your
2  presentation to the jury or your intended
3  presentation to the jury with regard to electric
4  clippers?
5    A.   I was probably going to show them a
6  manual clipper as well because some of this
7  equipment that is in the prior art is very old and
8  I wanted to have something that's comparable,
9  comparable in age.
10   Q.   And what were you going to show them
11 with regard to the manual hair clipper?
12   A.   I was going to show them that there was
13 such a thing and I was going to show how old it is
14 and I was going to show that even it is pretty easy
15 to get apart. It's not as easy as the electric but
16 it's pretty easy. No tools are required. Just
17 takes a little longer.
18   Q.   And how do you know how old the manual
19 hair clipper that you intend to show to the jury
20 is?
21   A.   Well, it's got a real old patent date on
22 it.
23   Q.   On the actual hair clipper?
24   A.   Yes.

19 (Pages 73 to 76)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 77

1    Q.   Is that one of the patents that you've
2  cited in your report?
3    A.   No, it isn't.
4    Q.   And how did you -- do you have one?
5    A.   Yes.
6    Q.   How did you obtain it?
7    A.   I bought it over the Internet.
8    Q.   When?
9    A.   Three, four, five months ago.
10   Q.   Is there any other explanation of hair
11 clipper that you intend to give to the jury?
12   A.   I don't think so. I think that covers
13 it.
14   Q.   Were you going to explain to the jury
15 how the hair clipper works?
16   A.   To the extent I needed to. I think it's
17 so obvious. It's very much like a razor, electric
18 razor.
19   Q.   In cleaning a hair clipper or I should
20 say in the patents that you've cited in connection
21 with your opinion with regard to anticipation of
22 the claims of the '328 patent --
23   A.   Yes.
24   Q.   -- some of them, and maybe all of them,

Page 78

1  disclose cleaning of hair clipper blades. Is that
2  correct?
3    A.   They disclose what I will call
4  generically as barber tools of various kinds and
5  completenesses.
6    Q.   One of which barber tools is a clipper
7  blade?
8    A.   Yes, it is.
9    Q.   And in connection with those patents do
10 you consider the clipper blade as discussed in
11 those patents to be the shaving head of the shaving
12 apparatus?
13   A.   Yes, I do.
14   Q.   And do you consider those clipper blades
15 to include both the cutter and the guard?
16   A.   Yes. I should say that they come apart
17 as soon as you have them out of the head so you
18 have -- you have individual pieces.
19   Q.   I will place what -- I'm going to place
20 before you what has been previously marked as
21 Phillips Exhibit No. 6 and ask you to turn to tab
22 39 in that.
23   A.   Yes.
24   Q.   Can you tell me what that first

Page 79

1  photograph is in tab 39?
2    A.   Well, yes. The first and second are of
3  the same thing.
4    Q.   Okay. What are the first and second?
5    A.   And the -- well, they are not terribly
6  well presented here. The -- they are two views of
7  it. They are the -- the first picture is the
8  bottom side. The second picture is the top side.
9  The one with the wing nut is the top side. And
10 those -- you see two scissor-like handles. You see
11 sort of knobs on the handles. Kind of like what
12 you have riding sidesaddle to keep you from falling
13 off. They help hold your fingers in position. The
14 thing looks clumsy, but it works very well.
15   Q.   And this is the manual hair clipper that
16 you intend to show to the jury?
17   A.   It is. It's got the patent number.
18 Can't quite see it in these pictures. It's
19 engraved in one of the handles. There are several
20 lines of text stuck in there. But you have -- the
21 picture is not good enough to tell.
22   Q.   Do you recall the vendor from whom you
23 purchased this?
24   A.   Some barber in Atlanta I think.

Page 80

1    Q.   Was he a vendor of hair clippers or this
2  is the one he had?
3    A.   It's a -- it's a -- it's either a barber
4  who is selling off his stuff or it's an antique
5  dealer who is interested in barber things. I'm not
6  real sure. I found a similar one in a catalog, a
7  modern catalog, but I haven't bought it. I was
8  only interested in that to see that they still made
9  them, because when I told the lawyers, they didn't
10 believe me that such a thing existed. So...
11   Q.   Now, to take apart the shaving head of
12 this manual hair clipper, what would you need to
13 do?
14   A.   You unscrew the wing nut and -- can you
15 see the wing nut in the second picture?
16   Q.   Yes.
17   A.   There is a spring washer underneath it
18 that is captive on it as I recall. And then the
19 part that is towards you in the second picture,
20 kind of a dome-shaped top, comes off and that
21 reveals the moving blade and below that the
22 stationary blade.
23        And I forget exactly what you have to do
24 then. I think you take the moving blade off. I

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 81

1  don't really remember. But you wind up with the
2  moving and stationary blades in your hand.
3      Q.    But that domed section is not the
4  shaving head?
5      A.    Well, you might look on it as a retainer
6  for the shaving head. You don't particularly have
7  to clean it.
8      Q.    Then turning your attention to the next
9  two photographs.
10     A.    Yes.
11     Q.    At tab -- or the next three photographs
12  at tab 39.
13     A.    Yes.
14     Q.    What is that?
15     A.    That's an electric hair clipper.
16     Q.    Can you tell me what these photographs
17  show?
18     A.    Yes. They are three views of --
19  actually the third picture would be my choice of
20  first picture because it shows the nameplate and
21  that is the -- that's the barber's eye view of it.
22  That's the top side.
23     Q.    Okay.
24     A.    I just wrapped the cord around it for

Page 82

1  safekeeping. The cord is not normally wrapped
2  around it. And the first picture is kind of an
3  oblique underside view and it shows the surface
4  that contacts the customer's scalp. It's that sort
5  of snow shovel-like appearance at the top of the
6  picture.
7          And then the second picture shows the
8  head removed, and do you see that that pivoted arm
9  that is sticking out below the -- what you might
10  say in the chin position?
11     Q.    Yes.
12     A.    Okay. That is spring-loaded and the way
13  you take it apart is turn to the first picture.
14  You -- in that picture you hold the body of the
15  razor in your right hand, you grasp the blade --
16  the blade portion with your left hand, the cutting
17  edge is put on the sides of them, sort of pinches
18  between you. You pull it towards you, and it
19  hinges around that bracket that's shown in the
20  second picture against the spring pressure and it
21  snaps to the position shown here and then you just
22  withdraw the head. Couldn't be easier.
23     Q.    Snaps in the position shown in?
24     A.    In the second picture.

