# EXHIBIT
# 34A

Juergen Hoeser  May 11, 2005

Page 1

```
1                   VOLUME: I
2                 PAGES: 1-116
3                EXHIBITS: 49-65
4
5      IN THE UNITED STATES DISTRICT COURT
6        FOR THE DISTRICT OF MASSACHUSETTS
7    - - - - - - - - - - - - - - - - - -x
8    BRAUN GmbH,
9                Plaintiff,
10   v.                   Civil Action
11   RAYOVAC CORPORATION,      No. 03-CV-12428-WGY
12               Defendant.
13   - - - - - - - - - - - - - - - - - -x
14
15     VIDEOTAPED DEPOSITION of JUERGEN HOESER
16                May 11, 2005
17                 9:17 a.m.
18             DWYER & COLLORA, LLP
19              600 Atlantic Avenue
20              Boston, Massachusetts
21
22
23
24     Reporter: Michael D. O'Connor, RPR
```

Page 2

```
1    APPEARANCES:
2
3      ROPES & GRAY
4      By William L. Patton, Esq. and
5      Dalila Argaez Wendlandt, Esq.
6      One International Place
7      Boston, Massachusetts 02110
8      (617)951-7884
9      For the Plaintiff.
10
11     KIRKLAND & ELLIS, LLP
12     By James A. Shimota, Esq.
13     200 East Randolph Drive
14     Chicago, Illinois 60601
15     (312)861-2336
16     For the Defendant.
17
18     Also Present: Lily Olm, Interpreter
19               Jodi Urbati, Videographer
20
21
22
23
24
```

Page 3

```
1                  I N D E X
2    Deposition of:           Direct  Cross
3    JUERGEN HOESER
4      By Mr. Shimota                6
5
6                E X H I B I T S
7    No.                          Page
8    49 Defendant's First Notice of Rule 30(b)(6)
9       Deposition                31
10   50 English version of Braun 1069 to 1073    54
11   51 German version of B1069 to 1076         54
12   52 Braun's Answers to Defendant's
13      Interrogatories            71
14   53 Mr. Hoeser's notes, Bates No. B000861    71
15   54 English translation of Bates
16      No. B000861              72
17   55 Bates No. B001064          72
18   56 Document filed as an Exhibit B to the
19      Declaration of Dietrich Pahl, which is
20      Entitled "R&D Shavers 'Future'"       72
21   57 Documents bearing the Bates range B3074
22      to 3076                   72
23   58 Document bearing the Bates range B4615
24      to B4617                 73
```

Page 4

```
1              E X H I B I T S (Cont'd)
2    No.                          Page
3    59 English translation of Exhibit 58      73
4    60 Documents with Bates Nos. B002089 to
5       B002095, with English translations   94
6    61 U.S. Patent No. 5,711,328           73
7    62 U.S. Patent No. 5,649,556           73
8    63 Individuals who work for Mr. Hoeser     70
9    64 Document with Bates Nos. B6737 to
10      B7102                    101
11   65 Rayovac's translation, English translation
12      of Exhibit 64             102
13
14   (Mr. Shimota has retained the original exhibits)
15
16
17
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

Juergen Hoeser  May 11, 2005

Page 5

1      P R O C E E D I N G S
2
3         VIDEOGRAPHER:  Here begins videotape number
4    one in today's deposition of Juergen Hoeser in the
5    matter of Braun versus Rayovac Corporation in the
6    United States District Court for the District of
7    Massachusetts, Civil Action No. 03-CV-12428-WGY.
8         Today's date is May 11, 2005.  The time,
9    9:17 a.m.  The videographer today is Jodi Urbati
10   contracted by LegaLink Boston.  This deposition is
11   taking place at Dwyer & Collora, and was noticed by
12   James Shimota of Kirkland & Ellis.
13        Counsel, please voice identify yourselves
14   and state whom you represent.
15        MR. SHIMOTA:  Jim Shimota, Kirkland &
16   Ellis, appearing on behalf of Defendant Rayovac
17   Corporation.
18        MR. PATTON:  Bill Patton of Ropes & Gray
19   appearing on behalf of Braun.
20        VIDEOGRAPHER:  Would all others present
21   please state their name for the record.
22        MS. WENDLANDT:  Dalila Wendlandt, counsel
23   for Braun GmbH.
24        INTERPRETER:  Lily Olm, the interpreter.

Page 6

1         VIDEOGRAPHER:  The court reporter today is
2    Michael O'Connor of LegaLink Boston.  Would the
3    reporter please swear in the witness.
4
5         JUERGEN HOESER
6
7    having been satisfactorily identified by the
8    production of his driver's license, and duly sworn
9    by the Notary Public, was examined and testified as
10   follows:
11
12        DIRECT EXAMINATION
13   BY MR. SHIMOTA:
14        Q.  Would you please state your name for the
15   record, sir.
16        A.  My name is Juergen Hoeser.
17        Q.  Would you also provide your address?
18        A.  The address is in Germany.  It's
19   Pfarrdriesch 9B in Neu Anspach 61267.
20        Q.  Before we begin, I'd just like to go over a
21   few bits of background for purposes of the
22   deposition.  You understand that over the course of
23   today and perhaps tomorrow I will ask you questions,
24   and you will be expected or you will give me

Page 7

1    answers, correct?
2         A.  Yes.
3         Q.  And just to be clear, you must or you
4    should attempt to, when answering my questions,
5    provide an audible response as opposed to nodding
6    your head?
7         A.  Okay, yes.
8         Q.  And if at any point during the deposition
9    you do not understand a question, would you please
10   tell me?
11        A.  Okay.
12        Q.  If at any point during the deposition you
13   come to believe that a prior answer you had given
14   was either incomplete or inaccurate, would you tell
15   me that?
16        A.  Okay.
17        Q.  Is there any reason that you can think of
18   sitting here now that you are unable to answer my
19   questions truthfully and accurately today?
20        A.  No.
21        Q.  Would you describe for me -- let me see if
22   I can remember what the correct word would be --
23   would you describe for me your education following
24   what would be school for children?

Page 8

1         A.  After the children's school, I did my
2    studying and I became a machine engineer.  My
3    training was for an apprenticeship for toolmaker.
4         Q.  Where did you do your apprenticeship for
5    tool making?
6         A.  In Germany, with the company Sperry
7    Vickers.  After the apprenticeship, I worked for a
8    half year as a mechanic in avionics.  Then I went
9    back to school and I did my high school diploma
10   called abitur in Germany.  This is high school.  The
11   American high school would be equivalent to abitur
12   in Germany.
13        Q.  Where did you study or where did you pursue
14   your high school studies?
15        A.  I will give you the equivalence literally.
16   It's a professional high school, literal
17   translation.
18        Q.  What was the name of the professional high
19   school?
20        A.  Fachhochschule, Oberursel being the
21   location of the school.
22        Q.  In what year did you perform your
23   apprenticeship for tool making?
24        A.  From 1977 to 1980.

2 (Pages 5 to 8)

Juergen Hoeser   May 11, 2005

Page 9

1    Q.  In your apprenticeship, did you focus on
2  the manufacture of any particular tools?
3    A.  No.  The apprenticeship was general in
4  character and it was geared to repair tools.
5    Q.  What products did Sperry Vickers
6  manufacture?
7      INTERPRETER: I don't know the exact
8  translation. I will see with the witness whether my
9  interpretation of the tools is correct.  He asked me
10  whether he should explain to me what it is. I know
11  what it is.  I will give you the exact literal
12  translation of this word.  It would be pumps to help
13  the steering.
14    A.   Then the reinforcer for the brake
15  potential, the brake strengths.  Sperry Vickers also
16  constructed steering equipment for military
17  aircrafts.
18    Q.  In your tool-making apprenticeship, did you
19  have occasion to witness or work with any cleaning
20  processes?
21    A.  Not really.  The apprenticeship is such
22  that we are trained in general techniques.  So we
23  are trained with working with the tools, such as
24  milling machines, vending machines, things like

Page 10

1  that.
2    Q.   During the apprenticeship, were the tools
3  that were made or used, were the tools ever cleaned?
4    A.   Yes, they were cleaned, but they were
5  mainly cleaned by using a brush in order to get rid
6  of chips.
7    Q.   Were they ever cleaned using fluids?
8    A.   Yes.  They were cleaned using a napkin with
9  a special cleaning substance, so that the rusting
10  would be avoided, the rust formation would be
11  avoided.
12    Q.   Were there any other cleaning methods using
13  the fluid that you recall?
14    A.   Not during the apprenticeship.
15    Q.   You next mentioned you went to work, I
16  believe, I will use the term, as an aeronautical
17  engineering or something akin to that?
18    A.   Engineer would not be the right translation
19  in the second part of the word you used.  It would
20  be below.
21    Q.   During what years did you work as a fellow?
22    A.   This only happened during six months, and
23  this was around 1980.
24    Q.   What were your responsibilities when you

Page 11

1  worked as a fellow?
2    A.  I was in charge of steering the Phantom
3  Hunters.  The steering units were returned to us
4  from the Air Force.  Then we checked the parts.  If
5  they needed repair, we did the repair, and then we
6  returned them to the Air Force.
7    Q.   During your work as a fellow, did you have
8  occasion to clean the steering equipment?
9    A.  Yes.  They were cleaned very carefully
10  using a humid brush.  So it's very important that
11  this is done very carefully, because the parts are
12  sensitive.
13    Q.  Were there any fluids used in this cleaning
14  process?
15    A.  Yes.  Cold cleaning.  This is a regularly
16  used substance which you use for cold cleaning.
17    Q.  Was the cleaning process automatic or
18  manual?
19    A.  Well, the liquid was in a recipient, and
20  then I drenched the brush into the recipient with
21  the liquid, and I cleaned manually the tool.
22    Q.  Were there any other cleaning processes you
23  worked with in your fellowship?
24    A.  No, but depending on the material of the

Page 12

1  tool that we cleaned, we used different cleaning
2  substances.
3    Q.  And why would you use different cleaning
4  substances?
5    A.  Because there were different materials
6  which were used, such as steel meshing.  It's like
7  copper.  So you have steel, you have a substance
8  which is like copper, or you have hand made
9  material, such as plastic.
10    Q.  Am I correct you choose your solvents to
11  avoid reactions with the particular material of the
12  steering equipment?
13    A.  It is not I myself who made the choice on
14  the liquids.  It's the Air Force that dictated us
15  which liquids to use.
16    Q.  Okay.  When you went to the high school in
17  Oberursel, what was your course of study?
18    A.  This is not like in college a study course
19  that you take with a specific concentration on the
20  subject.  This is a technical high school diploma,
21  general knowledge.  You need to have this diploma in
22  Germany in order to go to a college for further
23  education.
24    Q.  How many years did you attend the technical

3 (Pages 9 to 12)

Juergen Hoeser   May 11, 2005

Page 13

1   high school?
2       A. One year, and only one year, because this
3   was a specific program which was conceived for
4   people who had an apprenticeship.
5       Q. After you left the technical high school,
6   did you go to school or did you seek employment?
7       A. Then I started studying.
8       Q. And where did you study?
9       A. I studied in Frankfurt, mechanics.
10      Q. What school did you attend in Frankfurt?
11      A. This is a subject specific college. It's
12  called Fachhochschule. That's the name of the
13  college.
14      Q. Is it a technical college?
15      A. Yes.
16      Q. While you were at the school in Frankfurt,
17  did you focus on any particular courses or subject
18  matter?
19      A. It was construction and optics.
20      Q. Are you familiar with the term civil
21  engineering?
22      A. Yes, but civil engineering, that's not the
23  field I was studying in.
24      Q. Okay. When you say "construction," can you

Page 14

1   explain to me what career you would have been
2   looking to pursue after studying construction?
3       A. I have to correct this. Construction is
4   for what I did within construction is not the right
5   translation in English. Another word for
6   construction would be design.
7          INTERPRETER: There are three ways
8   interpreters know to translate the word construction
9   into English. I don't know which one it is.
10         MR. SHIMOTA: Okay. I got you. I
11  understand.
12      Q. Did you focus on the design of any
13  particular products or just design in general?
14      A. General design. So in general, it was the
15  objective of small design components.
16      Q. In connection with your design studies, do
17  you recall the courses you would have taken?
18      A. Partially. But there is a general
19  education system which has been conceived, which
20  everybody follows. It's the standard. During the
21  first three semesters, you have mathematics,
22  chemistry, physics, electronics and mechanics.
23      Q. Did you have occasion to study any cleaning
24  processes while you were at school in Frankfurt?

Page 15

1       A. No.
2       Q. How many years did you attend school in
3   Frankfurt?
4       A. I had to interrupt my studies after one
5   semester to finish my civil -- instead of going to
6   the military, you do the Civil Service. Then I went
7   back for seven semesters and I graduated.
8       Q. So it was approximately four and a half
9   years? I was wrong. I added it up wrong. Counting
10  the Civil Service, how long were you in school?
11      A. Somewhere between five and six years. So
12  the problem is this. Between the first semester and
13  the Civil Service, there was a break, and then there
14  was also another break between the end of the Civil
15  Service and the beginning of the next seven
16  semesters.
17      Q. What were your responsibilities when you
18  were in Civil Service?
19      A. I worked with refugees asylum seekers, in a
20  community of asylum seekers.
21      Q. Once you graduated from the school in
22  Frankfurt, what did you do next?
23      A. I had holiday for two months, and then I
24  did a job application for an engineer.

Page 16

1       Q. Where did you work following your studies
2   in Frankfurt?
