# EXHIBIT
# 41

Wolfgang Vorbeck    August 10, 2005

Page 3

1          Volume: I    Pages: 1 to 126
2          UNITED STATES DISTRICT COURT
3          DISTRICT OF MASSACHUSETTS
4    - - - - - - - - - - - - - - -
5
6    BRAUN GmbH,
7          Plaintiff
8    v.                   Civil Action
9    RAYOVAC CORPORATION,        No.
10         Defendant      03-CV-12428-WGY
11   - - - - - - - - - - - - - - -
12
13        DEPOSITION of WOLFGANG VORBECK
14        Wednesday, August 10, 2005
15             9:23 a.m.
16           Dwyer & Collora
17          600 Atlantic Avenue
18          Boston, Massachusetts
19
20
21
22
23
24   Melissa Z. Comins, RPR and CSR No. 132293

Page 3

1                I N D E X
2
3    Deposition of: WOLFGANG VORBECK        Page
4    Direct Examination by Mr. Shimota...............5
5
6              E X H I B I T S
7    No.                        Page
8    103 Subpoena....................................9
9    104 Privelege log..............................24
10   105 US patent No. 3,172,416....................47
11   106 US patent No. 6,698,437....................54
12   107 Braun theses Bates B005220 to B005277......58
13   108 Documents Bates Nos. 1138 to 1145..........67
14   109 Documents B00136 to B00146.................67
15   110 Documents B00126 to B00135.................68
16   111 Documents B00126 to B00135 in German.......68
17   112 US patent No. 5,711,328....................69
18   113 Bates B001097 to B00114....................71
19   114 US patent No. 3,890,988....................90
20   115 US patent No. 5,649,556....................90
21   116 Documents B1069 to B1073...................93
22   117 Braun 00861...............................107
23   118 Declaration...............................111
24   119 B0243 to B0247............................113

Page 2

1    APPEARANCES:
2
3        ROPES & GRAY LLP
4        By:  Dalila Argaez Wendlandt, Esq.
5        and Stanley D. Liang, Esq.
6        One International Place
7        Boston, Massachusetts 02110-2624
8        (617) 951-7000
9        Counsel for the Plaintiff
10
11       KIRKLAND & ELLIS LLP
12       By:  James A. Shimota, Esq.
13       200 East Randolph Drive
14       Chicago, IL 60601
15       (312) 861-2336
16       Counsel for the Defendant
17
18   ALSO PRESENT:
19
20       Lily Olm, Interpreter
21       Jason LaChapelle, Videographer.
22
23
24

Page 4

1              E X H I B I T S
2    No.                        Page
3    120 Answers to interrogatories...............116
4    121 B004615 to B004617........................118
5    122 Schematic B1064...........................118
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   (Original exhibits copied and attached.)

1 (Pages 1 to 4)

Wolfgang Vorbeck    August 10, 2005

Page 5

```
1              P R O C E E D I N G S
2
3              THE VIDEOGRAPHER:  Here begins
4   videotape No. 1 in the deposition of
5   Wolfgang Vorbeck in the matter of Braun versus
6   Rayovac in the United States District Court for the
7   District of Massachusetts, Case No. 03-CV-12428-WGY.
8              Today's date is August 10, 2005.  The
9   time on the video monitor is 9:24.  The video
10  operator today is Jason LaChapelle contracted by
11  LegaLink Boston, 320 Congress Street, Boston,
12  Massachusetts.
13             This deposition is taking place at
14  Dwyer & Collora, 600 Atlantic Avenue, Boston,
15  Massachusetts, and was noticed by James Shimoto and
16  Kirkland & Ellis.
17             Counsel, please voice identify
18  yourselves and state whom you represent.
19             MR. SHIMOTO:  James Shimoto of
20  Kirkland & Ellis appearing on behalf of Rayovac
21  Corporation.
22             MS. WENDLANDT:  Dalila Wendlandt of
23  Ropes & Gray appearing on behalf of Braun GmbH.
24             THE VIDEOGRAPHER:  The court reporter
```

Page 6

```
1   today is Melissa Comins of LegaLink Boston.
2              Would the translator please state your
3   name for the record.
4              THE INTERPRETER:  It's the
5   interpreter, my name is Lily Olm.
6              THE VIDEOGRAPHER:  And would the
7   reporter please swear in the interpreter and the
8   witness.
9              (Interpreter sworn.)
10
11             WOLFGANG VORBECK,
12  a witness called for examination by counsel for the
13  Defendant, having been satisfactorily identified and
14  duly sworn by the Notary Public, was examined and
15  testified as follows:
16
17             DIRECT EXAMINATION
18  BY MR. SHIMOTO:
19      Q.   Good morning.
20      A.   Good morning.
21      Q.   Would you please state your name for the
22  record?
23      A.   My name is Wolfgang Vorbeck.
24      Q.   And would you also provide your address?
```

Page 7

```
1       A.   My address is Germany, the village is
2   Idstein, ZIP code 65510, and the street is
3   Pfahlgrabeustrasse No. 69.
4              THE INTERPRETER:  Do you want me to
5   spell that?
6              THE COURT REPORTER:  Isn't that where
7   you -- yes.
8              (The witness talks
9              with the interpreter.)
10             THE INTERPRETER:  The name of the
11  location is spelled I-D as in David, S as in Sam, T
12  as in Tom E-I-N.
13             The name of the street is P as in
14  Paul, F as in Frank, A as in Alpha, H as in Henry, L
15  as in Lily, G as in George, R as in Richard, A as in
16  boy, E as in England, N as in Nancy, S as in Sam, T
17  as in Tom, R as in Richard A-S-S-E No. 69.
18      Q.   Have you ever been deposed before,
19  Mr. Vorbeck?
20      A.   No.
21      Q.   Okay.  Before we begin, there's a few
22  preliminaries I'd like to go through.
23             You understand that during the course
24  of today, I'm going to ask you questions and you
```

Page 8

```
1   will provide me with answers to the best of your
2   ability; is that correct?
3       A.   Yes, yes.
4       Q.   If during the course of the day you do not
5   understand any of my questions, would you please
6   tell me?
7       A.   Yes.
8       Q.   And if also at some point during the day
9   you come to believe that your
10  testimony -- that -- let me start again.
11             If during the course of the day you
12  come to believe that your prior testimony is either
13  inaccurate or incomplete, would you also tell me?
14      A.   Yes.
15      Q.   And is there any reason that you can sit
16  of -- think of sitting here today that you're unable
17  to testify truthfully and accurately?
18      A.   No, there is nothing.
19             MR. SHIMOTA:  I'd like to mark as
20  defendant's deposition Exhibit No. 3 defendant's
21  notice of deposition pursuant to rule 30(b)(6),
22  which I believe that you are designated to testify
23  today on.
24             (Pause.)
```

2 (Pages 5 to 8)

Wolfgang Vorbeck    August 10, 2005

Page 9

1    (Exhibit No. 103 marked
2    for identification.)
3    Q.   Take whatever time you need to read the
4  document, but I'll just ask you: Have you ever seen
5  it before?
6    A.   Yes, I have seen it.
7    Q.   And when had you seen it?
8    A.   Well, I got it by fax two or three weeks,
9  it was -- look, it was a week before or July 20, so
10  approximately because I thought it -- the deposition
11  would be on July 20, and I thought it's a really
12  short term, so it must be five or six, 15 of July,
13  maybe, that's around the date.
14    Q.   And would you turn to the second page?
15    A.   Yes.
16    Q.   You'll see that there are a number of
17  topics there?
18    A.   Yes.
19    Q.   And have you reviewed those topics?
20    A.   Yes, yes.
21    Q.   And are you designated by Braun to testify
22  regarding those topics today?
23    A.   Yes.
24    Q.   And you understand with respect to the

Page 10

1  list of topics that you are speaking not only on
2  behalf of yourself, but also the knowledge of Braun?
3    A.   Yes, I am the memory of Braun.
4    Q.   And what did you do to prepare yourself to
5  testify with respect to the topics listed in Exhibit
6  No. 103?
7    A.   Yes, yes, I went through such a stack of
8  papers, prosecution history of the two US patents,
9  prosecution history of the German patents, some
10  prior art literature and other papers, notes of the
11  deposition of Mr. Hoeser, notes of the deposition of
12  Mr. Braun, so practically all what is mentioned here
13  I went through that.
14    Further, I asked several persons in
15  the company whether they could give me additional
16  assistance or additional information, I talked
17  with -- who was it?
18    It was Mr. Hagele, who is now head of
19  the -- or director of the RD department shaver, I
20  talked with Mr. Faulstich, who is the product
21  program manager.
22    I talked with Uwe Sievers, who is the
23  patent guy responsible for the current prosecution,
24  and I think that's it.

Page 11

1    Further, I talked today with
2  Mr. Sievers to answer the special item later on
3  regarding Mrs. Hubatsch and some French translation
4  issues, and I tried to get Mr. Hoeser on the phone
5  to clarify what I couldn't answer, so that what I
6  did for preparation.
7    Q.   What information did Mr. Hagele provide
8  you generally?
9    A.   Nothing, he said he could nothing tell me
10  in this regard.
11    Q.   And what information did Mr. Faulstich --
12    A.   The same.
13    Q.   And what information did Mr. Sievers
14  provide you?
15    A.   He provided me today with -- should I give
16  you -- it's the information what documents were
17  provided to the interpreter translator Mrs. Hubatsch
18  regarding the translation of the Braun patent, he
19  gave me some information this morning.
20    Q.   Did he provide you any documents?
21    A.   No, just information by telephone call
22  because it was not possible to reach Mrs. Hubatsch
23  earlier, she was on vacation, and so we -- he got
24  her on the phone yesterday or this morning.

Page 12

1    Q.   Is Mrs. Hubatsch a Braun employee?
2    A.   No, she is a --
3    (The witness talks
4    with the interpreter.)
5    THE INTERPRETER:  She is a free-lance
6  translator.
7    Q.   Does she reside in Kronberg, to the extent
8  you know?
9    A.   No, she resides near Darmstadt, Darmstadt,
10  Erzhausen, Erzhausen, that's the village, Erzhausen,
11  E-R-Z hausen.
12    THE INTERPRETER:  E-R-Z-H-A-U-S-E-N,
13  and Darnstadt, that's D-A-R-N-S-T-A-D-T.
14    Q.   I actually got that one, I'll learn by the
15  end of this case.
16    A.   Okay.
17    (Laughter.)
18    Q.   Aside from reviewing the documents we
19  discussed and speaking with Mr. Hagele,
20  Mr. Faulstich, Mr. Sievers and attempting to talk
21  with Mr. Hoeser, did you do anything else to prepare
22  for this deposition?
23    A.   Yes, yes, well, we -- I came across on
24  Sunday night, and on Monday, we met, we went

3 (Pages 9 to 12)

Wolfgang Vorbeck    August 10, 2005

Page 13

1  with -- it was Dalila and it was Stanley, and we
2  went through the files and we looked at all the
3  questions and went through the prior art for about
4  three to four hours, and that was it.
5      Q.  So this was on -- you met with Stanley and
6  Dalila on Monday?
7      A.  On Monday, yes.
8      Q.  And that was for three to four hours?
9      A.  Yes.
10     Q.  Did you meet with counsel in preparation
11 for this deposition yesterday?
12     A.  No.
13     Q.  If you could describe for me in general
14 your post -- do understand what I mean by the term
15 high school in the United States terms?
16     A.  Yes, yes.
17     Q.  Okay, your post high school education?
18     A.  So after high school, I started studying
19 physics at University of Mainz.
20         THE INTERPRETER:  M-A-I-N-Z.
21     A.  And I made my diploma in about '78, so
22 that was diploma physics, I don't know the English
23 translation, and afterwards, I made my Ph.D or so in
24 physics, nuclear physics, and I finished university

Page 14

1  in 1982.
2      Q.  And following the receipt of your Ph.D,
3  where did you come to be employed?
4      A.  With a company Bosch, Bosch, it's
5  automotive supplier in Stuttgart, I started in the
6  patent department.
7      Q.  And how did you come to work in the patent
8  department?
9      A.  Well, it was --
10         (The witness talks
11         with the interpreter.)
12         THE INTERPRETER:  It was just by
13 accident.
14     A.  More important was the company Bosch had
15 some very good reputation in Germany, and so I tried
16 to work in patents and --
17     Q.  Okay, I understand.  Do you need to -- in
18 Germany in general, do you need to receive any legal
19 or formal legal education to work in patents?
20     A.  Yes.
21     Q.  And when you came to work at Bosch, had
22 you received --
23     A.  No, nothing.
24     Q.  So what was your -- what were your

Page 15

1  responsibilities within the patent department?
2      A.  Well, I was responsible for -- for
3  appli- -- filing, or drafting and filing
4  applications on some sensors, on -- what
5  else -- on --
6         (The witness talks
7         with the interpreter.)
8         THE INTERPRETER:  Catali- -- catalyst
9  technology.
10     A.  Catalyst -- so -- so -- and there I
11 drafted applications, I got -- so the older person
12 in that patent department gave me some information,
13 train me, so I got -- in this regard, I got some
14 training, but not a degree at Bosch.
15     Q.  Let me see if I understand you.  In
16 order -- when you're working at Bosch, you would
17 work on writing the applications?
18     A.  Yes, writing the applications or
19 prosecuting the applications.
20     Q.  Okay.  Let me see.  In Germany, do you
21 need a legal degree or a degree from a university in
22 order -- in law in order to interact with the German
23 patent office?
24     A.  It depends, if you are in your function as

Page 16

1  an employee of the company, you can represent the
2  company as an employee without any legal degree, but
3  if you are outside counsel, outside lawyer,
4  then -- if you want -- if you are not an employee of
5  the company, then you have to have a degree to
6  represent the company.  You understand that?
7      Q.  I understand.
8      A.  Okay.
9      Q.  How long did you work for Bosch?
10     A.  Exactly three years, to 1985.
11     Q.  And after you left Bosch, when -- where
12 did you go next?
13     A.  To the company Braun AG at that time,
14 first of July 1985 I started my job at Braun.
15     Q.  And what was your position at Braun at
16 that time?
17     A.  I was a patent specialist.
18     Q.  And what were your responsibilities as
19 patent specialist?
20     A.  At that time, I was responsible for oral
21 care and oral care -- drafting patents applications
22 prosecution for oral care appliances and hair care
23 appliances.
24     Q.  And how long were you responsible for oral

4 (Pages 13 to 16)

Wolfgang Vorbeck    August 10, 2005

Page 17

1  care and hair care applications?
2      A.  For oral care, I was responsible until end
3  of 2002, and hair care, I can't really remember,
4  that's eight, nine, ten years ago, so it was
5  approximately 1995.
6      Q.  Did your -- did your responsibilities for
7  patents on particular products expand?
8      A.  Yes, in -- in 1980 -- end of 1987, I went
9  to Munich to take the German patent attorney
10  diploma, and end of 1989, I'm not sure whether 1989
11  or 1990, I took the European patent law degree, so
12  from the legal side, this was -- or from the legal
13  education, this was a step forward.
14          And after having got the German patent
15  lawyer degree, I had in addition at that time look
16  for oral care for epilation devices, so these are
17  not shavers, but hair pluckers, we also call them
18  hair pluckers.
19      Q.  Did there come a time when you became
20  responsible for the prosecution of patents related
21  to shavers?
22      A.  Never.
23      Q.  When you were studying to receive your
24  diplomas or degrees in both German patent law and

