# EXHIBIT
# 42A

Confidential – Attorneys' Eyes Only

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRAUN GmbH,<br><br>Plaintiff,<br><br>v.<br><br>RAYOVAC CORPORATION,<br><br>Defendant. | Civil Action No. 03-CV-12428-WGY |

## THIRD REPORT OF SAMIR NAYFEH

Dated:  June 27, 2005

9746034

06/27/2005 16:39 FAX                                                              @004/079

Confidential – Attorneys' Eyes Only

## I.    INTRODUCTION

I am an Assistant Professor of Mechanical Engineering at the Massachusetts Institute of Technology in Cambridge, Massachusetts. I previously submitted two reports – the first dated May 23, 2005 ("First Nayfeh Report") and the second dated June 13, 2005 ("Second Nayfeh Report") – in connection with the above captioned litigation. A copy of my curriculum vitae was attached to the First Nayfeh Report.

I was asked by Braun GmbH ("Braun") to review the Second Expert Report of Samuel R. Phillips, PE, dated June 13, 2005, and to opine as to the bases set forth in Mr. Phillips' report upon which he purports to rely in support his conclusion that two patents – U.S. Patent No. 5,711,328 (the "'328 Patent") and U.S. Patent No. 5,649,556 (the "'556 Patent"), which I understand to be owned by Braun – are not infringed by the Rayovac's products that I discussed in the First Nayfeh Report.

These Rayovac products include two "Titanium Smart System" electric shaving systems: a men's rotary system with product designation R-9500 (the "R-9500 cleaning system") and a men's foil system with product designation MS-5500 (the "MS-5500 cleaning system");[1] and one "Smooth & Silky Titanium System", which is a women's foil system with product designation WDF-7000CS (the "WDF-7000CS cleaning system"). Each of these Rayovac products includes an electric shaver and a cleaning system.

In order to arrive at my opinion, I have again reviewed the '328 Patent and the '556 Patent. I have also reviewed the patent prosecution histories for each of these patents.

In addition, I have again examined the Rayovac products. I have also examined a Braun product with product designation "Syncro Smart System" as well as the website of the Activator product sold by Braun.

Also, I have reviewed Mr. Phillips' Second Report and the tabs and exhibits thereto. Further, I have reviewed the transcript from the March 15, 2005 *Markman* hearing. Finally, I have examined the transcript of the deposition of James Chasen, as well as those portions of the transcript of the deposition of Alan Schoepp referenced by Mr. Phillips in his Second Report.

## II.    OPINION SUMMARY

I disagree with Mr. Phillips' conclusion that the Rayovac products do not infringe claims 11, 12, 14, and 18 of the '328 Patent and claims 1, 6, and 18 of the '556 Patent. Moreover, I have seen nothing to indicate that Rayovac has developed a non-infringing

---

[1] I understand that Rayovac sells another men's foil shaver cleaning system with product designation MS-5700. I further understand that this MS-5700 cleaning system differs from the MS-5500 cleaning system only with respect to certain details of the electric shaver, which do not affect the cleaning operation and that the MS-5700 cleaning system is identical in all material respects to the MS-5500 cleaning system. Therefore, my opinion with regard to the MS-5700 cleaning system is the same as my opinion with regard to the MS-5500 cleaning system.

9746034

Confidential – Attorneys' Eyes Only

alternative to these products. I understand that Rayovac introduced its first infringing cleaning system (the R-9500 cleaning system) in the Fall of 2003. I have seen nothing to indicate that any of the so-called alternatives presented by Mr. Phillips in his Second Report were available at that time.

### III.    MR. PHILLIPS' PROPOSED MODIFICATION OF THE COURT'S CONSTRUCTION FOR THE "CRADLE STRUCTURE" ELEMENT OF EACH OF THE ASSERTED CLAIMS OF THE '328 AND '556 PATENTS IS INCORRECT

The Court has construed the following elements:

- a cradle structure adapted to receive a shaving head of a shaving apparatus

- a cradle structure adapted to receive therein the shaving head

of the asserted claims of the '328 Patent and the '556 Patent, respectively, as a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both. Mr. Phillips asserts that the Court should modify its claim construction to require that the cradle structure "receive and retain fluid" because (according to Mr. Phillips) the written description of the patents-in-suit is "is only for a cleaning system in which a shaver head is immersed in a bath." Phillips Second Report ¶27-28.

For the reasons set forth in the Second Nayfeh Report, I disagree that the written description is so limited. See Nayfeh Second Report at 26-27. And, therefore, I disagree with Mr. Phillips' proposed modification of the Court's construction of these elements of the asserted claims.

### IV.    COMPARISON OF CLAIMS AND RAYOVAC PRODUCTS

#### THE '328 PATENT

Claim 11

Mr. Phillips asserts that the Rayovac cleaning systems do not infringe claim 11 of the '328 Patent. He does not, however, dispute that each of the Rayovac cleaning systems has:

- "a cleaning fluid container,"

- a "cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure," and

- "a drying device."

06/27/2005 16:40 FAX                                                                    ☒006/079

**Confidential -- Attorneys' Eyes Only**

Instead, Mr. Phillips limits his analysis to two elements of claim 11. He argues that the Rayovac products do not contain:

- "a cradle structure adapted to receive a shaving head of a shaving apparatus," and

- "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure."

I disagree.

### Element: "Cradle Structure Adapted To Receive A Shaving Head Of A Shaving Apparatus"

In the First Nayfeh Report, I explained that each Rayovac cleaning system has "a cradle structure adapted to receive a shaving head of a shaving apparatus." As discussed above, the Court has construed this element to be a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both. Referring to photographs attached as Exhibits B, C, and D to the First Nayfeh Report, I noted that the manifold 3a, ports 3b, and supporting structures 3c[2] of the Rayovac cleaning systems together constitute the cradle structure.

Mr. Phillips argues that it is only the exterior surfaces of the ports 3b and the supporting structures 3c that support the shaver, and that these surfaces do not receive or retain cleaning fluid. See Phillips Second Report at ¶¶33, 66. Mr. Phillips' observation is not sound. It is clear to one of ordinary skill in the art that a "<u>structure</u> adapted to support or receive a shaving head" includes not only the "surfaces" of that structure that make direct contact with the shaving head, but also the entire structure that supports the shaving head. In this particular case, the ports 3b are integrally formed with the manifold 3a. Together with supporting structures 3c, these features all support the shaver head. Therefore, one of ordinary skill in the art would recognize that the manifold 3a, injection ports 3b, and supporting structures 3c together constitute "a structure adapted to support or receive a shaving head of a shaving apparatus."

Moreover, during the cleaning operation, the feed device of each of the Rayovac cleaning systems feeds cleaning fluid to the manifold 3a and thereby to the ports 3b. Thus, the "structure adapted to support or receive a shaving head" is also "able to receive or retain fluid or both."

Mr. Phillips next argues that the manifold 3a "operate as the 'conduits 64'" of Figure 6 of the patents-in-suit (which is reproduced below) and therefore is not part of the cradle

---

[2] Unless otherwise noted, I use the labels from the First Nayfeh Report when referring to features of the accused devices.

9746034                          -3-

06/27/2005 16:40 FAX                                                                   ☒007/079

Confidential – Attorneys' Eyes Only

Fig. 6





structure because Mr. Braun, one of the inventors, testified that conduit 64 was not part of what he considered to be the cradle structure. Phillips Second Report ¶34. I disagree.

To begin, Mr. Phillips misreads Mr. Braun's testimony. In particular, Mr. Braun was asked whether conduit 64 is part of the cradle structure, and he responded "Yes, this is just how the principle works." See Phillips First Report, Ex. 16 at pp. 72-73.

More importantly, however, unlike conduit 64 of Figure 6 of the patents-in-suit, the manifold 3a in Rayovac's cleaning systems supports the shaver head. One of ordinary skill in the art therefore would recognize that it forms a part of the claimed cradle structure, while conduit 64 (which does not support the shaving head) does not.

Therefore, manifold 3a, ports 3b, and supporting structures 3c of the Rayovac cleaning systems together constitute the cradle structure as claimed in claim 11.

**Element: "A Feed Device For Feeding Cleaning Fluid From Said Cleaning Fluid Container To Said Cradle Structure"**

In the First Nayfeh Report, I explained that the cleaning device of each Rayovac cleaning system has "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure." The Court has construed this element to be a mechanism that feeds cleaning fluid from the cleaning fluid container to the cradle structure. Referring to photographs attached as Exhibits B, C, and D to the First Nayfeh Report, I noted that pump 6 and conduit 7 of the Rayovac products feed fluid to the manifold 3a and ports 3b of the cradle structure during the cleaning operation.

Mr. Phillips apparently does not disagree that pump 6 and conduit 7 feed fluid to the manifold 3a and ports 3b. Instead, he argues that the Rayovac cleaning systems do not contain this claim element because the Rayovac products do not have a "cradle structure"

**Confidential – Attorneys' Eyes Only**

and fluid is not "fed" to supporting structures 3c.  See Phillips Second Report ¶¶47, 69-70.  I disagree.

For the reasons set forth above in connection with my discussion of the cradle structure element of claim 11, I disagree with Mr. Phillips' conclusion that the Rayovac products do not have a cradle structure.  In particular, manifold 3a, ports 3b, and supporting surfaces 3c constitute the cradle structure of the Rayovac products.

Moreover, as Mr. Phillips implicitly acknowledges, in each of the Rayovac products, fluid is fed by pump 6 via conduit 7 to the manifold 3a and ports 3b.  Therefore, these products contain the requisite feed device element of claim 11.

Therefore, the Rayovac products each infringe claim 11 of the '328 patent.

<u>Claim 12</u>

Claim 12 of the '328 Patent adds one limitation to claim 11:  that the drying device comprises an impeller.

For the reasons set forth in connection with his discussion of claim 11 of the '328 Patent, Mr. Phillips asserts that the Rayovac cleaning systems do not infringe claim 12.  See Phillips Second Report ¶72.  Because I disagree with Mr. Phillips' analysis in connection with claim 11, I disagree with Mr. Phillips' conclusion with regard to claim 12.

<u>Claim 14</u>

Claim 14 of the '328 Patent is identical to claim 11 except that claim 14 includes the limitation that the cradle structure 3a, 3b, and 3c be permanently open to atmosphere and does not require that the cleaning system include a drying device.

For the reasons set forth in connection with his discussion of claim 11 of the '328 Patent, Mr. Phillips asserts that the Rayovac cleaning systems do not infringe claim 14.  Because I disagree with Mr. Phillips' analysis in connection with claim 11, I disagree with Mr. Phillips' conclusion with regard to claim 14.

**Element:  "Said Cradle Structure Being Permanently Open To Atmosphere"**

In addition to the foregoing, Mr. Phillips argues that the Rayovac products do not have a cradle structure permanently open to atmosphere because (according to Mr. Phillips) the manifold 3a and its ports 3b become closed to the atmosphere when the shaving head is inserted into the cradle structure.  See Phillips Second Report ¶75.  I disagree.

The Court construed this element to require that the cradle structure be permanently open to air.  As explained in the specification of the '328 patent:

> It is a still further advantage that the cradle is arranged outside the cleaning fluid and/or above the fluid level of the cleaning fluid held in the cleaning fluid container,

Confidential – Attorneys' Eyes Only

and that at least the cradle and/or the cleaning fluid are permanently open towards the outside, that is, to atmosphere. This enables the shaving apparatus to be inserted in the cradle without any effort and to be withdrawn therefrom without the need to utilize any parts closing the cradle.

'328 Patent, col. 2, lines 44-51. In the case of the Rayovac products, the cradle structure 3a, 3b, and 3c is permanently open to the atmosphere. As in the case of the preferred embodiment of the '328 Patent, the shaver 1 is easily inserted in the cradle structure 3a, 3b, and 3c and removable therefrom. No elaborate seal is provided.

<u>Claim 18</u>

Claim 18 of the '328 Patent is identical to claim 11 except that claim 18 includes the limitation that the cleaning system include a bracket for insertion of the shaver, and does not require that it include a dryer.

