# Exhibit
# 1

1                          VOL. I, PAGES 1 - 224

2               IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT MASSACHUSETTS

4                 CIVIL ACTION NO. 03-CV2428-WGY

5

6    BRAUN, GmbH

7                              Plaintiff                    ORIGINAL

8    V.

9    RAYOVAC CORPORATION ,

10                            Defendant

11

12                       - - - - - - - -

13             Deposition of Samir Nayfeh, Ph.D.

14                  Friday, August 26, 2005

15                         8:58 a.m.

16                       Ropes & Gray

17                 One International Place

18                  Boston, Massachusetts

19                       - - - - - - - -

20          Reporter:   Deborah Roth, RPR/CSR

21

22

23

24

Dr. Samir Nayfeh    August 26, 2005

14

1  design should be able to understand all of these

2  patents.

3      Q.  Okay.  I guess that's where I do have some

4  confusion then.

5          I mean, in particular, the Lee patent,

6  would that be within the art of the patents-in-suit?

7      A.  Could you remind which one is Lee?

8      Q.  Tool-cleaning apparatus.  Do you have your

9  second report?

10         MS. WENDLANDT:  Page 23 of your second

11  report, Exhibit 151.

12     A.  Oh, okay.

13         So Braun had said that it was not

14  analogous art.

15         Whether it's analogous for this -- is

16  there a strict definition of the term "analogous,"

17  "analogous art," in other words?

18         I haven't really, anywhere in here,

19  rendered an opinion on it, or really considered it as

20  a question that I have analyzed.

21     Q.  So you haven't considered whether Braun's

22  argument as to whether it was analogous or not --

23  analogous art -- well, you do not offer an opinion as

24  to whether or not the Lee patent is or is not

Dr. Samir Nayfeh     August 26, 2005

15

1    analogous art; is that correct?

2        A.   Well, I haven't offered an opinion, I don't

3    think.

4        Q.   Let's take a step back to the level of skill

5    in the art.

6              I guess there may be agreement between

7    you and Mr. Phillips as to the level of skill.

8              For someone who lacks a formal education,

9    what type of experience would you expect that

10   individual to possess?

11       A.   I would say, again, experience in mechanical

12   design.

13       Q.   And, again, mechanical design of any

14   products?

15       A.   Yeah.  I would say broadly, unless the

16   person's experience was so narrow as to not provide

17   them any background in the basic elements of what is

18   going on here, but I would say typically someone with

19   a few year's experience in mechanical design would

20   have enough background to understand what is going on

21   here.

22       Q.   When you say "the basic elements of what is

23   going on here," what do you mean those basic

24   elements?

34

1    apparatus?

2        A.    No.

3        Q.    Why not?

4        A.    Shaving is cutting hairs off down to the

5    skin.  Hair clippers don't do that.

6        Q.    Have you ever use hair clippers before?

7        A.    Yes.

8        Q.    And it doesn't shave down to the skin?

9        A.    No.

10       Q.    So, in your opinion, shavings has to be

11   cutting down to the skin, that is a shaving

12   apparatus?

13       A.    Yes.

14       Q.    I believe it is also your opinion that a hair

15   clipper is not a dry shaving apparatus as well?  That

16   would be your opinion as well, correct?

17               MS. WENDLANDT:  Objection.

18       A.    Correct.

19       Q.    If you see in Figure 3, there is shown a

20   razor 42.  Do you see that?

21       A.    Yes.

22       Q.    Is razor 42 a shaving apparatus?

23       A.    Yes.

24       Q.    Look back to the upper paragraph at the top.

Dr. Samir Nayfeh    August 26, 2005

49

1          You would be looking for a device that

2    dries and is asking the person, the user of the

3    device to do the drying separately, seems not to fall

4    within the claims.

5      Q.  And what specific portion of the -- what

6    specific language in Claim 11 makes it fall outside

7    of the claims?

8      A.  Well, in other words, your cleaning devices

9    comprises all of these things.

10          So the towel on the side, I don't see as

11    part of this cleaning device, and it would just seem

12    bizarre to claim that it's providing a towel so

13    somebody would constitute having an invented a drying

14    device.

15      Q.  So you think it's -- the language that you

16    are pointing to precludes that the towel hypothetical

17    is a cleaning device in Claim 11?

