# Exhibit 7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**BRAUN GmbH,**

      **Plaintiffs,**

      **v.**                                **Civil Action No. 03-CV-12428-WGY**

**RAYOVAC CORPORATION,**

      **Defendant.**

---

## EXPERT REPORT OF
## LAURA B. STAMM

---

### I.   ASSIGNMENT

1.     I have been retained by Counsel for Rayovac Corporation[1] ("Rayovac") to provide an analysis of damages suffered by Braun GmbH ("Braun") as a result of any alleged infringement by Rayovac of U.S. Patent No. 5,711,328 and/or U.S. Patent No. 5,649,556 ("patents in suit").

---

[1]   I note that on May 2, 2005, Rayovac officially changed its name to Spectrum Brands, Inc. For the purpose of this report, I will continue using the previous corporation name.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## II.     QUALIFICATIONS

2.     I am a Managing Principal in the Boston office of Analysis Group, Inc. Analysis Group is a consulting firm specializing in microeconomic, financial and accounting analysis. As a consulting economist and accountant, I have conducted damages assessments in numerous cases involving commercial disputes and intellectual property issues. I have a Master of Science degree in management with a concentration in finance from the Massachusetts Institute of Technology. Prior to my joining Analysis Group, I spent several years in the Business Investigation Services Group at Coopers & Lybrand. A copy of my curriculum vitae is attached as Appendix A. A list of cases in which I have testified as an expert witness either at deposition or trial within the last four years is also included in Appendix B.

## III.     SCOPE OF ANALYSIS

3.     I have been retained by Counsel for Rayovac to provide an analysis of damages suffered by Braun as a result of any alleged infringement by Rayovac of the patents at issue relating to a cleaning device for electric shavers.

4.     Braun alleges that Rayovac has manufactured and sold electric shaving products that incorporate a cleaning system that infringes Braun's patents. I have analyzed the damages to Braun as a result of the alleged infringement. I was also asked to review and respond to the expert report of Jesse David submitted by Braun in this matter ("the David report").

5.     In completing this assignment, I reviewed materials produced by both parties, read deposition testimony pertaining to damages, and performed independent research. I also spoke with employees of Rayovac. Appendix C contains a list of materials I reviewed in forming my opinions, as well as the names of individuals with whom I spoke. In general, I relied on the following types of information:

- Financial information including product sales, prices and costs from both Braun and Rayovac;

- Information related to products, competition, pricing and business strategy produced by the parties, or publicly-available;

- Deposition testimony;

- Expert report and back-up materials of Jesse David;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Various court filings; and

- Conversations with various Rayovac employees.

6.    This report and the opinions expressed herein are based on my analysis of the materials I have reviewed to date.  I understand that discovery is on-going.  I may supplement, refine or revise my analysis as appropriate if additional testimony, documents or other discovery materials become available.

7.    My firm is being compensated at the rate of $475 per hour for time I incur on this matter. Payment is not contingent on my findings or on the outcome of this case.  Part of the work was performed by others at Analysis Group under my direction.  My findings are predicated on the necessary assumptions that the patents in suit are valid and infringed.  However, I express no opinion on the issues of liability.

## IV.    SUMMARY OF CONCLUSIONS

8.    I understand that Rayovac contends that it could have offered an alternative, acceptable, non-infringing cleaning system had it not been able to sell the accused products with the existing cleaning system.  In this case, Braun cannot establish that it has lost sales from Rayovac's infringement, and it is therefore entitled only to damages in the form of a reasonable royalty.

9.    In my opinion, a reasonable royalty for this technology is five dollars per unit.  This royalty would be applied to all of Rayovac's sales of the accused products.  The resulting damages are $2.25 million before interest.  Exhibit 1 summarizes the royalty damages.

10.    In the event that the Court does not find that the proposed design-around alternatives provide an acceptable and available alternative, I have analyzed the profits lost by Braun due to Rayovac's sales of its existing shaving products with a cleaning system.  Based on my review of the materials, I conclude that Braun would have captured only a minimal share of Rayovac's rotary product sales and a somewhat larger share of Rayovac's foil product sales. I calculate that under this scenario, Braun has lost approximately $2.33 million in profits on Rayovac's sales from the date of notice of infringement (December 2, 2003) through May 2005.  In addition, I calculate under this scenario lost profits from replacement cleaning solution sales to be $66,854 and from lost replacement foil/cutter sales to be $2.26 million. An award of reasonable royalty damages on the remaining Rayovac sales would be an additional $1.74 million.  See Exhibit 1.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11.     I find no evidence of price erosion damage to Braun. Braun's average intercompany selling price from its combined sales of products with the cleaning system has risen over the damages period.

12.     In the remainder of this report, I present these findings in more detail.

## V.     BACKGROUND

### A.     Rayovac

13.     Rayovac is a global branded consumer products company with leading market positions in two major product categories: consumer batteries and electric personal care products.[2] Rayovac completed the acquisition of Remington Products Company, L.L.C., on September 30, 2003.[3] It continues to sell the Remington electric shaver products under the Remington brand name. Rayovac offers both rotary and foil shavers. Remington is the second largest competitor in the electric shaver market behind Norelco.

14.     Three Remington men's shavers are accused of infringing the patents in suit. The R-9500 is a rotary product that was introduced in approximately October 2003. The MS-5500 is a foil product that was introduced in August 2004. The MS-5700 is also a foil product and was introduced in October 2004. In addition, Remington's WDF-7000 model, a women's foil product that was introduced in March 2005, is accused of infringing the patents in suit. Exhibit 2A summarizes the Remington SmartSystem product line. Exhibit 3 shows the average retail prices of these products compared to products offerings of the other three major brands.

### B.     Braun

15.     Braun is a manufacturer of small electric appliances based in Kronberg, Germany. The company has been a member of The Gillette Company ("Gillette") since 1967.[4] I understand that Gillette Commercial Operation North America ("CONA") has had the responsibility for the sales, marketing, and distribution of Braun's products in the United States since April

---

[2]     See: Rayovac Corporation, Form 10-K for the fiscal year ended September 30, 2004, p. 3.

[3]     See: Rayovac Corporation, Form 10-K for the fiscal year ended September 30, 2003, p. 1.

[4]     http://www.braun.com/na/company/portrait.html. Last visited on 6/8/05.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2000, under a Distributorship Agreement by which CONA is the exclusive distributor of the products in the United States.[5] I further understand that Gillette is not a party to this lawsuit.

16.   Braun sells only foil shavers. Between January 2002 and April 2005, Braun has sold eight different foil shaver products that used the automatic self-cleaning Clean&Charge system.[6] Exhibit 2B sets forth the technical specifications and pricing of these products.

### C.   Other Competitors

17.   The largest competitor of Braun and Remington in the dry shaver market is Norelco, with a total market share of approximately 50% during the relevant damages period. Norelco sells only rotary shavers, and had approximately 83% market share of the rotary products during the relevant period. Panasonic is the fourth competitor of note with products that compete against the accused products. Exhibit 6 presents a market share analysis of the electric shaver market shares for the years 2002 through April 2005.

## VI.   DETAILED FINDINGS – LOST PROFITS

### A.   Recovery Standards

18.   Braun has accused Rayovac of manufacturing and selling electric shavers that contain a cleaning base that infringes the patents in suit. I understand that Braun is seeking damages in the form of lost profits, price erosion and reasonable royalty. In order to establish a basis for lost profits, it is my understanding that the Plaintiff must establish that but for the infringement, it would have made the infringing sales. As Dr. David notes, making such a claim has historically required showing proof of four factors established in *Panduit Corp. v. Stahlin Bros. Fibre Works:* (1) demand for the patented product; (2) the absence of non-infringing substitutes at the time of infringement; (3) the manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit the patent holder would have made.[7]

19.   In instances in which there are suppliers other than the claimant and the alleged infringer, the Panduit test has been modified to allow a claimant to recover lost profits even where there is

---

[5]   See: Plaintiff's Supplemental Answers to Defendant's Interrogatories, Answer to Interrogatory No. 19, p. 9.

[6]   Source: NPD Data – R14182-R14209.

[7]   575 F. 2d 1152, 1160 (6th Cir. 1978).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

evidence of certain acceptable non-infringing substitutes (i.e., Factor 2 of the Panduit test is not satisfied). According to *State Indust., Inc. v. Mor-Flo Indus., Inc.*, if the claimant is able to prove Factors 1, 3, and 4 of Panduit, it may be entitled to profits on a certain share, but not all, of the alleged infringer's sales.[8]

20.     In *Grain Processing Corp. v. American Maize-Products*, the Court held that a lost profits analysis is necessarily a "but-for" inquiry that requires a reconstruction of the market as it would have developed.[9] A fair and accurate reconstruction must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had it not infringed. With sound economic proof, an infringer's alternative and acceptable products that were either "on the market" or "available to the market" may be used to defeat a claim for lost profits damages.

21.     I have been informed by Counsel that as a matter of law, Braun is not entitled to lost profits damages on Rayovac sales made before notice of infringement was given to Rayovac. I have been told that the date of notice is the date of the complaint – December 2, 2003 – because Braun did not mark its products pursuant to the marking provisions of 35 U.S.C. Section 287.[10]

22.     I have not seen evidence that Braun could not manufacture and market additional product, therefore I will discuss only the other three Panduit factors below.

**B.     Demand for the patented product**

23.     Various marketing documents produced by both parties establish that there is a demand for the cleaning system. However, Dr. David agrees that it is not the sole factor that influences purchase, and that one cannot assume that 100 percent of Rayovac's sales would have been made by Braun. I discuss these considerations in detail below in my discussion of a market share allocation.

---

[8]     883 F.2d 1573 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).

[9]     1999 U.S. App. LEXIS 18203 (Fed. Cir. 1999).

[10]     Braun's Answers to Remington's First Set of Interrogatories, Answer to Interrogatory No. 9, p. 9.

