# Exhibit
# 14

Page 1

1                                          VOLUME: I

2                                          PAGES: 1-116

3                                          EXHIBITS: 49-65

4

5              IN THE UNITED STATES DISTRICT COURT

6                FOR THE DISTRICT OF MASSACHUSETTS

7     - - - - - - - - - - - - - - - - - - - x

8     BRAUN GmbH,

9                                Plaintiff,

10        v.                                Civil Action

11    RAYOVAC CORPORATION,             No. 03-CV-12428-WGY

12                                Defendant.

13    - - - - - - - - - - - - - - - - - - - x

14

15          VIDEOTAPED DEPOSITION of JUERGEN HOESER

16                    May 11, 2005

17                     9:17 a.m.

18                DWYER & COLLORA, LLP

19                 600 Atlantic Avenue

20                Boston, Massachusetts

21

22

23

24         Reporter: Michael D. O'Connor, RPR

Juergen Hoeser  May 11, 2005

Page 58

1    personal computer, except mail files.

2         Q.    So you didn't provide the attorneys with

3    your electronic mail files?

4         A.    Yeah.

5         Q.    And do you know whether the attorneys

6    received the electronic mail files that you had

7    archived?

8         A.    I don't know.

9         Q.    Did the attorneys ask you for your

10   electronic mail files?

11        A.    No.

12        Q.    With respect to Mr. Schneider, did you

13   contact Mr. Schneider regarding the gathering of

14   documents related to the shaver cleaning center

15   project?

16        A.    No.  Mr. Schneider is the head of the

17   industrial design department of our company, and I

18   learned much later that he created an industrial

19   design.

20        Q.    What did you learn much later or how did

21   you learn much later that he had created an

22   industrial design of, I assume, the shaver cleaning

23   system?

24        A.    There are two types of information related

Page 59

1    to this question.  First there was a prototype, a

2    rapid prototype, a housing part.

3            INTERPRETER:  I will give this answer

4    again, interpreter's notes.  It was not well

5    understood before.

6        A.   I received from Mr. Schaefer two parts, and

7    these parts should have prototypes, and then I found

8    out that there was already a design for these parts

9    in existence.

10           The second source I was talking to you

11   about before was Mr. Littman.  Mr. Littman was an

12   industrial designer.  Together with him, I developed

13   the first industrial design for my own cleaning

14   center, in quotation marks.  He was the person who

15   told me that Mr. Schneider did an industrial design

16   in the past.

17       Q.   To your recollection, did Mr. Littman work

18   with Mr. Schneider?  Were they part of the same

19   group in the '93, '94, '95 time frame?

20       A.   Mr. Schneider is Mr. Littman's boss, but I

21   don't know when he became Mr. Littman's boss.  It

22   might have been '93, '94.  I don't know.

23       Q.   Did the design that Mr. Schneider made, was

24   that committed to paper form?  Was there a schematic

Juergen Hoeser   May 11, 2005

Page 60

```
 1   for that design?

 2        A.   I don't know.

 3        Q.   Well, let me just ask this question, then.

 4   What steps has Braun taken to collect documents from

 5   Mr. Schneider relating to the shaver cleaning center

 6   project?

 7        A.   I don't know.

 8        Q.   Next with respect to Mr. Littman, what

 9   steps has Braun taken to collect documents from Mr.

10   Littman related to the shaver cleaning center

11   project?

12        A.   I don't know.

13        Q.   I take it, then, you did not personally ask

14   Mr. Littman for --

15        A.   I did not personally ask.

16        Q.   Okay.  I understand.  I understand Mr.

17   Greubel is retired from Braun or he no longer works

18   at Braun?

19        A.   He is retired.

20        Q.   Do you know whether Braun has made any

21   efforts to locate documents which would have been

22   left by Mr. Greubel related to the shaver cleaning

23   center project?

24        A.   Mr. Greubel is an industrial designer, and
```

Juergen Hoeser   May 11, 2005

Page 61

1    as an industrial designer, he works in a way which

2    can be compared to an artist working with a form,

3    and he left this form for me.

4        Q.   So he left a prototype for you?

5        A.   Yes.  Mr. Greubel, and I myself, we met and

6    had a discussion.  I explained to him what the

7    apparatus should look like in broad outlines, and

8    then Mr. Greubel produced a 3D industrial design

9    using hard film and material.

10       Q.   Do you know if Mr. Greubel, aside from the

11   prototype and the physical materials he was working

12   with, if he ever generated any documents, written

13   documents?

14       A.   Not as far as I know.

15       Q.   Let me ask this question one more time.  Do

16   you know what efforts, if any, Braun has made to

17   collect written documents, if any exist, from Mr.

18   Greubel?

19       A.   No.

20       Q.   Do you know what steps were taken by Braun

21   to collect documents from Roland Ullmann relating to

22   the shaving cleaning center project?

