Samir Nayfeh, Ph.D.                                                                08/26/2005

Page 118

1    A. Was it the eyeglass cleaner that was cited?
2    Q. That's Cunningham that you're thinking of?
3    A. Cunningham?
4    Q. Cunningham.
5    A. Cunningham had a blower for drying. There
6  may have been others.
7    Q. Were there any references cited in which
8  either a shaver or parts of a shaver were cleaned
9  that incorporated a blower for drying?
10       MS. WENDLANDT: Objection.
11   A. Nothing comes to mind.
12   Q. If you turn to the top of Page 19, you cite
13 to a portion of the specification which refers to the
14 -- at the top -- the agitation and splashing of fluid
15 in the cradle.
16   A. Yes.
17   Q. Is there any requirement in the claims that
18 there -- claims of the '328 patent -- that there be
19 agitation and splashing in the cradle?
20       MS. WENDLANDT: Objection.
21   A. In the claims themselves?
22   Q. Yes.
23   A. No.
24   Q. And with respect to the MeKiney patent, which

Page 119

1  we discussed earlier, during cleaning, is there
2  agitation and splashing in tank 12?
3    A. There's agitation, probably not splashing.
4    Q. Why would you say there is agitation?
5    A. Well, you are going to flow -- flow liquid in
6  there and over and around areas structures. So you
7  are sure to have agitation.
8    Q. And in the Maatz patent, would there be
9  agitation -- let me take a step back to MeKiney.
10       It is your opinion in MeKiney there would
11 be agitation, but there would not be splashing of
12 liquid in the tank 12?
13   A. Correct.
14       I mean, presuming you didn't run the pump
15 too fast. You know, if you had a high enough flow
16 rate, you would certainly get splashing and
17 agitation, but not necessarily.
18   Q. And with respect to the Maatz patent, the
19 same question: Would there be agitation and
20 splashing in the Maatz patent?
21   A. Okay. Same question. Same answer.
22   Q. Okay. At the bottom of the page, where you
23 are discussing the Suzuki patent, in the last
24 sentence you say, "Such a system is not readily

Page 120

1  applicable to be a system that is open to atmosphere
2  and considerable inventiveness would be required by
3  one of -- one skilled in the art to arrive at the
4  arrangement disclosed in the '328 patent."
5       Do you see that?
6    A. Yes.
7    Q. The first question is: With respect to the
8  Claims 11 and 12, is there any requirement that the
9  cradle be open to the atmosphere? Claims 11 and 12
10 of the '328 patent.
11   A. No.
12   Q. The next question is: What do you mean by,
13 "the arrangement disclosed in the '328 patent"?
14   A. So there is the specific arrangement in the
15 specification. Well, that's what I was referring to
16 there.
17   Q. So you're refer there --
18   A. Okay. To the system of louvers and the
19 method of driving the system so as to keep
20 contaminants off the blower.
21   Q. As we discussed earlier today, you are
22 comparing the prior art to the claims in the system
23 disclosed in the specification in connection with
24 your obviousness opinion?

Page 121

1    A. So, yes. I am using a similar reasoning.
2    Q. Above that, above the Suzuki patent heading,
3  the second sentence above that, you state, "The
4  shutter system enables use of an impeller in close
5  proximity to the shaving head to blow directly upon
6  it through a large aperture."
7       Do you see that?
8    A. Yes.
9    Q. Is there any requirement in Claim 11 of the
10 '328 patent that the impeller be in close proximity
11 to the shaving head?
12       MS. WENDLANDT: Objection. You are
13 talking about Claim 12?
14   Q. Claim 11 or 12.
15       MS. WENDLANDT: 11 doesn't have an
16 impeller.
17   Q. I will ask you Claim 12 first.
18   A. It's not literally in the claims, no.
19   Q. With respect to Claim 11, is there any
20 requirement that the drying device be in close
21 proximity to the shaving head?
22   A. No.
23   Q. And in the system of the '328 patent, what
24 would happen to the blower if cleaning fluid got

31 (Pages 118 to 121)

Page 122

1 through the louvered shutter?
2     A. Well, the cleaning fluid would be carrying
3 particles, contaminants; and if the blower were at
4 rest at the time that it landed on there, then, say,
5 the cleaning fluid would evaporate, and it would
6 leave the particles stuck to, or in the neighborhood
7 of the blower -- the impeller itself.
8     Q. Would the device cease to function?
9     A. It would function more poorly the more
10 contaminants and dirt wound up on it.
11     Q. So over time, performance would decrease?
12     A. Yes. It could get to the point where it
13 doesn't blow at all.
14     Q. Okay. But fluid getting into the blower
15 system, in and of itself, would not cause the device
16 to immediately break down, would it?
17     A. No. Provided you have as good a seal between
18 the blower and the motor, as would be required to
19 prevent you from damaging the motor, or the -- in
20 this device, there is this clutch, but basically that
21 fluid getting onto mechanical elements that are
22 moving would also pretty quickly tear them, because
23 it would get rid of all of the lubricants.
24     Q. So let me make sure I understand your answer.

Page 123

1         It's possible that the device would break
2 down in time if fluid reached the blower, but it
3 would not be an immediate breakdown; is that correct?
4     A. Provided it didn't get into the electronics,
5 which it could.
6     Q. If you look to the next page, Page 20, and
7 you state there under the Davies patent, midway
8 through the paragraph, "Such a configuration could
9 not be readily adapted to the cleaning system of the
10 MeKiney or Maatz sterilizers which are open to the
11 atmosphere and contain no lid."
12         Do you see that?
13     A. Yes.
14     Q. As we discussed earlier, there is no "open to
15 the atmosphere" limitation in Claims 11 and 12 of the
16 '328?
17     A. Right. Because here we are talking about
18 MeKiney and Maatz.
19     Q. And I believe Mr. Phillips discusses Davies
20 in his third report. Let me see here.
21         At Page 43, Paragraph 152.
22     A. Okay.
23     Q. Do you disagree with Mr. Phillips that the
24 lid in the Davies patent is not necessary for the

Page 124

1 cleaning device?
2     A. Repeat the question, please.
3     Q. Do you disagree with Mr. Phillips that the
4 lid in the cleaning device of the Davies patent is
5 beneficial, but not necessary?
6     A. To the cleaning function or to the drying
7 function?
8     Q. Let's start with the drying function.
9     A. So it changes things quite a bit in terms of
10 drying.
11     Q. Well, I guess, if it changes things, but do
12 you disagree with him that the lid is not necessary
13 to the drying function?
14     A. So, to use, say, an airstream to dry an
15 object, the key thing is bringing dry air.
16         If we are drying alcohol away, it means
17 air with a little alcohol vapor in it, right up
18 against or across the surfaces that you are trying to
19 dry, with high speed, right?
20         So that if you took the Davies' thing,
21 where you have a fan out here (indicating), and that
22 is fan is blowing -- I forget if it is drawing humid
23 alcohol or cleaning fluid, humid air out of the tank,
24 or pushing atmospheric air, I forget which one it is

Page 125

1 -- but in either case, he is getting a little bit of
2 the velocity effect, but the main thing he's doing is
3 decreasing the vapor of the cleaning fluid in that
4 compartment, right?
5         So that if you took the lid off of
6 Davies, but still had a blower sitting there, as it
7 is configured, with just that bit of the lid, it
8 would have a considerably smaller effect than in the
9 presence of the lid.
10     Q. So I understand that there is a considerably
11 smaller effect, but again, do you disagree with
12 Mr. Phillips that the lid is not absolutely
13 necessary?
14         MS. WENDLANDT: Objection.
15     A. Okay. The lid is not absolutely necessary to
16 -- if the lid weren't there, it would be difficult to
17 make sense of that dryer, that fan, and whether it is
18 making a difference.
19         Does that make sense?
20     Q. Okay. I understand.
21         Let me ask this, then: For the MeKiney
22 and Maatz patents, do you think it would be difficult
23 to put a lid on tank -- the upper tanks in both
24 patents, or let me ask you this: Do you think it

LegaLink Boston
(800) 822-3376

Samir Nayfeh, Ph.D.                                                           08/26/2005

Page 126

1   would be beyond the still of the ordinary artisan to
2   put a lid on the top of each of those tanks?
3       A. That's a question of degree.
4           So, are you saying would it be obvious to
5   put a lid on both of those in terms of obviousness?
6           In other words, you say would one skilled
7   in the art be able to figure that out?  Well, one
8   skilled in the art would be able to figure most
9   things out.  So are you asking -- so --
10      Q. Would it require more than routine
11  engineering to design a system that would have a lid
12  on the tanks of either the MeKiney or Maatz patents?
13      A. So one could -- routine engineering would
14  allow you to design a lid for either of these, yes.
15      Q. Okay.  Am I correct that your opinion is that
16  where the inventiveness comes in is developing
17  something to allow for the provision of a fan in --
18  incorporated within a cleaning device of the sort in
19  the -- described in the '328 patent?  Am I right?
20      A. So incorporation of a fan in a way that would
21  actually improve drying in a substantial way.
22          Incorporation of a fan in general is
23  probably not difficult, but incorporation of a fan in
24  such away that it really does speed up the drying is

Page 127

1   a more difficult question.
2       Q. Okay.  The way the inventors did that was
3   through the louvered shutter system.
4       A. At least in that embodiment, yes.
5       Q. Was there any other embodiment?
6       A. I think that was the only -- well, I think
7   that was the only embodiment in which it was spelled
8   out, but I can't remember if they referred to it as
9   an alternative embodiment or not.  I don't recall.
10      Q. Let's turn to Page 21 of your report.
11          You discuss there the Zeischke thesis, if
12  I am pronouncing that correctly.
13      A. Yes.
14      Q. Have you compared the Zeischke thesis with
15  the French '111 patent referenced in the '328
16  specification?
17      A. No.
18      Q. So, I take it, then, in your report you're
19  not offering any opinion as to the differences
20  between the Zeischke thesis and the French '111
21  patent, if any?
22      A. I don't think I discussed the French '111
23  patent.
24      Q. Do you know if any of the references cited in

Page 128

1   connection with the prosecution of the '328 patent
2   disclose a bracket for insertion of a shaving
3   apparatus therein?
4       A. I don't know.  I really only addressed the
5   ones that were raised by Mr. Phillips.
6       Q. Okay.  And at the bottom of Page 21, you
7   state, "More importantly, even if Mr. Zeischke had
8   drawn a bracket into which the electronic shaver
9   could be inserted for storage and charging, this
10  would not have taught a bracket into which the shaver
11  could be inserted during cleaning."
12          Do you see that?
13      A. Yes.
14      Q. Where in Claim 18 of the '328 patent is there
15  a requirement that the shaver has to be inserted into
16  the bracket during cleaning?  And, again, I am
17  emphasizing "during cleaning" part of the statement.
18      A. So, again, it's not literally there, but
19  clearly from the specification when the bracket is
20  described, it's -- the bracket is -- you insert into
21  the bracket during the cleaning operation.
22      Q. Above that, in the paragraph above that, you
23  note that the rectangles, which I think are called
24  park positions, serve only to indicate the general

Page 129

1   location where a shaver could be placed for storage
2   and charging.
3       A. Yes.
4       Q. Isn't it correct that the bracket in the '328
5   patent is used for storage and charging of the
6   shaver?
7       A. It has additional functions, but those are --
8       Q. Two functions.
9       A. Yes.  And it doesn't perform them alone.
10          There is another distinction to make.
11  You store the shaver, not really in the bracket, but
12  in the combination of the bracket and cradle.
13      Q. Well, the park position described in Zeischke
14  would provide support while storing the shaver,
15  correct?
16      A. Yes.
17      Q. Then would they not function as a bracket
18  then?
19      A. I think a bracket is more than just a
20  function, as we discussed previously.
21      Q. Sure.  It is a structure.
22      A. A specific type of structure.
23      Q. Well, does the cradle in the '328 patent, in
24  the structure disclosed in the '328 patent, does that

LegaLink Boston
(800) 822-3376

Page 130

1  cradle function as a bracket?
2      A. It has some of the functions of a bracket,
3  some functions that could have been carried out by a
4  bracket.
5          As to whether you could consider it
6  itself a bracket or not, I haven't thought about
7  that.
8      Q. Okay. Well, a position where the shaver, in
9  terms of the Zeischke thesis, a location where the
10 shaver could be stored and charged, you would not
11 consider that location to be a bracket?
12     A. Not simply, No.
13         You could design a product to do that, or
14 possibly a pair of brackets, but there is nothing in
15 there that says "a bracket" --
16     Q. Well, would --
17     A. -- or implies a bracket.
18     Q. -- that functionality suggest a bracket to
19 one of ordinary skill in the art?
20     A. No. I think it suggests all kinds of
21 structures.
22     Q. Such as what structures?
23     A. You could have a small detente in the
24 surface, with electrical contacts, you place the

Page 131

1  shaver in. That wouldn't be a bracket.
2      Q. Are there any other structures?
3      A. Sure. You could have a system of pins that
4  engaged the electronics as well as supports the
5  shaver.
6      Q. Look to the next page, on Page 22, at the
7  bottom, where you are discussing at Helmut Kraus's
8  suggestion, you state, "that one skilled in the art
9  should understand the need of an interlock does not
10 render obvious its realization that using a bracket
11 incorporated into the system as claimed in the '328
12 patent."
13         Do you see that?
14     A. Yes.
15     Q. Why would one of ordinary skill in the art
16 understand the need for an interlock?
17     A. You want to prevent people from grabbing the
18 razor while it is running in the cleaning system and
19 while the cleaning system is running and pulling it
20 out. That's common sense, I think.
21     Q. When you say "common sense," would that be
22 obvious?
23     A. The need for an interlock? So, realizing the
24 need for an interlock, I think is obvious.

Page 132

1      Q. Is an interlock different from a bracket?
2      A. Oh, certainly.
3      Q. What are the difference between an interlock
4  and a bracket?
5      A. An interlock is a function. A bracket is a
6  structure.
7      Q. An interlock doesn't actually constitute a
8  structure?
9      A. You would have to realize the interlock using
10 the structure, but if you are telling me you need an
11 interlock, you are telling me of a function you need.
12     Q. So would one of the structures that you can
13 use to perform function of an interlock be a bracket?
14     A. Yes. I should say not simply a bracket, but
15 a bracket with various things in it to do this.
16     Q. Are there any other structures that you could
17 think of that could provide the functions of an
18 interlock?
19     A. Sure. You should have all types of shapes of
20 structures. You could have structures with pivots
21 that you bring onto the shaver. You could have a
22 strap that goes around the shaver and locks while it
23 is running. So I think there are many.
24     Q. Turning next to indefiniteness.

