Gilbert Greaves    April 29, 2005

Page 118

1    THE VIDEOGRAPHER: This marks the end of tape No. 2
2  in the deposition of Gilbert Greaves. We are off the
3  record at 12:44.
4        (a brief recess was taken)
5    THE VIDEOGRAPHER: This marks the beginning of tape
6  No. 3 in the deposition of Gilbert Greaves. We are on
7  the record at 12:55.
8    MR. UELAND: Q  Welcome back, Mr. Greaves.
9        Turning back to the time line, if you look to
10  the period right shortly after 1985, there is an arrow
11  that goes down and it says, market research Japan, use
12  of wet/dry shaver. And then underneath that in a box it
13  says cleaning with water U.S.A. (Phillips).
14        Do you know what that refers to?
15    A  No.
16    Q  So you don't know if that's the same product
17  that was referred to in -- well, let me ask it this way:
18  Do you know if that refers to Phillips' version of the
19  washable shaver?
20    A  I don't know. I don't know.
21    Q  All right. Beginning in 1990 -- now, I'm
22  correct that's when you started as business management
23  director of dry shavers?
24    A  Correct.

Page 119

1    Q  What -- do you know when in 1990?
2    A  Excuse me?
3    Q  When in 1990?
4    A  January.
5    Q  So first of the year?
6    A  First of the year, yes.
7    Q  It says first prototype Braun/Dr. Pahl, do you
8  see that?
9    A  Yes.
10    Q  And then if you flip to the next page where it
11  says document, do you see where it says first prototype
12  1990?
13    A  Yes.
14    Q  Do you recall that being the first prototype?
15    A  I can't remember. I can't remember that at all.
16    Q  Okay. So you don't know if that's the one that
17  you were referring to earlier in your deposition?
18    A  That was demonstrated to me?
19    Q  Yes.
20    A  No, I can't recall.
21    MR. UELAND: Okay. Handing you what's been
22  previously marked as Defendant's Exhibit 7. There is
23  both the German version and the English translation
24  attached to that document. I don't know which you feel

Page 120

1  more comfortable with. I suppose from your earlier
2  answer it would be the English department. And that's
3  the one that is clipped to the back of that. So you can
4  just take the clip right off, sir, and you can just look
5  at the English document, if you want.
6        (Exhibit 7 previously marked and tendered.)
7    MR. UELAND: Q  I'm going to just point you right
8  now to paragraph 4 of that document. And this is a
9  statement that was sworn to by Gebhard Braun. He says,
10  "From 1992 to 1995 I worked under the supervision of
11  Dr. Dietrich Pahl, director of research and development
12  for shavers in Braun's product development group."
13        Do you see that?
14    A  Yes.
15    Q  Okay. And underneath that in paragraph 5 it
16  says, "In 1992 Dr. Pahl asked me to develop further a
17  device for cleaning dry shavers," and then it says "(the
18  "cleaning center") that he had been developing."
19    A  Yes.
20    Q  "He showed me technical drawings, functional
21  models, and a prototype of the cleaning center."
22        Do you see that?
23    A  Yes.
24    Q  Okay. Do you understand from reading that that

Page 121

1  work on the cleaning center project began at least as
2  early as 1992?
3    A  Yes.
4    Q  Were you aware of Dr. Pahl's work on the
5  cleaning center project?
6    A  I can't remember. I can't recall it.
7    Q  Okay. Were you aware of Dr. Braun's being asked
8  to be involved in the project beginning in 1992?
9    A  I can't remember. ·I don't know.
10    Q  If this prototype was developed in 1990 as it
11  indicates in this time line, does it seem more plausible
12  to you that, in fact, it was Dr. Pahl who developed the
13  prototype instead of, as the time line indicates,
14  Braun/Pahl?
15    A  I can't make a judgment on that.
16    Q  I mean, it says in that paragraph 5, "He showed
17  me technical drawings, functional models and a prototype
18  of the cleaning center."
19        I mean, does that indicate to you that the
20  prototype was already designed before he asked Braun to
21  start working on the project?
22    A  I'm not qualified to make a judgment on that. I
23  don't have the technical background.
24    Q  What technical background do you think that that

31 (Pages 118 to 121)

Page 122

1  answer requires?
2    A  Somebody from the patent department or somebody
3  from the engineering R & D department, but not from a
4  commercial guy.
5    Q  Do you know what a prototype is?
6    A  I know what the Braun definition of a prototype
7  is.
8    Q  Okay.  Sir, can you indicate for the camera on
9  which side of you Mr. Patton is sitting?
10    A  Sorry?
11    Q  Can you indicate for the camera which side of
12  you Mr. Patton is sitting?
13    A  That's you?
14  MR. PATTON:  That's me.
15  THE WITNESS:  On my left side, that must be on the
16  camera's right side.
17  MR. UELAND:  Thank you.  I'm sorry, hold on a
18  second.  Can we go back on the record or up.
19    Q  Okay.  What is the Braun definition of
20  prototype?
21    A  When I stopped working on shavers, a prototype,
22  as I recall, was a working model of the final product
23  that also looked -- that functioned and looked exactly
24  like the final product, but it was like a one-off

Page 123

1  entity.
2    Q  Okay.
3    A  And it was used to -- you could do design tests
4  with it and you could do functional tests with it.
5    Q  Okay.
6    A  But that's a specific Braun definition of a
7  prototype.  Now, that definition might subsequently have
8  changed since that time within the company.
9    Q  So if the product -- or if the -- for lack of a
10  better word model didn't look exactly like the final
11  product, that did not meet the definition of prototype?
12    A  To my understanding at that time, no.
13    Q  Is that definition of prototype that you gave,
14  is that in any Braun policy?
15    A  Used to be.
16    Q  Okay.  What policy is it in?
17    A  I think it was in a document called a PPM
18  handbook.
19    Q  PPM?
20    A  Handbook.
21    Q  What does PPM stand for?
22    A  Product program management.
23    Q  Was that product program management -- is that
24  right?

Page 124

1    A  Correct.
2    Q  Was that handbook updated on an annual basis?
3    A  It was like a standard set of instructions, so
4  like the pilot code, once it's been set up, you follow
5  it.
6    Q  Did they have that handbook in 1990?
7    A  There was a version of it, yes, as I recall, as
8  I recall.
9    Q  Okay.  And was the definition of prototype
10  spelled out in that version of the handbook?
11    A  As I recall, yes.
12    Q  Would Dr. Pahl and Mr. Braun, would they be
13  aware of that definition of prototype?
14  MR. PATTON:  Object to the form of the question.
15  THE WITNESS:  I can't tell whether they were aware
16  or not.
17  MR. UELAND:  Q  But it was company policy, is that
18  right?
19  MR. PATTON:  Same objection.
20  THE WITNESS:  There was a handbook.
21  MR. UELAND:  Q  That stated company policy?
22    A  That laid out how projects were to be run.
23    Q  All right.  Again, what would you call then
24  something a version of a product that wasn't a prototype

Page 125

1  or an earlier version?
2    A  You would have a working model or a functional
3  model.
4    Q  Do you know, then, if the prototype referred to
5  here in paragraph 5 -- well, looking at the picture of
6  it on B002045 on the time line, that does not look like
7  the final product, right?
8    A  Which, this first prototype 1990?
9    Q  Right.
10    A  That is not a final product.
11    Q  Is that a prototype?
12    A  Obviously, according to the definition that I
13  have just given you, it's not.  But I can't evaluate the
14  way people have used terminology here.
15    Q  Do you recall ever seeing that first prototype?
16    A  I can't recall -- I can't recall seeing this
17  one, no.
18    Q  Did Dr. Pahl ever show you a prototype himself?
19    A  I can't remember him doing so.
20    Q  The only one you recall ever is the one that was
21  shown to you by Mr. Höser?
22    A  Höser, correct.
23  MR. PATTON:  If you want to stop for lunch, I think
24  that was just Jim Shimota.

32 (Pages 122 to 125)

Gilbert Greaves    April 29, 2005

Page 126

1    MR. UELAND:  Okay.  Would you like to stop and eat
2  lunch?
3    THE WITNESS:  Yes, I'm getting quite hungry,
4  actually.
5    MR. UELAND:  Let's go off the record and have lunch.
6    THE VIDEOGRAPHER:  Off the record at 1:05.
7        (a brief recess was taken)
8        (Whereupon, Mr. James Shimota entered the
9        deposition.)
10    THE VIDEOGRAPHER:  On the record at 1:53.
11    MR. UELAND:  Q  Welcome back.
12        Right before we went to lunch I asked you
13  whether Dr. Pahl had ever shown you a prototype of the
14  cleaning system.
15        Do you remember that?
16    A  No, I don't remember -- I'm sorry, I remember
17  the question.
18    Q  Right.  But you don't remember --
19    A  I don't remember.
20    Q  Okay.  Do you know, do you remember, had
21  Dr. Pahl shown you any drawings of the cleaning system?
22    A  I can't recall him doing so.
23    MR. UELAND:  Okay.  I'm going to hand you what's
24  previously been marked as Defendant's Exhibit No. 2.

Page 127

1        (Exhibit 2 previously marked and tendered.)
2    MR. UELAND:  Q  It is, as you can see, quite a
3  large document.  I have a reduced copy that you can take
4  a look at if you want.
5        Mr. Greaves, have you ever seen this document
6  before?
7    A  I don't remember ever seeing it.
8    Q  Do you ever remember seeing -- apart from this
9  specific document, do you recall seeing a drawing like
10  this one related to the cleaning system?
11    A  I can't remember, no.
12    MR. UELAND:  I'm going to hand you in conjunction
13  with that document what's been previously marked as
14  Defendant's Exhibit No. 1, and this is a declaration
15  given by Dr. Dietrich Pahl in this case.
16        (Exhibit 1 previously marked and tendered.)
17    THE WITNESS:  Uh-huh.
18    MR. UELAND:  Q  This isn't the document that you
19  were shown this morning, was it?
20    A  I haven't seen this document before.
21    Q  If you can turn to the second page, paragraph 5,
22  this says that, "I began working on the device by
23  mid-1992 at a Braun research and development facility in
24  Lyon, France."

Page 128

1        Do you see that?
2    A  Yes.
3    Q  Does that refresh your recollection at all that
4  the cleaning center project was began as early as
5  mid-1992?
6    A  It doesn't refresh my memory, no.
7    Q  Were you aware that Dr. Pahl was at the research
8  and development facility in Lyon in that time period?
9    A  I knew that it fit under his area of
10  responsibility, yes.
11    Q  Okay.  In addition to his function as director
12  of research and development of shavers in Kronberg?
13    A  Correct.
14    Q  In that same paragraph it says, "Starting in
15  1992 and through beginning of 1993 I developed a basic
16  idea and design concept for a device for cleaning dry
17  shavers."
18        Do you see that?
19    A  Yes, yes.
20    Q  Do you have any reason to disagree with the
21  fact, as stated there, that the basic idea and design
22  concept was developed in 1992 and 1993?
23    A  I have no knowledge when this project actually
24  started.

Page 129

1    Q  So you have no reason to disagree with that
2  statement?
3    A  No, I have no reason to disagree.
4    Q  Okay.  In paragraph 6 it says, "I commissioned
5  technical drawings, one of which I attached to this
6  declaration as Exhibit A," I will represent to you that
7  this is Exhibit A as attached, "and functional models
8  and a prototype of the cleaning center."
9        Before we went to lunch, we talked about the
10  difference between functional models and a prototype.
11    A  Uh-huh.
12    Q  Can you tell me again how you distinguish
13  between those two?
14    A  In the definition I'm familiar with from my time
15  in business management, a prototype would be a one-off
16  working model of the product to be manufactured that
17  replicated the functions of the product exactly and also
18  reflected the final design, so to all intents and
19  purposes it was exactly like the final product was going
20  to be.
21    Q  Okay.
22    A  And with this prototype you could do functional
23  tests, sound tests, you could even do handling tests
24  because it was exactly one to one what the final product

Gilbert Greaves    April 29, 2005

Page 130

1  was going to be.
2      A functional model would be a contraption that
3  would demonstrate that the function of the product could
4  be fulfilled. In this instance a functional model would
5  demonstrate that the shaver was cleaned, but it would
6  not in any way represent the final shape or form of the
7  product.
8      Q  Okay. I'm sorry, were you finished?
9      A  Yes.
10     Q  I had asked you earlier if you had seen any
11 prototypes prior to the one that you remember Mr. Höser
12 showing you and you said no.
13         Do you recall seeing any functional models of
14 the cleaning center project prior to that?
15     A  No.
16     Q  Do you recall ever seeing a functional model as
17 opposed to a prototype?
18     A  To repeat, the only thing I can recall seeing
19 for the first time is the functional model, whatever it
20 was, that Mr. Höser demonstrated to me.
21     Q  Okay. What about in conjunction with your
22 preparation of that case study that we talked about this
23 morning, did you ever have occasion to look at any
24 functional models of the cleaning center project?

Page 131

1      A  No. I only requested photographs.
2      Q  Okay. And the photographs that you were shown,
3  was that a prototype or was that a functional model?
4      A  Under the definition that I know, it would be a
5  functional model.
6      Q  Is that the earliest that you became aware that
7  there were functional models of the cleaning center
8  product?
9      A  On the occasion of Mr. Höser's demonstration,
10 yes, that was the earliest time.
11     Q  I'm sorry. And it's probably in the way I
12 phrased the question.
13         We were talking about your development of that
14 case study, and you said you saw a photograph of what
15 you would term as a functional model, is that right?
16     A  Well, I think I talked about two photographs.
17     Q  Oh, okay.
18     A  One was a very early version which I recollect
19 being told was developed around 1990.
20     Q  Uh-huh.
21     A  And then there was another photograph which
22 was -- came from '95, '96 -- well, sorry, a photograph
23 of another version, functional model, whatever you call
24 it. So there were two, one dated 1990, one dated '95,

Page 132

1  '96.
2      Q  Okay. So neither photograph represented what
3  you would term as a prototype?
4      A  Not the definition of the prototype as being a
5  one-off version of the final product, perfect in
6  appearance and function.
7      Q  And was it, when you first received those
8  photographs in 2002, is that the first time that you
9  became aware that there were functional models of the
10 cleaning center device?
11     A  Well, I had been aware of the version that
12 Mr. Höser demonstrated.
13     Q  The prototype?
14     A  Whatever we want to call it, the thing that
15 worked that he showed me in 1995, '96. It was the first
16 time I became aware that there had been a previous
17 version dating from the early '90s.
18     Q  Okay. Do you know whether or not the version
19 that you were shown by Mr. Höser in the 1995-1996 time
20 period, whether that had all the components that are
21 covered by the patents?
22     A  I can't tell. I don't know and I can't tell.
23     Q  Do you know if there was any further development
24 of that prototype that you were shown between that time

Page 133

1  period and the time it was commercialized?
2      A  I don't know. All I can say is the -- there is
3  a big difference between what I saw demonstrated and the
4  final product. What actually happened I don't know.
5      Q  You said that there was a big difference between
6  what you were shown and the final product.
7         You had -- You own a final product, right?
8      A  Yes.
9      Q  What differences can you tell me about?
10     A  For one, the size.
11     Q  Okay.
12     A  It's much smaller.
13     Q  The final product?
14     A  The final product.
15     Q  Okay.
16     A  As I recall, the final product is fully
17 automatic. The unit that was demonstrated was not --
18 you had to press a button to get it to work, et cetera,
19 it didn't work just by putting the shaver in, and just
20 those two things.
21     Q  When you were shown the working model or
22 prototype, did Mr. Höser actually run it for you?
23     A  Yes, he demonstrated it.
24     Q  Did you have any impressions of the device based

Page 134

1  on what you saw when he ran the device?
2      A  Well, I think I mentioned before I was struck by
3  the fact that it was bulky, what he showed me and it was
4  noisy.
5      Q  I'm sorry, it was?
6      A  Noisy, loud, it made a lot of noise.
7      Q  Did the fact that it was noisy, did that
8  contribute to your negative impression or skepticism
9  about this product?
10     A  The size of the noise and the cost, I think
11 those are the three things I mentioned, noise, cost, and
12 size where I had a question mark.
13     Q  Were there any other things that you had a
14 question mark about based on that first time you saw it?
15     A  No, those are the three key -- three areas of
16 concern.
17     Q  Okay.  Do you recall having any concern about
18 the smell that was generated by the prototype?
19     A  No, no.
20     Q  Did that ever come to be a concern in connection
21 with the development?
22     A  I don't know.  This was -- I don't know.  As I
23 said, I moved off shavers in '97.
24     Q  So in the time period that you were there,

Page 135

1  though, until 1997 --
2      A  It wasn't an issue, no.
3      Q  Taking a look at paragraph 7 of the Pahl
4  declaration, it says, "The cleaning center had many
5  components, including a trough or cradle in which the
6  shaving head of a dry shaver could be placed."  And it
7  says, "See Exhibit A," which, as I said, is this
8  drawing, showing the cradle as P204.
9         Can you find that on the drawing?
10     A  P204.
11     Q  It's in the diagram that's -- I guess it's
12 lettered F1 in the middle.
13     A  P250.
14        P204, yes, got it.
15     Q  Do you know if the model or prototype that you
16 were shown in 1995, 1996, had a spot for the head of a
17 dry shaver?
18     A  I can recall that the head of the shaver was
19 partially immersed in the liquid, that's all I can
20 recall.
21     Q  Okay.  And the rest of the shaver was not?
22     A  No.
23     Q  Okay.  So was there a specific area or like a
24 trough for the head of the shaver?

