Page 1

1             HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2             IN THE UNITED STATES DISTRICT COURT

3             FOR THE DISTRICT OF MASSACHUSETTS

4 - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5 BRAUN, GMBH,

6                      Plaintiffs,    Civil Action No.

7        against                 03 CV 12428 WGY

8 RAYOVAC CORPORATION,

9                      Defendant.

10 - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12                 TRANSCRIPT OF PROCEEDINGS

13 HEARING:  Deposition of JAMES DOYLE, III

14 DATE:     June 3, 2005

15 TIME:     9:00 a.m.

16 PLACE:    740 Regent Street, Madison, Wisconsin

17 REPORTER: Lynn M. Bayer, RPR, CM

18

19

20                         Confidential
                      For Attorney's Eyes Only
21

22

23

24

25 Job No: 3314

EXHIBIT F

Page 2

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
 2            A P P E A R A N C E S
 3
 4   FOR THE PLAINTIFF:
 5      Ropes & Gray, L.L.P.
 6      By: DALILA ARGAEZ WENDLANDT
 7      One International Plaza
 8      Boston, MA  02110-2624
 9      (617) 951-7884
10
11   FOR THE DEFENDANT:
12      Kirkland & Ellis, L.L.P.
13      By:  JAMES A. SHIMOTA
14      200 East Randolph Drive
15      Chicago, IL  60601
16      (312) 861-2336
17
18
19
20      (FOR INDEX SEE BACK OF TRANSCRIPT.)
21
22
23
24
25
```

Page 3

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
 2   JAMES A. DOYLE, III, DEPONENT WITNESS, DULY SWORN
 3             EXAMINATION
 4 BY MS. WENDLANDT:
 5 Q.  Can you state your name for the record.
 6 A.  James A. Doyle, III.
 7 Q.  And where do you live?
 8 A.  In Middleton, Wisconsin.
 9 Q.  What's your exact address?
10 A.  9715 Red Sky Drive, Middleton, Wisconsin, 53562.
11 Q.  Mr. Doyle, have you been designated by Rayovac to
12    speak on behalf of the company with regard to certain
13    topics --
14 A.  Yes.
15 Q.  -- listed in the Notice of Deposition?
16 A.  Yes.
17 Q.  One thing I should explain to you since you mentioned
18    earlier this was your first deposition is that you
19    need to wait until I finish asking my question even
20    though I'm a slow talker so people tend to try to get
21    in there, just wait because the court reporter needs
22    to write down everything that we say and she can only
23    do one at a time.
24 A.  Okay.
25 Q.  I'm going to put before you what's been previously
```

Page 4

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
 2    marked as Exhibit 1.
 3 A.  Okay.
 4 Q.  Have you seen this Notice of Deposition before?
 5 A.  Yes.
 6 Q.  Can I ask you to turn to page 5 which is the
 7    deposition subject matters.  Do you have that page?
 8      MR. SHIMOTA:  Page 5.  That's where you
 9    are.
10 BY MS. WENDLANDT:
11 Q.  Do you have that page?
12 A.  I have it right here, yes.
13 Q.  On which topics have you been designated by the
14    company to speak, that is, Rayovac Corporation?
15 A.  I haven't seen this -- I haven't seen this sheet,
16    have I?
17      MR. SHIMOTA:  What he is saying is our
18    objections, well, the version of it where we had
19    certain objections to it, so yes, he has, but --.
20 A.  It just looks different.
21 BY MS. WENDLANDT:
22 Q.  Okay.  Can I ask you then to turn to page 6 of
23    Exhibit 1.  And read to yourself topics 10, 11 and
24    13.
25 A.  Okay.
```

Page 5

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
 2      MR. SHIMOTA:  I'd also like to note for
 3    the record, as you recall, we designated Mr. Avila
 4    to speak on topic 13.
 5      MS. WENDLANDT:  Actually I had a question
 6    about that because you also designated Mr. Doyle.
 7    Is that a double designation?
 8      MR. SHIMOTA:  No, we were changing.  I'm
 9    sorry if there was any confusion.
10 BY MS. WENDLANDT:
11 Q.  Okay.  So can you read to yourself topics 10 and 11.
12 A.  Okay.  Okay.  I've read it.
13 Q.  And have you been designated by Rayovac Corporation
14    to speak on behalf of Rayovac with regard to topics
15    10 and 11?
16 A.  Yes.
17 Q.  Any other topics listed in this deposition notice?  I
18    know you say this is the first time you're seeing
19    this particular version of this document.  Can you
20    look at it, pages 5, 6 and 7.
21 A.  Read through all of them?  Read through all of them?
22 Q.  If you don't mind, to yourself.
23 A.  And 7?
24 Q.  Yes, please.
25 A.  Yep.  I've read it.
```

2 (Pages 2 to 5)

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 Q.  Having reviewed those lists of topics, have you been

3      designated by Rayovac to speak on behalf of Rayovac

4      with regard to any topics other than topics 10 and

5      11?

6 A.  I don't think so.  I haven't?

7          MR. SHIMOTA:  No, you have not.

8 A.  Just the 10 and 11.

9 BY MS. WENDLANDT:

10 Q.  I just wanted to make sure because there was some

11     confusion.

12 A.  Okay, no.

13 Q.  As a result of the designation by Rayovac, do you

14     understand that you're here today to testify under

15     oath not only as to matters personally known to you,

16     Mr. Doyle, but also as to matters known and

17     reasonably available to Rayovac on topics 10 and 11?

18 A.  Yes.

19 Q.  What did you do to prepare for this deposition?

20 A.  I sat with Mr. Shimota.

21 Q.  For how long?

22 A.  Four hours, five hours.

23 Q.  Aside from Mr. Shimota, did you speak to anyone else

24     in preparation for this deposition?

25 A.  Briefly on some of the financials, briefly.

1          HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q.  Mr. Doyle, can you tell me about your educational

3      history starting with college.

4 A.  Undergraduate -- where I went to school too, all of

5      that?

6 Q.  That would be great and the year that you graduated.

7 A.  Undergraduate Boston College 1991.

8 Q.  And what was your major?

9 A.  Marketing.  Minor in German.  MBA '94, Northeastern

10     University in Boston, marketing concentration.

11 Q.  Between 1991 and '94, were you employed?

12 A.  Well, you wanted two years for school.  I was

13     employed -- right?

14 Q.  MBA is two years, right.

15 A.  Okay.

16 Q.  Were you employed in '91 to '92?

17 A.  Briefly.

18 Q.  Okay.  Where was that?

19 A.  Investors Bank & Trust.

20 Q.  And what was your position?

21 A.  Mutual fund accountant.

22 Q.  Following the receipt of your MBA in '94, were you

23     employed?

24 A.  Yes.

25 Q.  Where?

1          HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2          (Discussion off the record.)

3 Q.  Who did you speak to about the financials?

4 A.  Al Choepp.

5 Q.  Did you speak to anyone else?

6 A.  No.

7 Q.  Did you review any documents in your preparation for

8      this deposition?

9 A.  Yes.

10 Q.  What documents?

11 A.  I would -- I wouldn't know what the names are of all

12     the documents.  But I -- I would need help on what

13     the documents are.  But I have reviewed documents.  I

14     reviewed -- I've looked at -- I briefly looked at

15     some of the patents.  God, not much more, right?

16 Q.  Did you look at the financials?

17 A.  Briefly.

18 Q.  Okay.  Any other subject matter of documents that you

19     can recall?

20 A.  (Shaking head.)

21          THE REPORTER:  Is that no?

22 A.  No.

23 BY MS. WENDLANDT:

24 Q.  I need a verbal answer.

25 A.  No.  You can't take my head?

1          HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 A.  I'll give you all the places I worked.  I did my

3      internship at Kraft in New York.

4 Q.  When was that?

5 A.  '93.  Yeah.  Yes, '93 was my first and second year.

6      And then I went to Timex Corporation.

7 Q.  When was that?

8 A.  After business school, so '94.

9 Q.  Having already received the degree you went to Timex?

10 A.  Yes.

11 Q.  Where was Timex?

12 A.  In Connecticut.

13 Q.  And how long did you stay there?

14 A.  Three years, three plus.  Three plus.

15 Q.  What was your position at Timex?

16 A.  It was a brand -- system brand manager kind of role,

17     traditional coming out of school kind of jobs.

18 Q.  And in 1997, '98 where --

19 A.  February of '98.

20 Q.  February of '98 where did you start?

21 A.  Remington.

22 Q.  And have you been at Remington continuously --

23 A.  Yes.

24 Q.  -- since 1998?

25 A.  Um-hmm.

3 (Pages 6 to 9)

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q.  And for purposes of this deposition and this case,
3     I'm going to be using the term Rayovac to refer to
4     both Remington and Rayovac because I understand the
5     two have merged.
6 A.  The two merged and then the name was changed.
7 Q.  That's right.
8 A.  So there is no Rayovac any longer.  It's Spectrum
9     Brands.
10        MR. SHIMOTA:  We can talk about that off
11    the record.  That's actually something that -- there
12    is a new corporation.
13        (Discussion off the record.)
14        MS. WENDLANDT:  Back on the record.
15 Q.  So let me just restate it.  For purposes of this
16    deposition, I'm going to be referring to Remington
17    and Rayovac as Rayovac Corporation.  And if there is
18    a distinction that you feel is necessary, please let
19    me know and we can clarify the distinction that needs
20    to be made.
21 A.  Okay.  So anytime Rayovac is mentioned --
22 Q.  I'm referring to --
23 A.  Referring to Remington which before there was any
24    association with Rayovac?
25 Q.  That's correct.

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 A.  Okay.
3 Q.  What was your position in February '98 at Rayovac?
4 A.  Brand manager.
5 Q.  For a particular brand?
6 A.  Men's shavers.
7 Q.  What were your duties as brand manager?
8 A.  To manage a business, P and L responsibility managing
9     the business.  Traditional, traditional set-up.
10 Q.  What do you mean by the traditional set-up?
11 A.  Where the brand team essentially develops the
12    marketing plan, has P and L responsibility, and works
13    with the cross-functional groups to accomplish the --
14    deliver the plan, the financial plan.
15 Q.  And how long were you brand manager for men's
16    shavers?
17 A.  A couple years.  No, a year and a half.
18 Q.  What was your next position at --
19 A.  Senior brand manager.
20 Q.  Can you wait until I finish my question.
21 A.  Yeah.
22 Q.  What was your next position at Rayovac?
23 A.  Senior brand manager.
24 Q.  Which you assumed in 2000 about?
25 A.  I assumed in '99.

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q.  '99.  And how long were you senior brand manager?
3 A.  Until 2002.
4 Q.  And what were your responsibilities as senior brand
5     manager?
6 A.  I had the additional responsibility of the accessory
7     business which are the replacement parts, which are
8     the lotions that we make.
9 Q.  Any other replacement parts?
10 A.  Yes -- oh, any -- I'm sorry, no, that-was it.
11 Q.  Just lotions?
12 A.  Well, lotions and all the parts that you have to
13    replace, all the blades that you have to replace.
14 Q.  So again, you were senior brand manager for men's
15    shaving?
16 A.  Um-hmm.
17 Q.  Okay.  And in 2002, what was your position?
18 A.  Director, director.  Marketing director.  Director of
19    marketing.
20 Q.  Was that for men's shaving?
21 A.  I got added -- added responsibility of women's
22    shavers.  And women's groomers.
23 Q.  Any other added responsibilities?
24 A.  No.
25 Q.  Any other added responsibilities for the men's

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2     shaving?
3 A.  No, that's -- I had everything.
4 Q.  And how long were you director of marketing?
5 A.  Less than two years.
6 Q.  What was your next position?
7 A.  Division vice president.
8 Q.  When did you assume that position?
9 A.  Officially January 1st, 2004.
10 Q.  And what were your responsibilities as --
11 A.  Men's -- additional --
12 Q.  I'm sorry, what was your -- division?
13 A.  Division vice president.
14 Q.  What were your responsibilities as division vice
15    president?
16 A.  Additional responsibility of the men's grooming
17    business.
18 Q.  Any other additional responsibilities?
19 A.  Yeah.
20 Q.  What were they?
21 A.  Let's see, when was -- January '05.  Additional
22    responsibilities for the entire personal care group
23    which is hair dryers, curling irons, setters,
24    stylers.  And that gave me the entire business, the
25    entire Remington portfolio for North America.

4 (Pages 10 to 13)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q.  Is that your current position, division vice
3      president?
4 A.  Um-hmm.  Of total Remington.
5 Q.  When did Rayovac first learn of Braun's development
6      of a cleaning system for dry shavers?
7 A.  When did we first learn about their development was
8      when they launched the product.
9 Q.  And when was that?
10 A.  To the best of my recollection, it was with the fall
11     resets during 2000.  So retail resets would be
12     August, around July, August of 2000.  That's when I
13     remember it being launched and that was the first
14     time I ever knew about it.
15 Q.  What are the fall resets?
16 A.  That's when the retailers reset their shelves, just
17     like Gillette would do, Braun would do, those come
18     once or twice a year.  But in this category once a
19     year.
20 Q.  What category?
21 A.  Shaving.
22 Q.  And how did Rayovac learn about Braun's launch in
23     fall -- in July, August 2000?
24 A.  By going to a store and seeing products on the shelf.
25 Q.  What did Rayovac do with this information?

---

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q.  Yes.
3 A.  Okay.  "Subject to its general objections, Rayovac
4      first became aware of U.S. patent numbers 5,711,328
5      and 5,649,556 in late 2001, around the time Rayovac
6      began considering development of a shaving/cleaning
7      system."
8 Q.  Does that refresh your recollection as to when
9      Rayovac first learned of the '328 patent marked
10     Exhibit 10?
11 A.  Yeah.  But were you asking me or the company?
12 Q.  I'm asking all of my questions to the company as
13     you've been designated on the topic.
14 A.  Okay.
15         MR. SHIMOTA:  Maybe just to be clear, do
16     you think you could tell him I'm asking you as
17     Rayovac because certain things you're asking him
18     aren't -- it might be helpful.
19         MS. WENDLANDT:  Sure, I thought I was
20     clear, but I can do that in the future.
21 A.  Yeah.
22 Q.  Sure, when did Rayovac first become aware of --
23 A.  In late 2001.
24 Q.  -- the '328 patent?
25 A.  In late 2001.  Okay.

