to receive fluid, retain fluid, or both receive and retain fluid. In the preferred embodiment, for example, the cradle is able to receive and retain fluid because the outlet port of the cradle is dimensioned such that the inflow of cleaning fluid from the pump is greater than the outflow of cleaning fluid. However, it would be clear to one of ordinary skill in the art that if the outlet port of the cradle were of a greater cross-sectional area, the inflow of cleaning fluid would be smaller than the outflow. In such a configuration, the cradle 7 would receive, but not retain cleaning fluid.

Moreover, I understand that limitations from the preferred embodiment ought not to be inserted into the claims. Thus, I do not consider the fact that in the preferred embodiment the outlet port of cradle 7 is dimensioned so that the inflow of cleaning fluid is greater than the outflow to be a limitation of the cradle structure element. In fact, such a limitation is found in dependent claim 2, which provides:

> A device as claimed in claim 1, wherein a cross-sectional area of the outlet port is dimensioned such that during the cleaning operation the amount of cleaning fluid drained through the outlet port is smaller than the amount of cleaning fluid supplied to the cradle structure by the feeding device.

'328 Patent, col. 13, lines 38-43.

In addition, while this was the inventors' preferred embodiment, during deposition testimony Dr. Pahl testified that he had conceived of a cleaning system wherein liquid was not retained by the cradle, but was flushed through the shaver head. See Phillips Report, Ex. 14, at p. 80, lines 2-14. Dr. Pahl concluded that this was not an effective cleaning method, and therefore it is not surprising that this idea was not set forth in the patents as a preferred embodiment.

In sum, the Court's claim construction is consistent with the written description of the patents-in-suit. And, therefore, I disagree with Mr. Phillips' conclusion that the patents lack an adequate written description.

## VII. NEW MATTER

Mr. Phillips opines that the U.S. patent applications for the '328 and '556 Patents contain new matter not present in the corresponding Germany applications because a "receptacle" is a different structure than a "cradle structure." See Phillips Report at ¶58. Mr. Phillips purports to support this opinion on his assertion that a "receptacle can merely maintain a liquid level" whereas a cradle structure can maintain a liquid level but has "the additional characteristic of receiving fluid, but then letting it run out . . . ."[6] Id. I disagree.

---

[6] Mr. Phillips mistakenly concludes that the French Patent described in the '328 Patent specification was not in the corresponding German application. However, a review of the German application reveals that the French Patent was included in an addendum to the corresponding German application. See German Patent Application, Prosecution History at B001138ENG-B001140ENG.

One of ordinary skill in the art would not construe the phrase "a receptacle adapted to receive a shaving head of a shaving apparatus" as limited to those structures that retain liquid. A receptacle, like a cradle structure, can receive liquid, retain liquid, or both. One skilled in the art would understand that the receptacle receives the shaving head, as explicitly indicated by the phrase "adapted to receive a shaving head of a shaving apparatus." To one skilled in the art, use of the world "receptacle" rather than "cradle structure" therefore implies no difference in the manner that cleaning fluid is handled.

In sum, the patents-in-suit do not contain new matter absent in the corresponding German applications.

## VIII. BEST MODE

Mr. Phillips opines that the inventors of the patents-in-suit failed to disclose the best mode contemplated by them for carrying out the invention because, according to Mr. Phillips, the inventors did not adequately disclose their preferred cleaning fluid. See Phillips Report at ¶¶60-66. I disagree.

Mr. Braun testified at his deposition that Dr. Pahl gave him the cleaning fluid used in the cleaning device, and he was not aware of its composition. He thought that the cleaning had to be fat soluble and talcum soluble. See Phillips Report, Ex. 16, Vol. I, p. 87, line 22 through p. 88, line14.

Dr. Pahl testified at his deposition that the appropriate cleaning fluid contemplated by him at the time of the invention was "alcohol." See Phillips Report, Ex. 14, p. 165, lines 10-24. He was not sure whether it was methyl or ethyl alcohol. He thought that the cleaning fluid contained a "little bit of grease, of oil to lubricate the cutter elements, and a fragrance." Id. Dr. Pahl never determined what fragrance would be best. Id. at p. 166, lines 12-16. He further testified that while he initially had a cleaning fluid made, he subsequently used a spray sold by Braun. Id. at pp. 166-169.

Mr. Hoeser testified that he continued to work with an outside company to develop an appropriate cleaning fluid for the cleaning devices long after Mr. Braun and Dr. Pahl had developed their invention. See Phillips Report, Ex. 17, Vol. 2, p. 72-75.

