container." In particular, the Maatz Patent discloses pump discharge port 34 and suction port 33 which pass fluid into and out of storage tank 12. (Ex. 10, at col. 2, ll. 45-47.)

### Claim 18

101.   The Maatz Patent discloses "the cradle structure is open towards atmosphere and is supplied with cleaning fluid from the cleaning fluid container by means of the fluid feed mechanism." As is clearly shown in Figure 2 of the Maatz Patent, the "cradle structure" is open to the atmosphere. Moreover, pump 32 feeds cleaning fluid from the storage tank 14 to the cradle. (Ex. 10, at col. 1, ll. 61-64.)

### The '328 Patent

### c.   U.S. Patent No. 3,365,267 ("MeKiney")

### Claim 11

102.   The application for the MeKiney Patent was filed on September 12, 1963 and issued as a patent on January 23, 1968. It is thus prior art to the '328 patent.

103.   The MeKiney Patent discloses "a cradle structure adapted to receive a shaving head of a shaving apparatus." I understand that the Court has tentatively construed the element-at-issue to mean "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both." The MeKiney Patent discloses a shelf 44 and a tank 12. The shelf 44 and tank 12 are adapted to receive and support the shaving head of a shaving apparatus. Indeed, the MeKiney Patent

36

states "shelf [44] is specifically adapted to support clipper blades such as 48 which will be retained and held on the shelf 44 by means of the magnets 46." (Ex. 8, at col. 3, ll. 37-39.) The shelf 44 and tank 12 also both receive and retain cleaning fluid.

104.    The '328 patent claims the broader "shaving apparatus," a term that includes both hair clippers and razors. In addition to the hair clippers cleaned in the MeKiney Patent, the MeKiney Patent also discloses the cleaning of a razor 42 with liquid. (Ex. 8, at Fig. 3.)

105.    I understand that the Court has tentatively construed the term "a cleaning fluid container separate from the cradle structure for holding a cleaning fluid" to mean "a container for holding cleaning fluid." Tank 14 holds cleaning fluid. (Ex. 8, col. 2, l. 43 & Figs. 1 and 3.)

106.    I understand that the Court has tentatively construed some of the asserted claims as requiring "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure." The MeKiney Patent discloses Pump 16 feeds cleaning fluid from tank 14 to the "cradle structure." (Ex. 8, at Figs 1 & 3.)

107.    I understand that the Court has construed the term "said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure" to mean "during the feeding operation, the cradle structure is above the fluid level of the fluid in the cleaning fluid container." The

37

"cradle structure" is above the fluid level in the tank 14 during the feeding of fluid to the "cradle structure." (Ex. 8, at Figs. 1 & 3.)

108.   I understand the Court has construed the term "a drying device" to mean "a device to dry the shaver head." The MeKiney Patent discloses a "drying device." In particular, the siphon tube 24 acts to automatically drain the fluid from tank 12, drip drying the cleaned shaver head. (Ex. 8, at col. 4, ll. 12-13.)

### Claim 14

109.   I incorporate by reference my discussion of the elements common to both claim 11 and claim 14 from above.

110.   Claim 14 further describes the "cradle structure" as "said cradle structure being permanently open to the atmosphere." Tank 12 and shelf 14 are clearly "permanently open to the atmosphere." (Ex. 8, at Figs. 1 & 3.)

### Claim 18

111.   I incorporate by reference my discussion of the elements common to both claim 11 and claim 18 from above.

112.   Claim 18 recites "a bracket for insertion of the shaving apparatus therein." I understand that the Court has tentatively construed the term "bracket" to mean "a bracket or projecting support." The MeKiney Patent discloses a bracket or projecting support for insertion of the shaving apparatus therein." In particular, shelf 34, slot 38, and magnets 46 meet the claim element. (Ex. 8, at col. 3, ll. 37-39.)

d.    U.S. Patent No. 3,478,758 ("Davies")

### Claim 11

113.    The application for the Davies Patent was filed on February 13, 1967 and

issued as a patent on November 18, 1969.  It is thus prior art to the '328

patent.  Figure 3 from the Davies Patent is reproduced immediately below.



