14 is initially fed to the container 12, through the fitting 80, until the liquid level rises above the implement on the tray. The implement is then submerged in its washing position within the liquid." (Ex. 9, at col. 4, l. 69 - col. 5, l. 1.)

111. Dr. Nayfeh states that "[i]t is clear from th[e] description [in the specification] that the tray 74 is not above the fluid level of the cleaning fluid in the cleaning fluid container during the entire feeding operation." (Second Nayfeh Report, at 7.) Dr. Nayfeh thus concedes that the fluid level of the cleaning fluid in the cleaning fluid container is below the tray 74 during at least part of the feeding operation.[10] Nothing in the parties' agreed claim construction requires that the fluid level be below the "cradle structure" during the entire feeding operation. It thus remains my opinion that the Davies Patent discloses the element at issue.

### Claim 12

112. I understand the Court has tentatively construed the term "an impeller" to mean "a rotating device or member of a turbine, blower, fan, or an axial or centrifugal pump." The Davies Patent thus discloses a drying device comprising an impeller. "Blower 22 is conventional and includes an outer cylindrical shroud 46 having a lower flange 48 which seats on the upper wall of container lid 28 about the lid opening 42 ... Rotably mounted within the shroud 46, for turning on the axis of the shroud, is a fan 50." (Ex. 9, at col. 3, ll. 53-57.) Dr. Nayfeh does not disagree with me.

---

[9] I note as well that Dr. Nayfeh's opinion is inconsistent with his opinion that the "fluid feed mechanism" limitation of the '556 patent does not require a sequence.

[10] . Moreover, as opined in my First Expert Report, when the fluid reaches the tray 74, the feeding operation is done. At that point, the cleaning operation begins.

CONFIDENTIAL
ATTORNEY EYES ONLY

### Claim 14

113. I incorporate by reference my discussion of the elements common to both claim 11 and claim 14 from above.

114. Claim 14 further describes the "cradle structure" as "said cradle structure being permanently open to the atmosphere." In the Davies Patent, openings in blower 22 and deodorizer cartridge permanently vent ("open") the cleaning device and the "cradle structure" to the atmosphere. "It is evident at this point that blower 22 is effective to exhaust air from the container 12 to atmosphere through the opening 42 in the container lid 28 and the opening 44 in the upper lid compartment 40." (Ex. 9, at col. 3, ll. 59-63.) "It is now obvious, therefore, that during operation of the blower 22, exhaust air flow from the container 12 occurs through the deodorizing cartridge 54, which is thereby effective to deodorize the emerging air." (Ex. 9, at col. 3, ll. 70-74.)

115. Dr. Nayfeh argues that "[a]s the '328 Patent explains this feature of the cradle structure enables the shaving apparatus to be inserted into the cradle structure without any effort and to be removed without the need to utilize any parts closing the cradle structure." (Second Nayfeh Report, at 10.) Dr. Nayfeh thus appears to be arguing that the "permanently open to the atmosphere" limitation requires a big hole for the shaver head. I disagree. I understand that the parties agreed that the limitation means only "permanently open to the air." The limitation regarding ease of insertion and removal appear nowhere in the parties' agreed construction.

116. That an operator of the Davies device would need to open the lid 28 of the device to insert an item to be cleaned does not change the fact that the tray 74 is

CONFIDENTIAL
ATTORNEY EYES ONLY

permanently vented to the open air. Dr. Nayfeh's statements about the opening and closing of the lid 28 thus have nothing to do with limitation at issue, as the parties have agreed it should be construed.

117. It thus remains my opinion that the Davies Patent discloses the element at issue.

  e.   U.S. Patent No. 3,500,840 ("Maatz")

### Claim 11

118. The Maatz Patent discloses "a cradle structure adapted to receive therein the shaving head." I understand that the Court has tentatively construed the element-at-issue to mean "a structure adapted to support or receive a shaving head of a shaving apparatus and able to receive or retain fluid or both." "Cleaning tank [10] is provided with a rack 15 and a series of magnets 16 for holding the tools while they are cleaned. A grid 17 is mounted in the tank for holding larger tools." (Ex. 10, at col. 2, ll. 27-30.) For reasons set forth at Paragraphs 122-127, I disagree with Dr. Nayfeh that the Maatz Patent does not disclose the "cradle structure" limitation.

119. Moreover, the claims of the '328 patent are not limited to a "dry shaving apparatus." Rather, the '328 patent claims the broader "shaving apparatus," a term that includes both hair clippers and razors.