Page 83

1          Then when you put it back on, you can't
2  see it in these pictures, the cutting head has a
3  kind of slot built into it that mates with that
4  lever and so you just insert the lever -- insert
5  the blade over the lever and then snap it to the
6  right clock-wise in that picture and it's ready to
7  go.
8          The moving part, you can just barely see
9  it. There is a motor that's driving this thing.
10  And in the second picture you see the shiny metal
11  part to the right of the lever. You see sticking
12  above it kind of a blackish thing.
13     Q.    Yes.
14     A.    That moves driven by the motor and it's
15  arranged so that it drives the cutter head. And as
16  you snap the head back on, you reengage that.
17     Q.    So, the head of the electric hair
18  clipper is the -- what's shown detached?
19     A.    It's the detached part in the second
20  picture, yes. And that's what the barber routinely
21  changes. When you take it apart, you can see that
22  it's got a number on it, there is a number one and
23  a number two and different sizes.
24     Q.    What is the shaving head of an electric

Page 84

1  razor?
2      A.    It's the guard which -- well, I guess
3  there are two principal kinds of electric shavers.
4  There is the foil kind and there is the rotary
5  kind. And the -- they are common -- they have some
6  common concepts. They have a guard, which is a
7  perforated plate.
8          In the foil kind -- the whole idea in
9  electric razors is to make the guard as thin as you
10  can. So, the early electric razors didn't have --
11  foil is a relatively recent invention. They use
12  foils because they can be made thin.
13          So, you have a perforated plate or foil
14  or guard that through which the hairs hopefully
15  protrude and which act as one of the two cutting
16  blades. The inside of the hole is I'm not going to
17  say sharpened but it's natively sharp.
18     Q.    It's, I'm sorry, natively?
19     A.    Yes. It comes that way. When you make
20  the hole, it just is sharp.
21     Q.    The hole itself is sharp?
22     A.    The edges of the hole are sharp or you
23  can cut against them. Just like the edge of a
24  sheet of glass. While it is not intentionally

21 (Pages 81 to 84)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 85

1 sharpened, it is sharp.  I don't think they sharpen
2 them individually.  It would be hard to think of
3 how they do that.
4        And then the blade is reciprocated next
5 to that -- next to the foil and one hopes cuts off
6 the hairs that stick through the foil, and there
7 are multiple blades all mounted in parallel.
8        In the shavers I have looked at there
9 are multiple blades side by side that are all
10 reciprocated back and forth together.  It's very
11 much like a hedge trimmer.  I keep using the hedge
12 trimmer analogy because you can see it.  It's big
13 enough.  You can see everything in it.
14        You have -- you watch my fingers here.
15 You will have multiple scissors in parallel.
16 (Indicating).  It's like that.
17        In the rotary kind it's very similar.
18 There is no foil.  There is instead a kind of
19 washer with slots in it and there is multi-pronged
20 rotary cutter behind it, but the action is the
21 same.
22        It's scissor-like action.  By
23 scissor-like, I mean there are two blades that
24 cooperate in cutting the hair or at least one of

Page 86

1 them is a holder and the other is a cutter.  Hard
2 to say which is which.
3    Q.    And where does your understanding of the
4 operation of a shaving head of an electric shaver
5 come from?
6    A.    From taking them apart, looking at them.
7    Q.    When did you do that?
8    A.    Well, I've done it in connection with
9 this case, but I recall it from the days when I had
10 an electric razor.
11    Q.    You took your own electric razor apart?
12    A.    Oh, sure.  You have to in order to clean
13 it, which is the whole point of this invention as I
14 understand it.
15    Q.    Why do you say you had to take it apart
16 to clean it?
17    A.    Well, it's full of little tiny parts
18 that trap the hairs.  It's a big mess.
19    Q.    You see the point of this invention as
20 not having to do that?
21    A.    That's right.
22    Q.    Now, in going back -- turning your
23 attention to Exhibit 7 again, which is the '328
24 patent, which I gave you a separate copy of.

Page 87

1    A.    I have it.  This patent here?
2    Q.    That's right.  Column 5.
3    A.    Yes.
4    Q.    Line 8 and 9.  The patent says, "The
5 inner cutter of the shaving head is activated" --
6    A.    Wait.  5 -- yes.  I got it.  The inner
7 cutter, yes.
8    Q.    In the patent it seems that there is a
9 distinction between the inner cutter and the
10 shaving head.  Do you see that?
11    A.    I do.
12    Q.    Do you make a distinction between the
13 two?
14    A.    Well, no.  I think the head includes the
15 inner cutter and that's kind of confirmed by this
16 where it says, "The inner cutter of the shaving
17 head."  The head -- the implication to me is that
18 the head is an assembly, and in the shavers I have
19 examined it is in fact an assembly.
20    Q.    Turning your attention to Exhibit 4, tab
21 8.
22    A.    Tab?
23    Q.    8, which is the MeKiney patent.
24    A.    Yes.

Page 88

1    Q.    U.S. Patent 3,365,267.
2    A.    Yes.
3    Q.    In the MeKiney patent, what is the
4 cradle structure adapted to receive the shaving
5 head of a shaving apparatus?
6    A.    Well, let's see where I referred to it
7 in my report.
8        I see on page 30, paragraph 84, page 30
9 of Exhibit 1.  Exhibit 1.
10    Q.    Sorry.  Okay?
11    A.    Got it?
12    Q.    Yes.
13    A.    I say there that the cradle structure of
14 MeKiney or the equivalent is the shelf 44 and the
15 tank 12.
16    Q.    Is there anything else in MeKiney that
17 is the cradle structure adapted to receiving the
18 shaving head of a shaving apparatus?
19    A.    Well, there is -- there is other parts
20 involved.  There is the magnets at 46.
21    Q.    And those magnets 46 support the clipper
22 blades?
23    A.    Yes.
24    Q.    On rack 44?

22 (Pages 85 to 88)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 89

1    A.   Shelf 44, yes.
2    Q.   Shelf 44. Asking you to turn your
3  attention to Exhibit 3, your third report, at
4  paragraph 92.
5    A.   Yes.
6    Q.   You state, "The MeKiney patent also
7  discloses the cleaning of a razor 42."
8    A.   Yes.
9    Q.   "Razor 42 is held in slot 38 and
10  received by tank 12"?
11    A.   Yes.
12    Q.   Do you see that?
13    A.   Yes, I do.
14    Q.   Is it your opinion that slot 38 is also
15  a cradle structure?
16    A.   It's part of the cradle structure.
17    Q.   It's part of shelf 44 and tank 12?
18    A.   It's not entirely clear whether it's
19  part of 44, but it's -- looks like it's more part
20  of 34.
21    Q.   So, again, what is the cradle structure
22  in the MeKiney patent?  Is it the combination of
23  shelf 44, slot 38 and tank 12?
24    A.   It's everything on top of figure 1. So,

Page 90

1  you have the tank 12 and you have the magnets 46
2  and you have the shelf 44, you have the other shelf
3  34 and you have features in 34, two of them are
4  numbered 36 and 38. So, all of those collectively
5  are the -- act to receive the shaving apparatus.
6    Q.   What is the shaving apparatus?
7    A.   Well, this one accepts at least two
8  kinds of shaving apparatus.  Accepts the straight
9  razor and it accepts the cutter blade, the head
10  assembly.
11    Q.   Of the clipper?
12    A.   Of the clippers.
13    Q.   What accepts the straight razor?
14    A.   This slot 38.
15    Q.   What is the shaving head of the straight
16  razor?
17    A.   Well, the straight razor is so elemental
18  that the head of it would be the -- the term was
19  not used for straight razors but to -- there is
20  only two parts of a straight razor.  There is the
21  blade and the case.  And the case also doubles as a
22  handle.
23         So, the thing is constructed like a
24  jackknife with one blade and the head therefore

Page 91

1  would be the blade that arrow 64 is pointing to.
2    Q.   And that's in figure 3 of MeKiney?
3    A.   Yes.
4    Q.   And what is it that receives the shaving
5  head of the clippers?
6    A.   It's the magnets and the shelf.  The
7  magnet 46 and the shelf 44.
8    Q.   You had previously said it received the
9  head assembly of the clippers?
10    A.   Yes.
11    Q.   Is that the cutter blades?
12    A.   Yes.
13    Q.   Okay.
14    A.   The cutter -- just to clarify.  The
15  cutter blade is part of the head.  Whether you take
16  it apart or don't take it apart may be the barber's
17  choice.  It's very easy to do.  He could easily do
18  it either way.
19    Q.   I guess this is where I am confused.
20  So, there is something called the head of a hair
21  clipper that includes as a part of it the cutter
22  blade?
23    A.   Yes.
24    Q.   And the other part of it is the guard?