3       A. With Black & Decker.
4       Q. When did you first come to work at Black &
5   Decker?
6       A. December 1, 1987.
7       Q. For how many years did you work at Black &
8   Decker?
9       A. Until 1994.
10      Q. What was your title at Black & Decker?
11      A. I had several functions within Black &
12  Decker. I started out as -- in this case it would
13  be a construction engineer. Then I became a project
14  manager. Then program manager. Then I changed
15  production. I then changed towards the production
16  field. There I was working with the finishing of
17  the products. I was head of production.
18      Q. While you were at Black & Decker, during
19  the whole period you were at Black & Decker, can you
20  describe for me generally what products you focused
21  on or were in charge of?
22      A. I only focused on one product during all of
23  those years, and those were pneumatic hammer drills.
24      Q. So this would have been from 1987 to 1994

4 (Pages 13 to 16)

Juergen Hoeser   May 11, 2005

Page 17

1  you focused exclusively on pneumatic hammer drills?
2      A.  This was a range of products.  I started
3  developing these products in 1987, and then up to
4  1994 I produced these hammer drills.
5      Q.  During your employment at Black & Decker,
6  did you have occasion to become familiar with any
7  cleaning processes?
8      A.  One cleaning process was used within the
9  production line.  But this cleaning process was part
10  of a machine, integrated into a machine, and we did
11  the acquisition of this cleaning process as a
12  service which was included in that machine.
13      Q.  Can you describe for me how this machine
14  operated?
15      A.  Only seen from the outside.
16      Q.  To the best of your recollection.
17      A.  So, for example, we manufactured ourselves
18  the gears which were used for the production of the
19  hammer drills.  They were put into boxes, bins, and
20  these bins were then sent through a washing line
21  system in order to get rid of the chips.
22      Q.  So were the boxes sent on a conveyor belt?
23      A.  Yes.
24      Q.  Would there have been jets above spraying

Page 18

1  fluid down onto the bins?
2      A.  It is not possible for me to answer this
3  question, because I don't know.  This was part of
4  the machine, and you couldn't see that from the
5  outside.  It was a closed machine.  At that point in
6  time I was in charge of the management of the entire
7  production.  I was not in charge of the technical
8  details.
9      Q.  What did you do after leaving Black &
10  Decker in 1994?
11      A.  So after 1994, I applied for a job with
12  different companies, several companies, and one of
13  these companies was Braun.  There was another
14  company by the name of Rockwell International.
15  Rockwell was the first one to employ me.  I worked
16  for one year, during one year for Rockwell.  Then I
17  signed a contract with Braun, and I switched jobs.
18  I went to work for Braun.
19      Q.  Let's start with Rockwell.  What was your
20  job title at Rockwell?
21      A.  I was project manager within Rockwell.
22      Q.  What products did you manage while you were
23  at Rockwell?
24      A.  I only managed one project within Rockwell,

Page 19

1  and the project was the sunroof of BMW.
2      Q.  While you were managing the manufacture of
3  sunroofs, did you have occasion to use any cleaning
4  processes?
5      A.  No.
6      Q.  So following your employment at Rockwell,
7  you came to work at Braun, correct?
8      A.  Yes.
9      Q.  Do you recall what month in which you began
10  to work at Braun?
11      A.  July 1, 1995.
12      Q.  When you came to work at Braun -- well, let
13  me ask you one question.  Did you receive a doctoral
14  degree while you were at the university or the
15  college in Frankfurt?
16      A.  No.
17      Q.  Let me just ask this question, then.  Did
18  you at some point receive a doctoral degree, at some
19  point leading up to today receive a doctoral degree?
20      A.  No.
21      Q.  When you came to work at Braun in July of
22  '95, what was your title?
23      A.  Project manager.
24      Q.  Were you the manager of any particular

Page 20

1  project?
2      A.  Yes.
3      Q.  What project was that?
4      A.  The name of the project was cleaning
5  center.
6      Q.  Do you know who was in charge of the
7  cleaning center project prior to your arrival at
8  Braun?
9      A.  Yes.
10      Q.  Who was that?
11      A.  That was Mr. Braun.
12      Q.  Are you aware that Mr. Braun left the
13  employment of Braun in early 1995?
14      A.  Yes.
15      Q.  Did you replace Mr. Braun?
16      A.  Yes.
17      Q.  Maybe that was a confusing question.  You
18  were project manager.  Did you have a direct
19  predecessor?
20      A.  Well, if you want to say it that way, you
21  could call Mr. Braun, my predecessor, but Mr. Braun
22  was never a project manager as far as I know.
23      Q.  Who was the project manager for the
24  cleaning center project prior to you assuming that

LegaLink Chicago
1-800-868-0061  www.legalink.com

Juergen Hoeser   May 11, 2005

Page 21

1  position?
2      A.  I can't give an answer to that question.
3      Q.  Why can't you give an answer to that
4  question?
5      A.  When I arrived, Mr. Braun has not been
6  working in that company for several months already.
7      Q.  Well, when you arrived, who was working on
8  the cleaning center project?
9      A.  Nobody.
10      Q.  Well, when you interviewed with Braun, did
11  your interviewer explain that they would like you to
12  begin working on the cleaning center project?
13          MR. PATTON:  I object to the form of the
14  question.
15      A.  No.
16      Q.  When did you first learn of the cleaning
17  center project?
18      A.  I would say that happened in the first or
19  second week after I started working for Braun.
20      Q.  How did you first come to learn of the
21  cleaning center project?
22      A.  If somebody starts working for Braun, it is
23  general procedure that this new employee, during the
24  first week of the employment, makes a tour of the

Page 22

1  department.  So the person learns to know the
2  colleagues, all the installations, the whole setup.
3  During that week, nobody talks about a specific
4  project, but it is an introduction to Braun in
5  general, to the department.
6      Q.  Okay.  After your original introduction,
7  how did you then first learn of the cleaning center
8  project?
9      A.  It was my direct supervisor or my direct
10  boss who informed me of this project.  He gave me
11  written material, written information material, and
12  some parts, and explained to me that I would have to
13  familiarize myself with the material.
14      Q.  Who was your direct supervisor in July of
15  1995?
16      A.  That was Mr. Walter Schaefer.
17      Q.  What written materials did Mr. Schaefer
18  provide to you?
19      A.  It was a binder, and in this binder were
20  some written information, some drawings, and some
21  figures.
22      Q.  Can you tell me approximately how many
23  pages of paper would have been in this binder?
24      A.  It was not that large of a binder.  I would

Page 23

1  estimate 20 pages.
2      Q.  You said that there was at least one
3  schematic.  Do you recall whether there was more
4  than one schematic?
5      A.  There were several drawings of parts, and
6  at that point in time I did not know much about
7  those parts yet.
8      Q.  Was there a complete drawing of the
9  cleaning device?
10      A.  As far as I recall, no.
11      Q.  Was there any written memoranda -- well,
12  are you familiar with the term "memoranda"?
13      A.  Not really.
14          INTERPRETER:  If you could translate this
15  into something German the witness says to me, there
16  are many different translations of that word.  So I
17  would need to know first what you mean.
18      Q.  Was there any correspondence between
19  individuals at Braun regarding the cleaning center
20  project?
21      A.  As far as I recall, no.
22      Q.  Beyond the drawings of the parts, can you
23  characterize what the other documents would have
24  been generally?

Page 24

1      A.  There were several pages, and in all of
2  these pages was the same drawing, and the same
3  drawing reflected the functioning of a -- I mean,
4  literal translation, a machine to give or to supply
5  a chicken with water.
6      Q.  This is a term I've heard before, the
7  chicken watering system.  Can you explain to me what
8  you mean by a chicken watering system?
9      A.  The drawing represented the cleaning system
10  in broad outlines, and then one of the functions
11  where they did this study or how they explained the
12  way the cleaning machine worked was with the example
13  of the chicken watering system.
14      Q.  Is there some type of system in agriculture
15  where chickens are fed or provided with water that
16  you were thinking of?
17      A.  Yeah.  I was born in a rural area, and
18  everybody has such equipment.
19      Q.  I wasn't.  So can you describe for me what
20  this equipment would look like, this chicken
21  watering trough?
22      A.  The trough is a recipient with liquid in
23  it, and the liquid is in the regular phases supplied
24  into this trough so that the trough never dries and

6 (Pages 21 to 24)

Juergen Hoeser   May 11, 2005

Page 25

1  the chicken always has water.
2      Q.   With the trough for the chickens, how is
3  the water supplied to the trough?
4      A.   When there is no water any more in the
5  trough, air is replacing the water, the function of
6  the water.
7      Q.   So is water pumped into the trough in some
8  way?
9      A.   No.
10     Q.   So is it poured into the trough manually?
11     A.   Yes.
12     Q.   Okay.  So when the trough becomes dry,
13 someone needs to come over and pour more water into
14 it?
15     A.   Yes.
16     Q.   Okay.  With that in mind, why did you think
17 or why were you reminded of the chicken feeding
18 system when you saw the original work on the
19 cleaning system at Braun?
20     A.   One cannot call this a system really.  It
21 is the function which was provided, which reminded
22 me of the trough, because this was a funny concept,
23 and it stuck in my mind, a funny name, and it stuck
24 in my mind.

Page 26

1      Q.   What was the funny name?
2      A.   Chicken trough.
3      Q.   Was chicken trough a term or chicken
4  watering system -- that's bad.  Was chicken trough a
5  term that you used in general to describe the
6  original cleaning system?
7      A.   No.
8      Q.   You never used the term "chicken watering
9  system" to describe what you saw?
10     A.   No.
11     Q.   When you started work on the cleaning
12 center project, did you have any experience in the
13 design of dry shavers?
14     A.   No.
15     Q.   Did you see your lack of experience in the
16 design of dry shavers as a problem with respect to
17 your management of the cleaning center project?
18     A.   No.
19     Q.   In July of 1995, did you believe you were
20 qualified to manage the cleaning center project?
21         MR. PATTON:  I object to the form of the
22 question.
23     A.   Yes.
24     Q.   Why did you believe that you were qualified

Page 27

1  to manage the cleaning center project?
2      A.   Well, prior to that, I was working on the
3  sunroof, and before working on the sunroof, I never
4  was working on the sunroof before, and you can
5  always study a certain technology.
6      Q.   So based upon your education and work
7  experience, you felt you were qualified to manage
8  the cleaning center project; is that correct?
9      A.   That's correct.
10     Q.   The binder that we were discussing, do you
11 still have that binder?
12     A.   That binder doesn't exist any more in its
13 original form.  During the first six months in 1995,
14 I compiled every single information I could gather
15 on the cleaning, shaving instruments, on the
16 cleaning systems.  So I organized my own binder with
17 my own information material.
18     Q.   Does the binder that you generated in the
19 first six months still exist?
20     A.   Well, of course this binder became much
21 larger over time.
22     Q.   When you say a binder, do you mean a
23 laboratory notebook or are you talking about
24 something along the lines of this?

Page 28

1      A.   We are talking about both.  I had my own
2  lab notebook, but then I also had my file, I mean my
3  binder, where I filed my own documents, my
4  information.  With each project phase, the order, I
5  mean, the way the binder is put together changes.
6      Q.   In the first phase, in the first six months
7  of the project, can you recall how large the binder
8  would have been, approximately, in terms of volume
9  of paper?
10     A.   I can't express this in the number of
11 pages, but it was a fat binder which was already
12 relatively full at that time.
13     Q.   Okay.  Why don't we take a step back.  You
14 mentioned Mr. Schaefer provided you with some
15 background materials.  Did you come to receive any
16 additional documents detailing work on the cleaning
17 center prior to your arrival at Braun?
18     A.   No.
19     Q.   Did you ever receive Mr. Braun's personal
20 files related to his work on the cleaning center
21 project?
22     A.   No.
23     Q.   Do you know what became of Mr. Braun's
24 files related to the cleaning center project after

LegaLink Chicago
1-800-868-0061   www.legalink.com

Juergen Hoeser    May 11, 2005

Page 29

1  he left the employment of Braun?
2      A.  Part of the documents in the first binder
3  were documents of Mr. Braun.  I found in that first
4  binder drawings that were made by Mr. Braun.
5      Q.  Okay.  So the first binder, you're talking
6  about what was provided to you by Mr. Schaefer?
7      A.  Yes.
8      Q.  And did you ever come to find any other
9  documents that were authored by Mr. Braun related to
10  the cleaning center project?
11     A.  Yes.  In the department where we keep the
12  drawings, there existed some large documents which I
13  then also took over.
14     Q.  How many large drawings -- I don't know if
15  you said documents or drawings -- how many large
16  documents would there have been, approximately?
17     A.  At the most, one or two.
18     Q.  The binders that -- well, let's just talk
19  about -- well, you said over the course of your work
20  on the cleaning center project you generated many
21  binders; is that correct?
22     A.  Yes.
23     Q.  Can you approximate for me how many
24  binders?

Page 30

1      A.  No.
2      Q.  Would it be more than ten?
3      A.  No.
4      Q.  So would it be more than five binders?
5      A.  Yes.
6      Q.  You used the term fat binders.  Are all the
7  binders you would be thinking of, would those be fat
8  binders?
9      A.  Yes.
10     Q.  Do you still have the five or more or
11  approximately five binders?
12     A.  I think I gave you all of the binders I
13  have.
14     Q.  So you believe you provided all of the
15  binders to Braun's attorneys?
16     A.  Yes.  Maybe to explain, from a certain
17  point on in the documents relating to the project,
18  everything is documented about our computer system.
19     Q.  So all the documents are archived
20  electronically?
21     A.  No.  I mean, from a certain point in time
22  onwards, the design, the main design, was done on
23  CAD.  So from that point on, no information could be
24  lost with regards to the design any more.  There is

Page 31

1  a possibility that some of these pages are
2  redundant, because I have it once computer generated
3  and I have it on papers.  So the same document might
4  appear twice.