Page 18

1  European patent law, did you ever receive any
2  training with respect to or was there any discussion
3  of US patent law?
4      A.  Well, a side aspect, and not during the
5  European exam or preparation for the exam, but to
6  some extent, you hear about US patent law when you
7  prepare for the German patent lawyer, so something
8  about that, and in the meantime, I have 23 years'
9  experience in patent matters, trademark matters and
10  that stuff, and so today, I have a bit more
11  experience also in the US patent law, but I'm not an
12  expert and I'm not US patent attorney.
13      Q.  So is it fair to say that Braun relies
14  upon outside US counsel to handle --
15      A.  Yes, that's true because we internal
16  patent lawyers cannot represent the company for US
17  PTO, for instance, or for the Japanese patent
18  office.
19          We can represent for the European
20  patent office, German patent office, and so we need
21  outside experts, US patent lawyers, Japanese patent
22  lawyers, Russian patent lawyers, to prosecute the
23  applications in these countries.
24      Q.  Do you know the name I believe it's Hans

Page 19

1  Dietrich Klauer?
2      A.  Yes, I know him personally.
3      Q.  Is it correct that Mr. Klauer is now
4  deceased?
5      A.  Yes, in 2000.
6      Q.  And when did you first meet Mr. Klauer?
7      A.  Well, he was already in the patent
8  department when I joined the patent department, so I
9  worked with him together for about 15 years, he was
10  a colleague of me.
11      Q.  So Mr. Klauer was working at Braun at
12  least in 1985?
13      A.  Yes, I think he started 1975 or around
14  that, I'm not sure, but he was a long time before me
15  in the patent department employed.
16      Q.  And what were -- to the extent you recall,
17  what were Mr. Klauer's responsibilities?
18      A.  He was, at the time I joined the patent
19  department, he was responsible for product range of
20  shavers and epilation devices.
21          No, that's not correct because in
22  1985, we did not even have a product epilation
23  device, so he was responsible for shavers.
24      Q.  And would he have become responsible for

Page 20

1  epilation devices around the time that Braun
2  purchased Silk-Epil?
3      A.  Silk-Epil, yes, so at that time, he became
4  also responsible for that because epilation devices
5  and shavers were one product field, or Braun was
6  structured that these both devices were in one
7  product area.
8      Q.  And to the extent you recall, what was
9  Mr. Klauer's educational background?
10      A.  He was a mechanical engineer, and that's
11  it, he had no degree as a patent lawyer for the
12  German or European patent office.
13      Q.  Do you know whether Mr. Klauer had
14  received any patents at Braun?
15      A.  As an inventor?
16      Q.  As an inventor, yes.
17      A.  I think he -- he was involved in some -- a
18  few cases, yes, I think he was, he was an inventor
19  in few shaver -- shaver applications or shaver
20  patents.
21      Q.  Do you know if he was the inventor in any
22  US patents or --
23      A.  I can't tell you, no, I have no idea.
24      Q.  Sure.

Legalink Chicago
(312) 263-3524

Wolfgang Vorbeck     August 10, 2005

Page 21

1      A.   Maybe the -- the application was also
2   filed in -- in the US, but I would have prepared
3   if --
4      Q.   I understand.
5      A.   -- so I can't answer that question.
6      Q.   If you could direct your attention to
7   topic No. 3.
8      A.   Yes.
9      Q.   It states, Therefore, the asserted
10  patents, the identities of all individuals covered
11  by 37 C.F.R., section 1.56 (c), can you tell me who
12  all those individuals would be?
13     A.   Yes, so I read this paragraph, and I think
14  these are the invent -- mainly the inventors and the
15  attorneys who prosecuted the cases. Am I right?
16     Q.   That would be correct.
17     A.   So inventor is Mr. Braun, he is one of the
18  individuals, then Mr. Klauer, who prosecuted that
19  within the company, and for the US case, we had, as
20  usual, Fish & Richardson and Eric Prahl was the
21  attorney there.
22          And when I went through the files, I
23  also -- I saw that also another US attorney was
24  involved, and that was I think Phylis Kristal, I saw

Page 22

1   her signature below some of the papers.
2      Q.   Were you involved in the prosecution of
3   the patents in suit?
4      A.   No, I was not responsible for shavers
5   regarding patent matters.
6      Q.   So did you -- you did not communicate at
7   all with Fish & Richardson regarding the prosecution
8   of the patents in suit?
9      A.   I saw under a few of those letters is also
10  my signature, but that depends or that is a problem
11  regarding German --
12          (The witness talks
13          with the interpreter.)
14          THE INTERPRETER:  Commercial law in
15  Germany.
16     A.   Because you need, according to that law
17  and our internal structure is to have two signatures
18  below, and one is --
19          (The witness talks
20          with the interpreter.)
21          THE INTERPRETER:  It's a procuration,
22  which means that you give somebody the power of
23  attorney to act in your name.
24     A.   So -- and one should be this PPA

Page 23

1   signature, and that was my signature at that time.
2   I saw it, but I had nothing to do with the case.
3          The other signature was that of
4   Hans Dieter Klauer, and he prosecuted the case, I
5   just signed to instruct, for instance, to give the
6   Fish & Richardson instructions to prosecute the case
7   that involves money and so on, so we needed two
8   signatures.
9      Q.   Okay. So I understand correctly, under
10  German law, in order to give authority to
11  Fish & Richardson to do things, there needed to be
12  two signatures?
13     A.   Yes, okay, that's -- one of those was my
14  one, but I was not material involved in that case, I
15  just signed it.
16     Q.   So at least with respect to you, you
17  wouldn't have been speaking with Mr. -- with
18  Gebhard Braun, for example, regarding prosecution?
19     A.   No, no, I think I didn't know him before,
20  so -- before this case came up.
21     Q.   So is it correct that the first time you
22  met Mr. Braun --
23     A.   I don't know whether I met him before, but
24  he is retired since a few years and I had nothing to

Page 24

1   do with the shaver department and we are about 2000
2   people at the Kronberg facility or location, so you
3   do not know each and every person, so I --
4      Q.   Sure.
5      A.   -- maybe I've seen him, but I didn't know
6   his name up to that time, and I couldn't connect the
7   face with the name.
8      Q.   Had you read -- well, in the 1994-1995
9   time frame, had you read the patent applications
10  for --
11     A.   No, no.
12     Q.   I'd like to mark as defendant's deposition
13  Exhibit No. 104 the privilege log produced by Braun
14  in this litigation. I'm just going to ask you about
15  a few names on this document.
16          (Exhibit No. 104 marked
17          for identification.)
18     Q.   If you could turn to page 3, if you see
19  there, there is the name of P. Sartorius?
20     A.   Yes.
21     Q.   Can you tell me who Mr. Sartorius is?
22     A.   Yes, I know him personally, he -- it's
23  Peter Sartorius, he lives near southern of us, near
24  Heidelberg Mannheim area, and he is a patent

Wolfgang Vorbeck    August 10, 2005

Page 25

1  attorney, a German patent attorney and European
2  patent attorney.
3          He runs a private practice, or at that
4  time, he started to run a private practice.
5          Formerly, he worked for German company
6  John Deere, not -- it's US company, but German
7  branch, I think it was John Deere, and he at that
8  time Dieter Klauer instructed him to draft some
9  patent applications.
10         Also these was applications on the
11  basis of some venture disclosures or information, so
12  he is an outside patent attorney.
13  Q.   Does Braun still have a relationship with
14  Mr. Sartorius?
15  A.   Not at the moment.  We -- at that time, it
16  was the philosophy of Braun or the -- regarding the
17  work in the patent department to do most of the work
18  in-house, and we needed only Peter Sartorius or
19  others to -- to --
20         (The witness talks
21         with the interpreter.)
22         THE INTERPRETER:  To help us deal with
23  the last details.
24  A.   No, we have not always continuous work,

Page 26

1  some --
2          (The witness speaks
3          with the interpreter.)
4          THE INTERPRETER:  Oh, if they have too
5  much, to deal with the overload of work.
6  A.   So this was at that time, I guess, we took
7  Peter Sartorius because Mr. Klauer had a lot to do
8  in other areas, but I don't know for certain why
9  we -- why we used him for this -- for these two
10  cases especially.
11  Q.   So did Mr. Sartorius draft the German
12  counterparts to the US patent applications?
13  A.   Yes, yes.
14  Q.   Do you know how he was able
15  to -- what -- let me start again.
16         Did Mr. Sartorius meet with Mr. Braun
17  in order to prepare the patent applications?
18         MS. WENDLANDT:  Objection, go ahead
19  and answer.
20  A.   I can't tell that, but I believe
21  Mr. Sartorius will have spoken with Mr. Klauer and
22  will have got the information, the invention
23  disclosure and maybe some prior art or whatever,
24  that's the usual way we handle it, to give the

Page 27

1  written description, to give some prior art, if
2  there is any, or if we are aware of any.
3          And sometimes if you have three or
4  four or five cases, it's better to -- to -- that the
5  attorney comes to the company with us and you have
6  a talk together.
7          And maybe then also the inventor will
8  be involved, but it was not -- I don't know it, but
9  it was not usual to have the outside attorney put
10  together with the inventor, only in cases there are
11  misunderstandings or something like that or someone
12  needs more information.
13  Q.   Well, do you know with respect to the
14  prosecution of the patents which are at issue here
15  if Mr. Sartorius came to Braun and met with the --
16  A.   To Mr. Braun or Braun the company Braun?
17  Q.   Well, if Mr. Sartorius came to the company
18  Braun and then met with Mr. Gebhard Braun?
19  A.   I don't know it, but can I say what I
20  guess?
21         MS. WENDLANDT:  No.
22  A.   Good.
23  Q.   Well, I just want to be -- I want to be
24  clear.

Page 28

1  A.   So I don't know whether Peter Sartorius
2  met Mr. Braun or not.
3  Q.   And when I'm -- maybe I should clarify.
4  When I'm asking you that question, I'm also asking
5  with respect to Braun's knowledge, does Braun know
6  whether Mr. Sartorius met with Mr. Gebhard Braun?
7  A.   I don't think so because the only person
8  who could definitely say that is Mr. Klauer, if he
9  would not -- would not have died, and I looked at
10  the files and who could also testify that would be
11  Mr. Gebhard Braun, and I think he was deposition, so
12  I can't --
13  Q.   Did Braun -- Braun -- pardon me.
14         Did Braun attempt to collect documents
15  from Mr. Sartorius related to his work on the
16  patents in suit?
17  A.   Mr. Gebhard Braun?
18  Q.   No, did the company Braun contact
19  Mr. Sartorius regarding his work on the patents in
20  suit?
21         MS. WENDLANDT:  Objection, you can go
22  ahead and answer if you know.
23  A.   Well, maybe I -- so when Mr. Sartorius has
24  drafted the applications on the basis of whatever

7 (Pages 25 to 28)

Wolfgang Vorbeck    August 10, 2005

Page 29

1  information, then he will have sent these drafts to
2  Mr. Klauer, Mr. Klauer reviewed it and maybe there
3  were some misformulated claims or some additional
4  disclosure, and there was communication between
5  Mr. Klauer and Mr. Sartorius, and then maybe
6  the -- the draft was revised and then it was filed
7  with the German patent office, that's how these
8  things work usually.
9      Q.  I want to be clear.  What I'm asking is
10 now in the 2003-2005 time period during this
11 litigation --
12     A.  Yes.
13     Q.  -- did the company Braun make any effort
14 to contact Mr. Sartorius?
15     A.  No, no, no.
16     Q.  So I take it you did not speak with
17 Mr. Sartorius in preparation for this deposition?
18     A.  No, but I spoke with him when we met at a
19 seminar, but not about this case.
20     Q.  Sure.
21     A.  The patent community is not so big, we are
22 1,500 German patent lawyers and to meet each other,
23 to -- some events, and then I saw also the last two
24 years Peter Sartorius.

Page 30

1      Q.  If Braun asked Mr. Sartorius, do you
2  believe that he would provide the files that he
3  retained, to the extent there are any?
4      A.  I think so, yes.  Why not?
5      Q.  If you could look at the bottom of
6  page 3 --
7      A.  Yes.
8      Q.  -- the last -- second to last entry,
9  there's listed an A. Dietrich?
10     A.  A. Dietrich, that's -- oh, that's a woman
11 which worked in the patent department, and she
12 unfortunately died also four or five years ago.
13         She had an accident, car accident,
14 so -- and she made the docketing of our files,
15 she -- she run the computer system to docket the
16 files and that stuff, so she had nothing to do with
17 the actual patent work, only --
18     Q.  She was -- was she a secretary of some
19 type?
20     A.  Yes, assistant, yes.
21     Q.  Do you know whose assistant she was or was
22 she just an assistant for the entire department?
23     A.  No, she had -- she had the function to
24 look over the terms and to -- to make the docketing

Page 31

1  of the files, to put the file numbers and all that
2  stuff in our computer system, so she reported I
3  think to the head of the patent department at that
4  time was Dieter Klauer.
5      Q.  If you could look at the next to last
6  entry, there's listed a C. Hirsch.
7      A.  Yes, that's also a secretary, fortunately,
8  she has not died, she still lives and she still is
9  in the patent department as an assistant.
10     Q.  Okay.  Please turn the page.
11     A.  Yes.
12     Q.  Page 4, look at the third entry, for
13 example, it's listed yourself and Mr. Klauer.
14     A.  Yes.
15     Q.  Do you believe this is the type of
16 situation where you would have --
17     A.  Yes, I think so.
18     Q.  Okay, as we discussed previously.  There's
19 listed also at approximately the sixth entry an
20 I. Heldmann.
21     A.  Yes, she was a --
22         (The witness talks
23         with the interpreter.)
24         THE INTERPRETER:  She was a temporary

Page 32

1  assistant.
2      A.  And she worked for some time in the patent
3  department, and -- but it was for one or two years,
4  I think so, and then she went to -- I don't know
5  where she went.
6      Q.  Okay.  The next entry, there's listed a
7  G. Haunold.
8      A.  Yes, Haunold, he's located in Austria and
9  he is a translator especially for Japanese into
10 German and French or English language, I don't know.
11     Q.  Did Mr. Haunold provide any translation
12 services in connection with the patents in suit?
13     A.  Maybe, I can't tell you, but usually
14 we -- we used at that time and use today Mr. Haunold
15 when we need translations from the Japanese into
16 English or German language, so -- and we had here
17 also a Japanese parallel of prosecution running.
18         It's likely that there has been some
19 Japanese literature cited as prior art and where
20 there's no foreign counterpart which is readable for
21 us, then we have that language translated, so it's
22 nothing unusual.
23     Q.  Okay.  If you can turn to the next page,
24 in the second entry, well, first, there's listed

8 (Pages 29 to 32)