For the reasons set forth in connection with his discussion of claim 11 of the '328 Patent, Mr. Phillips asserts that the Rayovac cleaning systems do not infringe claim 18. <u>See</u> Phillips Second Report ¶78. Because I disagree with Mr. Phillips' analysis in connection with claim 11, I disagree with Mr. Phillips' conclusion with regard to claim 18.

## THE '556 PATENT

<u>Claim 1</u>

Mr. Phillips asserts that the Rayovac cleaning systems do not infringe claim 1 of the '556 Patent. Although he does not dispute that each of the Rayovac cleaning systems is "a cleaning device for cleaning a shaving head of a dry shaving apparatus" and that each has "a filter," Mr. Phillips asserts that the Rayovac products do not contain the following four elements of claim 1:

- "a cradle structure adapted to receive therein the shaving head,"

- "a cleaning fluid container separate from the cradle structure for holding a cleaning fluid,"

- "a fluid feed mechanism which feeds the cleaning fluid after it passes through the filter to the cradle structure during cleaning," and

- "said container and filter being separable from the cradle structure as a unit."

I disagree.

9746034                                    -6-

06/27/2005 16:41 FAX                                                              @010/079

**Confidential – Attorneys' Eyes Only**

**Element: "A Cradle Structure Adapted To Receive Therein The Shaving Head"**

In the First Nayfeh Report, I explained that each Rayovac cleaning system has "a cradle structure adapted to receive therein the shaving head." The Court has construed this element to mean the same as the "cradle structure adapted to receive a shaving head of a shaving apparatus" element of claim 11 of the '328 Patent. In particular, the Court has construed this element to be a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both. Referring to photographs attached as Exhibits B, C, and D to the First Nayfeh Report, I noted that the manifold 3a, ports 3b, and supporting structures 3c of the Rayovac cleaning systems together constitute the cradle structure.

Mr. Phillips asserts that these structures do not constitute a cradle structure for reasons that mirror those set forth in connection with the discussion of the cradle structure element of claim 11 of the '328 Patent. See Phillips Second Report ¶¶27-35. Therefore, for the reasons set for above in connection with the discussion of the cradle structure element of claim 11 of the '328 Patent, I disagree.

**Element: "A Cleaning Fluid Container Separate From The Cradle Structure For Holding A Cleaning Fluid"**

In the First Nayfeh Report, I explained that each Rayovac cleaning system has "a cleaning fluid container separate from the cradle structure for holding a cleaning fluid." The Court has construed this element to be a separate cleaning fluid container that is a removable cartridge which holds cleaning fluid.

Mr. Phillips argues that the Rayovac devices do not contain this element of claim 1 because "[p]ouring fluid into a non-replaceable cartridge is very different from a removable cartridge that holds cleaning fluid." Phillips Second Report ¶38. I disagree.

In particular, one of ordinary skill in the art would understand that a cartridge is a case or container that holds a substance, device, or material which is difficult, troublesome, or awkward to handle and that usually can be easily changed. As I explained in the First Nayfeh Report, container 5 of the Rayovac products (i) holds cleaning fluid, (ii) is easily removed from the housing 2 and refilled with cleaning fluid when needed, and (iii) is distinct or separate from the cradle structure 3a, 3b, and 3c.

Mr. Phillips also argues that "[a]t best, the reservoir in Rayovac's . . . products functions like the 'collecting reservoir' 65 in Figure 2 of the '556 [P]atent." Phillips Second Report ¶38. I disagree.

As shown in Figure 2 (reproduced below), collecting reservoir 65 (unlabelled rectangular region indicated by dashed lines in lower portion of Figure 2) is not a container for holding cleaning fluid that is removable from the cleaning device. Instead, it appears to be fixed to the cleaning device.

08/27/2005 16:42 FAX                                                                                    ☒011/079

**Confidential – Attorneys' Eyes Only**

Moreover, collecting reservoir 65 and filter 24 are not, as a unit, separable from the cradle structure. In contrast, the container 5 of the Rayovac products is removable from the cleaning device and, together with the filter, is removable from the cradle structure.



Fig. 2

Also, it is clear from the specification that collecting reservoir 65 is not a container for holding cleaning fluid; instead it is designed to pass the fluid to the filter. In particular, the specification states: "The capacity of the collecting reservoir is substantially smaller compared with the capacity of the cleaning fluid container 61 of Fig. 7." See '328 Patent at col. 4, lines 49-51. The specification further teaches that this reservoir be configured so that hair particles remain agitated therein and fed to the filter rather than being allowed to settle at the bottom of the reservoir. See '328 Patent at col. 7, line 65 to col. 8, line13. Therefore, unlike the cleaning fluid containers in the accused devices, the collecting reservoir is not a cleaning fluid container for holding a cleaning fluid.

Finally, Mr. Phillips' analogy to ammunition cartridges as commonly used in firearms, see Phillips Second Report at ¶39, supports the conclusion that container 5 of the Rayovac products is a cartridge. These ammunition cartridges typically consist of a tube (the casing) that contains what would otherwise be the separate elements of the projectile, powder, and primer. Use of a cartridge makes it much easier to handle these elements and change them as a unit. Many operators of firearms reload cartridges by pouring powder (and assembling projectile and powder) into spent cartridges. Such a use is similar to Rayovac's products, which provides a container cartridge into which the operator can pour additional cleaning fluid.

Therefore, the Rayovac products include the requisite cleaning fluid container.

9746034                                             -8-

**Confidential – Attorneys' Eyes Only**

**Element:  "A Fluid Feed Mechanism Which Feeds The Cleaning Fluid After It Passes Through The Filter To The Cradle Structure During Cleaning"**

In the First Nayfeh Report, I explained that each Rayovac cleaning system has "a fluid feed mechanism which feeds the cleaning fluid after it passes through the filter to the cradle structure during cleaning." In the Rayovac products, pump 6 draws fluid from the container 5 after it passes through the filter 12, pumping it via the conduit 7 to the cradle structure manifold 3a and ports 3b during the cleaning operation.

Mr. Phillips does not disagree. Instead, he argues that the claim limitation is not met because parties have purportedly agreed to construe this element to be a mechanism that feeds cleaning fluid from the cleaning fluid container to the cradle structure after it passes through the filter (from the pump to the filter and then to the cradle). As I explained in the First Nayfeh Report, I do not consider the particular order of fluid flow to be limited by the claim. Though the inventors' preferred embodiment depicts a certain fluid flow (wherein the cleaning fluid flows from the pump to the filter and then to the cradle), one of ordinary skill in the art would not consider the claim itself to impose a limitation on the particular order of fluid flow. Nor would it be proper to import such a limitation simply because it is found in the preferred embodiment. To the extent that Mr. Phillips (see Phillips Second Report ¶¶42-46), the parties, or the Court read into this element a particular order of fluid flow limitation, I disagree.

Mr. Phillips next argues, as he does in connection with his discussion of claim 11 of the '328 Patent, that the Rayovac cleaning systems do not contain this claim element because the Rayovac products do not have a "cradle structure" and fluid is not "fed" to supporting structures 3c. See Phillips Second Report ¶¶47. For the reasons set forth above in connection with my discussion of the fed device element of claim 11 of the '328 Patent, I disagree.

As Mr. Phillips implicitly acknowledges, in each of the Rayovac products, fluid is fed from the container 5, after it passes through filter 12, by pump 6 via conduit 7 to the manifold 3a and ports 3b. Therefore, these products contain the requisite feed device element of claim1.

**Element:  "Said Container And Filter Being Separable From The Cradle Structure As A Unit"**

In the First Nayfeh Report, I explained that each Rayovac cleaning system has a "container and filter being separable from the cradle structure as a unit." The Court has construed this element to require that the container and filter are integrally formed or assembled as a unit, such unit being removable from the cleaning device. In the Rayovac products, the filter 12 and container 5 are assembled as a unit in that filter 12 is assembled to the container 5. When the container 5 is removed from the housing 2, both the filter 12 and container 5 are separated from the cleaning device together as a unit.

9746034                                         -9-

**Confidential – Attorneys' Eyes Only**

Mr. Phillips first argues that the Rayovac products do not have a "cartridge." See Phillips Second Report ¶49. For the reasons set forth above in connection with my discussion of the "a cleaning fluid container separate from the cradle structure for holding a cleaning fluid" element of claim 1 of the '556 Patent, I disagree.

Mr. Phillips next argues that in the Rayovac products, the filter 12 and the container 5 are not integrally formed. See Phillips Second Report ¶50. Mr. Phillips, however, does not dispute that the filter 12 and container 5 are assembled as a unit, as required by the claim construction.

Mr. Phillips next argues that in the Rayovac products, there is no cleaning device without the cleaning fluid container 5. See Phillips Second Report ¶¶51-53. Although it is not entirely clear, Mr. Phillips' argument is apparently that the container 5 in the Rayovac cleaning systems does not meet this claim limitation because it also serves a physical support and cosmetic function for the cleaning system. See id. I disagree. There is no requirement in either the claim language or the Court's construction that the container serve no functions other than those mentioned. And of course, one would not expect any cleaning system to be useable with the container separated from the cleaning device.

<u>Claim 6</u>

Claim 6 of the '556 Patent is identical to claim 1 except that it includes the further limitation that the container include ports through which cleaning fluid pass in and out of the cleaning fluid container.

**Element: "The Cleaning Fluid Container Includes Ports Through Which The Cleaning Fluid Passes In And Out Of The Cleaning Fluid Container"**

As I explained in the First Nayfeh Report, in the Rayovac products, the cleaning fluid container 5 includes ports 13 and 15 through which the cleaning fluid passes in and out of the cleaning fluid container

Mr. Phillips argues that the openings that I labeled 13 and 15 in the First Nayfeh Report are not ports. See Phillips Second Report at ¶60-61. I disagree. One of ordinary skill in the art would recognize that a port is an opening for intake or exhaust of a fluid. Despite Mr. Phillips' assertions to the contrary, the fact that a pump housing is inserted through port 15 to draw fluid through opening 15 (see Phillips Second Report ¶61) does not alter the fact that it is an opening through which fluid leaves the container. Therefore, opening 15 is a port. Similarly, opening 13 is a port because it is an opening through which the fluid enters the container.

Moreover, contrary to Mr. Phillips' assertion, the fact that the inlet port 13 is an inlet to the filter (see Phillips Second Report ¶60) does not render it outside the claim limitation. As discussed above, filter 12 and container 5 are assembled as a unit, and as in the preferred embodiment of the '556 patent, fluid passes through an inlet port (labeled 62 in

9746034                              -10-

**Confidential – Attorneys' Eyes Only**

Figures 6 and 7 of the patent) into the filter and thereby into the assembled unit comprising filter and cleaning fluid container.

<u>Claim 18</u>

Claim 18 of the '556 Patent is identical to claim 1 except that it includes the further limitation that the cradle structure be open to the atmosphere and supplied with cleaning fluid from cleaning fluid container by means of the fluid feed mechanism.

Mr. Phillips argues that Rayovac's systems do not infringe on claim 18 because claim 18 depends on claim 1. See Phillips Second Report ¶63. For the reasons set forth above in connection with my discussion of claim 1, I disagree.

## V.    PURPORTEDLY NON-INFRINGING ALTERNATIVES

### A.    GAS CLEANING SYSTEMS

Mr. Phillips asserts that Rayovac has developed two "gas cleaning" systems that are acceptable non-infringing substitutes for the patents-in-suit. See Phillips Second Report ¶¶81-83. Mr. Phillips purports to base his conclusion on (i) review of photographs and other materials of these gas cleaning systems, see id. at Ex. 37, (ii) conversations with James Chasen, the engineer who allegedly developed these gas cleaning systems, and (iii) the time it took Rayovac to introduce its foil cleaning system after its mechanical design was complete. See id. Though I have not had a conversation with Mr. Chasen, I have reviewed his deposition transcript, which I have attached hereto as Exhibit E. Based on his testimony and my review of the documents cited by Mr. Phillips, I disagree that Rayovac has developed gas cleaning systems that are acceptable non-infringing substitutes for their products.