18      A.  Well, I think if we said a cleaning device

19    comprising a set of those elements, and one of those

20    elements being a drying device, then you would look

21    for a device that is comprised within the cleaning

22    device that does the drying.

23      Q.  Are you aware that the parties have agreed

24    that the preamble to Claim 11 is not a limitation in

Dr. Samir Nayfeh    August 26, 2005

50

1    the case?

2                    MS. WENDLANDT:  Objection.

3        A.   Yes.  I'm aware of that.

4        Q.   So it is your opinion that -- let me ask

5    again then.

6                    What language in Claim 11 specifically

7    precludes my towel hypothetical?

8                    MS. WENDLANDT:  Objection.

9        Q.   Let me ask again.  What language in Claim 11

10   specifically precludes my towel hypothetical from

11   falling within the scope of Claim 11's coverage?

12                   MS. WENDLANDT:  Objection.

13       A.   You need a device that is part of the machine

14   as far as I can tell.

15                   The word "device" implies some mechanism,

16   something, some item and some physical object, and

17   all of these elements are components of this system,

18   and to sort of import the function of drying to

19   something outside of the system itself, I don't think

20   anybody skilled in the art would ever consider

21   somebody wiping a towel on the thing after you have

22   taken it out of the machine to be the drying device.

23       Q.   So you ponit me to the word "device" in Claim

24   11; is that correct?

Dr. Samir Nayfeh    August 26, 2005

51

1            MS. WENDLANDT:  Objection.

2     A.  At least the word "device."

3     Q.  Is there any other language that you can see,

4  sitting here today, that precludes my hypothetical

5  from falling within the scope of Claim 11?

6     A.  I think the word "comprising," whether or not

7  you consider "a cleaning device comprising" to be a

8  limitation, I think is meaningful.

9     Q.  So, any other language?

10     A.  I think that's it for specific language.

11     Q.  What if Rayovac began selling its cleaning

12  base, and also had in a larger box a handheld fan,

13  and included an instruction book that said, "use this

14  fan to dry off the head of the shaver after

15  cleaning," would that fall within the scope of Claim

16  11?

17     A.  No.

18     Q.  And why not?

19     A.  Repeat of the argument for the towel.  Same

20  principle.

21            You are asking somebody -- you are using

22  something that is not part of the cleaning device to

23  do the drying.  Whether it is a towel or hair dryer,

24  it's not important.

Dr. Samir Nayfeh   August 26, 2005

53

1      Q.   Okay.  So that -- the words "a drying device"

2   don't place any limitation on where the drying device

3   is; is that correct?

4           MS. WENDLANDT:   Objection.

5      A.   On their own, no.

6      Q.   So with respect to these series of questions

7   regarding my hypotheticals, the language you would

8   rely on is "a cleaning device comprising"; is that

9   correct?

10          MS. WENDLANDT:   Objection.

11     A.   So, yeah, the cleaning device has to comprise

12   a drying device in addition to the other elements.

13     Q.   Let's just stay on this topic.  If you should

14   turn to Page 18 of your expert report.

15     A.   Okay.

16     Q.   You speak there, in some detail, regarding

17   this louvered shutter system; is that correct?  It

18   starts at Page 18 --

19     A.   Correct.

20     Q.   -- but it continues on.

21          Where in Claims 11 and 12 of the '328

22   patent do we find this louvered shutter system?

23     A.   We don't.

24     Q.   So why, then, are you discussing the louvered

Dr. Samir Nayfeh    August 26, 2005

54

1    shutter system in connection with obviousness?

2        A.   Because when you look at obviousness, you ask

3    what would it take for the inventors to make this

4    invention?

5            The inventors couldn't have written the

6    claim that requires a drying device unless they could

7    have written a document which would enable one

8    skilled in the art to incorporate a drying device

9    into the cleaning system.

10       Q.   So absent the louvered shutter system, the

11   cleaning device with a -- the cleaning system with a

12   drying device would not work?

13           MS. WENDLANDT:   Objection.

14       A.   What I was pointing to was that they couldn't

15   have written that claim unless they had taught you

16   some means of incorporating the drying device into

17   the cleaning system.