---

ANALYSIS GROUP, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**C.    Alternative non-infringing substitutes**

24.    I have relied upon certain opinions expressed by Mr. Philips in his second expert report.  The first alternative design would utilize a gas cleaning system that would clean the shaving head by blowing the dirt out into a filter.  I understand from Mr. Philips' report that the mechanical designs are complete and that only a matter of months is required to bring the design to market.  I understand from Rayovac that such a product could be designed in such a way that the manufacturing costs were comparable to the current cleaning system products.  I have reviewed concept tests done by Rayovac involving consumer testing of the air cleaning concept.[11]  These tests show that the purchase intent by consumers is not significantly different for this concept than for the current solution-based cleaning concept.  Thus, this alternative would be acceptable to consumers.

25.    I understand that the second alternative design involves various minor mechanical design elements including removal of the fan, eliminating the bracket system, and adding a cover piece to the base.  I understand that Mr. Philips will testify that all of these alternative designs were readily available to Rayovac.  I understand that none of these features change the performance of the shaving product or the cleaning product and are therefore not likely to impact the consumer purchase decision.  Furthermore, various models of the Activator product do not include either the fan or the bracket, thus verifying the consumer acceptability of certain alternatives that Mr. Philips has opined were readily available to Rayovac.

26.    Had Rayovac designed its accused products to incorporate these alternative methods of achieving the same desired cleaning functionality and been able to sell the products at the same price, there is no reason to believe that consumers would have changed their purchasing behavior.  Thus, in such a but-for world, Rayovac would have made the same sales that it actually made, and Braun would not have made any more sales.  Therefore, under this scenario, Braun has no basis to claim lost profits damages.

27.    I understand that Braun may contend that there is no design-around alternative, therefore I have also analyzed a scenario in which I make that assumption.  Even in this scenario, there are acceptable non-infringing electric shaver products that perform the same basic shaving functions and that can be cleaned in some manner.  In the following section, I discuss my

---

[11]    R13244-R13246

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

consideration of these alternative products and my conclusion as to the best allocation of the allegedly infringing sales to Braun.

### D. Determination of Lost Profits assuming no design-around

#### 1. Market Share Analysis

28. Braun contends that had Rayovac not included the infringing cleaning system in its products, Braun would have made a substantial portion (but not all) of the infringing sales. Two factors complicate the analysis of lost profits. First, there are, and have been throughout the damages period, other acceptable non-infringing electric shavers available on the market. As discussed above, Norelco is the largest player in the market, with almost a 50% share of the electric shaver market revenues during the relevant period. Second, a simple market share allocation such as that used in the *Mor-Flo* case is not appropriate because the various available products are not identical, and the consumer's decision of which product to purchase is influenced by many factors other than the inclusion of the patented feature.

29. A USA Shaver Market Segmentation study conducted by SKIM Analytical for Braun in February 2004 found that the top five shaver needs among electric shaver users relate to the closeness of the shave, how comfortable and quick the shave is and the appearance of the face after the shave.[12]

30. Similarly, a Scout Market Intelligence analysis of the Men's Shaving market conducted by Equifax Marketing Services for Rayovac in 2004, found that among electric shaver purchasers, the cutting system and plug-in/cordless power system were the two most important features overall. The cleaning system feature, in comparison, was ranked as the 18th feature in importance out of 28 features, following features such as pop-up trimmer, product feel/shape, flexible foils/heads, number of cutting heads, portability, product appearance, quick charge, and shaves per charge, to name a few.[13]

31. After the introduction of the Syncro product in Japan, Braun did an analysis of consumer reply cards. The analysis shows that only one in three Syncro systems was bought as a result of the Clean & Charge feature. The other top reasons were brand, and shaving

---

[12]    B008484

[13]    R13926-R14077, pp. 77-78.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

performance.[14]  Similarly, a Remington study found that closeness, features, and new technology drive repeat purchases.[15]

32.    There are notable differences between the Rayovac accused products and the Braun products on which the plaintiff is claiming lost sales.  Below I discuss the significance of these differences.

*Rayovac heavily markets and advertises its Titanium blades[16] and other unique features including the pop-up mini-blade on the foil shaver.*

33.    Rayovac's use of Titanium is the focus of its marketing.[17]  In discussing its strategy to enter the premium priced foil segment, Rayovac discussed its plan to "leverage" the Titanium concept.[18]  Rayovac actively markets the Titanium brand to consumers.  For example, the most prominent packaging feature on Remington shavers is the word "TITANIUM" in large font.

34.    Remington also believes it has other advantages over features in the Braun foil shavers such as raked cutting technology, pop-up mini-foil, and a three position pop-up trimmer.[19]  In concept documents for the MS-5700, Rayovac lists ten features, with Titanium first, the pop-up mini-screen second, and the cleaner third.

35.    Consistent with the above information, the Equifax report referred to above indicates that the Titanium brand is significantly more important to purchasers of Remington shavers' than to purchasers of other shavers, while the cleaning system feature is less important.[20]

---

[14]    B002254

[15]    R13647

[16]    The shavers' blades are coated with titanium nitride.

[17]    R13635

[18]    R13185

[19]    R13608

[20]    *Ibid*, pp. 79-80.

ANALYSIS GROUP, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*Braun shavers also offer unique features.*

36.   Braun shavers offer unique features such as a 4-way moving head and platinum coated foil in
      the Syncro System Smart Logic; and smart foil technology, an advanced middle trimmer, and
      a 3-stage shaving system in the Activator shaver.[21]

37.   Braun users come disproportionately from Braun (37% compared to its market share of 25%)
      and from Norelco (37%).  Only 17% of Braun Syncro System users had been previous
      Remington users.[22]

      *Braun's products sell at higher retail price points.*

38.   The most recent market data show that Braun's average retail price on its cleaning system
      products was almost $140, compared to the average retail price on Remington shavers of
      approximately $110, a difference of approximately 30%.[23]

39.   Exhibit 3 shows the product offerings of Braun, Norelco, Panasonic and Remington by price
      category based on the average retail selling price as of November 2004.  As this exhibit
      shows, Braun and Norelco both have products that sell for above $150.  The highest price
      Remington shaver is the MS-5700 at an average selling price of $118.  The closest Braun
      product in terms of price is the Syncro 7526 that sold for an average of $108.  Dr. David
      assumed an elasticity of demand of -2, indicating that consumers of these products are price
      sensitive.

      *Braun's product line has never included rotary products.*

40.   Over time, there has been a gradual shift towards rotary shavers.[24]  However, there is a high
      degree of loyalty to a particular cutting system among shaver consumers.  For example, the
      Equifax report found that 78% of Norelco purchasers, 71% of Remington purchasers, and
      70% of Braun purchasers ranked cutting system as an important feature.[25]  That same study

---

[21]   http://www.braun.com/na/products/shavinggrooming/dryshaving/dryshaving.html. Last visited on 6/9/05.

[22]   B007833

[23]   NPD Data – R14182-R14209.   The $30 price difference was confirmed by Mr. Matthew Parker in his
       deposition, p. 156 (rough transcript).

[24]   R13433

[25]   R13926-R14077, p. 79.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

found that almost four in five replacement and additional purchasers were loyal to their cutting system and that previous rotary users were slightly more likely than foil owners to buy the same type of cutting system.[26]  Consistent with a belief in system loyalty, Remington viewed a Braun rotary entry or a Norelco foil entry as a risk/threat to its shaver business.[27]

41.    I reviewed data collected and analyzed by Rayovac from consumer profile cards – the product registration cards that consumers receive with the packaging.  The data show that of the R-9500 purchasers, only 10.2 percent had previously used a Braun product.[28]  System loyalty should be given particular weight in the analysis of the accused products because consumers are typically "trading up" to these higher-end products, as opposed to users new to electric shavers who may not be predisposed to one system or the other.[29]

42.    The product differences discussed above suggest that, absent the infringing features, many of the consumers who purchased a Rayovac accused product likely would have purchased a product other than one of the Braun cleaning system products.  My review of the historical data confirms that there is little evidence of significant lost sales to Braun.

43.    Exhibit 4 shows that Braun's retail unit sales have been increasing since Braun's introduction of these products.  Exhibit 5 shows the same analysis for Braun's intercompany sales to Gillette, both in terms of unit sales and dollar sales, and results in the same finding of increasing sales.

44.    I analyzed market share using retail sales data from NPD.[30]  Exhibit 6 shows that from 2002 to 2004, Rayovac's market share did increase significantly, going from 18.6% to 24.5%.  However, Braun's market share increased slightly during this time, while Norelco's share fell by approximately the same amount as the increase in Rayovac's share.  These data suggest that Rayovac was taking sales away from Norelco, not Braun.

45.    The consumer profile data from Rayovac confirm that Remington shavers are more likely to be taking sales away from Norelco.  The majority of R-9500 purchasers (60.8%) responded

---

[26]    *Ibid*, p. 68.

[27]    R13635

[28]    R14216-R14217.

[29]    See deposition testimony of Matthew Homes Parker, pp. 199 (rough transcript).

[30]    The NPD Group is a third party provider of retail sales data.  The NPD data exclude Wal-Mart.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

that they had planned to buy a Norelco, whereas only 15.9% had planned to buy a Braun. Among MS-5500 purchasers, the results show more interaction between Remington and Braun. With the foil product, 51.4% indicated that they had planned to purchase a Braun.[31]

46.  Based on the data I have reviewed, I find there is little evidence that sales of the accused rotary products took sales away from Braun. Therefore, I estimate that only a small percentage of Rayovac's rotary product sales should be allocated to Braun. For the purposes of my calculations, I have used 15% as the best point estimate. The documents suggest a greater interaction between Rayovac and Braun's foil products, therefore I have used 50% in my calculations.

### 2.    Lost profits on lost shaver sales

47.  Braun produced summary level data showing its intercompany profits by product for its cleaning system products. Dr. David states his understanding that the costs being subtracted from the intercompany sales are direct manufacturing costs and other incremental costs, but at present, I have no means for verifying that these costs do indeed reflect all incremental costs. I have used the profit figures in my calculations and will revise the calculations if necessary after more information about these costs becomes available.