23       A.   Mr. Ullmann is another industrial designer,

24   and I did his documentation myself.  I am the author

Juergen Hoeser   May 11, 2005

Page 62

1  of his documents.   In those days, we worked in the

2  following way.   Mr. Ullmann steered or guided myself

3  so that I could produce with the virtual system on

4  the CAD system a 3D industrial design.

5      Q.   How did you communicate with Mr. Ullmann;

6  was it always verbally or did you communicate in

7  writing or both?

8      A.   In those days, Mr. Ullmann came every day

9  to my workplace, and we spoke about all the details,

10 sitting together in front of the computer monitor.

11 So Mr. Ullmann saw what I was doing, and when he

12 wanted to have a modification done, it could be done

13 directly there.   So it was done in the realtime.

14     Q.   Okay.   I understand.   With that in mind, do

15 you know if anyone at Braun, including yourself, has

16 asked Mr. Ullmann if he personally has documents

17 related to his work on the shaver cleaning system?

18     A.   I personally asked him for this

19 information, but I didn't ask him for written

20 material.   I asked him for his 3D industrial design

21 models, because this is what he does for his work.

22 That's the way he expresses himself.

23     Q.   Okay.   Do you know if he would have had any

24 other documents, aside from the 3D design?

Juergen Hoeser   May 11, 2005

Page 63

1      A.   I don't know.

2      Q.   Aside from yourself, do you know if anyone

3   at Braun has asked him if he has any other

4   information, aside from his 3D designs?

5      A.   I don't know.

6      Q.   What steps were taken by Braun to collect

7   documents from the files of Gilbert Greaves relating

8   to the shaver cleaning center project?

9      A.   I don't know.

10     Q.   What steps were taken by Braun to collect

11  documents from the files of Alf Jahn related to the

12  shaving cleaning center project?

13     A.   Alf Jahn was my co-worker about 1997.  In

14  all the documents he earned are now in my propriety.

15  I own them now.

16     Q.   So Mr. Jahn gave you all of his files?

17     A.   Yes.

18     Q.   Has Mr. Jahn left the employment of Braun?

19     A.   Yes.

20     Q.   As part of what you provided to the

21  lawyers, you provided the files of Mr. Jahn,

22  correct?

23     A.   Yes.

24     Q.   Tell me what steps were taken by Braun to

Juergen Hoeser   May 11, 2005

Page 64

1    collect documents from the files of Norbert Kreutz

2    related to the shaving cleaning center project?

3        A.    That I don't know.  Mr. Kreutz was a

4    technical drawer who was only helping us out in that

5    capacity with the drawing.

6        Q.    Is Mr. Kreutz still employed by Braun?

7        A.    Yes.

8        Q.    What steps were taken by Braun to collect

9    documents from the files of Thomas Schamberg

10   relating to the saving cleaning center project.

11       A.    I don't know.  Mr. Schamberg, his function

12   was the same as Mr. Kreutz.

13       Q.    And finally, what steps -- finally from the

14   list and hopefully we can finish up quickly and take

15   lunch, if that sounds good.  What steps were taken

16   by Braun to collect documents from the files of Mr.

17   Smetana relating to the saving cleaning center

18   project?

19       A.    Mr. Sievers talked to him, and that's all I

20   know.

21       Q.    Do you know when Mr. Sievers talked to him?

22       A.    No.

23       Q.    Who did you contact regarding the gathering

24   of documents related to the saving cleaning center

Juergen Hoeser    May 11, 2005

Page 65

1    project?

2         A.    At what point in time?

3         Q.    Well, you said you had a project or you

4    treated gathering documents as a project.

5         A.    Well, this was a new project for me from

6    the beginning on where I started working on this

7    project.  At that point in time, because I was new

8    in the company, I gathered all the information I

9    could possibly find.  I spoke to the patent

10   department.  My spokesperson was Mr. Klauer.  I also

11   talked to the quality department.

12        Q.    Okay.  I think there's some confusion.  You

13   understand there's a litigation between or Braun is

14   suing Rayovac or Remington, correct?

15        A.    Yes.

16        Q.    In connection with that litigation, were

17   you personally tasked with gathering documents

18   related to the safer cleaning center project?

19        A.    Yes.

20        Q.    And my question, then, is from the start of

21   that project or from the start of the litigation,

22   when you began working on that, until today, who are

23   all of the individuals that you contacted regarding

24   the gathering of documents?

Juergen Hoeser   May 11, 2005

Page 66

1      A.   Almost nobody, because -- almost all of the

2   documents which had to do with this project were in

3   my own folders, with the exception of the quality

4   control reports, the CAD data, et cetera.

5      Q.   Who did you contact regarding the quality

6   control reports?

7      A.   I did not contact anybody, because it

8   didn't make any sense to me to pull test information

9   with regards to testing performed in '99 and 2000 in

10   the context of this litigation.

11      Q.   So am I correct that you did not provide

12   the quality control reports to the attorneys?

13      A.   Yes.

14      Q.   Did you provide the CAD drawings to the

15   attorneys?

16      A.   No.   Nobody asked me to do that.

17      Q.   In terms of contacting people, you said you

18   contacted virtually no one, I believe.   Who were the

19   people that you did contact?