Page 133

1          You render the opinion that the '328
2  patent is not indefinite; is that correct? '328 and
3  '556 patent are not indefinite?
4      A. Correct.
5      Q. What is your understanding of the analytical
6  framework for indefiniteness?
7      A. So you would ask whether one skilled in the
8  art reading the patent would be able to distinguish
9  between those items which are claimed and those which
10 are not.
11         I may be missing something here, but I
12 think that's -- I paraphrased what I get from it.
13         So it has to be definite, and it has to
14 lay out definitely what has been invented.
15     Q. It is your opinion that the inventors in fact
16 did that?
17     A. Yes.
18     Q. In the third paragraph, under
19 "indefiniteness," you state that "The claimed cradle
20 structure was a framework for supporting an object."
21         Do you see that?
22     A. Yes.
23     Q. Can you tell me where in the court's
24 construction of cradle structure the term "framework"

Page 134

1  appears, or word?
2      A. It does not.
3      Q. Do you believe that "framework" is implied
4  anywhere in the court's construction of the "cradle
5  structure" limitation?
6      A. No.
7      Q. So why do you say in the next sentence, "In
8  this case, a" -- or in the next clause of the same
9  sentence -- "In this case, a framework adapted for
10  supporting and receiving the shaving head"?
11      A. Well, remember that this paragraph is talking
12  -- is stepping back from the court's construction and
13  looking at the claim itself, right?
14      Q. Okay.
15      A. What we are talking about here is we are
16  taking a step back, at least in this prelude to the
17  section here, from the court's construction, which is
18  already laid out; and we are talking about, okay, you
19  know, where this business -- how the court arrived at
20  that construction; and I think in the Marksman
21  hearing that the judge did -- talked about the ships'
22  cradles and so on, which -- you know, discussions
23  along these lines.
24          So I'm not claiming here that the word

Page 135

1  "framework" is in the court's construction itself.
2      Q. Do you think that one of the ordinary skill
3  in the art would understand "cradle structure" to
4  mean "a framework for supporting an object"?
5      A. Would understand that a framework is -- so we
6  are going to move down the chain here of terms. We
7  will get to "framework."
8          So it depends on what you think of as
9  framework, but generally I think that's a pretty good
10  synonym for "cradle structure."
11      Q. And if you turn your attention to the Lee
12  patent, which I think I marked earlier.
13      A. Yes.
14      Q. And this is the --
15          MR. SHIMOTA: Did I?
16          MS. WENDLANDT: No.
17      A. No. We just looked at the picture in the
18  report.
19          MR. SHIMOTA: I would like to mark as
20  157, Defendant's Exhibit No.157, U.S. Patent No.
21  3,890,988, which we have been calling the Lee patent.
22          EXHIBIT NO. 157 MARKED
23      Q. Okay. And you refer to the metal sink 10 in
24  the Lee patent in your report. Do you see that?

Page 136

1      A. Yes.
2      Q. In your opinion, is the metal sink 10 a
3  structure?
4      A. Yes.
5      Q. Is the metal sink 10 able to receive and
6  retain fluid?
7      A. Yes.
8      Q. Is the metal sink 10 in the Lee patent a
9  receptacle?
10      A. Yes. That's the word used in the patent.
11      Q. Is the metal sink 10 in the Lee patent a
12  framework?
13      A. Yeah, probably -- well, I haven't thought
14  about that question. It would seem to be debatable.
15      Q. And is the item 10 in the Lee patent -- in
16  your opinion, is the reciprocal 10 in the Lee patent
17  a cradle structure?
18      A. No.
19      Q. And in your opinion, is the receptacle 10 of
20  the Lee patent able to receive or support the shaving
21  head of the shaving apparatus?
22      A. Able to? Yes.
23      Q. Excuse me, a -- I'm sorry. That's my
24  mistake.

Page 137

1          Is the receptacle 10 of the Lee patent
2  adapted to receive the shaving head of a shaving
3  apparatus?
4      A. No.
5      Q. But I guess -- well, it is your opinion,
6  though, that the receptacle 10 of the Lee patent is
7  able to receive the shaving head of a shaving
8  apparatus?
9      A. Yes.
10      Q. And as we discussed this morning, it's
11  correct that you have not offered an opinion as to
12  whether or not the Lee patent is not analogous art?
13      A. Correct.
14      Q. Turning to the Schinn patent. Let me get
15  that out.
16          MR. SHIMOTA: Mark as Defendant's
17  Exhibit 158, U.S. Patent 4,815,486, referred to as
18  the Schinn patent.
19          EXHIBIT NO. 158 MARKED
20      Q. You offer an opinion regarding the hooks and
21  wire basket inside of drum 14 of the Schinn patent;
22  is that correct?
23      A. Correct.
24      Q. And is the drum 14 of the Schinn patent a

Samir Nayfeh, Ph.D.                                                                    08/26/2005

Page 138

1  structure?
2      A. Yes.
3      Q. And is the drum 14 of the Schinn patent able
4  to receive or retain cleaning fluid?
5      A. Yes.
6      Q. Is the drum 14 of the Schinn patent a
7  receptacle?
8      A. You probably would have to sharpen the
9  definition of "receptacle."
10         A receptacle for what, for example?
11     Q. Well, what is your understanding of a
12  receptacle?
13     A. Well, you could have a receptacle for an
14  electrical plug, or a receptacle for a pen, or a
15  receptacle for trash.
16     Q. Is this a receptacle for paint equipment?
17     A. Yes.
18         MS. WENDLANDT: Drum 14?
19         MR. SHIMOTA: Yes.
20     A. Yes. It does receive paint equipment.
21     Q. Is drum 14 a framework?
22     A. Yes. Similar to the sink, it's a structure,
23  but we haven't really laid out what "framework"
24  means.

Page 139

1      Q. Is drum 14 is a cradle structure?
2      A. I think you would again have to say a cradle
3  structure for --
4      Q. Is drum 14 a cradle structure for paint
5  equipment?
6      A. Okay. It would read on -- it would read on
7  the court's construction, because, as we say here, it
8  is adapted specifically to receive paint equipment.
9      Q. Okay. I understand.
10         Is drum 14 adapted to receive the shaving
11  head of a shaving apparatus? Receive or support,
12  excuse me.
13     A. No. I should -- I think I just made a
14  mistake a moment ago, because the -- that the hooks
15  and wire baskets are designed to receive paint
16  equipment.
17         We're -- there is not that much detail
18  given. So giving Schinn the benefit of the doubt
19  that they are designed to do that in a specific way,
20  but also we shouldn't sweep under the rug the
21  distinction between the hooks and wire baskets and
22  drum 14. Drum 14 contains a lot of stuff.
23     Q. Okay.
24     A. Again, I don't -- it may not be quite

Page 140

1  accurate to say that you could think of drum 14
2  itself as adapted to receive and support the patent
3  equipment.
4      Q. Well, let me ask this: Is drum 14 adapted to
5  receive the shaving head of a shaving apparatus?
6      A. No.
7      Q. Is drum 14 able to receive the shaving head
8  of a shaving apparatus?
9      A. Well, able, yes, but again, unless you took
10  the head off of the shaving apparatus, you would
11  probably wreck the shaving apparatus.
12     Q. I understand. Okay.
13     A. I should say that the same applies to the
14  Lee.
15     Q. Let's look to Cunningham. I will give you
16  that.
17         MR. SHIMOTA: Mark this as Defendant's
18  Exhibit 159, U.S. Patent No. 5,335,394, referred to
19  as the Cunningham patent.
20         EXHIBIT NO. 159 MARKED
21     Q. So directing your attention specifically to
22  Figure 4 of the Cunningham patent, which is actually
23  illustrated in your report.
24         Is the basket 45 shown in Figure 4 a

Page 141

1  structure?
2      A. Yes.
3      Q. Is the basket 45 a receptacle?
4      A. Again, I think you have to say receptacle for
5  something.
6      Q. A receptacle for here the dentures?
7      A. Yes.
8      Q. Is basket 45 a framework?
9      A. Yes.
10     Q. And is basket 45 a cradle structure?
11     A. Again, are you talking about a cradle
12  structure as claimed? A cradle structure for
13  dentures?
14     Q. I am saying a cradle structure, in general,
15  in the more general sense?
16     A. In general? I would say a cradle structure
17  -- I think not.
18     Q. Is the basket 45 of the Cunningham patent
19  able to receive fluid?
20     A. Well, it can be lowered into fluid. In that
21  sense, yes.
22     Q. Is the basket 45 of the Cunningham patent
23  adapted to receive or support the shaving head of a
24  shaving apparatus?

36 (Pages 138 to 141)

Samir Nayfeh, Ph.D.

08/26/2005

Page 142

1  A. No.
2  Q. Is the basket 45 of the Cunningham patent
3  able to receive the shaving head of a shaving
4  apparatus?
5  A. Depending on its dimensions, it could.
6  Q. Could you turn to Page 26 of your report.
7  A. 26?
8  Q. Yes.
9  A. Yes.
10  Q. In item 6 you discuss written description.
11  A. Okay.
12  Q. Can you provide for me your analytical
13  framework you used in discussing written description?
14  A. So what I did was I compared the court's
15  claim construction with the written description in
16  the patents and checked that they were consistent.
17  Q. And it is your opinion that the court's claim
18  construction and the written description are
19  consistent?
20  A. Yes.
21  Q. Do you disagree with Mr. Phillips that the
22  only embodiment of the cradle structure disclosed in
23  the '328 patent both receives and retains cleaning
24  fluid?

Page 143

1  A. Yes. That's the preferred embodiment.
2  Q. So you do agree with him that there's no
3  explicit description of a cleaning system with a
4  cradle structure that only receives cleaning fluid?
5  A. As we said, you can deduce from the claims
6  that one which only received but did not retain
7  cleaning fluid was contemplated by the inventors.
8  Q. It's a little different question.
9  A. I'm sorry.
10  Q. I am asking you with respect to the explicit
11  written description.
12  Do you disagree with Mr. Phillips that
13  there is no explicit written description
14  corresponding with a cradle structure that receives
15  but does not retain cleaning fluid?
16  MS. WENDLANDT: Objection.
17  A. Again, if you read the patent including the
18  claims, you see that, for example, Claim 1 was
19  intended to include cradle structures that do not
20  retain fluid.
21  Q. Where do you see that in Claim 1?
22  A. It's in Claim 2.
23  Q. It's in Claim 2?
24  A. Claim 2 implies that about Claim 1.

Page 144

1  Q. Why?
2  A. So Claim 2 says -- I will paraphrase -- Claim
3  2 says that the inventors claim a device in which the
4  outlet is small enough that it does retain fluid, but
5  otherwise it is like Claim 1.
6  It's a dependent claim of Claim 1. So
7  there would be no claim to Claim 2 if Claim 1 didn't
8  include things in which the outlet were large enough
9  that it did not retain fluid.
10  Q. Well, aside from Claim 2 -- would you agree
11  with me that Claim 2 doesn't say anything about a
12  cradle? You are implying from Claim 2 that a cradle
13  structure -- or you are inferring from Claim 2 a
14  cradle structure that receives but does not retain
15  cleaning fluid; is that correct?
16  MS. WENDLANDT: Objection.
17  A. I would say it just supports the overall
18  logical reading of the thing.
19  So Claim 1 says that the cradle structure
20  -- that there is a feed device that provides fluid to
21  the cradle structure. It doesn't lay out whether it
22  retains or doesn't retain.
23  Then to you to Claim 2, and you are
24  saying we want to include things like Claim 1, but

Page 145

1  also specifically things that retain fluid, which
2  would indicate to you, unless Claim 2 were completely
3  meaningless, that Claim 1 includes things that did
4  not retain fluid.
5  Q. Okay. What other written description, aside
6  from Claim 2, corresponds with a cradle structure
7  that receives but does not retain cleaning fluid?
8  A. I can't think of specific phrases or mention.
9  As I said, the preferred embodiment did
10  contain...
11  Q. Would you agree with there is only one
12  preferred embodiment described in the '328 patent?
13  A. There is one preferred embodiment, and then
14  there is a second embodiment mentioned which goes
15  into details about how the motors are configured or
16  the motor is configured and the clutches.
17  Q. I understand.
18  A. I think that's a second embodiment, although
19  it doesn't jump out at you when you read it.
20  Q. That embodiment, would you agree with me,
21  that second embodiment has nothing to do with whether
22  or not the cradle receives --
23  A. It doesn't talk about the cradle, yes.
24  Q. Well, if you use the device in the '328

Samir Nayfeh, Ph.D.                                                          08/26/2005

---

Page 146

1  patent, in the preferred embodiment of the '328
2  patent -- if you use the device described in the
3  preferred embodiment of the '328 patent with a cradle
4  structure that did not retain cleaning fluid, would
5  the shaver be cleaned?
6          MS. WENDLANDT: Objection.
7      A. It could be cleaned. It would really depend
8  a lot on details.
9      Q. Such as what?
10     A. Such as where the inlet -- where the cleaning
11 fluid is actually delivered relative to the razor,
12 whether when the razor is running it would draw fluid
13 into it's interior.
14         So you could conceive of it working, yes.
15     Q. Are any of those details provided in the
16 specification of the '328 patent which you have just
17 mentioned?
18     A. No. I think it's pretty vague on those
19 counts.
20     Q. Have you reviewed -- you said you reviewed
21 the summary judgment motions filed in this case?
22     A. Yes. I should say I think those submitted by
23 Rayovac, but not those submitted by Braun.
24     Q. Did you have a chance to look at the

---

Page 147

1  deposition testimony that Rayovac cited in connection
2  with its arguments pertaining to written description
3  for Mr. Braun and Dr. Pahl?
4      A. I don't recall the specifics.
5      Q. For example, in your opinion here, you state
6  Dr. Pahl testified that he conceived that he had --
7  Dr. Pahl testified that he had conceived of a
8  cleaning system wherein liquid was not retained by
9  the cradle, but was flushed through the shaver head.
10         Do you see that?
11     A. Yes.
12     Q. Does it remain your opinion that Dr. Pahl
13 offered that testimony?
14         MS. WENDLANDT: Objection.
15     A. The only way I would change it if I were to
16 reread it. So far, it remains my opinion, yes.
17     MR. SHIMOTA: I would like to mark as
18 Defendant's Exhibit 160 the deposition of Diethrich
19 Paul.
20         EXHIBIT NO. 160 MARKED
21     Q. I cite you to Page 80, specifically Lines 2
22 through 14.
23         Can you tell me where on Lines 2 to 14
24 Dr. Pahl said he conceived of a system wherein

---

Page 148

1  liquid was flushed through the shaver head?
2      A. "Let's put that way. We once considered
3  whether we could spray the stuff in."
4      Q. That's what you think that means? That's
5  flushing it through the shaving head? That's what
6  you are relying upon?
7      A. Yes.
8      Q. Did you read the next part of his testimony
9  that states, "Well, when we pumped the liquid in,
10 it's basically also spraying cold spray. You can
11 pump it. Call it pumping. Don't really, as long as
12 you have a cradle. How you feed in a liquid into the
13 cradle is irrelevant for my opinion. The main thing
14 is that the cutter block is immersed in the liquid."
15         Do you see that?
16     A. Correct.
17     Q. Does that change your opinion in any way that
18 Dr. Pahl conceived of a system in which the cradle
19 did not retain cleaning fluid?
20         MS. WENDLANDT: Objection.
21     A. It doesn't really.
22         I mean, he is talking about you could
23 spray it, spray it into the cradle or pump it into
24 the cradle, when he is talking about spraying fluid

---

Page 149

1  into a dishwasher, right?
2      Q. Yes.
3      A. When he said, "Let's put that way, we once
4  considered whether we would spray the stuff in," he
5  is talking -- an analogy to a dishwasher which sprays
6  stuff at the dishes.
7          So I don't think that looking at the word
8  "spray" is the key, because he used the word "spray"
9  in a different sense, but rather what he was talking
10 about here was spraying in -- you are going to spray
11 it into the cleaning head or immerse it.
12         In other words, that first sentence --
13 read the whole sentence. "Let's put that way, we
14 once considered whether we could spray the stuff in,
15 but I personally feel it's much more efficient if you
16 immerse the shaver head, especially the cutter block
17 into liquid."
18         So in that sentence he is comparing two
19 approaches: Spraying the liquid -- you are going to
20 spray it -- could spray it into cradle, but here,
21 based on the context, you think he is spraying it
22 into the shaver head, but he decided it was better to
23 immerse the shaving head. So I don't see why you are
24 reading this to the contrary.