Page 136

1      A  All I can remember was that the head was in
2  liquid, that's all I can recall.
3      Q  Do you see how it's depicted in the diagram at
4  P204?
5      A  Uh-huh.
6      Q  Did the model that you saw, did it look like
7  this drawing?
8      MR. PATTON:  Well, I object to the form of the
9  question.
10     THE WITNESS:  I can't, I'm not able -- I do not have
11 ability to transfer two-dimensional drawings into
12 three-dimensional objects.
13     MR. UELAND:  Q  All right.  If you look at
14 paragraph 8 of the Pahl declaration, it says, "The
15 cleaning center also had a container for cleaning fluid
16 which is positioned below the cradle," and that's
17 referenced that P203 of the same drawing, do you see
18 that?
19     A  Uh-huh.
20     Q  Did the model that you were shown in that 1995,
21 1996 time period, did that have a cleaning fluid
22 container?
23     A  I can't remember.
24     Q  Well, you said that Mr. Höser ran the device for

Page 137

1  you, right?
2      A  Correct.
3      Q  Was there cleaning fluid involved in that
4  device?
5      A  There was cleaning fluid, yes.
6      Q  Well, was there a contain for it anywhere in the
7  device?
8      A  Yes, obviously, but I don't know if it was --
9  where it was positioned -- I can't remember where it was
10 positioned.
11     Q  But you know that there was a cleaning fluid
12 container in the device you saw?
13     A  Yes.
14     Q  It says in paragraph 9, "During the cleaning
15 operation an electrical circuit activated a pump."
16        Do you know if the model that you saw in 1995,
17 1996, did that utilize a pump?
18     A  I can remember the shaver head being cleaned.
19 What drove the apparatus I can't recall.
20     Q  Did Mr. Höser explain how the apparatus was
21 working when he showed it to you?
22     A  Yes.
23     Q  Do you remember, did he tell you whether or not
24 that there was a pumped that pumped --

35 (Pages 134 to 137)

Page 138

1    A  I can't remember the details of his explanation.
2    Q  Can you remember as a general matter what he
3  told you about how the cleaning center worked?
4    A  In very general vague terms, yes.
5    Q  What can you remember in general terms?
6    A  The circulation of the fluid would flush out the
7  hair residue.  I think the alcohol would remove the fat
8  deposits on the foil and cutter block.
9    Q  So you understood that there was fluid being
10  circulated somehow in the device?
11    A  Yes.
12    Q  And whether or not that was a pump you don't
13  know?
14    A  I can't recall exactly.
15    Q  But there was certainly a device for pushing the
16  cleaning fluid through the device?
17    A  Yes.
18    Q  Based on the paragraphs that we just talked
19  about and the specific components that I asked you
20  about, the cradle or trough, the cleaning fluid
21  container and the pump that Mr. Braun -- or Dr. Pahl says
22  were in his drawings and in his functional prototype in
23  1992, 1993, those same components were all in the model
24  or prototype that you saw later on?

Page 139

1    MR. PATTON:  I'm sorry, I object to the form of the
2  question.  This has been asked and answered in various
3  forms.
4    THE WITNESS:  I don't know.  I just don't know.
5    MR. UELAND:  Q  Well, I mean, didn't we just talk
6  about each of those things, each of those components and
7  you said that each of those were in the model that you
8  saw in 1995, 1996, right?
9    MR. PATTON:  I'm sorry, I object to the form of the
10  question.  That is not what the witness testified.  His
11  testimony is recorded.
12    MR. UELAND:  Q  Was there a cradle in the model
13  that you saw or a spot where the shaver head was
14  immersed in water?
15    A  I think I've said I remember the shaver head
16  being immersed in water -- in the cleaning liquid.  How
17  that was done I can't recall.
18    Q  Turning to paragraph 20, it says, "In 1992 as
19  part of my duties as director of research and
20  development for shavers, I began to supervise Mr. Braun
21  and asked him to develop further the cleaning center
22  that I had begun developing in France."
23      Was it common for you as the head of -- or the
24  business manager of the dry shaver unit to have contact

Page 140

1  with the director of research and development for
2  shavers?
3    A  I worked with Dr. Pahl.
4    Q  Okay.  Does this refresh your recollection that
5  in 1992 the director of research and development,
6  Dr. Pahl, began to supervise Mr. Braun in developing the
7  cleaning center?
8    A  I don't recollect this, no.
9    Q  When is your -- Do you have any recollection of
10  any conversations with Dr. Pahl about the cleaning
11  center project?
12    A  Not with Dr. Pahl, no.
13    Q  Does that surprise you that you wouldn't know or
14  that the director of research and development for
15  shavers wouldn't tell the business management director
16  for dry shavers about the development of a new cleaning
17  system?
18    MR. PATTON:  I object to the form of the question.
19  The witness has testified he doesn't have a
20  recollection.  He has not testified that he wasn't told
21  something.  He's testified he doesn't have a
22  recollection.  It's unfair to the witness to put a
23  question that has in it a premise that is not what he
24  has said.

Page 141

1    MR. UELAND:  Q  Can you answer that question?
2    A  Can you repeat the question?
3    Q  Sure.  My question was and, Mr. Patton, your
4  objection will stand, does it surprise you that being
5  the business management director of the dry shaver unit
6  that you were not aware of Dr. Pahl beginning to
7  supervise Mr. Braun in further developing the cleaning
8  center project?
9    A  I think I've explained how the R & D department
10  works.  And there is -- they're working on so many
11  projects that may never see the light of day that it is
12  absolutely normal that, anyway, that I can't recall.
13  And if I was informed and have subsequently forgotten,
14  it wouldn't surprise me.
15    Q  Do you think that it's likely that he would have
16  told you that?
17    MR. PATTON:  Object to the form of the question.
18    THE WITNESS:  I have no idea.  I can't put myself in
19  his mind.
20    MR. UELAND:  Q  Okay.  Handing you -- Would it
21  surprise you to learn that Dr. Pahl testified that he
22  showed you a prototype of the cleaning center project
23  and told you about it in the 1992, 1993 time frame?
24    MR. PATTON:  Object to the form of the question.

36 (Pages 138 to 141)

Gilbert Greaves   April 29, 2005

Page 142

1   THE WITNESS: I can't recollect Dr. Pahl showing me
2   a prototype.
3   MR. UELAND: Q   Would it surprise you that
4   Dr. Pahl -- that he testified that he did do that?
5   MR. PATTON: Please note my objection.
6   THE WITNESS: No.
7   MR. UELAND: Q   It wouldn't surprise you?
8   A   It wouldn't surprise me at all.
9   Q   So the conversation could have occurred?
10   A   I can't remember being told about or seeing the
11   prototype before the demonstration by Mr. Höser.
12   MR. UELAND: Handing you what's been previously
13   marked as Defendant's Exhibit 8.
14   (Exhibit 8 previously marked and tendered.)
15   MR. UELAND: Q   If you take a look at that
16   document, and I think that there is German pages and
17   English pages, so there is duplicate pages back to back.
18   A   Okay.
19   Q   Mr. Greaves, have you ever seen this document
20   before?
21   A   I don't remember seeing it, no.
22   Q   Do you know what this document is?
23   A   It seems to be a notification of an invention to
24   the patent department or application.

Page 143

1   Q   Is this a common form or was this a common form
2   in Braun?
3   A   I don't remember seeing it. I don't remember
4   seeing either this document or this form.
5   Q   So you don't know if it was standard in Braun
6   for inventors to fill out an application and submit it
7   to the patent department?
8   A   I knew that they did it, but at this point in
9   time I can't recollect what formats they used.
10   Q   Okay. So would you review a document like this?
11   Not specific -- and I'm not tying that question to the
12   cleaning center project. I'm talking about an invention
13   application to the patent department related to
14   inventions for dry shavers at all, would you ever see
15   that, this kind of document?
16   A   As I say, I don't recall seeing this. I don't
17   recall seeing this.
18   Q   Do you recall seeing any sorts of documents from
19   inventors prior to the time that they were submitted to
20   the patent department?
21   A   What would come across the desk of a product
22   line director was an application to progress with the
23   project, that was something that came across quite
24   regularly or quite often on all kinds of projects.

Page 144

1   Q   This application to progress with the project,
2   who would submit that to a product line director?
3   A   That would come out of the R & D department.
4   Q   Okay. Was it filled out by the director of the
5   R & D department?
6   A   Yes, or by his people, yes.
7   Q   Okay. So in this 1992, 1993 time period, the
8   director of the R & D department for dry shavers was
9   Dr. Pahl?
10   A   Correct, yes.
11   Q   Okay. Did you ever receive an application to
12   proceed with this project from Dr. Pahl?
13   A   I couldn't recollect it until this morning.
14   Q   You couldn't recollect --
15   A   Recollect having seen it until this morning.
16   Q   Oh, you saw the application from --
17   A   Yes.
18   Q   Okay. And you testified earlier that that was
19   produced in this litigation or you represented that?
20   MR. PATTON: I do.
21   MR. UELAND: Q   Okay. So you did receive one,
22   then, from Dr. Pahl?
23   A   Yes, my signature is on the document.
24   Q   Okay.

Page 145

1   A   But I have no recollection of having seen it or
2   having signed it.
3   Q   Was it necessary for the director of research
4   and development or for a project to go forward to get or
5   to fill out that application to progress?
6   A   It was part of the procedure at the time, yes.
7   Q   So it was required?
8   A   Yes.
9   Q   So the project couldn't proceed unless you
10   signed off on it?
11   A   It would have caused problems, yes, it would
12   have caused problems.
13   Q   Okay. In conjunction with you signing off on
14   this application to continue progress on the cleaning
15   center project, do you recall inquiring into the status
16   of the project?
17   A   No.
18   Q   Do you recall receiving a report as to where the
19   project was at?
20   A   Not until the demonstration by Mr. Höser.
21   Q   Okay. If you look at the first page of this
22   document in English, I guess, if that's more comfortable
23   for you, above the signature lines do you see where it
24   says, "It is hereby assured that all information was

37 (Pages 142 to 145)

Page 146

1  provided to the best of my knowledge and that no
2  additional inventors participated in the creation of
3  this invention"?
4      A  I'm sorry, where is this?
5      Q  I'm sorry, if you let me point.
6      A  Oh, here, sorry, yes.
7      Q  Do you see that?
8      A  Uh-huh, yes.
9      Q  Do you know why the patent department required
10  the applicant to make that statement and to sign it?
11     A  No, I don't know why.
12     Q  Do you know if it was the policy within Braun to
13  make sure that the proper inventor was named on an
14  invention?
15     A  I don't know anything about the policy.
16     MR. UELAND:  Okay.  I am handing you what I'm going
17  to mark as Defendant's Exhibit 43.
18     (Exhibit 43 marked as requested.)
19     MR. UELAND:  And it's Bates labeled B000861.  And
20  there is also attached to this document a translated
21  version that's Bates labeled B000861 ENG.
22     I'm also going to hand you what I'll mark as
23  Defendant's Exhibit 44.
24     (Exhibit 44 marked as requested.)

Page 147

1      MR. UELAND:  Q  And it's Bates labeled B00856.1
2  through 860.  And included within this document are
3  translated versions that bear the same Bates numbers
4  with the suffix ENG.
5      And I will just state on the record that my
6  colleague Mr. Shimota marked the document together as
7  one, and I am now marking the two documents pulled out
8  as separate exhibits.
9      Turning first to the document Bates labeled
10  B00861, is that the document you were shown this
11  morning?
12     A  861?
13     Q  Correct.
14     A  No.
15     Q  No, it's not?
16     A  No.
17     Q  Do you see at the top of the document it says
18  from patent department to Gilbert Greaves and
19  Dr. Dietrich Pahl?
20     A  Yes.
21     Q  Is this document Dr. Pahl's response?
22     A  Yes.  This is -- It's not my handwriting.
23     Q  Why did the patent department send this document
24  to you and to Dr. Pahl?

Page 148

1      MR. PATTON:  Object to the form of the question.
2      THE WITNESS:  I don't know.
3      MR. UELAND:  Q  I'm sorry?
4      A  Can you repeat the question.
5      Q  Do you know why the patent department sent this
6  document to you and Dr. Pahl?
7      A  Again, I think I've explained the process.
8  Limited resources, not all projects can be pursued,
9  there is a cost in applying for things.  You don't apply
10  for a patent for a product that has a low chance of
11  commercial realization, so that's why these things were
12  circulated.
13     Q  Is this the application to progress that you
14  referred to earlier?
15     A  As I recall, yes, if my recollections are
16  correct.
17     Q  Let's take a look at Defendant's Exhibit 44,
18  specifically page 000856.1, is this your handwriting?
19     A  Is this my signature?
20     Q  Yes.
21     A  Yes, that's my signature.
22     Q  Okay.  The date of this document is August 3rd,
23  1993.  Do you understand this application to progress
24  being related to the cleaning center project?

Page 149

1      A  If these attachments were attached to this
2  document in 1993, yes.  But I can't see from the
3  document -- I mean, if you look at the title page, it
4  lives and breathes with what's attached to it.  So if
5  this technical stuff was attached to it in 1993, yes.
6      Q  Does that invention application file No. 5818,
7  does that have any meaning to you?
8      A  I have to see what document it refers to.  I
9  can't recall.
10     Q  Do you have any reason to believe that those
11  attachments that are attached to this document weren't
12  attached to it?
13     A  No, I have no reason to believe -- I'm just
14  answering your question.  If 5818 -- 05818 refers to the
15  documentation on the cleaning center, then that's it.
16  There has to be a whole mass of documents attached to
17  this.
18     Q  A whole mass of documents?
19     A  Well, it has to be attachment.
20     Q  When you filled out forms like this, did it
21  usually have a larger attachment attached to it than
22  just these pages?
23     A  It would have a description of the product.
24     Q  Would that generally be lengthier or longer than

38 (Pages 146 to 149)

Page 150

1    the attachment that's attached here?
2        A   No, it would be something in this scope, yes.
3        Q   So this looks about right to you?
4        A   Looks about from my -- I mean, I can't remember
5    this specific document, but lots of documents like this
6    came across my desk.
7        Q   This asks you a series of questions and you
8    responded to them.  The first question is:  Do you
9    consider the proposal to be a practicable solution to
10   achieve the intended objective.  And you answer yes.
11       A   Uh-huh.
12       Q   Is that right?
13           Do you recall why you thought that?
14       A   No.
15       Q   Do you recall thinking that the cleaning center
16   project -- Well, let me ask you this way:  You testified
17   in 1995 and 1996 when you saw it you were skeptical
18   about it, right?
19       A   Correct.
20       Q   Now, this document is dated August 3rd, 1993,
21   and this says:  Do you consider the proposal to be a
22   practicable solution to achieve the intended objective?
23   And the answer there is yes.
24       A   Uh-huh.