---

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 A.  Nothing initially.
3 Q.  And thereafter it did what?
4 A.  Monitored the sales of the product as we do with
5      every competitive product.
6 Q.  And do you recall what specific product was launched
7      in July, August 2000?
8 A.  The Braun Syncro.
9 Q.  I'm going to place before you what has been
10     previously marked as Exhibit 10 which is a copy of a
11     patent that I'll refer to as the '328 patent.
12 A.  Okay.
13 Q.  When did Rayovac first learn of the '328 patent?
14 A.  I don't know.
15         (Exhibit No. 45 was marked.)
16 Q.  I'm placing what has been marked as Exhibit 45 before
17     you.  Have you seen this document before, which is
18     entitled defendant's responses and objections to
19     plaintiff's second set of interrogatories?
20 A.  Yes.
21 Q.  I'll ask you to turn to fax page 6 which is indicated
22     on the upper right-hand corner.  Under the heading
23     response, can you read to yourself the first
24     sentence.
25 A.  Subject to its general objections?

---

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q.  What was the context in which Rayovac first became
3      aware of the '328 patent?  Why did Rayovac become
4      aware of the '328 patent?
5 A.  Because we were beginning initial development of
6      our -- looking at this idea as a concept and starting
7      investigating Braun's patents.
8 Q.  I'm sorry, started to investigate Braun's what?
9 A.  To understand what patents Braun had.
10 Q.  And what -- you said Rayovac started looking at this
11     idea, what idea?
12 A.  The cleaning system idea, investigating our own
13     launch of a cleaning system.
14 Q.  And why did Rayovac look in particular to the '328
15     patent, Exhibit 10?
16 A.  I'll just say generally they were looking at all of
17     the -- whatever patents existed for the product.
18 Q.  So it was Rayovac's understanding that Braun's
19     product that was being marketed starting in July 2000
20     was covered by the '328 patent?
21 A.  Yeah -- yes.
22 Q.  What did Rayovac do with its knowledge of the '328
23     patent, Exhibit 10?
24 A.  They --
25 Q.  When it first began looking at it.

5 (Pages 14 to 17)

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 A. They investigated all patents to understand, to

3   understand what was -- what was covered or protected

4   under the Braun's cleaning system in order to ensure

5   that no patents were violated.

6 Q. And what did Rayovac learn as to what was covered by

7   the '328 patent?

8      MR. SHIMOTA: Objection, outside the

9   scope.

10 BY MS. WENDLANDT:

11 Q. You can still answer the question.

12      MR. SHIMOTA: You may answer subject to my

13   objection, but you may answer.

14 A. Okay, can you restate the question.

15      MS. WENDLANDT: Can you read it back.

16      (Question read by the reporter.)

17 A. I am not sure.

18 Q. How did Rayovac learn that the Braun Syncro was

19   covered by the '328 patent?

20 A. My understanding via patent searches to understand

21   what patents existed on the product which is

22   protocol -- was protocol for the company for any kind

23   of launch of any product.

24 Q. Any kind of launch of its own products?

25 A. Of its own products, we always did patent searches.

---

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. And when you say we, was it something that was done

3   internally at Rayovac?

4 A. It was done -- it was managed via an external party

5   but via an internal source, there was internal

6   general counsel.

7 Q. And who was the general counsel?

8 A. Joel Bedol.

9 Q. And what was the external source?

10 A. Mel Stoltz.

11 Q. Prior to 2001, was Rayovac aware of the application

12   that was filed that ultimately issued as the '328

13   patent?

14 A. Not to the best of my knowledge. We had no idea

15   about the product idea.

16 Q. When did you personally learn of the '328 patent?

17 A. I learned about patents, I can't tell you that it was

18   '328 or any other number, we learned about patents

19   after we conducted our initial search.

20 Q. Is that the search that was conducted internally by

21   Joel Bedol and externally by Mel Stoltz?

22 A. Yes, and Joel Bedol may not have been there. It may

23   have been the previous counsel actually I think

24   through the dates.

25 Q. And who was that previous general counsel?

---

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 A. Can I come back to you on that?

3 Q. Yes.

4 A. Okay.

5      (Portion of record read.)

6 Q. Was that initial search the search that you had

7   spoken of earlier that was conducted either by Joel

8   Bedol or his predecessor and Mel Stoltz?

9 A. Yes.

10 Q. Do you personally have any recollection of your first

11   awareness of the '328 patent as opposed to any other

12   patents you may have been looking at issued to Braun?

13 A. This is a personal question to me?

14 Q. That's right.

15 A. Okay. Since I was never -- it was never referred to

16   as a '328 patent, but I was made aware that there

17   were patents that Braun had, certain patents that

18   Braun had. But I didn't know -- I didn't really know

19   any of the real specifics of what they were. That

20   was really the engineer community who managed that

21   via the legal community.

22 Q. And who at the engineer community managed that?

23 A. Yuri Avila would be the person on point.

24 Q. I'm placing before you what has been previously

25   marked as Exhibit 11 which I'll refer to at this

---

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2   deposition as the '556 patent. When did Rayovac

3   first learn of the '556 patent?

4 A. Again, I'm going to answer it broadly. It's -- they

5   learned about patents in -- during the initial

6   search. So whatever patents were available to be

7   viewed, they found.

8 Q. And that would have been the initial search conducted

9   in 2001?

10 A. Yes.

11 Q. Did Rayovac know of the patent application leading to

12   the '556 patent, Exhibit 11?

13 A. I'm sorry, can you repeat it again.

14 Q. Sure. Did Rayovac know of the patent application for

15   the '556 patent?

16 A. Again, whatever was available they -- Rayovac knew

17   about. So I --.

18 Q. You had stated that Rayovac learned of the '556

19   patent during its initial search in 2001. I'm

20   wondering if prior to that -- prior to 2001 Rayovac

21   had any knowledge of the patent application that was

22   filed with the patent office for the '556 patent?

23 A. Is that a personal question?

24 Q. It's not, it's a Rayovac question.

25 A. I don't know.

---

6 (Pages 18 to 21)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 Q. And what did Rayovac do with its knowledge of the
3 '556 patent, Exhibit 11?
4 A. Understood the patent and made sure that as we
5 developed our product we didn't violate anything that
6 was protected by the patent.
7 Q. And what did Rayovac determine was protected by the
8 patent?
9    MR. SHIMOTA: Objection, outside the
10 scope.
11 A. The engineering community would be able to answer
12 that better than I could.
13 BY MS. WENDLANDT:
14 Q. And that again would be Mr. Avila?
15 A. Yes.
16 Q. I should also mention that if at any time during this
17 deposition you need to take a break, feel free to let
18 me know and we'll take one.
19    I'm placing before you what has been
20 previously marked as Exhibit 5 which is an E-mail
21 dated October 22nd, 2001, from Robert Schenck to
22 Frank Mercurio. Can you review that.
23 A. You would like me to read the entire document?
24 Q. You can review it. I'm going to ask you some
25 questions about a particular sentence which is the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 A. I don't know.
3 Q. Okay. Is Mr. Mercurio still at Rayovac?
4 A. Yes.
5 Q. Is he in Madison?
6 A. He is. Can I ask a question just to help me, guide
7 me through this.
8 Q. Sure.
9 A. When you say question related to 10 or 11, is there a
10 way you can make me aware of what that is as the
11 company versus personal questions. It's just me.
12 I'm getting confused on what's my opinion, what's the
13 10 or 11. If you could just help me with that.
14 Q. Sure, sure.
15 A. All right.
16 Q. And you're referring to topics 10 and 11, not
17 Exhibits 10 and 11?
18 A. Right. We're on the 30(b) --
19 Q. (6).
20 A. 30(6)(b) (sic).
21 Q. Sure. Did you review Exhibit 5, the E-mail, in
22 connection with your preparation for this deposition?
23 A. Yes, yes.
24 Q. And what did you learn during your preparation?
25 A. I -- as I stated, I really didn't learn -- really

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 sentence reading "I will need to review the patents
3 to make sure that our mutual plans are okay."
4 A. Okay. Would you like me to read the balance of this
5 or just the cover?
6 Q. I think if it makes you more comfortable, feel free
7 to review it. But I think the questions are not
8 pertinent to that.
9 A. Okay.
10 Q. Who is Frank Mercurio?
11 A. He is an engineer that works for Yuri Avila.
12 Q. In this -- in his E-mail, Mr. Schenck says to
13 Mr. Mercurio "I will need to review the patents to
14 make sure our mutual plans are okay. I will notify
15 you if I see a conflict. It may impact the plan."
16 Do you see that series of sentences?
17 A. I do.
18 Q. Who is Mr. Schenck?
19 A. I do not know.
20 Q. Do you know whether Mr. Schenck reviewed the patents?
21 A. I do not know.
22 Q. Do you know whether he notified Rayovac of what he
23 found if he reviewed the patents?
24 A. I don't know.
25 Q. Do you know what resulted of his review?

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 didn't learn much except read the E-mail.
3 Q. So all you know on behalf of Rayovac Corporation
4 now --
5    MR. SHIMOTA: Wait a second. This is
6 something that Yuri testified about, this falls
7 under topic 13. I don't believe this falls under
8 topic 10 or 11, so he is not here to testify about
9 this on behalf of Rayovac. Yuri testified in detail
10 yesterday about this document. So I'll just make
11 that clear. But --
12    MS. WENDLANDT: Sure. That's helpful to
13 me. Thank you.
14 Q. In connection with your preparation, however, you
15 learned only what's written on this page?
16 A. Correct.
17 Q. Okay. I'll ask you to turn back to Exhibit 45, which
18 is that exhibit right there. Under the heading
19 response, the second full paragraph, states -- sorry,
20 the first full paragraph says, the last sentence "To
21 ensure that Rayovac's initial development work did
22 not conflict with the intellectual property of third
23 parties, Rayovac sought the assistance of Melvin I.
24 Stoltz, an outside patent attorney." Do you see
25 that?

7 (Pages 22 to 25)

Page 26

1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY
2 A.  Yes.
3 Q.  When did Rayovac seek the assistance of Mr. Stoltz?
4 A.  Mr. Stoltz has worked with the company for many
5        years; but in this particular matter it was late '01,
6        later part of '01.
7 Q.  And who asked -- who at Rayovac asked Mr. Stoltz for
8        assistance?
9 A.  It's -- it was a combination of the engineering
10        community and the legal community.
11 Q.  And based on your prior testimony, that would have
12        been Mr. Avila --
13 A.  Yes.
14 Q.  -- and --
15 A.  Yes --
16 Q.  -- Mr. Bedol or his predecessor?
17 A.  Yes. And I'll remember his name before we leave.
18 Q.  And what did Mr. Stoltz say to Rayovac about its
19        initial development work?
20 A.  Can you be more specific.
21 Q.  Sure. It says in the sentence that Rayovac sought
22        the assistance of Mr. Stoltz in connection with its
23        initial development work. I'm wondering if
24        Mr. Stoltz provided any advice with regard to that
25        initial development work?

Page 28

1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY
2 Q.  When you say the idea was already in the marketplace,
3        you're talking about the Braun Syncro?
4 A.  I'm talking about the idea of an automatic --
5        something that automatically cleans a product. So
6        when I refer to the idea, I've been trained to
7        develop concepts which are just ideas with no
8        specifics around them. So the idea is that something
9        automatically gets cleaned.
10 Q.  And that idea of automatically cleaning an electric
11        shaver was in the marketplace?
12 A.  Yes.
13 Q.  Who was marketing that idea?
14 A.  Braun had it, Braun had it in the marketplace.
15 Q.  And what was the embodiment of that idea?
16 A.  The embodiment; it was just an automatic-cleaning
17        system.
18 Q.  In what product?
19 A.  In the Braun shaver.
20 Q.  Which shaver?
21 A.  The Braun Syncro.
22 Q.  Okay. And how did you determine that this idea was a
23        good idea in the marketplace?
24 A.  By looking at third-party syndicated data which
25        showed that Braun had achieved growth in market share

Page 27

1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY
2 A.  I think that's a question for Yuri to provide
3        specifics.
4 Q.  Can you describe the genesis of the idea at Rayovac
5        for creating the titanium Smart Systems cleaning
6        device?
7 A.  All right. By genesis, what do you mean?
8 Q.  The beginning, you said that in 2000 Rayovac noticed
9        the launch of the Braun Syncro.
10 A.  Yes.
11 Q.  In 2001 in connection with Rayovac's initial
12        development work, it sought the assistance of
13        Mr. Stoltz and the engineering community to analyze
14        Braun's patents that covered the Syncro?
15 A.  Yes.
16 Q.  Because at that time Rayovac was considering the
17        launch of its own cleaning system?
18 A.  Yes.
19 Q.  And I'm wondering what was -- who came up with the
20        idea to launch Rayovac's own cleaning system?
21 A.  The idea was already -- the idea was in the
22        marketplace; and as we value every competitive idea
23        and I would have been the person in charge of
24        understanding if competitors had a good idea in the
25        marketplace, so that would have been me.

Page 29

1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY
2        after years of decline.
3 Q.  What was this third-party syndicated data?
4 A.  It's scanner data.
5 Q.  What is scanner data? I apologize, I'm totally
6        ignorant about this. So what is scanner data?
7 A.  Simply it's what goes over the shelf, what goes over
8        the register and then is captured in a centralized
9        database which is then sold to companies like
10        Remington, like Braun, like Gillette, like Norelco,
11        so we can all look at the same numbers.
12 Q.  And who sells this database?
13 A.  There are a number of companies that sell it. There
14        is NPD is a company we use. Nielsen or -- Nielsen is
15        another company that provides this type of data.
16        N I E L S E N.
17 Q.  What precisely does this data tell you, the number of
18        units being sold?
19 A.  Units being sold, number of dollars being sold.
20 Q.  And what about this data led you to conclude that the
21        idea of automatic cleaner was a good idea in the
22        marketplace?
23 A.  They had sold considerable amount of units and
24        dollars.
25 Q.  Braun?