Each patent states that the cleaning fluid that the inventors contemplated was a "fat-dissolving cleaning fluid." '328 Patent at col. 6, lines 14-16; '556 Patent at col. 4, lines 23-24. Among the most widely used fat solvents (especially in consumer applications) are alcohols, and therefore the phrase "fat-dissolving cleaning fluid" would immediately suggest to one skilled in the art the use of an alcohol-based cleaning fluid. It is not clear that the inventors knew of any special advantages of alcohol over other solvents, or that they were entirely clear as to what sorts of additives to use. Thus, the phrase "fat-dissolving cleaning fluid" provides an adequate guide to the reader toward the key property of the cleaning fluid.

In addition, because the application is cleaning a shaving head, one of ordinary skill would recognize that a lubricant would be desired to maintain the integrity of the cutters within the shaving head. Also, there are several reasons that a low viscosity cleaning fluid is desirable, including ease of pumping. Finally, because the cleaning product is a personal hygiene product, one of ordinary skill would know that a fragrance would be desired as part of the cleaning fluid.

Therefore, the patents-in-suit do not fail to disclose the best mode of carrying out the invention contemplated by the inventors.

IX.   INVENTORSHIP

    A.   DR. PAHL

I understand that there is no dispute between Braun and Mr. Phillips that Dr. Pahl is a co-inventor of the patents-in-suit.

    B.   NORBERT SMETANA

Mr. Phillips opines that Norbert Smetana, an engineer who assisted Mr. Braun in the development of the type of drying device used in a prototype cleaning device developed by Mr. Braun, is a co-inventor of unasserted claim 13 of the '328 Patent. See Phillips Report at ¶69. I disagree.

Claim 13 of the '328 Patent provides: "A cleaning device as claimed in claim 12, wherein the drying device further comprises a heater."

Mr. Phillips argues that Mr. Smetana is a coinventor because, according to Mr. Phillips, Mr. Smetana had the idea for claim 13 of the '328 Patent. I disagree.

According to Dr. Pahl, the original prototype developed by Dr. Pahl in Leon, France had a heater and an impeller. See Phillips Report, Ex. 14, p. 110, lines 5-15; p. 148, lines 10-12. Mr. Hoeser further testified that a November 1992 presentation of Dr. Pahl's prototype illustrates the heater and fan of Dr. Pahl's original prototype. See Phillips Report, Ex. 17, Vol. 1, pp. 83-83. This prototype existed prior to Mr. Smetana's involvement in the cleaning device.

Moreover, the use of heat to speed drying was well known by the ordinary artisan prior to Mr. Smetana's involvement in the cleaning device. Indeed, as Mr. Smetana notes, hair dryers have been using impellers coupled with heating elements long before the time Dr. Pahl and Mr. Braun developed their cleaning device. See Phillips Report, Ex. 29, pp. 48-49, 50-51.

Therefore, Mr. Smetana is not a co-inventor of claim 13 of the '328 Patent.

### C. HELMUT KRAUS

Mr. Phillips opines that Helmut Kraus, a regulator with the German testing agency for approbation – the VDE – is a co-inventor of unasserted claim 19 of the '328 Patent. See Phillips Report at ¶69. I disagree.

Claim 19 of the '328 Patent provides: "A cleaning device as claimed in claim 18, further comprising a switch for interlocking the shaving apparatus to the bracket."

Mr. Braun testified that, based on his own past experience, he was aware of the need to keep the shaver apparatus locked in place during the cleaning operation for safety reasons. See Phillips Report, Ex. 16, Vol. 1, pp. 76-77. He further testified that the idea of providing a switch for interlocking the shaving apparatus to the bracket was his idea. See id., Vol. 1, pp. 68-69. Dr. Pahl confirmed Mr. Braun's recollection. See Phillips Report, Ex. 14, pp. 111-113.

Mr. Kraus's suggestion that a mechanical lock is required to avoid harm to the operator of the shaving device merely restates a safety requirement about which Mr. Braun testified he was aware from his own past experience. The suggestion itself does not disclose how or where the lock should be implemented. In sum, the suggestion does not make Mr. Kraus a coinventor of claim 19, which requires a switch for interlocking the shaving apparatus to the bracket.

JUN-13-2005 13:59 FROM: TO:191-2890200-16179517 P.2/2
Case 1:03-cv-12428-WGY   Document 214-2   Filed 10/14/2005   Page 5 of 5

-31-

## X. CONCLUSION

I disagree with Mr. Phillips' conclusion that the asserted claims of the patents-in-suit are anticipated or obvious in light of the prior art cited by Mr. Phillips in his report. Also, I disagree with Mr. Phillips' conclusions on the issues of indefiniteness, written description, new matter, best mode and inventorship.

*[signature]*
Samir Nayfeh
June 13, 2005