FIG. 3

114.    The Davies Patent discloses "a cradle structure adapted to receive therein

the shaving head."  I understand that the Court has tentatively construed

the element-at-issue to mean "a structure adapted to support or receive a

shaving head of a shaving apparatus and able to receive or retain fluid or

both."  The Davies Patent discloses: "[I]mplement positioning means 20

comprises a perforated tray 74 for holding an implement to be washed and

sterilized and locating the instrument in its aforementioned washing and

sterilizing positions."  (Ex. 9, at col. 4, ll. 34-36.)  Such structure receives

cleaning fluid.    While the Davies Patent cleaning system describes

39

cleaning many "implements," the one object to be cleaned that is explicitly disclosed is hair clippers, a type of dry shaving apparatus. (Ex. 9, at col. 5, l. 75.) Thus, the structure is also adapted to receive and support a shaving head.

115.    I understand that the Court has tentatively construed the term "a cleaning fluid container separate from the cradle structure for holding a cleaning fluid" to mean "a container for holding cleaning fluid." "Container 12" in the Davies Patent is a container for holding cleaning fluid. (Ex. 9, at col. 2, ll. 22-23.)

116.    I understand that the court has construed some of the asserted claims as requiring "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure." The Davies Patent discloses such a structure. In the Davies Patent, fluid is fed from an external source through fitting 80 to the cradle structure. (Ex. 9, at col. 4, ll. 66-69.)

117.    I understand that the Court has construed the term "said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure" to mean "during the feeding operation, the cradle structure is above the fluid level of the fluid in the cleaning fluid container." In one embodiment of the Davies Patent, the level of cleaning fluid in the container 12 is below the "cradle structure" prior to the washing of the implement. "According to the alternative method ... of locating an implement in its washing and sterilizing positions, the implement tray 74

40

is supported in its elevated position of FIGURE 3, and the liquid 14 is initially fed to the container 12, through the fitting 80, until the liquid level rises above the implement on the tray. The implement is then submerged in its washing position within the liquid." (Ex. 9, at col. 4, l. 69 - col. 5, l. 1.) The Davies Patent thus discloses the element-at-issue.

118.    I understand the Court has construed the term "a drying device" to mean "a device to dry the shaver head." The Davies Patent discloses a blower to dry the implement after it has been washed. (Ex. 9, at col. 3, ll. 53-63.)

**Claim 12**

119.    I understand the Court has tentatively construed the term "an impeller" to mean "a rotating device or member of a turbine, blower, fan, or an axial or centrifugal pump." The Davies Patent thus discloses a drying device comprising an impeller. "Blower 22 is conventional and includes an outer cylindrical shroud 46 having a lower flange 48 which seats on the upper wall of container lid 28 about the lid opening 42 … Rotably mounted within the shroud 46, for turning on the axis of the shroud, is a fan ("impeller") 50 ." (Ex. 9, at col. 3, ll. 53-57.)

**Claim 14**

120.    I incorporate by reference my discussion of the elements common to both claim 11 and claim 14 from above.

121.    Claim 14 further describes the "cradle structure" as "said cradle structure being permanently open to the atmosphere." In the Davies Patent, openings in blower 22 and deodorizer cartridge permanently vent ("open")

the cleaning device and the "cradle structure" to the atmosphere. "It is evident at this point that blower 22 is effective to exhaust air from the container 12 to atmosphere through the opening 42 in the container lid 28 and the opening 44 in the upper lid compartment 40." (Ex. 9, at col. 3, ll. 59-63.) "It is now obvious, therefore, that during operation of the blower 22, exhaust air flow from the container 12 occurs through the deodorizing cartridge 54, which is thereby effective to deodorize the emerging air." (Ex. 9, at col. 3, ll. 70-74.)

e.    **U.S. Patent No. 3,500,840 ("Maatz")**

**Claim 11**

122.    The Maatz Patent was filed on November 30, 1967 and issued as a patent on March 17, 1970. It is thus prior art to the '328 patent. Maatz discloses "a cradle structure adapted to receive therein the shaving head." I understand that the Court has tentatively construed the element-at-issue to mean "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both." Cleaning tank 10 is a structure adapted to at least receive a shaving head of a shaving apparatus. (Ex. 10, at col. 2, ll. 27-30.) The cleaning tank 10 receives and retains cleaning fluid.