120. In addition to the hair clippers cleaned in the Maatz Patent, the barbers' tools reference would necessarily include wet razors, another type of shaving apparatus. As can be seen in Figure 2, rack 15 has a rectangular slot that would be used to hold a wet razor. The wet razor would be place through the rectangular slot in rack 15 and then

33

CONFIDENTIAL
ATTORNEY EYES ONLY

received and supported in tank 10. "The tools to be cleaned are placed in the cleaning tank either by positioning into the rack 15 or laying them on the grid 17. The circulating pump is then started and the fluid circulated." (Ex. 10, at col. 3, ll. 2-5.)

121. Dr. Nayfeh states that tank 10 "is adapted to receive sterilizing fluid; it is not adapted to receive a shaving head of shaving apparatus." (Second Nayfeh Report, at 8.) As the quote above illustrates, that is nonsense. The tank 10 is adapted to receive fluid and the barbers' tools. Otherwise, nothing would get cleaned. The tank 10 is a structure meeting the Court's tentative claim construction. It thus remains my opinion that the Maatz Patent discloses the "cradle structure" limitation.

122. I understand that the Court has construed the term "a drying device" to mean "a device to dry the shaver head." In the Maatz Patent, the cleaning tank 12 has a drain 22 (Ex. 10, at Fig. 2.) The drain is a device which allows the fluid to drain from the cleaning tank 10, thereby facilitating the drying of the shaver head.

123. Dr. Nayfeh's opinion regarding the drain of the Maatz Patent is identical to his opinion regarding the siphon tube of the MeKiney Patent. That is, he concludes that the Maatz Patent does not disclose a "drying device" by modifying the parties' agreed claim construction. As with the MeKiney Patent, it remains my opinion that the Maatz Patent discloses a "drying device."

### Claim 14

124. I incorporate by reference my discussion of the elements common to both claim 11 and claim 14 from above.

CONFIDENTIAL
ATTORNEY EYES ONLY

125.  Claim 14 further describes the "cradle structure" as "said cradle structure being permanently open to the atmosphere." Cleaning tank 10 is clearly permanently open to the atmosphere. (Ex. 10, Fig. 2.) Dr. Nayfeh does not disagree.

### Claim 18

126.  I incorporate by reference my discussion of the elements common to both claim 11 and claim 18 from above.

127.  Claim 18 recites "a bracket for insertion of the shaving apparatus therein." I understand that the Court has tentatively construed the term "bracket" to mean "a bracket or projecting support." The Maatz Patent discloses a bracket or projecting support for insertion of the shaving apparatus therein. In particular, rack 15 and a series of magnets are all brackets into which the shaving apparatus is inserted during cleaning. (Ex. 10, at col. 2, ll. 28-29.)

128.  Dr. Nayfeh concedes that "a rack, like a shelf, can be considered in certain circumstances a bracket[.]" (Second Nayfeh Report, at 14). But, he then states that rack 15 "is not a projecting support or bracket for insertion of a hair clipper apparatus." (Second Nayfeh Report, at 14.) Dr. Nayfeh has again misunderstood my opinion. The rectangular slot of rack 15 is clearly used to support a wet razor. As stated above, it is my opinion that a wet razor is a shaving apparatus, and Dr. Nayfeh offers no opinion to the contrary. It the remains my opinion that the Maatz Patent discloses a "bracket for insertion of the shaver therein."

   f.   U.S. Patent No. 2,976,552 ("Loeffler")

### Claim 14

35

CONFIDENTIAL
ATTORNEY EYES ONLY

129. I understand that the Court has construed the term "a cleaning fluid container" to mean "a container for holding cleaning fluid." In the Loeffler Patent, the cleaning device includes a spray that holds a cleaning and sterilizing fluid. (Ex. 6, at col. 2, ll. 50-53.)

130. Dr. Nayfeh states that "the fluid in spray can 60 of the Loeffler device sterilizes the shaver; it does not clean it," and then concludes that the spray can is not a cleaning fluid container. (Second Nayfeh Report, at 11.) Dr. Nayfeh is wrong.