Page 92

1    A.   That's what I'm calling as the guard.  I
2  don't know what else to call it.
3    Q.   Are there any other components to the
4  head of a clipper blade?
5    A.   Well, in the -- the ones that I have
6  seen have been the two that are disclosed so far in
7  this case; and in the electric case the head shown
8  detached in one of the photographs is two pieces,
9  but one of those -- one or both of those pieces may
10  in turn be made up of other pieces that you do not
11  disassemble.
12         Analogous to rivets that are permanent
13  assembly.  The manual clipper is similarly
14  constructed.  They are small parts, but each of
15  them is quite complicated -- it's a complex shape.
16    Q.   And so the cutter blade is -- consists
17  of --
18    A.   The head consists of the cutter blade
19  and the guard, but both the cutter blade and the
20  guard may in turn consist of other parts but you
21  can't get them apart.
22    Q.   Okay.
23    A.   So, for your purposes it's two pieces.

23 (Pages 89 to 92)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 93

1   There may be other parts, but I can't think of them
2   now.  Those are certainly the major ones, the ones
3   you would want to clean.
4       Q.   Does the siphon in the MeKiney patent,
5   which I think is No. 24, is that correct?
6       A.   Well, it's -- there is two siphon-like
7   objects.  There is 24.  And the other one is the
8   feed pump.  24 is the siphon, that's correct.
9       Q.   Siphon 24, does that dry the barber
10  tools that are cleaned or sterilized in the MeKiney
11  patent?
12      A.   It assists in the drying.
13      Q.   In Exhibit 3, your third report, at
14  page 95.
15      A.   Yes.
16      Q.   You say, "Simply, without the siphon
17  tube, the barbers' tools could not drip dry and the
18  barber would need to dry them with, for example, a
19  towel."
20          Do you see that?
21      A.   I do.
22      Q.   Does the siphon tube eliminate the need
23  for a towel?
24      A.   Well, it lets them drip dry.  Depends

Page 94

1   how quickly you need to reuse the tool.  It will
2   dry.
3       Q.   If you needed to use them right away,
4   you would need to dry them in some way?
5       A.   That's right.
6       Q.   With a towel?
7       A.   With a towel or some other means, hair
8   dryer, whatever.
9       Q.   In the MeKiney patent what is the
10  bracket for insertion of the shaving apparatus
11  therein?
12          Let's start with your first shaving
13  apparatus, the straight razor.  What is the bracket
14  for insertion of the straight razor?
15      A.   Well, you have, once again, the shelf
16  34, the slot 38 and magnets 46, although the
17  magnets aren't related to the straight razor.  But
18  the shelf 34 and the slot 38 is -- are.
19      Q.   So, in your opinion the slot 38 and
20  shelf 34 are both the cradle structure for the
21  straight razor and the bracket?
22      A.   Well, the cradle also includes the tank.
23  12, is that it?
24      Q.   Yeah, that's right.

Page 95

1       A.   Because you need something to stop the
2   razor from falling through.  So, all together, they
3   form both the cradle and the bracket.
4       Q.   So, tank 12 is part of the cradle but
5   not part of the bracket?
6       A.   Yes, I think that's a fair statement.
7   It cooperates with the bracket, but it's not part
8   of the bracket.
9       Q.   And for your second shaving apparatus,
10  the clipper, the hair clipper, what is the bracket
11  for insertion of the hair clipper in the MeKiney
12  patent?
13      A.   The magnet, the magnet would be the
14  equivalent.
15      Q.   Is the magnet a projecting support?
16      A.   It can be.  I see how it's shown in this
17  drawing.
18      Q.   Figure 3?
19      A.   Figure 3.  And it's not entirely clear
20  how it's done.  If it is projecting, it's not
21  projecting very far.
22      Q.   Staying with Exhibit 4, if you could
23  turn to tab 9, the Davies patent, U.S. Patent
24  3,478,758.

Page 96

1       A.   Yes, I have it.
2       Q.   In the Davies patent what is the cradle
3   structure adapted to receive the shaving head of a
4   shaving apparatus?
5       A.   Just a moment, please.
6       Q.   Sure.
7       A.   Could I have the question again, please.
8       Q.   In the Davies patent what is the cradle
9   structure adapted to receive the shaving head of a
10  shaving apparatus?
11      A.   It's the tray 74.
12      Q.   What is the shaving apparatus?
13      A.   It's what -- it's shaving heads, razors,
14  barber tools in general.  The Davies is intended
15  for any kind of sharp instrument.  It's not limited
16  to shaving equipment.  It refers briefly to shaving
17  equipment buried in the body of the patent, but
18  it's intended to be a more versatile device.
19  Perhaps a veterinarian might use it or a
20  manicurist.
21      Q.   And at column 5 through 6, starting at
22  line 73 of column 5.
23      A.   Yes.
24      Q.   The Davies patent says, "Also, two

24 (Pages 93 to 96)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 97

1  revolving brushes rotating in opposite directions
2  and spaced to receive hair clippers and other
3  instruments may be provided to remove hairs and
4  other particles from such instruments for cleaning
5  purposes"?
6    A.   Yes.
7    Q.   Do you see that?
8    A.   I do see that.
9    Q.   Is that the reference you were referring
10 to?
11   A.   Yes, it is.
12   Q.   In the Davies patent what is the feed
13 mechanism for feeding cleaning fluid from container
14 12 to tray 74?
15   A.   Well, in Davies, you have a -- you have
16 an external source of liquid and there is a tap in
17 the bottom of the tank, Item 80, and the liquid is
18 fed through that.  So, that's the feed device.
19   Q.   Tap 80 is the feed device?
20   A.   Fitting 80 I think is the proper name
21 for it.
22   Q.   Fitting 80 feeds fluid from container 12
23 to tray 74?
24   A.   I'm trying to find 12.  But I don't