5      Q.  Did there come a time within Braun where
6  there was an intranet which would have had a file
7  related to the cleaning center project?
8      A.  No.
9          MR. SHIMOTA:  Could you like to take a
10  little break?
11         MR. PATTON:  I would.
12         VIDEOGRAPHER:  Off the record, 10:30 a.m.
13         (Recess)
14         VIDEOGRAPHER:  Back on the record, 10:42
15  a.m.
16         MR. SHIMOTA:  Welcome back.  I would like
17  to mark as Defendant's Deposition No. 49 Defendant's
18  First Notice of Rule 30(b)(6) deposition.
19         (Document marked as Exhibit 49
20          for identification)
21     Q.  I'd ask you if you recognize this document?
22     A.  Yes.
23     Q.  If you could direct your attention to Page
24  4 through Page 6, do you see that there are 26

Page 32

1  numbered topics listed on those pages?
2      A.  Yes.
3      Q.  Are you prepared to testify today on behalf
4  of Braun with respect to each of those 26 topics?
5      A.  Yes.
6      Q.  And you understand with respect to those 26
7  numbered topics, you are not only testifying as to
8  your personal knowledge, but also as to the
9  knowledge of Braun, correct?
10     A.  Yes.
11     Q.  What did you do to prepare for the
12  deposition today?
13     A.  I was sitting in with the attorneys, and we
14  went through these points.
15     Q.  Would the attorneys have been Mr. Patton
16  and Ms. Wendlandt?
17     A.  Yes.
18     Q.  Did you meet with any other attorneys?
19     A.  Mrs. Wolf was there as well.
20     Q.  Did you meet with attorneys for a day or
21  more than one day?
22     A.  One day.
23     Q.  And over approximately how many hours did
24  you meet with attorneys?

8 (Pages 29 to 32)

Juergen Hoeser  May 11, 2005

Page 33

1    A.  I would say three hours.
2    Q.  Over the course of those three hours, did
3  you review any documents?
4    A.  Yes.
5    Q.  Do you recall how many documents you
6  reviewed?
7    A.  No.
8    Q.  Do you recall any particular documents that
9  you reviewed?
10    A.  Yes.
11    Q.  What documents would those be?
12    A.  The chronology line.
13    Q.  Oh, the time line?
14    A.  Yes.
15    Q.  Did you review any other documents aside
16  from the time line?  Let me rephrase that question.
17  Do you recall any specific documents that you
18  reviewed aside from the time line?
19    A.  Yes.  The patent application of Mr. Braun.
20    Q.  Do you mean Mr. Braun's actual patent or
21  his invention disclosure record?
22    A.  I mean the disclosure, the patent
23  disclosure.
24    Q.  Did you review the patents that are

Page 34

1  asserted against Rayovac in this?
2    A.  We were talking about them.
3    Q.  Do you recall any other documents
4  specifically that you reviewed aside from what we've
5  already discussed?
6    A.  The Messinger files.  Messinger is the name
7  of the person who compiled files.
8    Q.  Do you recall any other documents
9  specifically that you reviewed?
10    A.  The depositions of Braun and Pahl from last
11  year.
12    Q.  You reviewed the deposition transcripts of
13  Mr. Braun and Mr. Pahl?
14    A.  I just looked over them.
15    Q.  Do you recall how long you would have
16  looked over them?
17    A.  A few minutes.
18      MS. WENDLANDT:  Jim, just to clarify, I
19  think there may have been a mistranslation.  It
20  wasn't the deposition transcripts, but the
21  affidavits.
22      MR. SHIMOTA:  All right.  I didn't quite
23  understand how he would have done that.
24    Q.  Did you review your laboratory notebooks in

Page 35

1  preparation for your deposition?
2    A.  No.
3    Q.  Have you reviewed your laboratory notebooks
4  at all recently?
5    A.  No.
6    Q.  Aside from your meeting with the lawyer --
7  did the meeting with the lawyers occur yesterday?
8    A.  No.  It was Monday.
9    Q.  Okay.  Aside from your meeting with the
10  lawyers on Monday, did you do anything else to
11  prepare yourself to testify with respect to the 26
12  topics in Defendant's Exhibit 49?
13    A.  No.
14    Q.  Did you talk with any employees of Braun to
15  provide yourself with knowledge with respect to the
16  26 listed topics?
17    A.  I talked to Mr. Sievers who works in the
18  patent department.
19    Q.  Did you discuss with Mr. Sievers -- well,
20  did Mr. Sievers provide you any information to
21  enable you to testify with respect to the 26 listed
22  topics?
23    A.  Certainly.
24    Q.  What information did Mr. Sievers provide

Page 36

1  you?
2    A.  I asked him if it would be possible for him
3  to explain in broad outlines the two patents to me.
4    Q.  So I take it -- well, had you seen the two
5  patents prior to speaking with Mr. Sievers?
6    A.  No.
7    Q.  Had you seen the German versions of the two
8  patents?
9    A.  Yes.
10    Q.  Do you recall when you had seen the German
11  versions of the two patents?
12    A.  I can't say with certainty, but it must
13  have been '95, '96.
14    Q.  Did Mr. Sievers provide you any other
15  information to enable you or to help you prepare to
16  testify with respect to the 26 listed topics in
17  Defendant's Exhibit 49?
18    A.  No.
19    Q.  Aside from Mr. Sievers, did you talk with
20  anyone else at Braun to gain information to help you
21  testify with respect to the 26 topics listed in
22  Defendant's Exhibit 49?
23    A.  No.
24    Q.  If you could look to Topic 14 on Page 5, I

9 (Pages 33 to 36)

Juergen Hoeser    May 11, 2005

Page 37

1  take it you are prepared to testify with respect to
2  Braun's document retention and destruction policies?
3      A.  Yes.
4      Q.  Can you describe for me in general what
5  Braun's document retention policy is?
6      A.  The main document retention with regards to
7  a certain project always happens at a certain point
8  in time on our CAD system and our parts system.  The
9  employees have absolutely no impact on the length of
10  time when these documents are retained.
11     Q.  When you say the employees have no input as
12  to the length of time the documents are retained,
13  who makes the decision as to the length of time?
14     A.  As far as I know, the decision is made in
15  the department, which is in charge of data
16  management.
17     Q.  Okay.  Who is in charge of the department
18  of data management?
19     A.  I don't know.
20     Q.  Is there a written policy with regard to
21  the length of time -- well, let me take a step back.
22  I believe we are talking about electronic
23  information in the CAD system and the part system;
24  is that correct?

Page 38

1      A.  Yes.
2      Q.  Is there a written policy with respect to
3  how long that particular electronic information is
4  maintained within the Braun system?
5      A.  As far as I know, no.
6      Q.  When you say as far as you know, did you
7  check whether there is a written policy?
8      A.  The lawyers checked that.
9      Q.  What lawyers checked that?
10     A.  Our lawyers.
11     Q.  And you learned from your lawyers that
12  there is not a written policy?
13     A.  Yes.
14     Q.  Well, is the decision with respect to the
15  retention of the electronic -- well, let me ask this
16  question.  How do the people in the information
17  department know how long to retain the electronic
18  information?
19     A.  The documents are retained as long as the
20  project is active, because the developer of the
21  project needs at any time to be able to retrieve any
22  information with regards to the project.
23     Q.  Is the cleaning center still
24  project?

Page 39

1      A.  Yes.
2      Q.  So documents related to the cleaning center
3  project would still be -- well, the electronic
4  information related to the cleaning center project
5  would still be retained by Braun?
6      A.  Yes.
7      Q.  With respect to the electronic information,
8  you mentioned the CAD system, correct?
9      A.  And I also mentioned the parts system.
10     Q.  Let's start with the CAD system first.  Am
11  I correct that in the CAD system, there would be
12  drawings of both the cleaning system as a whole and
13  parts of the cleaning system?
14     A.  There are drawings related to the parts.
15  There are drawings related to design groups, and
16  then there are, of course, the parts themselves and
17  the design groups themselves.
18     Q.  Do you recall what year in which Braun
19  would have been using the CAD system with respect to
20  the cleaning center project?
21     A.  Approximately in 1997.
22     Q.  Can you approximate for me from 1997 to the
23  present how many drawings would have been created
24  for the cleaning center project in the CAD system?

Page 40

1      A.  Do you mean with or without amendments?
2      Q.  I mean both, with amendments, you know,
3  combining original drawings and amendments to those
4  drawings.  Iterations if that makes sense.
5      A.  Hundreds.
6      Q.  Could it be more than a thousand drawings?
7      A.  I don't know.
8      Q.  Now, you also mentioned the parts system.
9  Can you explain to me what you mean by the parts
10  system?
11     A.  A parts list documents what parts in which
12  order are necessary in order to manufacture a
13  product, and which materials and which colors,
14  including the packaging, are necessary.
15     Q.  When you say the list of parts, are you
16  familiar with the term "bill of materials"?
17     A.  Yes.
18     Q.  Are you talking about a bill of materials?
19     A.  Yes.
20     Q.  Within the electronic database, do you have
21  any estimation of how many bills of materials there
22  would be related to the cleaning center project?
23     A.  I'm certain that there are more than 20 or
24  30, because every country receives its own bill of

10 (Pages 37 to 40)

Juergen Hoeser   May 11, 2005

Page 41

1  materials. We are only talking about the active
2  ones.
3      Q.  I would like to know, starting from what
4  would be the original bill of materials that were
5  stored electronically, to present, how many would
6  you estimate?
7      A.  To clarify, when I start with a bill of
8  materials, if there is a modification or an
9  amendment made to the bill of material, I do not
10  start a new bill of material, but there will be a
11  difference in indexing. It will just have a
12  different index.
13      Q.  It would be, for example, a bill of
14  materials, version one, bill of materials, version
15  two?
16      A.  Exactly.
17      Q.  With that clarification in mind, can you
18  estimate for me approximately how many bills of
19  materials would be stored electronically at Braun?
20      A.  I don't know.
21      Q.  Would it be more than a thousand?
22      A.  No.
23      Q.  More than a hundred?
24      A.  It's a guess.

Page 42

1      Q.  Okay. Aside from the CAD system
2  information and the parts system information, would
3  there be any other information stored electronically
4  with respect to the cleaning center project at
5  Braun?
6      A.  Yes.
7      Q.  What information would that be?
8      A.  There are the e-mails, and then there are
9  presentations in the computer systems which are
10  managed by the individuals, and there are reports.
11      Q.  Let's start with reports. What do you mean
12  by "reports"?
13      A.  The word "report" has several meanings.
14  There are conversation reports, meeting reports, and
15  quality reports.
16      Q.  Are the meeting reports stored in a central
17  location electronically or are they stored with an
18  individual?
19      A.  Individual.
20      Q.  Can you explain what you mean by quality
21  report?
22      A.  When we test a product, for example, the
23  user friendliness of the product. Then this report
24  is officially generated by the quality department,

Page 43

1  the quality control department, and this is then
2  stored in the central system.
3      Q.  With respect to the quality reports -- do
4  you know what is Braun's document retention policy
5  with respect to the quality reports?
6      A.  No.
7      Q.  Do you have any idea who could answer the
8  question what is Braun's document retention policy
9  with respect to the quality reports?
10      A.  Yes. We do have somebody who manages all
11  the documents. There is a department for that
12  purpose.
13      Q.  Do you know of a name of that individual?
14      A.  Yes.
15      Q.  What is that individual's name?
16      A.  Uta Abraham.
17      Q.  Have you seen the quality reports in the
18  central -- is it a central database?
19      A.  I don't know how you mean this. What do
20  you mean by see?
21      Q.  Let me take a step back and ask this
22  question. There's a central computer or group of
23  computers at Braun in which electronic information
24  is stored, correct?

Page 44

1      A.  I assume that.
2      Q.  Well, do you know whether within that
3  computer information is segregated by project?
4      A.  Yes.
5      Q.  Am I correct that it is segregated by
6  project?
7      A.  Yes.
8      Q.  So am I also correct that there is a
9  database for the cleaning center project?
10      A.  I wouldn't call this a data bank. You have
11  to enter a word and do a search, perform a search.
12  I don't know how the data bank is organized.
13      Q.  But the particular area for the project is
14  searchable by a user, correct?
15      A.  Yes.
16      Q.  Have you personally performed searches in
17  this folder or files for -- well, let me rephrase.
18  Have you personally performed searches related to
19  the cleaning center project within this grouping of
20  information?
21      A.  Yes.
22      Q.  Who has access at Braun to this cleaning
23  center file?
24      A.  I don't know the names of the people who

11 (Pages 41 to 44)

Juergen Hoeser   May 11, 2005

Page 45

1  have access, but I know that a number of people who
2  have access is a limited number.  You have to have a
3  user ID and a password.
4      Q.   Within this file folder, I think we have
5  been talking about, in general, for terms of
6  electronic information, technical information; is
7  that fair to say?
8      A.   Yes.
9      Q.   Within these files, would there also be
10 financial information related to the cleaning center
11 project?
12     A.   No.
13     Q.   Well, is this file solely -- well, let me
14 take a step back.  Within this file or this grouping
15 of electronic information, is there also information
16 related to the marketing of the cleaning center
17 project?
18     A.   As far as I know, no, and I don't have
19 access to that information anyway.
20     Q.   Well, do you know whether from 1995 to the
21 present whether there have been marketing studies
22 with respect to the cleaning center project?
23     A.   Yes.
24     Q.   Do you know where the market research would

Page 46

1  be stored at Braun?
2      A.   No.
3      Q.   Do you know what Braun's document retention
4  policies are with respect to the market research
5  pertaining to the cleaning center project?