Wolfgang Vorbeck     August 10, 2005

Page 33

1  there in the second entry E. Cordes.
2      A.  Yes, that's my secretary.
3      Q.  Also in the -- farther over, there's
4  listed a notification of invention.  Do you see
5  that?  And it's the same entry.
6      A.  Yes, yes.
7      Q.  What is a notification of invention, is
8  that --
9      A.  It's an IDS, invention disclosure.
10  According to German inventors law, you have to
11  disclose, if you believe you have made an invention,
12  you have to disclose that to your employer, and
13  you -- and there are several rules what you have to
14  describe the invention, you have describe prior art
15  and all that stuff, and that is called a
16  notification of invention or invention disclosure.
17      Q.  And that's required by German law?  Well,
18  let me -- excuse me.  German law requires the filing
19  of a notification of invention?
20      A.  Yes.
21      Q.  And to the extent you know, why does
22  German law require the filing of a notification of
23  invention?
24      A.  This inventors law comes out of the time

Page 34

1  of 1930, 1940 in the war times, and I have no idea
2  why they put this phrase in it.
3      Q.  Well, do you know what the purpose of the
4  legal requirement of the notification of invention
5  is under German law?
6          MS. WENDLANDT:  Objection.
7      A.  No.
8      Q.  Well, at Braun, why do employees file a
9  notification of invention?
10      A.  Besides the law, they have a -- usually a
11  preamble in their contract that if they think
12  they've made an invention, they've disclosed this
13  invention to the employer, that's in the -- in their
14  contract because the company does not want that
15  inventions are -- or that inventions cannot be filed
16  since -- an employee believes he must not tell this
17  fact to the company.
18      Q.  So is the contractual requirement so that
19  the employee doesn't try to take the invention for
20  himself?
21      A.  Yes.
22      Q.  Is the purpose of the German law, to the
23  extent you know, also to ensure that the employee
24  does not take the invention for himself away from

Page 35

1  the employer?
2          MS. WENDLANDT:  Objection.
3      A.  The -- to make it simple, the structure of
4  the German inventors law is as follows:  If an
5  invention has been disclosed to the company, then
6  the company is, from that point of time, four
7  months, to lead over the rights on the invention
8  from the inventor to the company.
9          If the company misses to lead over the
10  rights within this four months' term, the rights
11  stay with the inventor, so this four months' term is
12  a very, very strict term, you cannot --
13          (The witness talks
14          with the interpreter.)
15          THE INTERPRETER:  Extend.
16      A.  You cannot extend it, nothing, and in case
17  the company leads over the rights from the inventor
18  to the -- on the invention from the inventor to the
19  company, then the inventor will get a right for
20  compensation.
21          So he gives away the right on the
22  invention, which he originally has as an
23  employer -- employee person, but he gets a claim
24  against the company to get some compensation.

Page 36

1      Q.  Okay.
2      A.  So that's -- and maybe that's a reason why
3  it is said you have to -- to -- in the law, it
4  is -- there's pre -- there is what clause that you
5  have to disclose --
6          (The witness talks
7          with the interpreter.)
8          THE INTERPRETER:  To expedite.
9      A.  Immediately the invention to the company,
10  that's maybe an explanation.
11      Q.  How does, in Germany or at Braun, how does
12  the -- an employee typically give his rights and
13  invention to his employer?
14      A.  Oh, he doesn't give -- he has no chance.
15  If the employer wants to have the right, he just
16  says, Well, I take the right from you, he has no
17  chance to say no, okay, so it's --
18          (The witness talks
19          with the interpreter.)
20          THE INTERPRETER:  It is a one-sided
21  type of -- a type of transaction.  There is no
22  two-way structure possible.
23      A.  It's not -- it's not an agreement where
24  two parties agree that one party will get the right

9 (Pages 33 to 36)

Wolfgang Vorbeck    August 10, 2005

Page 37

1  on the invention.
2         The law says the company has just to
3  say we want to have the right, and the inventor can
4  say yes or no or whatever, the right transfers from
5  the inventor over to the company, so he has
6  no -- the inventor does not have to agree.
7      Q.  So just let me make sure I'm
8  reciting -- so within four months of a filing a
9  notification of invention, if an employer wants the
10  rights within four months, they need to file an
11  application with the German patent office?
12     A.  No, from the date when the company
13  receives the invention disclosure --
14         (The witness talks
15         with the interpreter.)
16         THE INTERPRETER:  The date of entry,
17  the date of issue.
18     A.  No, the date when the --
19         THE INTERPRETER:  Entry.
20     A.  IDS, the written IDS, written and signed
21  IDS receives the company, normally the patent
22  department, from this point of time four months, the
23  company has four months' time to declare that the
24  rights have to be transferred from the inventor to

Page 38

1  the company.
2      Q.  I see.  And --
3      A.  So if you have a stamp on the IDS, and we
4  have here one IDS in the files, and from that stamp,
5  four months in the future, that's the term the
6  company has.
7      Q.  How does Braun then declare to an employee
8  that they have chosen to take the rights?
9      A.  Well, we send them a letter and say well,
10  we lead over the rights to the company.
11     Q.  And once that occurs, you mentioned that
12  there is compensation to the employee; is that
13  correct?
14     A.  Yes.
15     Q.  How does Braun compensate inventors?
16     A.  It depends whether the -- firstly, you
17  have to file an application, the IDS is not
18  sufficient, so you can only be compensated for a
19  monopoly right, if you have no monopoly right, the
20  inventor will not get compensation.
21         So there should be at least an
22  application, there should be better, even better, a
23  patent, a grounded patent, and then it depends
24  whether the invention is used or not used.

Page 39

1         So if the invention -- if you have a
2  patent on the invention and the invention is not
3  used, the compensation is about a thousand euros at
4  the moment, $1,200 for all inventors, and if the
5  invention is used, there is some kind of royalty
6  like model, and that could be less or more, it
7  depends how much products are sold or what are the
8  costs of the invention involved and all that stuff,
9  so it's -- it's -- you can read books like this high
10  (indicating) how to competence inventors, so you are
11  lucky that you have not this clause, you have only
12  the inventors dollar, I think.
13     Q.  It used to be that way.
14     A.  Yes.
15     Q.  Has -- I guess with respect to the patents
16  in suit, has Braun the company compensated
17  Gebhard Braun?
18     A.  Yes, but not filing because it's ongoing I
19  think every one or two years, it's again calculated
20  what came in addition because the inventions are
21  used here in this special regard, and so he has got
22  compensation.
23     Q.  Do you know how much he's been
24  compensated?

Page 40

1      A.  Maybe 20, 30, 20 to 30, maybe 40,000
2  euros, I don't know, but I'm not sure, but I think
3  it's in this area.
4      Q.  Do you know if you had to find out, how
5  would you find out how much Mr. Braun --
6      A.  I would ask one of my assistants.
7      Q.  Do you know if records are kept with
8  respect to disbursements to him?
9      A.  Yes.
10     Q.  And what do those records look like?
11     A.  The records regarding inventors
12  compensation?
13     Q.  Well, more particularly, the records
14  regarding -- well, in general, but what would the
15  records regarding compensation to Mr. Braun look
16  like?
17         MS. WENDLANDT:  Objection.
18     A.  So each -- each person at the Braun who
19  made inventions has a file, and there are some
20  persons who have 20, 30, 40 patent applications or
21  patents, others have only one or two, and so it
22  depends whether the patents or patent applications
23  are used or not used, so one's on the one hand you
24  have a standard compensation.

10 (Pages 37 to 40)

Wolfgang Vorbeck    August 10, 2005

Page 41

1    The other is a use dependent
2    compensation, and really these files look like we
3    got the numbers from other departments, how many
4    products were sold, what are the costs of that
5    switch with subject to the invention or whatever,
6    then you have some four years and you have to just
7    to calculate it, and at the end, you have a letter
8    which says well, at the time from that to that, you
9    receive compensation for X euros or whatever, and
10   that's it, so -- so -- so it's --
11       Q.   Okay.   So -- so essentially you'd send a
12   letter to Mr. Braun and presumably a check along
13   with that?
14       A.   No, it's -- it's done not by check,
15   we -- there are tax issues in addition, this
16   something is also taxable and Mr. Braun is --
17           (The witness talks
18           with the interpreter.)
19       THE INTERPRETER:  He is retired.
20       A.   He is retired, so it's not so easy, but I
21   think that he will get it on his account, we
22   just --
23           (The witness talks
24           with the interpreter.)

Page 42

1       THE INTERPRETER:  Transferred.
2       A.   Transferred on his account.   He will not
3    get a check, that's unusual.
4       Q.   And does the -- how often -- how often
5    are -- would these letters be sent?
6       A.   Well, they should be sent regularly, and
7    I'm now -- since three years head of the patent
8    department, and I'm now at the process we do that
9    regularly every two years, but we are not still at
10   the end.
11          Inventors compensation is time
12   consuming, and if the attorneys have to move or
13   shift some work, this can be shifted relatively
14   easily.
15          The rest you have other terms which
16   cannot be extended or whatever, so inventors
17   compensation is an issue which I want to have -- be
18   in contact with a bit more regularly, and we are
19   just in the process, and I think it would be
20   appropriate every two years.
21       Q.   Has Braun compensated Dr. Pahl at all with
22   respect to the patents in suit?
23       A.   No, no.
24       Q.   Does Braun have any intention of

Page 43

1    compensating Dr. Pahl with respect to --
2       A.   Well, we are thinking about that.
3       MS. WENDLANDT:  Objection, go ahead.
4       A.   Sorry, we are thinking about that, and he
5    has been cited in the US case as an inventor, and
6    we -- and I think we have to do something in this
7    regard, but we haven't compensated him up to now.
8           So he has not received any money with
9    respect to these two inventors compensation with
10   respect to these two cases.
11      Q.   Has Braun discussed with Mr. Braun,
12   Mr. Gebhard Braun returning some of the money that
13   he has been paid with respect to --
14      A.   That's not discussable because the German
15   inventors law says once you have paid inventors
16   compensation, that's not returnable.
17      Q.   So even if there is incorrect
18   inventorship, money cannot be returned?
19      A.   No.
20      Q.   And how long does the -- how long does the
21   right to compensation last in the case of Mr. Braun?
22      A.   As long --
23      MS. WENDLANDT:  Objection.
24      A.   As long as the monopoly will be there, so

Page 44

1    until the end of the patent lifetime, if we have the
2    patents up to the end of lifetime.
3       MR. SHIMOTO:  I would like to request
4    the copies of the letters sent to Mr. Braun
5    regarding compensation, production of those
6    documents.
7       MS. WENDLANDT:  Sure, I think that
8    they have been produced, if they haven't we'll get
9    them to you if they are not privileged.
10      MR. SHIMOTO:  If I'm not -- if I'm
11   mistaken, then we would request them.
12      Q.   Look at the bottom of page 5 where there's
13   an entry there for R. Bader, I believe, to
14   M. Fullgrabe?
15      A.   I'm not sure.   We have a Mr. Bader in the
16   shaver department, but I don't know whether -- I
17   think that person writes with two A, I'm not
18   certain, and Fullgrabe, no, maybe I've heard these
19   names, but I have no idea to -- to what person I
20   should connect the names.
21      Q.   You see the entry there at June 12 of
22   2003?
23      A.   Mm-hmm.
24      Q.   Did Braun anticipate litigation with

11 (Pages 41 to 44)

Wolfgang Vorbeck    August 10, 2005

Page 45

1  Remington in June of 2003 with respect to the
2  patents in suit?
3  　　　　　MS. WENDLANDT: Objection.
4  　　A.  I can't -- we anticipated litigation when
5  Remington launched their product, and I've
6  not -- I'm not aware of the exact date when that
7  was.
8  　　Q.  Okay.  So it's your recollection that
9  Braun began to think of litigation with Remington
10  when Remington launched it's product commercially?
11  　　　　　MS. WENDLANDT: Objection.
12  　　A.  Yes, before we didn't know.  Before we
13  didn't know that that would be a case of
14  infringement or of potential infringement.
15  　　Q.  Turn to page 7.
16  　　A.  Mm-hmm.
17  　　Q.  On the third to last entry, there's listed
18  a T. Wieske.
19  　　A.  Yes, Wieske, he is a patent attorney who
20  worked for Braun about two to three years, and he
21  was at that time responsible for shaver electronics,
22  so only the -- not the mechanical of the electronic
23  part, and -- but he was only two -- two, two and a
24  half years with the company, and then he went to

Page 46

1  private practice.
2  　　Q.  So was Mr. Wieske, was he involved with
3  the prosecution of either of the patents in suit?
4  　　A.  No, I don't think, because as I said, he
5  was a specialist for electronics, and these patents
6  here are more mechanical stuff.
7  　　Q.  Okay.
8  　　A.  Can I return this, or --
9  　　　　　MS. WENDLANDT:  We can start a pile
10  here (indicating).
11  　　　　　MR. SHIMOTO:  Just set it off to the
12  side, we won't use that again.
13  　　Q.  If you'd look again at the deposition
14  notice, topics 6, 7 and 8, roughly.
15  　　A.  Yes.
16  　　Q.  The first topic is any patentability,
17  validity or prior art search, study or analysis
18  relating to the alleged inventions claimed or
19  disclosed in the asserted patents.
20  　　　　　At the time in around 1993 to 1995,
21  did Braun conduct any prior art search related to
22  the patents in the suit?
23  　　A.  I talked about this issue performed with
24  Uwe Sievers, and he checked our files and there's

Page 47

1  nothing, but there has been or there must have been
2  some prior art search because in the original patent
3  application, a US document was cited as prior art
4  and I have no idea how Dieter Klauer, and he must
5  have found it, I guess, maybe he conducted a search
6  or -- but we have no -- no -- no indication
7  that -- so we have no files and I can't tell that.
8  　　Q.  So -- and I can mark that patent, if it
9  would be helpful to you.
10  　　　　　(Pause.)
11  　　　　　MR. SHIMOTO:  Let's mark it as
12  defendant's deposition Exhibit No. 105, US patent
13  No. 3,172,416.
14  　　A.  Yes.
15  　　Q.  There you go.
16  　　　　　(Exhibit No. 105 marked
17  　　　　　for identification.)
18  　　Q.  This is a patent which is discussed in the
19  specification of the patents in suit.
20  　　A.  Yes.
21  　　Q.  Does Braun know -- does Braun, the
22  company, know how this patent was located?
23  　　A.  No, I just try to tell you we looked in
24  our files, we did not find any documents regarding

Page 48

1  prior art searches, and we have no idea how
2  Dieter Klauer, and he must have found the document
3  because it was his job, and no idea.
4  　　Q.  Do you know if Fish & Richardson conducted
5  any prior art searches on behalf of Braun related to
6  the patents in suit?
7  　　A.  No, I don't think so because that must
8  have been in the prosecution files, we would have
9  instructed them, and normally, we do not instruct
10  our attorneys to conduct additional searches because
11  we have searches before the German patent office,
12  European patent office, Japanese and US patent
13  office and so why spend additional money when
14  there's no need.
15  　　Q.  Do you know if Braun located any prior art
16  in searching -- well, do you know if Braun located
17  any prior art related to the patents in suit which
18  was not disclosed to the United States Patent and
19  Trademark Office?
20  　　A.  Well, do you mean -- what do you mean in
21  the prior -- with the word prior art, prior art is
22  all -- all what is known before the filing date or
23  the date of invention.
24  　　　　　Do you mean relevant pertinent prior

12 (Pages 45 to 48)