To begin, Mr. Chasen testified that he began developing a type of gas cleaning system in June 2004. See Ex. E, p. 92. I understand that Rayovac launched its first infringing product (the R-9500 cleaning system) in the Fall 2003. Thus, at the time Rayovac began infringing the patents-in-suit, it had not even begun to develop any of its allegedly non-infringing gas cleaners. Indeed, as to one of the documents -- the operating instructions (see Phillips Second Report, Ex. 37 at R010591 - R010592) for a prototype gas-based cleaning system -- Mr. Chasen testified that he "just did this" at the time his deposition was taken on May 5, 2005. See Ex. E, p. 91.

Moreover, there is nothing in the undated photographs and other materials relied on by Mr. Phillips (see Phillips Second Report, Ex. 37) to support his conclusion that the two gas cleaning systems "have proven to be effective in cleaning dirty shaving heads." See Phillips Second Report ¶82. Even if (as Mr. Phillips suggests) Mr. Chasen, the engineer who developed these products, believes that they are effective cleaners, that is not the test. In particular, Mr. Phillips points to no consumer studies showing that consumers believe that these gas cleaning systems are substitutable for the products that read on the patents-in-suit. Such a study would need, at a minimum, to account for the relative

**Confidential – Attorneys' Eyes Only**

cleaning efficacy of the gas cleaners versus the products on the market and the price for the competing products. And there is considerable reason to believe that consumer would not find the gas cleaners to be adequate substitutes for the current products. In particular, the '328 Patent notes that prior art gas cleaners have not been effective in removing sebum and other dirt from shaver heads and require a seal. See '328 Patent at col. 1, lines 9-23; id. at col. 1, lines 61-67. Thus, Mr. Phillips' mere assertion that the products are substitutes is not enough.

Further, it is not clear that Rayovac has either the know-how or the equipment to bring the gas cleaning systems to market. Mr. Phillips asserts that Rayovac was able to bring its foil cleaning system (the MS-5500 cleaning system) to the market "in a matter of months after the design was complete." Phillips Second Report ¶83. And, on that basis, he concludes that Rayovac has the ability and know-how to bring the gas cleaners to market. Id. I disagree. First, design and production of the foil cleaning system required only slight modification of the rotary cleaning system, which Rayovac had launched one year earlier. Therefore, it is inappropriate to use the timing of the launch of the foil cleaning system as a basis for predicting the timing of the launch of any Rayovac gas cleaning system it should in the future bring to market.

Second, even Mr. Chasen admits that his prototype gas cleaners are "not a production unit, so it's a little bit not as user friendly as it could be." See Ex. E, p. 93. Mr. Chasen further testifies that the gas cleaner system is "a little bit not user friendly, but it was designed to demonstrate to people the principles of this method of cleaning." Id. at p. 94. Thus, Mr. Phillips' conclusion that the mechanical design for these systems is "complete" is unsupported even by the engineer who developed them.

In fact, it appears that the design of these gas cleaning systems is far from complete, even one year after their development commenced. The undated documents (see Phillips Second Report, Ex. 37 at R010934-R010938) that Mr. Phillips cites to support his assertion that Rayovac has developed a gas cleaning system that employs a compressor appear to be photographs of a stand-alone compressor in various states of disassembly, not a cleaning system. And the undated documents (see id. at R010599, R010791-R010801) that Mr. Phillips cites to support his assertion that Rayovac has developed a gas cleaning system that employs a carbon dioxide cartridge support only the conclusion that Rayovac has a laboratory test stand for such a system:

- Document R010599, for example, is photograph of a carbon dioxide cartridge, cartridge holder, and valve mechanism. The valve mechanism appears to be a slight modification of that labeled as "Seltzer Mechanism" in document R010593. And the cartridge and cartridge holder appear to be identical to those that accompany the "Seltzer Mechanism" in document R010593.

- Documents R010791-R010793, for example, are photographs of a bench-top apparatus in which a razor sits in a cradle affixed to a plywood board via threaded rods. A number of flexible tubes supply gas to the cradle from a

Confidential – Attorneys' Eyes Only

commercially available carbon dioxide cartridge and valve ("Ultraflate Plus") to the shaving head.

- As made clear from the photographs in Documents R010794 and R010798, this apparatus employs fittings attached to the shaving head to couple the flexible tubes to the shaving head.

Thus, the cited documents show only crude laboratory test stands that could not even be called prototype commercial cleaning systems. And it is clear from the photographs and the accompanying instructions, which Mr. Chasen "just did" prior to his May 5, 2005 deposition, that the prototype which he developed is far from the level of refinement required to bring a product to market.

There are several technical challenges that would need to be solved by Rayovac to bring a gas cleaning system to market. For example, the carbon dioxide cartridges do not last very long. Indeed, according to the instructions (see Phillips Second Report, Ex. 37 at R010591 - R010592), the cartridge would last for only two weeks if the shaver is cleaned once every three or four days of use. Such hurdles, coupled with the admission of Mr. Chasen as to the preliminary nature of the Rayovac designs, cast considerable doubt on whether Rayovac has a completed mechanical design.

Therefore, I do not agree with Mr. Phillips conclusion that these two gas cleaning systems are available non-infringing alternatives for the current products.

## B.    MR. PHILLIPS' OTHER SYSTEMS

Mr. Phillips next several "substitutes" for Rayovac's infringing products appear to be a laundry list of modifications (apparently developed by Mr. Phillips and not Rayovac) to Rayovac's existing products apparently targeted to design around the patents-in-suit. See Phillips Second Report ¶¶84-103. I disagree with Mr. Phillips that consumers would consider any of these modified products substitutes for the current Rayovac products and, given their obviously preliminary nature, that Rayovac has the know-how and equipment currently (or more importantly, at the time it began selling its first infringing device in the Fall of 2003) to make such modifications.

### Filter Position Modification

Mr. Phillips' first proposed modification is to "removably latch the filter to the bottom of . . . housing 2." See Phillips Second Report ¶86. Mr. Phillips provides no detail of how such a filter would be latched to the housing 2 or what other modifications to the housing or to the cleaning fluid container 5 would need to be made. Nor does Mr. Phillips explain why such a system would be considered by the consumer as a substitute for Rayovac's current infringing products. In particular, such a filter latching design would be awkward for the consumer. It would involve a messy cleaning fluid replenishment process, since the filter bag (now dirty) would drip fluid on the bathroom counter, rather than remain contained in the cleaning fluid container. Moreover, assembly of the housing 2, now latched to the filter, would be cumbersome. The consumer would need to line up the

**Confidential – Attorneys' Eyes Only**

filter bag and ensure that it does not get tangled or pinched during reassembly. Such a product is unlikely to be as successful as the current product in which the filter and container are easily handled with a minimum of manipulation.

Further, Mr. Phillips statement that Rayovac has the know-how, equipment, and materials to make the needed modifications to its cleaning system supported. Indeed, there is no suggestion by Mr. Phillips that Rayovac has even considered such a design, either at present or in the past.

Thus, I do not consider this design to be an available non-infringing alternative.

Passive Drying

Mr. Phillips' next modification is removal of Rayovac's drying device. See Phillips Second Report ¶90. I do not consider this modification to be a substitute for the current Rayovac products because the cleaning cycle would be lengthened. Among the primary concerns of the designers of wet cleaning systems is the total cycle time. For example, Mr. Chasen testified that it was a critical design criterion for Rayovac in developing its current products that the cleaning cycle duration should be less than one-half hour. See Ex. E, p. 62. Thus, the additional time needed to air or drip dry the shaving head was not acceptable to Rayovac at the time it designed its current products. There is no reason to believe, therefore, that it would be acceptable to consumers now.

There is, moreover, no suggestion by Mr. Phillips that Rayovac has considered such a design, either at present or in the past.

Thus, I do not agree with Mr. Phillips that such a system is an available non-infringing alternative.

Induction Heating

Mr. Phillips' next modification is replacement of Rayovac's drying device with a drying device that uses induction heating. See Phillips Second Report ¶95. Mr. Phillips does not explain how such a substitution would be made, he presents no analysis of the complexities involved in making the substitution, and provides no insight on even where the induction heater would be located. Implementation of an induction heating device would require considerable engineering development. It requires placement of an electrical coil to induce magnetic fields in the electrically conducting components of the shaving head as well as a supply of alternating electrical current. There is no evidence that Rayovac has completed any of this engineering development.

Additionally, there is no indication in Mr. Phillips' Second Report that he or anyone at Rayovac has the know-how, equipment, materials, or ability to make the requisite modifications. Indeed, there is no suggestion by Mr. Phillips that Rayovac has considered such a design, either at present or in the past.

06/27/2005 16:45 FAX                                                    ☒018/079

**Confidential – Attorneys' Eyes Only**

Thus, I do not agree with Mr. Phillips that such a system is an available non-infringing alternative.

## Cradle Structure Covers

Mr. Phillips' next modification is to incorporate a plastic cover (either removable or hinged) to the cradle structure. <u>See</u> Phillips Second Report ¶98. Mr. Phillips asserts without any basis that such modified products are a "non-infringing substitutes" for Rayovac's current products. <u>Id.</u> at ¶99. I disagree.

In particular, introduction of a cover (hinged or removable) over the cradle structure in Rayovac's cleaning systems would make the products less appealing to the consumer, a consideration mentioned explicitly by the inventors in both the '328 and '556 Patents. For example, the '328 Patent states that it is an advantage of the claimed invention that the cradle structure be open to the atmosphere, enabling "the shaving apparatus to be inserted in the cradle without any effort and to be withdrawn therefrom without the need to utilize any parts closing the cradle." <u>See</u> '328 Patent at col. 2, lines 44-55. Not surprisingly, there is no indication that Rayovac has ever considered a design with such a cover.

Thus, I do not agree with Mr. Phillips that such a system is an available non-infringing alternative.

## Bracket Without Vertical Projections

Mr. Phillips suggests that Rayovac could modify its current design to make its cradle structure deeper and thereby eliminate the bracket. <u>See</u> Phillips Second Report at ¶103. Mr. Phillips provides no details of the suggested redesign. Such a redesign involving significant changes to the dimensions of the cradle structure would require considerable engineering effort and new tooling. And it is unclear how Mr. Phillips's proposed modifications would eliminate the need for a projecting support into which the shaver is inserted.

Thus, I do not agree with Mr. Phillips that such a system is an available non-infringing alternative.

**Confidential – Attorneys' Eyes Only**

## VI.   CONCLUSION

I disagree with Mr. Phillips' conclusion that the asserted claims of the patents-in-suit are not infringed.  I further disagree that Rayovac has developed any available non-infringing alternatives.