18           So when you look at obviousness, you

19   can't just look at the claims.  You have to look at

20   the active invention, and the active invention

21   includes being able to write the enabling document.

22       Q.   What is your understanding of what you are

23   supposed to be comparing for purposes of the

24   obviousness analysis?

Dr. Samir Nayfeh    August 26, 2005

55

1      A.  I don't see it as strictly a comparison.

2      Q.  Okay.  When you were rendering your opinions

3  on obviousness, you weren't comparing the claims to

4  the prior art?

5              MS. WENDLANDT:  Objection.

6      A.  You're not comparing strictly the claims.

7              You're looking at the claim in the

8  context of the overall invention and asking whether

9  the active invention was obvious.

10     Q.  And what is the active invention?

11     A.  The active invention is conceiving of what is

12  claimed and enabling what is claimed.

13     Q.  So when you were opining on obviousness, you

14  were considering the claims and the specification

15  against the prior art; is that right?

16     A.  Yes.

17     Q.  And did counsel explain to you what you were

18  supposed to consider in connection with your

19  obviousness analysis?

20     A.  I think when I first wrote this, we hadn't

21  discussed it, and it's just things that I had learned

22  in previous experiences.

23     Q.  Turn back to Page 4.

24              MS. WENDLANDT:  Jim, if this is an okay

1   correct?

2      A.  At least that.  I don't remember if there is

3   anything else.

4      Q.  There is also the point -- you also mention

5   the point about the clipper blades, too, and that's

6   not the shaving head of a shaving apparatus?

7      A.  Yes.

8      Q.  But one of your opinions, like MeKiney and

9   Davies, is that grid 17 and tank 10 do not have a

10  particular shape; is that correct?

11     A.  Correct.

12     Q.  And that's where at the bottom of this

13  paragraph you say, "Such surfaces cannot properly be

14  called cradle structures and are not adapted to

15  receiving a shaving head of the shaving apparatus"?

16     A.  Correct.

17     Q.  Now, have you -- you've also considered that

18  the '556 patent in connection with this litigation;

19  is that correct?

20     A.  Yes.

21     Q.  And you're aware that the '556 patent

22  explicitly calls out a dry shaving apparatus; is that

23  correct?

24     A.  Yes.

Dr. Samir Nayfeh    August 26, 2005

79

1      Q.  And are you also aware that the '328 patent

2  does not explicitly require a dry shaving apparatus?

3      A.  Yes.

4      Q.  And with respect to the drying device element

5  of the Maatz patent at the bottom of this page --

6      A.  Yes.

7      Q.  -- your opinion is that the drain hole 22 is

8  not a drying device; is that correct?

9      A.  Correct.

10     Q.  If you took the drain hole 22 out of the --

11 well, if you plug the drain hole 22 in the Maatz

12 patent, would it take longer for the cleaned tools to

13 dry?

14     A.  Yes.

15     Q.  So does the drain hole aid in the drying of

16 the barber's tools, cleaned barber tools?

17     A.  I think the word is it is a prerequisite for

18 the drying of those tools.

19     Q.  Do you see a distinction there?

20         Well, do you see a distinction between

21 being a prerequisite for drying the tools and aiding

22 in the drying of the tools?

23     A.  I think so.

24         I mean, if you said, "aid," I guess in

Dr. Samir Nayfeh    August 26, 2005

98

1   cleaning fluid container within the agreed

2   construction of the parties?

3            MS. WENDLANDT:   Objection.

4      A.  Yes.

5      Q.  And is it your understanding that that spray

6   can would have been similar to the -- is it your

7   understanding that the spray can that Dr.  Pahl

8   procured would be similar to the spray can 60 of the

9   Loeffler patent?

10           MS. WENDLANDT:   Objection.

11     A.  I can't say.

12     Q.  You also note with respect to the spray can

13  in 60 of the Loeffler patent, in the last sentence,

14  you state, "As is clear from Figure 1 of the Loeffler

15  patent reproduced immediately above, there is no

16  provision to catch or contain the contaminated fluid

17  that would drain from the shaving head in a fluidic

18  cleaning operation."

19           Do you see that?

20     A.  Yes.

21     Q.  Can you point me to where in the language of

22  Claim 14 there is any requirement of a provision to

23  catch or contain contaminated fluid?