48.  Dr. David has assumed in his lost profit calculations that Braun's lost sales would be comprised of Flex, Syncro, and Activator product sales in the same proportion as Braun's actual sales. For damages beginning in Q2 2004, that calculation implies that more than a quarter of the lost sales would have been sales of the top of the line Activator 8595 and Syncro 7680 models. These premium products carry retail prices of over $150 – a price point at which there are no accused products. For the lost profits calculation, the distinction between the products is important because Braun's average profit on these products is higher on a per unit basis. I believe a more reasonable assumption is that the lost sales would have been comprised of the three Braun products that are more comparable in price to the Remington shavers. As Exhibits 2A, 2B, and 3 show, the Remington accused products are more closely mapped to the Activator 8585, the Syncro 7526 and the Flex 5790 products in terms of both features and price. Matthew Parker testified that Braun studied the effect to which the new Activator models would cannibalize sales of the Syncro line and found that the

---

[31]    R14216-R14217

ANALYSIS GROUP, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

interaction between the two products was small enough to warrant maintaining both product lines.[32]

49.    I have calculated lost profits using the average profit rate on the three products cited above. Exhibit 7 shows the calculation of Braun's lost profits by quarter beginning with Rayovac sales in December 2003. I calculate the total lost profits to be $2.3 million on Rayovac's through May 2005.

### 3.    Lost Profits on Accessories

50.    I understand that lost profits are awardable on collateral sales if the collateral products are tied functionally to products that compete with those that infringe the patent or patents at issue. In this case, the collateral sales include refill cleaning solution cartridges and replacement blades/cutters.

51.    In Exhibits 8 and 9 I have calculated lost profits from the lost sales of these accessories using the same assumptions as Dr. David with respect to the amount of refill and replacement sales. At present, I have no means of verifying the profit data from Braun. I calculate lost profits from replacement cleaning solution sales to be $66,854 and from lost replacement foil/cutter sales to be $2.3 million.

## VII.    DETAILED FINDINGS – PRICE EROSION

52.    Braun is claiming lost profits damages based on its intercompany sales and profits from Braun to Gillette, yet Dr. David looks to retail sales prices for his price erosion claim. Furthermore, although he claims price erosion on all lost sales, he calculates the extent of the price erosion using retail data on only the Syncro product (in contrast to his lost profits analysis where he uses the higher profitability figures that result from taking an average of the Syncro and Activator products).

53.    I performed a similar analysis of the retail data analyzed by Dr. David. Dr. David's conclusions of price erosion were based on his position that there was an increasing decline in the Syncro retail price during 2004. Exhibits 10A and 10B are similar to charts in Dr. David's report, except that they include data for all of Braun's cleaning system product lines, instead of just the Syncro line of products. The graphs show no evidence of a change in the

---

[32]    Deposition testimony of Matthew Homes Parker, pp. 154-155 (rough transcript).

ANALYSIS GROUP, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

price trend following the introduction of Remington's R-9500 product in October 2003. The downward trend in retail pricing that Dr. David cites occurs prior to the introduction of the Activator product during the second quarter of 2004 and is explained by Braun's Mr. Parker as part of the natural life-cycle of the Syncro product. According to Mr. Parker, products need to be "refreshed" on average every three years, and during that three-year life of a product, the retail price decreases.[33] (See Exhibit 13 for the average retail price of the Syncro products and the Activator products separately).

54.  I also analyzed the intercompany data provided by Braun for evidence of price erosion caused by the introduction of the Remington's R-9500 rotary product in October 2003 or its MS-5500 foil product in September 2004. Mr. Parker testified that Braun did not take any specific pricing action following the launch of the Remington rotary product.[34] He cited some increased promotional activities which could affect the retail price, however such activities were done by Gillette and would not have affected Braun's profits.

55.  The data produced by Braun show that the intercompany prices are set in euros on an SKU level and in more recent periods seem to remain constant for several consecutive months.[35] For example, during 2002, the price on the most popular Syncro model decreased monthly; however, in 2004, the price on the Syncro 7680 model is at approximately 77 euros for January and February of 2004, and then drops to approximately 61 euros in March where it remains for the rest of the year.

56.  Exhibit 11 presents the quarterly average intercompany prices in euros by SKU from 2002 through the first quarter of 2005. Exhibit 12 presents a graph of this information aggregated up to the model level (e.g., Syncro 7680). The graph shows a declining price trend from the introduction of the Syncro products in early 2002 through the end of Q2 2003. The trend is reversed in Q3 2003 and prices increased through Q4 2003, before resuming the general downward trend. Since Q2 2004 (the time of the introduction of the Activator line), the prices have remained constant despite the introduction of Remington's foil product in September 2004.

---

[33]  Deposition testimony of Matthew Homes Parker, p. 143 (rough transcript).

[34]  Deposition testimony of Matthew Homes Parker, p. 53 (rough transcript).

[35]  SKU stands for "stock keeping unit" and reflects each unique packaging. For example, there are four separate SKU's for the Activator 8595 model.

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

57.    Exhibit 14A shows the average intercompany sales price in US dollars.  Upon the
       introduction of the higher-end Activator product in Q2 2004, the Syncro price dropped by
       more than $10.  However, because the Activator carries a higher selling price than the
       Syncro, the average price (weighted by unit sales) for the cleaning system products continues
       to increase through 2004 and into 2005.  When the price is calculated as an average across all
       models (weighted by unit sales) and the effect of the falling dollar is considered, Braun's
       price per unit has actually been increasing throughout the damages period.  (Exhibit 14B
       shows the same analysis with the prices shown in euros).

## VIII.    DETAILED FINDINGS – REASONABLE ROYALTY

58.    The courts have affirmed specific guidelines for determining a reasonable royalty to
       compensate a licensor for infringement.  These guidelines include the concept of a
       hypothetical negotiation, and the use of the *Georgia-Pacific* factors.[36]

59.    A reasonable royalty can be thought of as the rate that would have resulted from a
       hypothetical negotiation between a patent owner and a potential licensee of the patented
       invention at the time of first infringement.  The hypothetical negotiation framework assumes
       that the patent is known to be valid, the licensee's use of the invention infringes the patent,
       the patent holder is willing to issue a license, the licensee is willing to take a license and all
       relevant business facts are known to both parties.

60.    In this case, I consider the hypothetical negotiation that would have taken place at the time of
       the alleged first infringement, in or around October 2003 – the date that Rayovac's R-9500
       was introduced.

### A.    Bargaining Context for the Hypothetical Negotiation

61.    I start my analysis of the hypothetical negotiation by specifying each party's bargaining
       position in the negotiations.

62.    At the time of the hypothetical negotiation, Rayovac's predominant business objective was to
       enter the $80+ (and $100+) price segment.[37]  Rayovac believed that the cleaning system with

---

[36]    *Georgia-Pacific v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120-21 (S.D.N.Y. 1970), modified
        and affirmed, 446 F.2d 295 (2d Cir. 1971).

[37]    R002812-002814, R13760, R13771.

---

ANALYSIS GROUP, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

the Titanium feature would make a competitive offering in this segment.[38]  However, Norelco and Panasonic had already entered this segment with products that did not include a cleaning system.

63.  Rayovac believes that there are other possible mechanisms for achieving an innovative cleaning feature that will not infringe the patent.  There would be some cost and some risk to pursuing these alternatives as opposed to licensing the patents from Braun.  Although Dr. David contends there are no design-around possibilities, Mr. Parker testified that Norelco will be introducing a line of products this Fall that will include a cleaning system.[39]

64.  The products that incorporate the cleaning system were not expected to offer higher profitability.  The price premium for these products was expected to approximate the added cost of manufacturing the cleaning system.[40]  The advantage to Rayovac is the ability to offer a more complete range of price points.

65.  The profit per unit is approximately $15.62 after accounting for direct product expenses but not general and administrative costs.[41]  Allocating a share of those administrative costs would decrease the profit further.  This profit of $15.62 is not the maximum rate that Rayovac would expect since many of the incremental sales are likely to come from cannibalization of its lower priced products.  Dr. David assumed that "as much as" 68.1% of sales that could be lost without the cleaning feature.  Using Dr. David's figure therefore results in a maximum rate of $10.64 per unit that Rayovac would be willing to accept.

66.  Braun would be willing to accept any royalty rate greater than zero, as Dr. David admits, since the hypothetical license will not cause Braun to lose sales.  All royalty income would be incremental to Braun.  Furthermore, since the market has been slowly shifting towards rotary shavers, licensing the technology to Rayovac would allow Braun to capitalize on that trend.  Braun may also benefit from increased awareness and acceptance of the cleaning system concept through Remington advertising.

---

[38]    R13166, R13185-R13186.

[39]    Deposition testimony of Matthew Homes Parker, p. 43 (rough transcript).

[40]    See *e.g.*, R002468-2470.

[41]    Based on 2005 data.  2004 product-line data does not fully incorporate all product expenses as a result of a transition period following the acquisition of Remington by Rayovac.

---

ANALYSIS GROUP, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

67. Based on the above, a bargaining range is established at $0 - $10.64. In the remainder of this section, I discuss factors that would influence where the reasonable royalty rate would fall within this range.

**Nature and Advantage of Patent**

- *The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*
- *The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.* -

68. All shavers can be cleaned. The oldest mode of cleaning is to use a brush to clean out the debris in the shaver. More recently, shavers have been designed to be "washable" so that they can be rinsed under the sink.[42] The advantage of the patented technology over the washable method appears to be the automatic cleaning function. However, there are also disadvantages to the consumer of the cleaning system, for example the need to purchase cleaning fluid cartridges and the large footprint of the cleaning base.

69. As will be discussed below, Braun and Rayovac both charge more for products that include the feature, but the products also include other advanced features as well. The added manufacturing costs of the Remington products that include the cleaning system is high compared to price premium that can be charged. Furthermore, although having the cleaning system as an additional feature to justify the higher price point was an advantage to Remington, the cleaning system is not the only way to achieve a higher price point. Norelco and Panasonic both offer high-end products that do not include a cleaning system. Norelco's high-end shavers offer a 4-Stage Multi-Blade Cutting System (for the Quadra models) and a Personal Comfort Control Selector Dial (for the Spectra models),[43] while the Panasonic high-end models offer an adjustable pivoting head, a 30° inner blade angle for a more precise and accurate shaving, a Linear motor, and a Turbo Cleaning Mode.[44]

---

[42] See *e.g.*, R12845.

[43] Source: Philips website. Last visited on 6/10/05.