20      A.   I contacted the person who was in charge of

21   the so-called Messinger files.

22      Q.   Who was in charge of the Messinger files?

23      A.   We have a department which is called

24   research.   Mr. Messinger used to be the head of that

Juergen Hoeser  May 11, 2005

Page 67

1    department, and for that reason those binders were

2    retained in that department, and those binders

3    contain written information.

4         Q.   Aside from contacting the research

5    department regarding the Messinger files, did you

6    contact any other individuals?

7         A.   I contacted my boss, because there was a

8    video which was created in '97/'98, and which showed

9    the function of one of those function designs,

10   prototypes, but we did not find that video.

11        Q.   Okay.  Did you contact anyone else?

12        A.   No.

13        Q.   Were you tasked with gathering documents

14   related to the market research for the shaving

15   cleaning center project?

16        A.   No.

17        Q.   Were you tasked with finding financial

18   information related to the shaving cleaning center

19   project?

20        A.   No.

21        Q.   Now asking you not on behalf of yourself

22   personally, but I'm asking you as Braun's

23   representative, what individuals or who are the

24   individuals that Braun contacted, aside from --

Juergen Hoeser   May 11, 2005

Page 81

1        A.    No.

2        Q.    Do you know who was on the team in France

3   that worked with Dr. Pahl on the cleaning center?

4        A.    I know that there were three people on this

5   team, but I don't know the names of those people.

6        Q.    How do you know there were three people on

7   the team?

8        A.    At that point in time, Mr. Schaefer told me

9   that there were three people working on it, and this

10  time it was in the conversation, during the

11  conversation I had with the lawyers, they also told

12  me that.

13       Q.    So you're referring to point one when you

14  talked with Mr. Schaefer at some point in '95, and

15  you're referring also to when you spoke with the

16  lawyers just recently?

17       A.    Monday.

18       Q.    Okay.  Do you know if Braun has attempted

19  to gather documents which would have been retained

20  from the three individuals in France who worked on

21  the cleaning center?

22       A.    I don't know that.

23       Q.    Can you show me, if you can, anywhere on

24  this document -- I believe there's a blower shown, a

Page 192

1       Q.   Did he ever tell you why he was interested

2   in the work on the cleaning center project?

3       A.   Maybe we have to add that it was Mr. Pahl

4   who recruited me.

5       Q.   Oh, Dr. Pahl interviewed you?

6       A.   Yes.

7       Q.   When did he interview you?

8       A.   At the end of 1994.

9       Q.   At that time did he discuss with you the

10  cleaning center project?

11      A.   No.

12      Q.   So circle back.  I think you learned -- the

13  first time you learned of the cleaning center

14  project was when you came to Braun in '95?

15      A.   Mm-mm.

16      Q.   If you look on page 6810 there is listed

17  Inchem, Mr. Arendt?

18      A.   Yes.

19      Q.   Who is Mr. Arendt?

20      A.   Inchem is the company that produces the

21  cleaning liquid, and Mr. Arendt is the project

22  manager, the chemist, of this company.

23      Q.   I believe you mentioned earlier

24  correspondence you may have had with suppliers,

Page 193

1    third-party suppliers; is that correct?  Would you

2    have corresponded with Mr. Arendt?

3        A.  Yes.

4        Q.  Do you know if you still have any

5    correspondence with Mr. Arendt?

6        A.  Yes.

7        Q.  And did you provide that correspondence to

8    Braun's attorneys?

9        A.  No.

10       Q.  How do you know that you still have that

11    correspondence?

12       A.  Because I have 3 binders.

13       Q.  Three binders of correspondence with Mr.

14    Arendt specifically?

15       A.  Those are 3 binders in which I have all the

16    information linked to the cleaning liquid.

17       Q.  And did you give any of those -- any of the

18    documents in those 3 binders to Braun's attorneys?

19       A.  No.

20       Q.  Do you recall -- when you first started

21    working on the cleaning center project do you recall

22    what the cleaning fluid -- what cleaning fluid was

23    used?

24       A.  Yes.

Juergen Hoeser   May 12, 2005
Volume II

Page 209

1       Q.   Do you know why Mr. Petretty was involved in

2   this particular meeting?

3       A.   Yes, because Janaette was participating as

4   well, and Janaette is Petretty represent

5   electronics.

6       Q.   What did Petretty do?  What was Petretty's

7   role in the development of the shaver cleaning

8   system?

9       A.   He is the co-worker who works in the

10   electronic development department, which is a part

11   of the -- which represents a part of the razor

12   development -- shaver development department.

13       Q.   Did Mr. Petretty develop the circuitry used

14   in the cleaning center?

15       A.   Yes.

16       Q.   What steps has Braun taken to collect

17   documents from Mr. Petretty regarding his work on

18   the shaver cleaning system?

19       A.   I don't know.

20       Q.   Do you know the names of any other

21   individuals who would have worked on the control

22   circuitry for the cleaning center?