---

**Page 150**

1  Q. Did you consider the rest of the testimony on
2  Page 81?
3  A. I will take a moment to read it.
4  Q. Sure.
5  A. Okay. I have read it.
6  Q. After reading that testimony, it still
7  remains your opinion that Dr. Pahl thought of a
8  cradle that received, but did not retain cleaning
9  fluid?
10      MS. WENDLANDT: Objection.
11  A. Yes, I think so.
12      I mean, he said "better cleaning result"
13  when he was asked about immersion. So it is better
14  than what? Better than spraying it in.
15  Q. So you're inferring that here he's saying you
16  get a better cleaning result than if you spray fluid
17  in?
18      MS. WENDLANDT: Objection.
19  A. I mean, I am just reading it. They're
20  discussing -- they start by discussing spraying, like
21  a dishwasher.
22      He said we considered spraying like a
23  dishwasher, but he thought it was more efficient to
24  immerse, right?

**Page 151**

1      Then we continue down, and he gives some
2  details. He said we didn't test spraying, but we
3  decided it was better to dive the thing down, and
4  then the question is: Spray liquid into the cradle?
5      He said, well, you could spray it into
6  the cradle or pump it into the cradle, called the
7  same thing, and then he had emphasized that the most
8  important thing for the cleaning is the immersion,
9  and, uhm, I think they continue on, and finally says
10  -- the questioner asks: What other ways did you
11  consider to operate your cleaning system? He says,
12  well, okay, that was it.
13  Q. So you see that he says: I think it was
14  simply that thing, fill up a cradle with liquid, put
15  the shaver it in, and let the cutter blocks operate.
16      Do you see that, right?
17  A. So he is summarizing what he thought was the
18  best way.
19  Q. You see it says, the question is next asked,
20  "That's the idea you thought of, right? And the
21  answer is "yes"?
22  A. Yes. But I don't think he was -- I don't
23  think he -- I don't think that question in that
24  context means that is the only idea you thought of.

**Page 152**

1      I mean, clearly they had thought of
2  brushes. They had thought of all sorts of things,
3  right? So I don't think -- I don't think that is
4  read as that is the only idea you thought of.
5  Q. Okay. So after reading that, your opinion is
6  based upon -- well, taking a look at the top of Page
7  80 where he says "spray stuff in" --
8  A. Yes.
9  Q. -- you're assuming from that he means that
10  stuff is sprayed inside the shaving head, not into
11  the cradle, and when stuff is sprayed into the
12  shaving head, it is not -- no stuff is retained by
13  the cradle; is that correct?
14      MS. WENDLANDT: Objection.
15  A. Yeah, because he was looking at -- in other
16  words, he was looking at alternatives to immersing
17  the shaver head.
18      So that alternative, the only way I could
19  see it is that you spray and stuff draining out
20  without accumulating, at least accumulating enough to
21  immerse the shaver head. That seems to me the only
22  way you could read it.
23  Q. Well, don't you see where it he says it
24  doesn't matter how fluid gets to the cradle, at Line

**Page 153**

1  16, as long as there is immersion of the cutter
2  block?
3  A. Right. That was once he concluded that
4  immersion was effective.
5  Q. So he says it doesn't spray it or pump, the
6  main thing is immersion?
7  A. Right. Because that sentence at Line 5, 6
8  and 7, it's talking about immersion and an
9  alternative to immersion. I don't think you could
10  argue with that.
11  Q. Okay.
12  A. When he's talking 16 -- for example, 16 to
13  21, he is reaffirming the choice to go with
14  immersion.
15  Q. All right. From this testimony, have you
16  deduced that Dr. Pahl thought of this idea prior to
17  the filing of the '328 patent?
18      MS. WENDLANDT: Objection.
19  A. I don't think there is a time -- I didn't
20  study this to see when he had conceived of this, when
21  this was going on.
22      So on its own, you couldn't conclude
23  about this thought process relative to the time of
24  filing, unless from the larger context you can, but I

39 (Pages 150 to 153)

Samir Nayfeh, Ph.D.

08/26/2005

Page 154

1  can't find that; but at the time of filing, you will
2  find claims in the German application, like Claim 2,
3  which is I think is much stronger and clearer
4  anyways.
5      Q. Have you considered the German application
6  and the American application?
7      A. Yes. Translation in the prosecution history.
8      Q. Do you know whether the claims of the German,
9  the original German patent application match those of
10  the U.S. Patent application?
11     A. Well, they changed, but the relevant claim
12  that we are talking about here, which is Claim 2, and
13  finally the '328 is -- appears maybe once or twice in
14  the original Claim 1, I think Claim 9 and maybe
15  another claim. So it's there from the very
16  beginning.
17     Q. So it never changed during prosecution?
18         MS. WENDLANDT: Objection.
19     A. Well, claims changed, and maybe the phrasing
20  changed, but this was definitely a claim in the
21  German application that talked about -- that was
22  dependent on previous claims that talked about
23  dimensioning the outlet so that fluid was retained.
24     Q. Okay. So you need -- well, stepping back to

Page 155

1  the testimony, you don't know when Dr. Pahl came up
2  with his alleged spraying idea; is that correct?
3      A. Dates aren't given. It's implied that it was
4  early on, but it's not definite, I don't think.
5      Q. Okay. And when you are discussing written
6  description, why are you talking -- going back to
7  your report -- why are you talking about claim
8  construction?
9          MS. WENDLANDT: Objection.
10     A. Well, I think the argument that Mr. Phillips
11  brought was that the patents lack an adequate written
12  description, and he was pointing to the court's
13  construction. So I simply responded to that.
14     Q. Well, do you understand the claim
15  construction and the validity of a patent's --
16  patent validity are different issues?
17         MS. WENDLANDT: Objection.
18     A. I think so. But again, I was really just
19  responding to the argument advanced by Mr. Phillips.
20     Q. Isn't Mr. Phillips' argument that there is no
21  written description corresponding with the cradle
22  structure that receives but does not retain cleaning
23  fluid?
24         MS. WENDLANDT: Objection.

Page 156

1      A. Maybe we should read it, but I think that was
2  the key to it, but he did point to the construction,
3  I believe.
4          I don't remember the details of what he
5  wrote.
6      Q. Have you considered Mr. Braun's testimony in
7  connection with the cradle structure?
8      A. I read it. I don't know -- I don't seem to
9  have discussed it here.
10     Q. Do you know when you read it?
11     A. Braun's deposition? Early on in this thing.
12  Probably before the first report, but I'm not
13  certain.
14         THE VIDEOGRAPHER: Going off the record.
15  This marks the end of videotape number two in the
16  deposition of Samir Nayfeh. We are going off the
17  record. The time is 2:24.
18         (A recess was taken.)
19         THE VIDEOGRAPHER: We are back on the
20  record. This marks the beginning of videotape number
21  three in the deposition of the Samir Nayfeh. The
22  time is 2:34.
23         MR. SHIMOTA: I would like to mark as
24  Defendant's Exhibit 161 Volume 1 of the deposition of

Page 157

1  Gebhart Braun.
2         EXHIBIT NO. 161 MARKED
3         MS. WENDLANDT: Jim, we should probably
4  take the opportunity to correct Dr. Nayfeh's previous
5  testimony about when he first read Mr. Braun
6  deposition transcript.
7         I think he indicated before, it was prior
8  to his first report. It is clear it wasn't until
9  after Mr. Phillips' first report.
10        MR. SHIMOTA: Okay. Thank you.
11     Q. And I would like to direct your attention to
12  Page 75, which you can look at the other pages for
13  context, but in particular I am interested in the
14  question which starts at Line 3 on 75: "Did you ever
15  test the cleaning system in a situation where there
16  was no fluid retained in the cradle structure?"
17        "Answer: This was like if I just turn
18  the razor with the head down, and I just operate it.
19  How should this cleaning work? This would mean we
20  would need a cleaning system. This would mean we
21  would just have to turn the razor and run it."
22     Q. Do you see that?
23     A. Yes.
24     Q. Does that testimony in any way change your

40 (Pages 154 to 157)

Page 158

1   opinion that the inventors conceived of a system in
2   which the cradle received but did not retain cleaning
3   fluid?
4       A. No.
5       Q. Why not?
6       A. Well, the question asks: *Did you test the*
7   *system?* So you already got the system in a situation
8   where the cradle was not filled with fluid at all.
9           Okay. Then you rephrased the question.
10  The situation was no fluid retained in the cradle
11  system. You are asking him whether he took his
12  system and ran it without cleaning fluid retained,
13  and he said: Well, that wouldn't work.
14      Q. Let me see if I understand. Would you agree
15  with me that the -- let me start again.
16          Would you agree with me that in the
17  *preferred embodiment of the cleaning system of the*
18  *'328 patent* if the cradle structure does not retain
19  fluid, the cleaning device will not work; i.e.,
20  clean?
21          MS. WENDLANDT: Objection.
22      A. So you asked me that question before, and I
23  answered that it would depend on where the fluid is
24  delivered to that area and details of how the cradle

Page 159

1   structure and the fluid might be drawn into the
2   razor. *So my answer is the same as before.*
3       Q. Well, do you think with respect to the
4   deposition testimony that we are describing here, do
5   you think that Mr. Braun was working with a different
6   cleaning system than the cleaning system described in
7   the '328 patent?
8           MS. WENDLANDT: Objection.
9       A. That could be.
10          There is not necessarily a one-to-one
11  correspondence between what they were building and
12  what they put in the specification.
13      Q. Why do you say there *is not* a one-to-one
14  correspondence to what is disclosed in the
15  specification?
16      A. Well, there could have been differences.
17          They could have -- they might have never
18  prototyped this thing with exactly these dimensions.
19  They might have changed parameters. You know, they
20  are not exactly the same thing.
21          You asked him about his model, which
22  meant this thing that existed. You asked him if he
23  ran it in a particular way. So that's a lot narrower
24  question than if you took *the device described in the*

Page 160

1   patent and tried to run it without such things,
2   right.
3       Q. Let me ask you about the question at the top
4   of Page 74 --
5       A. Uh-huh.
6       Q. -- where it states there, "Well, in your
7   work, did you ever attempt to develop a cleaning
8   system in which the shaver was sprayed with cleaning
9   fluid rather than being bathed?" "Answer: No."
10          "In your work at Braun, did you think of
11  the idea of pumping fluid into the interior of the
12  shaving head to flush out hair?" "Answer: To pump
13  fluid into the shaver, this could not be."
14          Do you see that?
15      A. Yeah. Yeah. You had completely confused
16  him.
17          *He is saying pumping fluid into the*
18  shaver, not the shaver head. He said you do not want
19  to clean the whole shaver. We just want to clean the
20  cutting head.
21          So, all those preclude questions were
22  confused.
23      Q. Would you look a little further down, where
24  it says, "What I meant is, did you ever think of

Page 161

1   pumping fluid directly into the shaver head to flush
2   out hair?"
3       A. Right.
4       Q. "Answer: But we found out if the trough was
5   not filled high enough, the level of fluid was too
6   low to cover the cutting head, the result was no so
7   good."
8           Do you see that?
9       A. You asked him if he ever thought of
10  something. He told you what he found.
11          Again, it's not -- so the way I read that
12  -- so I don't see this as indicating they had never
13  *conceived of this thing of not retaining fluid.*
14          I should also mention your question at
15  Line 3, you asked, "Did you ever attempt to develop a
16  cleaning system?" He said, "No."
17          Okay. They didn't attempt to develop
18  such a system. Early on they decided they preferred
19  the other system.
20      Q. And you're basing that on the inferences you
21  draw from Dr. Pahl testimony, correct?
22      A. I think all three things: Dr. Pahl,
23  Mr. Braun, the original application, all of those
24  things.

41 (Pages 158 to 161)

Samir Nayfeh, Ph.D.

08/26/2005

Page 162

1   Q. Let's put the chronology together.
2       So you think Dr. Pahl thought of it
3   first?
4       MS. WENDLANDT: Objection.
5   Q. How do you think this chronology took place
6   then?
7       MS. WENDLANDT: Objection.
8   A. I am not sure I can answer any of this.
9       I think you have all of this deposition
10  testimony, which is the only thing I have seen as to
11  trying to give you chronology, and you have the
12  patent application.
13      So I'm in no position, you know, to
14  create a timeline. I don't think there is enough
15  temporal information in here to do so. It probably
16  wouldn't be my place, anyways.
17  Q. Okay. Fair enough.
18      Your opinions regarding best mode on Page
19  28, if you would, at the bottom you state, "Among" --
20  the last paragraph, second sentence, you state,
21  "Among the most widely used fat solvents, especially
22  in consumer applications, are alcohols, and
23  therefore, the phrase 'fat-dissolving cleaning fluid'
24  would immediately suggest to one skilled in the art

Page 163

1   the use of an alcohol-based cleaning fluid."
2       Do you see that?
3   A. Yes.
4   Q. Do you agree that the '328 patent does not
5   explicitly state that an alcohol-based cleaning
6   solution should be used?
7   A. Correct.
8   Q. So it is your opinion that it would be
9   obvious to use an alcohol-based cleaning system?
10      MS. WENDLANDT: Objection.
11  Q. Cleaning solution?
12      MS. WENDLANDT: Objection.
13  Q. Fluid?
14      MS. WENDLANDT: Same objection.
15      MR. SHIMOTA: Sure.
16  A. I am not sure I should say the word
17  "obvious," which has all sorts of implications, but I
18  would say that it certainly -- it certainly would be
19  on the short list of things suggested to you when you
20  said "fat-dissolving cleaning fluid."
21  Q. What would be on the short list?
22  A. So alcohols, kerosene and related substances
23  like naphtha, acetone; and then what I am saying here
24  is that one would not want to use one of these

Page 164

1   kerosenes or naphthas in a consumer product in a
2   house or acetone.
3       So that's what I meant when I said your
4   first choice immediately would be to use alcohol.
5   Q. Okay. Turning to the next page, you discuss
6   the lubricant.
7       Would you agree with me that the '328
8   patent says nothing explicitly about the use of a
9   lubricant in the cleaning fluid?
10  A. Correct.
11  Q. Would you agree with me that the addition of
12  a lubricant to a cleaning fluid would affect its
13  viscosity?
14  A. I'm not sure whether it would have a
15  significant effect or not on the viscosity.
16  Q. Okay. Well, you -- I don't want to use the
17  word "obvious" then.
18      You suggest that it would be clear to one
19  of ordinary skill in the art that you would want to
20  include a lubricant in the cleaning fluid; is that
21  correct?
22  A. That's a paraphrase of what I said, so yes.
23  Q. Have I stated your opinion inaccurately?
24  A. Well, I would just say that one of ordinary

Page 165

1   skill in the art would recognize that a lubricant
2   isn't important for the cleaning function, but rather
3   for the maintenance of the shaving head. So there
4   might be a distinction there if you just interested
5   in cleaning the thing.
6   Q. Okay. Is it fair to say -- well, one of
7   skill in the art would recognize the need to use a
8   lubricant, but they would not necessarily recognize
9   the need to put the lubricant in the cleaning fluid;
10  is that fair?
11  A. So, yes, one could imagine you have a
12  cleaning device, and you tell the user when he pulls
13  it out to apply some oil.
14  Q. And next you also state there are several
15  reasons that a low viscosity cleaning fluid is
16  desirable. Do you see that?
17  A. Yes.
18  Q. Would you agree with me that the '328 patent
19  does not explicitly state that a low viscosity
20  cleaning fluid is desirable?
21  A. Correct.
22  Q. So it is your opinion that it would be clear
23  to the one of ordinary skill in the art that a low
24  viscosity cleaning fluid would be desirable?

42 (Pages 162 to 165)

Samir Nayfeh, Ph.D.