Page 151

1        Q   Do you know why you had a difference of opinion
2    two years earlier?
3        A   Well, I think as I've said, the first time I saw
4    anything physical was in '95, '96 when Mr. Höser
5    demonstrated the functional model for the first time.
6    That triggered the reactions you've talked about here.
7            And I can't remember this coming across my
8    desk.  I really can't -- I can't remember anything about
9    the reasons for my answers on this page.
10       Q   Do you have any reason to believe that you
11   didn't think that it was practicable in 1993?
12       A   Let me say it again.  I can't remember this
13   document coming across my desk.
14       Q   That's fine.  My question is a little different.
15       A   And I can't remember the reasons for the
16   evaluations on this document.  I just cannot remember.
17   I had many, many documents of this kind coming across my
18   desk all through my time in business management.
19       Q   I appreciate that.  My question is:  Do you have
20   any reason to disagree with or any reason to think that
21   what you wrote in 1993 wasn't true at the time?
22       A   I can't answer that because I can't remember the
23   reasons for the answers.
24       Q   Okay.  This says -- question No. 2 is:  Is it

Page 152

1    proposed to implement the proposal in an existing or
2    future product in which in-house product?  And there is
3    a handwritten response on 856.1 in the version that has
4    not been translated.
5            Can you read that handwritten response?
6        A   Across No. 2?
7        Q   Correct.
8        A   That means possibly, 6016, that's the code name
9    of the shaver; and 94 means products after '94.  Is that
10   what you're referring to?
11       Q   No, sir, I'm referring to the other document,
12   the one that's Bates labeled 856.1.  There is a -- right
13   here, do you see that handwriting?
14       A   Yes.
15       Q   Is that your handwriting?
16       A   This handwriting?
17       Q   Right.
18       A   No, no.
19       Q   All right.  I'm confused.  I'm sorry.  I thought
20   that you had testified that 856.1 is your signature?
21       A   This is my signature.
22       Q   But that's not your handwriting?
23       A   But this is not my handwriting.  Is that your
24   question?

Page 153

1        Q   Yes.
2        A   Yes, this is my signature, but that's not my
3    handwriting.
4        Q   Whose handwriting is that?
5        A   I don't know.
6        Q   So are these not your responses?
7        A   They're not the responses I wrote.  It's not my
8    handwriting.
9        Q   Would you typically sign off on something that
10   you didn't write?
11       A   I would sign off on something that I agreed with
12   at the time.
13       Q   Okay.  Did you ever or do you remember having
14   someone else fill out something for your signature?  Let
15   me change the question.
16           When you received these applications to
17   progress with the project -- well, first, let me ask
18   you, that's a pretty important step, I think you
19   testified earlier, that it's required, right?
20       A   Yes.
21       Q   So you take them pretty seriously, right?
22       A   Yes.  What --
23       Q   Sorry.  Sir, the question is yes or no.
24       MR. PATTON:  I'm sorry, the answer is the witness'

39 (Pages 150 to 153)

answer. He can answer the question however he can answer it if he can answer it.
THE WITNESS: Can you repeat the question.
MR. UELAND: Q So did you take these forms seriously? Were they important?
A Yes.
Q Okay. Did you take care in filling them out?
A Yes.
Q Did you usually have someone else fill out the form for you? Was that a standard practice?
A No. What could happen is that answers would have been put in that I agreed with or that I couldn't add to or there was nothing more that I could add. So I would accept the opinion of somebody who had seen the document before.
Q Okay. Well, this document is addressed to you and to Dr. Pahl. And we have a document that reflects Dr. Pahl's responses and we have this document.
Who do you think would have filled out the document?
A I have no idea. I don't recognize the handwriting.
Q That's not your secretary's handwriting?
A I don't know. I can't recall. I don't

recognize the handwriting.
Q So would you sign off on something that you agree with the substance but you don't know who wrote it, is that something that you would typically do?
MR. PATTON: Well, I object to the form of the question.
THE WITNESS: Well, I can only speculate.
MR. PATTON: Don't speculate.
THE WITNESS: I can only speculate. I don't know who wrote it. I can't remember signing this document. I did sign it, but I can't remember signing it. And I don't know the reasons that I agreed with the evaluations that you see on the document.
MR. UELAND: Q Would you have signed it if you didn't agree with the evaluations?
A I would not sign something I don't agree with.
Q Can you read the handwriting on that page across from No. 2?
A This one?
Q Correct.
A I think this is a ja or German for yes.
Q Okay.
A No. 3.
Q I'm sorry, is that all that's written across

from No. 2? Because it looks like to me in No. 1 that looks like ja. And then in No. 2 it looks like two words.
A I would assume it's eignes produck, which means own product.
Q Okay.
A I think, if I read the writing correctly.
I think No. three is a ja, a yes again and then there are two question marks.
And No. 5 I think it says siehe anhang, which means refer to attachment. On anhang is attachment in German and siehe is look at. So that means look at the attachment.
Q Okay. Is it referring to -- well, the question there where it says see attachment or refers to the attachment, it says, "Are you aware of prior art going beyond the details in the invention application?" And it says "state sources." And the response is, "See enclosure."
A Uh-huh.
Q That's not referring to what's attached to this document, is it?
A I don't know. I don't know. All I can say is this to me looks like look at attachment.

Q Okay. Is that look at attachment, is that a response that you would have filled out on a form like this -- and not this form, but you said you saw many forms like this come across your desk when you were the business management director for dry shavers. Would you often just refer in your answer to enclosures in response?
A Yes.
Q And would that be, then, something that you would provide in response, documents that you were aware of that answered the question that was asked?
A If it was a commercial document, yes. Technical, no.
Q Okay.
A I would not prepare a technical document.
Q Do you know what prior art is?
A I'm not sure.
Q When you would receive these documents as the director or business management director for dry shavers, did you ever ask anybody for guidance as to what prior art meant?
A Well, my assumption is that something that has been invented already, it's already on the market, it's not new and original.

Gilbert Greaves    April 29, 2005

Page 158

1    Q   Did you use that assumption when you filled out
2    these forms?
3    A   Can you explain?
4    Q   Sure.  My question to you -- my initial question
5    was, was you testified before that as business
6    management director, you had received many, many forms
7    like this one and filled them out, right?  And for that
8    question that says -- that asks about prior art, I asked
9    you if you knew what prior art was?
10    A   I think earlier this morning I said that from a
11    commercial point of view the stronger and more
12    comprehensive patent protection was, obviously the more
13    interesting the commercial project would be because that
14    would be a longer time without competition for some
15    commercial reasons.
16       If something -- if prior art means that there
17    is something like this already on the market or it's not
18    original, then, obviously, the danger of a copy is much
19    greater and the commercial potential is probably less.
20    That's, I think, what I said earlier this morning.
21    Q   Okay.
22    A   And, therefore, the whole issue is this an
23    original invention, is it going to be protected by
24    patents, or is it something that is me, too, and is

Page 159

1    going to be knocked off very quickly is always central
2    to any company selling products.
3    Q   Is that what you understood the import of
4    question No. 5 to be?
5    MR. PATTON:  Well, I object to the form of the
6    question.  Again, the witness has testified he doesn't
7    recall this document.
8    MR. UELAND:  Q   I'm not tying it specifically to
9    this document.
10       Do you understand that explanation that which
11    you just gave about the commercial liability of seeking
12    patent protection to be the import of question No. 5?
13    A   It's part of it.  It's part of it.
14    Q   Are there other parts of it?
15    A   Well, obviously, No. 4.
16    Q   I'm not talking about No. 4.  I'm talking about
17    No. 5.
18    A   I'm saying that No. 5 is part of all the
19    considerations that were going to the issue of patent
20    protection.
21    Q   Okay.  Do you recall reviewing these enclosures
22    that are listed in response to question No. 5 on
23    document B00856.1?
24    A   No, I don't recall because my first recollection

Page 160

1    of this project is the demonstration by Mr. Höser in
2    '95, '96.
3    Q   So this doesn't refresh your recollection of
4    reviewing any enclosures?
5    A   No, it doesn't, not at all.
6    Q   Would you have signed this document without
7    reviewing those enclosures?
8    A   I can't tell.  I mean, as I say, I cannot
9    remember this document coming across my desk, although
10    my signature is on the document.
11    Q   As a practice would you sign something without
12    knowing what you were agreeing to or supporting?
13    A   In general principle, no.
14    Q   Is there any reason to think that you would have
15    done so here?
16    A   I can't think of a reason.  But as I repeat
17    again, although my signature is on this document, I
18    cannot recall it coming across my desk and I cannot
19    recall signing it.
20    Q   And so you don't know who would have supplied
21    those enclosures? .
22    A   I do not know who supplied those enclosures.
23    Q   Do you have -- who do you think might have?
24    MR. PATTON:  I object to the form of the question.

Page 161

1    THE WITNESS:  I have no idea.  This is almost 15
2    years ago.  I can't recall.
3    MR. UELAND:  Q   I appreciate that it's been a
4    while.
5       Well, you see here that it's also addressed to
6    Dr. Pahl, and 861 is Dr. Pahl's response?
7    A   Yes.
8    Q   Do you recall discussing this document with
9    Dr. Pahl?
10    A   No.  As I say, my -- again, my initial first
11    recollection of this project is the demonstration by
12    Mr. Höser.
13    Q   Do you think that it's likely you would have
14    talked to Dr. Pahl about your response to this document?
15    A   I can't recall any conversation with him.
16    Q   Do you keep a calendar, Mr. Greaves?
17    A   Yes.
18    Q   Did you keep a calendar as of August 3rd, 1993?
19    A   Yes, of course.
20    Q   If you had met with Dr. Pahl around August 3rd,
21    1993, would that meeting be listed in your calendar?
22    A   If I had met with him, his name would be in the
23    calendar.
24    Q   Okay.

41 (Pages 158 to 161)

Page 162

1      A   Almost definitely not the topic of the meeting.
2      Q   Do you keep your calendar from year to year?
3      A   No.
4      Q   So is your calendar from 1993 destroyed?
5      A   Yes, because I've moved house at least four
6  times since 1993.
7      Q   Can you think of any other way since you don't
8  recall to determine whether or not you spoke with
9  Dr. Pahl in or around August of 1993 regarding this form
10  or regarding the cleaning center project?
11     A   I can't think of a way you could reconstruct it
12  from today.
13     Q   This says, if you look down at 6.1: Do you
14  consider the inventor details to be correct?  Do you see
15  that?
16     A   Yes.
17     Q   And there is no response on your document.
18     A   Yes.
19     Q   My first question to you is, well, do you know
20  why this question was on this document?
21     A   No.
22     Q   You don't know why -- well, was it Braun policy
23  to make sure that the details of inventorship were
24  correct?

Page 163

1      MR. PATTON:  Well --
2      THE WITNESS:  I can't give you any information on
3  Braun patent policy.  I just don't know.
4      MR. UELAND:  Q   Who would know about Braun patent
5  policy, who would know the answer to that question?
6      A   Somebody in the patent department.
7      Q   Can you think of any names?
8      A   Mr. Sievers.
9      Q   Would he know if it was Braun policy to make
10  sure that --
11     A   I don't know.  All I can say is that he might be
12  able to help you to get the information you need.
13     Q   Did you review the attachments to 856.1 do you
14  remember?  No?
15     A   I cannot remember anything prior to the
16  demonstration in '95, '96.
17     Q   Did you review the attachments to 856.1 this
18  morning with your attorneys?
19     A   No.
20     Q   You didn't review the attachment at all?
21     A   No, no.
22     Q   You just looked at the first page of the
23  document?
24     A   Correct.

Page 164

1      Q   Well, will you look at the attachment now
2  starting on page 857?
3      A   Oh, 856.1?
4      Q   Correct.  Just the document continues.
5      A   Page 857, yes.
6      Q   And it says enclosure for invention application
7  shaver cleaner?
8      A   Uh-huh.
9      Q   In that third paragraph you see that it says,
10  "The cleaning principle is based on the finding that the
11  shaving head of an electric shaver cleans itself without
12  disassembly if it is continually immersed in an
13  appropriate cleaning liquid."
14         Do you see that?
15     A   Yes.
16     Q   Did you understand this invention being directed
17  toward a shaver that was immersed in cleaning fluid?
18     A   I repeat, the product that Mr. Höser
19  demonstrated to me, the head of the shaver was submerged
20  in a liquid and subsequently cleaned.  That's what I can
21  remember.
22     Q   So in that invention it was immersed in cleaning
23  fluid?
24     A   The head of the shaver?

Page 165

1      A   Yes.
2      A   Yes.
3      Q   Okay.  Did you say that you would have reviewed
4  these attachments at the time you signed this document?
5      A   Excuse me, did I?
6      Q   Did you say that?
7      A   I said I can't remember reading them.
8      Q   But that it was more than likely that you would
9  have reviewed them?
10     A   Yes, more than likely, but I can't remember
11  reading this.
12     Q   Having read it right now or looking at it, that
13  page, does that refresh your recollection?
14     A   Absolutely not, no.
15     Q   Why don't you take a look at the rest of the
16  pages, kind of flip through them and see if that
17  refreshes your recollection about whether or not you
18  would have reviewed these attachments.
19     A   My memory is not jogged by this.
20     MR. UELAND:  Let's go off the record for a minute.
21     THE VIDEOGRAPHER:  Off the record at 2:48.
22         (discussion had off the record)
23     THE VIDEOGRAPHER:  This marks the end of tape No. 3
24  in the deposition of Gilbert Greaves.

42 (Pages 162 to 165)

Page 166

1      (a brief recess was taken)
2      THE VIDEOGRAPHER: This marks the beginning of tape
3   No. 4 in the deposition of Gilbert Greaves. We are on
4   the record at 2:56.
5      MR. UELAND: Q  Welcome back, Mr. Greaves.
6      In response to some of my questions this
7   morning and this afternoon, you've testified that the
8   first thing you recall as related to the cleaning center
9   project was when you were shown the prototype by
10  Mr. Höser in 1995 or 1996?
11     A  Uh-huh.
12     Q  Is that right?
13     A  That's right, yes.
14     Q  Why does that event stick out for you so much?
15     A  Because it was the -- well, it's the first thing
16  I can remember. And there was the physical prototype
17  model in front of me working. So it was the first time
18  I saw anything physical.
19     Q  Are you certain that that was the first time you
20  saw anything physical?
21     A  Absolutely.
22     Q  It's the -- I'm sorry. I don't mean to cut you
23  off. Were you done? Okay.
24     Is it the fact that you remember like seeing

Page 167

1   something physical and being able to touch something
2   physical that helps make it stick out in your mind?
3      A  It's the first time I can remember the -- this
4   seeing -- my first recollection of this project is that
5   product demonstration.
6      Q  I guess what I'm asking is, had you been shown
7   something physical in 1993, a physical representation or
8   model of it, do you think you would remember that?
9      A  I don't know. I can't answer that question.
10     Q  Well, then that's the part I'm having a problem
11  with, then.
12     What is it about that 1995 that makes you so
13  certain that that was the first time you saw something
14  physical?
15     A  The first time, my first recollection of this
16  project is that product demonstration by Mr. Höser in
17  the R & D laboratories '95, '96.
18     Q  But will you agree with me that based on the
19  document that we just looked at that you were obviously
20  aware of the cleaning center project before then, as
21  early as 1993?
22     A  I cannot -- I don't have any recollection of the
23  project prior to the demonstration.
24     Q  But from the documents, the documents show that

Page 168

1   you were aware of it beginning in at least as early as
2   August of 1993?
3      A  But I have no recollection of the project before
4   the demonstration.
5      Q  Okay. I guess is there anything about that
6   event in 1995, 1996 that makes it stick out in your
7   mind?
8      MR. PATTON: I object. This has been asked and
9   answered several times.
10     MR. UELAND: Well, I think it's been asked.
11     MR. PATTON: It's been answered several times, and
12  the record is clear.
13     MR. UELAND: The witness can certainly indulge me in
14  responding again.
15     Q  If you would, sir, is there something special
16  about the 1995, 1996 event? I ask you this because I
17  thought I understood you earlier that it was the
18  physical part of it. But then I asked you if you were
19  shown something physical in 1993, would you remember it,
20  and you said no.
21     MR. PATTON: I'm sorry, I object. That's not what
22  he said.
23     MR. UELAND: Well, we can read it back if you want
24  to.