8 (Pages 26 to 29)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 A. Yes.
3 Q. And when did you arrive at that conclusion?
4 A. Sometime in '01, middle of '01, approximately.
5 Q. How often do you get this scanner data?
6 A. Every month.
7 Q. Is it divided by product, by idea, how is it divided?
8 A. Everything. By product, by brand, by SKU which is
9    product.
10 Q. Any other category?
11 A. What --
12 Q. Product, brand, SKU.
13 A. Not -- category -- well, category but that would --
14    that's it, that's it.
15 Q. And what did you do after you concluded that this
16    idea was a good idea in the marketplace?
17 A. We began, we began initial -- looking -- we began to
18    understand -- answer?
19        MR. SHIMOTA: Yeah, sure.
20 A. We began looking at ways to build our own system.
21 BY MS. WENDLANDT:
22 Q. Who was involved in that effort?
23 A. Engineering, legal, marketing. Those were the
24    general groups that were managing -- would be
25    managing it.

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 Q. So around -- this is dated revised August 21, 2001.
3 A. It was -- yeah, it was revised since the previous
4    meeting a week earlier. It was -- this is about the
5    start of when this all started, you know.
6 Q. So this Exhibit 2 refreshes your recollection that
7    this is about August 2001 when Rayovac began its
8    initial development work on its own cleaning system?
9 A. Before any development work starts, we actually also
10    concept test our ideas typically. I can't remember
11    if we did for this. But there would usually be some
12    time before it actually went to the engineering group
13    to understand the marketing -- if there was a market
14    for the product.
15 Q. And if any concept testing had been done for the
16    cleaning, for Rayovac's own cleaning system, where
17    would -- would that have generated any documents?
18 A. It would have but I'm not sure we did -- I'm not sure
19    that we -- I'm not sure that we -- I'm not sure that
20    we did it for this. I think we may have started the
21    system after this.
22 Q. How would you determine whether or not Rayovac did
23    concept testing?
24 A. Well, we must not have done it because we searched
25    our files, all my files were searched.

---

Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 Q. Who was in the marketing group managing the project?
3 A. There was me. There was -- let's see, is this '01?
4    There -- an assistant of mine.
5 Q. Who is that?
6 A. I'm so bad with names. I'll remember the name.
7 Q. Is it Peter Katz?
8 A. Was Peter on the project at that time? No. Not yet.
9 Q. So you and an assistant, anyone else?
10 A. No.
11 Q. How about on the engineering team?
12 A. Yuri and his team and I'm not sure exactly, there are
13    a number of people in that group. Yuri's my contact.
14 Q. And on the legal team?
15 A. It would be in '01, again, it's -- I'm not clear on
16    the timing. It's either Joel or his predecessor.
17 Q. Joel Bedol?
18 A. Joel Bedol, yes. I'm so bad with names.
19 Q. I'm placing what has been previously marked as
20    Exhibit 2 before you. Have you seen this document
21    before?
22 A. I believe I have.
23 Q. Do you recall when?
24 A. I would have been involved with the project from the
25    beginning, so --

---

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 Q. Under objective in Exhibit 2, it says provide
3    Remington electric shavers consumers -- I'm sorry,
4    provide Remington electric shaver consumers a
5    convenient cleaning/recharging unit; do you see that?
6 A. Yes.
7 Q. Why did Rayovac want to provide its customers with a
8    cleaning/recharging unit?
9 A. Because the market accepted the Braun cleaning system
10    as a strong idea, a strong concept.
11 Q. Prior to the Braun cleaning system, had Rayovac
12    considered providing its customers with a
13    cleaning/recharging unit?
14 A. No. We had considered ways to make it easier to
15    clean the product, but we had not considered this --
16    sort of a cleaning system.
17 Q. What ways had you considered to make it easier to
18    clean a product?
19 A. Well, one of the things that we actually launched, I
20    think we -- I believe we were first in foils was to
21    make the shavers washable so you can rinse them under
22    the sink. So I believe we were -- pretty sure we
23    were first to market with that, the actual
24    cleaning -- the actual utilization of water -- or
25    liquid to clean it, to clean the shaver which had

9 (Pages 30 to 33)

Page 34

1    HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2    previously not existed.
3 Q.  And that washable foil shaver, it was water that was
4    used?
5 A.  Yes.  It would be whatever -- it would be whatever
6    you'd like to put on it.  I mean the housing was, was
7    proofed so no water could get into it.
8 Q.  Waterproofed?
9 A.  Waterproof is a term, but it was proofed against
10    liquids.
11 Q.  Sealed?
12 A.  Yeah, sealed.  Sealed.  So that was actually I
13    believe our idea first.
14 Q.  And did Rayovac actually launch that product?
15 A.  Yes.
16 Q.  And how was it received in the marketplace?
17 A.  Terrific.  Our share went up three share points that
18    year.
19 Q.  What year was that?
20 A.  That was 2000 on the foils.  So that was the year
21    before the Syncro was launched.  We had our version
22    of a more manual but a cleaning device as a system
23    that would be cleaned.
24       (Recess taken from 9:58 to 10:02 a.m.)
25 BY MS. WENDLANDT:

Page 35

1    HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 Q.  I'm asking you to turn your attention to Exhibit 2.
3    Under specifications.
4 A.  Right here?  That's right here?
5 Q.  Yes.  Under specifications, that bullet says size no
6    larger than the Braun Syncro unit.  Do you know why
7    the size constraints of Rayovac's cleaning/charging
8    system would have been a function of the Braun
9    Syncro?
10 A.  I believe our judgment was that the Braun was too big
11    for the counter, and so we wanted something that was
12    smaller and a little more elegant and that wouldn't
13    be as obtrusive.  But I believe that was just
14    judgment on our part.
15 Q.  Not based on any consumer or -- testing?
16 A.  Yes.  That's right.
17 Q.  Now, this next question may be again for Mr. Avila,
18    but since you were part of at least the initial
19    effort I thought I'd ask you as well.  I'm placing
20    before you Exhibit 4 which is a document dated
21    October 12th, 2001, entitled shaver cleaner and
22    charger system.  Have you seen this document before?
23 A.  I have not.
24 Q.  Were you aware of the -- looking at the bottom of the
25    first page there is what appears to be a cleaning

Page 36

1    HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2    system.  Do you see that?
3 A.  Yes.
4 Q.  Were you aware of this cleaning system concept being
5    considered at Rayovac?
6 A.  I have never seen this.  I have never seen this.  So
7    I can't really comment.
8 Q.  Do you know if Rayovac ever considered having a
9    cartridge for its cleaning fluid container?
10 A.  Yes, we did at one point.
11 Q.  And was that cartridge concept rejected?
12 A.  Yes, it was.
13 Q.  Why?
14 A.  I believe it was deemed to be in violation of the
15    Braun patent.
16 Q.  Do you know which one?
17 A.  No.
18 Q.  And who deemed it to be in violation of the Braun
19    patent?
20 A.  I believe outside counsel.
21 Q.  Was that Mel Stoltz?
22 A.  Yes.
23 Q.  I'm placing before you what has been previously
24    marked as Exhibit 6 which appears to be several
25    photographs of a cleaning system or a prototype of a

Page 37

1    HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2    cleaning system.  Have you seen this prototype?
3 A.  I have not.
4 Q.  Have you seen these photos before?
5 A.  I have not.  I have not seen the photos or prototype
6    or anything of this sort.
7 Q.  Are you aware of any such prototype being developed
8    at Rayovac?
9 A.  No.
10 Q.  I'm placing before you what has been previously
11    marked as Exhibit 39.  Have you seen this document
12    before?
13 A.  Yes.
14 Q.  It's entitled marketing plan 2003 men's shaver.
15 A.  Yes.
16 Q.  When did you first see this document?
17 A.  Fall '02.
18 Q.  Why?
19 A.  Since -- because I wrote most of it.
20 Q.  Okay.  And --
21 A.  Or wrote most of it or directed it to be written, a
22    combination of.
23 Q.  On the first page, paragraph labeled B, products.
24 A.  On which?  I'm sorry.
25 Q.  First page, paragraph B products, it says, quote, "We

10 (Pages 34 to 37)

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1 
2    must launch a new high-end foil and rotary shaver
3    with cleaning system." Do you see that?
4 A. Yes.
5 Q. Why did Rayovac need to launch a new high-end foil
6    and rotary shaver with cleaning system?
7 A. We deemed it to be a consumer need that we weren't
8    addressing with our current assortment of products.
9 Q. Including the washable foil shaver that you had
10    launched in 2000?
11 A. Um-hmm. Yes.
12 Q. Asking you to turn your attention to the next page,
13    page labeled R 12413.
14 A. Yes.
15 Q. Under number 1, cleaning system, do you see that?
16 A. Yes.
17 Q. It says, quote, "The cleaning concept is a winning
18    idea based on the following reasons."
19 A. Yes.
20 Q. And then the next bullet is in market results, the
21    Syncro cleaning system continues to grow.
22 A. Yes.
23 Q. Why was that important?
24 A. Why is that important?
25 Q. Yes, why was it important to note that the Syncro

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1 
2    cleaning system continues to grow?
3 A. Because that's the way you understand what your
4    competitors are doing and how they're performing,
5    which is just a fundamental of running a business.
6 Q. What's the connection between the Syncro cleaning
7    system continued growth and the cleaning concept
8    being a winning idea?
9 A. What's the connection?
10 Q. Yes.
11 A. One is an in-market validation by a competitor, that
12    would be the first bullet point. And the second is
13    an internal validation using our internal concept
14    testing methodology.
15 Q. Are you referring to that second bullet?
16 A. Yes, yes.
17 Q. Consumer testing?
18 A. Um-hmm.
19 Q. Does this refresh your recollection as to whether any
20    concept testing was done for the --
21 A. Yes, but --
22 Q. Sorry, for the Rayovac cleaning system?
23 A. Yes. But the question was on timing, the question
24    was on timing. As I stated previously, I wasn't sure
25    exactly the timing. I knew we had done testing at

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1 
2    some point, but I'm not sure exactly if it was '01 or
3    '02, exactly when it was. And so, yeah, absolutely
4    we did testing at some point in the continuum.
5 Q. And what tests were done?
6 A. We had a standard concept testing format where we --.
7 Q. Where you what?
8 A. Where we -- where we wrote a concept and tested with
9    consumers.
10 Q. And what was the concept that was tested?
11 A. It was -- the idea was a self-cleaning shaver system.
12 Q. How did you present that to a consumer who was being
13    asked to take this test?
14 A. On a sheet of paper on line.
15 Q. Was there a drawing of the device?
16 A. No. There was not.
17 Q. Just a statement on a sheet of paper that said --
18    what?
19 A. A statement.
20 Q. Said what?
21 A. Well, we have a format which has a few pieces to it.
22 Q. Can you describe it?
23    THE WITNESS: Do I need to share that? I
24    mean that's our internal --.
25    MR. SHIMOTA: There is a protective order

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1 
2    in the case, so your testimony will be designated
3    highly confidential so only the outside lawyers can
4    see it.
5 A. Sure. It's a testing methodology for Procter &
6    Gamble which essentially there is -- since our whole
7    marketing -- since everybody has confidence in
8    Procter & Gamble. And what it is is a concept test
9    starting -- concept statement starting with
10    introducing -- introducing the idea, self-cleaning
11    shaver, you talk about what it does, what's the
12    benefit and then what's the support on -- a brief
13    description of how it works, very generic. And
14    that's it. And then a price point. And then you
15    get, and then you get -- and we test it on line
16    quantitatively and you get scores back.
17 BY MS. WENDLANDT:
18 Q. So is a consumer presented with the option, you know,
19    1 through 10 how much --
20 A. No, no.
21 Q. So how do you --
22 A. They're presented with an idea --
23 Q. How do you test it on line quantitatively then?
24 A. It's a standard format.
25 Q. Which I don't understand so if you could explain it

11 (Pages 38 to 41)

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1   for me.

2   A.   Okay.  You present a concept to the consumer.  They

3   either -- they rate it on a scale of what -- they

4   like it or don't like it.  And then you end up with a

5   number.  And the -- and there are four metrics which

6   test which are purchase intent, believability,

7   uniqueness, and likability.

8   Q.   And who administers this test?

9   A.   A third-party.

10  Q.   Who is that?

11  A.   I can't remember who we used at the time.  There are

12  several firms that we used over the years.  But they

13  don't actually add any value.  They just administer

14  the test on line via panel.

15  Q.   And what was the scale, and just specifically with

16  regard to Exhibit 39, it says that the cleaning

17  system concept tested exceptionally well scoring the

18  best of all concepts, 5.7 out of 7 on purchase

19  interest scale.

20  A.   Right.

21  Q.   What does that mean?

22  A.   On this particular test where this was tested there

23  was a 1 to 7 scale, and so it received -- and the top

24  would be, you know, definitely would buy, probably

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1   would buy, maybe would buy, on a 7 point scale down.

2   And so this one scored very, very high.  Round

3   numbers, 6 out of 7.

4         No business person ever sees this, right?

5         MR. SHIMOTA:  No.

6         MS. WENDLANDT:  Not from Braun.

7         MR. SHIMOTA:  The designation at the

8   bottom, that's what that means.  Attorneys' eyes

9   only.  You can see it right there.

10        THE WITNESS:  Yeah, I know, but I'm not an

11  attorney.

12        MR. SHIMOTA:  Sure, but you're a business

13  person from Rayovac.

14  BY MS. WENDLANDT:

15  Q.   And you wrote it.

16  A.   I know.

17  Q.   The third-party, and I know you don't know who it was

18  for this particular test, who conducts this test on

19  line, how do they present the results to Rayovac?  Is

20  there a report, do they give you each consumer that

21  they tested and their numbers or how do they do it?

22  A.   They give us a report.  We have to pull it off on

23  line, we just have to pull it, it's on computer data

24  base often times.  But yes, you can -- there is

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1   some -- there is some form of report that

2   typically -- that you typically get.  Either you pull

3   it yourself or you have it produced.