123.    It is important to note that, unlike the '556 patent, the claims of the '328 patent are not limited to a dry shaving apparatus. Rather, the '328 patent claims the broader "shaving apparatus," a term that includes both hair clippers and razors. One of ordinary skill in the art would recognize that

42

the barber's tools in the Maatz Patent include hair clippers, a type of "dry shaving apparatus." One of ordinary skill in the art would also recognize that the barber's tools in the Maatz Patent include razors, a type of "shaving apparatus."

124.    I understand that the Court has tentatively construed the term "a cleaning fluid container separate from the cradle structure for holding a cleaning fluid" to mean "a container for holding cleaning fluid." In the Maatz Patent, the storage tank 12 contains a cleaning and sterilizing fluid. (Ex. 10, at col. 1, ll. 61-63.)

125.    I understand that the court has construed some of the asserted claims to require "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure." Maatz teaches such a structure. Pump 32 feeds the cleaning fluid from the storage tank 12 to the cleaning tank 10. (Ex. 10, at col. 1, ll. 63-64.)

126.    I understand that the Court has construed the term "said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure" to mean "during the feeding operation, the cradle structure is above the fluid level of the fluid in the cleaning fluid container." In the Maatz Patent, the cleaning tank 10 is mounted above the storage tank 12. (Ex. 10, at col. 1, ll. 61-62.) During feeding of fluid to the cleaning tank, the "cradle structure" in the cleaning tank is above the level of the fluid in the storage tank 12. (Ex. 10, at Fig. 2.)

43

127.   I understand that the Court has construed the term "a drying device" to mean "a device to dry the shaver head." In the Maatz Patent, the cleaning tank 12 has a drain 22 (Ex. 10, at Fig. 2.) The drain is a device which allows the fluid to drain from the cleaning tank 10, allowing the shaver to drip dry, thereby drying the shaver head. (Ex. 10, at col. 3, ll. 28-29.)

### Claim 14

128.   I incorporate by reference my discussion of the elements common to both claim 11 and claim 14 from above.

129.   Claim 14 further describes the "cradle structure" as "said cradle structure being permanently open to the atmosphere." Cleaning tank 10 is clearly permanently open to the atmosphere. (Ex. 10, Fig. 2.)

### Claim 18

130.   I incorporate by reference my discussion of the elements common to both claim 11 and claim 18 from above.

131.   Claim 18 recites "a bracket for insertion of the shaving apparatus therein." I understand that the Court has tentatively construed the term "bracket" to mean "a bracket or projecting support." The Maatz Patent discloses a bracket or projecting support for insertion of the shaving apparatus therein. In particular, rack 14 and a series of magnets are all brackets into which the shaving apparatus is inserted during cleaning. (Ex. 10, at col. 2, ll. 28-29.)

**f.    U.S. Patent No. 2,976,552 ("Loeffler")**

**Claim 14**

132.    The Loeffler Patent was filed on November 12, 1957 and issued as a patent on March 28, 1961. ("The Loeffler Patent," Ex. 6) It is thus prior art to the '328 patent. Figure 1 of the Loeffler Patent is reproduced immediately below.



133.    I note that the Loeffler Patent incorporates the claims and written description of U.S. Patent No. 2,788,536 ("the '536 patent") issued to the same inventor. (Ex. 5.)

134.    The Loeffler Patent discloses "a cradle structure adapted to receive a shaving head of a shaving apparatus." I understand that the Court has tentatively construed the element-at-issue to mean "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both." In the Loeffler Patent, there is a "cradle 50 … shaped to receive therein the head of [a] hair clipper." (Ex. 6, at col.