131. A can is obviously a container. Dr. Nayfeh also concedes that the can holds sterilizing fluid. His opinion is therefore that "sterilizing" is not "cleaning." Washing by spraying is necessarily a cleaning process, and one of ordinary skill in the art would know that sterilization is cleaning. Dr. Pahl, in fact, facilitated the development of Braun's cleaning device by using the existing cleaning fluid sold in Braun spray cans. (Ex. 14, Pahl Dep., at 36-37.) Indeed, in connection with his discussion of the MeKiney Patent, Dr. Nayfeh stated: "The sterilizing fluid then builds up in the upper tank, soaking the barber tools in the cleaning fluid." (Second Nayfeh Report, at 3.) Dr. Nayfeh's opinion is particularly suspect insofar as he is uses the terms "sterilizing fluid" and "cleaning fluid" as synonyms elsewhere in his report.

132. Dr. Nayfeh also opines that the cleaning fluid container limitation is not met because "there is no provision to catch or contain the contaminated fluid that would drain from the shaving head in a fluidic cleaning operation." It is true that fluid does not return to the spray can, but the "cleaning fluid container" limitation has no such requirement. The parties have agreed that "cleaning fluid container" means "a container

36

for holding cleaning fluid." Once again, Dr. Nayfeh appears to be attempting to change the parties' agreed construction to evade the prior art. I moreover disagree that the "cleaning fluid container" means "a container for holding cleaning fluid that catches or re-contains contaminated cleaning fluid," as Dr. Nayfeh appears to suggest. It thus remains my opinion that the Loeffler Patent discloses a "cleaning fluid container."

133. The Loeffler Patent discloses "a feed device for feeding cleaning fluid from said cleaning fluid container to said cradle structure." "The spraying can 60 is at the top thereof provided with a conventional, depressible valve 75 having the usual spray opening 76 at one side thereof." (Ex. 6, at col. 2, l. 73 - col. 3, l. 2.)

134. Dr. Nayfeh states that "[v]alve 75 and opening 76 cannot rightly be called fluid feed devices." (Second Nayfeh Report, at 12.) The valve 75 is a fluid feed device.[11] To illustrate, the Loeffler Patent states: "This causes the valve to be depressed to open the valve to force a powerful spray of disinfectant against the surface of the clipper head[.]" (Ex. 6, at col. 3, ll. 15-18.) "Forcing" a spray of fluid is clearly "feeding" that fluid to the clipper head. It is my opinion that one of ordinary skill in the art could not understand that explicit disclosure any other way.

135. I understand that the Court has construed the term "said cradle structure being arranged above a fluid level of the cleaning fluid in said cleaning fluid container during the feeding of said cleaning fluid to said cradle structure." As is shown in Figure 1 of the Loeffler Patent, prior to spraying the clipper head, the spray can is tilted

---

[11] Insofar as Dr. Nayfeh has concluded that (1) a hose and tap and (2) valve 75 are not "fluid feed devices," one has to wonder what aside from a pump Dr. Nayfeh thinks can "rightly be called" a fluid feed device.

CONFIDENTIAL
ATTORNEY EYES ONLY

downward. Thus, the level of sterilizing/cleaning fluid in the can would be below the cradle. (Ex. 6, at Fig. 1.) In addition, the Loeffler Patent discloses that over time the amount of fluid in a particular spray can decreases, and the spray can will need to be replaced. (Ex. 6, at col. 1, ll. 51-56.) Thus, in the Loeffler Patent, the level of fluid in the "cleaning fluid container" will necessarily be below the "cradle structure" at least some of the time. Dr. Nayfeh opines that "the fluid level in the Loeffler device's sterilizing fluid container is not below the cradle structure until the spray can has been partially emptied." (Second Nayfeh Report, at 12.) While I continue to believe that the fluid level in the spray can will always be below the cradle structure during feeding, Dr. Nayfeh concedes that the fluid level will be below the cradle structure at least part of the time.

### Claim 18

136. I incorporate by reference my discussion of the elements common to both claim 11 and claim 18 from above.

137. Claim 18 recites "a bracket for insertion of the shaving apparatus therein." I understand that the Court has tentatively construed the term "bracket" to mean "a bracket or projecting support." As shown in Figures 1 and 2 of the Loeffler Patent, there is an opening in the top of enclosure 1 into which the shaving apparatus is inserted above the cradle for the shaver head. (Ex. 6, at Figs. 1 and 2.) This opening provides support for the shaving apparatus and functions as a "bracket."