Page 98

1  think it's 12.
2    Q.   Sorry.
3    A.   I think it's from outside.  It's not
4  from anything.  It's from some unnamed source.
5  Yeah, it's not from 12.  It's to 12.  And 12
6  contains the tray 74 and that in turn is holding
7  the shaving apparatus.
8    Q.   Turning your --
9    A.   Excuse me a moment.  I realize we had a
10 break not too long ago, but I'd like to do another
11 one.
12   MS. WENDLANDT:  Sure.
13   MR. SHIMOTA:  Do you want to break for lunch
14 now?
15   THE WITNESS:  Didn't mean to entirely break
16 the flow.
17   MS. WENDLANDT:  This is a good time.
18       (WHEREUPON, at 11:55 a.m. the
19       deposition of SAMUEL R. PHILLIPS
20       was recessed, to be reconvened at
21       12:40 p.m.)
22
23
24

Page 99

1         IN THE UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS
3
4  BRAUN GmbH,                )
5         Plaintiff,   )
6    -vs-                ) Civil Action No.
7  RAYOVAC CORPORATION,       ) 03-CV-12428-WGY
8         Defendant.   )
9
10
11          August 30, 2005
12          12:52 p.m.
13
14       The deposition of SAMUEL R. PHILLIPS
15 resumed pursuant to recess at the offices of
16 Kirkland & Ellis LLP, Suite 5600, 200 East Randolph
17 Drive, Chicago, Illinois.
18
19
20
21
22
23
24

Page 100

1  PRESENT:
2
3       ROPES & GRAY LLP,
4       (One International Place,
5       Boston, Massachusetts  02110-2624,
6       617-951-7000), by:
7       MS. DALILA ARGAEZ WENDLANDT,
8       dwendlandt@ropesgray.com,
9         appeared on behalf of the Plaintiff;
10
11      KIRKLAND & ELLIS LLP,
12      (200 East Randolph Drive,
13      Chicago, Illinois  60601,
14      312-861-2336), by:
15      MR. JAMES A. SHIMOTA,
16      jshimota@kirkland.com
17        appeared on behalf of the Defendant.
18
19
20 REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
21
22
23
24

25 (Pages 97 to 100)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 101

1       SAMUEL R. PHILLIPS,
2  called as a witness herein, having been previously
3  duly sworn and having testified, was examined and
4  testified further as follows:
5       EXAMINATION (RESUMED)
6  BY MS. WENDLANDT:
7     Q.   Welcome back.
8     A.   Thank you.
9     Q.   Mr. Phillips, I'm asking you to turn
10  your attention to Exhibit 4, tab 10, the Maatz
11  patent, U.S. Patent No. 3,500,840.
12       What is the cradle structure adapted to
13  receive the shaving head of the shaving apparatus
14  in the Maatz patent?
15     A.   It's got -- it's got a rack with some
16  holes in it. It has a row of magnets and it has a
17  grid or perforated shelf. All of those serve as a
18  structure to receive shaving apparatus.
19     Q.   Are you referring to the numbers 17, 16
20  and 15 in figure 2?
21     A.   Yes. Yes.
22     Q.   What is the shaving apparatus that rack
23  10 is adapted to receive? Rack 15. I'm sorry.
24     A.   Unlike some of the previous --

Page 102

1  previous -- the prior art we discussed previously,
2  it doesn't show any pictures of the tools being in
3  there, but scissors, razors, combs, all kinds of
4  barber tools.
5     Q.   Are razors a shaving apparatus?
6     A.   No.
7     Q.   Combs?
8     A.   No.
9     Q.   But razors are?
10     A.   Razors are.
11     Q.   And is rack 15 adapted to receive the
12  shaving head of a clipper, hair clippers?
13     A.   Maatz does not name clippers
14  specifically. The provisions, though, for
15  accepting them are the same as in some of the
16  patents we've discussed previously, namely, racks
17  and magnets. So, yes, it is adapted to holding the
18  heads of clippers.
19     Q.   So, to hold the heads of a clipper you
20  would use magnet 16 and rack 15 together?
21     A.   Certainly magnet 16. I think more
22  likely magnet 16 and the perforated tray 17
23  together.
24     Q.   The Maatz patent discloses a drain.

Page 103

1  Does the drain dry the barber tools?
2     A.   It aids the drying. The tools dry
3  naturally in air, but without the drain they
4  wouldn't dry at all.
5     Q.   What is the bracket for insertion of the
6  hair clipper apparatus in the Maatz patent?
7     A.   The rack -- well, 15 is -- there is
8  nothing that identifies the racks specifically. 15
9  comes the closest. It's pointing to a hole in the
10  rack. That would be the bracket.
11     Q.   The actual hole that the number 15 is
12  pointing to?
13     A.   Well, 15 is pointing to a hole. There
14  is nothing pointing to the rack as a -- as a whole,
15  w-h-o-l-e. But the piece of metal that the hole is
16  in, that hole 15 is in, that's the rack. Would be
17  some different hole, one that was aligned with a
18  magnet would be the bracket.
19     Q.   Can you explain that, what hole aligned
20  with the magnet?
21     A.   Well, you would -- there would be a
22  hole -- a hole aligned -- the picture here shows
23  the magnets kind of spaced without relation to the
24  holes in the rack above them, but if you

Page 104

1  specifically wanted to -- let me rephrase this.
2       Depending upon the shape of the shaver
3  head, you either would need a bracket or not and if
4  you needed one, the rack in which hole 15 is put
5  would be it.
6     Q.   So, it's your understanding of the Maatz
7  patent that the rack in which hole 15 exists is a
8  bracket for insertion of, for example, the hair
9  clipper apparatus?
10     A.   Well, for shaving apparatus.
11     Q.   So, in your one example, one of the
12  shaving apparatuses was a hair clipper?
13     A.   Yes, or a straight razor.
14     Q.   Okay. Let's stick with the hair
15  clipper. What is the bracket for insertion of the
16  hair clipper apparatus in the Maatz patent?
17     A.   It would be one of the holes in rack 15.
18     Q.   And that would be the same with regard
19  to a straight razor?
20     A.   Yes, probably be a different hole.
21     Q.   Because?
22     A.   Because they are different shapes or
23  sizes.
24     Q.   Is there in your opinion any difference

26 (Pages 101 to 104)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 105

1  between cleaning something and sterilizing it?
2      A.  There is certainly some difference.
3      Q.  What is that difference?
4      A.  But it's clear that sterilizing is a
5  form of cleaning.
6      Q.  So, in the Teknek case concerning the
7  cleaning machine for sheet, sheets?
8      A.  Sheets.
9      Q.  Was that a sterilizing machine?
10      A.  No.
11      Q.  And why -- what is the distinction then?
12  Are you saying sterilizing is a subset of cleaning?
13      A.  Yes, I do.
14      Q.  Okay.  And what distinguishes a
15  sterilizing process from a cleaning process?
16      A.  Well, a sterilizing process bears the
17  additional burden of killing any germs that are
18  there but there is a lesser burden on removing
19  particles.  So you have a concept of clean dirt,
20  which is exactly what you have in an operating
21  room.
22      Q.  You have clean dirt in an operating
23  room?
24      A.  Yes.