6      A.   No.
7      Q.   Let me see if I can expedite this.  Your
8  knowledge with respect to Braun's document retention
9  and destruction policies pertains to retention and
10 destruction of technical documentation pertaining to
11 the cleaning center project; is that correct?
12     A.   Yes.
13     Q.   Do you know who I would ask, if I needed to
14 -- well, do you know who I would ask the question
15 what is Braun's -- let me rephrase that.
16          Do you know who I should ask the question
17 what are Braun's document retention policies for the
18 marketing research for the cleaning center project?
19     A.   Ms. Abraham.
20     Q.   If I wanted to ask the same question with
21 respect to financial information, would I also ask
22 Ms. Abraham?
23     A.   That I don't know.
24     Q.   Taking a step back, you also mentioned

Page 47

1  presentations which would be stored individually or
2  presentations which could be stored individually?
3      A.   Yes.
4      Q.   What is Braun's document retention policy
5  with respect to individual presentations?
6      A.   There is no policy.  Everybody maintains
7  those presentations as long as he or she believes
8  they would serve them.
9      Q.   You also mentioned e-mails?
10     A.   Yes.
11     Q.   How long has Braun had e-mail?
12     A.   I would say it was around '97, '98.
13     Q.   What is Braun's document retention policy
14 with respect to electronic mail?
15     A.   Everybody has a limited file size, and if
16 the individual employee goes beyond that size, then
17 they have to delete files.  There is the possibility
18 to transfer some files to an intermediary archive
19 system, but also that intermediary archive system is
20 limited in space.
21     Q.   Do you know if there are e-mails archived
22 related to the cleaning center project?
23     A.   Certainly.
24     Q.   Would they be in the intermediary archive?

Page 48

1      A.   I can also speak on my personal behalf.
2  That's the place where my files would be.
3      Q.   Would those files be stored -- we talked
4  earlier about the cleaning center project file.
5  Would the e-mails also be grouped in the cleaning
6  center file or would that be a separate location?
7      A.   So everybody can organize the e-mails the
8  way he or she likes to do so, I myself organize my
9  own file with mails related to the cleaning center.
10     Q.   Do you know how many individuals who have
11 worked on the cleaning center project have archived
12 e-mails related to the cleaning center project,
13 approximately?
14     A.   No.  When one works on such a project,
15 everybody is involved in some way in this project.
16 There are people who work with the finishing of the
17 products, the manufacturing, the production line,
18 and then there is the management department, there
19 is the sales department.  So many people can be
20 involved in this.
21     Q.   Well, for yourself personally, can you
22 approximate for me how much e-mail you have archived
23 related to the cleaning center project?
24     A.   Hundreds.

12 (Pages 45 to 48)

Juergen Hoeser   May 11, 2005

Page 49

1     MR. SHIMOTA:  We need to take a break to
2  change the tape.
3     VIDEOGRAPHER:  Here ends tape number one.
4  Off the record, 11:28 a.m.
5     (Recess)
6     VIDEOGRAPHER:  Here begins videotape number
7  two in today's deposition of Juergen Hoeser.  Back
8  on the record at 11:37 a.m.
9   BY MR. SHIMOTA:
10    Q.  We were previously discussing electronic
11  information, and correct me if I'm wrong, but I
12  think Braun started using electronic information in
13  generating electronic information in earnest around
14  1997?
15    A.  That's correct.
16    Q.  Prior to that time I assumed everything was
17  recorded on paper?
18    A.  Yes.
19    Q.  With respect to the cleaning center
20  project, what is Braun's document retention policy
21  with respect to paper records?
22    A.  There is none.
23    Q.  Is there a document destruction policy with
24  respect to the paper records?

Page 50

1     A.  Not to my knowledge.
2     Q.  So with respect to the paper records, am I
3  correct with respect to paper records an employee is
4  free to either keep them or throw them away?
5     A.  Yes.
6     Q.  Do you know if there is any archive of
7  paper records with respect to the cleaning center
8  project?
9     A.  My own archive.
10    Q.  Other than your own, is there any other
11  storage of paper records relating to the cleaning
12  center project?
13    A.  In the patent department.
14    Q.  Have you seen the archival records in the
15  patent department?
16    A.  I have not seen them with my own eyes, but
17  I know that they exist there.
18    Q.  Let me make sure.  In the patent
19  department's archives, are there technical
20  documents, and I don't mean patents, retained?
21    A.  There are patents and there are
22  invention-related material.
23    Q.  Well, you said you know that this archive
24  exists.  How do you know it exists?

Page 51

1     A.  Because of conversations with Mr. Sievers
2  and his predecessor.
3     Q.  Who is Mr. Sievers' predecessor?
4     A.  Mr. Klauer, K-l-a-u-e-r.
5     Q.  So Mr. Klauer and Mr. Sievers told you
6  there's an archive of materials related to the
7  cleaning center project?
8     A.  No.
9     Q.  What did Mr. Klauer or Mr. Sievers tell you
10  regarding the archiving of information regarding the
11  cleaning center project?
12    A.  They didn't say anything to me with regards
13  of archiving of information regarding the cleaning
14  center project.  They said to me that
15  invention-related material is maintained, is stored.
16    Q.  Okay.  Do you know what Braun's document
17  retention policy is with respect to
18  invention-related materials?
19    A.  No.
20    Q.  Do you know who I should ask the question
21  what Braun's policy is with respect -- well, Braun's
22  document retention policy is with respect to the
23  invention-related materials?
24    A.  Mr. Sievers.

Page 52

1     Q.  Do you know whether Mr. Sievers received
2  all of Mr. Klauer's files?
3     A.  No.
4     Q.  If you could look to Topic No. 3 --
5  actually, topics six and seven, but look to three
6  first.  Topic 7 says, "Any and all steps taken by
7  Braun to collect documents authored by, sent to or
8  from the files of Dietrich Pahl or Gebhard Braun."
9     INTERPRETER:  There wasn't any question,
10  right?
11    MR. SHIMOTA:  No.  I was just directing his
12  attention to it.
13    Q.  What steps were taken by Braun to collect
14  documents authored by, sent to or from the files of
15  Dietrich Pahl?
16    A.  I was asked to provide my documents.  This
17  includes the documents of Mr. Pahl and Mr. Braun.
18  As far as I owned those documents, and I provided
19  all of those documents to the lawyers.
20    Q.  What documents did you have from Dr. Pahl?
21    A.  I had the chicken trough drawings, the
22  chicken trough documents, and some drawings.
23    Q.  What are the chicken trough documents that
24  you refer to?

13 (Pages 49 to 52)

LegaLink Chicago
1-800-868-0061  www.legalink.com

Juergen Hoeser    May 11, 2005

Page 53

1    A.  I refer to the very first documents in the
2    very first binder, which I received with regards to
3    explaining the effects of such a chicken trough.
4        Q.  Was there a memo explaining the effects of
5    the chicken trough or did I mishear you?
6        A.  Yes.
7        Q.  What did this memo look like?
8        A.  It had the following respect.  You saw a
9    cleaning center, very rough sketched of a cleaning
10   center, and underneath that drawing you had the
11   explanations in lines of the effects of such a
12   chicken trough cleaning center.
13       Q.  Did this memo have written at the top
14   "future" --
15       A.  No.
16       Q.  Do you recall the date of this document?
17       A.  No.  I even think there was no date on this
18   document, but I'm not 100 percent sure.  In any
19   case, this document was authored prior to 1995.
20           MR. SHIMOTA:  I'd like to mark as
21   Defendant's Deposition Exhibit No. 50 English
22   version of Braun 1069 to 1073, and mark as
23   Defendant's Deposition Exhibit 51 the German version
24   of B1069 to 1073, although this actually goes to

Page 54

1    1076.  This is B1069 to 1076.
2        (Documents marked as Exhibits 50 and 51
3        for identification)
4        Q.  Is this the memo you referred to?
5        A.  No.
6        Q.  Do you recall who was the author of the
7    memo?  Not that, but the memo regarding the chicken
8    trough?
9        A.  I believe that it was Mr. Braun.
10       Q.  Was the memo distributed to anyone?
11       A.  What do you mean "distributed"?
12       Q.  Was the memo prepared for any other
13   individuals.
14       A.  No.  When this document was prepared by Mr.
15   Braun for his own work, and he did this memo for
16   himself to explain steps of his own work to himself.
17       Q.  As of when you provided the documents to
18   your lawyers, did this memo still exist?
19       A.  No, I can't answer that.
20       Q.  Let me take a step back.  When you talk
21   about the steps that Braun took to collect the
22   documents of Dietrich Pahl and Gebhard Braun, you
23   mentioned the 20 or so documents provided to you by
24   Mr. Schaefer, correct?

Page 55

1        A.  Yes.
2        Q.  Were you able to distinguish from those
3    documents which were the documents of Dr. Pahl and
4    which were the documents of Gebhard Braun?
5        A.  Only partially.
6        Q.  When you say "only partially," what do you
7    mean when you say "only partially"?
8        A.  When I received those documents, some of
9    those documents did not have a signature, to give
10   you an example.
11       Q.  Well, can you recall any of them which you
12   knew were documents owned or were documents of Dr.
13   Pahl?
14       A.  I can't recall that now.
15       Q.  When you received the documents in July of
16   '95, were you aware they were documents from both
17   Mr. Braun and Dr. Pahl?
18       A.  Yes.  Mr. Schaefer told me so.
19       Q.  Mr. Schaefer told you that you were
20   receiving documents from both Mr. Braun and Dr.
21   Pahl?
22       A.  Yes.  He said these are the documents which
23   have to do with the cleaning center project, and
24   those documents that Mr. Pahl and Mr. Braun were

Page 56

1    working on.
2        Q.  Mr. Schaefer told you Mr. Braun and Dr.
3    Pahl were both working on the cleaning center
4    project?
5        A.  Yes.
6        Q.  Did he tell you what roles Mr. Braun and
7    Dr. Pahl had on the cleaning center project
8    respectively?
9        A.  It was clear that Pahl was the boss and
10   Braun was the co-worker.
11       Q.  When you started working, did anyone tell
12   you who made the first cleaning center?
13       A.  Not directly.  I was told that the person
14   who worked on this before was retired, and that it
15   was Mr. Braun, and Mr. Pahl didn't work there any
16   more.
17       Q.  Taking us back to Topic No. 7, aside from
18   you personally looking through your files for the
19   documents of Dietrich Pahl and Gebhard Braun, what
20   other steps did Braun take to collect documents
21   authored by, sent to or received from the files of
22   those two gentlemen?
23       A.  I don't know.
24       Q.  If you could look at Topic 3, I'm going to

14 (Pages 53 to 56)

Juergen Hoeser   May 11, 2005

Page 57

1  ask you the same type of question I did for No. 7.
2  Do you see the first individual is yourself.  What
3  did you do to collect documents from your personal
4  files related to the shaver cleaning center project?
5      A.  I handled this as a project.  This was a
6  project for me.  In my own department, I contacted
7  all the people who might have made a contribution,
8  and all those people who might have information
9  which could help me.
10     Q.  So there's a list of individuals here
11  following your name.  Did you contact each of these
12  individuals and ask them to gather documents related
13  to the shaver cleaning system project?
14     A.  I certainly spoke to all of those people,
15  but I did not contact them at the very beginning.
16  Some of those people joined Braun much later or only
17  help out at that time, then, with the project.
18     Q.  Taking a step back to yourself, am I
19  correct that you did not provide your electronic
20  information to Braun's attorneys, your electronic
21  information relating to the shaver cleaning center
22  project?
23     A.  I provided the Braun attorneys with all the
24  personal electronic information which was on my

Page 58

1  personal computer, except mail files.
2      Q.  So you didn't provide the attorneys with
3  your electronic mail files?
4      A.  Yeah.
5      Q.  And do you know whether the attorneys
6  received the electronic mail files that you had
7  archived?
8      A.  I don't know.
9      Q.  Did the attorneys ask you for your
10  electronic mail files?
11     A.  No.
12     Q.  With respect to Mr. Schneider, did you
13  contact Mr. Schneider regarding the gathering of
14  documents related to the shaver cleaning center
15  project?
16     A.  No.  Mr. Schneider is the head of the
17  industrial design department of our company, and I
18  learned much later that he created an industrial
19  design.
20     Q.  What did you learn much later or how did
21  you learn much later that he had created an
22  industrial design of, I assume, the shaver cleaning
23  system?
24     A.  There are two types of information related

Page 59

1  to this question.  First there was a prototype, a
2  rapid prototype, a housing part.
3          INTERPRETER:  I will give this answer
4  again, interpreter's notes.  It was not well
5  understood before.
6      A.  I received from Mr. Schaefer two parts, and
7  these parts should have prototypes, and then I found
8  out that there was already a design for these parts
9  in existence.
10         The second source I was talking to you
11  about before was Mr. Littman.  Mr. Littman was an
12  industrial designer.  Together with him, I developed
13  the first industrial design for my own cleaning
14  center, in quotation marks.  He was the person who
15  told me that Mr. Schneider did an industrial design
16  in the past.
17     Q.  To your recollection, did Mr. Littman work
18  with Mr. Schneider?  Were they part of the same
19  group in the '93, '94, '95 time frame?
20     A.  Mr. Schneider is Mr. Littman's boss, but I
21  don't know when he became Mr. Littman's boss.  It
22  might have been '93, '94.  I don't know.
23     Q.  Did the design that Mr. Schneider made, was
24  that committed to paper form?  Was there a schematic

Page 60

1  for that design?
2      A.  I don't know.
3      Q.  Well, let me just ask this question, then.
4  What steps has Braun taken to collect documents from
5  Mr. Schneider relating to the shaver cleaning center
6  project?