Wolfgang Vorbeck    August 10, 2005

Page 49

1  art, or -- because all is prior art, so --
2      Q.  Yes, I guess I mean pertinent prior art.
3      A.  Yes, no, what was your question again
4  regarding pertinent prior art?
5      Q.  Do you know if -- well, let me put it this
6  way:  Braun does not know today what searches
7  Mr. Klauer would have performed related to what
8  patent -- what prior art searches Mr. Klauer would
9  have performed related to the patents in suit?
10     A.  Well, we could not identify any documents
11 which revealed that he conducted prior art searches,
12 but he cited at the beginning this document, so he
13 must have got it, anyway, and we don't
14 know -- Braun, the company Braun does not know how
15 he came to this document.
16     Q.  And so the company Braun also does not
17 know whether Mr. Klauer found any additional pieces
18 of prior art which he did not disclose; is that
19 correct?
20         MS. WENDLANDT:  Objection.
21     A.  I think if it's -- if Dieter Klauer would
22 have thought it is -- it is pertinent prior art, he
23 would have revealed it because that is -- that is a
24 philosophy of Braun for the last at least 20 years

Page 50

1  when I'm with the company, we want to have valid
2  patents and if he would find a pertinent prior art,
3  we would not hide it, we would disclose it.
4      Q.  So -- well, are you -- well, when you came
5  to work at Braun, were you aware of the duty of
6  disclosure in United States?
7      A.  Yes.
8      Q.  Do you know if Mr. Klauer was aware of the
9  duty of disclosure in the United States?
10     A.  Well, I think so, I think so, and he -- he
11 made a lot of US cases, and usually, our US
12 attorneys, Fish & Richardson, ask us at some point
13 of time is there additional prior art out of foreign
14 prosecutions or searches something, so I think he
15 knew about that, yes.
16     Q.  And am I correct that the duty of
17 disclosure is different in the United States such
18 that there is no corresponding duty Europe; correct?
19         MS. WENDLANDT:  Objection.
20     A.  Yes, so Germany and Europe, but the
21 failing of disclosing pertinent prior art does --
22 must not lead to deficiency with the patent, that's
23 the -- the consequence is different.
24     Q.  Do you know how -- well, does Braun know

Page 51

1  how Gebhard Braun would have received defendant's
2  deposition Exhibit No. 105 during -- at the time
3  that he was working on his -- that he filed his
4  notice of invention?
5      A.  He would have received this document, if
6  he has received it, and I think he has received it,
7  from Dieter Klauer.
8      Q.  Am I correct, then, that Dieter Klauer was
9  solely -- well, within Braun, the company, was
10 Dieter Klauer solely responsible for the preparation
11 and handling of the patents in suit?
12     A.  Yes.
13     Q.  Taking a step back to the German
14 inventorship law that we were discussing, is it
15 typical that people in the patent department ask an
16 inventor whether anyone else assisted him with
17 respect to a particular invention?
18         MS. WENDLANDT:  Objection.
19     A.  Well, it's not typical that the person in
20 the patent department responsible for this area asks
21 an inventor, but I know we have a written statement
22 on the invention disclosure that -- that the
23 inventor himself testifies that there are no
24 additional inventors involved.

Page 52

1      Q.  And what is the purpose of that statement?
2      A.  Maybe to check or to guarantee that
3  inventors compensation is paid to the right persons.
4      Q.  And is it Braun's expectation that its
5  employees will be honest when filling out notices of
6  invention?
7      A.  The expectation or the experience?
8      Q.  Well, let's start out with the expectation
9  first.
10     A.  Yes, I think so.
11     Q.  And what is the experience?
12     A.  The experience confirms the expectations,
13 there are only really few cases in the last -- there
14 have been only a few cases in the last 20 years
15 where there were some problems.
16     Q.  And do you recall the few cases where
17 there would have been a problem?
18         Well, I mean, there -- I guess one
19 would be this case; is that correct?
20     A.  No, this was not a problem to that point
21 of time when we had to look closer to all the
22 history and what happened because of this trial
23 here, otherwise, nobody would have seen your
24 problem, and for Braun, for the company Braun, he

13 (Pages 49 to 52)

Wolfgang Vorbeck    August 10, 2005

Page 53

1  has not a problem.
2         Problems arise when one group files an
3  invention disclosure and maybe another group which
4  they worked partly together says well, we also
5  invent this, so that's a problem, this is not a
6  problem in this regard.
7     Q.  Okay.  So problems arise when some other
8  group basically holds out their hand and says we
9  want money?
10    A.  Yes, or another inventor, not only group
11  but single person.
12    Q.  Okay.
13    A.  But it's very -- it's seldom, so I had
14  that two or three times, it's -- it's -- it works
15  well.
16    Q.  All right.  So both the expectation and
17 the experience of Braun is its employees will be
18 honest when filling out notices of inventions?
19    A.  Yes.
20    Q.  If you could look at topic No. 9, it
21 states, The earliest date upon which Braun became
22 aware of the number of US patents, do you see that?
23    A.  Yes.
24         MR. SHIMOTO:  Let's mark as deposition

Page 54

1  Exhibit No. 106 US patent No. 6,698,437, which is to
2  list Mr. Hoeser a number of other individuals as
3  inventors.
4         MS. WENDLANDT:  Jim, just to clarify,
5  this is not one of the ones listed on topic 9.
6         MR. SHIMOTO:  No, no, no, I just have
7  questions about it.
8         MS. WENDLANDT:  Okay.
9         (Exhibit No. 106 marked
10         for identification.)
11    Q.  Have you ever seen this document before?
12         MS. WENDLANDT:  Objection.
13    A.  I can't tell whether I've seen it
14 because -- yes, okay, I can't tell you.
15    Q.  You have or have not seen it?
16    A.  I don't know.
17    Q.  Oh, okay.  If you look under the
18 references cited --
19    A.  Yes.
20    Q.  -- we can start with the first, there's
21 listed one US patent No. 1,868,904 to Johnston, and
22 that's one of the patents listed in topic No. 9?
23    A.  Yes.
24    Q.  Can you tell me, then, what was the

Page 55

1  earliest date that Braun became aware of US patent
2  No. 1,868,904?
3     A.  No, I can't tell you.
4     Q.  What would you need to do to be able to
5  tell me when Braun became aware of I'll start first
6  US patent No. 1,868,904?
7     A.  Maybe I would have looked into the files
8  of this US patent or the parallel files to evaluate
9  where this document was cited.
10         Was it cited by the examiner, by the
11 German examiner, European examiner, US examiner,
12 then maybe I could tell you what the
13 earliest -- what the latest date, and the earliest
14 date I can't tell you, that I don't know, that is
15 very old reference from 1932, maybe Braun knew it in
16 1934, I can't tell you.
17    Q.  Well, with respect to topic No. 9, what
18 did you do to gain knowledge as to the earliest date
19 upon which Braun would become aware of the listed
20 patents?
21    A.  I went through or we went through these
22 documents, and as far as I recall, this -- let me do
23 it like that -- this document here (indicating)
24 that's the document cited in the original

Page 56

1  application.
2         The 146 patent, that must be known
3  somewhere around 1993, 1992 to Braun, and then we
4  have here three documents, I think the 988486 and
5  394, these were documents cited in the prosecution,
6  and as far as I recall, the other documents have
7  been cited during litigation, and that's -- and
8  it's -- the question, the earliest date, the
9  earliest date could be the date of publication of
10 these documents, but I have no idea how I or how I
11 speaking for Braun could have checked that.
12    Q.  Well, I guess one thing I would request,
13 and maybe we -- well, we can't do it today, maybe we
14 can follow up on this, if you could check into the
15 prosecution of this particular patent and the files
16 related to the prosecution of Mr. Hoeser's patents,
17 perhaps then you would be able to ascertain at least
18 a somewhat earlier day as to when Braun would have
19 been aware as to some of the patents listed in this
20 topic, but that said, sitting here today, aside from
21 the patents where you can find dates, the rest of
22 them, the answer is Braun doesn't know precisely the
23 earliest date --
24    A.  Yes, yes.

14 (Pages 53 to 56)

Wolfgang Vorbeck    August 10, 2005

Page 57

1    Q.  -- when they knew of them.
2        MS. WENDLANDT:  And even with regard
3    to the files of exhibit -- what is this, 106?
4        MR. SHIMOTO:  Mm-hmm.
5        MS. WENDLANDT:  That wouldn't answer
6    the question of the earliest date, it would just
7    give you, as I think Mr. Vorbeck has testified, the
8    latest date upon which we knew.
9        MR. SHIMOTO:  Well, yes, I think a
10   reasonable search is all you can ask.
11       A.  So what -- could you repeat exactly what
12   you want me or us to do with regard to the
13   prosecution history of this file of the 437 patent?
14       Q.  Well, for -- for these particular
15   patents --
16       A.  These listed here?
17       Q.  Yes, well, listed in topic 9, not all of
18   them, but the ones that are listed in topic 9 --
19       A.  Okay, mm-hmm.
20       Q.  -- look if there are files related to the
21   prosecution of Mr. Hoeser's patents, I would suggest
22   that might be a place where you would be able to
23   determine dates when Braun would have been -- had
24   gained knowledge as to those patents.

Page 58

1    A.  Okay, so the number -- the documents
2    listed in question 9, which are also here on this
3    (indicating) --
4    Q.  That is correct.
5    A.  Okay.
6    Q.  If you'd like a break now --
7    A.  No, I just want to make a note.
8    Q.  Okay.
9        MS. WENDLANDT:  I'll take notes on
10   that because that's the official exhibit.
11       MR. SHIMOTO:  I'd like to mark as
12   defendant's deposition Exhibit No. 107, I will just
13   call -- it's a Braun 5220 to Braun 5277, it is the
14   thesis of Stefan Zeischke.
15       (Exhibit No. 107 marked
16       for identification.)
17   Q.  I'd just like to ask you if you've ever
18   seen this document before.
19   A.  Yes, during the preparation for this
20   deposition.
21   Q.  Topic No. 10 is the knowledge of or
22   awareness by any and all individuals covered by 37
23   USC section 1.56 (c) for the asserted patents of
24   Mr. Zeischke's thesis during or before the

Page 59

1    prosecution of the asserted patents.  Do you see
2    that?
3    A.  Yes.
4    Q.  For the individuals covered by 37
5    USC -- no, 37 C.F.R. section 1.56 (c) during the
6    relevant time period, who was aware of
7    Mr. Zeischke's thesis?
8    A.  I can -- if you look at the last page,
9    there is -- Mr. Klauer mentioned in the A -- it's
10   page 5277, B005277, last page on this document, and
11   the -- on the third last line, Herr Klauer, Braun
12   AG, that is Mr. Klauer, and so I -- this is --
13       (The witness speaks in German.)
14   A.  That means with whom or what information
15   got Mr. Zeischke from whom and he got here
16   information from Mr. Klauer, so I believe since
17   Mr. Klauer is cited here, that Mr. Klauer was aware
18   of this document.
19       (The interpreter speaks in German.)
20       THE INTERPRETER:  That is a source
21   reference.
22       MR. SHIMOTO:  Yes, oh, I gotcha.
23   Q.  Did Braun ever attempt to pursue patent
24   protection on Mr. Zieschke's work?

Page 60

1        MS. WENDLANDT:  Objection.
2    A.  I don't think so.  I could check that, but
3    because the development went -- this is a cleaning
4    station for a shaver involving brushes and the like,
5    and the development, the actual development went in
6    the totally other direction, so I cannot imagine,
7    but if necessary, I will check that.
8    Q.  Well, how would you find out if --
9    A.  I would go into our computer system or I
10   would go into Internet, look for inventor Zeischke
11   and application Braun AG at the time, if I find
12   something, I would look at it, and if I find
13   nothing, I would leave it.
14   Q.  Is this thesis or the work embodied in the
15   thesis the property of Braun?
16       MS. WENDLANDT:  Objection.
17   A.  No, it's -- it's the property of -- it
18   would have been the property of Braun if Braun would
19   have filed a patent application on it.
20       Since then, you need to lead over the
21   rights from the inventor, Mr. Zeischke, to Braun,
22   but in case there is no patent application, the
23   rights were with Mr. Zeischke.
24   Q.  Okay.  So it would be necessary to

15 (Pages 57 to 60)

Wolfgang Vorbeck    August 10, 2005

Page 61

1 determine whether Braun filed a patent application
2 to determine whether this is the property of Braun?
3    A. Yes, yes.
4    Q. If you could look at topic No. 11.
5    A. Yes.
6    Q. There it states, The knowledge of or
7 awareness by any and all individuals covered by 37
8 C.F.R. section 1.56 (c) for the asserted patents of
9 the ultrasonic cleaning device discussed at several
10 pages of Mr. Hoeser's deposition.
11    A. Mm-hmm.
12    Q. Do you see that?
13    A. Yes.
14    Q. Do you understand what is meant by the
15 ultrasonic cleaning device?
16    A. Well, I haven't seen it, but I understand
17 what an ultrasonic cleaning device is, and I don't
18 know the specialty wise, but what ultrasonic
19 cleaning device, I know about that.
20    Q. Well, are you aware that there is an
21 ultrasonic cleaning device used in the shaver
22 department currently at Braun?
23    A. No, I am not aware.
24    Q. So you have not seen this device?

Page 62

1    A. No, I haven't seen it.
2    Q. What did you do to prepare yourself to
3 answer questions regarding topic No. 11?
4    A. Yes, the -- the question is who of the
5 persons Mr. Klauer, Mr. Braun, Mr. Gebhard Braun and
6 Eric Prahl, these are the persons that have known
7 about that device, and I know from the depositions
8 of Mr. Hoeser cited here that Mr. Gebhard Braun knew
9 about it.
10         And in addition, I tried to reach
11 Mr. Hoeser, who is on vacation at the moment,
12 whether he could tell me since that is not clear
13 from the deposition whether Mr. Klauer knew about
14 it, that was unclear, but unfortunately, I could not
15 reach Mr. Hoeser up today.
16         I phoned him on his cell phone and his
17 company phone, but I couldn't get him, but maybe
18 that could be answered later on, if it is necessary.
19    Q. Well, I would like --
20    A. That Mr. Hoeser could tell whether
21 Mr. Klauer knew about that ultrasonic cleaning
22 device or not.
23    Q. That is a fairly important question which
24 I would like an answer to, if you could find an

Page 63

1 answer to that.
2    A. Yes.
3    Q. Do you know whether Mr. Prahl knew about
4 the ultrasonic cleaning device?
5    A. I went through the prosecution files and
6 there's no correspondence regarding this ultrasonic
7 cleaning device, so I think Braun GmbH is of the
8 opinion that Eric Prahl did not know about that.
9         And further, we tried to reach
10 Eric Prahl and we got him, but he cannot remember
11 anything because it's a long time ago.
12         In the meantime, he has left
13 Fish & Richardson, so it's -- yes, so that can be
14 answered as probably no, but we do not know it
15 certain, that's it.
16    Q. Do you know in general does Braun
17 encourage -- does Braun the company encourage its
18 employees to provide all relevant prior art of which
19 they know in connection with --
20    A. Yes, yes.
21    Q. Does Braun also typically inform -- well,
22 when a US patent application is filed, does Braun
23 the company typically inform its employees of the
24 duty to disclose all material information?