Samir Nayfeh
June 27, 2005

**EXHIBIT E**

06/27/2005 16:45 FAX                                                    ☑021/079

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------
BRAUN, GmbH,
                                    Civil Action No.
                                    03 CV 12428 WGY
                    Plaintiff,

        -against-

RAYOVAC CORPORATION,

                    Defendant.
-----------------------------------------------

DEPOSITION OF JAMES CHASEN

Thursday, May 5, 2005

New Haven, Connecticut

*** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

Reported By:

LINDA J. GREENBERG

JOB NO. 3208

7a129155-49aa-4907-8dee-42ac5376e13a

06/27/2005 16:46 FAX                                                    ☑022/079

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 2

```
 1
 2              May 5, 2005
 3              9:34 A.M.
 4
 5
 6
 7       Deposition of JAMES CHASEN, taken by
 8   Plaintiff, pursuant to Notice, at the offices of
 9   Wiggin & Dana, 265 Church Street, New Haven,
10   Connecticut, before Linda J. Greenberg, a
11   Certified Shorthand Reporter and Notary Public
12   of the States of New York and Massachusetts.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   APPEARANCES:
 3
 4   ROPES & GRAY, L.L.P.
     Attorneys for Plaintiff
 5       One International Place
         Boston, Massachusetts 02110-2624
 6   BY:   DALILA ARGAEZ WENDLANDT, ESQ.
 7
 8   KIRKLAND & ELLIS, L.L.P.
     Attorneys for Defendant
 9       200 East Randolph Drive
         Chicago, Illinois 60601
10
     BY:    JAMES A. SHIMOTA, ESQ.
11
12
13
14
15
16
17   Also Present:
18   Stanley D. Liang, Esq.
     Ropes & Gray, L.L.P.
19
20
21
22
23
24
25
```

Page 4

```
 1
 2               JAMES CHASEN,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5              (Exhibit 1 for
 6   identification, Notice of deposition.)
 7   EXAMINATION BY
 8   MS. WENDLANDT:
 9       Q.   Would you please state your name.
10       A.   James Chasen.
11       Q.   Mr. Chasen, I'm placing before you
12   what has been previously marked as Exhibit 1.
13           Have you seen this notice of
14   deposition of Rayovac Corporation before?
15       A.   No, I haven't.
16       Q.   I ask you to flip to page 5 of
17   Exhibit 1.
18       A.   Do you want me to read the whole
19   thing?
20       Q.   Actually, why don't you read the
21   first two pages.
22           Have you finished reading the two
23   pages?
24       A.   Page 5?
25       Q.   Yes.  Can you please turn to
```

Page 5

```
 1           JAMES CHASEN - CONFIDENTIAL
 2   page 5.  I'm going to ask you to read topic
 3   number 1 listed on page 5.
 4       A.   "Defendant's research and
 5   development, product design and testing for the
 6   cleaning devices of its shaving products,
 7   including, but not limited to, Titanium Smart
 8   Systems."
 9       Q.   Mr. Chasen, have you been
10   designated by Rayovac Corporation to speak on
11   behalf of the company with regard to topic
12   number 1?
13       A.   Yes.
14       Q.   Can I ask you to read to yourself
15   topics 6, 7, 8 and 9, and let me know when
16   you're done.
17       A.   Out loud or just to myself?
18       Q.   You can read it to yourself.
19       A.   I'm sorry, I did see this document
20   before.  I was looking at the very first page,
21   but I remember seeing these.
22       Q.   Page 5?
23       A.   Yes, I just wanted to clarify that.
24       Q.   Sure.
25       A.   Okay.
```

2 (Pages 2 to 5)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dee-42ac5376e13a

06/27/2005 16:46 FAX                                                      Ø023/079

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

---

Page 6

JAMES CHASEN - CONFIDENTIAL
1
2    Q.    Have you been designated by Rayovac
3 Corporation to speak on behalf of the company
4 with regard to topics 6, 7, 8 and 9 as well?
5    A.    Yes.
6    Q.    And, Mr. Chasen, as a result of
7 that designation by Rayovac, do you understand
8 that you are here today to testify under oath,
9 not only as to matters known to you personally,
10 but also as to matters known or reasonably
11 available to Rayovac Corporation with regard to
12 these five topics?
13    A.    Yes.
14    Q.    What did you do to prepare for
15 today's deposition?
16    A.    Well, Jim and I just went over --
17 briefly over some of my notes to refresh my
18 memory so that -- in preparation.
19    Q.    Aside from Mr. Shimota, who else
20 did you speak to, if anyone?
21    A.    About this deposition?
22    Q.    Yes, in order to prepare for this
23 deposition.
24    A.    Nobody.
25    Q.    What documents did you review? You

---

Page 7

JAMES CHASEN - CONFIDENTIAL
1
2 said your notes -- anything else?
3    A.    Most of my development notes that I
4 had. I had a lot of looseleaf binders with my
5 personal files, and there were also some e-mails
6 and things that I just briefly scanned that were
7 from some other people of our group.
8    (Mr. Liang enters deposition.)
9    MS. WENDLANDT: Mr. Chasen, this is
10 my colleague, Mr. Liang.
11    Q.    Mr. Chasen, can you briefly tell me
12 about your educational history starting with
13 college?
14    A.    I have a Bachelor of Science in
15 mechanical engineering from Fairleigh Dickinson
16 University.
17    Q.    When did you receive your BS in ME?
18    A.    1983.
19    Q.    Any other education beyond that?
20    A.    No.
21    Q.    Describe your employment history
22 following college.
23    A.    I worked for a company called CE
24 Lummus Engineering as a piping and
25 instrumentation engineer for about three years,

---

Page 8

JAMES CHASEN - CONFIDENTIAL
1
2 two to three years.
3    After that, I worked for Electrolux
4 Corporation. They're an appliance manufacturer
5 of vacuum cleaners. I was a product engineer
6 there for approximately three to four years.
7    Following that, I was hired as a
8 project engineer, senior project engineer for
9 Black & Decker, and I was with them for over 16
10 years doing new product development, R&D, that
11 type of thing, mainly related to appliances.
12    Black & Decker changed hands --
13 actually, sold the appliance division to a
14 company called Applica, so the names are a
15 little different. I don't know if that's
16 relevant.
17    Q.    This was during the 16-year period
18 that you were there?
19    A.    Yes. But it was basically the same
20 company doing the same thing. It was purchased
21 by another company. I don't know if that's
22 relevant.
23    After that, I worked for Remington
24 Corporation and I've been with them ever since,
25 primarily doing new product development, R&D.

---

Page 9

JAMES CHASEN - CONFIDENTIAL
1
2    Q.    When did you begin your employment
3 with Remington?
4    A.    January of 2003.
5    Q.    And I understand that now Remington
6 has been merged with Rayovac Corporation?
7    A.    This is a common trend that's been
8 going on in my life.
9    Q.    So for purposes of this deposition,
10 just so you know, I will be referring to
11 Remington and Rayovac interchangeably.
12    A.    As one company, that's fine.
13    Q.    If there's a significant difference
14 that makes the question not understandable by
15 you, please let me know.
16    A.    Okay, sure.
17    Q.    You began with Remington in January
18 of 2003?
19    A.    Yes.
20    Q.    What was your position when you
21 began?
22    A.    I started as a consultant and I was
23 a consultant for approximately three months, a
24 full-time consultant, actually working
25 approximately 40 hours a week; and then after

---

3 (Pages 6 to 9)

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 10

1          JAMES CHASEN - CONFIDENTIAL
2    that, Yuri Avila, the person I was reporting to,
3    offered me a full-time position as a Remington
4    employee, so around April of 2003 I was then
5    hired as an R&D engineer, was my job title.
6          Q.    What were your responsibilities in
7    April of 2003?
8          A.    Primarily the development of the
9    cleaning system was what I was hired for, and
10   that was my main job for the next year or so,
11   and then I started getting a few other
12   assignments, but primarily that was my main
13   assignment.
14         My function was primarily in the
15   conceptualization of new ideas, the testing, the
16   evaluation, the prototyping. Just making the
17   product work was the main reason I was hired.
18         Q.    Did you have a job title at the
19   time, April 2003?
20         A.    Yes. It was an R&D engineer.
21         Q.    What is your current position?
22         A.    With Rayovac it's called a
23   principal engineer, although my card says
24   "Principal Engineer, Research and Development,"
25   so -- I like that end of it.

Page 11

1          JAMES CHASEN - CONFIDENTIAL
2          Q.    Have your responsibilities changed
3    as a result of the title switch?
4          A.    No. Still the same.
5          Q.    Mr. Chasen, can you describe the
6    genesis of the idea for the Remington cleaning
7    device?
8          A.    Well, when I came on board, the
9    genesis of the idea was already established, so
10   it wasn't me coming up with the idea saying,
11   "Oh, let's do a cleaning system."
12         The idea of a wet cleaning system
13   was already established --
14         Q.    I'm sorry, a wet cleaning system?
15         A.    Yes.
16         When I say "wet," it means with
17   alcohol because -- I won't get into that.
18         I'm working on other things that
19   aren't necessarily alcohol, so --
20         Q.    You're currently working on other
21   things that are not necessarily alcohol?
22         A.    Uh-huh.
23         Q.    But at the time when you started,
24   in January or April 2003, you were working on
25   the alcohol-based cleaning system?

Page 12

1          JAMES CHASEN - CONFIDENTIAL
2          A.    That's correct.
3          Q.    I understand that the genesis of
4    the idea had already formed when you joined
5    Rayovac, but you're here to testify on behalf of
6    the knowledge of the company.
7          Do you know who came up with the
8    idea for the alcohol-based cleaning system?
9          A.    No, I don't know the person who
10   said, "We want to have an alcohol-based cleaning
11   system." That, I don't know.
12         Q.    Is there somebody at Rayovac that
13   knows that?
14         A.    Probably, yes. I would say
15   probably Yuri Avila would know the person that
16   initially came up with that.
17         Q.    Do you know when the idea was
18   conceived?
19         A.    No. I do know that they were
20   thinking about it at least a year or two ahead
21   of time, but not a lot has been really done.
22         Q.    Ahead of the time that you were
23   hired?
24         A.    That I arrived, yes.
25         It was obvious that some work had

Page 13

1          JAMES CHASEN - CONFIDENTIAL
2    been done prior to my arrival. Exactly how
3    long, I don't know.
4          Again, Yuri Avila would probably be
5    the person that would have that information.
6          Q.    What was the motivation behind
7    Rayovac's decision to come up with an
8    alcohol-based cleaning system?
9          A.    I think they wanted to get into a
10   higher price-point category for their shaver
11   line. I think there was so much they could
12   charge for an electric shaver, so they wanted
13   higher price-points. I believe that's why they
14   did it. I'm not in marketing so I can't say for
15   certain what their reasons were.
16         Q.    So it's Rayovac's testimony that
17   the decision to go forward with the
18   alcohol-based cleaning system was made by
19   somebody in marketing?
20         A.    Yes. That's usually how it works.
21         (Exhibit 2 for
22   identification, One page document entitled,
23   "Remington Cleaning/Recharging System,"
24   production numbers R 002955.)
25         Q.    Mr. Chasen, I've placed before you

4  (Pages 10 to 13)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dee-42ac5376e13a

08/27/2005 16:47 FAX                                                                    @025/079

# ESQUIRE DEPOSITION SERVICES
## HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 14

JAMES CHASEN - CONFIDENTIAL
1
2  what has been marked Exhibit 2, which is a
3  document entitled, "Remington Cleaning
4  Recharging System, Revised August 21, 2001."
5      Do you see that?
6  A.  Uh-huh.
7  Q.  Can you review that document?
8  A.  Okay.
9  Q.  This is the earliest document that
10  Rayovac has produced regarding Remington's
11  cleaning device.
12      Do you have any knowledge of any
13  documents earlier concerning the Rayovac
14  cleaning device?
15  A.  No.  This was well before my time.
16  Q.  And you have not, in preparation
17  for your deposition on behalf of Rayovac,
18  reviewed any documents that are earlier than
19  this?
20  A.  To be honest, I don't remember. I
21  mean, I skimmed a lot of pages, so if it was
22  something that was earlier than that, I wasn't
23  looking at dates or anything. I was just kind
24  of skimming through it, so --
25  Q.  Is Mr. Avila still with Rayovac

Page 15

JAMES CHASEN - CONFIDENTIAL
1
2  Corporation?
3  A.  Yes.
4  Q.  Where does he work?
5  A.  Madison, Wisconsin.
6  Q.  Prior to today's deposition, had
7  you seen this document before?
8  A.  I believe I might have scanned it
9  yesterday in preparation. I looked at a lot of
10  pages.
11  Q.  Mr. Chasen, do you know why in this
12  document the Braun Syncro device is mentioned?
13  A.  No, I don't.
14  Q.  Do you know why in this document
15  the size constraints for the Rayovac cleaning
16  device would be determined as a function of the
17  Braun cleaning device?
18  A.  No.
19      The only thing I can think of is, I
20  guess at this date the Braun Syncro was a
21  competitor product out on the market, and we do
22  that all the time when we're looking to
23  introduce a new product, we look at the
24  competition and see what's out there. It's a
25  normal occurrence.

Page 16

JAMES CHASEN - CONFIDENTIAL
1
2  Q.  Do you know at this time, August
3  21, 2001, did Rayovac have a competing device
4  for the Braun Syncro?
5  A.  Did Rayovac? Not to my knowledge.
6  Q.  You mentioned Rayovac --
7  A.  You said did Rayovac have a
8  cleaning device prior to this date? I keep
9  going Remington in my mind. No, they didn't.
10  There was no cleaning device prior to this
11  time --
12  Q.  At this time, August 21, 2001, the
13  date of this document, did Rayovac have a
14  competing device for the Braun Syncro device?
15  A.  Not to my knowledge.
16      (Exhibit 3 for
17  identification, One page document, handwritten
18  notes, production numbers R 000666.)
19  Q.  Mr. Chasen, I've placed before you
20  what has been marked Exhibit 3, which is a
21  document dated 9/17/01, "Test Braun Syncro."
22      Do you see that?
23  A.  Yes.
24  Q.  Have you seen this document before?
25  A.  No, I don't believe I have.