24     A.  It's only implied.

Dr. Samir Nayfeh    August 26, 2005

99

1      Q.  And implied within the construction of

2   cleaning fluid container?

3      A.  Yes.  And possibly elsewhere.  Yeah.  It's

4   implied when you say "cleaning fluid."

5      Q.  Let me ask you this:  You're aware that

6   Rayovac sells its product with a bottle of cleaning

7   fluid; is that correct?

8      A.  Yes.

9      Q.  And is that bottle of cleaning fluid a

10  cleaning fluid container?

11     A.  Yes.

12     Q.  And you are also aware that the fluid is

13  poured out of that bottle into Rayovac's device,

14  correct?

15     A.  Correct.

16     Q.  And you're also aware that the contaminated

17  fluid is not poured back into that bottle; is that

18  correct?

19          MS. WENDLANDT:  Objection.

20     A.  It could be, but probably not.  You wouldn't

21  expect to.

22     Q.  So, let me ask, also, as well:  They sell

23  detergent for mops, for cleaning dishes and perhaps a

24  floor in containers; is that correct?  Are you aware

**Legalink Chicago**
**(312) 263-3524**

Dr. Samir Nayfeh    August 26, 2005

100

1   of those?

2       A.  Correct.

3       Q.  And are those cleaning fluid containers, a

4   bottle of dishwasher detergent?

5       A.  Yes.

6       Q.  Do people return the dishwasher detergent to

7   the bottle after the detergent has been used for

8   cleaning?

9           MS. WENDLANDT:  Objection.

10      A.  No.

11      Q.  Could you look at the feed device element,

12  Part 11 of your report?

13      A.  Yes.

14      Q.  You opine that the feed device element is not

15  met by the Loeffler patent?

16      A.  Yes.

17      Q.  You also state that valve 75 is a flow

18  control device?

19      A.  Yes.

20      Q.  What is the difference between a feed device

21  and a flow control device?

22      A.  So the feed device, as we mentioned,

23  exemplified by the pump and conduits, and possibly

24  other components, includes that thing which provides

128

1    connection with the prosecution of the '328 patent

2    disclose a bracket for insertion of a shaving

3    apparatus therein?

4        A.  I don't know.  I really only addressed the

5    ones that were raised by Mr. Phillips.

6        Q.  Okay.  And at the bottom of Page 21, you

7    state, "More importantly, even if Mr. Zeischke had

8    drawn a bracket into which the electronic shaver

9    could be inserted for storage and charging, this

10   would not have taught a bracket into which the shaver

11   could be inserted during cleaning."

12              Do you see that?

13       A.  Yes.

14       Q.  Where in Claim 18 of the '328 patent is there

15   a requirement that the shaver has to be inserted into

16   the bracket during cleaning?  And, again, I am

17   emphasizing "during cleaning" part of the statement.

18       A.  So, again, it's not literally there, but

19   clearly from the specification when the bracket is

20   described, it's -- the bracket is -- you insert into

21   the bracket during the cleaning operation.

22       Q.  Above that, in the paragraph above that, you

23   note that the rectangles, which I think are called

24   park positions, serve only to indicate the general

Dr. Samir Nayfeh    August 26, 2005

192

1    ports.

2        Q.  So fluid does not go from the cleaning fluid

3    container to the supporting surfaces 3C directly; is

4    that correct?

5        A.  As we discussed, it is shot into, or at, at

6    least, the shaving head, and then makes it way down

7    there and possibly gets those wet.

8              MR. SHIMOTA:  Why don't we take a brief

9    break.

10              THE VIDEOGRAPHER:  Going off the record.

11    The time is 3:37.

12              (A recess was taken.)

13              THE VIDEOGRAPHER:  One moment.  We are

14    back on the record.  The time is 3:46.

15        Q.  We were talking a little bit about

16    infringement.

17              I know you offered opinions with respect

18    to literal infringement; is that correct?

19        A.  You might want to clarify what you mean.

20        Q.  Sure.  Are you familiar with the term the

21    "doctrine of equivalence"?  Have you ever encountered

22    that before?

23        A.  I have read about it a bit, but I haven't

24    done any detailed opinions on that.