[44] Source: Panasonic website. Last visited on 6/10/05.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Profit Attributable to the Invention**

- *The established profitability of the product made under the patent; its commercial success; and its current popularity.*
- *The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.*
- *The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.*
- *The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.*

70.    In Exhibit 15, I present product line profitability information for Rayovac's accused products for FY2005. I have not included an analysis of FY2004 profitability because of data limitations due to a system conversion that occurred during that year. As a result of that conversion, many costs such as trade rebates and other customer expenses were not captured at the product level and therefore profits are overstated.[45] Rayovac tracks some expenses directly at the product level, but other expenses, such as marketing and advertising are tracked only at the higher category level of men's shaving products. Through May 16, 2005, the fiscal year advertising and marketing expenses have been almost 25% of net sales for the men's shaver product line. I understand that this percentage will be lower for the entire year because advertising tends to be disproportionately higher in the first half of the year, primarily as a result of Father's Day promotions. I understand that the current forecasted level of advertising and marketing expense is approximately 17% of sales for the year, therefore I have used that percentage in my determination of product-line profits. Other expenses such as selling, general, and administrative costs are tracked only at a corporate level. I have not attempted to allocate those expenses to the product line, but doing so would result in still lower profitability. The analysis in Exhibit 15 shows an average profit per unit of $29.31 before advertising and marketing and $15.62 after an allocation of advertising and marketing expense.

71.    Dr. David cites an industry rule of thumb frequently called the "25% rule" in his report. A recent article confirmed empirically the validity of this rule and in particular calculated that

---

[45]    See deposition transcript of Alan Schoepp, p. 91.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

for consumer products the median royalty rate as a percentage of the profits of the product incorporating the patented technology was closer to 30%.[46]  This article also clarifies that the rule should be used with "fully-loaded" profits, that is profits after accounting for all of the operating expenses associated with product activity.  Applying the 25%-30% range to Rayovac's profit of $15.62 yields a royalty range of $3.91 to $4.69 per unit.

### Derivative or Convoyed Sales

- *The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.*

72.   Rayovac does earn additional profits from the sale of cleaning solution and replacement foils and cutters.  This factor would tend to increase the royalty rate.

### Relationship of the Parties

- *The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.*

73.   The parties are competitors, however, as Dr. David points out in his report, the sales that are subject to royalty are those that would not have been made by Braun, therefore this factor actually tends to decrease the rate.

### Relevant Licensing Policies

- *The royalties received by the patentee for the licensing of the patents in suit, proving or tending to prove an established royalty.*
- *The rates paid by the licensee for the use of other patents comparable to the patents in suit.*
- *The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting license under special conditions designed to preserve the monopoly.*

---

[46]   "Use of the 25 Per Cent Rule in Valuing IP," Robert Goldsheider, John Jarosz & Carla Mulhern, Les Nouvelles, December 2002.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

74.    I understand that Braun has not licensed the patent in the past and that there is no established royalty rate for this particular technology.[47]

75.    A recent study of royalty rates across different industries found that the median royalty rate for consumer products was 5% of sales.[48] Applying this royalty rate to the average selling price of $85.80 (see Exhibit 15) would result in a royalty rate of $4.29 per unit.

### Terms and Scope

-    *The duration of the patent and the term of the license.*

-    *The nature and scope of the license, an exclusive or non-exclusive; or a restricted or non-restricted in terms of the territory or with respect to whom the manufactured product may be sold.*

76.    The term of the hypothetical license would be until 2015, twelve years following the introduction of the R-9500. In my opinion, this factor does not have a strong influence on the negotiated rate. Because Rayovac believed that there were design-around alternatives available, it may have been more willing to invest the research and development efforts given the relatively long remaining life of the patents, and therefore be less willing to accept a higher rate.

77.    All else equal, an exclusive license would command a higher rate than a non-exclusive license. As discussed above, however, Norelco plans to introduce its own cleaning system product this year, therefore, the license would not protect Rayovac from further competition from products with cleaning systems, a fact which lessens the weight of this factor.

### Conclusion with Respect to Reasonable Royalty

-    *The amount a licensor and a licensee would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have*

---

[47]    Braun's Answers to Remington's First Set of Interrogatories, Answer to Interrogatory No. 10, p. 10; Deposition testimony of Matthew Homes Parker, pp. 30-31 (rough transcript).

[48]    "Use of the 25 Per Cent Rule in Valuing IP," Robert Goldsheider, John Jarosz & Carla Mulhern, Les Nouvelles, December 2002.

---

ANALYSIS GROUP, Inc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.*

- *The opinion testimony of qualified experts.*

78. In my opinion, based on consideration of the bargaining context, the negotiating range, and the factors discussed above, a reasonable royalty rate is $5.00 per unit. This rate represents more than 25% of the profits earned by Rayovac and is consistent with (though again slightly higher than) the median royalty rate on consumer goods licenses generally of 5% of sales.

**B.     Calculation of Royalty Damages**

79. In Exhibit 16 and 17, I calculate the royalty damages under two different scenarios. In Exhibit 16, I multiply the royalty rate by the total of Rayovac's allegedly infringing unit sales. This calculation results in royalty damages of $2.25 million. In Exhibit 17, I apply the royalty rate only to those sales not treated as lost sales in the lost profits calculation. This calculation results in royalty damages of $1.74 million that would then be added to the lost profits damages.

**C.     Prejudgment Interest**

80. It is my understanding that the Court may award prejudgment interest to compensate plaintiffs for the time that has passed between when they would have received the money had infringement not occurred, and when the damages award is granted. I agree with Dr. David that the appropriate interest rate to use is the historical Treasury bill rate. I expect to be asked to compute prejudgment interest at the time of trial.

Date:  June 13, 2005                                 Submitted by:


                                                     Laura B. Stamm

# APPENDIX A

# LAURA B. STAMM
**Managing Principal**

111 Huntington Avenue
Tenth Floor
Boston, MA 02199
Phone: (617) 425-8178
Fax: (617) 425-8001
LStamm@AnalysisGroup.com

Laura Stamm, a Managing Principal of Analysis Group, specializes in the application of finance and accounting to problems in complex business litigation. She has served as an expert on matters involving both commercial disputes and lost earnings. She has also worked with leading academic experts from prominent institutions, such as Harvard, Princeton and M.I.T., on high profile cases involving issues ranging from intellectual property to securities violations.

Ms. Stamm has provided assistance to attorneys on all phases of pretrial and trial practice including development and review of pretrial discovery, development of economic and financial models to analyze damages, critique of analyses propounded by opposing experts, and preparation of testimony. She has conducted damages assessments in cases involving commercial disputes and intellectual property issues, has analyzed issues relating to the valuation of financial instruments, and has provided valuation analyses of privately-held companies. She has also prepared expert reports in cases involving claims of lost earnings as a result of employment actions.

Outside of litigation, Ms. Stamm has assisted numerous businesses in a variety of industries with the development of business plans and financial projections, often through the use of complex integrated financial models. Prior to joining Analysis Group, Ms. Stamm was a Manager at Price Waterhouse in Dispute Analysis and Corporate Recovery Services where she managed several projects involving the analysis of damages in business litigation. She has also served as a Senior Associate in the Business Investigation Services division of Coopers & Lybrand, providing litigation support services as well as auditing services, due diligence analysis in support of mergers & acquisitions, and consulting services to financially distressed companies.

Ms. Stamm is a graduate of the Sloan School of Management at the Massachusetts Institute of Technology, where she received an M.S. in Management with a Concentration in Finance. She received a B.A. in Mathematics from Williams College. Ms. Stamm is a Certified Public Accountant and a member of the Massachusetts Society of Certified Public Accountants, where she has served on the litigation support committee.

## EDUCATION

| | |
|---|---|
| 1989 | Massachusetts Institute of Technology, Sloan School of Management, Cambridge, MA<br>S.M. Management, Concentration: Finance |
| 1984 | Williams College, Williamstown, MA<br>A.B. Mathematics, magna cum laude, phi beta kappa. |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1984-1987 | Temple Barker & Sloane, Lexington, MA |
| 1989-1992 | Coopers & Lybrand (Business Investigation Services), Boston, MA |
| 1992-1993 | Price Waterhouse (Dispute Analysis & Corporate Recovery Services) Boston, MA |
| 1993-present | Analysis Group, Boston, MA |

## PROFESSIONAL AFFILIATIONS

Certified Public Accountant, Licensed in Massachusetts, 1992

Member, American Institute of Certified Public Accountants

Member, Massachusetts Society of Certified Public Accountants

## SELECTED LITIGATION EXPERIENCE

### Intellectual Property Analyses

Ms. Stamm has consulted on financial and economic issues related to the licensing, selling and alleged unauthorized use of patents, copyrights, trademarks, trade dress and trade secrets. She has served as an expert witness on damages assessments involving reasonable royalty determinations, price erosion, and lost profits analyses. She has also been retained as a consulting expert to assist attorneys in managing complex cases involving multiple experts. Selected case examples include:

#### Representative Engagements as a Testifying Expert

- *Knowledge Mechanics Inc. v. OutStart, Inc., et al.*
  Expert rebuttal report on topics related to disgorgement of profits and reasonable royalty for matter involving allegations of software copyright (United States District Court, District of Massachusetts).

- *The Topps Company v. Cadbury Stani*
  Expert report and deposition testimony on topics related to disgorgement of profits and reasonable royalty for matter involving allegations of theft of trade secrets used in bubble gum manufacture (United States District Court, Southern District of New York).

- *Spectronics Corporation v. Mastercool, Inc.*
  Expert report on reasonable royalty damages from alleged infringement of patents related to leak detection equipment  (United States District Court, Eastern District of New York).

- *T-Netix, Inc. v. MCI WorldCom Communications, Inc. and Global Tel\*Link Corporation*
  Expert report on lost profits and reasonable royalty damages from alleged infringement of patents related to prison phone systems (United States District Court, Eastern District of Texas, Marshall Division).

- *Sakharam D. Mahurkar, MD and Sherwood Medical Company v. Arrow International, Inc.*
  Expert reports and deposition testimony on lost profits and reasonable royalty damages from alleged infringement of patent related to catheters  (United States District Court, Northern District of Illinois, Eastern Division).