23       A.   Yes.

24       Q.   Could you provide me with those names?

Page 210

1      A.   Cimbal, C-i-m-b-a-l; first name J-o-c-h-e-n.

2      Q.   Is there anyone else aside from Mr. Cimbal?

3      A.   I don't think so.

4      Q.   What steps has Braun taken to collect

5   documents from Mr. Cimbal related to his work on the

6   shaver cleaning system?

7      A.   I don't know.

8      Q.   Do you know if Mr. Petretty and Mr. Cimbal

9   developed the control circuitry for the original

10  cleaning center.   Let me -- do you know if Mr.

11  Petretty and Mr. Cimbal developed the control

12  circuitry for the cleaning center that Mr. Braun and

13  Dr. Pahl worked on?

14     A.   I don't know.

15     Q.   Let me ask this question, was it considered

16  a secret that Dr. Pahl had worked on the cleaning

17  center?

18          ATTY. PATTON:   I object to the form of

19  the question.   You can answer it if you understand.

20     A.   I don't know.   It was before my time.

21     Q.   Well, did you perceive that -- well, did Dr.

22  Pahl ever tell you to keep his work on the cleaning

23  center a secret?

24     A.   No.

Juergen Hoeser    May 12, 2005
Volume II

Page 211

1      Q.   Did you -- I mean, had you discussed with

2   Dr. Paul work that he had done on the cleaning

3   center?

4      A.   No.

5      Q.   I guess you had told me -- previously you

6   had mentioned to me that Mr. Schaefer and Mr. Klauer

7   had told you that Dr. Pahl had worked on the

8   cleaning center; are there any other individuals who

9   informed you about Dr. Paul's work on the cleaning

10   center to your recollection?

11      A.   No.

12      Q.   You can set aside this notebook.  I'd like

13   to mark next as Defendant's Deposition Exhibit No.

14   71, a document bearing the Bates No. B 007653 --

15   there are two -- 007656.  I'm only interested in the

16   first 2 pages, and I believe there is an English

17   translation of these.

18           Actually, if you would, can I just have

19   that back.  I want to rip off the last 2 pages.

20   I'll just restaple them in a second.

21           (Document marked as Exhibit 71

22            for identification.)

23      Q.   I ask you if you recognize this document.

24      A.   Yes.

Juergen Hoeser   May 12, 2005
Volume II

Page 212

1        Q.   And what is Defendant's Deposition Exhibit
2    71?
3        A.   This is a chart which I put together for Mr.
4    Greaves, a summary, and this is a chart where I
5    compare what Mr. Pahl did in quotation marks with
6    what Mr. Hoeser did.
7        Q.   You said you prepared this for Mr. Greaves?
8        A.   Yes, this was.  I remember it was prepared
9    for Mr. Greaves.
10       Q.   Do you recall when you prepared it for Mr.
11   Greaves?
12       A.   Four or 5 years ago.
13       Q.   Did Mr. Greaves tell you why he wanted this
14   document?
15            ATTY. PATTON:   Object to the form.
16       A.   No.
17       Q.   Do you know if Mr. Greaves used this
18   document for any purpose?
19       A.   No.  I don't know.
20       Q.   So it's correct that you generated this at
21   the request of Mr. Greaves and then you don't know
22   what happened to it afterwards?
23            MR. HOESER:   Correct me.
24       A.   The request came from Dr. Haegele, and he

Juergen Hoeser   May 12, 2005
Volume II

Page 213

1    told me, Okay, I should prepare this document for

2    Mr. Greaves, and I send it, I don't know, directly

3    to Greaves or by Dr. Haegele to Greaves.

4        Q.  I want to make sure.  Did Dr. Haegele tell

5    you why Mr. Greaves wanted this document?

6        A.  No.

7        Q.  I'm going to work from the English version,

8    but you can look at the German.  I believe under the

9    4th bullet point under the Dr. Pahl column, does it

10   state no cartridge but integrated fluid container?

11       A.  Yes.

12       Q.  Under the 4th bullet under your device it

13   says removable cartridge below cleaning device,

14   cartridge taped with needle; is that correct?

15       A.  Yes.

16       Q.  Why did you state underneath the Dr. Pahl

17   column no cartridge but integrated fluid container?

18       A.  I can only assume things.

19       Q.  Well, what is your best recollection?

20       A.  The task consisted in showing us, as clearly

21   as possible, the differences between the 2 devices

22   which are shown here on the picture.  If the task

23   had been to describe the similarities I would have

24   brought up the liquid container in those cases.

Juergen Hoeser    May 12, 2005
Volume II

Page 214

1      Q.   Let me see if I understand.   The device

2   which is pictured underneath the Dr. Pahl column,

3   that device did not have a cartridge?

4      A.   Both the devices have a liquid container.

5      Q.   Sure.   And wouldn't -- when you wrote this

6   document, what did you mean when you use the term

7   cartridge?

8      A.   In this context I understand on the

9   cartridge from the user's perspective the simplicity

10  to remove the cartridge and easily replace it.