08/26/2005

Page 166

1    A.  Well, yes.  And how low would be depend on
2  your designing pumps, your designing filters.
3         In order to use a reasonable pump,
4  reasonable filter, you start optimizing parameters.
5  You would discover -- probably, I didn't do the
6  numbers -- that viscosity was important.
7    Q.  And, finally, you render an opinion regarding
8  the fragrance of the cleaning fluid?
9    A.  Right.
10   Q.  Would you agree that the '328 patent
11  specification does not explicitly say anything about
12  the addition of a fragrance to the cleaning fluid?
13   A.  Correct.
14   Q.  So am I correct that it is your opinion that
15  it would be clear to one of ordinary skill in the art
16  that you should use a fragrance in the cleaning
17  fluid?
18   A.  Yes.
19   Q.  Under the inventorship for Mr. Smetana, you
20  note a November 1992 presentation by Dr. Pahl.
21   A.  Yes.
22   Q.  Have you seen this presentation?
23   A.  I believe so.  It was in an exhibit to -- I
24  believe it was one of the exhibits attached to the

Page 167

1  Phillips report.
2    Q.  Is it your opinion that that presentation
3  shows a heater?
4         MS. WENDLANDT:  Objection.
5    A.  I don't remember what was in that
6  presentation.
7         MR. SHIMOTA:  Dalila, our guys forgot to
8  make copies.  If I could just show him that
9  presentation.
10        MS. WENDLANDT:  Okay.
11   A.  What I say here is Mr. Hoeser testifies that
12  that presentation illustrates the fan -- the heater
13  and fan.  That is what I quoted.
14   Q.  I will like to know if you agree with that.
15   A.  Okay.  I would have to look at that.
16        Do you guys have the translation?
17   Q.  Just from the drawing.
18   A.  I can't tell you what is what on that
19  drawing.
20   Q.  From the drawing, you can't tell me if there
21  is a heater included in this?
22   A.  I am hard-pressed to read this drawing here.
23   Q.  So the answer is no?
24   A.  Which question?

Page 168

1    Q.  Based on the drawing, can you point a heater,
2  to me, out?
3    A.  I can't point out a heater.
4    Q.  Okay.  Turning next to Claim 13, the next
5  paragraph under inventorship.  You state that "The
6  use of heat to speed drying was well-known to the
7  ordinary artisan prior to Mr. Smetana's involvement
8  in the cleaning device."
9         Do you see that?
10   A.  Yes.
11   Q.  Is it your opinion that the Claim 13 of the
12  '382 patent is obvious?
13        Let me ask this:  Is it your opinion that
14  the additional element of a heater in Claim 13 of the
15  '328 patent is obvious?
16        MS. WENDLANDT:  Objection.
17   A.  No.
18   Q.  Why not?
19   A.  Simply knowing that a heater is useful to dry
20  things doesn't get you to the invention of a device
21  that incorporates a heater into the cleaning device
22  in a practical way.
23   Q.  So it is your opinion that whoever came up
24  with the idea of incorporating the heater, that

Page 169

1  person was an inventor, or that person needed to
2  undertake some type of inventiveness; is that right?
3         MS. WENDLANDT:  Objection.
4    A.  So I said it was not obvious to include a
5  heater.  The person who came up with that would be an
6  inventor, yes.
7    Q.  If I could direct your attention back to the
8  '328 patent which is --
9    A.  I am not sure I have copy.
10        Yes.  At the very bottom of my stack,
11  yes.
12   Q.  If you look it Column 6 of the '328 patent,
13  approximately Line 22, it states, "The clinging
14  device 5, in particular, the wet portion thereof,
15  that is the cradle 7."  It goes on.
16        Do you see that?
17   A.  Uh-huh.
18   Q.  Do you have any understanding of what is
19  meant by the use of the term "the wet portion"?
20   A.  So the portion that comes into contact with
21  cleaning fluid.
22        That's not saying that it's the only
23  thing in the cleaning device that comes into contact
24  with the cleaning fluid since clearly the tank is a

43 (Pages 166 to 169)

Page 170

1  wet portion.
2      Q.  Sure.
3      A.  But it's pointing you to towards that most of
4  the cradle -- he is describing the cradle as the wet
5  portion.
6      Q.  So is it fair to say that the patent does
7  describe the cradle as getting wet during cleaning?
8          MS. WENDLANDT:  Objection.
9      A.  So he is saying that the wet portion is
10 synonymous with the cradle.
11     Q.  Okay.  Look at Column 6, about Line 44, where
12 it states that "The outlet port 27 is dimensioned
13 such that cradle 7, when supplied with cleaning fluid
14 from a pump 23, described in the following, rather
15 than be allowed to run empty, is at all times filled
16 to the rim, with excess cleaning fluid being manually
17 discharged over the rim of the cradle," and it goes
18 on.
19          Do you see that?
20     A.  Yes.
21     Q.  How is that description any different than
22 what you referred to previously about Claim 2 of the
23 '328 patent that we discussed earlier?
24     A.  Different?  Well, in this embodiment, the

Page 171

1  cradle is kept full, and that's he is saying here.
2      Q.  He is talking about the dimensions of the
3  outlet port, correct?
4      A.  Yes.
5      Q.  Am I wrong in saying that is saying the exact
6  same thing as what is stated in Claim 2?
7      A.  Claim 2 is stating -- yeah, Claim 2 is
8  claiming specifically that element, yes.
9      Q.  Grab your first report real quick.
10         If I look what is behind B, Tab B of your
11 report, your exhibits, photographs of the Rayovac
12 devices.
13     A.  Yes.
14     Q.  3A is the manifold of the Rayovac device; is
15 that correct?
16     A.  Yes.
17     Q.  What is the shape of the manifold in
18 Rayovac's device?
19     A.  In this particular device, since --
20     Q.  Sure.  Let's start with the R 9500,.
21     A.  That's a good question.  Hard to put into
22 words.
23         It's a -- if you look at it from the top,
24 it's like two legs, plus some curves of a triangle.

Page 172

1          MR. SHIMOTA:  Would you mark as
2  Defendant's Exhibit 162 a sheet of paper.
3      Q.  And ask if you could to draw the shaft of the
4  manifold, if you would, please.
5          EXHIBIT NO. 162 MARKED
6      A.  So you would like a top view?
7      Q.  Sure, please.
8      A.  (Witness drawing.)
9          Do you want more detail?
10     Q.  No, that's fine.
11         Does the manifold that you call 3A or
12 that you designate as 3A in the R 9500 make contact
13 with the shaver at all, shaver head?
14     A.  Its ports do.  So 3B does, but 3A itself
15 would not normally.
16     Q.  Well, you distinguish between 3A and 3B?
17         MS. WENDLANDT:  Objection.
18     A.  Yes.  If you would like me to continue with
19 that distinction, 3A normally would not.
20     Q.  When you say "normally would not," can you
21 think of -- are you thinking of some situation where
22 it would?
23     A.  If you were to push the razor while it is in
24 there, and you deflect that manifold enough that it

Page 173

1  probably would touch.
2      Q.  Okay.  So if you use the -- if a user
3  mishandled the Rayovac device, it might come into
4  contact with the manifold?
5          MS. WENDLANDT:  Objection.
6      A.  Yes.
7      Q.  That's one possibility?
8      A.  Yes.
9      Q.  But normally there would be no contact
10 between the manifold 3A and the shaver head?
11     A.  Correct.
12     Q.  Okay.  You, also in your drawing, there are
13 the ports, 3B?
14     A.  Yes.
15     Q.  Do you see those?  Do the ports 3B retain
16 cleaning fluid?
17     A.  Yes.  During the feed operation, they are
18 full of cleaning fluid.
19     Q.  So, in your opinion, retention of cleaning
20 fluid requires that the ports be full?
21     A.  No.
22         MS. WENDLANDT:  Objection.
23     A.  Just that they hold some volume of the
24 cleaning fluid.  That they are full implies that they

44 (Pages 170 to 173)

Samir Nayfeh, Ph.D.

08/26/2005

Page 174

1  are retaining.
2     Q.  I assume it's also your opinion that the
3  ports also receive cleaning fluid, too?
4     A.  Yes.
5     Q.  If you look at your drawing -- I don't have
6  it here -- in the drawing of the cleaning center,
7  there is a bottom in the opening for -- there is a
8  base at the bottom of the base.
9        Do you see that lower surface, that lower
10 plane?
11    A.  Which drawing?
12    Q.  The photo.  This surface at the bottom
13 (indicating)?
14    A.  Yes.
15    Q.  You don't opine that that lower surface is
16 part of the cradle structure, do you?
17    A.  If I could take a moment, please.
18    Q.  Sure.
19    A.  Right.
20    Q.  Turning back -- you are back at the picture,
21 but you also opine that the supporting surface 3C is
22 part of the cradle structure; is that correct?
23    A.  Yes.
24    Q.  Do the supporting surfaces 3C receive or

Page 175

1  retain cleaning fluid?
2     A.  They receive.  They get wet.
3     Q.  But they do not retain cleaning fluid?
4     A.  No.
5     Q.  Had you tested Rayovac's products to
6  determine that the supporting surfaces receive
7  cleaning fluids?
8     A.  Yeah.  I ran them several times, and they did
9  get wet.
10    Q.  Does the shape -- let me ask you.
11       EXHIBITS NOS. 163 AND 164 MARKED
12    MR. SHIMOTA:  And 164, an exhibit for
13 the women's rotary product; 163, an exhibit for the
14 men's rotary product.
15    Q.  Would you please draw the manifold for both
16 -- the bird's eye view for the men's foil and the
17 women's foil?
18    A.  So the men's foil is R 5500?  And R 5700?
19    Q.  Yes.
20       MS. WENDLANDT:  I think it's actually
21 MS.
22       MR. SHIMOTA:  You're right.  That's
23 fine.
24       MS. WENDLANDT:  Just note for the

Page 176

1  record Dr. Nayfeh is doing this based -- he is
2  looking at the drawings and memory.  The device is
3  not before him.
4     MR. SHIMOTA:  That's fine.
5     A.  (Witness drawing.)  That's the (indicating),
6  okay.
7     Q.  Now, in the men's foil product, does the
8  manifold make contact with the shaving head?
9     A.  I don't recall if it does.  I can't tell from
10 the photos.  I don't remember.
11    Q.  Did you consider that question?
12    A.  I don't think so.
13    Q.  So I would presume that opinion is not
14 expressed in your expert report?
15    A.  I don't think I said that the manifold
16 contacts or doesn't contact the shaving head.
17       I could be forgetting, but I don't
18 remember having said that.
19    Q.  In the women's product, does the manifold
20 contact the shaver head?
21    A.  Same answer.  I'm not sure if it does or
22 doesn't.
23    Q.  Turning back not rotary product.  In the
24 Rayovac rotary product, does the manifold 3A receive

Page 177

1  or support the shaving head?
2     A.  Yes.
3     Q.  How does it do so without making contact with
4  the shaver head?
5     A.  It's integral with the structures 3B.
6        So if you are looking for the structure
7  that supports it, we are looking at the manifold with
8  ports 3B that contact the shaving head, but that's
9  certainly all part of the framework that supports the
10 shaving head.  It's all part of the structure that
11 supports the shaving head.
12    Q.  So the manifold indirectly supports the
13 shaving head?
14       MS. WENDLANDT:  Objection.
15    A.  Well, I am not sure I like that
16 characterization.
17       We looked for the structure that provides
18 the support and don't just look at a surface that
19 provides the support, but rather the structure that
20 provides the support.
21       So I think one skilled in the art would
22 definitely read the structure as including not just
23 the ports, but that piece of plastic to which the
24 ports are, you know, integral, and through which the

45 (Pages 174 to 177)

Samir Nayfeh, Ph.D.                                                                                  08/26/2005

Page 178

1  load is transmitted.
2      Q.  Okay.  Why, then, if you were just looking
3  for what provides the shaver support, why didn't you
4  look to what you labeled as the upper housing 10?
5  Why isn't that part of the cradle structure?
6          MS. WENDLANDT:  Objection.  Go ahead.
7      A.  Well, you have this whole device, and it is
8  sitting on the table down to the ground, and so we
9  look for the portion of the structure that's adapted to
10  specifically to receive the shaving head, as in the
11  specification, we see that the cradle structure is
12  not the entire cleaning system, not the whole
13  housing, but that structure local to the support
14  bears the load that is adapted to receive the shaving
15  head.
16      Q.  So the cradle structure bears the entire load
17  of the shaving head?
18      A.  No.  Some of the load is carried by the
19  bracket.
20      Q.  What differences do you see between the -- if
21  any, between the design of the -- don't bear any
22  differences do you see of the design, what you
23  classify as the cradle structure in Rayovac's device
24  and the cradle structure in Braun's preferred

Page 179

1  embodiment?
2      A.  I'm not sure how to answer that.  Do you want
3  a list?
4      Q.  Well, to the extent you have an answer, I
5  would like to know what your answer -- answers are.
6      A.  Some things that have already been pointed
7  out, I think.
8          The conduits analogous to the manifolds
9  in the patent embodiment are -- don't bear any load.
10  They are distinct from the cradle structure.  Whereas
11  here they are integrated into the cradle structure or
12  somewhat integrated.
13          You have in this case several discrete
14  points of contact.  Whereas in the specification,
15  that embodiment, there is sort of one compliant pad
16  against which the thing rests in the cradle
17  structure.
18      Q.  Do you know of any other differences?
19      A.  One could come up with others.  I don't know
20  what you're looking for in particular.
21      Q.  Okay.  How do you know that the conduit 64 in
22  the ' '328 patent don't bear any load?
23      A.  Well, they're drawn as a distinct structure
24  from the cradle structure.

Page 180

1          I shouldn't say:  Think don't bear any
2  load.  I should say they don't directly or they are
3  not part of the -- they are not part of the component
4  of the cleaning system that is adapted to support the
5  shaving head.
6      Q.  How can you -- you can tell that from the
7  drawing, Figure 6 in the '328 patent?
8      A.  Well, that's a very schematic drawing, and it
9  implies that it is -- to the extent we are going to
10  deduce structure from this schematic, that would
11  imply it doesn't -- you know, it doesn't -- it's
12  quite distinct from the cradle structure and the --
13  doesn't play a role in providing support.
14      Q.  So am I correct that you can't tell from the
15  '328 patent whether or not the conduit 64 bear any of
16  the load of the shaver head?
17      A.  I don't want to use the phrase "bear any
18  load."
19      Q.  Okay.
20      A.  The -- put it this way:  There is no
21  indication that it should bear any load, and I don't
22  know if there are any drawings in which it is shown
23  in more detail, but there is no indication that it
24  should, and then from the reading of the patent you

Page 181

1  don't see any suggestion that it should.
2      Q.  Okay.  I think you also say that another
3  difference is that in the '328 patent, I guess the
4  cradle structure is one discrete part, whereas in
5  Rayovac's -- well, let me see if this is a fair
6  characterization of your testimony.
7          You state that in the '328 patent the
8  cradle structure is one discrete part whereas in the
9  Rayovac device the cradle structure is several
10  structures which together make up a cradle?
11      A.  Oh, no.  That wasn't my point at all.
12      Q.  Okay.
13      A.  What I meant to say is that it supports the
14  shaving head at several discrete points -- several
15  discrete points of contact, we could say.
16          Whereas the cradle in the, say, Figure 1
17  of the '328 patent, it doesn't really -- in fact,
18  there is this compliant pad, which is there between
19  the cradle structure and the shaving head and there
20  is one contact patch.
21      Q.  You would agree with me another difference is
22  that in at least Braun's preferred embodiment the
23  shaving head is immersed in cleaning fluid, whereas
24  in the Rayovac's device there is no immersion of the