Page 169

1      MR. PATTON: I don't want to.
2      MR. UELAND: Q  You can disagree with me,
3   Mr. Greaves.
4      A  I think I said I don't know.
5      All I can say is that demonstration is my first
6   recollection, that's all I can say.
7      Q  And you can't say if there is anything about
8   that demonstration that particularly makes it stand out
9   in your mind?
10     A  No, no.
11     Q  This morning we talked about this case study
12  that you had done in the 2002, 2003 time period, and I
13  asked you if you still had a copy of that document. And
14  you told me that it was in an electronic folder that was
15  on the Braun server?
16     A  When I left the company.
17     Q  Right.
18     A  Yes.
19     Q  What other documents were in that folder?
20     A  In my folder?
21     Q  Uh-huh.
22     A  If my -- if I remember correctly, the strategic
23  business plans for 2003-2009 or 2003-2008, I can never
24  remember, and probably the strategic plan for the cycle

43 (Pages 166 to 169)

Page 170

1    before, and there might have been some other documents
2    that I left in because they might be useful to other
3    people.
4        Q   Would those strategic plans have included any
5    discussion about the cleaning center?
6        A   They would have included -- the shaver financial
7    projections would be based on projected sales figures of
8    shavers with the cleaning segment.
9        Q   You testified you left Braun in March of 2004?
10       A   My last working day was the 28th or 29th of
11   February, yes.
12       Q   Did anyone at Braun ever ask you about any
13   documents that you might have that might relate to the
14   cleaning center project?
15       A   Subsequent to leaving Braun?
16       Q   While you were still there.
17       A   No.
18       Q   Did anyone tell you that you should keep any
19   documents that you have that are related to the cleaning
20   center project?
21       A   No, not that I recall.
22       Q   So you weren't ever asked to collect any of your
23   personal documents that you had that were related to the
24   cleaning center project?

Page 171

1        A   No, no.
2        Q   When you left your role as the business
3    management director for dry shavers, you passed your
4    records along, is that right, to your successor?
5        A   They stayed in my office.
6        Q   Okay.  So I guess they didn't go anywhere,
7    they --
8        A   They stayed in -- because he moved into my
9    office and I moved into another office.
10       Q   Your successor inherited the documents, is that
11   fair to say?
12       A   Correct, yes.
13       Q   That document that we were just reviewing,
14   856.1, the one with your signature on it, is that a
15   document that you would have kept in your personal files
16   when you were the business management director for dry
17   shavers?
18       A   I don't know.  I just don't know what happened
19   to this document.
20       Q   Well, I guess my question was a little bit
21   different.  I asked, do you know, is this the kind of
22   document that would have been kept in your personal
23   files?
24       A   It says here please return within ten days to

Page 172

1    PT.  PT, that hasn't been translated.  Oh, yes, please
2    handle within ten days and return directly to the PT,
3    patent, I don't know what PT is.
4        Q   So would you not normally keep a copy of those
5    documents for your own files?
6        A   I can't remember.
7        Q   So you don't know if this document would have
8    been produced from the files that you left behind?
9        A   I can't tell, I can't tell you.
10       Q   Have you had any subsequent conversations with
11   any of your successors -- any of the people who have
12   since been the business management director for dry
13   shavers since you left that position?
14       A   Yes, of course, in my new function, yes,
15   discussing strategic plans, yes.
16       Q   Okay.  In discussing strategic plans, does
17   litigation ever come up, the fact that there is a
18   lawsuit pending?
19       A   No, no, it's not --
20       Q   Is that not taken into account in future
21   planning for a company or for Braun?
22       A   In future planning, no.  I mean -- No, it
23   wouldn't, no.
24       Q   Did you ever talk to any of your successors as

Page 173

1    business management director about this lawsuit?
2        A   Now wait a minute, this --
3        Q   Do you want me to restate the question?
4        A   Yes, yes.
5        Q   Okay.  Earlier you testified that there were
6    three individuals that you can remember who have since
7    been the business management director for dry shavers.
8            Have you talked to any of those individuals
9    about this lawsuit?
10       A   No, no, no.
11       Q   And I know that it has been a while since, you
12   know, some of these documents are from August of 1993.
13           Would it help you to recall events around
14   August of 1993 if you had the files that you left in
15   your office when you left the position as business
16   management director?
17       A   I can't -- I can't tell.  That's 11, 12 years
18   ago.  I can't tell.
19       Q   Well, I'm just saying, if you had other
20   documents that were contemporaneous with that document
21   dated August of 1993, do you think any further context
22   would help you remember those events?
23       A   I don't know.  I just don't know.  I can't
24   answer the question.

44 (Pages 170 to 173)

Page 174

1    Q   Well, let me ask you this way:  If I asked you
2   about current events from January 5th, 1992 -- I mean, I
3   can't imagine that you would know what the front page
4   story was then, is that right?
5    A   January the 5th, '92?
6    Q   Yes.
7    A   No.
8    Q   But if you had a newspaper from January 5th,
9   1992, would it be easier for you to testify or to talk
10  to me about what the current events were on January 5th,
11  1992?
12   A   If the newspaper was dated.
13   Q   Of course, one from that date?
14   A   But if somebody changed the date to 1993, I
15  would get very mixed up.
16   Q   Certainly, certainly.
17       But a document contemporaneous would help your
18  recollection?
19   MR. PATTON:  I object to the form of the question.
20   THE WITNESS:  I don't know.  I don't know.
21   MR. UELAND:  Handing you what's been previously
22  marked as Defendant's Exhibit 20 -- Hold on a second.
23       Handing you what I will mark as Defendant's
24  Exhibit 45, and it's Bates labeled B001065, and it has

Page 175

1   also attached to it an English translation that's Bates
2   labeled 001065 ENG and a certification page that attests
3   to its authenticity from the translator.
4       (Exhibit 45 marked as requested.)
5    MR. UELAND:  Q   Have you ever seen this document
6   before?
7    A   I don't remember ever seeing it before.
8    Q   Do you remember ever attending a presentation in
9   November of 1992 that Dr. Dietrich Pahl gave about the
10  future of shavers for Braun?
11   A   No, I don't recall.
12   Q   Would that be something that you would generally
13  attend?
14   A   Not necessarily.
15   Q   Would you as the business management director
16  for dry shavers have sent one of your, I guess,
17  employees in your place?
18   A   You have to distinguish between a presentation
19  that Dr. Pahl might have held within the R & D -- within
20  the technical department compared to one which he would
21  hold through the general management or one between
22  business management and R & D.  So different meetings,
23  different audiences.
24   Q   Okay.  If you look at the English translation,

Page 176

1   if that's more comfortable for you, on 1065, you see
2   that it's translated, it says "Known disadvantages."
3    A   Uh-huh.
4    Q   Do you recall ever speaking with Dr. Pahl about
5   known disadvantages as it pertains to dry shavers?
6    A   No, I don't recall.
7    Q   Do you recall ever any discussion at all within
8   Braun during the time that you were the business
9   management director about any disadvantages vis-a-vis
10  dry shavers and their ability to be cleaned?
11   A   I don't remember any specific conversations,
12  that it was a topic at the back or the front of
13  everybody's minds, it was obvious.  But I don't remember
14  any specific conversations with specific people on this
15  topic.
16   Q   When you say it was obvious, what was obvious?
17   A   The cleaning issue, that it was an area which
18  could be improved.  It was like shaving closer or
19  shaving faster or shaving with less skin irritation.  It
20  was in that category of shavers that could be improved.
21   Q   Was that based on any known studies that showed
22  that there was dissatisfaction with the current methods
23  that shavers were cleaned by?
24   A   It was more areas which could be improved.

Page 177

1    Q   I'm sorry?
2    A   It's more areas that could be improved.  If I
3   can draw an analogy, greater fuel economy cars, less
4   vibration in cars, I mean, it's -- it's just -- it is
5   inherent in the product that this would be an area which
6   is always in need of improvement.
7    Q   Okay.  Was it a -- do you recall a time where it
8   became a focus for Braun to specifically concentrate on
9   improving the way a shaver could be cleaned?
10   A   As I said, my recollection of where it became a
11  very -- topic of practicable was subsequent to the
12  demonstration of Mr. Höser.
13   Q   Okay.  So you don't recall there being any
14  particular urgency to develop a better system for
15  cleaning shavers prior to the time you saw that
16  prototype?
17   A   I don't recall any heightened priority, no.
18   Q   Okay.  And as business management director for
19  dry shavers, if that was a priority for your product
20  line to develop a better way to clean shavers or if you
21  thought it was before 1995, 1996, who would you have
22  told?
23   A   Who?
24   Q   Let me ask it another way.

45 (Pages 174 to 177)

Page 178

1    You said that that's the earliest that you can
2    recall.  So do you know personally, was it a priority
3    for you prior to that point?
4    A    I said I can't -- I can't recall.  But, again,
5    analogously, there was work going on on, as I recall, on
6    vibration.  There was work going on on cutting systems.
7    There was work going on on improved energy storage.
8    There was work going on on improved electronics all the
9    time.
10    And I would be generally aware of this.  But of
11    the specifics of the various projects, I wouldn't need
12    to be involved until they came to a point much closer tó
13    commercialization or potential commercialization.
14    Q    Okay.  But you never provided any specific
15    direction to the R & D department to specifically
16    address that problem?
17    A    I can't recollect doing so.  I just don't
18    remember.
19    Q    Okay.
20    A    I mean, this is now we're talking 16 years ago
21    when I started in 1990, 1991.  This is a long, long time
22    ago.  I just don't recall.
23    Q    Okay.  If you had provided that direction, would
24    you have written a memoranda or memorandum to the

Page 179

1    director of research and development?
2    MR. PATTON:  I object to the form of the question.
3    How can the witness answer that when he has just said he
4    doesn't recall?
5    MR. UELAND:  Q  I think you can answer it.
6    MR. PATTON:  It's entirely hypothetical.
7    THE WITNESS:  I can't say.  I can't say.
8    MR. UELAND:  Q  During the time that you were the
9    business management director for dry shavers, did you
10    ever direct the research and development department to
11    specifically focus on solutions to problems or things
12    that you thought could be improved with respect to dry
13    shavers?
14    A    There were occasions where there would be a
15    request for a shaver to meet a certain price point for a
16    certain rate of profitability, yes.
17    Q    And would you issue those requests in writing?
18    A    They would probably be formulated by the product
19    program management as a result of a series of meetings.
20    Q    Would those meetings be specifically called to
21    address these problems or --
22    A    Either a specific project or within the
23    framework of looking for ideas for new shavers.
24    THE WITNESS:  Just off the record, I have to be out

Page 180

1    of here the latest at half past 4:00.
2    MR. UELAND:  Okay.  We'll do our best to accommodate
3    you.
4    Handing you what I will mark as Defendant's
5    Exhibit 46, a version of this document that is in German
6    was previously marked as Defendant's Exhibit 16
7    (Exhibit 46 marked as requested.)
8    MR. UELAND:  Q  I'm going to call your attention,
9    Mr. Greaves, back to the time line that I marked as
10    Defendant's Exhibit 36, if you could look at that for a
11    minute.
12    Do you see that shortly after 1990 there it
13    says thesis for diploma, cleaning station Braun/FH Ffm?
14    A    Yes.
15    Q    Do you see that?
16    Do you know if the thesis that I marked as
17    Defendant's Exhibit 46, which bears the Bates No.
18    B005220 to 5227, is the thesis that's referred to in
19    that time line?
20    A    I don't know.  I don't recall seeing this
21    document before.
22    Q    Do you recall -- Do you know who Stefan Zeischke
23    is?
24    A    No, I don't recall him.

Page 181

1    Q    That name doesn't sound familiar to you?
2    A    No, no.
3    Q    If you turn to the last page of the document,
4    you see that this is a list of references?
5    A    Uh-huh.
6    Q    And it says patent department Braun AG, REM
7    department Braun AG, and documentation Braun AG.  Who is
8    REM or what does that refer to?
9    A    I have no idea.  REM.  I have no idea at all.
10    No.
11    Q    You see the title of this thesis is development
12    of a cleaning station for electric shaver, do you see
13    that?
14    A    Yes.
15    Q    And on the list of references, one of the
16    engineers listed is Dr. Jung.
17    A    Dr. Jung, yes -- Mr. Jung you mean on the last
18    page?
19    Q    Yes.
20    A    Yes.
21    Q    Earlier I was asking you about people who worked
22    on the cleaning center project.  Was Dr. Jung someone
23    who worked on the cleaning center project?
24    A    I don't remember him.  I don't remember him

Gilbert Greaves    April 29, 2005

Page 182

1    working on that project.
2    Q  Do you know who Dr. Jung is?
3    A  I worked with a Dr. Jung when he was the R & D
4    director of personal care, hair care appliances and I
5    was also responsible for that line for a bit.
6    Q  Do you see two names under Dr. Jung there is
7    also listed a Mr. Jung?
8    A  Sorry. I've seen a Mr. Jung. Where is the
9    Dr. Jung?
10    Q  Well, it says Dr. Jung engineer, Braun AG, and
11    then just underneath that it says Mr. Jung?
12    A  I'm referring to the Dr. Jung.
13    Q  The doctor?
14    A  Dr. Jung, that's the guy I worked with on
15    personal care. Mr. Jung -- Mr. Jung I don't recall.
16    Q  Do you know the company Mink Bürsten?
17    A  No, never heard of them, no.
18    Q  Did students typically work with the Braun
19    research and development program in conjunction with
20    writing their thesis?
21    A  I can't answer that question.
22    Q  Are you aware of any times that that happened
23    while you were working at Braun?
24    A  I don't recall any. I really don't recall any.

Page 183

1    Q  Would there be any sort of approval that would
2    be necessary for the company to support or work with
3    master's candidates?
4    A  I don't know what the processes were.
5    Q  Who would know that?
6    A  Mr. Jestadt, the head of R & D, J-E-S-T-A-D-T.
7    Q  Mr. Greaves, would you have been the most
8    knowledgeable person at Braun regarding the needs of the
9    shaver business in the early 1990s?
10    MR. PATTON: I'd object to the form of the question.
11    THE WITNESS: I can't -- I mean, there is such a
12    huge knowledge of this category spread all through the
13    company that so many people had so much experience and
14    knew such a lot. In 1992 I had just been working on the
15    line for 24 months.
16    MR. UELAND: Q  What about the commercial needs
17    related to the dry shaving products?
18    A  There had been --
19    MR. PATTON: I'm going to object to the form.
20    THE WITNESS: As I said, there were a huge body of
21    knowledge distributed among many people all through the
22    company working on shavers longer than I had, working
23    within Braun longer than I had been with the company.
24    MR. UELAND: Q  Well, as business management

Page 184

1    director for dry shavers, did you think that it was
2    necessary for you to be aware of the commercial needs in
3    that market?
4    MR. PATTON: I'm sorry, I object to the form of the
5    question.
6    THE WITNESS: Can you rephrase or repeat the
7    question.
8    MR. UELAND: Q  Sure, I'll repeat it.
9    As business management director for dry
10    shavers, did you think it was necessary for you to be
11    aware of the commercial needs in the market?
12    MR. PATTON: Same objection.
13    THE WITNESS: The requirements of the job would be
14    to be as well informed as possible.
15    MR. UELAND: Q  Okay. And if there were people
16    more knowledgeable than you, who were those people?
17    MR. PATTON: Same objection.
18    THE WITNESS: I can only say that spread across the
19    company there were and are people with an immense
20    knowledge of shavers, all the various aspects of dry
21    shaving.
22    MR. UELAND: Q  Well, you said it would be
23    important for you to know in your role as business
24    management director, right?