4   Q.   And did you give to your counsel the report for this

5   particular consumer test?

6   A.   I'm not sure, I'm not sure.

7   Q.   And how long are these tests kept on line?

8   A.   How long does the test run?

9   Q.   No, the report that you said --

10  A.   How long is it maintained?

11  Q.   That's correct, yeah, how long is the report

12  maintained?

13  A.   On line?

14  Q.   Yes.

15  A.   I don't know.  But -- I don't know.

16  Q.   Okay.  And do you know if there was a hard copy of

17  this report that may be in your files?

18  A.   I'm not sure.  I'm not sure -- I'm not sure where it

19  would be.

20  Q.   Okay.  The next sentence in this Exhibit 39 is

21  "Additionally, based on our Scout panel data, the

22  Syncro cleaner" underlined cleaner "had very high

23  satisfaction scores, 69 percent top box, average

24  feature top box 43 percent."  Can you tell me what is

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1   meant by that sentence?

2   A.   Sure.

3   Q.   First what is the Scout panel data?

4   A.   It's an attitude and usage study, also known as an

5   A and U, that most fairly sophisticated businesses

6   would conduct either annually or biannually where you

7   understand what your competitors -- understand what

8   your competitors are doing.  And so in this case, one

9   of the metrics that we have is satisfaction for all

10  competitive products, every single SKU in the entire

11  category.  Remington's or the competition, Norelco or

12  Braun or anybody else.

13  Q.   And is Scout a company that provides this data?

14  A.   Yes.  And it's proprietary to us.

15  Q.   To Rayovac?

16  A.   Yes.  But anybody could run the same study and should

17  generate the same results.

18  Q.   And what does the 69 percent top box satisfaction

19  score mean?

20  A.   Extremely satisfied.  69 percent or extremely

21  satisfied.

22  Q.   It was 69 percent of the consumers that Scout tested

23  were extremely satisfied, is that what you mean?

24  A.   69 percent of the respondents to the study that were

12 (Pages 42 to 45)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2  Braun Syncro owners responded favorably.
3 Q. And what does it mean that the average feature top
4    box is 43 percent?
5 A. I'm not sure.
6 Q. Do you have an understanding what that means?
7 A. No, no, I do, yes. What it means is there are a
8    number of product attributes, in other words, a
9    shaver has an LED, a light, it has an on/off button,
10   it has a lot of features. And so the cleaning -- the
11   cleaning feature was isolated and it scored better
12   than the typical features you find on a shaver.
13   Hopefully that clarifies it.
14 Q. And that's why the cleaning is underlined in that
15   sentence -- or Syncro cleaner is underlined, is that
16   what you mean?
17 A. Yes. That's why clean -- yes, that's right. Because
18   referring to the -- not to the product, but to the
19   feature.
20 Q. Okay. Turning your attention to page 12419, under D
21   distribution.
22 A. Yes.
23 Q. And then on to -- actually, would you turn to the
24   next page, under the check mark Syncro success.
25 A. Yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2    retailer to expand the presence in that area.
3 Q. And the way you would encourage retailers to expand
4    their presence in the cleaner area would be to show
5    how successful the Syncro had been?
6 A. Yes.
7 Q. Under the next check mark, it says consumers want a
8    Remington cleaner. What does that mean?
9 A. We -- we previously stated we conducted concept
10   testing under the Remington brand. And under the
11   Remington brand the product concept scored very, very
12   well.
13 Q. And what need was being met by the Remington cleaner
14   that -- what was the need that was being met by the
15   Remington cleaner?
16 A. The ability -- the ability to automatically clean the
17   shaver.
18 Q. Is that in contrast to other cleaning methods that
19   were out there before?
20 A. Yes.
21 Q. Including the washable foil shaver that you had
22   introduced in 2000?
23 A. Yes.
24 Q. Placing before you what has been previously marked as
25   Exhibit 41.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2 Q. Can you read that sentence to yourself.
3 A. Um-hmm.
4 Q. Why was it important to distribution to show how
5    successful the Braun Syncro had been over the past
6    two years?
7 A. Let me just -- let me put it in the context of the
8    entire paragraph.
9 Q. Sure.
10 A. Okay. Restate your question again.
11      (Question read by the reporter.)
12 A. Anytime there is an existing success story in any
13   category, utilizing category management approach you
14   would expand whatever has been successful. So it
15   would be utilizing category management technique when
16   you expand successful segments and you contract not
17   successful segments. That's how you would approach
18   distribution in a sophisticated way using fact based
19   approach.
20 Q. What are these category management techniques that
21   you're referring to in your last answer?
22 A. It would be to help set the shelf according to what
23   consumers are buying. So if consumers are moving
24   towards a new segment, in this case, cleaning systems
25   are a growing segment, you want to encourage the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2 A. Should I close this?
3 Q. We're all done with -- yes. Which is a document
4    entitled 2003 business review men's shaver.
5 A. Yep.
6 Q. Did you have -- take part in authoring this document?
7 A. Yes.
8 Q. What was your role?
9 A. I authored the majority of it.
10 Q. Asking you to turn your attention to page 12432.
11 A. Yes.
12 Q. The paragraph under section B starting with although
13   the Syncro. Can you read that to yourself.
14 A. Yes.
15 Q. That paragraph indicates that consumers had two
16   issues with the cleaning system, the Braun Syncro.
17   The first was that the cleaning cycle was too long.
18   Why was that important for -- or why did you point
19   that out in this Exhibit 41?
20 A. Why did I point that out?
21 Q. Yeah, why did you think it was significant to point
22   that out in this Exhibit 41?
23 A. These were two dissatisfiers from a combination of
24   judgment and some consumer feedback that we had with
25   regard to the Braun system.

13 (Pages 46 to 49)

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2 Q.  And why was it important to point out dissatisfiers?
3 A.  In order to give the consumer what they wanted in
4    terms of a cleaning system.
5 Q.  So was Rayovac intending to solve these dissatisfiers
6    with its own cleaning system?
7 A.  Yes, we were intending to make our product -- to --
8    yes, to understand what the dissatisfiers were and
9    address them in our product.
10 Q.  And did Rayovac address the cleaning cycle is too
11    long to satisfy in the product that it ultimately
12    launched?
13 A.  That's a Yuri question. That's a -- that's a Yuri
14    question.
15 Q.  And with regard to the second dissatisfier, was that
16    something that Rayovac addressed in its own cleaning
17    system that was ultimately launched?
18 A.  I believe we improved it.
19 Q.  You improved --
20 A.  Minimized dissatisfaction.
21 Q.  Minimized spilling?
22 A.  Minimized dissatisfaction of spilling.
23 Q.  And how did Rayovac do that?
24 A.  It's a technical question. Having to do with the
25    construction of the product. I would defer that to

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2    Yuri.
3 Q.  So in the indicated action section, it says our
4    shaver will have superior cutting performance while
5    our cleaning system will have a shorter running time
6    and spillproof base. Do you see that?
7 A.  Um-hmm, yes.
8 Q.  You don't know whether or not your product actually
9    has a shorter running time?
10 A.  I don't.
11 Q.  And you don't know whether or not your product has a
12    spillproof base?
13 A.  I know that it's -- I don't know. I don't know. I
14    don't -- it's -- I'm not sure.
15 Q.  What did you mean in this document when you said
16    spillproof base?
17 A.  I think you can literally take the translation of
18    spillproof.
19 Q.  So you can turn it upside down and it doesn't spill?
20 A.  That's why I can't answer it. Because it's all the
21    ways the consumers use it. It's spillproof if used
22    properly, it's less so if it's not.
23 Q.  Okay. Aside from this on line concept testing and
24    the Scout data, were there any other market studies
25    that Rayovac conducted or consulted in connection

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2    with its development of the cleaning system?
3 A.  From a commercial perspective, in other words, is it
4    commercially viable? The answer is I don't -- no, I
5    don't think so.
6 Q.  What other kind of market studies are you aware of?
7 A.  I'm not. I'm not aware of any other thing related to
8    decision to launch such a product which would fall
9    into my camp to the best of my recollection.
10    (Exhibit No. 46 was marked.) —
11 Q.  I've placed before you what has been marked as
12    Exhibit 46 which is a document dated June 20, 2002,
13    entitled marketing basis of interest form. Have you
14    seen this Exhibit 46 before?
15 A.  I believe I have.
16 Q.  Under paragraph 1 market opportunity, it says, quote,
17    "Taking advantage of the success Braun Syncro has
18    had." Do you see that?
19 A.  Yes.
20 Q.  What is meant by that statement?
21 A.  I think it's consistent with what I said before which
22    is just capturing -- which is leveraging the strength
23    of the Braun in market performance, leveraging that
24    concept which consumers gravitate to. That's what
25    that means.

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2 Q.  Under consumer needs, it refers to Insight Product
3    Development.
4 A.  Yes.
5 Q.  What is that?
6 A.  Insight Product Development is an external firm that
7    was helping with the identification of a new shaver
8    platform.
9 Q.  And in connection with the cleaning system and the
10    charging system that Rayovac was developing, what
11    does it mean that the concept received the highest
12    scores in our external research -- in our recent
13    external research program with Insight Product
14    Development?
15 A.  I believe the scores that were previously shown were
16    actually part of this Insight Product Development
17    program.
18 Q.  Was that the 5.7 out of 7?
19 A.  Yes.
20 Q.  So that would have been the on line report that we
21    were discussing?
22 A.  Yeah. I believe they did it on line as well. We
23    also did things internally. But I believe during
24    this time period we used this firm to do all of that
25    kind of research.

14 (Pages 50 to 53)

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. What is the point of Exhibit 46? Was there a
3    presentation made or -- ?
4 A. No. This is, this is a document to start thinking
5    about a new -- to start thinking about a new idea, so
6    this is an internal form. It doesn't actually -- I
7    don't believe this actually kicks off any project.
8    But I believe it kicks -- it attempts to gain the
9    company's support as an idea is the way I recall this
10   form, the way this form is being used.
11 Q. And who at the company is this form intending to gain
12   support among?
13 A. It would just be an initial screen, it would just go
14   into the marketing department which would not kick
15   off any project because that would require many, many
16   cross-functional people to sign off on a product
17   before it started. This is just we think we have an
18   idea.
19 Q. And you see this is dated June 20th, 2002.
20 A. Yes.
21 Q. Whereas the previous exhibit we looked at regarding
22   the Rayovac cleaner and charger was dated August
23   2001.
24 A. Yeah.
25 Q. What explains the --

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 A. About a month time period? I'm not sure. That one
3    was -- it was about a month difference, right, five
4    or six weeks?
5 Q. I'm referring to Exhibit 2 which you have in your
6    pile. It's actually almost a year difference.
7 A. Oh, I'm sorry. I was in the wrong year. I'm sorry.
8    I was in the wrong year.
9 Q. Sure. Yeah.
10 A. All right. Restate your question, please.
11 Q. I guess what explains the time lag between Exhibit 2
12   which is dated August 21st, 2001, discussing the
13   Rayovac cleaner and charging system and this market
14   basis of interest form which is dated June 20th,
15   2002?
16 A. I am not sure. I was trying to remember back in
17   history and I'm struggling with what would have been
18   the reason for the difference. I know that we did
19   reorganize the company and created a global product
20   development group of which Peter Katz actually ran.
21   But I just don't know. I just honestly don't know.
22 Q. And you mentioned the global product development
23   group because it was created in between these
24   periods?
25 A. Yes. It was created in between these periods. And

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2    so that's what I'm struggling with.
3 Q. I'm placing what has been previously marked as
4    Exhibit 36 before you. And I ask you to direct your
5    attention to the item number 8, cost and training
6    prices, target prices.
7 A. Yes.
8 Q. If you wouldn't mind, if you could compare those to
9    the target prices in Exhibit 46.
10 A. Okay.
11 Q. What accounts for the difference in these target
12   prices? Why are they so different?
13 A. Which ones are you referring to?
14 Q. Well, let's start with the current standard cost.
15 A. It's just a mistake.
16 Q. Which is a mistake?
17 A. The current standard cost. It's not a reasonable
18   number.
19 Q. In Exhibit 46?
20 A. Yes.
21 Q. Okay. So Exhibit 36 is more reasonable?
22 A. Yes.
23 Q. Under number 9, forecast information, again,
24   comparing Exhibit 36 to 46, you see that for each
25   year the forecast information in dollars and units is

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2    significantly higher in Exhibit 36 than it was in
3    Exhibit 46. Do you know what accounts for the
4    forecast information differential between the two
5    documents?
6 A. I'm not. I'm not. Document 36 is a more reasonable
7    document, closer to reality.
8 Q. And you base that on what?
9 A. Based on more typical margins, what it would --
10   knowing from experience what a product costs to make
11   and what the typical margins are, including the
12   volumes. The volumes are much more reasonable on
13   document Exhibit 36.
14 Q. How did Rayovac initially determine what price to
15   sell its cleaner to the trade at?
16 A. To the trade or to the consumer?
17 Q. We'll start with the trade.
18 A. Well --
19 Q. I'm assuming the trade is Wal Mart.
20 A. Yeah, but --
21 Q. No? Can you explain the difference?
22 A. The consumer is what the consumer is willing to pay.
23   You always have to start with the consumer.
24 Q. So your price to the trade would be a function of the
25   price to the consumer?