45

2, ll. 35-36.)  The cradle receives cleaning fluid from a spray can during the cleaning of the shaving head.  (Ex. 6, at col. 2, ll. 45-46.)

135.    The "cradle structure" in the Loeffler Patent is also "permanently open to the atmosphere."  As is shown in Figure 1 of the Loeffler Patent, the cradle is permanently open to the air through the openings in enclosure 2. (Ex. 6, at Fig. 1.)

136.    I understand that the Court has construed the term "a cleaning fluid container" to mean "a container for holding cleaning fluid."  In the Loeffler Patent, the cleaning device includes a spray can that holds a cleaning and sterilizing fluid.  (Ex. 6, at col. 2, ll. 50-53.)

137.    I understand that the Court's tentative construction requires that one or more claims include "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure."  The Loeffler Patent discloses such a structure.  "The spraying can 60 is at the top thereof provided with a conventional, depressible valve 75 having the usual spray opening 76 at one side thereof."  (Ex. 6, at col. 2, l. 73 - col. 3, l. 2.)

138.    I understand that the Court has construed the term "said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure."  As is shown in Figure 1 of the Loeffler Patent, prior to spraying the clipper head, the spray can is tilted downward.  Thus, the level of sterilizing/cleaning fluid in the can would be below the cradle. (Ex. 6, at Fig. 1.)  In addition, the Loeffler Patent discloses that over time

46

the amount of fluid in a particular spray can will decrease, and the spray can will need to be replaced. (Ex. 6, at col. 1, ll. 51-56.) Thus, in the Loeffler Patent, the level of fluid in the "cleaning fluid container" must be below the "cradle structure" at least some of the time.

### Claim 18

139.    I incorporate by reference my discussion of the elements common to both claim 11 and claim 18 from above.

140.    Claim 18 recites "a bracket for insertion of the shaving apparatus therein." I understand that the Court has tentatively construed the term "bracket" to mean "a bracket or projecting support." As shown in Figures 1 and 2 of the Loeffler Patent, there is an opening in the top of enclosure 1 into which the shaving apparatus is inserted above the cradle for the shaver head. (Ex. 6, at Figs. 1 and 2.) This opening provides support for the shaving apparatus and functions as a "bracket." The opening is further illustrated as item 107 in Figure 2 of the '536 patent.

### G.    OBVIOUSNESS

141.    I understand that a patent claim is invalid if what is claimed would have been obvious to one of ordinary skill in the art. I also understand that, to determine whether a patent claim is obvious, it is necessary to consider: (1) the scope and content of the prior art; (2) the differences between the prior art and the patent claims; (3) the level of ordinary skill in the art; and (4) the so-called secondary considerations of nonobviousness. I further understand that, in analyzing the question of obviousness, the person of

47

ordinary skill in the art is presumed to know all of the pertinent prior art. I also understand that there must be a motivation to combine references.

142.    While I see very few differences (indeed, my opinion is that there are none) between the prior art and the asserted claims, if Braun attempts to assert any such differences, I reserve the right to consider and address such arguments. It is my opinion, however, that any such differences would have been obvious to one of ordinary skill in the art.

### The '328 Patent

a.    **The MeKiney or Maatz Patents combined with the Davies Patent, U.S. Patent No. 4,480,394 ("Salas"), U.S. Patent No. 5,076,306 ("Suzuki"), or the ultrasonic shaver head cleaning system at Braun.**

### Claim 12

143.    The only difference between claim 12 and both the MeKiney Patent and Maatz Patent cleaning systems is that there is no impeller. As a preliminary matter, one of ordinary skill in the art would have well understood that a fan could be used to speed drying without using a towel.