138. Dr. Nayfeh opines: "[I]n Figure 1 of the Loeffler Patent, the opening is drawn larger than the shaver, indicating a large clearance between the shaver and the enclosure. There is nothing in the Loeffler Patent to indicate that this opening provides

38

CONFIDENTIAL
ATTORNEY EYES ONLY

any support for the hair clippers." (Second Nayfeh Report, at 14.) The fact that the opening in the device appears "large" to Dr. Nayfeh is irrelevant. The hair clipper in the Loeffler Patent obviously has a center of gravity. The cradle structure shown in Figure 2 of the Loeffler Patent is V-shaped, and it clearly would not provide support sufficient to stop the shaver from tipping over. The opening into which the hair clipper is inserted thus must necessarily provide support.

139. A hole punched in a piece of sheet metal is a conventional bracket construction. The opening in the Loeffler Patent is precisely that type of construction. It thus remains my opinion that the Loeffler Patent discloses a "bracket for insertion of the shaving apparatus therein."

### G. OBVIOUSNESS

140. I understand that a patent claim is invalid if what is claimed would have been obvious to one of ordinary skill in the art. I also understand that, to determine whether a patent claim is obvious, it is necessary to consider: (1) the scope and content of the prior art; (2) the differences between the prior art and the patent claims; (3) the level of ordinary skill in the art; and (4) the so-called secondary considerations of nonobviousness. I finally understand that, in analyzing the question of obviousness, the person of ordinary skill in the art is presumed to know all of the pertinent prior art.

141. While I believe there are no differences between the prior art and the asserted claims, if Braun attempts to assert any such differences I reserve the right to consider and address such arguments. It is my opinion, however, that any such differences would have been obvious to one of ordinary skill in the art.

CONFIDENTIAL
ATTORNEY EYES ONLY

### The '328 Patent

a.  **The MeKiney and Maatz Patents combined with the Davies Patent, U.S. Patent No. 4,480,394 ("Salas"), U.S. Patent No. 5,076,306 ("Suzuki"), or the ultrasonic shaver head cleaning system at Braun.**

142.   Initially, Dr. Nayfeh states that "Mr. Phillips' argument rests on the false premise that claim 11 of the '328 patent is anticipated by the MeKiney and Maatz Patents." (Second Nayfeh Report, at 18.) In addition to the "cradle structure" element, he opines that I have failed to address the obviousness of the "drying device" element. The reason, of course, is that the MeKiney and Maatz Patents both disclose "drying devices" under the construction agreed to by the parties. Moreover, it is my opinion that it would have been obvious to use an impeller with the cleaning devices of the MeKiney and Maatz Patents. Assuming that Dr. Nayfeh agrees that an "impeller" is a "drying device," his attack upon my opinion amounts to little.

143.   Dr. Nayfeh also points to the specification of the '328 patent to argue that "an inventor wishing to employ a blower to aid in drying in such a system would need to invent a method for preventing the contaminated cleaning fluid from reaching the blower system (or entering any conduits that might be used to channel air from the blower system to the shaving head) as it is agitated and splashed." (Second Nayfeh Report, at 19.) Dr. Nayfeh's argument rests upon analysis of the sole embodiment disclosed in the '328 patent, not anything that actually appears in the claims.

144.   To be clear, Dr. Nayfeh is wrong in his assumption that the claimed "cradle structure" and the "drying device" must be next to each other in a unitary device. The parties have agreed that the preambles to all asserted claims of the '328 patent are

40

not limitations. Dr. Nayfeh cannot use the words "cleaning device" to salvage claim 12.[12]

145. Moreover, neither claim 11 nor claim 12 require that contaminated cleaning fluid not reach the blower. As a practical matter, that would be a choice of design, not a matter of necessity. If cleaning fluid did reach a blower, it would simply evaporate.

146. Likewise, neither claim 11 nor claim 12 say anything about cleaning fluid being agitated and splashed. It may be the case that fluid is agitated in the "cradle structure" of Braun's only disclosed embodiment, but Braun certainly did not incorporate that limitation into the claims.[13] As a practical matter, in the MeKiney and Maatz Patents, there is no agitation of the cleaning fluid, rendering Dr. Nayfeh's opinion particularly irrelevant.

147. Dr. Nayfeh then argues that the louvered shutter system 149 in the '328 patent is inventive. (Second Nayfeh Report, at 19.) While I have not considered the question in detail, it may be that the louvered shutter system 149 was inventive. After reviewing the Markman briefing and the Markman Hearing transcript, however, I can locate no instance where Braun argued that the louvered shutter system 149 should be read into the claims. The louvered shutter system 149 certainly does not appear in claims

---

[12] Even if the preamble were a limitation, combining washing and drying functions into a single device is well known. One example is combination clothes washer-driers such as U.S. Patent No. 4,154,003. (Ex.40.)