Page 106

1      Q.  Why do you say that?
2      A.  Well, semiconductor clean rooms are
3  where people really know how to clean and they are
4  a lot more rigorously enforced than anything I have
5  seen in a hospital.  Their shoes, beard, hair nets,
6  all those things are not well taken care of in an
7  operating room.
8      Q.  So, an operating room is a sterile
9  environment or sterilized environment but not
10  necessarily clean?
11      A.  That's right.  Now, sterilizing with a
12  wet sterilant is intrinsically a cleaning process.
13      Q.  Why do you say that?
14      A.  You are washing.  Physical removal of
15  dirt unavoidably.
16      Q.  And how is the dirt removed when
17  something is sterilized with a wet liquid?
18      A.  With washing it specifically.  And in
19  fact some of the prior art, there is sterilization
20  with spraying on from a spray can.
21      Q.  Right.  Let's turn to that.  I think
22  it's the Loeffler patent.  Let me see what it is.
23  It's tab 6 to Exhibit 4.  U.S. Patent 2,976,552.
24          Can you explain to me -- is this what

Page 107

1  you were referring to?
2      A.  Yes.
3      Q.  Can you explain to me how this is a
4  cleaning as well as sterilizing process?
5      A.  Yes.  The spraying process is a washing
6  process.  I'm familiar with its use for cleaning
7  things.
8      Q.  And how does the spray in the Loeffler
9  patent physically remove the dirt or particles?
10      A.  By dissolving some of the material and
11  by impingement on the rest -- on other material.
12      Q.  What do you mean by "dissolving some of
13  the material"?
14      A.  Well, depends what's in the -- in the
15  sterilant, but conceivably there are solvents in
16  there.  It's perhaps alcohol-based.  We don't
17  really know.  It just says sterilant or sterilizing
18  liquid is probably what it says.
19      Q.  I believe at column 2, line 52 or 53 it
20  says, "Spraying can 60, containing the sterilizing
21  fluid."
22      A.  Yes.  It also -- it also says -- no, I
23  think your reference number is right.
24      Q.  And from that reference, you believe

Page 108

1  that conceivably it could contain solvents?
2      A.  Yes.
3      Q.  Spray can 60?
4      A.  Yes.
5      Q.  Is that something about which you are
6  confident?
7      A.  It mentions -- it mentions in column 1,
8  line 43 that the head of a clipper is cleansed in
9  the device.  It mentions cleansing again at line
10  59.  There may be other places.
11      Q.  Sticking with that first reference, the
12  line is, "It is, in view of this, the further
13  object of the invention to provide means for
14  automatically applying a suitable sterilizing fluid
15  to the head of the clipper each time it is cleansed
16  in that device."
17          You read that to be that the sterilizing
18  fluid is doing the cleansing, or do you?
19      A.  It's assisting with the cleansing.  I
20  realize this device has a brush as an important
21  part of it.
22      Q.  What is the function of the brush?
23      A.  The brush is to agitate the surface and
24  cooperating with the liquid does the cleaning.  Not

27 (Pages 105 to 108)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 109

1  just the dry brushing. It's a wet brushing, which
2  is more thorough.
3      Q.   And so the brushes are carrying away
4  some of these dirt particles?
5      A.   Yes, presumably they are falling on the
6  floor of the device.
7      Q.   You also said in answer to my previous
8  question that one of the ways the spray can is
9  washing is that it impinges the rest of the
10  material. You said it dissolves some and then it
11  impinges on the other. What does that mean,
12  impinging?
13      A.   Well, impacts. It's got a connotation
14  of velocity in it. There is relative motion, which
15  can dislodge small particles, perhaps those that
16  the brush misses.
17      Q.   Do you know whether spray can 60
18  includes solvents?
19      A.   No, I don't. I -- since probably the
20  cheapest sterilizing fluid you could use would be
21  alcohol of the various kinds, it's likely to be
22  alcohol and the alcohols are solvents. So, there
23  would be a combination of cleaning and sterilizing.
24      Q.   In this Loeffler patent, what is the

Page 110

1  feed device for feeding cleaning fluid from spray
2  can 60 to the cradle structure?
3      A.   The spray can has -- is charged at the
4  factory with compressed gas and -- which you of
5  course cannot see in the picture, but it's there.
6  And there is a dip tube in the can and then a valve
7  at the top of the can and then a spray nozzle which
8  is visible. That's Item 76. And that combination
9  is the feed device.
10         So it's got four elements: The
11  pressurized gas, the dip tube, the valve and the
12  spray nozzle.
13      Q.   I'm sorry. The dipped?
14      A.   The dip tube.
15      Q.   Dip tube. Okay.
16      A.   It's not shown there, but that's the
17  only way you can get liquid out of a spray can.
18      Q.   Asking you to turn your attention to
19  Exhibit 3, your third report, paragraph 134.
20      A.   Yes.
21      Q.   You state, "The valve 75 is a fluid feed
22  device"?
23      A.   Yes.
24      Q.   Is it the valve alone or the four

Page 111

1  components that you just now named that are the
2  feed device of the Loeffler patent?
3      A.   Well, the valve is a fluid feed device,
4  but there are others. I'm not sure what your
5  question is.
6      Q.   I guess my question is: Is it the valve
7  alone that is the fluid feed device or is it the
8  valve in conjunction with these three other
9  elements, the compressed gas, the dip tube and the
10  nozzle?
11      A.   It's in conjunction with the three other
12  objects. Each of them is a fluid feed device.
13  Collectively they are the fluid feed device.
14      Q.   What do you mean, "each is a fluid feed
15  device"?
16      A.   Well, a component of a system is a part
17  of a system.
18      Q.   But a component of a system isn't the
19  system?
20      A.   I just said that. That's correct.
21      Q.   Okay. But you said that valve 75 is a
22  fluid feed device?
23      A.   It's a.
24      Q.   Yes. It's a component of the fluid feed

Page 112

1  device?
2      A.   Yes. That would be more complete.
3      Q.   In paragraph 135 on the next page, you
4  conclude, "I continue to believe that the fluid
5  level in the spray can will always be below the
6  cradle structure during feeding."
7         Can you explain that statement or what's
8  the basis of your belief there?
9      A.   Upon -- the complete accuracy of that
10  statement depends upon where the liquid level is in
11  the can at the start, and I do not know the
12  proportion of gas and liquid in the can. I don't
13  know how full it is filled at the factory.
14         Depending on the level that is filled,
15  though, there is a level at which the -- with the
16  geometric arrangement shown in the picture, the
17  level of the liquid will be below and remain below
18  the head of the clipper.
19      Q.   Going down to paragraph 138.
20      A.   Yes.
21      Q.   At page 39 you state, "The hair clipper
22  in the Loeffler patent obviously has a center of
23  gravity."
24      A.   Yes.