7      A.  I don't know.
8      Q.  Next with respect to Mr. Littman, what
9  steps has Braun taken to collect documents from Mr.
10  Littman related to the shaver cleaning center
11  project?
12     A.  I don't know.
13     Q.  I take it, then, you did not personally ask
14  Mr. Littman for --
15     A.  I did not personally ask.
16     Q.  Okay.  I understand.  I understand Mr.
17  Greubel is retired from Braun or he no longer works
18  at Braun?
19     A.  He is retired.
20     Q.  Do you know whether Braun has made any
21  efforts to locate documents which would have been
22  left by Mr. Greubel related to the shaver cleaning
23  center project?
24     A.  Mr. Greubel is an industrial designer, and

15 (Pages 57 to 60)

Juergen Hoeser   May 11, 2005

Page 61

1  as an industrial designer, he works in a way which
2  can be compared to an artist working with a form,
3  and he left this form for me.
4      Q.   So he left a prototype for you?
5      A.   Yes.  Mr. Greubel, and I myself, we met and
6  had a discussion.  I explained to him what the
7  apparatus should look like in broad outlines, and
8  then Mr. Greubel produced a 3D industrial design
9  using hard film and material.
10      Q.   Do you know if Mr. Greubel, aside from the
11  prototype and the physical materials he was working
12  with, if he ever generated any documents, written
13  documents?
14      A.   Not as far as I know.
15      Q.   Let me ask this question one more time.  Do
16  you know what efforts, if any, Braun has made to
17  collect written documents, if any exist, from Mr.
18  Greubel?
19      A.   No.
20      Q.   Do you know what steps were taken by Braun
21  to collect documents from Roland Ullmann relating to
22  the shaving cleaning center project?
23      A.   Mr. Ullmann is another industrial designer,
24  and I did his documentation myself.  I am the author

Page 62

1  of his documents.  In those days, we worked in the
2  following way.  Mr. Ullmann steered or guided myself
3  so that I could produce with the virtual system on
4  the CAD system a 3D industrial design.
5      Q.   How did you communicate with Mr. Ullmann;
6  was it always verbally or did you communicate in
7  writing or both?
8      A.   In those days, Mr. Ullmann came every day
9  to my workplace, and we spoke about all the details,
10  sitting together in front of the computer monitor.
11  So Mr. Ullmann saw what I was doing, and when he
12  wanted to have a modification done, it could be done
13  directly there.  So it was done in the realtime.
14      Q.   Okay.  I understand.  With that in mind, do
15  you know if anyone at Braun, including yourself, has
16  asked Mr. Ullmann if he personally has documents
17  related to his work on the shaver cleaning system?
18      A.   I personally asked him for this
19  information, but I didn't ask him for written
20  material.  I asked him for his 3D industrial design
21  models, because this is what he does for his work.
22  That's the way he expresses himself.
23      Q.   Okay.  Do you know if he would have any
24  other documents, aside from the 3D design?

Page 63

1      A.   I don't know.
2      Q.   Aside from yourself, do you know if anyone
3  at Braun has asked him if he has any other
4  information, aside from his 3D designs?
5      A.   I don't know.
6      Q.   What steps were taken by Braun to collect
7  documents from the files of Gilbert Greaves relating
8  to the shaver cleaning center project?
9      A.   I don't know.
10      Q.   What steps were taken by Braun to collect
11  documents from the files of Alf Jahn related to the
12  shaving cleaning center project?
13      A.   Alf Jahn was my co-worker about 1997.  In
14  all the documents he earned are now in my propriety.
15  I own them now.
16      Q.   So Mr. Jahn gave you all of his files?
17      A.   Yes.
18      Q.   Has Mr. Jahn left the employment of Braun?
19      A.   Yes.
20      Q.   As part of what you provided to the
21  lawyers, you provided the files of Mr. Jahn,
22  correct?
23      A.   Yes.
24      Q.   Tell me what steps were taken by Braun to

Page 64

1  collect documents from the files of Norbert Kreutz
2  related to the shaving cleaning center project?
3      A.   That I don't know.  Mr. Kreutz was a
4  technical drawer who was only helping us out in that
5  capacity with the drawing.
6      Q.   Is Mr. Kreutz still employed by Braun?
7      A.   Yes.
8      Q.   What steps were taken by Braun to collect
9  documents from the files of Thomas Schamberg
10  relating to the saving cleaning center project.
11      A.   I don't know.  Mr. Schamberg, his function
12  was the same as Mr. Kreutz.
13      Q.   And finally, what steps -- finally from the
14  list and hopefully we can finish up quickly and take
15  lunch, if that sounds good.  What steps were taken
16  by Braun to collect documents from the files of Mr.
17  Smetana relating to the saving cleaning center
18  project?
19      A.   Mr. Sievers talked to him, and that's all I
20  know.
21      Q.   Do you know when Mr. Sievers talked to him?
22      A.   No.
23      Q.   Who did you contact regarding the gathering
24  of documents related to the saving cleaning center

16 (Pages 61 to 64)

Juergen Hoeser  May 11, 2005

Page 65

1   project?
2       A.   At what point in time?
3       Q.   Well, you said you had a project or you
4   treated gathering documents as a project.
5       A.   Well, this was a new project for me from
6   the beginning on where I started working on this
7   project. At that point in time, because I was new
8   in the company, I gathered all the information I
9   could possibly find. I spoke to the patent
10  department. My spokesperson was Mr. Klauer. I also
11  talked to the quality department.
12      Q.   Okay. I think there's some confusion. You
13  understand there's a litigation between or Braun is
14  suing Rayovac or Remington, correct?
15      A.   Yes.
16      Q.   In connection with that litigation, were
17  you personally tasked with gathering documents
18  related to the safer cleaning center project?
19      A.   Yes.
20      Q.   And my question, then, is from the start of
21  that project or from the start of the litigation,
22  when you began working on that, until today, who are
23  all of the individuals that you contacted regarding
24  the gathering of documents?

Page 66

1       A.   Almost nobody, because -- almost all of the
2   documents which had to do with this project were in
3   my own folders, with the exception of the quality
4   control reports, the CAD data, et cetera.
5       Q.   Who did you contact regarding the quality
6   control reports?
7       A.   I did not contact anybody, because it
8   didn't make any sense to me to pull test information
9   with regards to testing performed in '99 and 2000 in
10  the context of this litigation.
11      Q.   So am I correct that you did not provide
12  the quality control reports to the attorneys?
13      A.   Yes.
14      Q.   Did you provide the CAD drawings to the
15  attorneys?
16      A.   No. Nobody asked me to do that.
17      Q.   In terms of contacting people, you said you
18  contacted virtually no one, I believe. Who were the
19  people that you did contact?
20      A.   I contacted the person who was in charge of
21  the so-called Messinger files.
22      Q.   Who was in charge of the Messinger files?
23      A.   We have a department which is called
24  research. Mr. Messinger used to be the head of that

Page 67

1   department, and for that reason those binders
2   retained in that department, and those binders
3   contain written information.
4       Q.   Aside from contacting the research
5   department regarding the Messinger files, did you
6   contact any other individuals?
7       A.   I contacted my boss, because there was a
8   video which was created in '97/'98, and which showed
9   the function of one of those function designs,
10  prototypes, but we did not find that video.
11      Q.   Okay. Did you contact anyone else?
12      A.   No.
13      Q.   Were you tasked with gathering documents
14  related to the market research for the shaving
15  cleaning center project?
16      A.   No.
17      Q.   Were you tasked with finding financial
18  information related to the shaving cleaning center
19  project?
20      A.   No.
21      Q.   Now asking you not on behalf of yourself
22  personally, but I'm asking you as Braun's
23  representative, what individuals or who are the
24  individuals that Braun contacted, aside from --

Page 68

1   well, who are the individuals that Braun has
2   contacted regarding the gathering of documents
3   related to the shaving cleaning center project?
4       A.   I don't know.
5       Q.   One last question and then we can break for
6   lunch. Following the filing of this lawsuit, and I
7   don't know if you know exactly when that was, has
8   Braun provided any instruction to its employees
9   regarding the duty to preserve evidence related to
10  the shaving cleaning center project?
11      A.   I don't know that.
12      Q.   Let me just make sure from the legal mumbo
13  jumbo. Did anyone tell Braun employees that they
14  should keep their documents related to the shaving
15  cleaning center project?
16      A.   I was told to do so, and I then transmitted
17  that message to the people that work in my
18  department, and I also told the same thing to the
19  people who work in the research department, because
20  of the Messinger files.
21      Q.   Did you communicate this via e-mail or
22  verbally?
23      A.   I went there in person and told them.
24      Q.   When you told them to keep their documents,

17 (Pages 65 to 68)

Juergen Hoeser    May 11, 2005

Page 69

1  did you also ask them to give their documents to
2  Braun's lawyers?
3      A.  No.  I am pretty sure that I am almost the
4  only one who has the entire document files in my
5  possession.  So I told my co-workers that if they
6  find anything, they should forward that to me, they
7  should give it to me.
8      Q.  Has anyone forwarded anything to you?
9      A.  No.
10     Q.  And who were the co-workers that you asked
11 to forward information to you?
12     A.  Only Mr. Kreutz is still working there, but
13 I have 11 other co-workers who work with me, and the
14 reason why I told all of those co-workers to do this
15 was that we moved our department, and I wanted to
16 make sure that no information was lost.
17     Q.  Why don't we do this after lunch.  The next
18 question I want to ask you are who are those 11
19 individuals.
20     A.  I start reflecting now.
21         VIDEOGRAPHER:  Off the record, 12:36 p.m.
22         (Luncheon Recess)
23
24

Page 70

1                  AFTERNOON SESSION
2          VIDEOGRAPHER:  Back on the record, 1:55
3  p.m.
4          MR. SHIMOTA:  Right before we went back on
5  the record, Mr. HOESER wrote a list of the
6  individuals would now work under him.  I'd like to
7  mark this -- I've premarked some exhibits at lunch
8  -- and just mark this as Defendant's Exhibit No. 63.
9          (Document marked as Exhibit 63
10             for identification)
11     Q.  Does Defendant's Exhibit 63 reflect the 11
12 individuals who currently work under you?
13     A.  Yes.
14     Q.  Do you know if any of these 11 individuals
15 have provided -- well, let me ask this question.  Do
16 all of these 11 individuals perform work related to
17 the shaver cleaning system?
18     A.  No.
19     Q.  None of them do?  Oh, I asked you all of
20 them.  Who amongst the 11 performed work related to
21 the shaver cleaning system?
22     A.  Mr. Larchead, Mr. Kreutz, and the others
23 just if the company is in need of them.
24     Q.  Is the Mr. Kreutz you mentioned --

Page 71

1      A.  It's on the list.
2      Q.  Do you know if Braun has asked Mr. Larchead
3  to provide documents related to the work on the
4  shaver cleaning system?
5      A.  I don't think so.
6      Q.  I'm going to hand you several documents
7  which I had premarked, and I will get to them in
8  order.
9          (Document marked as Exhibit 52
10             for identification)
11     Q.  I'm handing you what I've marked as
12 Defendant's Exhibit 52, which is Braun's Answers to
13 Defendant's Interrogatories.
14     A.  Mr. Braun's?
15         MR. SHIMOTA:  No.
16         MR. PATTON:  The company.
17     Q.  I will hand you what I've marked as
18 Defendant's Deposition Exhibit 53, which bears the
19 Bates label B000861.
20         (Document marked as Exhibit 53
21             for identification)
22     Q.  I will hand you what I've marked as
23 Defendant's Deposition Exhibit 54.  It is the
24 English translation of B861.

Page 72

1          (Document marked as Exhibit 54
2             for identification)
3      Q.  I will hand you what I've marked as
4  Defendant's Deposition Exhibit 55, a document
5  bearing the Bates number B001064.
6          (Document marked as Exhibit 55
7             for identification)
8      Q.  I hand you a document bearing the Bates
9  number -- I'm going to mark as Defendant's Exhibit
10 No. 56, a document filed as an Exhibit B to the
11 declaration of Dietrich Pahl, which is entitled "R&D
12 Shavers 'Future'."
13         (Document marked as Exhibit 56
14             for identification)
15     Q.  I will mark as Defendant's Deposition
16 Exhibit 57, documents bearing the Bates range B3074
17 to 3076.
18         (Document marked as Exhibit 57
19             for identification)
20     Q.  Mark the next a document as Defendant's
21 Deposition Exhibit 58, a document bearing the Bates
22 range B4615 to B4617, and the English translation of
23 that document as Defendant's Deposition Exhibit 59.
24

18 (Pages 69 to 72)

Juergen Hoeser   May 11, 2005

Page 73

1    (Documents marked as Exhibits 58 and 59
2    for identification)
3    Q.  Finally, I'd like to mark as Defendant's
4  Deposition Exhibit 61, U.S. patent No. 5,711,328.
5    (Document marked as Exhibit 61
6    for identification)
7    Q.  As Defendant's Deposition Exhibit 62, U.S.
8  Patent No. 5,649,556.
9    (Document marked as Exhibit 62
10    for identification)
11    Q.  All right.  If you could return back to the
12  Notice of Deposition which we talked about earlier,
13  which is Defendant's Deposition Exhibit 49.  If I
14  could direct your attention to Topic No. 15.
15    Are you prepared to testify on behalf of
16  Braun regarding the conception and reduction to
17  practice date for the alleged inventions of the
18  patents in suit identified in Braun's response to
19  interrogatory No. 2 and the evidentiary basis for
20  such dates?