Page 64

1         MS. WENDLANDT: Objection.
2    A. At the time the US application is filed,
3 that's your question?
4    Q. Mm-hmm.
5    A. I don't think so, because in 99 percent,
6 before we had the German application, and there, we
7 would also, not having this -- the duty of
8 disclosure, file all of that relevant prior art.
9         So we ask already the inventors before
10 filing the German application to provide us with
11 relevant prior art and then when foreign
12 applications are filed, discussion is not posed any
13 more because we claim priority, and under normal
14 circumstances, the prior art is identical in all
15 prosecutions.
16         Maybe there might be a slight
17 difference due to the difference in the -- in the
18 law, in the US law and European or German law
19 regarding novelty, the definitions are different, so
20 there could be, in exceptional cases, document be a
21 prior art document in the US, but not in Europe, and
22 the other way around, but yes, we -- patents is also
23 mass production, and so we cannot put endless time
24 in all this things and so it is not done.

16 (Pages 61 to 64)

Wolfgang Vorbeck     August 10, 2005

Page 65

1      Q.   Okay.  If you look at your deposition
2  notice that there's basically topics 13, 14, 15, 16,
3  17, 18, 19, there's a number of these which relate
4  to the translation.
5      A.   Yes.
6      Q.   And I know you talked with Mr. Sievers?
7      A.   Yes, yes.
8      Q.   In general, what document was provided
9  to -- well, with respect to the 328 patent, what
10 document was provided to Ms. Hubatsch for
11 translation?
12     A.   Yes, so I give you the full information I
13 received this morning.
14          Mrs. Hubatsch got an order letter from
15 my secretary, Mrs. Cordes, that's an additional
16 question later on who the identity of the
17 individuals who provided the documents, so my
18 secretary Mrs. Cordes, sent to Mrs. Hubatsch a
19 letter, which the letter said, Please find attached
20 the German application documents.
21          Please translate them because we
22 intend to file in Japan, US and foreign filings.
23          In addition, this 146 patent is
24 enclosed for your reference, so Mrs. Hubatsch likes

Page 66

1  it if we can provide her with prior art, with
2  original English language prior art to have -- have
3  the meaning of certain -- certain words to get that
4  better, so we provided to her this 146 patent, and
5  what is said, the application documents from the
6  German application, and then now Mr. Sievers
7  telephoned today or yesterday with Mrs. Hubatsch and
8  he said -- so she said she received -- she looked in
9  her files, she received the original application
10 documents, but there was inserted one page with the
11 evaluation of this French reference that was
12 inserted as page 3B or whatever, and she translated
13 all these papers.  Is that clear?
14          So we sent her the 146 US document and
15 we sent her or Mrs. Cordes sent her application,
16 German language application documents which were,
17 beside one point, identical.
18          It was the original application that
19 was inserted on page 3B was the evaluation of this
20 French reference, these 20 lines or whatever.
21          MS. WENDLANDT:  And if I could just
22 clarify, it's not the 146 patent, it's actually
23 reversed, it's the 416 patent.
24     A.   Oh, that's -- that's --

Page 67

1          MR. SHIMOTO:  All right, I have it
2  wrong in the -- it's probably wrong in the dep
3  notice, so that's my own fault.
4          MS. WENDLANDT:  Right.
5      Q.   And I can mark all the exhibits, but are
6  you also aware that the claims and the counterpart
7  to the 328 patent changed from the original filing,
8  they were amended in October of 1994; correct?
9      A.   No, I'm not aware, so maybe I will look on
10 the files.
11     Q.   Sure.
12     A.   So what you mean is the claims changed
13 from the original German language when being
14 translated to the English language?
15     Q.   No, actually, the claims in the German
16 application were changed.
17     A.   Mm-hmm, okay.
18     Q.   So we'll mark as defendant's deposition
19 Exhibit No. 108 is the English version of Braun 1138
20 through 1145, let's mark as Braun -- excuse me --
21 Rayovac deposition Exhibit No. 109 B00136 to B00146,
22 German version.
23          (Exhibits Nos. 108 and 109
24          marked for identification.)

Page 68

1          MR. SHIMOTO:  I'll mark as defendant's
2  deposition Exhibit No. 110 B00126 to B0013 -- 135.
3          (Exhibit No. 110 marked
4          for identification.)
5          MR. SHIMOTO:  And mark as defendant's
6  deposition Exhibit No. 111 the German version of
7  B00126 to B00135.
8          (Exhibit No. 111 marked
9          for identification.)
10     Q.   If you could look at what I believe I
11 marked as the first one, so it would be -- it's the
12 document beginning October 24, 1994, which is
13 B00138.
14     A.   Yes, yes, I see it, and actually, maybe
15 I've overviewed it in the prosecution files, but I
16 see here that Mr. Klauer filed a new claim with the
17 features of essentially claims 1, 7 and 7, I can see
18 it.
19     Q.   Have you -- so sitting here now, you are
20 aware that the claims of the German application were
21 amended during prosecution in Germany?
22     A.   Yes.
23     Q.   Have you compared the claims of the US 328
24 patent application to the application, the German

17 (Pages 65 to 68)

Wolfgang Vorbeck    August 10, 2005

Page 69

1  application, which was filed in the 328 application?
2      A.  No.
3      Q.  Want me to mark the 328?  I know we've got
4  a bunch of papers here.  Do you understand the
5  question?
6      A.  So you mean -- your question is whether
7  the claim originally filed in the US application is
8  identical to the claim of features 1, 7 and 9, our
9  original claim, or what is the question?
10     Q.  Let me try and ask it an easier way.  What
11 claims did Mrs. Hubatsch translate when she was
12 making the translation for the 328 patent
13 application?
14         MS. WENDLANDT:  Objection.
15     A.  I thought she translated the original
16 claim.
17     Q.  Okay.  Do you know if the claims in the US
18 patent application match up with the original claims
19 or the amended claims?
20     A.  I'd have to look at it, so --
21     Q.  I apologize, but this is what we do, it's
22 a lot of paper, there's no way around it.
23         MR. SHIMOTO:  I'd like to mark as
24 defendant's deposition Exhibit No. 112 the

Page 70

1  prosecution history for US patent No. 5,711,328.
2         (Exhibit No. 112 marked
3         for identification.)
4      Q.  I believe you can find claim 1 in the
5  application at B00169.
6      A.  00169, yes, I have it, and that has to be
7  prepared with the claim of Mr. Klauer's letter of
8  October 24, 1994, that's right?
9      Q.  Yes.
10         (Pause.)
11     A.  So claim 1, according to B00169, is
12 practically identical to this claim (indicating).
13     Q.  Have you seen the original claim 1?
14     A.  No.  Have you --
15     Q.  I do have it, I can show it to you.  This
16 will be in -- wait a minute, I have to give you
17 another document, mark them all.
18         Let's mark as defendant's deposition
19 Exhibit No. 113 a document bearing the Bates range
20 B001097 to B001114, it's a German unexamined patent
21 application.
22     A.  Okay.
23     Q.  I didn't hand you something -- okay,
24 sorry, too much stuff going on here.

Page 71

1      If I could direct your attention to
2  B001103, there's claim 1, and I represent to you
3  that is the original application claim.
4         MS. WENDLANDT:  It's a translation of
5  it, right.
6         MR. SHIMOTO:  It's a translation of
7  it; that is correct.
8         (Exhibit No. 113 marked
9         for identification.)
10         (Pause.)
11     A.  Okay.  Yes, there's a difference.
12     Q.  Do you know how Mrs. Hubatsch would have
13 come to translate the amended application claim 1
14 and not the original application of claim 1?
15     A.  Well, as I told you, Mrs. Hubatsch got,
16 per this order letter, copies of the -- of documents
17 which were named in that order letter above
18 mentioned application, and it was this 4,402,238
19 application, and there was added at least what we
20 saw one -- one additional page, it's this evaluation
21 of the prior art, and I have no idea, but that must
22 have been -- or should be checked.
23         Whether she also got the amended
24 version of the claims, I don't know from the

Page 72

1  timing -- just a moment -- oh, look (indicating).
2         This revised version of the claim, so
3  that limited claim was filed in October 24 and as
4  far as I recall, October -- the order letter to
5  Mrs. Hubatsch was sent in November 21, so one month
6  later might be that she also got the revised version
7  of the claims.
8      Q.  Does this order letter still exist to
9  which you refer?
10     A.  Well, I have to check that when I'm back,
11 I didn't see it here in the files and I -- I will
12 check that.
13     Q.  Okay.  But you believe that Mrs. Hubatsch
14 would have received documents in approximately
15 November 1994?
16     A.  Yes.
17     Q.  How do you know that?
18     A.  Because Uwe told me there was a term -- a
19 handwritten notice that she wanted to have the
20 translation to one month later to December 21,
21 that's what he told me.
22     Q.  So did the notation say that she needed a
23 month to complete the translation?
24     A.  Yes, yes, and so I had in my mind the 21st

18 (Pages 69 to 72)

Wolfgang Vorbeck    August 10, 2005

Page 73

1  of December, I think, so -- but we will check that
2  and we will provide --
3      Q.  Did you -- did you ask -- Mr. Sievers
4  spoke with Mrs. Hubatsch; correct?
5      A.  Yes.
6      Q.  Did he ask her whether she literally
7  translated the original application or she changed
8  the application in any way?
9          MS. WENDLANDT:  Objection.
10     A.  I know Mrs. Hubatsch was still working for
11 us, and I'm certain she would never change without
12 any instructions from Braun the text and she would
13 never certify if there would have been changes that
14 this is a translation of the original.
15         I think she got from Braun from
16 Mrs. Cordes for whatever reasons, we have to check
17 that, documents which she believed to be the
18 original documents and she translated them and
19 certified them.
20         So I think that was the way how it
21 went, but I'm not sure, and from our file copies, we
22 cannot -- because what we -- was a clause to this
23 order letter does not exist as a copy, we do not put
24 the paper we send to Mrs. Hubatsch an additional

Page 74

1  copy to our files just to save the paper and that
2  not be too big.
3          So she has to clarify or she -- she
4  might be in a position to clarify what she received
5  and what I did not see up to now is this amended
6  claim, I only saw the -- the -- the --
7          (The witness talks
8          with the interpreter.)
9          THE INTERPRETER:  The insertion.
10     A.  -- the insertion of this additional prior
11 art reference, the French reference, and that's the
12 only difference.
13     Q.  Okay.
14     A.  And so I -- we only looked for this issue,
15 and that was -- that can be explained she got from
16 Braun Gmb- -- Braun AG at that time, she got papers
17 which had to be translated where this insert was
18 added.
19     Q.  So she had been instructed to add that
20 insert?
21     A.  I can't tell you, I can't tell you.
22     Q.  Okay.
23     A.  Because that's really unusual.  Normally,
24 we file the -- the application as it is also

Page 75

1  foreign, or there is some prior art, but I -- I -- I
2  have at the moment no -- no -- I can't explain that,
3  that was the word that I want, what I was looking
4  for, but we will recheck that.
5          Maybe we will find in her files what
6  we actually sent her.  I don't know whether she kept
7  that for 12 years or how long it is.
8      Q.  Well, I guess, you know, based upon at
9  least the insert in claim 1, Braun is aware
10 that -- what the original application and the
11 translation in the 328 patent application, there are
12 differences between them; is that correct?
13     A.  Yes, but it's also not a -- I think not a
14 must to file a US application it's identical to the
15 German application, that it's -- there is no rule
16 which it's only question whether you can claim
17 priority or not.
18         So if it is a different invention,
19 then you cannot claim priority and you do not have
20 this additional 12 months' grace period, that's all,
21 it's all -- but I think that's --
22     Q.  Okay, well, let's take it in pieces.
23     A.  Yes.
24     Q.  Braun is aware that there is a difference

Page 76

1  between what the German paper files and the
2  translation to the US application?
3      A.  Yes, yes, yes.
4      Q.  And Braun does not know why, sitting here
5  today, Braun does not know how that the differences
6  occurred?
7      A.  Well, we know that the papers sent to
8  Mrs. Hubatsch had an additional page was this
9  evaluation of the French reference, and why -- and I
10 also see that Mrs. Cordes, she is assistant to
11 secretary, will not put this paper on her own into
12 the application, that's how it's translated by, so
13 she must have been advised by Mr. Klauer to do so,
14 but for what reasons and whether she also put other
15 claims to the -- to the -- in German language to the
16 stuff which should be translated by Mrs. Hubatsch, I
17 don't know, but I didn't see this problem until now
18 you put me on it, so I have to check that.
19     Q.  Okay.  Are you aware that during the
20 prosecution of the 328 patent, that the patent
21 office said that there wasn't an English translation
22 file for the German original; correct?
23     A.  Yes, yes, notice of missing parts.
24     Q.  Yes, and are you also aware that

19 (Pages 73 to 76)

Wolfgang Vorbeck     August 10, 2005

Page 77

1  Braun -- well, Fish & Richardson on behalf of Braun
2  filed a document saying, Well, yes, we had in fact
3  filed a translation of the German original?
4      A.  Yes.
5      Q.  And sitting here today, is it Braun's
6  position that the paper filed by Fish & Richardson
7  is accurate?
8          MS. WENDLANDT:  Objection.
9      A.  Well, I think everybody at that point of
10  time thought the English language US application is
11  a word by word translation of the US application.
12          The one person who should not believe
13  that could have been Mr. Klauer because he, for
14  whatever reasons, put something in it, but, for
15  instance, Fish & Richardson will not check whether
16  the translation is identical to the German original
17  so they have a certified translation, I think they
18  rely on it, and so Fish & Richardson, they believed
19  it is a true and certified translation and relied
20  upon it, and maybe Mr. Klauer could have said
21  something to that, but --
22      Q.  Well, did Mr. Klauer -- do you know if
23  Mr. Klauer discussed with Fish & Richardson the
24  notice to file missing parts of the application?

Page 78

1      A.  No, I don't think so, because actually I
2  think Fish & Richardson saw in their files or in
3  some documents got -- they received back from the US
4  PTO that English translation application was filed
5  and the US PTO told we didn't receive it, so they
6  put the thing on it and said well, look here, we
7  filed the English language translation, and that was
8  it, and then the US PTO agreed, I think, and that it
9  was -- the petition was granted.
10      Q.  With respect to the amendment made to the
11  original German counterpart application, that was
12  done by Mr. Klauer; correct, there's a number of
13  documents here --
14      A.  You mean the German --
15      Q.  Yes, the German counterpart to the 328
16  patent.
17      A.  So the first application.
18      Q.  Yes, yes.
19      A.  Yes, they were made by Mr. Klauer, yes.
20      Q.  So Mr. Klauer was aware that the German
21  counterpart application had changed; correct?
22      A.  Yes, I think so, yes.
23      Q.  And Mr. Klauer provided the documents to
24  Mrs. Hubatsch; correct?