Page 17

JAMES CHASEN - CONFIDENTIAL
1
2  Q.  Do you know why on September 17,
3  2001 Rayovac would have been conducting tests of
4  Braun Syncro's device?
5  A.  I could speculate.
6  Q.  Well, you're here to speak on
7  behalf of Rayovac Corporation. Not to
8  speculate.
9  A.  Okay. It was most likely to
10  evaluate competitor units.
11  Q.  And at this time, September 19,
12  2001, Remington had no competitor unit for the
13  Braun Syncro, did it?
14  A.  No.
15  Q.  Do you know who tested the Braun
16  Syncro?
17  A.  No, I don't. I don't know who
18  tested it back then.
19  Q.  Do you know whose handwriting is
20  depicted in Exhibit 3?
21  A.  It's either Bob Garbarino or Will
22  Valentine. One of those two gentlemen.
23  Q.  Is Bob Garbarino still with Rayovac
24  Corporation?
25  A.  No.

5 (Pages 14 to 17)

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

**Page 18**

1          JAMES CHASEN - CONFIDENTIAL
2     Q.    Do you know where he is?
3     A.    I believe he's working for a
4  company in Milford, Connecticut.
5     Q.    How about Will Valentine?
6     A.    He's working for Hubbel Corporation
7  in Bridgeport, Connecticut.
8     Q.    As of September 17, 2001, did
9  Rayovac Corporation have a prototype of a
10  cleaning device that was intended to compete
11  with the Braun Syncro?
12     A.    I don't believe so, no.  Not that
13  early.
14     Q.    What was the original concept for
15  the Remington or Rayovac cleaning device?  Would
16  you describe that for us?
17          MR. SHIMOTA:  Objection to form.
18     A.    The original concept?
19     Q.    That's right.
20          On September 17, 2001, there was no
21  Rayovac prototype.  Did there come a time that
22  Rayovac came up with a concept design?
23     A.    Well, when I came on the picture in
24  '03, there was already a fairly well defined
25  concept or direction to go into.  I know that

**Page 19**

1          JAMES CHASEN - CONFIDENTIAL
2  they were looking at some other approaches, but
3  I really don't know exactly what those were.
4  They were kind of before my time; and when I
5  came on board it was kind of like, okay, here we
6  go.  We're going to go in this direction and
7  let's try to make it work, and that's what I was
8  hired to do.
9     Q.    Who at Rayovac would know about the
10  original concepts?
11     A.    Again, Yuri Avila would be the --
12  he was the engineering manager for shavers, and
13  that fell under his jurisdiction from an
14  engineering standpoint.  From a marketing
15  standpoint, you'd have to -- you know, sometimes
16  they have some ideas that might have been
17  floating around then, so you'd have to talk to
18  them.
19     Q.    Who would be the marketing person?
20     A.    Jim Doyle.
21          (Exhibit 4 for
22  identification, Multi-page document, first page
23  entitled, "Shaver Cleaner & Charger System,"
24  production numbers R 002935 through R 002941.)
25     Q.    Mr. Chasen, I've placed before you

**Page 20**

1          JAMES CHASEN - CONFIDENTIAL
2  what has been marked Exhibit 4.  Have you seen
3  this document before?
4     A.    No, I have not.
5     Q.    Can I ask you to review the
6  document which is dated October 12, 2001,
7  Exhibit 4.
8     A.    Okay.
9     Q.    Turning your attention to the
10  second page of the exhibit, number 13 on that
11  page of major components --
12     A.    Yes.
13     Q.    It states, "Two options to be
14  considered: A, disposable cartridge; B,
15  refillable container," and then it goes on.
16          Did Rayovac consider a cartridge at
17  one point?
18     A.    I don't know.  I don't know.
19          They were -- when I came on board,
20  it was having separate bottles and filling the
21  bottom housing with fluid.  Cartridges were not
22  considered when I came on board.
23     Q.    Would Yuri Avila be the person to
24  answer that question?
25     A.    Probably would, yes.

**Page 21**

1          JAMES CHASEN - CONFIDENTIAL
2     Q.    Exhibit 4 discusses a shaver
3  cleaner and charger system.
4          Prior to reviewing this document,
5  had anybody discussed with you this type of
6  cleaner charger system for Rayovac?
7     A.    You mean the way it's executed
8  right here?
9     Q.    That's right.
10     A.    No, no.
11     Q.    So you don't know anything about
12  this particular cleaning system?
13     A.    No, I don't.  I really don't.  This
14  was before my time.  Obviously they were
15  tinkering with some other executions than the
16  way it is now.
17     Q.    Do you know if Rayovac created a
18  prototype of this concept, the one shown or
19  described in Exhibit 4?
20     A.    No, I don't believe -- no, I've
21  never seen this prototype.
22     Q.    Did Rayovac conduct any market
23  studies to determine consumer's tastes as to a
24  cleaning device for dry shavers?
25          MR. SHIMOTA:  Objection.

6 (Pages 18 to 21)

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 22

1  JAMES CHASEN - CONFIDENTIAL
2      Outside the scope.
3      A.   I believe -- I don't know for sure,
4  but they must have.  They definitely must have.
5      Q.   Are you aware of any market studies
6  yourself?
7      MR. SHIMOTA:  Same objection.
8      A.   I don't know.  I really -- my
9  function there was strictly engineering, so a
10 lot of those marketing-type functions, I really
11 wasn't privy to a lot of that, especially during
12 the first three months I was there as a
13 consultant coming in.  My main focus was the
14 engineering side of it.  Not the marketing side
15 of it.
16     Q.   As part of your engineering duties,
17 did you have an understanding of what the
18 motivation was behind Remington's decision or
19 Rayovac's decision to enter the market with the
20 cleaning device?
21     A.   I would assume it was a way to
22 clean the shaver.  You know, they wanted to come
23 out with a higher price-point product that can
24 clean their rotary shavers and foil shavers.
25     Q.   Did anybody explain that motivation

Page 23

1  JAMES CHASEN - CONFIDENTIAL
2  to you when you started at Rayovac?
3      A.   Well, Yuri Avila, when I
4  interviewed there, he said, "We're working on a
5  system to clean shavers and this is what we have
6  so far," and kind of walked me through it.  They
7  didn't go into a big marketing thing, "This is
8  why we're doing it, to" -- anything like that.
9  It was just, you know --
10     Q.   So you can't today speak to any
11 knowledge of Rayovac Corporation with regard to
12 the development of its cleaning device prior to
13 the time that you joined?
14     A.   I'd feel uncomfortable doing that
15 because I wasn't there.
16     Q.   Even though Rayovac has designated
17 you as the person to speak on its behalf?
18     A.   Right.  I do know of -- like, even
19 what was done maybe three or four months before
20 I arrived, I saw some earlier work, but I mean
21 stuff that's even before that, I mean, the
22 decision was already made at that time not to go
23 in this direction that you showed me here.
24     Q.   Exhibit 4?
25     A.   Exhibit 4, yes.

Page 24

1  JAMES CHASEN - CONFIDENTIAL
2      That was just not on the table.
3  They had developed a prototype that had -- that
4  is similar to what you see on this table here,
5  although nonfunctioning at the time, and that's
6  kind of where I came in.
7      So -- and I know that there was
8  some work done previous to that by a gentleman,
9  Will Valentine, who was a product engineer as
10 well, and he was doing some earlier work with
11 cleanibility and so forth, using this type of
12 approach.
13     Q.   When you say "this type of
14 approach" and "what you see on this table,"
15 you're --
16     A.   Injecting into the hair pocket of
17 the shaver.
18     Q.   Let me finish the question, though.
19     When you said in your previous
20 answer "this type of approach" and "what you see
21 on this table," you're referring to the products
22 that Remington is currently marketing?
23     A.   That's correct.
24     Q.   Prior to the Braun Syncro cleaning
25 system, was Rayovac aware of any other cleaners

Page 25

1  JAMES CHASEN - CONFIDENTIAL
2  for dry shavers?
3      A.   Not to my aware -- not to my
4  knowledge.
5      (A recess was taken.)
6      (Exhibit 5 for
7  identification, Multi-page document, E-mail
8  dated 10/22/01 with attachment, production
9  numbers R 002956 through R 002958.)
10     (Exhibit 6 for
11 identification, Multi-page document, photographs
12 of cleaning device, production numbers
13 R 002950 through R 002954.)
14     Q.   Mr. Chasen, we're back on the
15 record.
16     I placed before you what has been
17 marked as Exhibit 6.
18     A.   6 before 5?
19     Q.   That's right.
20     Which appear to be photographs of a
21 cleaning device.
22     A.   Okay.
23     Q.   Have you seen this device before,
24 or these photographs?
25     A.   No, I haven't.  I haven't seen this

7  (Pages 22 to 25)

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 26

1        JAMES CHASEN - CONFIDENTIAL
2   before. It looks like a blender.
3        Q.   Do you know if it's a cleaning
4   device for shavers?
5        A.   No doubt it is.
6        Q.   You have no doubt that it is?
7        A.   Yes. Well, I could see the -- the
8   top is shaped like a head of a rotary shaver, so
9   this is most likely for a rotary shaver cleaning
10  system; and I guess the intent was that the
11  shaver would fit in the top there and it looks
12  like there's some plumbing devices down below
13  that would move fluid.
14       Q.   Beyond that, do you know how this
15  device operates?
16       A.   Based on Exhibit 5, I do.
17       Q.   Okay. Can you tell me what Exhibit
18  5 is?
19       A.   Well, Exhibit 5 is a proposal for
20  an electric controller, so what this is, is a
21  communication between Fred Mercurio and a guy
22  named Robert Schenck who is a consultant for
23  prototyping electronics, so what he's doing is
24  he's communicating to him for a proposal to
25  control some pumps and other devices

Page 27

1        JAMES CHASEN - CONFIDENTIAL
2   sequentially for cleaning.
3        So he's saying we want a breadboard
4   prototype of this. This is not that uncommon.
5   We do this kind of stuff all the time for making
6   prototypes, have a consultant make a part for
7   us, make an electronic board or something like
8   that.
9        Q.   So this consultant, Mr. Schenck, is
10  making a prototype board for the --
11       A.   Or he's quoting, he's saying phase
12  I, this is what it will be and this is what I'll
13  charge. It's a proposal for making a control
14  board for a cleaning system.
15       Q.   And based on your review of
16  Exhibits 5 and 6 --
17       A.   I don't know for sure if these two
18  tie exactly together. I mean, if they were
19  dated, you know -- if they were dated I could
20  probably tell that it was -- this was for that,
21  but just reading this and looking at that
22  picture, I can't be 100 percent certain that
23  this goes with that.
24       Q.   But are you familiar with
25  Mr. Schenck?

Page 28

1        JAMES CHASEN - CONFIDENTIAL
2        A.   No, I'm not.
3        Q.   You had previously described him as
4   a consultant?
5        A.   Yes. Because it says "RAS
6   Consulting, 245 West Main Street, Hebron"; and
7   on the bottom he's saying how much he's going to
8   charge, so there's no doubt that this guy
9   is a consultant.
10       Q.   Do you know why Mr. Schenck was
11  testing the Braun unit?
12       A.   Probably because -- well, it was a
13  competitive unit at the time on the market for a
14  cleaning system, so as a base of reference they
15  probably took the competitive Braun unit, took
16  the motor out and did an analysis of it. That's
17  all.
18       Q.   In this e-mail dated October 22,
19  2001, which is Exhibit 5, Mr. Schenck goes on to
20  say in the middle of the paragraph, "I will need
21  to review the patents to make sure our mutual
22  plans are okay."
23       A.   Where is this?
24       Q.   On the first page.
25       A.   Okay.