Dr. Samir Nayfeh    August 26, 2005

193

1    Q.  So I take it you have not offered any

2    opinions that Rayovac's devices infringe under the

3    doctrine of equivalence; is that correct?

4    A.  I don't think so.

5    Q.  In your reports, do you offer any -- well, do

6    you offer any opinion, assuming that the court

7    modifies its "cradle structure" construction as

8    suggested by Mr. Phillips and now Rayovac?

9          MS. WENDLANDT:  Opinion as to?

10    Q.  Opinion as to infringing -- infringement --

11    let me rephrase that question.

12          In your reports, is there any opinion

13    offered as to whether or not Rayovac's devices

14    infringe, if the court's "cradle" construction is

15    modified as suggested by Mr. Phillips?

16    A.  The only modification being to require

17    receive and retain?

18    Q.  Yes.

19    A.  I don't think I have offered an opinion on

20    that, as I recall.

21    Q.  Okay.  So that opinion would not be found in

22    either your first or your third expert report?

23    A.  I don't think so.

24    Q.  Okay.

Dr. Samir Nayfeh    August 26, 2005

194

1          MR. SHIMOTA:  I would like to mark

2    Defendant's Exhibit 165, your third expert report.

3               EXHIBIT NO. 165 MARKED

4    Q.  And most specifically to Page 13, when you

5    talk about the substitutes.

6               MS. WENDLANDT:  Just to clarify for the

7    record, mine has Jesse Davies report as well.

8               Should we take that out?

9               MR. SHIMOTA:  Yes.

10              MS. WENDLANDT:  Is that Page 62 of the

11   fax?

12              MR. SHIMOTA:  Yes.  We can do that.  I'm

13   not going to ask you about it.  We can do it off the

14   record.  I guarantee you I won't ask you about that,

15   because I haven't read it closely.

16   Q.  What is your -- what is the analytical

17   framework you applied for assessing whether

18   noninfringing -- acceptable noninfringing substitutes

19   were available to Rayovac?

20   A.  I really just responded to what Mr. Phillips

21   had written.

22   Q.  Okay.  I am focusing on -- you make the

23   statement, and you have a prelude paragraph, and you

24   state, at the last sentence, "Or more importantly, at

Dr. Samir Nayfeh    August 26, 2005

195

1    the time it began making its first infringing devices

2    in the fall of 2003."

3            Do you see that?

4    A.   Yes.

5    Q.   Why you do you think that fact is

6    significant?

7    A.   Well, just my understanding that that the

8    substitutes would have had to have been available at

9    the time that the infringement occurred.

10   Q.   Okay.  Do you understand that in assessing

11   whether substitutes would be available you are to

12   assume that Rayovac knew that it wouldn't be able to

13   sell devices as are currently configured?  Rayovac

14   had that information available to it?

15   A.   We would assume that Rayovac knew that it was

16   infringing on a valid patent.

17   Q.   Knew that it could not --

18   A.   Okay.  Uhm, I didn't know that.

19   Q.   Okay.  You refer to on Page 14 a passive

20   drying.  Do you see that?

21   A.   Right.

22   Q.   I believe you state, "There is no reason to

23   believe" -- at the end of the first paragraph --

24   "Therefore, it would be acceptable to consumers now."

Dr. Samir Nayfeh    August 26, 2005

221

1       A.   I don't recall seeing any such report.

2       Q.   You can't comment on what you have not seen?

3       A.   Yes.  Yes.

4       Q.   If you heard about it, maybe you could.

5            One last question.  Are you aware that

6    Mr. Phillips opines upon, how it referred to, as

7    secondary considerations of nonobviousness in his

8    report?

9       A.   I seem to recall that, yes.

10      Q.   Am I correct that you do not offer any

11   opinions on secondary considerations of

12   nonobviousness, right?

13      A.   I don't recall having done so.

14           At most, I might have quoted somebody.  I

15   don't recall giving any opinions on that.

16      Q.   I mean, can you say one way or the other

17   whether you have?

18      A.   To be definitive, I would have to read --

19           MS. WENDLANDT:  Jim, we can stipulate

20   that if it is not in the report, he hasn't opined on

21   it, or he can sit here and read it.

22      Q.   I don't want you to read it.

23      A.   I could be proven wrong, because I have

24   thought about these issues, but I don't recall