- *Plastics Research Corporation, Inc. v. Brite Millwork, Inc.*
  Expert report on lost profits, reasonable royalty and price erosion damages from alleged infringement of patent related to injection molded lattice products (United States District Court, Eastern District of Michigan, Southern Division).

- *Benetton Sportsystem USA, Inc v. Wilson Sporting Goods*
  Expert report and deposition testimony on lost profits, reasonable royalty and price erosion damages from alleged infringement of patents on tennis racquet technology (United States District Court, District of New Jersey).

- *ADC Telecommunications, Inc. v. Thomas & Betts Corporation*
  Expert report and deposition testimony on lost profits, reasonable royalty and price erosion damages from alleged infringement of patents on hardware used with telecommunications systems (United States District Court, District of Minnesota).

- *Dayco Products, Inc. v. Total Containment, Inc.*
  Expert report on lost profits and reasonable royalty damages from alleged infringement of patents relating to underground fuel delivery systems (United States District Court, Western District of Missouri, Southern Division).

- *The Yankee Candle Company, Inc. v. The Bridgewater Candle Company, LLC*
  Expert reports and deposition testimony on damages issues related to trade dress infringement (United States District Court, District of Massachusetts).

- *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc. and Lextron, Inc.*
  Expert report and trial testimony rebutting lost profits claim in a patent infringement litigation involving cattle feedlot equipment (United States District Court, District of Colorado).

- *Telemac Corporation v. Topp Telecom, Inc.*
  Rebuttal analyses of lost profits and reasonable royalty damages in a patent infringement litigation concerning technology used in providing prepaid cellular phone service (United States District Court, Northern District of California, Oakland Division).

**Representative Engagements as a Consulting Expert**

- *National Education Training Group, Inc. v. Skillsoft Corporation et al.*
  Valuation and stock price analysis in rebuttal of damages claimed by plaintiff using an unjust enrichment theory as a remedy for alleged theft of trade secrets used in software development (Circuit Court of Cook County, Illinois)

- *Berlex Laboratories, Inc. v. Biogen, Inc.*
  Econometric analysis of pharmaceutical sales for lost profits claims in patent infringement case; design and analysis of market research survey of Multiple Sclerosis patients for use in damages model (United States District Court, District of Massachusetts).

- *Compaq Computer Corp. v. Packard Bell Electronics*
  Determination of damages resulting from price erosion and lost sales in the retail computer market as a result of patent infringement (United States District Court, District of Texas).

- *Compaq Computer Corp. v. eMachines*
  Determination of damages resulting from price erosion and lost sales in the retail computer market as a result of patent infringement (United States District Court, District of Texas).

- *Lotus Development Corporation v. Borland International*
  Support of three damages experts in copyright infringement case; econometric and marketing analysis of the spreadsheet market, and accounting analysis of incremental costs (United States District Court, District of Massachusetts).

## Anti-trust Matters

Ms. Stamm has consulted to attorneys and supported the work of leading academics on antitrust cases involving price-fixing, attempted monopolization, predatory conduct and other claims. Her experience includes in-depth quantitative studies of market definition and market power. She has also provided testimony on issues related to damages.

### Representative Engagements as a Consulting Expert

- *FTC v. Mylan Laboratories*
  Analysis of issues of vertical restraint of trade and horizontal price fixing stemming from Mylan's exclusive deal with an ingredient supplier for two anti-anxiety drugs. Managed case team in support of two leading academic experts providing testimony on liability and damages issues.

- *Volvo Penta of Americas, Inc. v Brunswick Corporation*
  Overall management of case team involving multiple academic experts studying issues related to monopolization charges, including unlawful acquisitions of boat builders, use of long term contracts to foreclose competition in stern drive and inboard engines, and use of various price discount programs to effect exclusive dealing and foreclose competition (United States District Court, District of Virginia)

### Representative Engagements as a Testifying Expert

- *Ace Tire & Axle Inc. v. Lippert Tire & Axle*
  Expert rebuttal report on lost profits from alleged unfair competition (United States District Court, Eastern District of Texas).

**General Commercial Damages**

Ms. Stamm has provided testimony on economic, financial and accounting analyses in a broad array of complex commercial litigation matters involving legal claims of breach of contract, torts, accounting malpractice, fraudulent conveyance, and breach of fiduciary duty. In breach of contract matters, she has directed analyses which typically involve gathering and organizing accounting and contract records, determining ex ante expectations, analyzing sales trends, assessing profitability, preparing projections, and analyzing changing market conditions. Selected cases include:

- *The Eurotrain Consortium v. Taiwan High Speed Rail Corporation*
  Expert report and hearing testimony related to lost profits, unjust enrichment, and out-of-pocket expenses stemming from a breach of contract related to the Taiwan High Speed Rail Project (International Chamber of Commerce, International Court of Arbitration).

- *Microsoft Corporation v. Nvidia Corporation.*
  Expert report and hearing testimony related to cost and pricing analyses in a contract dispute (American Arbitration Association).

- *Independent Media Services, Inc. v. Aegis Group PLC, et al.*
  Trial testimony on damages from the breach of a non-solicitation clause in a non-disclosure agreement (Supreme Court of the State of New York).

- *Advanced Retail Marketing, Inc. v. News America Marketing FSI, Inc.*
  Expert report and trial testimony on damages from breach of contract to use technology for in-store coupon machines (Supreme Court of the State of New York).

- *Co-Options, Inc. v. News America Marketing In Store, Inc.,*
  Expert report and deposition testimony on damages from breach of contract to participate in a joint venture to provide co-operative in-store sampling and demonstrations programs (Superior Court, Complex Litigation Docket, State of Connecticut).

- *PBM Products, Inc. v. Mead Johnson & Company*
  Expert report and deposition testimony on damages related to a false advertising campaign concerning infant formula (United States District Court, Eastern District of Virginia).

- *Jan Pottker, et al. v. Kenneth J. Feld et al.*
  Expert report and deposition testimony on damages related to allegations of tortious interference with respect to the research and publication of a non-fiction book (Superior Court of the District of Columbia).

- *Hartford Electric Supply Company v. Allen Bradley Company, Inc.*
  Expert report and deposition testimony on lost profits damages from attempted termination of electrical supply distributor (Superior Court, State of Connecticut).

- *PrimeTime 24 Joint Venture v. DirectTV*
  Expert report on damages from breach of contract to purchase network television services for satellite television subscribers (United States District Court, Southern District of New York).

**Finance, Valuation and Securities**

Ms. Stamm has worked with clients to understand and asses the facts and circumstances in finance-based litigations. She has managed cases in areas involving analyses of complex derivative securities, mergers and acquisitions, banking issues, and business valuations. In addition to the selected cases below, Ms. Stamm has provided business valuations in other contexts such as contemplated acquisitions, divorce settlements and estate tax filings.

### Representative Engagements as a Testifying Expert

- *HCM High Yield Opportunity Fund et al. v. Skandinaviska Enskilada Banken AB et al.*
  Expert report on the impact of alleged misrepresentations on bond prices (United States District Court, Southern District of Florida, Miami Division).

- *Michael D'Amelio, et al. v. Illinois Tool Works Inc. and ITW Finance II LLC,*
  Expert report and deposition testimony on the impact of alleged financial statement misrepresentations on the value of a manufacturer of adhesives, sealings and coatings (United States District Court, District of Massachusetts).

- *Bank Brussels Lambert and Skopbank v. The Chase Manhattan Bank.*
  Expert reports and deposition testimony regarding analyses of collateral valuation and damages stemming from claims of negligence and misrepresentation (United States District Court, Southern District of New York).

- *The Chase Manhattan Bank, N.A., et al v. Credit Lyonnais (Suisse) S.A.*
  Expert reports, deposition and trial testimony regarding analyses of collateral valuation and damages in case involving conversion of cash collateral (United States District Court, Southern District of New York).

### Representative Engagements as a Consulting Expert

- *Legion Insurance Company v. John Hancock Life Insurance Company*
  Analysis of claims related to consequential damages arising out of John Hancock's failure to pay reinsurance recoverables (Arbitration).

- *Class Action v. Raytheon Corporation and PriceWaterhouseCoopers*
  Analysis of class action damages under 10(b)5 litigation related to alleged accounting failures and misrepresentations in financial statements (United States District Court, District of Massachusetts).

- *Robotic Vision Systems, Inc. v. General Scanning Inc.*
  Rebuttal analyses related to the bidding process and outcome of a takeover contest (United States District Court, Eastern District of New York.).

- *The Procter & Gamble Company v. Bankers Trust Company and BT Securities Corporation*
  Financial analysis of complex derivative financial instruments involving issues of risk, return, and proper selling practices (United States District Court, Southern District of Ohio).

- *Healthco International, Inc. v. Hicks, Muse & Co. Inc.*
  Development of expert analyses in support of multiple experts providing reports in response to fraudulent conveyance and negligence claims stemming from the failed leverage buyout of a large dental distribution business. Scope of analyses included solvency analysis, reasonableness of financial projections, industry analyses, fiduciary duty issues, capital structure, and damages (United States Bankruptcy Court, District of Massachusetts).

## OTHER CONSULTING ACTIVITIES

- Development of an integrated financial model for a physician management company and research on competitive and industry factors for use in developing financial projections.

- Due diligence activities for a venture capital firm considering investments in several start-up companies.

- Business valuations of privately-held companies.

- Appraisals for tax purposes.

## PUBLICATIONS AND PRESENTATIONS

"Valuation Methods for Appraisal," MCLE Panelist, April 1998.

"Valuing a Business in a Litigation Context," New York Law Journal, February 10, 1994.

"Estimating the Cost of Capital," (with Harindra deSilva and Julie Oh), in *Litigation Services Handbook*, 2nd ed. Ed. Weil et al. New York: John Wiley & Sons, 1995.

"Forecasting Lost Revenue," MSCPA panelist, May 1995.

"Consolidation and Restructuring: The Next Step in Managed Care," in *Health Care Management: State of the Art Reviews*, Vol. 2, No.1, September 1995, 221-236, Hanley & Belfus, Inc. (with Patricia M. Danzon and Paul Greenberg).