11     Q.   So am I correct that in the pictured device

12  under the Dr. Pahl column, using the definition you

13  have just provided me, that device did not have a

14  removable and replaceable cartridge?

15     A.   I would not formulate it that way.

16     Q.   Well, what was the pictured device lacking

17  which led you to express that it had no cartridge?

18     A.   The issue here is that the liquid container

19  is not a removable part, but part of the device.

20     Q.   Who came up with the idea of having a liquid

21  container being -- well, let me ask this question,

22  did you come up with the idea of the liquid

23  container being removable from the cleaning center?

24     A.   No.

Juergen Hoeser    May 12, 2005
Volume II

Page 215

1      Q.   Who came up with that idea?

2      A.   That idea existed when I joined Braun.

3   There was a device with a cartridge that was

4   removable.

5      Q.   There are 2 devices pictured here?

6      A.   Yes.

7      Q.   So I assume between -- at some point between

8   the creation of the first device under Dr. Paul and

9   the second device listed under you there is some

10  intermediate device.

11     A.   Right.

12     Q.   Do you know who created that device?

13     A.   Yes.

14     Q.   Who was that?

15     A.   Braun.

16     Q.   Mr. Braun?

17     A.   Yes.

18     Q.   Would that have been --

19     A.   It's not in the time line.

20     Q.   Actually, see, there is pictures here?

21     A.   Okay.

22     Q.   Can you find it handy, or... there are a lot

23  of pages of things.  At about the third page of the

24  time line at B 2045 there is shown, listed as,

Juergen Hoeser    May 12, 2005
Volume II

Page 216

1    Design P. Schneider.

2        A.   Yes.

3        Q.   Is that the device you are referring to?

4        A.   Yes.

5        Q.   Was that device created at some point in

6    1994?

7        A.   I don't know.  This is a guess from my side.

8    It's rough point in time.  It could be 1993, 1994.

9    I don't know.

10        Q.   Well, why did you guess 1994?  Let me ask,

11    did you base your guess of 1994 upon any facts?

12        A.   When I wrote this time line in '96, '97 or

13    '98, I had -- I was at a meeting once where I came

14    across a design pattern, and the design pattern

15    matched the schedule, and then I was told that the

16    design was made in '94.  That is what I was basing

17    myself on.

18        Q.   Who told you the design was made in 1994?

19        A.   I can't remember.

20        Q.   Do you know if that document, the document

21    which showed something like the device we were

22    discussing, does that document still exist?

23        A.   This document, no.

24        Q.   You said you found a drawing that appeared

Juergen Hoeser   May 12, 2005
Volume II

Page 217

1   to correspond with the design where it says design

2   P. Schneider 1994?

3       A.   Not drawing.

4       Q.   You came across the actual prototype?

5       A.   Yes.

6            THE VIDEOGRAPHER:   Off the record 1:42

7   p.m.

8            (Recess taken.)

9            THE VIDEOGRAPHER:   Here begins Videotape

10  Number 6 in this deposition of Juergen Hoeser.   Back

11  on the record 1:46 p.m.

12      Q.   Had you ever spoken -- or have you ever

13  asked Mr. Schneider when he created the design

14  represented on your time line?

15      A.   No.

16      Q.   Have you ever spoken with Mr. Schneider

17  about what he did with respect to the cleaning

18  center project?

19      A.   No.

20      Q.   Have you ever spoken with Mr. Schneider at

21  all?

22      A.   Yes.

23      Q.   Have you talked with him -- have you

24  discussed the cleaning center project with Mr.

Juergen Hoeser   May 12, 2005
Volume II

Page 218

1    Schneider in any way?

2        A.   Yes, towards the end.

3        Q.   What did you speak with him about?

4        A.   Mr. Schneider was, in fact, always

5    participating in this discussion, but only at

6    those -- but only when he really wanted to do so.

7        Q.   When you say only when he really wanted to

8    do so, what do you mean?

9        A.   So Mr. Schneider is the director, or the

10   supervisor, director, of the design department, and

11   so his first responsibility is to approve the final

12   design, so when every time the design had to be

13   drastically changed, Mr. Schneider entered his veto.

14       Q.   How would he enter -- or how would Mr.

15   Schneider review a design change?

16       A.   All the people, except Mr. Schneider, we see

17   on this list have to report to Mr. Schneider, and

18   the directives that people have to follow that work

19   in the design department are very clear every design

20   that leaves the department needs to be approved by

21   Mr. Schneider.

22       Q.   Was Mr. Schneider the head of the industrial

23   design department in the 1993-1994 time frame?

24       A.   I'm not sure.

Juergen Hoeser   May 12, 2005
Volume II

Page 219

1        Q.   Was he the head when you came to Braun in

2    the 1995?   He was the head then?

3        A.   Yes.

4        Q.   I guess, I don't know if you know, but did

5    he have to approve his own design which is shown,

6    Design P Schneider 1994?

7        A.   I think so.   Yes.

8        Q.   What form would the approval take?   Was

9    there a document?   Was there some form that needed

10   to be filled out in order to approve of something?