Page 182

1    shaver head in cleaning fluid?
2         MS. WENDLANDT: Objection.
3         A. You are comparing the preferred embodiment?
4         Q. Yes.
5         A. In the preferred embodiment, there is
6    immersion. In the Rayovac device, it is not
7    immersed.
8         Q. Do you have any opinion as to which of the
9    two cleaning methods, immersion versus nonimmersion,
10   is more efficient?
11        A. I haven't formed an opinion on that.
12        Q. In the men's foil device, do the supporting
13   surfaces 3C -- or in the men's rotary -- in the men's
14   foil devices, do the supporting surfaces 3C receive
15   cleaning fluid?
16        A. I can't say for sure. I can't recall if they
17   got wet or not.
18        Q. Is that something that you considered?
19        A. Well, it wasn't important to -- it was not
20   something that -- I don't believe it is in the
21   report, and I don't think I went about systematically
22   trying to find out whether or not they get wet.
23        So I guess I did not consider it really.
24        Q. So the answer to my question -- my original

Page 183

1    question: Do you whether the supporting surfaces
2    gets wet? Is: I don't know?
3         A. I don't know.
4         Q. Do you know whether the supporting surfaces
5    get wet, the supporting surface 3C gets wet in the
6    women's device?
7         A. The same answer.
8         Q. And turning back to the rotary device, do all
9    of the supporting surfaces of 3C get wet, or are you
10   referring to that middle nub?
11        A. I think I had previously indicated to you
12   that the ribs or gussets do get wet. I just remember
13   that.
14        I don't remember if the middle
15   cylindrical provision does or does not get wet, or
16   whether it entirely gets wet or not.
17        Q. So it is your testimony that the ribs do not
18   get wet, and also you don't remember whether the nub
19   in the middle gets wet?
20        A. Yes. At least in the trials that I ran.
21        Q. Turn to Page 5 of your first report.
22        In the paragraph where you are discussing
23   the open to the atmosphere, about the second-to-last
24   sentence, you state, "This arrangement eliminates the

Page 184

1    need to provide an elaborate seal around the cradle
2    structure."
3         Do you see that?
4         A. Yes.
5         Q. So is it your opinion that Claim 14 -- I
6    think I discussed this before.
7         What do you mean by "an elaborate seal"?
8         A. Well, I was paraphrasing, I think the
9    specification, and I can't seem to find it here, but
10   as I recall, they were trying to draw a distinction
11   between the present invention and the previous
12   inventions that did require such a seal.
13        Q. Okay. So, again, is it your opinion that the
14   "permanently open towards the atmosphere" language
15   requires that the cradle structure be unsealed?
16        A. Yes.
17        Q. Is the manifold in the Rayovac's products
18   sealed or unsealed?
19        A. Unsealed.
20        Q. And are the ports in Rayovac's device sealed
21   or unsealed?
22        A. Unsealed.
23        Q. The same is true of the supporting
24   structures?

Page 185

1         A. Correct.
2         Q. Now, when the manifold is filled with fluid
3    during feeding, is the manifold open to the air?
4         A. Yes.
5         Q. In what way? Why do you say that?
6         A. So in the sense used in the patent "open to
7    air" again implies you can take a shaver in and out
8    without closing otherwise, right? So you are open to
9    the air.
10        And you haven't -- the business of
11   requiring the seals is about -- you are not providing
12   a secondary seal that would have to be removed when
13   you -- -- I shouldn't say the word "secondary."
14        You are not using a seal around the
15   shaving head to prevent anything from escaping around
16   the shaving head during the cleaning operation.
17        Q. So would you agree with me that during
18   feeding -- the ports on the manifold are distinct, in
19   your opinion, or are different or at least separately
20   identifiable structures?
21        A. Well, the ports are features that we can
22   identify. I don't want to say "separate structure."
23   It's a question of interpretation, I guess.
24        Q. So during the feeding you have fluid going

Samir Nayfeh, Ph.D.

08/26/2005

Page 186

1  from the cleaning fluid container through the pump
2  into the manifold, and then onto the ports, and then
3  into the shaving head, is that correct --
4      A. Yes.
5      Q. -- in the Rayovac's device?
6         So when that is occurring, you think that
7  the fluid or the manifold is open towards the air?
8      A. Well, sure. It's pumping fluid through the
9  ports.
10        I think there is some leakage around the
11 ports. At one port or two ports you often find a
12 little gap between the port and razor.
13        You are using the jet. There is clearly
14 gaps. So, for example, in the -- in this one
15 (indicating), there is a port -- is it okay if I add
16 to the sketch?
17     Q. Sure.
18     A. If there is port at the edge of this inverted
19 V and ports here (indicating), and when you are
20 running it, there is a gap between this port
21 (indicating) and the razor. It is open in that
22 sense.
23        Second, as you are pumping liquid into
24 here (indicating), it goes into the razor. It is

Page 187

1  displacing air, right, in the razor, and so you would
2  have to say this thing is open to the air, either
3  directly, because of these gaps, or because the razor
4  itself is open to atmosphere.
5         Although, I would say that -- well, I
6  shouldn't keep talking.
7      Q. Well, I guess -- and this is where I am
8  confused, because the -- I mean, how is the -- in the
9  Davies patent where air is allowed into the device,
10 how is that any -- how is that any less open to the
11 air than the manifold when it is filled with fluid?
12     A. So the thing I was about to say is that this
13 is all a digression, because our understanding of
14 "open to the atmosphere" is open so you can pull in
15 and take out a razor.
16     Q. Essentially, then, "open to the atmosphere"
17 means no lid?
18     A. I would hate to create equivalence.
19        I think that that is a phrase from the
20 patent, you could say, from the specification in this
21 case.
22        It makes sense, but I don't want to
23 create -- I don't just want to create a
24 generalization that it means no lid.

Page 188

1         The "open to the atmosphere" we said
2  means you can take the razor in and out without
3  opening and closing stuff, and that's certainly true
4  of these cradle structures.
5      Q. Okay. So, I mean, does that -- how does that
6  really have anything to do at all with being open to
7  the air or not? I mean, you could have a cover for a
8  cradle structure, and it would be open to the air?
9  It wouldn't be hermetically sealed; isn't that right?
10     A. So, remember, the claim languages says, "open
11 to the atmosphere."
12        So "atmosphere" we are taking as the
13 exterior of the cleaning system; and open to that, as
14 explained in the specification, means that you can
15 put the razor in, take it out, without opening or
16 closing lids.
17        That seems -- in other words, that seems
18 to be the story. I am not sure what the question is.
19     Q. Well, I mean, I guess my question is, isn't
20 that "open towards atmosphere" a rather awkward way
21 to say "cradle that is easy to insert and remove
22 shaver"?
23        MS. WENDLANDT: Objection.
24     A. Well, they are not exactly synonymous.

Page 189

1         In other words, "easy to insert and
2  receive" could be a lot of things. It could be I
3  have a cover, but I make it a nice cover that feels
4  good to the user to open and close.
5         "Open to atmosphere" says no cover, at
6  least in these examples.
7      Q. Okay. So I take it you disagree with
8  Mr. Phillips that the manifold, for example, is open
9  to the air when it is filled with fluid?
10        MS. WENDLANDT: Objection.
11     A. I can't quite answer that. You would have to
12 show me specifically what I am disagreeing with.
13     Q. Okay. We will get to that in a second.
14        On the next page, on 6, where you are
15 talking about permanently open to the air, you say
16 that no elaborate seal is provided in your analysis
17 of the Remmington shaving systems?
18     A. Right. Yes.
19     Q. Is there any requirement -- does the language
20 of Claim 14 "permanently open towards the
21 atmosphere," does that have anything to do with
22 elaborate seals or not?
23     A. You can think of closing this thing off from
24 the atmosphere in two ways: One, by providing a

48 (Pages 186 to 189)

Page 190

1  door, so with seals or not. The other -- and I need
2  to reread the specification here.
3         So I really was paraphrasing, if you look
4  at Column 2, say, Line 49, "This enables the shaving
5  apparatus to be inserted into the cradle without any
6  effort and to be withdrawn therefrom without the need
7  to utilize any parts closing the cradle. Moreover,
8  this arrangement obviates the provision of an
9  elaborate seal, enabling an economical cleaning
10 device to be built, affording substantially greater
11 operating comfort than the cleaning system known in
12 the art."
13    Q.  Okay.
14    A.  Uhm.
15    Q.  Turning back again to the operation of
16 Rayovac's devices.
17        When fluid is fed, it's fed to the
18 manifold, and then to the ports, and then inside the
19 shaver head; is that right?
20    A.  Yes.
21    Q.  Okay. Fluid is not this -- we looked at one
22 of your pictures for the R 9500.
23        Fluid is not fed from the feed device to
24 the interior of that bowl or that basin; is that

Page 191

1  correct?
2     A.  The basin, which I don't think I numbered,
3  but the basin beneath which the shaver rests, fluid
4  is -- reaches it through the razor.
5         Well, aside from whatever might leak out
6  throughout the ports, but essentially the shaving
7  head.
8     Q.  Fluid drains out by the force of gravity?
9     A.  Predominately. There would be others, yes.
10    Q.  That's how fluid reaches the supporting
11 surfaces 3C, if at all; is that correct?
12    A.  Okay. The surface is 3C, yeah.
13        I should say it may not be all through
14 the force of gravity. In other words, when you shoot
15 these streams into the shaving head, you probably
16 still have some momentum -- - didn't look inside to
17 see what was going on -- and probably as you fill it
18 up, you start developing a pressure.
19        It wouldn't, say, be necessarily, uhm,
20 just due to gravity.
21    Q.  But the fluid goes to the shaving head first
22 and then to the supporting surfaces 3C in the case of
23 the 9500?
24    A.  Mostly, unless there are leaks around the

Page 192

1  ports.
2     Q.  So fluid does not go from the cleaning fluid
3  container to the supporting surfaces 3C directly; is
4  that correct?
5     A.  As we discussed, it is shot into, or at, at
6  least, the shaving head, and then makes it way down
7  there and possibly gets those wet.
8         MR. SHIMOTA: Why don't we take a brief
9  break.
10        THE VIDEOGRAPHER: Going off the record.
11 The time is 3:37.
12        (A recess was taken.)
13        THE VIDEOGRAPHER: One moment. We are
14 back on the record. The time is 3:46.
15    Q.  We were talking a little bit about
16 infringement.
17        I know you offered opinions with respect
18 to literal infringement; is that correct?
19    A.  You might want to clarify what you mean.
20    Q.  Sure. Are you familiar with the term the
21 "doctrine of equivalence"? Have you ever encountered
22 that before?
23    A.  I have read about it a bit, but I haven't
24 done any detailed opinions on that.

Page 193

1     Q.  So I take it you have not offered any
2  opinions that Rayovac's devices infringe under the
3  doctrine of equivalence; is that correct?
4     A.  I don't think so.
5     Q.  In your reports, do you offer any -- well, do
6  you offer any opinion, assuming that the court
7  modifies its "cradle structure" construction as
8  suggested by Mr. Phillips and now Rayovac?
9         MS. WENDLANDT: Opinion as to?
10    Q.  Opinion as to infringing -- infringement --
11 let me rephrase that question.
12        In your reports, is there any opinion
13 offered as to whether or not Rayovac's devices
14 infringe, if the court's "cradle" construction is
15 modified as suggested by Mr. Phillips?
16    A.  The only modification being to require
17 receive and retain?
18    Q.  Yes.
19    A.  I don't think I have offered an opinion on
20 that, as I recall.
21    Q.  Okay. So that opinion would not be found in
22 either your first or your third expert report?
23    A.  I don't think so.
24    Q.  Okay.

49 (Pages 190 to 193)

Page 194

1    MR. SHIMOTA: I would like to mark
2 Defendant's Exhibit 165, your third expert report.
3    EXHIBIT NO. 165 MARKED
4    Q. And most specifically to Page 13, when you
5 talk about the substitutes.
6    MS. WENDLANDT: Just to clarify for the
7 record, mine has Jesse Davies report as well.
8    Should we take that out?
9    MR. SHIMOTA: Yes.
10    MS. WENDLANDT: Is that Page 62 of the
11 fax?
12    MR. SHIMOTA: Yes. We can do that. I'm
13 not going to ask you about it. We can do it off the
14 record. I guarantee you I won't ask you about that,
15 because I haven't read it closely.
16    Q. What is your -- what is the analytical
17 framework you applied for assessing whether
18 noninfringing -- acceptable noninfringing substitutes
19 were available to Rayovac?
20    A. I really just responded to what Mr. Phillips
21 had written.
22    Q. Okay. I am focusing on -- you make the
23 statement, and you have a prelude paragraph, and you
24 state, at the last sentence, "Or more importantly, at

Page 195

1 the time it began making its first infringing devices
2 in the fall of 2003."
3    Do you see that?
4    A. Yes.
5    Q. Why you do you think that fact is
6 significant?
7    A. Well, just my understanding that that the
8 substitutes would have had to have been available at
9 the time that the infringement occurred.
10    Q. Okay. Do you understand that in assessing
11 whether substitutes would be available you are to
12 assume that Rayovac knew that it wouldn't be able to
13 sell devices as are currently configured? Rayovac
14 had that information available to it?
15    A. We would assume that Rayovac knew that it was
16 infringing on a valid patent.
17    Q. Knew that it could not --
18    A. Okay. Uhm, I didn't know that.
19    Q. You refer to on Page 14 a passive
20 drying. Do you see that?
21    A. Right.
22    Q. I believe you state, "There is no reason to
23 believe" -- at the end of the first paragraph --
24 "Therefore, it would be acceptable to consumers now."

Page 196

1 This is passive drying.
2    Do you see that?
3    A. Yes.
4    Q. Are you aware that Braun currently sells a
5 cleaning system employing passive drying?
6    A. I read in one of the deposition -- I forget
7 which -- that they did have such a product.
8    Q. It would have been the deposition of
9 Mr. Hoeser?
10    A. I'm not sure.
11    Q. So given the fact that the Braun has a
12 passive drying product on the market, is it your
13 opinion that consumers would not purchase a product
14 that employs passive drying?
15    MS. WENDLANDT: Objection.
16    A. It's not clear whether it would be successful
17 or has been successful.
18    I have no information that says it has
19 been successful or as successful with products with
20 drying. So that piece of data doesn't change the
21 analysis.
22    Q. Well, have you asked Braun?
23    A. No.
24    Q. Would you like to ask them. Would you want

Page 197

1 to know that information before stating that the
2 products could not be -- would not be acceptable to
3 consumers?
4    MS. WENDLANDT: Objection.
5    A. I said there is no reason to believe it was
6 acceptable.
7    In other words, I wasn't -- I don't think
8 I said it is not acceptable. All I said is if
9 somebody wants to assert it would be just as
10 successful a product, they would have to back that
11 up.
12    Q. Okay. So you're not offering affirmative
13 evidence that the product would not be successful or
14 would not be acceptable to consumers?
15    A. Correct. I am only pointing out the lack of
16 evidence saying this it would be acceptable to the
17 consumer.
18    Q. And you don't think the fact that Braun has
19 the product on the market is evidence it would be, at
20 least Braun thought it might be acceptable to
21 consumers?
22    MS. WENDLANDT: Objection.
23    A. That would be conjecture. Assume? Lots of
24 product fail. I mean, some succeed.

50 (Pages 194 to 197)

Samir Nayfeh, Ph.D.                                                          08/26/2005

Page 198

1    Q. Well --
2    A. Well, it doesn't prove such a product would
3    be acceptable.
4    Q. Okay. So you don't know one way or the other
5    whether the products is acceptable?
6    A. Correct. I only know that I have no evidence
7    to show that it is acceptable.
8    Q. Would you assume -- are you aware that Braun
9    sells the cleaning bases without shavers in them,
10   separately?
11   A. I don't recall reading that.
12   Q. Okay. Would it surprise you that Braun sells
13   cleaning bases with and without dryers for exactly
14   the same price?
15        MS. WENDLANDT: Objection.
16   A. That they are exactly alike products, except
17   for the lack of the dryer, for the same price?
18   Q. Well, you are aware that there are basically
19   three different types of cleaning bases that are
20   offered by Braun now: One, the old one with the
21   tower and the fan; the second, no tower, no dryer;
22   and the third, no tower induction heater? Are you
23   aware of that?
24        MS. WENDLANDT: Objection.