Page 185

1    MR. PATTON: I'm sorry, I object to the form of the
2    question. This is unintelligible. I'm not going to
3    stand by and let the witness answer a question that has
4    no meaning.
5    MR. UELAND: Are you going to instructing him not to
6    answer?
7    MR. PATTON: No. I'm objecting to the form.
8    MR. UELAND: Well, your objection is noted. You
9    know, we're wasting time with your colloquy.
10    MR. PATTON: We're wasting time with a question that
11    says it's important to know. Know what? And I'd be
12    glad to -- this transcript -- This is a big waste of
13    time because we're sitting here asking him questions
14    that nobody can answer.
15    MR. UELAND: Are you finished?
16    MR. PATTON: For now.
17    MR. UELAND: Q  All right. You testified that it
18    was important as the business management director to be
19    knowledgeable about the commercial needs in the market?
20    MR. PATTON: I'm sorry, I object to the form. That
21    is not what his testimony was.
22    MR. UELAND: Q  Was that -- Is that important as
23    the business management director to know what consumers
24    want?

47 (Pages 182 to 185)

Page 186

1    A  It is important to know as much as possible
2  about the category.
3    Q  Including what consumers want?
4    A  Including what consumers want.
5    Q  Including what features consumers consider
6  desirable, right?
7    A  Including that, yes.
8    Q  Now, are you the most -- were you the most
9  knowledgeable person during the time from 1990 to 1997
10  at Braun on that subject?
11    A  I cannot answer that question.  How can I
12  possibly answer that question?  You'd have to organize a
13  quiz among all the people working in Braun from 1990 to
14  1997 as to what they knew about shavers in that period
15  of time.  I cannot answer that question.  I have no
16  idea.
17    Q  In gathering information about that, did you
18  ever do that, did you ever ascertain to find out what
19  consumers wanted or what features consumers thought were
20  desirable?
21    A  There was a stream of information coming in from
22  the selling subsidiaries, from market research reports,
23  from retail audit panels.  It was all being analyzed and
24  collated and conclusions were being drawn.  That was an

Page 187

1  ongoing process.  It's still going on.
2       Now, whether that represents the total sum of
3  knowledge on dry shavers and whether that knowledge was
4  in the head of one person, nobody can say.
5       Some people might claim to have that knowledge,
6  but it's extremely arrogant and very unlikely that they
7  do have it.
8    Q  Did you ever have to report to anyone on what
9  new products Braun might look to develop that were
10  responsive to consumer desires?
11    A  There was a regular process.
12    Q  Who did you report to?
13    A  The board of the company.
14    Q  Did you prepare for those presentations?
15    A  We prepared for those presentations with R & D.
16    Q  Okay.  So would you ask people in R & D about
17  what the marketplace was demanding or what they -- the
18  marketplace thought was desirable in terms of features
19  for --
20    A  There was a dialogue going on the whole time, an
21  on-going dialogue.
22    Q  Okay. · Who in R & D would you ask about those
23  issues?
24    A  Dr. Pahl, the people responsible for the various

Page 188

1  families of shavers, there would be formal conversation,
2  there would be informal conversation going on the whole
3  time.  There would be people coming in from the markets.
4  This was, as I say, this is an ongoing -- it's a fluid
5  situation.
6    Q  Would there ever -- would you ever request
7  anything in writing from the people in research and
8  development?
9    A  The documentation was usually generated and
10  managed by the PPM function.
11    Q  And the PPM function again is?
12    A  The product program management function.
13    Q  And are those the people who are under the group
14  managers in your department?
15    A  That was a separate -- the PPM function is a
16  separate function within technical or used to be.  I
17  don't know how it's organized now.
18    Q  Would you ask the PPM for documentation?
19    A  Well, he would usually put the documents
20  together.  He would -- one of his functions was to
21  manage the documentation.
22    Q  The PPM would?
23    A  The PPM would.
24    Q  And give them to you?

Page 189

1    A  Well, he would circulate them to the engineers,
2  the R & D, and the business managers.
3    Q  Do you know if you ever received anything from
4  the PPM regarding consumer desires for a better way to
5  clean a shaver?
6    A  I can't remember.
7    Q  If you had -- If documents that pertained to
8  that subject exist, would they be with the PPM still?
9    A  I don't know.  I don't know the status of the
10  archives.
11    Q  But they would have been at PPM at the time?
12    A  Probably, yes.
13    Q  Okay.  And you don't know generally how long PPM
14  keeps documents?
15    A  I don't know.
16    Q  Does Braun have off-site storage or somewhere
17  where they put documents --
18    A  I don't know.  I've been retired for 12 months.
19  I have no idea what's going on now.
20    Q  Did they when you were working for the company?
21    A  I don't know.
22    Q  Did there ever come a time where you had
23  documents that you no longer thought were useful, what
24  did you do with them?

48 (Pages 186 to 189)

Page 190

1    A  Me personally?
2    Q  You personally.
3    A  I occasionally shredded documents, yes.
4    Q  Did you ever send anything to any off-site
5 storage facility?
6    A  I can't remember doing so.
7    MR. UELAND:  Are you aware of any research -- I'm
8 sorry.
9       Let me first mark as Defendant's Exhibit 47 a
10 document that is Bates labeled B001008 through 1012.
11 And, again, sir, I would invite you to look at the time
12 line in conjunction with this document.
13       (Exhibit 47 marked as requested.)
14    THE WITNESS:  Yes.
15    MR. UELAND:  Q  This document is entitled external
16 studies for C & C.
17    A  Uh-huh.
18    Q  Does this refer to studies that were
19 commissioned by Braun by outside entities?
20    A  I don't know who commissioned them.  There is a
21 list of external organizations, but who commissioned the
22 work I don't know.
23    Q  Well, if it's related to the Clean & Charge
24 project, doesn't --

Page 191

1    A  I just don't -- I don't know.  I don't know.  I
2 don't want to give you the wrong answer.
3    Q  All right.  Do you see the first line, it says
4 Fresenius.  Am I pronouncing that incorrectly?
5    A  Fresenius, yes.
6    Q  Fresenius hygiene study 1994/1998/2000.
7       Now, I understand you left your role as the
8 business management director for dry shavers in 1997.
9    A  Correct.
10    Q  So I'll just focus on the 1994.  Do you remember
11 any Fresenius hygiene study?
12    A  No.
13    Q  Who is Fresenius?
14    A  It is, I think, a laboratory that does chemical
15 tests principally, I think, on water, on safety and
16 cleanliness of water.  So if you want some material
17 tested for its components or whether it's safe, whether
18 the food is safe, you would go to this institute.  I
19 think that's what they're specialized in.
20    Q  Okay.  Did you ever have an occasion to work
21 with Fresenius while you were the business management
22 director?
23    A  Personally not.
24    Q  Did you ever direct anyone to --

Page 192

1    A  No, never, never.
2    Q  If you see down underneath the Fresenius entry,
3 and then the one for TÜV Rheinland, there is one that
4 says CONFARMA/Inchem 1997 and 1998.  And underneath that
5 it says, compatibility of substances with skin,
6 compatibility of substances with mucous membrane.
7       Do you see that?
8    A  Yes.
9    Q  Who is CONFARMA?
10    A  I don't know.  I'm sorry.  I haven't heard of
11 them.
12    Q  Who is Inchem?
13    A  Also, I don't know, I don't know.
14    Q  If there were external studies that were done in
15 conjunction with a project, is that a function more
16 of -- under you as the business management director or
17 more under someone like Dr. Dietrich Pahl as the head of
18 the R & D department?
19    MR. PATTON:  I object to the form of the question.
20    THE WITNESS:  Put it this way, I would not in my
21 function commission technical outside studies.
22    MR. UELAND:  Q  Okay.  Do you know what entity
23 would do that?
24    A  Somebody in the technical department.

Page 193

1    Q  Does the technical department include research
2 and department?
3    A  It would include research and development, yes.
4    Q  Who else would it include or what other
5 functions would it include?
6    A  Engineering, quality, manufacturing and design.
7    Q  Don't all those entities that you just listed,
8 don't they all fall under the larger umbrella of
9 research and development?
10    A  No.
11    Q  No?
12    A  No.
13    Q  They're separate?
14    A  They're separate.
15    Q  Well, who is the head of engineering?
16    A  Do you really want somebody who has been outside
17 the company to talk about the organization at Braun?
18    Q  Who was the head of engineering during the time
19 that you were the business management director?
20    A  I don't remember his name.  I just -- I don't
21 know.
22    Q  Would I go to HR for that?
23    A  You would have to go to HR for that.
24    Q  Who is -- You said quality is another

Gilbert Greaves    April 29, 2005

Page 194

1  department. What do you mean by that?
2      A  Quality control, quality integrity.
3      Q  Okay. Who was the head of the quality control
4  department during the time that you were the business
5  management director at Braun for dry shavers?
6      A  The name is gone, I don't know. I just don't
7  remember.
8      Q  I would have to follow up with HR for that?
9      A  Yes.
10     Q  What about manufacturing and development or, I'm
11 sorry, manufacturing and design, do you know who the
12 head of the manufacturing and design department was?
13     A  Well, they are two separate departments. Design
14 I think was still Professor Rams, R-A-M-S. And
15 manufacturing, again, I have a hazy memory, I don't
16 know, I can't give you -- it would be speculation if I
17 gave you a name.
18     Q  Okay. Do you know why any of these divisions
19 would commission external tests as they were developing
20 a product?
21     A  No, that would be their decision for their
22 reasons.
23     Q  So you don't know why someone in one of those
24 groups would commission a hygiene test?

Page 195

1      A  No.
2      Q  And would -- and the results of a hygiene test
3  wouldn't be shared with the business management
4  director?
5      A  I cannot recall seeing the results of the -- of
6  any of these tests. And as you yourself said, after
7  1997 it wouldn't have been my area of responsibility.
8      Q  Apart from the cleaning center project, sir, do
9  you recall ever being shown the results of a hygiene
10 test when you were the business management director?
11     A  I can't recall now.
12     Q  Okay. What about any tests from Inchem, and,
13 again, this is apart from the cleaning center project,
14 are those the kinds of external studies that you're
15 shown?
16     A  I don't know what Inchem does. I don't even
17 know what the company does.
18     Q  All right. Do you know what an approbation
19 inquiry for fire and explosion is?
20     A  If you want to sell an electrical product in a
21 country, you have to get the product approbated. In
22 other words, an independent authority has to confirm
23 that the product is safe for sale.
24     In the United States I think it's UL, United

Page 196

1  Laboratories, and in Canada it's CSA, so you will see a
2  symbol on products sold in the States with UL/CSA.
3      And the process of getting the approval that
4  the product is safe for sale and meets all technical and
5  safety requirements is called the approbation authority.
6  Also, obviously a product must be fire safe.
7      So that would be the background for this
8  approbation. It is the -- The approbation process
9  obtains the certification that the product meets legal
10 requirements and can be sold. If you don't have the
11 approbation, you can't sell.
12     Q  So it's a prerequisite to commercialization?
13     A  Correct.
14     Q  So as a business management director, are you
15 concerned with getting an approbation?
16     A  I would be very concerned with not getting one
17 because then you can't launch your new sales. Yes, it's
18 extremely important to get the product approbated.
19     Q  Would you -- is that your responsibility to get
20 it approbated?
21     A  No.
22     Q  Whose responsibility is that?
23     A  When I was working, I think it was in the
24 quality department, it was one of the functions of the

Page 197

1  quality -- to -- based on the information provided to
2  them to liaise with the approbation authorities and get
3  the sales release.
4      Q  Would you only hear about quality about
5  approbation if it wasn't approbated or would you hear,
6  yes, we got the thumbs up, we got approbation?
7      A  Both. You got it -- also, you get a warning
8  that there is a problem because if there is a problem,
9  you'd have to go to the sales subsidiaries and say there
10 could be a delay or there is a delay.
11     Q  Okay. Do you know during the time that you were
12 the business management director, was there ever a
13 problem or an issue getting the cleaning center
14 approbated?
15     A  Prior to 1997?
16     Q  Well, my question does have that limitation
17 built into it, so that would be my first question, yes.
18     A  It wasn't relevant. I mean, to get an
19 approbation, you have to submit a final product.
20     Q  I see.
21     A  To get the final -- you have to go to them, this
22 is the shaver, this is the cleaning center, please do
23 all your tests and tell us -- and give us the
24 approbation.

50 (Pages 194 to 197)

Page 198

1    Q  So you weren't thinking this thing -- This
2  cleaning center project to your mind wasn't anywhere
3  near being ready to be commercialized at the time you
4  left?
5    A  It was a long way in the future as far as I
6  could tell at the time I left, yes.
7    Q  Okay.  So, I mean, it just wasn't an issue at
8  all?
9    A  Not when I left shavers, no.
10    Q  Do you know -- and you asked me, you know, if I
11  was asking you ever about approbation.
12        Do you know if ever, including the time after
13  you left your role as business management director,
14  there ever became an issue with obtaining approbation
15  for the cleaning center?
16    A  I cannot recall any problems.  I have no
17  recollection of there being any problems at all.
18    Q  Okay.  If there were problems with it, would
19  those kinds of documents reporting on those problems be
20  in the quality assurance group?
21    A  I would assume that all documentation relative
22  to approbation would be within the quality department if
23  that's where this process is still -- still lies.
24    Q  Would information about problems with obtaining

Page 199

1  approbation be shared with the business management
2  director for dry shavers in the instance that it
3  pertains to the cleaning center project?
4    A  If the problem were grave enough to endanger
5  launch dates, yes.
6    Q  Well, doesn't failure to obtain approbation
7  affect launch dates?
8    A  Well, you can have a small problem that can be
9  fixed very quickly and doesn't affect the timetable.
10    Q  Okay.
11    A  Then that would just, you know, that's normal
12  work.
13        If it's something major that requires a product
14  redesign or some major change, then, obviously, the red
15  flag would go up.
16    Q  Okay.  How much of a red flag is that?  Is it
17  something that you as in your role of director of
18  strategic analysis, is that right?
19    A  This would be relevant for the product line
20  director.
21    Q  Only?
22    A  Only.  Well, I mean, it's -- a delayed product
23  launch is relevant for the whole company, but
24  operationally it's a major, major issue for the product

Page 200

1  line director.
2    Q  I guess my questions is how high up does that
3  information go?  Would the product line director have to
4  report that to someone?
5    MR. PATTON:  I object to the form.
6    THE WITNESS:  I mean, let's put it this way, a delay
7  in the approbation on a major product is an issue for
8  the whole company.
9    MR. UELAND:  Q  Fair enough.
10        Do you know if Braun had any research, any
11  market research that indicated that consumers did not
12  believe that the cleaning process was of high
13  importance?
14    A  I'm not aware of -- I'm not aware of that
15  research.
16    MR. UELAND:  All right.  I'm going to hand you what
17  I'm going to mark as Defendant's Exhibit 48.
18        (Exhibit 48 marked as requested.)
19    MR. UELAND:  Q  And it is Bates labeled B001028
20  through 1032, and this document includes German pages
21  and then translated pages, as well.
22        If you turn to the page marked B001028 ENG,
23  it's the first page in English, it's entitled group
24  discussion washable shaver Braun user.

Page 201

1        Have you seen this document before?
2    A  I don't recall seeing it, no.
3    Q  Okay.  Do you know, is this something that Braun
4  is -- typically does, that is, invite groups of users of
5  its products for discussions?
6    A  When I was running shavers, yes, it was
7  something we would typically do, yes.
8    Q  This helps you ascertain --
9    A  By the way, can I make a general observation?
10    Q  Yes.
11    A  I repeat, I have not been working at this
12  company for 12 months.
13    Q  I understand.
14    A  So when you ask me does Braun do this, does
15  Braun do that, when I'm talking about business
16  management, it's valid up to 1997.
17    Q  Okay.  That's fair.
18    A  It's quite important, I think.  And that
19  anything I say between '97 and 2004 is within the
20  function of strategic planning.  And for two years I was
21  not working here, I was working in the United States of
22  America, so just to qualify everything I've said.
23  Sorry.  That was a digression.
24    Q  That's not a problem.