15 (Pages 54 to 57)

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 A.   Completely.
3 Q.   And how did you determine what price the consumer
4      would be willing to pay for the Rayovac --
5 A.   Are we referring to the rotary shaver or the foil?
6 Q.   For the rotary.
7 A.   For the rotary?
8 Q.   Yeah.
9 A.   We looked at our own offerings and Norelco's
10     competitive offerings and then assigned a value which
11     was about 30, about $30 of value to the cleaning
12     system.
13 Q.  And how did you determine the $30 value to the
14     cleaning system?
15 A.  It was approximately the difference between the Braun
16     with cleaner and without cleaner.  That was about the
17     difference.
18 Q.  I'm sorry, with and without cleaner?
19 A.  Yeah.  Braun has most of their business actually
20     outside of cleaners.  So we looked at the difference
21     between with a cleaning system versus a shaver
22     without, albeit products were slightly different.
23 Q.  Okay.  And how did Rayovac determine the pricing for
24     its foil cleaning system?
25 A.  We used the same -- we used the same system where the

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2      cleaning system was worth approximately $30 and
3      looked at that versus our existing shavers without,
4      and that was about the difference.
5 Q.   So you looked at Rayovac's own foil shaver offerings?
6 A.   Right.  Without a cleaner.
7 Q.   Without a cleaner?
8 A.   And then assigned a value of about $30,
9      approximately.
10 Q.  Well, in connection with the rotary pricing, you
11     looked at Norelco's offerings as well.  Did you look
12     at any other competitor offerings?
13 A.  We did.  But the offerings in foils are so very
14     different between the competitors.  Braun only offers
15     dual foils, so every product in the -- two foils
16     instead of three and so it was much more difficult to
17     do because Braun essentially has the same product
18     from a $40 shaver all the way up to over a hundred
19     dollars is essentially the same product and it's
20     just -- it's a lot -- more difficult to gauge versus
21     our product line which has a, you know, has a single
22     foil, a two foil and a triple foil.  So it was much
23     more difficult to compare that way versus on the
24     rotary side where it's much more of a -- it's much
25     easier to compare the features because they're all

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2      triple foil -- triple-edged shavers.  Now --.
3 Q.   Do you need to take a break?
4 A.   No.  I was going to add just one thing on the
5      pricing.
6 Q.   Yes.
7 A.   Our pricing on the rotaries was about $30 higher than
8      the cheapest foil cleaning system from Braun at the
9      time.  $30 more expensive.  So we were 129, they were
10     99.  Okay?
11 Q.  In setting the pricing, was that a consideration that
12     you were coming in at a higher price?
13 A.  Not for the rotary.  But on the foil, I guess my
14     point is to some degree we looked at that, what Braun
15     had been doing with the pricing.  And Braun had
16     already taken the market -- taken the pricing in the
17     market down considerably on foils which drove our
18     pricing -- which drove our pricing strategy to some
19     degree.
20 Q.  You priced downward as well, is that what happened,
21     to match --
22 A.  They -- Braun took the market down.
23 Q.  Yes.
24 A.  And so when we launched our products --
25 Q.  The foil?

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 A.   The foil, it was priced closer to -- lower than the
3      rotary offering because Braun had taken the market
4      down on their own for whatever reason.
5 Q.   Sheer generosity.
6 A.   Yes.
7 Q.   Prior to Braun's cleaning system, you mentioned that
8      Rayovac launched its own washable foil system.  Were
9      you aware of any other cleaning systems for electric
10     or dry shavers?
11 A.  Cleaning system -- the washable feature as a system
12     because the washable feature is not a system, it's
13     just -- it's a feature.
14 Q.  Yes.  Were you aware of any --
15 A.  Yes.  Norelco had about at the same time launched a
16     washable shaver.
17 Q.  About 2000 you mean?
18 A.  Yes.  About that time.
19 Q.  And how did that shaver function?
20 A.  How did it physically work?
21 Q.  No, not the shaver itself.  I guess maybe I should
22     clarify.  How did the washability feature of it work?
23 A.  You would open the head and rinse it under water or
24     pour whatever cleansing agent you wanted to put on it
25     with some restrictions.

16 (Pages 58 to 61)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. And how was the Norelco washable shaver received in
3    the marketplace?
4 A. In 2000. Not as strongly as ours. Our market share,
5    as I said, went up three share points when we
6    launched that. I believe Norelco's went down.
7 Q. Were you aware of any other dry shaver systems with
8    the cleaning feature?
9 A. No. Oh, I'm sorry, I'm sorry. Yes, with the -- all
10    right. Let me clarify. Panasonic makes a shaver
11    that is intended to be used in the shower. So you
12    can get it wet, but it's not marketed as a shaver
13    that you clean. It's just used in the shower, versus
14    our product which was specifically marketed and
15    designed to be washable, cleanable. But using other
16    forms besides, you know, blowing it out or tapping it
17    out as consumers had done for many, many years.
18 Q. Do you know what time frame the Panasonic shower
19    shaver was introduced?
20 A. Oh, it's been around for many years. And in fact
21    Remington had had in-the-shower shavers going back to
22    the early '90s. But they were designed for shower
23    use versus putting it under water and letting it get
24    cleaned out. They were just different -- if you open
25    one of our packages or even on the outside on the box

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. Do you know if in the development of Rayovac's
3    cleaning system it considered devices for sterilizing
4    barber clippers or any devices used by barbers?
5 A. Not that I'm aware of.
6 Q. Why not?
7 A. I don't know.
8 Q. I'm placing before you what has been previously
9    marked as Exhibit 7, which is an E-mail from Peter
10    Katz to Jeff Hovis dated August 23, 2002. Hovis is
11    H O V I S. Have you seen this document before?
12 A. I think I have, yes.
13 Q. Turning your attention to paragraph 2 A, if you
14    follow the chain of E-mails, it looks to me that
15    Mr. Katz is saying, quote, "I'm only interested in
16    making claims associated with cleaning the actual
17    shaver similar to the of Braun." Do you see that?
18 A. Um-hmm.
19 Q. Why was Mr. Katz only interested in making claims
20    similar to Braun's?
21 A. I'm not sure that's what it says.
22 Q. Okay. What is your understanding of what it says?
23 A. It says we're only interested in making claims
24    associated with the cleaning of the actual shaver
25    that is part of the package sold. And it just

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2    it would say -- it would show you how to use it. It
3    was an important feature.
4 Q. The shower feature?
5 A. No, the cleaning feature.
6 Q. The cleaning feature. Okay.
7 A. Yeah.
8 Q. And do you know how the Panasonic shower shaver was
9    received when it was launched?
10 A. They had a 7 percent market share for a long, long
11    time. And then -- and now they have virtually no
12    share. But when it was launched it was just -- they
13    have always been a third or fourth player in the
14    category.
15 Q. And again, you think it was launched in the early
16    '90s?
17 A. Ours was. Panasonic's may even have been before
18    that.
19 Q. In the development of Rayovac's cleaning system, did
20    Rayovac consider devices for sterilizing barber
21    tools?
22        MR. SHIMOTA: Objection, vague.
23 BY MS. WENDLANDT:
24 Q. You can answer.
25 A. I'm not sure what any of this means.

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2    references similar to Braun, doesn't even seem like
3    it's part of the actual -- it seems like it's just an
4    add-on. But it doesn't seem as part -- the idea here
5    is to avoid I guess levels of regulation. I don't
6    know that it's referring to any comparison to Braun,
7    it's just saying that's the way that Braun has also
8    approached the project would be my interpretation of
9    that sentence.
10 Q. Okay. And in paragraph 2 B where Mr. Katz appears to
11    be saying Braun appears to be treating their product
12    as a household cleaning product.
13 A. Yes.
14 Q. Why is Mr. Katz pointing out Braun's treatment of its
15    product?
16 A. I would assume it's the only comparative similar
17    product on the market. So it would be foolish not to
18    look at the competitive product in order to
19    understand what they're trying to do or have done.
20 Q. And on the next page, paragraph 6, discussing the
21    pricing point for Rayovac's at that time proposed
22    cartridge, Katz says, quote, "same as Braun with
23    perhaps the opportunity to come in under them." Do
24    you see that?
25 A. Yes.

17 (Pages 62 to 65)

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. Why again was Mr. Katz making a comparison to Braun's

3    cleaning solution?

4 A. Because I believe we believed that Braun was gouging

5    the consumer and we wanted to provide -- deliver a

6    price point that was reasonable to the consumer.

7 Q. But you wanted to be the same as Braun?

8 A. I don't know that that's what it's saying.

9 Q. Well, it says same as Braun.

10       MR. SHIMOTA: Objection, form.—

11 BY MS. WENDLANDT:

12 Q. You disagree that Mr. Katz was indicating that the

13    price point for Rayovac's cleaning solution would be

14    same as Braun?

15 A. It's completely vague with regard to what the pricing

16    is. It's saying could be at their price, it could be

17    below them. I mean the way it's written it could be

18    anything. It could have been any pricing.

19 Q. Could it be higher than them?

20 A. It could be, but I wouldn't have supported that and I

21    would have had to sign off on it, because I always

22    thought that the Braun pricing was very high for what

23    you received.

24 Q. Placing before you what has been marked Exhibit 8.

25 A. Are we done with this?

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. Yes, we are. I hope. Can I ask you -- which is an

3    E-mail dated September 9th, 2002, from Jeff Hovis at

4    Product Genesis to Yuri Avila is it?

5 A. Yes.

6 Q. I ask you to read to yourself paragraph 1.

7 A. Okay.

8 Q. Did Rayovac consider copying Braun's solution and

9    repackaging it at one point?

10 A. By copying, clarify copying.

11 Q. I guess I'm trying to understand the second sentence

12    in this paragraph. It could be that Mr. Avila is the

13    only person that can do that; but since you were

14    involved in the process I thought I'd ask anyway.

15    What is your understanding of that second sentence?

16 A. I can't interpret it. I don't -- I just don't

17    physically understand the English. I mean --

18 Q. Does that mean --

19 A. That's why I read it four times. And I don't

20    understand what it's saying.

21 Q. And you don't know whether Rayovac at one point

22    considered just taking Braun's cleaning solution and

23    repackaging it with a Rayovac label?

24 A. To the best of my knowledge that would never be --

25    never have been done. We actually -- just -- we

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2    actually did not like the way their formulation

3    smells, I mean, just --

4 Q. The fragrance?

5 A. Yeah, the fragrance and a number of other elements.

6    We just personally didn't think it was very consumer

7    friendly. It was too medicinal. And so we went

8    through great efforts to develop our own cleaning

9    solution, and I was a part of the actual development

10    from a fragrance standpoint and what the consumer

11    would smell and kind of see. So I don't know why we

12    would have copied something that we thought wasn't

13    very well done.

14 Q. We had talked earlier about Rayovac's rejection of

15    having its own cleaning fluid cartridge. Do you

16    recall when that occurred?

17 A. I don't. I just know it was early on in the process.

18    But I cannot tell you a date.

19 Q. Do you think it was 2001, 2002, '3?

20 A. I don't know. I just -- I don't know. I know it was

21    fairly on in the pro -- early in the project.

22 Q. I'm asking you to turn your attention back to Exhibit

23    46, the market basis of interest form, dated June

24    20th, 2002.

25 A. Okay.

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. Under 5, product definition, it says including a

3    disposable cartridge. Does this refresh your

4    recollection that at least as of June 20th, 2002,

5    Rayovac was still considering a disposable cartridge?

6 A. It refreshes my memory that we were considering a

7    cartridge. I don't know exactly when it was taken --

8    when it was taken off.

9 Q. And turning your attention to Exhibit 36 under

10    product definition, you'll see that it has changed

11    from a disposable cartridge to including alcohol

12    based cleaning solution consumable. Does that give

13    you reference as to when the change from cartridge to

14    non-cartridge occurred?

15 A. I can't answer that because -- I can't answer that.

16 Q. Because -- even though Exhibit 36 is dated January

17    29th, 2003, and Exhibit 46 is dated June 20th, 2002,

18    that doesn't give you a range?

19 A. There are a number of mistakes on this first

20    document, document Exhibit 46 which I think -- so I'm

21    not sure if these were copies from another -- I'm not

22    sure what happened here. But very clearly there are

23    some mistakes in the volumes and the standard cost

24    assumptions and so I don't know -- I'm not sure

25    what -- I'm not sure what credence to place on this

18 (Pages 66 to 69)

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1   document.
2
3 Q. Exhibit 46?
4 A.   Yes. I mean gross miscalculations and standard costs
5      off by multiple -- about four times of what reality
6      would be. So I don't know, I can't answer that
7      question very -- I can't answer that question.
8 Q.   Okay. At one point Rayovac considered a cleaning
9      system where the cleaning head would be immersed in
10     cleaning fluid; is that correct?
11 A.  I don't know. That's a Yuri, question for Yuri.
12        (Exhibit No. 47 was marked.)
13 Q.  Placing before you Exhibit 47 which is a document
14     entitled CCS1 cleaning system.
15 A.  Yes.
16 Q.  Item number 101, the task issue, is liability review.
17     Do you see that?
18 A.  Yes.
19 Q.  And then the next column says action, set up meeting
20     with legal to review product and solution. Do you
21     see that?
22 A.  Yes.
23 Q.  Did Rayovac do that, set up a meeting with legal?
24 A.  To the best of my knowledge. That's what it says.
25 Q.  And what was the outcome?

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2         MS. WENDLANDT: Can you repeat it.
3         (Question read by the reporter.)
4 A.   Yes.
5         (Exhibit No. 48 was marked.)
6 Q.   I place before you Exhibit 48, directing your
7      attention to number 34. It says under issue task,
8      tooling release was delayed due to legal concerns.
9      Do you see that?
10 A.  I do.
11 Q.  What were those legal concerns?
12 A.  I don't know.
13 Q.  Who would know?
14 A.  Yuri.
15 Q.  How did Rayovac determine to first launch a rotary
16     and cleaning system and then the foil cleaning
17     system? If you will recall in the 2003 document that
18     you wrote, --
19 A.  Yes.
20 Q.  -- you didn't distinguish between the foil and
21     rotary, it was a document for both. And then
22     ultimately Rayovac came out with the rotary first --
23 A.  Yes.
24 Q.  -- the foil second. Why?
25 A.  The reason was the shaving system that was coupled

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2 A.   I believe we were given the green light to proceed.
3 Q.   Well, you said you believe that this is what it says,
4      that is, that the meeting actually occurred. As I
5      read this, the meeting was expected to occur on
6      February 28th, 2003, and the status is open. Do you
7      see that?
8 A.   Yeah, I believe -- this is --
9 Q.   Maybe I'm on the wrong line. No, that's right.
10 A.  I believe this is a tracking document. So I don't
11     know how many -- there probably would have been one
12     of these every single week, correct, so we're picking
13     a snapshot in time?
14 Q.  I don't know. These were the documents produced to
15     me. I don't know anything else.
16 A.  Okay. I don't know either.
17 Q.  But at some point a meeting was set up with legal and
18     you were given the green light to proceed?
19 A.  Yes --
20         MR. SHIMOTA: Objection, calls for
21     speculation.
22 BY MS. WENDLANDT:
23 Q.  And your answer was yes?
24         MR. SHIMOTA: You may answer.
25 A.  What was the question again?