144.    I have reviewed the deposition of Mr. Hoeser, Braun's designee on the topic of secondary considerations of nonobviousness. Mr. Hoeser referred to Braun's cleaning system as a "logical result." (Ex. 17, Hoeser Dep., at 55.) When pressed as to what he meant, Mr. Hoeser analogized the automatic dishwasher. (Ex. 17, Hoeser Dep., at 56.) Mr. Hoeser explained that it was "logical" to automate the process of washing and drying dishes by hand, and that analogy applied to Braun's cleaning

48

system. (Ex. 17, Hoeser Dep., at 56.) I agree with Mr. Hoeser, and particularly with respect to the use of a fan to dry an object after it has been washed. Simply, both a person of ordinary skill in the art and lay people encounter fan drying of washed objects on a regular basis.

145. Beyond Mr. Hoeser's analogy to dishwashers, both the MeKiney and Maatz patents cite dishwasher prior art. The cited art is U.S. Patent Nos. 1,979,504, 2,324,234, 2,681,658, and 3,267,944. Thus, a person of ordinary skill in the art would have been motivated to combine dishwasher art with either the MeKiney or Maatz patents.

146. Today, lay people are familiar with automatic dishwashers with a drying function. There are many ways in which drying can be accomplished. One example is the Suzuki Patent. The Suzuki Patent includes a fan 21, heater 13, heat exchanger 107, and associated ducting to form a "drying device" for the dishes after washing. (Ex. 32, at col. 2, l. 29.) The drying device of the Suzuki Patent operates much like the fan and heater in Mr. Smetana's memorandum discussed above. It is my opinion that claim 12 is obvious in light of the Maatz or MeKiney patents combined with the Suzuki Patent.[4]

147. In developing a shaver cleaning system, one of ordinary skill in the art would also be motivated to analyze other shaver cleaning systems and to combine advantageous features. Evidence of the preceding proposition is

---

[4]     Likewise, even if the drain and siphon of Maatz and MeKiney were not "drying devices" (but they are), claim 11 of the '328 is obvious.

49

the student thesis of Mr. Zeischke written in 1991. (Ex. 31 ("the Zeischke thesis").) In Mr. Zeischke's thesis, he notes at the outset that he has reviewed numerous shaver cleaning systems in the art. This example illustrates that a person of ordinary skill in the art would be motivated to combine advantageous elements in shaver cleaning systems.

148.    The Davies Patent itself anticipates many claims of the '328 patent including claims 11 and 12. However, even if Braun were to argue that Davies does not itself anticipate, one of ordinary skill in the art would be motivated to combine the Davies Patent with either the MeKiney Patent or the Maatz Patent. That is, for reasons expressed above, it would have been obvious to combine the blower (with an impeller) of the Davies Patent in the shaver cleaning systems of the MeKiney or Maatz patents.

149.    From review of the testimony of Mr. Hoeser, I have learned that Braun has used an ultrasonic cleaning system for cleaning shaver heads since the early 1960s.[5] (Ex. 17, Hoeser Dep., at 30-33.) Mr. Hoeser stated that Braun purchased the ultrasonic cleaning device from an unidentified third party. (Ex. 17, Hoeser Dep., at 31-32.) This ultrasonic cleaning device was located approximately 60 feet from Mr. Braun's desk at Braun. (Ex. 17, Hoeser Dep., at 35.) Indeed, Mr. Braun has testified that he had seen the operation of the ultrasonic cleaning device. (Ex. 16, Braun Dep., at 79-80.)

---

[5]    I understand that Braun has not produced an documents regarding this ultrasonic cleaning device. To the extent that Braun does produce such documents, I reserve the right to review them and comment upon them.

50

150.    The ultrasonic cleaning device consisted of a cleaning fluid container. (Ex. 17, Hoeser Dep., at 79.) A basket, which Mr. Hoeser classified as a "cradle," would hold dirty shaving heads of shavers. (Ex. 17, Hoeser Dep., at 79.) The basket with the shaver heads would be dipped into the cleaning fluid container and washed ultrasonically. (Ex. 17, Hoeser Dep., at 80.) Following washing, the basket would be removed from the cleaning fluid container, and the shaver heads would be dried with a blower. (Ex. 17, Hoeser Dep., at 80.) The idea of using a blower to speed the drying of a shaving head after cleaning did not originate with Braun.