[13] Tellingly, for obviousness, Dr. Nayfeh assumes that the "cradle structure" must be filled with fluid, resulting in agitation and splashing. For written description, however, he says it would be clear to the ordinary artisan that the "cradle structure" need not retain fluid. It appears that Dr. Nayfeh does not have an consistent opinion on what a "cradle structure" is.

41

**CONFIDENTIAL**
**ATTORNEY EYES ONLY**

11 and 12. It is thus my opinion that Dr. Nayfeh's discussion of the louvered shutter system 149 is irrelevant.

### Claim 12

148. None of Dr. Nayfeh's attacks on particular prior art changes my opinion. I address each piece of prior art in order.

149. It remains my opinion that the Suzuki Patent combined with the MeKiney or Maatz Patents renders claim 12 obvious. The Suzuki Patent includes a fan 21, heat exchanger 107, and associated ducting to form a "drying device" for the dishes after washing. (Ex. 32, at col. 2, l. 29.) The drying device of the Suzuki Patent operates much like the fan and heater in Mr. Smetana's memoranda discussed above. It is my opinion that claim 12 is obvious in light of the Maatz or MeKiney Patents combined with the Suzuki Patent.

150. Dr. Nayfeh opines that the system of the Suzuki Patent "is not readily applicable to a system that is open to the atmosphere and considerable inventiveness would be required by one of ordinary skill in the art to arrive at the arrangement disclosed in the '328 Patent." (Second Nayfeh Report, at 19.) Dr. Nayfeh appears to be confusing what is disclosed in the specification with what Braun actually claimed. Unlike claim 14, claim 12 does not have any requirement that the "cradle structure" be open to the atmosphere, and it is inappropriate to read the limitation from claim 14 into claim 12. Moreover, removing any alleged complexity in the Suzuki Patent's dishwasher would have been routine engineering when applying the solution of the Suzuki Patent to a shaver cleaning system.

CONFIDENTIAL
ATTORNEY EYES ONLY

151. The Davies Patent itself anticipates many claims of the '328 patent including claims 11 and 12. However, even if Braun were to argue that Davies does not itself anticipate, one of ordinary skill in the art would be motivated to combine the Davies Patent with either the MeKiney Patent or the Maatz Patent. That is, for reasons expressed above, it would have been obvious to combine the blower (with an impeller) of the Davies Patent in the shaver cleaning systems of the MeKiney and Maatz Patents.

152. Dr. Nayfeh argues that the blower from the Davies Patent could not be incorporated into the MeKiney or Maatz Patents because the cleaning device in the Davies Patent has a lid and the devices in the MeKiney and Maatz Patents do not. (Second Nayfeh Report, at 20.) The lid is a red herring as it is beneficial in the cleaning device of the Davies Patent, but not necessary. It remains my opinion that it would have required no more than routine engineering to use a blower to dry the tools in the MeKiney or Maatz Patent cleaning systems.

153. Dr. Nayfeh also argues that the blower in the Davies Patent requires protection "if the cleaning fluid was agitated and caused to splash." As discussed above, this argument by Dr. Nayfeh is illogical and irrelevant as there is no agitation and splashing in the MeKiney and Maatz Patents.

154. It also remains my opinion that the ultrasonic cleaning device at Braun combined with the Maatz or MeKiney Patentss renders claim 12 obvious. Dr. Nayfeh argues that knowledge of the ultrasonic cleaning system "would not render obvious to one skilled in the art a method for incorporation of a blower into a system that cleans and dries the shaving head in a single station without disassembly from the shaver."

43

155. Dr. Nayfeh again appears to be analyzing the specification, not the claims. First, the claims are clearly directed to an apparatus, not a method. Second, as discussed above, the preamble is not a limitation, and there is thus no requirement in the claims that the cleaning and drying functions must occur in a "single station." Finally, as discussed at great length above, claim 12 does not forbid disassembly of the shaving head from the shaver. As Dr. Nayfeh has not addressed my opinion with reference to the actual claim language, my opinion regarding the ultrasonic cleaning device remains.