28 (Pages 109 to 112)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 113

1    Q.    Have you calculated where the center of
2    gravity would be --
3    A.    No.
4    Q.    -- in the Loeffler patent?
5    A.    No.
6    Q.    Turning your attention to Exhibit 6,
7    which is Exhibits 38, 39, 40 and 41 to your
8    reports.
9    A.    Thank you.
10    Q.    At Exhibit 40.
11    A.    Yes.
12    Q.    You have Mnller patent.
13    A.    Yes.
14    Q.    U.S. Patent 4,154,003.
15    A.    Yes.
16    Q.    I couldn't find the Mnller patent cited
17    in your report, but I was wondering why it was
18    included as an exhibit?
19    A.    It is cited but it's hard to find.
20    Q.    Okay.
21    A.    It is on page 41.
22    Q.    Of the third report?
23    A.    In the footnote. Yeah.
24    Q.    What is the proposition for which you

Page 114

1    are citing this patent for?
2    A.    That one can combine washing and drying
3    in the same -- in the same device. They don't have
4    to be separated.
5    Q.    What is the connection between that and
6    this case?
7    A.    It's -- it's rebutting what some of
8    Dr. -- what -- some of what Dr. Nayfeh says where
9    he is talking about the -- that it's bad to have
10    the cleaning fluid introduced into the drying
11    device.
12    Q.    I see. And with regard to Exhibit 6,
13    tab 41, which I believe is a Japanese abstract,
14    patent abstract?
15    A.    Yeah.
16    Q.    And it may include the patent itself
17    also. What is the proposition for which you are
18    citing this patent?
19    A.    I don't recall right now.
20          Well, at the bottom of page 44 in
21    footnote 14 there is -- I think I mentioned earlier
22    that there were such things as electric wet razors,
23    and I knew that Panasonic is a leading maker of
24    those and Panasonic is a brand of Matsushita who

Page 115

1    owns its patents. So it's not very surprising.
2          And what they have got is an impeller in
3    there. It's -- the proposition is to augment the
4    Salas information or the Salas prior art.
5    Q.    Okay. Mr. Phillips, do you dispute that
6    each of the Rayovac cleaning systems that are
7    accused of infringement in this patent litigation
8    each include a cleaning fluid container?
9    A.    I don't dispute that.
10    Q.    And do you dispute that each of them
11    include a structure that's arranged above the fluid
12    level of the cleaning fluid in the container?
13    A.    I don't dispute that.
14    Q.    Do you dispute that each of them contain
15    a drying device?
16    A.    They each contain a drying device.
17    Q.    Turning your attention to Exhibit 2,
18    your second report.
19    A.    Yes.
20    Q.    At paragraph 79 of your report, you
21    begin to describe what you refer to as acceptable
22    non-infringing substitutes?
23    A.    Yes.
24    Q.    The first such substitute is a -- either

Page 116

1    one or two gas cleaning systems that Rayovac is
2    currently developing?
3    A.    Yes.
4    Q.    What is the basis for your opinion that
5    that gas cleaning system is a non-infringing
6    substitute, an available non-infringing substitute?
7    A.    I understand that available means that
8    it could be placed on the market in some short time
9    without defining what short means. It doesn't mean
10    that you can go and buy one today. But it means
11    that Rayovac could manage its business so that you
12    could go and buy one before too long, whatever "too
13    long" means.
14    Q.    To conclude that Rayovac could place
15    such a gas cleaning system on the market in a short
16    time, whatever that time is, to whom did you speak?
17    A.    Mr. Chasen.
18    Q.    Anyone else?
19    A.    No. Well, I spoke to Mr. Shimota.
20    Q.    Anyone else at Rayovac?
21    A.    No one else at Rayovac.
22    Q.    And did you review any documents in
23    connection with your opinion that the gas cleaning
24    system is an available non-infringing substitute?

29 (Pages 113 to 116)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 117

1    A.    Yes, I did.
2    Q.    Placing before you what I have marked as
3  Phillips Exhibit 8, which is tab 37 to your report.
4  Are those the documents that you reviewed in
5  connection with forming your opinion?
6    A.    Yes, they are.
7    Q.    Did you review any other documents?
8    A.    I recall there were some -- some kind of
9  test reports, some kind of written documents
10  conditioned with these pictures, but I don't now
11  see them.  They were not very formal test reports,
12  but I don't know where they are.
13    Q.    Well, the last two pages of the tab 37
14  is a document entitled "Carbon Dioxide Rotary
15  Shaver Cleaner Operating Instructions."
16          Is that what you are referring to?
17    A.    I think there is more than that.  But I
18  don't see it here and I know that Mr. Shimota
19  turned over to you everything that we had.  So,
20  maybe my memory is wrong.
21    Q.    Well, if you did see such test reports,
22  do you still have a copy of them?
23    A.    Presumably I do.  But everything I have
24  like this I got from Mr. Shimota in the first

Page 118

1  place.  So, it's --
2    Q.    It could just be that it was missing
3  from the actual document we reviewed at Ropes &
4  Gray?
5    A.    Or it could be that I'm wrong.  I just
6  don't know which is which.  I thought there were
7  some documents that kind of look like this
8  instruction but that they were more -- more
9  test-oriented.
10          Not trying to hold anything out on you
11  here.
12    Q.    I just want to make sure we have
13  everything.
14    A.    Right.  We have what we have.
15    MS. WENDLANDT:  Jim, to the extent there are
16  such test reports, if you could produce them, that
17  will be great.
18    MR. SHIMOTA:  Sure.  If there is anything we
19  haven't produced, I will.
20  BY MS. WENDLANDT:
21    Q.    What did Mr. Chasen tell you about the
22  gas cleaning system that he was developing?
23    A.    Let me get my report in front of me here
24  just to refresh my memory so I don't leave anything

Page 119

1  out.
2          What he told me was he was developing a
3  completely dry system and, as you know, in the art
4  there are -- there are blower and vacuum systems
5  designed to clean razors.  His concept -- but all
6  of them to date that I have -- that I know anything
7  about involve a fan or blower or some
8  electric-powered motive device.
9          And his concept was to use compressed
10  gas and while it could be done with an air
11  compressor -- well, he mentions it here I see.
12          He's got two kinds.  One of them uses a
13  miniature compressor and the other one uses CO2
14  cylinders of the small kind, usually called
15  Sparkletts cylinders.  That is a trade name.  It's
16  "Spark" and then l-e-t-t-s, two Ts.
17          Such cartridges have been adapted for,
18  oh, pellet guns, starting small engines, all kinds
19  of things, and are available in the market.
20    Q.    Have you seen Mr. -- either of
21  Mr. Chasen's gas cleaning systems?
22    A.    No, only photographs and discussion with
23  him on the phone while looking at the photographs.
24    Q.    Do the photographs tell you that it

Page 120

1  could be an effective cleaning system?
2    A.    Yes.
3    Q.    How do they show that?
4    A.    They showed some before and after
5  pictures.  Again, that's either him stepping
6  through them with me on the phone -- well, you see,
7  he has numbered the tests and there is a
8  progression of development and as it proceeds
9  through this progression, the after photographs get
10  cleaner and cleaner.
11          And I think he has some comparisons that
12  I am not sure I can show them to you here.  I think
13  he has some comparisons that show after -- after
14  wet cleaning to establish a benchmark.  So, he's
15  satisfied that the thing is doing a good job of
16  cleaning.
17    Q.    What is the status of Mr. Chasen's gas
18  cleaning system today?
19    A.    As far as I know it is ready to be
20  turned into a product.  Still a laboratory unit as
21  far as I know, but the -- the heavy-duty
22  engineering is done.
23    Q.    And these are -- that conclusion is
24  based on your discussions with Mr. Chasen?