21    A.  Yes.
22    Q.  And I take it, then, that you have also
23  reviewed Braun's response to interrogatory No. 2?
24    A.  This year?

Page 74

1    Q.  Yes.  That's what I'm talking about.  If I
2  can help you, I will direct your attention to --
3    A.  This is a document which I've seen for the
4  first time today.
5    Q.  Are you familiar with the conception and
6  reduction to practice dates for some of the
7  inventions which are described in these two patents?
8    A.  In broad lines.
9    Q.  What did you do to prepare yourself to
10  testify regarding the conception and reduction to
11  practice dates?
12    A.  I spoke with the two attorneys, and
13  together with the two attorneys I perused the dates
14  which led to the patents.
15    Q.  Okay.  I don't know if interrogatory No. 2
16  will help you at all.  If you can just take the
17  patents, I just want to go through the various
18  claims and the dates we have, and I want to ask you
19  questions about that.  If we can start with Claim 1
20  of the '556 patent.
21    A.  Which page is it?
22    Q.  That would be the last page of it.
23  Interrogatory No. 2 states that "Claim 1 of the '556
24  patent was conceived on or before July 22, '93 and

Page 75

1  reduced to practice on or before July 22, 1993."
2    A.  Yes.
3    Q.  My question is, what is the evidentiary
4  basis for the assertion of that particular date?
5    A.  I was told the dates, because all of this
6  happened prior to my arrival at Braun.
7    Q.  Well, do you know of any -- aside from what
8  the lawyers tell you, are you aware of any facts
9  which would corroborate the date of July 22, 1993?
10    A.  I know that there is in discovery an
11  invention with those dates.
12    Q.  Are you referring to this document, which
13  is the English translation?
14    A.  Yes.
15    Q.  Have you reviewed this document before?
16    A.  Yes.
17    Q.  Can you point me to in, I believe it's
18  Exhibit 50 or 51, where there is any discussion of a
19  cartridge with an integrated filter?
20    A.  Here in the last paragraph there is talk in
21  this paragraph about the cleaning recipient.
22    MR. SHIMOTA:  What did you say?
23    INTERPRETER:  In this last paragraph there
24  is talk about the cleaning recipient.

Page 76

1    A.  And there is talk about the reserve in
2  liquid, such as a filter.
3    Q.  So this is the last paragraph at the bottom
4  that bears the Bates number B001070?
5    A.  Yes.  But I am going now to read further in
6  this document.
7    Q.  Sure.
8    A.  Then I would like to refer to the drawing.
9  You see the drawing shows a recipient which contains
10  the liquid.  Yes.
11    Q.  When you started work in July of 1995, did
12  you see a prototype of a cleaning center?
13    A.  Not immediately, but within the course of
14  the first few months.
15    Q.  Did that prototype have a removable
16  cartridge which contained fluid and also had a
17  filter?
18    A.  This is the prototype, and the lower part
19  of this apparatus, that's removable, and the filter
20  is part of that lower part of this apparatus.
21    Q.  Okay.  Do you know the word "cartridge"?
22    A.  Yes.
23    Q.  In Braun's current device there is a
24  cartridge which contains cleaning fluid and has a

19 (Pages 73 to 76)

Juergen Hoeser   May 11, 2005

Page 77

1  filter, correct?
2      A.  Yes.
3      Q.  Do you know who had the idea for using a
4  cartridge which contained fluid and had a filter --
5  did you know who had the idea using a cartridge
6  which contained a fluid in the cleaning center?
7      A.  The idea existed when I started working
8  there, and I take it that the idea is from Mr.
9  Braun.
10     Q.  Circling back, do you see the idea for a
11 cartridge containing fluid -- do you see the idea
12 for a removable cartridge containing fluid with a
13 filter in it described in Defendant's Exhibit 50?
14     A.  I would say that that's the case, yes.
15     Q.  Okay.  Is that what you had pointed me to
16 previously?  I'm sorry, that was a bad word.  You
17 pointed me to one paragraph on the first page and
18 the figures at the end of the document; is that
19 correct?
20     A.  Yes.
21     Q.  Okay.  Did you see anyplace else in
22 Defendant's Exhibit 50 where there would have been
23 discussion of a removable cartridge?
24     A.  If you would like me to, I could read

Page 78

1  through the document one more time.
2      Q.  Well, do you know of any other documents,
3  any other evidence, which would indicate that the
4  idea of a removable cartridge containing cleaning
5  fluid was conceived on or before July 22, 1993?
6      A.  I know this drawing.
7      Q.  So can you see a removable cartridge in
8  this drawing?
9      A.  I wouldn't use the word "cartridge" on this
10 drawing.
11     Q.  Why wouldn't you use the word "cartridge"?
12     A.  The nomenclature which led to Braun's use
13 of the word "cartridge" is not logical.  In German
14 one would call this item a recipient-containing
15 liquid.
16     Q.  Are you referring to something of this
17 drawing, when you say a recipient-containing liquid?
18     A.  This is just a general comment.  In German,
19 it is not cartridge, it is a recipient for a liquid
20 or a liquid container.
21     Q.  Okay.
22     A.  You wouldn't call it cartridge.
23     Q.  So in Braun's current product, the device
24 or the product which you insert and out of the

Page 79

1  cleaning center, that is not called a cartridge?
2      A.  I would call this in German a container
3  with liquids, a recipient with liquids.
4      Q.  I want to make sure we're clear here.  Have
5  you ever used for that device -- have you ever
6  called what is inserted into Braun's current device,
7  have you personally called that a cartridge or do
8  you always call it a recipient carrying liquids?
9      A.  We use in the meantime the word
10 "cartridge," because this is a word which became
11 Germanized over time.
12     Q.  So "cartridge" is not a term that would be
13 used in German regularly, but it's something that
14 you came to adopt for, I guess, business purposes?
15     A.  That's correct.
16     Q.  Does looking again at this document, since
17 we have it out, was this one of the documents
18 provided to you by Mr. Schaefer?
19     A.  Yes.
20     Q.  Did you review this document when you first
21 received it in July of 1995, approximately?
22     A.  Yes.
23         MR. PATTON:  Jim, just so the record is
24 clear, Exhibit 55 we are looking at?

Page 80

1          MR. SHIMOTA:  Yes.  Thank you for that.
2      Q.  Do you see at the bottom in the lower
3  right-hand corner listed "Braun France SA"?
4      A.  Yes.
5      Q.  Did you recognize that in approximately
6  July of 1995 when you received this document?
7      A.  Yes.
8      Q.  Did you ever ask anyone how people in
9  France came to be working on the cleaning center?
10     A.  Yes.
11     Q.  Who did you ask?
12     A.  I asked my boss, Walter Schaefer, and he
13 told me that this drawing originated in France,
14 because Dr. Pahl, and there was no reference made to
15 a year, but Dr. Pahl was the supervisor of a
16 development group in France, and it was this group
17 or team that offered this drawing upon instruction
18 from Mr. Pahl.
19     Q.  Do you recall, approximately, when Mr.
20 Schaefer would have provided you with this
21 information?
22     A.  Maybe during the first two months.
23     Q.  Did Mr. Schaefer tell you how he learned
24 the information that he had conveyed to you?

20 (Pages 77 to 80)

Juergen Hoeser   May 11, 2005

Page 81

1    A.  No.
2    Q.  Do you know who was on the team in France
3  that worked with Dr. Pahl on the cleaning center?
4    A.  I know that there were three people on this
5  team, but I don't know the names of those people.
6    Q.  How do you know there were three people on
7  the team?
8    A.  At that point in time, Mr. Schaefer told me
9  that there were three people working on it, and this
10  time it was in the conversation, during the
11  conversation I had with the lawyers, they also told
12  me that.
13    Q.  So you're referring to point one when you
14  talked with Mr. Schaefer at some point in '95, and
15  you're referring also to when you spoke with the
16  lawyers just recently?
17    A.  Monday.
18    Q.  Okay.  Do you know if Braun has attempted
19  to gather documents which would have been retained
20  from the three individuals in France who worked on
21  the cleaning center?
22    A.  I don't know that.
23    Q.  Can you show me, if you can, anywhere on
24  this document -- I believe there's a blower shown, a

Page 82

1  fan shown at the bottom of this document; is that
2  correct?  Correct me if I'm wrong.
3    A.  There are several components on this
4  drawing, which I can recognize very well.  First
5  there is a container with the liquid.  There is the
6  absorption part, the cradle, the pump, the filter,
7  the filter outlet, the clutch for the pump, the
8  shaver head, power supply.
9    Q.  Okay.  Was in this original work done by
10  Dr. Pahl included a drawing device?
11    A.  Yes.
12    Q.  Where is the drawing device?
13    A.  It's not so clear on this drawing.  It's a
14  fan plus heater.
15    Q.  So is there shown anywhere the fan plus the
16  heater in this drawing?
17    A.  No.
18    Q.  Let's set this document aside.  Let's go to
19  '328 patent, interrogatory No. 2.  Interrogatory No.
20  2 states that -- do you have the '328 patent in
21  front of you?  I'm sorry.  This would be the third
22  to last page.  Claim 11 provides a lot of -- well,
23  there are several elements, and the last is a
24  drawing device.  It states in interrogatory No. 2

Page 83

1  that Claim 11 was conceived on or before November,
2  '92 and reduced to practice on or before November of
3  '92.
4       So my question is what is the evidentiary
5  basis for the date of November, '92?
6    A.  It is this part of a presentation.
7    Q.  Can you show me Defendant's Exhibit 56
8  where there is shown the drawing device?
9    A.  You don't see the dryer on this drawing.
10  It's not recognizable.  But it is explained in the
11  comments.
12    Q.  What is stated in the comments?
13    A.  The functions of the products I explained,
14  and it starts with a shaver in and out, then to pump
15  and filter the liquids, and then dry, to dry.
16    Q.  So can you point me to where it is shown in
17  this document the idea of drying with a fan?
18    A.  That I cannot read from this document, but
19  this is a picture of the product where you have the
20  drawing over here.  This product corresponds to this
21  drawing.  And this product certainly existed prior
22  to the point in time where I started working at
23  Braun.  This product corresponds 100 percent to this
24  drawing, and the missing parts in the drawing you

Page 84

1  can see them on the picture.  Here you see the
2  heater.
3    Q.  Can you point me to the heater?
4    A.  It's this black part.
5    Q.  That's not the shaver then that's inserted?
6    A.  No, no, that's not the share.  The cradle
7  is here in front.
8    Q.  I got you.
9    A.  Here is the cradle.  This is the heater,
10  and below the heater is the fan.  It sucks warm air
11  and blows it onto the shaver.
12    Q.  Can you tell me when the device illustrated
13  in Braun 3074 to 3076 was built?
14    A.  This device?
15    Q.  Yes.
16    A.  I don't know.  It was before my start at
17  Braun.
18    Q.  Aside from the documents we've discussed,
19  is there any other document of which you know which
20  would show the first time when a blower and a heater
21  were used in the cleaning center?
22    A.  I don't recall any one which is not on this
23  table.
24    Q.  We talked about the presentation, which is

21 (Pages 81 to 84)

Juergen Hoeser  May 11, 2005

Page 85

1  Defendant's Exhibit 56, the picture of the device,
2  and we also discussed the large schematic, which is
3  Defendant's Exhibit 55. Is there anything else that
4  you can think of sitting here today?
5      A.  Yes. We also have Exhibit 58.
6      Q.  What is Defendant's Exhibit 58?
7      A.  There we talk about the drying process of a
8  shaver with the help of a fan.
9      Q.  Is Defendant's Exhibit 58 a document that
10  would have been in the 20 or so -- is Defendant's
11  Exhibit 58 something that was provided to you by Mr.
12  Schaefer in '95?
13      A.  I am not 100 percent sure. The second part
14  of this document, there I am 100 percent sure. With
15  the first part of the document, I am not 100 percent
16  sure.
17      Q.  Okay. Is the first part of the document,
18  the first memo, something that you reviewed
19  yesterday?
20      A.  No. I looked at it today.
21      Q.  Do you mean you looked at it -- did you
22  look at it prior to this deposition or during this
23  deposition now?
24      A.  Right now.

Page 86

1      Q.  Okay. Have you ever seen this document
2  before, the first one? I'm sorry, we shouldn't have
3  put these together.
4      A.  I am not sure.
5      Q.  Do you know whether the first document, the
6  memo from, I believe, Mr. Smetana to Dr. Pahl, Dr.
7  Braun and Dr. Jahn, is evidence of the use of a fan
8  and a heater in the cleaning center?
9      A.  At least with regard to the fan.
10      Q.  When you say "at least with regard to the
11  fan," does it also discuss the use of a heater with
12  the fan?
13      A.  No. As far as I can read here, I don't see
14  that.
15      Q.  So this document is also -- well, I guess
16  aside from this picture, then, this is the only
17  place where you can actually see the leaves of the
18  heater in the cleaning center in the documents we've
19  reviewed?
20      A.  Yes.
21      Q.  You said you were definitely familiar with
22  the following document, which, I believe, is from
23  Mr. Stiegler to Mr. -- well, several people. Why do
24  you recall this document?

Page 87

1      A.  This document was from Mr. Stiegler to Mr.
2  Schaefer, and Mr. Schaefer was my supervisor, and
3  the content of this document represents one of the
4  main problems we had to solve.
5      Q.  What was the main problem or one of the
6  main problems you had to solve with the cleaning
7  center?
8      A.  The main problem consisted in the fact that
9  the shaver had to be locked in the cleaning center.
10  The reason for this being the fact that the shaver
11  during the cleaning process becomes very wet, and
12  the shaver being charged with 220/110 respectively
13  volt, it cannot be removed under any circumstances
14  in its wet state.