Page 79

1          MS. WENDLANDT:  Objection.
2      Q.  Or -- or -- let me rephrase --
3      A.  His secretary did it.
4      Q.  Do you know whether Mr. Klauer interacted
5  with Mrs. Hubatsch in terms of what her
6  responsibilities were?
7          MS. WENDLANDT:  Objection.
8      A.  Can you repeat your question?
9      Q.  Sure.  Did Mr. Klauer provide instructions
10  to Mrs. Hubatsch as to the scope of her
11  responsibilities?
12      A.  What scope of responsibilities?
13      Q.  Let me withdraw that question and just
14  restate it.
15          Did Mr. Klauer tell Mrs. Hubatsch what
16  she was expected to do with the documents which had
17  been transmitted to her?
18      A.  She should translate them from German to
19  English language, that was the purpose why we
20  involved or why she was involved in this.
21      Q.  And how did Fish & Richardson receive the
22  translation from Mrs. Hubatsch?
23      A.  The -- I can't tell you how it went this
24  way, but normally, at that time, there was no

Page 80

1  e-mail, we had no e-mail, and I think it was
2  unusual, it was all sent by paper.
3          So we send it, the German text,
4  whatever it was, to Mrs. Hubatsch, Mrs. Hubatsch
5  made the translations, send it -- the English text
6  back, maybe it was a diskette, so that you have a
7  word document, but that was it, and then we -- we
8  put all the stuff for the US application and the
9  Japanese application together and send it to
10  Fish & Richardson and Japanese attorneys, that's how
11  it worked.
12      Q.  And that would have been Mr. Klauer and in
13  the case of the asserted patents, that he would have
14  then sent those materials to Fish & Richardson?
15      A.  Well, it's a -- to put all the documents,
16  it's a package of paper like this (indicating) to
17  file for an application, and priority document and
18  translation, prior art, if there is any, so it's a
19  lot of paper.
20          This is put together by the
21  assistants.  Then you have an order letter, please
22  file it in Japan or in the US, and two persons,
23  Mr. Klauer and me or Mr. Klauer and any other sign
24  it and it's sent away, but the -- the -- putting

20 (Pages 77 to 80)

Wolfgang Vorbeck    August 10, 2005

Page 81

1  together these documents is done by the assistant
2  and nobody will go through all the papers and read
3  each and every word to look whether it's all correct
4  or not, it's translated and certified and then it
5  runs, goes off to the foreign -- foreign law firms.
6       MS. WENDLANDT: Jim, if this is a good
7  time for a break --
8       MR. SHIMOTO: Yes, this is a good time
9  for a break, why don't we take -- I could use one.
10      MS. WENDLANDT: Want to take five
11 minutes?
12      MR. SHIMOTO: Yes.
13      THE VIDEOGRAPHER: Going off the
14 record, this marks the end of videotape No. 1 in the
15 deposition of Wolfgang Vorbeck, the time is
16 11:12 a.m.
17      (Discussion held off the record.)
18      THE VIDEOGRAPHER: We're back on the
19 record, this marks the beginning of videotape No. 2
20 in the deposition of Wolfgang Vorbeck, the time is
21 11:27.
22      Q.  If you could direct your attention first
23 to topic No. 12 and also topic No. 20 in the
24 30(b)(6) deposition notice, and what did you do to

Page 82

1  make -- prepare yourself to answer questions
2  regarding those two topics?
3       A.  Well, as I told you, we tried to -- to
4  talk with Eric Prahl on this issue, he cannot
5  remember, and so I looked at -- at the files. There
6  is one page regarding this telephone interview, it's
7  minutes of telephone conference or whatever, and the
8  substance is that during this telephone conference,
9  the claim was amended by putting I think the concave
10 feature to the cradle structure and that there's a
11 hole or whatever where the liquid can pour out of
12 the cradle. That's the substance of this telephone
13 interview.
14      Q.  See if you can look to the 328 file
15 history, do you have that, page 366, item B --
16      A.  Yes.
17      Q.  -- on the second sentence, it states, re
18 claim 1, the patent to Mekiney and Hilliker and are
19 cited disclosing a cleaning device comprising a
20 cradle, 12 and 6 respectively?
21      A.  Yes, yes.
22      Q.  And then after that -- well, my first
23 question is: Did Braun disagree with the examiner
24 that Mike Mekiney disclosed a cradle?

Page 83

1       A.  Well, I think so.  If you look at the
2  answer of -- to this communication of the patent
3  office -- oh, no after that, I think -- am I right?
4  There was the telephone interview.
5       Q.  That's correct.
6       A.  Yes, so let me put it in this way:
7  The -- this --
8       Q.  The telephone interview is at page 374.
9       A.  Yes, yes, I know, but -- so this letter
10 from the US patent office says under B, and you're
11 right, at claims 1, 7, 8, 9 and so on are rejected
12 because of several reasons, and then they say under
13 D, claims 2 to 6 are objected to as being dependent
14 upon a rejected claim, but would be allowable if
15 rewritten.
16      And since Braun did not rewrite the
17 claims as recommended here, so we did not agree with
18 the opinion, the claims were amended in another
19 kind.  Do you understand what I want to say?
20      Q.  Sure.
21      A.  So that if you would have agreed with this
22 statement, we would have drafted or put the claims
23 in the form as recommended here by the examiner to
24 get notice of allowance, but we didn't.

Page 84

1       Q.  Okay.  Well, you had the telephone
2  interview; correct, if you look at page 374;
3  correct?
4       A.  Yes.
5       Q.  And it states there that Hilliker and
6  Mekiney were discussed; is that correct?
7       A.  Yes.
8       Q.  And then underneath there, it says it was
9  noted that claim 1 would be amended to include the
10 shape of the cradle concave and the drainage port at
11 the base of the concave cradle and to include the
12 bracket?
13      A.  Yes, yes.
14      Q.  Why was it agreed that claim 1 would be
15 amended in that manner?
16      MS. WENDLANDT: Objection.
17      A.  I can't tell you because I only saw this
18 was the third or fourth objection by the examiner,
19 really long examination procedure as compared to
20 usual examination procedures, maybe they wanted --
21      (The witness speaks
22      with the interpreter.)
23      THE INTERPRETER: In vague
24 context -- I mean, if you can translate this

21 (Pages 81 to 84)

Wolfgang Vorbeck    August 10, 2005

Page 85

1  literally, this would be to open the knot, knot,
2  K-N-O-T.
3      A.  The examiner always had objections, then
4  the applicant reacted by amended claims or some
5  arguments and the examiner objected again, then the
6  applicant meant -- and that went three or four
7  times, so what I would do in such circumstances
8  would speak with the examiner because I see maybe in
9  writing will not come across, so that was the
10  reason, but I think Braun did not agree with the
11  statement in this last -- last letter from the US
12  PTO that the both references, Mekiney and the other
13  one, would -- would have novelty or -- on claim 1
14  was obvious for the combination of these two
15  references, that was not agreed, otherwise, we would
16  have accepted the recommendation of the examiner to
17  rewrite the claims as suggested.
18      Q.  During this telephone interview, did Braun
19  tell the examiner that Mekiney did not disclose a
20  cradle structure?
21          MS. WENDLANDT:  Objection.
22      A.  I don't know, I was not aware, Mr. Klauer
23  was not aware, this telephone interview was run by
24  Mrs. P. Kristal, she is or was, I don't know, an

Page 86

1  attorney Fish & Richardson, and what they discussed,
2  we have no indications, and that's all here what we
3  have.
4      Q.  Well did you talk with Mrs. Kristal?
5      A.  I can't -- I did not talk with her because
6  if one would have talked, it must have been
7  Mr. Klauer, but I don't know.
8      Q.  If you look to page 382, at the top
9  sentence -- at the top in the top sentence, it
10  states, Mekiney's merely teaches a rectangular tank
11  12, not a cradle structure having a concave surface,
12  do you see that?
13      A.  Yes, yes.
14      Q.  During the telephone interview, did Braun,
15  by and through its attorneys, tell the examiner that
16  it was going to change the cradle structure
17  limitation to include a concave surface to get
18  around the Mekiney reference?
19          MS. WENDLANDT:  Objection.
20      A.  I can't tell you.  For Braun, I have no
21  information why this amendment was made, I can't
22  tell you anything about that.
23      Q.  Well, sitting here today speaking on
24  behalf of Braun, is it correct that you have no

Page 87

1  knowledge as to what Braun may have told the
2  examiner about the Mekiney reference?
3      A.  Yes.
4      Q.  So beyond what is stated here in the
5  prosecution history, Braun has no additional
6  knowledge to add?
7      A.  No, no.
8      Q.  And again, could you just tell me what
9  Braun did to gain knowledge with respect to the
10  subject or what you did to gain knowledge with
11  respect to the subject matter we've been discussing?
12      A.  Yes, this is a detail of the US
13  prosecution of a Braun case, and the person who
14  could give me additional information besides what
15  can be found in the files would be Mr. Klauer,
16  that's not possible, or that could be Mr. Eric Prahl
17  or this Mrs. -- this other attorney.
18          And we ask Eric Prahl and he couldn't
19  say more than or he could not remember anything, and
20  that's it, so where could I get additional knowledge
21  from?
22      Q.  Did you talk with Mrs. Kristal?
23      A.  No, I didn't.
24      Q.  Do you know if Mrs. Kristal still works at

Page 88

1  Fish & Richardson?
2      A.  I don't know.
3      Q.  If you'd look at topic 21, which is any
4  and all investigations made by an individual covered
5  by 37 C.F.R. 1.56 (c) during prosecution of the
6  asserted patents regarding one, the level of skill
7  in the art, and two, whether particular prior art
8  was analogous or nonanalogous art.  Do you see that?
9      A.  Yes.
10      Q.  And what did you do to prepare yourself to
11  answer questions regarding this topic?
12      A.  Again, I went through files and that's it.
13  The persons here, Mr. Braun, Gebhard Braun
14  definitely gave no input in this regard, he is no
15  patent expert, he will not know what prior art is or
16  whether prior art will be analogous or not
17  analogous, and Mr. Klauer cannot give any more
18  information and Eric Prahl does not remember.
19          So I read the files and I saw that
20  there were some discussions regarding special
21  documents, whether they are analogous or
22  nonanalogous prior art, that's -- that's -- these
23  are the investigations, Braun GmbH knows about.
24      Q.  Well, you know, and I can mark the file

22 (Pages 85 to 88)

Wolfgang Vorbeck    August 10, 2005

Page 89

1  history, but you have seen the arguments made with
2  respect that this reference is not analogous and
3  that reference is not analogous?
4      A.  Yes, yes.
5      Q.  How did Braun come make the determination
6  that a particular reference cited by the examiner
7  was analogous or not analogous or --
8      A.  Well, that -- that can be read in the
9  prosecution history.  It was prior art directed
10 to -- I have to look at it, but -- let's take the
11 prior art, then.
12     Q.  Sure.
13     A.  And we can -- the arguments --
14     Q.  We can mark this one as an example, mark
15 as defendant's deposition Exhibit No. 114 US patent
16 No. 3,890,988, the Lee patent.
17     A.  Mm-hmm.
18     Q.  This is one of the references that Braun
19 argued -- if you'd like to see the place in
20 the -- would you like to see the prosecution history
21 where that was argued?
22     A.  Yes, please.
23     Q.  We'll mark as defendant's deposition
24 Exhibit No. 115 US patent No. 5,649,556.

Page 90

1          (Exhibits Nos. 114 and 115
2          marked for identification.)
3      Q.  Probably find that at B0095, or B95.
4      A.  Okay.
5          (Pause.)
6      A.  Well, here the --
7          MS. WENDLANDT:  Well, let's wait for a
8  question.
9      A.  Okay, a question?
10     Q.  Sure.  You see it -- you see that there's
11 an argument regarding the Lee patent; correct?
12     A.  Yes.
13     Q.  And my question is:  Before making this
14 statement to the United States Patent and Trademark
15 Office, what investigation did Braun conduct to
16 determine that the Lee patent was, in fact,
17 nonanalogous art?
18     A.  Braun served its law investigations, that
19 is the objective or the task of the US attorneys, so
20 they look -- this -- this problem analogous or
21 nonanalogous prior art, that's special US issue, and
22 in, for instance, before the European patent office
23 you call that similar problem the would could test,
24 so would a person have combined two prior art

Page 91

1  documents or could he have combined them, it's not
2  sufficient that he could have combined them,
3  according to European perspective, but that he would
4  have combined them.
5          He must have an indication to put
6  the -- both documents together, and you call that
7  here, according to US patent law, analogous or
8  nonanalogous prior art, and that's -- that's special
9  US law and therefore we have our US patent attorneys
10 who deal with this issue, so we are not the experts
11 regarding US law, we would -- we would argue before
12 the European patent office or the German patent
13 office, Mr. Klauer, for instance, but not -- this
14 was done by Fish & Richardson.
15     Q.  Okay.  So -- I guess so now I guess that
16 we have that in mind, you are aware that there were
17 several places where the argument was made
18 regarding nonanalogous art --
19     A.  No, this was only example, the European
20 patent, we posted to this one, but to the other
21 US patent, we had nothing like that, and I think
22 here too we got relative broad protection.
23          It was just an example generally
24 speaking, this problem of analogous and nonanalogous

Page 92

1  prior art is special US feature for US patent law
2  and US patent prosecution.
3          In Europe, we call it another way,
4  round would could test and there are maybe some
5  similar, but also other approaches to it, and so I
6  wanted to set forth that such -- such questions had
7  to be answered by the competent US lawyers, not by
8  Mr. Klauer or whoever else was involved, this is a
9  special problem related to US law, and therefore, we
10 take our -- our experts in US law, and these are the
11 outside US attorneys.
12     Q.  Okay.
13     A.  So that's what I wanted to say.
14     Q.  Yes.  So just let me make sure I'm clear.
15 So when arguments were made with respect to the
16 patents regarding analogous or nonanalogous art,
17 Fish & Richardson was not asking engineers at Braun
18 whether they considered the art pertinent or not?
19     A.  Yes, yes.
20     Q.  I'd like to mark as defendant's deposition
21 Exhibit No. 116 a document bearing the Bates range
22 B1069 to B1073, it also has the English and German.
23          I'd like to ask you if you've ever
24 seen this document before?