Page 29

1        JAMES CHASEN - CONFIDENTIAL
2        Q.   It says, "I will need to review the
3   patents to make sure our mutual plans are okay.
4   I will notify you if I see a conflict. It may
5   impact the plans," and then it goes on.
6        Do you know whether Mr. Schenck
7   reviewed patents in connection with his work for
8   Rayovac?
9        A.   It was to probably make sure that
10  it didn't infringe with what Braun was doing.
11  They wanted to make sure that they didn't
12  infringe on Braun's patents.
13       Q.   When you say "they," who are you
14  referring to?
15       A.   Frank and Robert Schenck.
16       Q.   Frank Mercurio?
17       A.   Yes. Frank was a design engineer
18  working under Yuri Avila. He's been with the
19  company maybe, like, five years, six years.
20  Something like that.
21       Q.   And he's still with the company?
22       A.   Yes. He's in Madison, Wisconsin.
23  He's now a manager under Yuri now. When he
24  moved out there he got a promotion.
25       Q.   Do you know whether Mr. Schenck

8  (Pages 26 to 29)

7a129155-49aa-4907-8dee-42ac5376e13a

Page 30

1       JAMES CHASEN - CONFIDENTIAL
2   actually reviewed any of Braun's patents in
3   connection with his work?
4       A.    No. Unfortunately, I don't. I
5   don't. I'm just talking based on this document.
6       Q.    And you don't know the results of
7   his patent review, if any?
8       A.    No. Unfortunately, I'm sorry.
9       Q.    Do you know whether he notified
10  Rayovac of his review of the Braun patents?
11      A.    No, I don't.
12      Q.    Aside from what Mr. Schenck may or
13  may not have done with regard to this e-mail,
14  Exhibit 5, did Rayovac conduct a liability
15  review in the course of developing the Rayovac
16  cleaning system?
17      A.    I know that there was a lot of
18  discussion with Mel Stoltz, S-T-O-L-T-Z, I
19  think. He was our corporate attorney and
20  everything that we did we made sure that we
21  cleared it through him to make sure it was okay,
22  that we weren't doing any infringing on anybody.
23  So we had several meetings with Mel at Rayovac,
24  or Remington at the time, in Bridgeport, and
25  showed him all phases of the project.

Page 31

1       JAMES CHASEN - CONFIDENTIAL
2       And I know for a fact even before I
3   came that they also had conversations with Mel
4   Stoltz to make sure what they were doing was
5   okay, the directions that they were taking were
6   okay.
7           (Exhibit 7 for
8   identification, Multi-page document, E-mail
9   dated 8/23/02, production numbers R 002714
10  through R 002715.)
11      Q.    Mr. Chasen, I've placed before you
12  Exhibit 7, which is two e-mails, the last one
13  dated August 23, 2001.
14      Have you seen this document before?
15      A.    I don't believe I have. Do you
16  want me to read it in detail here or --
17      Q.    One moment. I'll ask you a
18  question. Actually, yes. You can review the
19  document.
20      A.    Okay.
21      Q.    Directing your attention to the
22  first page, paragraph 2-A, why was Rayovac only
23  interested in making claims associated with
24  cleaning the actual shaver similar to that of
25  Braun?

Page 32

1       JAMES CHASEN - CONFIDENTIAL
2       MR. SHIMOTA: Objection.
3       Outside the scope. Form.
4       A.    I'm not really sure.
5       Well, according to this document,
6   it says if you only make claims about cleaning
7   the shaver, then the cleaning solution is
8   regulated as a household cleaning product -- I'm
9   just reading what it says here in 2-5 and
10  stating what it says, so -- what was your
11  specific question? Do I know why they were only
12  making claims about --
13      Q.    The question was, why was Rayovac,
14  quote, "only interested in making claims
15  associated with cleaning the actual shaver that
16  is part of the package sold with the cleaning
17  base, similar to that of Braun"?
18      MR. SHIMOTA: Objection.
19      Outside the scope.
20      A.    They wanted to develop a cleaning
21  system for a shaver. That's what they were
22  interested in.
23      Q.    Why was it important or significant
24  to be similar to Braun?
25      MR. SHIMOTA: Same objection.

Page 33

1       JAMES CHASEN - CONFIDENTIAL
2       A.    I don't know. I mean, maybe your
3   best of talking to somebody in marketing about
4   that. It's possible that that was their
5   benchmark, a competitive benchmark to go after.
6       Q.    So in the design of the Remington
7   device, whether or not Braun was a benchmark was
8   something that the design engineers didn't know?
9       A.    It was always -- I'm not going to
10  lie. We looked at the Braun as far as its
11  cleaning efficacy and it did a pretty decent job
12  in cleaning the shaver, so in the development of
13  this product, we wanted to make sure that it
14  cleaned equally as well.
15      Marketing was apparently satisfied
16  with the cleanibility of the Braun unit on how
17  well it performed, so when we developed this
18  product, it came up in discussions that, "Gee,
19  we would like it to perform as well as the Braun
20  unit," so -- I don't know if I answered you --
21      Q.    You did answer the question.
22      It appears based on Mr. Shimota's
23  objection and your lack of knowledge that
24  actually Exhibit 7 may be something related to
25  the marketing, not necessarily the design of the

9 (Pages 30 to 33)

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 34

JAMES CHASEN - CONFIDENTIAL

2 device.
3    A.    The way I interpret this document,
4 Product Genesis is some kind of a consulting
5 house and they're having this conversation on
6 how should we brand this, how should we sell the
7 solution.  They're asking these type of
8 questions, which I normally -- engineering, my
9 function would not get involved in these types
10 of discussions at all.
11    Q.    And who would?
12    A.    Jim Doyle -- Jim Doyle is even
13 copied on here.  Peter Katz at the time was the
14 marketing manager for this product line and he
15 left the company during -- when I was there.
16    Q.    Do you know how long ago he left?
17    A.    Sometime -- I think it might have
18 been in '03, towards the latter end of the year.
19    Q.    Do you know where Mr. Katz is now?
20    A.    I have no idea where he is, no.
21    I wish I could be more help on
22 this --
23    Q.    You're doing fine.
24    A.    I'm trying here.  I really am.
25    Q.    Some of my questions might not make

Page 35

JAMES CHASEN - CONFIDENTIAL

2 sense.  You know more about the business than I
3 do --
4    A.    Think of me as a technical
5 geekhead.  Don't think of me as a marketing
6 side, but I'll doing whatever I can to answer
7 the questions.  I do know some.
8    Q.    I appreciate that.
9         (Exhibit 8 for
10 identification, Multi-page document, E-mail
11 dated 9/9/02, production numbers R 002729
12 through R 002732.)
13    Q.    Mr. Chasen, I've placed before you
14 Exhibit 8.  Have you seen this e-mail before
15 dated September 9, 2002?
16    A.    No, I haven't.
17    Q.    Can I ask you to read the first
18 paragraph of that e-mail.
19    A.    Okay.  The two top paragraphs?
20    Q.    No.  Just the first paragraph,
21 actually.
22    A.    Sure.
23    Q.    What were the two solutions being
24 explored by Rayovac with Thermoelectron?
25    A.    I don't know who Thermoelectron is.

Page 36

JAMES CHASEN - CONFIDENTIAL

2 We were working with an outfit called Topiderm
3 out on Long Island, a formulating house for our
4 solution.  They formulated the cleaning solution
5 for us.  I have never heard of Thermoelectron.
6    Q.    How about Product Genesis?
7    A.    I don't know who those guys are
8 either. I'm sorry.
9    Q.    This e-mail is directed to
10 Mr. Avila.  Would he be the most knowledgeable
11 person at Rayovac about this?
12    A.    Yes, I believe he would.
13    Q.    I'll ask you to turn back to
14 Exhibit 4.  Exhibit 4 describes a cleaning
15 system which appears to include a disposable
16 cartridge.  Do you know when Rayovac decided to
17 reject the disposable cartridge concept of this
18 design?
19    A.    I don't know the exact date.  It
20 was definitely before I got there.  I know that
21 marketing would have liked to have had a
22 disposable cartridge like yours because it's a
23 nice little system.
24    Q.    When you say "like yours," do you
25 mean Braun?

Page 37

JAMES CHASEN - CONFIDENTIAL

2    A.    Braun.  Yes.  It was a very
3 desirable feature that I think marketing would
4 have liked, but there were most likely some
5 infringement possibilities that prevented us
6 from taking that approach; and also, it was a
7 little bit more difficult to execute.
8         I think our system, from a plumbing
9 standpoint, is a little more straightforward, a
10 little more easier.
11    Q.    You stated that there was likely
12 infringement possibility.
13         What do you mean by that?
14    A.    Well, they probably ran it by Mel
15 Stoltz, our attorney, and he said, "You can't do
16 that."
17    Q.    Do you know if, in fact, that
18 happened?
19    A.    No, I don't.
20    Q.    Who would know that?
21    A.    Yuri would probably know that.
22    Q.    And you also mentioned that the
23 reason for rejection of the cartridge device was
24 the difficulty in executing it due to plumbing?
25    A.    Yes.  I mean, there's -- when I

10 (Pages 34 to 37)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 38

JAMES CHASEN - CONFIDENTIAL
1   came on the project, the design direction was
2   already pretty much solidified; and when
3   marketing asked for a cartridge, we were, like,
4   well, gee, that's like a major thing, a major
5   design change, very difficult to execute, to
6   have it removed and come out and so forth,
7   there's a lot that goes in there so we decided
8   not to do that.
9       Q.   So going back to Exhibit 4, which
10  is dated October 12, 2001 --
11      A.   To my knowledge, I've never seen
12  this prototype. This was never made or never
13  seriously considered.
14      I mean, it was laid out at the time
15  saying here's one approach, and they laid it
16  out, but I have never seen this prototype and I
17  know that I would have seen it if it was ever
18  made because I was on the technical team and I'm
19  sure I would have seen prior things that they've
20  done. They would have shown me, "Here, we made
21  this, what do you think?" Never saw this.
22      Q.   I'm trying to figure out the
23  time-line. That, Exhibit 4, appears to be a
24  concept of a cleaner that includes a cartridge.

Page 39

JAMES CHASEN - CONFIDENTIAL
1   At some point, the cartridge was rejected prior
2   to your employment at Rayovac?
3       A.   Right. And I don't know the exact
4   reason why. I mean --
5       Q.   Let me finish the question first.
6       So in 2001 there's a cartridge
7   design at least being considered based on
8   Exhibit 4.
9       2003, you come on board and the
10  cartridge design has already been rejected.
11  Now, you stated that at some point marketing
12  asked you to reintroduce the cartridge, and at
13  that point you determined that it was difficult
14  from an engineering perspective to introduce a
15  cartridge?
16      A.   Yes. I knew their desire for a
17  cartridge. It's obvious that marketing looked
18  at the Braun system and liked the way the
19  cartridge could be removed and it was simple for
20  the consumer to interface with.
21      And when they asked that question
22  of us, we were, like, "The product is already
23  designed. We can't go back and redesign
24  anything right now."