**Appendix B**
**Prior Four Year's Testimony of Laura B. Stamm**

- *Medical Technology and Innovation, Inc. v. Lenscrafters Inc. et al.*
  American Arbitration Association
  Hearing testimony, May 2005

- *Doyle v. FleetBoston Financial Corporation et al.*
  Superior Court of Massachusetts
  Trial testimony, May 2005

- *Marubeni Corporation v. Southeast Wood Fiber, et al.*
  American Arbitration Association
  Depostion testimony, February 2005

- *Palomar Medical Technologies, Inc. v. Cutera, Inc.*
  United States District Court, District of Massachusetts
  Deposition testimony, December 2004

- *Pediamed Pharmaceuticals, Inc. v. Breckenridge Pharmaceutical Inc. et al.*
  United States District Court, District of Maryland, Southern Division
  Deposition testimony, October 2004

- *The Topps Company, Inc. v. Cadbury Stani S.A.I.C. et al.*
  United States District Court, Southern District of New York
  Deposition testimony, March 2004

- *Jan Pottker; Writer's Cramp, Inc. et al. v. Feld Entertainment, Inc. et al.*
  Superior Court of the District of Columbia
  Deposition testimony, February 2004

- *The Eurotrain Consortium v. Taiwan High Speed Rail Corporation*
  International Chamber of Commerce, International Court of Arbitration
  Hearing testimony, June 2003

- *Microsoft Corporation v. Nvidia Corporation*
  American Arbitration Association
  Hearing testiony, January 2003

- *Independent Media Services, Inc. v. Aegis Group PLC et al.*
  Supreme Court of the State of New York
  Trial testimony, October 2002

- *Sakharam D. Mahurkar. M.D. and Sherwood Medical Company v. Arrow International Inc.*
  United States District Court, Northern District of Illinois, Eastern Division
  Deposition testimony, October 2002

ANALYSIS GROUP, Inc.

- *Advanced Retail Marketing, Inc. v. News America Marketing FSI, Inc.*
  Supreme Court of the State of New York
  Trial testimony, March 2002

- *Michael D'Amelio, et al. v. Illinois Tool Works Inc. and ITW Finance II LLC*
  United States District Court, District of Massachusetts
  Deposition testimony, February 2002

- *Co-Options, Inc. v. News America Marketing In Store, Inc.*
  Superior Court, Complex Litigation Docket at Waterbury, State of Connecticut
  Deposition testimony, November 2001

- *PBM Products, Inc. v. Mead Johnson & Company*
  United States District Court, Eastern District of Virginia
  Deposition testimony, September 2001

- *Bank Brussels Lambert et al. v. Credit Lyonnais (Suisse) S.A.*
  United States District Court, Southern District of New York
  Trial testimony, July 2001

- *ADC Telecommunications, Inc. v. Thomas & Betts Corporation*
  United States District Court, District of Minnesota
  Deposition testimony, April 2001

- *Hartford Electric Supply Company v. Allen Bradley Company, Inc.*
  Superior Court, State of Connecticut
  Deposition testimony, March 2001

- *Benetton Sportsystem, Inc. v. Wilson Sporting Goods*
  United States District Court, District of New Jersey
  Deposition testimony, February 2001

ANALYSIS GROUP, Inc.

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**Appendix C**
**Documents Reviewed**

**Bates-Numbered Documents**

B000407 – B000424
B000681 – B000695
B000862
B000863 – B000894
B000895 – B000897
B000898 – B000907
B000909 – B000911
B000912 – B000921
B000922
B000923 – B000941
B000942 – B000960
B000961 – B001007
B001008 – B001032
B002128 – B002165
B002244 – B002272
B002457 – B002504
B002571 – B002578
B002997ENG – B003035ENG
B003044ENG
B003047ENG
B004681ENG – B004682ENG
B004683ENG
B004684ENG – B004685ENG
B007688 – B007711
B007712 – B007794
B007795 – B007814
B007815 – B007817
B007818 – B007824
B007825 – B007829
B007830 – B007831
B007832 – B007833
B007834 – B007889
B007890 – B007942
B007958
B007959 – B007973
B007974 – B007981
B007982 – B007995
B007996 – B008065
B008066 – B008122

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

B008123 - B008190
B008191 - B008217
B008218 - B008239
B008240 - B008252
B008253 - B008267
B008268 - B008285
B008286 - B008304
B008305 - B008323
B008324
B008325 - B008329
B008330 - B008331
B008332 - B008347
B008348 - B008355
B008356 - B008361
B008362 - B008369
B008370
B008371 - B008372
B008425 - B008433
B008434 - B008449
B008450 - B008527
B008528 - B008533
GIL003853 - GIL003931
R001426 - R001427
R001428
R001913 - R001918
R002162 - R002163
R002164 - R002166
R002178 - R002187
R002456 - R002457
R002460 - R002465
R002467
R002468 - R002471
R002472 - R002517
R002518 - R002569
R002760 - R002766
R002781
R002800 - R002801
R002804 - R002808
R002809
R002810
R002811
R002812 - R002813
R002814 - R002815
R002816 - R002861

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

R003555
R003578 - R003584
R003587 - R003588
R003591
R004028 - R004034
R004362 - R004364
R004936 - R004953
R010572 - R010949
R013915 - R013925
R10478
R11740 - R11769
R11770 - R12285
R12286
R12287 - R12297
R12298 - R12305
R12306
R12307 - R12325
R12326 - R12337
R12338
R12339 - R12357
R12358 - R12369
R12370
R12371 - R12395
R12396 - R12411
R12412 - R12429
R12430 - R12437
R12438
R12439 - R12449
R12450 - R12458
R12459 - R12464
R12465 - R12484
R12485 - R12513
R12514 - R12537
R12538 - R12540
R12541 - R12561
R12562 - R12595
R12596 - R12625
R12626 - R12655
R12656 - R12676
R12677 - R12704
R12705 - R12726
R12727 - R12747
R12748 - R12765
R12766 - R12797

*CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER*

R12798 - R12810
R12811 - R12864
R12865
R12866 - R12872
R12873 - R12874
R12875 - R12880
R12881 - R12882
R12883 - R12901
R12902 - R12933
R12934 - R12964
R12965 - R12976
R12977 - R12995
R12996 - R13025
R13026 - R13062
R13063 - R13080
R13081 - R13110
R13111 - R13160
R13161 - R13237
R13238 - R13246
R13247 - R13265
R13266 - R13287
R13288 - R13290
R13291 - R13326
R13327 - R13373
R13374 - R13394
R13395 - R13419
R13420 - R13494
R13495 - R13581
R13582 - R13668
R13669 - R13674
R13675 - R13693
R13694 - R13757
R13758 - R13908
R13915 - R13925
R13926 - R14077
R14079 - R14178
R14182 - R14209
R14210 - R14215
R14216 - R14217

**Legal Documents**

Second Expert Report of Samuel R. Phillips, PE

*CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER*

Braun Gmbh's Answers to Remington's First Set of Interrogatories
Response to Plaintiff's First Set of Interrogatories to Defendant
Answer to the Amended Complaint
First Amended Complaint
Braun's Answers to Defendant's Second Set of Interrogatories
Braun's Supplemental Response to Second Set of Interrogatories
Expert Report of Jesse David

## Depositions

Deposition Testimony of Juergen Hoeser, May 11-12, 2005
Deposition Testimony of Matthew Holmes Parker, June 6, 2005
Deposition Testimony of Alan Schoepp, May 12, 2005

## Other Documents Considered

Shaver device with lid.pdf
Remington Website, http://www.remington-products.com
Braun Website, http://www.braun.com
Norelco Website, http://www.norelco.com
Panasonic Website, http://www.panasonic.com
Goodman's Website, http://www.goodmans.net
COSTeLECTRONICS Website, http://shop.store.yahoo.com/etronics4less/
Epinions.com Website, http://www.epinions.com
Buy-It-Now-Store.com Website, http://shop.store.yahoo.com/buyitnow64
CelebrityAppliance.com Website, http://www.celebrityappliance.com
MarBeck.com Website, http://www.marbeck.com
Goldscheider, Robert, John Jarosz, and Carla Mulhern, "Use of the 25 Percent Rule in Valuing IP,"
*Les Nouvelles*, December 2002, pp. 123-133.
Rayovac Corporation, SEC Form 10-K, for the fiscal year ended September 30, 2003
Rayovac Corporation, SEC Form 10-K, for the fiscal year ended September 30, 2004

## Rayovac Employees Spoken With

Sean Martin, Director - Remington Men's Shaving
Alan Schoepp, Controller for North America Marketing
Yuri Bobrang Avila, Director - Shaving and Grooming Technology
Michael Alan Andrew, Chief Engineer  - Remington Men's Shaving

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.

**Exhibit 1**

**Summary of Damages**

**Scenario 1 - Reasonable Royalty Only**

| | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|
| [A] Royalties | $ 663,090 | $ 1,382,315 | $ 204,765 | $ 2,250,170 |

**Scenario 2 - Lost Profits & Royalties**

| | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|
| [B] Lost Profits on Shavers | $ 34,856 | $ 2,024,474 | $ 274,118 | $ 2,333,448 |
| [C] Lost Profits on Replacement Foil/Cutters | $ 25,678 | $ 1,977,749 | $ 257,658 | $ 2,261,085 |
| [D] Lost Profits on Cleaning Solution | $ 759 | $ 58,477 | $ 7,618 | $ 66,854 |
| [E] Royalties on Remaining Sales | $ 657,265 | $ 933,642 | $ 146,313 | $ 1,737,220 |
| [F] **Total** | $ 718,558 | $ 4,994,343 | $ 685,706 | $ 6,398,607 |

Sources:
[A] See Exhibit 16.
[B] See Exhibit 7.
[C] See Exhibit 8.
[D] See Exhibit 9.
[E] See Exhibit 17.
[F] = [B] + [C] + [D] + [E]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 2A**

**Remington SmartSystem Product Specifications**

| Model Number | Blade Type | Power Operation | Cordless Operation (minutes) | Quick Charge (minutes) | Worldwide Voltage | Titanium Blades/Foils | Trimmer Type | Display Type |
|---|---|---|---|---|---|---|---|---|
| MS-5500 | Foil | Cord/Cordless | 60 | 5 | √ | √ | 3-Position | LED |
| MS-5700 | Foil | Cord/Cordless | 60 | 5 | √ | √ | 3-Position | LCD |
| R-9500 | Rotary | Cord/Cordless | 60 | 5 | √ | √ | Easy-View | LCD |

Source:
Product specifications for all models are taken from the Remington product's Men's Shavers website: http://www.remington-products.com/usa/products/mshavers/index.html (last visited on 5/24/05).