11       A.   No.   It's the designer, so the designers do

12   the job, coming with a mock-up into the office of

13   Mr. Schneider, and then they discuss about what is

14   the reason why the shaver is tilted, what is the

15   reason why the cartridge is somewhere else, what is

16   the reason why you like it in silver or black, and

17   they reviewing everything, and as soon as there is a

18   technical reason for any change, the designer says,

19   I'm sorry, boss, Hoeser has a technical problem to

20   solve, that's the reason why he tilted the shaver,

21   or he needs to tilt the shaver.   This is the -- so

22   point in time where I enter the discussion.

23       Q.   I understand.   As an aside, why did you tilt

24   the shaver?

Juergen Hoeser   May 12, 2005
Volume II

Page 220

1    A.   Why?

2    Q.   Yes, why is the shaver tilted?

3    A.   The shaver is tilted because that way less

4    liquid is left in the head.

5    Q.   So it's to encourage the draining or the

6    speed at which the fluid drains out of the cradle?

7    A.   Yes.  Not the cradle, the shaver.  Both, but

8    first of all the shaver.  I can tilt in a part of

9    the cradle as much as I need without any influence

10   on the shaver.  As soon as I tilt the shaver, then I

11   get all the fluids flowing back into the cradle,

12   and then from there back into the cartridge.

13          ATTY. SHIMOTA:  I would like to mark as

14   Defendant's Deposition Exhibit No. 72 US Patent No.

15   6236890.

16          (Document marked as  Exhibit No. 72

17          for identification.)

18   Q.   I ask you if you recognize this document.

19   A.   Yes.

20   Q.   If you would look to the 30(b)(6) notes if

21   you have that handy for yourself.

22   A.   Yes.

23   Q.   Defendant's Exhibit 49.

24   A.   Which number?

Juergen Hoeser     May 12, 2005
Volume II

Page 243

1    provide you any guidance as to the cleaning center

2    project?

3        A.  No.

4        Q.  I don't mean on this day, I mean ever, at

5    any time.

6        A.  No.  As you can read here, it just mention

7    that I should think about the evaporation curve of

8    alcohol on the temperature and the heat expansion of

9    the fluid.

10       Q.  If you could turn to page 6558.  There near

11   the bottom there is referenced a Mr. Bopp?

12       A.  Yes.

13       Q.  Who was Mr. Bopp?

14       A.  Mr. Bopp is the colleague of Mr. Port in

15   the model shop, and he was in charge of the supply

16   of materials which needed to be imported from the

17   outside.

18       Q.  Does Mr. Bopp still work at Braun?

19       A.  No.

20       Q.  Do you know what steps Braun has taken to

21   gather documents that Mr. Bopp may have had

22   regarding the cleaning center project?

23       A.  I don't know.

24       Q.  Turn to page 6579, B 6579.  At the top I

Juergen Hoeser   May 12, 2005
Volume II

Page 255

1      A.   Yes.

2      Q.   Who is Dr. Finger?

3      A.   At this point of time Dr. Finger was the

4   head of chemical lab, the service lab in -- was in

5   Braun R&D community.

6      Q.   What role did Dr. Finger play in the

7   development of the shaver cleaning system?

8      A.   At this point of time I wasn't an expert in

9   the cleaning fluid, because I'm not a chemist, I'm a

10  designer, or a technician, and Dr. Finger is a

11  chemist, and I have idea to discuss with him how we

12  can improve the recipe of the fluid to get rid of

13  some problems.

14     Q.   So did Dr. Finger do work on optimizing the

15  cleaning fluid?

16     A.   No.

17     Q.   He did not?

18     A.   No.

19     Q.   Did he do anything with respect to the

20  cleaning fluid?

21     A.   Not really.

22     Q.   Did he provide you any advice?

23     A.   No.

24     Q.   Do you know if -- well, it says here at the

Juergen Hoeser    May 12, 2005
Volume II

Page 256

1  bottom, Give him recipe for cleaning liquid; do you

2  see that?

3      A.  Yes.

4      Q.  Did you give him the recipe for the cleaning

5  liquid?

6      A.  Yes.

7      Q.  How would you have given it to him?  Would

8  you have given it to him as a document or verbal?

9      A.  No, as a document, copy of my own document.

10     Q.  Does Dr. Finger still work at Braun?

11     A.  Yes.

12     Q.  Do you know if Braun has contacted Dr.

13  Finger to ask him if he has any documents related to

14  the development of the shaver cleaning system?

15     A.  No.

16          ATTY. SHIMOTA:  I have one more to go.

17  I'd like to mark as Defendant Deposition Exhibit No.

18  78 an English translation of documents at Braun

19  006636 to B 006735.

20          (Document marked as Exhibit 78

21          for identification.)

22          THE VIDEOGRAPHER:  Off the record 3:10

23  p.m.

24          (Recess taken.)

Juergen Hoeser    May 12, 2005
Volume II

Page 173

1    Q.  And that's because you set the replacement

2    time at 30 days as opposed to 60 days as discussed

3    earlier?