Page 199

1    A. My knowledge of these is what I read in
2    Hoeser's deposition -- I believe it was Hoeser -- and
3    sort of advertisements and Web pages you come across,
4    but I hate to say anything like that, because I
5    didn't really study Braun's product line.
6    Q. Let me ask this: Would it be your
7    expectation that consumers would pay more for a
8    device with an active drying system than they would
9    for a device with a passive drying system?
10        MS. WENDLANDT: Objection.
11   A. If that were the only difference between the
12   products?
13   Q. Yes.
14   A. I think an educated customer would want one
15   that dried faster, and I don't know how things are
16   marketed and presented to the customer, to say what
17   the customer might pay or not pay.
18   Q. So you would assume that, all other things
19   being equal, Braun would charge more for a device
20   that has a dryer than one that does not?
21        MS. WENDLANDT: Objection.
22   A. I think market dynamics and business dynamics
23   can be counterintuitive. So I would not like to
24   offer comment on how they offer things.

Page 200

1    Q. Well, is it fair to say -- I mean, you are
2    not really -- you don't have expertise in the area of
3    what consumers would or would not want in these types
4    of devices at issue in this litigation?
5        MS. WENDLANDT: Objection.
6    A. I am going here mostly on what I have read
7    in, say, Hoeser's or Pahl's or Braun's deposition.
8    I am not an expert on the market for
9    personal shaving apparatus.
10   Q. I assume at trial you won't offer any
11   opinions as to what consumers may or may not want in
12   a product?
13        MS. WENDLANDT: Objection.
14   A. I haven't thought about what will happen at
15   trial.
16   Q. Well, I mean, do you ever envision yourself
17   in a situation where you held yourself out to a jury
18   as an expert in the marketing of what consumers would
19   and would not want in a product such as what we're
20   talking about in this litigation?
21   A. I haven't envisioned it.
22        For some types of products, I might feel
23   comfortable doing that. It's a very big
24   hypothetical.

Page 201

1    Q. Well, let's make it for these products, the
2    Rayovac and Braun products at issue in this
3    litigation.
4        Would you feel comfortable providing
5    expert testimony as to the business dynamics for
6    these products, for the cleaning center products?
7    A. I wouldn't envision doing that.
8    Q. You seem to imply, based upon Mr. Chasen's
9    testimony, that drying time is critical for these
10   types of cleaning systems; is that correct?
11        MS. WENDLANDT: Objection.
12   A. I --
13   Q. 14.
14   A. I want to see who I quoted. I think various
15   people talked about that. But here I quote or
16   paraphrase Mr. Chasen saying that drying time was
17   critical, yes.
18   Q. Do you agree with Mr. Chasen?
19        MS. WENDLANDT: Objection.
20   A. I don't have a basis for surveying, and I
21   don't think Mr. Chasen had a basis for asking or
22   answering the question of what market penetration
23   would be for a system that dried in various amounts
24   of time.

51 (Pages 198 to 201)

Page 202

1    It seems that Mr. Chasen, like Mr. Braun
2  and others, had the notion that the faster the thing
3  dried, the happier the customer would be, and they
4  designed and invented around that.
5    Q. How often do you shave during a day?
6    A. I may be a bad example. I shave maybe once a
7  week.
8    Q. Say, for the user who shaves once a day,
9  would you agree with me it would be sufficient if the
10 razor dried within 24 hours --
11        MS. WENDLANDT: Objection.
12   Q. -- assuming you cleaned it every day, too?
13        MS. WENDLANDT: Objection.
14   A. First of all, I already said I don't -- I am
15 not providing my own intuitions here.
16        If I were to provide a speculative
17 answer, you are assuming that people always remember
18 to clean after they shave, but it's quite possible
19 that somebody might fail to do that and then put it
20 into clean, you know, 20 minutes before he expects to
21 shave.
22   Q. So for that user or subset of users that
23 would be unacceptable for people who use the device
24 as instructed, drying time wouldn't matter?

Page 203

1    A. Again --
2        MS. WENDLANDT: Objection.
3    A. -- with the big disclaimer that I'm not an
4  expert, not providing my own opinions as to what the
5  consumer would want.
6        Another example is your going to travel.
7  You shave. You clean your shave and then want to
8  pack it.
9        I mean, most people are not systemic
10 enough that they could always expect to wait 24
11 hours.
12   Q. I think you said, though, you are providing
13 this from intuition and you are guessing about
14 consumer's needs; is that correct?
15        MS. WENDLANDT: Objection.
16   A. Yes. I answered that question only to
17 provide a few examples, but I can't give numbers or
18 quantitative notions as to what -- how big a
19 difference it would make in the market.
20   Q. Okay. In the second paragraph, it's just a
21 sentence, you state, "There is moreover no suggestion
22 by Mr. Phillips that Rayovac had considered such a
23 design either at past or in the -- either in the
24 presence or in the past."

Page 204

1    A. Correct.
2    Q. Is it your belief that Rayovac lacks the
3  technical capability to take the fan out of its
4  cleaning device?
5        MS. WENDLANDT: Objection.
6    A. No.
7    Q. I mean, you would agree it wouldn't require
8  -- it wouldn't be an engineering challenge to take
9  the fan out?
10        MS. WENDLANDT: Objection.
11   A. Not an engineering challenge. It would take
12 some time and work.
13   Q. Would it require anything more than routine
14 engineering?
15   A. Well, you again get to something vague.
16        I mean, if the question is whether you
17 could come up with this idea and describe how to do
18 it, but it seems to me the question Mr. Phillips was
19 addressing was from coming up with this idea to
20 getting your product on the market and in stores, and
21 there's a lot more to that than describing how you
22 were going to do this.
23   Q. Okay. Let me ask you this question: Let's
24 assume that in the fall of 2003 the government came

Page 205

1  to Rayovac and said: You are not allowed to have a
2  dryer in your cleaning device.
3        Do you think it would have required much
4  engineering work for Rayovac to take the fans out of
5  its products at that time and sell a device that
6  employed passive drying?
7    A. Again, the term "much engineering work" is
8  kind of a broad thing. You would at a minimum have
9  to go into your manufacturing process and your
10 documentation and your supply chain and make a lot of
11 changes. So I don't know if you consider that a lot
12 of engineering.
13   Q. That's probably vague. Certainly -- I won't
14 say "certainly."
15        Don't you agree it wouldn't have been
16 technically infeasible? No double negative.
17        Would you agree that it would have been
18 technically feasible to do that in the fall of 2003
19 if Rayovac were forced to take the dryer out?
20   A. And how soon start selling these without the
21 dryer?
22   Q. Well, how long do you think it would take
23 them to do it?
24        MS. WENDLANDT: Objection.

Samir Nayfeh, Ph.D.

08/26/2005

Page 206

1    A. I would have to speculate, but -- as I
2  described, depending on the organization, your
3  manufacturing, all those things would have to come --
4    Q. Do you think this would be a matter of years?
5  A matter of months?
6    A. I don't know. It would really depend on the
7  efficiency of -- the rapidity with which they can
8  implement these kinds of changes across sort of a big
9  enterprise. I would hate to give a time.
10   Q. So, you sitting here, you have no opinion
11 expressed in your report as to how long it would take
12 Rayovac to implement that change as a technical
13 matter; is that correct?
14   A. I don't believe I gave any kind of estimate
15 of that.
16   Q. And is that something that you considered
17 before today?
18   A. That I considered -- sorry, what was the
19 question?
20   Q. Have you considered how much time and effort
21 it would take for Rayovac to implement the removal of
22 the drying device from its cleaning centers?
23   A. No.
24   Q. Below that is the induction heating. Do you

Page 207

1  see that?
2    A. Yes.
3    Q. Are you aware that Braun has a product on the
4  market which employs induction heating as opposed to
5  using a fan for drying the shaving head?
6    A. Yes.
7    Q. Do you offer any opinion in this report as to
8  how much time and effort it would require Rayovac to
9  change its cleaning system to remove the fan and
10 instead incorporate an induction heater for drying?
11   A. No.
12   Q. And have you considered that question?
13   A. Again, no.
14       It would require I know a lot more about
15 Rayovac, its internal workings, to be able to make
16 that kind of estimate.
17   Q. Did you request any information regarding
18 Rayovac's inner workings?
19   A. No.
20       I should also mention I didn't -- I
21 didn't think I needed to -- I didn't think it was
22 necessary for me to provide such an estimate. All I
23 did was really respond to Mr. Phillips' assertions.
24   Q. Again, just going back with respect to the

Page 208

1  noninfringing substitutes.
2       You don't expect to be offering any
3  affirmative testimony at trial with respect to these
4  substitutes; is that correct?
5       MS. WENDLANDT: Objection.
6    Q. Let me withdraw that question.
7       You don't expect to be testifying at
8  trial as to whether or not Rayovac has the ability to
9  implement the substitutes that Mr. Phillips proposes
10 in his expert report?
11      MS. WENDLANDT: Objection.
12   A. I don't expect to, but if Mr. Phillips
13 provides some argument or somebody else from Rayovac
14 provides some argument saying this is how we could
15 have done it in this much time, then I would feel
16 quite comfortable looking at the technical aspects of
17 that and saying -- and responding, depending on what
18 the contents of the argument are.
19      So all I have done so far is Mr. Phillips
20 would say such and such and such, and I would say,
21 but he fails to show these things, but I don't think
22 I need to do more than that.
23      If he provides a more detailed argument,
24 then I may -- I would anticipate arguing a response.

Page 209

1    Q. Okay. On the next page, Page 15, you discuss
2  what you call the "cradle structure covers"?
3    A. Yes.
4    Q. Do you think it would require -- well, how
5  much effort do you think it would require Rayovac to
6  put plastic covers on the cradles?
7    A. This question is similar to earlier ones that
8  I couldn't answer.
9    Q. For this one in particular, do you think this
10 would be an engineering challenge?
11      MS. WENDLANDT: Objection.
12   A. The words "engineering challenge" is part of
13 the story; and as we said, you would have to change
14 your manufacturing, packing, so on and so on.
15      It doesn't require, I think, a lot of
16 inventiveness, but I think all of the comments were
17 made with respect to the passive drying apply here.
18   Q. And those remarks would be you don't how much
19 time and effort it would take?
20      MS. WENDLANDT: Objection.
21   A. I would agree I can't say how long it would
22 take to implement this change.
23   Q. Let me ask you this: If you were assigning
24 this project to students at MIT and you brought in

LegaLink Boston
(800) 822-3376

Page 210

1  Rayovac -- you teach laboratory courses, correct?
2      A. Yes.
3      Q. And you asked your students at MIT to be able
4  to take Rayovac's existing device and put a lid or
5  cover on it, how long would you expect would be a
6  reasonable amount of time for them to complete that
7  project?
8      A. You're asking to put a cover on a prototype
9  on the bench in our lab?
10     Q. Take Rayovac's device as it stands today.
11     A. Yeah.
12     Q. The prototype, what it would have been in its
13 final stages of development.
14     A. Okay.
15     Q. Say you need to put a cover on this hole that
16 the shaver head goes into.
17     A. That one prototype, or put a cover on that
18 shaver, pull it into the production line, and make a
19 mass produced -- integrate the product and get the
20 product on market or do it in the lab?
21     Q. Let's start with put the cover on in the lab.
22 Finish design.
23     A. Our students aren't all that good.
24     Q. At MIT?

Page 211

1      A. At this kind of thing? Absolutely not.
2      To do it right, probably weeks.
3      Q. A couple weeks for a student at MIT to
4  complete that design?
5      A. I mean, to do it to the standard that a
6  professional at Braun, or someone would do, I would
7  think at least a month.
8      Q. With respect to taking the fan out. I am not
9  taking about put it into production and those issues,
10 but completing the design, how long would you expect
11 for one of your students to take to complete that
12 project in a laboratory course?
13     A. Well, if you gave them a lab prototype and
14 you said disable the fan, they could do that quite
15 quickly, say, shorting the leads on the motor, but
16 that wouldn't be anything close to what you could do
17 if you wanted to, say, sell that thing.
18     Q. What else would you have to do if you sell
19 it?
20     A. You can't -- I don't think you can sell a
21 thing with shorted leads that you pumping current
22 toward.
23     Q. Okay. I understand.
24     A. So I think -- so you would have to take out

Page 212

1  stuff. You would have to change the molds and the
2  tooling for the stuff around there.
3      You wouldn't want to have that chamber in
4  which the blower sits without the blower or anything
5  in there.
6      See, that retooling is very time-
7  consuming. Almost any manufacturing change you want
8  to make in a mass-produced item like this is
9  surprisingly time-consuming.
10     So for the student to redesign it so that
11 you would have professional grade product, without
12 the blower and fan, I think, again, would be at least
13 a month.
14     Q. Okay. You also cite in the middle paragraph,
15 with respect to the cradle structure covers,
16 statements in the '328 and '556 patent regarding
17 advantages of the -- of having the cradle open as
18 opposed to having a lid?
19     A. Yes.
20     Q. Are you relying upon what is stated in the
21 '328 patent and the '556 patent for evidence of what
22 consumers would or would not prefer?
23     A. I'm relying on it, yes.
24     Q. For what?

Page 213

1      MS. WENDLANDT: Objection.
2      A. Okay. I am relying on the statements in the
3  patents to tell us -- as written here, relying on the
4  statements in the patents to tell us that a product
5  without the need for cover or without a cover is an
6  advantage.
7      One advantage I think that is mentioned
8  in the patent, although it is not quite quoted here,
9  is that it makes easier to use.
10     The patent may also have -- I don't
11 recall, but it may mention more advantages:
12 simplicity, low cost or something like that.
13     Q. With respect to the next -- bracket without
14 vertical projections. Do you see that?
15     A. Yes.
16     Q. Have you taken into the account the fact that
17 Braun now sells a product without a bracket?
18     A. Well, I haven't looked at that product, and I
19 think -- let me make sure I -- so I think the
20 question is whether eliminating the vertical
21 projection eliminates the bracket or renders this
22 thing not a bracket?
23     Q. Well, is the vertical projection in Rayovac's
24 devices a part of the cradle structure?

Page 214

1    A.  The vertical projection in Rayovac's devices
2  is not part of the cradle structure.
3    Q.  So Mr. Phillips is proposing that you get rid
4  of that vertical projection?
5    A.  Okay.
6    Q.  You understand that, correct?
7       MS. WENDLANDT:  Objection.
8    A.  Well, sort of seeing a drawing of it, it is
9  not clear exactly what the proposal -- what exactly
10  the proposed design is.
11    Q.  Have you asked Braun to see Braun's products?
12    A.  No.
13    Q.  Were you curious how they got rid of the
14  vertical support?
15    A.  Not particularly.
16    Q.  Why?
17    A.  Because I think the real question is if you
18  want to eliminate the bracket, is eliminating the
19  projection -- and the projection -- so the Rayovac
20  device -- so even if you made that vertical much
21  smaller or made that structure so broad that it
22  appeared not to be a distinct projection, you would
23  still have this projecting support that forms U-shape
24  -- the '328 specification -- uhm, you know, the '328

Page 215

1  specification says that the bracket, along with the
2  cradle, form a U-shape thing into which you insert
3  the shaver, and it's not clear to me if I shorten 10,
4  make the cradle deeper, that I still wouldn't have
5  that bracket that projects out to create the U-shape
6  to somehow enclose the shaver.
7    Q.  Is it your opinion, then, it is not possibly
8  to design a cleaning device of that sort without
9  including a bracket?
10       MS. WENDLANDT:  Objection.
11    A.  No.
12    Q.  Do you misunderstand what Mr. Phillips is
13  saying about making the cradle deeper to bear more of
14  a load?
15       MS. WENDLANDT:  Objection.
16    A.  Well, it's rather vague.
17       In other words, it -- I don't think I
18  misunderstand, but what I -- what is unclear to me is
19  whether he's going to get rid of a projecting support
20  altogether.  What he mentions, I believe, is
21  eliminating the vertical projection.
22    Q.  Okay.
23    A.  And that's all I say here is that eliminating
24  the vertical wouldn't eliminate the need for

Page 216

1  projected support.
2       So just by saying he is going to make the
3  cradle deeper, make it shorter, he hasn't showed us
4  something that doesn't have a bracket.
5    Q.  Okay.  Let's go back to your real-world
6  hypothetical again.
7       How difficult of a project would it be to
8  assign to your students, taking the laboratory
9  course, taking Rayovac's device, and their assignment
10  is to remove the bracket?
11    A.  Oh, that's very difficult.  I don't think
12  they would do it in a semester.
13    Q.  Why would that be very difficult?
14    A.  You would have to change the dimensions of
15  many things.
16       Second, we haven't quite spelled out how
17  to get rid of the bracket yet.  So I would be saying
18  to them come up with something that doesn't involve a
19  bracket and define for them the bracket, and I can't
20  yet based on this suggestion tell them how to do
21  that.
22       Second, the changes you would be making
23  to this system are -- there are a lot of changes.  So
24  it seems quite difficult to me.