Page 202

1    The reason why during the time that you were
2  the business management director you would hold these
3  group discussions is because it was a good way to find
4  out what consumers wanted or what was important to
5  consumers?
6    MR. PATTON: Object to the form of the question.
7    THE WITNESS: It was a standard process to elicit
8  information from the market relative to a product or to
9  a particular issue, product issue.
10   MR. UELAND: Q  The first question here is what
11 negative aspects of dry shaving can you spontaneously
12 think of, do you see that?
13   A  Uh-huh.
14   Q  And then it has number, and then it has a number
15 of, I guess, responses. The first one is 14 not so
16 thorough. Does that indicate to you that 14 people
17 responded that the number -- the thing that they could
18 spontaneously think of was that dry shaving was not so
19 thorough.
20   A  The reason I can't answer that question is that
21 I don't know how many people took part in these group
22 discussions. I don't see a description of the
23 methodology, so I would be speculating if I told you
24 what I thought 14 meant.

Page 203

1    Q  Does that stand to reason that it's 14 people
2  respond to that?
3    MR. PATTON: Object to the form of the question.
4    THE WITNESS: We'd have to look at the methodology
5  to -- otherwise it's a speculative answer.
6    MR. UELAND: Q  That's fine.
7    If you please turn to B001031 ENG.
8    A  Yes.
9    Q  There are a number of questions there. It says,
10 how often do you clean the shaver, and there is times
11 per week sort of on a little bit of a graph here. Then
12 there is three, how satisfied are you with. And that's
13 on a scale of one to seven with seven being very
14 satisfied and one being not satisfied at all. And then
15 question 4 is when considering the complete shaving
16 process, what importance does the cleaning process have
17 for you, and that again is on a sale of one to seven
18 with one being low importance and seven being high
19 importance.
20   And at the bottom there next to the arrow it
21 says, the cleaning process does not have such a high
22 importance.
23   Does this refresh your recollection that Braun
24 had market research that suggested that the cleaning

Page 204

1  process wasn't important to consumers?
2    MR. PATTON: I object to the form of the question.
3    THE WITNESS: Well, I don't recollect seeing this
4  particular piece of research. And I don't recollect --
5  I don't recollect seeing this particular piece of
6  research.
7    MR. UELAND: Q  And it doesn't refresh your
8  recollection that Braun knew or had market research that
9  stated the cleaning process did not have such a high
10 importance?
11   MR. PATTON: Please note my objection.
12   MR. UELAND: Q  It's apart from whether or not
13 you've seen this document.
14   Just does it refresh your recollection that
15 Braun had that information?
16   A  If this is a group discussion with a certain
17 number of respondents, No. 1, this is not a quantitative
18 study. The next stage would be to go and validate what
19 you think you found in here on a statistically
20 significant sample of people. So the fact that you got
21 this piece of paper, the next thing you have to do is go
22 out and validate it with a representative sample on a
23 much bigger scale.
24   So this is not knowledge, this is not validated

Page 205

1  knowledge.
2    Q  What is it, then?
3    A  What I just mentioned, that you'd have to go out
4  and validate the results.
5    Q  And you don't know either way whether or not
6  this was ever validated?
7    A  I don't know. I don't know.
8    Q  Okay. You know, we've been talking -- we talked
9  today a little bit about the commercialization of a
10 product. And you said that you were consulted by the
11 patent department to determine whether or not it was
12 commercially worthwhile to pursue patent protection, is
13 that right?
14   A  On a -- generally, yes.
15   Q  Okay. Apart from just working with the patent
16 department, were you as the business management director
17 for dry shavers in a position where you were to evaluate
18 whether a product was worth commercializing?
19   A  It was part of the evaluation of the potential
20 of products. It was part of the -- it was part of the
21 function of the department.
22   Q  So yes?
23   A  Yes.
24   Q  Okay. What sorts of data did you rely on in

52 (Pages 202 to 205)

Page 206

1 deciding whether or not products were worthwhile of
2 development and that they should be commercialized?
3     A  You would use things like design tests to see if
4 people liked the design.  You would do price point
5 studies to see if people were -- the people responded
6 with interest in a product at a particular price point.
7 You would do tests on various positionings.  You would
8 do tests on the advertising.  You would test the
9 packaging.  There would be a whole range of tests that
10 you could -- that we can do up to 1997.
11        Since 1997, as I understand it, there was a
12 whole new range of techniques which I can't explain to
13 you.  But I know that they've been developed to evaluate
14 the product's potential.
15     Q  All right.  If you had information that
16 indicated that consumers were satisfied with the status
17 quo with the way that shavers that cleaned right now,
18 would that make it more or less likely for Braun to
19 pursue commercialization of a new product?
20     MR. PATTON:  I object to the form of the question.
21 It's a hypothetical.
22     THE WITNESS:  I think it's a platitude about
23 consumers that people don't know what they want.  Okay.
24 Who wanted an iPod before it came out?

Page 207

1     MR. UELAND:  Q  Who wanted a what?
2     A  An iPod before it came out.  And there are many,
3 many examples of some product coming on the market and
4 being extremely successful.  It creates its own demand
5 or, okay, yes, it doesn't seem so important.  But if the
6 solution is so simple, well, okay, I will buy it, it's
7 not a major, major issue, but it's such a fantastic
8 solution, it's so easy to use, and I am generalizing, I
9 am prepared to pay the price.
10        And, unfortunately, you cannot rely on --
11 sometimes you can't rely on market research to pull out
12 this kind of consumer response.
13     Q  Would you think it's a fair comparison to
14 compare the cleaning center to the iPod in terms of that
15 sort of demand?
16     A  I was talking in general terms.  I was just
17 talking and making an analogy.  All analogies are false,
18 as we know.
19     Q  Right.  And I'm just asking you, do you think
20 it's an apt analogy, I'm taking your analogy and asking
21 you whether or not you think that that's a good way to
22 describe the demand for this product?
23     A  The response that this product receives and
24 continues to receive I think is -- confirms the fact

Page 208

1 that it's fulfilling a consumer need.  I think that as a
2 fact nobody would disagree with that.
3        I can't judge whether the -- I'm not capable of
4 judging whether all the work done prior to the launch
5 correctly projected the extent of the consumer response.
6 I can't judge that.  All I can tell you is that it's,
7 obviously, at least it was until I left the company, a
8 very successful product.
9     Q  How do you define a commercially successful
10 product?
11     A  One that meets the financial criteria that the
12 Gillette Company has set up.
13     Q  Is there a specific criteria that the Gillette
14 Company has set out?
15     A  They set a minimum criterion, yes.
16     Q  Do you know what those are?
17     A  No, no longer, no longer, things like return on
18 investment and the standard return and return on
19 investment, things like that.
20     Q  Is that something that a business management
21 director for a particular line or product would know?
22     A  Yes.
23     Q  Is that written down somewhere?
24     A  That would be somewhere in the financial

Page 209

1 department, yes, again, until the end of February, 2004.
2     Q  Right, no, right, I understand.  I understand.
3        Outside of those numbers are there any other
4 indicators to you as to whether a product is
5 commercially successful?
6     A  Well, there are financial criteria that have to
7 be fulfilled consistently.  That's one measure.  Then
8 there is the -- you put together a sales plan, how many
9 products are you going to sell at what price, have you
10 met those requirements, then have you met the cost
11 targets, have you generated the sales within the
12 advertising budgets.  I mean, there are a whole slew of
13 criteria which have to be met.  But probably the core
14 one is the return on the investment.
15     Q  Okay.  When you first saw the prototype in 1995,
16 1996, did you think or did you have any urgency to get
17 that product to market?
18     A  I think I've mentioned that when I first saw it
19 and I had these observations on size, noise, and initial
20 cost estimates.  And until those issues had been
21 resolved, it was very difficult to make an informed
22 evaluation.
23     Q  At that point you were --
24     A  At that point.

53 (Pages 206 to 209)

Page 210

1   Q   Okay.  So at the time you saw it, you didn't
2  have any idea that we need to get this product to market
3  as soon as we can?
4      MR. PATTON:  I object to the form of the question,
5  asked and answered.
6      THE WITNESS:  I can only repeat that when I saw it,
7  I saw question marks on size, noise, and cost.
8      MR. UELAND:  Q   Okay.  Do you know of any
9  information or market research that Braun has or
10 gathered prior to commercializing the product that
11 suggested that this product would be a success?
12     A   I can't recall.  I can't recall any.  As I said,
13 I moved off the shaver line in '97.
14     Q   Would your successors, would they have that
15 information if it existed?
16     A   As I said, if it exists, it's in the market
17 research archive.
18     Q   Okay.
19     A   If it's still on record.
20     Q   Okay.
21     MR. UELAND:  If we can go off right now, I can just
22 see how much I have left and hopefully finish up.
23     THE VIDEOGRAPHER:  Off the record at 3:59.
24     (a brief recess was taken)

Page 211

1      THE VIDEOGRAPHER:  On the record at 4:03.
2      MR. UELAND:  Q   All right.  Mr. Greaves, earlier on
3  you testified about your group manager who was under you
4  during the time that you were the business management
5  director, a man by the name of Mr. Blueder?
6      A   Correct.
7      Q   When Mr. Blueder would communicate or report to
8  you, would he ever do it in writing?
9      A   He would copy me in memos or e-mails if we had
10 e-mails at that time, I can't remember.  He would copy
11 me in.  But he was -- our offices were next to each
12 other, so, I mean, it was mostly verbal communication.
13     Q   Okay.  But the memos that from time to time that
14 he would copy you on, would you keep those documents in
15 your files?
16     A   Yes.
17     Q   Earlier on I asked you who the most
18 knowledgeable person in Braun about consumer desires
19 about particular features of products would be, and I
20 appreciate that Braun is a large company and that there
21 might not be one person who is most knowledgeable.
22     But let me ask you this:  You said you started
23 in 1990.  If on the first day of your job someone asked
24 you, Mr. Greaves, please tell me what consumers desire

Page 212

1  in a dry shaver, who would you have gone to to get that
2  information?
3      A   I would have talked to the people in Germany
4  because it's a big market, Japan is extremely
5  important, so I would have talked to the company manager
6  of Japan, I would have talked to the R & D people, I
7  would have talked to the market researchers.  I would
8  have talked to the product managers I inherited when I
9  took over the line.
10     Q   Who are some of those names that you mentioned
11 in those titles?
12     A   I'm not being facetious, mostly people who have
13 since retired.
14     Q   Okay.  Can you give me their names in any event?
15     A   Hans Pauli, who was the company manager in
16 Japan; David Hawkins who ran market research but he is
17 apparently very sick, has a big onus.  Then the -- I
18 mean, how many names do you want?
19     Q   Well, why don't you give me the names of the
20 project managers that you inherited?
21     A   You're not going to call them as witnesses, are
22 you?
23     Q   Oh, that's all right, I forgot.  We asked that
24 earlier and you didn't recall.

Page 213

1      A   I don't remember the product managers.  I
2  remember David Hawkins was head of market research.
3  Pauli was the R & D guy.  Helmet Faulstich, a name I've
4  mentioned, was PPM.  He has tremendous experience on
5  program management on shavers.  Hans Pauli was in
6  Germany.  I think, actually, Hans-Martin Blueder was
7  running shavers in Germany at the time.  So he knew a
8  lot about the German market.
9      And, you know, so the list of -- there is a guy
10 called Peter Waller who was the marketing manager in the
11 United States, but he is -- I think he works for
12 Kentucky Fried Chicken now.  I mean, the lists -- I
13 mean, that's the trouble, people -- they change their
14 jobs and then they go on to another company and then
15 they go on to the next company.
16     Q   Right.  Did any of those names that you listed,
17 did they leave the company in the time period that you
18 were the business manager?
19     A   Peter Waller did.
20     Q   He is the one who went to Kentucky Fried
21 Chicken?
22     A   Yes.
23     Q   Do you know who replaced Peter Waller?
24     A   These guys are going to kill me.  A guy called

54 (Pages 210 to 213)

Gilbert Greaves    April 29, 2005

Page 214

1  Dick Cantwell became the marketing manager of the United
2  States. He ran the United States marketing operation
3  for many years.
4      Q  Okay.
5      A  So he knew the United States market very well.
6      Q  Okay. So after the time that Mr. Waller left
7  and if you needed to know what consumers wanted in the
8  United States market, would you go to Mr. Cantwell?
9      A  Well, when you say what consumers wanted in the
10  United States market, I don't think anybody had that
11  comprehensive knowledge. The marketing manager in the
12  United States would tell me about the market conditions,
13  which shaver models were selling well, what the trade
14  was saying, the problems and opportunities he saw from
15  his perspective. That kind of information would be
16  coming in on a permanent basis from all markets. It was
17  kind of institutionalized in the company.
18      Q  If you could just turn back to the time line,
19  Defendant's Exhibit 36.
20      MR. PATTON: Here it is.
21      THE WITNESS: Thanks.
22      MR. UELAND: Q  You see that sometime after 1995
23  but it looks like before 2000 it says Phillips washable
24  Quadra action U.S.A.

Page 215

1      A  Yes.
2      Q  Are you familiar with or do you know what the
3  Phillips washable Quadra action is?
4      A  I think that it refers to a product that
5  Phillips brought out with a sachet with cream, and I
6  think like a saving foam. And as you shaved, this --
7  the cream came onto the skin and then you -- to make a
8  more refreshing, smoother shave.
9      Q  The cream came out of the shaver?
10      A  Out of the shaver, yes. And then there was a
11  sachet on the back of the shaver. I think with the
12  pressure and this stuff would come out onto the skin
13  with the shaving action. Subsequent to the shave you
14  would wash it off your face and you would rinse the
15  shaver to get all the cream and dirt out. I think
16  that's what it's referring to.
17      Q  Okay. Have you ever heard of a product called
18  the Philishave Action Cleaner?
19      A  I assume it's this one. Action Cleaner? No.
20      Q  No?
21      A  No. Phillips Action Cleaner, no.
22      Q  Did you ever -- Did there ever come a time that
23  you can recall, and this is in or around the end of your
24  tenure as business management director, looking at a

Page 216

1  video of a competitive shaving product or competitive
2  cleaning product for a dry shaver?
3      A  No, no, not around '96, '97.
4      Q  Before then?
5      A  No, no.
6      I can recall Phillips' commercials, but when
7  the product with the sachet came out, I'm afraid I can't
8  remember. I can remember seeing commercials, but I
9  can't remember a specific commercial on the cleaning.
10      Q  Do you remember Phillips ever commercializing a
11  product, a dry shaver product that could be cleaned
12  using a cleaning fluid?
13      A  I remember seeing in trade, trade business in
14  the States a Phillips cleaning contraption, but I can't
15  remember how it worked. But it was a separate, as I
16  recall it, a separate unit that you bought separate from
17  the shaver, but I can't remember how it worked.
18      Q  So you don't know if it used cleaning fluid
19  either?
20      A  I can't recall. I'm afraid I can't recall.
21      Q  So you don't know if Braun ever did any testing
22  on that Phillips cleaning fluid?
23      A  I cannot recall I'm afraid, no.
24      Q  Do you know if that Phillips product employed

Page 217

1  the use of a filter?
2      A  I don't know. I'm afraid I can't remember.
3      MR. UELAND: Okay. Mr. Greaves, thank you for your
4  time. I don't have any other questions for you.
5      THE WITNESS: Thank you.
6      MR. PATTON: No, no. Thank you.
7      THE VIDEOGRAPHER: This marks the end of tape No. 4
8  in the deposition of Gilbert Greaves. We are off the
9  record at 4:12.
10          - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

55 (Pages 214 to 217)

Gilbert Greaves    April 29, 2005

Page 218

1  STATE OF ILLINOIS )
                     ) ss:
2  COUNTY OF COOK )
3
4        The within and foregoing deposition of the
5  aforementioned witness was taken before TRACY L.
6  BLASZAK, CSR, CRR, and Notary Public, at the place, date
7  and time aforementioned.
8        There were present during the taking of the
9  deposition the previously named counsel.
10        The said witness was first duly sworn and was
11  then examined upon oral interrogatories; the questions
12  and answers were taken down in shorthand by the
13  undersigned, acting as stenographer and Notary Public;
14  and the within and foregoing is a true, accurate and
15  complete record of all of the questions asked of and
16  answers made by the aforementioned witness, at the time
17  and place hereinabove referred to.
18        The signature of the witness was not waived,
19  and the deposition was submitted, pursuant to
20  Rules 30(e) and 32(d) of the Rules of Civil Procedure
21  for the United States District Court, to the deponent
22  per copy of the attached letter.
23        The undersigned is not interested in the within
24  case, nor of kin or counsel to any of the parties.