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1
2      with the cleaner was much further along in
3      development.
4 Q.   The rotary?
5 A.   Yes.
6 Q.   I'm placing before you what has been previously
7      marked as Exhibit 37 which is as I understand it a
8      marketing basis of interest form for the foil --
9 A.   Um-hmm.
10 Q.  -- cleaner system?
11 A.  Yes.
12 Q.  And I believe the second page is the actual foil
13     system with the cleaner. The first page is just the
14     shaver. Is that how you read this?
15 A.  Yes.
16 Q.  Under number 2 of that second page, competitive
17     environment, it states "Braun Syncro launch has
18     captured 25 percent of the plus $10 price point in
19     the shaver category."
20 A.  Um-hmm.
21 Q.  What was the significance of that to the market basis
22     of interest?
23 A.  It speaks again to the viability of the opportunity.
24         (Recess taken from 11:14 to 11:20 a.m.)
25         (Exhibit No. 49 was marked.)

19 (Pages 70 to 73)

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1         HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2      MS. WENDLANDT: Back on the record.
3 Q. Mr. Doyle, I'm placing before you Exhibit 49 which is
4      a document entitled agenda for MS-5500, 5700 program
5      review dated February 9th, 2004. Have you seen this
6      document before?
7 A. I don't think -- I don't think I've seen this.
8 Q. Can you look under -- can you review it.
9 A. Yes. Are there elements that you'd like me to
10     review?
11 Q. Yeah. I'm going to ask you in particular under
12     capital, it says no capital found for the CCS2, and
13     then I'm going to ask you a question about forecast
14     volumes.
15 A. Okay. Okay.
16 Q. Okay. Under capital, it says, as I said, no capital
17     found for the CCS2. What does that mean?
18 A. No -- probably nobody had appropriated any capital
19     mistakenly for the -- for that project.
20 Q. And whose job would it have been to appropriate
21     capital for the CCS2 project?
22 A. It would have been Peter Katz's job to find -- to get
23     the money from corporate.
24 Q. And Rayovac obviously ultimately came out with a foil
25     cleaning system, so was the capital found for the

Page 75

1         HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2     CCS2?
3 A. Yes. The CCS2 is the --
4 Q. As I understand it, the CCS1 is the rotary cleaning
5     system, the CCS2 is the foil system --
6 A. Yeah, you're right.
7 Q. -- and the CCS3 system is the women's cleaner?
8 A. Yes.
9 Q. This is referring to the CCS2?
10 A. Yes.
11 Q. My question was was the capital ultimately found for
12     the CCS2?
13 A. Yes, it was.
14 Q. Under forecast volumes, there is a column that says
15     MS-5500 CS then another one that says MS-5700 CS?
16 A. Are we under the North American NA? Because I can
17     only speak to the NA, North America.
18 Q. Oh, I see.
19 A. The others are UK, Europe, Australian are the other
20     acronyms.
21 Q. I was focusing on the last two columns which is NA.
22 A. What's the question?
23 Q. The question is can you explain these numbers to me,
24     the MS-5500 CS? There is the first entry after NA is
25     10,900.

Page 76

1         HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 A. Yeah. These --
3 Q. What does that mean?
4 A. These are volume requirements by week or biweekly.
5     This is what we would require to ship out to our
6     customers, Wal Mart, K Mart, Target, et cetera.
7 Q. And what were these forecasted volumes -- what was
8     the basis of these forecasted volumes?
9 A. A number of them are very predictable because they're
10     pipeline -- what we call pipeline fill requirements.
11     So if Wal Mart has 3,000 stores and there are two
12     pieces per carton, that means they need 6,000 pieces.
13     So you can do that by -- for every account, calculate
14     how much you need to launch the product. And not all
15     retailers have the same reset dates. So that's
16     essentially what that was.
17 Q. This is what you were referring to before as the fall
18     reset?
19 A. Yes, yes.
20 Q. And who was in charge of setting these market or
21     forecasted volumes?
22 A. This would be my group would have provided these
23     numbers, and Peter was responsible for worldwide
24     consolidation of the numbers. So all these numbers
25     would have come from my group.

Page 77

1         HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 Q. And that's Peter Katz?
3 A. Yeah. Peter Katz would have consolidated them. He
4     wouldn't actually create the numbers. Because
5     there -- the business -- the business owners in each
6     market of which I was one, and then there was one in
7     Europe and one in Australia, we each provided numbers
8     in. There was a group in each of those markets.
9 Q. And were these forecasted volume numbers what you
10     describe as the pipeline fill requirement type of
11     numbers?
12 A. Yes.
13 Q. You had said some were predictable, some are not?
14 A. Yeah -- excuse me?
15 Q. You had said some were more predictable than others
16     in the pipeline --
17 A. The pipeline fills were. But now just remember, the
18     date that this came out was for all the retailers
19     that made their decisions on which SKUs they were
20     going to take. Okay. So this is the best guess on
21     February 9th on who would take it and how many they
22     would take. A part of -- once you understand who's
23     going to take it, understanding how many they need is
24     easy. But the question on whether they'll take it or
25     not is the more difficult question and less

20 (Pages 74 to 77)

Page 78

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2   predictable.
3 Q. How did you determine this best guess?
4 A. Working with the sales force to understand what they
5   believe the viability of gaining distribution was.
6 Q. Okay.
7     (Exhibit No. 50 was marked.)
8 Q. I place before you what has been marked as Exhibit 50
9   which is, again, a market basis of interest form.
10   This one appears to be for the women's shaver; is
11   that correct?
12 A. Correct.
13 Q. Now, we had talked previously how prices had been set
14   by Rayovac for the rotary and for its foil version of
15   the cleaning system. How did Rayovac determine
16   pricing for its women's cleaning system?
17 A. Because Rayovac or Remington essentially owns the --
18   not -- owns is the wrong word, but has a very high
19   share of the women's shaver market. And what we did
20   is we used the same approach, identification of the
21   value for the cleaning system which we deemed to be
22   about $30 and then we took our high-end shaver which
23   was about $50 on average and we added $30, and that's
24   how we created the price for that particular SKU.
25 Q. Is this women's shaver currently being offered for

Page 80

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2   employees including James Chasen, Yuri Avila and
3   James Doyle that the design Rayovac chose to pursue --
4   did not infringe any claims of the patents in suit
5   and Rayovac relied upon such advice." Do you see
6   that?
7 A. Yes, I do.
8 Q. What reason did Mr. Stoltz provide to you that
9   Rayovac's chosen design did not infringe the '328
10   patent which was -- let me just see -- Exhibit 10?
11 A. That's a technical question. I was told that it was
12   viable, legally viable to launch. And in terms of
13   the details, that was handled by the legal group in
14   terms of why -- of why it was fine.
15 Q. So beyond it being viable to launch from a legal
16   perspective, you weren't given any specifics?
17 A. No, no. I wouldn't be in a position to -- I'm not
18   trained in engineering matters anyway.
19 Q. Right, and I'm just asking what Mr. Stoltz told you
20   in connection with his advice that it didn't -- that
21   the chosen design did not infringe any of the claims?
22 A. Yes. And Mr. Stoltz did not tell me personally. It
23   came through Mr. Avila, okay, and it came through --
24   internally.
25 Q. So it would have been Mr. Avila speaking to --

Page 79

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2   sale in the United States?
3 A. It just shipped, yes. It's in store -- it's in
4   stores right now. The answer is yes, it's in stores
5   right now.
6 Q. And when did Rayovac first offer this for sale?
7 A. Offer for sale meaning the first day a consumer can
8   purchase it?
9 Q. The first day you offered it to the trade, start with
10   that.
11 A. Fall of last year, late fall of last year, roughly.
12   Roughly in that time period.
13 Q. And when you said it's in stores now, when could
14   consumers actually purchase the --
15 A. About a month ago. For Mother's Day was the about
16   the first time that the product was available for
17   purchase.
18 Q. Asking you to turn your attention back to Exhibit 45,
19   the interrogatory answers.
20 A. Okay.
21 Q. The second full paragraph under response says --
22 A. Are we on 10?
23 Q. Yes, I'm sorry, yes. Interrogatory number 10
24   response, the second full paragraph, the second
25   sentence starts "Mr. Stoltz, in fact, advised Rayovac

Page 81

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 A. And internal counsel would have provided that.
3 Q. So who actually spoke to Mr. Stoltz?
4 A. Yuri my understanding is continuously.
5 Q. In that same paragraph, the second-to-last sentence
6   says "Once Rayovac began working on its foil
7   products, Rayovac again consulted Mr. Stoltz to
8   ensure that such products did not infringe either of
9   the patents in suit."
10 A. Yes.
11 Q. What was the nature of the consultation?
12 A. I can't provide the specifics. I would defer to Yuri
13   on that. But the result was the same, that it was
14   legally acceptable to launch.
15 Q. And who told you that?
16 A. A combination of Yuri and our legal folks.
17 Q. And they didn't provide you with the bases for that
18   conclusion?
19 A. No.
20 Q. Continuing on, the next paragraph states "In the fall
21   of 2004, Rayovac asked Mr. Stoltz to memorialize his
22   advice. On October 29, 2004, Mr. Stoltz provided
23   written opinions to Rayovac in which he re" -- I'm
24   sorry, "represented his advice that no Rayovac
25   product infringed any claim of the patents in suit."

21 (Pages 78 to 81)

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2   Do you see that?
3 A.   Um-hmm. Yes.
4 Q.   Was there any difference between his October 29th,
5     2004, written opinion and his oral communications
6     with Rayovac earlier?
7 A.   No. Can I ask a question, this is 30(6)(b) (sic) for
8     me, what we're going through now?
9 Q.   I thought it would be, yes. Did you in preparation
10    for this deposition talk to Mr. Avila who spoke
11    directly with Mr. Stoltz?
12 A.   I did not.
13 Q.   So when you said there was no difference between the
14    written and the oral communication, you meant that
15    the ultimate conclusion which you learned was the
16    same?
17 A.   Yes.
18        (Exhibit No. 51 was marked.)
19 Q.   You have before you Exhibit 51 which is the October
20    29th, 2004, opinion of Mr. Stoltz. Do you see that?
21 A.   Um-hmm. Yes.
22 Q.   Have you seen this document before?
23 A.   Yes. I believe I've seen this.
24 Q.   When?
25 A.   I've seen this, right?

Page 84

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2   you that there is no mention of foil shavers later
3     on. So my question to you is in light of that, did
4     Mr. Stoltz memorialize his oral communication to
5     Rayovac about its foil shavers in any document?
6 A.   I'm not aware -- I'm not aware, I can't answer that,
7     I'm not aware of that.
8 Q.   But you know for certain that Mr. Stoltz advised
9     Rayovac that its foil shavers didn't infringe the
10    patents in suit?
11 A.   Yes, yes, yes.
12 Q.   And with regard to the foil shavers, it was again
13    Mr. Avila that was discussing the legality or the
14    patent infringement or non-infringement of your
15    Remington foil shavers with Mr. Stoltz?
16 A.   Yes.
17 Q.   So to understand or to know what the substance of
18    Mr. Stoltz's communications were to Rayovac, one
19    would need to speak to Mr. Avila?
20 A.   Yes.
21 Q.   When you reviewed this document in preparation for
22    this deposition, was there an appendix to this
23    document that you were shown?
24 A.   I don't believe so.
25 Q.   Turning your attention to page R 10975.

Page 83

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2      MR. SHIMOTA: Yes, you have.
3 BY MS. WENDLANDT:
4 Q.   When did you see this?
5 A.   A few days ago.
6 Q.   And before then you had not seen it?
7 A.   That's correct.
8 Q.   You'll notice that the first paragraph refers to the
9     '328 patent and notes that Mr. Stoltz is providing
10    his opinion of the '328 patent, quote, "to the extent
11    such claims may be relevant to Remington's cleaning
12    system for rotary shavers." Do you see that?
13 A.   Yes.
14 Q.   And so this opinion is limited to the rotary shavers;
15    is that correct?
16 A.   Not having read the balance of it, I can't answer it.
17    It's what the first paragraph says. I will agree
18    with that.
19 Q.   Okay. And to the extent --
20 A.   I don't know if there is any reference to foils
21    later. So I can't answer -- I can't fairly answer if
22    there is anything more in here because I haven't read
23    it, I haven't read the entire document.
24 Q.   And if upon reading this entire document there is no
25    mention of foil shavers -- well, I'll represent to

Page 85

1      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 A.   Yes.
3 Q.   The last half paragraph on this page, it says at tab
4     8. Do you see that?
5 A.   Yes.
6 Q.   And then the following page, there is two paragraphs,
7     last two paragraphs that say at tab 10 and at tab 11.
8     Do you see that?
9 A.   Yes.
10 Q.   Do you know what these tabs refer to?
11 A.   No.
12 Q.   And who would have these tabs if they exist?
13 A.   I'm not sure.
14 Q.   Would it be kept in the legal department or Yuri?
15 A.   I assume one of them would have it.
16 Q.   On page 15 of this Exhibit 51, Mr. Stoltz says at the
17    top "It is my opinion that the shaver cleaning system
18    being manufactured and sold by Remington does not
19    infringe any of these claims since the Remington
20    cleaning" -- I'm sorry, "since the Remington shaver
21    cleaning system, 1, does not incorporate, quote, a
22    cradle structure as described in the '328 patent,
23    and/or, 2, does not incorporate a feed device for
24    feeding cleaning fluid from the cleaning fluid
25    container to the cradle structure." Do you see that?