151.    I understand that the ultrasonic cleaning system is prior art to the '328 patent. For reasons expressed above, it would have been obvious to combine the blower (with an impeller) of Braun's ultrasonic cleaning system in the shaver cleaning systems of the MeKiney or Maatz patents.

152.    Finally, I have also reviewed U.S. Patent No. 4,480,394 ("Salas"). The Salas Patent was filed on March 29, 1983, and it issued as a patent on November 6, 1984. The Salas Patent discloses a system in which the shaver head of a wet razor is inserted into opening. (Ex. 33, at col. 1, l. 49.) There is a fan and a heater underneath the opening. (Ex. 33, at FIG. 2.) The fan and heater direct warm air to the opening to dry the shaver head. (Ex. 33, at col. 2, ll. 35-38.)

153.    As discussed above, one of ordinary skill in the art would be motivated to combine prior art related to maintaining the hygiene of shaving apparatus. Against that background, claim 12 (and claim 11) would have been

51

obvious over the Maatz Patent or the MeKiney Patent in light of the Salas Patent.

154.    It is thus my opinion that claim 12 of the '328 patent is at a minimum obvious.    I have presented the combination of several patents to substantiate my opinion.  However, the list of prior art cleaning systems employing a fan for drying could go on and on.  Suffice it to say, blowers (and the like) were well known to one of ordinary skill in the art in 1995, and the use of blowers following the washing of an object was equally well known.

### Claim 18

**b.    The MeKiney, Maatz, or Loeffler Patents combined with the Zeischke Thesis or the idea of Helmut Kraus.**

155.    As discussed above, it is my opinion that the MeKiney, Maatz, and Loeffler patents all anticipate claim 18 of the '328 patent.  To the extent that Braun might argue that these patents do not disclose "a bracket for insertion of the shaver therein," that element would have been obvious in light of the MeKiney, Maatz, or Loeffler patents combined with the prior art.

156.    As discussed above, the Zeischke Thesis itself suggests consideration of additional prior art patents.    In his thesis, Mr. Zeischke proposed a cleaning system for shavers employing brushes and a vacuum.  (Ex. 31, at 41.)  Essentially, facial hair, dirt, etc. would be brushed and then sucked off the shaver head.  In addition to the cleaning operation, Mr. Zeischke

52

proposed that his cleaning station would be used to charge the shaving apparatus as well. (Ex. 31, at 41-42.) To that end, items #6 and #8 of the schematics at pages 41 and 42 respectively are listed as "park positions" for shaver charging. The "park positions" constitute "brackets," as construed by the Court.

157. To a person of ordinary skill in the art equipped with the Zeischke Thesis and any of the MeKiney, Maatz, or Loeffler patents, it would have been at least obvious to use "brackets" in the liquid cleaning systems of any of the patents. From the Zeischke Thesis, it would be clear to a person of ordinary skill in the art that, in addition to cleaning, a shaver could also be charged in a cleaning system. Routine engineering would then result in a "bracket or projecting support" to hold the shaver in place while charging. While I believe that the MeKiney, Maatz, and Loeffler patents all have "brackets," it is thus my opinion that claim 18 is at least obvious.

158. Second, I understand that the instruction of Mr. Kraus regarding the interlock constitutes prior art. As discussed above, Mr. Kraus instructed Braun that an interlock was necessary so that a consumer could not remove a wet shaver while it was being charged. For reasons just discussed in connection with the Zeischke Thesis, if a person of ordinary skill in the art possessed the instruction of Mr. Kruas and any of the Maatz, MeKiney, or Loeffler patents, it would have been obvious and routine to add a "bracket" similar to what is shown in Figure 1 of the '328 patent. Indeed, Braun appears to have made the interlock a month after

Mr. Kraus' instruction, as indicated in Mr. Braun's internal invention application. This supports my obviousness opinion.