156. Finally, I have also reviewed U.S. Patent No. 4,480,394 ("Salas Patent"). The Salas Patent discloses a system in which the shaver head of a wet razor is inserted into opening. (Ex. 33, at col. 1, l. 49.) There is a fan and a heater underneath the opening. (Ex. 33, at FIG. 2.) The fan and heater direct warm air to the opening to dry the shaver head. (Ex. 33, at col. 2, ll. 35-38.) It remains my opinion that claim 12 would have been obvious over the Maatz Patent and the McKiney Patent in light of the Salas Patent.

157. Dr. Nayfeh's only attack on the Salas Patent is to argue that "the Salas Patent does not teach any method for preventing contaminated cleaning fluid or even dust particles from falling onto the heating element and impeller described."[14] (Second Nayfeh Report, at 20.) Dr. Nayfeh is thus falling back to his irrelevant discussion of the louvered shutter system. As discussed above, the prevention of contaminated cleaning

---

[14] Dr. Nayfeh implies that the Salas Patent is lacking because it is for a "safety or wet razor." While I disagree with that implication, I have also reviewed Japanese Patent Application No. 05-057066 ("the Matsushita Application"), published on March 9, 1993. (Ex. 41.) The Matsushita Application discloses a station for an electric razor with an impeller for drying a wet electric razor. (Ex. 41, at Fig. 12.) The impeller of the Matsushita Application resembles the impeller of the Salas Patent. My opinions are the same for the Matsushita Application and the Salas Patent.

44

CONFIDENTIAL
ATTORNEY EYES ONLY

fluid from reaching a blower is not essential or even claimed in the '328 patent.[15] In the Salas Patent, for example, fluid would simply evaporate without fatal effects to the fan blades.

### Claim 18

**b.  The MeKiney, Maatz, or Loeffler Patents combined with the Zeischke Thesis or the idea of Helmut Kraus.**

158.  It also remains my opinion that claim 18 of the '328 patent is at least obvious. I address each of Dr. Nayfeh's opinions in order.

159.  In his thesis, Mr. Zeischke proposed a cleaning system for shavers employing brushes and a vacuum. (Ex. 31, at 41.) Essentially, facial hair, dirt, etc. would be brushed and then sucked off the shaver head. In addition to the cleaning operation, Mr. Zeischke proposed that his cleaning station would be used to charge the shaving apparatus as well. (Ex. 31, at 41-42.) To that end, items #6 and #8 of the schematics at pages 41 and 42 respectively are listed as "park positions" for shaver charging. I understand a "park position" to be a holding position. The "park positions" constitute "brackets," as construed by the Court. To the ordinary artisan equipped with the Zeischke Thesis and any of the MeKiney, Maatz, and Loeffler Patents, it would have been at least obvious to use "brackets" in the liquid cleaning systems of any of those patent.

160.  Dr. Nayfeh argues that the "park positions" in the Zeischke Thesis are no brackets, as construed by the Court. The "park positions" that Mr. Zeischke discloses

---

[15]  The '328 patent does not say anything about dust either.

45

clearly operate like a chuck. They necessarily hold the shaver in position during storage and charging as a bracket. In fact, the '328 patent explicitly notes that storage is a function of the disclosed "bracket." (Ex. 17, at col. 3, ll. 60-67.)

161.  Dr. Nayfeh also argues that the Zeischke Thesis does not disclose "a bracket into which the shaver could be inserted during cleaning." The flaw in Dr. Nayfeh's argument is that claim 18 likewise does not require "a bracket into which the shaver could be inserted during cleaning." Once again, Dr. Nayfeh is attempting to read in limitations from the specification to argue non-existent differences between the claims and the prior art.

162.  It remains my opinion that, if the ordinary artisan possessed the instruction of Mr. Kruas and any of the Maatz, MeKiney, or Loeffler Patents, it would have been obvious to add a "bracket" similar to what is shown in Figure 1 of the '328 patent. Dr. Nayfeh states "[t]hat one skilled in the art should understand the need for an interlock does not render obvious its realization using a bracket incorporated into the system as claimed in the '328 patent." I disagree.

163.  As discussed above, the easiest way to provide an interlock would be with a bracket with a built-in electrical switch. There are, of course, other ways to accomplish the interlocking function, as Dr. Nayfeh suggests. Dr. Nayfeh's opinion supports my argument that there are acceptable non-infringing alternatives to claim 18 of the '328 patent. It, however, does not undermine my opinion that claim 18 of the '328 patent is at least obvious.

**CONFIDENTIAL**
**ATTORNEY EYES ONLY**

Dated: June 27, 2005

_____
Samuel R. Phillips, PE