30 (Pages 117 to 120)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 121

1    A.   Yes.
2    Q.   Those discussions were prior to your
3  submission of the second Phillips report?
4    A.   Yes, yes, it was.
5    Q.   Another non-infringing available
6  substitute that you described in your report is
7  elimination of the dryer.
8    A.   Yes.
9    Q.   Is elimination of the dryer something
10 that Rayovac is currently developing?
11   A.   I don't -- I don't recall.  I -- there
12 are -- there are two things you can do about
13 eliminating a dryer.  You can just not have one or
14 you can -- and take the penalty of a longer drying
15 time.  Or you can substitute some different means
16 of drying such as induction heat, as Mr. Hoeser
17 mentions.
18       I understand that Braun has -- currently
19 markets both kinds, that is, no dryer at all and an
20 induction heating form of dryer in addition to the
21 blower one that is in dispute here.
22       I think Rayovac is contemplating the
23 same things; but where it lies, I don't know.
24   Q.   And what is your basis of your belief

Page 122

1  that Rayovac is contemplating the same things?
2    A.   I don't think I talked to Mr. Chasen
3  about that, but I talked to Mr. Shimota about that.
4    Q.   Have you seen any documents concerning
5  the elimination of the dryer?
6    A.   No.
7    Q.   What were your discussions were
8  Mr. Shimota about the elimination of the dryer?
9    A.   Just that they might -- that Rayovac
10 might do it.  Certainly be easy to do.
11   Q.   Why is the development of an induction
12 heating device to dry -- I'm sorry.  Start that
13 again.
14       Why is the introduction of an induction
15 heating device to dry the shaver head easy to do?
16 I'm not saying it's not.  I just don't know.
17   A.   The one that I said was easy to do was
18 take out the dryer entirely.  The induction heater,
19 it would take some development.  It's by no means
20 rocket science.  There are plenty of people to help
21 you design that.
22   Q.   But you haven't spoken to anyone at
23 Rayovac who would be one of those people?
24   A.   No, I haven't.

Page 123

1    Q.   With regard to your non-infringing
2  substitute involving the covers.
3    A.   Yes.
4    Q.   Which I think are on page -- well,
5  paragraph 98 of your report.
6    A.   Yes.
7    Q.   Is that something that Rayovac is
8  currently considering?
9    A.   I don't know the extent they are
10 considering it.  It's -- Rayovac did provide these
11 sketches and Rayovac says it would be easy for them
12 to do.  And having looked at the sketches, I agree
13 with them.
14   Q.   And who at Rayovac provided the
15 sketches?
16   A.   They came to me through Mr. Shimota.  I
17 don't know where they came from in Rayovac.
18   Q.   Did you talk to anyone at Rayovac about
19 the cover substitute?
20   A.   I might have talked to Mr. Chasen while
21 I had him on the phone, but I don't remember it.
22 Not much to talk about.
23   Q.   With regard to the non-infringing
24 available substitute which would require

Page 124

1  elimination of the bracket in the Rayovac device.
2    A.   Yes.
3    Q.   To whom did you speak to with regard to
4  that one?
5    A.   I don't think I talked to anybody about
6  that.  It's just that they could do it.
7    Q.   Why do you say they could do it?
8    A.   Well, there is so much precedent.
9  Cordless telephone comes immediately to mind.  The
10 only thing the bracket does is -- it does two
11 things.  It adds stability and it adds electric
12 power and both of those you can do with other
13 devices that are well-known.  I mean, I know of
14 them and presumably Rayovac knows of them.
15   Q.   But you haven't spoken to anyone at
16 Rayovac to confirm that?
17   A.   I don't believe I have.
18   Q.   And you haven't seen any Rayovac
19 documents concerning this?
20   A.   No, definitely not seen any Rayovac
21 documents.
22   Q.   Have you tested these what you call
23 available non-infringing substitutes against any of
24 the other claims in the '328 patent, that is, the

31 (Pages 121 to 124)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 125

1  ones that have not been asserted in this case?
2      A.   I don't think I have. I don't think
3  I've paid any attention to the non-asserted ones.
4      Q.   Can I ask you to look at claim 9 of the
5  '328 patent, which is Exhibit 7.
6      A.   All right.
7      Q.   As I read them, the only difference
8  between claim 9 and claim 11, which is one of the
9  asserted claims, is that claim 11 requires a drying
10  device and claim 9 requires an electrical
11  arrangement for temporarily operating the shaving
12  head of the shaving apparatus and the feed device?
13      A.   Yes.
14      Q.   Is that your reading as well?
15      A.   Let me do my own comparison here.
16      Q.   Sure.
17      A.   Yes, I think you're reading this
18  correct.
19      Q.   So, with regard to the non-infringing
20  substitute which would eliminate the dryer, would
21  that non-infringing substitute escape infringement
22  of claim 9?
23      MR. SHIMOTA: Objection; outside the scope,
24  form.

Page 126

1  BY THE WITNESS:
2      A.   Of course, I haven't reached an opinion
3  on that. I'd have to study that a bit to see what
4  the -- what the result would be.
5  BY MS. WENDLANDT:
6      Q.   Do you know whether the -- any of the
7  three Remington or Rayovac products accused of
8  infringement in this case have an electrical
9  arrangement that operates both the feed device and
10  the shaving head?
11      MR. SHIMOTA: Objection.
12  BY THE WITNESS:
13      A.   No, I'm sorry, I don't know.
14  BY MS. WENDLANDT:
15      Q.   Okay. Turning your attention back to
16  claim 1 of the '328 patent, which is the -- one of
17  the elements is a cradle structure with an outlet
18  port.
19          Isn't the dimension of the outlet port
20  something that you would need to know in order to
21  answer the question whether the cradle structure is
22  able to retain cleaning fluid?
23          Again, assuming that claim 1 did not
24  have a concave cradle structure.

Page 127

1      A.   Oh, assuming that.
2      Q.   Yes.
3      A.   If it didn't have the concave structure,
4  the need for the outlet port disappears. I mean it
5  says that the outlet port allows hair to drain.
6  There is nothing to drain from -- I mean, that's
7  entirely dependent upon the first element being the
8  way it is. The minute you take the concave surface
9  away, there is nothing to drain.
10      Q.   So, you couldn't have a cradle structure
11  that wasn't concave that had an outlet port?
12      A.   I'm having a hard time of thinking what
13  it might be.
14      Q.   So, the outlet port -- the existence of
15  an outlet port to one of ordinary skill in the art
16  would imply a concave cradle structure?
17      A.   Yes. Because if it's not concave, then
18  it's plane or convex. I don't know what else it
19  can be. Or it can be porous and, in any event,
20  there is no particular need for a drain because the
21  water will just run off.
22      Q.   Before our lunch break you had testified
23  that you had taken apart a shaving head of a
24  shaving apparatus during this case and also

Page 128

1  previously in connection with cleaning --
2      A.   Yes.
3      Q.   -- your own shaving apparatus?
4      A.   Yes.
5      Q.   And at that time you said that the point
6  of the invention here was that you wouldn't have to
7  do that, that is, take it apart?
8      A.   That's my understanding of it. It's
9  supposed to be convenient.
10      Q.   Where in the '328 patent, Exhibit 7, do
11  you see that the point of the invention is to add
12  this level of convenience to cleaning the shaving
13  head?
14      A.   Would you repeat the question, please.
15      Q.   Sure.
16      MS. WENDLANDT: Can you read back the
17  question.
18          (WHEREUPON, the record was read
19          by the reporter as requested as
20          follows: Q. Where in the '328
21          patent, Exhibit 7, do you see that
22          the point of the invention is to
23          add this level of convenience to
24          cleaning the shaving head?)