15      Q.  How was that problem solved?
16      A.  I'm a good engineer. The problem was
17  solved by not charging the shaver any more with 220
18  volt, but with 12 volts.
19      Q.  Once you stepped down the voltage for
20  charging, did you know longer need the mechanical
21  lock?
22      A.  From a technical security point of view, it
23  is not a must any more.
24      Q.  In the commercial cleaning center

Page 88

1  introduced by Braun, was there an interlock
2  included?
3      A.  I would call it a soft lock.
4      Q.  In this document, do you know who Mr. --
5  there's listed a Mr. Kraus with VDE. Do you know
6  who that is?
7      A.  Yes.
8      Q.  Do you know Mr. Kraus?
9      A.  I never met Mr. Kraus personally, in
10  person.
11      Q.  Did you know of Mr. Kraus?
12      A.  Yes.
13      Q.  How did you know of Mr. Kraus?
14      A.  From Mr. Stiegler in our approbation
15  department.
16      Q.  Did you gain any other information, aside
17  from this document, from Mr. Stiegler regarding Mr.
18  Kraus?
19      A.  No.
20      Q.  So this is the only time you knew of Mr.
21  Kraus?
22      A.  Yes.
23      Q.  What is your understanding of this
24  document? Is this document conveying the

22 (Pages 85 to 88)

Juergen Hoeser    May 11, 2005

Page 89

1    suggestions of VDE to the suggestions Mr. Stiegler
2    received from VDE to various individuals at Braun?
3        A.    In fact, those are no suggestions.  Those
4    are instructions.
5        Q.    So VDE told Braun you need to do this or we
6    will not approve of your device?
7        A.    Exactly.
8        Q.    Look, again, to the '328 patent, and
9    interrogatory No. 2, it states that Claim 14 of the
10    '328 patent was conceived and reduced to practice on
11    or before November of 1992?
12        A.    Could you repeat the question one more
13    time.
14        Q.    Sure.  What is the evidentiary basis for
15    the statement that Claim 14 of the '328 patent was
16    conceived and reduced to practice on or before
17    November of 1992?
18        A.    I have to refer to this document.
19        MR. PATTON:  "This document" is exhibit?
20        MR. SHIMOTA:  Defendant's Exhibit 56.
21        Q.    And Exhibit 55, the schematic?
22        A.    Yes.
23        Q.    If we could look, then, to Claim 18 of the
24    '328 patent.  Interrogatory No. 2 states that Claim

Page 90

1    18 of the '328 patent was conceived on or before
2    July 22, 1993 and reduced to practice on or before
3    July 22, 1993.  My question is, what is the
4    evidentiary basis for that date?
5        A.    That date is mentioned on the invention
6    document.
7        Q.    So the idea of a bracket to Braun's
8    knowledge was not conceived prior to -- or the
9    earliest date that Braun can point to for the
10    conception of a bracket is Mr. Braun's invention
11    disclosure record?  Turn to the front page,
12    Embodiment 10 is the bracket.
13        A.    The bracket is the lock.
14        Q.    Is that when they were discussing the lock
15    in the memo to Mr. Stiegler, that's what you were
16    referring to as Item 10, the bracket?
17        A.    Yes.  Ten plus nine.
18        Q.    Well, an earlier date, then, July of '93,
19    would be that memo from Mr. Stiegler, correct?  That
20    would be in June of '93?
21        A.    Yes.
22        Q.    Do you know of any date earlier than that
23    June of '93 memo?
24        A.    No.

Page 91

1        Q.    There's discussion of various dates in
2    which inventions were conceived and reduced to
3    practice.  Did any of the activities related to
4    conception and reduction to practice occur in the
5    United States?
6        A.    To the best of my knowledge, no.
7        Q.    In interrogatory No. 2, there are listed
8    with individuals with knowledge, and that would be
9    Dietrich Pahl, Mr. Gebhard Braun, Wolfgang Vorbeck
10    and Peter Sartorius.  My question for you is -- I
11    know who the first three individuals are.  Who is
12    Peter Sartorius?
13        A.    Sorry.  I don't know.
14        MR. SHIMOTA:  Why don't we take a break to
15    change the tape.
16        VIDEOGRAPHER:  Here ends videotape No. 2.
17    Off the record at 2:57 p.m.
18        (Recess)
19        VIDEOGRAPHER:  Here begins videotape No. 3
20    in today's deposition of Juergen Hoeser.  Back on
21    the record at 3:05 p.m.
22    BY MR. SHIMOTA:
23        Q.    If you would look at this document, I will
24    read off the translation, and I've marked that as

Page 92

1    Defendant's Exhibit 53.  Have you ever seen this
2    document before?
3        A.    No.
4        Q.    You have not seen it before?
5        A.    I've seen it on Monday.
6        Q.    If you look under point five, it states,
7    "Are you aware of prior art going beyond the details
8    in the invention application of state sources"?  In
9    the 30(b)(6) it states you were designated by Braun
10    to testify as to the identity and contents of the
11    enclosures identified in Defendant's Exhibit 53; is
12    that correct?
13        A.    Yes, that's correct.
14        Q.    Speaking on behalf of Braun, what are or
15    what were the enclosures referenced in point five?
16        A.    It has to do with point four in document
17    51, and that relates to point five in document 53.
18        Q.    So under point four, there's generally
19    described one U.S. patent and like a shaking beaker
20    for shaving heads; is that correct?
21        A.    There are two things.  The beaker is the
22    American.
23        Q.    Let me try and ask this question.  So under
24    point four there is described, one, a shaking beaker

23 (Pages 89 to 92)

Juergen Hoeser   May 11, 2005

Page 93

1  for shaving heads, and two, U.S. patent No.
2  3,172,416, correct?
3      A.  Yes.
4      Q.  Is it Braun's position Dr. Pahl attached
5  U.S. patent No. 3,172,416 to Defendant's Exhibit 53?
6      A.  I cannot confirm to that.
7      Q.  Well, does Braun have a position as to what
8  the enclosures were attached to Defendant's Exhibit
9  53?
10     A.  No.
11     Q.  Under point 23 in the 30(b)(6), it is
12  listed --
13     A.  This one?
14     Q.  Yes, exactly.  Point 23 states "Any and all
15  states taken by Braun to collect the enclosures
16  identified in B00861."  What steps did Braun take to
17  gather the enclosures which are referenced in
18  Defendant's Exhibit 53?
19     A.  Exhibit 53 originates from the patent
20  department, and I don't know what steps they
21  undertook.
22     Q.  So do you know whether Braun checked the
23  files of Mr. Klauer to see if the enclosures were in
24  Mr. Klauer's files?

Page 94

1      A.  I cannot say that.  But if you attach the
2  invention documents together with this document,
3  then you have the enclosures.  That's what I assume.
4      Q.  Okay.  So when you say you assume, you're
5  guessing, essentially, that's what is referred to by
6  the enclosures?
7      A.  Yes.
8      Q.  I'd like to hand you what's been marked as
9  Defendant's Deposition Exhibit 60, a document
10  bearing the Bates range B002089 to B002095, and it
11  also includes English translations.  Let me direct
12  your attention to B002090.
13         (Document marked as Exhibit 60
14         for identification)
15     Q.  At the bottom there is described the
16  cleaning operation?
17     A.  Yes.
18     Q.  In the first two sentences there's
19  generally described the fact that while the shaver
20  is in the basin, its cutters rotate in fluid and
21  that enhances the cleaning operation; is that
22  correct?
23         INTERPRETER:  He asked me to repeat the
24  translation.

Page 95

1      A.  Either the translation is wrong or the
2  comment is wrong.
3      Q.  Let's see, it states in the second sentence
4  in the English translation, "After about ten
5  seconds, the pump starts to pump the cleaning fluid
6  from the exchangeable cartridge into the cleaning
7  tray."  And it also states, "This pumping continues
8  throughout the cleaning operation," and then it
9  states, "The moving cutters create a strong movement
10  of the fluid throughout the cleaning operation which
11  in conjunction with the chemical and physical
12  properties of the cleaning fluid results in very
13  thorough cleaning."
14     A.  That's correct.
15     Q.  Am I correct during the cleaning operation,
16  the cleaning tray is continuously filled with fluid,
17  correct?
18     A.  Yes.
19     Q.  And the cutters are oscillating in the
20  fluid, correct?
21     A.  Correct.
22     Q.  Now, am I correct that the oscillation of
23  the cutters in the cleaning fluid places a heavier
24  load on the motor?

Page 96

1      A.  This is a question which cannot be answered
2  with yes or no.
3      Q.  You're right.  That was a bad question.
4  The cutter head oscillates once the fluid has
5  drained in order to shake off excess fluid; is that
6  right?
7      A.  I think your translation was wrong.
8      Q.  Well, relative to the operation of the
9  cutter heads, just when they are in the air, it
10  takes more power to oscillate the cutting heads when
11  they are in fluid; is that correct?
12         MR. PATTON:  I object to the question as
13  being outside the notice, but the witness, of
14  course, may answer if he understands it.
15     A.  I understood the question.  The answer is,
16  once again, not an easy answer.  The fact is that
17  even though we have to oscillate a heavier load, we
18  have less friction.
19     Q.  In designing the cleaning center, did you
20  ever consider using a trough that was not
21  continuously filled with fluid during the cleaning
22  operation?
23     A.  Yes, and that is done in such a way.
24     Q.  When is that done?

24 (Pages 93 to 96)

Juergen Hoeser    May 11, 2005

Page 97

1    A.   We fill the basin, and then we drain the
2  basin many times.
3    Q.   So it fills up and then goes up, fills up
4  and then goes down?
5    A.   Yes.
6    Q.   How many times is the basin filled?
7    A.   Three times entirely, and one time only a
8  little bit.
9    Q.   Did you ever consider designing the
10  cleaning center such that fluid would be injected
11  into the interior of the shaving head?
12    A.   Yes.
13    Q.   When did you consider that?
14    A.   I don't recall.  It was one of those
15  concepts which were in the air.
16    Q.   Was that your idea?
17    A.   I think so.
18    Q.   Would you have recorded that idea in one of
19  your laboratory notebooks?
20    A.   I can't recall.
21    Q.   Do you know why that particular idea was
22  not pursued or why that particular idea of yours was
23  not pursued?
24    A.   I can only give you several reasons.

Page 98

1    Q.   If you would, please.
2    A.   One of the reasons being that we did not
3  want to give up the standard of the cutting
4  elements.  Another reason is the improved cleaning
5  performance.
6    Q.   For the first reason you gave, am I correct
7  that you wanted to make a device that you could use
8  for all different types of shavers in future
9  generations?
10    A.   No.
11    Q.   Well, could you explain further what you
12  mean by standardization of the cutting elements?
13    A.   Yes.  We did not want to worsen the quality
14  of the shaver because of the cleaning center.
15    Q.   With your idea regarding injection, how
16  would you have worsened the quality of the shaver or
17  why was that the perception?
18    A.   At that point this time, that was only an
19  assumption.  But if, for example, you perforate the
20  head of the shaver, then on those perforation
21  points, dirt is also coming out of those holes.
22    Q.   I understand.  Did you communicate your
23  idea regarding the injection of fluid into the
24  shaving head to any other individuals at Braun?

Page 99

1    A.   I don't want to respond to that question,
2  because that has to do with the current development.
3    Q.   Is this something that you're working on, a
4  product that you're working on currently that you're
5  thinking of?
6    MR. PATTON:  You can answer.
7    A.   Yes.
8    MR. PATTON:  There's a protective order in
9  place.
10    A.   So there is an application related to the
11  invention information where I am the author of, and
12  in a project, we are examining this.  So it was in
13  that project team that we discuss about this.
14    Q.   Okay.  Would there be any documents related
15  to this project that you're working on?
16    A.   Of course.
17    Q.   Do you know if those documents have been
18  provided to the attorneys?
19    A.   I don't think so.
20    Q.   Let me ask you this.  You're aware that
21  Remington is being sued for a cleaning system?
22    A.   Yes.
23    Q.   Have you or has anyone in your group ever
24  analyzed the Remington device?

Page 100

1    MR. PATTON:  I object to the question as
2  outside the notice.  If you understand the question,
3  you can answer.
4    A.   Yes.
5    Q.   And what have you done to analyze the
6  Rayovac device?
7    MR. PATTON:  Same objection.
8    A.   I would describe it in the following way.
9  We used the general way of doing this type of work.
10  The analysis was performed mainly by our laboratory.
11    Q.   Who in your laboratory performed the
12  analysis of the Rayovac device?
13    A.   Mr. Steghaus.
14    Q.   Would you spell that, please?
15    A.   S-t-e-g, and house.
16    Q.   h-a-u-s.
17    A.   Right.
18    Q.   Do you know if Mr. Steghaus provided his
19  analysis of the Remington device to Braun's lawyers?
20    A.   I don't know.
21    Q.   Have you seen his analysis?
22    A.   Yes.
23    Q.   Does this analysis taken a written form?
24    A.   Yes.

25 (Pages 97 to 100)

Juergen Hoeser  May 11, 2005

Page 101

1    Q.  How long was this document, approximately?
2    A.  Four to five pages.
3    Q.  Do you know when this document was
4  authored, approximately?
5    A.  Immediately after launching the product.
6    Q.  After Remington launched their product?
7    A.  Yes.
8    Q.  Why was Remington's product analyzed?
9    A.  It's a standard procedure within Braun to
10  analyze or review all apparatus which is coming from
11  other companies.
12    Q.  So it's standard procedure for Braun to
13  look at what the competition is doing?
14    A.  Yes.
15    Q.  What I'm going to do next is go through
16  your laboratory notebook.