23 (Pages 89 to 92)

Wolfgang Vorbeck    August 10, 2005

Page 93

1    A.  Let me just --
2    Q.  No problem.
3    A.  The first page I saw, but --
4         (Exhibit No. 116 marked
5         for identification.)
6         (Pause.)
7    A.  This is the invention disclosure regarding
8   the 581, that's the -- this (indicating) patent, I
9   think, the 328 patent, but I cannot exactly remember
10  whether I saw it with these remarks here, so these
11  handwritten remarks.
12   Q.  Just so the first preliminary question, do
13  you recognize that handwriting?
14   A.  Yes.
15   Q.  Whose handwriting?
16   A.  It's Dieter Klauer.
17   Q.  So after Mr. Klauer's passed away, did his
18  files come to reside with any Braun employee?
19   A.  What means to reside?
20   Q.  Or were his files transferred to any Braun
21  employee?
22   A.  Yes, to Uwe Sievers.
23   Q.  Do you know if this document with
24  Mr. Klauer's handwriting would have come from his

Page 94

1   original files?
2    A.  Once more, please.
3    Q.  Do you know if defendant's deposition
4   Exhibit No. 116, the German version of it, at least,
5   would have come from Mr. Klauer's original files?
6    A.  Do you mean that he wrote that?
7    Q.  Well, when -- you understand that Braun
8   collected documents and they were produced to
9   Rayovac in connection with this litigation?
10   A.  Yes.
11   Q.  Would this have been one of the documents
12  that now is with Mr. Sievers, but would have
13  originally been with Mr. Klauer?
14   A.  Look, our files look similar like yours,
15  we have --
16        (The witness speaks
17        with the interpreter.)
18        THE INTERPRETER:  We have a
19  classification device, you can call it files, a
20  filing system.
21   A.  No, no -- yes, and we put -- therein is
22  the invention disclosure, if you talk about the
23  German file, the invention disclosure.
24        There is some other stuff in it, and

Page 95

1   there is also the prosecution history of the German
2   file in it.
3        So we have another file there, we have
4   the US file and another European one, which splits
5   later on, and several French and so on, and
6   all -- and these files are in a cupboard.
7        (The witness speaks
8        with the interpreter.)
9        THE INTERPRETER:  In a filing
10  cupboard.
11   A.  Yes, and when Dieter Klauer went away, his
12  successor was Uwe Sievers and he was responsible for
13  something, so he had to deal with these files, it
14  was not so that we had this invention disclosure and
15  was on Dieter's table and it was forwarded to --
16   Q.  I understand.
17   A.  So it's -- and you must know at that time,
18  this file was similar to a hundred other files, we
19  had no litigation, nothing, so why should we put
20  special -- special attendance just to this file.
21   Q.  Okay.
22   A.  We have hundreds of patents on shavers,
23  so --
24   Q.  I believe we were discussing, if you look,

Page 96

1   at the signature line --
2    A.  Yes.
3    Q.  -- is what we were discussing earlier, I
4   believe it states in English, roughly translated, It
5   is hereby assured that all information was provided
6   to the best of my knowledge and that no additional
7   inventors participated in creation of the invention?
8    A.  Yes.
9    Q.  That's the statement that we were
10  discussing earlier?
11   A.  Yes.
12   Q.  And it's been your expectation and
13  experience that Braun employees are generally honest
14  when signing that?
15   A.  Yes, yes.
16   Q.  Do you see next to that oath, there is a
17  place, or there's in the chart there, where it says
18  share an invention percentage?
19   A.  Here, yes, yes.
20   Q.  Yes, what is the purpose of that entry or
21  that column?
22   A.  That's only for calculation of inventors
23  compensation.
24   Q.  Okay.  So say, for example, someone

24 (Pages 93 to 96)

Wolfgang Vorbeck    August 10, 2005

Page 97

1  contributes 90 percent to an invention and
2  someone --
3      A.  The other 10, so he gets 90 percent and
4  the other, 10 percent.  There are other factors, but
5  it depends whether you are in a high level position
6  or low level position, it's not expected from you if
7  you're in a lower level position to make big
8  inventions, so you will get more money in you are a
9  worker or whatever than the head of R and D, so
10  there are -- but one point is also someone who
11  contributes more to the invention gets more.
12      Q.  I know you'd mentioned earlier that Braun
13  has contemplated compensating Dr. Pahl; is that
14  correct?
15      A.  Contemplated?
16          (The witness speaks
17          with the interpreter.)
18      A.  Yes.
19      Q.  Has there been any thought given to what
20  percentage of compensation is due to Dr. Pahl and
21  what percentage is due to Mr. Braun going forward?
22      A.  No, we -- look, the intention of Dr. Pahl
23  was, by not being cited here, not to get any money,
24  but now due to all this litigation, Braun was forced

Page 98

1  to put him on the inventors list in the US
2  prosecution.
3          And I think -- I don't know how that
4  will come out, but I think Mr. Pahl will get some
5  lump sum payment or whatever jut to compensate him
6  for all the things he had to suffer here, for
7  instance, his deposition and all that stuff.
8      Q.  That's not that bad, is it?
9      A.  Yes, but, see, it's like that, so he never
10  said that he wants to have compensation.  That was
11  one of his main reasons not to be put here on the
12  list, so he does not now approach, as Braun says,
13  Hey, now, I'm coinventor, I want to have
14  compensation, that's not what he is doing, so it's
15  on the -- or fair -- fair --
16          (The witness speaks
17          with the interpreter.)
18          THE INTERPRETER:  It's a fair gesture.
19      A.  -- fair gesture by Braun to just give him
20  some compensation for all this stuff which is going
21  on.
22      Q.  In that regard, conversely, has Mr. Braun
23  come to Braun and said, You've given me too much,
24  I'd like to get some back?

Page 99

1          MS. WENDLANDT:  Objection.
2      A.  Who?
3      Q.  Mr. Braun, Gebhard Braun, has he --
4      A.  No, no inventor would say that.
5      Q.  If you see there, it says, and one of the
6  topics is that it's hereby assured that all
7  information is provided with that oath, roughly
8  speaking, that signature block where it's on -- here
9  on the front, the --
10      A.  Yes, yes, yes.
11      Q.  That roughly corresponds with an oath in
12  German application; is that correct?
13      A.  Well, it's not an oath, we would not call
14  it an oath, it's just a signature.
15          (The witness speaks
16          with the interpreter.)
17      Q.  When you say it's just a signature, what
18  is the purpose of that in German applications?
19          MS. WENDLANDT:  Objection.
20      A.  You mean this other form?
21      Q.  Yes.
22      A.  That's not a Braun form, it's a standard
23  form which you can get or which you just use to fill
24  out the inventorship, and that was not produced by

Page 100

1  Braun, so I don't know what the purpose of this
2  other form, you don't have it here, I don't think
3  so...
4      Q.  No.  Well, if you lie regarding
5  inventorship in Germany --
6      A.  Yes.
7      Q.  -- what is the effect of that?
8          MS. WENDLANDT:  Objection.
9      A.  No, no effect, regarding -- no effect
10  regarding the validity of the patent.
11      Q.  Well, is there any affect?
12          MS. WENDLANDT:  Objection.
13      A.  Well, there is an effect regarding
14  inventor's compensation, for instance, but you can
15  put the wrong inventors on a German application, the
16  application is not unvalid for these reasons, or the
17  patent, the later patent.
18      Q.  So there is -- well, how is inventor's
19  compensation -- to the extent you know, how is
20  inventor's compensation affected if one inventor
21  lies about inventorship?
22      A.  Well, if he -- if he actually is not
23  inventor, the amount he receives, that's -- that's
24  what's the problem, then, or if some others are

25 (Pages 97 to 100)

Wolfgang Vorbeck    August 10, 2005

Page 101

1 not -- not cited, the -- they do not receive
2 inventorship, so that's a problem -- not
3 inventorship, inventor's compensation.
4     Q.   So at least there is a reason for naming
5 the inventors under German patent law?
6          MS. WENDLANDT:   Objection.
7     A.   Not patent law, inventor's compensation.
8     Q.   Okay.  Well, there is a reason to
9 ascertain the correct inventors in the German law?
10    A.   Yes, yes.
11    Q.   And one of the -- pile of stuff here --
12 topic No. 24, it's any and all training, instruction
13 or other guidance given to Braun employees prior to
14 or during the prosecution of the asserted patents
15 regarding invention applications and disclosure of
16 all individuals who participated in the development
17 of an invention.  Do you see that?
18    A.   Yes.
19    Q.   Are Braun employees given any
20 instruction -- well, let me ask this question in a
21 more concrete form.
22          Invention applications such as what we
23 were discussing before, does the patent department
24 provide them any assistance or any instruction

Page 102

1 regarding --
2     A.   Well, at that time, I don't think so.  In
3 our days, we have yearly or two yearly, not two
4 yearly, every two years a seminar, and especially
5 new attorneys attend these seminars and there is
6 also something said about how to -- to fill out this
7 invention disclosure, who might be coinventor, but
8 at that time, we had not regularly information for
9 the inventors, only in such cases as I told you
10 some -- an hour ago, if there were problems,
11 problems arising between one group and an additional
12 inventor that he was not cited, and we talk with all
13 these individuals and then they have to agree what
14 happens, but it was not regular communication, only
15 if in the past, problems arose, then we talk with
16 these problem groups, I shouldn't say it like that.
17    Q.   Well, do you know, for topic No. 25, it
18 talks about training or guidance given to
19 Gebhard Braun or Dietrich Pahl.
20          Do you know if either of them ever
21 received any training or guidance regarding inventor
22 or inventorship or invention applications?
23    A.   I can't tell that, I don't know.
24    Q.   Well, and I'm asking you to speak on

Page 103

1 behalf of Braun, not yourself.
2     A.   Yes, yes, I told you at that time, we had
3 not these regular seminars like we have now, since
4 three, two, three, two, four years, and only in
5 cases where problems arose, the patent department
6 talk with these group of persons who had problems
7 regarding inventorship.
8          And so from the files, and in case
9 there would have been problems, Dietrich Klauer
10 would have talked with both of them or one of them
11 and I know about -- I know nothing about that.
12    Q.   Well, for example, in connection with the
13 328 patent prosecution, and we can get to the page,
14 but are you aware that Mr. Braun signed both in
15 connection with the filing of this patent?
16    A.   You mean the declaration?
17    Q.   Yes, B0026 or B261.
18    A.   Yes.
19    Q.   Do you know if anyone discussed this
20 declaration with Mr. Braun?
21    A.   No, I don't.
22    Q.   Do you know how it came to -- do you know
23 how this document came to be in Mr. Braun's
24 possession when he signed it?

Page 104

1     A.   I don't know that, but I know how these
2 documents regularly come into -- how they are
3 signed, the secretary assistant calls the person,
4 the inventor, he comes down to the patent
5 department, signs it and goes back to his office, so
6 that's how it works.
7     Q.   Well, do you, and just regularly, do you
8 ask -- well, is it the practice of Braun's patent
9 department to ask employees to read documents such
10 as this declaration before they are signed?
11    A.   Yes, as -- as an attorney or the patent
12 attorney, I would -- would say to every person that
13 this person should read the document before signs
14 it, not only German language declaration, but any
15 document.
16          But you have to see that this was
17 approximately one year or more after the first
18 filing in Germany, and they are -- practically all
19 was done.
20          The -- Mr. Gebhard Braun was the only
21 inventor for the German language application in
22 Germany, why shouldn't he be the inventor for the
23 practically identical English language US
24 application?

26 (Pages 101 to 104)

Wolfgang Vorbeck    August 10, 2005

Page 105

1   Q.  Well --
2   A.  The problems were before.
3   Q.  Well, you -- do you know if -- do you
4  typically tell Braun employees that this document is
5  being signed under penalty of perjury?
6   A.  No, I don't think so, that we tell it, and
7  where, is this penalty?  Oh, I see it here, you can
8  be punished by paying money or imprisonment, okay, I
9  don't think we -- we --
10   Q.  I mean, do --
11   A.  No, in this special event, I can't tell
12  it, but I think the persons read it or read it not
13  and sign it.
14   Q.  Topic No. 20 -- well, let me, I guess, to
15  finish up this thought, do you know if any attorneys
16  in the United States at Fish & Richardson would have
17  talked to Mr. Braun to discuss with him the oath
18  that he signed in connection with the prosecution of
19  the 328 patent?
20   A.  No, I don't know that.
21   Q.  Did you ask Mr. Prahl that?
22   A.  Well, Mr. Eric Prahl was asked whether he
23  can remember anything, and he said no, so we -- the
24  answer is:  We did not ask Mr. Prahl regarding this

Page 106

1  special issue of whether he took contact with the
2  inventor and -- and gave him assistance or showed
3  him what to do or what not to do.
4        But I would say if an outside attorney
5  would ring up an internal inventor without my
6  knowledge, we -- I think that is not the best way to
7  cooperate.
8   Q.  I understand.  For topic No. 26, so it's
9  any and all investigations made by Braun regarding
10  the inventorship for the asserted patents and their
11  German equivalents, what investigations were made by
12  Braun?
13   A.  Well, we have only one investigation in
14  this regard, and that's the questionnaire which is
15  sent to the head of the inventor or the group of
16  inventors, so here in this regard to Dieter Pahl, so
17  there is a questionnaire, you have it there.
18   Q.  Yes.
19   A.  And that is regularly done with each and
20  any invention disclosure.
21        MR. SHIMOTO:  Let's mark this as
22  defendant Exhibit No. 117 Braun 00861.
23   A.  Thanks.
24   Q.  I didn't give you mine, did I, with

Page 107

1  handwriting on it?  Is there any handwriting on
2  there?  No.
3        (Exhibit No. 117 marked
4        for identification.)
5   Q.  Do you recognize what has been marked as
6  defendant's deposition Exhibit No. 117?
7   A.  This.
8   Q.  Yes, that document.  And what is it?
9   A.  Well, it's a translation -- it's a
10  questionnaire, a written questionnaire which asks
11  some persons high up in the management, mostly R and
12  D people, sometimes also business management people
13  like Gilbert Greaves to evaluate the invention
14  disclosure regarding certain aspects.
15        So whether it's a good solution for
16  the problems or whether they agree to file a patent
17  application, and also whether -- do you consider the
18  inventor details to be correct, so that's -- that's
19  this questionnaire which we have.
20   Q.  Is this a standard document from Braun?
21   A.  Yes, yes, we send it for each and any
22  invention disclosure to the respective persons.
23   Q.  And this is the one investigation that
24  Braun performed regarding inventorship?

Page 108

1   A.  Yes, yes.
2   Q.  Do you expect that Braun employees will be
3  honest when filling out this investigation form?
4   A.  Yes, I -- I expect that.
5   Q.  And have you had any problems with people
6  being dishonest in filling out these forms?
7        MS. WENDLANDT:  Objection.
8   Q.  Let me put -- ask -- with respect to 6.1
9  where it says, Do you consider the inventor details
10  to be correct, have you had problems in the past
11  with individuals being dishonest with respect to the
12  answer to 6.1?
13        MS. WENDLANDT:  Objection.
14   A.  You mean -- you mean the people who judge
15  here?
16   Q.  Yes.
17   A.  No, no, never.
18   Q.  So it's been your experience that people
19  in general, when they read invention
20  applications --
21   A.  Yes, these are -- in practice, these are
22  directors of the company, very high level, and
23  why -- so -- why should they do -- do
24  wrong -- wrong -- make wrong statements here?