Page 40

JAMES CHASEN - CONFIDENTIAL
1       Q.   When did they ask you that
2   question?
3       A.   Maybe sometime during the first
4   year of my employment.
5       Q.   When you stated in your previous
6   answer that there was a likely infringement
7   possibility, did that also enter the analysis at
8   the time that marketing asked your group to
9   reintroduce the cartridge concept?
10      A.   I'm not sure. Most likely, yes.
11      It's very -- when there's a
12  competitor product, you don't just say "I'm
13  going to do it exactly like that" because there
14  are repercussions. That's why we're sitting
15  here. We're usually very careful about not
16  copying somebody's design like that, so I'm sure
17  they looked at the Braun design, saw the
18  cartridge and said, you know, "You can't just
19  take their idea."
20      You have to make sure that -- you
21  know, that their patents on it are respected and
22  I'm sure that that's what was done.
23      Q.   Going back to Exhibit 4, as I
24  understand Exhibit 4, and feel free to correct

Page 41

JAMES CHASEN - CONFIDENTIAL
1   me, from an engineering perspective, what was
2   considered there was also not only a cartridge
3   system, but a system where the shaver head was
4   immersed in a basin?
5       A.   That is correct.
6       Q.   When did Rayovac reject that design
7   concept?
8       A.   I know it was sometime in the year
9   before I got there because the approach that we
10  took was thought to be -- thought to not
11  infringe on the way Braun did it.
12      They obviously looked at your
13  patent, saw what you had done for immersing the
14  head there under fluid, and saw that that was
15  protected, so they decided not to go that route.
16      Q.   Who made that determination?
17      MR. SHIMOTA: Objection.
18      Outside the scope.
19      A.   I'm not sure who made that
20  determination. It's probably somebody -- Tim
21  Simone, who was the director of engineering, and
22  Yuri Avila probably sat down and had that
23  discussion, along with Mel Stoltz.
24      Q.   When did the concept of spraying

11 (Pages 38 to 41)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 42

1       JAMES CHASEN - CONFIDENTIAL
2   cleaning fluid directly or injecting cleaning
3   fluid directly to the shaver head arise?
4       A.   That would be on the disclosure --
5   I could find that on the original disclosure for
6   the patent.
7       Q.   What patent are you referring to?
8       A.   Well, we have our own patent
9   applications for the way we're executing this
10  design, and that document --
11      MR. SHIMOTA: I'll instruct you not
12  to disclose the contents of that document.
13      THE WITNESS: All right.
14      A.   But at least there's a date there
15  that would say that's when it was formally
16  entered into the system.
17      MS. WENDLANDT: Mr. Shimota, just
18  so I understand your objection, is that based on
19  an attorney-client confidentiality?
20      MR. SHIMOTA: It's privileged.
21      MS. WENDLANDT: What kind?
22      MR. SHIMOTA: Attorney-client
23  privilege.
24      MS. WENDLANDT: So it hasn't been
25  disclosed, this application, to any third party?

Page 43

1       JAMES CHASEN - CONFIDENTIAL
2       MR. SHIMOTA: I believe he's
3   talking about invention disclosure as opposed to
4   a patent application.
5       THE WITNESS: Right. I'm just
6   trying to help you. You want me to give you a
7   time-line and I'm thinking if I were to try to
8   find a time-line, I would look at that document
9   and say, oh, that's when they invented it.
10      MS. WENDLANDT: Thank you for the
11  clarification.
12      Q.   Do you know who came up with the
13  idea of injecting the fluid to the shaver head?
14      A.   Tim Simone.
15          (Exhibit 9 for
16  identification, Multi-page document entitled,
17  "Cleaning System Design," production numbers
18  R 001800 through R 001810.)
19      Q.   Mr. Chasen, I've placed before you
20  Exhibit 9, which is a document dated 12/18/02,
21  just a month before you started your consulting
22  for Rayovac.
23          Is this the original -- I should
24  say the design that you were originally told of
25  by Yuri Avila?

Page 44

1       JAMES CHASEN - CONFIDENTIAL
2       A.   Yes.
3       Q.   Can you explain to me how this
4   12/18/02 cleaning system works?
5       A.   Sure.
6           You've got a pump, a fluid pump
7   located in this area here. This section right
8   here.
9       Q.   Would you mark that? Could you
10  label it "pump."
11      A.   And what happens is, this bottom
12  housing here contains the cleaning solution, and
13  this is your filter area right here.
14      Q.   Could you label it "filter,"
15  please.
16      A.   And what happens is, the fluid gets
17  sucked up by the pump right here in the bottom,
18  and there is plumbing here which is not shown in
19  this view, but the outlet of the pump goes to
20  what we call the injector, and the injector is a
21  manifold with three nozzles sticking out, and
22  those three nozzles, just like in here --
23      Q.   Just sticking with the 12/18
24  design.
25      A.   It's the same. That's why I

Page 45

1       JAMES CHASEN - CONFIDENTIAL
2   figured for clarification.
3           So the fluid then comes up out of
4   the pump into the manifold and gets instructed
5   into the hair pocket of the shaver, and this is
6   the hair pocket --
7       Q.   Can I stop you?
8           What is the manifold?
9       A.   It's not shown in this view, but
10  it's a way of injecting the fluid into the hair
11  pocket.
12      Q.   Is it shown in any other view that
13  is part of this Exhibit 9?
14      A.   No. Because at the time he had not
15  designed that part yet.
16      Q.   Who is "he"?
17      A.   Scott Larsen.
18          Scott Larsen was a consultant that
19  was hired by Remington at the time. Scott
20  Larsen was a design engineer hired by Remington
21  at the time to put some of these major
22  components together.
23          So at the time the injectors and
24  manifold was not designed yet, but it was
25  intended to go into here.

12  (Pages 42 to 45)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 46

JAMES CHASEN - CONFIDENTIAL
1
2  So this, for all intents and
3  purposes, this is incomplete, this drawing. It
4  was kind of like a work in progress, saying,
5  like, it's going to be about this big and this
6  is where the fluid is going to be held and this
7  is where the filter is going to be. This is how
8  I'm thinking where the shaver should go inside,
9  but a lot of those other details were not
10 formulated as of yet.
11     Q.   Can you show me where the fluid is
12 supposed to be and label that?
13     A.   I'll show it half filled.
14          How is that?
15     Q.   That's fine.
16          So the pump sucks up the fluid to
17 the manifold, which injects it --
18     A.   Into the hair pocket of the shaver.
19 When I say "hair pocket," that's that part that
20 pivots open on the shaver.
21     Q.   Can you show me on the physical
22 device?
23     A.   This part here.
24     Q.   Thank you.
25     A.   You'll see a lot of this

Page 47

JAMES CHASEN - CONFIDENTIAL
1
2  terminology in a lot of the documents.
3     Q.   The hair pocket --
4     A.   The hair pocket.
5          And for foils as well, the hair
6  pocket on a foil is the same thing -- it's the
7  part that's kind of like housing. It's like an
8  end housing --
9     Q.   For the cutters?
10    A.   Yes. It's kind of where all the
11 hair kind of goes and collects.
12          You're not an electric shaver user?
13    Q.   I personally am not.
14    A.   And you work for Braun?
15          Yes, so it goes from the manifold
16 and it's got little nozzles on the manifold that
17 inject it into these three openings on the hair
18 pocket.
19    Q.   And those openings, are they shown
20 on this exhibit?
21    A.   No, they're not.
22          Like I said, this was work in
23 progress, and these particular drawings were
24 only, like, an outline towards -- they didn't
25 show too much detail, so -- and these drawings

Page 48

JAMES CHASEN - CONFIDENTIAL
1
2  are other parts that go in here that are, in my
3  opinion, not relevant, but I can explain what
4  they are if you'd like.
5     Q.   No, that's fine. You can stick to
6  the first two pages of Exhibit 9.
7     A.   The way it works, the pump sucks up
8  the fluid from this bottom housing here. It
9  goes up through some tubing into the manifold.
10         There are injection nozzles on the
11 manifold that direct the fluid into the hair
12 pocket of the shaver, and then the fluid then
13 comes out of the hair pocket and dribbles down
14 to this device here, which we call the basin.
15    Q.   Can you label the basin on Exhibit
16 9?
17    A.   Sure.
18         The basin then just channels that
19 fluid right out into the filter and then it
20 recirculates around, so it's just a continuous
21 flow system. So it gets sucked up, injectors,
22 through the filter, goes down that way. It's
23 actually very simple.
24    Q.   When you were retained in January
25 of 2003 to work for Rayovac you were a

Page 49

JAMES CHASEN - CONFIDENTIAL
1
2  consultant at the time. What was your job
3  description?
4     A.   Well, I didn't have a job title
5  because I was a consultant, but --
6     Q.   What were your responsibilities?
7     A.   Prototyping, testing, invention,
8  part -- you know, inventing some of the
9  subsystems to make it work, doing some of the
10 R&D, as we speak, research and development,
11 making it work. Evaluating the function of the
12 product, evaluating some of the test results.
13 Making corrections to make the product work
14 properly, doing engineering calculations, doing
15 evaluation of materials.
16    Q.   You mean the type of materials to
17 be used in the construction?
18    A.   Right, right.
19         We were proposing, for example, on
20 the injectors, we were having trouble that they
21 were melting during our shipping test. You
22 would put it in an oven and it would come out
23 like a pretzel, so we had to look at different
24 materials. That kind of thing.
25         Evaluating screen sizes of the

13 (Pages 46 to 49)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 50

1          JAMES CHASEN - CONFIDENTIAL
2    filter. Evaluating how some of the problems
3    that came up, we would have to solve these
4    problems. I did a lot of that.
5        Q.    And this is all exclusively in
6    connection with the cleaning system?
7        A.    Yes. That was like I lived and
8    breathed these cleaning systems from January
9    '03 for the next, like, year and a half.
10       Q.    Did Rayovac involve manufacturers
11   in connection with the development of the
12   cleaning device?
13       A.    Yes.
14       Q.    When in the process did
15   manufacturers --
16       A.    Very fairly early on. They used a
17   manufacturer, Heroka Industries. They're a
18   supplier to Rayovac and they also have some
19   engineering capability and design capability,
20   and we were working very closely with this
21   manufacturer throughout the whole phase of the
22   project. Their president is a fellow by the
23   name of Edric Lau. He's a really nice guy.
24       Q.    Any other manufacturers involved in
25   the design process?

Page 51

1          JAMES CHASEN - CONFIDENTIAL
2        A.    The shaver itself was an Izumi, so
3    -- the shaver was pretty much well developed
4    already and there were only some minor changes
5    that had to be made to it to make it work with
6    the cleaning base.
7        Q.    Who chose Heroka to be the
8    manufacturer of the cleaning base?
9        A.    I'm not sure why they picked them.
10   I don't know. I didn't have privy to that
11   information.
12       Q.    In the documents I've also seen
13   another manufacturer, Haking?
14       A.    Haking.
15       Q.    What was their role?
16       A.    They make that shaver right there,
17   the MS 5500 series.
18       Let me start over again.
19   Izumi makes the rotary shavers, the
20   R-9500 series. Heroka makes all three cleaning
21   bases. Heroka also makes the women's shaver.
22   That one there.
23       Q.    WDF 7000?
24       A.    Correct, WDF 7000.
25       And Haking makes the MS 5500 and

Page 52

1          JAMES CHASEN - CONFIDENTIAL
2    5700 foil shaver.
3        Q.    Did Izumi play any role in the
4    development of the cleaning base?
5        A.    Some -- yes, well, the shaver and
6    cleaning base kind of go hand-in-hand. Their
7    primary function was making sure the shaver was
8    properly interfaced with the cleaning base, so
9    there were modifications that had to be made to
10   the shaver to accommodate the cleaning base.
11       Do you want me to go into some
12   detail of what those modifications are?
13       Q.    Not of the shaver, no.
14       Did Haking have any involvement in
15   the development of the cleaning base?
16       A.    No, no. They were strictly the
17   shaver end of it.
18       (Exhibit 10 for
19   identification, Multi-page document, U.S. Patent
20   No. 5,711,328.)
21       Q.    Did Rayovac at any time ask Izumi
22   to manufacturer the cleaning base?
23       MR. SHIMOTA:  Objection.
24       Outside the scope.
25       A.    Not really sure, to be perfectly

Page 53

1          JAMES CHASEN - CONFIDENTIAL
2    honest. I don't know. They might have.
3        Q.    I've placed before you Exhibit 10,
4    which is the '328 patent. Have you seen this
5    patent before?
6        A.    Recently, yes. I've skimmed it
7    over.
8        Q.    When was the first time you saw it?
9        A.    Actually, just recently.
10       Q.    Within a week?
11       A.    Yes, yes.
12       Q.    Why did you skim the patent?
13       A.    Because I knew that we were having
14   a deposition and I just wanted to kind of skim
15   it over and look at the patent.
16       Q.    In connection with your design of
17   the Remington cleaning device, did you consider
18   the '328 patent?
19       A.    No, because the direction was
20   already well established. Mel Stoltz was our
21   corporate attorney who was helping us along the
22   way, and, quite frankly, that's his job. So I
23   said, "Hey, Mel, are we okay?", and --
24       Q.    And when you asked him if you were
25   okay --

                              14  (Pages 50 to 53)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dee-42ac5376e13a

06/27/2005 16:53 FAX                                                    @035/079

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 54

JAMES CHASEN - CONFIDENTIAL
1
2    A.    With respect to the Braun patents.
3    Q.    Were you referring to the '328
4  patent?
5    A.    I didn't know the number of the
6  Braun patent. I just said with respect to
7  Braun's patents.
8    Q.    Were you referring to Braun's
9  patents related to their cleaning device,
10  Braun's cleaning device.
11    A.    Yes, yes.
12          (Exhibit 11 for
13  identification, Multi-page document, U.S. Patent
14  No. 5,649,556.)
15    Q.    Mr. Chasen, I've placed before you
16  Exhibit 11, which is the '556 patent. Have you
17  seen this patent before?
18    A.    Is this the one I looked at or the
19  '328? They looked the same. I just skimmed
20  these a week ago and I was looking at one. I
21  didn't know there were two here.
22    Q.    So you in the last week or so
23  skimmed one of either Exhibit 10 or 11?
24    A.    Yes, yes. I'm sorry, I don't
25  remember the number that I was looking at.