ANALYSIS GROUP, INC.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Exhibit 2B
Braun Clean&Charge Product Specifications

| Product Group | Model Number | Blade Type | Power Operation | Charge Time (minutes) | Cordless Operation (minutes) | Quick Charge (minutes) | 3-Stage Cutting/Shaving | Flexible/Contour Hugging Head | Active/Moving Head (head oscillation) | Display Type | Smart Foil (hole size variation) | Smart Logic (battery optimization) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Activator System | 8595 | Foil | Cord/Cordless | 60 | 50 | 3 | ✓ | ✓ | ✓ | LCD | ✓ | ✓ |
| Activator System | 8585 | Foil | Cord/Cordless | 60 | 50 | 3 | ✓ | ✓ | ✓ | LED | ✓ | ✓ |
| Flex Integral | 5441 | Foil | Cord/Cordless | 60 | 50 | 3 | ✓ | ✓ | | LED | | |
| Flex XP II | 5790 | Foil | Cord/Cordless | 240 | 40 | | ✓ | ✓ | | LED | | |
| Syncro System | 7680 | Foil | Cord/Cordless | 60 | 50 | 3 | ✓ | ✓ | ✓ | LCD | | ✓ |
| Syncro System | 7570 | Foil | Cord/Cordless | 60 | 50 | 3 | ✓ | ✓ | ✓ | LCD | | |
| Syncro System | 7546 | Foil | Cord/Cordless | 60 | 50 | 3 | ✓ | ✓ | ✓ | LED | | |
| Syncro System | 7526 | Foil | Cord/Cordless | 60 | 50 | 3 | ✓ | ✓ | ✓ | LED | | ✓ |

Sources:
1. Product specifications for all models (excluding 5441, 7570, and 7546) are taken from the Braun's products Male Shaving & Grooming (Dry Shaving) website: http://www.braun.com/ba/products/shaving/grooming/dryshaving/dry (last visited on 5/24/2005).
2. Product specifications for Flex Integral model 5441 are taken from Goodmans.net, http://www.goodmans.net/get_item_br-5441_braun-5441-flex-integral-clean-charge-electric-raz.htm, and COST+ELECTRONICS online store,
   http://shop.store.yahoo.com/ctronics#zaybr54eaflts54.html (both last visited on 6/6/2005).
3. Product specifications for Syncro System model 7570 are taken from Epinions.com, http://www.epinions.com/well+Personal+Electric_Razors-All-Self_Cleaning_Shaver_System_Model_7570/display_~full_specs, and Buy-It-Now-Store.com,
   http://shop.store.yahoo.com/buyitnow64br7546invoice.html (both last visited on 6/6/2005).
4. Product specifications for Syncro System model 7546 are taken from CelebrityAppliance.com, http://www.celebrityappliance.com/7546.html, and Marbeck.com, http://www.marbeck.com/braun_shaver_syncro_7546.html (both last visited on 6/6/2005).

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Exhibit 3
Average Retail Prices of Selected Shavers in the $80 and Higher Segment
November 2004

| Price Range | Braun | Remington | Norelco | Panasonic |
|---|---|---|---|---|
| Over $150 | 8595 ($176.64)<br>7680 ($156.02) | | 8894XL ($178.48) | ES-8095 ($190.38)<br>ES-8152 ($174.37) |
| $100 - $150 | 8585 ($134.56)<br>7526 ($108.15) | MS-5700 ($118.26)<br>R-9500 ($112.42) | 8825XL ($119.76) | ES-8092 ($110.90) |
| $80 - $99.99 | 5790 ($93.49)<br>7505 ($93.27) | MS-5500 ($92.60) | 5810XL ($87.18)<br>6716X ($84.96) | ES-7018 ($81.00) |

Source:
R14182-R14209

Note:
Self-clean products are identified by italic fonts.

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.

Exhibit 4

**Retail Unit Sales of Braun Clean&Charge Products**



Source:
R14182-R14209
Note:
Clean&Charge products include Braun model numbers 5441, 5790, 7526, 7546, 7570, 7680, 8585 and 8595.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER





Exhibit 5

**Braun Clean&Charge Products**
**Intercompany Unit Sales and Total Revenue**

Source:
B008325-B008329
Notes:
1. Dollars were converted from euros using monthly exchange rates calculated as the average of daily 12PM exchange rates for the given month.
2. Clean&Charge products include Braun model numbers 5441, 5790, 7526, 7570, 7650, 7680, 8585 and 8595. Model number 7546 is excluded due to missing data in the source document.

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Exhibit 6

Market Share - Dollar Sales
Electric Shaving Market
2002- 2005



Legend: ■ Braun    ⊠ Remington    □ Norelco    ⊠ Other

| | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Remington (top) | 6.9% | 4.1% | 4.8% | 11.9% |
| Norelco | 50.6% | 50.7% | 45.5% | 41.8% |
| Other | 18.6% | 19.9% | 24.5% | 22.3% |
| Braun | 23.9% | 25.4% | 25.2% | 24.1% |

Source:
R14182-R14209
Note:
Data for 2005 is year to date as of April.

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Exhibit 7

**Calculation of Lost Profit on Shavers**

**December 1, 2003 - May 16, 2005**

| | [A] | FY04 | | | | FY05 | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3TD | |
| **Remington Unit Sales** | | | | | | | | | |
| R-9500[B] | [C] | 7,767 | 14,796 | 14,494 | 26,972 | 78,295 | 2,058 | 7,405 | 151,787 |
| MS-5500 | [D] | - | - | - | 44,260 | 92,732 | 10,757 | 9,259 | 157,008 |
| MS-5700 | [E] | - | - | - | - | 2,110 | 494 | 32 | 2,636 |
| Total Foil Sales | [F] | - | - | - | 44,260 | 94,842 | 11,251 | 9,291 | 159,644 |
| **Braun Alleged Lost Sales** | | | | | | | | | |
| Lost Sales on Rotary | [G] | 1,165 | 2,219 | 2,174 | 4,046 | 11,744 | 309 | 1,111 | 22,768 |
| Lost Sales on Foil | [H] | - | - | - | 22,130 | 47,421 | 5,626 | 4,646 | 79,822 |
| Total Braun Lost Sales | [I] | 1,165 | 2,219 | 2,174 | 26,176 | 59,165 | 5,934 | 5,756 | 102,590 |
| Braun Average Profit per Unit | [J] | $ 29.92 | $ 21.87 | $ 22.49 | $ 20.30 | $ 23.59 | $ 23.45 | $ 23.45 | |
| Braun Lost Profits on Shavers | [K] | $ 34,856 | $ 48,543 | $ 48,900 | $ 531,329 | $ 1,395,702 | $ 139,145 | $ 134,972 | $ 2,333,448 |

Notes & Sources:

[A] The Rayovac Fiscal Year is the 12-month period ending September 30.

[B] Sales of reconditioned R-9500 units are excluded.

[C] - [E]: R13915-R13925. FY2004 Q1 includes only sales made during December.

[F] = [D] + [E]

[G] = [C] x 15%. Lost sales on rotary shavers are calculated as 15% of Remington's unit sales of rotary shavers.

[H] = [F] x 50%. Lost sales on foil shavers are calculated as 50% of Remington's unit sales of foil shavers.

[I] = [G] + [H]

[J] B008325-B008329. Profit per Unit is calculated using the average profit for the 8585, 7526 and 5790 models; Dollars were converted from euros using an average of the daily 12PM exchange rates during a given month; Braun profit per unit for FY2005 Q3TD is calculated as the profit for FY2004 Q1 - the average intercompany profit for December 2003 ($29.92) is used instead of the quarterly average profit ($30.62).

[K] = [I] x [J]

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 8**

**Calculation of Lost Profit on Replacement Foil/Cutters**

**December 1, 2003 - May 16, 2005**

| | | FY04 | | | | FY05 | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3TD | |
| Total Braun Lost Sales | [B] | 1,165 | 2,219 | 2,174 | 26,176 | 59,165 | 5,934 | 5,756 | 102,590 |
| Foil/Cutter Replacement Profit per Shaver | [C] | $ 22.04 | $ 22.04 | $ 22.04 | $ 22.04 | $ 22.04 | $ 22.04 | $ 22.04 | $ 22.04 |
| Lost Replacement Foil/Cutter Profits | [D] | $ 25,678 | $ 48,916 | $ 47,917 | $ 576,915 | $ 1,304,002 | $ 130,790 | $ 126,868 | $ 2,261,085 |

Notes & Sources:
[A] The Rayovac Fiscal Year is the 12-month period ending September 30.
[B] See Exhibit 7.
[C] See David Report, Exhibit 6.
[D] = [B] x [C]

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Exhibit 9

## Calculation of Lost Profit on Cleaning Solution
### December 1, 2003 - May 16, 2005

| | [A] | | FY 2004 | | | | FY 2005 | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3TD | | |
| Braun Lost Shavers Sales | [B] | 1,165 | 2,219 | 2,174 | 26,176 | 59,165 | 5,934 | 5,756 | | 102,590 |
| Braun Lost Refill Sales | [C] | 5,616 | 10,698 | 10,479 | 126,167 | 285,177 | 28,603 | 27,745 | | 494,484 |
| Average Revenue per Unit | [D] | $ 1.69 | $ 1.69 | $ 1.69 | $ 1.69 | 1.69 | 1.69 | 1.69 | $ | 1.69 |
| Lost Refill Revenues | [E] | $ 9,490 | $ 18,079 | $ 17,710 | $ 213,223 | $ 481,948 | $ 48,339 | $ 46,889 | $ | 835,678 |
| Intercompany Royalty Rate | [F] | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | 8% |
| Lost Refill Profits | [G] | $ 759 | $ 1,446 | $ 1,417 | $ 17,058 | $ 38,556 | $ 3,867 | $ 3,751 | $ | 66,854 |

Notes & Sources:
[A] The Rayovac Fiscal Year is the 12-month period ending September 30.
[B] See Exhibit 7.
[C] = [B] x 4.82. See David Report, Exhibit 6.
[D] See David Report, Exhibit 6.
[E] = [C] x [D]
[F] See David Report, Exhibit 6.
[G] = [E] x [F]

ANALYSIS GROUP, INC.