4    A.  Yes.

5    Q.  Is the cleaning center commercially

6    successful because a particular type of drying

7    device is used?

8    A.  Yes.

9    Q.  And why is that?

10   A.  Because of the drying the alcohol is as fast

11   as possible removed from the lacquered parts of the

12   plastic material, and because of this the plastic

13   material is maintained.  I mean, it's more durable.

14   Q.  Is the commercial success of the cleaning

15   center tied in any way to the use of a fan as

16   opposed to a different type of drying device?

17   A.  What do you understand here by commercial

18   success?

19   Q.  You are here to speak about Interrogatory

20   Number 5, so I want what you believe, for you to use

21   your understanding of commercial success.

22   A.  For the client it doesn't make any

23   difference if we dry the shaver using a fan or

24   inductively.  For us, because we want to sell the

Juergen Hoeser    May 12, 2005
Volume II

Page 174

1    product, the fan is, from a technical point of view,

2    the easiest solution.

3        Q.   So from a consumer point of view it makes no

4    different, though, right?

5        A.   Yes.   The only thing that matters for the

6    consumer is that it dries fast.

7        Q.   Is the cleaning center commercially

8    successful because of the replaceable cartridge?

9        A.   Yes.

10       Q.   And why is that?

11       A.   Because the cartridge supports in an optimal

12    way the convenience.

13       Q.   Take it out, throw it away, put a new one

14    in?

15       A.   Fire and forget.

16       Q.   Did you ever consider designing the cleaning

17    center such that cleaning fluid would be poured in

18    and then dumped when it was finished?

19           Let me rephrase the question.  It was

20    bad.  Did you ever consider designing the cleaning

21    center such that cleaning fluid would be poured in

22    at the beginning, or when the user starts using the

23    cleaning center, and then would be dumped out once

24    the cleaning fluid was spent or used up.

Juergen Hoeser   May 12, 2005
Volume II

Page 169

1              MR. HOESER:  -- put the shaver in, press

2       the button, and go away.

3          A.  It's called fire and forget.

4          Q.  Does the location of the cleaning fluid

5       below the cradle contribute to the commercial

6       success of the cleaning center?

7          A.  Yes.

8          Q.  And why is that?

9          A.  Because that's the best possible way to

10      regroup the elements to get the highest efficiency

11      with the least direct cost.

12         Q.  Why is that the most efficient?

13         A.  Because it's only one pump, and without

14      using vents I have one liquid circuit --

15             MR. HOESER:   -- by using the physical

16      effect.

17             THE INTERPRETER:   -- if you use all the

18      physical effect.

19         Q.  Does the dome contribute to the commercial

20      success of the cleaning center?

21         A.  No.

22         Q.  Does the fact that the cradle is not sealed

23      contribute to the commercial success of the product?

24         A.  Do you mean now again to where it's -- I

Page 83

1    that Claim 11 was conceived on or before November,

2    '92 and reduced to practice on or before November of

3    '92.

4            So my question is what is the evidentiary

5    basis for the date of November, '92?

6        A.    It is this part of a presentation.

7        Q.    Can you show me Defendant's Exhibit 56

8    where there is shown the drawing device?

9        A.    You don't see the dryer on this drawing.

10   It's not recognizable.  But it is explained in the

11   comments.

12       Q.    What is stated in the comments?

13       A.    The functions of the products I explained,

14   and it starts with a shaver in and out, then to pump

15   and filter the liquids, and then dry, to dry.

16       Q.    So can you point me to where it is shown in

17   this document the idea of drying with a fan?

18       A.    That I cannot read from this document, but

19   this is a picture of the product where you have the

20   drawing over here.  This product corresponds to this

21   drawing.  And this product certainly existed prior

22   to the point in time where I started working at

23   Braun.  This product corresponds 100 percent to this

24   drawing, and the missing parts in the drawing you

Page 84

1    can see them on the picture.  Here you see the

2    heater.

3        Q.   Can you point me to the heater?

4        A.   It's this black part.

5        Q.   That's not the shaver then that's inserted?

6        A.   No, no, that's not the share.  The cradle

7    is here in front.

8        Q.   I got you.

9        A.   Here is the cradle.  This is the heater,

10   and below the heater is the fan.  It sucks warm air

11   and blows it onto the shaver.

12       Q.   Can you tell me when the device illustrated

13   in Braun 3074 to 3076 was built?

14       A.   This device?

15       Q.   Yes.

16       A.   I don't know.  It was before my start at

17   Braun.

18       Q.   Aside from the documents we've discussed,

19   is there any other document of which you know which

20   would show the first time when a blower and a heater

21   were used in the cleaning center?

22       A.   I don't recall any one which is not on this

23   table.

24       Q.   We talked about the presentation, which is

Page 85

1   Defendant's Exhibit 56, the picture of the device,

2   and we also discussed the large schematic, which is

3   Defendant's Exhibit 55.  Is there anything else that

4   you can think of sitting here today?