Page 217

1    Q.  So this would be a hard project as opposed to
2  take out the fan and put on the cover?
3       MS. WENDLANDT:  Objection.
4    A.  I didn't say any of them were easy, but I
5  would say this is more difficult.
6    Q.  We need to talk about the air-drying system,
7  too.
8       With respect to the air-drying system,
9  you don't disagree that that -- the gas-cleaning
10  system --
11    A.  Gas-cleaning.
12    Q.  Gas-cleaning.  Pardon me.
13       That the gas-cleaning system wouldn't
14  infringe the '328 patent, do you?
15       MS. WENDLANDT:  Objection.
16    A.  I don't think I have rendered an opinion on
17  that.  That's a pretty big statement.  So that would
18  require a little thought.
19    Q.  Really?  What would you have to think about?
20       MS. WENDLANDT:  Objection.
21    A.  I would just want to go back through claims
22  and construction and make sure that it didn't read
23  upon it.
24    Q.  Well, someone who employs gas, would that

55 (Pages 214 to 217)

Samir Nayfeh, Ph.D.

08/26/2005

Page 218

1  have a cradle that would receive or retain fluid?
2      A. I think not.
3      Q. Do you offer any opinion with respect to
4  whether or not consumers would like or dislike a
5  gas-cleaning system as opposed to a liquid-cleaning
6  system?
7      A. Again, I think that I only drew from
8  Mr. Chasen's testimony.
9          So I don't think I -- I don't think I
10 offer any sort of homemade marketing survey.
11     Q. Okay. And you don't think you would be
12 qualified to do that, correct?
13     A. Given the data, I think I could do it, but
14 just...
15     Q. As an expert in the sense of testifying in
16 court?
17         MS. WENDLANDT: Objection.
18     A. That's, again, a large hypothetical.
19         Potentially depending on the type of data
20 that I'm given, I know the basics of this.
21         Of course, I would suggest they maybe get
22 a more expert consumer products marketing person to
23 do it, but I...
24     Q. Okay. Paraphrasing a bit, I will see if you

Page 219

1  agree with me here.
2          Your opinion with respect to the
3  gas-cleaning system is essentially you can't tell
4  whether Mr. Chasen has this system ready to go or
5  not; is that correct?
6          MS. WENDLANDT: Objection.
7      A. In fact, I would say there are indications
8  from what is provided to us that he doesn't have it
9  ready to go. So it is a little bit stronger
10 statement than we can't tell if it is ready to go.
11     Q. Would it surprise you -- well, are you aware
12 that the trial is currently set for October?
13     A. I didn't realize that it was set.
14     Q. Scheduled. Pardon me. You are right.
15         Currently scheduled for October?
16     A. Yes.
17     Q. Would it surprise you if Rayovac had a
18 completed gas-cleaning system by October?
19         MS. WENDLANDT: Objection.
20     Q. I mean not a prototype, but one that would be
21 ready for commercialization?
22         MS. WENDLANDT: Objection.
23     A. Not necessarily. If they put enough
24 resources onto a project like that, they could do it

Page 220

1  pretty quickly.
2      Q. How quickly do you think they could do it if
3  they put enough resources on it?
4          MS. WENDLANDT: Objection.
5      A. That's one I already have had so much trouble
6  answering.
7          Of course, I should say, that there are
8  indications from what we have seen that they are not
9  close to ready.
10         If they had other stuff, in other words,
11 it's not clear they have necessarily shown us their
12 most advanced thing as of the date of the report and
13 deposition.
14         Again, this is another way in which they
15 could be ready.
16     Q. Okay. Did you review the report of Laura
17 Stamm in connection with your analysis of
18 noninfringing substitutes?
19     A. I don't think so.
20     Q. So you have no opinion -- sitting here today,
21 you have no opinion whatsoever as to what she had to
22 say about noninfringing substitutes?
23         MS. WENDLANDT: Objection.
24     Q. If at all? If anything?

Page 221

1      A. I don't recall seeing any such report.
2      Q. You can't comment on what you have not seen?
3      A. Yes. Yes.
4      Q. If you heard about it, maybe you could.
5          One last question. Are you aware that
6  Mr. Phillips opines upon, how it referred to, as
7  secondary considerations of nonobviousness in his
8  report?
9      A. I seem to recall that, yes.
10     Q. Am I correct that you do not offer any
11 opinions on secondary considerations of
12 nonobviousness, right?
13     A. I don't recall having done so.
14         At most, I might have quoted somebody. I
15 don't recall giving any opinions on that.
16     Q. I mean, can you say one way or the other
17 whether you have?
18     A. To be definitive, I would have to read --
19         MS. WENDLANDT: Jim, we can stipulate
20 that if it is not in the report, he hasn't opined on
21 it, or he can sit here and read it.
22     Q. I don't want you to read it.
23     A. I could be proven wrong, because I have
24 thought about these issues, but I don't recall

56 (Pages 218 to 221)

Samir Nayfeh, Ph.D.

08/26/2005

Page 222

1 writing about it.
2          MR. SHIMOTA:  That being said, thank you
3 for your time.  I have no further questions.
4          MS. WENDLANDT:  No questions.
5          THE VIDEOGRAPHER:  This marks the end of
6 videotape number three in the deposition of Samir
7 Nayfeh.  We are going off the record.  The time is
8 4:30.
9      (The deposition was adjourned at 4:30 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 224

1 COMMONWEALTH OF MASSACHUSETTS )
2 SUFFOLK, SS        )
3
4 I, Deborah L. Roth, and Notary Public in and for the
5 Commonwealth of Massachusetts, do hereby certify
6 that there came before me on August 26, 2005, the
7 person hereinbefore named, who was by me duly sworn
8 to the truth concerning any knowledge in this cause;
9 that that person was thereupon examined under oath,
10 and the examination reduced to typewriting; and that
11 the deposition is a true record of the testimony
12 given by the witness.
13 I further certify that I am neither related to nor
14 employed by any attorney or counsel employed by  the
15 parties hereto or financially interested in the
16 action.
17 In witness whereof, I have hereunto set my hand this
18 29th day of August 2005.
19
20
21 DEBORAH ROTH, Notary Public
22 My commission expires: 2/7/08
23
24

Page 223

1      E R R A T A   S H E E T
2      I, Samir Nayfeh, do hereby certify
3 that I have read the foregoing transcript of my
4 testimony, and further certify that it is a true and
5 accurate record of my testimony (with the exception
6 of the corrections listed below):
7 Page ____ Line ____    Correction
8 ____ ____ _____ _____
9 ____ ____ _____ _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 ____ ____ _____ _____
19
20 Signed under the pains and penalties of perjury this
21 ____ day of _____, 2005.
22          _____
23
24          Samir Nayfeh

57 (Pages 222 to 224)

## A

**ability** 8:23 208:8
**able** 12:24 14:1 17:2,10
  36:19,22 40:21 54:21
  58:6 77:8 126:7,8
  133:8 136:5,20,22
  137:7 138:3 140:7,9
  141:19 142:3 195:12
  207:15 210:3
**absence** 112:18,22
**absent** 54:10 113:11
**absolutely** 125:12,15
  211:1
**acceptable** 194:18
  195:24 197:2,6,8,14
  197:16,20 198:3,5,7
**access** 117:3
**account** 113:7 213:16
**accumulating** 152:20
  152:20
**accurate** 29:19 44:2,3
  109:15 140:1 223:5
**accurately** 9:13
**acetone** 163:23 164:2
**act** 10:4 62:2 72:10,10
**acting** 46:21 47:3,7,8
**action** 1:4 7:15 224:16
**active** 45:14,19,23
  54:20,20 55:9,10,11
  199:8
**acts** 46:3 52:24
**actual** 72:19
**adaptation** 40:9
**adapted** 37:23 39:11
  39:12,24 40:3,5,6,12
  40:24 41:5,13 42:12
  43:1,16,19 44:9,10
  44:11,12,17,19,23
  58:9,15 59:3,8,13,15
  59:16 77:23 78:14
  89:20 92:1 123:9
  134:9 137:2 139:8,10
  140:2,4 141:23 178:9
  178:14 180:4
**adaptive** 60:3,4,10
**add** 186:15
**addition** 53:12 108:13
  164:11 166:12
**additional** 23:13 36:8
  63:11 129:7 168:14
**address** 4:16
**addressed** 128:4
**addressing** 204:19
**adequate** 155:11
**adjourned** 222:9
**advanced** 155:19

220:12
**advantage** 213:6,7
**advantages** 212:17
  213:11
**advertisements** 199:3
**aerosol** 102:10,13,20
  104:19 105:23 106:6
**affect** 164:12
**affirmative** 197:12
  208:3
**affording** 190:10
**agitation** 118:14,19
  119:2,3,4,7,9,11,17
  119:19
**ago** 8:3 21:8 117:19
  139:14
**agree** 10:4 11:20 28:21
  33:2 41:6,9 59:22
  69:9 71:20 72:2 77:6
  82:9 88:2 89:7,19
  97:18 102:7 103:15
  105:19 106:14,17
  143:2 144:10 145:11
  145:20 158:14,16
  163:4 164:7,11
  165:18 166:10
  167:14 181:21
  185:17 201:18 202:9
  204:7 205:15,17
  209:21 219:1
**agreed** 12:6 29:1 49:23
  70:4 87:16 97:19
  98:1 116:6
**agreement** 9:24 15:6
**ahead** 178:6
**aid** 52:18 79:15,24 80:1
**aiding** 79:21
**aids** 52:23
**air** 81:8,17,22 82:2,5
  82:11,17 83:6,8,9,12
  86:1,4,8,11,13,17
  87:1,20,22,22 88:2,3
  88:4,15,16,16 94:14
  124:15,17,23,24
  185:3,7,9 186:7
  187:1,2,9,11 188:7,8
  189:9,15
**airstream** 124:14
**air-drying** 217:6,8
**akin** 113:12
**alcohol** 124:16,17,23
  164:4
**alcohols** 162:22 163:22
**alcohol-based** 163:1,5
  163:9
**alike** 198:16

**alleged** 24:5,8 155:2
**allow** 126:14,17
**allowed** 170:15 187:9
  205:1
**alternative** 127:9
  152:18 153:9
**alternatives** 152:16
**altogether** 215:20
**American** 154:6
**amount** 80:3 210:6
**amounts** 201:23
**analogous** 13:9,21
  14:14,15,16,17,22,23
  15:1 137:12 179:8
**analogy** 70:21 149:5
**analysis** 54:24 55:19
  114:1,17 189:16
  196:21 220:17
**analytical** 133:5 142:12
  194:16
**analyzed** 14:20 83:3
**answer** 9:12 12:22
  16:13 21:5 62:19
  68:21 96:10 97:16
  119:21 122:24
  151:21 157:17 159:2
  160:9,12 161:4 162:8
  167:23 176:21 179:2
  179:4,5 182:24 183:7
  189:11 202:17 209:8
**answered** 158:23
  203:16
**answering** 201:22
  220:6
**answers** 8:22 18:19
  31:7,8 179:5
**anticipate** 75:16 89:16
  208:24
**anybody** 50:20
**anyways** 80:2 154:4
  162:16
**aperture** 121:6
**apparatus** 13:9,13 14:8
  34:1,12,15,22 37:24
  38:5,7,8,10,11,19,23
  39:3,8,13 40:4 41:1,5
  41:14,19,21 58:10,17
  77:24 78:6,15,22
  79:2 83:14,22 85:6
  89:21 90:3 91:22
  92:2,9 128:3 136:21
  137:3,8 139:11 140:5
  140:8,10,11 141:24
  142:4 190:5 200:9
**apparently** 57:13
**appear** 5:1 40:8

**appeared** 214:22
**appearing** 4:8,10,21
**appears** 31:3 106:20
  134:1 154:13
**applicable** 120:1
**application** 154:2,5,6,9
  154:10,21 161:23
  162:12
**applications** 162:22
**applied** 194:17
**applies** 52:12 85:6
  140:13
**apply** 52:7 81:9 165:13
  209:17
**approaches** 149:19
**approximately** 8:3 9:20
  17:3,10 25:8 28:14
  28:15 43:18 169:13
**approximation** 113:4
**April** 9:23
**area** 93:8 158:24 200:2
**areas** 93:14 119:6
**arena** 93:19
**Argaez** 2:4
**argue** 153:10
**argued** 59:2
**arguing** 208:24
**argument** 13:7 14:22
  51:19 58:13 111:2
  155:10,19,20 208:13
  208:14,18,23
**arguments** 116:21
  147:2
**arranged** 91:1 108:23
**arrangement** 120:4,13
  120:14 183:24 190:8
**arrive** 120:3
**arrived** 18:24 134:19
**art** 11:21 12:11,13,20
  13:9,13,18,21 14:6
  14:14,17,23 15:1,5
  16:8,21,22 17:5 24:5
  24:5,8 48:21 50:20
  54:8 55:4,15 64:16
  101:7 117:12 120:3
  120:22 126:7,8
  130:19 131:8,15
  133:8 135:3 137:12
  162:24 164:19 165:1
  165:7,23 166:15
  177:21 190:12
**artisan** 126:1 168:7
**Asada** 18:16 19:11
**aside** 21:20 22:4 27:4
  30:10 32:20 60:19
  61:18 76:24 144:10

145:5 191:5
**asked** 23:8 28:23 59:7
  60:8 150:13 151:19
  158:22 159:21,22
  161:9,15 196:22
  210:3 214:11
**asking** 10:5 23:1 35:23
  47:7 49:2 51:21 55:8
  57:4 63:22,24 72:12
  72:14 75:6 85:15,17
  115:2 117:15 126:9
  143:10 158:11
  201:21 210:8
**asks** 151:10 158:6
**ASM** 6:20 8:5
**aspects** 17:17 208:16
**assembled** 38:19 110:1
**assert** 116:12 197:9
**asserted** 84:16,17
**assertions** 207:23
**assessing** 194:17
  195:10
**assign** 216:8
**assigning** 209:23
**assignment** 216:9
**assistant** 10:19
**associate** 10:18 11:5
**assume** 5:15 27:1 97:14
  104:21 111:22 112:4
  112:7,12 174:2
  195:12,15 197:23
  198:8 199:18 200:10
  204:24
**assuming** 104:13 152:9
  193:6 202:12,17
**atmosphere** 80:15,20
  80:23 82:3,6,22
  83:24 84:1,2,13 85:2
  85:3 87:23 88:6 89:8
  89:23 94:8 120:1,9
  123:11,15 183:23
  184:14 187:4,14,16
  188:1,11,12,20 189:5
  189:21,24
**atmospheric** 124:24
**attached** 61:9 166:24
**attaching** 107:17
**attempt** 160:7 161:15
  161:17
**attention** 135:11
  140:21 157:11 169:7
**attorney** 224:14
**attorneys** 7:21
**August** 1:14 224:6,18
**automatic** 64:11
**available** 194:19 195:8