Page 219

1        Witness my official signature and seal as
2  Notary Public in and for Cook County, Illinois, on this
3  _____ day of _____, A.D. _____.
4
5
6
7
8        _____
         TRACY L. BLASZAK, CSR, CRR
9        CSR No. 084-002978
         230 West Monroe Street
10       Suite 1500
         Chicago, Illinois  60606
11       Phone:  (312) 263-3524
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 220

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRAUN GmbH,                    )
                               )
        Plaintiff,             )
                               )
    -vs-                       )  No. 03-CV-12428 (WGY)
                               )
RAYOVAC CORPORATION,           )
                               )
        Defendant.             )

    I, GILBERT GREAVES, being first duly sworn, on
oath say that I am the deponent in the aforesaid
deposition taken on April 27, 2005; that I have read the
foregoing transcript of my deposition, consisting of
pages 1 through 220 inclusive, and affix my signature to
same.


            _____
                 GILBERT GREAVES

Subscribed and sworn to
before me this _____ day
of _____, _____.


_____
Notary Public
tb


            LEGALINK  -  CHICAGO
                (312) 263-3524

            LEGALINK - CHICAGO
        230 West Monroe St. - Suite 1500
             Chicago, Illinois 60606
     (312) 263-3524    (312) 236-8461

                          May 9, 2005

Mr. Gilbert Greaves
c/o Ropes & Gray, LLP
One International Place
Boston, MA 02110
Attn: Mr. William L. Patton
    Re:  Braun vs. Rayovac
         03-CV-12428
    Dep:  Mr. Gilbert Greaves - 4-29-05
Dear Mr. Greaves:
    The deposition testimony given on April 29, 2005,
in the above-captioned case has been transcribed, and
inasmuch as signature was not waived, this is to advise
that the deposition will be available in our office for
30 days for reading and signing.
    If you choose to read and sign your deposition at
our offices, please call the undersigned for an
appointment. Our office hours are from 9:00 a.m. to
4:00 p.m., Monday through Friday.

    If you choose to make other arrangements for the
reading and signing of your deposition, please advise us
of the arrangements you have made in writing within 30
days from the date of this letter.
        Sincerely yours,


        _____
                 LegaLink


cc: Mr. Kevin S. Ueland          tb126187
        LEGALINK  -  CHICAGO
            (312) 263-3524

Gilbert Greaves    April 29, 2005

| A | | | | |
|---|---|---|---|---|

**A**

abilities 21:11
ability 61:24 136:11
  176:10
able 8:18 57:10 90:17
  109:7,11 136:10
  163:12 167:1
above-captioned
  221:11
absence 63:19
absolutely 8:24 14:17
  49:7 76:24 78:4 86:4
  141:12 165:14
  166:21
absorbed 93:1
accept 154:14
access 49:14 93:21
accommodate 180:2
accompanies 89:16
account 29:22 31:14,18
  172:20
Accountancy 15:15
accurate 40:9 68:4,7
  70:2 218:14
achieve 150:10,22
acting 218:13
action 5:19 214:24
  215:3,13,18,19,21
activated 137:15
activities 20:24
activity 22:21 105:21
actual 10:23 38:15 69:9
adapting 20:8
add 154:13,13
addition 17:15 22:2
  69:15 128:11
additional 146:2
address 29:16 51:19
  52:2 178:16 179:21
addressed 154:16
  161:5
administration 25:13
advance 12:22
advertising 20:9,19
  22:18 26:19 27:5
  38:6,15 206:8 209:12
advise 221:12,17
advising 73:4
aerosol 102:1
affairs 40:5
affect 199:7,9
affix 220:13
aforementioned 218:5
  218:7,16
aforesaid 220:10
afraid 216:7,20,23

217:2
afternoon 166:7
AG 181:6,7,7 182:10
agency 30:5,7
ago 5:4,9,10 9:19 27:17
  40:18 161:2 173:18
  178:20,22
agree 14:8,9 106:1,12
  155:3,15,16 167:18
agreed 10:6 11:8,8
  153:11 154:12
  155:12
agreeing 160:12
ahead 85:2 98:9
AIR 110:2
alcohol 138:7
Alf 77:17
allocated 92:4,20
allow 5:2
allowed 85:11,22 102:9
amend 7:10
America 201:22
amount 6:3 29:23
analogies 207:17
analogously 178:5
analogy 177:3 207:17
  207:20,20
analysis 20:24 21:2,11
  21:13,15,18 22:3,3
  32:10,12 42:21 61:12
  199:18
analyst 16:7,11 17:12
  17:20 18:21
analyze 21:21
analyzed 186:23
analyzing 16:14
anhang 156:10,11
annual 35:14 124:2
answer 7:23 8:14 13:5
  13:22 23:6 27:23
  40:9 43:6 45:18 46:4
  46:6 58:1 69:14
  71:13 72:21 73:1,11
  73:13 79:20 81:19
  83:12,15,17,18,20
  84:5 86:1,4 90:22,24
  95:4 101:24 103:21
  109:5,5,7,11,17
  112:16 114:5,6 117:4
  117:7 120:2 122:1
  141:1 150:10,23
  151:22 153:24 154:1
  154:1,2,2 157:6
  163:5 167:9 173:24
  179:3,5 182:21 185:3
  185:6,14 186:11,12

186:15 191:2 202:20
  203:5
answered 31:16 34:20
  109:21 139:2 157:11
  168:9,11 210:5
answering 8:8 149:14
answers 7:10,14 88:3
  90:14 102:6 151:9,23
  154:11 218:12,16
anybody 36:1 40:15
  44:7,17 46:1 52:14
  66:7,20 76:9 80:2
  100:15;17 157:20
  214:10
anymore 39:24
anyway 141:12
apart 127:8 195:8,13
  204:12 205:15
apologize 25:18
apparatus 137:19,20
apparently 212:17
appear 42:19
appearance 132:6
appliance 35:13
appliances 182:4
applicant 146:10
application 45:4
  142:24 143:6,13,22
  144:1,11,16 145:5,14
  148:13,23 149:6
  156:17 164:6
applications 41:23
  153:16
applied 43:8 45:11,24
  46:11 93:12
applies 80:3
apply 45:21 148:9
applying 45:15 148:9
appointed 9:13
appointment 221:15
appointments 51:7
appreciate 151:19
  161:3 211:20
apprised 49:2,6,8
  80:20 84:9
approbated 195:21
  196:18,20 197:5,14
approbation 195:18
  196:5,8,8,11,15
  197:2,5,6,19,24
  198:11,14,22 199:1,6
  200:7
appropriate 164:13
appropriation 94:15
  94:19,22
approval 38:12 183:1

196:3
approvals 97:2
approve 94:11
approved 38:9,10 95:5
approves 88:8
approximately 18:23
approximating 79:4
April 1:15 3:2 4:4
  220:11 221:11
apt 207:20
archive 210:17
archives 117:9,13,15
  189:10
area 25:1 32:18 59:11
  85:4,21 128:9 135:23
  176:17 177:5 195:7
areas 134:15 176:24
  177:2
arrangements 221:16
  221:17
arrogant 187:6
arrow 107:7 118:10
  203:20
art 156:16 157:16,21
  158:8,9,16
ascertain 186:18 201:8
ashamed 50:9
aside 89:6 98:9
asked 9:16 10:4,16
  11:5 30:14 31:17
  35:15 52:10,10 63:22
  73:16,19 75:13 76:5
  79:5 95:15 109:14
  112:18 120:16 121:7
  121:20 126:12
  130:10 138:19 139:2
  139:21 157:11 158:8
  168:8,10,18 169:13
  170:22 171:21 174:1
  198:10 210:5 211:17
  211:23 212:23
  218:15
asking 10:19 34:16
  73:2 77:4 79:6 83:6
  91:4 109:19 167:6
  181:21 185:13
  198:11 207:19,20
asks 14:5 150:7 158:8
aspects 59:17 61:19,21
  72:20 73:4 184:20
  202:11
assets 27:2
associated 59:4 68:1,6
  68:10 98:11
association 65:8
assume 28:16 78:11

94:7 107:1 111:18,18
  156:4 198:21 215:19
assumption 157:22
  158:1
assurance 198:20
assured 145:24
Astrid 50:8,10,17,19
Astrid's 50:12
atmosphere 85:10
attached 119:24 129:5
  129:7 146:20 149:1,4
  149:5,11,12,16,21
  150:1 156:21 175:1
  218:22
attachment 149:19,21
  150:1 156:11,11,13
  156:15,16,24 157:1
  163:20 164:1
attachments 149:1,11
  163:13,17 165:4,18
attend 175:13
attending 175:8
attention 103:18 180:8
attests 175:2
Attn 221:7
attorney 9:12
attorneys 10:13 11:14
  12:6 22:11 73:3
  163:18
attorney-client 10:24
audiences 175:23
audit 186:23
August 15:24 25:14
  148:22 150:20
  161:18,20 162:9
  168:2 173:12,14,21
Austria 19:13,20 20:3
  21:12 22:10 23:9,11
Austrian 21:1
authenticity 175:3
authorities 197:2
authority 195:22 196:5
automatic 81:6 133:17
autonomous 37:23
available 10:5,7,17
  81:21 84:17 221:12
awarded 6:3
aware 42:5,8,9,10,11
  42:12,13,14,17 44:9
  44:10 79:2,3 82:10
  82:19 84:22 101:15
  101:21 102:8 103:13
  104:4 121:4,7 124:13
  124:15 128:7 131:6
  132:9,11,16 141:6
  156:16 157:10

| | | | | |
|---|---|---|---|---|
| 167:20 168:1 178:10 182:22 184:2,11 190:7 200:14,14 | best 29:13 49:17 64:20 66:18 68:18,22 76:10 81:5 84:17 87:8 96:2 96:9,23 103:1,5 115:15 146:1 180:2 | 10:15 11:2,3,5,10,12 13:16 14:5 15:23,24 16:23 25:14,22,23 27:12,21 29:16,17 32:17,18 34:24 35:12 | 104:12 brings 7:17 broken 33:20 brought 5:19,22 54:23 54:24 68:21 103:18 | B000861 146:19,21 B001008 190:10 B001028 200:19,22 B001031 203:7 B001065 174:24 |
| awful 85:12 A.D 1:15 219:3 a.Japan 110:2 a.m 1:14 221:15 | better 123:10 177:14 177:20 189:4 beyond 156:17 big 37:7 38:13 47:22 | 35:18 37:13,16,20,23 38:7,16,17,21,23 39:3,7 42:5,18 44:4,5 46:21 47:2 50:10 51:15 52:2,7,24 | 215:5 Brown 2:11 4:6 brush 102:5 brushed 102:4 budget 55:1 85:6 92:1 | B002045 125:6 B005220 180:18 B00856.1 147:1 159:23 B00861 147:10 |
| **B** Bürsten 182:16 back 18:16 23:11 29:14 39:10 48:17 62:21 | 55:16 73:10 74:12 77:6 115:4 133:3,5 185:12 212:4,17 bigger 23:17 204:23 | 58:15,23 60:7 61:4 64:23 65:18,19 69:17 69:21,23 70:15 71:4 | 92:1 budgeting 91:13 budgets 38:9,10 91:11 | **C** C 190:16,16 calculated 87:11 |
| 93:22 105:20 107:22 114:16 117:9,14,15 118:8,9 120:3 122:18 126:11 142:17,17 | Bill 4:13 110:21 bit 8:6 14:18 16:8 55:3 58:11 67:20 74:11 77:16 92:9 95:17 | 87:2,11 89:22 90:18 92:12 94:24 95:16 96:22 97:1,16 99:8 101:22,24 102:9,12 | 209:12 building 53:12,13,14 53:14,16,16,18,19 built 197:17 | calendar 51:4,10 161:16,18,21,23 162:2,4 call 36:3 65:20 87:20 124:23 131:23 |
| 166:5 168:23 176:12 180:9 214:18 215:11 background 121:23,24 196:7 | 114:17 171:20 182:5 203:11 205:9 blade 16:14 23:15 blades 19:14 | 102:13,23 103:2 104:5,13,16,18,22 105:3 108:6,9,15,19 109:1 110:11,16 | bulk 18:14 bulky 74:12 75:19 134:3 business 26:22,23 | 132:14 180:8 212:21 221:14 called 4:18 6:12,13 10:4 15:1 23:21 |
| bad 36:9 based 47:4,6 62:4 75:7 133:24 134:14 138:18 164:10 | Blaszak 1:10 218:6 219:8 222:23 223:23 blender 5:16 6:13,13 6:19,20,20 | 111:5,13,14,23 112:2 112:3 113:11,18,19 113:24 115:2 116:4 | 27:19 28:5,9 29:9 30:21 32:1,5 35:13 36:16 39:11,13,21 | 24:18 39:14 40:4 50:7,8 65:7 96:3 115:3 123:17 179:20 |
| 167:18 170:7 176:21 197:1 basic 7:4 9:6 128:15,21 | blenders 6:10 26:4 block 102:2,3,4,4 107:23 138:8 | 117:2,18,19 120:9 121:20 122:6,19 123:6,14 124:12 | 40:1,6,7,13 41:8,20 45:7,9 46:10 48:19 49:22 50:1 53:5,21 | 196:5 213:10,24 215:17 calls 91:5 |
| basis 47:5 79:12 80:10 93:2 124:2 214:16 Bates 146:19,21 147:1 | blow 106:9 blowing 105:24 106:1 Blueder 55:12,17,18,19 | 127:23 139:20 140:6 141:7 143:2,5 146:12 162:22 163:3,4,9 | 55:5 56:14 59:3,8,14 63:4 67:24 68:5,10 68:16,20 71:14 72:19 | Cambridge 15:2,3,17 15:19 camera 122:8,11 camera's 122:16 |
| 147:3,9 152:12 174:24 175:1 180:17 190:10 200:19 | 56:2,7,11 76:11,12 100:12 211:5,7 213:6 Blueder's 55:21 56:17 | 169:15 170:9,12,15 172:21 175:10 176:8 177:8 181:6,7,7 | 73:4 78:1 79:23 82:3 84:13,21 90:3 91:8 91:21 100:20 101:14 | campaigns 20:9 Canada 196:1 candidates 183:3 |
| bathroom 43:15 45:22 46:12,16 47:1,18 bear 147:3 | board 30:16 35:24 38:4 38:14 187:13 body 183:20 | 182:10,18,23 183:8 183:23 186:10,13 187:9 189:16 190:19 | 103:6,18 111:21 112:1,10,18 113:12 114:7,12,15 118:22 | Cantwell 214:1,8 cap 94:10 97:2 capable 43:22 72:11 |
| bears 180:17 beats 107:23 becoming 88:19 | Boston 2:2 4:13 57:11 221:6 bother 85:14 | 193:17 194:5 200:10 200:24 201:3,14,15 203:23 204:8,15 | 129:15 139:24 140:15 141:5 151:18 157:5,19 158:5 | 208:3 capacity 60:18 capital 38:9,12 55:1 |
| bed 85:18 began 16:1 52:8 93:15 102:23 121:1 127:22 | bothering 73:11 bottom 58:13 97:4 203:20 | 206:18 210:9 211:18 211:20 216:21 220:3 221:8 222:1 223:1 | 169:23 171:2,16 172:12 173:1,7,15 175:15,22 176:8 | 92:21,23 93:14,15 94:2,11,16 95:5 96:19 |
| 128:4 139:20 140:6 beginning 60:17 62:18 88:21 90:18 118:5,21 | bought 216:16 box 107:16 109:24 118:12 | Braun's 37:9,18 67:22 86:13 87:1 100:17 101:16,16 115:10 | 177:18 179:9 183:9 183:24 184:9,23 185:18,23 189:2 | capture 79:14 care 154:7 182:4,4,15 career 18:16,19 |
| 121:8 128:15 141:6 166:2 168:1 begins 4:1 | boxes 108:3 box/sink 107:9 brand 19:9,10,11,12 | 117:16 120:12 121:7 Braun/Dr 119:7 Braun/FH 180:13 | 191:8,21 192:16 193:19 194:4 195:3 195:10 196:14 | carefully 20:20 cars 177:3,4 case 8:10 14:1,1,5 24:3 |
| begun 139:22 behalf 2:4,8 4:12,14 14:6 106:19 | 22:10 23:17 24:15,16 24:19,23 33:12,14,15 34:5 111:12 115:4 | Braun/Pahl 121:14 break 48:13 62:8,23 breathes 149:4 | 197:12 198:13 199:1 201:15 202:2 205:16 208:20 211:4 213:18 | 50:21 60:14,16 61:2 61:12,15,17 62:24 63:6,9 65:3,12 66:4,7 |
| believe 63:24 69:13 84:12 91:5 149:10,13 151:10 200:12 | branded 19:16,18,20 brands 18:12 23:15 Braun 1:3,13 4:2,8,14 | bridge 53:17 brief 48:15 62:17,23 118:4 126:7 166:1 | 215:24 216:13 butchering 54:9 button 133:18 | 66:23 78:17 79:6,11 81:20 127:15 130:22 131:14 169:11 |
| bell 99:5 belonged 24:24 | 5:11,24 6:1,3 9:15 | 210:24 briefly 57:20 62:7 | buy 207:6 B-L-U-E-D-E-R 55:16 | |