22 (Pages 82 to 85)

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1
2 A.  Yes.
3 Q.  What was Rayovac's understanding as to why its device
4     did not incorporate a, quote, cradle structure as
5     described in the '328 patent?
6 A.  That's a question for Yuri. I can't answer that.
7 Q.  And with regard to number 2 concerning the feed
8     device, is that your same answer?
9 A.  Yes. It's a technical question.
10    (Exhibit No. 52 was marked.)
11 Q. I've placed before you what has been marked as
12    Exhibit 52 which is the October 29th opinion of
13    Mr. Stoltz with regard to the '556 patent.
14 A.  Yes.
15 Q.  You'll notice that in that first paragraph as with
16    the '328 patent Mr. Stoltz limits his advice to
17    the -- quote, "to the extent that such claims may be
18    relevant to Remington's cleaning system for rotary
19    shavers." Do you see that?
20 A.  Yes.
21 Q.  So to the extent Mr. Stoltz gave oral advice to
22    Rayovac about the foil shavers, the person to speak
23    to about that would be Yuri Avila?
24 A.  Yes.
25 Q.  And again on page 8 of this Exhibit 52, section B,

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1
2     that first paragraph refers to a tab 1 and a tab 3,
3     and the next page 9, it refers to tab 4, 6, 7. You
4     haven't seen those tabs?
5 A.  I haven't.
6 Q.  And to the extent these tabs exist, they would be
7     housed either with Yuri or with the legal department
8     of Rayovac?
9 A.  I would assume.
10 Q. And have you seen Exhibit 52 before?
11 A.  I've seen it.
12 Q.  When was the first time?
13 A.  A few days ago.
14 Q.  In connection with your preparation for this
15    deposition?
16 A.  Yes.
17 Q.  Asking you to turn your attention to page 11, the
18    bottom paragraph, the last paragraph, not full -
19    paragraph, but half paragraph says "In comparing the
20    shaver and cleaning system developed by Remington to
21    these structures, your system is more analogous to
22    Browning than it is to Braun. In your construction,
23    the bottom surface of your basing is constructed to
24    support the top surface of the shaving head in a
25    manner similar to Browning without peripherally

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1
2     surrounding and closely enveloping the shaving head
3     in its entirety." Do you see that?
4 A.  Yes.
5 Q.  What was your understanding or what is Rayovac's
6     understanding of the Browning patent?
7        MR. SHIMOTA:  Objection, outside the
8     scope.
9 BY MS. WENDLANDT:
10 Q. You can answer.
11 A.  I don't know.
12 Q.  And does Rayovac believe that its construction is
13    similar to the Browning patent?
14       MR. SHIMOTA:  Same objection.
15 BY MS. WENDLANDT:
16 Q.  Do you have an answer?
17 A.  I don't know.
18 Q.  Have you ever seen the Browning patent?
19 A.  No.
20    (Exhibit No. 53 was marked.)
21 Q.  I've placed before you Exhibit 53 which is the
22    Browning patent. You'll notice that in -- on the
23    second page, figure 1, there is a number 44 by the
24    bottom of the toothbrush. Do you see that?
25 A.  Yes.

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

1
2 Q.  And it's indicating a divot at the bottom of that
3     structure. Do you see that?
4        MR. SHIMOTA:  Objection, outside the
5     scope.
6 A.  I do.
7 BY MS. WENDLANDT:
8 Q.  And do you consider that divot to be similar to the
9     Remington cleaning system?
10       MR. SHIMOTA:  Same objection.
11 A.  I can't answer that. It's a technical question.
12 BY MS. WENDLANDT:
13 Q.  Turning your attention back to Exhibit 45, the
14    answers to the interrogatories. It says at the -- I
15    think it's two lines up from the bottom,
16    "Subsequently in November 2004, out of an abundance
17    of caution, Rayovac retained Michael E. Godar to
18    provide a written infringement opinion for the
19    MS-5500 device." Do you see that?
20 A.  Yes.
21 Q.  Why did Rayovac obtain a second opinion with regard
22    to the foil shaver?
23 A.  That's -- I believe that's a legal question, the
24    legal department made a decision.
25 Q.  Had you seen the written opinion of Mr. Godar?

23 (Pages 86 to 89)

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 A. I have seen it.
3 Q. When was the first time you saw it?
4 A. A few days ago.
5 Q. And when was the first time that you knew that it had
6   been obtained?
7 A. I'm not sure. I'm not sure. That's a personal
8   question to me?
9 Q. Yes.
10 A. I don't know. I don't know exactly when.
11 Q. But you knew that Rayovac had obtained Mr. Godar's
12   opinion prior to just a few days ago when you were
13   preparing the deposition, for the deposition?
14 A. I was aware that we were soliciting outside counsel
15   point of view, but -- above me on that. I didn't
16   know anything else.
17 Q. And no one told you why a second opinion was being
18   sought?
19 A. No.
20 Q. And you didn't ask?
21 A. No. I mean my understanding was there were
22   absolutely no issues with the -- there were no issues
23   from the launch from our perspective.
24 Q. Did it puzzle you that a second opinion was being
25   asked for?

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 A. No.
3 Q. And when you first learned of the fact that Rayovac
4   was seeking a second opinion about the foil cleaning
5   system, did you learn the substance of the opinion?
6 A. Briefly. My understanding, it just corroborated the
7   original point of view.
8 Q. And who told you that?
9 A. I can't remember. It wasn't an official meeting. It
10   was just -- I don't know exactly how I learned about
11   it, but I learned about it.
12 Q. And when you say it corroborated the original point
13   of view, are you referring to the analyses itself or
14   the ultimate conclusion of non-infringement?
15 A. The conclusion of Mel Stoltz.
16 Q. The conclusion that your product didn't infringe?
17 A. Correct.
18 Q. And at that time, were you informed of the bases for
19   that conclusion?
20 A. No.
21      (Exhibit No. 54 was marked.)
22 Q. I've placed before you Exhibit 54 which is the
23   December 27th, 2004, opinion of Mr. Godar regarding
24   the '328 patent and the foil version of the Remington
25   cleaner. Do you see that?

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2 A. Yes.
3 Q. And the first time you saw this document was a few
4   days ago in preparation for this deposition?
5 A. Yes.
6 Q. Turning your attention to page 16 of Mr. Godar's
7   opinion, the first full paragraph states, quote, "We
8   interpret," do you see that, "we interpret the,
9   quote, cradle structure as recited in claim 1."
10 A. Am I on the wrong page? Page 16, first full
11   paragraph. Okay.
12 Q. It says, quote, "We interpret the term cradle
13   structure as recited in claim 1 of the '328 patent to
14   mean a support constructed to have a bottom and sides
15   (thus resembling a baby's bed) for supporting the
16   head of the shaver in a position immersed in cleaning
17   fluid." Do you see that?
18 A. Yes.
19 Q. What was the basis of Mr. Godar's opinion with regard
20   to his interpretation of the cradle structure?
21      MR. SHIMOTA: Objection, outside the
22   scope.
23 A. I can't answer that.
24 BY MS. WENDLANDT:
25 Q. With whom did Mr. Godar interact with Rayovac in

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY

2   connection with this December 27th opinion?
3 A. I believe it's Tom Parker.
4 Q. And did you speak with Mr. Parker in connection with
5   your preparation for this deposition?
6 A. I did not.
7 Q. Has Rayovac obtained any other opinions with regard
8   to the '328 patent and its rotary -- well, and its
9   foil cleaning system?
10 A. I'm not aware of any.
11 Q. And with regard to its rotary system in the '328
12   patent?
13 A. I'm not aware of any, but it's possible that they
14   exist. I'm not aware of it.
15 Q. And with regard to the '556 patent and the rotary
16   shaver, are you aware of any other opinions?
17 A. No. Same answer. I'm not aware of any.
18 Q. And with the '556 and the foil shaver you're not
19   aware of any?
20 A. Not aware of any.
21 Q. Okay.
22      (Exhibit No. 55 was marked.)
23 Q. I place before you Exhibit 55, which is the December
24   13th, 2004, opinion of Mr. Godar with regard to the
25   '556 patent and the foil cleaning system. Do you see

24 (Pages 90 to 93)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2  that?

3 A. Yes.

4 Q. When was the first time you saw this December 13th

5  opinion?

6 A. Two days ago.

7 Q. In preparation for this deposition?

8 A. Yes.

9 Q. And prior to that were you aware of Mr. Godar's

10  advice with regard to the '556 patent and the foil

11  shaver?

12 A. I was aware of it generally speaking. Not '556 or

13  '328, just generally.

14 Q. I see. And your awareness with regard to both of

15  these patents was what?

16 A. Again, that they corroborated the original point of

17  view that we were in a legally safe position.

18 Q. Turning your attention to page 18, under the heading

19  traditional claim construction analysis.

20 A. Yes.

21 Q. The last sentence says "That is, the container and

22  filter combine to form a, quote, unit which is

23  treated as a single component, not as separate

24  components." Do you see that?

25 A. I do.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. Do you know what the bases was for Mr. Godar's

3  opinion as to that unit definition?

4 A. I do not.

5     MR. SHIMOTA: Same objection as

6  previously.

7 BY MS. WENDLANDT:

8 Q. After Remington launched its cleaning system, how did

9  you measure -- how did Rayovac measure the success or

10  lack of success of its cleaning system?

11 A. Whether or not it delivered its -- the numbers that

12  were in the plan that are set in the financial

13  objectives by the company.

14 Q. And what numbers are you referring? I'm not

15  specifically looking for 30,000, but is it a unit

16  number, dollar number?

17 A. Dollar number.

18 Q. And with regard to the rotary cleaning system has

19  that been successful?

20 A. Yes.

21 Q. And the foil system?

22 A. Yes.

23 Q. And the women's shaver I'm assuming you don't know

24  yet?

25 A. It's too early.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. I'm placing before you Exhibit 19 which is a document

3  entitled Men's 2006 Shaving, Global Shaving NPD Team

4  Recommendation, September 29, 2004. Have you seen

5  this document before?

6 A. I have.

7 Q. And in what connection did you see this? Why did you

8  see this?

9 A. I typically saw all -- I typically saw all new

10  product development initiatives.

11 Q. Is that what NPD stands for?

12 A. Yes, new product development. It's just a general

13  term in the industry.

14 Q. You had referred to NPD as the third-party scanner

15  data, totally different?

16 A. Totally different.

17 Q. Okay. On page 7 of Exhibit 19, it lists internal

18  benchmarks and external benchmarks. And one of the

19  external benchmarks listed is the Braun Syncro. Do

20  you see that?

21 A. Yes.

22 Q. Why was the Braun Syncro an external benchmark?

23 A. Because it's the closest product to the MS-5500.

24 Q. What does it mean to be a benchmark?

25 A. Benchmark, just something you compare to.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. On page 10, the portion of this document that's

3  labeled general pop results total U.S.

4 A. Yes.

5 Q. On the second bullet it says Braun Syncro and then it

6  has the numbers 3 and 14. Can you explain to me what

7  this means?

8 A. Just give me a second to try to remember what this

9  is.

10 Q. Sure.

11 A. This test is slightly different, this test is

12  conducted using -- is being used -- is a new test to

13  me which is different than what I'm used to, but I'll

14  give you a general idea of what purchase intent

15  means. Purchase intent is when the respondent or

16  potential consumer, your target market is presenting

17  an idea and they're asked whether they would buy it

18  or not. And there are a number of levels of would

19  you buy: definitely, probably, maybe, definitely not

20  and maybe not. And so I believe the numbers are a

21  little bit -- the numbers are just simply trying to

22  validate or deny whether a concept -- and these are

23  all concepts going down vertically here on the left

24  side, whether they're strong concepts or not.

25 Q. And does a purchase intent top box percentage of 3 --

25 (Pages 94 to 97)

Page 98

1       HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2    what does that mean?
3 A.   It's -- I'm not -- this test was done slightly
4    differently than I'm used to doing them.  So I can't
5    really answer it.  I can't really answer it.  A 5 I
6    believe is -- I can't answer it.
7 Q.   And then --
8 A.   This is not the way -- this is not even the norm for
9    the industry in how you do testing.  I don't know why
10   we did it this way.
11 Q.  Do you know what top box percentage means?
12 A.  Yeah, top box percent typically means people, the
13   respondent, if you were a respondent who said they
14   would definitely buy it.  Top 2 box would be
15   definitely or probably.  All right.  So it's sort of
16   descending down to would not buy.  All right.  So the
17   higher top box score the better in market success you
18   will most likely have.
19 Q.  Okay.  On page 27 of Exhibit 19, it's a document
20   entitled headlines on foil versus rotary and the
21   second box is Braun Syncro.  It says under foil,
22   significantly higher on PI than all other concepts
23   driven by strong liking scores, strong believability
24   scores?
25 A.  Yes.

Page 100

1       HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 A.   This was handled by the global product innovation
3    group and not my group which is a small group of
4    people who do just new product developments.  So my
5    job is to run the business and run the region.  So
6    some of the details around how they tested this I'm
7    not going to be able to answer.  But I'll do my best
8    just from my good experience on market research.
9 Q.   Who's the -- what was that group?
10 A.  Global product innovation, GPI.
11 Q.  And who would be the person there who would know
12   about this document?
13 A.  The person that runs the group is a guy Mark Zander.
14 Q.  And so if you had questions about this document you
15   might go to Mr. Zander?
16 A.  Yes, or somebody in that group.
17 Q.  I'm placing what has been marked as Exhibit 25 before
18   you which is a document called men's shaving
19   marketing plan dated September 2004.
20 A.  Yes.
21 Q.  Have you seen this marketing plan before?
22 A.  Yes.  My group generated this, this document.
23 Q.  And how can you tell that your group generated that
24   one versus the other one?
25 A.  That one?

Page 99

1       HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 Q.   Can you explain, is PI purchase intent?
3 A.   It is.
4 Q.   Okay.  And what does it mean that the significantly
5    higher PI was driven by the liking scores and
6    believability scores?
7 A.   There are a number of metrics.  Purchase intent is
8    one.  Likability, believability and uniqueness are
9    typically the others.  So say that it had strong
10   scores.
11 Q.  On those three metrics?
12 A.  Right.
13 Q.  The PI, the likability and believability?
14 A.  Yes.
15 Q.  And what were the all other concepts?
16 A.  Where do you see that?
17 Q.  In the same box, it says significantly higher on PI
18   than all other concepts.  This is September 29th,
19   2004.
20 A.  Yeah, I know.
21 Q.  I don't know if that helps you.
22 A.  I'm not sure.  I'm assuming it's the previous
23   concepts on the previous page here on page 10.  I'm
24   assuming.  I'm not completely sure.
25 Q.  Page 10.