### c.    Secondary Considerations

159.    I understand that Braun has asserted (1) long-felt need and (2) commercial success as secondary indicia of the nonobviousness of the asserted patent claims. (Ex. 27, Braun's Response to Rayovac Interrogatory No. 5.) I understand that the list of secondary indicia includes: (1) commercial success of the invention; (2) long felt need for the invention; (3) failure of others; (4) licenses to the invention; (5) copying; (6) unexpected results; and (7) skepticism by others. I further understand that, for commercial success to be relevant, Braun must demonstrate a nexus between the commercial success and the patented invention.

160.    I have reviewed the deposition testimony of Mr. Hoeser, Braun's corporate designee on the topic of secondary considerations. Mr. Hoeser testified that, when the engineering and business heads of Braun's shaver department first heard about the shaver cleaning system, they both concluded that there was no need for such a product. (Ex. 17, Hoeser Dep., at 70.)[6]

161.    It is also my opinion that there is no nexus between the alleged commercial success of Braun's products and the alleged inventions.

---

[6]    Braun's interrogatory response also indicates that it introduced the first shaver cleaning system that did not employ brushes or a shaking beaker. (Ex. 27, Braun's Response to Interrogatory No. 5.) Based upon the prior art discussed above, this is simply not true. Moreover, Mr. Hoeser testified that Philips introduced two shaver cleaning systems prior to Braun. (Ex. 17, Hoeser Dep., at 78-82.)

162.     For the '328 patent, with respect to the commercial success, Mr. Hoeser
testified that there is no nexus between the alleged commercial success of
Braun's products and "the bracket." (Ex. 17, Hoeser Dep., at 53.) Mr.
Hoeser also testified that there is no nexus between the alleged
commercial success of Braun's products and the impeller. (Ex. 17, Hoeser
Dep., at 53.) Indeed, Mr. Hoeser noted that, due to noise, the impeller is
actually a detriment to the product. (Ex. 17, Hoeser Dep., at 113-14.)
Braun currently sells a shaver cleaning system without an impeller or
heater, casting further doubt on any allegation that there is a nexus
between the "drying device" and the commercial success of Braun's
products. (Ex. 17, Hoeser Dep., at 113-14.) In addition, Mr. Braun
testified that there is no "magic" attributable to the location of the cleaning
fluid container below the "cradle." (Ex. 16, Braun Dep., at 62.)

163.     For the '556 patent, based upon the testimony of Mr. Hoeser, it appears
that Braun's commercial products are not even covered by the asserted
patent claims. I understand that the parties have agreed that all asserted
claims of the '556 patent require that fluid be fed from the pump first to
the filter and then to the "cradle." This particular fluid circuit is
represented by Figure 6 in both of the patents-in-suit. (Ex. 17, Hoeser
Dep., at 107.) When Mr. Hoeser began working on the Braun's shaver
cleaning system, however, he rejected the fluid circuit of Mr. Braun and
Dr. Pahl because of its disadvantages. (Ex. 17, Hoeser Dep., at 107.) To
the extent that Braun has not abandoned its agreed position as to the scope

55

of the '556 patent, it is my opinion that there is no nexus between the alleged commercial success of Braun's products and the '556 patent.

164.    I note that, when asked, Mr. Hoeser could identify no additional evidence that Braun would present on the issue of secondary indicia. (Ex. 17, Hoeser Dep., at 56.) I also note that Braun has admitted that there are no licenses to either of the patents-in-suit. (Ex. 27, Braun's Response to Interrogatory No. 10.)

165.    I am aware of no evidence showing the failure of others, copying, unexpected results, or skepticism of others in the field. It is thus my opinion that no such evidence exists. To the extent that Braun attempts to introduce such evidence, I reserve the right to review and comment.

## V.    CONCLUSION

166.    The opinions in this report are rendered on the basis of a reasonable degree of engineering certainty and are subject to modification and amendment as new information becomes available.

Dated: May 23, 2005

Samual R. Phillips, PE