32 (Pages 125 to 128)

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 129

1  BY THE WITNESS:
2      A.   Whereas I do not find those specific
3  words, I find several references of storing the
4  razor and of -- and of avoiding taking it apart.
5  BY MS. WENDLANDT:
6      Q.   And what are those references?
7      A.   Well, let me go through it again and
8  find them for you.
9      Q.   Sure.
10     A.   Column 2, line -- beginning with line 5,
11  the inference I draw is that you don't want to take
12  it -- don't want to remove the shaving head.
13     Q.   Okay.
14     A.   Since it's discussing an advantage over
15  a prior art.
16         Then there is -- there is -- I'm going
17  to skip around a little as I remember them.
18         It can be operated -- let's see.  In
19  column 4, at the top, there is some discussion of
20  operating it while it's in the cleaner, and it has
21  to be together for you to do that.  I have to find
22  the exact reference for you.
23         I'm jumping back to the first page of
24  the patent again.  Well, he mentions a storage

Page 130

1  device, column 2, line 22, and it's associated with
2  arrangement for operating it electrically.
3         So, the cradle is configured as a
4  cleaning dish, a drying dish and/or a storage
5  device all together and all of that says to me you
6  don't want to take it apart.
7         Then around line 40, you ought to
8  operate it after drainage.  I'm sorry.  That's
9  something else.  Forget that.
10         At the top of column 3 he mentions more
11  specifically the benefit of operating it while it's
12  under water.
13     Q.   And from that benefit you infer that you
14  don't take it apart?
15     A.   I do infer that.  At the bottom of
16  column 3, beginning about line 63, he talks again
17  about storing it, perfect, well protected,
18  indefinite period of time, locked in place.
19         Again, the inference I draw, until -- he
20  goes on the next one, "until the cleaning and
21  drying operations are completed and the shaving
22  apparatus is needed for a shave."  Again, the
23  inference is that it's together, not disassembled.
24         There may be others, but that is --

Page 131

1  those are some.
2      Q.   Can you describe for me the process by
3  which your reports were drafted; that is, did you
4  write the initial draft?  Who did that?
5      A.   I did write an initial draft and
6  Mr. Shimota rewrote it and we had a number of
7  meetings in which we would discuss aspects of the
8  report.  So, I've been over the report in
9  considerable detail several times.
10     Q.   Were these meetings in person or
11  telephonic?
12     A.   Typically in person.
13     MS. WENDLANDT:  If we could just take a
14  five-minute break, I may be done.
15         (WHEREUPON, a recess was had
16          from 1:56 to 2:01 p.m.)
17  BY MS. WENDLANDT:
18     Q.   You will recall that prior to the lunch
19  break we spoke about the disclosure in the Simmons
20  patent of a cleaning fluid that -- to which one
21  would add a lubricant?
22     A.   Yes, I do recall that.
23     Q.   In light of that disclosure, do you
24  still opine that it would be counterintuitive to

Page 132

1  one skilled in the art to add the lubricant to the
2  cleaning fluid in the '328 patent?
3      A.   In light of that, no, I don't.
4      MS. WENDLANDT:  I have no further questions.
5      MR. SHIMOTA:  Okay.  I have nothing.
6         Signature is reserved.
7         (Time Noted:  2:02 p.m.)
8      FURTHER DEPONENT SAITH NAUGHT.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

SAMUEL R. PHILLIPS, AUGUST 30, 2005

Page 133

1    IN THE UNITED STATES DISTRICT COURT
2         DISTRICT OF MASSACHUSETTS
3
4    BRAUN GmbH,              )
5           Plaintiff,    )
6     -vs-                  ) Civil Action No.
7    RAYOVAC CORPORATION,    ) 03-CV-12428-WGY
8          Defendant.    )
9
10
11        I hereby certify that I have read the
12   foregoing transcript of my deposition given at the
13   time and place aforesaid, consisting of Pages 1 to
14   132, inclusive, and I do again subscribe and make
15   oath that the same is a true, correct and complete
16   transcript of my deposition so given as aforesaid,
17   and includes changes, if any, so made by me.
18
19            SAMUEL R. PHILLIPS
20   SUBSCRIBED AND SWORN TO
21   before me this       day
22   of         , A.D. 2005.
23        Notary Public
24

Page 134

1    STATE OF ILLINOIS )
2              ) SS:
3    COUNTY OF DU PAGE )
4         I, CORINNE T. MARUT, C.S.R. No. 84-1968,
5    a Certified Shorthand Reporter of the State of
6    Illinois, do hereby certify:
7         That previous to the commencement of the
8    examination of the witness, the witness was duly
9    sworn to testify the whole truth concerning the
10   matters herein;
11        That the foregoing deposition transcript
12   was reported stenographically by me, was thereafter
13   reduced to typewriting under my personal direction
14   and constitutes a true record of the testimony
15   given and the proceedings had;
16        That the said deposition was taken
17   before me at the time and place specified;
18        That the reading and signing by the
19   witness of the deposition transcript was agreed
20   upon as stated herein;
21        That I am not a relative or employee or
22   attorney or counsel, nor a relative or employee of
23   such attorney or counsel for any of the parties
24   hereto, nor interested directly or indirectly in

Page 135

1    the outcome of this action.
2         IN WITNESS WHEREOF, I do hereunto set my
3    hand at Chicago, Illinois, this 1st day of
4    September, 2005.
5
6
7
8         CORINNE T. MARUT, C.S.R. No. 84-1968
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 136

1              I N D E X
2    SAMUEL R. PHILLIPS          EXAMINATION
3      BY MS. WENDLANDT................  3
4      BY MS. WENDLANDT................ 101
5
6
7         E X H I B I T S
8    PHILLIPS DEPOSITION EXHIBIT      FIRST REFERRED TO
9    Phillips Exhibit 1.................  6
10   Phillips Exhibit 2.................  6
11   Phillips Exhibit 3.................  6
12   Phillips Exhibit 4.................  6
13   Phillips Exhibit 5................. 30
14   Phillips Exhibit 6................. 78
15   Phillips Exhibit 7................. 53
16   Phillips Exhibit 8................. 117
17
18
19
20
21
22
23
24

34 (Pages 133 to 136)