17    MR. SHIMOTA:  I'd like to mark as
18  Defendant's Deposition Exhibit 64 a document bearing
19  the Bates range B6737 to B7102.
20    (Document marked as Exhibit 64
21    for identification)
22    MR. SHIMOTA:  And I will mark as
23  Defendant's Deposition Exhibit 65 Rayovac's
24  translation, English translation of the same

Page 102

1  document.
2    (Document marked as Exhibit 65
3    for identification)
4    Q.  I will ask you first if you generally
5  recognize Rayovac Deposition Exhibit 64?
6    A.  Well, 64 I recognize, because it bears my
7  handwriting.  If 65 is correct, I can't tell.
8    Q.  65, I will represent to you, is that's our
9  translation.  When I ask you questions, feel free to
10  refer to your German original.
11    A.  Okay.  And the figures are corresponding?
12  Okay.
13    Q.  The figures won't show up in the English.
14  So in the originals, you have to refer to the
15  figures there.
16    Turn first to B006971.  Can you read to me
17  this document?
18    A.  In German?
19    Q.  Well, if you can read it in German, and
20  then have it translated in English.
21    A.  These are memos I took for myself with
22  regards to a conversation which I had with Mr.
23  Klauer and Dr. Hoegler.  The object of the
24  conversation is the invention information, and

Page 103

1  starting with the invention document information
2  "Pahl," and then it continues with other invention
3  application or patent applications by myself.
4    Q.  If you could look to the top where it says
5  start with 05818, 38, 39 and 40 you have written
6  next to it, "Braun/Pahl"; is that correct?
7    A.  Yes.
8    Q.  Why did you write "Braun/Pahl" next to
9  those numbers?
10    A.  Because Braun was the designer and Pahl the
11  manager, and my contact at that point in time was
12  still Mr. Pahl, because he was still with Braun,
13  worked for Braun, but not in his former function.
14    Q.  So did you meet with Dr. Pahl fairly often
15  regarding the cleaning center project?
16    A.  In fact, not so often, but he was always
17  interested.
18    Q.  At this meeting in December of 1997, what
19  did you discuss with Mr. Klauer and Dr. Hoegler
20  regarding the four patent numbers at top?
21    A.  I can only assume what you were talking
22  about, because at that point in time I am sure that
23  if we were talking about patents, that we wanted to
24  make sure that all the necessary steps were covered

Page 104

1  in order to secure the state of protection.
2    Q.  Do you recall what were any of the steps
3  that you felt that needed to be taken?
4    A.  No.
5    Q.  Had you ever discussed these patents, the
6  05818 to 05840, previously with Mr. Klauer?
7    A.  Certainly.
8    Q.  On what occasions would you have discussed
9  them with Mr. Klauer?
10    A.  The procedure we had in those days was when
11  a new patent application was made, Mr. Klauer was
12  compiling all the relevant patents which were
13  already in existence.
14    Q.  Would Mr. Klauer come to you to find
15  patents that were already in existence?
16    A.  No.  It was the other way around.  Because
17  if I want to author an invention, then I have to
18  refer to the state of the art.
19    Q.  And Mr. Klauer would provide you with what
20  was the state of the art?
21    A.  For example.
22    Q.  I understand.  So when you were developing
23  new things with respect to the cleaning center, Mr.
24  Klauer would have conveyed to you the work done in

26 (Pages 101 to 104)

Juergen Hoeser   May 11, 2005

Page 105

1  these patent applications?
2      A.  Yes.
3      Q.  Did he ever explain to you what those
4  patent applications represented?
5      A.  In broad lines.
6      Q.  Did he explain to you that those patent
7  applications represented the work of Dr. Pahl and
8  Mr. Braun?
9      A.  Yes.
10     Q.  Did Mr. Klauer provide you with the patent
11 applications, the 5818 to 5840?
12     A.  Certainly.  But I don't read such things.
13 I don't understand them.
14     Q.  That's the way everyone feels.  Why was Dr.
15 Hoegler involved in the meeting in December of 1997?
16     A.  Dr. Hoegler is the successor of Dr. Pahl,
17 and my supervisor, boss' boss.
18     Q.  Your boss' boss, two levels above you?
19     A.  Yes.
20     Q.  At the time Mr. Schaefer was your boss, and
21 then Dr. Hoegler was above Mr. Schaefer?
22     A.  Yes.
23     Q.  Is that still the case?  Is it Mr. Schaefer
24 and Dr. Hoegler or is it different now?

Page 106

1      A.  No.  It's different.
2      Q.  Okay.  Is Dr. Hoegler still at Braun?
3      A.  Yes.
4      Q.  In what capacity does he work now?
5      A.  The same.
6      Q.  So he's still your boss' boss?
7      A.  No.  He's my boss.  I'm promoted.
8      Q.  So you step in Mr. Schaefer's shoes?
9      A.  Exactly.
10     Q.  I understand.  Do you know if anyone asked
11 Dr. Hoegler to gather any documents he had related
12 to the shaver cleaning project?
13     A.  I don't know if the lawyers told him to do
14 so, but I asked him, and I said that to you before.
15 I asked him because of that video.
16     Q.  That's the boss you talked with?
17     A.  Yes.
18     Q.  Would there have been someone named Metzler
19 who would have made this video?  Does that name ring
20 a bell to you?
21     A.  Yes.
22     Q.  Is Mr. Metzler still at the company?
23     A.  No.
24     Q.  Was he someone that was brought in from

Page 107

1  outside of Braun?
2      A.  No.  He is a colleague responsible for the
3  video room.
4      Q.  Do you know who Mr. Metzler's successor
5  was?
6      A.  There is no successor.
7      Q.  So is there no longer a video room at
8  Braun?
9      A.  Video is so simpler right now, that
10 everybody can make videos.  So we stopped having
11 this position.
12     Q.  Okay.  I understand.  When you had meetings
13 related to patents with Mr. Klauer, would you
14 exchange written information?  Let me be more
15 specific.  That's a bad question.
16         When you had meetings with Mr. Klauer,
17 aside from actual patent applications and possibly
18 prior art, did he provide you with any other written
19 documents?
20     A.  Mr. Klauer was a very informal man, and it
21 was very rarely the case that he would circulate
22 documents.  When I started my work in 1995, I
23 received some binders from him that had to do, in
24 general, with shavers and the cleaning process of

Page 108

1  shavers, and this led me to the Messinger files.
2      Q.  When you received the binders related to
3  general information for cleaning shavers, do you
4  still have that binder?
5      A.  That binder is in the possession of Mr.
6  Klauer, and the content was not relevant for
7  cleaning centers.
8      Q.  Why do you say it wasn't relevant for the
9  cleaning center?
10     A.  Because the major part consisted in
11 complaint letters from customers that said the
12 shaver is not user friendly, is not easy to clean
13 such things.  In fact, you could call it suggestions
14 from clients.
15     Q.  Okay.  Was it suggestions in general saying
16 that cleaning was difficult or was it suggestions of
17 how to improve the process?
18     A.  Both elements apply.  For example, there
19 are people who sent in a drawing where they invented
20 or they came up with a double brush, things like
21 that, or a toothbrush.
22     Q.  These would have been people from within
23 Braun or third parties or both?
24     A.  Mostly third parties.

27 (Pages 105 to 108)

Juergen Hoeser    May 11, 2005

Page 109

1    Q.   When was the last time you saw this binder
2  of Mr. Klauer's?
3    A.   Well, this binder was really not that
4  interesting.  There was some amusing facts in this
5  binder, but I looked through this binder, and this
6  must have been in the end of '95, the beginning of
7  '96, and then I put the binder on the shelf.
8    Q.   So you kept the binder for yourself, did
9  you not give it back?
10   A.   No.  I gave it back.
11   Q.   Did you ever have a meeting with both
12  yourself, Mr. Klauer and Dr. Pahl?
13   A.   No.
14   Q.   In the materials that were provided to you
15  by Mr. Klauer -- well, in any of the materials
16  provided to you by Mr. Klauer, were there included
17  documents relating to work on the cleaning center
18  prior to your arrival at Braun?
19   A.   Only the invention of Braun/Pahl.
20   Q.   You mentioned that you at some point in
21  time went looking for the files of Mr. Messinger?
22   A.   Yes.
23   Q.   If I could direct your attention to -- you
24  can look in your German original.  If you could look

Page 110

1  to B6740, the second line.
2    A.   Okay.
3    Q.   Would that have been approximately when you
4  would have been looking for the file of Mr.
5  Messinger?
6    A.   Yes.
7    Q.   And why were you looking for Mr.
8  Messinger's file?
9    A.   I would say that at that point in time I
10  was still very interested in learning more about
11  Braun, the company Braun in itself, and Mr.
12  Messinger was kind of legend, a hero.  So I did not
13  only look at his cleaning procedures, but I also
14  looked at other things.
15   Q.   What, from Mr. Messinger's files, what
16  cleaning procedures did you learn of?
17   A.   The Messinger files were clear when it came
18  to the invention for Mr. Messinger himself, and his
19  invention consisted of a type of scraper where he
20  scrapes the dirt off the cutter block.
21   Q.   Did Mr. Messinger also catalog any work
22  related to cleaning shavers with liquid fluid?
23   A.   Yes.
24   Q.   Do you recall what was described, what

Page 111

1  cleaning processes with liquid?
2    A.   Essentially the cleaning of the shavers
3  with water.  He concentrated on that.  That was his
4  focus.  And he collected very good details about
5  shaver cleaning procedures in general.
6    Q.   What details did he collect about shaver
7  cleaning procedures in general?
8    A.   For example, the composition of dirt.  How
9  customers perceive cleaning, and such things.
10   Q.   Did you use any of the information in Mr.
11  Messinger's files when you were performing your work
12  on developing the cleaning center?
13   A.   Only as to support my argumentation.
14      MR. SHIMOTA:  How are we doing on time for
15  you?
16      MR. PATTON:  If we could wind up in the
17  next ten minutes, it will be helpful.
18   Q.   We will go back to your notebooks tomorrow.
19  I promise you we will get done with those.  Let me
20  ask you a few questions outside of that.
21      In the current iteration -- in the most
22  recent version of Braun's cleaner shaving system, is
23  there included a fan or an impeller?
24   A.   No.

Page 112

1    Q.   How is the shaver dried in the most recent
2  version of the shaver cleaning system?
3    A.   There are two methods.  The first one is
4  inductive, and the second one is passive.
5    Q.   Can you explain to me what you mean by
6  "passive"?
7    A.   "Passive" means in this context that we
8  have a very open system where alcohol can evaporate
9  very quickly.
10   Q.   So am I correct that "passive" means
11  essentially air drying or drip drying?
12   A.   Yes.
13   Q.   Induction heating, is that done through, I
14  guess, a coil which is heated up by application of
15  electric current?
16   A.   The cutting parts are heated using
17  inductive energy.
18   Q.   I guess there's the two methods of drying
19  now.  Are the two methods employed in the same
20  device or does certain devices employ one method and
21  other devices employ the latter?
22   A.   There are, in fact, three methods on the
23  market; the one with the fan, the inductive method,
24  and the passive method.  The three methods are used

28 (Pages 109 to 112)

Juergen Hoeser   May 11, 2005

Page 113

1  for very different types of devices.
2    Q.  What different types of devices are they
3  used for?
4    A.  Seen from which perspective?
5    Q.  When you say "different types of devices,"
6  are you talking about from the consumers'
7  perspective or from Braun's perspective?
8    A.  Both.  We have an old apparatus.  This old
9  apparatus is still on the market.  We do have a new
10  top line device, which uses inductive drying, and we
11  do have a mid-price device, that uses passive heat.
12    Q.  The device with the fan, that is the lowest
13  price device, and the device with passive drying is
14  the mid-priced device, and the induction heating is
15  the high-end device; is that correct?
16    A.  No.  The device with the fan is the former
17  top line.  The price is not lower for the device
18  with passive drying.  So it's a parallel.
19    Q.  Why was the decision made to, I guess,
20  pursue alternatives to using the fan for drying the
21  shaver head?
22    A.  There are several reasons for that.  The
23  first reason is the building space.  The second
24  reason is the noise.  And the third reason is that

Page 114

1  if I use the inductive heater, then I can
2  simultaneously perform different tasks.
3        MR. SHIMOTA:  I will tell you what, because
4  I know you have to go, why don't I finish up there.
5        MR. PATTON:  Do you want to start again at
6  eight o'clock?
7        MR. SHIMOTA:  Yes.
8        VIDEOGRAPHER:  Off the record, 4:13 p.m.
9        (Whereupon the deposition
10        suspended at 4:13 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 115

1        C E R T I F I C A T E
2    I, JUERGEN HOESER, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the corrections listed below):
7  Page  Line                Correction
8
9
10
11
12
13
14
15
16
17
18
19    Signed under the pains and penalties of perjury
20  this      day of            , 2005.
21
22        JUERGEN HOESER
23
24

Page 116

1        CERTIFICATE
2  Commonwealth of Massachusetts
3  Suffolk, ss.
4
5    I, Michael D. O'Connor, Registered Professional
6  Reporter and Notary Public in and for the
7  Commonwealth of Massachusetts, do hereby certify
8  that JUERGEN HOESER, the witness whose deposition is
9  hereinbefore set forth, was duly sworn by me and
10  that such deposition is a true record of the
11  testimony given by the witness.
12    I further certify that I am neither related to
13  or employed by any of the parties in or counsel to
14  this action, nor am I financially interested in the
15  outcome of this action.
16    In witness whereof, I have hereunto set my hand
17  and seal this 11th day of May, 2005.
18
19
20        Notary Public
21
22
23  My commission expires
24  November 7, 2008

29 (Pages 113 to 116)