27 (Pages 105 to 108)

Wolfgang Vorbeck    August 10, 2005

Page 109

1  That's -- so I would not suspect -- expect that.
2      Q.   And other than this investigation here,
3  there was no investigation, initial investigation
4  done into inventorship?
5      A.   No, no, no.
6      Q.   And is the reason that no additional
7  investigation was performed that the patent
8  department felt it could trust both this
9  investigation and the invention application filed by
10  Mr. Braun?
11      A.   Once more, please.
12      Q.   Yes.  Was the reason that no additional
13  investigation into inventorship was performed by the
14  patent department was that patent -- well,
15  maybe this is becoming too many double negatives.
16              Is it correct that the patent
17  department performed no additional investigations
18  into inventorship because it believed that it could
19  trust what was represented in defendant's deposition
20  Exhibit No. 117 and in Mr. Braun's invention
21  application?
22      A.   Yes.
23      Q.   For topic No. 28, I think we have -- so
24  it's the identity of the external lawyer referenced

Page 110

1  by Gebhard Braun in his deposition at several pages?
2      A.   Yes, yes.
3      Q.   We have an interrogatory response
4  regarding that which states it's possibly
5  Mr. Sartorius?
6      A.   Yes, it's Peter Sartorius, I think so,
7  too.
8      Q.   And do you know whether Mr. Sartorius
9  would have worked with Dr. Pahl and Gebhard Braun in
10  preparing the application, patent applications for
11  the shaver cleaning system?
12      A.   I -- I don't know that.
13      Q.   And for topic No. 27, it's Mr. Klauer's
14  understanding of inventorship law in the
15  United States and Germany during the prosecution of
16  the asserted patents, I'll ask first to Braun's
17  knowledge, what was Mr. Klauer's understanding of
18  inventorship law in the United States during the
19  prosecution of the patents in suit?
20      A.   I couldn't really tell you.  He knew
21  something about it, but what his personal
22  understanding of the inventorship law in the
23  United States was, I can't tell you.
24      Q.   So basically the only person who could

Page 111

1  tell us who cannot is Mr. Klauer.
2      A.   Yes, exactly.
3      Q.   I understand.  I'd like to mark as
4  defendant's deposition Exhibit No. 118, I apologize
5  for all the paper, the declaration which you filed
6  in July 8, 2004 with the court here in
7  Massachusetts, just if you recognize this document?
8              (Exhibit No. 118 marked
9              for identification.)
10      A.   Yes, it seems to be my signature.
11      Q.   Under paragraph 3, it states, I recently
12  learned that Dr. Dietrich Pahl made significant
13  contributions to the inventions disclosed in the
14  patents in suit, et cetera.  My question is:  How
15  did you learn of Dr. Pahl's contributions?
16              MS. WENDLANDT:  I'm going to instruct
17  the witness not to answer to the extent it requires
18  communication between your lawyers and yourself to
19  be revealed, so to the extent you can answer that
20  without revealing any conversations between you and
21  myself and Mr. Patton, you can answer.
22              THE WITNESS:  What -- what I
23  experienced during this discovery procedure without
24  talking to you, that can be --

Page 112

1              MS. WENDLANDT:  That's right, yes.
2      A.   So this litigation forced Braun to go
3  deeper into the history of this -- these two US
4  patents than you usually go to history, and we all
5  thought that Gebhard Braun is the sole inventor, all
6  documents showed that.
7              And when we evaluated the history of
8  the development of the clean and charge device, we
9  found this sample, this model built by the French
10  engineers, and we also learned that this was, what
11  Mr. Braun said, the starting point of his work, and
12  then we thought or we came to the conclusion if
13  Gebhard Braun started or his beginning of his R and
14  D work was this model and this model showed already
15  several features of the claims, that he could not
16  have been the sole inventor.
17              And so we came to the conclusion that
18  Mr. or Dr. Pahl, Dietrich Pahl should have been
19  coinventor at least coinventor or coinventor,
20  because he -- or the model was built on his
21  instructions, on his behalf, that was why we came to
22  the conclusion that Gebhard Braun could not be the
23  sole inventor of this model.
24      Q.   Who -- I'm not asking you what lawyers

28 (Pages 109 to 112)

Page 113

1  would have said to you.
2      Who at Braun provided you the
3  information that you just have been discussing
4  regarding the prototype and Dr. Prahl's original
5  work?
6      A.  The information that the starting point of
7  the work of Gebhard Braun was this prototype came
8  from Gebhard Braun.
9      Q.  Oh, so Mr. Braun informed you that --
10      A.  No, we asked him.  Mr. Hoeser made a
11  timeline history of all that stuff, and at some
12  point of this timeline, we had this sample,
13  this -- and then we asked where was the starting
14  point of Mr. Hoeser, and he said, Well, I started
15  with a sample, and so it came up that we personally,
16  Uwe Sievers and me, draw the conclusion that he
17  cannot be the sole inventor.
18      MR. SHIMOTO:  Let me mark as
19  deposition Exhibit No. 119 B0243 to B0247.
20      (Exhibit No. 119 marked
21      for identification.)
22      Q.  Is this the timeline that you were
23  referring to?
24      A.  No, I'm referring here to this first

Page 114

1  prototype here (indicating).
2      I'm not sure whether it's this one the
3  picture's on, but we had this prototype where we had
4  this cradle structure the shaver head was put in,
5  there was a blower, I think also a heating unit, and
6  all the features of this device were also
7  incorporated in some claims of the 328 or of one
8  patent.
9      Q.  Yes.
10      A.  That, and in addition, Gebhard Braun said,
11  When I started working on the clean and charge
12  device, this was what maybe Dieter Pahl gave me
13  then, and so that --
14      Q.  Let me see if I understand the chronology.
15      So first Mr. Hoeser provided a
16  timeline to you; is that correct, or --
17      A.  Well, he was developing that timeline, and
18  we saw the first time this prototype, let me say how
19  long is the litigation running now?
20      Two years ago or one and a half years
21  ago, I personally saw this prototype the first time
22  and Uwe Sievers as well and we were -- Uwe more than
23  we was deeply involved in all collecting all these
24  documents and that stuff together.

Page 115

1      And then I don't know when that was,
2  Mr. Braun, Gebhard Braun told -- told us at the
3  beginning, Dieter Pahl gave me this prototype, and
4  then -- then the conclusion that is --
5      (The witness speaks
6      with the interpreter.)
7      THE INTERPRETER:  It was -- it was a
8  healthy sense.
9      A.  Just natural thinking that he could not be
10  the sole inventor, that was the reason why we
11  started digging, looking, asking Mr. Pahl, before we
12  had no -- no --
13      (The witness speaks
14      with the interpreter.)
15      THE INTERPRETER:  No motivation.
16      A.  No motivation to talk to Mr. Pahl, so
17  that's how it came up.
18      Q.  Were you surprised when you learned
19  about --
20      A.  Yes, we were surprised, and this
21  is -- it's an exceptional case.
22      Q.  I mean, did you ask -- at that time, did
23  you ask Mr. Braun why -- why he had not -- why
24  Dr. Paul was not ever named --

Page 116

1      A.  Well, that came later, and I thought you
2  made the deposition with Dieter Pahl and Mr. Braun
3  and they explained that, I think, deeply.
4      Q.  Yes.  When -- when exactly did you, or not
5  exactly.  When roughly did you learn of -- or learn
6  of the prototype from Mr. Braun?
7      A.  Well, it was in connection with the
8  discovery here, and maybe it's -- oh, good, I made
9  this declaration a year ago, approximately, in July
10  (indicating), so maybe months or somewhat earlier
11  when we got -- yes.
12      MR. SHIMOTO:  I'd like to mark as
13  defendant's deposition Exhibit No. 120 Braun's
14  answers to then Remington's now Rayovac's first set
15  of interrogatories.
16      (Exhibit No. 120 marked
17      for identification.)
18      Q.  I'd just like to direct you to the answer
19  to interrogatory No. 2.
20      Take whatever time you need to, I
21  don't know if you've seen this before.
22      A.  No.
23      Q.  Interrogatory 2 asked questions regarding
24  conception --

29 (Pages 113 to 116)

Wolfgang Vorbeck    August 10, 2005

Page 117

1    A.   Just a moment.
2    Q.   Yes, sure, take your time, page 4.
3    Interrogatory No. 2 asks questions regarding
4    conception dates for claims.
5    A.   Yes.
6    Q.   And then there are answers given or
7    answers provided by Braun, and at the end, you were
8    listed as someone with knowledge regarding the
9    conception dates provided in the answer.
10    (Pause.)
11    A.   Yes.  Okay.  What's your question?
12    Q.   My question is:  What knowledge do you
13    have regarding the conception dates provided in
14    response to interrogatory No. 2?
15    A.   I think I'm listed here falsely, so I
16    could only give any information which I got in the
17    last one year, one and a half year with regard to
18    this litigation, but at that time all this actually
19    happened, I have no access to this information, so I
20    was not involved in it, only the last one or one and
21    a half years along the litigation is running.
22    Q.   That's fine, I understand.
23    MR. SHIMOTO:  I'll just mark these all
24    now.

Page 118

1    A.   Who put me in here?
2    MS. WENDLANDT:  Just to clarify, I
3    think your name was put in there because you are the
4    repository of H.D. Klauer's knowledge in the patent
5    history.
6    THE WITNESS:  Okay.
7    MR. SHIMOTO:  Okay, would I like to
8    mark as defendant's deposition Exhibit No. 121
9    documents bearing the Bates range B004615 to
10    B004617, both German and English.
11    (Exhibit No. 121 marked
12    for identification.)
13    MR. SHIMOTO:  I'll also mark -- this
14    is a big document -- a document bearing the Bates
15    No. B1064 as defendant's deposition Exhibit No. 122,
16    a very large schematic.
17    A.   Yes.
18    (Exhibit No. 122 marked
19    for identification.)
20    Q.   Okay.  Starting with the -- I'll start
21    with the schematics so we can get that out of your
22    way, B0164.
23    A.   Okay.
24    Q.   My question is:  Who had this document at

Page 119

1    Braun prior to it being produced to Rayovac?
2    A.   It was in the possession of Dieter Pahl, I
3    think this is the one of the prototype that I
4    mentioned.
5    Q.   So this -- this document was provided by
6    Dietrich Pahl?
7    A.   Yes, I think so, maybe it was also in
8    other files, but again, what do you -- when it was
9    produced one and a half years ago --
10    Q.   Yes, well, let me represent -- the
11    questions I'm asking is when people went out and got
12    these documents, when the lawyers came and collected
13    these documents --
14    A.   Yes, in what files they were?
15    Q.   Yes, were they found.  I'll represent to
16    you that I asked Dr. Pahl if he provided this
17    document in connection with this litigation, and he
18    said no, so my question is:  Who at Braun had this
19    document when it was given to the lawyers?
20    A.   I cannot -- I don't know, and I guess
21    maybe Mr. Hoeser.
22    Q.   So this document was -- well, did you
23    perform any investigation to determine who would
24    have had this document?

Page 120

1    A.   No, I didn't do that.  I thought it was
2    from Mr. Pahl, but now when you're telling me it's
3    not from him, well, he -- then it must be
4    Mr. Hoeser, the person who should have all of this
5    material in his files.
6    Q.   Okay.  So I take it, then, that a copy of
7    this document was not at the -- within the patent
8    department's files?
9    A.   No, no, I don't think so.
10    Q.   Are you sure whether this was in the
11    patent department's files?
12    A.   In the patent department's files regarding
13    the prosecution, or -- or anything else?  We have
14    checked our files.
15    The prosecution files are all with
16    you, and I think this document is not in the
17    prosecution files, and we have no additional files.
18    We could have prior art searches of
19    files at that time, and it was not there because we
20    had no files at that time regarding prior art
21    searches, so I can say it was not in the patent
22    department files.
23    Q.   Okay.  With respect to -- well, now you
24    can put this away (indicating).

30 (Pages 117 to 120)

Wolfgang Vorbeck    August 10, 2005

Page 121

1        (Pause.)
2     Q.   B004615, it's the memo, I believe, from
3  Mr. Braun and Mr. Smetana to --
4     A.   4615, mm-hmm, yes.
5     Q.   These are stapled together as actually two
6  memos.
7     A.   Yes.
8     Q.   From whose -- and I'm talking now about in
9  connection with this litigation, from who -- from
10 whom was the Smetana-Braun memo collected?
11    A.   I think it was collected from Mr. Smetana,
12 he -- I know that he -- he was also at the
13 deposition with you, and he is -- he -- he wrote
14 this -- this -- this memo, and so I think it was
15 collected from him.
16    Q.   Did you ask him?
17    A.   No, I didn't.
18    Q.   Then I'll represent to you as well that I
19 asked Mr. Smetana at his deposition if he presented
20 this memo to the lawyers, and he said no,
21 so -- but -- do you know if this would have been in
22 the files of the patent department?
23    A.   No, I don't think so because who, in
24 addition to Mr. Braun and Mr. Smetana, this memo was

Page 122

1  disputed to Dr. Pahl and Dr. Jung and not to the
2  patent department, and regarding the contents, I
3  see -- I see no issues why it should have been
4  transferred to the patent department.
5     Q.   With respect to the next page, which is
6  B004617 --
7     A.   Yes.
8     Q.   -- have you seen this document before?
9     A.   Yes.
10    Q.   Do you know from whose files this document
11 was collected in connection with this litigation?
12    A.   It's from the files of Mr. Hoeser.
13    Q.   So I take it this document also would not
14 have been with the patent department?
15    A.   No.
16        (Pause.)
17    A.   It's -- it's for VDE, that is something
18 corresponding to the underwriter laboratory here in
19 the US, why -- you cannot put all the stuff to
20 patent department, so --
21        MR. SHIMOTO:   Let me take a
22 five-minute break, I think we might be finished up.
23        THE VIDEOGRAPHER:   Going off the
24 record, the time is 12:31 p.m.

Page 123

1        (Discussion held off the record.)
2        THE VIDEOGRAPHER:   One moment.  We're
3  back on the record, the time is 12:36.
4        MR. SHIMOTO:   With the exception
5  of -- I would like -- well, there was a few
6  questions I had to ask that we were unable to ask,
7  but with the proviso that somehow we can work out
8  some way to get answers to those, I have no further
9  questions for you today, thank you.
10       THE WITNESS:   Thank you.
11       MS. WENDLANDT:   I have no questions.
12       THE VIDEOGRAPHER:   This marks the end
13 of videotape No. 2 in the deposition of
14 Wolfgang Vorbeck, we're going off the record, the
15 time is 12:36.
16       (Whereupon the deposition
17       concluded at 12:36 p.m.)
18
19
20
21
22
23
24

Page 124

1  Commonwealth of Massachusetts
2  Suffolk, ss.
3
4      I, Melissa Z. Comins, Certified Shorthand
5  Reporter No. 132293 and Registered Professional
6  Reporter and Notary Public in and for the
7  Commonwealth of Massachusetts, do hereby certify
8  that WOLFGANG VORBECK, the witness whose deposition
9  is hereinbefore set forth, was duly sworn by me and
10 that such deposition is a true record of the
11 testimony given by the witness.
12      I further certify that I am neither related to
13 or employed by any of the parties in or counsel to
14 this action, nor am I financially interested in the
15 outcome of this action.
16      In witness whereof, I have hereunto set my hand
17 and seal this 22nd day of August 2005.
18
19
20
21               Notary Public
22               CSR # 132293
23 My commission expires:
24 June 13, 2008

31 (Pages 121 to 124)

Wolfgang Vorbeck     August 10, 2005

Page 125

1     COMMONWEALTH OF MASSACHUSETTS
2
3        I, WOLFGANG VORBECK, do hereby certify that I
4     have read the foregoing transcript of my testimony
5     given in the aforementioned matter, and further
6     certify that said transcript is a true, accurate and
7     complete record of said testimony.
8
9        Signed under the pains and penalties of perjury
10    this          day of          , 2005.
11
12
13
14
15
16              WOLFGANG VORBECK
17
18
19
20
21
22
23
24

Page 126

1     ERRATA SHEET
2
3     PAGE   LINE     REASON FOR CORRECTION
4
5     _____ _____     _____
6     _____ _____     _____
7     _____ _____     _____
8     _____ _____     _____
9     _____ _____     _____
10    _____ _____     _____
11    _____ _____     _____
12    _____ _____     _____
13    _____ _____     _____
14    _____ _____     _____
15    _____ _____     _____
16    _____ _____     _____
17    _____ _____     _____
18    _____ _____     _____
19    _____ _____     _____
20    _____ _____     _____
21    _____ _____     _____
22    _____ _____     _____
23
24    SIGNATURE/DATE:   _____

32 (Pages 125 to 126)