Page 55

JAMES CHASEN - CONFIDENTIAL
1
2    Q.    Sure. Prior to that time, you had
3  not looked at either Exhibit 10 or 11?
4    A.    To be perfectly honest, no.
5    Q.    Did there come a time when any of
6  the three manufacturers -- Izumi, Heroka or
7  Haking -- expressed any concern about the Braun
8  cleaning device patents?
9    A.    No, no. I don't think that was
10  their function. I mean -- I won't comment on
11  that.
12    Q.    You may have answered this
13  question, but I don't think I asked it. Let me
14  just ask it.
15          How would you describe Rayovac's
16  continued use of Braun's cleaning device in its
17  development process?
18          MR. SHIMOTA: Objection. Vague.
19          Did you say Braun's cleaning
20  device?
21          MS. WENDLANDT: Yes.
22    Q.    How would you describe Rayovac's
23  continued use or testing of Braun's cleaning
24  device during Rayovac's development process for
25  its cleaning device?

Page 56

JAMES CHASEN - CONFIDENTIAL
1
2    A.    Okay --
3          MR. SHIMOTA: Same objection.
4          You can answer.
5    A.    We looked at some of its
6  performance characteristics during the
7  development of our product. There were
8  primarily just performance characteristics,
9  meaning we looked at things such as cleaning
10  efficacy, spill tendency -- when you tip it
11  over, it spills.
12    Q.    Is that the spill angle?
13    A.    Yes, cleaning efficacy, spill angle
14  -- oh, the cleaning cycle, the pump turns on,
15  the fan turns on. Just general operating
16  conditions, and we evaluated the fluid as well,
17  what type of solution you guys were using.
18    Q.    Why?
19    A.    Why? Well, it's a competitive
20  product. Competitive product evaluation. We do
21  that with not only cleaning systems, we do it
22  with shavers. All kinds of stuff. We want to
23  see what makes the competition tick, so --
24          I'm trying to think what other
25  tests we ran, but -- noise. We looked at noise

Page 57

JAMES CHASEN - CONFIDENTIAL
1
2  as well.
3          (Exhibit 12 for
4  identification, One-page document entitled,
5  "Cleaning System Feature Comparison," production
6  numbers R 002695.)
7    Q.    I've placed before you Exhibit 12,
8  which is a document dated May 14, 2003 with your
9  name on it at the bottom which is entitled,
10  "Cleaning System Feature Comparison, Braun
11  Versus Remington," is that correct?
12    A.    Yes.
13    Q.    Can you tell me who did this
14  comparison?
15    A.    I believe I did.
16    Q.    What was the purpose of the
17  comparison?
18    A.    To compare the cleaning system of
19  the Remington CCS-1 with the Braun Flex Interval
20  System 5441.
21    Q.    And what is the CCS-1?
22    A.    The CCS-1 is the cleaning base
23  portion of our product, this is CCS-1; CCS-2 is
24  the foil, and CCS-3 is the women's.
25          The product name, like when you buy

15  (Pages 54 to 57)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

7a129155-49aa-4907-8dae-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 58

1           JAMES CHASEN - CONFIDENTIAL
2   it at the store, includes the shaver and the
3   cleaning base, so they call it some other model
4   number, but when we refer to just the cleaning
5   base, this is the CCS-1 cleaning base.
6       Q.   CCS-1 is the one that works with
7   the rotary model?
8       A.   Yes.
9            So at the time -- and I think this
10  might have been requested of me from Yuri Avila
11  -- and he said to me, "Jim, just give me a
12  comparison of these two units as far as just
13  general function."
14      Q.   Was the goal of the Remington team
15  to mirror the features of the Braun device?
16      A.   No, not at all.
17           It was just to show that these are
18  our features and these are your features. It
19  was just a way to compare item by item how
20  theirs operated versus how ours will operate.
21      Q.   Turning your attention to item
22  number 6, "Recommended solutions/filter
23  replacement frequency."
24      A.   Yes.
25      Q.   Under the Braun system, it says,

Page 59

1           JAMES CHASEN - CONFIDENTIAL
2   "IB states 30 cleaning cycles."
3       A.   Yes.
4       Q.   What is "IB"?
5       A.   Instruction book.
6       Q.   In the next column under the CCS-1
7   design, it says "TBD." "To be decided"?
8       A.   "To be determined."
9       Q.   In parenthesis it says, "Target is
10  30 cleaning cycles." Why was the target 30
11  cleaning cycles?
12      A.   Because that equated to
13  approximately a month's worth of cleanings,
14  because we wanted to clean it once a day and
15  approximately 30 days in a month, so -- that was
16  our goal, our bogey, to get 30.
17      Q.   Why did Mr. Avila request this
18  comparison?
19      A.   I really don't remember at the time
20  why he would have -- I mean, he always requested
21  a lot of stuff, but -- I don't know.
22           It might have been for marketing
23  purposes. They wanted to know why -- how ours
24  works in comparison to the Braun unit just so
25  that could get kind of grounded.

Page 60

1           JAMES CHASEN - CONFIDENTIAL
2       Q.   To whom was this document
3   distributed, Exhibit 12?
4       A.   I don't know. Was it in my notes
5   somewhere? Was it an attachment to an e-mail?
6       Q.   As produced to me, it was not in
7   your notes.
8       A.   I really don't know. I can
9   probably look it up and try to figure that out
10  for you.
11           Most likely this was attached to an
12  e-mail that probably said something like, "Yuri,
13  please see attached, blah, blah per your
14  request," and it might have had a distribution
15  on it. But I'll tell you most likely it went to
16  somebody in marketing as well.
17      Q.   As a result of this comparison
18  between the Braun device and the Remington
19  CCS-1, were there any changes made to the
20  Remington CCS-1?
21      A.   I need a few minutes to read it and
22  see where we were.
23      Q.   Take your time.
24      A.   The only thing that could be a
25  little bit different here is the items 13-A and

Page 61

1           JAMES CHASEN - CONFIDENTIAL
2   13-B.
3            At the time we were fine-tuning
4   what the cleaning cycle durations were, so those
5   values might be different a little bit, as well
6   as that maximum noise level, item 15, because I
7   know we were looking at reducing the noise of
8   our unit, so that might be a little bit off.
9            But other than that, the functions
10  are correct as it is today in production.
11      Q.   Why were there changes to the
12  cleaning cycle duration?
13      A.   Well, I was responsible for setting
14  what the cleaning cycle was to obtain the
15  maximum benefit and we were playing with
16  different cleaning cycles, cycling the fluid on
17  and off and how long you operate the fan and the
18  algorithm, the controls, what that is. That was
19  my responsibility, to figure that out.
20           So when this document was made,
21  which is May 14, 2003, there might have been
22  some tweaks to that later on.
23      Q.   Was the cleaning cycle changed to
24  reduce it to the lower cleaning cycle of the --
25  or lesser cleaning cycle of the Braun device?

16 (Pages 58 to 61)

7a129155-49aa-4907-8dee-42ac5376e13a

ESQUIRE DEPOSITION SERVICES
HIGHLY COFIDENTIAL- ATTORNEYS' EYES ONLY

Page 62

JAMES CHASEN - CONFIDENTIAL
1
2    A.    No. Actually, the Braun had
3    nothing to do with it. We were just trying to
4    -- we wanted to make these things the best we
5    can. I don't really care what Braun was doing.
6    I just wanted to make sure that this thing was
7    as good as it could be.
8         I didn't want to have this thing
9    run for an hour, because that's pretty annoying
10   to having it run on somebody's counter for an
11   hour, so we tried to keep it under a half hour,
12   the entire cleaning cycle, was our --
13        (A recess was taken.)
14        (Exhibit 13 for
15   identification, One-page document entitled,
16   "Cleaning Solution Evaporation Comparisons,"
17   production numbers R 000965 through R 000968.)
18   Q.    Mr. Chasen, I've placed before you
19   Exhibit 13, which is a document dated 5/27/03
20   entitled, "Cleaning Solution Evaporation
21   Comparisons, Remington Versus Braun."
22        Do you see that?
23   A.    Yes.
24   Q.    Do you know who created this
25   document?

Page 63

JAMES CHASEN - CONFIDENTIAL
1
2    A.    Yes, I do.
3    Q.    Who?
4    A.    Me.
5    Q.    At the bottom of the first page of
6    the document, paragraph numbered 2, can you just
7    review that paragraph.
8    A.    Yes.
9    Q.    The last sentence says, "Our unit,
10   because of our shaver design, has a relatively
11   large and flat base in profile which tends to
12   retain more fluid at the end of a cleaning
13   cycle." Have I read that correctly?
14   A.    Yes.
15   Q.    What did you mean by that?
16   A.    What I mean is that, at the end of
17   the cleaning cycle there's some fluid that will
18   tend to -- I don't want to use the word
19   "puddle," but -- I guess the best analogy is
20   your sink in your bathroom. If you turn on the
21   faucet and then you turn it off, it all drains
22   out but there's a little water left in the
23   bottom of the sink.
24        That's what I'm talking about when
25   I say at the end of the cleaning cycle residual

Page 64

JAMES CHASEN - CONFIDENTIAL
1
2    fluid. And what I was referring to here, the
3    Braun unit is very steep so any residual was --
4    when everything shuts off and it's just sitting
5    here, any little driblets of water that are
6    there go right down into the filter and drain
7    into the -- I guess yours is the cartridge.
8         In ours, it tends to more or less
9    sit there because it's very shallow.
10   Q.    When you say the Braun device is
11   very steep, what part of the Braun device are
12   you referring to?
13   A.    I guess the area -- did you bring a
14   Braun unit here?
15   Q.    I didn't, no.
16   A.    I guess the area -- you'd call it
17   the -- your support. The cup. The cup that's
18   on your bottom that goes in.
19   Q.    You're referring to the cup in
20   which the shaver head sits?
21   A.    Right. The cup which the shaver
22   head sits is very steep on the Braun unit; and
23   as such, that at the end of a cleaning cycle
24   when everything is shut off on the Braun unit,
25   there's less fluid retention on those surfaces

Page 65

JAMES CHASEN - CONFIDENTIAL
1
2    versus ours. This was mainly for evaporation
3    study. It had nothing to do with the operation
4    of the unit.
5    Q.    This retention of fluid at the end
6    of the cleaning cycle, is that true with the
7    Remington commercial product as well?
8    A.    Oh, no. That has nothing to do
9    with that.
10   Q.    Let me clarify the question.
11        With the Remington commercial
12   product, either the CCS-1, the CCS-2 or the
13   CCS-3, is there fluid retained in the basin at
14   the end of the cleaning cycle?
15   A.    There are a few driblets of fluid,
16   yes. That's because it's so shallow, that's the
17   issue that we have.
18        I could explain why that's an issue
19   if you want me to go into it, but --
20   Q.    Why is it an issue?
21   A.    You like to retain as much of your
22   cleaning solution as possible to get it to last
23   as long as you can, and any driblets that are
24   left on that surface will just evaporate and
25   it's lost. You want it to go back into the

17 (Pages 62 to 65)

7a129155-49aa-4907-8dee-42ac5376e13a