Exhibit 10A

Average Retail Price of Braun Syncro and Activator Products

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.

Source:
R14182-R14209

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Exhibit 10B

Average Retail Price of All Braun Clean&Charge Products

Source:
R14182-R14209

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 11**

**Braun Intercompany Price by Product (euros)**

| Group / Article No. | Product Name | 2002 Q1 | Q2 | Q3 | Q4 | 2003 Q1 | Q2 | Q3 | Q4 | 2004 Q1 | Q2 | Q3 | Q4 | 2005 Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Synero** | | | | | | | | | | | | | | |
| 5491793 | 7680+CC NA TITAN/BK | | | | | | | | | € 68.68 | € 61.12 | € 61.12 | € 61.08 | € 61.14 |
| 5491746 | 7680+CC NA TITAN | | € 84.21 | 78.09 | 77.45 | 72.23 | € 67.63 | € 68.36 | € 77.02 | | | | | |
| 5493793 | 7526+CC NA TPB SR/BU | | | | 60.84 | 58.50 | € 53.84 | € 57.75 | € 61.83 | € 53.83 | € 48.84 | € 48.74 | | |
| 5493744 | 7526+CC NA CLS S/BL | | | | | | € 56.39 | 66.67 | € 64.81 | | | | | |
| 5493746 | 7526+CC NA SR/BU | | € 67.84 | 63.78 | 63.49 | | | | | | | | | |
| 5493747 | 7526+CC NA SR/BK R | | € 71.64 | 67.96 | 62.31 | 58.31 | | | | | | | | |
| 5493748 | 7526+CC NA SR/BU HEAD | € 273.07 | | | | | | € 66.67 | | | | | | |
| 5493794 | 7526+CC NA TPB SR/BU | | | | | | | | | | | € 45.96 | € 45.97 | € 45.98 |
| **Activator** | | | | | | | | | | | | | | |
| 5645745 | 8385+CC NA TPB RC | | | | | | | | | | € 61.31 | € 61.31 | € 61.81 | € 61.82 |
| 5645746 | 8385+CC NA TPB RC | | | | | | | | | | | | | |
| 5643745 | 8595+CC NA TPB SR/BU | | | | | | | | | | € 66.35 | 66.34 | € 66.67 | |
| 5643746 | 8595+CC NA TPB SR/BU | | | | | | | | | | | 67.71 | 67.69 | 67.70 |
| **Flex** | | | | | | | | | | | | | | |
| 5722745 | 5790+CC NA SR/grad | | | | | | € 45.74 | € 55.17 | € 59.39 | € 60.90 | | | | |
| 5722746 | 5790+CC NA TPB RC/CO | | | | | | | | | € 48.01 | | € 39.05 | € 39.06 | |
| 5485747 | 5441+CC NA BL/SI/RC | € 91.59 | € 56.78 | € 51.29 | € 51.85 | € 43.50 | € 43.44 | | € 83.33 | | | | | |

Notes & Sources:
1. B008325-B008329
2. Monthly product data that does not include both revenue and units sold in the source document is excluded.

ANALYSIS GROUP, INC.



Exhibit 12

Braun Intercompany Average Price for Selected Models

Source:
B008325-B008329
Note:
Monthly product data that does not include both revenue and units sold in the source document is excluded.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 13**

**Braun Intercompany Average Sales Price by Product Line**



Source:
B008325-B008329
Notes:
1. Dollars were converted from euros using monthly exchange rates calculated as the average of daily 12PM exchange rates for the given month.
2. Monthly product data that does not include both revenue and units sold in the source document is excluded.

ANALYSIS GROUP, INC.



Exhibit 14A

Braun Intercompany Average Sales Price of Clean&Charge Shavers

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.

Source:
B008325-B008329
Notes:
1. Dollars were converted from euros using monthly exchange rates calculated as the average of the daily 12PM exchange rates for the given month.
2. Monthly product data that does not include both revenue and units sold in the source document is excluded.



*CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER*

**Exhibit 14B**

**Braun Intercompany Average Sales Price of Clean&Charge Shavers**

ANALYSIS GROUP, INC.

Source:
B008325-B008329
Note:
Monthly product data that does not include both revenue and units sold in the source document is excluded.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.

**Exhibit 15**

**Product Profitability**

**Remington SmartSystem Electric Shavers - U.S.**

**Fiscal Year 2005**

| | | [A] FY 2005 |
|---|---|---|
| Units Sold | | 203,744 |
| ILC Before Returns | $ | 21,370,282 |
| Accrued Returns | | 3,888,816 |
| ILC Sales | $ | 17,481,466 |
| NSR Trade Rebates | | 946,894 |
| NSR Consumer offers | | 122,928 |
| Net (EITF) Sales | $ | 16,411,644 |
| Standard Cost of Goods Sold | | 9,375,767 |
| Other Customer Cost of Sales | | 398,432 |
| Gross Contribution (EITF) | $ | 6,637,445 |
| Customer Expenses | | |
| Selling Customer | | 79,367 |
| Advertising Customer | | (362) |
| Distribution Customer | | 585,799 |
| Customer Expenses Total | $ | 664,804 |
| Customer Contribution | $ | 5,972,641 |
| Customer Contribution as a Percentage of Net Sales | | 36.4% |
| Customer Contribution per Unit | $ | 29.31 |
| Advertising and Marketing Product Expenses | [B] | 2,789,979 |
| Product Profit | $ | 3,182,661 |
| Product Profit as a Percentage of Net Sales | | 19.4% |
| Average Price | $ | 85.80 |
| Average Profit per Unit | $ | 15.62 |

Notes:
[A] Fiscal Year 2005 figures are as of May 16, 2005.
[B] Advertising and Marketing Product Expenses are calculated as 17% of Net (EITF) Sales based on Rayovac's forecasted amount for Fiscal Year 2005.

Source:
R13915-R13925

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Exhibit 16

Calculation of Royalty Damages - Applied to All Infringing Sales

September 2003 - May 2005

| Model | [A] | FY03 Q4 | FY04 Q1 | Q2 | Q3 | Q4 | FY05 Q1 | Q2 | Q3TD | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| R-9500 | [B] | - | 129,306 | 14,796 | 14,494 | 26,972 | 78,295 | 2,058 | 7,405 | 276,638 |
| R-9500 Reconditioned | [C] | 3,312 | - | - | 600 | 2,404 | (200) | 798 | 4 | 3,606 |
| MS-5500 | [D] | - | - | - | - | 44,260 | 92,732 | 10,757 | 9,259 | 157,008 |
| MS-5700 | [E] | - | - | - | - | - | 2,110 | 494 | 32 | 2,636 |
| WDF-7000 | [F] | - | - | - | - | - | - | 4,480 | 5,666 | 10,146 |
| Total Sales | [G] | 3,312 | 129,306 | 14,796 | 15,094 | 73,636 | 172,937 | 18,587 | 22,366 | 450,034 |
| Royalty Rate | [H] | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 |
| **Royalty Damages** | [I] | $ 16,560 | $ 646,530 | $ 73,980 | $ 75,470 | $ 368,180 | $ 864,685 | $ 92,935 | $ 111,830 | $ 2,250,170 |

Notes & Sources:

[A] Fiscal Year 3Q2005 figures are as of May 16, 2005; The Rayovac Fiscal Year is the 12-month period ending September 30.

[B] - [F] R13915-R13925

[G] = [B] + [C] + [D] + [E] + [F]

[H] Royalty rate is equal to $5 per unit sold.

[I] = [G] x [H]

ANALYSIS GROUP, INC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ANALYSIS GROUP, INC.

Exhibit 17

### Calculation of Royalty Damages - Applied to Sales not Subject to Lost Profits Damages
### September 2003 - May 2005

| Model | [A] | FY03 Q4 | FY04 Q1 | Q2 | Q3 | Q4 | FY05 Q1 | Q2 | Q3TD | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| R-9500 | [B] | 3,312 | 129,306 | 14,796 | 14,494 | 26,972 | 78,295 | 2,058 | 7,405 | 276,638 |
| R-9500 Reconditioned | [C] | | | | 600 | 2,404 | (200) | 798 | 4 | 3,606 |
| MS-5500 | [D] | | | | | 44,260 | 92,732 | 10,757 | 9,259 | 157,008 |
| MS-5700 | [E] | | | | | | 2,110 | 494 | 32 | 2,636 |
| WDF-7000 | [F] | | | | | | | 4,480 | 5,666 | 10,146 |
| Total Sales | [G] | 3,312 | 129,306 | 14,796 | 15,094 | 73,636 | 172,937 | 18,587 | 22,366 | 450,034 |
| Sales Subject to Lost Profits Damages | [H] | | 1,165 | 2,219 | 2,174 | 26,176 | 59,165 | 5,934 | 5,756 | 102,590 |
| Total Remaining Sales | [I] | 3,312 | 128,141 | 12,577 | 12,920 | 47,460 | 113,772 | 12,653 | 16,610 | 347,444 |
| Royalty Rate | [J] | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 |
| Royalties on Remaining Products | [K] | $ 16,560 | $ 640,705 | $ 62,883 | $ 64,600 | $ 237,301 | $ 568,859 | $ 63,264 | $ 83,049 | $ 1,737,220 |

Notes and Sources:
[A] Fiscal Year 3Q2005 figures are as of May 16, 2005;  The Rayovac Fiscal Year is the 12-month period ending September 30.
[B] - [F] R13915-R13925
[G] = [B] + [C] + [D] + [E] +[F]
[H] See Exhibit 7.
[I] = [G] - [H]
[J] Royalty rate is equal to $5 per unit sold.
[K] = [I] x [J]