5       A.   Yes.  We also have Exhibit 58.

6       Q.   What is Defendant's Exhibit 58?

7       A.   There we talk about the drying process of a

8   shaver with the help of a fan.

9       Q.   Is Defendant's Exhibit 58 a document that

10  would have been in the 20 or so -- is Defendant's

11  Exhibit 58 something that was provided to you by Mr.

12  Schaefer in '95?

13      A.   I am not 100 percent sure.  The second part

14  of this document, there I am 100 percent sure.  With

15  the first part of the document, I am not 100 percent

16  sure.

17      Q.   Okay.  Is the first part of the document,

18  the first memo, something that you reviewed

19  yesterday?

20      A.   No.  I looked at it today.

21      Q.   Do you mean you looked at it -- did you

22  look at it prior to this deposition or during this

23  deposition now?

24      A.   Right now.

Page 89

1    suggestions of VDE to the suggestions Mr. Stiegler

2    received from VDE to various individuals at Braun?

3        A.    In fact, those are no suggestions.  Those

4    are instructions.

5        Q.    So VDE told Braun you need to do this or we

6    will not approve of your device?

7        A.    Exactly.

8        Q.    Look, again, to the '328 patent, and

9    interrogatory No. 2, it states that Claim 14 of the

10   '328 patent was conceived and reduced to practice on

11   or before November of 1992?

12       A.    Could you repeat the question one more

13   time.

14       Q.    Sure.  What is the evidentiary basis for

15   the statement that Claim 14 of the '328 patent was

16   conceived and reduced to practice on or before

17   November of 1992?

18       A.    I have to refer to this document.

19             MR. PATTON:  "This document" is exhibit?

20             MR. SHIMOTA:  Defendant's Exhibit 56.

21       Q.    And Exhibit 55, the schematic?

22       A.    Yes.

23       Q.    If we could look, then, to Claim 18 of the

24   '328 patent.  Interrogatory No. 2 states that Claim

Page 90

1    18 of the '328 patent was conceived on or before

2    July 22, 1993 and reduced to practice on or before

3    July 22, 1993.  My question is, what is the

4    evidentiary basis for that date?

5        A.   That date is mentioned on the invention

6    document.

7        Q.   So the idea of a bracket to Braun's

8    knowledge was not conceived prior to -- or the

9    earliest date that Braun can point to for the

10   conception of a bracket is Mr. Braun's invention

11   disclosure record?  Turn to the front page,

12   Embodiment 10 is the bracket.

13       A.   The bracket is the lock.

14       Q.   Is that when they were discussing the lock

15   in the memo to Mr. Stiegler, that's what you were

16   referring to as Item 10, the bracket?

17       A.   Yes.  Ten plus nine.

18       Q.   Well, an earlier date, then, July of '93,

19   would be that memo from Mr. Stiegler, correct?  That

20   would be in June of '93?

21       A.   Yes.

22       Q.   Do you know of any date earlier than that

23   June of '93 memo?

24       A.   No.

Page 175

```
 1     A.   Yes.

 2     Q.   And did you reject that idea?

 3     A.   Yes.

 4     Q.   And was that because that procedure would be

 5  less convenient than using the cartridge?

 6     A.   Yes.   And because then the client is in a

 7  position where he could use a liquid which is not an

 8  appropriate liquid.

 9     Q.   He could, for example, just pour water in

10  there?

11          MR. HOESER:   Or whiskey.

12          ATTY. SHIMOTA:   Or whiskey.   I got you.

13     Q.   Aside from long-felt need and the commercial

14  success is Braun relying upon any other secondary

15  considerations of non-obviousness for the patents in

16  suit?

17          ATTY. PATTON:   I object to the form of

18  the question.

19     A.   I did not understand the question.

20     Q.   Do you have the response in front of you to

21  Interrogatory Number 5?   As Braun's corporate

22  designee, with respect to the response to

23  Interrogatory Number 5, sitting here today is there

24  anything which needs to be added by way of
```

Juergen Hoeser    May 12, 2005
Volume II

Page 176

1    information as to interrogatory -- the response to

2    Interrogatory Number 5?

3        A.   From my perspective the cleaning center was,

4    for the client, a necessary, logical result, because

5    from the client's perspective, the client needs more

6    hygiene.

7            The client asks for systems that solve

8    problems.   The client doesn't want to buy a brush,

9    and the liquid, and this, and that; he wants one

10   system within which everything is included.

11       Q.   Why do you say it was then the logical

12   result for the client?

13       A.   For the client the result is never the way,

14   our way, of manufacturing -- of performing the

15   cleaning, it's only the result for him, from his

16   perspective, the simplicity.

17       Q.   What is logical about the result?

18       A.   For example, the dishwasher; the idea to

19   avoid the things during the day which you don't want

20   to do.

21       Q.   So you use the analogy of a dishwasher;

22   whereas someone in the past had to put things in a

23   sink, and wash them off, and then put them in a

24   drying rack, eventually someone put that all into an