195:11,14
aware 49:23 50:3 78:21
  79:1 84:23 96:20
  99:5,12,16,24 110:17
  116:6 117:12 196:4
  198:8,18,23 207:3
  219:11 221:5
awkward 188:20
A-S-A-D-A 18:16
a.m 1:15

_____ B _____
B 67:19 70:6 171:10,10
bachelor's 12:3,7
back 8:20 15:4 19:9
  21:7 24:4,14 26:23
  27:8,21 28:2 29:3
  34:24 55:23 56:7
  61:17 68:24 69:1
  70:14 72:8 74:22
  93:3,21 99:17 116:24
  119:9 134:12,16
  154:24 155:6 156:19
  169:7 174:20,20
  176:23 183:8 190:15
  192:14 197:10
  207:24 216:5 217:21
background 12:23
  15:17,20 22:24 106:2
back-and-forth 26:18
bacteria 95:24 96:4
bad 71:18 75:10 97:6
  202:6
ballpark 28:13
bank 29:15
bar 104:12
barber 35:3 45:14
  46:20 47:1 61:11
  79:16
barber's 79:16
base 48:8 51:12 174:8,8
based 31:2 62:6 84:9
  84:11 91:5,23 149:21
  152:6 168:1 176:1
  201:8 216:20
bases 48:6 198:9,13,19
basic 15:17,22,23 16:1
  16:6 106:8
basically 64:23 76:16
  84:6 122:20 148:10
  198:18
basics 218:20
basin 190:24 191:2,3
basing 161:20
basis 201:20,21
basket 58:2,19 66:5

137:21 140:24 141:3
  141:8,10,18,22 142:2
baskets 139:15,21
bathed 160:9
bear 179:9,22 180:1,15
  180:17,21 215:13
bears 178:14,16
began 51:11 195:1
beginning 69:24 73:21
  73:22 74:2,12 93:4
  154:16 156:20
begins 24:13 72:7
  73:11 74:7 75:2,5
behalf 4:8,10
belief 204:2
believe 8:4 9:7 11:2
  19:20 22:18 30:8
  32:9,12 34:14 41:12
  44:2 58:22 66:13
  68:18 73:9 75:19
  94:9 96:24 107:2
  123:19 134:3 156:3
  166:23,24 182:20
  195:22,23 197:5
  199:2 206:14 215:20
believed 7:8
belts 71:4
bench 210:9
beneath 191:3
beneficial 124:5
benefit 139:18
best 8:23 151:18
  162:18
better 16:15 70:21
  112:14 149:22
  150:12,13,14,16
  151:3
beyond 5:23 19:23
  23:24 24:3 126:1
bias 64:19
big 18:7 200:23 203:3
  203:18 206:8 217:17
billed 27:18
bird's 175:16
bit 19:21 59:10 73:11
  73:15 82:19 87:21
  117:1 124:9 125:1,7
  192:15,23 218:24
  219:9
bizarre 49:12
blade 41:18
blades 33:20 38:4 43:2
  43:7,9,20 78:5
  108:18
block 148:14 149:16
  153:2

blocks 151:15
blow 121:5 122:13
blower 117:22 118:5,9
  120:20 121:24 122:3
  122:7,14,18 123:2
  125:6 212:4,4,12
blowers 18:4
blowing 124:22
book 48:11 51:13
Boston 1:18 2:7 7:16
  8:10
bottle 99:6,9,13,17
  100:4,7
bottom 57:24 78:12
  79:5 119:22 128:6
  131:7 162:19 169:10
  174:7,8,12
bowl 190:24
box 48:7 51:12
bracket 106:11,15,18
  106:21,24 107:3
  108:16 109:7 110:4
  110:10,18 115:23
  128:2,8,10,16,19,20
  128:21 129:4,11,12
  129:17,19 130:1,2,4
  130:6,11,15,17,18
  131:1,10 132:1,4,5
  132:13,14,15 178:19
  213:13,17,21,22
  214:18 215:1,5,9
  216:4,10,17,19,19
brackets 115:20 130:14
Braun 1:6 3:18 13:8
  14:13 22:2,4,7 27:19
  58:23 59:2 96:21,22
  112:5,13 116:11,12
  117:3,21 146:23
  147:3 157:1,5 159:5
  160:10 161:23 196:4
  196:11,22 197:18,20
  198:8,12,20 199:19
  201:2 202:1 207:3
  211:6 213:17 214:11
Braun's 14:21 58:24
  156:6,11 178:24
  181:22 199:5 200:7
  214:11
break 56:1 92:10
  122:16 123:1 192:9
breakdown 123:3
breaks 71:2
breathing 82:8
brief 192:8
briefs 23:17 24:1 58:24
bring 132:21

bringing 68:14 124:15
broad 13:23 205:8
  214:21
broadly 15:15
Brooks 7:24
brought 47:15 155:11
  209:24
browsed 24:21 117:17
  117:18
brushes 113:7 114:18
  152:2
building 82:23 159:11
builds 35:3
built 20:8,14 190:10
business 17:21 85:8
  134:19 185:10
  199:22 201:5
button 64:24

_____ C _____
calculate 27:21
call 5:6 101:4 107:10
  148:11 172:11 209:2
called 25:13 78:14
  109:7 128:23 151:6
calling 56:24 135:21
calls 64:15 78:22
cans 96:22 102:13,20
  104:19 105:23 106:6
capability 204:3
care 112:23
careful 31:17 91:20
caring 7:7 73:13
carried 130:3 178:18
carriers 7:7
carrying 122:2
cars 7:7
case 8:15 22:18,21 23:9
  24:4,9 50:1 58:24
  83:8 102:15 116:8
  125:1 134:8,9 146:21
  179:13 187:21
  191:22
cases 95:11 102:16
  117:18
catch 98:16,23
categorical 43:12 85:20
  105:4,7
categorically 85:13
  113:13
cause 122:15 224:8
caveats 67:23
cease 122:8
center 110:24 111:18
  111:24 112:7,12,15
  112:17,23 113:5

174:6 201:6
centers 206:22
certain 31:14 105:12
  116:3 156:13
certainly 13:23 36:6
  39:12 60:24 63:1
  103:8 104:16,17
  119:16 132:2 163:18
  163:18 177:9 188:3
  205:13,14
certify 223:2,4 224:5
  224:13
chain 135:6 205:10
chair 71:1
challenge 204:8,11
  209:10,12
challenging 71:11
chamber 212:3
chance 110:13 146:24
change 113:9 147:15
  148:17 157:24
  196:20 206:12 207:9
  209:13,22 212:1,7
  216:14
changed 154:11,17,19
  154:20 159:19
changes 124:9,11
  205:11 206:8 216:22
  216:23
characterization
  177:16 181:6
charge 199:19
charged 28:3 130:10
charging 128:9 129:2,5
Chasen 201:16,18,21
  202:1 219:4
Chasen's 201:8 218:8
checked 76:3 142:16
Chicago 2:15
choice 153:13 164:4
chronology 162:1,5,11
circumstances 105:13
cite 118:12 147:21
  212:14
cited 117:12,16,21
  118:1,7 127:24 147:1
CIVIL 1:4
claim 30:6 33:8,9 38:9
  38:10,18 39:4,9,15
  39:18,19 44:10,11,12
  45:18,19 47:17 48:22
  49:6,12,17,24 50:6,9
  50:11,23 51:5,15
  52:3,14 54:6,15 55:7
  57:6,17,20 64:15,20
  65:5 72:15 74:5

75:17 76:4,4,23
77:22 80:13,13 81:15
83:20,21 84:7,11,12
84:13,18,18,19 85:5
85:7,10,14 86:11
87:22 89:16 98:22
105:17 121:9,13,14
121:17,19 128:14
134:13 142:15,17
143:18,21,22,23,24
143:24 144:2,2,3,5,6
144:6,7,7,7,10,11,12
144:13,19,23,24
145:2,3,6 154:2,11
154:12,14,14,15,20
155:7,14 168:4,11,14
170:22 171:6,7,7
184:5 188:10 189:20
**claimed** 6:3 29:16,22
30:3,11 31:16 47:8
48:4,14 55:12,12
56:19 57:15,22 61:15
65:11 131:11 133:9
133:19 141:12
**claiming** 134:24 171:8
**claims** 29:18 42:15
47:13 48:9,15,16,18
48:20 49:4,7 53:21
54:19 55:3,6,14 63:5
63:23 64:11,14 65:1
66:14 70:1,4 74:7,8
74:19,22,23 76:19
84:17,23 85:23 88:18
97:14,15 115:12,12
118:17,18,21 120:8,9
120:22 121:18
123:15 143:5,18
154:2,8,19,22 217:21
**clarification** 9:4
**clarify** 192:19 194:6
**class** 13:20,23
**classify** 178:23
**clause** 39:17,19 41:23
56:23 70:9 71:7 72:5
91:6 105:11 134:8
**clauses** 57:6
**clean** 46:22 95:23
158:20 160:19,19
202:18,20 203:7
**cleaned** 38:20 39:3,7
47:4 79:12,16 117:23
118:8 146:5,7 202:12
**cleaner** 118:1
**cleaning** 20:17,20,20
29:15,21 30:3 33:4,4
35:4,8 36:19,22 37:1

37:2,5,6,7,9,12,15
40:22 47:3 48:6 49:8
49:11,17,18,21 51:7
51:11,15,22 52:1,19
53:8,11 54:9,11,11
54:17 56:19 57:3,5,7
58:6 61:8,9,10,15,16
62:1,3 65:11,12,14
65:22,23 66:2,3,6,8
66:10,14,21,22,23
67:4,5 68:3,10 69:5,5
69:7,8,16,17,21,22
69:22 72:7,10 73:9
73:18 74:6,9,12,21
74:23 75:2,4,5,22
76:1,5,12 77:4,8,10
77:13,15,16,18,21
80:5 82:13 83:1 84:1
91:2,2,3,15,15 94:16
95:4,12,14,17,19,23
96:4,11,14,18,21
97:3,8,9,12,15,19,20
98:1,18 99:2,4,6,9,10
99:23 100:3,8 111:21
114:22,23 117:2,21
119:1 121:24 122:2,5
123:9 124:1,4,6,23
125:3 126:18 128:11
128:16,17,21 131:18
131:19 138:4 142:23
143:3,4,7,15 144:15
145:7 146:4,10 147:8
148:19 149:11 150:8
150:12,16 151:8,11
155:22 157:15,19,20
158:2,12,17,19 159:6
159:6 160:7,8 161:16
162:23 163:1,5,9,11
163:20 164:9,12,20
165:2,5,9,12,15,20
165:24 166:8,12,16
168:8,21 169:21,23
169:24 170:7,13,16
173:16,18,19,24
174:3,6 175:1,3,7
178:12 180:4 181:23
182:1,9,15 185:16
186:1 188:13 190:9
190:11 192:2 196:5
198:9,13,19 201:6,10
204:4 205:2 206:22
207:9 215:8
**cleans** 95:10
**clear** 8:12 68:10 69:15
98:14 157:8 164:18
165:22 166:15

196:16 214:9 215:3
220:11
**clearer** 154:3
**clearly** 128:19 152:1
169:24 186:13
**clinging** 169:13
**clipper** 33:19,21,24
34:15 38:4 43:2,9,19
78:5 93:24 94:5
108:18 110:18
111:13 112:8 113:11
114:5,7,11
**clippers** 34:5,6 90:2,17
90:19 91:16 114:8
**clipper's** 114:14
**clipping** 43:6
**close** 32:9 121:4,10,20
189:4 211:16 220:9
**closed** 82:9 84:24 85:1
**closely** 194:15
**closing** 83:16 185:8
188:3,16 189:23
190:7
**cloth** 46:17
**clutch** 122:20
**clutches** 145:16
**coefficient** 114:19
**coffee** 70:16,18
**cold** 148:10
**college** 17:4
**Column** 43:17 169:12
170:11 190:4
**combination** 17:1
42:24 129:12
**come** 9:6 16:4 17:22
28:20,20 81:11 173:3
179:19 199:3 204:17
206:3 216:18
**comes** 90:24 118:11
126:16 169:20,23
**comfort** 190:11
**comfortable** 85:16
200:23 201:4 208:16
**coming** 204:19
**comment** 199:24 221:2
**comments** 209:16
**commercialization**
219:21
**commission** 224:22
**common** 48:19 70:17
71:21 131:20,21
**Commonwealth** 224:1
224:5
**communicate** 25:22,24
**communications** 26:8
26:20

**Company** 21:14,18,23
**compared** 127:14
142:14
**comparing** 54:23 55:3
55:6 120:22 149:18
182:3
**comparison** 55:1
**compartment** 125:4
**compelling** 111:9
**complete** 16:5 210:6
211:4,11
**completed** 17:8 219:18
**completely** 39:6,7 65:8
89:4 96:8 145:2
160:15
**completing** 211:10
**compliant** 179:15
181:18
**component** 180:3
**components** 38:7,15,16
50:17 100:24
**comprehensively**
117:15
**comprise** 53:11 61:1
**comprised** 49:21
**comprises** 49:9
**comprising** 49:19 51:6
51:7 52:1,19 53:8
57:21
**conceive** 146:14
**conceived** 147:6,7,24
148:18 153:20 158:1
161:13
**conceiving** 55:11
**concepts** 17:11
**concerning** 224:8
**conclude** 84:9 111:14
153:22
**concluded** 153:3
**conclusion** 111:7
**conditions** 105:17
**conduit** 32:11 179:21
180:15
**conduits** 61:24 62:14
100:23 101:2 179:8
**configuration** 123:8
**configured** 102:11
125:7 145:15,16
195:13
**conform** 43:13
**confused** 160:15,22
187:8
**confusing** 67:2
**confusion** 14:4
**conjecture** 197:23
**connection** 4:20 5:2,15

6:15 7:14,17 8:5 9:15
10:1 11:9,17 13:2
22:11 27:10,23 28:3
28:10 54:1 55:18
58:24 78:18 113:8
117:13 120:23 128:1
147:1 156:7 220:17
**consider** 13:20 22:20
48:3 50:20 51:7
55:18 58:23 65:2
93:18 95:14 130:5,11
150:1 151:11 176:11
182:23 205:11
**considerable** 120:2
**considerably** 125:8,10
**considerations** 221:7
221:11
**considered** 14:19,21
22:15,17 31:9 42:17
65:4 78:17 85:18
106:19 117:8 148:2
149:4,14 150:22
154:5 156:6 182:18
203:22 206:16,18,20
207:12
**considering** 55:14
64:19
**consistent** 103:8
142:16,19
**consists** 76:8
**constantly** 70:18
**constitute** 38:17 49:13
61:1 132:7
**construction** 44:14,22
59:14,20,21,21 60:1
60:5,9 70:5 81:18
87:9,16 88:18,22
98:2 99:1 133:24
134:4,12,17,20 135:1
139:7 142:15,18
155:8,13,15 156:2
193:7,14 217:22
**construed** 81:15
**consulted** 23:2,4
**consulting** 10:9,10
28:18
**consumer** 12:16 162:22
164:1 197:17 203:5
218:22
**consumers** 195:24
196:13 197:3,14,21
199:7 200:3,11,18
212:22 218:4
**consumer's** 203:14
**consuming** 212:7
**contact** 47:15 169:20