218:24 221:11 222:1
223:1
category 6:12 80:23
176:20 183:12 186:2
Catherine 2:11 4:6
caused 145:11,12
cc 221:23
center 59:4,9 60:4 61:5
63:14 66:19 68:1,6
68:11 69:1 86:15
87:12,16,20 88:3
90:10 94:19 95:2
96:20 97:24 98:3,8
98:12 99:11 100:10
120:18,21 121:1,5,18
128:4 129:8 130:14
130:24 131:7 132:10
135:4 136:15 138:3
139:21 140:7,11
141:8,22 143:12
145:15 148:24
149:15 150:15
162:10 166:8 167:20
170:5,14,20,24
181:22,23 195:8,13
197:13,22 198:2,15
199:3 207:14
central 159:1
certain 38:11 52:15
85:4,21 88:17 92:18
92:21 166:19 167:13
179:15,16 204:16
certainly 8:4 57:23
97:1 138:15 168:13
174:16,16
certification 175:2
196:9
cetera 27:2 64:1,1,1
133:18
chairman 35:24 36:22
chance 95:9 148:10
change 7:14 19:7,22
23:13 28:13 34:4,17
40:8 62:7 75:2
117:23 153:15
199:14 213:13 222:4
222:6,8,10,12,14,16
222:18,20 223:4,6,8
223:10,12,14,16,18
223:20
changed 75:4 123:8
174:14
changes 54:3 62:8
characteristic 80:17
characterize 89:24
characterized 82:7

Charge 13:16 44:4,7
47:14,15 63:1 64:17
68:1,11 78:15 84:2
87:21 190:23
check 96:10
chemical 21:21 191:14
Chicago 2:7 4:7 219:10
220:24 221:1,2,24
222:24 223:24
Chicken 213:12,21
choose 221:14,16
Christian 64:11
chronical 61:17
circuit 137:15
circulate 189:1
circulated 138:10
148:12
circulation 138:6
circumstances 12:18
80:3
Civil 1:11 218:20
claim 22:19 187:5
claimed 43:5
claims 20:20 22:15,23
58:18 69:19,23
clarify 7:15
clean 13:16 44:4,7
47:14,15 63:1 64:17
68:1,11 78:15 84:2
87:21 101:11,17
102:4 104:23 105:18
106:1,12 107:2,2
108:16 177:20 189:5
190:23 203:10
cleaned 101:23 102:10
115:23 116:1 130:5
137:18 164:20
176:10,23 177:9
206:17 216:11
cleaner 164:7 215:18
215:19,21
cleaning 6:7 42:3,6,6
59:4,9 60:4 61:5
63:14 66:19 68:1,6
68:11 69:1 81:6
86:15 87:12,16,19
88:3 90:10 94:19
95:1 96:20 97:24
98:3,8,11 99:11
100:10 102:6 104:6
106:23 107:8,9,9,12
107:16,17,23 108:6
108:18 110:1,16
111:8,16 112:22
113:11 114:18
115:20 116:9,14

118:13 120:17,18,21
121:1,5,18 126:14,21
127:10 128:4,16
129:8 130:14,24
131:7 132:10 135:4
136:15,15,21 137:3,5
137:11,14 138:3,16
138:20 139:16,21
140:7,10,16 141:7,22
143:12 145:14
148:24 149:15
150:15 162:10
164:10;13,17,22
166:8 167:20 170:5,8
170:14,19,24 176:17
177:15 180:13
181:12,22,23 195:8
195:13 197:13,22
198:2,15 199:3
200:12 203:16,21,24
204:9 207:14 216:2,9
216:12,14,18,22
cleanliness 191:16
cleans 164:11
clear 46:16 55:4 168:12
clearly 13:19
clip 120:4
clipped 120:3
closely 17:13
closer 176:18 178:12
code 124:4 152:8
coffee 26:5 62:12
collated 186:24
colleague 147:6
collect 170:22
College 15:1
colloquy 185:9
come 7:24 9:11 10:12
10:19 14:8,9 16:22
21:6 32:4 47:9 52:1
52:24 74:21 103:7
134:20 143:21 144:3
157:4 172:17 189:22
215:12,22
comes 7:13 93:10
comfortable 8:22 9:3,7
120:1 145:22 176:1
coming 151:7,13,17
160:9,18 186:21
188:3 207:3 214:16
commercial 26:18,24
59:17,18,19 72:24
73:8,9,12,15,17 74:4
75:4,5,9 83:23 122:4
148:11 157:12
158:11,13,15,19

159:11 183:16 184:2
184:11 185:19 216:9
commercialization
71:7,11 75:17 178:13
178:13 196:12 205:9
206:19
commercialized 44:3
133:1 198:3 206:2
commercializing
205:18 210:10
216:10
commercially 61:9,10
205:12 208:9 209:5
commercials 216:6,8
commission 114:8
192:21 194:19,24
commissioned 113:23
114:3 117:2 129:4
190:19,20,21
common 139:23 143:1
143:1
communicate 36:17
37:3 211:7
communicated 36:8
37:1
communicating 27:5
35:17 36:21
communication 11:21
12:3 22:20 26:18
79:23 92:20 211:12
communications 36:12
44:6,17
companies 47:22
company 9:14 35:8,9
35:12,22,23 36:8,22
37:21 38:2 40:3,19
47:24 49:11 54:2,7
56:7 59:21 72:8
76:15 85:9,20 88:5
88:14 93:22 115:3
123:8 124:17,21
159:2 169:16 172:21
182:16 183:2,13,22
183:23 184:19
187:13 189:20
193:17 195:17
199:23 200:8 201:12
208:7,12,14 211:20
212:5,15 213:14,15
213:17 214:17
company's 14:6
compare 207:14
compared 35:12
175:20
comparison 116:14
207:13

compatibility 192:5,6
competent 72:14
competition 71:16
158:14
competitive 22:21
71:17 114:1 216:1,1
competitor 20:24 21:8
115:2,10,11
competitors 17:12 18:1
20:15,22 21:3 22:5
22:15,19 35:12 49:6
49:13,14
complaints 103:10,13
103:17,22 104:1
complete 114:1
203:15 218:15
completed 81:23
completely 34:19 93:8
117:7
components 58:18
132:20 135:5 138:19
138:23 139:6 191:17
composition 21:21
comprehensive 158:12
214:11
computer 65:20
conceived 83:1
concentrate 177:8
concept 30:16 63:13,15
128:16,22
concern 134:16,17,20
concerned 22:15 29:3
61:22 196:15,16
conclusion 61:11 80:2
conclusions 74:3 75:9
186:24
conditions 214:12
conduct 30:8
CONFARMA 192:9
CONFARMA/Inchem
192:4
confidentiality 85:6
confirm 195:22
confirms 207:24
conforms 117:19
confused 152:19
conglomerate 115:4
conjecture 99:12
conjunction 127:12
130:21 145:13
182:19 190:12
192:15
connection 37:4 63:14
134:20
consider 150:9,21
162:14 186:5

considerable 81:15
88:23 89:2,8,15,23
90:8,15,17,19 92:13
92:19,21 93:3,15
95:1
considerations 159:19
considering 203:15
consistently 209:7
consisting 220:12
constantly 28:15
consulted 72:19 205:10
consulting 39:5
consumer 18:6 27:5
32:10 49:2 59:24
60:3 61:9,24 103:7
103:17 106:16,19
112:20 187:10 189:4
207:12 208:1,5
211:18
consumers 18:13 27:9
29:4,12,17 30:13,14
30:19 31:1,23 72:23
103:11,14 106:5
113:19 185:23 186:3
186:4,5,19,19 200:11
202:4,5 204:1 206:16
206:23 211:24 214:7
214:9
contact 9:24 52:24 57:2
139:24
contacted 10:1 42:18
contain 137:6
container 136:15,22
137:12 138:21
contemporaneous
173:20 174:17
context 73:6,14 85:16
85:23 173:21
Continental 16:13
continually 164:12
continue 24:17 25:11
145:14
continues 164:4 207:24
contracted 4:7 30:4
contractors 87:4
contraption 130:2
216:14
contribute 134:8
contributed 47:10
control 194:2,3
convention 10:18
conversation 8:7,7
11:14 48:4 74:1
142:9 161:15 188:1,2
conversations 11:18
22:11 47:11,16,20,22

48:2 70:14,16,17,21
70:22,24 73:3 78:7
78:12,14 79:2,10
86:18,20 87:15 97:9
97:22 98:1,4,6,8
100:24 140:10
172:10 176:11,14
Cook 218:2 219:2
cooking 26:7
cooperation 83:22
copies 51:1 57:16 64:14
64:19
copy 65:15,17,23,24
110:21 127:3 158:18
169:13 172:4 211:9
211:10,14 218:22
core 209:13
corporate 10:20 86:14
87:1
Corporation 1:6 4:3,12
5:4 220:6
correct 6:20 9:22 12:8
17:18 18:20,24 20:4
20:14 23:2,19 24:7
28:10 29:5 32:3,11
33:6 35:19,19 38:22
38:24 44:16 48:10
49:18,18 55:20 57:7
57:9 60:1,20 61:1
63:7,10 64:16,18
65:5,14 66:1,12 67:6
70:13 82:5,9,16 87:3
91:9 95:21,23 96:7
105:12 118:22,24
124:1 125:22 128:13
137:2 144:10 147:13
148:16 150:19 152:7
155:20 162:14,24
163:24 164:4 171:12
191:9 196:13 211:6
correctly 55:23 73:23
156:7 169:22 208:5
correspond 52:4
correspondence 51:2
corresponds 43:11
cost 74:17 75:20
134:10,11 148:9
209:10,20 210:7
counsel 1:17 4:9 14:14
83:13,14 97:15,16,22
98:2 218:9,24
countries 18:3
country 195:21
counts 95:23
County 218:2 219:2
couple 69:22 106:22

course 13:8 34:22
49:22 63:2 91:23
93:11 161:19 172:14
174:13
court 1:1 4:15 7:18
8:11 55:13 218:21
220:1
Courts 1:12
cover 45:21
covered 13:19 43:18,21
46:2,17 58:17 69:19
132:21
covers 45:11 46:11
cradle 135:5,8 136:16
138:20 139:12
cream 215:5,7,9,15
created 86:14
creates 207:4
creation 146:2
criteria 208:11,13
209:6,13
criterion 208:15
crossover 113:21
CRR 1:10 218:6 219:8
CSA 196:1
CSR 1:10 218:6 219:8
219:9
cup 37:5 62:12
current 40:1 174:2,10
176:22
currently 39:3
cut 92:16 166:22
cutter 102:2,3,4,4
107:23 138:8
cutting 178:6
cycle 169:24
c/o 221:5

_____

## D

D 26:19 30:17 72:8,8
73:20,21,23,23 79:24
84:24 85:7,22 86:5
90:9 91:19,20 92:1,2
92:6,7,7,11,19 93:6
100:9 105:21 122:3
141:9 144:3,5,8
167:17 175:19,22
178:15 182:3 183:6
187:15,16,22 189:2
192:18 212:6 213:3
danger 158:18
dark 108:3
data 31:1 205:24
date 4:4 45:20 46:8
84:20 90:18 148:22
174:13,14 218:6

221:18 222:1,22
223:1,22
dated 131:24,24 150:20
173:21 174:12
dates 199:5,7
dating 132:17
David 212:16 213:2
day 1:15 43:16 83:4
84:4 141:11 170:10
211:23 219:3 220:18
days 31:9 171:24 172:2
221:13,18
deal 37:7
Dear 221:10
decides 89:22
deciding 71:12 206:1
decision 72:4,7,7 74:8
75:18 194:21
decisions 30:22 38:5
declaration 127:14
129:6 135:4 136:14
dedicating 94:24
dedication 89:15
deduce 80:6
defendant 1:7 2:8 4:12
220:7
Defendant's 41:13,14
44:22 57:14,15 95:8
101:2 104:9 119:22
126:24 127:14
142:13 146:17,23
148:17 174:22,23
180:4,6,10,17 190:9
200:17 214:19
defer 83:13
define 208:9
defined 33:21 55:2
defining 26:17 27:8
definitely 7:10 31:18
52:6 162:1
definition 31:14 102:20
122:6,19 123:6,7,11
123:13 124:9,13
125:12 129:14 131:4
132:4
definitive 74:8 75:18
degree 15:3,5
delay 197:10,10 200:6
delayed 199:22
demand 20:6 207:4,15
207:22
demanding 187:17
demark 88:21
demonstrate 130:3,5
demonstrated 48:5,7
63:20 73:24 74:7

81:14 119:18 130:20
132:12 133:3,17,23
151:5 164:19
demonstration 44:11
70:9 74:20,23 76:24
77:9 84:11 101:19,21
131:9 142:11 145:20
160:1 161:11 163:16
167:5,16,23 168:4
169:5,8 177:12
deodorant 21:20,22
deodorants 19:14
Dep 221:9
department 52:13,17
54:20 56:24 57:1,2,6
64:6,7,13 80:19 85:7
86:14 87:1 90:9,16
92:4,5,6 120:2 122:2
122:3 141:9 142:24
143:7,13,20 144:3,5
144:8 146:9 147:18
147:23 148:5 163:6
175:20 178:15
179:10 181:6,7
188:14 192:18,24
193:1,2 194:1,4,12
196:24 198:22
205:11,16,21 209:1
departments 36:3
83:23,24 84:24 85:8
85:14,22 194:13
depend 52:9
depending 21:15 30:10
96:18
depends 80:22,22
depicted 136:3
deponent 11:12 218:21
220:10 222:2 223:2
deposed 5:6,12 6:24
7:3 10:20
deposition 1:9,17 3:1,9
3:10,11,12,13,14,15
3:16,17,18,19,20,21
3:22,23 4:2,7 8:6,23
9:16,17,20,21 11:4
12:13 13:4,19 14:13
34:23 62:15,19 97:8
97:9,14 118:2,6
119:17 126:9 165:24
166:3 217:8 218:4,9
218:19 220:11,12
221:11,12,14,17
depositions 1:13 11:22
deposits 138:8
describe 19:24 43:10
43:14,15 79:21 80:4