Page 101

1       HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
2 Q.   Exhibit 19.
3 A.   Because it's a global -- it's a global initiative.
4    And I run the region.
5 Q.   Thank you.
6 A.   That's global new product development; and my job is
7    to run everything, so I would be advertising,
8    pricing, everything.
9 Q.   Now, turning your attention to page 13760, which is
10   three pages in.  Now, there is a bullet, quote,
11   defend against Braun foil share gains with new
12   products.  Do you see that?
13 A.  Yes, yes, I do.
14 Q.  What did your group mean by that?  Well, more
15   specifically, what were the Braun foil share gains?
16 A.  A lot of them were at the lower price points.
17 Q.  So you weren't referring here to the higher price
18   cleaning systems of -- that Braun sells?
19 A.  I think we were partially.  I believe the period -- I
20   know for a fact the period in which this -- that
21   we're referencing is Braun had strong performance, as
22   we did.
23 Q.  And what new products did you intend to use to defend
24   against Braun's foil gains, foil share gains?
25 A.  Well, we're in the process -- all this is attorneys

26 (Pages 98 to 101)

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 only with respect to business units?

3    MR. SHIMOTA: Right.

4 A. We're in the process of developing a whole line of

5    new foil shavers that we're launching in the next

6    couple months. And none of them actually compete

7    with -- in the Syncro price point ranges. They're

8    all in the middle, middle -- mid, primarily middle

9    price points, so -- . That's what these are referring

10    to. If you probably read further, you'll see that it

11    shows where we're launching the products at the price

12    points below that.

13 BY MS. WENDLANDT:

14 Q. Okay. Asking you to turn your attention to page

15    R 13773. Have you got it?

16 A. Yes.

17 Q. It says lessons learned, observation, Remington

18    entree?

19 A. Yes.

20 Q. Into $100 plus segment with R 9500 has been hugely

21    successful. And then later on it says, under R 9500

22    it has these .3, .1, 18.8 and 6.9?

23 A. Right.

24 Q. Can you explain these numbers going across for me?

25 A. On the bottom line? Sure --

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. Well, on the R 9500 line.

3 A. Yeah. They're -- simply it's our gross sales and the

4    profit associated with that in the previous fiscal

5    year versus this fiscal year '04. And just shows

6    that we basically didn't have -- we launched the

7    product with -- we launched the product at the very

8    tail end of fiscal '03 which ended in September and

9    so you saw a tiny bit of sales and the next year

10    there was tremendous amount of sales in that segment.

11 Q. So the .3 is what, a percentage?

12 A. No, it's just numbers -- oh, .3 is $300,000.

13 Q. Oh, I see.

14 A. And 18.8 would be $18.8 million.

15 Q. Oh, and so based on this significant increase, you

16    conclude that the, you know, product, the R 9500 has

17    been hugely successful; is that correct?

18 A. Yes.

19 Q. Under page 13778, it says observation Braun foil

20    share up 5.3 -- is that price points?

21 A. Percentage points.

22 Q. Percentage points in '04 driven by increased

23    advertising, strong retail execution and Syncro

24    cleaning system. Can you explain to me what that

25    means?

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2    MR. SHIMOTA: Objection to form.

3    THE WITNESS: I answer?

4    MR. SHIMOTA: You may answer.

5 A. Okay. It just -- it says their business -- their

6    business in foils grew during this period of time.

7 BY MS. WENDLANDT:

8 Q. Okay. And the reason Rayovac believes that, you

9    know, there has been increased advertising, strong

10    retail execution and the Syncro cleaning-system?

11 A. Right.

12 Q. Okay. Turning your attention to page 13790. It

13    appears to be a time line.

14 A. Yes.

15 Q. And the first set of I guess products are the best

16    products? It's a column labeled best or row labeled

17    best?

18 A. Yeah, yeah.

19 Q. What is the new shaving technology listed after the

20    MS-5500, 5700? Is that a new cleaning system? What

21    is that?

22 A. It's a new cutting system.

23 Q. New cutting system. And the next page, the first row

24    is the R 9500 with cleaning base?

25 A. Um-hmm.

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. And then it has in 2006 new evolutionary concept.

3    What does that refer to?

4 A. That's the -- we're working on a cutting system.

5 Q. So it's not a cleaning system?

6 A. There is some work being done on cleaning systems,

7    but that's not what that's referring to.

8 Q. And underneath that row, there is a --

9 A. There is almost at all times work being done on all

10    of these products just like I'm sure at Braun and

11    Gillette and Panasonic and everywhere else.

12 Q. Okay. The next row, it says new in 2005 third

13    quarter new R 9400 with cleaning base?

14 A. Yes.

15 Q. Was that a product -- or has that product been

16    launched?

17 A. No.

18 Q. Are there plans to launch the product?

19 A. No.

20 Q. So that product's been put off?

21 A. It's put off for now, yes.

22 Q. And what was the R 9400 product?

23 A. It was a more competitively priced cleaning system.

24 Q. Okay.

25 A. Shaver.

27 (Pages 102 to 105)

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 Q. And how did it differ from the -- how would it have
3     differed from the 9500?
4 A. It just has fewer features.
5 Q. Turning your attention to page 13813.
6 A. Yes.
7 Q. Under risks, the second bullet is Braun cleaning base
8     patent and then it's got an 8.0 dollar parenthetical.
9     Can you explain what that means?
10 A. It's just -- it's the potential risk. I believe we
11     were already engaged by Braun at that point on --
12     whatever would be associated with the lawsuit.
13 Q. And you're referring to this lawsuit?
14 A. Yes.
15 Q. And what does the 8.0 paren mean?
16 A. It's $8 million.
17 Q. This Exhibit 25, who -- what's the distribution list
18     for this? Is it distributed to anyone?
19 A. Marketing.
20 Q. Just internally within your group?
21 A. Um-hmm. Within my group and then just my boss.
22 Q. And who's your boss?
23 A. Robert Hopton, he's the chief marketing officer.
24 Q. And on that same page under opportunities, there are
25     new product upsides. The first one is the MS-5500

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2     with I think that's $2 million?
3 A. Yes.
4 Q. And that is the -- is that the cleaning -- I mean,
5     sorry, the foil cleaning system product?
6 A. Yes.
7 Q. And the MS-5100, 5200, what is that?
8 A. Those are new products for launching.
9 Q. Are those cleaning system products?
10 A. No.
11 Q. And the R 9400 we discussed before?
12 A. Yes.
13 Q. On the next page, R 13814, it says open issues, the
14     last issue is Braun cleaning system patent
15     contingencies. What did you mean by that?
16 A. It's just uncertainty around the case.
17 Q. And then page 13902, the last bullet says attack
18     Braun Syncro Activator, dash, introduce rate cutters
19     into MS-5500. What did you mean by that?
20 A. By what?
21 Q. By attack Braun Syncro first.
22 A. It's just a collection of words designed to talk
23     about competing with the competition which is our job
24     for all of us no matter whether you're sitting on
25     Braun's side or our side. So in this -- as you can

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2     see, they have been segmented by price point and so
3     Braun's real product offerings over $80 are the
4     Syncro and the Activator, and so we were making sure
5     that we were competitively positioned against them.
6 Q. And the way you would ensure that would be to
7     introduce the rate cutters into the MS-5500?
8 A. That was the -- that was part of our plan, yes.
9 Q. What was the other part? --
10 A. That was the plan.
11     (Discussion off the record.)
12     (Exhibit No. 56 was marked.)
13 Q. I place before you Exhibit 56 which is a document
14     entitled -- well, Remington Smart Move men's shavers
15     San Diego pre-read. Do you see that?
16 A. Yes.
17 Q. Have you seen this before?
18 A. Yes, I have.
19 Q. In connection with what did you see this?
20 A. This was in preparation for a major sale -- annual
21     sales meeting in San Diego.
22 Q. And is it a presentation that Rayovac was going to
23     give?
24 A. There was a more detailed version of the big
25     presentation I was going to give in front of, you

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2     know, a hundred people up on a stage. And so they
3     were expected to have pre-read and understand the
4     material even before we arrived in San Diego.
5 Q. And these were the hundred people?
6 A. Yeah, our sales force and then other guests. But the
7     only people who received this document were the sales
8     force.
9 Q. The Rayovac sales force?
10 A. Rayovac sales force, 27 -- 20-some people.
11 Q. On page 31 of your presentation of this Exhibit 56,
12     it's a document entitled objective number 2.
13 A. 41? Oh, 31.
14 Q. Yeah, it's R 12841. But 31 on your presentation.
15 A. Okay.
16 Q. It says strategy, lever national FSI to drive more
17     than fair share of features/displays of R 9500 and
18     MS-5500. What does that mean? What is it to lever
19     the national FSI?
20 A. To leverage.
21 Q. Leverage. And what is national FSI?
22 A. Freestanding insert. It's what you receive in your
23     Sunday paper. Coupon.
24 Q. And what did you mean by drive more than fair share?
25 A. Around this time period when you drop an FSI, you

28 (Pages 106 to 109)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 typically will get a significant amount of support
3 from the retailers because you're supporting the
4 business with considerable amount of money and so
5 they need -- it's their duty or they need to
6 participate in the program by making sure that we
7 have enough of our displays up and have achieved a
8 feature which is in the Sunday paper, the fliers
9 where you have a product in it that's typically on
10 sale.
11 Q.  So Rayovac puts a flier -- pays to put a flier in the
12 Sunday paper --
13 A.  Yes, right.
14 Q.  -- and as result Wal Mart needs to coordinate with
15 Rayovac to stock its shelves more because people will
16 be buying?
17 A.  Yes, yes.
18 Q.  And who at Rayovac determines whether or not -- maybe
19 it's not Rayovac, but who determines whether or not
20 Rayovac will offer a discount on a particular
21 product? I notice that in your financial -- in the
22 financial statement some -- there is different SKUs
23 given based on whether it was the product as is or a
24 product with a bonus or a product with --
25 A.  The brand team, my team would drive the pricing of

---

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 STATE OF WISCONSIN )
3 MILWAUKEE COUNTY .)
4       I, LYNN M. BAYER, Registered Merit Reporter
5 with Eastwood-Stein Deposition Management and Notary
6 Public in and for the State of Wisconsin, hereby certify
7 that the matters set forth in the caption to the foregoing
8 deposition are true and correct; that the witness, JAMES
9 DOYLE, III, appeared before me at the time and place set
10 forth; that said witness was first duly sworn, and
11 thereupon proceeded to testify in said cause; that the
12 proceedings were taken down in machine shorthand and
13 thereafter transcribed via computerized transcription
14 under my direction; and that the foregoing is a true and
15 correct transcription of the testimony given and the
16 proceedings had during the taking of said deposition.
17       I further certify that I am not a relative or
18 employee of any of the parties hereto, nor a relative or
19 employee of such attorney or counsel; nor do I have any
20 interest in the outcome or events of the action.
21       WITNESS MY HAND AND SEAL OF OFFICE, this the
22 16th day of June, 2005.
23       _____
24    Notary Public in and for the State of Wisconsin
25       My Commission Expires June 15, 2008

---

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2 the products in market. However, retailers don't
3 always comply with the stated pricing. They
4 typically do but they don't always.
5 Q.  And what would cause your team to determine to give a
6 discounted price or to recommend a discounted price
7 to the retailers?
8 A.  Just from historical data that we have on if you
9 lower your price by $10 you typically can generate
10 X-amount of volume additional.
11 Q.  And would that be triggered by like a holiday event
12 or --
13 A.  Yes, typically. Typically but not always.
14       MS. WENDLANDT: Can we take a five-minute
15 break. I may be done.
16       (Recess taken from 12:28 to 12:36 p.m.)
17       MS. WENDLANDT: Back on the record. I
18 have no further questions.
19       MR. SHIMOTA: I have no questions either.
20       (The deposition concluded at 12:36 p.m.)
21
22
23
24
25

---

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY

2       INDEX
3 WITNESS                              PAGE
4 JAMES DOYLE, III, WITNESS, DULY SWORN       3
5   Examination by Ms. Wendlandt            3
6
7       EXHIBITS
8 EXHIBIT NO.   DESCRIPTION        PAGE ID'D
9  45 defendant's responses and objections to
10      second set of interrogatories    15
11 46 marketing basis of interest form    52
12 47 CCS1 cleaning system tasks/issues    70
13 48 document re issues/tasks    72
14 49 agenda for MS-5500/5700 program review  74
15 50 marketing basis of interest form (women's) 78
16 51 Stoltz opinion re '328 patent    82
17 52 Stoltz opinion re '556 patent    86
18 53 U.S. Patent 4,991,609    88
19 54 Godar opinion re '328 patent    91
20 55 Godar opinion re '556 patent    93
21 56 Smart Move San Diego pre-read    108
22 EXHIBITS PREVIOUSLY MARKED BUT REFERENCED IN TRANSCRIPT:
23  2  8/21/01 Remington cleaning/recharging system 31
24  4  shaver cleaner/charger system    35
25  5 10/22/01 E-mail from Schenck to Mercurio   22

29 (Pages 110 to 113)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 114

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES' ONLY
 2   6  photos of cleaning system or prototype     36
 3   7  8/23/02 E-mail chain from Katz to Hovis    64
 4   8  9/9/02 E-mail from Hovis to Avila          67
 5  10  '328 patent                   15
 6  11  '556 patent                   20
 7  19  men's 2006 shaving, global shaving NPD team
 8      recommendation               96
 9  25  men's shaving marketing plan          100
10  36  marketing basis of interest form       56
11  37  marketing basis of interest form       73
12  39  marketing plan 2003 men's shavers      37
13  41  2003 business review men's shaver       19
14
15      (Original exhibits retained by Ms. Wendlandt.)
16
17
18
19
20
21
22
23
24
25
```

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**